# EXHIBIT A

**Ronald J. Logar --State Bar No. 303**
**Eric Pulver--State Bar No.** 7874
LAW OFFICE OF LOGAR & PULVER, PC
225 S. Arlington Ave., Ste. A
Reno , NV  89501
Tel:     (775) 786-5040
Fax:     (775) 786-7544

**Michael J. Flynn, Mass. State Bar No.**
**Philip H. Stillman, California State Bar No. 152861**
FLYNN & STILLMAN
224 Birmingham Drive, Suite 1A4
Cardiff, CA 92007
Tel:     (888) 235-4279
Fax:     (888) 235-4279
(*Application for Admission Pro Hac Vice forthcoming*)

Attorneys for Plaintiff DENNIS MONTGOMERY, an individual
and MONTGOMERY FAMILY TRUST,
a California Trust

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| DENNIS MONTGOMERY, an individual; and MONTGOMERY FAMILY TRUST, a California Trust, <br><br> Plaintiff, <br><br> vs. <br><br> eTREPPID TECHNOLOGIES, LLC., a Nevada Limited Liability Company; WARREN TREPP, an individual; and DOES 1 through 10, <br><br> Defendants. | CASE NO.: <br><br> **COMPLAINT FOR:** <br><br> 1.   COPYRIGHT INFRINGEMENT; <br> 2.   COPY RIGHT INFRINGEMENT BY DISTRIBUTION; <br> 3.   DECLARATORY JUDGMENT; <br> 4.   ACCOUNTING; <br> 5.   BREACH OF FIDUCIARY DUTY; <br> 6.   FRAUD; <br> 7.   BREACH OF CONTRACT; <br> 8.   MISAPPROPRIATION OF TRADE SECRETS; <br> 9.   CONVERSION. |

Plaintiffs, Dennis Montgomery and the Montgomery Family Trust, hereby allege against Defendant, eTreppid Technologies, LLC, and Defendant, Warren Trepp, the following Claims for Relief:

## INTRODUCTION

1. This is an action arising out of the unauthorized use of extremely valuable copyrighted computer software technology by Defendant eTreppid Technologies, LLC and Defendant, Warren Trepp. Not content to reap millions of dollars on the technology without a license, the majority shareholder of eTreppid Technologies, Defendant Warren Trepp, used his majority position to squeeze out, dilute and misappropriate vast sums of money from the inventor and fellow shareholder, Dennis Montgomery, and the Montgomery Family Trust. Moreover, as fully stated below, even those breaches of fiduciary duty did not satisfy Mr. Trepp. He went further by trying to obtain plaintiff Montgomery Family Trust's extremely valuable technology through a knowingly false claim that the Montgomery Family Trust's technology was contributed to the company by Mr. Montgomery, then attempting to reverse engineer the software in direct violation of federal copyright laws. Accordingly, in addition to all other remedies, Plaintiff seeks not only a declaration of ownership under the 1976 Copyright Act of the software at issue in this litigation, but injunctive relief against any further use of the technology without a license and an accounting of all profits obtained as a result of the unauthorized exploitation of the copyrights and those derivative works therefrom.

## PARTIES

2. Plaintiff, Dennis Montgomery is an individual who resides in Washoe County, Nevada and is the inventor of all technology that is subject to this action. Montgomery is also a minority shareholder in eTreppid Technologies, LLC, Defendant above named.

3. Plaintiff Montgomery Family Trust (the "Trust") is a California irrevocable trust formed and operated under the laws of the State of California and is the owner of the copyrights at issue in this action.

4. Defendant, eTreppid Technologies, LLC, (eTreppid), is upon information and belief a Nevada limited liability company, with its principle place of business in Washoe County, Nevada.

Defendant Warren Trepp ("Trepp") is, upon information and belief, an individual who resides in Washoe County, Nevada and is the majority shareholder in eTreppid Technologies, LLC.

5.     Plaintiffs are presently unaware of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue said Defendants under such fictitious names. Plaintiffs are informed and believe that such fictitious Defendants are responsible in some manner for the events and happenings herein referred to, and proximately caused the damage to Plaintiffs as herein alleged.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

6.     Plaintiffs  raise a claim under the federal Copyright Act of 1976.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1338(a) and 1338(b).  The Court also has jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction)  and over the state law claims pursuant to 28 U.S.C. §1367 (supplemental jurisdiction).  Venue is proper pursuant to 28 U.S.C. §1391(b) and 28 U.S.C. §1400.

## FACTUAL ALLEGATIONS

7.     Dennis Montgomery (Montgomery) is an inventor and software developer.  In or about 1982, Montgomery developed certain pattern recognition software for which the U.S. Copyright Office granted a series of copyrights.  The Montgomery Family Trust (Trust) is the owner of Copyright Registration Nos. TXu-98-018, TXu-98-699, TXu-98-727, TXu-98-728, TXu-98-731, TXu-117-868, TXu-119-540,  TX-1-983-147, TX-1-992-867, TX-2-000-234, TX-2-083-750 and TX-2-095-009 (the "Copyrights").

8.     After the registration of these copyrights, Montgomery developed Derivative Works based on the pattern recognition technology originally copyrighted between 1982 and January 1987 (the "Derivative Works").  Those uniquely important Derivative Works were fully developed prior to 1998 and are the exclusive property of the Trust.

9.     In or about September 1998, Montgomery and Defendant Trepp, formed Intrepid Technologies, LLC, a Limited Liability Company, which name was later changed to eTreppid

-2-

Technologies, LLC (hereafter referred to as eTreppid.)  Pursuant to a "Contribution Agreement" dated September 28, 1998, between Trepp, Montgomery and the Trust, in exchange for a fifty percent interest in eTreppid Technologies, LLC to Montgomery, the Trust contributed specific technology to eTreppid that is identified in paragraph 1.2.1 of the Contribution Agreement.

10.     That Paragraph specifically identifies the contributed technology as "the software compression technology contained on that certain Software Compression Engine Development Program contained on CD No. 1."

11.     Significantly, because the Trust owned other technology, Paragraph 1.3 of the Contribution Agreement states that the Trust is expressly not "contributing, transferring or conveying to eTreppid under this agreement or by any other means, nor is eTreppid acquiring from [the Trust] any other tangible and intangible assets of" the Trust or Montgomery.

12.     Thus, pursuant to the express terms of the Contribution Agreement, Intrepid only acquired the software compression technology contained on CD No. 1 and nothing else.

13.     In particular, the Derivative Works were *not* part of the software compression technology contained on CD No. 1 that is subject to the Contribution Agreement.

14.     Subsequently, Trepp began to dilute Montgomery's share in eTreppid and, used his majority interest in eTreppid to obtain favorable treatment for himself as a majority shareholder at the expense of Montgomery.

15.     In or about 2003, eTreppid began sublicensing the Derivative Works to various entities, including the United States government and collecting licensing fees for the sublicenses. eTreppid was never granted a license to the Derivative Works by, and failed to pay royalties to, the Trust.

16.     At no time did any of the Defendants have a written license to exploit the Trust's Derivative Works as required by 17 U.S.C. § 204(a).  As a result, at best, eTreppid only can claim (if anything) an oral, non-exclusive license to exploit the Derivative Works.

17.     Although the Trust denies that it granted any oral nonexclusive license to eTreppid, any such oral license was terminated by the Trust on January 19, 2006, orally and by letter dated

-3-

January 25, 2006.

18.     eTreppid has failed to and refuses to cease exploitation of the Derivative Works and has so far refused to account for any profits obtained as a result of its unlicensed exploitation of the Derivative works.

19.     Moreover, because of the highly confidential and sensitive nature of the Derivative Works, the Derivative Works are protected from reverse engineering and/or tampering by sophisticated safeguards.  As a result of eTreppid's improper attempts to obtain and reverse engineer the Derivative Works, Defendants have, upon information and belief, destroyed part of the "source code" of the Derivative Works, further harming Plaintiffs.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement against all Defendants)

20.     Plaintiffs incorporate by reference the foregoing allegations contained in Paragraphs 1 through 19 as though restated herein in full.

21.     The Montgomery Family Trust is the owner of Copyright Registration Nos. TXu-98-018, TXu-98-699, TXu-98-727, TXu-98-728, TXu-98-731, TXu-117-868, and Txu-119-540 and the Derivative Works created therefrom.

22.     Defendants have for the past three years and continuing to the present, exploited the Trust's derivative works without any license therefor and without paying royalties.

23.     Defendant Trepp, as Manager of eTreppid, knowingly and intentionally directed eTreppid's willful infringement on the Trust's copyrights and Derivative works.

24.     As a direct and proximate result of the Defendants' willful infringement on the Trust's Derivative works, the Trust has suffered and continues to suffer damages in an amount to be determined at trial.

25.     Pursuant to the Copyright Act of 1976, the Trust is entitled to actual damages, statutory damages as provided therein, and its reasonable attorney's fees.

## SECOND CLAIM FOR RELIEF

### (Copyright Infringement - Unlawful Distribution of Copyrighted Work - Injunction

**17 U.S.C. §106(3)**)

26.     Plaintiffs incorporate into this claim for relief the allegations contained in each and every preceding paragraph of this Complaint as if the same were set out at length herein.

27.     Plaintiff Trust is the owner and author of the Derivative Works

28.     In doing the acts alleged, Defendants violated the Trust's right and interest to distribute copies of the Derivative Works to the public under 17 U.S.C. § 106(3), and said acts were and are infringements of the Trusts' copyrights.

29.     Plaintiffs have been and are being substantially damaged by said infringement, particularly, upon information and belief, the unauthorized use of  the Derivative Works by Defendants.  Further harm and injury to Plaintiffs is imminent, and Plaintiffs are without adequate remedy at law unless Defendants' infringement is enjoined by the court.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Relief)**

30.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 29 set forth herein.

31.     An actual controversy has arisen and exists among Plaintiffs and Defendants under the Copyright Act of 1976.  The Trust contends that it is the exclusive owner of the Derivative Works at issue in this action.  The Defendants dispute this contention.

32.     Plaintiffs desire a judicial declaration that Plaintiffs are the owners of the Derivative Work and further, that any actual or implied oral nonexclusive license is terminated.

33.     Furthermore, as Plaintiffs  have never validly assigned any interest in the copyrights or the Derivative Works to Defendants, Plaintiffs are entitled to a declaration that the Trust is entitled to 100% of the license fees obtained by the exploitation and sublicensing of the Derivative Works as matter of federal copyright law.

34.     A declaration of rights is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights and duties with respect to Defendants, and with respect to any third parties who may claim an interest in either the Copyrights or the Derivative Works either by license or

alleged sublicense.

## **FOURTH CLAIM FOR RELIEF**

### **(Accounting)**

35.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 34 set forth herein.

36.     Plaintiff Trust is the exclusive owner of the Copyrights and the Derivative Works.

37.     Defendants have wrongfully exploited the Copyrights and Derivative Works without payment to the Trust therefor.

38.     As a result, the Trust is entitled to an accounting of all income and profits derived from Defendants' exploitation of the Copyrights and the Derivative Works.

## **FIFTH CAUSE OF ACTION**

### **(Breach of Fiduciary Duty)**

39.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 38 set forth herein.

40.     As the majority shareholder in eTreppid Technologies, Trepp owed a fiduciary duty of utmost loyalty and good faith to Plaintiff Dennis Montgomery, including within that duty, an obligation not to use his majority interest to the detriment of the minority shareholder, and an obligation not to further his own interests at the expense of the minority shareholder, Dennis Montgomery.

41.     In violation of his fiduciary duties to Plaintiff, Trepp improperly used his majority interest in order to among other things, attempt to reduce Montgomery's shares relative to his own, devalue the holdings of Montgomery while at the same time increasing the value of his shares, pay himself exorbitant dividends from the company without paying equal dividends to plaintiff Montgomery, and to misappropriate millions of dollars at Montgomery's expense from the company accounts.

42.     As a direct and proximate result of Trepp's breach of fiduciary duty, Plaintiff Montgomery has suffered and continues to suffer damages in an amount to be determined at trial but

-6-

in any event no less than $6 million.

43.    Because Trepp's actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Trepp.

### SIXTH CAUSE OF ACTION

### (Fraud against Trepp)

44.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 43 set forth herein.

45.    At the time of the formation of eTreppid Technologies, LLC, and the execution by Plaintiffs of the Contribution Agreement, Trepp orally and in writing promised Plaintiffs that Montgomery would be a 50% shareholder in eTreppid Technologies with Trepp. He further represented that Montgomery would share equally with Trepp in the profits of the company.

46.    At the time that Trepp made the foregoing representations to Montgomery and the Montgomery Family Trust, Trepp knew them to be false. Moreover, he made said representations in order to induce Plaintiffs to contribute valuable software compression technology to the company.

47.    In reliance on those representations, Montgomery and the Montgomery Family Trust contributed the "software compression technology" to the company in reliance on Trepp's promise to share the profits therefrom.

48.    However, Trepp has failed to share the profits equally and has instead failed to pay equal dividends or royalties.

49.    As a direct and proximate result of Trepp's fraud, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but in any event no less than $6 million.

50.    Because Trepp's actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Trepp.

### SEVENTH CAUSE OF ACTION

### (Breach of Contract)

51.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 50 set forth herein.

52. Plaintiffs and Defendant Trepp entered into a written contract titled "Contribution Agreement."

53. In pertinent part, in exchange for Plaintiffs contributing the "software compression" technology to the company, Plaintiff Montgomery was to receive 50% of the company.

54. Plaintiffs performed all obligations under the contract.

55. However, Trepp breached the contract by failing to maintain Montgomery's 50% interest, and instead, attempted to reduce his ownership interest in the company.

56. As a direct and proximate result of Trepp's breach of contract, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but in any event no less than $6 million.

## EIGHTH CAUSE OF ACTION

### (Misappropriation of Trade Secret)

57. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 56 set forth herein.

58. The Derivative Works constitute trade secrets of Plaintiffs.

59. By the actions alleged above, Defendants Trepp and eTreppid Technologies have wrongfully attempted to misappropriate and convert Plaintiffs' Derivative Works.

60. As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial.

61. Because Defendants' actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Trepp.

## NINTH CAUSE OF ACTION

### (Conversion)

62. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 61 set forth herein.

63. Plaintiffs own the Derivative Works currently in the possession of Defendants.

64. Defendants converted Plaintiffs' property for their own use and have failed and

-8-

refused to return it to Plaintiffs or give Plaintiffs access to their property.

65. As a direct and proximate result of Defendants' conversion, plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but in any event no less than $500 million.

66. Because Defendants' actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Defendants.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial on all issues in the Complaint so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray to the court for:

1. Temporarily and preliminarily enjoin Defendants during the pendency of this action and permanently thereafter as follows:

    a. Prohibit Defendants from infringing, conspiring to infringe, or contributing to or participating in the infringement by others of Plaintiffs' copyrighted and derivative works;

    b. Prohibit Defendants from possessing any of the copyrighted or Derivative Works owned by Plaintiffs Trust, and any Derivative Works thereof, and in this regard, that Defendants be required to deliver upon oath, to be impounded during the pendency of this action, all such copies in their possession, as are alleged to infringe upon Plaintiffs' copyrights together with all recordings, tapes, cds , dvds, masters, print or digital documents and media, or any other means for recording and storing the Trust's copyrighted and Derivative Works that allow Defendants to make infringing copies, and Writs of Seizure be issued by this court in the manner provided by the Copyright Act and by the rules of the Supreme Court of the United States for Practice and Procedure in Copyright Cases, and that at the conclusion of this action, the court order all such matters be held to be surrendered to Plaintiffs or destroyed under Writs of Destruction, whichever shall seem to the court to be the most just and proper;

    c. Order Defendants to pay Plaintiffs such damages as Plaintiffs have sustained

in consequence of Defendants' infringement of the Trust's copyrights and to account for and pay over to the Trust all the profits that Defendants have derived from their willful infringement of Plaintiffs' copyrights;

        d.    Order Defendants to pay such damages to Plaintiffs as this court shall consider just and proper within the provisions of the Copyright Act; and

        e.    Order Defendants to pay Plaintiffs for Defendants' intentional, willful, and malicious infringement of plaintiff's copyrighted and Derivative Works, such damages as this court shall deem just and proper with the provisions of the Copyright Act, but not less than $150,000 for each separate infringement of Plaintiff's copyright.

2.    Award Plaintiffs their attorneys' fees according to proof and/or as required or permitted by the Copyright Act;

3.    Award Plaintiffs their costs; and

4.    Grant such other and further relief as the court deems just and proper.

DATED this 31st day of January, 2006.

        LAW OFFICE OF LOGAR & PULVER, PC


        By:_____*(RJL)*_____
        Ronald J. Logar, Esq.
        Attorney for Plaintiff Dennis Montgomery
        and Plaintiff Montgomery Family Trust
        Nevada Bar No. 303
        225 S. Arlington Ave. Ste. A
        Reno, Nevada 89501
        Phone: 775-786-5040
        Fax:    775-786-7544
        Email: Lezlie@Renofamilylaw.com

**PROOF OF SERVICE**

1

I, Lezlie M. Lucas declare:

2

I am an employee in the City of Reno, County of Washoe, State of Nevada, of the LAW

3

OFFICE OF LOGAR & PULVER, PC, with the business address at 225 S. Arlington Avenue, Suite

4

A, Reno, NV 89501.  I am over the age of 18 years old and not a party to this action,

5

and that on the 31st  day of January, 2006,  I

6

_X___ deposited for mailing in the U.S. Mail, with sufficient postage affixed thereto via U.

7

S. Regular Mail.

8

_____ sent via Federal Express or other overnight delivery service

9

_____ delivered via facsimile machine to fax number:

10

_____ personally delivered

11

_____ caused to be delivered via Reno-Carson Messenger Service

12

the foregoing document addressed to:

13

| | |
|---|---|
| Jerry M. Snyder, Esq. | Via: Facsimile 775-786-6179 |
| Hale Lane Peek Dennison and Howard | Copy to Follow US Regular Mail |
| 5441 Kietzke Lane | |
| Second Floor | |
| Reno, NV 89511 | |

14

15

16

and

17

| | |
|---|---|
| Pillsbury Winthrop Shaw Pittman, L.L.P. | Via: Copy Regular US Mail |
| David A. Jakopin, Esq. | |
| Jonathan D. Butler, Esq. | |
| 2475 Hanover Street | |
| Palo Alto, CA 94304-1114 | |
| Facsimile: 650-233-4545 | |

18

19

20

_____ _(LML)_ _____

21

LEZLIE M. LUCAS
Legal Assistant to the
Law Office of Logar & Pulver, PC

22

23

24

25

26

27

-11-

# EXHIBIT B

1   PETER D. KEISLER
    Assistant Attorney General
2   DANIEL G. BOGDEN
    United States Attorney
3   District of Nevada
    GREG ADDINGTON
4   Assistant United States Attorney
    Nevada Bar 6875
5   100 West Liberty, Suite 600
    Reno, Nevada 89501
6   VINCENT M. GARVEY
    Deputy Branch Director
7   CARLOTTA P. WELLS
    Senior Trial Counsel
8   Federal Programs Branch
    Civil Division - Room 7150
9   U.S. Department of Justice
    20 Massachusetts Ave., NW/P.O. Box 883
10  Washington, D.C.  20044

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

12  ETREPPID TECHNOLOGIES, LLC,        )
                                       )
13         Plaintiff,                  )
                                       )        CV-N- 06-00145 (BES)(VPC)
14  v.                                 )
                                       )
15  DENNIS MONTGOMERY, et al.,         )
                                       )
16         Defendants.                 )
    _____   )
17  DENNIS MONTGOMERY, et al.,         )
                                       )
18         Plaintiffs,                 )
                                       )        CV-N-06-00056 (BES)(VPC)
19  v.                                 )
                                       )
20  ETREPPID TECHNOLOGIES, INC.,       )
    et al.,                            )
21                                     )
           Defendants.                 )
22  _____   )

## NOTICE OF MOTION AND MOTION FOR
## PROTECTIVE ORDER BY THE UNITED STATES

        TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: Please take notice that,

pursuant to Federal Rule of Civil Procedure 26(c), defendant, the United States Department of

Defense (DoD), hereby submits its motion for a protective order to prevent disclosure of

information that could harm the national security interests of the United States.  In addition, DoD

moves to stay its discovery obligations during the pendency of its motions to dismiss all claims against the government in these cases. The motion is based on this notice of motion and motion and the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF UNITED STATES' MOTION FOR PROTECTIVE ORDER

### INTRODUCTION

The United States seeks a protective order in these cases pursuant to Rule 26(c)[1] to prevent the disclosure of information relating to (1) the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services; and (2) any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits. The basis for the protective order is that the information is protected by the military and state secrets privilege. That privilege, as properly asserted by the United States here, acts as an absolute bar when disclosure of the material would harm national security, regardless of a party's need for the information. As explained in the declarations accompanying this motion, because the disclosure of information at issue in this litigation reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to national security, see Declaration of John D. Negroponte (Negroponte Dec.), attached

---

[1] The United States Department of Defense (DoD) has been named a party to this litigation, but has moved to dismiss the claims against it on jurisdictional grounds. Even if DoD is dismissed as a party, the United States' interest in protecting national security information would remain and, if appropriate, the government could file a statement of interest pursuant to 28 U.S.C. § 517. That statute provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or District in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

hereto as Exhibit 1; <u>see</u> <u>also</u> Classified Declaration to be submitted <u>in camera</u> <u>ex parte</u>,[2] the United States' interest in preserving its state secrets is overriding and must be safeguarded, even if a party is thereby precluded from establishing its legal position in these cases.

The assertion of the privilege does not mean that there is actually a relationship between the intelligence community and any individual or entity involved in these cases. Rather, as Mr. Negroponte explains, in order to protect from disclosure those instances where there is a relationship, the United States must prevent the disclosure of information that would tend to either confirm or deny that any relationship or connection exists even in cases where there is no such relationship. <u>See</u> Negroponte Dec. ¶ 12. To do otherwise would inevitably lead to the compromise of national security information, because if the United States were forced to deny relationships where none existed, the United States' refusal to respond to future allegations in other cases would, as one district court explained, "be tantamount to a confirmation." <u>See</u> <u>Maxwell v. First National Bank of Maryland</u>, 143 F.R.D. 590, 595 (D. Md. 1992). For these reasons, the Court should uphold the United States' assertion of the military and state secrets privilege and enjoin the disclosure of any information that might tend to confirm or deny the existence or non-existence of any relationship (including any communication, meeting or transaction) between the U.S. intelligence community and any individual or entity associated with the underlying events giving rise to these suits, as well as any actual or proposed interest in, application, or use by any intelligence agency other than the United States Air Force of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

Further, on June 21, 2006, DoD filed motions to dismiss all of the claims against it as asserted in these cases. Etreppid filed its notices of non-opposition on July 10, 2006.

_____

[2] The classified <u>in camera</u>, <u>ex parte</u> declaration can be made available for review by the Court at its convenience. Because of the declaration's classification level, however, it must be stored at all times, except when being reviewed by appropriate personnel, in a Sensitive Compartmented Information Facility (SCIF).

-3-

Montgomery's opposition were filed, under seal, on September 15, 2006.  Defendant has not yet

been served with discovery requests, although the deadline for the parties to produce their initial

disclosures was, by stipulation of the parties, August 14, 2006.  In its motions to dismiss, DoD

argued that the Court should dismiss these actions as to DoD for lack of subject matter

jurisdiction.  If the Court grants the government's  motions, it will dispose of the claims against

DoD in their entirety.  Therefore, in the interests of judicial economy, the Court should exercise

its discretion under Rule 26(c) of the Federal Rules of Civil Procedure and stay all discovery

relating to DoD pending its ruling on the government's motions to dismiss.[3]

Counsel for the parties conferred in an attempt to reach agreement on the issues raise in

this motion, but were unable to do so.

**BACKGROUND**

A.    Factual Statement

The instant litigation is comprised of two actions, Civil Action No. 06-00056 (hereinafter

referred to as the "Federal Case") and Civil Action No. 06-00145 (hereinafter referred to as the

"Removed Case").  Dennis Montgomery, et al. (Montgomery) and eTreppid Technologies, Inc.

(eTreppid) have filed countersuits relating, *inter alia,* to claims involving copyright infringement,

misappropriation of trade secrets, breach of contract, and breach of fiduciary duty.  Montgomery

also has filed claims against DoD in both suits, seeking declaratory relief in both as well as relief

for copyright infringement in the Federal Case.  The dispute between the private parties primarily

concerns the ownership of source codes and their derivatives, *see* Federal Case Complaint ¶¶ 11-

14; Removed Case Complaint ¶¶ 31-33; Removed Case Countercomplaint ¶ 23.

In a complaint originally filed in state court, eTreppid has asserted a claim of entitlement

to protect and recover trade secrets from Montgomery.   Removed Case Complaint ¶ 35.

Montgomery, a former employee, officer, and director of the company, filed a counter-complaint

---

[3]  DoD does not take a position with respect to whether discovery between eTreppid and
Montgomery should proceed notwithstanding the pendency of the government's motion to
dismiss.

as well as a federal court action, alleging that eTreppid had infringed his copyright interests. Montgomery claims that he is an inventor and software developer who developed software for which he was granted copyrights in 1982. Removed Case Counter-complaint ¶ 8; Federal Case Complaint ¶ 8. Montgomery asserts that, after registration of the copyrights, he developed derivative works based on the copyrighted technology. Removed Case Counter-complaint ¶ 9; Federal Case Complaint ¶ 9. In September 1998, Montgomery and counter-defendant Warren Trepp formed eTreppid. Removed Case Counter-complaint ¶ 10; Federal Case Complaint ¶ 10. Pursuant to an agreement entered into between Montgomery and Trepp, Montgomery alleges he contributed certain technology in exchange for a 50 percent interest in eTreppid. *Id.*

The dispute between Montgomery and eTreppid stems from the issue of the extent to which Montgomery retained the sole interest in the derivative works based on the copyrighted technology. Removed Case Counter-complaint ¶¶ 11-14; Federal Case Complaint ¶¶ 11-14. Montgomery alleges that, in 2003, eTreppid "began sublicensing the Derivative Works to various entities, including the United States government and collecting licensing fees for the sublicenses," without having a license to take such action. Removed Case Counter-complaint ¶¶ 16-18; Federal Case Complaint ¶¶ 16-18. Further, Montgomery claims that, to the extent eTreppid had "an oral nonexclusive license to exploit the Derivative Works," such oral license was terminated in January 2006. Removed Case Counter-complaint ¶¶ 17-18; Federal Case Complaint ¶¶ 17-18. For its part, eTreppid claims that Montgomery has misappropriated trade secrets, violated the terms of his contracts with eTreppid, and improperly converted confidential information for his own use. Removed Case Complaint ¶¶ 36, 43, 46.

Montgomery also has asserted a claim against DoD. Montgomery alleges that he is prevented from fully disclosing the information he needs to present his case because he signed a "secrecy contract" with the United States government relating to the nature of the work that he performed on behalf of the government while associated with eTreppid and that disclosure of such information could subject him to criminal prosecution. Federal Complaint ¶¶ 69, 71;

-5-

Removed Case Counter-complaint ¶ 24. Montgomery claims that he can neither defend against eTreppid's claims nor prosecute his own without revealing the "nature of the technology, the type of work he has performed on the government contracts using his technology versus that of eTreppid, and the capabilities of his technology . . . in performing work for certain government agencies." Federal Case Complaint ¶¶ 71; Removed Case Counter-complaint ¶¶ 24. *Accord* Federal Case Complaint ¶¶ 72; Removed Case Counter-complaint ¶¶ 25. Montgomery therefore seeks, in both cases, a declaration that disclosure of such information will not constitute a violation of the "the contract between Montgomery and the United States to maintain [] secrets, and/or a declaration of immunity for Montgomery from the United States." Federal Case Complaint ¶ 73; Removed Case Counter-complaint ¶ 26.

Montgomery signed a Classified Information Nondisclosure Agreement (Nondisclosure Agreement), which was executed with the Defense Security Service, an agency within the DoD, on September 16, 2003. Exhibit 2. Pursuant to the terms of the Nondisclosure Agreement, Montgomery *inter alia*: (1) accepted certain obligations in exchange for being granted access to classified information (para. 1); (2) agreed never to divulge classified information to anyone unless authorized under the terms of the agreement and to comply with all laws prohibiting the unauthorized disclosure of classified information (para. 3); (3) stated he had been advised that the unauthorized disclosure of classified information could violate certain criminal statutes (para. 4); (4) stated he understood that the United States government may seek any remedy available to it to enforce the terms of the agreement, including but not limited to seeking a court order to prohibit the unauthorized disclosure of classified information (para. 6); (5) stated he understood that the classified information to which he would have or obtain access to was and would remain the property and under the control of the United States government (para. 7); and (6) agreed that the conditions and obligations imposed upon him under the agreement apply unless and until he is relieved of such obligations in writing by an authorized representative of the United States government (para. 8). *Id.*

**B.** <u>Terms of the Proposed Protective Order</u>

The proposed protective order (Exhibit 3) states that certain intelligence information that may or may not be relevant to the claims and defenses of the parties to this litigation is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States (para. 1). The proposed order then defines the categories of information that shall not be discussed, mentioned or otherwise subject to discovery or disclosure during all proceedings in this action:

> 2. The parties to these actions shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services [hereinafter referred to as "any intelligence agency"], or any current or former official, employee, or representative thereof, and any individuals or entities associated with these lawsuits, or any current or former officer or employee thereof.
>
> 3. The parties to these actions shall not serve or take any discovery relating to or questioning any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

*Accord* paragraphs 5 and 6.

In addition, the proposed order (para. 4) delineates issues relating to the parties' interactions with the government that would not be precluded. The areas in which questions or discovery would not be precluded include:

> a. The existence and nature of the "Big Safari" contract [hereinafter referred to as "the contract"] between eTreppid, Inc. and the United States Air Force, including but not limited to the fact that the contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the contract involved image identification technology;
>
> b. The fact that the contract required employees and/or officers of eTreppid, Inc. to sign secrecy agreements with the Department of Defense;
>
> c. The technical specifications relating to any technology, owned or claimed by any non-government individual or entity associated with these lawsuits, used under the terms of the contract or any other contract, relationship, agreement, connection, contract, transaction, communication, or meeting of any

-7-

kind, unless covered by paras. 2 and 3 above;

        d. Any actual or potential commercial or government applications of any technology owned or claimed by any non-government individual or entity associated with these lawsuits at any time, except to the extent that any application is covered by paragraph 2 and/or 3 above; and

        e. Facts relating to the issue of ownership, by any non-government individual or entity associated with these lawsuite, of any right or interest in the source code, software, or other technology owned or claimed by the parties to these lawsuits, except to the extent that any application is covered by paragraph 2 and/or 3 above.

The proposed order also states that, to the extent information or documents are sought by the private parties that would implicate the information defined in paragraphs 2 and 3 of the proposed order, then such requests shall be deemed, without the need for objection, not to require a response that would include any such information (paras. 7 and 8). The proposed order further sets forth measures by which the United States can ensure that the classified information is protected against disclosure by, for example, requiring service upon attorneys representing the government of all discovery and motions (para. 10), requiring notice to the government's attorneys of all decisions and notices for hearings in this litigation (para 11), authorizing attendance by attorneys for the United States at all depositions and proceedings as well as their right to make objections as necessary to protect national security information (para. 12), and authorizing the participation by attorneys for the United States in any proceeding in this litigation (para. 13).

Finally, as noted above, the proposed protective order also provides that the government is excused from its Rule 26 obligations during the pendency of DoD's motion to dismiss. The obligations that are to be stayed include complying with the obligation to produce initial disclosures as all well as all discovery obligations.

**ARGUMENT**

I.  The Standard Of Review Is A Narrow One, And A Properly Invoked
    Claim Of The State Secrets Privilege Is An Absolute Bar To Disclosure

The military and state secrets privilege is a unique privilege, with constitutional underpinnings,[4] which permits the Government to protect against the unauthorized disclosure in litigation of information that may adversely affect national security interests.  See United States v. Reynolds, 345 U.S. 1, 7-8 (1953); Black v. United States, 62 F.3d 1115, 1118 (8th Cir. 1995), cert. denied, 517 U.S. 1154 (1996); Ellsberg v. Mitchell, 709 F.2d 51, 56 (D.C. Cir. 1983), cert. denied, 465 U.S. 1038 (1984).  The privilege is not limited to military secrets, but is "both expansive and malleable."  Ellsberg, 709 F.2d at 57.  Thus, it includes within its scope information that would result in "'impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.'"  Black, 62 F.2d at 1118 (quoting Ellsberg, 709 F.2d at 57).[5]

---

[4] National security information is subject to the exclusive control of the President and the Executive Branch of the U.S. Government, pursuant to the President's powers under Article II of the Constitution.  Department of Navy v. Egan, 484 U.S. 518, 527 (1988).  Justice Stewart observed in his concurring opinion in New York Times Co. v. United States, 403 U.S. 713, 728-29 (1971), as follows:

> If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully.

[5] See, e.g., Reynolds, 345 U.S. at 5 (Air Force crash investigation report containing national security information was privileged); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1242-43 (4th Cir. 1985) (expert testimony on Navy marine mammal research programs was precluded as privileged);  Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 400-402 (D.C. Cir. 1984) (Department of Defense documents containing national security information, including communications with foreign governments and intra-government letters, were privileged); Halkin v. Helms, 690 F.2d 977, 990, 993 (D.C. Cir. 1982) (information concerning diplomatic relations with foreign governments and intelligence-gathering methods and capabilities was privileged).

The military and state secrets privilege is invoked when the government makes [1] a "formal claim of privilege, [2] lodged by the head of the department which has control over the matter, after [3] actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8 (footnotes omitted); Black, 62 F.3d at 1118.  The privilege is asserted to protect against the unauthorized disclosure of information that may adversely affect national security interests, regardless of how the person who has the information or seeks its disclosure is related to the Government.  See generally 2 S. Stone & R. Taylor, Testimonial Privileges § 9.12 at 9-37 (2d ed. 1995).  Thus, "the privilege may be invoked only by the government and may be asserted even when the government is not a party to the case." Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 546 (2d Cir. 1991) (citing Fitzgerald, 776 F.2d 1236 (4th Cir. 1985)).

The standard of review of a military and state secrets privilege claim is a "narrow one," and "[c]ourts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978); see also Reynolds, 345 U.S. at 10; Black, 62 F.3d at 1119.  The role of the court is to assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure will harm national security. Zuckerbraun, 935 F.2d at 546-47.  "[T]he government need not demonstrate that injury to the national interest will inevitably result from disclosure; a showing of 'reasonable danger' that harm will ensue is sufficient." Ellsberg, 709 F.2d at 58 (footnote omitted).  In this regard, courts have been "willing[] to credit relatively speculative projections of adverse consequences [of disclosure]." Id. at 58 n.35.

In considering the claim of military and state secrets privilege, the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect," Reynolds, 345 U.S. at 8, although it is appropriate for the court to consider in camera and ex parte declarations or other submissions of the Government explaining why a matter should be protected, Black, 62 F.3d at 1119. See, e.g., Kasza v. Browner, 133 F.3d 1159, 1169 (9th Cir. 1998); Farnsworth Cannon,

Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980) (en banc)); Maxwell, 143 F.R.D. at 595.[6]

Likewise, a judicial opinion on a claim of military and state secrets privilege "should not strip the

veil from state secrets even if ambiguity results in a loss of focus and clarity." Black, 62 F.3d at

1119; see also Ellsberg, 709 F.2d at 59 n.41 (open, detailed discussion by a court of the

application of general principles to particular facts is impossible in this area of the law).

A properly invoked claim of privilege is an absolute bar to disclosure, no matter how

compelling the need for the information, or relevance thereof, to a proper resolution of the case.

Reynolds, 345 U.S. at 11; Black, 62 F.3d at 1119; Fitzgerald, 776 F.2d at 1240; Northrop, 751

F.2d at 399.  In other words, if the court determines that there exists a showing of harm which

might reasonably flow from disclosure, the privilege cannot be overcome by "even the most

compelling necessity."  Reynolds, 345 U.S. at 11; In re Under Seal, 945 F.2d at 1288 n.2 ("Upon

proper invocation by the head of the affected department, the privilege renders the information

unavailable regardless of the other party's need in furtherance of the action"); Halkin, 690 F.2d at

---

[6]  In a number of contexts, national security concerns require ex parte, in camera review of classified information, including any classified state secrets declarations submitted by the government, to protect such information from unauthorized disclosure.  See e.g., Ellsberg, 709 F.2d at 61 ("It is well settled that a trial judge called upon to assess the legitimacy of a state secrets privilege claim should not permit the requester's counsel to participate in an in camera examination of putatively privileged material.  The rationale for this rule is that our nation's security is too important to be entrusted to the good faith and circumspection of a litigant's lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of secrecy) or to the coercive power of a protective order"); In re Eisenberg, 654 F.2d 1107, 1112 (5th Cir. 1981) ("Our adversarial legal system generally does not tolerate ex parte determinations on the merits of a civil case. . . . An exception to this principle is made when countervailing government interests dictate that information sought to be discovered should remain secret.  Privilege questions are determined on the basis of in camera, ex parte examinations of the evidence."); In re Under Seal, 945 F.2d 1285 (4th Cir. 1991) (classified in camera affidavit reviewed by both the district court and court of appeals without being disclosed to plaintiff's counsel); Stillman v. CIA, 319 F.3d 546, 549 (D.C. Cir. 2003) (same); Crater Corp. v. Lucent Technologies, Inc., 255 F.3d 1361, 1370 n. 4 (Fed. Cir. 2001)(rejecting claims of improper ex parte communications between the district court and the government in a case between two private parties but involving classified information).

-11-

1  990.

2      If the consequent unavailability of the information precludes either party from

3  establishing its legal position on the ultimate issues in the case, then the case must be dismissed.

4  See Black, 62 F.3d at 1119 (case was properly dismissed where privileged information was at the

5  core of plaintiff's claims); see also Fitzgerald, 776 F.2d at 1241-42 ("in some circumstances

6  sensitive military secrets will be so central to the subject matter of the litigation that any attempt

7  to proceed will threaten disclosure of the privileged matters"); Farnsworth, 635 F.2d at 281 ("any

8  attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of

9  state secrets that the overriding interest of the United States and the preservation of its state

10  secrets precludes any further attempt to pursue this litigation"); Tilden v. Tenet, 140 F. Supp. 2d

11  623, 627 (E.D. Va. 2000) (case would be dismissed where there was no way in which lawsuit

12  could proceed without disclosing state secrets).[7]

13  II.    The United States Has Properly Invoked The Privilege, And The Court Should Issue A
        Protective Order Barring Disclosure Of The Information In Question

14      The United States has properly asserted the military and state secrets privilege in these

15  cases.   The current head of the U.S. Intelligence community, Director of National Intelligence

16  John D. Negroponte, after personal consideration of the matter, has formally invoked the

17  privilege on behalf of the United States with respect to the information described in his

18  declaration.  See Reynolds, 345 U.S. at 7-8; Negroponte Dec. ¶¶ 3, 9 (Exhibit 1).[8]  As Mr.

19

20      [7] Notwithstanding the need to protect certain information from disclosure, the scope of
21  the information that would be protected by the state secrets privilege in these cases is relatively
    limited in scope.  For this reason, the government's proposed protective order specifically
22  identifies issues relating to the parties' interactions with the government that would not be
    precluded.  As a result of the fact that privilege covers only some but not all of the information
23  relating to the government's interactions with eTreppid and Montgomery, it appears at this point
24  that the underlying litigation should be able to proceed in some fashion.

25      [8] The public declaration is sufficient to establish the United States' military and state
26  secrets privilege claim in this case.  See Reynolds, 345 U.S. at 8 (the court should not "forc[e] a
    disclosure of the very thing the privilege is designed to protect").  Moreover, while "the court
27  should not jeopardize the security which the privilege is meant to protect by insisting upon an

28                                             -12-

Negroponte explains, the information to be protected from disclosure includes information concerning the existence or non-existence of any actual or proposed relationship involving any U.S. intelligence agency and any individuals and/or companies associated with these lawsuits and any actual or proposed interest in, application of, discussion of, or use by any intelligence agency of any technology owned or claimed by individuals and/or companies associated with these lawsuits.  Negroponte Dec. ¶ 11.  The disclosure of this information, which may or may not be relevant to the parties' claims and defenses in their lawsuits relating to copyright ownership and trade secrets, could reasonably be expected to damage the national security.  Id. at ¶¶ 9, 12;  see also Classified Declaration submitted in camera ex parte.

Based on the assertion by the head of the United States intelligence community that damage to national security could reasonably be expected to result from any disclosure of information that would tend to confirm or deny the existence or non-existence of any relationship between the United States intelligence community and the private parties as well as the application by a member of the U.S. intelligence community of software or technology that the parties claim to own, the United States' claim of privilege is valid.  It therefore meets the narrow standard of review to which the state secrets claim is subject, and the Court should accord it the utmost deference.  See Halkin v. Helms, 598 F.2d at 9; see also Black, 62 F.3d at 1119.  In view of the United States' showing that unauthorized disclosure of the information described in Mr. Negroponte's declaration could reasonably be expected to cause serious, and in some cases exceptionally grave, damage to national security, whether in response to the parties' discovery requests or otherwise, disclosure of that information is completely barred, no matter how

examination of the evidence, even by the judge alone, in chambers," id. at 10, a more detailed description of the national security concerns at issue in this case is contained in a classified declaration which the United States has already prepared.  Because that declaration is classified, it can only be presented for the Court's ex parte, in camera review.  The Department of Justice Security Office can arrange for this Court's ex parte, in camera review of the classified declaration in a secure setting at the Court's convenience.

-13-

compelling any party's alleged need for the information.  <u>Reynolds</u>, 345 U.S. at 11; <u>Northrop</u>, 751 F.2d at 399; <u>Halkin</u>, 690 F.2d at 990.

That the assertion of the military and state secrets privilege might leave a party to litigate "in the dark" is nothing extraordinary or unusual.  Such was the case in <u>Farnsworth</u>, 635 F.2d at 281, where plaintiff's counsel was left unaware of the scope of excluded information, as well as in <u>Maxwell</u>, 143 F.R.D. at 599-600, where plaintiff's counsel was rebuffed in his attempts to discover matters with respect to which the privilege had been asserted.  In such instances, the Government simply has an "overriding interest."  <u>See</u> <u>Farnsworth</u>, 635 F.2d at 281.  Accordingly, the Court should issue a protective order prohibiting the disclosure of the information at issue in these cases.

III.    In the Interest of Judicial Economy, the Court Should Enter a Protective Order Staying <u>Discovery Until Resolution of DoD's Motion to Dismiss.</u>

Courts have broad discretion under the Federal Rules of Civil Procedure to regulate the discovery process, <u>Herbert v. Lando</u>, 441 U.S. 153, 177 (1979), including the discretion to deny discovery.  <u>See</u> Fed. R. Civ. P. 26(c); <u>Jarvis v. Regan</u>, 833 F.2d 149, 155 (9th Cir. 1987) ("A district court's decision to allow or deny discovery is reviewable only for abuse of discretion."); <u>Petrus v. Bowen</u>, 833 F.2d 581, 583 (5th Cir. 1987) ("trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined"); <u>B.R.S. Land Investors v. United States</u>, 596 F.2d 353, 356 (9th Cir. 1979) ("A district court may properly exercise its discretion to deny discovery where . . . it is convinced that the plaintiff will be unable to state a claim upon which relief can be granted.").

Exercise of the Court's discretion to stay discovery is especially appropriate where a dispositive motion is pending and the discovery sought is not necessary to resolve the issues raised by that motion.  <u>See</u> <u>Alaska Cargo Transport, Inc. v. Alaska R.R. Corp.</u>, 5 F.3d 378, 383 (9th Cir. 1993) (stay of discovery was proper where the discovery sought was not relevant to "whether or not the court ha[d] subject matter jurisdiction"); <u>Jarvis v. Regan</u>, 833 F.2d at 155 (district court properly stayed discovery that was not needed to resolve motion to dismiss); <u>Wood</u>

-14-

1  v. McEwen, 644 F.2d 797, 801 (9th Cir. 1981) ("A district court may limit discovery 'for good

2  cause' and may continue to stay discovery when it is convinced that the plaintiff will be unable to

3  state a claim for relief.") (citation omitted). "Indeed, such a procedure is an eminently logical

4  means to prevent wasting the time and effort of all concerned, and to make the most efficient use

5  of judicial resources." Coastal States Gas Corp. v. Department of Energy, 84 F.R.D. 278, 282

6  (D. Del. 1979).

7  These are just such cases. Allowing discovery would impose significant and unnecessary

8  burdens on DoD (and potentially the Court, if there are discovery disputes) at a time when

9  significant issues have been raised regarding the Court's jurisdiction over this matter. Discovery

10  is not needed to resolve those jurisdictional issues and, thus, a stay of discovery is warranted in

11  these circumstances. See Jarvis, 833 F.2d at 155 ("Discovery is only appropriate where there are

12  factual issues raised by a Rule 12(b) motion."); Rae v. Union Bank, 725 F.2d 478, 481 (9th Cir.

13  1984) (district court properly stayed discovery where plaintiff "failed to point to any specific

14  information obtainable through discovery that would have enabled" plaintiff to withstand motion

15  to dismiss). Given the dispositive jurisdictional issues DoD has raised, the principle of judicial

16  economy favors a stay of discovery until the Court has ruled on the pending motions to dismiss.

17  **CONCLUSION**

18  For the foregoing reasons, the United States' assertion of the military and state secrets

19  privilege should be upheld, discovery involving the government should be stayed pending the

20  disposition of DoD's motions to dismiss, and the government's motion for a protective order

21  should be granted.

22  DATED: September 25, 2006

23  Respectfully submitted,

24  PETER D. KEISLER
   Assistant Attorney General

25

26  DANIEL G. BOGDEN
   United States Attorney
   District of Nevada

27

28  -15-

GREG ADDINGTON
Assistant United States Attorney
Nevada Bar 6875
100 West Liberty, Suite 600
Reno, Nevada 89501

VINCENT M. GARVEY
Deputy Branch Director


/s/ Carlotta P. Wells
CARLOTTA P. WELLS
Senior Trial Counsel
Federal Programs Branch
Civil Division - Room 7150
U.S. Department of Justice
20 Massachusetts Ave., NW
P.O. Box 883
Washington, D.C.  20044

Counsel for Counter-Defendant,
United States Department of Defense

IT IS SO ORDERED

Date: _____, 2006          _____
                                     UNITED STATES DISTRICT JUDGE


## CERTIFICATE OF SERVICE

I hereby certify that I am an employee in the office of the United States Department of Justice, Civil Division in Washington DC and I am of such age and discretion as to be competent to serve papers.  On September 25, 2006, I served copies of the United States Notice of Motion and Motion for Protective Order, with the accompanying Memorandum of Points and Authorities, by placing said copies in postpaid envelopes addressed to the persons named below at the places and addresses stated below and by depositing said envelopes and contents in the United States mail at the United States Department of Justice, 20 Massachusetts Avenue, Washington D. C. 20001.

-16-

1   Ronald J.  Logar, Esq.
    Eric A. Pulver, Esq.
2   LAW OFFICES OF LOGAR & PULVER, PC
    255 S. Arlington Avenue, Suite A
3   Reno, NV 89501

4   Michael J. Flynn, Esq.
    Philip H. Stillman, Esq.
5   FLYNN & STILLMAN
    224 Birmingham Drive, Suite 1A4
6   Cardiff, CA 92007

7   Stephen J. Peek, Esq.
    Jerry M. Snyder, Esq.
8   HALE LANE PEEK DENNISON AND HOWARD
    5441 Kietzke Lane, Second Floor
9   Reno, NV 89511

10

11  David A. Jakopin, Esq.
    Jonathan D. Butler, Esq.
    PILLSBURY WINTHROP SHAW PITTMAN, L.L.P.
12  2475 Hanover Street
    Palo Alto, CA 94304-1114

13

14                          /s/ Carlotta P. Wells
                            Carlotta P. Wells
15                          Senior Trial Counsel
                            Federal Programs Branch, Civil Division
16                          United States Department of Justice

17

18

19

20

21

22

23

24

25

26

27

28                          -17-

# EXHIBIT C

1

2                    UNITED STATES DISTRICT COURT

3                         DISTRICT OF NEVADA

4                                * * *

5   DENNIS MONTGOMERY and the        )
    MONTGOMERY FAMILY TRUST          )        3:06-CV-00056-PMP-VPC
6                                    )        BASE FILE
            Plaintiffs,              )
7                                    )        3:06-CV-00145-PMP-VPC
       vs.                           )
8                                    )        **ORDER RE PROTECTIVE ORDER**
    ETREPPID TECHNOLOGIES, LLC;      )
9   WARREN TREPP; and the UNITED     )
    STATES DEPARTMENT OF DEFENSE,    )
10                                   )
            Defendants.              )
11  _____ )
                                     )
12  AND ALL RELATED MATTERS.         )
    _____ )
13

14          Prior to consolidation of these two related cases, Defendant United States

15  Department of Defense filed Motions for Protective Order (3:06-CV-00056-PMP-VPC,

16  Doc. #83, and 3:06-CV-00145-PMP-VPC, Doc. #51) to prevent disclosure of information

17  that could harm the national security interests of the United States.  Specifically, the United

18  States' seeks a protective order pursuant to Federal Rule of Civil Procedure 26(c) to prevent

19  the disclosure of information relating to (1) the existence or non-existence of any actual or

20  proposed relationship, agreement, connection, contract, transaction, communication or

21  meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4),

22  which includes intelligence elements of the military services; and (2) any actual or proposed

23  interest in, application, or use by any intelligence agency, or any current or former official,

24  employee, or representative thereof, of any technology, software, or source code owned or

25  claimed by any individuals or entities associated with these lawsuits.

26  / / /

The United States' supports its application for protective order under the military and States Secret privilege by the Declaration of John D. Negroponte, formally Director of National Intelligence, and a Classified Declaration which has been reviewed by the Court in camera and ex parte, which demonstrate that disclosure of information at issue in this litigation subject to the proposed protective order could be expected to cause serious, and some cases exceptionally grave damage to national security.

Issues relating to whether information subject to a claim of military and states secrets privilege were contained in pleadings, motions, declarations and other materials filed in these consolidated cases as well as in the related in the Search Warrant case (3:06-CV-0263-PMP-VPC), have required considerable attention by the parties and the Court. In this regard, counsel for Defendant United States' and those authorized to assert the military and states secrets privilege on behalf of Defendant United States' have met with counsel in these related actions as well as with counsel in the related Search Warrant case, and have reviewed copies of all pleadings, motions, documents and exhibits filed in the above referenced cases for the purpose of identifying and redacting those portions subject to a claim of military and state secrets privilege on behalf of Defendant United States. The Court has reviewed all such papers in camera and ex parte with counsel for Defendant United States' and those authorized to assert the military and states secret privilege on behalf of Defendant United States, and has approved the redaction of material subject to the privilege claim.

Defendant United States' Department of Defense Motion for Protective Order has now been fully briefed and on June 12, 2007, the Court conducted a hearing regarding the United States' Motion for Protective Order and other pending motions.

On June 21, 2007, Defendant United States' filed a Revised Proposed Protective Order (3:06-CV-00056-PMP-VPC (Doc. #196). The Court finds that said Protective Order is warranted as to form and content and hereby approves the same.

/ / /

IT IS THEREFORE ORDERED that Defendant United States Department of
Defense Motions for Protective Order (3:06-CV-00056-PMP-VPC, Doc. #83, and 3:06-CV-
00145-PMP-VPC, Doc. #51) is GRANTED.

DATED: August 29, 2007.

_____
PHILIP M. PRO
United States District Judge

# EXHIBIT D

1 PETER D. KEISLER
  Assistant Attorney General
2 STEVEN W. MYHRE
  Acting United States Attorney
3 District of Nevada
  GREG ADDINGTON
4 Assistant United States Attorney
  Nevada Bar 6875
5 100 West Liberty, Suite 600
  Reno, Nevada 89501
6 VINCENT M. GARVEY
  Deputy Branch Director
7 CARLOTTA P. WELLS
  Senior Trial Counsel
8 Federal Programs Branch
  Civil Division - Room 7150
9 U.S. Department of Justice
  20 Massachusetts Ave., NW/P.O. Box 883
10 Washington, D.C. 20044
  Telephone: (202)514-4522
11 Facsimile: (202) 616-8470

12                **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
13

14 _____
   DENNIS MONTGOMERY, et al.,          )
15                                     )
           Plaintiffs,                 )
16                                     )     3:06-CV-00056-PMP-VPC
                                       )     **BASE FILE**
   v.                                  )
17                                     )     3:06-CV-00145-PMP-VPC
   ETREPPID TECHNOLOGIES, INC.,        )
18 et al.,                             )
                                       )
           Defendants.                 )
19 _____)

20              UNITED STATES  **PROTECTIVE ORDER**

21         Pursuant to Federal Rule of Civil Procedure 26, in order to protect the classification,

22 confidentiality and the rights to information and documents developed and disclosed in

23 connection with this litigation, and to facilitate discovery by and among the parties to this

24 action and from third parties, the United States hereby proposes entry of the following

25 protective order.

26

27

28

IT IS HEREBY ORDERED as follows:

1.       Certain information that may or may not be relevant to the claims and/or defenses of eTreppid Technologies, LLC and its current or former officers or employees (hereinafter collectively referred to as "eTreppid"), Warren Trepp, Dennis Montgomery, the Montgomery Family Trust and/or Dennis Montgomery and Brenda Montgomery as trustees of the Montgomery Family Trust (hereinafter collectively referred to as "the Parties"), as delineated in paragraphs 2 and 3 below, is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States.  Such information shall not be subject to discovery or disclosure by any of the Parties during all proceedings in these actions, and shall be excluded from evidence at trial.

2.       The Parties shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services, or any current or former official, employee or representative thereof (hereinafter collectively referred to as "intelligence agency") and the Parties.

3.       The Parties shall not serve or take any discovery relating to or questioning any actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties.

4.       This Order does not preclude the Parties from serving or taking any discovery from other Parties or third parties relating to, or questioning, the following:

a.      The existence and nature of the "Big Safari" contract (hereinafter referred to as "the Big Safari Contract") between eTreppid and the Unites States Air Force, including but not limited to the fact that the Big Safari Contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the Big Safari Contract involved image identification technology;

b.      The fact that the Big Safari Contract required employees and/or officers of eTreppid to sign secrecy agreements with the Department of Defense;

c.      The computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties ("the Technology");

d.      Any contract, relationship, agreement, connection, transaction, communication or meeting of any kind relating to the Technology, unless covered by paragraphs 2 or 3 above;

e.      Any actual or potential commercial or government applications of the Technology, unless covered by paragraphs 2 or 3 above;

f.      Facts relating to the issue of ownership by the Parties of any right or interest in the Technology, unless covered by paragraphs 2 or 3 above;

g.      The revenue, income, expenses, profits and losses of the Parties, unless disclosure of such information would be covered by paragraphs 2 or 3 above; and

h.      Any consideration received by any of the Parties relating to the Technology, unless covered by paragraphs 2 or 3 above.

5.      The Parties shall not discuss, mention, question or introduce as evidence, either at trial, in any pleading or motion, or in any case-related correspondence, any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between any intelligence agency and any of the Parties.

6.     The Parties shall not discuss, mention, question or introduce as evidence, either at trial, in any pleading or motion, or in any case-related correspondence, any actual or proposed intelligence agency interest in, application of or use of the Technology.

7.     No question and no document request in discovery or at trial shall require a response that would include any information covered by paragraphs 2, 3, 5 or 6 above, but if the responding party believes that a full and complete response could disclose information within the scope of the state secrets privilege, the responding party shall provide timely notice of such belief and the full and complete response to the United States prior to responding, and shall respond only with information that the United States has determined is not subject to the state secrets privilege.

8.     The military and state secrets privilege, the claim that any discovery is covered by paragraphs 2 or 3 above, and the claim that any evidence is covered by paragraphs 2 or 3 above, can only be invoked by the United States.  These claims cannot be asserted by a private individual or entity.

9.     All Parties shall serve the attorneys for the United States with (a) a copy of all notices of depositions, (b) a copy of all requests for discovery and responses thereto, and (c) a copy of all pleadings and motions filed together with supporting memoranda (hereinafter collectively referred to as the "documents"), unless such documents request or relate to information covered by paragraphs 2 or 3 above.  If the documents request or relate to information covered by paragraphs 2 or 3 above, the Parties shall submit the documents to the United States for privilege review prior to service or filing.  All documents filed or sought to be used as evidence by the Parties in this case shall be unclassified.  This requirement applies to all motions, pleadings, briefs, and any other document, including exhibits, correspondence, or anything appended thereto or filed therewith.  If the United States determines that a document or discovery response includes

information covered by paragraphs 2 or 3 above, the United States shall redact the information and provide the parties and Court with a redacted copy of the document or discovery response.

10.     The Clerk of the Court shall send attorneys for the United States a copy of all future decisions and notices for hearings in these cases.

11.     As the United States deems necessary, attorneys for the United States may attend all depositions and proceedings in this case and may make objections as necessary to protect national security information.  If attorneys for the United States assert an objection based on the need to protect national security information with respect to either witness testimony or documents introduced or otherwise relied upon during a deposition, then the witness shall be precluded from testifying with respect to the line of inquiry that engendered the objection, and the document shall be withdrawn from the record pending an order of the Court with respect to the scope of the government's national security objection.

12.     To protect the United States' interests, attorneys for the United States may participate in any proceeding in these cases, including but not limited to motions hearings, all pre-trial proceedings, or trial by making and opposing motions, submitting briefs, and participating in arguments.

13.     The United States shall be excepted from all party discovery during the pendency of its motions to dismiss the claims against the Department of Defense. It is so ordered.

Dated:  August 29, 2007
_____

_____
PHILIP M. PRO
United States District Judge

-5-

# EXHIBIT E

1                     UNITED STATES DISTRICT COURT
                           DISTRICT OF NEVADA
2        BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                              ---o0o---
3

4     DENNIS MONTGOMERY and the      :
      Montgomery Family Trust,       :
5                                    :
                     Plaintiffs,     :  No. 3:06-CV-56-PMP(VPC)
6                                    :
           -vs-                      :  June 24, 2008
7                                    :
      ETREPPID TECHNOLOGIES, LLC,    :  Reno, Nevada
8     WARREN TREPP, and the          :
      UNITED STATES DEPARTMENT OF    :
9     DEFENSE,                       :
                                     :
10                   Defendants.     :
                                     :
11    _____AND RELATED CASES _____:

12

13        TRANSCRIPT OF CONTINUED ORDER TO SHOW CAUSE HEARING

14    APPEARANCES:

15    FOR THE PLAINTIFFS:  DEBORAH KLAR and MARK GUNDERSON
                           Attorneys at Law
16

17    FOR THE DEFENDANTS:  J. STEPHEN PEEK, JERRY SNYDER,
                           BRIDGETT ROBB PECK, GREGORY SCHWARTZ and
18                         ANDREW LIESE
                           Attorneys at Law
19

20    FOR INTERESTED       CARLOTTA WELLS and RAPHAEL GOMEZ
      PARTIES:             Assistant U.S. Attorneys
21

22    Reported by:            Margaret E. Griener, CCR #3, RDR
                               Official Reporter
23                             400 South Virginia Street
                               Reno, Nevada 89501
24                             (775)329-9980

25              COMPUTER-ASSISTED TRANSCRIPTION

2

```
 1              RENO, NEVADA, TUESDAY, JUNE 24, 2008, 9:00 A.M.

 2                             ---o0o---

 3

 4              THE CLERK:  This is the date and time set for

 5   the continued order to show cause hearing in case number

 6   06-CV-0056-PMP(VPC), Dennis Montgomery, et al., versus

 7   eTreppid Technologies, et al.

 8              Present on behalf of plaintiff, Deborah Klar and

 9   Mark Gunderson.

10              Present on behalf of defendants, Stephen Peek, Jerry

11   Snyder, Bridget Robb Peck.

12              Present telephonically on behalf of defendants,

13   Gregory Schwartz and Andrew Liese.

14              Present on behalf of interested party, Carlotta

15   Wells and Raphael Gomez.

16              THE COURT:  Thank you very much.  Please just

17   give me a moment to get my papers in order.

18              This is a continued hearing pursuant to this Court's

19   order to show cause concerning why Dennis Montgomery and the

20   Montgomery Family Trust should not be held in contempt of

21   court for failure to obey a series of discovery orders that

22   were issued in this case.

23              As the parties and counsel well know, we had a

24   day-long hearing on June 10, and it has been continued to

25   today.
```

Case 1:06-mc-00053-PMP-MAU  Document 131  Filed 07/23/08  Page 5 of 200

3

```
 1              Just some preliminary matters.  First of all, the

 2   Court, during the last -- the June 10th, hearing had several

 3   exhibits, and I'm going to admit those into evidence.

 4              Do counsel have any objections to those?  I believe

 5   those are Exhibits 1 through -- let's see, the Court's

 6   exhibits, I believe, were 1 through 16.  Is that correct,

 7   Ms. Clerk?

 8              THE CLERK:  Your Honor, I show 1 through 18.

 9              THE COURT:  Were the court's exhibits?

10              THE CLERK:  Yes.

11              THE COURT:  All right.  Do counsel have any

12   objection to the admission of those exhibits?

13              MR. PEEK:  I don't, your Honor.  I would just

14   like to have a list from the clerk so that we know what we

15   have because I don't think -- I don't think all 18 were

16   actually shown to the witness and identified.

17              THE COURT:  All right.  Ms. Klar?

18              MS. KLAR:  Your Honor, we would like to see a

19   list before we take a position because --

20              THE COURT:  All right.

21              MS. KLAR:  -- Mr. Peek is right, they all were

22   not shown to the witness.

23              THE COURT:  All right.  What I'll do is at one

24   of the breaks we'll go ahead and take care of that, and,

25   Ms. Clerk, if you would provide copies of the exhibit list to
```

1    counsel, that would be helpful, and then we can take care of

2    that housekeeping matter.

3            The other matter, just for the record, the Court did

4    receive -- was filed at 7:35 p.m. last night docket 696 which

5    is the Montgomery parties' brief for a limitation on subject

6    matter of correspondence required to be produced pursuant to

7    eTreppid's request number 26 in request for production set 2.

8            And the Court notes it was filed but certainly isn't

9    saying any more than that because we're proceeding with this

10   hearing today.  Whether it was filed with the intention that

11   it somehow be considered today, I don't know, but I just

12   wanted to note that the Court is aware it was filed.

13           All right.  When we were last in session, Mr. Peek

14   was examining Mr. Montgomery, and I assume, Mr. Peek, you're

15   ready to proceed?

16               MR. PEEK:  I am ready to proceed, your Honor.

17           I did want to at least -- I don't know that we need

18   to address document 696.  I did receive it, did review it and

19   prepared argument to argue it.

20           And the reason I say that is it may go to at least

21   the good faith or bad faith of Montgomery in connection with

22   one of the productions because I think what he's going to

23   probably say is, well, I didn't understand the order because

24   that's what Ms. Klar says, I didn't understand the order, I

25   think it meant something other than what the request said.

 1          So I'm not trying to urge the Court to decide that

 2    right now or make a decision on it, but certainly it does

 3    impact this hearing.

 4               THE COURT:  Mr. Gunderson?

 5               MR. GUNDERSON:  Your Honor, I do have one other

 6    preliminary matter, and that involves the series of motions

 7    involving the Flynn pleadings.

 8          I think, as the Court is probably aware, an article

 9    appeared in yesterday's Reno Gazette-Journal citing

10    extensively Mr. Flynn's pleadings with this court.

11          We have fully briefed the issues related to the

12    Flynn pleadings and believe that proceeding with that motion

13    still pending would be highly prejudicial to Mr. Montgomery

14    and raise issues that are collateral to this proceeding, and

15    we would like to have a ruling on that, if we could, prior to

16    commencing today's hearing.

17               THE COURT:  Well, I appreciate that,

18    Mr. Gunderson, and I appreciate your concern.

19          There are -- we are now at docket number 696 in this

20    case.  This Court and Judge Pro, the district judge, we are

21    doing our best to try to keep up with the many motions that

22    are filed.

23          This is another example when -- this paper was filed

24    yesterday at 7:30 in the evening.  This is a practice.  My

25    problem is there are not enough hours in the day for me to

1    address all of these in the time -- and I appreciate counsel

2    have very compelling reasons why they are concerned about

3    this.

4         I also have a docket of 400 other cases that I have

5    to attend to on a daily basis.  So I'm not prepared and I'm

6    not going to rule on those motions.

7         I'm aware they're under submission, and I will do my

8    very best to -- along with all of the other motions that are

9    pending -- we spent a day, I think -- I know you were there

10   last week -- an entire day dealing with a series of complex

11   discovery motions that the parties have been dealing with.

12   That's just an illustration of the problems the Court is

13   confronted with in dealing with this case.

14        So, while I certainly appreciate your point of view,

15   the Court is not prepared to rule on those motions today and

16   will not do so.

17        MR. GUNDERSON:  Well, it is of such importance

18   to Mr. Montgomery and the Montgomery parties, your Honor, that

19   we feel that that has to be addressed as an item before we go

20   forward, and if we can't have a ruling on that, we would ask

21   that this proceeding be stayed until we do have a ruling so we

22   know what ground rules we are operating under.

23        THE COURT:  Then this is my question,

24   Mr. Gunderson.  If you were going to make such a request for a

25   stay -- this hearing was set on June -- we had a hearing on

7

1    June 10th.  Today is June 24th.  I received no filing from the

2    Montgomery parties requesting a hearing in advance of this

3    that this -- and so on.

4              And so now here we are at 9:15 a.m. on the day of

5    the hearing, and you're saying, well, you know, it's of such

6    importance that we can't possibly go forward when everybody is

7    here ready to proceed.

8              MR. GUNDERSON:  I don't disagree with that.

9              Had it not been for the action that occurred

10   yesterday, which is just a recently-discovered or

11   recently-performed act when we pick up the newspaper first

12   thing on Monday morning and here's a news article.  I never

13   even saw it, unfortunately, until after it had been published

14   and it had been out there in the newspaper and had a chance to

15   talk to my client.

16             I was in a hearing all day yesterday in Las Vegas.

17   I finally had a chance to talk to Ms. Klar and Mr. Montgomery,

18   and this is the reason that it's being made orally today.

19   It's not because we didn't have the capacity or the ability or

20   the intention to bring it to your attention.

21             If we had an extra day, if we had had a day, that's

22   the unfortunate part about it.  This is the precipitating

23   event that necessitates my request to the Court.

24             THE COURT:  All right.  Thank you.

25             Mr. Peek.

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

1          MR. PEEK:  Your Honor, I have nothing to say.  I
2     think the Court is well versed in this.
3          Certainly, if the Court looked at its docket for the
4     last three or four days, they would see not only the paper
5     filed at 7:20 last night, but many, many more papers filed at
6     the end of last week.  They certainly had adequate opportunity
7     to do that.
8          This is not a jury trial where he can argue jury
9     prejudice, that the pool has been tainted.  Is he saying that
10    the Court has been tainted somehow by a newspaper article?  I
11    think we know that he's not saying that.
12         So I don't know what it means the fact that there
13    was a newspaper article out there.
14         The papers have been filed, the Court is aware of
15    them.  They've been fully briefed.  The Court is certainly
16    capable, if she did, in fact, read the paper, of separating
17    the article, which is really a recap of the papers, which the
18    Court is going to have to do anyway to make the decision.  So
19    I don't see how it has any bearing.
20         THE COURT:  Well, the oral motion to stay these
21    proceedings that Mr. Gunderson has made is denied, and we're
22    going to go ahead and proceed.
23         So with that, are you ready to proceed?
24         MR. PEEK:  I am ready, your Honor.  I'm waiting
25    for Mr. Montgomery to take the witness stand.

Case 3:06-mc-00053-PMP-VPC Document 131 Filed 07/28/08 Page 51 of 800
Case 3:06-cv-00056-PMP-VPC Document 131 Filed 07/28/08 Page 51 of 800

9

1    THE COURT:  All right.  Mr. Montgomery, take the

2    stand, please.

3    MS. KLAR:  Your Honor, just a housekeeping

4    matter?

5    THE COURT:  Yes.

6    MS. KLAR:  During the recent hearing last week,

7    status conference, you had requested that Mr. Montgomery

8    submit a declaration, which he did do.

9    THE COURT:  Right.

10   MS. KLAR:  Since we have had an opportunity to

11   look at those photographs, we have determined that the -- and

12   we have provided photographs that are Bates stamped 1490

13   through 1599, DM 1490 through 1599, and those are appended, I

14   believe, to Mr. Montgomery's declaration.

15   We would request that those CDs be eliminated from

16   this case because all of those CDs relate to a time before

17   Mr. Montgomery ever became involved with eTreppid.  They are

18   all prior to September of 1998.

19   And given the scope of the search warrant, we're at

20   a loss to understand why these CDs were taken in the first

21   place, but they were, and those are the facts, and we think

22   that those CDs should be eliminated from this record and not a

23   subject of discovery because clearly they have nothing to do

24   with anything that is currently before the Court.

25   THE COURT:  All right.  So, first of all, just

Case 3:23-mc-00073-CKK-MAU Document 734 Filed 07/28/23 Page 52 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/23 Page 52 of 265

10

```
 1   so our record is clear, the court's record that is -- you're

 2   referring to docket number 690, Ms. Klar, which was filed

 3   June 20, 2008, entitled Declaration of Dennis Montgomery

 4   Regarding Efforts to Search For CDs Depicted in FBI Photos?

 5                MS. KLAR:  That is correct, your Honor.

 6                THE COURT:  All right.  And so Exhibit A starts

 7   with -- is numbered DM 890, and I don't know if this is -- is

 8   this serially, consecutively numbered to 14 -- the last page

 9   is 1599.  That's what I have.

10                MS. KLAR:  Yes, your Honor.

11        I think what I -- it's probably part of Exhibit C,

12   and perhaps on a break I can go through and just identify for

13   the Court the specific pages that are part of Exhibit C

14   because I'm not sure they're all in there sequentially.

15                THE COURT:  Maybe I don't have -- maybe I just

16   have --

17                MS. KLAR:  Exhibit --

18                THE COURT:  Maybe I just have --

19                MR. PEEK:  Your Honor, Exhibit C begins at Bates

20   number 1556 if it's in your copy.

21                THE COURT:  Oh, okay.

22                MS. KLAR:  That's not --

23                THE COURT:  I've got it.

24                MS. KLAR:  My Exhibit C starts with 1469.

25                THE COURT:  My Exhibit C starts at 1556.
```

1          MR. PEEK:  She must have a different Exhibit C

2    than we do, your Honor.

3          THE COURT:  Well, why don't -- Ms. Klar, this is

4    what we're going to do, is we need to -- obviously there's

5    some confusion about what Exhibit C is, and I'm sure it can be

6    taken care of and clarified during a break.

7          I'm not sure -- I'm not sure why you're asking that

8    the Court now decide what is in docket number 690 not be part

9    of this case.  I'm a little unclear why you're asking for that

10   relief at this time.  Do you want to explain that?

11         MS. KLAR:  The reason, your Honor, is really

12   quite simple.  I don't think it's a proper subject of

13   questions, and I don't want to have the Court spending its

14   time or our collective time on these CDs when we now

15   understand that they all relate to a time frame before

16   Mr. Montgomery ever became involved with eTreppid.

17         THE COURT:  All right.

18         MS. KLAR:  So it's a housekeeping matter more

19   than anything.

20         THE COURT:  All right.

21         MR. PEEK:  Your Honor, this needs to be fully

22   briefed.

23         I mean, to give you an example, document 1596 says

24   source code 9-10-96.  I don't know if that source code may or

25   may not relate to CD 1.  I don't know if that source code

1  relates to work that Mr. Montgomery said he undertook and

2  performed before he came to eTreppid and whether or not that

3  source code has any relationship to this case.  It may have.

4        So I don't think just sort of an on-the-fly motion

5  by Ms. Klar when we were here last Tuesday and the Court asked

6  a number of times is there anything else.

7        These photos have been available to them for some

8  time now, and now all of a sudden they want to come and say,

9  oh -- on the moment we're about ready to the start, well, gee,

10  I don't want to have the Court talk about or include anything

11  before September 1998.

12        Well, let's have that briefed.  I want to see what

13  the argument is.  I want to know from Mr. Montgomery what

14  might be on those because I don't know that.  Just because

15  they have a date pre-September 1998 doesn't necessarily not

16  make them discoverable.

17        THE COURT:  Well, it may, as Ms. Klar has

18  pointed out, simply be a housekeeping matter, or it may not.

19  I'm not prepared to rule on that.  I mean, again, I have no

20  idea.

21        I mean, what -- I haven't reviewed these exhibits

22  other than to see just generally what they are.  I don't -- I

23  presume that Mr. Peek has had some opportunity to do so, but

24  I'm not going to enter a ruling at this time concerning what

25  is and isn't part of this discussion.

1          This is what Mr. Montgomery has been asked to do by

2     the Court is to provide a review and tell the Court what he's

3     found, which he's done, and that's fine.

4          So to the extent that the Montgomery parties feel

5     that it's extraneous, I think it's going to have to be

6     briefed, and I'm really at a loss to make a decision on that

7     at this time, Ms. Klar.  It may be well taken.

8          MS. KLAR:  Your Honor, given your comments about

9     the docket in this case and how many motions have been filed,

10    I'm just trying to expedite things.

11          THE COURT:  Right.  Why don't you -- well, and

12    you may -- I appreciate that, Ms. Klar.

13          At a recess or break today, perhaps you can speak

14    with Mr. Peek, and it may be that you can reach some

15    understanding because I have an abiding interest in reducing

16    the number of papers filed in this case, and I suspect counsel

17    may have a similar feeling, and the parties, so that we can

18    move the case along.

19          MR. PEEK:  I have a similar one, but I also have

20    an abiding interest in openness and completeness, and I don't

21    think I've had openness and completeness, your Honor.

22          THE COURT:  All right.  Well --

23          MR. PEEK:  That's why we're here.

24          THE COURT:  Right.  We shall see.

25          I would like the two of you to discuss this issue at

Case 3:23-mc-00073-GKK-WAU  Document 731  Filed 07/28/23  Page 56 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/28/23  Page 14 of 205

14

1    a recess, see if you can reach an agreement, and, if you

2    can't, I guess we'll have to take it up.  All right?

3             Mr. Montgomery, sir, do you understand that you

4    continue to be under oath, sir?

5                   THE WITNESS:  Yes.

6                   THE COURT:  All right.  Very good.  You may

7    proceed.

8                   MR. PEEK:  Thank you.

9                   D E N N I S   M O N T G O M E R Y,
         recalled as a witness on behalf of the Plaintiff,
10     having been previously sworn, testified further as follows:

11                   CROSS-EXAMINATION RESUMED

12   BY MR. PEEK:

13    Q   Just to stay on this subject matter for just a moment

14   about the CDs, I'm going to come back to it later in more

15   detail, but one of the things that I found absent in your

16   declaration is an identification of what five CDs you were

17   unable to locate.  What are they?

18    A   There were at least two, if not three.  I don't recall

19   specifically.

20    Q   But you certainly did have the photographs available to

21   you, did you not, sir?

22    A   Yes.

23    Q   And the photographs certainly were reviewable and had

24   names on them, did they not?

25    A   Several of them are very difficult to read.

1    Q    I understand, but on the ones that you couldn't read it,

2    you must have said to yourself I can read this one, or I can't

3    find that one, and there are five of them.

4              You didn't say I can't read these and I don't know

5    what they are, you said I know there are five that I could not

6    locate.  What five are they that you did not tell us about in

7    your declaration?

8                   MS. KLAR:  Objection, your Honor, argumentative.

9                   THE COURT:  Overruled.  Go ahead.

10                  MR. PEEK:  Thank you, your Honor.

11                  THE COURT:  Answer the question.

12                  THE WITNESS:  I don't know specifically.

13   BY MR. PEEK:

14   Q    Well, did you know when you gave this declaration on the

15   20th of June, last Friday, that there were less than five CDs

16   and what the names were?  Did you know that last Friday?

17   A    I believe I was doing it by the count.

18   Q    Well, you say,

19              "Despite my diligent efforts, I have not been

20        able to locate a small number (less than five) of the

21        CDs depicted in the FBI CD photos, and I cannot say

22        with absolute certainty that all CDs reproduced on

23        Exhibits A, B and C matched CDs depicted in the FBI

24        CD photos."

25              So you're just telling me that the five was just

 1  based on the count --

 2   A   No, I --

 3   Q   -- of the number -- sorry -- of the number of CDs in the

 4  photos versus the number of CDs that you have.

 5   A   No, I believe there was one or two pictures that I could

 6  not find the CD for.

 7   Q   And you didn't tell the Court, though, that you could not

 8  read and therefore could not locate, did you?

 9   A   I don't -- I don't have it in front of me.

10   Q   You mean the declaration?

11   A   I don't have the declaration in front of me.

12   Q   Let me just hand you --

13            MR. PEEK:  May I approach, your Honor?

14            THE COURT:  You may.

15  BY MR. PEEK:

16   Q   This is page 2 of docket -- excuse me, page 3 of docket

17  690, your declaration, and I'm looking at your paragraph 7.

18  Do you see that?

19   A   Yes, I see it.

20   Q   And you don't say there that you could not locate the

21  less than five because you could not read on the photographs

22  what they were, do you?

23   A   I believe it says the print or -- writing is fuzzy or

24  illegible.

25   Q   Okay.  And you said, "Despite my efforts, I was unable to

Case 3:23-mc-00073-GKK-MAU Document 731 Filed 07/28/23 Page 59 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/23 Page 59 of 800

-17

1  locate less than five." You don't say I was unable to locate

2  them because I could not read.

3  A    It says writing is fuzzy or illegible.

4  Q    I was reading from the paragraph, "Despite my efforts" --

5  A    So am I.

6  Q    Okay.

7  A    I'm reading the same paragraph.

8  Q    Now, is there a CD in the group that is labeled "Warren's

9  old e-mail"?

10  A    I believe there was a picture of that, yes.

11  Q    So you read that one.

12  A    I believe there was a picture of that.

13  Q    Okay. So you could see it was not fuzzy, it wasn't

14  illegible?

15  A    I don't remember if that was one of the fuzzy ones or

16  not.

17  Q    Okay. But you remember that, correct?

18  A    Correct.

19  Q    Did you produce that one?

20  A    Not that I know of.

21  Q    And why?

22  A    Because I've been unable to locate it.

23  Q    And where did you search?

24  A    Ever, you mean, or --

25  Q    Well --

Case 3:23-mc-00073-GKK-MAU Document 7-4 Filed 07/28/23 Page 60 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 19 of 205

-18

1   A    I thought we went through --

2   Q    First of all, the request for production has been

3   outstanding for over two years.  I'm just wondering where it

4   was that you searched for the CDs.

5   A    My home in Reno.

6   Q    Okay.

7   A    Home in Yarrow Point.

8   Q    Okay.

9   A    Storage in Yarrow Point.

10  Q    Okay.

11  A    Storage in Rancho Mirage.

12  Q    Okay.

13  A    Home in Rancho Mirage.

14  Q    Okay.  Now, when the CDs were returned to you by the FBI,

15  you recall that eTreppid made a motion to have a forensic copy

16  of all of the electronic data.  Do you recall that?

17  A    No.

18  Q    You don't recall that.

19       Do you recall that you opposed that request?

20  A    I don't recall that specifically.

21  Q    And do you recall that the Court ordered, in lieu of a

22  forensic image, that all photographs be taken?

23  A    No.

24  Q    And do you recall that the reason why he wanted

25  photographs to be taken is to assure all the parties that what

Case 3:23-mc-00073-GKK-WAU  Document 731  Filed 07/28/23  Page 61 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/28/08  Page 61 of 205

—19

1  was returned was, in fact, preserved.  Do you remember that?

2   A   No.

3   Q   And do you remember that the Court in its order with

4  respect to the photographing ordered that you, you know,

5  preserve and protect those CDs?

6   A   I know there was something saying that I needed to

7  protect them.  I don't remember that it said that they needed

8  to be photographed.

9   Q   Okay.  And do you recall -- now, you picked them up on or

10  about March 29, correct?

11   A   Yes.

12   Q   And you -- once they were given to you, you were in the

13  presence of your lawyer, Mr. Pulver?  He was present was he

14  not?

15   A   Yes.

16   Q   And Ms. Blixeth was present, was she not?

17   A   Yes.

18   Q   And Mr. Scalia, who is in the courtroom was also present,

19  was he not?

20   A   Yes.

21   Q   Okay.  And then you got on the airplane, on Ms. Blixeth's

22  airplane, private jet, with the --

23          MS. KLAR:  Objection, your Honor.

24          MR. PEEK:  I'm trying to get the chain of

25  custody where these went, your Honor.

Case 3:23-mc-00073-CKK-MAU  Document 7-1  Filed 07/28/23  Page 62 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 62 of 205

—20

1             MS. KLAR:  We've been through this at the last

2     hearing extensively.

3             MR. PEEK:  We did not, your Honor.

4             MS. KLAR:  I read it last night in the

5     transcript.

6             THE COURT:  Well, I'm going to just

7     foundationally allow you to go ahead and go through this.

8         There was testimony at the June 10th hearing

9     concerning Mr. -- and Mr. Montgomery testified, as I recall,

10    about where he kept --

11            MR. PEEK:  And there's one gap in it, your

12    Honor, that I want to --

13            THE COURT:  And I think that Mr. Peek is

14    entitled to just clarify that for the chronology.

15        Go ahead, sir.

16    BY MR. PEEK:

17     Q   You got on the private jet of Ms. Blixeth and --

18            THE WITNESS:  Can I move this monitor?

19            THE COURT:  Oh, you may, sir.  Thank you.  Thank

20    you.

21            THE WITNESS:  Go ahead.

22    BY MR. PEEK:

23     Q   You gathered the property returned to you by the FBI, did

24    you not?

25     A   Yes.

Case 3:23-mc-00073-GKK-WAU Document 731 Filed 07/28/23 Page 63 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 21 of 209

21

1    Q    And then you took it on an airplane, Ms. Blixeth's

2    private jet?

3    A    Yes, but the way the FBI returned the property was very

4    unusual.

5    Q    I understand that, and that may or may not be the subject

6    of another hearing, but the property that was given to you by

7    the FBI was carried by you, or somebody else in this group,

8    Ms. Blixeth or Mr. Scalia or Mr. Pulver, and taken in a car to

9    the private jet, correct?

10   A    Yes, I -- the answer is yes.

11   Q    And where did the private jet land?

12   A    Rancho Mirage.

13   Q    And did it drop you off at Rancho Mirage?

14   A    Yes.

15   Q    And when you were dropped off, did you take the material,

16   the seized property, with you?

17   A    Yes.

18   Q    And then you entered a car?

19              MS. KLAR:  Objection, your Honor, this has all

20   been gone through by Mr. Peek at the last hearing.  He asked

21   the very same questions.

22              THE COURT:  Once again, I'm going to just

23   overrule the objection.  I think that for purposes of

24   Mr. Montgomery's declaration, just for bringing us back to the

25   issue concerning the FBI return, it's helpful to the Court to

```
 1   just briefly go back over this chronology of events.
 2            So go ahead, sir.
 3   BY MR. PEEK:
 4    Q    You rented a car there?
 5    A    I don't recall if I rented a -- yes, actually I did, yes.
 6    Q    Okay.  And you took the seized property that had been
 7   returned to you and put it in that car, did you not?
 8    A    Yes.
 9    Q    And that was on or about March 29th or March 30?
10    A    Same day.
11    Q    Okay.  Did the plane go directly from Reno to Rancho
12   Mirage, or did it make a side trip?
13            MS. KLAR:  Objection, relevance, your Honor.
14            MR. PEEK:  I'm trying to follow a chain of
15   custody, your Honor, to make sure that there is no gap here.
16            THE COURT:  Overruled.
17            MS. KLAR:  Your Honor, there's been testimony
18   that Mr. Montgomery had the CDs and everything else with him
19   in his possession, custody and control while he was on the
20   plane.  Whether the plane stopped someplace else or not has
21   nothing to do with whether or not Mr. Montgomery ceased to
22   have --
23            MR. PEEK:  We're spending more time on
24   argument --
25            MS. KLAR:  -- the documents --
```

```
 1                    THE COURT:  Go ahead.

 2                    MS. KLAR:  -- in his -- whatever he took from

 3   the FBI in his custody or control.

 4          I mean, the fact that it may have stopped someplace,

 5   what does that have to do with anything?

 6                    THE COURT:  Overruled.  Just go ahead.

 7                    THE WITNESS:  The plane didn't stop.

 8   BY MR. PEEK:

 9    Q    Okay.  And how long did that property remain in that

10   rental car?

11    A    I want to say that day and through the night, though I

12   did take some of it out.

13    Q    And where did you put it?

14    A    In the room I was in.

15    Q    So you were, what, in a motel room or something?

16    A    No, I stayed on her property.

17    Q    Oh, I thought -- her property is in Rancho Mirage.

18    A    Yes.

19    Q    Is that where Porcupine Creek is?

20    A    Yes.

21    Q    Okay.  So some of it, then, was taken out of the trunk of

22   the car, you think, and put in a room?

23    A    Right, with me.

24    Q    And so how long did it stay in your room and in that car?

25    A    Until I left.
```

Case 3:23-mc-00073-CKK-MAU Document 734 Filed 07/28/23 Page 26 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/23 Page 24 of 205

-24

1    Q    And when was that?

2    A    I believe the next day.

3    Q    And so whatever you took into the room you put back into

4    the trunk of the automobile?

5    A    That's correct.

6    Q    Where did it go from there?

7    A    To the airport.  I don't believe I went directly to the

8    airport.

9    Q    But wherever you went and had an intermediate stop,

10   everything went with you?

11   A    No.

12   Q    Okay.  So there was an intermediate stop and some of it

13   was left someplace?

14   A    I had a storage facility in Rancho Mirage.

15   Q    Okay.  And what of the property was put in the Rancho

16   Mirage, if any?

17   A    I don't know exactly but some portion.

18   Q    Some portion of it was put in the storage facility and

19   some portion of it remained with you, and then where did the

20   portion that remained with you go?

21   A    Yarrow Point, Washington; Bellevue, Washington.

22   Q    Okay.  And did you make a list of what you left at the

23   storage unit versus what you took with you?

24   A    No.

25   Q    Did you segregate what you put in the storage unit from

1   other things that were in the storage unit?

2    A    Initially, yes.

3    Q    Okay.  And then when you took it to Washington, did you

4   put it in another storage unit in Washington, or did you put

5   it in your home in Washington?

6    A    What I wanted to correct which I didn't say on the

7   last -- can I answer this --

8    Q    That's why we're doing this, we want to make sure we get

9   it accurate.

10   A    I didn't mention Washington, I don't believe, and you're

11   asking that, and if -- okay, and I was here to correct that

12   today.

13   Q    I thought so, too, that your testimony is different today

14   than it was the last -- two weeks ago.

15   A    No, it's not, because you asked me specifically about the

16   disk drives, and I believe what I took was CDs, but either

17   way, I took some portion with me on the plane to Bellevue,

18   Washington.

19   Q    Okay.  And then you put it in your storage unit there or

20   in your home?

21   A    My office -- we had a storage unit and there is some went

22   in my office.

23   Q    Okay.  So now we have the seized property broken up into

24   three segments, am I correct, some in the --

25   A    Yes.

1   Q   -- Yarrow Point, is that -- Yarrow point, am I saying

2   that --

3   A   My home was in Yarrow Point, my office is in Bellevue.

4   Q   Some in Yarrow Point, you don't know what exactly, maybe

5   CDs, maybe the disks, some in your office in Bellevue, and

6   some in the storage facility in Bellevue; is that correct?

7   A   Yes.

8   Q   And was there -- is that the extent of the -- sort of the

9   segregation of the -- broken down into three parts?

10  A   From the original pieces --

11  Q   Yes.

12  A   -- that I returned.

13  Q   Yes.

14  A   Yes.  I think so, yes.

15  Q   You think so.

16          Did you, in your office in Bellevue, segregate

17  whatever it was that you took with you from other items that

18  you had?

19  A   Yes.

20  Q   Okay.  And then what you put in the storage unit in

21  Bellevue, did you segregate it from other items that you may

22  have had in that storage unit?

23  A   Yes.

24  Q   And how did you segregate it in your office?

25  A   I just put it in a separate box.

1    Q    Okay.  And how did you segregate it in your storage

2  facility?

3    A    Same way.

4    Q    Okay.  So you put it in a separate box.  Was the box

5  labeled?

6    A    Yes.

7    Q    Okay.  So each of the boxes in the Bellevue storage unit

8  and your office were labeled, correct?

9    A    Right.

10   Q    And what did the labels say?

11   A    FBI-raided material.

12   Q    Okay.  And then did you put the -- the seized property

13 that you put in the Yarrow Point storage facility in a similar

14 box?

15   A    I'll correct this.  The Yarrow Point is my home.

16   Q    I'm sorry, you had said storage facility at Yarrow Point.

17   A    I'm sorry, I'm correcting it.

18   Q    So, again, we are changing the testimony --

19   A    No, we're not changing the testimony.

20   Q    But you put it in your home.

21   A    Right.  I mean -- no, there was a storage facility in

22 Bellevue, Washington, we had an office in Bellevue,

23 Washington, and I had a home in Yarrow Point.

24   Q    So you put the property in your home in Yarrow Point,

25 correct?

Case 3:23-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 70 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 28 of 205

28

1    A    Yes.

2    Q    Okay.  And you segregated it from whatever else you had.

3    A    Yes.

4    Q    And how did you segregate it?

5    A    I marked it.

6    Q    And in what manner did you mark it?

7    A    Same way I told you before, FBI-raided material.

8    Q    And was it in a box --

9    A    Yes.

10   Q    -- or more than one box?

11   A    A box.

12   Q    Okay.  So now we have three boxes of materials in three

13   separate locations each labeled FBI-raided material; is that

14   correct?

15   A    No.

16   Q    Okay.  What else did you do?

17   A    Because it took more than three boxes to hold it.

18   Q    Okay.  How many different boxes, then, were there and

19   where were they in each location?

20   A    The physical devices, the computers, the nonelectronic

21   media I left in the storage place.  That would be the

22   computer, the driver, the Granite Digital device holder.

23         The only thing that was moved was the actual CDs and

24   the DVDs from time to time.  So what I'm saying --

25   Q    I'm just trying to start with -- I'm getting a starting

1    point, and I want to just stick with the starting point, then
2    I'll move forward.
3           I know you want to do it quicker than I do, but the
4    starting point is you put it into three places, and it was --
5    some was in boxes.  Now, are you telling us some was not --
6    some of the material was not in boxes?
7    A    They were never at all three places at the exact same
8    time.  So I may have taken two boxes, I may have put one in my
9    home, one in my office.
10   Q    Well, we're trying to understand what you did.
11          You stopped off at Yarrow Point and put some of the
12   seized material in your home in the Yarrow Point; is that
13   correct?
14   A    That, I believe, is correct.
15   Q    And you don't know what material you put in your home in
16   Yarrow Point; is that correct?
17   A    That's correct.
18   Q    But you know that you put it in a box or more than one
19   box, sir?
20   A    I believe initially it was in one -- I don't know if it
21   was one or two boxes.
22   Q    Okay.  So maybe one or two boxes in the home in Yarrow
23   Point each with a label, I assume handwritten --
24   A    Yes.
25   Q    -- of FBI-raided material, correct?

1          Am I saying that -- is that correct or --

2    A    I believe -- I believe so, that's correct.

3    Q    Okay.  So then the remaining items you then took on the

4    airplane with you to Bellevue, Washington, and separated it

5    again.

6    A    No.

7    Q    Okay.  No.  Sorry.  We'll start over again.

8    A    I didn't take the box physically on the plane, I just put

9    the material into my luggage, took it onto the plane.  When I

10   got to where I was at, I look a legal box, wrote on it

11   FBI-raided material and put it in it.

12   Q    Okay.  So let's go back then.

13          So what you had left over of the FBI material that

14   you did not leave at Yarrow Point fit into a suitcase?

15   A    No.

16   Q    Is that correct?

17   A    No, no, that's not what you asked me.

18          MS. KLAR:  Objection, your Honor, I think that

19   Mr. Peek is confusing Yarrow Point with Rancho Mirage.  The

20   witness has testified he left material -- left something in a

21   storage unit in Rancho Mirage.

22          MR. PEEK:  He did not say that.

23          THE WITNESS:  Yes, I did.

24          THE COURT:  I think he did.  I think my

25   understanding --

1          MR. PEEK:  Then I apologize, your Honor.

2          THE COURT:  All right.  So my understanding is

3   that when -- and so then perhaps you can just clarify, is that

4   when you went to Rancho Mirage, you left some material in

5   Rancho Mirage.

6          You flew from Rancho Mirage to Washington.  You have

7   a residence at Yarrow Point, an office in Bellevue.

8          Some of the material that you took -- you took

9   material with you from Rancho Mirage to Washington.  Some of

10  it is in a box or boxes at your home in Yarrow Point labeled

11  FBI-raided material, another box or boxes are at your storage

12  unit.

13          MR. PEEK:  No, there are two -- there are

14  actually now four places, your Honor.  If I can go back to

15  this, I would appreciate it.

16          THE COURT:  All right.  So, anyway --

17          MR. PEEK:  I understand the objection, and I'll

18  try to clarify.

19          MS. KLAR:  Your Honor --

20  BY MR. PEEK:

21   Q   So what you left Rancho Mirage --

22          THE COURT:  Wait.

23          MS. KLAR:  Your Honor, if I could also make an

24  objection.

25          The focus of the hearing is on what you have ordered

Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/23 Page 74 of 265

32

1   Mr. Montgomery to produce.  He has been ordered to produce

2   hard drives.  There's no dispute.  The hard drives have been

3   produced.  They had serial numbers and they've been produced.

4          He's been directed to produce CDs.  We have provided

5   a declaration, and the only thing that's at issue here is five

6   CDs, or less than five CDs.

7          We have now spent 15 minutes talking about where all

8   of this material was transferred to.  Most of it is in no way

9   relevant to your order.

10          And my request would be can we keep this focused on

11   the things that are in dispute which are the less than five

12   CDs which are the subject of Mr. Montgomery's recent

13   declaration.

14          MR. PEEK:  Respectfully, your Honor, Ms. Klar

15   wants to try her case in the way she frames the issues.  I

16   want to try it the way I see the issues framed, and what I see

17   is that Mr. Montgomery has testified that he had the material,

18   he commingled it, and he can't find everything.

19          And now he says I can't even locate five CDs.  Not

20   only has he not located the five CDs, but we don't even have

21   electronic copies of the CDs, the photocopies of which we now

22   have, and of the photocopies that we have, and of the

23   electronic versions that we have, we have electronic copies of

24   CDs that were not seized, and I don't know why we have that

25   other than Mr. Montgomery, I'm sure, will say, well, I didn't

1    know what the FBI returned and so I just gave you copies of

2    things.

3              He has only given us the date.  Five of the 100 and

4    some odd -- 160 some odd CDs that were seized by the FBI, we

5    only have five -- approximately five electronic copies of

6    those.  So I've been trying to understand where this material

7    was, what he did with it.

8              We also have issues, your Honor, with the electronic

9    production on the two hard drives, and, you know, I don't know

10   whether any of that was or was not seized by the FBI, or

11   whether or not it was maintained and how its integrity was

12   maintained.  I don't know whether there was spoliation of even

13   the 30 hard drives that he has now delivered to us, copied and

14   delivered to us.

15             So there's a lot of material here, your Honor, that

16   I want to be able to go over with Mr. Montgomery in this

17   hearing to show the bad faith in which Mr. Montgomery has

18   conducted himself over the course of the last four months from

19   February 21st until today, February [sic] 24th.

20             MR. SCHWARTZ:  Your Honor, this is Greg Schwartz

21   in Seattle representing Atiego.  May I make an objection at

22   this point as well?

23             THE COURT:  Go ahead.

24             MR. SCHWARTZ:  I don't want to weigh into this

25   because Atiego has no position as to the substantive issue

Case 3:06-cv-00056-PMP-VPC    Document 731    Filed 07/28/08    Page 76 of 205

34

 1    being addressed at the moment, but I do want to add an

 2    objection to Ms. Klar's.

 3              It appears to me that Mr. Peek is going beyond the

 4    scope of the hearing and essentially treating this as a first

 5    chance at a deposition.

 6              There will be an opportunity to depose

 7    Mr. Montgomery at some point.  In the interest of my client, I

 8    would ask that the Court limit the scope of this hearing to

 9    the issues the Court needs to make its decision on the order

10    to show cause which I think are quite a bit more limited than

11    the scope of Mr. Peek's questioning.

12              THE COURT:  Well, thank you, sir.

13              Well, this is -- the Court is looking at its order

14    to show cause, docket 646, dated May 29, 2008.  It indicates

15    that, in summary, among the items the Montgomery parties were

16    ordered to produce were photocopies of the faces of all CDs

17    seized during the FBI's March 2006 search of the Montgomery

18    residence and storage unit and a copy of any CDs seized by the

19    FBI and marked as eTreppid CDs.

20              This line of questioning to me is relevant to the

21    document production that was ordered by the Court to

22    understand, to the extent, as part of this Court's discovery

23    order, why or why not these items that were ordered produced

24    cannot be produced is highly relevant to what the Court

25    perceives this hearing to be about.

```
 1              And, for example, it may be that -- I would like to
 2    hear what Mr. Montgomery has to say about his efforts to
 3    maintain the items that were seized, problems that arose.
 4    That's helpful to the Court.
 5              So I'm overruling the objections.  I do recognize
 6    and understand that this is not a deposition, and to the
 7    extent I wish this proceeding to be narrow in its scope, and I
 8    am mindful of that.
 9              So with those comments -- and I'm mindful -- I'm not
10    interested in this being a deposition.
11              MR. PEEK:  I'm not either, your Honor.
12              THE COURT:  So -- well, so, proceed with these
13    questions.  I would like to know where these items are, what
14    happened to them.  I think it's relevant.  Please proceed.
15              MR. PEEK:  Thank you.
16    BY MR. PEEK:
17     Q   I apologize, Mr. Montgomery, for my misunderstanding of
18    the fact that -- some of the items were left at -- actually,
19    they were left at what's called Porcupine Creek, weren't they?
20     A   No.
21     Q   They were left at Rancho Mirage in a storage unit?
22     A   Yes.
23     Q   Okay.  Let me go back then.
24              So what we had is the first stop you made after
25    leaving Porcupine Creek was the storage facility in Rancho
```

Case 3:23-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 78 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 36 of 269

36

1    Mirage.

2    A    Yes.

3    Q    And some items were put in that storage facility in

4    Rancho Mirage.

5    A    Yes, outside of Porcupine Creek.

6    Q    Outside of Porcupine Creek, in a public storage facility

7    where you pay fees for storage.

8    A    Yes.

9    Q    What was the name of that?

10    A    I don't remember the original name.

11    Q    What was the address of it?

12    A    It was on Diana [sic] Shore.

13    Q    Okay.  Now, so the first stop you made was Rancho Mirage,

14    and items were put there.  Were they put in a box?

15    A    You mean, the storage unit?

16    Q    In the storage unit in Rancho Mirage.

17    A    The electronic media was, but the other stuff, the

18    documents they took from me and so forth, those were put in a

19    separate box, and then the computer and so forth were just set

20    by themselves.

21    Q    Were those the three things, then, the electronic media,

22    the paper documents and the computers, that were left at the

23    Rancho Mirage facility?

24    A    As a result of what was given to me on the 29th, is that

25    what you're asking me?

Case 3:23-mc-00073-CKK-MAU  Document 731  Filed 07/28/23  Page 79 of 800
Case 3:06-cv-00056-FMF-VPC  Document 731  Filed 07/28/23  Page 39 of 265

-37

1   Q    From the material given to you, all of the FBI-seized

2   property returned to you on March 29th that you took on the

3   airplane and put in the rental car and then went to Porcupine

4   Creek, Ms. Blixeth's home, is that correct, or Ms. Blixeth's

5   estate?

6   A    Yes.

7   Q    Okay.  So that's the material I'm talking about.

8   A    Yes.

9   Q    Okay.  So we have in the Rancho Mirage storage facility,

10  a public storage facility, three categories of seized

11  property, electronic media, paper documents and computers; is

12  that correct?

13  A    Yes, yes.

14  Q    And the electronic media was put in a box?

15  A    Yes.

16  Q    Was the box labeled?

17  A    You just asked me that.

18  Q    Was the box labeled FBI-raided material?

19  A    Yes.

20  Q    Okay.  So it was therefore segregated in some manner from

21  other items in the storage facility; is that correct?

22  A    Yes.

23  Q    And then you then make another stop at your home in

24  Yarrow Point; is that correct?

25  A    I leave from --

1    Q    You went from the Rancho Mirage storage facility to your

2    home in Yarrow Point; is that correct?

3    A    Yes.

4    Q    And you left also items of the FBI-seized property in

5    your home in Yarrow Point; is that correct?

6    A    Yes.

7    Q    And what items did you leave there?

8    A    Well, the stuff that was taken.

9    Q    What were they?  There was a lot of things taken that are

10   the subjective of the photographs and the search.

11   A    I believe disk drives and the CDs.

12   Q    Okay.  All CDs or just some CDs?

13   A    Some.

14   Q    Okay.  So some CDs.  All disk drives or some disk drives?

15   A    Some.

16   Q    Okay.  So some disk drives, some CDs.

17           Now, the electronic media that was left at the

18   Rancho Mirage facility, what electronic media was that?

19   A    Well, you just asked.  It's the same material --

20   Q    Which ones --

21   A    The portion that was not taken with me.

22   Q    Okay.  So some CDs and some hard drives were left in the

23   Rancho Mirage storage facility, correct?

24   A    Correct.

25   Q    Some CDs and some disk drives were left in the Yarrow

1   Point home, correct?

2   A    Yes.

3   Q    And put in one or two boxes in the Yarrow Point home.

4   A    I think two.

5   Q    Okay.  And also labeled FBI-raided material, correct?

6   A    I believe so, yes.

7   Q    And then what was left was put into your suitcase; is

8   that correct?

9   A    No.

10   Q    Okay.

11   A    Well, I mean, whatever I left here I took with me on the

12   airplane in a suitcase.

13   Q    That's what I said.  Whatever was left that you had not

14   left at Rancho Mirage or not left at Yarrow Point you put in a

15   suitcase.

16   A    No, that's not true because --

17   Q    It was already in the suitcase?

18   A    I had to get from Rancho Mirage to Yarrow Point.

19   Q    So --

20   A    That was put in a suitcase, taken on a airplane with me.

21   When I arrived in Yarrow Point, I took it out of the suitcase,

22   put into it a box --

23   Q    Okay.  I apologize.  So you went from Rancho Mirage to

24   Yarrow Point in the airplane.

25   A    Commercial flight, that's correct.

1    Q    Commercial flight.

2            And what you took was the items that had not been

3    left at Rancho Mirage, and you put them in a suitcase; is that

4    correct?

5    A    Say that --

6    Q    The items that --

7            THE COURT:  Let me just interject.  Let me just

8    ask a clarifying question.

9            You got on a plane, and you put any of the items

10   that were seized by the FBI that you didn't store in Rancho

11   Mirage, you put them in a suitcase.  You flew from Rancho

12   Mirage to Washington state, so you have one suitcase, correct?

13           THE WITNESS:  Yes.

14   BY MR. PEEK:

15   Q    Okay, just one suitcase.

16   A    Yes, I believe so, that's correct.

17   Q    Okay.  And then you went from -- after it landed you went

18   to Yarrow Point first?

19   A    I don't recall specifically if I did.

20   Q    But whatever stop you made, one of the stops was Yarrow

21   Point, and you put some of the material in your suitcase into

22   one or two boxes.

23   A    That's correct.

24   Q    And they were labeled FBI-raided material.

25   A    I believe so, that's correct.

1    Q   And then, as I understood you to say, there was still

2   some FBI-raided material or seized material that had been

3   returned to you still left, and you took it to your office in

4   Bellevue, correct?

5    A   Left where?

6    Q   Left over from what you hadn't deposited in Rancho Mirage

7   or your home.

8    A   No.

9    Q   So was there anything left over after you --

10   A   No, I believe I originally just put it in my home.

11   Q   Okay.  So now we have two locations where the FBI-seized

12  material was kept within days after it was returned to you.

13   A   Yes.

14   Q   Rancho Mirage and Yarrow Point.

15   A   The storage facility in Rancho Mirage, correct.

16   Q   Okay.  And at sometime, as you told us, that it was in

17  your office and in a separate facility in Bellevue,

18  Washington, when did that occur?

19   A   I don't know specifically when but sometime during a

20  three- or four-month period.

21   Q   And was it just the material from your home in Yarrow

22  Point that you took to Bellevue and then separated into two

23  parts, or was it some of the Rancho Mirage?

24   A   Both.

25   Q   Okay.  So you put some of the FBI-seized material

Case 3:23-mc-00073-CKK-MAU   Document 7-4   Filed 07/28/23   Page 84 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 42 of 269

42

```
 1   together, some from Rancho Mirage, some from Yarrow Point, and

 2   did you take that to your office in Bellevue?

 3   A    At some point, yes.

 4   Q    At some point.

 5   A    Yes.

 6   Q    Within, what, the next two or three months?

 7   A    I would say over that period, yes.

 8   Q    And then you -- was it still in the FBI -- or in the

 9   boxes labeled FBI-raided material?

10   A    I believe so, yes.

11   Q    And then you segregated whatever you took from Yarrow

12   Point and Rancho Mirage in two, again, more segregations?

13   A    No, because the boxes weren't full.  I mean --

14   Q    Well, you told us earlier that you had taken some of the

15   material that you had collected and put in your Bellevue

16   office, that was separated into two, some put in a storage

17   facility in Bellevue and some kept at our office.

18   A    Right.  From that suitcase, put into two newer boxes in

19   Yarrow Point.  Now there are four boxes.

20   Q    I'm understanding that so far.  Then how many of those

21   four boxes ended up in Bellevue?

22   A    All of them.

23   Q    All four of them ended up in Bellevue, okay.

24   A    All of it ended up in Bellevue, all of the electronic

25   media ended up in Bellevue.
```

-43-

```
 1   Q    What remained at Rancho Mirage, then, just the papers?

 2   A    The papers and the nonelectronic physical media, the

 3   actual -- there was a computer and there was, I think, two

 4   storage units, you know, two Granite Digital drive containers.

 5   Q    And no media inside the Granite Digital drive containers?

 6   A    No.

 7   Q    Okay.  And the Granite Digital drives were eTreppid

 8   property, were they not?

 9   A    I don't recall specifically if they were or not.

10   Q    So all the electronic media, then, ended up in Bellevue,

11   Washington, of the four boxes?

12   A    I can't say that only four boxes ended up being in Yarrow

13   Point.  It might have been six, it might have --

14   Q    Okay.

15   A    Do you want me to answer the question?

16   Q    I'm waiting for you to answer, sir.

17   A    Well, I'm telling you, at some point I made additional

18   boxes because the boxes were very heavy.  So, you know, I made

19   two -- I think I made two boxes.  I think all together there

20   were six boxes.

21   Q    So you made two additional boxes that contained what, the

22   Rancho Mirage material or the Yarrow Point material?

23   A    At some point both.

24   Q    Okay.  And now you have six boxes.

25   A    Yes.
```

```
 1    Q    And are they all labeled?

 2    A    You mean now or then?

 3    Q    Then.  When you put them into the six boxes -- we know

 4    that there were four boxes you told us.

 5    A    I believe so.

 6    Q    Okay.  Am I correct when I say there were four boxes, two

 7    in Rancho Mirage and two in Yarrow Point?

 8    A    Yes.

 9    Q    Okay.  And of those four boxes, now, they got put into

10    six boxes; is that correct?

11    A    Yes.

12    Q    How was the material shipped from Rancho Mirage to Yarrow

13    Point?

14    A    I carried it on an airplane.

15    Q    In boxes or in a suitcase?

16    A    No, in a suitcase.

17    Q    Okay.  And that was sometime two or three months after

18    the property was returned to you?

19    A    I don't -- over what period of time?  I don't know

20    specifically.  It would be more like probably closer to, like,

21    six months.

22    Q    Was it in more than one trip then?

23    A    Yes.

24    Q    Okay.  So from time to time you would go to the Rancho

25    Mirage facility, pick up certain items out of the FBI-raided
```

 1  material boxes, put it in a suitcase and take to it your home

 2  in Yarrow Point, correct?

 3  A   Yes.

 4  Q   And you did that, you don't know how many occasions, but

 5  you did it on a number of occasions?

 6  A   I think it was two or three times actually.

 7  Q   So the boxes that had been labeled FBI-raided material in

 8  Rancho Mirage ultimately were empty; is that correct?

 9  A   I believe so.

10  Q   And then all of the material that you from time to time

11  carried to Yarrow Point got put into six different boxes,

12  correct?

13  A   I believe so.

14  Q   And each of those boxes was labeled FBI-raided material?

15  A   I don't remember if all of them were or not.  I remember

16  four of them were.

17  Q   Now, before you began to transport from the six boxes to

18  Bellevue, your office in Bellevue, had you taken any of the

19  material out of Yarrow Point or Rancho Mirage to your office

20  in Bellevue?

21  A   Yes.

22  Q   Okay.  So was it from the six -- one or more of the six

23  boxes?

24  A   Yes.

25  Q   Had the six boxes even been created before you took it to

1   your office in Bellevue?

2    A   I tried to keep them in those legal -- I tried to keep

3   them in those legal boxes.

4    Q   You tried to.

5    A   Yes.

6    Q   And is there a reason why you weren't able to do that?

7    A   I don't understand what your question is.

8    Q   Is there a reason why you weren't able to keep it in the

9   legal boxes?

10   A   Yes.

11   Q   What was that reason?

12   A   I moved from Yarrow Point to Rancho Mirage.

13   Q   Okay.  And did you then have to take the media or that

14  FBI-seized material out of the box in order to move from

15  Yarrow Point to Rancho Mirage?

16   A   The packers wanted to put it in their own box.

17   Q   Okay.  And who were the packers?

18   A   You mean the name of the company?

19   Q   Yes.

20   A   It was a national company.  I don't remember what the

21  name was.

22   Q   You would have a record of that someplace, though,

23  wouldn't you?

24   A   Yes.

25   Q   And when did you move from Yarrow Point to Rancho Mirage?

1    A    I believe it was August or September of '07.

2    Q    And did you understand that you were ordered to maintain

3    and protect the seized material?

4    A    I -- I don't remember that specifically, but --

5    Q    You don't remember Judge Pro's order along those lines?

6    A    I tried to the best I could.

7    Q    Okay.  When the movers put the seized material into their

8    own boxes as you say they did, did you label the outside of

9    their boxes to say FBI-raided material or seized material?

10   A    I wasn't there for the move.  I don't recall at the

11   initial part of the packing I was there for.

12   Q    Okay.  So you didn't pack up the boxes yourself, you

13   asked the movers to do that, and you weren't present; is that

14   correct?

15   A    I was present, I just don't remember if I was present all

16   the time.

17   Q    Okay.  Did you see the electronic media that was --

18   whatever boxes there were that were left at Yarrow Point, put

19   into the mover's boxes?

20   A    Well, everything that ended up in Yarrow Point was in

21   mover's boxes.

22   Q    Now, how much of the electronic media, or the FBI-raided

23   material, was in the Bellevue office versus what was left at

24   Yarrow Point that got moved to Rancho Mirage?

25   A    I moved everything when I moved.

                                                                    —48

1    Q    Okay.  So at some time you had the FBI-raided material

2    that you labeled in your office in Bellevue, correct?

3    A    Yes.

4    Q    Some of it but maybe not all, or was it all?

5    A    No, I don't think I ever had all of it at any given time,

6    no.

7    Q    You had also mentioned at sometime, and perhaps I

8    misheard, that some of the FBI-seized material was put in a

9    storage unit in Bellevue.  Did I mishear you?

10   A    No, that's correct.

11   Q    That is correct.

12            And why was it put in -- when was it put into a

13   storage facility?

14   A    Sometime during that stay between the time it was

15   returned to me and the time that I left.  I don't remember.

16   Q    So when you left Yarrow Point, is that what you mean?

17   A    Yes.

18   Q    So did it go from Yarrow Point to the storage facility,

19   or from the office to the storage facility?

20   A    It would have went from the office, I believe, to the

21   storage facility.

22   Q    Did it still have its label on it?

23   A    I believe -- I believe so.

24   Q    And then -- so then that's -- so the material you had in

25   your office in Bellevue and the material in the storage

1   facility that each had labels on it then went back to your

2   home in Yarrow Point at sometime?

3    A   I don't know if all the boxes had labels.  I testified

4   that I believe four of them did.  You asked me did all six of

5   them, and I said I wasn't certain.

6    Q   So when you put it into the six boxes, are you telling

7   the Court that you didn't label the other two boxes?

8    A   I don't remember if they were labeled or not.

9    Q   So what effort, if any, did you take to segregate the

10  material and maintain its integrity?

11   A   During what period of time?

12   Q   The period of time when you took the four boxes and made

13  six boxes.

14   A   I don't know specifically what you're asking me.

15   Q   Whatever did you make to segregate and keep and protect

16  the integrity of, by labeling or something, the other two

17  boxes?

18           MS. KLAR:  Objection, your Honor, that assumes

19  that Mr. Montgomery had some obligation to segregate these

20  materials.  I haven't seen an order that required that he do

21  that.

22           MR. PEEK:  Your Honor, there's a Judge Pro

23  order, and I -- if he --

24           MS. KLAR:  My --

25           MR. PEEK:  Go ahead, Ms. Klar, sorry.

Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/03   Page 92 of 205

—50—

 1                    MS. KLAR:  My understanding is, is that there is

 2     some order which I've never seen because, as you know, I

 3     wasn't involved in that proceeding.

 4                    According to at least counsel for eTreppid,

 5     Mr. Montgomery was required to maintain those materials.  But

 6     I'm not aware of any order that says he couldn't integrate

 7     them with the other materials that he had.

 8                    MR. PEEK:  Your Honor, there's a -- Judge Pro,

 9     when the motion for forensic images was made, issued an order,

10     and that order -- I believe it's March 27, 28, and I'll try to

11     locate it at a break --

12                    THE COURT:  Was that in the search warrant

13     proceeding?

14                    MR. PEEK:  No, no, it was in this proceeding,

15     your Honor.  You may recall that the FBI on motion by --

16     excuse me.

17                    I'm trying to think exactly procedurally, your

18     Honor, what happened on the 41(g), but ultimately Judge Pro

19     ordered the property -- or you ordered the property returned,

20     and Judge Pro affirmed your order, then we made a motion in

21     this proceeding, this consolidated proceeding, to have it -- a

22     forensic image made of it.  Judge Pro denied that request but

23     ordered that it be photographed and that it be preserved and

24     protected.

25                    And I believe that order is March -- it was before

1    the property was turned over on the 29th.

2           THE COURT:  Just for counsel appearing

3    telephonically, I'm looking at the docket sheet.

4           Well, I can't -- I can't recall.

5           In looking at the docket sheet just quickly, I don't

6    want to delay the proceedings, but I know that Judge Pro

7    issued an order concerning the FBI-seized materials that were

8    returned, but I am not clear on what the language -- what

9    number the language is and what it said.

10          MS. KLAR:  According to Mr. Peek, it said the

11   materials need to be preserved and protected.  That's not what

12   his question is asking.

13          His question is asking what did you do to segregate

14   it, and I don't think it's a fair question because I don't

15   think there's any evidence that that was an obligation.

16          MR. PEEK:  Well, the obligation to preserve,

17   your Honor, would be some method of segregating it so you can

18   preserve its integrity as opposed to commingling it with other

19   items.  That's what he said he did.  That's a clear violation

20   of Judge Pro's order and clear violation of the duty to -- you

21   know, the duty to preserve any evidence, otherwise it

22   constitutes spoliation.

23          I mean, there's no question about that this was a

24   subject matter of many disputes, so the fact that even if

25   there wasn't an order, there is an obligation on the part of a

Case 3:23-mc-00073-GKK-WAU Document 734 Filed 07/28/23 Page 94 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 94 of 205

-52-

 1   party to preserve evidence.  This is evidence.

 2               THE COURT:  Well, to the extent you're relying

 3   on Judge Pro's order for this line of questioning, I think you

 4   and Ms. Klar can argue about what the subtext of preserve

 5   means.  I need to see -- to review the order to really --

 6               MR. PEEK:  I'll ask the question a different

 7   way, your Honor.

 8               THE COURT:  All right.  Thank you.

 9               MR. PEEK:  Thank you.  I'd just like to move on.

10   I don't want to spend --

11               MS. KLAR:  Your Honor, I would just state for

12   the record I'm not aware of any case law that interprets the

13   word preserved in the manner implied by Mr. Peek.

14        It is evident that action was taken to preserve the

15   evidence.  I don't think that there's any case law that says

16   you can't commingle.

17               THE COURT:  All right.  Ms. Wells.

18               MS. WELLS:  Your Honor, I believe the order in

19   question may be 141 in the docket.

20               THE COURT:  Oh, thank you.

21               MR. PEEK:  Thank you.  That's why I need my

22   laptop.  May I -- thank you.

23                    (Discussion held off the record.)

24               THE COURT:  Oh, you're speaking of -- well, this

25   is proposed order 141.  Docket 141 is a proposed order.

1    MR. PEEK:  Yeah, but I -- no, the Court did not

2    adopt this order, your Honor, because this is one where we

3    proposed to have it actually forensically copied.

4    THE COURT:  Well, let's go ahead and move on.

5    MR. PEEK:  We'll get it at the break so we can

6    move on, and I'll ask the question in a different manner.

7    THE COURT:  Thank you.  Go ahead, please.

8    BY MR. PEEK:

9    Q   Did you, when you created these six boxes, label the six

10   boxes in any way other than -- label the mixed -- label the

11   other two boxes in any way?

12   A   I don't remember if they were labeled.

13   Q   Okay.  Did you put other electronic media inside any of

14   the six boxes?

15   A   It's possible, yes.

16   Q   Okay.  I'm not asking about possibilities.  Do you know

17   whether you did or did not?  A simple yes or no.

18   A   I believe I did.

19   Q   Okay.  And what other electronic media did you put in

20   there?

21   A   I don't recall specifically.

22   Q   Okay.  And when you moved from Yarrow Point to Rancho

23   Mirage, did you put other electronic media, or do you know

24   whether the movers put other electronic media besides the

25   seized property into their boxes?

 1   A   I believe they did.

 2   Q   Okay.  Did you observe them to do that?

 3   A   I didn't observe them, but I observed the output.

 4   Q   So when you got -- when you say the output, you mean when

 5   you unloaded the boxes --

 6   A   Yes.

 7   Q   -- unpacked the boxes?

 8   A   Yes, yes.

 9   Q   Now, was there a time when the electronic media was

10   stored in a closet in Porcupine -- in Ms. Blixeth's estate at

11   Porcupine Creek?

12             MS. KLAR:  Objection, your Honor, this goes to

13   the issue of the Flynn declaration.  Mr. Flynn, we believe in

14   violation of the attorney-client privilege and applicable

15   Nevada Rules of Professional Responsibility, has disclosed

16   information which we have asked be stricken from the record,

17   and we have expressly asked that no questions be asked based

18   on that declaration, and that's the only source that Mr. Peek

19   has.

20             MR. PEEK:  I believe it's also contained in the

21   filing for motion for sanctions and the 3.3 motion, your

22   Honor, in the time line.  I may be mistaken.

23             MS. KLAR:  Your Honor, and we have requested --

24             MR. PEEK:  But that's not -- sorry.

25             MS. KLAR:  And, your Honor, we have requested

Case 3:23-mc-00073-GKK-WAU Document 731 Filed 07/28/23 Page 97 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 93 of 265

-55-

1    that information also be stricken because it clearly discloses

2    attorney-client information.

3          Those motions have not been ruled upon, and we think

4    it is unfair for Mr. Peek to use information that we believe

5    has been improperly disclosed for purposes of this hearing

6    today.

7          MR. PEEK:  Your Honor, this is information -- I

8    mean, either it was or was not stored in a closet.  It's a

9    very simple question.

10         You know, if he wants to say it was not, then it was

11   not.  That may put at issue in the 3.3 hearing whether or not

12   there has been a crime of fraud committed upon this Court and

13   whether or not Mr. Montgomery has testified falsely under

14   oath.

15         I think I'm entitled to know that because this goes

16   to where the property was and how its integrity was maintained

17   and what involvement Ms. Blixeth had with it as well.

18         MS. KLAR:  Your Honor --

19         THE COURT:  Well, let me just say I think, I may

20   be mistaken, but I thought at the June 10th hearing

21   Mr. Montgomery was asked this question and he answered it.

22         MS. KLAR:  No, he was not.

23         MR. PEEK:  He did not, he was not asked.

24         MS. KLAR:  No.

25         THE COURT:  He was not?  All right.

1          MS. KLAR:  I think, your Honor, you asked him

2    questions about where the property moved from place to place.

3          But I think that we are not here, as far as I know,

4    to determine whether or not Mr. Montgomery did or didn't

5    violate Judge Pro's order.  That is not a subject that is the

6    subject of your OSC, and, quite frankly, your Honor, we're not

7    here prepared to address that issue.

8          So to the extent these questions are designed to

9    elicit testimony about that, I think that they are unfair and

10   violate Mr. Montgomery's due process right because we were not

11   on notice that this is a subject of this hearing.

12         Likewise, your Honor, to the extent Mr. Peek wants

13   to use this hearing as a forum to obtain information to

14   support an assertion about the crime fraud exception, that

15   also is not a subject of the hearing today.  We are not

16   prepared to address that issue.

17         We are here on a very narrow issue, narrow issues,

18   and that is whether or not these documents and electronic data

19   have been produced.

20         And to the extent that we go down the slippery slope

21   of allowing Mr. Peek to ask questions based on Mr. Flynn's

22   improper disclosures of the attorney-client privilege

23   addresses precisely the issue raised by the oral motion and

24   request for a stay.

25         MR. PEEK:  Isn't this a search for the truth,

Case 3:23-mc-00073-CKK-MAU  Document 734  Filed 07/28/23  Page 99 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/28/03  Page 57 of 265

-57-

1    your Honor?  It seems to me it's a search for the truth.

2            It's just -- a fair question, was any of the seized

3    property ever placed in a closet in Ms. Blixeth's estate.

4            THE COURT:  Well, I --

5            MR. PEEK:  I mean, it may have then been

6    spoliated there.

7            THE COURT:  Well, what I will allow you to ask,

8    Mr. Peek, is whether -- which I think is a fair question, I'm

9    mindful of the Montgomery parties' concerns, I think you can

10   ask whether Mr. Montgomery stored this -- the seized property

11   and returned property at any other locations, and, if so, at

12   what locations.

13   BY MR. PEEK:

14   Q    Was the seized property ever stored at any other location

15   other than what you've described here today?

16   A    Yes.

17   Q    Where was that?

18   A    Either Michael Flynn's son's home, or a storage facility

19   that Michael Flynn's son had in Portland, Oregon.

20   Q    Okay.  Anyplace else?

21   A    I'm not certain I can answer that without divulging

22   attorney-client privilege.

23   Q    It's just a question, where was it stored, it has nothing

24   to do with attorney-client privilege.

25            MS. KLAR:  Your Honor, may I -- we've been going

Case 1:23-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 100 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 58 of 205

-58-

1    for about an hour and half --

2                    MR. PEEK:  Your Honor, I would like to have this

3    question answered before we break.

4                    THE COURT:  He can answer this question.  I'm

5    not sure -- I mean --

6                    MS. KLAR:  If Mr. Montgomery has a concern about

7    the attorney-client privilege, I think that at a minimum he

8    should be allowed to consult with his counsel.

9            I'm not aware of what the particular issue is, but I

10   think that Mr. Montgomery has not abused that privilege in the

11   course of these proceedings and has only interposed the

12   privilege when it's been appropriate, and if he has a question

13   about it or needs to be clarified, I'm the only person he can

14   speak with about it, or Mr. Gunderson.

15                   MR. PEEK:  Your Honor, the question is, is there

16   any other place where the FBI-seized property was stored.

17                   THE COURT:  How does that implicate the

18   attorney-client privilege?

19                   MS. KLAR:  Your Honor, I don't know until I

20   speak with my client.

21                   THE WITNESS:  My only concern is I don't want to

22   say something and then somebody say I just divulged some

23   attorney-client piece of information and now I waived my whole

24   right from now on.

25                   MR. PEEK:  I don't think either I or the Court

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 101 of 800
Case 3:06-cv-00056-PMP-MAU   Document 731   Filed 07/08/08   Page 59 of 265

-59

```
 1   are looking to call this a complete waiver or even -- it's

 2   inadvertent if it's even divulged.

 3            But were there places besides the places he

 4   described where the FBI-seized material was stored --

 5                MS. KLAR:  Your Honor, perhaps Mr. Montgomery

 6   can answer that yes or no, and then to the extent that there

 7   is any follow-up and there is a concern about the

 8   attorney-client privilege, we can take a break and consult

 9   with me.

10                MR. PEEK:  I would like to continue this line,

11   your Honor.

12                THE COURT:  Well, ask your question, Mr. Peek.

13   Answer it yes or no, sir, and then we'll go from there.

14   BY MR. PEEK:

15    Q   Is there any other place, other than what you've

16   described, where the FBI-seized material was stored?

17    A   Yes.

18    Q   Where?

19    A   I can't -- you're asking me to now divulge

20   attorney-client privilege.

21    Q   No, I'm just asking you where it was stored.  It's just a

22   physical location, at what physical location was the FBI

23   material?

24                THE COURT:  Well, what I'm going to do is --

25   Mr. Montgomery has concerns.  I'm having a hard time fathoming
```

Case 3:20-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 102 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 60 of 265

60

1   how the attorney-client privilege is implicated here in that

2   particular question that Mr. Peek has asked.

3          He's not asking Mr. Montgomery to say -- to divulge

4   any communication between an attorney and client as far as I

5   can tell.  It seems to me a straightforward question, but I'm

6   going to allow a recess in any case to give the court reporter

7   a rest and to allow Mr. Montgomery to confer with his

8   attorney.  We will reconvene at 10:40.

9          MR. PEEK:  Thank you, your Honor.

10          THE COURT:  We're in recess.

11          (A recess was taken.)

12          THE COURT:  All right.  Ms. Klar.

13          MS. KLAR:  Your Honor, having had an opportunity

14   to speak with Mr. Montgomery, he has been instructed that he

15   can testify as to what he has observed, but to the extent that

16   he may have received information from counsel with regard to

17   where any of these materials may have gone, that would

18   constitute attorney-client privilege, and he's been instructed

19   not to testify as to those conversations.

20          THE COURT:  All right.  Go ahead, sir.

21   BY MR. PEEK:

22   Q   Okay.  Where?

23   A   My attorneys.

24   Q   Okay.  Which attorneys?

25   A   Can I answer that without waiving the privilege?

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 103 of 800
Case 3:06-cv-00056-PMP-MAU   Document 731   Filed 07/08/08   Page 61 of 280

61

 1                    MS. KLAR:  Yes, you can.

 2                    THE WITNESS:  Mike Flynn and Saul Pelchin.

 3     BY MR. PEEK:

 4      Q    And who?

 5      A    D.C. attorneys, Saul Pelchin (phonetic).

 6      Q    Saul Pelchin?

 7      A    In Mr. Bennett's office.

 8      Q    Those were your criminal lawyers that were hired in

 9     connection with the grand jury subpoena; is that correct?

10                    MS. KLAR:  Objection, your Honor, that

11     discloses, A, grand jury information, and, B, attorney-client

12     information.

13                    THE COURT:  All right.  Just say that -- just

14     tell me, sir, the names of -- Mr. Bennett, did you say?

15                    THE WITNESS:  Mr. Bennett and Mr. Pelchin.

16     BY MR. PEEK:

17      Q    Mr. Bennett represents you in connection with the grand

18     jury subpoena; is that correct?

19                    MS. KLAR:  Same objection, your Honor, that has

20     no relevance to this proceeding here today in addition.

21                    MR. PEEK:  Your Honor, I want to know -- I know

22     that this may well go to Mr. Flynn's declaration because

23     certainly there is a serious issue here as to whether or not

24     any of this material was ever delivered to an attorney to, in

25     turn, turn over to the FBI, or, excuse me, to turn over to the

```
1   grand jury so I think I'm entitled to inquire.

2              THE COURT:  Well, I wish to maintain a narrow

3   focus for this hearing.  Your inquiry has been about where the

4   materials that were returned that were the subject of the

5   search warrant proceeding, where they've gone.

6         He's testified about that they've gone to someone

7   named Mr. Bennett who is an attorney and Mr. Pelchin who is an

8   attorney.

9         If it's public record what that representation

10  concerns, I suppose he can testify about it.  I don't -- just

11  identify quickly who they are.  I don't see why that's an

12  issue unless --

13             MR. PEEK:  I'll move on, your Honor.

14             THE COURT:  All right, go ahead.

15             MR. PEEK:  I'll just move on.

16  BY MR. PEEK:

17   Q   Which of the items are in the -- were in the possession

18  of the three lawyers, Mr. Flynn, Mr. -- did I say Pelchin, am

19  I saying that correctly?

20   A   Pelchin, yes.

21   Q   Pelchin and Mr. Bennett?

22   A   It's really Mr. Pelchin.  I mean, Mr. Bennett --

23   Q   Okay.  What --

24   A   I don't recall specifically which ones.

25   Q   Okay.  So it was just some but not all of the FBI-seized
```

Case 1:23-mc-00073-CKK-MAU   Document 1-1   Filed 07/28/23   Page 105 of 800
Case 3:06-cv-00056-PMP-MAU   Document 734   Filed 07/08/08   Page 65 of 200

63

```
 1   material?

 2    A    That would be correct.

 3    Q    Okay.  Now, I've seen at least in some of the pleadings

 4   and declarations, and you can correct me if I'm wrong, that

 5   you maintain that anywhere from 60 to 80 percent of the

 6   FBI-seized property contains classified information.  Do you

 7   remember that, those declarations and testimony?

 8    A    I don't remember specifically, but if you're telling me

 9   that I said it --

10    Q    Well, do you recall -- well, I'll just ask you a

11   different question then.

12           Did you maintain at any time that 60 to 80 percent

13   of the data contained with the electronically-stored material

14   that you had had classified information?

15    A    I don't remember making that statement specifically.

16    Q    Do you contend that any of it had classified information?

17    A    Yes.

18    Q    What percentage of it?

19    A    I don't know.

20    Q    Okay.  And did you think it appropriate to leave lying

21   around in storage units top secret classified information?

22           MS. KLAR:  Objection, your Honor, there's been

23   no testimony that this is top secret classified information.

24           MR. PEEK:  Your Honor, he's maintained that it

25   was, and if he's maintained that it was, he had a duty to
```

Case 3:23-mc-00053-CKM-MAU   Document 7-1   Filed 07/28/23   Page 106 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 64 of 265

64

 1    maintain the integrity of it as well, not just Judge Pro's

 2    order.

 3              And it's also inconsistent with the position he took

 4    in the search proceedings.  You may recall the position that

 5    Mr. Flynn and Mr. Montgomery took in the search proceedings is

 6    that the basis upon which the search occurred was the seizure

 7    of classified information.  They took the position there was

 8    no classified information.

 9              Now they then take an inconsistent position and say

10    there was classified information, and if there was classified

11    information, they shouldn't have been treating it so loosely

12    to give it to movers, to be put in storage units, to leave it

13    in closets, to leave it in his home.

14              I mean, it's just -- not only is there Judge Pro's

15    order, we can get to that, there's the duty to preserve, and

16    then there's also the classified nature of this which he

17    maintains.

18              I mean, he stood here or sat there two weeks ago and

19    said there's 17 CDs, I'm going to give them to the government.

20              THE COURT:  Go ahead.

21              MS. KLAR:  Your Honor, I think that Mr. Peek's

22    speech illustrates the key problem or a key problem with what

23    he is trying to transform this hearing into.

24              This is not a hearing, as I stated, to deal with

25    Judge Pro's order which does not say what Mr. Peek represented

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 107 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 65 of 265

65

1   to the Court it did say.

2            This is not a hearing to determine whether or not

3   Mr. Montgomery properly preserved classified information.

4   Mr. Peek and his client have no standing with respect to that

5   issue.  That is an issue that the government can address, not

6   Mr. Peek.

7            And that is certainly not within the scope of your

8   order.  The scope of your order is did the documents he had --

9   he had in his possession, custody or control, have they been

10  produced pursuant to your orders.  We are now going off on a

11  fishing expedition that has absolutely nothing to do with

12  these issues, and we are not prepared today to address those

13  issues.

14           We had no notice that these are the issues that are

15  going to be the subject of this OSC, and it is highly

16  prejudicial to Mr. Montgomery to allow this type of

17  questioning to continue.

18           THE COURT:  The Court is going to sustain

19  Ms. Klar's objection.

20           The questions, Mr. Peek, that you're asking about

21  custody and how he dealt with classified information or not,

22  or what was classified, may be of interest to the United

23  States, or may have other implications as it relates to this

24  case, but for purposes of this order to show cause hearing and

25  what precipitated the hearing, I ask that you focus on -- I've

Case 1:23-mc-00053-PKH-MAU   Document 7-1   Filed 07/28/23   Page 108 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/08/08   Page 66 of 205

-66-

1   allowed you to inquire about the chain of custody, where

2   documents went, how they were kept and so forth because some

3   of those documents have been the subject of document

4   production requests and they haven't been produced.  That

5   makes sense that you ought to be able to inquire.

6          But beyond -- I am concerned about broadening the

7   scope of this hearing.  So please proceed with that in mind.

8          MR. PEEK:  May I make a quick little proffer,

9   your Honor, with respect to why I was asking that?

10         THE COURT:  Go ahead, sir.

11         MR. PEEK:  It really goes to the

12  disingenuousness and the lack of credibility of Mr. Flynn --

13  excuse me, Mr. Montgomery here and the inconsistent positions

14  that he's taken throughout these proceedings, and really goes

15  to the good faith and bad faith of Mr. Montgomery and the way

16  he has treated this discovery.

17         And I'll move on, your Honor.

18         THE COURT:  Let's just move on.

19         MR. PEEK:  I am.

20  BY MR. PEEK:

21   Q   With respect to the CDs -- and they're both CDs and DVDs,

22  are they not?

23   A   That's correct.

24   Q   And you told us, and I think we now understand that the

25  CDs seized by the FBI were in many respects commingled or

Case 1:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 109 of 800
Case 3:06-cv-00056-PMP-VPC   Document 741   Filed 07/28/08   Page 67 of 205

67

```
 1   intermingled with other CDs and DVDs you had; is that correct?

 2    A   I believe that's correct.

 3    Q   So at some time along the way you lost the integrity of

 4   what was seized and returned to you and what wasn't seized; is

 5   that right?

 6              MS. KLAR:  Objection -- objection, your Honor,

 7   lacks foundation.  I don't know what it means to lack

 8   integrity.

 9              There is nothing in Judge Pro's order which says you

10   cannot commingle.  The order is very specific.  It says he's

11   prohibited from destroying, modifying, duplicating,

12   distributing, disseminating, hypothecating, transferring

13   licensing or assigning such property until such further order

14   of the court.

15              This Court has ordered that certain of these

16   documents be produced, and we assume, based on that order,

17   Mr. Montgomery is authorized to duplicate these materials.

18              But, again, we object to this line of questioning.

19   It has absolutely nothing to do with what we are here today

20   for.  We are not prepared to address issues relating to

21   whether or not Mr. Montgomery did or did not violate Judge

22   Pro's order.

23              THE COURT:  Well, the Court has reviewed the

24   order, it's docket number 143 which is the March 23rd, 2007,

25   minute order from a joint hearing between -- that Judge Pro
```

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 110 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 68 of 285

68

1    and I presided over concerning matters related to the search

2    warrant proceeding and the civil proceeding.

3          And, as always with minute orders, as counsel are

4    well aware, the minute order is simply that, it's a shorthand

5    order of what occurred at a proceeding, and I suspect that a

6    transcript of that hearing might be very illuminating

7    concerning -- insofar as it may flesh out what Judge Pro meant

8    or didn't mean.

9          I note for the record that just above the paragraph

10   entering the order there's a statement as follows:

11         "Ms. Wells advises the Court" -- pardon me.  Pardon

12   me, wrong section.  It's on page 3, in the middle it says,

13              "Ms. Wells advises the Court today the

14         government has no objections to the items being

15         returned to Mr. Montgomery as he is under an

16         injunction not to disseminate it, use it, share it,

17         or do anything with it except hold it."

18         And it is correct, as Ms. Klar has stated, that the

19   paragraph that she read into the record follows that which

20   states that the items are subject to the preliminary

21   injunction previously entered in this case, and then Judge Pro

22   outlines what is -- what is said in that preliminary

23   injunction until further order of the Court.

24         So I guess that is an issue, but if you could ask

25   your questions, Mr. Peek -- I mean, you're raising -- you're

```
 1   obviously drawing objections by how you characterize things.

 2   I think you might have more success if you just reword them.

 3              MR. PEEK:  I will, your Honor.

 4              THE COURT:  All right.

 5   BY MR. PEEK:

 6   Q    Did you commingle the FBI-seized property with other

 7   electronic data?

 8   A    Yes.

 9   Q    And when did you do that?

10   A    Sometime between the point of which it was returned to

11   me, after that point.

12   Q    Did you take any steps at all to identify what was

13   FBI-seized property and what was being commingled with it?

14   A    I don't understand what you're asking.

15   Q    Well, what efforts, if any, did you -- did you take any

16   efforts to identify what property was FBI-seized property

17   versus what you were putting with the FBI-seized property?

18   A    I put it in a box that was marked that.

19   Q    Okay.  But did you add then other electronic data in the

20   form of CDs or disk drives into those same boxes?

21   A    At some point, yes.

22   Q    And I believe at some point you said the movers did the

23   same thing?

24   A    I believe so.

25   Q    And I think you told us you weren't able to label the
```

Case 3:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 112 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 112 of 265

70

1   boxes that the movers put the electronic data into; is that

2   correct?

3                MS. KLAR:  Objection, your Honor, we have been

4   over this.

5           Mr. Peek told us --

6                MR. PEEK:  I'll move on, your Honor.

7                MS. KLAR:  -- at the conclusion of the last

8   hearing that he had one and a half to two hours.  We've now

9   been here more than two hours.

10               MR. PEEK:  Your Honor, I didn't think that there

11  was a limit just because I said that.  I certainly did expect

12  to be quicker, but this witness has not been the most

13  forthcoming and forthright in his answers --

14               THE COURT:  All right.  That question was asked

15  and answered.

16               MR. PEEK:  And I moved on.

17               THE COURT:  Please move on.  Go ahead.

18  BY MR. PEEK:

19   Q   With respect to the CDs, how many of the CDs have

20  actually been -- of the FBI-seized property, how many of those

21  have actually been copied, not photocopied the faces, but the

22  electronic data copied and provided to eTreppid?

23   A   I don't know.

24   Q   Do you know who was making the electronic copies of the

25  FBI-seized property?

Case 1:23-mc-00052-CKK-MAU   Document 7-1   Filed 07/28/23   Page 113 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 113 of 200

71

1    A    I don't know for certain.

2    Q    Were you doing it?

3    A    No.

4    Q    So some outside vendor was doing it?

5    A    I gave them to my attorneys, yes.

6    Q    Okay.  So you had no responsibility, then, for the

7    copying of the electronic data on the CDs and DVDs that were

8    returned to you, the seized property?

9    A    I don't know, I don't understand what you're asking me.

10   Q    You had no responsibility other than to turn them over to

11   your attorney and that was the extent of your responsibility.

12   A    As far as I know, yes.

13   Q    Did you know that they were ordered to be copied, the

14   electronic data was ordered to be copied?

15   A    Yes.

16   Q    Okay.  When did you turn the CDs over to your attorney?

17   A    I don't remember specifically.

18   Q    Do you remember generally, sir, like a month?

19   A    I thought it was in February or March.

20   Q    So all of the CDs were turned over to your attorney in

21   February or March of 2008, sir?

22   A    No.

23   Q    Okay.  So some were turned over in February and March?

24   A    Right.  I requested on multiple occasions for someone to

25   give me a list, and I believe I did that a long time ago, of

Case 1:23-mc-00053-CKK-MAU Document 1-1 Filed 07/28/23 Page 114 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 72 of 200

72

 1    knowing which CDs were actually taken from the raid, and until

 2    recently I had got pictures, and until then I had not gotten a

 3    single picture.

 4    Q    And, of course, the reason you didn't know which ones

 5    were seized and which were returned was because you didn't

 6    maintain them in a segregated manner, isn't that correct?

 7                    MS. KLAR:  Objection, your Honor, argumentative.

 8    We've been over this point again and again and again.

 9                    My client has admitted he commingled them.  I don't

10    know why Mr. Peek insists on badgering the witness.

11                    MR. PEEK:  Because he had a duty to preserve

12    evidence, your Honor, and he didn't preserve the evidence.

13                    MS. KLAR:  Your Honor --

14                    MR. PEEK:  Irrespective of Judge Pro's order,

15    there is an inherent duty to preserve evidence.  There were

16    discovery requests outstanding.  This was going to be

17    evidence.  We knew that.  We were asking for forensic images

18    to be made.  It was denied, so photographs.

19                    Ms. Klar has never made a request as we did to the

20    FBI to have the photographs turned over, in fact, objections

21    were made.  And so until very recently we got the photographs,

22    but did Ms. Klar ever make an effort to do that so that she

23    could comply, along with her client, with the Court's orders?

24                    This goes to the good faith and bad faith of

25    Mr. Montgomery by failing to protect them and preserve it, and

Case 3:23-mc-00073-SKM-MAU   Document 7-1   Filed 07/28/23   Page 115 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 75 of 200

73

 1   then hiding behind and saying I didn't know what the FBI took.

 2   They are hiding behind that and have been constantly hiding

 3   behind that.

 4           Did they ever come to you and say, your Honor, in

 5   any of their motion practice, including even the arguments on

 6   February 21st when the Court entered its order, did Ms. Klar

 7   stand up and say to you I and my client do not know what was

 8   seized and returned?

 9           THE COURT:  Well, I'm sustaining the objection

10   because it was asked and answered.

11           I think you've established, Mr. Peek, through your

12   questioning that Mr. Montgomery commingled the returned

13   property from the FBI with other items so please move on.

14   BY MR. PEEK:

15   Q   So beginning in February and March, you began to turn

16   over certain CDs and DVDs to your lawyer; is that correct?

17   A   Yes.

18   Q   And for what period of time after that did you continue

19   to turn over CDs to your lawyer?

20   A   Up until just recently.

21   Q   Up until just recently meaning when, last Friday?

22   A   Well, I brought the rest with me, I mean, if that's your

23   question.

24   Q   You mean you brought the rest with you today?

25   A   Yes.

1    Q    The rest of the CDs you brought with you today?

2    A    Yes.

3    Q    So you have -- okay.  So you haven't turned them over to

4    your lawyers to be copied or produced then, have you?

5    A    I turned over what I had at that time.  The remaining

6    ones which, once given the photographs that I could identify,

7    I brought.

8    Q    Okay.  How many is that?

9    A    Over a hundred.

10   Q    Okay.  So -- and those are the hundred that you

11   identified brought with you today, so you haven't yet made

12   arrangements to have them copied; is that correct?

13   A    That wasn't -- I brought them to the court.  I didn't

14   know who was supposed to do it and when they're supposed to do

15   it.

16   Q    Well, are you aware that the Court ordered that certain

17   of the CDs be, not only photocopied, but electronically

18   copied?

19   A    And I did that as soon as I was able to identify them.

20   Q    Okay.  Of the 100 plus that you brought with you today,

21   what arrangements, if any, have you made to have them

22   electronically copied?

23   A    You have to ask my attorney.

24   Q    Okay.  So it's the attorney's job then.

25        Now, are you aware, sir, that of the seized property

1    that only five of those CDs have, in fact, been electronically

2    reproduced?

3     A    No.

4     Q    So you wouldn't be able to give me an explanation as to

5    why only five of the FBI-seized property has been

6    electronically photocopied since it was ordered to be on

7    February 21st?

8     A    Are you saying that I have only given my attorneys who

9    have ultimately only given you five CDs?

10    Q    That's what I'm saying, sir, five electronic copies of

11   CDs.

12    A    I don't know.  I don't know that process.

13    Q    Okay.  Did you photocopy the CDs that were appended or,

14   excuse me, made exhibits to your declaration?  Did you

15   photocopy them?

16    A    I made a photocopy and gave them to my attorney.  I don't

17   know if that's the ones that were ultimately appended to it.

18    Q    Okay.  Let me show you, again, docket number 690, and

19   this is just part of 690-6.

20    A    It's in this book?

21    Q    It's in the book that I gave you, and just look at

22   example -- for example, these are appended exhibits.  See,

23   look at 1598.

24    A    That's the Bates number on the bottom?

25    Q    Yes, the Bates number on the bottom, sir.

Case 1:23-mc-00073-CKK-MAU   Document 1-1   Filed 07/28/23   Page 118 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 75 of 288

76

```
 1    A    Okay.  I see it.

 2    Q    Do you see that?

 3    A    Yes.

 4    Q    Can you read that?

 5    A    No.

 6    Q    Okay.  Look at 1599.  Can you read that one?

 7    A    No.

 8    Q    1597, can you read that one?

 9    A    No.

10    Q    1595, can you read that one?

11    A    It starts with an F.

12    Q    Okay, and 15 -- do you know what that meant?

13    A    Actually, I think it's Fred.  No, I --

14    Q    How about 1594, can you read that one?

15    A    No.

16    Q    So you made these photocopies that were then photocopied

17   by your lawyer and put on your declaration?

18    A    I don't know if those are a photocopy of a photocopy.  I

19   made a photocopy.

20    Q    And gave to it your lawyer.

21    A    Yes.

22    Q    Now, going to the two hard drives that you produced, do

23   you remember those?

24    A    No.

25    Q    Well, are you aware that you produced two hard drives
```

1   with electronic data on them to -- well, you produced the hard

2   drives that were seized by the FBI, or, excuse me, copied them

3   and produced the copies to us.  You're aware of that?

4    A   I don't understand what you're asking, the question.

5    Q   Okay.  On or about May 23rd, your lawyer produced to us

6   certain hard drives --

7    A   Okay.

8    Q   -- which contained electronic data which you claimed and

9   you discussed with the Court on June 10th, responses to the

10   request for production.

11    A   Okay.

12    Q   You remember that?

13    A   Yes, yes.

14    Q   And do you remember we talked and showed you pictures of

15   individuals and parties --

16    A   I got it now.

17    Q   -- you know, dogs and things like that?

18    A   Yes.

19    Q   Do you remember that?

20    A   Yes.

21    Q   Okay.  And you said that those came from backups that you

22   had undertaken?

23    A   I believe so, yes.

24    Q   Okay.  So can you tell me which computers were you

25   backing up?

1   A    At any given -- I mean, I don't remember specifically.

2   Q    Can you tell us even generally, sir, which computers?

3   A    Sue Perez, Warren's, Len Glogauer, Patty Gray.  I believe

4   Sloan Venables' was backed up, and there may have been some

5   programers from time to time, I don't recall specifically.

6   Q    You don't know that?

7   A    I don't remember specifically.

8   Q    All right.  Do you remember generally?

9   A    No.

10  Q    Any other besides Sue Perez, Warren, Len Glogauer, Patty

11  Gray, Sloan Venables and some programers?

12  A    Altan, I believe was --

13              THE COURT:  Is that a first or last name?

14              THE WITNESS:  First name, I believe.

15              MR. PEEK:  Okay.

16              THE WITNESS:  Monika's.

17  BY MR. PEEK:

18  Q    And that's Monica with a K, is it not?

19  A    I don't know if it's with a K or not.

20          Whoever her associate was, I don't remember her

21  name.  I think it was Tony.

22  Q    Okay.  Is Altan spelled A-l-t-a-n or o-n?

23  A    I don't know.

24  Q    Okay.  Cindy?

25  A    Yes.

79

1    Q    Gianna?

2    A    Yes.

3    Q    Lee?

4    A    I believe so, yes.

5    Q    Sue Zangara?

6    A    I don't remember the name.  Actually, if I remember, she

7    was before Gianna, yes.

8    Q    Okay.  Because there's a Sue Perez, I just wanted to be

9    sure -- there's a Sue Zangara, is there not?

10        And John Tyson?

11   A    I believe his was backed up, yes.

12   Q    John Hughes?

13   A    Yes.

14   Q    Mike Conser (phonetic)?

15   A    Yes, probably.

16   Q    Now, none of these individuals that we've listed are, in

17   fact, programmers, are they?

18   A    Yes.

19   Q    Okay.  Which ones are programmers?

20   A    Sloan.

21   Q    And Sloan also served in another capacity besides

22   programmer, did he not?

23   A    I believe so.

24   Q    Pardon?

25   A    Yes.

Case 1:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 122 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 80 of 285

-80-

1    Q    And what was that?

2    A    I don't actually know what his title was.  I don't recall

3    what his title was specifically.

4    Q    What were his duties besides programming?

5               MS. KLAR:  Objection, your Honor, what relevance

6    does this --

7               MR. PEEK:  Your Honor, I'll get to the relevance

8    because what -- you're going to see the relevance as we go

9    through when Mr. Karchmer testifies as to what's actually on

10   the hard drive.

11              THE COURT:  All right.  Well, I'll overrule the

12   objection for now, but I trust you'll connect with --

13              MR. PEEK:  I will, your Honor.

14              THE WITNESS:  What was the question?

15   BY MR. PEEK:

16   Q    What other duties did Mr. Venables have?

17   A    I guess he was the IT guy, head of IT.

18   Q    And he had the responsibility to do the backups every

19   night, did he not?

20   A    Well, I don't know if he had a responsibility of backing

21   up every night.  I don't --

22   Q    As an IT director, he had the responsibility to perform

23   the backups, did he not?

24   A    No, I don't think so, I don't know.

25   Q    You don't think so?

Case 1:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 123 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/08/08   Page 81 of 285

-81

```
 1              Okay.  Now, when you say you performed backups, how
 2    did you go about performing the backups of each of the
 3    individuals' computers that you've identified here?
 4    A    I just copied it from one machine to another.
 5    Q    When you say you copied it from one machine to another,
 6    did you have to insert some kind of drive or link to the one
 7    computer to another computer to be able to perform a backup?
 8    A    Sometimes you did, sometimes you didn't.
 9    Q    Okay.  So as you're copying from one computer to another,
10    what devices did you use?
11    A    A computer.
12    Q    Okay.  You used another computer.  How did you link the
13    two computers?
14    A    Through a network card.
15    Q    Okay.  And were you backing up all of the data on the
16    computer?
17    A    No.
18    Q    What data were you backing up and what data weren't you
19    backing up?
20    A    Sometimes just the documents directory, sometimes the
21    whole thing.
22    Q    So when you say sometimes the whole thing, you mean all
23    data on that?
24    A    There was I don't think an occasion where all the data
25    was ever copied.
```

Case 1:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 124 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 82 of 286

-82-

 1    Q    Well, wasn't the purpose, as you said, to sort of

 2    maintain the integrity of these?  Mr. Trepp had told you he

 3    wanted to have them backed up and taken offsite?  Wasn't there

 4    a purpose behind that that he told you?

 5                    MS. KLAR:  Objection, your Honor, argumentative.

 6    BY MR. PEEK:

 7    Q    When Mr. Trepp asked you to do the backup, did he tell

 8    you why he wanted the backup performed?

 9    A    I don't recall if he did or not.

10    Q    Did he tell you what to do with the data?

11    A    Take it offsite.

12    Q    Okay.  And did he tell you to only copy certain data or

13    did he say copy all data?

14    A    I don't remember him telling me either one.

15    Q    Okay.  But he said -- did he say do a backup of these

16    computers and take them offsite?

17    A    Yes.

18    Q    And then did you take that to mean all the data or just

19    some of the data?

20    A    I just backed it up, I didn't interpret it either way.

21    Q    Okay.  When you say you backed it up, so you backed up

22    all the data on each computer.

23    A    No, that's not the case.

24    Q    Why not, sir?

25    A    Well, they were using the machine for one place.

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 125 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 83 of 205

83

1    Q    But did you perform this during work hours or after work?

2    A    Both.

3    Q    When you did it after work, there was no interference

4    from the machine or the person working the machine, was there?

5    A    It was still on.

6    Q    What do you mean it was still on?  Sue's computer,

7    Patty's computer, Altan's computer, Monaka's computer, the

8    office staff?

9    A    Yes.

10   Q    They were still on?

11   A    Yes.

12   Q    And you can't perform backup when the computers are on?

13   A    There were files that were locked.

14   Q    Okay.  Which filed were locked?

15   A    The files on the operating system.

16   Q    Which ones?

17   A    It depends on what program they had open.

18   Q    Well, what programs?  You mean, you couldn't go in as the

19   chief technology officer of this company and be able to

20   complete a backup of all of the data as you had said you were

21   supposedly instructed to do so?

22             MS. KLAR:  Objection, your Honor, argumentative.

23             MR. PEEK:  Your Honor, that's not argumentative.

24             THE COURT:  Restate the question.

25             MR. PEEK:  I'll restate it.

Case 3:23-mc-00053-GMK-MAU   Document 7-1   Filed 07/28/23   Page 126 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/03/08   Page 84 of 265

84

1    BY MR. PEEK:

2     Q    Did you perform a backup of all of the data at one time

3    or another of each of the computers, Sue Perez, Warren Trepp,

4    Len Glogauer, Patty Gray, Sloan Venables, Altan, Monaka,

5    Cindy, Gianna, Lee, Sue Zangara and John Hughes?

6                  MS. KLAR:  Objection, your Honor, the question

7    is overbroad, vague as to time and compound.

8                  THE COURT:  Well --

9                  MR. PEEK:  I can break it down by person if she

10   wants me to, your Honor, each person.

11                 THE COURT:  It seems to me what Mr. Peek is

12   trying to elicit from Mr. Montgomery is what he backed up,

13   what he didn't back up, whose computers he backed up, and so

14   on, and this is of interest to the Court.

15             And so to the extent if we want to go through every

16   computer and every person that Mr. Montgomery's identified to

17   eliminate your concern about it being compound, that's fine,

18   we can do that.  So go ahead, start over.

19                 MR. PEEK:  I will, your Honor.  I'll break it

20   down by each individual.

21                 MS. KLAR:  Your Honor, can I just respond?

22                 THE COURT:  Yes.

23                 MS. KLAR:  I believe Mr. Montgomery has

24   testified that -- in response to questions by Mr. Peek that he

25   backed up a whole series of people, their computers, on a

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

1  periodic basis.

2          We are talking about a period of time, I believe, of

3  six to eight years.  I think it is an inherently unfair

4  question to say did you do X at any point in time with respect

5  to eight or nine people over a nine-year period.

6          Moreover, I don't think it's in any way relevant.

7  What's on the CDs that have been produced is what's on the

8  CDs.  They want to make the argument that we've overproduced,

9  that we've acted in bad faith, that's fine, that's what we're

10  here to discuss today, that's the subject matter of this

11  hearing.

12          A subject matter of this hearing is not how

13  Mr. Montgomery backed up these files.  That's not, as I

14  understand it, consistent with the terms of this Court's

15  order.

16          And while I appreciate the Court might find this of

17  interest, I think we have certain due process rights.  We have

18  a right to be on notice what the subject matter of the hearing

19  might be today.

20          MR. PEEK:  Your Honor, respectfully, again, to

21  Ms. Klar, she wants to frame the issues as she sees it.  I'm

22  moving on now to the hard drives on which there was

23  significant data produced to us.

24          You may recall that on June 10th Mr. Montgomery said

25  that the reason why he did it, and data he was producing to us

Case 3:23-mc-00053-CMK-MAU   Document 7-1   Filed 07/28/23   Page 128 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 86 of 205

86

 1    from the hard drives, came from the backups that he performed

 2    from time to time on the computers.

 3            I'm entitled to then inquire as to the nature of

 4    those backups because I want to know what data should be on

 5    the two hard drives which contain 1.4 million files as the

 6    Court knows from the testimony last June 10th.

 7            MS. KLAR:  Your Honor, whether or not

 8    Mr. Montgomery complied with the Court's order has nothing to

 9    do with what Mr. Peek may contend should have been on those

10    backup files.  That's not before the Court.

11            The issue before the Court is simply based on the

12    information that Mr. Montgomery had in his possession, custody

13    and control, if he complied with the Court's order.

14            MR. PEEK:  Last June 10th, Ms. Klar on page 186

15    and 187, reported to the Court when we were talking about the

16    backup drives and what was on the hard drives:

17            "MS. KLAR:  Your Honor, we have told the

18        Court and we have told eTreppid that we produced the

19        backup drives in their entirety.  We stipulate that

20        there is information on these drives that is not

21        responsive.  We produced more, not less."

22            I want to make sure that Ms. Klar's representation

23    to this Court is accurate where she says, "we produced the

24    backup drives in their entirety," that's what she told us on

25    page 186 and 187.  Now she wants to say that that isn't what I

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 129 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 87 of 265

87

1   said.

2           I mean, the Court's order was -- and there are

3   certain requests, 30 through 31, 32, 33, in the first

4   requests, and I think 24 through 27 of the second request that

5   the Court inquired of Mr. Montgomery at that time, and because

6   he was ordered to produce that, Ms. Klar has said to this

7   Court that the hard drives, which are the two, one containing

8   one terabyte of data and the other one on a 500 gigabyte, I

9   think, containing significantly less than that, that were

10  produced to us on May 23rd and May 27th that were purported to

11  contain responses to the requests for production.

12          And Ms. Klar and Mr. Montgomery told us that how he

13  obtained that information was he had it in backups.  I'm

14  entitled to know what the backups were and how he went about

15  doing it because, you know, I want to know what should be on

16  this hard drive.

17          Because that's what Ms. Klar said,

18          "We have told the Court, and we have told

19      eTreppid that we've produced the backup drives in

20      their entirety."

21          MS. KLAR:  Your Honor, perhaps I should have

22  been more precise then in my representation to the Court, but

23  what I thought meant -- what I thought I said to the Court is

24  what we produced were the backup -- the information from the

25  backup drives that Mr. Montgomery had in his possession,

Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/23   Page 130 of 800
Case 3:06-cv-00056-PMP-VPC   Document 74   Filed 07/03/08   Page 88 of 205

88

 1     custody or control at the time of the production.

 2              And the question of how Mr. Montgomery prepared the

 3     drives that were produced from the information that he had at

 4     the point in time that he transferred that information is what

 5     I understand to be the scope of this hearing.

 6              I do not understand the scope of this hearing to be

 7     to allow Mr. Peek to go back in time over an eight-year period

 8     to find out how Mr. Montgomery backed up those files while he

 9     was at eTreppid.

10              My understanding is the starting point of this

11     hearing is the point in time when -- after Mr. Montgomery left

12     eTreppid and had that information in his custody and control.

13              THE COURT:  I'm going to allow Mr. Peek to ask

14     some questions concerning how Mr. Montgomery -- his custom and

15     practice concerning the backing up the eTreppid tapes.  I

16     think that's relevant to this hearing.

17              I agree with Ms. Klar that going back through eight

18     years of Mr. Montgomery's employment to discuss what he might

19     have done in 2000 and what backups -- first of all, I suspect

20     he's not going to remember, only in general terms.

21              So I will allow Mr. Peek to go ahead and inquire

22     about Mr. Montgomery's practice and custom in terms of how he

23     backed these up and how he did it and when he did it.

24              Go ahead.

25              MR. PEEK:  Thank you.  I wasn't going to each

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 131 of 800
Case 3:06-cv-00056-PMP-MAU   Document 731   Filed 07/08/08   Page 89 of 265

89

 1  year, your Honor, I'm trying not to.

 2  BY MR. PEEK:

 3   Q   Can you tell us -- I just want to know from time to time

 4  over the course of when you were first asked to perform

 5  backups -- maybe we should establish some time.

 6          When were you first asked to perform these backups?

 7   A   I don't recall specifically.

 8   Q   And from the time that you were asked to do that until

 9  you left employment in 2006, January, did you continue to

10  perform these backups on some regular basis?

11          MS. KLAR:  Your Honor, I would also object to

12  the use of the word employment.

13          MR. PEEK:  Relationship, your Honor.

14          THE COURT:  All right, relationship.

15  BY MR. PEEK:

16   Q   When you left the company in January of 2006 --

17   A   There was no regular basis.

18   Q   Okay.  So there was no regular basis, and you don't know

19  when you started it.

20          Did you continue to do it on this irregular basis

21  from the time you were asked to do it until January 2006?

22   A   I don't know if I did it up to -- up to 2006.

23   Q   Okay.  So through December of 2005, let's say.

24   A   I don't even know then.

25   Q   Well, when was the last time that you recall that you

Case 3:23-mc-00073-CMK-MAU   Document 1-1   Filed 07/28/23   Page 132 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/28/08   Page 90 of 289

90

```
 1   performed this so-called backup on these listed computers?

 2    A   Well, I didn't -- I'm not implying I did every one of

 3   those computers every time I backed up, and I think your

 4   question just implied that.

 5    Q   Okay.  You were asked by the CEO of the company, is that

 6   a correct statement?

 7    A   Warren, yes.

 8    Q   You were asked by the CEO of the company.

 9    A   Yes.

10    Q   You were asked by the CEO of the company to perform

11   backups and take them offsite, correct?

12    A   From time to time, yes.

13    Q   Okay.  So you weren't asked to do it, he said, Dennis, on

14   a regular basis, or just I want you to perform backups?  Did

15   he have to ask you each time to do it?

16    A   No.

17    Q   So you were asked to do it and you were asked to take it

18   offsite.

19    A   Is that a question?

20    Q   Yes.  You were asked to do it and you were asked to take

21   it offsite; is that correct?

22    A   I was asked to do it.  I don't know -- I guess the answer

23   is yes.

24    Q   Well, were you asked to take it offsite?

25    A   Yes, but you're asking me -- the way you said it is did
```

Case 1:23-mc-00073-CKK-MAU Document 1-31 Filed 07/28/23 Page 133 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 91 of 265

91

1    he say that every single time I did it.

2    Q    No, I'm just asking you, did he ask you --

3    A    Yes.

4    Q    -- to perform these backups and to take them offsite?

5    A    Yes.

6    Q    Did he do it on more than one occasion?

7    A    I believe so.

8    Q    Okay.  How many different occasions?

9    A    I don't know.

10   Q    And did you understand the reason why he wanted it

11   offsite, or did you come to a conclusion as to why he wanted

12   it offsite?

13   A    During what period of time?

14   Q    During any period of time.

15   A    Yes.

16   Q    And what conclusion did you draw from that request?

17   A    I don't think -- I need to ask the government attorneys a

18   question before I answer it.

19              MR. PEEK:  Okay.  I think he's permitted to do

20   that, your Honor, under the protective order.

21              THE WITNESS:  Do I just go over here?

22              THE COURT:  Go ahead.

23              MR. PEEK:  I'm trying to understand why Sue

24   Perez, Warren, Len Glogauer, Patty Gray -- you know, but go

25   ahead.

Case 1:23-mc-00053-CKK-MAU   Document 7-1   Filed 07/28/23   Page 134 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 52 of 265

92

1              (Discussion held off the record.)

2              THE COURT:  Just let the record reflect that I

3    thought it prudent for Mr. Montgomery to confer with

4    government counsel -- I can overhear just a little bit.  I'm

5    trying my best -- yes.

6              MS. KLAR:  Your Honor, I just wanted to address

7    one of the points that Mr. Montgomery just testified about.

8         He has brought with him the CDs, and we have not had

9    an opportunity, given time constraints, to have those CDs

10   copied.

11        We will take -- I will take those back to

12   Los Angeles and have those copied, and hopefully we can do

13   them within the next week or so.

14        Also at Fulcrum are CDs and hard drives that we

15   brought to the hearing the last time, and I am told by Fulcrum

16   that those will be available to be inspected by eTreppid, that

17   we should have them back in our office by Friday.

18              THE COURT:  All right.

19              MS. KLAR:  So I think that we have almost got

20   through the entire universe of documents.

21        I think Mr. Montgomery has some other CDs he's

22   brought today, and then there are CDs that have to go --

23   excuse me, hard drives onto which he's transferred data, and

24   then I think there is information on hard drives that he needs

25   to give to the government, and he's waiting for instruction

Case 3:23-mc-00053-CKK-MAU Document 7-1 Filed 07/28/23 Page 135 of 800
Case 3:06-cv-00056-PMP-VPC Document 741 Filed 07/28/08 Page 93 of 205

93

1    from the government how to handle that transfer.

2                    THE COURT:  All right.

3                    MR. PEEK:  Your Honor, respectfully, this is too

4    little too late.  We were told on June 10th that the 30 CDs,

5    that they said that they were going to copy those immediately

6    and provide to us.  That was two weeks ago.

7                    MS. KLAR:  Your Honor, given the fact that

8    eTreppid has yet to produce a single electronic file in

9    response to discovery, I'm at a loss to understand how

10   Mr. Peek with a straight face can say to the Court it's too

11   little too late.

12            They have the same discovery obligations as

13   Mr. Montgomery, and they told the Court last week that they

14   couldn't get all of this information produced for a couple of

15   months.

16            So we are doing the best we can.  The documents went

17   to -- not the documents, the CDs and the hard drives went to

18   Fulcrum, they are doing the best they can.

19                   THE COURT:  All right.  Well, we'll address

20   these issues.

21                   MR. PEEK:  In final argument.

22                   THE COURT:  Right.  As well, I'll, of course,

23   want the United States counsel to be privy to discussions

24   about the issues that Ms. Klar just raised so we'll just wait

25   until he's finished, Mr. Montgomery has finished speaking with

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 136 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 94 of 265

94

1    counsel for the government.

2                    (Discussion held off the record.)

3                    THE COURT:  Let the record reflect that

4    Mr. Montgomery has resumed the stand and has apparently

5    completed his conference with Mr. Gomez and Ms. Wells, counsel

6    for the United States.

7                    All right.  You may proceed, sir, Mr. Peek.

8                    THE WITNESS:  The question was?  I mean, I

9    forgot it now.

10                    THE COURT:  Ms. Court Reporter, could you please

11   read it back?

12                    (The question was read by the reporter as
                     follows:  Question:  And what conclusion did you draw
13                   from that request?)

14                    THE WITNESS:  The request was for the backup.

15   BY MR. PEEK:

16    Q    The backup of the specific Sue Perez, Warren, Len

17   Glogauer, Patty Gray, not the backup of classified information

18   that we know you gave to Mr. Trepp that he put in the safe,

19   I'm talking about these other backups?

20    A    Whoa, whoa.  I didn't say -- what do you mean give

21   Mr. Trepp and put in the safe?

22    Q    Go ahead, I'm sorry --

23    A    No, no, you're the one that asked.

24    Q    Okay.  Sorry.  What conclusion did you draw?

25    A    Pre-2002 I think he just wanted a copy of it.

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00053-CKK-MAU Document 1-1 Filed 07/28/23 Page 137 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 95 of 266

95

1    Q   Okay.  What conclusion did you draw from why he wanted a

2    copy out of the building?

3                   MS. KLAR:  Objection, your Honor, lacks

4    foundation.

5                   THE COURT:  Overruled.  Go ahead and answer the

6    question, sir.

7                   THE WITNESS:  I don't recall specifically.  He

8    just wanted one out of the building.

9    BY MR. PEEK:

10   Q   Okay.  You didn't conclude, for example, that he wanted

11   to make sure that he maintained the data, it couldn't get

12   destroyed or lost?

13   A   That would be a reason.

14   Q   Okay.  And if you want to back up data, wouldn't you want

15   to back up all the data on each computer so you wouldn't

16   destroy or lose it?

17   A   That would be one conclusion.

18   Q   And you took the direction from the CEO and, in fact, did

19   back up all of the date on each of the computers?

20   A   Absolutely not.

21   Q   You did not.  Which data did you not back up?

22   A   The files that were open at the time the backup occurred.

23   Q   Okay.  So was that on every computer?

24   A   Whatever --

25                   MS. KLAR:  Objection, your Honor, we're back to

1    where we started when you instructed Mr. Peek to ask

2    Mr. Montgomery what his custom and practice was.

3            Now, he's circled around completely, and he's back

4    to the same question he was asking when I objected and the

5    Court ruled as it did.

6            MR. PEEK:  The Court overruled the objection,

7    your Honor, so --

8            THE COURT:  Well, I'm going to allow you to go

9    ahead and ask that question.  I'm trying to understand this so

10   go ahead.  Answer the question.

11           THE WITNESS:  The question --

12           MR. PEEK:  I'll try to see if I can rephrase it

13   and move along as fast as I can, Mr. Montgomery.

14   BY MR. PEEK:

15    Q   You did not -- excuse me, you performed backups on each

16   and every one of the computers from time to time pre-2002; is

17   that correct?

18    A   From time to time, that's correct.

19    Q   Okay.  And there was no regularity to what you were --

20   when you did it or what you did; is that correct?

21    A   I believe that's correct.

22    Q   Okay.  And when you would attempt to back up a computer,

23   you could only back up those files that were not open in the

24   operating system; is that correct?

25    A   Or application programs.

Case 1:23-mc-00053-CKM-MAU    Document 7-1    Filed 07/28/23    Page 139 of 800
Case 3:06-cv-00056-PMP-MAU    Document 734    Filed 07/08/08    Page 97 of 280

97

1    Q    Or application programs that were, in fact, open, you

2    couldn't back them up?

3    A    The programs or the data?

4    Q    I'm trying to find out the data.  I'm not looking for the

5    programs, I'm not looking, for example, to back up Word?

6    A    Whatever files were locked by the operating system,

7    whether that be operating system files or application data.

8    Q    For example, if Word is open, would you be able to

9    perform a backup of all of the documents that have been

10   created in a Word format?

11   A    No.

12   Q    Okay.  So if Word were closed, then you would be able to

13   perform a backup of all the documents that have been created

14   and stored in a Word format?

15   A    Assuming no other application has them locked or the

16   operation system doesn't have them locked.

17   Q    Okay.  Well, were you able to ascertain as you were

18   performing these backups which application could not be backed

19   up?

20              MS. KLAR:  Objection, your Honor.  We are

21   dealing with an eight-year period.  Computer systems, computer

22   applications, computers -- everything changes.

23         The question is so hopelessly overbroad, and we're

24   talking about how many people?  And, again, it's not relevant.

25              THE COURT:  Well, I thought that Mr. Peek's

Case 1:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 140 of 800
Case 3:06-cv-00056-PMP-MAU   Document 731   Filed 07/28/08   Page 98 of 265

98

```
 1    question, and perhaps I'm incorrect, concerned backups
 2    Mr. Montgomery performed from time to time on all computers
 3    pre-2002.
 4               MR. PEEK:  That's correct.
 5               THE COURT:  He testified he didn't -- my notes
 6    reflect he didn't perform those backups with any particular
 7    regularity, he did it periodically, and Mr. Peek was trying
 8    to, I think, find out pre-2002 what files he could back up
 9    that were open versus those that were not open.
10               MR. PEEK:  That's exactly what the question was.
11               MS. KLAR:  Your Honor, the question assumes a
12    simple answer.
13          We're talking about multiple computers.  We're
14    talking about from the years 1998 through 2002, and we're
15    talking about a subject matter that is entirely irrelevant.
16          We are not talking about, as I understand it, how
17    those files were backed up during a relevant period of time,
18    we are talking about did Mr. Montgomery, in compliance with
19    the Court's order, produce the documents that were in his
20    custody or control at the time the orders were entered.
21               THE COURT:  Well, I'm going to allow -- go ahead
22    and answer.
23          I mean, I guess the way I see it is if
24    Mr. Montgomery can't answer the question, he should say so.
25    If it's too hopeless -- if it's too convoluted, that's fine,
```

Case 1:23-mc-00073-CKK-MAU   Document 1-1   Filed 07/28/23   Page 141 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 99 of 200

99

 1    just say so.

 2            I would like to move on, so please wrap up this area

 3    of questioning, Mr. Peek.

 4                  THE WITNESS:  What's the question?  I'm sorry?

 5    BY MR. PEEK:

 6    Q    The question was would you know which files you were

 7    backing up and which ones you weren't backing up as you were

 8    performing these irregular backups?

 9    A    No.

10    Q    After 2002, did you continue to perform backups on Sue

11    Perez, Warren, Len Glogauer, Patty Gray, Sloan Venables,

12    Altan, Monaka, Cindy, Gianna, Lee, Sue Zangara and John

13    Hughes' computers?

14    A    All of those people were not at the company through all

15    of those years.

16    Q    Those that were at the company after 2002 of the ones

17    I've listed, I'm not going over them individually, did you

18    continue to perform these backups as Mr. Montgomery -- excuse

19    me, as Mr. Trepp asked you and as you understood and performed

20    the tasks?

21    A    I continued to back up, yes.

22    Q    Okay.  And I assume your answers on those computers or

23    the instructions were still the same by Mr. Trepp, back up

24    these computers and take the data and store it offsite.

25    A    Yes.

Case 3:23-mc-00073-GMK-WAU Document 731 Filed 07/28/08 Page 142 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/23/08 Page 100 of 205

-100-

1    Q   And did he have to give another instruction after 2002,

2    or was it the same instruction he had given you pre-2002?

3    A   You have asked me this question many times.  I'm telling

4    you he said it sometimes.  I don't recall how often or when he

5    did it, but he continued to say it.

6    Q   Okay.  And you continued then to perform the same tasks

7    of backup on an irregular basis from 2002 until sometime in

8    late 2005.  Is that correct, sir?

9    A   What's the question again?

10   Q   After 2002, you continued to perform, did you not, on an

11   irregular basis backups of those individuals whose names I

12   have listed who were still employees?

13   A   Yes.

14   Q   And you took the data that you had collected and stored

15   it offsite.

16   A   I wouldn't say all the data.

17   Q   Just some of the data.  Why did you only take some of the

18   data and not all of the data that you had collected?

19              THE WITNESS:  I'm concerned if I answer this

20   question, your Honor, I'm going to have the government -- I

21   don't want to say something I shouldn't.

22              MR. PEEK:  Before he does that, your Honor,

23   could I ask a few questions preliminarily?

24              THE COURT:  Go ahead.

25

```
1    BY MR. PEEK:

2     Q    Did any of the individuals whose names I have listed

3    other than Warren Trepp have any top secret clearances?

4     A    Yes.

5     Q    Okay.  And putting aside those individuals who had top

6    secret clearances other than Mr. Trepp that you say had top

7    secret clearances, can you answer the question?

8     A    I'm not certain of your question.  Are you -- are you

9    asking me if the only people that you said to me that were on

10   that list are the only ones with top secret clearance?

11    Q    I'm asking you of those individuals on the list, Sue

12   Perez, Len Glogauer, Patty Grace, Sloan Venables, Altan,

13   Monaka, Cindy, Gianna, Lee, Sue Zangara and John Hughes, did

14   any of those have top secret clearances?

15    A    Yes.  At some point I believe the answer to that is yes.

16    Q    Who?

17    A    Sloan.

18    Q    Okay.

19    A    I don't know what Len's clearance ever was, I don't think

20   it was top secret.

21    Q    Okay.

22    A    Patty, Warren.  I can't remember the other people.

23    Q    So setting aside then Warren, Len Glogauer, Patty and

24   Sloan, I'm not acknowledging that they did or did not have

25   secret -- or clearances, did you perform similar backups of
```

Case 3:23-mc-00075-RMK-WAU Document 731 Filed 07/28/23 Page 144 of 800
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/03/08 Page 102 of 205
-102

1    the other individuals who were still employees as you had told

2    us prior to 2002 on some irregular basis and take the data and

3    store it offsite?

4    A   I don't know if I backed it up after that point in the

5    same way.

6    Q   Okay.  Well, in what way did you do it, then, after 2002?

7    A   I don't know if I -- I don't recall specifically which

8    parameters that I was using at the time to back it up, and at

9    some point I changed that list of parameters.

10   Q   And what did you change it to and in what way?

11   A   I gave it a different list.

12   Q   And what list did you give it to back up?

13   A   I don't recall specifically.

14   Q   Well, what was the list that you had before that you were

15   using to perform backups?

16   A   I don't believe there was a list.

17   Q   So you were just copying all files?

18   A   No, I didn't copy all the files.  You have asked me that

19   five times, I've told you five times I --

20   Q   I understand, and I don't mean to go back over, and I

21   apologize, Mr. Montgomery, I'm not trying to do that.

22           But when you performed the backups, the list that --

23   there was no list that said only back up these, it was to back

24   up every file other than those that might be open, would that

25   be correct?

Case 3:23-mc-00073-SKH-WAU  Document 7-1  Filed 07/28/23  Page 145 of 800
Case 3:06-cv-00056-PMP-VPC  Document 734  Filed 07/03/08  Page 103 of 265
-103

1   A   No, that's not correct.

2   Q   Okay.  Which files, then, did you pre-2002 have that were

3   not copied at any time?

4   A   I can't -- I can't specifically say that there was never

5   a list prior to 2000 -- late 2002.  I believe at sometime

6   there was.

7   Q   Okay.  Prior to 2002, sir, were you copying all files on

8   the computers?

9   A   No.

10  Q   Which ones were you not copying then?

11  A   Files that were open.

12  Q   Other than those, other than the ones that were open when

13  the applications were open, there was no list of that -- that

14  you did not copy?

15  A   That's not correct.

16  Q   Okay.  Well, then, what list -- what copies, what files

17  did you not copy other than the ones that were open?

18  A   Hidden system files.

19  Q   Okay.  Such as?

20  A   You just asked me the question, I just gave you the

21  answer.  Hidden or system files I know specifically I remember

22  was not a parameter.

23  Q   Okay.  Then after 2002 you don't know what was on that

24  list of what files were to be copied?

25  A   Okay.  You're mixing up the lists.  There was a list of

Case 3:22-cv-00076-CKK-MAU Document 734 Filed 07/08/08 Page 146 of 260
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/08/08 Page 104 of 260

-104-

1    saying to the backup go to all of this.  There was also a list

2    saying do all this, exclude these files.

3         So you're -- when you keep saying list, you're

4    saying generally, but that's not the case.

5    Q    Okay.  The first list then pre-2002 was to go copy

6    everything.

7    A    No.

8    Q    Okay.

9    A    There was never ever a command ever that I know of with

10   that statement that you're giving me.

11   Q    Okay.  Was there a statement of copy everything except

12   those, and then we do that, but not copy those that are open?

13   A    I don't believe it ever copied hidden or system files,

14   and there may be other restrictions because programs change

15   over time, and how they react to files that have attributes on

16   them or not affects the backup.

17   Q    Okay.  So that's pre-2002.  After 2002 you said you

18   created a list.  Am I correct?

19   A    There was some files that were clearly avoided I think.

20   Q    What were those?

21   A    I don't recall specifically.

22   Q    Can you recall generally?

23   A    Certain types of recording files.

24   Q    Such as what?

25   A    Without divulging government information, I think that

Case 1:23-mc-00076-CKK-WAU   Document 731   Filed 07/08/08   Page 147 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 147 of 200

105

1    would be a problem.

2     Q   Well, on Sue Perez's files, would that be a problem?  She

3    wouldn't have any classified information on her computer,

4    would she?

5     A   Well, I don't know if -- you're asking me to answer a

6    question that I may -- I don't want to make a mistake.

7              MR. PEEK:  Go ahead, take the time, your Honor,

8    have him take the time.

9              THE WITNESS:  Okay.

10             MS. KLAR:  Your Honor, I think this just

11   demonstrates how unfair the questioning is.

12             Mr. Peek takes the position that because somebody

13   didn't have top security clearance ipso facto there could be

14   nothing on their files that would fall within these

15   parameters, and I don't think that's a fair conclusion to

16   reach.

17             But, again, it's not relevant, and I don't know why

18   we're spending, you know --

19             MR. PEEK:  Your Honor, he's playing games with

20   us.  This is pure, unmitigated --

21             THE WITNESS:  That's absolutely untrue.

22             MR. PEEK:  -- gamesmanship on the part of

23   Mr. Montgomery; pure unmitigated.

24             Sue Perez is an office clerk who performs accounting

25   tasks from time to time and other clerical stuff.  She never

Case 3:22-mc-00076-GMN-WAU  Document 7-1  Filed 07/08/08  Page 148 of 200
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 106 of 265

-106-

 1    had a top secret clearance, and under no circumstances could

 2    anybody have a good faith belief, including Mr. Montgomery,

 3    that Sue Perez would have had any classified, state secret

 4    information on her computer.

 5                    THE WITNESS:  Allow me to talk to the government

 6    first, then they can answer your question for you.

 7                    THE COURT:  All right.

 8                    MR. PEEK:  Take the time to do it, your Honor.

 9                        (Discussion held off the record.)

10                    THE COURT:  The record will reflect that

11    Mr. Montgomery has now resumed the witness stand and counsel

12    for the United States have also returned.

13           Go ahead, sir.

14                    MS. WELLS:  Excuse me, your Honor.

15                    THE COURT:  Yes.

16                    MS. WELLS:  Based on our conversations with

17    Mr. Montgomery, we would actually request that he not answer

18    the question that Mr. Peek has posed to him under the terms of

19    the United States' protective order.

20           The fact that he may or may not have backed up

21    certain types of files on certain employees' systems could, in

22    fact, implicate the terms of the protective order.

23                    MR. PEEK:  I'll respect that and move on, your

24    Honor.

25                    THE COURT:  Thank you.

Case 3:22-mc-00078-SKK-WAU  Document 731  Filed 07/28/08  Page 149 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/23/08  Page 149 of 205

—107

1    BY MR. PEEK:

2     Q    Backups are for disaster recovery, are they not?

3                   MS. KLAR:  Objection, your Honor, relevance.

4                   MR. PEEK:  Your Honor, may I have a little

5    latitude here?  I mean, what's the purpose here?  I mean, if

6    you're going to backup, I mean, there has to be some reason to

7    do it.

8          You don't just -- the CEO says do it, I mean, it's

9    obviously -- you do it for disaster recovery, and then I want

10   to go on again, if it's for disaster recovery, what files he

11   copied, why didn't he copy all the files.

12                  THE COURT:  All right.  Well, I'll allow -- it's

13   five to 12:00 so --

14                  MR. PEEK:  I'm mindful of the time as well.

15   BY MR. PEEK:

16    Q    For disaster recovery?

17          THE COURT:  All right.  I'm going to go ahead and

18   overrule the objection, but let's wrap it up.

19   BY MR. PEEK:

20    Q    For disaster recovery?

21    A    That would be one reason.

22    Q    Okay.  And so you would want to make sure that you

23   captured, because of the disaster -- a disaster might occur,

24   all of the work product, if you will, of the employees; is

25   that correct?

 1   A    I guess that could be a reason.

 2   Q    You wouldn't be worried about the temporary Internet

 3   files on a person's computer, would you?

 4   A    I don't really know.

 5   Q    You wouldn't be worried about personal photos either,

 6   would you?

 7   A    Well, I wouldn't say that.

 8   Q    Okay.  Now, with respect to other backups, Mr. Venables

 9   was performing backups on a regular basis on each of the

10   computers, was he not?

11                 MS. KLAR:  Objection, asked and answered.

12                 MR. PEEK:  No, it wasn't, your Honor.

13                 THE COURT:  Well --

14                 MR. PEEK:  I asked him what Mr. Venables did, he

15   couldn't tell me what he did.

16          What I'm asking him now, a specific question, was

17   that one of Mr. Venables' jobs to perform backups of a regular

18   basis on each of these computers.  It's a simple yes or no.

19   We can move on.

20                 MS. KLAR:  Your Honor, Mr. Peek asked the very

21   same question --

22                 MR. PEEK:  Well, then, what was the answer?  If

23   Ms. Klar tells us what the answer was, we can move on.

24                 THE COURT:  Well, it may have been asked and

25   answered, Ms. Klar, I just don't remember so just please

```
 1   answer the question, Mr. Montgomery.

 2              THE WITNESS:  I don't -- ask it again.

 3   BY MR. PEEK:

 4   Q   Was Mr. Venables performing on a regular basis backups of

 5   the computers at eTreppid, including those whose names you

 6   gave us previously?

 7   A   No.

 8   Q   Was he doing it on any -- at any time at all?

 9   A   I can't say -- I don't know if he -- you mean ever?

10   Q   Yes, ever.

11   A   I would have no way of knowing.

12   Q   And wasn't that one of his jobs?

13   A   I don't --

14              MS. KLAR:  Objection, your Honor, we've been

15   through this.

16              THE COURT:  He did -- he apparently -- as I

17   understand Mr. Montgomery's testimony, it wasn't his job.

18   BY MR. PEEK:

19   Q   So it wasn't Mr. Venables' job to do that?

20   A   He backed up the servers in the server facility and in

21   his office, and I don't know -- did he do other people's

22   computers?  He might have from time to time, I don't know.

23   Q   All right.  Now, so you would have been backing up e-mail

24   files, would you not, on these individual computers from time

25   to time unless, of course, the application was open?
```

1   A   Yes.

2   Q   Okay.  Now, in the -- so e-mail folders are in what's

3   called PST files, are they not?

4   A   Yeah, e-mails are PST files, yes.

5   Q   Can you tell the Court what a PST file is.

6   A   It's an e-mail -- it's an e-mail file.

7   Q   Okay.  And what does that mean, it's an e-mail file?

8   A   It's where e-mails are kept.

9   Q   Okay.  Were there any PST files on the disks that you

10  produced to eTreppid on May 23rd and May 27th?

11  A   I don't recall if there was or not.

12  Q   Okay.  Well, you said -- you told us that those drives,

13  the one terabyte and half a gigabyte -- excuse me, five -- 500

14  gigabyte, half a terabyte, were from the backups of the

15  individual computers, were they not?

16  A   Yes.

17  Q   So you would expect to see PST files on those two disks,

18  would you not, sir?

19  A   If they were backed up.

20  Q   Okay.  So over the course, then, of the time that you

21  performed the backups from 2002 -- excuse me, pre-2002 to

22  November 2005 randomly, irregularly, you would expect to see

23  one or more PST files, would you not?

24  A   Well --

25              MS. KLAR:  Your Honor, I think that

1    mischaracterizes the drives that were produced.

2            MR. PEEK:  I'm just going by what Ms. Klar told

3    us, your Honor, it is from all of the backups and it's an

4    overproduction, not an underproduction, and that he went

5    through it because he wanted to be able to comply with the

6    court order so he just copied everything that had been -- that

7    he had backed up.

8            And now we find that there are no PST files at all

9    on these hard drives, and, as the Court knows, native format

10   was the required production for e-mails and everything else.

11   So if he performed these backups as he said he did, he would

12   have PST files someplace.

13           Now, whether he produced them on the hard drives or

14   not, we know he did not.  But what we also know is that we do

15   not have any PST files yet, and he was ordered to produce

16   e-mails in native format.

17           MS. KLAR:  Your Honor, my understanding is that

18   what has been produced and what's the subject of this

19   testimony is two drives, not all of the hard drives, for

20   example, Mr. Montgomery brought to court at the time of the

21   June 10 hearing which are now at Fulcrum being copied.

22           So what I understand Mr. Montgomery produced is

23   something that is much more narrow in scope than the scope of

24   the question that's being asked.

25           THE COURT:  All right.  The objection is

Case 3:22-mc-00056-GNK-WAU  Document 731  Filed 07/08/08  Page 154 of 200
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 154 of 200
-112

```
 1    overruled, just ask the question, then we're going to take the

 2    noon recess.

 3                    MR. PEEK:   Okay.

 4    BY MR. PEEK:

 5    Q    Are there any PST -- well, each of the individuals whose

 6    computers you backed up would have a separate PST file, would

 7    they not?

 8    A    Not necessarily.

 9    Q    Well, would they have an e-mail folder?

10    A    I don't know if all those people had e-mail.

11    Q    You never determined whether any of these individuals,

12    Sue Perez, Warren Trepp, Len Glogauer, Patty Grace, Sloan, on

13    and on, did not have e-mail?

14    A    Obviously, some of those people did.

15    Q    Okay.  So we would expect to see a separate and discreet

16    PST file for each of those individual computers that had

17    e-mail; is that correct?

18    A    Unless it was open at the time.

19    Q    Unless it was open at the time.

20            So, again, randomly doing this from a period

21    pre-2002 all the way to November 2005, you would expect to see

22    at least one or more PST files from one or more of these

23    computers, would you not, sir?

24    A    I don't have a comment on that.

25    Q    Wouldn't you expect to see that?
```

Case 3:23-cv-00073-RJK-WPC Document 731 Filed 07/28/23 Page 155 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 155 of 200

113

1    A    I haven't looked at all the files.

2    Q    So in the course of trying to respond to the productions,

3    you haven't looked at any files, any PST files?

4    A    That is not true.

5    Q    Did you understand you were to produce in native format

6    certain e-mails?

7    A    Yes.

8    Q    Have you produced any e-mails in any native format at

9    all?

10   A    I believe my -- whatever my attorneys had have been

11   produced.

12   Q    So your attorney has them, but you don't know whether

13   they've been produced or not?

14         Tell us what you produced to your attorneys so we

15   can address these questions maybe to the Court and counsel.

16   A    I've given them files I believe that did have PSTs on

17   them.

18   Q    Which ones?

19   A    I don't recall.

20   Q    Are there any PST files, for example, of all of the

21   e-mails that you've produced in this case that you say may or

22   may not have been given by you or Mr. Flynn to either the Wall

23   Street Journal or NBC News?

24   A    Is that a question?

25   Q    Yes, it is a question.

1    A    Which is?

2    Q    Have you produced any PST files of those e-mails that you

3    produced to us that you said were e-mails that may or may not

4    have been given to the Wall Street Journal by you or by

5    Mr. Flynn, or to NBC News by you or Mr. Flynn?

6    A    I believe so.

7    Q    And when did you do that?

8    A    Some time ago.

9    Q    When some time ago?

10   A    I don't remember specifically.

11   Q    May?  The month of May?

12   A    I think it was before that.

13   Q    Okay.  So before that.  So the month of April, then, or

14   month of March?

15   A    I don't recall specifically.

16   Q    So you produced the PST files for those e-mails to your

17   lawyer?  Is that what you're telling us?

18   A    You mean, have I ever?

19   Q    Have you produced them to your lawyer to be copied to be

20   given to me as required by the court order?

21   A    I've produced them to my attorneys.  I don't --

22   Q    When?

23   A    You just asked me that.  I don't recall.

24   Q    So March or April?

25   A    I don't recall specifically.

Case 3:22-mc-00073-GKF-VPC  Document 7-1  Filed 07/28/08  Page 157 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 115 of 265

-115-

1    Q    Generally.  What month?  Was it March, was it April, was

2    it May?

3    A    I don't remember which month it was.

4    Q    Was it June?

5    A    You would have to ask them, I don't know.

6    Q    You just don't know, then.  But you're the one here that

7    is being ordered to show cause why your case shouldn't be

8    dismissed.  Don't you care?

9                   MS. KLAR:  Objection, argumentative.

10                  THE COURT:  All right.

11                  THE WITNESS:  But I had to go through millions

12   of files that the government considers sensitive.

13                  THE COURT:  Mr. Montgomery, all right, objection

14   sustained.  That's argumentative.

15             All right.  We're now going to take the noon recess

16   until 1:30.

17                  (The noon recess was taken.)

18

19

20

21

22

23

24

25

Case 3:22-mc-00076-GMK-WAU Document 7-1 Filed 07/28/23 Page 156 of 260
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/28/08 Page 156 of 265

116

Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/23/08 Page 156 of 265

1          RENO, NEVADA, TUESDAY, JUNE 24, 2008, 1:30 P.M.

2                 ---o0o---

3

4          THE COURT:  Before we proceed with the hearing,

5  I did want to note that we'll take a three o'clock recess

6  which we probably would do anyway, but I have a brief criminal

7  matter and an initial appearance that I need to take care of,

8  and you can leave everything up, I don't think there will be

9  any problem.  So we'll just take a few minutes and then we can

10  resume.

11          MR. PEEK:  Thanks, your Honor.

12          THE COURT:  All right, go ahead, sir.

13            CROSS-EXAMINATION RESUMED

14  BY MR. PEEK:

15  Q  When the computers that you backed up -- well, let me

16  just back up a little bit.

17          When a -- I'm trying to think of the right word,

18  when a person who uses his or her computer saves a file, it

19  generally is given by that user a name, is it not?

20          In other words, you save something, it's given a

21  name.  You save a Word document, you save an e-mail, it's

22  given a name?

23  A  I guess.  I presume --

24  Q  You don't know that as --

25  A  What is the name you're referring to?

Case 3:23-mc-00073-PMP-WGC   Document 731   Filed 07/28/08   Page 159 of 200
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 159 of 200

-117-

 1   Q   Well, if, for example, files are created on a computer,

 2   they have a name, do they not?

 3   A   Yes.

 4   Q   And it's either a name that the computer gives it or it's

 5   a name that the user gives it; is that correct?

 6   A   I believe so.

 7   Q   Okay.  When you performed the backups of these individual

 8   computers, did the names of the files stay the same on the

 9   backup or did they change?

10               MS. KLAR:  Objection, your Honor, lacks

11   foundation, there's been no evidence that these files, in

12   fact, did have names.

13               MR. PEEK:  He said, your Honor, they either have

14   names or they're given a name.

15               THE COURT:  Overruled.  Proceed.

16               THE WITNESS:  You're referring to the two

17   drives --

18   BY MR. PEEK:

19   Q   I'm referring to the backups.  When you backed up the

20   computers that you described, and I don't want to go through

21   the list of the names --

22   A   I got it.  What's your question?

23   Q   The question is when you performed the backups on all of

24   these various computers, did the backup tape have any

25   instruction to change the names of the file that was backed up

Case 3:22-mc-00073-CKK-MAU Document 73-1 Filed 07/08/23 Page 160 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 118 of 265

118

1  to something other than what either the computer or the user

2  had named it?

3  A    Yes.

4  Q    And what were those?

5  A    Well, it would depend on the circumstance.

6  Q    Well, did you have to give an instruction, then, on the

7  backup tape for the names of the files to change?

8  A    No.

9  Q    It just did it automatically?

10  A    Yes.

11  Q    Okay.  And to what did they generally change them?

12  A    Some form of the original name, plus it would add

13  something.

14  Q    What would it add?

15  A    I don't recall specifically.

16  Q    Okay.  And then when you copied from the backups onto

17  these two hard drives that you produced here, the one terabyte

18  hard drive and the 500 gig drive, did you change the names?

19  A    No.

20  Q    They remained the same as what they were on your backup?

21  A    You're asking me if I personally changed --

22  Q    Yes, I'm asking you --

23  A    No, no.

24  Q    -- or did any program that you wrote change the names.

25  A    I didn't write any program.

Case 3:22-mc-00073-CKK-WAU  Document 34  Filed 07/28/23  Page 161 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 119 of 205
-119

1    Q    Okay.  So the names that were on the backups, backup

2    drives -- were they tapes or drives, by the way?

3    A    Drives.

4    Q    Okay.  -- on the backup drives remained the same as what

5    they had been from the time that you had backed up those

6    individual computers; is that correct, sir?

7    A    No.

8    Q    It's not correct.

9         Okay.  So how did the names change?

10   A    There were circumstances when the backup was ongoing that

11   the name could be changed.

12   Q    There was certain what again, I'm --

13   A    Circumstances.

14   Q    Okay.  And what were the circumstances that would change

15   the name?

16   A    If the files were copied -- if the files end up copied

17   from one drive to another and they're copied from a

18   multiple-tier directory to a single directory.

19   Q    Okay.  How would it change for example?

20   A    I think it just adds an appendix to the name.

21   Q    Changed it to what?

22   A    1, 2, 3, I don't remember specifically.

23   Q    But once that name changed on the backup dive, is -- is

24   there only one name change from the --

25   A    I don't know if the subject directory also changed or

1    not.

2    Q    Okay.  What I'm just trying to understand is that we have

3    the user -- the computer has either the name that a computer

4    gave a file or what the operator gave the file.

5             When it was backed up, those names could have been

6    changed by the backup tape, or the backup drive, excuse me; is

7    that correct?

8    A    I believe so, yes.

9    Q    Okay.  And from the time that those file names were

10   changed until you then copied from those backup drives onto

11   the two disks that were produced in this proceeding, did those

12   file names change in any way?

13   A    You're saying files, not directories.

14   Q    Files and/or directories.

15   A    Okay.  Now, that's a different question.

16   Q    Files, I'm talking about files to start with.

17   A    I don't think so.

18   Q    Okay.  So the files would have had the same name that the

19   backup tape or backup drive would have given them; is that

20   correct?

21   A    I think so, yes.

22   Q    So let's talk about directories.  Directories are

23   something that you created, then, on the hard drives?

24   A    Well, in some circumstances, yes.

25   Q    Okay.  And what directory did you create on the hard

Case 3:23-mc-00073-CKK-VPC Document 731 Filed 07/08/08 Page 163 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 121 of 205
-121-

 1   drive?

 2    A    I have no idea.

 3    Q    You don't remember what you did.

 4         Do you remember -- and we were trying to pin this

 5   down, but from the time you testified on June 14th until

 6   today, can you tell us, sir, on what date you copied from the

 7   backup drives onto the one terabyte disk drive and the 500 gig

 8   disk drive that were produced in this matter on May 23rd and

 9   May 27th?

10    A    No.

11    Q    Can you remember a month in any way?

12    A    It had to be very close around that time frame.

13    Q    Around that time frame meaning May of 2008?

14    A    No, the time -- what's the question again?

15    Q    The question is, you produced to us through your counsel

16   two hard drives, one on a one terabyte hard drive and one a

17   500 gigabyte hard drive on March 23rd -- excuse me, May 23rd

18   and then May 27th.

19    A    Okay.  What's -- okay.

20    Q    Okay.  When did you put -- excuse me.  When did you

21   transfer the data from the backup tapes -- backup drives that

22   you had onto these two hard drives?

23         MS. KLAR:  Objection, your Honor, all of this

24   was went through -- was gone through in detail during the last

25   hearing on June 10th.  It's in the transcript.

Case 3:23-mc-00076-CKK-MAU   Document 731   Filed 07/08/08   Page 164 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 122 of 205
-122

1           MR. PEEK:  I asked him, your Honor, from the

2   time to today, can he remember, and I'm just trying to see if

3   I can get a better date than what I got last time, because I

4   couldn't get a real good date, so I'm asking from the time

5   that he testified on June 10th until today, could we get a

6   better date.

7           THE COURT:  Overruled.  Go ahead and answer.

8           THE WITNESS:  I'm not certain.

9   BY MR. PEEK:

10   Q   Can you give me a month?

11   A   No.

12   Q   Okay.  Would it have been at least after February 21st,

13   2008?

14           MS. KLAR:  Your Honor, objection, we went

15   through all this before.

16           MR. PEEK:  Your Honor, this goes to his bad

17   faith, this goes to the timing of when he did it, and also,

18   your Honor, it goes to two things, the date of the formatting

19   of the tapes which is dated in 2003 and 2004, which we know to

20   be a contrived and false date --

21           MS. KLAR:  Your Honor --

22           MR. PEEK:  -- because the terabyte drive was not

23   even manufactured and could not have even been purchased until

24   late 2007, or maybe early 2008, and we'll have testimony on

25   this.

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

1          So I'm trying to elicit from him when in 2008 or

2   2007 he did it.  He certainly couldn't have done it before he

3   bought the terabyte drive.

4               THE COURT:  Go ahead, Ms. Klar.

5               MS. KLAR:  Your Honor, all of these questions

6   were asked and answered, and he asked him the questions about

7   when he purchased the drives, when he formatted them, all of

8   these questions were asked and answered.

9          So he can make the arguments, he's got the evidence.

10  I'm not certain why we have to go through this again.

11         He gave a time estimate of an hour and a half to two

12  hours at the time of the last hearing.  We have now been here

13  for three hours, and we're going probably for hour four or

14  hour five.

15              THE COURT:  Well, that doesn't concern me, but

16  what -- I'm going to allow -- I mean, it concerns me in a way,

17  but what concerns me more is -- I'll let you ask a few more

18  questions to -- I'm looking at these as sort of foundational

19  to bring you up-to-date on where you're going to go based -- I

20  know you asked some questions at the June 10th hearing which I

21  believe he did ask and answer.

22         So ask a few in summary, sir, but then we need to

23  move on.

24  BY MR. PEEK:

25   Q   Just very, very quickly, can you pinpoint any month at

Case 3:22-mc-00073-PMP-WGC Document 731 Filed 07/28/08 Page 166 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 124 of 205
-124-

1   all when you copied the data from the backup drives that you

2   had onto the two drives that you produced at the end of May

3   2008?

4   A    No.

5   Q    Can you give me a year?

6   A    I presume this year.

7   Q    Thank you.  And I think we've established that there's

8   about 1.4 million files on the two drives combined, are there

9   not?

10  A    I don't remember if that was the number.

11  Q    You don't remember --

12  A    I've looked at a lot of files before then and since then.

13  Q    Okay.  And did you copy the files at or about the same

14  time that you formatted the disks?

15  A    I don't remember when the drive was formatted, I don't

16  know.

17  Q    Well, you remember actually copying the files, do you

18  not, sir?

19  A    Yes.

20          MS. KLAR:  Your Honor, I'd like to object.

21      If we look at page 174, 173 through 175 and on, all

22  of these questions were gone over almost verbatim.

23          MR. PEEK:  Your Honor --

24          MS. KLAR:  We're retilling the same earth, and

25  that's -- that assumes that they're even relevant.  But --

1           MR. PEEK:  Your Honor, I'm happy to look at

2    that, and I think what you'll find is there certainly were

3    questions about formatting, and I'm just trying to establish

4    whether or not the copying occurred on or about the same time

5    because this witness is giving me again more evasive answers

6    as to what he did and when he did it.

7           And what we do know, and we'll connect up with

8    Mr. Karchmer, is that the files were formatted in 2003 on one

9    of the drives, and on the other one, 2004.  I'd like an

10   explanation of that.

11          He gave us a lame explanation last time about, well,

12   gee, I don't know whether my computer clock is correct or not.

13          Here's a man who calls himself a chief scientist and

14   a programmer?  Calls himself chief technical officer,

15   technology officer at eTreppid, and he doesn't know enough

16   about a clock of a computer to be able to set his own and

17   maintain his clock on his computer?

18          THE COURT:  Where do you want to go with this,

19   Mr. Peek?

20          MR. PEEK:  I want to show, your Honor, the bad

21   faith of Mr. Montgomery in a number of ways, and we'll connect

22   it up with Mr. Karchmer.

23          Number one, he changed the file names from what they

24   were on the individual computers.  I'll connect that up with

25   Mr. Karchmer.

Case 3:23-mc-00075-RMP-WBU Document 731 Filed 07/08/08 Page 168 of 300
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 126 of 265

-126-

 1          Number two, he formatted on a date, and we

 2   established that last time when, in fact, there were no -- the

 3   terabyte wasn't even being sold.

 4          What we also know is that the files were copied

 5   immediately thereafter, within seconds.  So there is about a

 6   16-second gap from the time of the formatting of the disk

 7   drive until the copying started, and so for this witness to

 8   sit here and tell me that I don't know when I formatted versus

 9   when I copied, I don't know if I did them simultaneously, is a

10   purely evasive answer.

11          And I'm going to connect that up with Mr. Karchmer,

12   so I want to be able to at least get his answers so that I can

13   show that there are more lies coming from Mr. Montgomery.

14          MS. KLAR:  Your Honor, eTreppid filed a motion

15   for sanctions, and they set forth in that motion the grounds

16   upon which they were seeking those sanctions.  Absolutely --

17   and then they had an opportunity to reply.  Absolutely none of

18   these arguments were made in those filings.

19          And so here we are today, and we are being

20   sandbagged with arguments that have never been made before and

21   arguments that clearly go beyond the scope of the papers that

22   were filed by eTreppid, and --

23          THE COURT:  Well --

24          MS. KLAR:  For that -- I mean, I'm not going to

25   comment on the substance of what Mr. Peek is telling the

```
 1    Court, but for him to be allowed, A, to make these arguments
 2    and to ask these questions, in my view, is not relevant,
 3    grossly exceeds the scope of the OSC, but to then be permitted
 4    to go over the same questions -- I mean, he says -- he says
 5    when did you format the drive, and he went through the same
 6    series of questions on the 10th.
 7              THE COURT:  All right, all right.  I would like
 8    to finish this hearing up today.
 9              MR. PEEK:  I would, too, your Honor.
10              THE COURT:  And that's my intention so everyone
11    is on notice of that fact.
12              MR. PEEK:  Part of this depends upon --
13              THE COURT:  All right.
14              MR. PEEK:  -- the witness's --
15              THE COURT:  All right.
16              MR. PEEK:  -- willingness to be --
17              THE COURT:  All right.
18              MR. PEEK:  -- more candid and less evasive.
19              THE COURT:  All right.  The reason that I find
20    this to be relevant to the order to show cause hearing is that
21    the question in the Court's mind is whether Mr. Montgomery has
22    provided all of the information he has that is responsive to
23    eTreppid's discovery requests.
24         I think this line of questioning -- and I'm going to
25    tell you don't ask questions he's already answered.  Please
```

1    don't do that.  We need to move this along.

2          I am interested in ascertaining what Mr. Montgomery

3    should have or has, based on his work as a chief technology

4    officer at eTreppid, and what he has to testify about

5    concerning his role in backing up that system.  That is

6    helpful to me.

7          So -- but let us focus, and if it's been asked and

8    answered, I'm going to sustain the objections because -- I

9    mean, whatever he said he said.

10          MR. PEEK:  Well, the date of the formatting, I

11   agree, your Honor.  I was asking him about when the files were

12   transferred from those backups to the --

13          THE COURT:  Go ahead and ask.

14          MR. PEEK:  That did not get testified to.

15          THE COURT:  Then go ahead and ask and then

16   let's --

17          THE WITNESS:  The question is?

18   BY MR. PEEK:

19    Q    The question really was did you -- when you performed

20   your backup -- excuse me, when you performed the transfer of

21   data from the backup onto the one terabyte hard drive and the

22   500 gigabyte hard drive, did you do that right after you had

23   formatted each of them?

24    A    I don't know if it was around that time or not.

25    Q    Okay.  Did you perform the backup of the 500 gigabyte

Case 3:23-cv-00073-GMN-VPC Document 731 Filed 07/08/08 Page 171 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 171 of 200

-129

1  hard drive on or about March 25th, 2004?

2   A   I don't remember 2004.

3   Q   Well, would you have transferred the data onto the

4  gigabyte --

5   A   Oh, I'm sorry, I'm sorry, no.

6   Q   -- the 500 gigabyte on or about March 25th, 2004?

7   A   No.

8   Q   Okay.  And would you have transferred the files from the

9  backup tapes onto the one terabyte on or about November 18th,

10  2003?

11   A   You mean disks, not tapes, I presume.

12   Q   Excuse me, the disk, the backup disk, would you have

13  transferred the data from the backup disks that you undertook

14  to keep and take off premise, would you have done that on or

15  about November 18th, 2003?

16   A   No.

17   Q   Did you ever check the dating on your hard drive, the

18  terabyte hard drive and the 500 gigabyte hard drive, to

19  determine on what date it showed they were being copied?

20           MS. KLAR:  Objection, asked and answered.

21           MR. PEEK:  I didn't ask him that whether he

22  actually looked to see what date it was, your Honor, to see

23  whether it was an accurate date.

24           THE COURT:  Objection overruled.  Answer the

25  question.

Case 3:23-mc-00073-CKK-MAU Document 7-1 Filed 07/08/08 Page 172 of 800
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/03/08 Page 130 of 265
-130-

1          THE WITNESS:  I don't know -- I don't remember

2     if the other drive was a 500 gigabyte drive.  I'm going to

3     rely on you telling me it is.  I don't remember specifically

4     if it was or not.

5          Are you -- I'm asking you because I don't remember

6     specifically.  You keep saying two drives, one 500 gigs and

7     one terabyte.

8          MR. PEEK:  That's correct.

9          THE WITNESS:  Assuming that's correct --

10    BY MR. PEEK:

11    Q    So you don't know, then, that you transferred the data on

12    the backup drives onto one terabyte hard drive and one 500

13    gigabyte hard drive, is that your testimony?

14    A    I don't remember specifically sitting here right now if

15    that was the exact drive it was transferred to.

16    Q    Okay.  So, again, I'll represent to you that one is a one

17    terabyte and one is a 500 gigabyte.  Whatever they were --

18    A    Right.

19    Q    -- did you determine what the dates were on those hard

20    drives before you produced them to make sure that they were

21    accurate?

22    A    Accurate to what?

23    Q    Accurate to the date on which you copied.

24    A    Why would they be?  Explain to me why they would be?

25    When the backup utility maintains the original file attributes

-131-

1    of when the backup occurred, the file attributes are put up by

2    the backup tape which puts it back the exact way that it was

3    taken off the backup.

4    Q    Okay.  Okay, that's fair.

5            So then are you telling me that the last backup that

6    you performed at eTreppid was no later than March of 2004?

7    A    Absolutely not.

8    Q    Okay.  And are you telling me that the last backup was

9    November 18th, 2003?

10   A    No.

11   Q    Okay.  So it's your testimony that the dates that I've

12   given you of when the files were transferred are dates that

13   are not the date that the computer says that the transfer

14   occurred but a date that comes from the backup drives.  Is

15   that what you're telling me?

16   A    The backup utility attempts to maintain the directory and

17   file attributes when it is backed up onto it.  So that's it.

18   Q    So are you telling us that the last backup drive that you

19   had to which you copied on the terabyte had the last data that

20   was November 18, 2003?

21   A    You just asked me that question, I said no.

22   Q    Well, what would be the last date if it's going to

23   maintain the same utility date?  What date --

24   A    What are you talking about?  I don't understand what

25   you're asking.

Case 3:22-mc-00076-PMP-WGC Document 731 Filed 07/08/08 Page 134 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 132 of 209
-132

1    Q    Maybe I don't understand because I'm not as smart as you

2    when it comes to computers.  I'm not.

3                   MS. KLAR:  Objection, your Honor, argumentative.

4                   THE COURT:  Sustained.

5    BY MR. PEEK:

6    Q    What date then -- are you telling us, then, that the date

7    that should be on that terabyte, November 18, 2003, which

8    shows the date that you ran the copying, is a date that comes

9    from the backup drives or does it come from the computer?

10   A    Which date are you getting that from?

11   Q    The date that is shown on the hard drive, the one

12   terabyte hard drive, is the date that it shows that the files

13   were copied.

14   A    That's impossible.  I mean, you may say the drive shows

15   that, but the backup as it's being restored onto that drive

16   maintains its attributes onto that drive, not the original

17   drive attributes.

18   Q    So you're telling me, then, that the date that shows on

19   the hard drive of when the files were created, the date that

20   they were started and the date that they were finished and the

21   number of files copied, is inaccurate?

22   A    Where is that date?  I don't even know where that date --

23   Q    That came from the hard drive, sir, that you produced.

24   A    Where on the hard drive?  You're saying that as if it

25   comes --

Case 3:22-mc-00078-GMK-WAU Document 731 Filed 07/28/23 Page 175 of 800
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/08/08 Page 175 of 269

133

1    Q   The folders that you created, you created three folders,

2    did you not, a folder of 2003, a folder of 2004 and a folder

3    of 2005?

4    A   I don't remember if that was the file structure, but I

5    understand what you're saying.

6    Q   You created three folders, did you not?

7    A   I don't remember if I created them or if they were just

8    taken off somewhere else on the drive and moved onto it.

9    Q   Okay.  And you're unaware that the start time of when the

10   folder for 2003 was started was November 18, 2003, at 4:59

11   a.m., and that it finished on 11/18/2003 at 8:00 a.m.

12   A   I also don't know if that file attribute that's on that

13   directory that you're referring to is a result of the backup

14   tape that maintains the last date of the last file transferred

15   into that directory.  I don't know.

16   Q   You don't know that, then.  You think that this date may

17   come from the backup drive as opposed to from the date that

18   you actually performed the task?

19   A   I have no way of knowing that.

20   Q   And then you don't know that for the subfolder 2004 that

21   it was commenced to be copied on 11/18 at 8:37 a.m., some

22   37 minutes after the 2003 file finished -- excuse me, on 8:38,

23   and it finished at 1:01 p.m. that same date.

24   A   These files have been copied off multiple drives multiple

25   times over the years so you have no way of knowing where that

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

-134-

1   date actually comes from.

2   Q    So you're also unaware that the hard drive shows that the

3   subfolder named 2005 began to be copied on 11/18/2003 at 3:34

4   and finished at 10:11 p.m. that night?

5   A    You're assuming that, not me.

6   Q    Okay.  But you think those dates of 11/18/2003, started

7   3:34 and finished at 11/18/2003 at 10:11 is a date that came

8   from the backup drive?

9   A    Or in the backup process, that's correct.

10  Q    Okay.  And so the elapsed times that are shown on that

11  one terabyte, do those also come from the hard drive, or,

12  excuse me, from the backup hard drives?

13  A    I have no idea.

14  Q    Okay.  And then with respect to the 500 gig hard drive,

15  the formatting began on March -- supposedly March 25th,

16  2004 -- in fact, when somebody is formatting, the date shows

17  on that format, doesn't it, shows on the hard drive?

18  A    Not if a partition is copied from one drive to another.

19  Q    Okay.  So is that you did?

20  A    You asked me that last time.

21  Q    Is that what you did then?

22  A    I don't recall on that drive if I did that or not.

23  Q    Okay.  And then with respect to the time that it started,

24  it started on 3/25/2004, one minute later, after it was

25  formatted, and it took about an hour and a half, finishing at

1  5:10 on that date of March 25th, 2004.

2   A   You're telling me this?  I don't know.

3   Q   Yeah.  That's what your hard drive shows.

4   A   That's what you say the hard drive shows.

5   Q   Okay.  So you don't know one way or the other whether

6  they show that or not.

7   A   I guess I don't.

8   Q   Now, you've also produced in this matter those

9  1.4 million files in the two hard drives that we've been

10  discussing.  Do you know how many of those 1.4 million files

11  that were produced to us are, in fact, searchable files?

12   A   You asked me this at the last hearing.

13   Q   And what was your answer?  You don't know.

14   A   No.

15   Q   Okay.  And would it surprise you to know that about less

16  than two percent are even searchable, the rest are just noise,

17  garbage, photos unrelated to this matter?

18   A   That's your determination.

19   Q   Okay.  Well, you were trying to capture what you believed

20  to be responsive to the request for production, were you not?

21   A   Sure.

22   Q   And what was it you thought you were capturing in those

23  hard drives?

24   A   Things that were responsive to the discovery request.

25   Q   And what were those discovery requests that you thought

Case 3:22-mc-00073-GMK-WAU   Document 7:31   Filed 07/28/28   Page 178 of 269
Case 3:06-cv-00056-PMK-VPC   Document 731   Filed 07/03/08   Page 136 of 269

136

1    you were capturing?

2     A    I don't have them in front of me.

3     Q    You don't recall them as you sit here today?

4     A    Sitting here right this millisecond, no.

5     Q    Okay.  Now, let's move on now to the Glogauer e-mail.

6    You produced a Glogauer e-mail in PST format, did you not?

7     A    I believe so, yes.

8     Q    And did you -- how did you go about creating and copying

9    just the one Glogauer e-mail of September 2003?

10                MS. KLAR:  Your Honor, I'm going to object on

11   the grounds of attorney-client privilege and --

12                THE COURT:  What was your question?

13                MR. PEEK:  He was asked to produce, your Honor,

14   a PST file of the Glogauer e-mail.  I'm asking him how did he

15   go about doing it.  If he says I didn't do it, doesn't that

16   solve it?

17                MS. KLAR:  Well, perhaps you can ask him that

18   question, but --

19                MR. PEEK:  Well, then, perhaps the fault lies

20   with counsel in the way this was done because he must have

21   given something to somebody to be able to give to this Court

22   and to me a PST file which we have found again to be false and

23   fraudulent, your Honor, and we'll have testimony to that with

24   Mr. Karchmer.

25                We've been arguing for some time about the validity

 1   of the Glogauer e-mail which was a subject matter earlier of a

 2   motion for sanctions, and we'll have more testimony on that,

 3   but what we also know is we don't really have the PST file.

 4   What we have is something that somebody contrived, and I want

 5   to know about that.

 6                   THE COURT:  How is that explained?

 7                   MS. KLAR:  Your Honor, Mr. Montgomery did not

 8   create the PST file, and how that came about, any information

 9   Mr. Montgomery has with respect to how that came about is

10   derived from communications with counsel --

11                   MR. PEEK:  Your Honor, he would have had --

12                   MS. KLAR:  -- and therefore --

13                   MR. PEEK:  I'm sorry, I apologize.

14                   MS. KLAR:  And therefore we would assert the

15   attorney-client privilege.

16          My understanding, again, with regard to the scope of

17   this hearing is whether a PST of that file has or has not been

18   produced.

19          There is nothing in the papers that deal with the

20   question of the validity of any Glogauer e-mail, and we are

21   not prepared today and have not been given notice that this

22   hearing would include testimony and the need to rebut evidence

23   with regard to that subject matter.

24                   MR. PEEK:  Your Honor, the reason we didn't, on

25   May 27 when we filed our motion for sanctions, say anything

1  about the PST file is because we didn't have it at that time.

2  So we were saying we still don't have all of these items that

3  the Court ordered them to produce so it certainly is at issue.

4         They then later produced a false and fraudulent PST

5  file, and so I'm entitled to --

6         THE COURT:  When was that produced, sir?

7         MS. KLAR:  Your Honor, I believe that the file,

8  the PST file, was transmitted by mail and, for some reason,

9  never made it to Mr. Gunderson's office, and when we found

10 that out -- we had nothing to do with it, but it was resent --

11        MR. PEEK:  It was either June 6th or June 9th,

12 your Honor.

13        MS. KLAR:  And I believe that it was received

14 the day before the hearing which I believe is June 9th.

15        However, your Honor, to the extent they wanted to

16 raise that as an issue rather than sandbagging us here,

17 they've had plenty of opportunity, they got it on June 9th, to

18 raise this in some kind of a supplemental pleading so that we

19 would be prepared.

20        We are not prepared, and it's not consistent with

21 the scope of your Honor's order or with any paper that has

22 been filed with this case.  The only issue is was the PST file

23 produced as ordered by the Court.

24        MR. PEEK:  That's not the issue, your Honor,

25 whether a PST file was produced.

1            What is at issue is was a PST file responsive to the

2    Court's request produced and is it, in fact, in complete

3    native format which the Court ordered it to be done, and that

4    was the subject matter of the motion for sanctions.

5            And, certainly, Ms. Klar, if she did not produce it

6    in complete native format, is at risk of being subject in the

7    motion for sanctions to sanctions for not doing that.

8                    THE COURT:  Is it produced in complete native

9    format?

10                   MR. PEEK:  No, it is not, your Honor.

11                   MS. KLAR:  Your Honor, I'm not in a position to

12   respond to that.  I had absolutely nothing to do --

13                   THE COURT:  Well, who -- who has something to do

14   with it?  I'm lost.

15                   MS. KLAR:  There is a consultant who was

16   retained, not by me, to --

17                   THE COURT:  Well, by whom was the consultant

18   retained?

19                   MS. KLAR:  By another law firm.  And it is my

20   understanding --

21                   THE COURT:  Well, someone that Mr. Montgomery

22   has retained?

23                   MS. KLAR:  That is correct, your Honor, and it

24   is my understanding that it is a reputable firm, they were

25   directed, consistent with your order, to make a PST file.

Case 3:22-mc-00073-GMK-WAU  Document 731  Filed 07/08/08  Page 182 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 140 of 205

-140-

1            And while they may be contending -- while eTreppid

2    may be contending that it's fraudulent, at a minimum I should

3    be entitled to respond to that.

4            THE COURT:  Well, what's this other law firm?

5    I'm just -- I have no idea how -- what other law firm are we

6    talking about?

7            How would some other law firm who is apparently not

8    named, no one has named the law firm yet, have anything to do

9    with this case unless they are part of this case?

10           In other words, is this like a shadow law firm?

11           MS. KLAR:  No, your Honor.

12           THE COURT:  What -- I don't have any idea what's

13   going on now.

14           MS. KLAR:  Your Honor, we have taken the

15   position in the past that this e-mail has nothing to do with

16   this case because it doesn't make any claim or defense that

17   has been asserted.

18           What this e-mail does relate to is the grand jury

19   proceeding, and my information about its relationship to the

20   grand jury proceeding ends with I can tell you it's somehow

21   related to the grand jury proceeding.

22           THE COURT:  All right.

23           MS. KLAR:  And it is in connection with that

24   that a consulting firm was retained, and the identity of that

25   firm is a matter of work product.

Case 3:22-mc-00076-SKK-WAU  Document 731  Filed 07/28/08  Page 183 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/28/08  Page 141 of 209
-141

1          THE COURT:  Which one is a matter of work

2    product?

3          MS. KLAR:  The identity of the firm.

4          Now, you gave us an order on Wednesday, as I recall,

5    to get that PST file produced in native format within three

6    days, and pursuant to that order, I did whatever I could that

7    was humanly possible to get it produced.

8          I had no control over it, Mr. Montgomery had no

9    control at that point in time other than to give the

10   directions.  Physically, neither of us had what we needed to

11   be able to provide eTreppid with a PST file.

12         Now, if you're going to allow eTreppid to make these

13   arguments, what we would request is the opportunity to be able

14   to respond because we are not in a position today to be able

15   to respond, and these are rather serious accusations that this

16   is a fraudulent PST file.

17         THE COURT:  Well, what my order to show cause

18   says, docket 646 at page 4, I refer to -- as we all know,

19   there was a February 21 order, district court's March 19 order

20   and this Court's May 7, 2008, order, and I quote the May 7,

21   2008, order, and I state in docket 646, the order to show

22   cause,

23         "Mr. Montgomery shall produce the Glen" --

24      and, I'm sorry, it's Len, "Glogauer e-mail as part of

25      its document production no later than Friday, May 23,

Case 3:22-mc-00075-GMN-VPC  Document 731  Filed 07/28/08  Page 184 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 142 of 205

142

1     2008, and these documents shall be produced in PST or

2     native format.  Footnote.  With respect to production

3     of documents provided to the Wall Street Journal, as

4     well as any other reporters or media organizations

5     which discuss or refer to Mr. Trepp, eTreppid or Jim

6     Gibbons, Ms. Klar stated that her law firm had those

7     documents, and they should have been produced, and

8     she would ensure they were produced on May 23rd,

9     2008."

10                  So --

11                  MR. PEEK:  That was when it was produced, your

12    Honor, to the Wall Street Journal.

13                  THE COURT:  So the Len Glogauer e-mail you're

14    saying was produced in native format, is that what you're

15    telling me?

16                  MS. KLAR:  That is my understanding.  Those were

17    the directions that I gave, and, as I understand it, what I

18    was assured is that it was produced as a PST file, and that

19    was what was sent to Mr. Gunderson, which I believe

20    Mr. Gunderson transmitted to counsel for eTreppid.

21                  Now --

22                  THE COURT:  So you haven't seen it.

23                  MS. KLAR:  I have not seen it.

24                  THE COURT:  Why haven't you seen it?

25                  MS. KLAR:  Why haven't I seen it?

Case 3:22-mc-00073-SKW-MAU  Document 731  Filed 07/28/23  Page 185 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/28/08  Page 145 of 265
-143-

```
 1                THE COURT:  Right.

 2                MS. KLAR:  Because I've seen a copy of it.  I

 3   mean, I've seen it in its written format.

 4                THE COURT:  All right.

 5                MS. KLAR:  But for me to look at it as a PST,

 6   that's not something I'm an expert.

 7                THE COURT:  Okay.

 8                MS. KLAR:  So if the Court is going to allow

 9   this kind of questioning, and I don't think that what I've

10   just heard is consistent with expanding the scope of this

11   hearing to include that, but if the Court were to do that,

12   then at a minimum we believe we should be given an opportunity

13   to respond and to put on evidence, because this is the first

14   I'm hearing that there's any problem with this PST file.

15                THE COURT:  Mr. Peek?

16                MR. PEEK:  Your Honor, I don't know how to

17   respond because both my motion and the Court's order was

18   clear.  It didn't happen on May 23rd, and had it happened on

19   May 23rd, perhaps more would have been discussed on May 10th

20   or even before that.

21                We got it on June 9th, and over the course of the

22   last two weeks we have had an opportunity to evaluate whether

23   or not it is, in fact, as ordered, a complete PST in native

24   format, and the conclusion that we have reached is that it is

25   not.
```

Case 3:22-mc-00073-GMK-WGC   Document 7-31   Filed 07/28/23   Page 186 of 800
Case 3:06-cv-00056-MMD-VPC   Document 731   Filed 07/28/08   Page 144 of 265

-144-

 1           I don't know -- I don't know how to respond.  And

 2   Ms. Klar said it's not an issue.  It absolutely is an issue in

 3   this case.

 4           THE COURT:  Well, all right.  This for me is --

 5   the order to show cause, my interest is in ensuring that the

 6   orders that this Court issued were complied with.

 7           And just as -- and the question is, the motion for

 8   sanctions was based on eTreppid's position that orders had not

 9   been followed.  I construed that as an order to show cause

10   because those are orders of the Court.

11           And to the extent that the Montgomery parties,

12   including Mr. Montgomery, were supposed to do things that this

13   Court ordered, including provide or produce this particular

14   e-mail, that's what he was supposed to do.

15           And to the extent that whatever was produced is or

16   isn't what I ordered, I think, is highly relevant to the

17   hearing today.  And I don't think there's a lack of notice or

18   anything else.  I think that this is what this hearing is

19   about.

20           And so, just as Mr. Peek can inquire about the

21   procedures Mr. Montgomery engaged in in producing the hard

22   drives and copying them and when he copied them and so forth

23   so the Court has some idea what was done or what wasn't done,

24   what should be part of a document production, what shouldn't,

25   and, if it isn't, why it isn't, this seems to me to be what

Case 3:22-mc-00073-PMP-VPC Document 734 Filed 07/28/08 Page 187 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 145 of 209

145

1   we're hearing today.

2            So I'm going to allow this -- some questions on this

3   issue.

4            MS. KLAR:  Your Honor, Mr. Montgomery has had

5   nothing to do with the production of this e-mail.

6            THE COURT:  Well, then, he can so testify.

7            MS. KLAR:  And if the Court deems it relevant,

8   then we would request an opportunity to respond to whatever

9   accusations are being made by eTreppid, and I can't do that

10  without speaking with the counsel who I had to track down

11  after this Court issued the order, which took several days,

12  and do what I needed to do to effect as immediate compliance

13  with the order as possible.

14           So I think at a minimum we should be entitled to

15  respond to whatever Mr. Karchmer is going to testify to

16  because it will be evident upon further questioning of

17  Mr. Montgomery that he had nothing to do with this process,

18  this was something that was handled exclusively by counsel.

19           THE COURT:  All right.  Well, I'll certainly

20  consider that, and you've made your record of that request,

21  and it may be that that will be appropriate.

22           MS. KLAR:  Thank you, your Honor.

23           THE COURT:  Go ahead.

24  BY MR. PEEK:

25   Q    You had, did you not, the original PST files of the

Case 3:22-cv-00078-GNK-WAU Document 731 Filed 07/28/08 Page 126 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 146 of 205
146

1  Glogauer e-mail?

2   A   I don't know if it was the original or not, I had a PST

3  file.

4   Q   And how did you obtain the PST file of the Glogauer

5  e-mail which contains language along the lines of we have to

6  take care of Jim?

7   A   I don't recall specifically.  What are you asking?  I

8  don't --

9   Q   How did you obtain that e-mail?

10   A   Off a disk drive.

11   Q   What disk drive?

12   A   I don't know which one specifically.

13   Q   Is it part of the backup?

14   A   It might have been, yes.

15   Q   And then, of course, we know that you downloaded all the

16  backups, and there's no PST files on the hard drives you

17  produced to us.  We know that, too, don't we?  So where is --

18  where is the backup drive for the Glogauer e-mails?

19   A   Let me answer the question.  You asked me two questions.

20   Q   Okay.  Go ahead and answer.

21   A   The first question was what?

22   Q   The first question is on what drive or what medium did

23  you copy the Glogauer e-mails to.

24   A   I don't recall which one it was.

25   Q   Okay.  Was it in connection with your backups that you

Case 3:23-mc-00073-CMK-MAU Document 7-1 Filed 07/28/08 Page 189 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 147 of 205

147

1    were performing from time to time that you testified to

2    already?

3     A    It might have been.

4     Q    It might have been, you don't know.

5     A    I don't know specifically --

6     Q    So if it were part of the backups that you did, we would

7    expect to see it on the one terabyte hard drive and the 500

8    gigabyte hard drive, correct?

9     A    No.

10    Q    Okay.  And why not?

11    A    Because those drives, I believe, were non -- people that

12   were not involved with the government work between 1998 and

13   2005, and it was only the files prior to, I think it was,

14   December of 2002 of those people that were involved.

15    Q    And then post-2002, those who were involved in performing

16   government contracts, that would include Mr. Glogauer?

17    A    Yes.

18    Q    And you ran -- you performed different backups for those

19   individuals than you did for the other individuals after

20   December of 2002?

21    A    Yes.

22    Q    Okay.  Tell us -- you haven't told us about the

23   differences, you just said you continued to do the same

24   thing --

25    A    I can't --

Case 3:23-mc-00073-CNK-WAU  Document 731  Filed 07/28/23  Page 190 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 148 of 265
-148-

1    Q    -- after December 2002, and, of course, you're going to

2    tell us you can't talk about it, but did you perform backups?

3    A    Yes.

4    Q    And did those backups include Mr. Glogauer's computer?

5    A    Yes.

6    Q    And did it include his e-mail?

7    A    That e-mail or just in general --

8    Q    Generally, the e-mail which is a full PST file.

9    A    I don't recall if it did or not.

10   Q    Well, did you only then copy this one e-mail of September

11   23rd, 2003, or 25th?  Is that the only one you copied?

12   A    I don't believe so.

13   Q    Okay.  So you copied the entire PST file --

14   A    Oh, I --

15   Q    -- of Mr. Glogauer, did you not, and --

16   A    Is that the question?

17   Q    Yes, that is the question.

18   A    I believe so.

19   Q    Okay.  And then what did you do with that backup of all

20   of the Glogauer e-mails in this PST file?

21   A    You mean what did I do with the backup of the PST file?

22   Q    Yes, what did you do with it?

23   A    I submitted it to Washington.

24   Q    Okay.  And when did you do that?

25   A    I don't remember the exact date.

1    Q   Okay.  And before you submitted it, did you keep a copy

2    of it?

3    A   No.

4    Q   And you submitted it -- has it actually been submitted to

5    the U.S. Attorney's office or is it just in the hands of a

6    lawyer?

7              MS. KLAR:  Objection, your Honor, relevance,

8    grand jury proceedings.

9              MR. PEEK:  Your Honor, they have raised the

10   grand jury proceedings in multiple proceedings.  For example,

11   Mr. Montgomery, in the same Pro order that we saw, told Judge

12   Pro and told you who was also at that hearing that these --

13   all of the seized property was going to be immediately turned

14   over to the government because it's part of the subpoena.

15         What we know now is that it wasn't because we know,

16   we went through a number of different -- I don't need to

17   recount that, but it did do that.

18         So now we're being told, okay, let's hide behind the

19   grand jury because I don't have that.

20         So at least I want to know where it went, when it

21   went there, and then I'm going to be able to inquire why I

22   don't have the entire PST file because I don't have the entire

23   PST file in its original format.

24         That may be a lawyer's fault, but that still doesn't

25   relieve this individual of his obligations under the order

Case 3:22-mc-00076-CKK-WAU Document 731 Filed 07/28/23 Page 192 of 260
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/23 Page 192 of 265

-150-

1    unless it is currently in the hands of the grand jury which I

2    don't believe it is because I don't think that anything that

3    Mr. Montgomery has been asked to produce on the grand jury

4    subpoena has, in fact, been given to the grand jury.

5                    THE WITNESS:  You want me to answer that

6    question?

7                    MS. KLAR:  No, excuse me, Mr. Montgomery.

8            First, whatever Mr. Flynn told this Court I'm not

9    responsible for.  And if Mr. Flynn told this Court and Judge

10   Pro that all of this information was going to be turned over

11   to the grand jury or it had been subpoenaed and had to go to

12   Washington --

13                   THE COURT:  He did.

14                   MS. KLAR:  That's -- and that's not what

15   happened --

16                   THE COURT:  No.

17                   MS. KLAR:  Then perhaps that will influence the

18   Court in terms of its evaluation of the credibility of the

19   assertions that Mr. Flynn is making now against me, against

20   Mr. Montgomery, Edra Blixeth and everyone else.

21           To the extent that Mr. Montgomery has information

22   with regard to what has happened with any hard drive, it is

23   all covered by privilege.

24           He has no independent communications with anyone at

25   the U.S. Attorney's office, and to the extent that these

Case 3:22-mc-00078-GMN-WAU  Document 734  Filed 07/28/23  Page 193 of 200
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 193 of 265

-151-

 1    questions are designed to elicit responses regarding the

 2    whereabouts of that information or the whereabouts of that

 3    drive, it's all based on privileged communications, and I

 4    would instruct him not to answer so --

 5                    THE COURT:  All right.  Well --

 6                    MR. PEEK:  Do you want me to respond at all,

 7    your Honor?

 8             I mean, it's -- Ms. Klar, as an officer of the

 9    court, has an obligation to at least inform this Court as to

10    where the -- the whereabouts of that original PST file is.

11             She can't just say it's in the hands of this unnamed

12    law firm and this unnamed consultant, or it's in the hands of

13    the grand jury and therefore perhaps not available.

14             Was this ever raised.  When the Court had its

15    hearing --

16                    THE COURT:  I know.

17                    MR. PEEK:  It's just more shell game -- let's

18    move the little shells around, let's hide the little kernel

19    under them, and let's decide what's appropriate at the moment,

20    as opposed to being candid with this tribunal.  She's not

21    being candid with this tribunal, nor is Mr. Montgomery being

22    candid with this tribunal.

23                    THE COURT:  What are your -- tell me --

24                    MR. PEEK:  Your Honor, what I want to know is --

25    what he said to us is that he did at least have a copy of the

Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 194 of 800
Case 3:06-cv-00056-PMP-VPC  Document 734  Filed 07/08/08  Page 152 of 265

-152

1    entire PST file of Glogauer, I believe, in native format.

2              THE COURT:  Right.

3              MR. PEEK:  And we know that apparently at some

4    time along the way that that was produced to a law firm whose

5    name we don't know because we think, but we don't know for

6    sure, that it was the subject of a grand jury subpoena so that

7    was out of our -- that's been sort of out of our hands.

8              And now we're being told, well, it was turned over

9    to that law firm to then capture that Glogauer e-mail from

10   this original native format and produce it in a clone form of

11   just one single entry, which is what we have, and it's not

12   native format, it's not original file, and we don't have it,

13   which is what the Court ordered to be done.

14             Mr. Montgomery says I don't have an answer how it

15   was done.  Ms. Klar says I don't have an answer how it was

16   done.  Somebody has to provide us with an answer, and if they

17   don't, they haven't met their burden.  It's their burden to

18   show cause why this case shouldn't dismissed.

19             THE COURT:  Well, let's not go there.

20             Tell me what your question was that you --

21             MR. PEEK:  Oh, it had to do with the grand jury,

22   your Honor, is the e-mail -- is the entire PST file in the

23   possession of the grand jury of the United States Attorney,

24   because, if it is, I think maybe that's a reason that they

25   might have for why they shouldn't have to produce it.

1          But I don't believe that it is because otherwise

2     this unnamed law firm and this unnamed consultant wouldn't

3     have been able to clone this and give us what they gave us.

4                THE COURT:  So, why don't you ask -- it would

5     seem to me an appropriate question would be to ask whether,

6     absent an attorney-client privilege communication -- I mean,

7     Ms. Klar has invoked the attorney-client privilege.  Absent --

8     if he can answer without violating the attorney-client

9     privilege what he knows, he can go ahead and answer.

10               MR. PEEK:  I would agree, your Honor, but let's

11    keep in mind this is a sword and shield on the part of

12    Ms. Klar and on the part Mr. Montgomery because -- so if

13    they want to go there, that's certainly their risk to go

14    there.

15          Because if they -- if it's actually demonstrated

16    that, in fact, this is not, as I argue to the Court and

17    proffer to the Court, a complete original PST file, then they

18    have some explaining to do, but I'll ask that question.

19               THE COURT:  All right.

20    BY MR. PEEK:

21     Q   Can you, Mr. Montgomery --

22               MS. KLAR:  Your Honor, if I can just respond

23    briefly.

24          There have been a lot of allegations to which we

25    have not responded made by Mr. Peek about us being engaged in

Case 3:23-mc-00076-SMK-WPC Document 731 Filed 07/08/08 Page 196 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 194 of 269
-154-

1   shell games, et cetera.  We vehemently deny that.

2          I endeavored in whatever way I could to comply with

3   this Court's order to make sure that -- I understood the PST

4   was produced.  If that has not happened, the first I'm hearing

5   about it is today.

6          THE COURT:  All right.  Go ahead and ask your

7   questions, and if the questions -- Ms. Klar has advised that

8   there may be some attorney-client privileged communication,

9   and if those are the bases for Mr. Montgomery's answer,

10  Ms. Klar has the right to interpose an objection and instruct

11  her client not to answer, and let's proceed.

12          MR. PEEK:  I will, your Honor.  I'm going to ask

13  a few preliminary questions though.

14  BY MR. PEEK:

15   Q   With respect to the Len Glogauer backups that you

16  performed which captured his e-mail file, where did you

17  maintain those?

18   A   Either my home or storage in Reno originally.

19   Q   Okay.  And then after your home or storage in Reno, what

20  happened to the backups of the Len Glogauer e-mail file, the

21  PST?

22   A   They were in the possession of Mr. Flynn.

23   Q   Okay.  So they were in Mr. Flynn's possession beginning

24  when and ending when?

25   A   I think I went through this before, you asked me this in

155

```
 1   the first hearing.
 2   Q   I did not, sir, but --
 3   A   I thought you did.
 4   Q   Just answer the question, please.
 5   A   I'm sorry, when was it?
 6   Q   When did Mr. Flynn take possession of the Len Glogauer
 7   PST file of his e-mails?
 8   A   I don't know specifically that file, but the drives --
 9   Q   Well, the drives which had that file on it, when did he
10   take possession of that?
11   A   Either directly before or directly after the raid on my
12   home and my storage.
13   Q   And then you told us basically what happened to all of
14   these hard drives last -- or two weeks ago where they went
15   back to you and then to Mike Flynn, Jr., and then back to Mike
16   Flynn and back to you.  Is that the same testimony you would
17   give this Court?
18   A   Yes.
19   Q   Okay.  So at some time you did have possession of the
20   Glogauer e-mail file which is a PST file.
21   A   Yes.
22   Q   And did you have that in or about, say, April of 2007?
23   A   I don't know specifically if I did or not at that exact
24   time.
25   Q   Okay.  And at some time you turned that file over to an
```

1    attorney, correct?

2    A    Yes.

3    Q    And when did you do that?

4    A    I don't remember specifically.

5    Q    Do you remember a month?

6    A    No.

7    Q    Do you remember a year?

8    A    2007, I believe.

9    Q    Okay.  Can you remember a season of 2007?

10   A    No, I don't remember.

11   Q    Okay.  To what attorney did you turn it over?

12   A    Is that not divulging attorney-client privilege?

13   Q    No, it's not, sir.

14   A    Saul Pelchin.

15   Q    Okay.  That's the same lawyer in Mr. Bennett's office.

16   A    Yes.

17   Q    That's your lawyer in Washington, D.C.

18   A    Yes.

19   Q    And is it your testimony that Mr. Pelchin -- am I saying

20   that correctly?

21   A    I think it's Pelchin, whatever, maybe it's the same

22   thing, we both said --

23   Q    We may be saying the same thing.

24          But is it your testimony, then, that Mr. Pelchin has

25   had this Len Glogauer PST file from the time you gave it to

1     him until today?

2                      MS. KLAR:  Mr. Montgomery, you are instructed

3     not to answer that question to the extent it requires that you

4     disclose attorney-client communications.

5                      THE COURT:  So what Ms. Klar is saying -- ask

6     the question again -- just a minute, Mr. Peek.

7            I'm going to have Mr. Peek state the question again,

8     and then Ms. Klar has instructed you, to the extent it

9     requires you to disclose attorney-client communications, she

10    doesn't want you to answer.

11           So say the question again, sir.

12    BY MR. PEEK:

13     Q   Is it your understanding that Mr. Pelchin has had the

14    entire Glogauer PST original file from the time you gave it to

15    him until today?

16     A   I can't answer that without divulging attorney-client

17    privileged information.

18                      MR. PEEK:  Okay.  Your Honor, it seems to me

19    that -- I understand, certainly, attorney-client privilege, I

20    understand the importance of the attorney-client privilege,

21    but when, in a proceeding such as this, the party hides behind

22    a privilege to say that he doesn't know the whereabouts of

23    documents required to be produced by this Court pursuant to

24    its May order, and we have not heard anything at all from

25    Ms. Klar, who is counsel in this proceeding, about the

Case 3:23-mc-00078-CKK-WAU Document 731 Filed 07/08/08 Page 200 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 200 of 265

-158

 1    location of that until today on June 24th, that that,

 2    respectfully, is not really a privilege.

 3              You know, what's the confidential communication

 4    there?  The file is located in X place or is located in Y

 5    place.  That's really not a confidential communication.

 6    That's a communication, but it's not a confidential

 7    communication designed to be kept confidential as to what the

 8    location of it is.

 9              That's what the attorney-client privilege is, it's

10    to protect those communications that are deemed to be

11    confidential.  This is not one of those.  This is just a

12    communication, it's like a transmittal letter, I enclose the

13    following.

14              You know, that's not, although a lot of lawyers

15    think it is, an attorney-client confidential communication.

16    It is a communication between an attorney and a client, but

17    it's not one to be protected, and I think that's similar here,

18    not one that should be protected.

19                   THE COURT:  Ms. Klar?

20                   MS. KLAR:  Your Honor, I disagree.  This is a

21    confidential communication.  It also involves work product

22    issues, and I would instruct Mr. Montgomery not to answer.

23                   THE COURT:  All right.  Well, I'm not going to

24    have oral arguments on whether the information -- testimony

25    Mr. Montgomery might provide in response to this particular

Case 3:22-mc-00073-PMP-WGC   Document 731   Filed 07/28/08   Page 201 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 193 of 205

159

1   question or lines of questioning are subject to the

2   attorney-client privilege.

3           I will -- I certainly -- to the extent its invoked,

4   it's invoked, and to the extent that issues become apparent in

5   the future at sometime that it's not subject to the

6   attorney-client privilege or shouldn't have been and that it

7   was improperly invoked, the Court will certainly have to take

8   that up, but I'm not going to instruct Mr. Montgomery to do

9   other than what Ms. Klar has instructed him.

10          So please proceed.

11              MR. PEEK:  Thank you.

12   BY MR. PEEK:

13   Q    Who asked you to backup Len's e-mails?

14   A    I don't know who specifically.

15   Q    You just did it?

16   A    Well, Warren told me to back up those machines, he was

17   one of them.

18   Q    Okay.  Do you know -- without divulging the

19   attorney-client privilege -- the name of the individual who

20   prepared the PST file that was produced to us that supposedly

21   contains the Glogauer e-mail?

22              MS. KLAR:  The same instruction.

23   BY MR. PEEK:

24   Q    Have you seen that name of the expert who did this on

25   anything other than an attorney-client privileged

Case 3:23-mc-00076-CMK-WPC Document 7-1 Filed 07/08/23 Page 202 of 800
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/03/08 Page 202 of 205

160

1    communication, for example, a bill, for example, a

2    correspondence from this expert that you were copied on?

3              MS. KLAR:  Your Honor, the characterization of

4    this firm as an expert is incorrect.  They have been

5    designated as a consultant, and, for that reason, the work

6    product privilege has been invoked, they are not designated as

7    an expert.

8              MR. PEEK:  Your Honor, you can't hide behind

9    that, produce something and say I'm only a consultant.

10            You know, if they actually went forward and copied

11   something, they become percipient witnesses now.  They're no

12   longer a consultant if they have actually performed a task

13   that is percipient in nature with respect to court orders

14   about production of documents.

15            They're now a percipient witness, they have lost

16   whatever consultant work product privilege they had when they

17   undertook to perform tasks related to production of documents

18   in this proceeding.  They're now percipient.

19            THE COURT:  I am really struggling with this

20   concept of what Ms. -- I understand Ms. Klar is articulating

21   which is the Court orders a document to be produced, neither

22   the client nor the law firm representing the client in this

23   case produces the document.

24            Somebody else who -- some law firm who, for some

25   reason, has the e-mail is the one who produced it and then

1    nobody gets to ask any questions about it.  What is going on?

2                      MS. KLAR:  Your Honor, because of the shortness

3    of time, we were not in a position to have the firm that we

4    would normally have used to deal with this issue create the

5    PST file.

6                      THE COURT:  The law firm?

7                      MS. KLAR:  No, the -- Fulcrum.

8                      THE COURT:  The consultant -- okay.

9                      MS. KLAR:  Fulcrum.

10                     THE COURT:  The similar electronic --

11                     MS. KLAR:  We would have used, and I had to

12   evaluate in compliance with your order or having somebody who

13   could come and testify about this perform the work that needed

14   to be done on a very expedited basis.

15               To the extent that we need to present a witness,

16   percipient witness, I would like an opportunity to confer with

17   counsel in Washington, and one of two things can happen, we

18   can agree that that firm will appear and be available for

19   questioning, or, alternatively, option two would be to have

20   Fulcrum do what I would have had them do in the first instance

21   and give us some time to have them create the PST file.  But

22   for the Court's order, that would have been the procedure that

23   I would have followed.

24                     MR. PEEK:  Your Honor, this matter has been at

25   issue since we filed the motion for sanctions in July of last

Case 3:23-mc-00073-SMK-WAU  Document 734  Filed 07/08/08  Page 204 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 162 of 265

-162

1    year, and the Court, you know, did what it did.

2         She knew it was an issue, she had an expert who

3    testified about what Mr. Karchmer did.  This whole thing has

4    been at issue, this is not anything new to Ms. Klar.  We have

5    never given up on --

6         THE COURT:  Well, I am really struggling with

7    this whole concept of we have this other law firm who is not

8    an attorney of record in this case who has produced a document

9    which is part of this case.  This e-mail is part of this case,

10   it's part of the discovery in this case, period.

11        And now, I guess, no one today can tell us -- can

12   answer questions which seem to me to simply be routine in a

13   discovery dispute about documents and who produced them and

14   who organized them and so forth.  I'm just at a real loss to

15   understand what is -- frankly, what's going on.

16        And it may be that whoever this unnamed law firm is,

17   I don't know if it's Mr. Pelcher or Pelchin or someone else,

18   is going to have to come out here and explain himself, and

19   we'll just have another hearing where that may well be what's

20   going to happen, I don't know.

21        MS. KLAR:  Your Honor, could we take a brief

22   recess so I can try to call somebody in Washington?

23   Unfortunately, Mr. Pelchin I know is on vacation.

24        THE COURT:  All right.

25        MS. KLAR:  But I'll endeavor to reach somebody

1    so I can get some further information on --

2              THE COURT:  All right.  Let's do this.  We have

3    a three o'clock recess, it's 20 minutes to 3:00.  Mr. Peek, if

4    you have another line of questioning, keeping in mind --

5              MR. PEEK:  I will do that, keeping in mind what

6    I told you.  I understand, your Honor, I'm trying to get

7    through this.

8              THE COURT:  All right, all right, all right, and

9    so -- anyway, go on to something else, Ms. Klar can take the

10   three o'clock recess to see about contacting someone

11   concerning this issue.  So let's proceed with another line of

12   questioning.  Go ahead, sir.

13   BY MR. PEEK:

14   Q    Okay.  There are other e-mails, e-mail files that you

15   copied from another individuals' computers, are there not?

16   A    Probably, yes.

17   Q    Okay.  And those were copied -- and those files, those

18   e-mail files, are called PST files, are they not?

19   A    Yes.

20   Q    And do you still have those?

21   A    I've been going through the drives looking for them.

22   Q    Okay.  And have you found those PST files for all of the

23   other individuals like Mr. Trepp, like Ms. Gray, like Jale

24   Trepp?

25   A    Is that a question?

Case 3:22-mc-00073-PMP-VPC Document 731 Filed 07/28/08 Page 206 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 164 of 205
-164

1   Q   Yeah.

2   A   What was the question?

3   Q   Have you found them?  You said you've been going through

4   them.  Have you found any PST files of the e-mail files that

5   you took from the eTreppid computers?

6   A   I have been concentrating on separating the post-2003 to

7   2005 files from the state files that have been deemed state

8   secrets.  For the last two weeks that's what I've concentrated

9   on doing.

10  Q   Well, nothing has been deemed state secrets until you

11  make a good faith belief, and then you submit it to the

12  government and the government makes that decision, isn't that

13  true?

14  A   No.  Is that -- I didn't think that was the case.

15  Q   Well, you have to make a good-faith determination that it

16  is and submit it to the government, do you not?

17  A   Well, I believe they told me what that is, and if it is

18  that, I presumed it is that.

19  Q   Okay.  Let's just go back to the e-mails.

20          Have you found in your search the e-mail folders,

21  the PST files, for other -- individuals other than Len

22  Glogauer?  We know where it is now.

23  A   I have not looked because I've been looking through the

24  drives one drive by one drive separating out the -- the

25  government's sensitive material from the nongovernment

```
 1    sensitive material.

 2    Q    One, you have not looked?

 3    A    I'm not done.

 4    Q    Okay.  But, one, you have not looked yet for the e-mails,

 5    e-mail folders in PST form?

 6    A    No, I didn't say that.

 7    Q    Okay.

 8    A    What I've done is separate the files between the two, and

 9    I brought to the Court the 2003, 2004 and 2000 drives with

10    Len, Sloan, Patty and Warren, files that I did not think were

11    considered government sensitive and --

12    Q    Are there any e-mails on those?

13    A    I didn't look, I just separated out the files that I knew

14    weren't government sensitive.

15    Q    Okay.  And you brought those with you today?

16    A    Yes.

17    Q    Okay.  Why haven't you produced them before today?

18    A    Because I just finished it recently.

19    Q    So you don't still yet know whether or not you have PST

20    files which contain e-mails from any other individuals other

21    than Mr. Glogauer; is that correct?

22    A    I have not got through all the drives, that's correct.

23    Q    Okay.  How many drives do you have of eTreppid material?

24    A    Well, you asked me that the last time, didn't you?

25    Q    How many do you have?
```

```
1    A    I said there's, like, 30 to 40.

2    Q    Okay.  And how many have you gone through so far to date?

3    A    Probably 20 to 25.

4    Q    Okay.  And there's 20 to 30, you've got through 20 to 25,

5    so you've only got 5 to 10 left?

6    A    Yes.

7    Q    And of those 25 that you've looked at, did you find any

8    e-mails on them?

9    A    I wasn't, specifically on those drives, looking for that.

10   I was concentrating on doing the searches and separating the

11   sensitive from the nonsensitive material.

12   Q    Okay.  When you opened the file, could you see anything

13   that related to the name Outlook?

14   A    There's 650,000 files.

15   Q    Did you see anything or run a search with the name

16   Outlook?

17   A    No, that wasn't one of the searches I was looking for.

18   Q    Okay.  But that's an e-mail -- the name of a program,

19   isn't it?

20   A    Yes, but I --

21   Q    And the e-mail files would have a name somewhere in it

22   with Outlook, would they not?

23   A    At eTreppid, not necessarily, no.

24   Q    Did eTreppid use Outlook for its e-mail?

25   A    Yes.
```

Case 3:23-mc-00075-PMP-WGC   Document 731   Filed 07/28/08   Page 209 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/28/08   Page 167 of 265

-167-

1   Q   So as you sit here today, you can't tell this Court where

2   the e-mail files in PST, original PST with native data on

3   them, native format, are?

4   A   Not until I've gone through all the drives.

5   Q   Okay.  And are you going to produce to the Court today or

6   to me today these 20 to 25 drives that you brought with you?

7   A   I didn't say I brought 20 to 25 drives, I believe I've

8   already produced how many?

9   Q   None.

10  A   No drives?

11  Q   None.

12          MS. KLAR:  Your Honor --

13          THE WITNESS:  Okay.

14          MR. PEEK:  You've produced the two hard drives,

15  one terabyte and one gigabyte -- and 500 gigabytes, and you've

16  given us copies of our original hard drives which were seized

17  by the FBI.  You've given us those, but those don't have the

18  data on it.

19          MS. KLAR:  Your Honor, I indicated while

20  Mr. Montgomery was conferring with the government that we had

21  brought with us the last time drives that Mr. Montgomery had

22  reviewed and taken information off of his hard drives and put

23  on those drives to be produced, and I stated that after the

24  hearing on the 10th, I gave those hard drives to Fulcrum to

25  copy and that those hard drives will be available for

Case 3:22-mc-00076-CKK-WAU Document 731 Filed 07/08/08 Page 210 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 210 of 265

—168

1    inspection by eTreppid.  I'm told by Fulcrum, they should have

2    completed the task of copying all of them by Friday.

3              THE COURT:  And how many, just estimate,

4    Ms. Klar, how many hard drives.

5              THE WITNESS:  I think there were 12 or 14.

6              THE COURT:  Twelve to 14 hard drives, just so I

7    understand, that you had given to Fulcrum so that they can

8    make copies.

9              MS. KLAR:  Yes, your Honor.  I have a list of

10   those, I believe, with me today.

11             THE COURT:  All right.

12             MS. KLAR:  If you would like me to provide that

13   to eTreppid.  I asked for them last night, to send me a list

14   of the hard drives they have.

15             THE COURT:  All right, thank you.

16             MR. PEEK:  I guess what I want to know, your

17   Honor, is that's well and good.  You asked them to produce in

18   response to my request e-mails in native format.  That's part

19   of my request.

20        And you may recall, your Honor, that I stood up

21   before this Court and said we have Wall Street Journal and NBC

22   e-mails in text format, but we required and requested them to

23   be produced in native format, and they were ordered by the

24   Court to be produced in native format.

25        Now all we're told by Mr. Montgomery, I don't know

1   whether they're on those drives or not, I don't know where

2   they are, I haven't been able to locate them, I haven't even

3   looked for them.

4          And Ms. Klar says, and, oh, by the way, we now have

5   them at Fulcrum.  What do they have at Fulcrum?  Is she

6   telling this Court as an officer of the court that these are,

7   in fact, the PST files of the e-mails that he took off of the

8   various computers at eTreppid over the course of his time

9   there from '98 all the way through December of 2005?

10          THE COURT:  Well, at the recess Ms. Klar says

11   she's got a copy of whatever the 12 to 14 that have been sent

12   to Fulcrum, and if that would be a starting place in

13   responding to that question, I don't know.

14          MR. PEEK:  Well, this witness has told me he

15   doesn't know whether they are or not.

16   BY MR. PEEK:

17   Q   Are the e-mails on there, on those drives?

18   A   I do not know if they are or not.

19   Q   And you don't where they are located, then, do you?

20   A   I'm not through all the drives yet.

21   Q   Do you understand that the Court ordered you to produce

22   the e-mails that you were going to produce, required you to

23   produce with respect to the Wall Street Journal and NBC news,

24   in native format?

25   A   Yes.

1    Q    Why haven't you done that?

2    A    Because there are millions of files and it takes so many

3    to get through each day.

4    Q    Well, that is a court-ordered requirement.  How often --

5    what searches have you run, if any, to look for e-mail files?

6    A    I believe I was looking for government sensitive material

7    to separate from the drives.

8              THE COURT:  All right.  So the answer is --

9    would the answer, Mr. Montgomery, to Mr. Peek's question be

10   that you have not yet done a search for E-mails because you've

11   been focusing on this other task?

12             THE WITNESS:  Correct.

13             MR. PEEK:  Okay.  I'll move on, your Honor.

14   I'll reserve for argument as to what that means.

15   BY MR. PEEK:

16   Q    Now, with respect, then, to the Wall Street Journal and

17   NBC e-mails, you have produced to us in text form certain

18   e-mails, have you not?

19   A    Yes.

20   Q    And how were those -- was the text on these created?

21   A    I believe they were just printed out.

22   Q    Printed out in what way, from what medium?

23   A    I don't recall.

24   Q    Well, you said they were just printed out.  They had to

25   be printed out from something, didn't they?

```
 1    A    You mean printed --

 2    Q    When you said they were just printed out, that's what you

 3    said.

 4    A    I don't -- I don't remember if they were taken -- they

 5    were just taken in ASCII form.

 6    Q    And where were they saved in ASCII form?

 7    A    I think they were just either -- on a hard drive.

 8    Q    And how did they get converted into ASCII form to PST

 9    form?

10    A    I believe they were just saved.

11    Q    Saved by you?

12    A    I don't know if I did or Mr. Flynn did.

13    Q    But somebody saved them from the original hard drives and

14    put them into some -- into ASCII format.

15    A    I think so.

16    Q    And you don't know who did that?

17    A    No.

18    Q    And do you know when that was done?

19    A    I believe before the raid on my home.

20    Q    So before March 1st or 2nd of 2006; is that correct?

21    A    I believe so.

22    Q    And was there any organization to those e-mails?

23    A    No, not that I remember.

24    Q    Well, did you just have the e-mail file, the PST file,

25    and then just say save it, or did you take some order out of
```

Case 3:23-mc-00073-SKK-WAU Document 731 Filed 07/28/08 Page 214 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 214 of 265

                                                                              -172

1    the e-mails?

2     A    I don't remember.

3     Q    Well, you don't remember how they were -- in what order

4    you saved them, you just saved them but don't know how or why,

5    what rhyme or reason was --

6     A    That was two and a half years ago.

7     Q    I understand it was two and a half years ago, sir.

8     A    Well, I just gave you my answer.

9     Q    You don't know, in other words.

10    A    I don't remember the logic.

11    Q    Well, was the logic that they were to be saved sort of in

12   the manner in which they were created, in other words, so that

13   the earliest string on the e-mail would be at the last and the

14   most recent would be at the top?

15    A    No.

16    Q    They weren't saved that way?

17    A    I don't think so.

18    Q    Okay.  Were they saved by some subject matter?

19    A    I don't recall at the time if they were or not.

20    Q    And when they were saved in this ASCII format, where did

21   they -- where did they go?  I mean, where did you keep them?

22    A    I thought originally it was on a hard drive.

23    Q    You thought it was or it was?

24    A    I don't remember.

25    Q    So you don't know where you kept them; is that correct?

1    A    You mean the original?  Yeah.

2    Q    I'm talking about those e-mails --

3    A    I know what you're talking about, you just asked me that

4    and I just said I don't remember.

5    Q    You don't remember where you kept them.  Okay.  That's

6    fair.

7              And when you were responding to the request to

8    produce all e-mails that were provided to the media, how did

9    you go about collecting those e-mails?

10   A    I think I just had a series of text files.

11   Q    Pardon?

12   A    I think there were just -- I had -- I believe they were

13   just text files off the hard drive.

14   Q    Okay.  They were a series of text files on a hard drive.

15   A    Yes.

16   Q    Okay.  And how did you know that those series of text

17   files -- so those were the ones that you had saved previously?

18   A    I'm sorry?

19   Q    Were these the E-mails that you had saved previously that

20   you had downloaded into this ASCII format and then put into --

21   A    I thought I said I did or Mr. Flynn did.

22   Q    Well, whoever did it, okay, now, so did you know which

23   e-mails were given to NBC News and to the Wall Street Journal?

24   A    No.

25   Q    And so you just downloaded a bunch of E-mails that were

1  in text files and produced them to us?

2              MS. KLAR:  Mr. Montgomery, you are instructed

3  not to provide any attorney-client information in response to

4  that question.

5              MR. PEEK:  Your Honor, this is -- this is

6  absolutely laughable because we hide behind every chance we

7  get the attorney-client privilege.

8              He has an obligation to produce.  Ms. Klar has an

9  obligation as an officer of this court to be candid with the

10 Court, and to say, well, don't say anything.  Either he did or

11 did not.  I mean, how would he go about keeping them, how did

12 he go about finding them, is that what Ms. Klar did or

13 Mr. Flynn did?  I'm entitled to know.

14             I'm entitled to know what the basis of the privilege

15 is, and it's similar to what you would do in a (inaudible),

16 give us that kind of information so this Court can make a

17 determination.

18             THE COURT:  Why is this subject to the

19 attorney-client privilege, Ms. Klar?

20             MS. KLAR:  Because our law firm produced these

21 documents based on communications that we had with

22 Mr. Montgomery.

23             I'm not telling Mr. Montgomery not to respond to

24 questions about how he kept them or how they were maintained,

25 but once we received those files, we produced them in response

1    to this Court's order and --

2              THE COURT:  Isn't that true any time, I mean,

3    any production?  If there's an order saying, all right, party,

4    produce this wedge of documents, usually the lawyer tells the

5    client go get these, and the client does, the client goes and

6    gets them and gives them to the lawyer, the lawyer produces

7    them in the format under Rule 34.

8              And if what you're saying is true, any time any

9    party is asked questions about, well, how did you get these,

10   what did you do with them and so forth, you can say, well,

11   that's attorney-client privilege?

12             MS. KLAR:  No, your Honor, that's not what I'm

13   saying at all.

14             THE COURT:  Okay.

15             MS. KLAR:  What I'm saying is that he --

16   Mr. Peek is asking specific questions with regard to the

17   physical production of these documents.

18             We physically produced the documents so, if anyone

19   is to be questioned about it, arguably it should be me or my

20   law firm.

21             But, in terms of the questions that you are

22   suggesting, I'm not telling Mr. Montgomery not to respond to

23   those questions, but questions about the physical production,

24   the only way --

25             THE COURT:  Right.

-176

```
 1                    MS. KLAR:  In other words, how they went from

 2    our firm to eTreppid, that information would be privileged.

 3                    MR. PEEK:  I wasn't asking that, your Honor.

 4                    THE COURT:  Right.  Okay.  He's not asking that.

 5    Go ahead.

 6                    MR. PEEK:  Thank you.

 7    BY MR. PEEK:

 8    Q    The text files that you talked to us about, they were

 9    maintained on a hard drive.  Is that correct, so far?

10    A    I believe so, that's correct.

11    Q    Okay.  And were they segregated in any way so that you

12    could identify that these documents were the ones that you

13    gave to the Wall Street Journal?

14    A    No.

15    Q    Okay.  So you just picked and chose from certain text

16    files and then produced them?

17    A    No, I -- that group is kind of what I thought was

18    produced at that time.

19    Q    Okay.  So these are -- the e-mails that you produced to

20    us of e-mails given to the media are ones that you think may

21    have been given to the media.

22    A    Yes.

23    Q    Okay.  And I think you've also said you don't know

24    whether you gave them to the media or Mr. Flynn gave them to

25    the media; is that correct?
```

1   A    That's correct.

2   Q    Okay.  But you believe that the ones that you produced --

3   now, how did you go about assembling the group of documents

4   that you believe may have been given to the media?

5   A    I don't know what you mean.

6   Q    Well, just that.  It's very simple.  How did you go about

7   assembling this group and say I think this -- when you looked

8   into your hard drive, you certainly copied certain documents

9   that were saved in a text file, and you believe that that

10  group is what may or may not have been given to the media.

11  A    I had a subfolder under documents that I had with my

12  prior attorney, and it was labeled in a way that I thought --

13  led me to --

14  Q    What was the label?

15  A    Media.

16  Q    Okay.  So you went into a subfolder that said media.

17  A    Yeah, I think that was the name.

18  Q    Okay.  And who put them in this -- who recreated that

19  subfolder, you?

20  A    I don't know if I did or my prior attorney did.

21  Q    Well, on whose computer did you find this information?

22  A    Mine, I'm sorry.

23  Q    Okay.  So if we had a forensic copy of that, we would

24  know who created that and when it was created, wouldn't we?

25  A    I guess.

```
 1              THE COURT:  All right, sir, it's about two
 2   minutes to 3:00 so I'm going to take a brief recess.
 3              MR. PEEK:  Let me move this stuff off of the
 4   lectern.
 5              THE COURT:  You can move -- you don't need to
 6   move any of your things unless you would like to do so.
 7              Counsel, this won't take long, and it's a public
 8   proceeding so you're all welcome to remain, and it will be
 9   very brief.
10              In the meantime, I know Ms. Klar is going to make a
11   phone call, and I think she also is going to provide -- to the
12   extent that there are copies of documents that might need to
13   be copied, could you --
14              MS. KLAR:  I have a number of copies.
15              THE COURT:  Oh, you do.  Very good.
16              All right.  So we'll be in recess and reconvene
17   shortly.  Thank you.
18                    (A recess was taken.)
19              THE COURT:  Go ahead, sir.
20              MR. PEEK:  Thank you.
21   BY MR. PEEK:
22    Q   Mr. Montgomery --
23              MR. PEEK:  And, your Honor, I marked my exhibits
24   actually beginning with 1 as opposed to beginning at 19.  Is
25   that going to be a problem?  If it is, I can certainly change
```

Case 3:22-mc-00073-GMK-WAU  Document 731  Filed 07/28/08  Page 221 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 179 of 269

-179

1    the numbers on my binders and just call them -- and the clerk

2    can mark them correctly.  Do I start with Defendants' 1 versus

3    Court's Exhibit through --

4                    THE COURT:  Ms. Clerk?

5                    THE CLERK:  It won't be a problem.  Yours are

6    designated court exhibits so the plaintiff can have their

7    exhibits and the defendants can have their exhibits.

8                    THE COURT:  All right.  Go ahead, sir.

9                    MR. PEEK:  Thank you.

10          Your Honor, I ask the clerk to mark as Defendant's

11   Exhibit 8 -- excuse me, Exhibit 9, and it's in that binder tab

12   9, and then after she's done, hand to it Mr. Montgomery.

13                   THE CLERK:  Do you have an extra copy, Mr. Peek,

14   for me?

15                   MR. PEEK:  Another one?

16                   THE CLERK:  Thank you.  Let's do that.  Thank

17   you very much, sir.

18                   MR. PEEK:  Thank you.

19                       (Defendant's Exhibit 9 marked for
                          identification.)
20                   THE WITNESS:  Got it.

21   BY MR. PEEK:

22    Q    Do you recognize Exhibit 9 as anything you've seen before

23   today?

24                   MS. KLAR:  Your Honor, for the record, while we

25   recognize that the Court has ordered us to produce these

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 3:23-mc-00073-GMN-WGC Document 734 Filed 07/08/08 Page 222 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 180 of 205

-180-

 1   documents, we take the same position with regard to these

 2   e-mails as we did with respect to the Len Glogauer e-mail.

 3          We don't believe that these e-mails are relevant to

 4   any claim or defense in this litigation, and, unlike the Len

 5   Glogauer e-mail which was submitted to the Court by Mr. Flynn

 6   appended to a declaration of Mr. Montgomery, these e-mails, to

 7   my knowledge, never were provided to the Court at any time,

 8   and so we continue to be at a loss to understand how these

 9   documents have anything to do with this lawsuit.

10                   THE COURT:  All right.

11                   MR. PEEK:  Do I need to respond, your Honor?

12          Two things, the issue of defamation is directly at

13   issue in this case against both Edra Blixeth and Dennis

14   Montgomery, and the defamation comes from the Len Glogauer

15   e-mail in which Mr. Glogauer is purported to have said that we

16   need to take care of Jim as we've done before, or something

17   along those lines.

18          That is a false and defamatory statement because it

19   implies, as the Wall Street Journal did, and as Mr. Montgomery

20   has in many statements, public corruption.

21          Additionally, that are E-mails in which Jale Trepp

22   is reported to have stated to Mr. Warren Trepp on March 22nd,

23   2005, please don't forget to bring the money you promised Jim

24   and Dawn on the trip, again, a defamatory statement.

25          We don't have that native -- or PST file in native

Case 3:22-mc-00073-GMK-WAU Document 731 Filed 07/28/08 Page 223 of 800
Case 3:06-cv-00056-MMF-VPC Document 731 Filed 07/03/08 Page 181 of 205

-181

1    format from Mr. Montgomery of either the Glogauer e-mail or

2    the Jale Trepp e-mail, and there are many, many other e-mails

3    that were provided to the Wall Street Journal in an effort by

4    Ms. Blixeth to destroy and tarnish and defame Mr. Trepp.

5    That's at issue in this case.

6             I don't know whether Ms. -- whether Ms. Klar is

7    reading the same complaint that I'm reading, but that's at

8    issue.

9             THE COURT:  All right.  Well, we're at -- this

10   is an order to show cause hearing concerning discovery.  These

11   are documents that are a series of documents involved in a

12   request for production of documents and interrogatories, and,

13   once again, to the extent that, as far as the Court is

14   concerned for the purposes of this hearing, the question is

15   the Court had ordered production of certain documents.

16   Whether they lead to the discovery of admissible evidence is

17   not an issue that the Court is focusing on today so I'm going

18   to allow -- counsel have made a record of their positions, and

19   I want to proceed.

20             MS. KLAR:  Thank you, your Honor.

21             MR. PEEK:  Thank you, your Honor.

22             THE COURT:  Go ahead.

23   BY MR. PEEK:

24    Q    The question before you, Mr. Montgomery, is do you

25   recognize anything in Defendant's Exhibit 9 as something

Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/08/08 Page 224 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 132 of 205

-182-

1    you've seen before today?

2    A    Yes.

3    Q    And what is contained within Exhibit 9 which consists of

4    Bates numbers DM 1107 through DM 1387?

5    A    E-mails.

6    Q    And is it your understanding that these e-mails, Bates

7    numbers DM 1107 through DM 1387, Exhibit 9, are what you

8    believe to be documents, e-mails that may or may not have been

9    given by you or by Mr. Flynn to the media?

10   A    Yes.

11         I would also state for the record, I would say some

12   of these e-mails probably the government should review.  I

13   don't know if they've reviewed them or not, given some of the

14   names I just fanned through it and looked at.

15   Q    Before you produced them to your counsel to produce to

16   me, did you conduct a good faith review?

17   A    I put the names in, but I didn't hit these names.

18   Q    Okay.  And you gave these e-mails, you believe, or these

19   e-mails may or may not have been given to the Wall Street

20   Journal?

21   A    I don't think all of them were.

22   Q    Okay.  Can you tell me which of them were not?

23   A    No.

24   Q    Okay.  Now, the first document -- and these are all text

25   files, correct?

1   A    Yes.

2   Q    And these are all contained in a native PST format

3   someplace, correct?

4   A    I don't know if all of them are; some of them.

5   Q    Well, they were -- at one time, you had possession of the

6   native PST files did you not, sir?

7   A    You mean before they raided my house?  Yes.

8   Q    Okay.  Are you suggesting, then, that the FBI compromised

9   the data that you had in native PST files?

10  A    I don't know if they have or not.  I've asked for an

11  evidentiary hearing for two years and haven't gotten one yet.

12  Q    Okay.  And is it still your position today that you want

13  an evidentiary hearing?

14  A    I have to discuss it with my attorneys.

15  Q    Okay.  But, in any event, you did have -- at one time or

16  another before the FBI raid have all of these e-mails in

17  native PST format, did you not?

18  A    I don't believe all of them.

19  Q    Okay.  Well, did you at one time or another have all of

20  them in native PST format, sir?

21  A    Isn't that the same question you just asked me?

22  Q    Did you at one time have it all?  You say you don't have

23  it today, I'm asking did you ever at any time have --

24  A    I don't know if every one of these e-mails --

25  Q    Where did you get them if you did not get them off of

Case 3:23-mc-00073-CKK-MAU Document 7-1 Filed 07/28/23 Page 226 of 800
Case 3:06-cv-00056-MW-VPC Document 731 Filed 07/08/08 Page 184 of 265

-184-

1    native PST files?

2    A    I don't -- I don't how to answer that because I don't

3    know if they all did or did not come off native PST files.

4    Q    Okay.

5    A    I have to read every one of these.  I don't know.

6    Q    But you were required to produce them by court order.

7    A    Yeah.

8    Q    And I understand about the millions, we don't need to go

9    down that road.

10   A    In a reasonable amount of time and review everything else

11   and produce date-sensitive material in a time that wasn't

12   sufficient to do it.

13   Q    And you've had since November of 2007 to do that, have

14   you not, sir?

15   A    No.  The answer to that is no.

16   Q    Okay.  The request -- the requests have been

17   outstanding --

18   A    But the electronic --

19   Q    Excuse me, sir.  The requests have been outstanding since

20   November 2007, have they not, sir?

21   A    In written form but not electronic.  That was, I believe,

22   in February when the electronic protective -- what are you

23   shaking your head for?

24   Q    I'm just incredulous --

25   A    (Inaudible).

1    Q    I'm sorry, sir?

2    A    No, just --

3    Q    Okay.  You're not aware, then, that in the request to

4    produce, it requires you to produce in native format PST

5    files.

6    A    Yes, I'm aware of that.

7    Q    Okay.  And you're aware that was contained in requests in

8    November of 2007?

9    A    I don't --

10              MS. KLAR:  Your Honor, I would object because

11   there were discussions pursuant to Rule 26, I'm not sure when

12   those discussions occurred exactly, pursuant to which the

13   parties agreed that things would be produced in native format.

14              And, once again, for the record, eTreppid has yet to

15   produce a single document in native PST format or to produce

16   any electronic data at all.

17              So I'm not sure why Mr. Peek thinks it's appropriate

18   to try to grill and intimidate Mr. Montgomery in the manner

19   that he is.

20              MR. PEEK:  I'm happy to respond to any motion

21   that Ms. Klar wants to bring against me for any discovery

22   abuses and discovery sanctions, your Honor, and respond to it.

23   I'm not going to respond to it here just on the fly.

24              THE COURT:  All right.  Let's proceed.

25              MR. PEEK:  All right.  Your Honor, does the

Case 3:22-mc-00073-GMN-WGC Document 734 Filed 07/28/08 Page 228 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 186 of 265

186

1    Court recall what it marked as eTreppid's second request for

2    production?

3                    THE COURT:  I think I may have left my list in

4    chambers.  I could probably find it.  Ms. Clerk --

5                    MR. PEEK:  I don't want to mark something

6    else --

7                    THE COURT:  Here are the exhibits.  It's the

8    second request for production?

9                    MR. PEEK:  Yes.

10                    THE COURT:  Do you have the list, Ms. Clerk?

11   Let me see it.

12                    MS. KLAR:  Your Honor, I have the list, I don't

13   see it on here.

14                    MR. PEEK:  I know the Court read from the

15   various requests.  Maybe you were reading from the order, but

16   I can make another exhibit here.

17                    THE COURT:  What are you looking for, Mr. Peek?

18                    MR. PEEK:  What's that?

19                    THE COURT:  Which item?

20                    MR. PEEK:  I'm looking for the second request,

21   your Honor.  I have another one so I can mark it.  I just

22   didn't want to duplicate.

23                    THE COURT:  All right.

24                    MR. PEEK:  But it's exhibit -- in my binder,

25   your Honor, I'll have it marked.

Case 3:22-mc-00073-GMN-WGC Document 71 Filed 07/28/23 Page 229 of 800
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/03/08 Page 187 of 265

-187

1          THE COURT:  Well, marked as Exhibit 1, the

2   Court's Exhibit 1, is docket number 432, and attached to that

3   are responses to document production request.

4          There's the first set of requests, eTreppid's first

5   set of requests for production of documents, then there is the

6   Montgomery parties' response.  I don't know if that's what

7   you're looking for.

8          MR. PEEK:  I'm looking for the second request,

9   your Honor.  Does that have the second request?

10          THE CLERK:  I have it.

11          MR. PEEK:  Which -- do you know which exhibit it

12   is?

13          THE COURT:  It's Exhibit 1, I believe, docket

14   432-6.  Is that --  Ms. Clerk, is that what you are seeing?

15          MR. PEEK:  Exhibit D to docket 430 --

16          THE COURT:  No, it's Exhibit E.  If you're

17   looking for the Montgomery parties' response to the second set

18   of requests by eTreppid Technologies and --

19          MR. PEEK:  Can we have that shown to the

20   witness, Ms. Clerk?

21          What court exhibit is that?

22          THE COURT:  I believe that's Exhibit 1.

23          MR. PEEK:  Okay.

24          THE COURT:  I don't have it any more.

25          THE WITNESS:  I don't know.  I don't know how

Case 3:22-mc-00075-RMK-WAU  Document 731  Filed 07/38/08  Page 230 of 800
Case 3:06-cv-00056-PMK-VPC  Document 731  Filed 07/03/08  Page 130 of 205
-188

1  you tell.

2                THE COURT:  There's a tab.

3                MR. PEEK:  Well, there's a request for

4  production --

5                THE COURT:  Just for the record --

6                THE WITNESS:  E?  Exhibit E?

7                THE COURT:  No.  Ms. High -- it's tabbed

8  Exhibit 1, I believe, Court's Exhibit 1 on the side.  Right

9  there, see?

10                THE WITNESS:  Okay.

11                THE COURT:  Got it.  Thank you.

12                THE WITNESS:  Okay.  Go ahead.

13  BY MR. PEEK:

14   Q   Can you read request for production number 26 in that

15  exhibit, Court's Exhibit 1, docket number 432?

16                THE COURT:  Correct.

17  BY MR. PEEK:

18   Q   Read that aloud to the Court.

19   A   Yeah, I got it.  Okay.

20                "Please produce any and all documents,

21        including but not limited to, correspondence, e-mails

22        in native format, calendar notes, journal entries, or

23        phone messages memorizing [sic] any communication

24        between you and anyone acting on your behalf and Edra

25        Blixeth, OpSpring, Inc., AziMyth, Inc." --

```
 1    Q    Now, are you aware that those --

 2    A    I wasn't done.

 3    Q    I'm sorry.  Please continue.

 4    A    -- "Michael Sandoval, or Atiego, Inc."

 5    Q    I apologize, I actually wanted you to read -- maybe I was

 6    mistaken here, request number 23.  That relates to the --

 7    A    Okay.  You want me to read the --

 8    Q    Twenty-two and 23.

 9    A    Do you want me to read the whole thing into the --

10    Q    Yes.

11    A    Okay.  Request for production number -- did you say 22

12    and 23?

13    Q    Yes.

14    A        "Response to request for production number 22.

15         Regarding parties object to this request" --

16    Q    Just the request, just the request.  Read the request,

17    not the response, sir.

18    A    Oh, I'm sorry.

19    Q    Twenty-two.

20    A    Okay.

21             "Please provide all documents which you have

22         provided to NBC, the Wall Street Journal, or any

23         other newspaper, television network or other media

24         outlet regarding Warren Trepp, eTreppid, Jim Gibbons,

25         or any other aspect of the present litigation."
```

Case 3:22-mc-00075-RJK-MAU Document 731 Filed 07/28/08 Page 232 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 196 of 265

-190-

1   Q   And request number 23, read that one, please.

2   A   Twenty-three.

3           "Please provide all correspondence between

4       you or anyone acting on your behalf and reporter John

5       Wilke of the Wall Street Journal, reporter David

6       Johnston of the New York Times, or any other

7       reporters which discusses, refers to, or relates to

8       Trepp, eTreppid, Jim Gibbons, or any other aspect of

9       the present litigation."

10  Q   Okay.  I'm going to now hand you --

11          MR. PEEK:  Let me get it marked.  Would you mark

12  that as Exhibit 31.

13              (Defendant's Exhibit 21 marked for
                identification.)
14          MS. KLAR:  Your Honor?

15          THE COURT:  Yes.

16          MS. KLAR:  You didn't ask me, but I wanted to

17  report to you on the results of my attempt to communicate with

18  counsel.  I don't know if this is a good time, or if you want

19  to deal with it at the conclusion --

20          THE COURT:  I think we'll deal with that at the

21  conclusion as well as getting exhibits taken care of.

22          MS. KLAR:  There's just one other issue for the

23  conclusion, your Honor.

24          During the status conference, you indicated to us

25  that if we were having difficulty getting a date for the

Case 3:23-mc-00076-GMK-WAU  Document 731  Filed 07/08/08  Page 233 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 233 of 269
-191

 1    deposition that was scheduled on June 19th, that we should

 2    come back to you promptly, and I would like to raise that

 3    issue at the conclusion.

 4                    THE COURT:  All right.

 5                    THE WITNESS:  Okay.  I've got it front of me.

 6    BY MR. PEEK:

 7    Q    And Exhibit 31 is labeled -- is captioned what, sir?

 8    A    You mean the title?

 9    Q    Yes, what's the title?

10    A    Second Set of Requests By eTreppid Technologies, LLC.,

11    and Warren Trepp for Inspection -- no, excuse me, and Warren

12    Trepp for Production or Inspection of Documents or Tangible

13    Things.

14    Q    And it contains, does it not, the same requests 22 and 23

15    that you read, does it not, about NBC, Wall Street Journal and

16    John Wilke?

17    A    Yes.

18    Q    Okay.  And then would you go to the definition section on

19    page 3 of Exhibit 31.

20    A    Okay, I see it.

21    Q    Do you see the item labeled Document there?

22    A    No.  Are you talking about --

23    Q    Do you see a paragraph that says number two, and it says

24    Document or Documents.  Are you on page 3 of 11?

25    A    I was on 4, now I'm on 3.

-192-

1    Q    Okay.  Well, I ask you to be on 3.  Do you have item 2?

2    A    Yes.

3    Q    Does it say "Document means"?  Do you see that?  Gives a

4    definition of what document is?

5    A    Yes, I see it, yes.

6    Q    Okay.  And then on page 4, what's the last sentence say

7    on page 4 of item 2, lines 7 and 8?

8    A        "All electronically stored information to be

9         produced in native format, including all metadata."

10   Q    Okay.  And you had that in November of 2007, did you not,

11   with respect to -- you had it in native format with respect to

12   the Wall Street Journal, NBC and John Wilke.

13   A    In my possession?

14   Q    Yes.

15   A    No.

16   Q    You didn't have any of it?

17   A    No.

18   Q    And where was it?

19   A    I'm sorry, I'm sorry, I'm sorry.  Restate the question, I

20   want --

21   Q    You had, in November of 2007, the PST files, the e-mails

22   of the electronically-stored information given to the Wall

23   Street Journal.

24   A    No.

25   Q    Where was it?

1    A    I think we went through that about an hour earlier,

2    didn't we?

3    Q    Okay.  So you're telling me that the same e-mails that

4    were provided to the Wall Street Journal, those same e-mail

5    PST files were provided to this unnamed counsel, to this

6    unnamed consultant; is that correct?

7    A    No.

8    Q    Well, where are they?

9    A    You just asked me --

10   Q    Where are they, sir?

11   A    If you let me answer the question, I'll be glad to.

12   Q    You haven't started to answer it yet.

13   A    Well, what's the question then?

14   Q    Where are the electronically-stored PST files of Jale

15   Trepp, Patty Gray, Len -- we know where Len Glogauer is,

16   Warren Trepp -- let's see, others that we see -- and there's a

17   whole bunch of names here.  Where are they?

18   A    They could be on the drives that I have just produced or

19   on the remaining drives.

20   Q    Okay.  So you have them in your possession, then, don't

21   you?

22   A    Well, I don't have them.  It's possible.

23   Q    Did you make an effort to search for them when this

24   production went to you in November of 2007?

25   A    I was searching for a lot of things, that was one of

Case 3:22-mc-00073-PMP-VPC   Document 731   Filed 07/28/08   Page 236 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 194 of 265

-194-

 1  them.

 2   Q   Okay.  And did you find any from November of 2007 when

 3  this request was made to you until today?

 4   A   I don't recall if I did or not.

 5   Q   Okay.  And have you produced any PST files of any of the

 6  e-mails provided to the Wall Street Journal, the NBC News and

 7  John Wilke?

 8   A   No.

 9   Q   Okay.  Now, you met with John Wilke in the fall

10  of 2000 -- late summer and fall of 2007 -- 2006, did you not?

11              MS. KLAR:  Objection, your Honor, relevance.

12              MR. PEEK:  Your Honor, I want to go through the

13  fact that he met with him, and he's the one who gave them to

14  him, not Mr. Flynn.

15         Because what we have is we have as another exhibit,

16  I believe, it's a production that they say are the e-mails

17  that were given to the Wall Street Journal and the media and

18  it's only Mr. Flynn.

19         And then they supplemented it and gave us this

20  production which is now called I think I may have given these,

21  or Mr. Flynn may have given these, I don't know which.

22         What I want to establish is that this is another

23  contrivance, another fabrication because this gentleman met

24  with Mr. Wilke, and he's the one who gave the e-mails to

25  Mr. Wilke, and he knows which ones he gave.

Case 3:23-mc-00056-GMN-WGC Document 731 Filed 07/08/08 Page 237 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 195 of 265

195

1           MS. KLAR:  Your Honor, this is all, once again,

2    derived from the improper disclosures of attorney-client

3    communications by Mr. Flynn in his various -- sometimes sworn,

4    sometimes unsworn declarations and other submissions to this

5    Court.

6           And whether or not Mr. Montgomery provided these

7    documents individually to the Wall Street Journal is not the

8    issue here.  The issue here is whether or not these documents

9    have been produced, and they have been produced.

10           And if Mr. Peek wants to ask Mr. Montgomery the

11    question did you hand these documents to Mr. Wilke, I guess

12    that's a fair question, but to start out going down the road

13    of asking him about what his communications with Mr. Wilke

14    were is not part of this hearing today and it is well beyond

15    its scope.

16           MR. PEEK:  Your Honor, it goes to the good faith

17    or bad faith of Mr. Montgomery, and, frankly, Ms. Klar says

18    it's attorney-client privilege, well, she doesn't know that

19    because I may have talked to Mr. Wilke.

20           She's just assuming that this came from Mr. Flynn,

21    but either he did or he didn't meet with Mr. Wilke, and then,

22    during the course of those meetings that took place maybe in

23    Washington, D.C., maybe in Seattle, I am almost certain that

24    Mr. Montgomery gave e-mails to Mr. Wilke, and that will be

25    followed up with Mr. Wilke's testimony as well.

Case 3:23-mc-00073-CKK-WAU Document 731 Filed 07/28/23 Page 238 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 196 of 265

196

 1              MS. KLAR:  Well, if Mr. Peek wants to make a

 2    representation to this Court that he has spoken to Mr. Wilkie,

 3    and Mr. Wilke has told him that, again, I don't think it's

 4    relevant.  The question is whether or not the documents have

 5    been produced, and the documents have, in fact, been produced.

 6              THE COURT:  The objection is overruled, ask the

 7    question.

 8    BY MR. PEEK:

 9     Q    Did you meet with Mr. Wilke face-to-face?

10     A    Yes.

11     Q    On how many occasions?

12              MS. KLAR:  Your Honor, can I just have a

13    continuing objection to this line of questions?

14              THE COURT:  You may.

15              MS. KLAR:  Thank you.

16              THE WITNESS:  I believe once.

17    BY MR. PEEK:

18     Q    Okay.  Only once?

19     A    I believe so.

20     Q    Okay.  It could have been more than once.

21     A    I don't think so.

22     Q    Okay.  And when you met with him, did you provide him

23    with any documents?

24     A    I don't believe so.

25     Q    Okay.  Then afterwards, did you provide him via e-mail,

1  via fax, via United States mail, via hand courier, any

2  E-mails?

3   A   I don't think so.

4   Q   So are you then telling this Court that the only e-mails

5  that Mr. Wilke would have received would have come from

6  somebody other than you?

7   A   I don't think I directly produced them to him, that's

8  correct.

9   Q   Well, did you indirectly produce them to him?

10   A   I can't answer that without divulging attorney-client

11  privilege.

12   Q   Meaning that in some way Mr. Flynn provided these to

13  Mr. Wilke?

14   A   I couldn't rule that out.

15   Q   Okay.  And then that may have been as a result of a

16  conversation that you had with Mr. Flynn that he gave them to

17  Mr. Wilke.

18   A   You're asking me to divulge attorney-client --

19   Q   No, I'm asking you, as a result of a conversation that

20  you had, do you know whether or not Mr. Flynn provided them to

21  Mr. Wilke?

22              MS. KLAR:  Your Honor, that is directly trying

23  to elicit --

24              MR. PEEK:  No, it's not, your Honor.  Did you

25  take actions as a result of a conversation.

Case 3:22-mc-00073-GNK-VPC   Document 731   Filed 07/28/08   Page 240 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 240 of 265

198

1          THE COURT:  The objection is sustained, ask

2    another question.

3    BY MR. PEEK:

4     Q    And you also produced to us certain e-mails that you

5    contend are Mr. Flynn's e-mails to media outlets.  Are you

6    aware of that?

7     A    No.

8     Q    You're not aware of that.  Okay.

9          So do you know where those e-mails came from?

10    A    Which ones are you referring to?

11    Q    The e-mails of Mr. Flynn with media outlets.

12          MS. KLAR:  Your Honor, those e-mails were

13    produced by my law firm.

14          MR. PEEK:  Well, I understand they were

15    produced, but I don't know where they came from.  They

16    obviously had to have been provided to the law firm by

17    somebody.

18          We've been told repeatedly that Mr. Flynn has a

19    retaining lien on documents so they couldn't have come from

20    Mr. Flynn.

21          Now, did they come from Ms. Blixeth, did they come

22    from Mr. Montgomery, did they come from somebody else?  I

23    don't know.  I'd like to know where they came from and if he

24    knows where they came from.

25          MS. KLAR:  Your Honor, the e-mails came from

Case 3:22-mc-00073-CKK-WAU Document 731 Filed 07/28/08 Page 241 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 199 of 205

199

 1    Mr. Montgomery.

 2              MR. PEEK:  Then it's a lot simpler, your Honor,

 3    just -- to go down that road easier.

 4    BY MR. PEEK:

 5     Q   So you provided e-mails of what you believed to be

 6    Mr. Flynn's communications with the media, correct?

 7     A   Obviously, I believe so, yes.

 8     Q   And where did you get those?

 9     A   I had those.

10     Q   And you had them because you were copied on the various

11    communications that Mr. Flynn had with the media?

12     A   Without seeing them, I don't know.

13              MR. PEEK:  Okay.  Exhibit 6.  I don't have an

14    extra one for you, Ms. Clerk, I'm sorry.

15              THE CLERK:  That's all right.

16                   (Plaintiff's Exhibit 6 marked for
                       identification.)
17              THE WITNESS:  Okay.

18              MR. PEEK:  Okay?

19    BY MR. PEEK:

20     Q   Do you recognize Exhibit 6 as something you've seen

21    before today?

22     A   I can't recall specifically.

23     Q   Well, you provided what you believe to be e-mails that

24    were responsive to request 22 and 23, did you not?

25     A   Yes.

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 3:23-cv-00073-CMA-MAU   Document 731   Filed 07/08/08   Page 242 of 260
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 200 of 205

-200-

1    Q    And you represented in papers to this Court that you

2    believe that Mr. Flynn provided e-mails to the media, correct?

3    A    Yes.

4    Q    And not yourself.

5    A    I don't -- I believe that's correct.

6    Q    And you're now testifying here under oath today that you

7    did not provide any e-mails to Mr. Wilke at the Wall Street

8    Journal.

9    A    I don't believe I directly did, that's correct.

10   Q    Okay.  But you indirectly did, is what you're saying?

11   A    Well, I don't recall how he -- you asked me if I talked

12   to him, which I told you I did.

13   Q    Okay.

14   A    You asked me if I handed him e-mails, which I said I

15   don't remember doing that.

16   Q    Okay.  But I asked you if you gave them to him in any

17   other form, whether it be e-mail, U.S. mail, fax, hand courier

18   or any other form of --

19   A    I don't think I did.

20   Q    Okay.  Now, Exhibit 6 -- what does the letter of May 21

21   purport -- what does it say?

22   A    What page am I --

23   Q    The letter on page 1 of Exhibit 1 -- or Exhibit 6.

24              MS. KLAR:  Your Honor, the document speaks for

25   itself.

Case 3:23-mc-00078-GMN-WAU  Document 731  Filed 07/08/08  Page 243 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 243 of 265

-201

 1                    THE WITNESS:  Okay.

 2                    MS. KLAR:  Mr. Montgomery never received a copy

 3     of this.

 4                    MR. PEEK:  I just asked him to read it, your

 5     Honor.  I can read it for him.

 6                    THE WITNESS:  Do you want me to read the whole

 7     thing?

 8                    MR. PEEK:  Just the letter, pursuant to the

 9     Magistrate Cooke's order.

10                    THE WITNESS:  Okay.  Pardon me.  I don't

11     understand -- I'm on the page --

12     BY MR. PEEK:

13      Q   This letter says, does it not,

14               "Dear Jerry:  Pursuant to Magistrate Cooke's

15          May 7th order and today's instruction, enclosed

16          please find document Bates number Mont 1 through Mont

17          119 relating to communication with the media which

18          refer to Mr. Trepp, eTreppid or Jim Gibbons, as well

19          as a privilege log."

20      A   Yes, it's the same letter.

21      Q   And you provided these documents to your counsel that you

22     believed were responsive to request number 22 and 23,

23     Exhibit 31, correct?

24      A   I guess I must have.  I don't remember --

25      Q   And did you find in the course of your investigation any

Case 3:23-mc-00073-CNK-WAU Document 731 Filed 07/08/08 Page 244 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 202 of 205

-202

1    e-mail correspondence, any transmittal letter, any facsimile

2    cover sheet of any nature whatsoever between Mr. Flynn and

3    Mr. Wilke before November 1st, 2006?

4     A    Say that again?

5     Q    Okay.  Did you find during your search of records of

6    communications with Mr. Wilke, and you produced these

7    communications that Mr. Flynn had here in Exhibit 6, did you

8    find anything that you produced that was an e-mail, a

9    transmittal cover letter via U.S. mail, a facsimile cover

10   sheet, a hand courier transmittal from Mr. Flynn to Mr. Wilke

11   saying I enclose, I attach, faxed herewith are, hand delivered

12   herewith are, did you find anything at all when you were

13   making your search?

14              MS. KLAR:  Your Honor, I believe that these

15   questions are derived once again from Mr. Flynn's improper

16   attorney-client disclosures.

17              MR. PEEK:  Your Honor, they're from the document

18   because there is no transmittal, there is no e-mail, and yet

19   there is a replete number of e-mails with other media prior to

20   November -- or after November 1st, 2006.  That's the date of

21   the article in the Wall Street Journal.

22              And the Court, when we get to argument, will hear

23   from me, rather than have him go through each and every one of

24   them to show that there are no -- there are no e-mails

25   pre-November 1, 2006, with Mr. Wilke between Mr. Flynn and

1    Mr. Wilke, these are all post, and then with Mr. Coolican of
2    the -- I think the Review Journal, and then -- or the Sun, I
3    don't know which.  Let me see, Patrick Coolican is the Las
4    Vegas Sun, and then there is another individual, there's
5    Ms. Bellisle who is from the Reno Gazette-Journal, there is
6    Steve Kanigher, the Las Vegas Sun.
7                    THE COURT:  All right.  Well --
8                    MR. PEEK:  I mean, there's nothing here with
9    Mr. Wilke pre-November 1, 2006.
10               I don't have to be able to read anything from
11   Mr. Flynn to know when I see a production that they have
12   provided me that doesn't include anything.  I'm just asking
13   did he find anything.
14                    THE COURT:  The objection is overruled.  Go
15   ahead, ask the question.
16                    THE WITNESS:  No.
17   BY MR. PEEK:
18    Q   Okay.  So -- and did you find even in the -- even in the
19   e-mails that you did find between Mr. Flynn and members of the
20   media, did you find that Mr. Flynn was attaching any of these
21   e-mails that are part of Exhibit 9 to any of the media that we
22   see in the Exhibit 6?
23    A   Not that I recall.
24    Q   Now, going back to Exhibit 9 which you have in front of
25   you, I'm going to try to get through some of these things.

Case 3:22-mc-00076-SKK-VPC Document 731 Filed 07/28/23 Page 246 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 246 of 265

204

1    A    Got it.

2    Q    Thank you.  Would you look at -- let's see, now, the

3    first page DM 1107, has a heading at the top Jale1a, do you

4    see that?

5    A    Yes.

6    Q    Where does that come from?

7    A    I don't recall.

8    Q    Did you create that file called Jale1a?

9    A    Not that I recall.

10   Q    Did it get created by the backup drives from which you

11   created ASCIIs from which you created text files?

12   A    It might have, I don't know.

13   Q    Okay.  And how does the ASCII file from which it -- to

14   which it was copied get the name Jale1a?

15   A    I don't know.

16   Q    Is it something you've seen before?  The name just sort

17   of pops up, Jale1a?

18   A    I don't know how the name got put on there.

19   Q    Okay.  And when you copied these files, were you copying

20   them in a manner in which they appeared in the PST folder?

21   A    What does that mean?  I don't know.

22   Q    Well, in a PST folder they would appear from the latest

23   at the top to the earliest at the bottom in the e-mail string,

24   correct?

25   A    Yeah, I guess.

Case 3:23-cv-00073-SMK-WAU Document 731 Filed 07/28/23 Page 247 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 245 of 205

205

1  Q    That's typical in Outlook, is it not?

2  A    That's a function, it's not necessarily typical.

3  Q    Okay.  It's a function of Outlook.

4        So in these text files, did these also appear to be

5  where the latest is at the top and the earliest is at the

6  bottom?

7  A    I don't recall.

8  Q    Well, let's look at the first one.

9  A    Okay.

10 Q    What's the first one?  What's the -- is the latest at the

11 top, the earliest at the bottom?

12 A    It's the latest at the -- the earliest is at the top.

13 Q    Okay.  Who made that decision to make this and create

14 this file Jale1a which has the earlier -- earliest e-mail at

15 the top and the later one below?

16 A    I don't recall.

17 Q    Did you do that?

18 A    I don't recall.

19 Q    Okay.  But somebody had to have actually done that when

20 they created this text file, did they not?

21 A    Probably.

22 Q    And so they cut and pasted things to put into this text

23 file, did they not?

24 A    They easily could have.

25 Q    And did you do that?

Case 3:22-mc-00078-CKJ-MAU Document 731 Filed 07/28/08 Page 248 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 206 of 265

206

1    A    I don't recall if I cut it or pasted it.

2    Q    Well, who would have done it besides you?

3    A    I have an attorney.

4    Q    So either you or Mr. Flynn; is that correct?  Which of

5    the two of you did it?

6    A    I don't know.

7    Q    Okay.  Let's look at the next one.  It begins at DM 110

8    in Exhibit 9.

9    A    Okay.  I see it.

10   Q    I think it may be 1108, I apologize, the page is cut off,

11   or the number is cut off at the bottom.

12   A    The next page.

13   Q    The next page.

14   A    I got it.

15   Q    We see at the top of this Jale1, do we not?

16   A    Yes.

17   Q    As opposed to Jale1a.

18   A    Yes.

19   Q    And what's the first e-mail?

20   A    One dated 9/17.

21   Q    The same one that appears on the previous page, correct,

22   at the top?

23   A    It appears to be, yes.

24   Q    And then about, let's see, one, two, three more e-mails

25   down, we see the e-mail from Warren Trepp that purports to be

Case 3:23-mc-00073-SKW-WAU Document 7-1 Filed 07/28/23 Page 249 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 249 of 265

—207

1   a true and correct e-mail, "Don't you ever send this kind of

2   message to me."

3    A    What's the question?

4    Q    We see that about three down, don't we?

5    A    Yes.

6    Q    And, again, this e-mail string doesn't start from the

7   bottom with the earliest and the latest at the top, does it?

8    A    Well, the first four --

9    Q    The first four aren't even part of an e-mail string, are

10  they?

11   A    I don't understand what you're asking.

12   Q    They're not part of an e-mail -- do you know what an

13  e-mail string is?

14   A    I guess not.

15   Q    Pardon?

16   A    I guess not.

17   Q    An e-mail string starts out where somebody sends an

18  e-mail to me, and then I respond back, and then you respond

19  back, and maybe people are copied on it, and people who are

20  copied also respond.

21   A    I got you.

22   Q    And that's an e-mail string, isn't it?

23   A    If that's what you're defining it as, I understand --

24   Q    Well, do you have something else in mind when I use the

25  word e-mail string?

```
 1    A    I didn't have anything in mind.

 2    Q    Okay.  You never heard that term before, that's brand new

 3   to you today.

 4    A    Actually that's correct.

 5    Q    Brand new to you today.  You are the chief technology

 6   officer and chief scientist.

 7    A    Thank you for keep reminding me of that.

 8              MS. KLAR:  Objection, your Honor, argumentative.

 9              THE COURT:  Sustained.

10   BY MR. PEEK:

11    Q    This is not an e-mail string, is it?

12    A    Under your definition, I guess not.

13    Q    In fact, the first e-mail says reference Jim, does it

14   not?

15    A    I see that.

16    Q    The second e-mail below it says Heidi's fundraising, does

17   it not?

18    A    I see that.

19    Q    And the third one says Heidi's fundraising, does it not?

20    A    I see that.

21    Q    And then the next one goes back to re Jim, and then we

22   come back to Heidi's fundraising.

23    A    Am I to be agreeing with you?

24    Q    They're not part of an e-mail string, are they?

25    A    Well, there are surely e-mails between them.
```

209

```
 1   Q   Correct.  Somebody had to cut and paste these e-mails
 2   into this text file, did they not?
 3   A   I don't know if that's how they were dumped into this
 4   file, if that's what you're saying.
 5   Q   Well, they had to have somehow -- you had to take one
 6   from --
 7   A   That's not the case.  You keep giving me a single and
 8   only one option by which all this could happen.  Somebody
 9   could have put an advanced find search in Outlook and only
10   said look for one exact same thing.
11   Q   Who is that somebody?
12   A   I'm not the only one who could have done it.
13   Q   Who is that somebody?
14   A   I'm saying that's an example.
15   Q   Who is that somebody who did that in this case?
16   A   I have no idea.
17   Q   Who created this text file?
18   A   I don't recall specifically.
19   Q   Whoever created it created it in a manner where the
20   e-mails are cut and pasted from different PSTs, are they not?
21   A   They could have been.
22   Q   Okay.  Well, at the bottom of the page, not the Bates
23   number, but the bottom of this 1108, you see page 1?
24   A   Yes.
25   Q   And then it continues 2, 3?
```

Case 3:22-mc-00073-CKK-MAU Document 731 Filed 07/28/08 Page 252 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 210 of 265

-210-

1    A    Yes.

2    Q    And all the way up to page 20, does it not?

3    A    I'll check.

4    Q    Which is on Bates number 1127.

5    A    I can't see the end numbers.

6    Q    Okay.  You'll get there.  When you get to page 20, you'll

7    see it.

8    A    Okay.  I see them now.  Okay, I saw it.

9    Q    In all of these, 1 through 20 contain the heading at the

10   top Jale1, do they not?

11   A    Yes.

12   Q    And they're all e-mails with varying dates and varying

13   subject matters in pages 1 through 20, are they not?

14   A    Yes.

15   Q    Who created this?

16   A    I don't know.

17   Q    Who named it Jale1?

18   A    You've asked me that --

19   Q    You don't know?  Sorry?

20   A    Okay.

21   Q    Somebody did.

22   A    Yeah.

23   Q    Who made the decision to cut and paste into Jale1 all of

24   these e-mails that appear on page 1108 through 1127 that have

25   the heading Jale1?

Case 3:22-mc-00073-SKK-WAU   Document 731   Filed 07/38/08   Page 253 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 253 of 265

211

1    A    I don't know.

2    Q    Who made the decision to give these to the Wall Street

3    Journal in this fashion?

4    A    I don't know.

5    Q    Okay.  Let's then look at the document in Exhibit 9,

6    Bates numbered 1129 at the bottom.

7    A    The same --

8    Q    Bates number 1129 at the bottom.

9    A    I got it.

10   Q    You got it now?

11   A    Yes.

12   Q    And at the top it has the heading Len2, does it not?

13   A    Yes.

14   Q    And who put that heading on there?

15   A    I don't know.

16   Q    And there are, in fact, in the Len2 category 34 pages,

17   are there not, of Len2 e-mails?

18   A    Would you like me to count them?

19   Q    No, you can just look at the page numbers at the bottom,

20   goes 1 through 34, Mr. Montgomery.

21   A    Okay.  What's the last number?

22   Q    Thirty-four, Bates number 1162, sir.

23   A    Got it, I see it.

24   Q    And who made the decision to put these e-mails under the

25   heading Len2 consisting of these 34 pages that have no rhyme

Case 3:23-cv-00076-GKF-WAU Document 731 Filed 07/28/08 Page 254 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 212 of 265

212

1    or reason to them?

2    A   I don't know that.

3    Q   And these are not part of one e-mail, these 34 pages are

4    not one e-mail string either, are they?

5    A   I doubt it.

6    Q   They're varying dates, varying subject matters, are they

7    not?

8    A   I don't know.  I could read them if you would like.

9    Q   No, I just want you to just look at them.  Do they have

10   varying dates and varying subject matters so they're not part

11   of an e-mail string?

12   A   What was the first page?

13   Q   Page 1, 1129.  You can look at the bottom of the page

14   to --

15   A   I got it.

16   Q   Okay?

17   A   What was your question?

18   Q   The question was these are not part of one e-mail string,

19   they have different subject matters and different dates, isn't

20   that correct?

21   A   Yes.

22   Q   Somebody made a decision to dump these into a file called

23   Len2, did they not?

24   A   I would say so.

25   Q   Somebody had to cut and paste from varying e-mails from

1    varying PST files to put them into this text file, did they

2    not?

3     A    Not necessarily.

4     Q    Then how did it get done?  Was it done electronically

5    with a program?

6     A    I mean, there isn't only one way this file could have got

7    created.

8     Q    Okay.  Tell me --

9     A    Well, you just named one, I believe.

10    Q    Okay.  Is that the way it happened?

11    A    Not that I recall.

12    Q    How did it happen?

13    A    I don't recall.  You've asked me this --

14    Q    Okay.  You don't know, again.

15         So you or somebody gave it a name, and somebody

16   chose to put into that certain E-mails from the PST files that

17   you had in your possession; is that correct?

18    A    From the -- I can't say that every one of those came from

19   a PST because you've already asked me that question.

20    Q    Okay.

21              THE WITNESS:  Your Honor, I would like to stop

22   for a minute and take a break to use the restroom.

23              THE COURT:  All right.  We're going to take a

24   quick five-minute break until 4:10 --

25              MR. PEEK:  I'm not going to go anywhere, your

Case 3:23-mc-00076-SKK-WAU  Document 734  Filed 07/28/08  Page 256 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 214 of 269

214

1    Honor.

2                    THE COURT:  We'll be in recess for five minutes.

3                         (A recess was taken.)

4                    MR. PEEK:  Your Honor, I want to apologize to

5    the Court, to Ms. Klar, I made representations to the Court

6    there was a defamation claim outstanding.  Mr. Snyder reminded

7    me there is not.  It will be the subject matter of further

8    conversation and motion practice as well.

9                    THE COURT:  All right.

10                   MR. PEEK:  But I wanted to at least clear that

11   up with the Court and apologize to the Court and Ms. Klar for

12   making that representation which was in fact wrong.

13                   THE COURT:  I understand the government wishes

14   to have a sidebar; is that correct?

15                   MS. WELLS:  That's correct.

16                   THE COURT:  Lawyers, if you're there appearing

17   telephonically, I apologize, but we are not able to hook you

18   in for the sidebar, but all other lawyers please come on over

19   here.

20                        (Following is discussion at sidebar.)

21                   THE COURT:  All right.  I understand that the

22   government has concerns about documents appearing in the

23   exhibits that eTreppid is examining Mr. Montgomery on this

24   afternoon.

25                   MS. WELLS:  Okay.  We have some concerns about

```
 1    some of the documents that are appearing in Exhibit 8 and
 2    Exhibit 6, and what we would like to do is --
 3                   MR. PEEK:  Eight or 9?
 4                   MS. WELLS:  Eight.  You have not used 9 yet.
 5                   MR. PEEK:  I'm using 9 right now.
 6                   MS. WELLS:  No, we do not have concerns about 9,
 7    we have concerns about 8 and 6, and there are pages within
 8    those two exhibits that we would like to pull and take back to
 9    Washington and make the redactions, and we'll provide copies
10    back to everybody.
11                   MR. GOMEZ:  There's also several pages --
12                   MS. WELLS:  No, that's Exhibit 6.
13                   THE COURT:  Okay.  So what I would propose we
14    do, I know you would like to FedEx these back this evening,
15    correct, sir?
16                   MS. WELLS:  Yes.
17                   THE COURT:  Okay.  And so -- all right.  So what
18    I propose we do, I understand -- and I'll put this on the
19    record, Ms. Klar, I think you mentioned to my law clerk or my
20    court clerk that Mr. Montgomery's --
21                   MS. KLAR:  He's hit the wall.
22                   THE COURT:  -- tired.  Anyway, we have some
23    other housekeeping matters to take up.
24            I propose that we continue this and that I send
25    Mr. Gomez and Ms. Wells -- sorry, long day -- into my jury
```

Case 3:23-mc-00076-SKK-WAU Document 734 Filed 07/08/23 Page 258 of 269
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/03/08 Page 216 of 269
216

1   room, and you could begin -- we'll just hand over all the

2   binders now, and you can now get going on that, assured that

3   what we will do for the balance of the afternoon -- I think

4   we're going to be wrapping it up pretty quickly.

5           There were some housekeeping matters that we need to

6   take care of, we'll do that, and then we will be setting a

7   continued hearing so you'll need to --

8           MS. WELLS:  What I would suggest is that maybe

9   Mr. Ferrera and Mr. Gomez can take the binders and pull these

10  and then they can stay in the courtroom.

11          THE COURT:  All right.

12          MR. GUNDERSON:  What are we going to do with the

13  binders that counsel have?

14                  (Simultaneous indecipherable
                        conversation.)

15          MS. WELLS:  We are just removing the pages which

16  we believe need to be redacted.  We will be giving the

17  remained of the binders back to counsel.

18          THE COURT:  That was Ms. Wells.  Nobody talk.

19      All right.  Thank you.

20          MS. WELLS:  Thank you.

21                  (End of sidebar discussion.)

22          THE COURT:  All right.  The Court has had a

23  sidebar, and I'm going to have Mr. Gomez and the court

24  security officer take possession of -- is it all of the

25  binders; is that correct?

Case 3:22-mc-00073-CKJ-MAU  Document 74  Filed 07/28/23  Page 259 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 217 of 265

217

```
 1                    MS. WELLS:  No, just binders 1 and 2.

 2                    THE COURT:  Take possession of binders 1 and 2,

 3   all copies.

 4                    MR. PEEK:  Are we done with his examination,

 5   your Honor?  Because Exhibit 9 is in my volume 2 so I

 6   didn't --

 7                    THE COURT:  I think we're finished.  I think

 8   that we're going to wrap things up for today.

 9              Well, I only have exhibit -- I only have binder 1,

10   volume 1.

11                    MR. GUNDERSON:  Your Honor, the Montgomery

12   parties are going to surrender their volumes 1 and 2 now to

13   the government.

14                    (Discussion held off the record.)

15                    THE WITNESS:  Can I step down or no?

16                    THE COURT:  You may step down.  I'm going to

17   have Mr. Montgomery step down.

18                    MR. PEEK:  Your Honor, I have another volume 1

19   here.

20                    MS. ROBB PECK:  Your Honor, and just for the

21   record, local counsel for both Atiego and Mr. Sandoval have

22   surrendered volumes 1 and 2 as well.

23                    THE COURT:  Thank you.

24              Go ahead and have a seat, Mr. Montgomery.

25                    THE WITNESS:  Okay.
```

Case 3:23-mc-00073-CWR-MAU   Document 7-1   Filed 07/08/23   Page 260 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 218 of 265

-218

 1                  THE COURT:  All right.  I just want to poll

 2      counsel so I'll just go around the room, the courtroom.

 3                  So, Ms. Klar, have you provided the binders volumes

 4      1 and 2 to government counsel?

 5                  MS. KLAR:  We have, your Honor.

 6                  THE COURT:  All right.  And Ms. Robb Peck

 7      advises on behalf of Atiego and Mr. Sandoval she also did.

 8                  MS. ROBB PECK:  That's correct, your Honor.

 9                  THE COURT:  And I've provided volumes 1 and 2 of

10      my exhibits.  Did we have any additional exhibits, Ms. Clerk?

11                  THE CLERK:  I did, your Honor, and I provided

12      those as well.

13                  THE COURT:  All right.  And, Mr. Peek, have you

14      provided all of your copies that are here in the courtroom

15      to --

16                  MR. PEEK:  I have, your Honor, and I've also

17      canvassed my staff to make sure that we didn't have any extras

18      here.

19                  THE COURT:  All right, thank you.

20                  All right.  So pursuant to the sidebar, the

21      government will be reviewing certain documents that are in

22      those exhibits.

23                  And so Mr. Montgomery advised Ms. Klar that he would

24      really -- I think, is tired, and it turns out that -- I think

25      it's making sense to me that we set yet another date for

Case 3:23-cv-00073-GMN-WGC  Document 731  Filed 07/28/23  Page 261 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 219 of 265

219

```
 1   continued hearing, but what I want to -- and we're going to

 2   take care of some housekeeping matters as well.  We aren't

 3   doing a continued hearing yet.

 4           I want to take care of -- it's unfortunate, I've

 5   lost my glasses.

 6                   MR. PEEK:  I do that all the time, your Honor.

 7                   THE COURT:  I don't know.

 8           Oh, thank you, Ms. Court Reporter.

 9           All right.  The first thing I'd like to do is go

10   over the exhibits.  All right.  I just want to go through the

11   laundry list.

12           I had the clerk of the court review the first

13   transcript of the June 10 hearing to determine which court

14   exhibits were actually discussed and the subject of questions,

15   and I'll just tell counsel what they are if you would like to

16   look at your exhibit list.

17           They were Exhibit 1, Exhibit 2, Exhibit 3,

18   Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 7, and Exhibit 12,

19   and Exhibit 16.  So, in other words, those were the only

20   exhibits on which the Court questioned Mr. Montgomery.

21           I think the other exhibits were included initially

22   with the thought that they might be the subject of inquiry,

23   and if other counsel are interested in having those admitted,

24   but I would like to ask if -- I'd like to admit those

25   exhibits, 1, 2, 3, 4, 5, 6, 7, 12 and 16.  Any comment from
```

Case 3:22-mc-00075-CMK-WAU  Document 731  Filed 07/38/08  Page 262 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 226 of 265

220

1  counsel?

2              MR. PEEK:  No objection, your Honor.

3              MS. KLAR:  Your Honor, we have no objection, but

4  I'm wondering whether you questioned Mr. Montgomery about

5  number 9 which was the Court's May 21, 2008 order.  I don't

6  have independent recollection, but --

7              THE COURT:  I may have so let's go ahead and

8  include that as part of the record if there's no objection.

9        Hearing none, I'll also include Exhibit 9.

10        And I think some of these other items were never

11  intended to be exhibits, they just found their way somehow on

12  this list.  I don't know how.

13        But, so, any objection to those exhibits with that

14  exception?

15              MS. KLAR:  No objection, your Honor.

16              THE COURT:  Thank you very much, Ms. Klar.

17          Mr. Peek.

18              MR. PEEK:  No objection.

19              THE COURT:  Ms. Robb Peck?

20              MS. ROBB PECK:  No, your Honor.

21              THE COURT:  And Mr. Schwartz?

22              MS. SCHWARTZ:  No, your Honor.

23              THE COURT:  Mr. Liese?

24              MR. LIESE:  Mr. Liese, and no objection, your

25  Honor.

Case 3:22-mc-00076-CWK-VPC Document 734 Filed 07/28/08 Page 263 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 221 of 265

221

1            THE COURT:  All right.  Thank you, sir.  I'm

2    sorry for mispronouncing your name.

3                         (Court's Exhibits 1 through 7, 9, 12 and
                          16 received in evidence.)

4            THE COURT:  All right.  Well, then as to your

5    exhibits, Mr. Peek, I guess we need to have the United States

6    review those exhibits, and then at the continued hearing we

7    can take up admission of those exhibits unless someone has

8    another proposal.

9            MR. PEEK:  I would at least offer Exhibit 9 and

10   Exhibit 31, your Honor.  Exhibit 31 was the second request for

11   production identified by Mr. Montgomery.  Exhibit 9 was the

12   production of the e-mails to the media.

13           THE COURT:  Let me just ask the government

14   before you respond, Ms. Klar, do you have any objections on

15   behalf of the government to admission of either of those

16   exhibits?

17           MS. WELLS:  Certainly not to Exhibit 31, and I

18   would just like to clarify on Exhibit 9, but I don't believe

19   we will, but if we could reserve that, I would appreciate it.

20           MR. PEEK:  I can wait then to offer that, your

21   Honor, just out of an abundance of caution.

22           THE COURT:  All right.  Let's reserve all of

23   those exhibits until such time as they're all reviewed.

24        Ms. Klar, any objection to that?

25           MS. KLAR:  No, your Honor.

Case 3:23-mc-00073-CMK-WAU Document 734 Filed 07/28/08 Page 264 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 222 of 265

222

```
 1                THE COURT:  And, Ms. Robb Peck, any objection?

 2                MS. ROBB PECK:  No, your Honor.

 3                THE COURT:  Mr. Schwartz, any objection, sir?

 4                MR. SCHWARTZ:  No, your Honor.

 5                THE COURT:  Mr. Liese, any objection, sir?

 6                MR. LIESE:  No, your Honor.

 7                THE COURT:  All right, very good.

 8          All right.  Now, the next item -- I can't read my

 9   note, but I know that Ms. Klar wished to be heard on the

10   30(b)(6) deposition.

11          At -- I don't know if it was the June 10th hearing,

12   or if it was at last week's discovery status conference that

13   there was a discussion about 30(b)(6) deposition of eTreppid's

14   person most knowledgeable, and efforts were underway to set a

15   time for that, and, Ms. Klar, what do you have to report?

16                MS. KLAR:  An e-mail went out to all counsel, I

17   think, within a day or two of last week's hearing asking for

18   dates that were convenient during the next two weeks.

19          The response from most counsel was to give us dates.

20   The response from Mr. Peek was that he had yet another

21   vacation planned.

22          We then sent an e-mail to him on Friday saying,

23   Mr. Peek, can you please give us dates subsequent to your

24   return from your vacation, and also asking him to give us

25   dates for all the other vacations he has planned for the
```

1    summer so that we can make sure not to schedule any

2    depositions on those dates.

3           We have not had the courtesy of a response that I'm

4    aware of, and we would like to convene that deposition

5    sometime right after the July 4 holiday which is when, I

6    believe, Mr. Peek returns.

7           THE COURT:  All right.  Mr. Peek, I just recall

8    from -- I think it was the June 10 hearing that you had a

9    holiday, a vacation planned.

10          MR. PEEK:  The 25th through the 5th.  I told

11   Ms. Klar, I told the Court that.

12          THE COURT:  Right, right.

13          MR. PEEK:  So I don't know what this "yet

14   another holiday" is, that's the same one I had.

15          THE COURT:  All right.  Well, so let's set a

16   date.

17          MR. PEEK:  Okay.  And, your Honor, I got the

18   correspondence late Friday.  Frankly, I have not had a chance

19   to get back to Ms. Klar.  I know it is certainly high on her

20   list of priorities.  Certainly today's hearing and preparing

21   for it was high on my list of priorities.

22          I wasn't ignoring her.  I responded very quickly the

23   first time I got the e-mail, I just got a little occupied.

24          And Mr. -- I will just tell the Court two things.

25   One, Mr. Trepp is not available from July 1st through

1    July 14th.  I start a jury trial in Las Vegas on July 14th,

2    I'm available the following week, which is the week of July

3    21st, and so is Mr. Trepp.

4             And I also think, your Honor, and this will be the

5    subject matter of a written motion, but I want to at least let

6    the Court know that I think it appropriate that discovery,

7    whether it be on my side or on Ms. Klar's side, in the nature

8    of oral discovery at least be held until such time as there is

9    complete production.

10            My concern is, and I'll put this in papers, is that

11   we start without a complete production by both sides and then

12   somebody comes back and says, oh, you've now given me more

13   documents, I want to take another one, or then there's a third

14   one.

15            And so I'll make that the subject matter of a motion

16   before we have the hearing on the 15th, but I'm available the

17   week of the 21st, your Honor.

18            THE COURT:  All right.  Then counsel are

19   directed to go ahead and schedule -- look at your calendars

20   and make -- please do your best.  I know it is the summer

21   vacation season, that's just -- for people, and there are also

22   special occasions that come during the summer that people have

23   to attend to.

24            So, though, until further order of the Court it is

25   ordered that counsel for the parties meet and confer and

Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 267 of 800
Case 3:06-cv-00056-PMP-VPC Document 734 Filed 07/03/08 Page 225 of 269
-225

```
1    schedule the deposition -- I presume it would be Mr. Trepp is
2    the person most knowledgeable -- for the week of July 21,
3    2008, and that you do so, complete that, make that decision by
4    the end of this week, by June 27, 2008, get the time set, and,
5    Mr. Peek, if you're leaving for a vacation, please do your
6    best.
7                    MR. PEEK:  I'll give Mr. Snyder my dates during
8    that week, as well as Mr. Trepp's.
9                    THE COURT:  All right.
10                   MR. PEEK:  And then the other thing, your Honor,
11   is I would just inquire whether or not Ms. Klar expects us to
12   go beyond one day.
13         We have not had a meet and confer, and I know we
14   need to have that --
15                   THE COURT:  Right.
16                   MR. PEEK:  -- on whether or not we're going --
17   how long the depositions are going to take place.
18                   THE COURT:  Well, I think that's also another
19   subject of -- two issues are arising.  One, is the timing of
20   any oral discovery.  Two, is -- the next question is, of
21   course, how long these will take.
22         So I'm going to ask counsel to discuss that, that
23   should be part of your discussion between now and June 27th,
24   so that you can reach an understanding -- yes, Ms. Wells?
25                   MS. WELLS:  Well, I just wanted to clarify, and
```

1    I know that we have been included in the e-mails to date, but

2    your order only mentioned the parties, that the counsel for

3    the United States be included in the scheduling for this

4    deposition because, given the topic areas to be covered, it

5    does implicate --

6                 THE COURT:  Yes, I apologize for that oversight,

7    Ms. Wells.

8                 MS. WELLS:  And may I just state for the record,

9    I'm unavailable the week of the 21st, but I'm not sure whether

10   Mr. Gomez would be available.

11                THE COURT:  All right, thank you.

12         Well, we're going to -- please do your best, and --

13                MR. PEEK:  How about counsel, Mr. Schwartz and

14   Mr. Liese?

15                THE COURT:  Well, I want everybody -- we are

16   going to have a chat about that today.

17                MR. PEEK:  Okay.

18                THE COURT:  That's why I'm giving you until the

19   27th to see what you can come up with, and maybe if you want

20   to stay after for a few minutes and discuss it, that's fine

21   with me.

22         Oh, I know.  Ms. Klar, you were going to report on a

23   discussion you had during a recess with counsel from

24   Washington, D.C.

25                MS. KLAR:  Your Honor, I was not able to reach

```
 1   Mr. Pelchin, he is vacationing in Greece until July 4th, but I
 2   was able to speak to the junior associate who is working on
 3   this matter, and she will get an e-mail to him and try to
 4   contact him tomorrow so I can have a conversation with him --
 5              THE COURT:  All right.
 6              MS. KLAR:  -- and a determination can be made
 7   how to proceed with this issue.
 8              Given Mr. Peek's schedule, it would appear that we
 9   cannot reconvene this hearing until sometime after July 21st.
10              So given that fact, I think we will have adequate
11   time, but what I would ask the Court is, if a decision is made
12   to reproduce that PST file, would that run afoul of the
13   Court's order, and the point being, we would reproduce it and
14   have Fulcrum do whatever needs to be done so that they can be
15   available to respond to any questions.
16              THE COURT:  When you ask how would it run afoul
17   of the Court's order, tell me why you ask that question.
18              MS. KLAR:  Well, because I don't want to run
19   afoul of your order.
20              THE COURT:  Right.  Which order?
21              MS. KLAR:  Well, you ordered us to produce
22   something by a certain date.
23              THE COURT:  Oh, I see.
24              MS. KLAR:  And I am basically asking you to do a
25   substitute production, and the reason I'm doing that is
```

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 3:22-mc-00078-CKK-VPC Document 731 Filed 07/08/08 Page 270 of 200
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 270 of 200
-228

1  because, given the short time frame that we have, we made an

2  election.  If I had it to do -- if I had had additional time,

3  I would not have made that election.

4        So if what we're looking for is the best copy of the

5  PST file and a witness who can testify about it, my solution

6  would be to have a new PST file produced in the next week or

7  so and served on eTreppid, and then, if there are questions,

8  we can have Fulcrum appear and testify.

9        MR. PEEK:  Your Honor?

10        THE COURT:  Any objection, sir?

11        MR. PEEK:  Yes, I do -- I don't have any

12  objection to them doing whatever they think is necessary to

13  comply with the Court's order, but I don't want them to be

14  relieved of the obligation.

15        Number one, they've had the obligation since

16  November -- well, they've known about the request since

17  November 19th, and they have failed to do it.  The Court's

18  order ordered them to do it by May 23rd.  It did not happen

19  until June 9th.

20        So they're already in violation of that order.  They

21  were in violation of it on February 21st, all the way up

22  through the 3/14 order, through the May 7th order, through the

23  May 21st order.

24        So I don't want Ms. Klar to be relieved of that

25  obligation -- or, excuse me, Montgomery, it's not her --

Case 3:22-mc-00056-CKK-WAU Document 731 Filed 07/08/08 Page 271 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 271 of 269
-229

1  Mr. Montgomery to be relieved of that obligation and say, oh,

2  by the way, now extend my time because I didn't do it right

3  the first time, I didn't know that I didn't do it right, and I

4  want now to be relieved of that.

5          I'm sorry, I don't think that's appropriate, your

6  Honor, to relieve them of an obligation and a court order when

7  that court order has been out there for a long time.

8          THE COURT:  Right.

9          MR. PEEK:  Just so there's no misunderstanding

10  with Ms. Klar, that the problem with the e-mail file is it is

11  just one e-mail, it is just the September 25th e-mail.  That

12  is not a PST file in native format.  That is not the original

13  file.

14          So I hope she doesn't make -- that they don't

15  make -- the Montgomery parties don't make that mistake a

16  second time.

17          THE COURT:  All right.  Did you wish to say

18  something, Ms. Klar?

19          MS. KLAR:  No, your Honor.

20          THE COURT:  All right.  Well, what I want is I

21  want you to talk with counsel in Washington, D.C.

22          I want whatever can be produced in PST format that

23  is responsive to be completed, and then I'll take up the issue

24  that you've requested.

25          What you're requesting is, you know, substituting

Case 3:23-mc-00073-CKK-MAU   Document 731   Filed 07/28/08   Page 272 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 230 of 265

230

1    that -- and you've explained the reasons why you went ahead

2    and made the decision that better to produce something than

3    nothing and that's what you did.

4           I'm going to take all of those issues up as part of

5    this proceeding.  It seems to me in the interest of the spirit

6    of the rules of discovery, I'm not sure anything in this case

7    is in the interest of Rule 1 which is speedy resolution of a

8    dispute, but we're trying.

9           But it seems to me to make sense to get that

10   production completed, and to the extent, Ms. Klar, that you

11   can do that and volunteer to do that, I think you may proceed.

12          And you can argue, make the arguments, whatever you

13   want, at the appropriate time, but let's just get it done,

14   seems to make sense to me.

15          All right.  Ms. Clerk, my calendar, please.

16          All right.  Now, Mr. Peek, can you give the Court an

17   idea of the time that you believe you may need, and I know --

18   I think you have Mr. Karchmer who may be testifying?

19               MR. PEEK:  Mr. Karchmer.

20               THE COURT:  You may have some additional

21   questions of Mr. Montgomery.

22               MR. PEEK:  I do.

23               THE COURT:  And it may be necessary for the

24   person Ms. Klar has referred to to appear.  I don't know that

25   yet.  I think it makes sense to see what the production is.

Case 3:23-mc-00073-PMP-WAU  Document 734  Filed 07/28/08  Page 273 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 231 of 269
                                                                    231

```
 1   There may be no questions, I don't know, or there may be, but

 2   we'll figure out some process.

 3              MS. KLAR:  Your Honor, can we ask for two

 4   things.  One, can we have a time limit --

 5              THE COURT:  Yes.

 6              MS. KLAR:  -- on the continuation of

 7   Mr. Montgomery's testimony?

 8              THE COURT:  Yes.

 9              MS. KLAR:  We've now been here for two days.

10         The other thing I would request, your Honor, is a

11   list of the witnesses that Mr. Trepp's counsel, eTreppid's

12   counsel plans to call.  We've now heard John Wilke is a

13   possible witness --

14              MR. PEEK:  No, No, I didn't say that.  I said

15   John Wilke will be a witness in this proceeding.  I didn't say

16   that John Wilke --

17              THE COURT:  She may have -- I also inferred when

18   you said this proceeding -- that's all right.

19              MR. PEEK:  He's not subject to the subpoena

20   power of this court, that's the problem I have, your Honor.

21              THE COURT:  All right.  Well, go ahead,

22   Ms. Klar.

23              MS. KLAR:  If we could simply get a list of the

24   witnesses for this OSC hearing.

25              THE COURT:  Yes.
```

Case 3:23-mc-00073-PMP-WPC   Document 73-1   Filed 07/28/08   Page 234 of 200
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 232 of 269

232

1          MS. KLAR:  -- that Mr. Peek plans to call.  We

2    think that in fairness --

3          THE COURT:  And a time limit, I think that's

4    fair.

5          Okay.  So do you know at this time, sir, apart from

6    some additional testimony of Mr. Montgomery, Mr. Karchmer, are

7    there any other witnesses?

8          MR. PEEK:  Mr. Trepp, your Honor, would also be

9    included in that, although I don't know for certain.  It

10   depends upon what the final testimony is of Mr. Montgomery,

11   but Mr. Trepp would be somebody else.

12         THE COURT:  All right.

13         MR. PEEK:  Mr. Glogauer may also be included as

14   a witness.  Those are the only -- only ones I can think of

15   right now.

16         THE COURT:  All right.  We'll start at -- I'll

17   start early, but we're going to finish this in one more day.

18         MR. PEEK:  That's fine, your Honor.  I can

19   finish in one more day.

20         THE COURT:  All right.  Then we'll start at

21   9:00, finish at -- we'll have noon, okay, and we're going to

22   have a recess in the middle, then we'll start at 1:30 and go

23   till 5:00.  That's how much time you have.

24         What I contemplate we'll do, and I'll get to the

25   allotment of time, I think most especially if you can give an

Case 3:23-mc-00073-PMP-WGC Document 731 Filed 07/08/08 Page 235 of 269
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 235 of 269
233

1    estimate, and I think it's fair, of how much longer you

2    have -- you estimate, and I want a good faith estimate for

3    Mr. Montgomery.

4                    MR. PEEK:  May I have a moment -- for

5    Mr. Montgomery?  Just Mr. Montgomery?

6                    THE COURT:  Yes, sir.

7                    MR. PEEK:  I would venture to say, and, again, a

8    lot of this depends on Mr. Montgomery, your Honor, and I won't

9    go into that, the Court has its own views --

10                   THE COURT:  No, no, don't go into that.

11                   MR. PEEK:  -- but I would anticipate at least

12   three hours with Mr. Montgomery and perhaps less.

13                   MS. KLAR:  Your Honor, we had a time estimate

14   the last hearing of one and a half to two hours.  We've been

15   here seven hours.

16                   THE COURT:  Okay.  You get two more hours with

17   Mr. Montgomery.

18                   MR. PEEK:  Thank you, your Honor.

19            And do you want to know about Karchmer?

20                   THE COURT:  Yes, sir.

21                   MR. PEEK:  I'm just consulting with Mr. --

22                   MR. SCHWARTZ:  This is Greg Schwartz in Seattle.

23   Did I miss the date that we're talking about?

24                   THE COURT:  We haven't discussed it yet, sir.

25   So I'm trying to pin down timing and witnesses, then we'll do

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 3:22-mc-00078-GMN-WAU  Document 734  Filed 07/28/08  Page 276 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 234 of 265

234

1    that, sir.  Thank you, though.

2                    MR. SCHWARTZ:  Just double checking.  Thank you,

3    your Honor.

4                    MR. PEEK:  With respect to Mr. Montgomery, I'm

5    assuming that the two hour is my limit of cross.

6                    THE COURT:  Yes.

7                    MR. PEEK:  Ms. Klar may have some redirect of

8    him, I don't know.

9              And then with respect to Mr. Karchmer, we would have

10   two hours on direct, I don't know how much cross.

11                   THE COURT:  All right.  And then so --

12                   MR. PEEK:  And then Mr. Trepp would be an hour

13   and a half at the most.

14                   THE COURT:  So that is five and a half hours.

15                   MS. KLAR:  Your Honor, that doesn't give me very

16   much time for any kind of rebuttal.

17                   THE COURT:  No, it doesn't.  What do you

18   anticipate?  Do you know at this time?

19                   MS. KLAR:  I don't.  I'm assuming that I'm going

20   to have to put an expert on to respond to Mr. Karchmer, and I

21   think I also will have to -- I may have to put testimony on in

22   response to Mr. Trepp, and I would assume that I will be

23   cross-examining Mr. Trepp.

24                   THE COURT:  All right.  Well -- all right.

25              Oh, please hand that extra exhibit -- the record is

Case 3:23-mc-00076-CWK-WAU Document 734 Filed 07/28/23 Page 277 of 209
Case 3:08-cv-00056-MMK-VPC Document 731 Filed 07/08/08 Page 235 of 269
235

```
 1    reflecting that the law clerk is delivering yet another binder
 2    to Mr. Gomez that he needs to take a look at.
 3              Please make sure, everybody, before you leave today,
 4    I know everybody is doing their best, it's which binders?
 5    One --
 6              MS. WELLS:  1 and 2.
 7              THE COURT:  Binders 1 and 2.  Don't take them.
 8    Make sure when you're packing up, my law clerk will be here,
 9    and we can deliver those to Mr. Gomez and the court security
10    officer.
11              All right.  Well, I'll -- what I'm going to tell --
12    I'm gone, so I'll tell counsel when I'm available.
13              I think what we're going to have to do is this,
14    rather than decide all of this today, I want to give counsel,
15    Mr. Peek and Ms. Klar, an opportunity to consider how you want
16    to proceed at the continued show cause hearing and what time
17    you think you're going to need, and then I think you can
18    submit what your individual proposals are about what you would
19    request from the Court in terms of time.
20              And then what I'll do is either issue an order
21    saying here's when I'm available and this is how much time
22    you're getting and this is when I can be available, but I will
23    tell you -- let's see.  I think next week is out, right?
24              Well, I'm available before July 21, but I guess --
25    and I'm available the week of July 21st on the 24th or the
```

Case 3:22-mc-00073-CKK-VPC Document 731 Filed 07/28/08 Page 236 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 236 of 269

236

1    25th.

2              MR. PEEK:  Your Honor, as always, there's a

3    chance that a case could settle the week of the 14th, but I

4    don't --

5              THE COURT:  I'm just -- I understand.  I'm just

6    telling you that I'm available so you know, and I could

7    possibly continue a matter on July 23rd.  So July 23rd, 24th,

8    or 25th, I am out.  The Ninth Circuit conference is the

9    following week and I am gone, and I am gone for part of the

10   next week.

11             So I'm available the week of August 11 on Monday,

12   the 11th, Tuesday, the 12th.  I could revise my schedule to be

13   available the week of August 11 on the 11th, the 12th, 13th,

14   and the 14th.

15             We have on Tuesday, August 19, the status conference

16   with Judge Pro.  I'm available August 20th, could be available

17   the 21st and the 22nd also.  I think that gives you --

18             MR. PEEK:  When would you like us to give

19   you our --

20             THE COURT:  Wait a minute.

21             THE CLERK:  It was moved to Monday, the 18th.

22             THE COURT:  Oh, I'm sorry, I moved it, I moved

23   the hearing to accommodate Judge Pro's schedule.  I apologize,

24   that's now set for Monday, August 18th.

25             MR. PEEK:  Does that make the Court available on

1    the 19th?

2              THE COURT:  Yes.  So I'm not asking you to do

3    this today, I want you all to go home and look at your

4    calendars, and then I want you to contact my court clerk on

5    the 27th of this -- of June, just say what days you're

6    available of those dates that I picked.  Talk to one another,

7    figure out what days you're available.

8              If we need to set it for two days.  Realistically, I

9    would rather do that and get it done than keep bringing you

10   all back at expense to your clients.

11             But what I also want, counsel, will it give you

12   adequate time to decide what amount of time you would like to

13   request, if you can do that by Friday, would that be

14   sufficient time, Ms. Klar?

15             MS. KLAR:  Yes, your Honor.

16             THE COURT:  All right.  And, Mr. Peek?

17             All right.  So -- and on the 27th, just file a paper

18   saying requested time and witnesses for evidentiary hearing,

19   and then I'll decide how long it's going to be and what I'm

20   going to do, and then, in the meantime, everybody can just

21   either jointly or separately file a notice of availability and

22   which dates you and your clients are available of the dates

23   that I mentioned.  All right?

24             MR. PEEK:  Thank you, your Honor.

25             MS. KLAR:  Thank you very much, your Honor.

Case 3:22-mc-00073-CKK-MAU   Document 731   Filed 07/28/23   Page 280 of 800
Case 3:06-cv-00056-MHP-VPC   Document 731   Filed 07/03/08   Page 238 of 265
238

1          THE COURT:  Is there anything else that anyone

2    has?  Ms. Klar?

3          MS. KLAR:  No, your Honor.

4          THE COURT:  All right.  Mr. Peek?

5          MR. PEEK:  No, your Honor.

6          THE COURT:  Ms. Robb Peck?

7          MS. ROBB PECK:  No, your Honor.

8          THE COURT:  Mr. Schwartz?

9          MR. SCHWARTZ:  No, your Honor.

10          THE COURT:  Mr. Liese?

11          MR. LIESE:  No, your Honor.

12          THE COURT:  Ms. Wells and Mr. Gomez?

13          MS. WELLS:  No, your Honor.

14          THE COURT:  All right.  Thank you very much,

15    then, we're adjourned for today.

16                        -o0o-

17

18          I certify that the foregoing is a correct
           transcript from the record of proceedings
19          in the above-entitled matter.

20          /s/Margaret E. Griener        07/03/2008
           Margaret E. Griener, CCR #3, RDR, FCRR
21          Official Reporter

22

23

24

25

1

**'**

**'07** [1] - 47:1
**'98** [1] - 169:9

**/**

**/s/Margaret** [1] - 238:20

**0**

**06-CV-0056-PMP(VPC** [1] - 2:6
**07/03/2008** [1] - 238:20

**1**

**1** [39] - 3:5, 3:6, 3:8, 11:25, 119:22, 178:24, 179:2, 187:1, 187:2, 187:13, 187:22, 188:8, 188:15, 200:23, 201:16, 202:25, 203:9, 209:23, 210:9, 210:13, 211:20, 212:13, 217:1, 217:2, 217:9, 217:10, 217:12, 217:18, 217:22, 218:4, 218:9, 219:17, 219:25, 221:3, 230:7, 235:6, 235:7
**1.4** [4] - 86:5, 124:8, 135:9, 135:10
**10** [5] - 2:24, 111:21, 166:5, 219:13, 223:8
**100** [2] - 33:3, 74:20
**10:11** [2] - 134:4, 134:7
**10:40** [1] - 60:8
**10th** [16] - 3:2, 7:1, 20:8, 55:20, 77:9, 85:24, 86:6, 86:14, 93:4, 121:25, 122:5, 123:20, 127:6, 143:19, 167:24, 222:11
**11** [3] - 191:24, 236:11, 236:13
**11/18** [1] - 133:21
**11/18/2003** [4] - 133:11, 134:3, 134:6, 134:7
**110** [1] - 206:7
**1107** [3] - 182:4, 182:7, 204:3
**1108** [3] - 206:10, 209:23, 210:24
**1127** [2] - 210:4, 210:24
**1129** [3] - 211:6, 211:8, 212:13
**1162** [1] - 211:22
**119** [1] - 201:17
**11th** [2] - 236:12, 236:13

**12** [5] - 168:5, 169:11, 219:18, 219:25, 221:3
**12:00** [1] - 107:13
**12th** [2] - 236:12, 236:13
**1387** [2] - 182:4, 182:7
**13th** [1] - 236:13
**14** [4] - 10:8, 168:5, 168:6, 169:11
**141** [3] - 52:19, 52:25
**143** [1] - 67:24
**1469** [1] - 10:24
**1490** [2] - 9:12, 9:13
**14th** [5] - 121:5, 224:1, 236:3, 236:14
**15** [2] - 32:7, 76:12
**1556** [2] - 10:20, 10:25
**1594** [1] - 76:14
**1595** [1] - 76:10
**1596** [1] - 11:23
**1597** [1] - 76:8
**1598** [1] - 75:23
**1599** [4] - 9:13, 10:9, 76:6
**15th** [1] - 224:16
**16** [4] - 3:6, 219:19, 219:25, 221:3
**16-second** [1] - 126:6
**160** [1] - 33:4
**17** [1] - 64:19
**173** [1] - 124:21
**174** [1] - 124:21
**175** [1] - 124:21
**18** [5] - 3:8, 3:15, 131:20, 132:7, 133:10
**186** [2] - 86:14, 86:25
**187** [2] - 86:15, 86:25
**18th** [5] - 129:9, 129:15, 131:9, 236:21, 236:24
**19** [3] - 141:19, 178:24, 236:15
**1998** [5] - 9:18, 12:11, 12:15, 98:14, 147:12
**19th** [3] - 191:1, 228:17, 237:1
**1:01** [1] - 133:23
**1:30** [3] - 115:16, 116:1, 232:22
**1st** [4] - 171:20, 202:3, 202:20, 223:25

**2**

**2** [17] - 4:7, 16:16, 119:22, 192:1, 192:7, 209:25, 217:1, 217:2, 217:5, 217:12, 217:22, 218:4, 218:9, 219:17, 219:25, 235:6, 235:7
**20** [11] - 10:3, 163:3, 166:3, 166:4, 167:6, 167:7, 210:2, 210:6, 210:9, 210:13

**2000** [4] - 88:19, 103:5, 165:9, 194:10
**2002** [16] - 98:14, 99:10, 99:16, 100:1, 100:7, 100:10, 102:2, 102:6, 103:5, 103:7, 103:23, 104:17, 110:21, 147:14, 147:20, 148:1
**2003** [14] - 122:19, 125:8, 129:10, 129:15, 131:9, 131:20, 132:7, 133:2, 133:10, 133:22, 136:9, 148:11, 165:9
**2004** [11] - 122:19, 125:9, 129:1, 129:2, 129:6, 131:6, 133:2, 133:20, 134:16, 135:1, 165:9
**2005** [10] - 89:23, 100:8, 110:22, 112:21, 133:3, 134:3, 147:13, 164:7, 169:9, 180:23
**2006** [11] - 34:17, 89:9, 89:16, 89:21, 89:22, 171:20, 194:10, 202:3, 202:20, 202:25, 203:9
**2007** [14] - 67:24, 122:24, 123:2, 155:22, 156:8, 156:9, 184:13, 184:20, 185:8, 192:10, 192:21, 193:24, 194:2, 194:10
**2008** [18] - 1:6, 2:1, 10:3, 34:14, 71:21, 116:1, 121:13, 122:13, 122:24, 123:1, 124:3, 141:20, 141:21, 142:1, 142:9, 220:5, 225:3, 225:4
**20th** [2] - 15:15, 236:16
**21** [6] - 141:19, 190:13, 200:20, 220:5, 225:2, 235:24
**21st** [12] - 33:19, 73:6, 75:7, 122:12, 224:3, 224:17, 226:9, 227:9, 228:21, 228:23, 235:25, 236:17
**22** [5] - 189:11, 189:14, 191:14, 199:24, 201:22
**22nd** [2] - 180:22, 236:17
**23** [8] - 141:25, 189:6, 189:8, 189:12, 190:1, 191:14, 199:24, 201:22
**23rd** [14] - 67:24, 77:5, 87:10, 110:10, 121:8, 121:17, 142:8, 143:18, 143:19, 148:11, 228:18, 236:7
**24** [4] - 1:6, 2:1, 87:4, 116:1
**24th** [5] - 7:1, 33:19, 158:1, 235:25, 236:7
**25** [5] - 166:3, 166:4, 166:7, 167:6, 167:7
**25th** [9] - 129:1, 129:6, 134:15, 135:1, 148:11,

223:10, 229:11, 236:1, 236:8
**26** [3] - 4:7, 185:11, 188:14
**27** [4] - 50:10, 87:4, 137:25, 225:4
**27th** [8] - 87:10, 110:10, 121:9, 121:18, 225:23, 226:19, 237:5, 237:17
**28** [1] - 50:10
**29** [2] - 19:10, 34:14
**29th** [4] - 22:9, 36:24, 37:2, 51:1
**2nd** [1] - 171:20

**3**

**3** [12] - 1:22, 16:16, 68:12, 119:22, 191:19, 191:24, 191:25, 192:1, 209:25, 219:17, 219:25, 238:20
**3.3** [2] - 54:21, 55:11
**3/14** [1] - 228:22
**3/25/2004** [1] - 134:24
**30** [6] - 22:9, 33:13, 87:3, 93:4, 166:1, 166:4
**30(b)(6** [2] - 222:10, 222:13
**31** [8] - 87:3, 190:12, 191:7, 191:19, 201:23, 221:10, 221:17
**32** [1] - 87:3
**33** [1] - 87:3
**34** [5] - 175:7, 211:16, 211:20, 211:25, 212:3
**37** [1] - 133:22
**3:00** [2] - 163:3, 178:2
**3:06-CV-56-PMP(VPC** [1] - 1:5
**3:34** [2] - 134:3, 134:7

**4**

**4** [7] - 141:18, 191:25, 192:6, 192:7, 219:18, 219:25, 223:5
**40** [1] - 166:1
**400** [2] - 1:23, 6:4
**41(g** [1] - 50:18
**430** [1] - 187:15
**432** [2] - 187:2, 188:15
**432-6** [1] - 187:14
**4:10** [1] - 213:24
**4:59** [1] - 133:10
**4th** [1] - 227:1

**5**

**5** [4] - 166:5, 219:18, 219:25
**500** [16] - 87:8, 110:13,

2

118:18, 121:7, 121:17,
128:22, 128:25, 129:6,
129:18, 130:2, 130:6,
130:12, 130:17, 134:14,
147:7, 167:15
**5:00** [1] - 232:23
**5:10** [1] - 135:1
**5th** [1] - 223:10

---

## 6

**6** [12] - 199:13, 199:16,
199:20, 200:20, 200:23,
202:7, 203:22, 215:2, 215:7,
215:12, 219:18, 219:25
**60** [2] - 63:5, 63:12
**646** [3] - 34:14, 141:18,
141:21
**650,000** [1] - 166:14
**690** [4] - 10:2, 11:8, 16:17,
75:18
**690-6** [1] - 75:19
**696** [3] - 4:4, 4:18, 5:19
**6th** [1] - 138:11

---

## 7

**7** [7] - 16:17, 141:20, 192:7,
219:18, 219:25, 221:3
**775)329-9980** [1] - 1:24
**7:20** [1] - 8:5
**7:30** [1] - 5:24
**7:35** [1] - 4:4
**7th** [2] - 201:15, 228:22

---

## 8

**8** [4] - 179:11, 192:7, 215:1,
215:7
**80** [2] - 63:5, 63:12
**890** [1] - 10:7
**89501** [1] - 1:23
**8:00** [1] - 133:11
**8:37** [1] - 133:21
**8:38** [1] - 133:22

---

## 9

**9** [22] - 179:11, 179:12,
179:19, 179:22, 181:25,
182:3, 182:7, 203:21,
203:24, 206:8, 211:5, 215:3,
215:4, 215:5, 215:6, 217:5,
220:5, 220:9, 221:3, 221:9,
221:11, 221:18
**9-10-96** [1] - 11:24
**9/17** [1] - 206:20

---

**9:00** [2] - 2:1, 232:21
**9:15** [1] - 7:4
**9th** [5] - 138:11, 138:14,
138:17, 143:21, 228:19

---

## A

**A.M** [1] - 2:1
**a.m** [4] - 7:4, 133:11,
133:21
**abiding** [2] - 13:15, 13:20
**ability** [1] - 7:19
**able** [27] - 15:20, 33:16,
46:6, 46:8, 66:5, 69:25,
74:19, 75:4, 81:7, 83:19,
97:8, 97:12, 97:17, 111:5,
125:16, 126:12, 136:21,
141:11, 141:13, 141:14,
149:21, 153:3, 169:2,
203:10, 214:17, 226:25,
227:2
**above-entitled** [1] - 238:19
**absent** [2] - 14:15, 153:6
**Absent** [1] - 153:7
**absolute** [1] - 15:22
**absolutely** [6] - 65:11,
67:19, 105:21, 139:12,
144:2, 174:6
**Absolutely** [4] - 95:20,
126:16, 126:17, 131:7
**abundance** [1] - 221:21
**abused** [1] - 58:10
**abuses** [1] - 185:22
**accommodate** [1] - 236:23
**According** [2] - 50:4, 51:10
**accounting** [1] - 105:24
**accurate** [4] - 25:9, 86:23,
129:23, 130:21
**Accurate** [2] - 130:22,
130:23
**accusations** [2] - 141:15,
145:9
**acknowledging** [1] -
101:24
**act** [1] - 7:11
**acted** [1] - 85:9
**acting** [2] - 188:24, 190:4
**action** [2] - 7:9, 52:14
**actions** [1] - 197:25
**actual** [2] - 28:23, 43:3
**add** [4] - 34:1, 69:19,
118:12, 118:14
**addition** [1] - 61:20
**additional** [6] - 43:17,
43:21, 218:10, 228:2,
230:20, 232:6
**Additionally** [1] - 180:21
**address** [11] - 4:18, 6:1,
36:11, 56:7, 56:16, 65:5,

---

65:12, 67:20, 92:6, 93:19,
113:15
**addressed** [2] - 6:19, 34:1
**addresses** [1] - 56:23
**adds** [1] - 119:20
**adequate** [3] - 8:6, 227:10,
237:12
**adjourned** [1] - 238:15
**admissible** [1] - 181:16
**admission** [3] - 3:12, 221:7,
221:15
**admit** [2] - 3:3, 219:24
**admitted** [2] - 72:9, 219:23
**adopt** [1] - 53:2
**advance** [1] - 7:2
**advanced** [1] - 209:9
**advised** [2] - 154:7, 218:23
**advises** [3] - 68:11, 68:13,
218:7
**affects** [1] - 104:16
**affirmed** [1] - 50:20
**afoul** [3] - 227:12, 227:16,
227:19
**afternoon** [2] - 214:24,
216:3
**afterwards** [1] - 196:25
**ago** [9] - 25:14, 64:18,
71:25, 93:6, 114:8, 114:9,
155:14, 172:6, 172:7
**agree** [4] - 88:17, 128:11,
153:10, 161:18
**agreed** [1] - 185:13
**agreeing** [1] - 208:23
**agreement** [1] - 14:1
**ahead** [53] - 3:24, 8:22,
15:9, 20:7, 20:15, 20:21,
22:2, 23:1, 23:6, 33:23,
49:25, 53:4, 53:7, 60:20,
62:14, 64:20, 66:10, 70:17,
84:18, 88:21, 88:24, 91:22,
91:25, 94:22, 95:5, 96:9,
96:10, 98:21, 100:24, 105:7,
106:13, 107:17, 116:12,
122:7, 123:4, 128:13,
128:15, 145:23, 146:20,
153:9, 154:6, 163:12, 176:5,
178:19, 179:8, 181:22,
188:12, 203:15, 217:24,
220:7, 224:19, 230:1, 231:21
**airplane** [9] - 19:21, 19:22,
21:1, 30:4, 37:3, 39:12,
39:20, 39:24, 44:14
**airport** [2] - 24:7, 24:8
**al** [2] - 2:6, 2:7
**allegations** [1] - 153:24
**allotment** [1] - 232:25
**allow** [16] - 20:7, 57:7, 60:6,
60:7, 65:16, 88:7, 88:13,
88:21, 96:8, 98:21, 107:12,
123:16, 141:12, 143:8,

---

145:2, 181:18
**Allow** [1] - 106:5
**allowed** [3] - 58:8, 66:1,
67:1
**allowing** [1] - 56:21
**almost** [3] - 92:19, 124:22,
195:23
**aloud** [1] - 188:18
**Altan** [5] - 78:12, 78:22,
84:4, 99:12, 101:12
**ALTAN** [1] - 78:22
**Altan's** [1] - 83:7
**alternatively** [1] - 161:19
**amount** [2] - 184:10,
237:12
**AND** [1] - 1:11
**Andrew** [1] - 2:13
**ANDREW** [1] - 1:18
**Angeles** [1] - 92:12
**Answer** [4] - 15:11, 59:13,
96:10, 129:24
**answer** [53] - 21:10, 25:7,
43:15, 43:16, 57:21, 58:4,
59:6, 60:25, 90:22, 91:18,
95:5, 98:12, 98:22, 98:24,
100:19, 101:7, 101:15,
103:21, 105:5, 106:6,
106:17, 108:22, 108:23,
109:1, 122:7, 123:21,
126:10, 135:13, 146:19,
146:20, 150:5, 151:4,
152:14, 152:15, 152:16,
153:8, 153:9, 154:9, 154:11,
154:4, 157:3, 157:10,
157:16, 158:22, 162:12,
170:8, 170:9, 172:8, 184:2,
184:15, 193:11, 193:12,
197:10
**answered** [11] - 55:21,
58:3, 70:15, 73:10, 108:11,
108:25, 123:6, 123:8,
127:25, 128:8, 129:20
**answers** [4] - 70:13, 99:22,
125:5, 126:12
**anticipate** [2] - 233:11,
234:18
**Anyplace** [1] - 57:20
**Anyway** [1] - 215:22
**anyway** [4] - 8:18, 31:16,
116:6, 163:9
**apart** [1] - 232:5
**apologize** [12] - 31:1,
35:17, 39:23, 102:21,
137:13, 189:5, 206:10,
214:4, 214:11, 214:17,
226:6, 236:23
**apparent** [1] - 159:4
**appear** [7] - 161:18, 204:22,
205:4, 210:24, 227:8, 228:8,
230:24

---

**appearance** [1] - 116:7
**APPEARANCES** [1] - 1:14
**appeared** [2] - 5:9, 204:20
**appearing** [4] - 51:2, 214:16, 214:22, 215:1
**appended** [5] - 9:13, 75:13, 75:17, 75:22, 180:6
**appendix** [1] - 119:20
**applicable** [1] - 54:14
**application** [6] - 96:25, 97:1, 97:7, 97:15, 97:18, 109:25
**applications** [2] - 97:22, 103:13
**appreciate** [8] - 5:17, 5:18, 6:1, 6:14, 13:12, 31:15, 85:16, 221:19
**approach** [1] - 16:13
**appropriate** [9] - 58:12, 63:20, 145:21, 151:19, 153:5, 185:17, 224:6, 229:5, 230:13
**April** [4] - 114:13, 114:24, 115:1, 155:22
**area** [1] - 99:2
**areas** [1] - 226:4
**arguably** [1] - 175:19
**argue** [5] - 4:19, 8:8, 52:4, 153:16, 230:12
**arguing** [1] - 136:25
**argument** [7] - 4:19, 12:13, 22:24, 85:8, 93:21, 170:14, 202:22
**argumentative** [9] - 15:8, 72:7, 82:5, 83:22, 83:23, 115:9, 115:14, 132:3, 208:8
**arguments** [9] - 73:5, 123:9, 126:18, 126:20, 126:21, 127:1, 141:13, 158:24, 230:12
**arising** [1] - 225:19
**arose** [1] - 35:3
**arrangements** [2] - 74:12, 74:21
**arrived** [1] - 39:21
**article** [6] - 5:8, 7:12, 8:10, 8:13, 8:17, 202:21
**articulating** [1] - 160:20
**ascertain** [1] - 97:17
**ascertaining** [1] - 128:2
**ASCII** [7] - 171:5, 171:6, 171:8, 171:14, 172:20, 173:20, 204:13
**ASCIIs** [1] - 204:11
**aside** [2] - 101:5, 101:23
**aspect** [2] - 189:25, 190:8
**assembling** [2] - 177:3, 177:7
**assert** [1] - 137:14
**asserted** [1] - 140:17

**assertion** [1] - 56:14
**assertions** [1] - 150:19
**assigning** [1] - 67:13
**Assistant** [1] - 1:20
**ASSISTED** [1] - 1:25
**associate** [2] - 78:20, 227:2
**assume** [4] - 4:14, 29:23, 67:16, 99:22, 234:22
**assumes** [3] - 49:18, 98:11, 124:25
**Assuming** [2] - 97:15, 130:9
**assuming** [4] - 134:5, 195:20, 234:5, 234:18
**assure** [1] - 18:25
**assured** [2] - 142:18, 216:2
**Atiego** [5] - 33:21, 33:25, 189:4, 217:21, 218:7
**attach** [1] - 202:11
**attached** [1] - 187:2
**attaching** [1] - 203:20
**attempt** [2] - 96:22, 190:17
**attempts** [1] - 131:16
**attend** [2] - 6:5, 224:23
**attention** [1] - 7:20
**Attorney** [1] - 152:23
**attorney** [58] - 54:14, 55:2, 56:22, 57:22, 57:24, 58:7, 58:18, 58:23, 59:8, 59:20, 60:1, 60:4, 60:8, 60:18, 61:11, 61:24, 62:7, 62:8, 71:11, 71:16, 71:20, 74:23, 75:16, 113:12, 136:11, 137:15, 153:6, 153:7, 153:8, 154:8, 156:1, 156:11, 156:12, 157:4, 157:9, 157:16, 157:19, 157:20, 158:9, 158:15, 158:16, 159:2, 159:6, 159:19, 159:25, 162:8, 174:3, 174:7, 174:19, 175:11, 177:12, 177:20, 195:2, 195:18, 197:10, 197:18, 202:16, 206:3
**Attorney's** [2] - 149:5, 150:25
**attorney's** [1] - 74:24
**attorney-client** [40] - 54:14, 55:2, 56:22, 57:22, 57:24, 58:7, 58:18, 58:23, 59:8, 59:20, 60:1, 60:8, 61:11, 136:11, 137:15, 153:6, 153:7, 153:8, 154:8, 156:12, 157:4, 157:9, 157:16, 157:19, 157:20, 158:9, 158:15, 159:2, 159:6, 159:19, 159:25, 174:3, 174:7, 174:19, 175:11, 195:2, 195:18, 197:10, 197:18, 202:16

**Attorneys** [3] - 1:15, 1:18, 1:20
**attorneys** [10] - 60:23, 60:24, 61:5, 71:5, 75:8, 91:17, 113:10, 113:14, 114:21, 183:14
**attribute** [1] - 133:12
**attributes** [6] - 104:15, 130:25, 131:1, 131:17, 132:16, 132:17
**August** [6] - 47:1, 236:11, 236:13, 236:15, 236:16, 236:24
**authorized** [1] - 67:17
**automatically** [1] - 118:9
**automobile** [1] - 24:4
**availability** [1] - 237:21
**available** [25] - 12:7, 14:20, 92:16, 151:13, 161:18, 167:25, 223:25, 224:2, 224:16, 226:10, 227:15, 235:12, 235:21, 235:22, 235:24, 235:25, 236:6, 236:11, 236:13, 236:16, 236:25, 237:6, 237:7, 237:22
**avoided** [1] - 104:19
**aware** [19] - 4:12, 5:8, 6:7, 8:14, 50:6, 52:12, 58:9, 68:4, 74:16, 74:25, 76:25, 77:3, 185:3, 185:6, 185:7, 189:1, 198:6, 198:8, 223:4
**AziMyth** [1] - 188:25

**B**

**backed** [27] - 78:4, 79:11, 82:3, 82:20, 82:21, 84:12, 84:13, 84:25, 85:13, 88:8, 88:23, 90:3, 97:18, 98:17, 102:4, 106:20, 109:20, 110:19, 111:7, 112:6, 116:15, 117:19, 117:25, 119:5, 120:5, 131:17
**backing** [5] - 77:25, 80:20, 81:15, 81:18, 81:19, 88:15, 99:7, 109:23, 128:5
**backup** [71] - 81:7, 82:7, 82:8, 82:15, 83:12, 83:20, 84:2, 86:10, 86:16, 86:19, 86:24, 87:19, 87:24, 87:25, 90:1, 94:14, 94:16, 94:17, 95:22, 97:9, 97:13, 100:7, 104:1, 104:16, 107:6, 117:9, 117:24, 118:7, 118:20, 119:1, 119:4, 119:10, 119:23, 120:6, 120:10, 120:19, 121:7, 121:21, 124:1, 128:20, 128:21, 128:25, 129:9, 129:12, 129:13, 130:12, 130:25,

131:1, 131:2, 131:3, 131:5, 131:8, 131:14, 131:16, 131:18, 132:9, 132:15, 133:13, 133:17, 134:8, 134:9, 134:12, 146:13, 146:18, 148:19, 148:21, 159:13, 204:10
**Backups** [1] - 107:2
**backups** [50] - 77:21, 80:18, 80:23, 81:1, 81:2, 86:1, 86:4, 87:13, 87:14, 88:19, 89:5, 89:6, 89:10, 90:11, 90:14, 91:4, 94:19, 96:15, 97:18, 98:1, 98:6, 99:8, 99:10, 99:18, 100:11, 101:25, 102:15, 102:22, 108:8, 108:9, 108:17, 109:4, 110:14, 110:21, 111:3, 111:11, 117:7, 117:19, 117:23, 118:16, 119:1, 128:12, 146:16, 146:25, 147:6, 147:18, 148:2, 148:4, 154:15, 154:20
**bad** [8] - 4:21, 33:17, 66:15, 72:24, 85:9, 122:16, 125:20, 195:17
**badgering** [1] - 72:10
**balance** [1] - 216:3
**based** [10] - 16:1, 54:17, 56:21, 67:16, 86:11, 123:19, 128:3, 144:8, 151:3, 174:21
**Based** [1] - 106:16
**bases** [1] - 154:9
**basis** [16] - 6:5, 64:6, 85:1, 89:10, 89:17, 89:18, 89:20, 90:14, 100:7, 100:11, 102:2, 108:9, 108:18, 109:4, 161:14, 174:14
**Bates** [12] - 9:12, 10:19, 75:24, 75:25, 182:4, 182:6, 201:16, 209:22, 210:4, 211:6, 211:8, 211:22
**bearing** [1] - 8:19
**became** [2] - 9:17, 11:16
**become** [2] - 159:4, 160:11
**BEFORE** [1] - 1:2
**began** [4] - 45:17, 73:15, 134:3, 134:15
**begin** [1] - 216:1
**beginning** [4] - 73:15, 154:23, 178:24
**begins** [2] - 10:19, 206:7
**behalf** [9] - 2:8, 2:10, 2:12, 2:14, 14:9, 188:24, 190:4, 218:7, 221:15
**behind** [4] - 73:1, 73:2, 73:3, 82:4, 149:18, 157:21, 160:8, 174:6
**belief** [2] - 106:2, 164:11
**Bellevue** [31] - 24:21,

25:17, 26:3, 26:5, 26:6, 26:16, 26:21, 27:7, 27:22, 30:4, 31:7, 41:4, 41:17, 41:22, 42:2, 42:15, 42:17, 42:21, 42:23, 42:24, 42:25, 43:10, 45:18, 45:20, 46:1, 47:23, 48:2, 48:9, 48:25
**Bellisle** [1] - 203:5
**below** [2] - 205:15, 208:16
**Bennett** [6] - 61:14, 61:15, 61:17, 62:7, 62:21, 62:22
**Bennett's** [2] - 61:7, 156:15
**best** [11] - 5:21, 6:8, 47:6, 92:5, 93:16, 93:18, 224:20, 225:6, 226:12, 228:4, 235:4
**better** [3] - 122:3, 122:6, 230:2
**between** [14] - 48:14, 60:4, 67:25, 69:10, 147:12, 158:16, 165:8, 188:24, 190:3, 202:2, 202:25, 203:19, 208:25, 225:23
**beyond** [5] - 34:3, 66:6, 126:21, 195:14, 225:12
**bill** [1] - 160:1
**binder** [4] - 179:11, 186:24, 217:9, 235:1
**Binders** [1] - 235:7
**binders** [10] - 179:1, 216:2, 216:9, 216:13, 216:17, 216:25, 217:1, 217:2, 218:3, 235:4
**bit** [3] - 34:10, 92:4, 116:16
**Blixeth** [9] - 19:16, 20:17, 21:8, 55:17, 150:20, 180:13, 181:4, 188:25, 198:21
**Blixeth's** [6] - 19:21, 21:1, 37:4, 54:10, 57:3
**book** [2] - 75:20, 75:21
**bottom** [13] - 75:24, 75:25, 204:23, 205:6, 205:11, 206:11, 207:7, 209:22, 209:23, 211:6, 211:8, 211:19, 212:13
**bought** [1] - 123:3
**box** [22] - 26:25, 27:4, 27:14, 28:8, 28:10, 28:11, 29:18, 29:19, 30:8, 30:10, 31:10, 31:11, 36:14, 36:19, 37:14, 37:16, 37:18, 39:22, 46:14, 46:16, 69:18
**boxes** [62] - 27:7, 28:12, 28:17, 28:18, 29:5, 29:6, 29:8, 29:21, 29:22, 31:10, 31:11, 39:3, 40:22, 42:9, 42:13, 42:18, 42:19, 42:21, 43:11, 43:12, 43:18, 43:19, 43:20, 43:21, 43:24, 44:3, 44:4, 44:6, 44:9, 44:10, 44:15, 45:1, 45:7, 45:11,

45:14, 45:17, 45:23, 45:25, 46:3, 46:9, 47:8, 47:9, 47:12, 47:18, 47:19, 47:21, 49:3, 49:6, 49:7, 49:12, 49:13, 49:17, 53:9, 53:10, 53:11, 53:14, 53:25, 54:5, 54:7, 69:20, 70:1
**brand** [1] - 208:2
**Brand** [1] - 208:5
**break** [11] - 10:12, 11:6, 13:13, 50:11, 53:5, 58:3, 59:8, 84:9, 84:19, 213:22, 213:24
**breaks** [1] - 3:24
**Bridget** [1] - 2:11
**BRIDGETT** [1] - 1:17
**brief** [5] - 4:5, 116:6, 162:21, 178:2, 178:9
**briefed** [5] - 5:11, 8:15, 11:22, 12:12, 13:6
**briefly** [2] - 22:1, 153:23
**bring** [4] - 7:20, 123:19, 180:23, 185:21
**bringing** [1] - 21:24, 237:9
**broadening** [1] - 66:6
**broken** [2] - 25:23, 26:9
**brought** [16] - 73:22, 73:24, 74:1, 74:7, 74:11, 74:13, 74:20, 92:8, 92:15, 92:22, 111:20, 165:9, 165:15, 167:6, 167:7, 167:21
**building** [2] - 95:2, 95:8
**bunch** [2] - 173:25, 193:17
**burden** [2] - 152:17
**BY** [69] - 14:12, 15:13, 16:15, 20:16, 20:22, 22:3, 23:8, 31:20, 35:16, 40:14, 53:8, 57:13, 59:14, 60:21, 61:3, 61:16, 62:16, 66:20, 69:5, 70:18, 73:14, 78:17, 80:15, 82:6, 84:1, 89:2, 89:15, 94:15, 95:9, 96:14, 99:5, 101:1, 107:1, 107:15, 107:19, 109:3, 109:18, 112:4, 116:14, 117:18, 122:9, 123:24, 128:18, 130:10, 132:5, 145:24, 153:20, 154:14, 157:12, 159:12, 159:23, 163:13, 169:16, 170:15, 176:7, 178:21, 179:21, 181:23, 188:13, 188:17, 191:6, 196:8, 196:17, 198:3, 199:4, 199:19, 201:12, 203:17, 208:10

---

## C

**calendar** [2] - 188:22,

230:15
**calendars** [2] - 224:19, 237:4
**candid** [5] - 127:18, 151:20, 151:21, 151:22, 174:9
**cannot** [4] - 15:21, 34:24, 67:10, 227:9
**canvassed** [1] - 218:17
**capable** [1] - 8:16
**capacity** [2] - 7:19, 79:21
**captioned** [1] - 191:7
**capture** [2] - 135:19, 152:9
**captured** [2] - 107:23, 154:16
**capturing** [2] - 135:22, 136:1
**car** [8] - 21:8, 21:18, 22:4, 22:7, 23:10, 23:22, 23:24, 37:3
**card** [1] - 81:14
**care** [11] - 3:24, 4:1, 11:6, 115:8, 116:7, 146:6, 180:16, 190:21, 216:6, 219:2, 219:4
**CARLOTTA** [1] - 1:20
**Carlotta** [1] - 2:14
**carried** [3] - 21:7, 44:14, 45:11
**case** [38] - 2:5, 2:22, 5:20, 6:13, 9:16, 11:9, 12:3, 13:9, 13:16, 13:18, 32:15, 52:12, 52:15, 60:6, 65:24, 68:21, 82:23, 104:4, 113:21, 115:7, 138:22, 140:9, 140:16, 144:3, 152:18, 160:23, 162:8, 162:9, 162:10, 164:14, 180:13, 181:5, 209:7, 209:15, 230:6, 236:3
**cases** [1] - 6:4
**CASES** [1] - 1:11
**categories** [1] - 37:10
**category** [1] - 211:16
**CAUSE** [1] - 1:13
**caution** [1] - 221:21
**CD** [5] - 11:25, 15:21, 15:24, 16:6, 17:8
**CDs** [69] - 9:15, 9:16, 9:20, 9:22, 10:4, 11:14, 14:14, 14:16, 15:15, 15:21, 15:22, 15:23, 16:3, 16:4, 18:4, 18:14, 19:5, 22:18, 25:16, 26:5, 28:23, 32:4, 32:6, 32:12, 32:19, 32:20, 32:21, 32:24, 33:4, 34:16, 34:18, 34:19, 38:11, 38:12, 38:14, 38:16, 38:22, 38:25, 64:19, 66:21, 66:25, 67:1, 69:20, 70:19, 71:7, 71:16, 71:20, 72:1, 73:16, 73:19, 74:1, 74:17, 75:1, 75:9, 75:11, 75:13, 85:7, 85:8, 92:8, 92:9,

92:14, 92:21, 92:22, 93:4, 93:17
**ceased** [1] - 22:21
**CEO** [5] - 90:5, 90:8, 90:10, 95:18, 107:8
**Certain** [1] - 104:23
**certain** [28] - 44:25, 49:5, 57:21, 67:15, 71:1, 73:16, 74:16, 77:6, 82:12, 85:17, 87:3, 101:8, 106:21, 113:6, 119:12, 122:8, 123:10, 170:17, 176:15, 177:8, 181:15, 195:23, 198:4, 213:16, 218:21, 227:22, 232:9
**Certainly** [3] - 8:3, 221:17, 223:20
**certainly** [22] - 4:8, 5:2, 6:14, 8:6, 8:15, 14:20, 14:23, 61:23, 65:7, 70:11, 123:2, 125:2, 138:3, 139:5, 145:19, 153:13, 157:19, 159:3, 159:7, 177:8, 178:25, 223:19
**certainty** [1] - 15:22
**certify** [1] - 238:18
**cetera** [1] - 154:1
**chain** [3] - 19:24, 22:14, 66:1
**chambers** [1] - 186:4
**chance** [6] - 7:14, 7:17, 34:5, 174:6, 223:18, 236:3
**change** [14] - 102:10, 104:14, 117:9, 117:25, 118:7, 118:11, 118:18, 118:24, 119:9, 119:14, 119:19, 119:24, 120:12, 178:25
**Changed** [1] - 119:21
**changed** [8] - 102:9, 118:21, 119:11, 119:23, 119:25, 120:6, 120:10, 125:23
**changes** [1] - 97:22
**changing** [2] - 27:18, 27:19
**characterization** [1] - 160:3
**characterize** [1] - 69:1
**chat** [1] - 226:16
**check** [2] - 129:17, 210:3
**checking** [1] - 234:2
**chief** [6] - 83:19, 125:13, 125:14, 128:3, 208:5, 208:6
**chose** [2] - 176:15, 213:16
**chronology** [2] - 20:14, 22:1
**Cindy** [4] - 78:24, 84:5, 99:12, 101:12, 101:13
**circled** [1] - 96:3
**Circuit** [1] - 236:8
**circumstance** [1] - 118:5
**Circumstances** [1] - 119:13

**circumstances** [4] - 106:1, 119:10, 119:14, 120:24

**citing** [1] - 5:9

**civil** [1] - 68:2

**claim** [3] - 140:16, 180:4, 214:6

**claimed** [1] - 77:8

**clarified** [2] - 11:6, 58:13

**clarify** [5] - 20:14, 31:3, 31:18, 221:18, 225:25

**clarifying** [1] - 40:8

**classified** [16] - 63:6, 63:14, 63:16, 63:21, 63:23, 64:7, 64:8, 64:10, 64:16, 65:3, 65:21, 65:22, 94:17, 105:3, 106:3

**clear** [6] - 10:1, 51:8, 51:19, 51:20, 143:18, 214:10

**clearance** [4] - 101:10, 101:19, 105:13, 106:1

**clearances** [5] - 101:3, 101:6, 101:7, 101:14, 101:25

**clearly** [4] - 9:23, 55:1, 104:19, 126:21

**clerical** [1] - 105:25

**Clerk** [10] - 3:7, 3:25, 179:4, 186:4, 186:10, 187:14, 187:20, 199:14, 218:10, 230:15

**clerk** [10] - 3:14, 105:24, 179:1, 179:10, 215:19, 215:20, 219:12, 235:1, 235:8, 237:4

**client** [55] - 7:15, 34:7, 54:14, 55:2, 56:22, 57:22, 57:24, 58:7, 58:18, 58:20, 58:23, 59:8, 59:20, 60:1, 60:4, 60:18, 61:11, 65:4, 72:9, 72:23, 73:7, 136:11, 137:15, 153:6, 153:7, 153:8, 154:8, 154:11, 156:12, 157:4, 157:9, 157:16, 157:19, 157:20, 158:9, 158:15, 158:16, 159:2, 159:6, 159:19, 159:25, 160:22, 174:3, 174:7, 174:19, 175:5, 175:11, 195:2, 195:18, 197:10, 197:18, 202:16

**clients** [2] - 237:10, 237:22

**clock** [3] - 125:12, 125:16, 125:17

**clone** [2] - 152:10, 153:3

**close** [1] - 121:12

**closed** [1] - 97:12

**closer** [1] - 44:20

**closet** [3] - 54:10, 55:8, 57:3

**closets** [1] - 64:13

**code** [4] - 11:24, 11:25, 12:3

**collateral** [1] - 5:14

**collected** [3] - 42:15, 100:14, 100:18

**collecting** [1] - 173:9

**collective** [1] - 11:14

**combined** [1] - 124:8

**coming** [1] - 126:13

**command** [1] - 104:9

**commenced** [1] - 133:21

**commencing** [1] - 112:24, 126:25, 219:25

**comment** [1] - 112:24, 126:25, 219:25

**comments** [2] - 13:8, 35:9

**Commercial** [2] - 39:25, 40:1

**commingle** [3] - 52:16, 67:10, 69:6

**commingled** [5] - 32:18, 66:25, 69:13, 72:9, 73:12

**commingling** [1] - 51:18

**committed** [1] - 55:12

**communicate** [1] - 190:17

**communication** [14] - 60:4, 153:6, 154:8, 158:3, 158:5, 158:6, 158:7, 158:12, 158:15, 158:16, 158:21, 160:1, 188:23, 201:17

**communications** [13] - 137:10, 150:24, 151:3, 157:4, 157:9, 158:10, 174:21, 195:3, 195:13, 199:6, 199:11, 202:6, 202:7

**company** [9] - 46:18, 46:20, 83:19, 89:16, 90:5, 90:8, 90:10, 99:14, 99:16

**compelling** [1] - 6:2

**complaint** [1] - 181:7

**complete** [10] - 59:1, 83:20, 139:2, 139:6, 139:8, 143:23, 153:17, 224:9, 224:11, 225:3

**completed** [4] - 94:5, 168:2, 229:23, 230:10

**completely** [1] - 96:3

**completeness** [2] - 13:20, 13:21

**complex** [1] - 6:10

**compliance** [3] - 98:18, 145:12, 161:12

**complied** [3] - 86:8, 86:13, 144:6

**comply** [4] - 72:23, 111:5, 154:2, 228:13

**compound** [2] - 84:7, 84:17

**compromised** [1] - 183:8

**COMPUTER** [1] - 1:25

**computer** [35] - 28:22, 36:19, 43:3, 81:7, 81:9, 81:11, 81:12, 81:16, 82:22, 83:6, 83:7, 84:16, 95:15,

95:23, 96:22, 97:21, 105:3, 106:4, 108:3, 116:18, 117:1, 117:4, 118:1, 120:3, 125:12, 125:16, 125:17, 131:13, 132:9, 148:4, 177:21

**Computer** [1] - 97:21

**computers** [43] - 28:20, 36:22, 37:11, 77:24, 78:2, 81:3, 81:13, 82:16, 83:12, 84:3, 84:13, 84:25, 86:2, 90:1, 90:3, 95:19, 96:16, 97:22, 98:2, 98:13, 99:13, 99:22, 99:24, 103:8, 108:10, 108:18, 109:5, 109:22, 109:24, 110:15, 112:6, 112:16, 112:23, 116:15, 117:8, 117:20, 117:24, 119:6, 125:24, 132:2, 163:15, 164:5, 169:8

**concentrated** [1] - 164:8

**concentrating** [2] - 164:6, 166:10

**concept** [2] - 160:20, 162:7

**concern** [7] - 5:18, 58:6, 58:21, 59:7, 84:17, 123:15, 224:10

**concerned** [5] - 6:2, 66:6, 98:1, 100:19, 181:14

**concerning** [12] - 2:19, 12:24, 20:9, 21:25, 51:7, 68:1, 68:7, 88:14, 88:15, 128:5, 163:11, 181:10

**concerns** [9] - 57:9, 59:25, 62:10, 123:16, 123:17, 214:22, 214:25, 215:6, 215:7

**conclude** [1] - 95:10

**conclusion** [3] - 70:7, 91:11, 91:16, 94:12, 94:24, 95:1, 95:17, 105:15, 143:24, 190:19, 190:21, 190:23, 191:3

**conduct** [1] - 182:16

**conducted** [1] - 33:18

**confer** [5] - 60:7, 92:3, 161:16, 224:25, 225:13

**conference** [6] - 9:7, 94:5, 190:24, 222:12, 236:8, 236:15

**conferring** [1] - 167:20

**confidential** [7] - 158:3, 158:5, 158:6, 158:7, 158:11, 158:15, 158:21

**confronted** [1] - 6:13

**confusing** [1] - 30:19

**confusion** [1] - 11:5

**connect** [5] - 80:12, 125:7, 125:21, 125:24, 126:11

**connection** [5] - 4:21, 61:9, 61:17, 140:23, 146:25

**consecutively** [1] - 10:8

**Conser** [1] - 79:14

**consider** [2] - 145:20, 235:15

**considered** [2] - 4:11, 165:11

**considers** [1] - 115:12

**consistent** [4] - 85:14, 138:20, 139:25, 143:10

**consisting** [1] - 211:25

**consists** [1] - 182:3

**consolidated** [1] - 50:21

**constantly** [1] - 73:2

**constitute** [1] - 60:18

**constitutes** [1] - 51:22

**constraints** [1] - 92:9

**construed** [1] - 144:9

**consult** [2] - 58:8, 59:8

**consultant** [10] - 139:15, 139:17, 151:12, 153:2, 160:5, 160:9, 160:12, 160:16, 161:8, 193:6

**consulting** [2] - 140:24, 233:21

**contact** [2] - 227:4, 237:4

**contacting** [1] - 163:10

**contain** [4] - 86:5, 87:11, 165:20, 210:9

**contained** [7] - 43:21, 54:20, 63:13, 77:8, 182:3, 183:2, 185:7

**containers** [2] - 43:4, 43:5

**containing** [2] - 87:7, 87:9

**contains** [4] - 63:6, 146:5, 159:21, 191:14

**contemplate** [1] - 232:24

**contempt** [1] - 2:20

**contend** [2] - 63:16, 86:9, 198:5

**contending** [2] - 140:1, 140:2

**continuation** [1] - 231:6

**continue** [12] - 14:4, 59:10, 65:17, 73:18, 89:9, 89:20, 99:10, 99:18, 180:8, 189:3, 215:24, 236:7

**CONTINUED** [1] - 1:13

**continued** [13] - 2:5, 2:18, 2:24, 99:21, 100:5, 100:6, 100:10, 147:23, 216:7, 219:1, 219:3, 221:6, 235:16

**continues** [1] - 209:25

**continuing** [1] - 196:13

**contracts** [1] - 147:16

**contrivance** [1] - 194:23

**contrived** [2] - 122:20, 137:4

**control** [9] - 22:19, 23:3, 65:9, 86:13, 88:1, 88:12, 98:20, 141:8, 141:9

**convene** [1] - 223:4

**convenient** [1] - 222:18
**conversation** [6] - 197:16, 197:19, 197:25, 214:8, 216:14, 227:4
**conversations** [2] - 60:19, 106:16
**converted** [1] - 171:8
**convoluted** [1] - 98:25
**Cooke's** [2] - 201:9, 201:14
**Coolican** [2] - 203:1, 203:3
**copied** [55] - 33:13, 53:3, 70:21, 70:22, 71:13, 71:14, 74:4, 74:12, 74:18, 74:22, 77:2, 81:4, 81:5, 81:25, 92:10, 92:12, 103:3, 103:24, 104:13, 107:11, 111:6, 111:21, 114:19, 118:16, 119:16, 119:17, 120:10, 121:6, 124:1, 126:4, 126:9, 129:19, 130:23, 131:19, 132:13, 132:21, 133:21, 133:24, 134:3, 134:18, 144:22, 148:11, 148:13, 160:2, 160:10, 163:15, 163:17, 177:8, 178:13, 199:10, 204:14, 204:19, 207:19, 207:20
**copies** [16] - 3:25, 32:21, 32:23, 33:1, 33:5, 70:24, 75:10, 77:3, 103:16, 167:16, 168:8, 178:12, 178:14, 215:9, 217:3, 218:14
**copy** [27] - 10:20, 18:15, 34:18, 82:12, 82:13, 93:5, 94:25, 95:2, 102:18, 103:14, 103:17, 104:5, 104:11, 104:12, 107:11, 124:13, 143:2, 146:23, 148:10, 149:1, 151:25, 167:25, 169:11, 177:23, 179:13, 201:2, 228:4
**copying** [13] - 71:7, 81:9, 102:17, 103:7, 103:10, 124:17, 125:4, 126:7, 132:8, 136:8, 144:22, 168:2, 204:19
**correct** [119] - 3:6, 10:5, 17:17, 19:10, 21:9, 24:5, 25:6, 25:11, 25:24, 26:6, 27:8, 27:15, 27:25, 28:14, 29:13, 29:14, 29:16, 29:17, 29:25, 30:1, 30:2, 30:16, 37:4, 37:12, 37:21, 37:24, 38:2, 38:5, 38:23, 39:1, 39:5, 39:8, 39:25, 40:4, 40:12, 40:16, 40:23, 40:25, 41:4, 41:15, 44:6, 44:10, 45:2, 45:8, 45:12, 47:14, 48:2, 48:10, 48:11, 61:9, 61:18, 63:2, 63:4, 66:23, 67:1, 67:2, 68:18, 70:2, 72:6, 73:16,

74:12, 90:6, 90:11, 90:21, 96:17, 96:18, 96:20, 96:21, 96:24, 98:4, 100:8, 102:25, 103:1, 103:15, 104:18, 107:25, 112:17, 117:5, 119:6, 119:8, 120:7, 120:20, 125:12, 130:8, 130:9, 134:9, 139:23, 147:8, 156:1, 165:21, 165:22, 171:20, 172:25, 176:9, 176:10, 176:25, 177:1, 182:25, 183:3, 193:6, 197:8, 199:6, 200:2, 200:5, 200:9, 201:23, 204:24, 206:4, 206:21, 207:1, 208:4, 212:20, 213:17, 214:14, 214:15, 215:15, 216:25, 218:8, 238:18
**Correct** [5] - 17:18, 38:24, 170:12, 188:16, 209:1
**correcting** [1] - 27:17
**correctly** [3] - 62:19, 156:20, 179:2
**correspondence** [6] - 4:6, 160:2, 188:21, 190:3, 202:1, 223:18
**corruption** [1] - 180:20
**Counsel** [1] - 178:7
**counsel** [52] - 2:23, 3:4, 3:11, 4:1, 6:1, 13:16, 50:4, 51:2, 58:8, 60:16, 68:3, 92:4, 93:23, 94:1, 94:5, 106:11, 113:15, 121:15, 136:20, 137:10, 142:20, 145:10, 145:18, 157:25, 161:17, 181:18, 182:15, 190:18, 193:5, 201:21, 216:13, 216:17, 217:21, 218:2, 218:4, 219:15, 219:23, 220:1, 222:16, 222:19, 224:18, 224:25, 225:22, 226:2, 226:13, 226:23, 229:21, 231:11, 231:12, 235:12, 235:14, 237:11
**count** [3] - 15:17, 16:1, 211:18
**couple** [1] - 93:14
**courier** [3] - 197:1, 200:17, 202:10
**course** [15] - 33:18, 58:11, 72:4, 89:4, 93:22, 109:25, 110:20, 113:2, 143:21, 146:15, 148:1, 169:8, 195:22, 201:25, 225:21
**court** [25] - 2:21, 5:10, 60:6, 67:14, 74:13, 111:6, 111:20, 114:20, 151:9, 160:13, 169:6, 170:4, 174:9, 179:6, 184:6, 187:21, 215:20, 216:23, 219:12, 219:13,

229:6, 229:7, 231:20, 235:9, 237:4
**Court** [134] - 3:2, 4:3, 4:8, 4:12, 5:1, 5:8, 5:20, 6:12, 6:15, 7:23, 8:2, 8:3, 8:10, 8:14, 8:15, 8:18, 9:24, 10:13, 11:8, 11:13, 12:5, 12:10, 13:2, 16:7, 18:21, 19:3, 21:25, 34:8, 34:9, 34:13, 34:21, 34:24, 35:4, 49:7, 53:1, 55:12, 58:25, 65:1, 65:18, 67:15, 67:23, 68:11, 68:13, 68:23, 73:6, 74:16, 77:9, 84:14, 85:16, 86:6, 86:10, 86:11, 86:15, 86:18, 86:23, 87:5, 87:7, 87:18, 87:22, 87:23, 93:10, 93:13, 94:10, 96:5, 96:6, 110:5, 111:9, 113:15, 127:1, 136:21, 138:3, 138:23, 139:3, 143:8, 143:11, 144:6, 144:10, 144:13, 144:23, 145:7, 145:11, 150:8, 150:9, 150:18, 151:9, 151:14, 152:13, 153:16, 153:17, 155:17, 157:23, 159:7, 160:21, 162:1, 165:9, 167:1, 167:5, 168:21, 168:24, 169:6, 169:21, 174:10, 174:16, 179:25, 180:5, 180:7, 181:13, 181:15, 181:17, 186:1, 186:14, 188:18, 195:5, 196:2, 197:4, 200:1, 202:22, 214:5, 214:11, 216:22, 219:8, 219:20, 223:11, 223:24, 224:6, 224:24, 227:11, 230:16, 233:9, 235:19, 236:25
**Court's** [26] - 2:18, 3:5, 34:22, 72:23, 85:14, 86:8, 86:13, 87:2, 98:19, 127:21, 139:2, 141:20, 143:17, 154:3, 161:22, 175:1, 179:3, 187:2, 188:8, 188:15, 220:5, 221:3, 227:13, 227:17, 228:13, 228:17
**court's** [3] - 3:9, 10:1, 141:19
**court-ordered** [1] - 170:4
**courtesy** [1] - 223:3
**courtroom** [4] - 19:18, 216:10, 218:2, 218:14
**cover** [3] - 202:2, 202:9
**covered** [2] - 150:23, 226:4
**create** [6] - 120:25, 137:8, 161:4, 161:21, 204:8, 205:13
**created** [25] - 45:25, 53:9, 97:10, 97:13, 104:18, 117:1, 120:23, 132:19, 133:1,

133:6, 133:7, 170:20, 172:12, 177:24, 204:10, 204:11, 205:20, 209:17, 209:19, 210:15, 213:7
**creating** [1] - 136:8
**credibility** [2] - 66:12, 150:18
**Creek** [7] - 23:19, 35:19, 35:25, 36:5, 36:6, 37:4, 54:11
**crime** [2] - 55:12, 56:14
**criminal** [2] - 61:8, 116:6
**CROSS** [2] - 14:11, 116:13
**cross** [3] - 234:5, 234:10, 234:23
**CROSS-EXAMINATION** [2] - 14:11, 116:13
**cross-examining** [1] - 234:23
**custody** [11] - 19:25, 22:15, 22:19, 23:3, 65:9, 65:21, 66:1, 86:12, 88:1, 88:12, 98:20
**custom** [3] - 88:14, 88:22, 96:2
**cut** [8] - 205:22, 206:1, 206:10, 206:11, 209:1, 209:20, 210:23, 212:25

**D**

**D.C** [5] - 61:5, 156:17, 195:23, 226:24, 229:21
**daily** [1] - 6:5
**data** [54] - 18:16, 56:18, 63:13, 69:7, 69:19, 70:1, 70:22, 71:7, 71:14, 77:1, 77:8, 81:15, 81:18, 81:23, 81:24, 82:10, 82:12, 82:13, 82:18, 82:19, 82:22, 83:20, 84:2, 85:23, 85:25, 86:4, 87:8, 92:23, 95:11, 95:14, 95:15, 95:21, 97:3, 97:4, 97:7, 99:24, 100:14, 100:16, 100:17, 100:18, 102:2, 121:21, 124:1, 128:21, 129:3, 129:13, 130:11, 131:19, 167:2, 167:18, 183:9, 185:16
**date** [52] - 2:4, 12:15, 33:3, 95:19, 121:6, 122:3, 122:4, 122:6, 122:18, 122:20, 123:19, 126:1, 128:10, 129:19, 129:22, 129:23, 130:23, 131:13, 131:14, 131:22, 131:23, 132:6, 132:8, 132:10, 132:11, 132:12, 132:18, 132:19, 132:20, 132:22, 133:14, 133:16, 133:17, 133:23,

134:1, 134:7, 134:16, 135:1, 148:25, 166:2, 184:11, 190:25, 202:20, 218:25, 223:16, 226:1, 227:22, 233:23

**date-sensitive** [1] - 184:11

**dated** [3] - 34:14, 122:19, 206:20

**dates** [17] - 130:19, 131:11, 131:12, 134:6, 210:12, 212:6, 212:10, 212:19, 222:18, 222:19, 222:23, 222:25, 223:2, 225:7, 237:6, 237:22

**dating** [1] - 129:17

**David** [1] - 190:5

**Dawn** [1] - 180:24

**day-long** [1] - 2:24

**days** [8] - 8:4, 41:12, 141:6, 145:11, 231:9, 237:5, 237:7, 237:8

**deal** [5] - 64:24, 137:19, 161:4, 190:19, 190:20

**dealing** [4] - 6:10, 6:11, 6:13, 97:21

**dealt** [1] - 65:21

**Dear** [1] - 201:14

**Deborah** [1] - 2:8

**DEBORAH** [1] - 1:15

**December** [5] - 89:23, 147:14, 147:20, 148:1, 169:9

**decide** [6] - 5:1, 11:8, 151:19, 235:14, 237:12, 237:19

**decision** [13] - 5:2, 8:18, 13:6, 34:9, 164:12, 205:13, 210:23, 211:2, 211:24, 212:22, 225:3, 227:11, 230:2

**declaration** [17] - 9:8, 9:14, 14:16, 15:7, 15:14, 16:10, 16:11, 16:17, 21:24, 32:5, 32:13, 54:13, 54:18, 61:22, 75:14, 76:17, 180:6

**Declaration** [1] - 10:3

**declarations** [3] - 63:4, 63:7, 195:4

**deemed** [3] - 158:10, 164:7, 164:10

**deems** [1] - 145:7

**defamation** [3] - 180:12, 180:14, 214:6

**defamatory** [2] - 180:18, 180:24

**defame** [1] - 181:4

**Defendant's** [4] - 179:10, 179:19, 181:25, 190:13

**defendants** [3] - 2:10, 2:12, 179:7

**Defendants** [1] - 1:10

**DEFENDANTS** [1] - 1:17

**Defendants'** [1] - 179:2

**defense** [2] - 140:16, 180:4

**DEFENSE** [1] - 1:9

**defining** [1] - 207:23

**definition** [3] - 191:18, 192:4, 208:12

**delay** [1] - 51:6

**deliver** [1] - 235:9

**delivered** [4] - 33:13, 33:14, 61:24, 202:11

**delivering** [1] - 235:1

**demonstrated** [1] - 153:15

**demonstrates** [1] - 105:11

**denied** [3] - 8:21, 50:22, 72:18

**DENNIS** [1] - 1:4

**Dennis** [5] - 2:6, 2:19, 10:3, 90:13, 180:13

**deny** [1] - 154:1

**DEPARTMENT** [1] - 1:8

**Depicted** [1] - 10:4

**depicted** [2] - 15:21, 15:23

**depose** [1] - 34:6

**deposited** [1] - 41:6

**deposition** [9] - 34:5, 35:6, 35:10, 191:1, 222:10, 222:13, 223:4, 225:1, 226:4

**depositions** [2] - 223:2, 225:17

**derived** [3] - 137:10, 195:2, 202:15

**described** [4] - 57:15, 59:4, 59:16, 117:20

**designated** [3] - 160:5, 160:6, 179:6

**designed** [2] - 56:8, 151:1, 158:7

**Despite** [3] - 15:19, 16:25, 17:4

**destroy** [2] - 95:16, 181:4

**destroyed** [1] - 95:12

**destroying** [1] - 67:11

**detail** [2] - 14:15, 121:24

**determination** [4] - 135:18, 164:15, 174:17, 227:6

**determine** [5] - 56:4, 65:2, 129:19, 130:19, 219:13

**determined** [2] - 9:11, 112:11

**device** [1] - 28:22

**devices** [2] - 28:20, 81:10

**Diana** [1] - 36:12

**differences** [1] - 147:23

**different** [15] - 11:1, 25:13, 28:18, 45:11, 52:6, 53:6, 63:11, 91:8, 102:11, 120:15, 147:18, 149:16, 209:20, 212:19

**difficult** [1] - 14:25

**difficulty** [1] - 190:25

**Digital** [4] - 28:22, 43:4, 43:5, 43:7

**diligent** [1] - 15:19

**direct** [1] - 234:10

**directed** [3] - 32:4, 139:25, 224:19

**direction** [1] - 95:18

**directions** [2] - 141:10, 142:17

**directly** [8] - 22:11, 24:7, 155:11, 180:12, 197:7, 197:22, 200:9

**director** [1] - 80:22

**directories** [3] - 120:13, 120:14, 120:22

**Directories** [1] - 120:22

**directory** [6] - 81:20, 119:18, 119:25, 120:25, 131:16, 133:13, 133:15

**disagree** [2] - 7:8, 158:20

**disaster** [7] - 107:2, 107:9, 107:10, 107:16, 107:20, 107:23

**disclose** [2] - 157:4, 157:9

**disclosed** [2] - 54:15, 55:5

**discloses** [2] - 55:1, 61:11

**disclosures** [3] - 56:22, 195:2, 202:16

**discoverable** [1] - 12:16

**discovered** [1] - 7:10

**discovery** [22] - 2:21, 6:11, 9:23, 34:22, 66:16, 72:16, 93:9, 93:12, 127:23, 135:24, 135:25, 162:10, 162:13, 181:10, 181:16, 185:21, 185:22, 222:12, 224:6, 224:8, 225:20, 230:6

**discreet** [1] - 112:15

**discuss** [7] - 13:25, 85:10, 88:18, 142:5, 183:14, 225:22, 226:20

**discussed** [4] - 77:9, 143:19, 219:14, 233:24

**discusses** [1] - 190:7

**discussing** [1] - 135:10

**Discussion** [5] - 52:23, 92:1, 94:2, 106:9, 217:14

**discussion** [6] - 12:25, 214:20, 216:21, 222:13, 225:23, 226:23

**discussions** [3] - 93:23, 185:11, 185:12

**disingenuousness** [1] - 66:12

**disk** [14] - 25:16, 38:11, 38:14, 38:16, 38:25, 69:20, 121:7, 121:8, 126:6, 129:12, 146:10, 146:11

**disks** [7] - 26:5, 110:9,

110:17, 120:11, 124:14, 129:11, 129:13

**dismissed** [2] - 115:8, 152:18

**dispute** [4] - 32:2, 32:11, 162:13, 230:8

**disputes** [1] - 51:24

**disseminate** [1] - 68:16

**disseminating** [1] - 67:12

**distributing** [1] - 67:12

**district** [2] - 5:20, 141:19

**dive** [1] - 119:23

**divulge** [2] - 59:19, 60:3, 197:18

**divulged** [2] - 58:22, 59:2

**divulging** [6] - 57:21, 104:25, 156:12, 157:16, 159:18, 197:10

**DM** [8] - 9:13, 10:7, 182:4, 182:7, 204:3, 206:7

**docket** [21] - 4:4, 5:19, 6:4, 8:3, 10:2, 11:8, 13:9, 16:16, 34:14, 51:3, 51:5, 52:19, 67:24, 75:18, 141:18, 141:21, 187:2, 187:13, 187:15, 188:15

**Docket** [1] - 52:25

**document** [18] - 4:18, 11:23, 34:21, 66:3, 116:21, 141:25, 144:24, 160:21, 160:23, 162:8, 182:24, 185:15, 187:3, 192:4, 200:24, 201:16, 202:17, 211:5

**Document** [3] - 191:21, 191:24, 192:3

**documents** [54] - 22:25, 36:18, 36:22, 37:11, 56:18, 65:8, 66:2, 66:3, 67:16, 81:20, 92:20, 93:16, 93:17, 97:9, 97:13, 98:19, 142:1, 142:3, 142:7, 157:23, 160:14, 160:17, 162:13, 174:21, 175:4, 175:17, 175:18, 176:12, 177:3, 177:8, 177:11, 178:12, 180:1, 180:9, 181:11, 181:12, 181:15, 182:8, 187:5, 188:20, 189:21, 195:7, 195:8, 195:11, 196:4, 196:5, 196:23, 198:19, 201:21, 214:22, 215:1, 218:21, 224:13

**Documents** [2] - 191:12, 191:24

**dogs** [1] - 77:17

**done** [29] - 13:3, 88:19, 123:2, 129:14, 136:20, 139:3, 144:23, 152:13, 152:15, 152:16, 161:14,

8

165:3, 165:8, 170:1, 170:10,
171:18, 179:12, 180:16,
189:2, 205:19, 206:2,
209:12, 213:4, 217:4,
227:14, 230:13, 237:9
**double** [1] - 234:2
**doubt** [1] - 212:5
**down** [15] - 26:9, 56:20,
84:9, 84:20, 121:5, 145:10,
184:9, 195:12, 199:3,
206:25, 207:4, 217:15,
217:16, 217:17, 233:25
**downloaded** [3] - 146:15,
173:20, 173:25
**draw** [4] - 91:16, 94:12,
94:24, 95:1
**drawing** [1] - 69:1
**drive** [68] - 43:4, 43:5,
80:10, 81:6, 87:16, 118:18,
119:17, 120:6, 120:19,
121:1, 121:7, 121:8, 121:16,
121:17, 122:22, 123:3,
124:15, 126:7, 127:5,
128:21, 128:22, 129:1,
129:17, 129:18, 130:2,
130:12, 130:13, 130:15,
131:18, 132:11, 132:12,
132:14, 132:15, 132:16,
132:17, 132:19, 132:23,
132:24, 133:8, 133:17,
134:2, 134:8, 134:11,
134:14, 134:17, 134:18,
134:22, 135:3, 135:4,
146:10, 146:11, 146:18,
146:22, 147:7, 147:8,
150:22, 151:3, 164:24,
171:7, 172:22, 173:13,
173:14, 176:9, 177:8
**driver** [1] - 28:22
**Drives** [1] - 119:3
**drives** [98] - 25:16, 32:2,
33:9, 33:13, 38:11, 38:14,
38:16, 38:22, 38:25, 43:7,
69:20, 76:22, 76:25, 77:2,
77:6, 85:22, 86:1, 86:5,
86:16, 86:19, 86:20, 86:24,
87:7, 87:19, 87:25, 88:3,
92:14, 92:23, 92:24, 93:17,
110:12, 111:1, 111:9,
111:13, 111:19, 117:17,
118:17, 119:2, 119:4,
120:10, 120:23, 121:7,
121:16, 121:21, 121:22,
123:7, 124:1, 124:2, 124:8,
125:9, 130:6, 130:12,
130:20, 131:14, 132:9,
133:24, 134:12, 135:9,
135:23, 144:22, 146:16,
147:11, 155:8, 155:9,
155:14, 163:21, 164:24,

165:9, 165:22, 165:23,
166:9, 167:4, 167:6, 167:7,
167:10, 167:14, 167:16,
167:21, 167:22, 167:23,
167:24, 167:25, 168:4,
168:6, 168:14, 169:1,
169:17, 169:20, 170:7,
171:13, 193:18, 193:19,
204:10
**drop** [1] - 21:13
**dropped** [1] - 21:15
**due** [2] - 56:10, 85:17
**dump** [1] - 212:22
**dumped** [1] - 209:3
**duplicate** [2] - 67:17,
186:22
**duplicating** [1] - 67:11
**During** [5] - 9:6, 49:11,
91:13, 91:14, 190:24
**during** [14] - 3:2, 11:6,
34:17, 41:19, 48:14, 83:1,
98:17, 121:24, 195:22,
202:5, 222:18, 224:22,
225:7, 226:23
**duties** [2] - 80:4, 80:16
**duty** [6] - 51:20, 51:21,
63:25, 64:15, 72:11, 72:15
**DVDs** [5] - 28:24, 66:21,
67:1, 71:7, 73:16

# E

**e-mail** [89] - 17:9, 109:23,
110:2, 110:6, 110:7, 112:9,
112:10, 112:13, 112:17,
116:21, 136:5, 136:6, 136:9,
136:14, 137:1, 137:20,
140:15, 140:18, 141:24,
142:13, 144:14, 145:5,
146:1, 146:5, 146:9, 148:6,
148:7, 148:8, 148:10, 152:9,
152:22, 154:16, 154:20,
155:20, 159:21, 160:25,
162:9, 163:14, 163:18,
164:4, 164:20, 165:5,
166:18, 166:21, 166:24,
167:2, 170:5, 171:24,
172:13, 180:2, 180:5,
180:15, 181:1, 181:2, 193:4,
196:25, 200:17, 202:1,
202:8, 202:18, 204:23,
205:14, 206:19, 206:25,
207:1, 207:6, 207:9, 207:12,
207:13, 207:17, 207:18,
207:22, 207:25, 208:11,
208:13, 208:16, 208:24,
212:3, 212:4, 212:11,
212:18, 222:16, 222:22,
223:23, 227:3, 229:10,
229:11

**E-mails** [7] - 170:10,
173:19, 173:25, 180:21,
182:5, 197:2, 213:16
**e-mails** [81] - 110:4, 110:8,
111:10, 111:16, 113:6,
113:8, 113:21, 114:2, 114:3,
114:16, 146:18, 146:23,
148:20, 155:7, 159:13,
163:14, 164:19, 165:4,
165:12, 165:20, 166:8,
168:18, 168:22, 169:7,
169:17, 169:22, 170:17,
170:18, 171:22, 172:1,
173:2, 173:8, 173:9, 173:23,
176:19, 176:20, 180:2,
180:3, 180:6, 181:2, 182:6,
182:8, 182:12, 182:18,
182:19, 183:16, 183:24,
188:21, 192:21, 193:3,
194:6, 194:16, 194:24,
195:24, 197:4, 198:4, 198:5,
198:9, 198:11, 198:12,
198:25, 199:5, 199:23,
200:2, 200:7, 200:14,
202:19, 202:24, 203:19,
203:21, 206:24, 208:25,
209:1, 209:20, 210:12,
210:24, 211:17, 211:24,
212:25, 221:12, 226:1
**earliest** [7] - 172:13,
204:23, 205:5, 205:11,
205:12, 205:14, 207:7
**early** [2] - 122:24, 232:17
**earth** [1] - 124:24
**easier** [1] - 199:3
**easily** [1] - 205:24
**Edra** [3] - 150:20, 180:13,
188:24
**effect** [1] - 145:12
**effort** [4] - 49:9, 72:22,
181:3, 193:23
**efforts** [7] - 15:19, 16:25,
17:4, 35:2, 69:15, 69:16,
222:14
**Efforts** [1] - 10:4
**eight** [5] - 85:3, 85:5, 88:7,
88:17, 97:21
**Eight** [2] - 215:3, 215:4
**eight-year** [2] - 88:7, 97:21
**Either** [4] - 57:18, 154:18,
155:11, 174:10
**either** [21] - 25:16, 35:11,
55:8, 58:25, 82:14, 82:20,
108:5, 113:22, 117:4,
117:13, 118:1, 120:3,
138:11, 171:7, 181:1,
195:21, 206:4, 212:4,
221:15, 235:20, 237:21
**elapsed** [1] - 134:10
**election** [2] - 228:2, 228:3

**electronic** [38] - 18:16,
32:21, 32:23, 33:5, 33:8,
36:17, 36:21, 37:11, 37:14,
38:17, 38:18, 42:24, 43:10,
47:17, 47:22, 53:13, 53:19,
53:23, 53:24, 54:9, 56:18,
69:7, 69:19, 70:1, 70:22,
70:24, 71:7, 71:14, 75:10,
77:1, 77:8, 93:8, 161:10,
184:18, 184:21, 184:22,
185:16
**electronically** [9] - 63:13,
74:17, 74:22, 75:1, 75:6,
192:8, 192:22, 193:14, 213:4
**electronically-stored** [3] -
63:13, 192:22, 193:14
**elicit** [5] - 56:9, 84:12,
123:1, 151:1, 197:23
**eliminate** [1] - 84:17
**eliminated** [2] - 9:15, 9:22
**employees** [3] - 100:12,
102:1, 107:24
**employees'** [1] - 106:21
**employment** [3] - 88:18,
89:9, 89:12
**empty** [1] - 45:8
**enclose** [2] - 158:12,
202:11
**enclosed** [1] - 201:15
**end** [5] - 8:6, 119:16, 124:2,
210:5, 225:4
**End** [1] - 216:21
**endeavor** [1] - 162:25
**endeavored** [1] - 154:2
**ended** [7] - 42:21, 42:23,
42:24, 42:25, 43:10, 43:12,
47:20
**ending** [1] - 154:24
**ends** [1] - 140:20
**engaged** [2] - 144:21,
153:25
**ensure** [1] - 142:8
**ensuring** [1] - 144:5
**enter** [1] - 12:24
**entered** [4] - 21:18, 68:21,
73:6, 98:20
**entering** [1] - 68:10
**entire** [8] - 6:10, 92:20,
148:13, 149:22, 152:1,
152:22, 157:14
**entirely** [1] - 98:15
**entirety** [3] - 86:19, 86:24,
87:20
**entitled** [12] - 10:3, 20:14,
55:15, 62:1, 86:3, 87:14,
138:5, 140:3, 145:14,
174:13, 174:14, 238:19
**entries** [1] - 188:22
**entry** [1] - 152:11
**especially** [1] - 232:25

9

**essentially** [1] - 34:4
**establish** [3] - 89:5, 125:3, 194:22
**established** [3] - 73:11, 124:7, 126:2
**estate** [3] - 37:5, 54:10, 57:3
**estimate** [6] - 123:11, 168:3, 233:1, 233:2, 233:13
**et** [3] - 2:6, 2:7, 154:1
**ETREPPID** [1] - 1:7
**eTreppid** [45] - 2:7, 9:17, 11:16, 12:2, 18:15, 34:19, 43:7, 50:4, 70:22, 86:18, 87:19, 88:9, 88:12, 88:15, 92:16, 93:8, 109:5, 110:10, 125:15, 126:14, 126:22, 128:4, 131:6, 140:1, 141:11, 141:12, 142:5, 142:20, 145:9, 164:5, 165:23, 166:23, 166:24, 168:1, 168:13, 169:8, 176:2, 185:14, 187:18, 189:24, 190:8, 191:10, 201:18, 214:23, 228:7
**eTreppid's** [7] - 4:7, 127:23, 144:8, 186:1, 187:4, 222:13, 231:11
**evaluate** [2] - 143:22, 161:12
**evaluation** [1] - 150:18
**evasive** [3] - 125:5, 126:10, 127:18
**evening** [2] - 5:24, 215:14
**event** [2] - 7:23, 183:15
**events** [1] - 22:1
**evidence** [16] - 3:3, 51:15, 51:21, 52:1, 52:15, 72:12, 72:15, 72:17, 117:11, 123:9, 137:22, 143:13, 181:16, 221:3
**evident** [2] - 52:14, 145:16
**evidentiary** [3] - 183:11, 183:13, 237:18
**exact** [6] - 29:7, 130:15, 131:2, 148:25, 155:23, 209:10
**exactly** [5] - 24:17, 26:4, 50:17, 98:10, 185:12
**EXAMINATION** [2] - 14:11, 116:13
**examination** [1] - 217:4
**examining** [3] - 4:14, 214:23, 234:23
**example** [16] - 5:23, 11:23, 35:1, 75:22, 95:10, 97:5, 97:8, 111:20, 113:20, 117:1, 119:19, 149:10, 160:1, 209:14
**exceeds** [1] - 127:3

**except** [2] - 68:17, 104:11
**exception** [2] - 56:14, 220:14
**exclude** [1] - 104:2
**exclusively** [1] - 145:18
**Excuse** [3] - 106:14, 129:12, 184:19
**excuse** [21] - 16:16, 50:16, 61:25, 66:13, 75:14, 77:2, 92:23, 96:15, 99:18, 110:13, 110:21, 120:6, 121:17, 121:20, 128:20, 133:22, 134:12, 150:7, 179:11, 191:11, 228:25
**exhibit** [10] - 3:25, 186:16, 186:24, 187:11, 187:21, 188:15, 194:15, 217:9, 219:16, 234:25
**Exhibit** [64] - 10:6, 10:11, 10:13, 10:17, 10:19, 10:24, 10:25, 11:1, 11:5, 179:3, 179:11, 179:19, 179:22, 181:25, 182:3, 182:7, 187:1, 187:2, 187:13, 187:15, 187:16, 187:22, 188:6, 188:8, 188:15, 190:12, 190:13, 191:7, 191:19, 199:13, 199:16, 199:20, 200:20, 200:23, 201:23, 202:7, 203:21, 203:22, 203:24, 206:8, 211:5, 215:1, 215:2, 215:12, 217:5, 219:17, 219:18, 219:19, 220:9, 221:9, 221:10, 221:11, 221:17, 221:18
**exhibits** [30] - 3:3, 3:6, 3:9, 3:12, 12:21, 75:14, 75:22, 178:23, 179:6, 179:7, 186:7, 190:21, 214:23, 215:8, 218:10, 218:22, 219:10, 219:14, 219:20, 219:21, 219:25, 220:11, 220:13, 221:5, 221:6, 221:7, 221:16, 221:23
**Exhibits** [3] - 3:5, 15:23, 221:3
**expanding** [1] - 143:10
**expect** [7] - 70:11, 110:17, 110:22, 112:15, 112:21, 112:25, 147:7
**expects** [1] - 225:11
**expedite** [1] - 13:10
**expedited** [1] - 161:14
**expedition** [1] - 65:11
**expense** [1] - 237:10
**expert** [7] - 143:6, 159:24, 160:2, 160:4, 160:7, 162:2, 234:20
**Explain** [1] - 130:24
**explain** [2] - 11:10, 162:18

**explained** [2] - 137:6, 230:1
**explaining** [1] - 153:18
**explanation** [3] - 75:4, 125:10, 125:11
**expressly** [1] - 54:17
**extend** [1] - 229:2
**extensively** [2] - 5:10, 20:2
**extent** [25] - 13:4, 26:8, 34:22, 35:7, 52:2, 56:8, 56:12, 56:20, 59:6, 60:15, 71:11, 84:15, 138:15, 144:11, 144:15, 150:21, 150:25, 157:3, 157:8, 159:3, 159:4, 161:15, 178:12, 181:13, 230:10
**extra** [4] - 7:21, 179:13, 199:14, 234:25
**extraneous** [1] - 13:5
**extras** [1] - 218:17

## F

**fabrication** [1] - 194:23
**face** [3] - 93:10, 196:9
**face-to-face** [1] - 196:9
**faces** [2] - 34:16, 70:21
**facility** [28] - 24:14, 24:18, 26:6, 27:2, 27:13, 27:16, 27:21, 35:25, 36:3, 36:6, 36:23, 37:9, 37:10, 37:21, 38:1, 38:18, 38:23, 41:15, 41:17, 42:17, 44:25, 48:13, 48:18, 48:19, 48:21, 49:1, 57:18, 109:20
**facsimile** [2] - 202:1, 202:9
**fact** [30] - 8:12, 8:16, 19:1, 23:4, 35:18, 51:24, 72:20, 75:1, 79:17, 93:7, 95:18, 97:1, 106:20, 106:22, 117:12, 126:2, 127:11, 134:16, 135:11, 139:2, 143:23, 150:4, 153:16, 169:7, 194:13, 196:5, 208:13, 211:16, 214:12, 227:10
**facto** [1] - 105:13
**facts** [1] - 9:21
**failed** [1] - 228:17
**failing** [1] - 72:25
**failure** [1] - 2:21
**fair** [9] - 51:14, 57:2, 57:8, 105:15, 131:4, 173:6, 195:12, 232:4, 233:1
**fairness** [1] - 232:2
**faith** [17] - 4:21, 33:17, 66:15, 72:24, 85:9, 106:2, 122:17, 125:21, 164:11, 164:15, 182:16, 195:16, 195:17, 233:2

**fall** [3] - 105:14, 194:9, 194:10
**false** [4] - 122:20, 136:22, 138:4, 180:18
**falsely** [1] - 55:13
**Family** [2] - 1:4, 2:20
**fanned** [1] - 182:14
**far** [7] - 42:20, 56:3, 60:4, 71:12, 166:2, 176:9, 181:13
**fashion** [1] - 211:3
**fast** [1] - 96:13
**fathoming** [1] - 59:25
**fault** [2] - 136:19, 149:24
**fax** [2] - 197:1, 200:17
**faxed** [1] - 202:11
**FBI** [63] - 10:4, 15:21, 15:23, 18:14, 20:23, 21:3, 21:7, 21:25, 23:3, 27:11, 28:7, 28:13, 29:25, 30:11, 30:13, 31:11, 33:1, 33:4, 33:10, 34:19, 37:1, 37:18, 38:4, 39:5, 40:10, 40:24, 41:2, 41:11, 41:25, 42:8, 42:9, 44:25, 45:7, 45:14, 46:14, 47:9, 47:22, 48:1, 48:8, 50:15, 51:7, 58:16, 59:4, 59:16, 59:22, 61:25, 62:25, 63:6, 66:25, 69:6, 69:13, 69:16, 69:17, 70:20, 70:25, 72:20, 73:1, 73:13, 75:5, 77:2, 167:17, 183:8, 183:16
**FBI's** [1] - 34:17
**FBI-raided** [17] - 27:11, 28:7, 28:13, 29:25, 30:11, 31:11, 37:18, 39:5, 40:24, 41:2, 42:9, 44:25, 45:7, 45:14, 47:9, 47:22, 48:1
**FBI-seized** [19] - 37:1, 38:4, 41:11, 41:25, 46:14, 48:8, 51:7, 58:16, 59:4, 59:16, 62:25, 63:6, 69:6, 69:13, 69:16, 69:17, 70:20, 70:25, 75:5
**February** [12] - 33:19, 71:19, 71:21, 71:23, 73:6, 73:15, 75:7, 122:12, 141:19, 184:22, 228:21
**FedEx** [1] - 215:14
**fees** [1] - 36:7
**Ferrera** [1] - 216:9
**few** [6] - 100:23, 116:9, 123:17, 123:22, 154:13, 226:20
**figure** [2] - 231:2, 237:7
**file** [90] - 93:8, 102:24, 110:5, 110:6, 110:7, 112:6, 112:16, 116:18, 117:25, 120:4, 120:9, 120:12, 125:23, 130:25, 131:1,

131:17, 133:4, 133:12, 133:14, 133:22, 136:14, 136:22, 137:3, 137:8, 137:17, 138:1, 138:5, 138:7, 138:8, 138:22, 138:25, 139:1, 139:25, 141:5, 141:11, 141:16, 142:18, 143:14, 146:3, 146:4, 148:8, 148:13, 148:20, 148:21, 149:22, 149:23, 151:10, 152:1, 152:12, 152:22, 153:17, 154:16, 154:20, 155:7, 155:8, 155:9, 155:20, 155:25, 156:25, 157:14, 158:4, 159:20, 161:5, 161:21, 166:12, 171:24, 177:9, 180:25, 204:8, 204:13, 205:14, 205:20, 205:23, 209:2, 209:4, 209:17, 212:22, 213:1, 213:6, 227:12, 228:5, 228:6, 229:10, 229:12, 229:13, 237:17, 237:21

**filed** [18] - 4:4, 4:8, 4:10, 4:12, 5:22, 5:23, 8:5, 8:14, 10:2, 13:9, 13:16, 83:14, 126:14, 126:22, 137:25, 138:22, 161:25

**Files** [1] - 103:11, 120:14, 120:16

**files** [121] - 83:13, 83:15, 85:13, 86:5, 86:10, 88:8, 95:22, 96:23, 97:6, 97:7, 98:8, 98:17, 99:6, 102:17, 102:18, 103:2, 103:7, 103:16, 103:18, 103:21, 103:24, 104:2, 104:13, 104:15, 104:19, 104:23, 105:2, 105:14, 106:21, 107:10, 107:11, 108:3, 109:24, 110:3, 110:4, 110:9, 110:17, 110:23, 111:8, 111:12, 111:15, 112:22, 113:1, 113:3, 113:16, 113:20, 114:2, 114:16, 115:12, 117:1, 117:8, 117:11, 118:7, 119:16, 120:13, 120:16, 120:18, 124:8, 124:12, 124:13, 124:17, 125:8, 126:4, 128:11, 129:8, 131:12, 132:12, 132:19, 132:21, 133:24, 135:9, 135:10, 135:11, 145:25, 146:16, 147:13, 163:14, 163:17, 163:18, 163:22, 164:4, 164:7, 164:21, 165:8, 165:10, 165:13, 165:20, 166:14, 166:21, 167:2, 169:7, 170:2, 170:5, 173:10, 173:13, 173:14, 173:17,

174:1, 174:25, 176:8, 176:16, 182:25, 183:6, 183:9, 184:1, 184:3, 185:5, 192:21, 193:5, 193:14, 194:5, 204:11, 204:19, 205:4, 213:1, 213:16

**filing** [2] - 7:1, 54:21

**filings** [1] - 126:18

**final** [2] - 93:21, 232:10

**finally** [1] - 7:17

**fine** [6] - 13:3, 84:17, 85:9, 98:25, 226:20, 232:18

**finish** [4] - 127:8, 232:17, 232:19, 232:21

**finished** [10] - 93:25, 132:20, 133:11, 133:22, 133:23, 134:4, 134:7, 165:18, 217:7

**finishing** [1] - 134:25

**firm** [28] - 139:19, 139:24, 140:4, 140:5, 140:7, 140:8, 140:10, 140:24, 140:25, 141:3, 142:6, 151:12, 152:4, 152:9, 153:2, 160:4, 160:22, 160:24, 161:3, 161:6, 161:18, 162:7, 162:16, 174:20, 175:20, 176:2, 198:13, 198:16

**First** [4] - 3:1, 18:2, 78:14, 150:8

**first** [35] - 7:11, 9:20, 9:25, 34:4, 35:24, 36:13, 40:18, 78:13, 87:3, 88:19, 89:4, 89:6, 104:5, 106:6, 143:13, 146:21, 146:22, 154:4, 155:1, 161:20, 182:24, 187:4, 204:3, 205:8, 205:10, 206:19, 207:8, 207:9, 208:13, 212:12, 219:9, 219:12, 223:23, 229:3

**fishing** [1] - 65:11

**fit** [1] - 30:14

**Five** [1] - 33:3

**five** [28] - 14:16, 15:3, 15:5, 15:6, 15:15, 15:20, 15:25, 16:21, 17:1, 32:5, 32:6, 32:11, 32:19, 32:20, 33:5, 75:1, 75:5, 75:9, 75:10, 102:19, 107:13, 110:13, 123:14, 213:24, 214:2, 234:14

**five-minute** [1] - 213:24

**flesh** [1] - 68:7

**flew** [2] - 31:6, 40:11

**flight** [2] - 39:25, 40:1

**fly** [2] - 12:4, 185:23

**Flynn** [45] - 5:7, 5:12, 54:13, 61:2, 62:18, 64:5, 66:12, 113:22, 114:5, 150:8, 150:9, 150:19, 154:22,

155:6, 155:15, 155:16, 171:12, 173:21, 174:13, 176:24, 180:5, 182:9, 194:14, 194:18, 194:21, 195:3, 195:20, 197:12, 197:16, 197:20, 198:11, 198:18, 198:20, 199:11, 200:2, 202:2, 202:7, 202:10, 202:25, 203:11, 203:19, 203:20, 206:4

**Flynn's** [9] - 5:10, 56:21, 57:18, 57:19, 61:22, 154:23, 198:5, 199:6, 202:15

**focus** [4] - 31:25, 62:3, 65:25, 128:7

**focused** [1] - 32:10

**focusing** [2] - 170:11, 181:17

**folder** [7] - 112:9, 133:2, 133:10, 204:20, 204:22

**folders** [6] - 110:2, 133:1, 133:6, 164:20, 165:5

**follow** [2] - 22:14, 59:7

**follow-up** [1] - 59:7

**followed** [3] - 144:9, 161:23, 195:25

**Following** [1] - 214:20

**following** [3] - 158:13, 224:2, 236:9

**follows** [4] - 14:10, 68:10, 68:19, 94:12

**Footnote** [1] - 142:2

**FOR** [3] - 1:15, 1:17, 1:20

**foregoing** [1] - 238:18

**forensic** [6] - 18:15, 18:22, 50:9, 50:22, 72:17, 177:23

**forensically** [1] - 53:3

**forget** [1] - 180:23

**forgot** [1] - 94:9

**form** [12] - 69:20, 118:12, 152:10, 165:5, 170:17, 171:5, 171:6, 171:8, 171:9, 184:21, 200:17, 200:18

**format** [43] - 97:10, 97:14, 111:9, 111:16, 113:5, 113:8, 127:5, 134:17, 136:6, 139:3, 139:6, 139:9, 141:5, 142:2, 142:14, 143:3, 143:24, 149:23, 152:1, 152:10, 152:12, 167:3, 168:18, 168:22, 168:23, 168:24, 169:24, 171:14, 172:20, 173:20, 175:7, 181:1, 183:2, 183:17, 183:20, 185:4, 185:13, 185:15, 188:22, 192:9, 192:11, 229:12, 229:22

**formatted** [8] - 123:7, 124:14, 124:15, 125:8, 126:1, 126:8, 128:23, 134:25

**formatting** [6] - 122:18, 125:3, 126:6, 128:10, 134:15, 134:16

**forth** [7] - 36:18, 36:19, 66:2, 126:15, 144:22, 162:14, 175:10

**forthcoming** [1] - 70:13

**forthright** [1] - 70:13

**forum** [1] - 56:13

**forward** [4] - 6:20, 7:6, 29:2, 160:10

**foundation** [3] - 67:7, 95:4, 117:11

**foundational** [1] - 123:18

**foundationally** [1] - 20:7

**four** [19] - 8:4, 31:14, 33:18, 41:20, 42:19, 42:21, 42:23, 43:11, 43:12, 44:4, 44:6, 44:9, 45:16, 49:4, 49:12, 123:13, 207:8, 207:9, 211:22

**four-month** [1] - 41:20

**frame** [5] - 11:15, 85:21, 121:12, 121:13, 228:1

**framed** [1] - 32:16

**frames** [1] - 32:15

**frankly** [3] - 56:6, 162:15, 195:17

**Frankly** [1] - 223:18

**fraud** [2] - 55:12, 56:14

**fraudulent** [4] - 136:23, 138:4, 140:2, 141:16

**Fred** [1] - 76:13

**Friday** [9] - 15:15, 15:16, 73:21, 92:17, 141:25, 168:2, 222:22, 223:18, 237:13

**front** [5] - 16:9, 16:11, 136:2, 191:5, 203:24

**Fulcrum** [15] - 92:14, 92:15, 93:18, 111:21, 161:7, 161:9, 161:20, 167:24, 168:1, 168:7, 169:5, 169:12, 227:14, 228:8

**full** [2] - 42:13, 148:8

**fully** [3] - 5:11, 8:15, 11:21

**function** [2] - 205:2, 205:3

**fundraising** [3] - 208:16, 208:19, 208:22

**future** [1] - 159:5

**fuzzy** [4] - 16:23, 17:3, 17:13, 17:15

## G

**game** [1] - 151:17

**games** [2] - 105:19, 154:1

**gamesmanship** [1] - 105:22

**gap** [3] - 20:11, 22:15, 126:6

**garbage** [1] - 135:17
**gathered** [1] - 20:23
**Gazette** [2] - 5:9, 203:5
**Gazette-Journal** [2] - 5:9, 203:5
**gee** [2] - 12:9, 125:12
**general** [2] - 88:20, 148:7
**Generally** [2] - 115:1, 148:8
**generally** [8] - 12:22, 71:18, 78:2, 78:8, 104:4, 104:22, 116:19, 118:11
**gentleman** [1] - 194:23
**Gianna** [5] - 79:1, 79:7, 84:5, 99:12, 101:13
**Gibbons** [4] - 142:6, 189:24, 190:8, 201:18
**gig** [3] - 118:18, 121:7, 134:14
**gigabyte** [14] - 87:8, 110:13, 110:14, 121:17, 128:22, 128:25, 129:4, 129:6, 129:18, 130:2, 130:13, 130:17, 147:8, 167:15
**gigabytes** [1] - 167:15
**gigs** [1] - 130:6
**given** [49] - 9:19, 13:8, 19:12, 21:6, 33:3, 36:24, 37:1, 48:5, 74:6, 75:8, 75:9, 78:1, 92:9, 93:7, 100:2, 113:16, 113:22, 114:4, 114:20, 116:19, 116:20, 116:22, 117:14, 120:19, 131:12, 136:21, 137:21, 143:12, 150:4, 162:5, 167:16, 167:17, 168:7, 173:23, 176:20, 176:21, 177:4, 177:10, 182:9, 182:13, 182:19, 192:22, 194:17, 194:20, 194:21, 224:12, 226:4, 227:10, 228:1
**Given** [1] - 227:8
**glad** [1] - 193:11
**glasses** [1] - 219:5
**Glen** [1] - 141:23
**Glogauer** [42] - 78:3, 78:10, 84:4, 91:24, 94:17, 99:11, 101:12, 101:23, 112:12, 136:5, 136:6, 136:9, 136:14, 137:1, 137:20, 141:24, 142:13, 146:1, 146:4, 146:18, 146:23, 147:16, 148:15, 148:20, 152:1, 152:9, 154:15, 154:20, 155:6, 155:20, 156:25, 157:14, 159:21, 164:22, 165:21, 180:2, 180:5, 180:14, 180:15, 181:1, 193:15, 232:13
**Glogauer's** [1] - 148:4

**Gomez** [9] - 2:15, 94:5, 215:25, 216:9, 216:23, 226:10, 235:2, 235:9, 238:12
**GOMEZ** [2] - 1:20, 215:11
**good-faith** [1] - 164:15
**government** [30] - 64:19, 65:5, 68:14, 91:17, 92:4, 92:25, 93:1, 94:1, 100:20, 104:25, 106:5, 115:12, 147:12, 147:16, 149:14, 164:12, 164:16, 165:11, 165:14, 167:20, 170:6, 182:12, 214:13, 214:22, 217:13, 218:4, 218:21, 221:13, 221:15
**government's** [1] - 164:25
**Grace** [2] - 101:12, 112:12
**grand** [11] - 61:9, 61:11, 61:17, 62:1, 140:18, 140:20, 140:21, 149:8, 149:10, 149:19, 150:1, 150:3, 150:4, 150:11, 151:13, 152:6, 152:21, 152:23
**Granite** [4] - 28:22, 43:4, 43:5, 43:7
**Gray** [6] - 78:3, 78:11, 84:4, 91:24, 94:17, 99:11, 163:23, 193:15
**Greece** [1] - 227:1
**Greg** [2] - 33:20, 233:22
**GREGORY** [1] - 1:17
**Gregory** [1] - 2:13
**grill** [1] - 185:18
**grossly** [1] - 127:3
**ground** [1] - 6:22
**grounds** [2] - 126:15, 136:11
**group** [6] - 17:8, 21:7, 176:17, 177:3, 177:7, 177:10
**guess** [19] - 14:2, 68:24, 80:17, 90:22, 98:23, 108:1, 116:23, 135:7, 162:11, 168:16, 177:25, 195:11, 201:24, 204:25, 207:14, 207:16, 208:12, 221:5, 235:24
**GUNDERSON** [6] - 1:15, 5:5, 6:17, 7:8, 216:12, 217:11
**Gunderson** [8] - 2:9, 5:4, 5:18, 6:24, 8:21, 58:14, 142:19, 142:20
**Gunderson's** [1] - 138:9
**guy** [1] - 80:17

**H**

**half** [11] - 58:1, 70:8, 110:13, 110:14, 123:11, 134:25, 172:6, 172:7, 233:14, 234:13, 234:14
**hand** [10] - 16:12, 179:12, 190:10, 195:11, 197:1, 200:17, 202:10, 202:11, 216:1, 234:25
**handed** [1] - 200:14
**handle** [1] - 93:1
**handled** [1] - 145:18
**hands** [5] - 149:5, 150:1, 151:11, 151:12, 152:7
**handwritten** [1] - 29:23
**happy** [2] - 125:1, 185:20
**hard** [76] - 32:2, 33:9, 33:13, 38:22, 59:25, 76:22, 76:25, 77:1, 77:6, 80:10, 85:22, 86:1, 86:5, 86:16, 87:7, 87:16, 92:14, 92:23, 92:24, 93:17, 111:9, 111:13, 111:19, 118:17, 118:18, 120:23, 120:25, 121:16, 121:17, 121:22, 128:21, 128:22, 129:1, 129:17, 129:18, 130:12, 130:13, 130:19, 132:11, 132:12, 132:19, 132:23, 132:24, 134:2, 134:11, 134:12, 134:14, 134:17, 135:3, 135:4, 135:9, 135:23, 144:21, 146:16, 147:7, 147:8, 150:22, 155:14, 167:14, 167:16, 167:22, 167:24, 167:25, 168:4, 168:6, 168:14, 171:7, 171:13, 172:22, 173:13, 173:14, 176:9, 177:8
**head** [2] - 80:17, 184:23
**heading** [6] - 204:3, 210:9, 210:25, 211:12, 211:14, 211:25
**hear** [2] - 35:2, 202:22
**heard** [5] - 143:10, 157:24, 208:2, 222:9, 231:12
**Hearing** [1] - 220:9
**hearing** [89] - 2:5, 2:18, 2:24, 3:2, 4:10, 5:3, 5:16, 6:25, 7:2, 7:5, 7:16, 9:6, 20:2, 20:8, 21:6, 21:20, 31:25, 33:17, 34:4, 34:8, 34:25, 55:5, 55:11, 55:20, 56:11, 56:13, 56:15, 62:3, 64:23, 64:24, 65:2, 65:24, 65:25, 66:7, 67:25, 68:6, 70:8, 85:11, 85:12, 85:18, 88:5, 88:6, 88:11, 88:16, 92:15, 111:21, 116:4, 121:25, 123:12, 123:20, 127:8, 127:20, 135:12, 137:17, 137:22, 138:14, 143:11, 143:14, 144:17,
134:25, 172:6, 172:7, 233:14, 234:13, 234:14
144:18, 145:1, 149:12, 151:15, 154:4, 155:1, 162:19, 167:24, 181:10, 181:14, 183:11, 183:13, 195:14, 216:7, 219:1, 219:3, 219:13, 221:6, 222:11, 222:17, 223:8, 223:20, 224:16, 227:9, 231:24, 233:14, 235:16, 236:23, 237:18
**HEARING** [1] - 1:13
**heavy** [1] - 43:18
**Heidi's** [3] - 208:16, 208:19, 208:22
**held** [7] - 2:20, 52:23, 92:1, 94:2, 106:9, 217:14, 224:8
**helpful** [4] - 4:1, 21:25, 35:4, 128:6
**herewith** [2] - 202:11, 202:12
**Hidden** [2] - 103:18, 103:21
**hidden** [1] - 104:13
**hide** [4] - 149:18, 151:18, 160:8, 174:6
**hides** [1] - 157:21
**hiding** [3] - 73:1, 73:2
**High** [1] - 188:7
**high** [2] - 223:19, 223:21
**highly** [4] - 5:13, 34:24, 65:15, 144:16
**himself** [4] - 33:18, 125:13, 125:14, 162:18
**hired** [1] - 61:8
**hit** [2] - 182:17, 215:21
**hold** [2] - 28:17, 68:17
**holder** [1] - 28:22
**holiday** [3] - 223:5, 223:9, 223:14
**home** [31] - 18:5, 25:5, 25:20, 26:3, 27:15, 27:20, 27:23, 27:24, 29:9, 29:12, 29:15, 29:22, 31:10, 37:4, 37:23, 38:2, 38:5, 39:1, 39:3, 41:7, 41:10, 41:21, 45:1, 49:2, 57:18, 64:13, 154:18, 154:19, 155:12, 171:19, 237:3
**Home** [2] - 18:7, 18:13
**Honor** [271] - 3:8, 3:13, 3:18, 4:16, 5:5, 6:18, 8:1, 8:24, 9:3, 10:5, 10:10, 10:19, 11:2, 11:11, 11:21, 13:8, 13:21, 15:8, 15:10, 16:13, 19:23, 19:25, 20:3, 20:12, 21:19, 22:13, 22:15, 22:17, 30:18, 31:1, 31:14, 31:19, 31:23, 32:14, 33:8, 33:15, 33:20, 35:11, 49:18, 49:22, 50:8, 50:15, 50:18, 51:17, 52:7, 52:11, 52:18, 53:2,

54:12, 54:22, 54:23, 54:25,
55:7, 55:18, 56:1, 56:6,
56:12, 57:1, 57:25, 58:2,
58:15, 58:19, 59:5, 59:11,
60:9, 60:13, 61:10, 61:19,
61:21, 62:13, 63:22, 63:24,
64:21, 66:9, 66:17, 67:6,
69:3, 70:3, 70:6, 70:10, 72:7,
72:12, 72:13, 73:4, 80:5,
80:7, 80:13, 82:5, 83:22,
83:23, 84:6, 84:10, 84:19,
84:21, 85:20, 86:7, 86:17,
87:21, 89:1, 89:11, 89:13,
91:20, 92:6, 93:3, 93:7, 95:3,
95:25, 96:7, 97:20, 98:11,
100:20, 100:22, 105:7,
105:10, 105:19, 106:8,
106:14, 106:24, 107:3,
107:4, 108:12, 108:20,
109:14, 110:25, 111:3,
111:17, 116:11, 117:10,
117:13, 121:23, 122:1,
122:14, 122:16, 122:18,
122:21, 123:5, 124:20,
124:23, 125:1, 125:20,
126:14, 127:9, 128:11,
129:22, 132:3, 136:10,
136:13, 136:23, 137:7,
137:11, 137:24, 138:7,
138:12, 138:15, 138:24,
139:10, 139:11, 139:23,
140:11, 140:14, 142:12,
143:16, 145:4, 145:22,
149:7, 149:9, 151:7, 151:24,
152:22, 153:10, 153:22,
154:12, 157:18, 158:20,
160:3, 160:8, 161:2, 161:24,
162:21, 163:6, 167:12,
167:19, 168:9, 168:17,
168:20, 170:13, 174:5,
175:12, 176:3, 178:23,
179:10, 179:24, 180:11,
181:20, 181:21, 185:10,
185:22, 185:25, 186:12,
186:21, 186:25, 187:9,
190:14, 190:23, 194:11,
194:12, 195:1, 195:16,
196:12, 197:22, 197:24,
198:12, 198:25, 199:2,
200:24, 201:5, 202:14,
202:17, 208:8, 213:21,
214:1, 214:4, 217:5, 217:11,
217:18, 217:20, 218:5,
218:8, 218:11, 218:16,
219:6, 220:2, 220:3, 220:15,
220:20, 220:22, 220:25,
221:10, 221:21, 221:25,
222:2, 222:4, 222:6, 223:17,
224:4, 224:17, 225:10,
226:25, 228:9, 229:6,
229:19, 231:3, 231:10,

231:20, 232:8, 232:18,
233:8, 233:13, 233:18,
234:3, 234:15, 236:2,
237:15, 237:24, 237:25,
238:3, 238:5, 238:7, 238:9,
238:11, 238:13
    **Honor's** [1] - 138:21
    **hook** [1] - 214:17
    **hope** [1] - 229:14
    **hopefully** [1] - 92:12
    **hopeless** [1] - 98:25
    **hopelessly** [1] - 97:23
    **hour** [8] - 58:1, 123:11,
123:13, 123:14, 134:25,
193:1, 234:5, 234:12
    **hours** [5] - 5:25, 70:8,
70:9, 83:1, 123:12, 123:13,
233:12, 233:14, 233:15,
233:16, 234:10, 234:14
    **house** [1] - 183:7
    **housekeeping** [7] - 4:2,
9:3, 11:18, 12:18, 215:23,
216:5, 219:2
    **Hughes** [3] - 79:12, 84:5,
101:13
    **Hughes'** [1] - 99:13
    **humanly** [1] - 141:7
    **hundred** [2] - 74:9, 74:10
    **hypothecating** [1] - 67:12

**I**

    **idea** [8] - 12:20, 121:2,
134:13, 140:5, 140:12,
144:23, 209:16, 230:17
    **identification** [4] - 14:16,
179:19, 190:13, 199:16
    **identified** [5] - 3:16, 74:11,
81:3, 84:16, 221:11
    **identify** [7] - 10:12, 62:11,
69:12, 69:16, 74:6, 74:19,
176:12
    **identity** [2] - 140:24, 141:3
    **ignoring** [1] - 223:22
    **illegible** [3] - 16:24, 17:3,
17:14
    **illuminating** [1] - 68:6
    **illustrates** [1] - 64:22
    **illustration** [1] - 6:12
    **image** [2] - 18:22, 50:22
    **images** [2] - 50:9, 72:17
    **immediate** [1] - 145:12
    **immediately** [3] - 93:5,
126:5, 149:13
    **impact** [1] - 5:3
    **implicate** [3] - 58:17,
106:22, 226:5
    **implicated** [1] - 60:1
    **implications** [1] - 65:23

    **implied** [2] - 52:13, 90:4
    **implies** [1] - 180:19
    **implying** [1] - 90:2
    **importance** [3] - 6:17, 7:6,
157:20
    **impossible** [1] - 132:14
    **improper** [3] - 56:22, 195:2,
202:15
    **improperly** [2] - 55:5, 159:7
    **inaccurate** [1] - 132:21
    **inadvertent** [1] - 59:2
    **inaudible** [1] - 174:15
    **Inaudible)** [1] - 184:25
    **Inc** [3] - 188:25, 189:4
    **include** [9] - 12:10, 137:22,
143:11, 147:16, 148:4,
148:6, 203:12, 220:8, 220:9
    **included** [5] - 219:21,
226:1, 226:3, 232:9, 232:13
    **including** [7] - 73:5, 106:2,
109:5, 144:12, 144:13,
188:21, 192:9
    **inconsistent** [3] - 64:3,
64:9, 66:13
    **incorrect** [2] - 98:1, 160:4
    **incredulous** [1] - 184:24
    **indecipherable** [1] - 216:14
    **independent** [2] - 150:24,
220:6
    **indicated** [2] - 167:19,
190:24
    **indicates** [1] - 34:14
    **indirectly** [2] - 197:9,
200:10
    **individual** [11] - 84:20,
109:24, 110:15, 112:16,
117:7, 119:6, 125:24,
149:25, 159:19, 203:4,
235:18
    **individually** [2] - 99:17,
195:7
    **individuals** [14] - 77:15,
79:16, 100:11, 101:2, 101:5,
101:11, 102:1, 112:5,
112:11, 147:19, 163:23,
164:21, 165:20
    **individuals'** [2] - 81:3,
163:15
    **inferred** [1] - 231:17
    **influence** [1] - 150:17
    **inform** [1] - 151:9
    **information** [50] - 54:16,
55:1, 55:2, 55:4, 55:7, 56:13,
58:23, 60:16, 61:11, 61:12,
63:6, 63:14, 63:16, 63:21,
63:23, 64:7, 64:8, 64:10,
64:11, 65:3, 65:21, 86:12,
86:20, 87:13, 87:24, 88:3,
88:4, 88:12, 92:24, 93:14,
94:17, 104:25, 105:3, 106:4,

127:22, 137:8, 140:19,
150:10, 150:21, 151:2,
157:17, 158:24, 163:1,
167:22, 174:3, 174:16,
176:2, 177:21, 192:8, 192:22
    **inherent** [1] - 72:15
    **inherently** [1] - 85:3
    **initial** [2] - 47:11, 116:7
    **injunction** [3] - 68:16,
68:21, 68:23
    **inquire** [6] - 62:1, 66:1,
66:5, 86:3, 88:21, 144:20,
149:21, 225:11
    **inquired** [1] - 87:5
    **inquiry** [2] - 62:3, 219:22
    **insert** [1] - 81:6
    **inside** [2] - 43:5, 53:13
    **insists** [1] - 72:10
    **insofar** [1] - 68:7
    **inspected** [1] - 92:16
    **inspection** [1] - 168:1
    **Inspection** [2] - 191:11,
191:12
    **instance** [1] - 161:20
    **instruct** [4] - 151:4, 154:10,
158:22, 159:8
    **instructed** [6] - 60:14,
60:18, 83:21, 96:1, 157:2,
157:8, 159:9, 174:2
    **instruction** [7] - 92:25,
100:1, 100:2, 117:25, 118:6,
159:22, 201:15
    **instructions** [1] - 99:23
    **integrate** [1] - 50:6
    **integrity** [9] - 33:11, 49:10,
49:16, 51:18, 55:16, 64:1,
67:3, 67:8, 82:2
    **intended** [1] - 220:11
    **intention** [3] - 4:10, 7:20,
127:10
    **interest** [9] - 13:15, 13:20,
34:7, 65:22, 84:14, 85:17,
144:5, 230:5, 230:7
    **INTERESTED** [1] - 1:20
    **interested** [4] - 2:14, 35:10,
128:2, 219:23
    **interference** [1] - 83:3
    **interject** [1] - 40:7
    **intermediate** [2] - 24:9,
24:12
    **intermingled** [1] - 67:1
    **Internet** [1] - 108:2
    **interpose** [1] - 154:10
    **interposed** [1] - 58:11
    **interpret** [1] - 82:20
    **interprets** [1] - 52:12
    **interrogatories** [1] - 181:12
    **intimidate** [1] - 185:18
    **investigation** [1] - 201:25
    **invoked** [5] - 153:7, 159:3,

—13

159:4, 159:7, 160:6
**involved** [7] - 9:17, 11:16, 50:3, 147:12, 147:14, 147:15, 181:11
**involvement** [1] - 55:17
**involves** [2] - 5:6, 158:21
**involving** [1] - 5:7
**ipso** [1] - 105:13
**irregular** [5] - 89:20, 99:8, 100:7, 100:11, 102:2
**irregularly** [1] - 110:22
**irrelevant** [1] - 98:15
**Irrespective** [1] - 72:14
**issue** [42] - 13:25, 21:25, 32:5, 33:25, 54:13, 55:11, 56:7, 56:16, 56:17, 56:23, 58:9, 61:23, 62:12, 65:5, 68:24, 86:11, 138:3, 138:16, 138:22, 138:24, 139:1, 144:2, 145:3, 161:4, 161:25, 162:2, 162:4, 163:11, 180:12, 180:13, 181:5, 181:8, 181:17, 190:22, 191:3, 195:8, 227:7, 229:23, 235:20
**issued** [5] - 2:22, 50:9, 51:7, 144:6, 145:11
**issues** [18] - 5:11, 5:14, 32:15, 32:16, 33:8, 34:9, 56:17, 65:12, 65:13, 65:14, 67:20, 85:21, 93:20, 93:24, 158:22, 159:4, 225:19, 230:4
**IT** [3] - 80:17, 80:22
**item** [6] - 6:19, 186:19, 191:21, 192:1, 192:7, 222:8
**items** [24] - 26:17, 26:21, 30:3, 34:15, 34:23, 35:3, 35:13, 35:18, 36:3, 36:14, 37:21, 38:4, 38:7, 40:2, 40:6, 40:9, 44:25, 51:19, 62:17, 68:14, 68:20, 73:13, 138:2, 220:10
**itself** [1] - 200:25

## J

**Jale** [4] - 163:23, 180:21, 181:2, 193:14
**Jale1** [5] - 206:15, 210:10, 210:17, 210:23, 210:25
**Jale1a** [6] - 204:3, 204:8, 204:14, 204:17, 205:14, 206:17
**January** [3] - 89:9, 89:16, 89:21
**Jerry** [2] - 2:10, 201:14
**JERRY** [1] - 1:17
**jet** [5] - 19:22, 20:17, 21:2, 21:9, 21:11

**Jim** [9] - 142:5, 146:6, 180:16, 180:23, 189:24, 190:8, 201:18, 208:13, 208:21
**job** [3] - 74:24, 109:17, 109:19
**jobs** [2] - 108:17, 109:12
**John** [13] - 79:10, 79:12, 84:5, 99:12, 101:13, 190:4, 191:16, 192:12, 194:7, 194:9, 231:12, 231:15, 231:16
**Johnston** [1] - 190:6
**joint** [1] - 67:25
**jointly** [1] - 237:21
**Journal** [27] - 5:9, 113:23, 114:4, 142:3, 142:12, 168:21, 169:23, 170:16, 173:23, 176:13, 180:19, 181:3, 182:20, 189:22, 190:5, 191:15, 192:12, 192:23, 193:4, 194:6, 194:17, 195:7, 200:8, 202:21, 203:2, 203:5, 211:3
**journal** [1] - 188:22
**Jr** [1] - 155:15
**Judge** [24] - 5:20, 47:5, 49:22, 50:8, 50:18, 50:20, 50:22, 51:6, 51:20, 52:3, 56:5, 64:1, 64:14, 64:25, 67:9, 67:21, 67:25, 68:7, 68:21, 72:14, 149:11, 150:9, 236:16, 236:23
**judge** [1] - 5:20
**July** [13] - 161:25, 223:5, 223:25, 224:1, 224:2, 225:2, 227:1, 227:9, 235:24, 235:25, 236:7
**JUNE** [2] - 2:1, 116:1
**June** [35] - 1:6, 2:24, 3:2, 6:25, 7:1, 10:3, 15:15, 20:8, 55:20, 77:9, 85:24, 86:6, 86:14, 93:4, 111:21, 115:4, 121:5, 121:25, 122:5, 123:20, 138:11, 138:14, 138:17, 143:21, 158:1, 191:1, 219:13, 222:11, 223:8, 225:4, 225:23, 228:19, 237:5
**junior** [1] - 227:2
**jury** [22] - 8:8, 61:9, 61:11, 61:18, 62:1, 140:18, 140:20, 140:21, 149:8, 149:10, 149:19, 150:1, 150:3, 150:4, 150:11, 151:13, 152:6, 152:21, 152:23, 215:25, 224:1

## K

**Kanigher** [1] - 203:6
**Karchmer** [14] - 80:9, 125:8, 125:22, 125:25, 126:11, 136:24, 145:15, 162:3, 230:18, 230:19, 232:6, 233:19, 234:9, 234:20
**keep** [15] - 5:21, 32:10, 46:2, 46:8, 49:15, 104:3, 129:14, 130:6, 149:1, 153:11, 172:21, 208:7, 209:7, 237:9
**keeping** [3] - 163:4, 163:5, 174:11
**kept** [9] - 20:10, 41:12, 42:17, 66:2, 110:8, 158:7, 172:25, 173:5, 174:24
**kernel** [1] - 151:18
**key** [2] - 64:22
**kind** [7] - 81:6, 138:18, 143:9, 174:16, 176:17, 207:1, 234:16
**KLAR** [180] - 1:15, 3:18, 3:21, 9:3, 9:6, 9:10, 10:5, 10:10, 10:17, 10:22, 10:24, 11:11, 11:18, 13:8, 15:8, 19:23, 20:1, 20:4, 21:19, 22:13, 22:17, 22:25, 23:2, 30:18, 31:19, 31:23, 49:18, 49:24, 50:1, 51:10, 52:11, 54:12, 54:23, 54:25, 55:18, 55:22, 55:24, 56:1, 57:25, 58:6, 58:19, 59:5, 60:13, 61:1, 61:10, 61:19, 63:22, 64:21, 67:6, 70:3, 70:7, 72:7, 72:13, 80:5, 82:5, 83:22, 84:6, 84:21, 84:23, 86:7, 86:17, 87:21, 89:11, 92:6, 92:19, 93:7, 95:3, 95:25, 97:20, 98:11, 105:10, 107:3, 108:11, 108:20, 109:14, 110:25, 111:17, 115:9, 117:10, 121:23, 122:14, 122:21, 123:5, 124:20, 124:24, 126:14, 126:24, 129:20, 132:3, 136:10, 136:17, 137:7, 137:12, 137:14, 138:7, 138:13, 139:11, 139:15, 139:19, 139:23, 140:11, 140:14, 140:23, 141:3, 142:16, 142:23, 142:25, 143:2, 143:5, 143:8, 145:4, 145:7, 145:22, 149:7, 150:7, 150:14, 150:17, 152:3, 157:2, 158:20, 159:22, 160:3, 161:2, 161:7, 161:9, 161:11, 162:21, 162:25, 167:12, 167:19, 168:9,

168:12, 174:2, 174:20, 175:12, 175:15, 176:1, 178:14, 179:24, 181:20, 185:10, 186:12, 190:14, 190:16, 190:22, 194:11, 195:1, 196:1, 196:12, 196:15, 197:22, 198:12, 198:25, 200:24, 201:2, 202:14, 208:8, 215:21, 218:5, 220:3, 220:15, 221:25, 222:16, 226:25, 227:6, 227:18, 227:21, 227:24, 229:19, 231:3, 231:6, 231:9, 231:23, 232:1, 233:13, 234:15, 234:19, 237:15, 237:25, 238:3
**Klar** [80] - 2:8, 3:17, 4:24, 7:17, 10:2, 11:3, 12:5, 12:17, 13:7, 13:12, 32:14, 49:25, 52:4, 60:12, 68:18, 72:19, 72:22, 73:6, 85:21, 86:14, 87:6, 87:12, 87:17, 88:17, 93:24, 108:23, 108:25, 111:2, 123:4, 139:5, 142:6, 144:2, 151:8, 152:15, 153:7, 153:12, 154:7, 154:10, 157:5, 157:8, 157:25, 158:19, 159:9, 160:20, 162:4, 163:9, 168:4, 169:4, 169:10, 174:8, 174:12, 174:19, 178:10, 181:6, 185:21, 195:17, 214:5, 214:11, 215:19, 218:3, 218:23, 220:16, 221:14, 221:24, 222:9, 222:15, 223:11, 223:19, 225:11, 226:22, 228:24, 229:10, 229:18, 230:10, 230:24, 231:22, 234:7, 235:15, 237:14, 238:2
**Klar's** [4] - 34:2, 65:19, 86:22, 224:7
**knowing** [4] - 72:1, 109:11, 133:19, 133:25
**knowledge** [1] - 180:7
**knowledgeable** [2] - 222:14, 225:2
**known** [1] - 228:16
**knows** [5] - 86:6, 111:9, 153:9, 194:25, 198:24

## L

**label** [9] - 29:23, 47:8, 48:22, 49:7, 53:9, 53:10, 69:25, 177:14
**labeled** [19] - 17:8, 27:5, 27:8, 28:13, 31:10, 37:16, 37:18, 39:5, 40:24, 42:9, 44:1, 45:7, 45:14, 48:2, 49:8,

53:12, 177:12, 191:7, 191:21
  **labeling** [1] - 49:16
  **labels** [3] - 27:10, 49:1, 49:3
  **lack** [3] - 66:12, 67:7, 144:17
  **lacks** [3] - 67:7, 95:3, 117:10
  **lame** [1] - 125:11
  **land** [1] - 21:11
  **landed** [1] - 40:17
  **language** [3] - 51:8, 51:9, 146:5
  **laptop** [1] - 52:22
  **Las** [4] - 7:16, 203:3, 203:6, 224:1
  **Last** [1] - 86:14
  **last** [52] - 3:2, 4:4, 4:13, 6:10, 8:4, 8:5, 8:6, 9:6, 10:8, 12:5, 15:15, 15:16, 20:1, 20:4, 21:20, 25:7, 25:14, 33:18, 70:7, 73:21, 78:13, 86:6, 89:25, 92:15, 93:13, 121:24, 122:3, 123:12, 125:11, 126:2, 131:5, 131:8, 131:18, 131:19, 131:22, 133:14, 134:20, 135:12, 143:22, 155:14, 161:25, 164:8, 165:24, 167:21, 168:13, 172:13, 192:6, 211:21, 222:12, 222:17, 233:14
  **late** [7] - 93:4, 93:11, 100:8, 103:5, 122:24, 194:10, 223:18
  **latest** [5] - 204:22, 205:5, 205:10, 205:12, 207:7
  **latitude** [1] - 107:5
  **laughable** [1] - 174:6
  **laundry** [1] - 219:11
  **law** [25] - 52:12, 52:15, 139:19, 140:4, 140:5, 140:7, 140:8, 140:10, 142:6, 151:12, 152:4, 152:9, 153:2, 160:22, 160:24, 161:6, 162:7, 162:16, 174:20, 175:20, 198:13, 198:16, 215:19, 235:1, 235:8
  **Law** [2] - 1:15, 1:18
  **lawsuit** [1] - 180:9
  **lawyer** [14] - 19:13, 73:16, 73:19, 76:17, 76:20, 77:5, 114:17, 114:19, 149:6, 156:15, 156:17, 175:4, 175:6
  **lawyer's** [1] - 149:24
  **lawyers** [5] - 61:8, 62:18, 74:4, 158:14, 214:18
  **Lawyers** [1] - 214:16
  **lead** [1] - 181:16
  **least** [16] - 4:17, 4:20,

14:18, 50:4, 63:3, 112:22, 122:12, 126:12, 149:20, 151:9, 151:25, 214:10, 221:9, 224:5, 224:8, 233:11
  **leave** [8] - 30:14, 37:25, 38:7, 63:20, 64:12, 64:13, 116:8, 235:3
  **leaving** [2] - 35:25, 225:5
  **lectern** [1] - 178:4
  **led** [1] - 177:13
  **Lee** [4] - 79:3, 84:5, 99:12, 101:13
  **left** [34] - 23:25, 24:13, 24:22, 28:21, 30:13, 30:20, 31:4, 31:21, 35:18, 35:19, 35:21, 36:22, 38:4, 38:17, 38:22, 38:25, 39:7, 39:11, 39:13, 39:14, 40:3, 41:3, 41:9, 47:18, 47:23, 48:15, 48:16, 88:11, 89:9, 89:16, 166:5, 186:3
  **Left** [2] - 41:5, 41:6
  **legal** [4] - 30:10, 46:2, 46:3, 46:9
  **Len** [22] - 78:3, 78:10, 84:4, 91:24, 94:16, 99:11, 101:12, 101:23, 112:12, 141:24, 142:13, 154:15, 154:20, 155:6, 156:25, 164:21, 165:10, 180:2, 180:4, 180:14, 193:15
  **Len's** [2] - 101:19, 159:13
  **Len2** [5] - 211:12, 211:16, 211:17, 211:25, 212:23
  **less** [11] - 15:15, 15:20, 16:21, 17:1, 32:6, 32:11, 86:21, 87:9, 127:18, 135:15, 233:12
  **letter** [8] - 158:12, 200:20, 200:23, 201:8, 201:13, 201:20, 202:1, 202:9
  **licensing** [1] - 67:13
  **lien** [1] - 198:19
  **lies** [2] - 126:13, 136:19
  **LIESE** [4] - 1:18, 220:24, 222:6, 238:11
  **Liese** [2] - 2:13, 220:23, 220:24, 222:5, 226:14, 238:10
  **lieu** [1] - 18:21
  **Likewise** [1] - 56:12
  **limit** [5] - 34:8, 70:11, 231:4, 232:3, 234:5
  **limitation** [1] - 4:5
  **limited** [2] - 34:10, 188:21
  **line** [9] - 34:20, 52:3, 54:22, 59:10, 67:18, 127:24, 163:4, 163:11, 196:13
  **lines** [5] - 47:5, 146:5, 159:1, 180:17, 192:7

  **link** [2] - 81:6, 81:12
  **list** [36] - 3:14, 3:19, 3:25, 24:22, 71:25, 101:10, 101:11, 102:9, 102:11, 102:12, 102:14, 102:16, 102:22, 102:23, 103:5, 103:13, 103:16, 103:24, 103:25, 104:1, 104:3, 104:5, 104:18, 117:21, 168:9, 168:13, 186:3, 186:10, 186:12, 219:11, 219:16, 220:12, 223:20, 223:21, 231:11, 231:23
  **listed** [2] - 79:16, 90:1, 99:17, 100:12, 101:2
  **lists** [1] - 103:25
  **litigation** [3] - 180:4, 189:25, 190:9
  **LLC** [2] - 1:7, 191:10
  **local** [1] - 217:21
  **locate** [11] - 14:17, 15:6, 15:20, 16:8, 16:20, 17:1, 17:22, 32:19, 50:11, 169:2
  **located** [4] - 32:20, 158:4, 169:19
  **location** [6] - 28:19, 57:14, 59:22, 158:1, 158:8
  **locations** [4] - 28:13, 41:11, 57:11, 57:12
  **locked** [5] - 83:13, 83:14, 97:6, 97:15, 97:16
  **log** [1] - 201:19
  **logic** [2] - 172:10, 172:11
  **look** [21] - 9:11, 30:10, 75:21, 75:23, 124:21, 125:1, 143:5, 165:13, 170:5, 204:2, 205:8, 206:7, 209:10, 211:5, 211:19, 212:9, 212:13, 219:16, 224:19, 235:2, 237:3
  **Look** [1] - 76:6
  **looked** [12] - 8:3, 113:1, 113:3, 124:12, 129:22, 164:23, 165:2, 165:4, 166:7, 169:3, 177:7, 182:14
  **looking** [19] - 16:17, 34:13, 51:3, 51:5, 59:1, 97:4, 97:5, 123:18, 163:21, 164:23, 166:9, 166:17, 170:6, 186:17, 186:20, 187:7, 187:8, 187:17, 228:4
  **loosely** [1] - 64:11
  **Los** [1] - 92:12
  **lose** [1] - 95:16
  **loss** [5] - 9:20, 13:6, 93:9, 162:14, 180:8
  **lost** [5] - 67:3, 95:12, 139:14, 160:15, 219:5
  **luggage** [1] - 30:9
  **lying** [1] - 63:20

**M**

  **machine** [5] - 81:4, 81:5, 82:25, 83:4
  **machines** [1] - 159:16
  **Magistrate** [2] - 201:9, 201:14
  **mail** [93] - 17:9, 109:23, 110:2, 110:6, 110:7, 112:9, 112:10, 112:13, 112:17, 116:21, 136:5, 136:6, 136:9, 136:14, 137:1, 137:20, 138:8, 140:15, 140:18, 141:24, 142:13, 144:14, 145:5, 146:1, 146:5, 146:9, 148:6, 148:7, 148:8, 148:10, 152:9, 152:22, 154:16, 154:20, 155:20, 159:21, 160:25, 162:9, 163:14, 163:18, 164:4, 164:20, 165:5, 166:18, 166:21, 166:24, 167:2, 170:5, 171:24, 172:13, 180:2, 180:5, 180:15, 181:1, 181:2, 193:4, 196:25, 197:1, 200:17, 202:1, 202:8, 202:9, 202:18, 204:23, 205:14, 206:19, 206:25, 207:1, 207:6, 207:9, 207:12, 207:13, 207:17, 207:18, 207:22, 207:25, 208:11, 208:13, 208:16, 208:24, 212:3, 212:4, 212:11, 212:18, 222:16, 222:22, 223:23, 227:3, 229:10, 229:11
  **mails** [88] - 110:4, 110:8, 111:10, 111:16, 113:6, 113:8, 113:21, 114:2, 114:3, 114:16, 146:18, 146:23, 148:20, 155:7, 159:13, 163:14, 164:19, 165:4, 165:12, 165:20, 166:8, 168:18, 168:22, 169:7, 169:17, 169:22, 170:10, 170:17, 170:18, 171:22, 172:1, 173:2, 173:8, 173:9, 173:19, 173:23, 173:25, 176:19, 176:20, 180:2, 180:3, 180:6, 180:21, 181:2, 182:5, 182:6, 182:8, 182:12, 182:18, 182:19, 183:16, 183:24, 188:21, 192:21, 193:3, 194:6, 194:16, 194:24, 195:24, 197:2, 197:4, 198:4, 198:5, 198:9, 198:11, 198:12, 198:25, 199:5, 199:23, 200:2, 200:7, 200:14, 202:19, 202:24, 203:19, 203:21, 206:24,

208:25, 209:1, 209:20, 210:12, 210:24, 211:17, 211:24, 212:25, 213:16, 221:12, 226:1

**maintain** [14] - 35:3, 47:2, 49:10, 50:5, 62:2, 63:5, 63:12, 64:1, 72:6, 82:2, 125:17, 131:16, 131:23, 154:17

**maintained** [8] - 33:11, 33:12, 55:16, 63:24, 63:25, 95:11, 174:24, 176:9

**maintains** [4] - 64:17, 130:25, 132:16, 133:14

**man** [1] - 125:13

**manner** [9] - 28:6, 37:20, 52:13, 53:6, 72:6, 172:12, 185:18, 204:20, 209:19

**manufactured** [1] - 122:23

**March** [25] - 19:10, 22:9, 34:17, 37:2, 50:10, 50:25, 67:24, 71:19, 71:21, 71:23, 73:15, 114:14, 114:24, 115:1, 121:17, 129:1, 129:6, 131:6, 134:15, 135:1, 141:19, 171:20, 180:22

**Mark** [1] - 2:9

**MARK** [1] - 1:15

**mark** [6] - 28:6, 179:2, 179:10, 186:5, 186:21, 190:11

**marked** [11] - 28:5, 34:19, 69:18, 178:23, 179:19, 186:1, 186:25, 187:1, 190:11, 190:13, 199:16

**matched** [1] - 15:23

**material** [65] - 21:15, 27:11, 28:7, 28:13, 29:6, 29:12, 29:15, 29:25, 30:9, 30:11, 30:13, 30:20, 31:4, 31:8, 31:9, 31:11, 32:8, 32:17, 33:6, 33:15, 37:1, 37:7, 37:18, 38:19, 39:5, 40:21, 40:24, 41:2, 41:12, 41:21, 41:25, 42:9, 42:15, 43:22, 44:12, 45:1, 45:7, 45:10, 45:14, 45:19, 46:14, 47:3, 47:7, 47:9, 47:23, 48:1, 48:8, 48:24, 48:25, 49:10, 59:4, 59:16, 59:23, 61:24, 63:1, 63:13, 164:25, 165:1, 165:23, 166:11, 170:6, 184:11

**materials** [9] - 28:12, 49:20, 50:5, 50:7, 51:7, 51:11, 60:17, 62:4, 67:17

**matter** [30] - 4:2, 4:3, 4:6, 5:6, 9:4, 11:18, 12:18, 14:13, 51:24, 85:10, 85:12, 85:18, 98:15, 116:7, 121:8, 135:8,

135:17, 137:1, 137:23, 139:4, 140:25, 141:1, 161:24, 172:18, 214:7, 224:5, 224:15, 227:3, 236:7, 238:19

**matters** [9] - 3:1, 68:1, 210:13, 212:6, 212:10, 212:19, 215:23, 216:5, 219:2

**mean** [63] - 11:23, 12:19, 12:21, 16:10, 17:24, 23:4, 32:21, 36:15, 39:11, 42:13, 44:2, 46:18, 48:16, 51:23, 54:4, 55:8, 57:5, 58:5, 62:22, 64:14, 64:18, 68:8, 68:25, 73:22, 73:24, 78:1, 81:22, 82:18, 83:6, 83:18, 87:2, 94:8, 94:20, 98:23, 102:20, 107:5, 107:6, 107:8, 109:9, 110:7, 114:18, 123:16, 126:24, 127:4, 128:9, 129:11, 132:14, 143:3, 148:21, 151:8, 153:6, 171:1, 172:21, 173:1, 174:11, 175:2, 177:5, 183:7, 191:8, 203:8, 204:21, 213:6

**meaning** [2] - 73:21, 121:13

**Meaning** [1] - 197:12

**means** [5] - 8:12, 52:5, 67:7, 170:14, 192:3

**meant** [4] - 4:25, 68:7, 76:12, 87:23

**meantime** [2] - 178:10, 237:20

**media** [41] - 28:21, 36:17, 36:21, 37:11, 37:14, 38:17, 38:18, 42:25, 43:2, 43:5, 43:10, 46:13, 47:17, 47:22, 53:13, 53:19, 53:23, 53:24, 54:9, 142:4, 173:8, 176:20, 176:21, 176:24, 176:25, 177:4, 177:10, 177:16, 182:9, 189:23, 194:17, 198:5, 198:11, 199:6, 199:11, 200:2, 201:17, 202:19, 203:20, 203:21, 221:12

**Media** [1] - 177:15

**medium** [2] - 146:22, 170:22

**meet** [4] - 195:21, 196:9, 224:25, 225:13

**meetings** [1] - 195:22

**members** [1] - 203:19

**memorizing** [1] - 188:23

**mention** [1] - 25:10

**mentioned** [4] - 48:7, 215:19, 226:2, 237:23

**message** [1] - 207:2

**messages** [1] - 188:23

**met** [5] - 152:17, 194:9,

194:13, 194:23, 196:22

**metadata** [1] - 192:9

**method** [1] - 51:17

**Michael** [5] - 57:18, 57:19, 189:4

**middle** [2] - 68:12, 232:22

**might** [19] - 12:14, 43:13, 68:6, 69:2, 85:16, 85:19, 88:18, 102:24, 107:23, 109:22, 146:14, 147:3, 147:4, 152:25, 158:25, 178:12, 204:12, 219:22

**Mike** [4] - 61:2, 79:14, 155:15

**million** [4] - 86:5, 124:8, 135:9, 135:10

**millions** [3] - 115:11, 170:2, 184:8

**millisecond** [1] - 136:4

**mind** [7] - 66:7, 127:21, 153:11, 163:4, 163:5, 207:24, 208:1

**mindful** [4] - 35:8, 35:9, 57:9, 107:14

**Mine** [1] - 177:22

**minimum** [4] - 58:7, 140:2, 143:12, 145:14

**minute** [8] - 67:25, 68:3, 68:4, 134:24, 157:6, 213:22, 213:24, 236:20

**minutes** [7] - 32:7, 116:9, 133:22, 163:3, 178:2, 214:2, 226:20

**Mirage** [49] - 18:11, 18:13, 21:12, 21:13, 22:12, 23:17, 24:14, 24:16, 30:19, 30:21, 31:4, 31:5, 31:6, 31:9, 31:21, 35:21, 36:1, 36:4, 36:13, 36:16, 36:23, 37:9, 38:1, 38:18, 38:23, 39:14, 39:18, 39:23, 40:3, 40:11, 40:12, 41:6, 41:14, 41:15, 41:23, 42:1, 42:12, 43:1, 43:22, 44:7, 44:12, 44:25, 45:8, 45:19, 46:12, 46:15, 46:25, 47:24, 53:23

**mischaracterizes** [1] - 111:1

**mishear** [1] - 48:9

**misheard** [1] - 48:8

**mispronouncing** [1] - 221:2

**miss** [1] - 233:23

**mistake** [2] - 105:6, 229:15

**mistaken** [3] - 54:22, 55:20, 189:6

**misunderstanding** [2] - 35:17, 229:9

**mixed** [1] - 53:10

**mixing** [1] - 103:25

**modifying** [1] - 67:11

**moment** [6] - 2:17, 12:9, 14:13, 34:1, 151:19, 233:4

**Monaka** [3] - 84:4, 99:12, 101:13

**Monaka's** [1] - 83:7

**Monday** [4] - 7:12, 236:11, 236:21, 236:24

**money** [1] - 180:23

**Monica** [1] - 78:18

**Monika's** [1] - 78:16

**monitor** [1] - 20:18

**Mont** [2] - 201:16

**MONTGOMERY** [1] - 1:4

**Montgomery** [168] - 1:4, 2:6, 2:19, 2:20, 4:5, 4:14, 4:21, 5:13, 6:18, 7:2, 7:17, 8:25, 9:1, 9:7, 9:17, 10:3, 11:16, 12:1, 12:13, 13:1, 13:4, 14:3, 20:9, 22:18, 22:21, 32:1, 32:17, 32:25, 33:16, 33:17, 34:7, 34:15, 34:17, 35:2, 35:17, 49:19, 50:5, 55:13, 55:21, 56:4, 57:9, 57:10, 58:6, 58:10, 59:5, 59:25, 60:3, 60:7, 60:14, 64:5, 65:3, 65:16, 66:13, 66:15, 67:17, 67:21, 68:15, 72:25, 73:12, 84:12, 84:23, 85:13, 85:24, 86:8, 86:12, 87:5, 87:12, 87:25, 88:2, 88:8, 88:11, 88:14, 92:3, 92:7, 92:21, 93:13, 93:25, 94:4, 96:2, 96:13, 98:2, 98:18, 98:24, 99:18, 102:21, 105:23, 106:2, 106:11, 106:17, 109:1, 111:20, 111:22, 115:13, 125:21, 126:13, 127:21, 128:2, 137:7, 137:9, 139:21, 141:8, 141:23, 144:11, 144:12, 144:21, 145:4, 145:17, 149:11, 150:3, 150:7, 150:20, 150:21, 151:21, 152:14, 153:12, 153:21, 157:2, 158:22, 158:25, 159:8, 167:20, 167:21, 168:25, 170:9, 174:2, 174:22, 174:23, 175:22, 178:22, 179:12, 180:6, 180:14, 180:19, 181:1, 181:24, 185:18, 187:6, 187:17, 195:6, 195:10, 195:17, 195:24, 198:22, 199:1, 201:2, 211:20, 214:23, 217:11, 217:17, 217:24, 218:23, 219:20, 220:4, 221:11, 228:25, 229:1, 229:15, 230:21, 232:6, 232:10,

233:3, 233:5, 233:8, 233:12, 233:17, 234:4

**Montgomery's** [11] - 9:14, 21:24, 32:12, 56:10, 84:16, 88:18, 88:22, 109:17, 154:9, 215:20, 231:7

**month** [11] - 41:20, 71:18, 114:11, 114:13, 114:14, 115:1, 115:3, 121:11, 122:10, 123:25, 156:5

**months** [5] - 33:18, 42:6, 44:17, 44:21, 93:15

**Moreover** [1] - 85:6

**morning** [1] - 7:12

**Most** [1] - 32:8

**most** [7] - 70:12, 172:14, 222:14, 222:19, 225:2, 232:25, 234:13

**motel** [1] - 23:15

**motion** [24] - 5:12, 8:20, 12:4, 18:15, 50:9, 50:15, 50:20, 54:21, 56:23, 73:5, 126:14, 126:15, 137:2, 137:25, 139:4, 139:7, 143:17, 144:7, 161:25, 185:20, 214:8, 224:5, 224:15

**motions** [8] - 5:6, 5:21, 6:6, 6:8, 6:11, 6:15, 13:9, 55:3

**move** [29] - 13:18, 20:18, 29:2, 46:14, 46:25, 47:10, 52:9, 53:4, 53:6, 62:13, 62:15, 66:17, 66:18, 70:6, 70:17, 73:13, 96:13, 99:2, 106:23, 108:19, 108:23, 123:23, 128:1, 136:5, 151:18, 170:13, 178:3, 178:5, 178:6

**moved** [12] - 28:23, 46:12, 47:24, 47:25, 53:22, 56:2, 70:16, 133:8, 236:21, 236:22

**mover's** [2] - 47:19, 47:21

**movers** [6] - 47:7, 47:13, 53:24, 64:12, 69:22, 70:1

**moving** [1] - 85:22

**MR** [299] - 3:13, 4:16, 5:5, 6:17, 7:8, 8:1, 8:24, 10:19, 11:1, 11:21, 13:19, 13:23, 14:8, 14:12, 15:10, 15:13, 16:13, 16:15, 19:24, 20:3, 20:11, 20:16, 20:22, 22:3, 22:14, 22:23, 23:8, 30:22, 31:1, 31:13, 31:17, 31:20, 32:14, 33:20, 33:24, 35:11, 35:15, 35:16, 40:14, 49:22, 49:25, 50:8, 50:14, 51:16, 52:6, 52:9, 52:21, 53:1, 53:5, 53:8, 54:20, 54:24, 55:7, 55:23, 56:25, 57:5, 57:13, 58:2, 58:15, 58:25, 59:10, 59:14, 60:9, 60:21, 61:3,

61:16, 61:21, 62:13, 62:15, 62:16, 63:24, 66:8, 66:11, 66:19, 66:20, 69:3, 69:5, 70:6, 70:10, 70:16, 70:18, 72:11, 72:14, 73:14, 78:15, 78:17, 80:7, 80:13, 80:15, 82:6, 83:23, 83:25, 84:1, 84:9, 84:19, 85:20, 86:14, 88:25, 89:2, 89:13, 89:15, 91:19, 91:23, 93:3, 93:21, 94:15, 95:9, 96:6, 96:12, 96:14, 98:4, 98:10, 99:5, 100:22, 101:1, 105:7, 105:19, 105:22, 106:8, 106:23, 107:1, 107:4, 107:14, 107:15, 107:19, 108:12, 108:14, 108:22, 109:3, 109:18, 111:2, 112:3, 112:4, 116:11, 116:14, 117:13, 117:18, 122:1, 122:9, 122:16, 122:22, 123:24, 124:23, 125:1, 125:20, 127:9, 127:12, 127:14, 127:16, 127:18, 128:10, 128:14, 128:18, 129:21, 130:8, 130:10, 132:5, 136:13, 136:19, 137:11, 137:13, 137:24, 138:11, 138:24, 139:10, 142:11, 143:16, 145:24, 149:9, 151:6, 151:17, 151:24, 152:3, 152:21, 153:10, 153:20, 154:12, 154:14, 157:12, 157:18, 159:11, 159:12, 159:23, 160:8, 161:24, 163:5, 163:13, 167:14, 168:16, 169:14, 169:16, 170:13, 170:15, 174:5, 176:3, 176:6, 176:7, 178:3, 178:20, 178:21, 178:23, 179:9, 179:15, 179:18, 179:21, 180:11, 181:21, 181:23, 185:20, 185:25, 186:5, 186:9, 186:14, 186:18, 186:20, 186:24, 187:8, 187:11, 187:15, 187:19, 187:23, 188:3, 188:13, 188:17, 190:11, 191:6, 194:12, 195:16, 196:8, 196:17, 197:24, 198:3, 198:14, 199:2, 199:4, 199:13, 199:18, 199:19, 201:4, 201:8, 201:12, 202:17, 203:8, 203:17, 208:10, 213:25, 214:4, 214:10, 215:3, 215:5, 215:11, 216:12, 217:4, 217:11, 217:18, 218:16, 219:6, 220:2, 220:18, 220:24, 221:9, 221:20,

222:4, 222:6, 223:10, 223:13, 223:17, 225:7, 225:10, 225:16, 226:13, 226:17, 228:9, 228:11, 229:9, 230:19, 230:22, 231:14, 231:19, 232:8, 232:13, 232:18, 233:4, 233:7, 233:11, 233:18, 233:21, 233:22, 234:2, 234:4, 234:7, 234:12, 236:2, 236:18, 236:25, 237:24, 238:5, 238:9, 238:11

**MS** [203] - 3:18, 3:21, 9:3, 9:6, 9:10, 10:5, 10:10, 10:17, 10:22, 10:24, 11:11, 11:18, 13:8, 15:8, 19:23, 20:1, 20:4, 21:19, 22:13, 22:17, 22:25, 23:2, 30:18, 31:19, 31:23, 49:18, 49:24, 50:1, 51:10, 52:11, 52:18, 54:12, 54:23, 54:25, 55:18, 55:22, 55:24, 56:1, 57:25, 58:6, 58:19, 59:5, 60:13, 61:1, 61:10, 61:19, 63:22, 64:21, 67:6, 70:3, 70:7, 72:7, 72:13, 80:5, 82:5, 83:22, 84:6, 84:21, 84:23, 86:7, 86:17, 87:21, 89:11, 92:6, 92:19, 93:7, 95:3, 95:25, 97:20, 98:11, 105:10, 106:14, 106:16, 107:3, 108:11, 108:20, 109:14, 110:25, 111:17, 115:9, 117:10, 121:23, 122:14, 122:21, 123:5, 124:20, 124:24, 126:14, 126:24, 129:20, 132:3, 136:10, 136:17, 137:7, 137:12, 137:14, 138:7, 138:13, 139:11, 139:15, 139:19, 139:23, 140:11, 140:14, 140:23, 141:3, 142:16, 142:23, 142:25, 143:2, 143:5, 143:8, 145:4, 145:7, 145:22, 149:7, 150:7, 150:14, 150:17, 153:22, 157:2, 158:20, 159:22, 160:3, 161:2, 161:7, 161:9, 161:11, 162:21, 162:25, 167:12, 167:19, 168:9, 168:12, 174:2, 174:20, 175:12, 175:15, 176:1, 178:14, 179:24, 181:20, 185:10, 186:12, 190:14, 190:16, 190:22, 194:11, 195:1, 196:1, 196:12, 196:15, 197:22, 198:12, 198:25, 200:24, 201:2, 202:14, 208:8, 214:15, 214:25, 215:4, 215:6, 215:12, 215:16, 215:21, 216:8, 216:15, 216:20,

217:1, 217:20, 218:5, 218:8, 220:3, 220:15, 220:20, 220:22, 221:17, 221:25, 222:2, 222:16, 225:25, 226:8, 226:25, 227:6, 227:18, 227:21, 227:24, 229:19, 231:3, 231:6, 231:9, 231:23, 232:1, 233:13, 234:15, 234:19, 235:6, 237:15, 237:25, 238:3, 238:7, 238:13

**multiple** [6] - 71:24, 98:13, 119:18, 133:24, 149:10

**multiple-tier** [1] - 119:18

**must** [4] - 11:1, 15:2, 136:20, 201:24

**N**

**name** [37] - 36:9, 36:10, 46:18, 46:21, 78:13, 78:14, 78:21, 79:6, 116:19, 116:21, 116:22, 116:25, 117:2, 117:4, 117:5, 117:14, 118:12, 119:11, 119:15, 119:20, 119:23, 119:24, 120:3, 120:18, 152:5, 159:19, 159:24, 166:13, 166:15, 166:18, 166:21, 177:17, 204:14, 204:16, 204:18, 213:15, 221:2

**named** [7] - 62:7, 118:2, 134:3, 140:8, 210:17, 213:9

**names** [24] - 14:24, 15:16, 61:14, 100:11, 101:2, 109:5, 117:8, 117:12, 117:14, 117:21, 117:25, 118:7, 118:18, 118:24, 119:1, 119:9, 120:5, 120:9, 120:12, 125:23, 182:14, 182:17, 193:17

**narrow** [5] - 35:7, 56:17, 62:2, 111:23

**national** [1] - 46:20

**native** [36] - 111:9, 111:16, 113:5, 113:8, 139:3, 139:6, 139:8, 141:5, 142:2, 142:14, 143:23, 152:1, 152:10, 152:12, 167:2, 167:3, 168:18, 168:23, 168:24, 169:24, 180:25, 183:2, 183:6, 183:9, 183:17, 183:20, 184:1, 184:3, 185:4, 185:13, 185:15, 188:22, 192:9, 192:11, 229:12

**nature** [5] - 64:16, 86:3, 160:13, 202:2, 224:7

**NBC** [10] - 113:23, 114:5, 168:21, 169:23, 170:17, 173:23, 189:22, 191:15,

192:12, 194:6
**necessarily** [5] - 12:15, 112:8, 166:23, 205:2, 213:3
**necessary** [2] - 228:12, 230:23
**necessitates** [1] - 7:23
**need** [25] - 4:17, 11:4, 51:11, 52:5, 52:21, 91:17, 116:7, 123:22, 128:1, 137:22, 149:16, 161:15, 178:5, 178:12, 180:11, 180:16, 184:8, 216:5, 216:7, 216:16, 221:5, 225:14, 230:17, 235:17, 237:8
**needed** [5] - 19:6, 19:7, 141:10, 145:12, 161:13
**needs** [6] - 11:21, 34:9, 58:13, 92:24, 227:14, 235:2
**network** [2] - 81:14, 189:23
**Nevada** [3] - 1:7, 1:23, 54:15
**never** [15] - 7:12, 29:7, 50:2, 72:19, 103:4, 104:9, 105:25, 112:11, 126:20, 138:9, 162:5, 180:7, 201:2, 208:2, 220:10
**new** [4] - 162:4, 208:2, 208:5, 228:6
**New** [1] - 190:6
**newer** [1] - 42:18
**News** [4] - 113:23, 114:5, 173:23, 194:6
**news** [2] - 7:12, 169:23
**newspaper** [5] - 7:11, 7:14, 8:10, 8:13, 189:23
**next** [13] - 24:2, 42:6, 92:13, 206:7, 206:12, 206:13, 208:21, 222:8, 222:18, 225:20, 228:6, 235:23, 236:10
**night** [8] - 4:4, 8:5, 20:4, 23:11, 80:19, 80:21, 134:4, 168:13
**nine** [2] - 85:5
**nine-year** [1] - 85:5
**Ninth** [1] - 236:8
**Nobody** [1] - 216:18
**nobody** [1] - 161:1
**noise** [1] - 135:16
**non** [1] - 147:11
**None** [2] - 167:9, 167:11
**none** [2] - 79:16, 126:17, 220:9
**nonelectronic** [2] - 28:20, 43:2
**nongovernment** [1] - 164:25
**nonsensitive** [1] - 166:11
**noon** [4] - 112:2, 115:15, 115:17, 232:21

**normally** [1] - 161:4
**note** [4] - 4:12, 68:9, 116:5, 222:9
**notes** [3] - 4:8, 98:5, 188:22
**nothing** [18] - 8:1, 9:23, 22:21, 57:23, 65:11, 67:9, 67:19, 86:8, 105:14, 137:19, 138:10, 139:12, 140:15, 145:5, 145:17, 164:10, 203:8, 230:3
**notice** [7] - 56:11, 65:14, 85:18, 127:11, 137:21, 144:17, 237:21
**November** [22] - 110:22, 112:21, 129:9, 129:15, 131:9, 131:20, 132:7, 133:10, 184:13, 184:20, 185:8, 192:10, 192:21, 193:24, 194:2, 202:3, 202:20, 202:25, 203:9, 228:16, 228:17
**Number** [1] - 125:23, 126:1, 228:15
**number** [41] - 2:5, 4:7, 5:19, 10:2, 10:20, 11:8, 12:6, 13:16, 15:20, 16:3, 16:4, 45:5, 51:9, 67:24, 75:18, 75:24, 75:25, 124:10, 125:21, 132:21, 149:16, 178:14, 187:2, 188:14, 188:15, 189:6, 189:11, 189:14, 190:1, 191:23, 201:16, 201:22, 202:19, 206:11, 209:23, 210:4, 211:8, 211:21, 211:22, 220:5
**numbered** [3] - 10:7, 10:8, 211:6
**numbers** [6] - 32:3, 179:1, 182:4, 182:7, 210:5, 211:19

## O

**o'clock** [3] - 116:5, 163:3, 163:10
**oath** [3] - 14:4, 55:14, 200:6
**obey** [1] - 2:21
**object** [6] - 67:18, 89:11, 124:20, 136:10, 185:10, 189:15
**objected** [1] - 96:4
**Objection** [31] - 15:8, 19:23, 21:19, 22:13, 30:18, 49:18, 54:12, 61:10, 63:22, 67:6, 70:3, 72:7, 80:5, 82:5, 83:22, 84:6, 95:3, 95:25, 97:20, 107:3, 108:11, 109:14, 115:9, 117:10, 121:23, 129:20, 129:24, 132:3, 149:7, 194:11, 208:8

**objection** [34] - 3:12, 21:23, 31:17, 31:24, 33:21, 34:2, 61:19, 65:19, 67:6, 73:9, 80:12, 96:6, 107:18, 111:25, 115:13, 122:14, 154:10, 196:6, 196:13, 198:1, 203:14, 220:2, 220:3, 220:8, 220:13, 220:15, 220:18, 220:24, 221:24, 222:1, 222:3, 222:5, 228:10, 228:12
**objections** [7] - 3:4, 35:5, 68:14, 69:1, 72:20, 128:8, 221:14
**obligation** [12] - 49:19, 51:15, 51:16, 51:25, 151:9, 174:8, 174:9, 228:14, 228:15, 228:25, 229:1, 229:6
**obligations** [2] - 93:12, 149:25
**observe** [2] - 54:2, 54:3
**observed** [2] - 54:3, 60:15
**obtain** [3] - 56:13, 146:4, 146:9
**obtained** [1] - 87:13
**Obviously** [2] - 112:14, 199:7
**obviously** [4] - 11:4, 69:1, 107:9, 198:16
**occasion** [2] - 81:24, 91:6
**occasions** [6] - 45:4, 45:5, 71:24, 91:8, 196:11, 224:22
**occupied** [1] - 223:23
**occur** [2] - 41:18, 107:23
**occurred** [8] - 7:9, 64:6, 68:5, 95:22, 125:4, 131:1, 131:14, 185:12
**odd** [2] - 33:4
**OF** [3] - 1:1, 1:8, 1:13
**offer** [2] - 221:9, 221:20
**office** [32] - 25:21, 25:22, 26:3, 26:5, 26:16, 26:24, 27:8, 27:22, 29:9, 31:7, 41:3, 41:17, 42:2, 42:16, 42:17, 45:18, 45:19, 46:1, 47:23, 48:2, 48:19, 48:20, 48:25, 61:7, 83:8, 92:17, 105:24, 109:21, 138:9, 149:5, 150:25, 156:15
**officer** [10] - 83:19, 125:14, 125:15, 128:4, 151:8, 169:6, 174:9, 208:6, 216:24, 235:10
**Official** [2] - 1:22, 238:21
**offsite** [13] - 82:3, 82:11, 82:16, 90:11, 90:18, 90:21, 90:24, 91:4, 91:11, 91:12, 99:24, 100:15, 102:3
**often** [2] - 100:4, 170:4
**old** [1] - 17:9
**ON** [1] - 78:22
**on-the-fly** [1] - 12:4

**Once** [1] - 21:22
**once** [11] - 19:12, 74:6, 119:23, 174:25, 181:13, 185:14, 195:1, 196:16, 196:18, 196:20, 202:15
**One** [6] - 165:2, 206:20, 223:25, 225:19, 231:4, 235:5
**one** [147] - 3:23, 4:22, 5:5, 13:19, 14:15, 15:2, 15:3, 16:5, 17:11, 17:15, 17:19, 20:11, 28:10, 29:8, 29:9, 29:18, 29:20, 29:21, 29:22, 39:3, 40:12, 40:15, 40:20, 40:22, 44:22, 45:22, 53:2, 70:8, 76:6, 76:8, 76:10, 76:14, 81:4, 81:5, 81:6, 81:9, 82:14, 82:25, 84:2, 87:7, 87:8, 90:2, 91:6, 92:7, 94:23, 95:8, 95:17, 96:16, 107:21, 108:17, 109:12, 110:13, 110:23, 112:22, 115:6, 118:17, 119:17, 119:24, 121:7, 121:16, 125:8, 125:9, 125:23, 128:21, 129:9, 130:6, 130:7, 130:12, 130:16, 130:17, 132:11, 134:11, 134:18, 134:24, 135:5, 136:9, 140:8, 141:1, 146:12, 146:24, 147:7, 148:10, 148:11, 152:11, 158:11, 158:17, 158:18, 159:17, 160:25, 161:17, 162:11, 164:24, 165:4, 166:17, 167:15, 179:15, 183:5, 183:11, 183:15, 183:19, 183:22, 183:24, 184:5, 186:21, 190:1, 190:22, 193:25, 194:13, 194:24, 199:14, 202:23, 205:8, 205:10, 205:15, 206:7, 206:21, 206:24, 208:19, 208:21, 209:5, 209:8, 209:10, 209:12, 212:3, 212:4, 212:18, 213:6, 213:9, 213:18, 223:14, 224:13, 224:14, 225:12, 228:15, 229:11, 232:17, 232:19, 233:14, 237:6
**ones** [23] - 15:1, 17:15, 38:20, 62:24, 72:4, 74:6, 75:17, 79:19, 83:16, 99:7, 99:16, 101:10, 103:10, 103:12, 103:17, 113:18, 173:17, 176:12, 176:20, 177:2, 194:25, 198:10, 232:14
**ongoing** [1] - 119:10
**open** [16] - 83:17, 95:22, 96:23, 97:1, 97:8, 98:9, 102:24, 103:11, 103:12,

103:13, 103:17, 104:12,
109:25, 112:18, 112:19
**opened** [1] - 166:12
**openness** [2] - 13:20, 13:21
**operating** [5] - 6:22, 83:15,
96:24, 97:6, 97:7
**operation** [1] - 97:16
**operator** [1] - 120:4
**opportunity** [14] - 8:6, 9:10,
12:23, 34:6, 60:13, 92:9,
126:17, 138:17, 141:13,
143:12, 143:22, 145:8,
161:16, 235:15
**opposed** [6] - 18:19, 51:18,
133:17, 151:20, 178:24,
206:17
**OpSpring** [1] - 188:25
**option** [2] - 161:19, 209:8
**oral** [5] - 8:20, 56:23,
158:24, 224:8, 225:20
**orally** [1] - 7:18
**ORDER** [1] - 1:13
**order** [106] - 2:5, 2:17, 2:19,
4:23, 4:24, 19:3, 32:9, 34:9,
34:13, 34:23, 46:14, 47:5,
49:20, 49:23, 50:2, 50:6,
50:9, 50:10, 50:20, 50:25,
51:7, 51:20, 51:25, 52:3,
52:5, 52:18, 52:25, 53:2,
56:5, 64:2, 64:15, 64:25,
65:8, 65:24, 67:9, 67:10,
67:13, 67:16, 67:22, 67:24,
67:25, 68:4, 68:5, 68:10,
68:23, 72:14, 73:6, 85:15,
86:8, 86:13, 87:2, 91:20,
98:19, 106:19, 106:22,
111:6, 114:20, 127:20,
138:21, 139:25, 141:4,
141:6, 141:17, 141:19,
141:20, 141:21, 143:17,
144:5, 144:9, 145:11,
145:13, 149:11, 149:25,
154:3, 157:24, 161:12,
161:22, 171:25, 172:3,
175:1, 175:3, 181:10, 184:6,
186:15, 201:9, 201:15,
220:5, 224:24, 226:2,
227:13, 227:17, 227:19,
227:20, 228:13, 228:18,
228:20, 228:22, 228:23,
229:6, 229:7, 235:20
**ordered** [34] - 18:21, 19:4,
31:25, 32:1, 34:16, 34:21,
34:23, 47:2, 50:19, 50:23,
67:15, 71:13, 71:14, 74:16,
75:6, 87:6, 111:15, 115:7,
138:3, 138:23, 139:3,
143:23, 144:13, 144:16,
152:13, 168:23, 169:21,
170:4, 179:25, 181:15,

224:25, 227:21, 228:18
**orders** [10] - 2:21, 65:10,
68:3, 72:23, 98:20, 144:6,
144:8, 144:10, 160:13,
160:21
**Oregon** [1] - 57:19
**organization** [1] - 171:22
**organizations** [1] - 142:4
**organized** [1] - 162:14
**original** [18] - 26:10, 36:10,
118:12, 130:25, 132:16,
145:25, 146:2, 149:23,
151:10, 152:10, 152:12,
153:17, 157:14, 167:2,
167:16, 171:13, 173:1,
229:12
**originally** [3] - 41:10,
154:18, 172:22
**OSC** [4] - 56:6, 65:15,
127:3, 231:24
**otherwise** [2] - 51:21, 153:1
**ought** [1] - 66:5
**outlet** [1] - 189:24
**outlets** [2] - 198:5, 198:11
**outlines** [1] - 68:22
**Outlook** [7] - 166:13,
166:16, 166:22, 166:24,
205:1, 205:3, 209:9
**output** [2] - 54:3, 54:4
**outside** [3] - 36:5, 47:8,
71:4
**Outside** [1] - 36:6
**outstanding** [5] - 18:3,
72:16, 184:17, 184:19, 214:6
**overbroad** [2] - 84:7, 97:23
**overhear** [1] - 92:4
**overproduced** [1] - 85:8
**overproduction** [1] - 111:4
**overrule** [3] - 21:23, 80:11,
107:18
**Overruled** [6] - 15:9, 22:16,
23:6, 95:5, 117:15, 122:7
**overruled** [5] - 96:6, 112:1,
129:24, 196:6, 203:14
**overruling** [1] - 35:5
**oversight** [1] - 226:6
**own** [4] - 46:16, 47:8,
125:16, 233:9

---

## P

**p.m** [3] - 4:4, 133:23, 134:4
**P.M** [1] - 116:1
**pack** [1] - 47:12
**packers** [2] - 46:16, 46:17
**packing** [2] - 47:11, 235:8
**page** [28] - 10:8, 16:16,
68:12, 86:14, 86:25, 124:21,
141:18, 191:19, 191:24,

192:6, 192:7, 200:22,
200:23, 201:11, 204:3,
206:10, 206:12, 206:13,
206:21, 209:22, 209:23,
210:2, 210:6, 210:24,
211:19, 212:12, 212:13
**Page** [1] - 212:13
**pages** [8] - 10:13, 210:13,
211:16, 211:25, 212:3,
215:7, 215:11, 216:15
**paper** [7] - 5:23, 8:4, 8:16,
36:22, 37:11, 138:21, 237:17
**papers** [1] - 2:17, 8:5,
8:14, 8:17, 13:16, 43:1, 43:2,
126:21, 137:19, 200:1,
224:10
**paragraph** [6] - 16:17, 17:4,
17:7, 68:9, 68:19, 191:23
**parameter** [1] - 103:22
**parameters** [3] - 102:8,
102:9, 105:15
**pardon** [1] - 68:11
**Pardon** [5] - 68:11, 79:24,
173:11, 201:10, 207:15
**part** [34] - 7:22, 10:11,
10:13, 11:8, 12:25, 34:22,
47:11, 51:25, 75:19, 105:22,
140:9, 141:24, 144:24,
146:13, 147:6, 149:14,
153:11, 153:12, 162:9,
162:10, 168:18, 195:14,
203:21, 207:9, 207:12,
208:24, 212:3, 212:10,
212:18, 220:8, 225:23,
230:4, 236:9
**Part** [1] - 127:12
**particular** [5] - 58:9, 60:2,
98:6, 144:13, 158:25
**parties** [16] - 2:23, 6:11,
6:18, 7:2, 13:4, 13:17, 18:25,
34:15, 77:15, 144:11,
185:13, 189:15, 217:12,
224:25, 226:2, 229:15
**PARTIES** [1] - 1:20
**parties'** [4] - 4:5, 57:9,
187:6, 187:17
**partition** [1] - 134:18
**parts** [2] - 26:9, 41:23
**party** [5] - 2:14, 52:1,
157:21, 175:3, 176:9
**past** [1] - 140:15
**paste** [3] - 209:1, 210:23,
212:25
**pasted** [3] - 205:22, 206:1,
209:20
**Patrick** [1] - 203:3
**Patty** [12] - 78:3, 78:10,
84:4, 91:24, 94:17, 99:11,
101:12, 101:22, 101:23,
112:12, 165:10, 193:15

**Patty's** [1] - 83:7
**pay** [1] - 36:7
**PECK** [6] - 1:17, 217:20,
218:8, 220:20, 222:2, 238:7
**Peck** [5] - 2:11, 218:6,
220:19, 222:1, 238:6
**PEEK** [285] - 1:17, 3:13,
4:16, 8:1, 8:24, 10:19, 11:1,
11:21, 13:19, 13:23, 14:8,
14:12, 15:10, 15:13, 16:13,
16:15, 19:24, 20:3, 20:11,
20:16, 20:22, 22:3, 22:14,
22:23, 23:8, 30:22, 31:1,
31:13, 31:17, 31:20, 32:14,
35:11, 35:15, 35:16, 40:14,
49:22, 49:25, 50:8, 50:14,
51:16, 52:6, 52:9, 52:21,
53:1, 53:5, 53:8, 54:20,
54:24, 55:7, 55:23, 56:25,
57:5, 57:13, 58:2, 58:15,
58:25, 59:10, 59:14, 60:9,
60:21, 61:3, 61:16, 61:21,
62:13, 62:15, 62:16, 63:24,
66:8, 66:11, 66:19, 66:20,
69:3, 69:5, 70:6, 70:10,
70:16, 70:18, 72:11, 72:14,
73:14, 78:15, 78:17, 80:7,
80:13, 80:15, 82:6, 83:23,
83:25, 84:1, 84:9, 84:19,
85:20, 86:14, 88:25, 89:2,
89:13, 89:15, 91:19, 91:23,
93:3, 93:21, 94:15, 95:9,
96:6, 96:12, 96:14, 98:4,
98:10, 99:5, 100:22, 101:1,
105:7, 105:19, 105:22,
106:8, 106:23, 107:1, 107:4,
107:14, 107:15, 107:19,
108:12, 108:14, 108:22,
109:3, 109:18, 111:2, 112:3,
112:4, 116:11, 116:14,
117:13, 117:18, 122:1,
122:9, 122:16, 122:22,
123:24, 124:23, 125:1,
125:20, 127:9, 127:12,
127:14, 127:16, 127:18,
128:10, 128:14, 128:18,
129:21, 130:8, 130:10,
132:5, 136:13, 136:19,
137:11, 137:13, 137:24,
138:11, 138:24, 139:10,
142:11, 143:16, 145:24,
149:9, 151:6, 151:17,
151:24, 152:3, 152:21,
153:10, 153:20, 154:12,
154:14, 157:12, 157:18,
159:11, 159:12, 159:23,
160:8, 161:24, 163:5,
163:13, 167:14, 168:16,
169:14, 169:16, 170:13,
170:15, 174:5, 176:3, 176:6,

176:7, 178:3, 178:20,
178:21, 178:23, 179:9,
179:15, 179:18, 179:21,
180:11, 181:21, 181:23,
185:20, 185:25, 186:5,
186:9, 186:14, 186:18,
186:20, 186:24, 187:8,
187:11, 187:15, 187:19,
187:23, 188:3, 188:13,
188:17, 190:11, 191:6,
194:12, 195:16, 196:8,
196:17, 197:24, 198:3,
198:14, 199:2, 199:4,
199:13, 199:18, 199:19,
201:4, 201:8, 201:12,
202:17, 203:8, 203:17,
208:10, 213:25, 214:4,
214:10, 215:3, 215:5, 217:4,
217:18, 218:16, 219:6,
220:2, 220:18, 221:9,
221:20, 223:10, 223:13,
223:17, 225:7, 225:10,
225:16, 226:13, 226:17,
228:9, 228:11, 229:9,
230:19, 230:22, 231:14,
231:19, 232:8, 232:13,
232:18, 233:4, 233:7,
233:11, 233:18, 233:21,
234:4, 234:7, 234:12, 236:2,
236:18, 236:25, 237:24,
238:5
   **Peek** [69] - 2:10, 3:21, 4:13,
4:14, 7:25, 12:23, 13:14,
20:13, 21:20, 30:19, 34:3,
51:10, 52:13, 54:18, 55:4,
56:12, 56:21, 57:8, 59:12,
60:2, 64:25, 65:4, 65:6,
65:20, 68:25, 70:5, 72:10,
73:11, 84:11, 84:24, 86:9,
88:7, 88:13, 88:21, 93:10,
94:7, 96:1, 98:7, 99:3,
105:12, 106:18, 108:20,
125:19, 126:25, 143:15,
144:20, 153:25, 157:6,
157:7, 163:3, 175:16,
179:13, 185:17, 186:17,
195:10, 196:1, 218:13,
220:17, 221:5, 222:20,
222:23, 223:6, 223:7, 225:5,
230:16, 232:1, 235:15,
237:16, 238:4
   **Peek's** [5] - 34:11, 64:21,
97:25, 170:9, 227:8
   **Pelcher** [1] - 162:17
   **Pelchin** [17] - 61:2, 61:5,
61:6, 61:15, 62:7, 62:18,
62:20, 62:21, 62:22, 156:14,
156:19, 156:21, 156:24,
157:13, 162:17, 162:23,
227:1

   **pending** [2] - 5:13, 6:9
   **people** [14] - 84:25, 85:5,
97:24, 99:14, 101:9, 101:22,
112:10, 112:14, 147:11,
147:14, 207:19, 224:21,
224:22
   **people's** [1] - 109:21
   **perceives** [1] - 34:25
   **percent** [3] - 63:5, 63:12,
135:16
   **percentage** [1] - 63:18
   **percipient** [5] - 160:11,
160:13, 160:15, 160:18,
161:16
   **Perez** [11] - 78:3, 78:10,
79:8, 84:3, 91:24, 94:16,
99:11, 101:12, 105:24,
106:3, 112:12
   **Perez's** [1] - 105:2
   **perform** [25] - 80:22, 81:7,
83:1, 83:12, 84:2, 89:4, 89:6,
89:10, 90:10, 90:14, 91:4,
97:9, 97:13, 98:6, 99:10,
99:18, 100:6, 100:10,
101:25, 102:15, 108:17,
128:25, 148:2, 160:17,
161:13
   **performed** [21] - 7:11, 12:2,
81:1, 82:8, 86:1, 90:1, 96:15,
98:2, 99:19, 102:22, 110:21,
111:11, 117:7, 117:23,
128:19, 128:20, 131:6,
133:18, 147:18, 154:16,
160:12
   **performing** [7] - 81:2,
97:18, 99:8, 108:9, 109:4,
147:1, 147:15
   **performs** [1] - 105:24
   **perhaps** [13] - 10:12, 13:13,
31:3, 48:7, 59:5, 87:21, 98:1,
136:17, 136:19, 143:19,
150:17, 151:13, 233:12
   **period** [15] - 41:20, 42:7,
44:19, 49:11, 49:12, 73:18,
85:2, 85:5, 88:7, 91:13,
91:14, 97:21, 98:17, 112:20,
162:10
   **periodic** [1] - 85:1
   **periodically** [1] - 98:7
   **permitted** [2] - 91:19, 127:3
   **person** [9] - 58:13, 83:4,
84:9, 84:10, 84:16, 116:18,
222:14, 225:2, 230:24
   **person's** [1] - 108:3
   **personal** [1] - 108:5
   **personally** [1] - 118:21
   **phone** [2] - 178:11, 188:23
   **phonetic** [1] - 79:14
   **phonetic)** [1] - 61:5
   **photocopied** [4] - 70:21,

74:17, 75:6, 76:16
   **photocopies** [4] - 32:21,
32:22, 34:16, 76:16
   **photocopy** [6] - 75:13,
75:15, 75:16, 76:18, 76:19
   **photographed** [2] - 19:8,
50:23
   **photographing** [1] - 19:4
   **photographs** [12] - 9:11,
9:12, 14:20, 14:23, 16:21,
18:22, 18:25, 38:10, 72:18,
72:20, 72:21, 74:6
   **photos** [6] - 12:7, 15:21,
15:24, 16:4, 108:5, 135:17
   **Photos** [1] - 10:4
   **physical** [6] - 28:20, 43:2,
59:22, 175:17, 175:23
   **Physically** [1] - 141:10
   **physically** [2] - 30:8,
175:18
   **pick** [2] - 7:11, 44:25
   **picked** [3] - 19:9, 176:15,
237:6
   **picture** [3] - 17:10, 17:12,
72:3
   **pictures** [3] - 16:5, 72:2,
77:14
   **piece** [1] - 58:23
   **pieces** [1] - 26:10
   **pin** [2] - 121:4, 233:25
   **pinpoint** [1] - 123:25
   **place** [12] - 9:21, 28:21,
56:2, 58:16, 59:15, 82:25,
158:4, 158:5, 169:12,
195:22, 225:17
   **placed** [1] - 57:3
   **places** [5] - 29:4, 29:7,
31:14, 59:3
   **Plaintiff** [1] - 14:9
   **plaintiff** [2] - 2:8, 179:6
   **Plaintiff's** [1] - 199:16
   **Plaintiffs** [1] - 1:5
   **plane** [8] - 12:1, 22:20,
23:7, 25:17, 30:8, 30:9, 40:9
   **planned** [3] - 222:21,
222:25, 223:9
   **plans** [2] - 231:12, 232:1
   **playing** [1] - 105:19
   **pleading** [1] - 138:18
   **pleadings** [4] - 5:7, 5:10,
5:12, 63:3
   **plenty** [1] - 138:17
   **plus** [2] - 74:20, 118:12
   **Point** [52] - 18:7, 18:9,
24:21, 26:1, 26:3, 26:4,
27:13, 27:15, 27:16, 27:23,
27:24, 29:11, 29:12, 29:16,
29:23, 30:14, 30:19, 31:7,
31:10, 37:24, 38:2, 38:5,
39:1, 39:3, 39:14, 39:18,

39:21, 39:24, 40:18, 40:21,
41:14, 41:22, 42:1, 42:12,
42:19, 43:13, 43:22, 44:7,
44:13, 45:2, 45:11, 45:19,
46:12, 46:15, 46:25, 47:18,
47:20, 47:24, 48:16, 48:18,
49:2, 53:22
   **point** [25] - 6:14, 26:1, 29:1,
29:4, 33:22, 34:7, 42:3, 42:4,
43:17, 43:23, 69:10, 69:11,
69:21, 69:22, 72:8, 85:4,
88:4, 88:10, 88:11, 101:15,
102:4, 102:9, 141:9, 227:13
   **pointed** [1] - 12:18
   **points** [1] - 92:7
   **poll** [1] - 218:1
   **pool** [1] - 8:9
   **pops** [1] - 204:17
   **Porcupine** [8] - 23:19,
35:19, 35:25, 36:5, 36:6,
37:3, 54:10, 54:11
   **portion** [6] - 24:17, 24:18,
24:19, 24:20, 25:17, 38:21
   **Portland** [1] - 57:19
   **posed** [1] - 106:18
   **position** [14] - 3:19, 33:25,
64:3, 64:4, 64:7, 64:9,
105:12, 139:11, 140:15,
141:14, 144:8, 161:3, 180:1,
183:12
   **positions** [2] - 66:13,
181:18
   **possession** [17] - 22:19,
62:17, 65:9, 86:12, 87:25,
152:23, 154:22, 154:23,
155:6, 155:10, 155:19,
183:5, 192:13, 193:20,
213:17, 216:24, 217:2
   **possibilities** [1] - 53:16
   **possible** [5] - 53:15, 141:7,
145:13, 193:22, 231:13
   **possibly** [2] - 7:6, 236:7
   **post** [1] - 203:1
   **post-2002** [1] - 147:15
   **post-2003** [1] - 164:6
   **power** [1] - 231:20
   **practice** [6] - 5:24, 73:5,
88:15, 88:22, 96:2, 214:8
   **pre** [3] - 12:15, 202:25,
203:9
   **Pre-2002** [1] - 94:25
   **pre-2002** [9] - 96:16, 98:3,
98:8, 100:2, 103:2, 104:5,
104:17, 110:21, 112:21
   **pre-November** [2] - 202:25,
203:9
   **pre-September** [1] - 12:15
   **precipitated** [1] - 65:25
   **precipitating** [1] - 7:22
   **precise** [1] - 87:22

**precisely** [1] - 56:23
**prejudice** [1] - 8:9
**prejudicial** [2] - 5:13, 65:16
**preliminarily** [1] - 100:23
**preliminary** [5] - 3:1, 5:6, 68:20, 68:22, 154:13
**premise** [1] - 129:14
**prepared** [13] - 4:19, 6:5, 6:15, 12:19, 56:7, 56:16, 65:12, 67:20, 88:2, 137:21, 138:19, 138:20, 159:20
**preparing** [1] - 223:20
**presence** [1] - 19:13
**Present** [4] - 2:8, 2:10, 2:12, 2:14
**present** [9] - 19:13, 19:16, 19:18, 47:13, 47:15, 161:15, 189:25, 190:9
**preserve** [12] - 19:5, 51:16, 51:18, 51:21, 52:1, 52:4, 52:14, 64:15, 72:11, 72:12, 72:15, 72:25
**preserved** [5] - 19:1, 50:23, 51:11, 52:13, 65:3
**presided** [1] - 68:1
**presume** [5] - 12:23, 116:23, 124:6, 129:11, 225:1
**presumed** [1] - 164:18
**pretty** [1] - 216:4
**previous** [1] - 206:21
**previously** [5] - 14:10, 68:21, 109:6, 173:17, 173:19
**print** [1] - 16:23
**printed** [5] - 170:21, 170:24, 170:25, 171:1, 171:2
**Printed** [1] - 170:22
**priorities** [2] - 223:20, 223:21
**private** [5] - 19:22, 20:17, 21:2, 21:9, 21:11
**privilege** [37] - 54:14, 56:22, 57:22, 57:24, 58:7, 58:10, 58:12, 58:18, 59:8, 59:20, 60:1, 60:18, 60:25, 136:11, 137:15, 150:23, 153:6, 153:7, 153:9, 156:12, 157:19, 157:20, 157:22, 158:2, 158:9, 159:2, 159:6, 159:19, 160:6, 160:16, 174:7, 174:14, 174:19, 175:11, 195:18, 197:11, 201:19
**privileged** [5] - 151:3, 154:8, 157:17, 159:25, 176:2
**privy** [1] - 93:23
**Pro** [14] - 5:20, 49:22, 50:8, 50:18, 50:20, 50:22, 51:6, 67:25, 68:7, 68:21, 149:11, 149:12, 150:10, 236:16
**Pro's** [11] - 47:5, 51:20,

52:3, 56:5, 64:1, 64:14, 64:25, 67:9, 67:22, 72:14, 236:23
**problem** [11] - 5:25, 64:22, 105:1, 105:2, 116:9, 143:14, 178:25, 179:5, 229:10, 231:20
**problems** [2] - 6:12, 35:3
**procedurally** [1] - 50:17
**procedure** [1] - 161:22
**procedures** [1] - 144:21
**Proceed** [1] - 117:15
**proceed** [19] - 4:15, 4:16, 7:7, 8:22, 8:23, 14:7, 35:12, 35:14, 66:7, 94:7, 116:4, 154:11, 159:10, 163:11, 181:19, 185:24, 227:7, 230:11, 235:16
**proceeding** [26] - 4:9, 5:12, 5:14, 6:21, 35:7, 50:3, 50:13, 50:14, 50:21, 61:20, 62:5, 68:2, 68:5, 120:11, 140:19, 140:20, 140:21, 157:21, 157:25, 160:18, 178:8, 230:5, 231:15, 231:18
**proceedings** [10] - 8:21, 51:6, 58:11, 64:4, 64:5, 66:14, 149:8, 149:10, 238:18
**process** [6] - 56:10, 75:12, 85:17, 134:9, 145:17, 231:2
**produce** [19] - 17:19, 32:1, 32:4, 34:16, 87:6, 93:8, 98:19, 111:15, 113:5, 136:13, 138:3, 139:5, 141:23, 144:13, 150:3, 152:10, 152:25, 160:9, 167:5, 168:17, 169:21, 169:22, 169:23, 173:8, 174:8, 175:4, 179:25, 182:15, 184:6, 184:11, 184:4, 185:15, 188:20, 197:9, 227:21, 230:2
**produced** [107] - 4:6, 32:3, 34:23, 34:24, 56:19, 65:10, 66:4, 67:16, 74:4, 76:22, 76:25, 77:1, 77:3, 77:5, 85:7, 85:23, 86:18, 86:21, 86:23, 87:10, 87:19, 87:24, 88:3, 93:14, 110:10, 111:1, 111:13, 111:18, 111:22, 113:8, 113:11, 113:13, 113:14, 113:21, 114:2, 114:3, 114:16, 114:19, 114:21, 118:17, 120:11, 121:8, 121:15, 124:2, 130:20, 132:23, 135:8, 135:11, 136:6, 137:18, 138:4, 138:6, 138:23, 138:25, 139:2, 139:8, 141:5, 141:7, 142:1, 142:7, 142:8,

142:11, 142:14, 142:18, 144:15, 146:17, 152:4, 154:4, 157:23, 159:20, 160:21, 160:25, 162:8, 162:13, 165:17, 167:8, 167:14, 167:23, 168:23, 168:24, 170:17, 174:1, 174:20, 174:25, 175:18, 176:16, 176:18, 176:19, 177:2, 182:15, 185:13, 192:9, 193:18, 194:5, 195:9, 196:5, 197:7, 198:4, 198:13, 198:15, 202:6, 202:8, 228:6, 229:22
**produces** [2] - 160:23, 175:6
**producing** [2] - 85:25, 144:21
**product** [6] - 107:24, 140:25, 141:2, 158:21, 160:6, 160:16
**production** [40] - 4:7, 18:2, 33:9, 34:21, 66:4, 77:10, 87:11, 88:1, 111:10, 135:20, 141:25, 142:2, 144:24, 145:5, 160:14, 160:17, 175:3, 175:17, 175:23, 181:12, 181:15, 186:2, 186:8, 187:3, 187:5, 188:4, 188:14, 189:11, 189:14, 193:24, 194:16, 194:20, 203:11, 221:11, 221:12, 224:9, 224:11, 227:25, 230:10, 230:25
**Production** [1] - 191:12
**productions** [2] - 4:22, 113:2
**Professional** [1] - 54:15
**proffer** [2] - 66:8, 153:17
**program** [5] - 83:17, 118:24, 118:25, 166:18, 213:5
**programers** [2] - 78:5, 78:11
**programmer** [2] - 79:22, 125:14
**programmers** [2] - 79:17, 79:19
**programming** [1] - 80:4
**programs** [6] - 83:18, 96:25, 97:1, 97:3, 97:5, 104:14
**prohibited** [1] - 67:11
**promised** [1] - 180:23
**promptly** [1] - 191:2
**proper** [1] - 11:12
**properly** [1] - 65:3
**property** [42] - 20:23, 21:3, 21:6, 21:16, 22:6, 23:9, 23:16, 23:17, 24:15, 25:23,

27:12, 27:24, 37:2, 37:11, 38:4, 43:8, 44:18, 50:19, 51:1, 53:25, 55:16, 56:2, 57:3, 57:10, 57:11, 57:14, 58:16, 63:6, 67:13, 69:6, 69:13, 69:16, 69:17, 70:20, 70:25, 71:8, 73:13, 74:25, 75:5, 149:13
**proposal** [1] - 221:8
**proposals** [1] - 235:18
**propose** [3] - 215:13, 215:18, 215:24
**proposed** [3] - 52:25, 53:3
**protect** [6] - 19:5, 19:7, 47:3, 49:15, 72:25, 158:10
**protected** [4] - 50:24, 51:11, 158:17, 158:18
**protective** [4] - 91:20, 106:19, 106:22, 184:22
**provide** [16] - 3:25, 13:2, 93:6, 141:11, 144:13, 152:16, 158:25, 168:12, 174:3, 178:11, 189:21, 190:3, 196:22, 196:25, 200:7, 215:9
**provided** [25] - 9:12, 32:4, 70:22, 127:22, 142:3, 173:8, 180:7, 181:3, 189:22, 193:4, 193:5, 194:6, 195:6, 197:12, 197:20, 198:16, 199:5, 199:23, 200:2, 201:21, 203:12, 218:3, 218:9, 218:11, 218:14
**prudent** [1] - 92:3
**PST** [96] - 110:3, 110:4, 110:5, 110:9, 110:17, 110:23, 111:8, 111:12, 111:15, 112:5, 112:6, 112:16, 112:22, 113:3, 113:20, 114:2, 114:16, 136:6, 136:14, 136:22, 137:3, 137:8, 137:17, 138:1, 138:4, 138:8, 138:22, 138:25, 139:1, 139:25, 141:5, 141:11, 141:16, 142:1, 142:18, 143:5, 143:14, 143:23, 145:25, 146:2, 146:4, 146:16, 148:8, 148:13, 148:20, 148:21, 149:22, 149:23, 151:10, 152:1, 152:22, 153:17, 154:3, 154:21, 155:7, 155:20, 156:25, 157:14, 159:20, 161:5, 161:21, 163:18, 163:22, 164:4, 164:21, 165:5, 165:19, 167:2, 169:7, 171:8, 171:24, 180:25, 183:2, 183:6, 183:9, 183:17, 183:20, 184:1, 184:3, 185:4, 185:15,

192:21, 193:5, 193:14,
194:5, 204:20, 204:22,
213:1, 213:16, 213:19,
227:12, 228:5, 228:6,
229:12, 229:22

**PSTs** [2] - 113:16, 209:20

**public** [5] - 36:6, 37:10,
62:9, 178:7, 180:20

**published** [1] - 7:13

**pull** [2] - 215:8, 216:9

**Pulver** [2] - 19:13, 21:8

**purchased** [2] - 122:23,
123:7

**pure** [2] - 105:20, 105:23

**purely** [1] - 126:10

**purport** [1] - 200:21

**purported** [2] - 87:10,
180:15

**purports** [1] - 206:25

**purpose** [3] - 82:1, 82:4,
107:5

**purposes** [4] - 21:23, 55:5,
65:24, 181:14

**Pursuant** [1] - 201:14

**pursuant** [9] - 2:18, 4:6,
65:10, 141:6, 157:23,
185:11, 185:12, 201:8,
218:20

**put** [85] - 22:7, 23:13,
23:22, 24:3, 24:15, 24:18,
24:25, 25:4, 25:19, 26:20,
26:25, 27:4, 27:12, 27:13,
27:20, 27:24, 29:4, 29:8,
29:11, 29:15, 29:18, 30:8,
37:3, 37:14, 39:3, 39:7,
39:14, 39:20, 39:22, 40:3,
40:9, 40:11, 40:21, 41:10,
41:25, 42:15, 42:16, 42:18,
44:3, 44:9, 45:1, 45:11,
46:16, 47:7, 47:18, 48:8,
48:12, 49:6, 53:13, 53:19,
53:23, 53:24, 55:11, 64:12,
69:18, 70:1, 76:17, 94:18,
94:21, 121:20, 131:1,
143:13, 167:22, 171:14,
173:20, 177:18, 182:17,
204:18, 205:22, 209:9,
211:14, 211:24, 213:1,
213:16, 215:18, 224:10,
234:20, 234:21

**puts** [1] - 131:2

**putting** [2] - 69:17, 101:5

## Q

**questioned** [3] - 175:19,
219:20, 220:4

**questioning** [15] - 34:11,

34:20, 52:3, 65:17, 67:18,
73:12, 99:3, 105:11, 127:24,
143:9, 145:16, 159:1,
161:19, 163:4, 163:12

**questions** [45] - 11:13,
21:21, 35:13, 54:17, 56:2,
56:8, 56:21, 65:20, 68:25,
84:24, 88:14, 100:23,
113:15, 123:5, 123:6, 123:8,
123:18, 123:20, 124:22,
125:3, 127:2, 127:4, 127:6,
127:25, 145:2, 146:19,
151:1, 154:7, 154:13, 161:1,
162:12, 174:24, 175:9,
175:16, 175:21, 175:23,
196:13, 202:15, 219:14,
227:15, 228:7, 230:21, 231:1

**quick** [2] - 66:8, 213:24

**quicker** [2] - 29:3, 70:12

**quickly** [5] - 51:5, 62:11,
123:25, 216:4, 223:22

**quite** [3] - 11:12, 34:10,
56:6

**quote** [1] - 141:20

## R

**raid** [4] - 72:1, 155:11,
171:19, 183:16

**raided** [18] - 27:11, 28:7,
28:13, 29:25, 30:11, 31:11,
37:18, 39:5, 40:24, 41:2,
42:9, 44:25, 45:7, 45:14,
47:9, 47:22, 48:1, 183:7

**raise** [4] - 5:14, 138:16,
138:18, 191:2

**raised** [4] - 56:23, 93:24,
149:9, 151:14

**raising** [1] - 68:25

**ran** [2] - 132:8, 147:18

**Rancho** [49] - 16:11, 18:13,
21:12, 21:13, 22:11, 23:17,
24:14, 24:15, 30:19, 30:21,
31:4, 31:5, 31:6, 31:9, 31:21,
35:21, 35:25, 36:4, 36:13,
36:16, 36:23, 37:9, 38:1,
38:18, 38:23, 39:14, 39:18,
39:23, 40:3, 40:10, 40:11,
41:6, 41:14, 41:15, 41:23,
42:1, 42:12, 43:1, 43:22,
44:7, 44:12, 44:24, 45:8,
45:19, 46:12, 46:15, 46:25,
47:24, 53:22

**randomly** [2] - 110:22,
112:20

**RAPHAEL** [1] - 1:20

**Raphael** [1] - 2:15

**rather** [5] - 138:16, 141:15,
202:23, 235:14, 237:9

**re** [1] - 208:21

**reach** [6] - 13:14, 14:1,
105:16, 162:25, 225:24,
226:25

**reached** [1] - 143:24

**react** [1] - 104:15

**read** [32] - 8:16, 14:25,
15:1, 15:2, 15:4, 16:8, 16:21,
17:2, 17:11, 20:4, 68:19,
76:4, 76:6, 76:8, 76:10,
76:14, 94:11, 94:12, 184:5,
186:14, 188:14, 189:5,
189:7, 189:9, 190:1, 191:15,
201:4, 201:5, 201:6, 203:10,
212:8, 222:8

**Read** [2] - 188:18, 189:16

**reading** [5] - 17:4, 17:7,
181:7, 186:15

**ready** [4] - 4:15, 4:16, 7:7,
8:23, 8:24, 12:9

**real** [2] - 122:4, 162:14

**Realistically** [1] - 237:8

**really** [15] - 8:17, 11:11,
13:6, 52:5, 62:22, 66:11,
66:14, 108:4, 128:19, 137:3,
158:2, 158:5, 160:19, 162:6,
218:24

**reason** [23] - 4:20, 7:18,
11:11, 18:24, 46:6, 46:8,
46:11, 72:4, 85:25, 91:10,
95:13, 107:6, 107:21, 108:1,
127:19, 137:24, 138:8,
152:24, 160:5, 160:25,
172:5, 212:1, 227:25

**reasonable** [1] - 184:10

**reasons** [2] - 6:2, 230:1

**rebut** [1] - 137:22

**rebuttal** [1] - 234:16

**recalled** [1] - 14:9

**recap** [1] - 8:17

**receive** [2] - 4:4, 4:18

**received** [7] - 7:1, 60:16,
138:13, 174:25, 197:5,
201:2, 221:3

**recent** [3] - 9:6, 32:12,
172:14

**recently** [7] - 7:10, 7:11,
72:2, 72:21, 73:20, 73:21,
165:18

**recently-discovered** [1] -
7:10

**recently-performed** [1] -
7:11

**recess** [20] - 13:13, 14:1,
60:6, 60:10, 60:11, 112:2,
115:15, 115:17, 116:5,
162:22, 163:3, 163:10,
169:10, 178:2, 178:16,
178:18, 214:2, 214:3,
226:23, 232:22

**recognize** [5] - 35:5,
179:22, 179:25, 181:25,
199:20

**recollection** [1] - 220:6

**reconvene** [3] - 60:8,
178:16, 227:9

**record** [31] - 4:3, 9:22, 10:1,
46:22, 52:12, 52:23, 54:16,
62:9, 68:9, 68:19, 92:1, 92:2,
94:2, 94:3, 106:9, 106:10,
145:20, 162:8, 179:24,
181:18, 182:11, 185:14,
188:5, 215:19, 217:14,
217:21, 220:8, 226:8,
234:25, 238:18

**recording** [1] - 104:23

**records** [1] - 202:5

**recount** [1] - 149:17

**recovery** [5] - 107:2, 107:9,
107:10, 107:16, 107:20

**recreated** [1] - 177:18

**redacted** [1] - 216:16

**redactions** [1] - 215:9

**redirect** [1] - 234:7

**reducing** [1] - 13:15

**refer** [3] - 141:18, 142:5,
201:18

**reference** [1] - 208:13

**referred** [1] - 230:24

**referring** [6] - 10:2, 116:25,
117:16, 117:19, 133:13,
198:10

**refers** [1] - 190:7

**reflect** [4] - 92:2, 94:3, 98:6,
106:10

**reflecting** [1] - 235:1

**regard** [6] - 60:16, 137:16,
137:23, 150:22, 175:16,
180:1

**regarding** [2] - 151:1,
189:24

**Regarding** [2] - 10:4,
189:15

**regular** [7] - 89:10, 89:17,
89:18, 90:14, 108:9, 108:17,
109:4

**regularity** [2] - 96:19, 98:7

**relate** [4] - 9:16, 11:15,
11:25, 140:18

**RELATED** [1] - 1:11

**related** [5] - 5:11, 68:1,
140:21, 160:17, 166:13

**relates** [4] - 12:1, 65:23,
189:6, 190:7

**relating** [2] - 67:20, 201:17

**Relationship** [1] - 89:13

**relationship** [3] - 12:3,
89:14, 140:19

**relevance** [8] - 22:13,
61:20, 80:5, 80:7, 80:8,

107:3, 149:7, 194:11
**relevant** [16] - 32:9, 34:20, 34:24, 35:14, 85:6, 88:16, 97:24, 98:17, 105:17, 124:25, 127:2, 127:20, 144:16, 145:7, 180:3, 196:4
**relief** [1] - 11:10
**relieve** [2] - 149:25, 229:6
**relieved** [4] - 228:14, 228:24, 229:1, 229:4
**rely** [1] - 130:3
**relying** [1] - 52:2
**remain** [2] - 23:9, 178:8
**remained** [6] - 24:19, 24:20, 43:1, 118:20, 119:4, 216:17
**remaining** [3] - 30:3, 74:5, 193:19
**remember** [69] - 17:15, 17:17, 19:1, 19:3, 19:7, 36:10, 45:15, 46:20, 47:4, 47:5, 47:15, 48:15, 49:8, 53:12, 63:7, 63:8, 63:15, 71:17, 71:18, 76:23, 77:12, 77:14, 77:19, 78:1, 78:7, 78:8, 78:20, 79:6, 82:14, 88:20, 101:22, 103:21, 108:25, 114:10, 115:3, 119:22, 121:3, 121:4, 121:11, 122:2, 124:10, 124:11, 124:15, 124:17, 129:2, 130:1, 130:3, 130:5, 130:14, 133:4, 133:7, 148:25, 156:4, 156:5, 156:7, 156:9, 156:10, 171:4, 171:23, 172:2, 172:3, 172:10, 172:24, 173:4, 173:5, 200:15, 201:24
**reminded** [1] - 214:6
**reminding** [1] - 208:7
**removing** [1] - 216:15
**Reno** [8] - 1:7, 1:23, 5:9, 18:5, 22:11, 154:18, 154:19, 203:5
**RENO** [2] - 2:1, 116:1
**rental** [2] - 23:10, 37:3
**rented** [2] - 22:4, 22:5
**repeatedly** [1] - 198:18
**rephrase** [1] - 96:12
**replete** [1] - 202:19
**reply** [1] - 126:17
**report** [3] - 190:17, 222:15, 226:22
**Reported** [1] - 1:22
**reported** [2] - 86:15, 180:22
**reporter** [4] - 60:6, 94:12, 190:4, 190:5
**Reporter** [4] - 1:22, 94:10, 219:8, 238:21
**reporters** [2] - 142:4, 190:7

**represent** [1] - 130:16
**representation** [5] - 62:9, 86:22, 87:22, 196:2, 214:12
**representations** [1] - 214:5
**represented** [2] - 64:25, 200:1
**representing** [2] - 33:21, 160:22
**represents** [1] - 61:17
**reproduce** [2] - 227:12, 227:13
**reproduced** [2] - 15:22, 75:2
**reputable** [1] - 139:24
**Request** [1] - 189:11
**request** [53] - 4:7, 4:25, 6:24, 7:23, 9:15, 18:2, 18:19, 32:10, 50:22, 56:24, 72:19, 77:10, 87:4, 91:16, 94:13, 94:14, 106:17, 135:20, 135:24, 139:2, 141:13, 145:8, 145:20, 168:18, 168:19, 173:7, 181:12, 184:16, 185:3, 186:1, 186:8, 186:20, 187:3, 187:8, 187:9, 188:3, 188:14, 189:6, 189:14, 189:15, 189:16, 190:1, 194:3, 199:24, 201:22, 221:10, 228:16, 231:10, 235:19, 237:13
**requested** [7] - 9:7, 54:23, 54:25, 71:24, 168:22, 229:24, 237:18
**requesting** [2] - 7:2, 229:25
**requests** [15] - 66:4, 72:16, 87:3, 87:4, 87:11, 127:23, 135:25, 184:16, 184:19, 185:7, 186:15, 187:4, 187:5, 187:18, 191:14
**Requests** [1] - 191:10
**required** [9] - 4:6, 49:20, 50:5, 111:10, 114:20, 157:23, 168:22, 169:22, 184:6
**requirement** [1] - 170:4
**requires** [3] - 157:3, 157:9, 185:4
**resent** [1] - 138:10
**reserve** [3] - 170:14, 221:19, 221:22
**residence** [2] - 31:7, 34:18
**resolution** [1] - 230:7
**respect** [21] - 19:4, 65:4, 66:9, 66:21, 70:19, 85:4, 106:23, 108:8, 134:14, 134:23, 137:9, 142:2, 154:15, 160:13, 169:23, 170:16, 180:2, 192:11, 234:4, 234:9
**respectfully** [3] - 85:20,

93:3, 158:2
**Respectfully** [1] - 32:14
**respects** [1] - 66:25
**respond** [25] - 84:21, 113:2, 139:12, 140:3, 141:14, 141:15, 143:13, 143:17, 144:1, 145:8, 145:15, 151:6, 153:22, 174:23, 175:22, 180:11, 185:20, 185:22, 185:23, 207:18, 207:20, 221:14, 227:15, 234:20
**responded** [2] - 153:25, 223:22
**responding** [2] - 169:13, 173:7
**Response** [1] - 189:14
**response** [13] - 84:24, 93:9, 158:25, 168:18, 174:3, 174:25, 187:6, 187:17, 189:17, 222:19, 222:20, 223:3, 234:22
**responses** [4] - 77:9, 87:11, 151:1, 187:3
**Responsibility** [1] - 54:15
**responsibility** [6] - 71:6, 71:10, 71:11, 80:18, 80:20, 80:22
**responsible** [1] - 150:9
**responsive** [8] - 86:21, 127:22, 135:20, 135:24, 139:1, 199:24, 201:22, 229:23
**rest** [5] - 60:7, 73:22, 73:24, 74:1, 135:16
**Restate** [2] - 83:24, 192:19
**restate** [1] - 83:25
**restored** [1] - 132:15
**restrictions** [1] - 104:14
**restroom** [1] - 213:22
**result** [5] - 36:24, 133:13, 197:15, 197:19, 197:25
**results** [1] - 190:17
**resume** [1] - 116:10
**resumed** [2] - 94:4, 106:11
**RESUMED** [2] - 14:11, 116:13
**retained** [4] - 139:16, 139:18, 139:22, 140:24
**retaining** [1] - 198:19
**retilling** [1] - 124:24
**return** [2] - 21:25, 222:24
**returned** [24] - 18:14, 19:1, 20:23, 21:3, 22:7, 26:12, 33:1, 37:2, 41:3, 41:12, 44:18, 48:15, 50:19, 51:8, 57:11, 62:4, 67:4, 68:15, 69:10, 71:8, 72:5, 73:8, 73:12, 106:12
**returns** [1] - 223:6
**review** [8] - 4:18, 13:2,

52:5, 182:12, 182:16, 184:10, 219:12, 221:6
**Review** [1] - 203:2
**reviewable** [1] - 14:23
**reviewed** [5] - 12:21, 67:23, 167:22, 182:13, 221:23
**reviewing** [1] - 218:21
**revise** [1] - 236:12
**reword** [1] - 69:2
**rhyme** [2] - 172:5, 211:25
**rights** [1] - 85:17
**risk** [2] - 139:6, 153:13
**road** [3] - 184:9, 195:12, 199:3
**ROBB** [6] - 1:17, 217:20, 218:8, 220:20, 222:2, 238:7
**Robb** [5] - 2:11, 218:6, 220:19, 222:1, 238:6
**role** [1] - 128:5
**room** [7] - 23:14, 23:15, 23:22, 23:24, 24:3, 216:1, 218:2
**routine** [1] - 162:12
**rule** [4] - 6:6, 6:15, 12:19, 197:14
**Rule** [3] - 175:7, 185:11, 230:7
**ruled** [2] - 55:3, 96:5
**rules** [2] - 6:22, 230:6
**Rules** [1] - 54:15
**ruling** [4] - 5:15, 6:20, 6:21, 12:24
**run** [5] - 166:15, 170:5, 227:12, 227:16, 227:18

**S**

**safe** [2] - 94:18, 94:21
**sanctions** [11] - 54:21, 126:15, 126:16, 137:2, 137:25, 139:4, 139:7, 144:8, 161:25, 185:22
**sandbagged** [1] - 126:20
**sandbagging** [1] - 138:16
**Sandoval** [3] - 189:4, 217:21, 218:7
**sat** [1] - 64:18
**Saul** [4] - 61:2, 61:5, 61:6, 156:14
**save** [4] - 116:20, 116:21, 171:25
**saved** [12] - 171:6, 171:10, 171:13, 172:4, 172:11, 172:16, 172:18, 172:20, 173:17, 173:19, 177:9
**Saved** [1] - 171:11
**saves** [1] - 116:18
**saw** [3] - 7:13, 149:11, 210:8

**Scalia** [2] - 19:18, 21:8
**schedule** [6] - 223:1, 224:19, 225:1, 227:8, 236:12, 236:23
**scheduled** [1] - 191:1
**scheduling** [1] - 226:3
**SCHWARTZ** [8] - 1:17, 33:20, 33:24, 220:22, 222:4, 233:22, 234:2, 238:9
**Schwartz** [7] - 2:13, 33:20, 220:21, 222:3, 226:13, 233:22, 238:8
**scientist** [2] - 125:13, 208:6
**scope** [18] - 9:19, 34:4, 34:8, 34:11, 35:7, 65:7, 65:8, 66:7, 88:5, 88:6, 111:23, 126:21, 127:3, 137:16, 138:21, 143:10, 195:15
**search** [19] - 9:19, 17:23, 34:17, 38:10, 50:12, 56:25, 57:1, 62:5, 64:4, 64:5, 64:6, 68:1, 164:20, 166:15, 170:10, 193:23, 202:5, 202:13, 209:9
**Search** [1] - 10:4
**searchable** [2] - 135:11, 135:16
**searched** [1] - 18:4
**searches** [3] - 166:10, 166:17, 170:5
**searching** [1] - 193:25
**season** [2] - 156:9, 224:21
**seat** [1] - 217:24
**Seattle** [3] - 33:21, 195:23, 233:22
**Second** [1] - 191:10
**second** [10] - 87:4, 186:1, 186:8, 186:20, 187:8, 187:9, 187:17, 208:16, 221:10, 229:16
**seconds** [1] - 126:5
**secret** [11] - 63:21, 63:23, 101:3, 101:6, 101:7, 101:10, 101:14, 101:20, 101:25, 106:1, 106:3
**secrets** [2] - 164:8, 164:10
**section** [2] - 68:12, 191:18
**security** [3] - 105:13, 216:24, 235:9
**See** [1] - 75:22
**see** [65] - 3:5, 3:18, 8:4, 8:19, 12:12, 12:22, 13:24, 14:1, 16:18, 16:19, 17:13, 32:16, 47:17, 52:5, 62:11, 76:1, 76:2, 80:8, 96:12, 98:23, 110:17, 110:22, 112:15, 112:21, 112:25, 122:2, 129:22, 147:7, 163:10, 166:12, 166:15, 186:11, 186:13, 188:9,

191:20, 191:21, 191:23, 192:3, 192:5, 193:16, 203:3, 203:11, 203:22, 204:2, 204:4, 206:9, 206:15, 206:24, 206:25, 207:4, 208:15, 208:18, 208:20, 209:23, 210:5, 210:7, 210:8, 211:23, 226:19, 227:23, 230:25, 235:23
**seeing** [2] - 187:14, 199:12
**seeking** [1] - 126:16
**seem** [2] - 153:5, 162:12
**sees** [1] - 85:21
**segments** [1] - 25:24
**segregate** [10] - 24:25, 26:16, 26:21, 26:24, 27:1, 28:4, 49:9, 49:15, 49:19, 51:13
**segregated** [5] - 28:2, 37:20, 42:11, 72:6, 176:11
**segregating** [1] - 51:17
**segregation** [1] - 26:9
**segregations** [1] - 42:12
**seized** [50] - 21:16, 22:6, 25:23, 27:12, 29:12, 32:24, 33:4, 33:10, 34:17, 34:18, 35:3, 37:1, 37:10, 38:4, 40:10, 41:2, 41:11, 41:25, 46:14, 47:3, 47:7, 47:9, 48:8, 51:7, 53:25, 57:2, 57:10, 57:14, 58:16, 59:4, 59:16, 62:25, 63:6, 66:25, 67:4, 69:6, 69:13, 69:16, 69:17, 70:20, 70:25, 71:8, 72:5, 73:8, 74:25, 75:5, 77:2, 149:13, 167:16
**seizure** [1] - 64:6
**send** [3] - 168:13, 207:1, 215:24
**sends** [1] - 207:17
**sense** [5] - 66:5, 218:25, 230:9, 230:14, 230:25
**sensitive** [8] - 115:12, 164:25, 165:1, 165:11, 165:14, 166:11, 170:6, 184:11
**sent** [3] - 142:19, 169:11, 222:22
**sentence** [1] - 192:6
**separate** [9] - 26:25, 27:4, 28:13, 36:19, 41:17, 112:6, 112:15, 165:8, 170:7
**separated** [4] - 30:4, 41:22, 42:16, 165:13
**separately** [1] - 237:21
**separating** [4] - 8:16, 164:6, 164:24, 166:10
**September** [7] - 9:18, 12:11, 12:15, 47:1, 136:9, 148:10, 229:11

**sequentially** [1] - 10:14
**serial** [1] - 32:3
**serially** [1] - 10:8
**series** [9] - 2:21, 5:6, 6:10, 84:25, 127:6, 173:10, 173:14, 173:16, 181:11
**serious** [2] - 61:23, 141:15
**served** [2] - 79:21, 228:7
**server** [1] - 109:20
**servers** [1] - 109:20
**session** [1] - 4:13
**set** [15] - 2:4, 4:7, 6:25, 36:19, 125:16, 126:15, 187:4, 187:5, 187:17, 218:25, 222:14, 223:15, 225:4, 236:24, 237:8
**Set** [1] - 191:10
**setting** [2] - 101:23, 216:6
**settle** [1] - 236:3
**seven** [1] - 233:15
**Several** [1] - 14:25
**several** [3] - 3:2, 145:11, 215:11
**shadow** [1] - 140:10
**shaking** [1] - 184:23
**shall** [3] - 13:24, 141:23, 142:1
**share** [1] - 68:16
**sheet** [4] - 51:3, 51:5, 202:2, 202:10
**shell** [2] - 151:17, 154:1
**shells** [1] - 151:18
**shield** [1] - 153:11
**shipped** [1] - 44:12
**Shore** [1] - 36:12
**short** [1] - 228:1
**shorthand** [1] - 68:4
**shortly** [1] - 178:17
**shortness** [1] - 161:2
**SHOW** [1] - 1:13
**show** [21] - 2:5, 2:19, 3:8, 33:17, 34:10, 34:14, 65:24, 75:18, 115:7, 125:20, 126:13, 127:20, 135:6, 141:17, 141:21, 144:5, 144:9, 152:18, 181:10, 202:24, 235:16
**showed** [2] - 77:14, 129:19
**shown** [5] - 3:16, 3:22, 132:11, 134:10, 187:19
**shows** [9] - 132:8, 132:12, 132:14, 132:18, 134:2, 134:16, 134:17, 135:3, 135:4
**sic** [3] - 33:19, 36:12, 188:23
**side** [4] - 22:12, 188:8, 224:7
**sidebar** [6] - 214:14, 214:18, 214:20, 216:21, 216:23, 218:20

**sides** [1] - 224:11
**significant** [1] - 85:23
**significantly** [1] - 87:9
**similar** [7] - 13:17, 13:19, 27:13, 101:25, 158:17, 161:10, 174:15
**simple** [6] - 11:12, 53:17, 55:9, 98:12, 108:18, 177:6
**simpler** [1] - 199:2
**simply** [5] - 12:18, 68:4, 86:11, 162:12, 231:23
**Simultaneous** [1] - 216:14
**simultaneously** [1] - 126:9
**single** [7] - 72:3, 91:1, 93:8, 119:18, 152:11, 185:15, 209:7
**sit** [3] - 126:8, 136:3, 167:1
**sitting** [1] - 130:14
**Sitting** [1] - 136:4
**six** [18] - 43:13, 43:20, 43:24, 44:3, 44:10, 44:21, 45:11, 45:17, 45:22, 45:25, 49:4, 49:6, 49:13, 53:9, 53:14, 85:3
**slippery** [1] - 56:20
**Sloan** [1] - 78:4, 78:11, 79:20, 79:21, 84:4, 99:11, 101:12, 101:17, 101:24, 112:12, 165:10
**slope** [1] - 56:20
**small** [1] - 15:20
**smart** [1] - 132:1
**SNYDER** [1] - 1:17
**Snyder** [3] - 2:11, 214:6, 225:7
**so-called** [1] - 90:1
**sold** [1] - 126:3
**solution** [1] - 228:5
**solve** [1] - 136:16
**someone** [6] - 62:6, 71:24, 139:21, 162:17, 163:10, 221:7
**someplace** [6] - 22:20, 23:4, 24:13, 46:22, 111:12, 183:3
**Sometime** [2] - 48:14, 69:10
**sometime** [10] - 41:16, 41:19, 44:17, 48:7, 49:2, 100:7, 103:5, 159:5, 223:5, 227:9
**Sometimes** [2] - 81:8, 81:20
**sometimes** [6] - 81:8, 81:20, 81:22, 100:4, 195:3, 195:4
**somewhere** [2] - 133:8, 166:21
**son** [1] - 57:19
**son's** [1] - 57:18

**soon** [1] - 74:19
**sorry** [25] - 16:3, 27:16, 27:17, 49:25, 54:24, 94:22, 99:4, 129:5, 137:13, 141:24, 155:5, 173:18, 177:22, 185:1, 189:3, 189:18, 192:19, 199:14, 215:25, 221:2, 229:5, 236:22
**Sorry** [3] - 30:7, 94:24, 210:19
**sort** [7] - 12:4, 26:8, 82:1, 123:18, 152:7, 172:11, 204:16
**source** [5] - 11:24, 11:25, 12:3, 54:18
**South** [1] - 1:23
**speaking** [3] - 52:24, 93:25, 145:10
**speaks** [1] - 200:24
**special** [1] - 224:22
**specific** [5] - 10:13, 67:10, 94:16, 108:16, 175:16
**specifically** [44] - 14:19, 15:12, 18:20, 25:15, 40:19, 41:19, 43:9, 44:20, 47:4, 49:14, 53:21, 62:24, 63:8, 63:15, 71:17, 78:1, 78:5, 78:7, 80:3, 89:7, 95:7, 102:7, 102:13, 103:4, 103:21, 104:21, 114:10, 114:15, 114:25, 118:15, 119:22, 130:3, 130:6, 130:14, 146:7, 146:12, 147:5, 155:8, 155:23, 156:4, 159:14, 166:9, 199:22, 209:18
**speech** [1] - 64:22
**speedy** [1] - 230:7
**spelled** [1] - 78:22
**spend** [1] - 52:10
**spending** [3] - 11:13, 22:23, 105:18
**spent** [2] - 6:9, 32:7
**spirit** [1] - 230:5
**spoken** [1] - 196:2
**spoliated** [1] - 57:6
**spoliation** [2] - 33:12, 51:22
**staff** [2] - 83:8, 218:17
**stamped** [1] - 9:12
**stand** [5] - 8:25, 9:2, 73:7, 94:4, 106:11
**standing** [1] - 65:4
**start** [15] - 12:9, 28:25, 30:7, 84:18, 120:16, 133:9, 179:2, 195:12, 207:6, 224:1, 224:11, 232:16, 232:17, 232:20, 232:22
**started** [9] - 89:19, 96:1, 126:7, 132:20, 133:10, 134:6, 134:23, 134:24,

193:12
**starting** [5] - 28:25, 29:1, 29:4, 88:10, 169:12
**starts** [5] - 10:6, 10:24, 10:25, 76:11, 207:17
**state** [10] - 40:12, 52:11, 106:3, 141:21, 157:7, 164:7, 164:10, 182:11, 226:8
**statement** [7] - 63:15, 68:10, 90:6, 104:10, 104:11, 180:18, 180:24
**statements** [1] - 180:20
**States** [6] - 65:23, 93:23, 94:6, 106:12, 152:23, 197:1, 221:5, 226:3
**states** [1] - 68:20
**States'** [1] - 106:19
**status** [4] - 9:7, 190:24, 222:12, 236:15
**stay** [9] - 6:25, 8:20, 14:13, 23:24, 48:14, 56:24, 117:8, 216:10, 226:20
**stayed** [2] - 6:21, 23:16
**step** [3] - 217:15, 217:16, 217:17
**Stephen** [1] - 2:10
**STEPHEN** [1] - 1:17
**steps** [1] - 69:12
**Steve** [1] - 203:6
**stick** [1] - 29:1
**still** [16] - 5:13, 41:1, 41:3, 42:8, 48:22, 83:5, 83:6, 83:10, 99:23, 100:12, 102:1, 138:2, 149:24, 163:20, 165:19, 183:12
**stipulate** [1] - 86:19
**stood** [2] - 64:18, 168:20
**stop** [8] - 23:7, 24:9, 24:12, 35:24, 36:13, 37:23, 40:20, 213:21
**stopped** [3] - 22:20, 23:4, 29:11
**stops** [1] - 40:20
**Storage** [2] - 18:9, 18:11
**storage** [47] - 24:14, 24:18, 24:23, 24:25, 25:1, 25:4, 25:19, 25:21, 26:6, 26:20, 26:22, 27:1, 27:7, 27:13, 27:16, 27:21, 28:21, 30:21, 31:11, 34:18, 35:21, 35:25, 36:3, 36:6, 36:7, 36:15, 36:16, 37:9, 37:10, 37:21, 38:1, 38:23, 41:15, 42:16, 43:4, 48:9, 48:13, 48:18, 48:19, 48:21, 48:25, 57:18, 63:21, 64:12, 154:18, 154:19, 155:12
**store** [3] - 40:10, 99:24, 102:3
**stored** [15] - 54:10, 55:8,

57:10, 57:14, 57:23, 58:16, 59:4, 59:16, 59:21, 63:13, 97:14, 100:14, 192:8, 192:22, 193:14
**straight** [1] - 93:10
**straightforward** [1] - 60:5
**Street** [25] - 1:23, 113:23, 114:4, 142:3, 142:12, 168:21, 169:23, 170:16, 173:23, 176:13, 180:19, 181:3, 182:19, 189:22, 190:5, 191:15, 192:12, 192:23, 193:4, 194:6, 194:17, 195:7, 200:7, 202:21, 211:2
**stricken** [2] - 54:16, 55:1
**string** [13] - 172:13, 204:23, 207:6, 207:9, 207:13, 207:17, 207:22, 207:25, 208:11, 208:24, 212:4, 212:11, 212:18
**structure** [1] - 133:4
**struggling** [2] - 160:19, 162:6
**stuff** [4] - 36:17, 38:8, 105:25, 178:3
**subfolder** [5] - 133:20, 134:3, 177:11, 177:16, 177:19
**subject** [41] - 4:5, 9:23, 11:12, 14:13, 21:5, 32:12, 51:24, 56:5, 56:6, 56:11, 56:15, 62:4, 65:15, 66:3, 68:20, 85:10, 85:12, 85:18, 98:15, 111:18, 119:25, 137:1, 137:23, 139:4, 139:6, 152:6, 159:1, 159:5, 172:18, 174:18, 210:13, 212:6, 212:10, 212:19, 214:7, 219:14, 219:22, 224:5, 224:15, 225:19, 231:19
**subjective** [1] - 38:10
**submission** [1] - 6:7
**submissions** [1] - 195:4
**submit** [4] - 9:8, 164:11, 164:16, 235:18
**submitted** [5] - 148:23, 149:1, 149:4, 180:5
**subpoena** [6] - 61:9, 61:18, 149:14, 150:4, 152:6, 231:19
**subpoenaed** [1] - 150:11
**subsequent** [1] - 222:23
**substance** [1] - 126:25
**substantive** [1] - 33:25
**substitute** [1] - 227:25
**substituting** [1] - 229:25
**subtext** [1] - 52:4
**success** [1] - 69:2
**sudden** [1] - 12:8
**Sue** [17] - 78:3, 78:10, 79:5,

79:8, 79:9, 84:3, 84:5, 91:23, 94:16, 99:10, 99:12, 101:11, 101:13, 105:2, 105:24, 106:3, 112:12
**Sue's** [1] - 83:6
**sufficient** [2] - 184:12, 237:14
**suggest** [1] - 216:8
**suggesting** [2] - 175:22, 183:8
**suitcase** [16] - 30:14, 39:7, 39:12, 39:15, 39:17, 39:20, 39:21, 40:3, 40:11, 40:12, 40:15, 40:21, 42:18, 44:15, 44:16, 45:1
**summary** [2] - 34:15, 123:22
**summer** [4] - 194:10, 223:1, 224:20, 224:22
**Sun** [3] - 203:2, 203:4, 203:6
**supplemental** [1] - 138:18
**supplemented** [1] - 194:19
**support** [1] - 56:14
**suppose** [1] - 62:10
**supposed** [4] - 74:14, 144:12, 144:14
**supposedly** [2] - 83:21, 134:15, 159:20
**surely** [1] - 208:25
**surprise** [1] - 135:15
**surrender** [1] - 217:12
**surrendered** [1] - 217:22
**suspect** [3] - 13:16, 68:5, 88:19
**sustain** [2] - 65:18, 128:8
**sustained** [2] - 115:14, 198:1
**Sustained** [2] - 132:4, 208:9
**sustaining** [1] - 73:9
**sword** [1] - 153:11
**sworn** [2] - 14:10, 195:3
**system** [9] - 83:15, 96:24, 97:6, 97:7, 97:16, 103:18, 103:21, 104:13, 128:5
**systems** [2] - 97:21, 106:21

**T**

**tab** [2] - 179:11, 188:2
**tabbed** [1] - 188:7
**tainted** [2] - 8:9, 8:10
**Tangible** [1] - 191:12
**tape** [6] - 117:24, 118:7, 120:6, 120:19, 131:2, 133:14
**tapes** [6] - 88:15, 119:2, 121:21, 122:19, 129:9, 129:11

**tarnish** [1] - 181:4
**task** [4] - 133:18, 160:12, 168:2, 170:11
**tasks** [4] - 99:20, 100:6, 105:25, 160:17
**technical** [1] - 125:14
**Technologies** [3] - 2:7, 187:18, 191:10
**TECHNOLOGIES** [1] - 1:7
**technology** [4] - 83:19, 125:15, 128:3, 208:5
**telephonically** [3] - 2:12, 51:3, 214:17
**television** [1] - 189:23
**temporary** [1] - 108:2
**terabyte** [21] - 87:8, 110:13, 110:14, 118:17, 121:7, 121:16, 122:22, 123:3, 126:3, 128:21, 129:9, 129:18, 130:7, 130:12, 130:17, 131:19, 132:7, 132:12, 134:11, 147:7, 167:15
**term** [1] - 208:2
**terms** [8] - 85:14, 88:20, 88:22, 106:18, 106:22, 150:18, 175:21, 235:19
**testified** [15] - 14:10, 20:9, 30:20, 32:17, 49:3, 55:13, 62:6, 84:24, 92:7, 98:5, 121:5, 122:5, 128:14, 147:1, 162:3
**testifies** [1] - 80:9
**testify** [9] - 60:15, 60:19, 62:10, 128:4, 145:6, 145:15, 161:13, 228:5, 228:8
**testifying** [2] - 200:6, 230:18
**testimony** [26] - 20:8, 22:17, 25:13, 27:18, 27:19, 56:9, 63:7, 63:23, 86:6, 109:17, 111:19, 122:24, 130:13, 131:11, 136:23, 137:2, 137:22, 155:16, 156:19, 156:24, 158:24, 195:25, 231:7, 232:6, 232:10, 234:21
**text** [19] - 168:22, 170:17, 170:20, 173:10, 173:13, 173:14, 173:16, 174:1, 176:8, 176:15, 177:9, 182:24, 204:11, 205:4, 205:20, 205:22, 209:2, 209:17, 213:1
**themselves** [1] - 36:20
**thereafter** [1] - 126:5
**therefore** [5] - 16:8, 37:20, 137:12, 137:14, 151:13
**they've** [8] - 32:3, 62:5, 62:6, 113:13, 138:17,

182:13, 228:15, 228:16
**They've** [1] - 8:15
**thinks** [1] - 185:17
**third** [2] - 208:19, 224:13
**Thirty** [1] - 211:22
**Thirty-four** [1] - 211:22
**three** [27] - 8:4, 14:18, 25:24, 26:9, 28:12, 28:17, 29:4, 29:7, 36:21, 37:10, 41:20, 42:6, 44:17, 45:6, 62:18, 116:5, 123:13, 133:1, 133:6, 141:5, 163:3, 163:10, 190:2, 206:24, 207:4, 233:12
**throughout** [1] - 66:14
**tier** [1] - 119:18
**timing** [3] - 122:17, 225:19, 233:25
**tired** [2] - 215:22, 218:24
**title** [4] - 80:2, 80:3, 191:8, 191:9
**TO** [1] - 1:13
**today** [61] - 2:25, 4:10, 4:11, 6:15, 7:18, 13:13, 25:12, 25:13, 33:19, 55:6, 56:15, 57:15, 61:20, 65:12, 67:19, 68:13, 73:24, 74:1, 74:11, 74:20, 85:10, 85:19, 92:22, 121:6, 122:2, 122:5, 126:19, 127:8, 136:3, 137:21, 141:14, 144:17, 145:1, 154:5, 157:1, 157:15, 158:1, 162:11, 165:15, 165:17, 167:1, 167:5, 167:6, 168:10, 179:23, 181:17, 182:1, 183:12, 183:23, 194:3, 195:14, 199:21, 200:6, 208:3, 208:5, 217:8, 226:16, 235:3, 235:14, 237:3, 238:15
**Today** [1] - 7:1
**today's** [3] - 5:16, 201:15, 223:20
**together** [2] - 42:1, 43:19
**tomorrow** [1] - 227:4
**Tony** [1] - 78:21
**took** [35] - 21:1, 22:6, 23:2, 24:3, 24:23, 25:3, 25:16, 25:17, 26:17, 28:17, 30:3, 30:9, 31:8, 36:18, 37:2, 39:11, 39:21, 40:2, 41:3, 41:22, 42:11, 45:25, 49:12, 64:3, 64:5, 64:7, 73:1, 95:18, 100:14, 134:25, 145:11, 164:5, 169:7, 195:22
**top** [22] - 63:21, 63:23, 101:3, 101:5, 101:6, 101:10, 101:14, 101:20, 105:13, 110:1, 172:14, 204:3, 204:23, 205:5, 205:11, 205:12, 205:15, 206:15,

206:22, 207:7, 210:10, 211:12
**topic** [1] - 226:4
**track** [1] - 145:10
**transcript** [5] - 20:5, 68:6, 121:25, 219:13, 238:18
**transfer** [4] - 93:1, 121:21, 128:20, 131:13
**transferred** [11] - 32:8, 88:4, 92:23, 128:12, 129:3, 129:8, 129:13, 130:11, 130:15, 131:12, 133:14
**transferring** [1] - 67:12
**transform** [1] - 64:23
**transmittal** [5] - 158:12, 202:1, 202:9, 202:10, 202:18
**transmitted** [2] - 138:8, 142:20
**transport** [1] - 45:17
**treated** [1] - 66:16
**treating** [2] - 34:4, 64:11
**Trepp** [33] - 82:2, 82:7, 84:3, 94:18, 94:21, 99:19, 99:23, 101:3, 101:6, 112:12, 142:5, 163:23, 163:24, 180:21, 180:22, 181:2, 181:4, 189:24, 190:8, 191:11, 191:12, 193:15, 193:16, 201:18, 206:25, 223:25, 224:3, 225:1, 232:8, 232:11, 234:12, 234:22, 234:23
**TREPP** [1] - 1:8
**Trepp's** [2] - 225:8, 231:11
**trial** [2] - 8:8, 224:1
**tribunal** [3] - 151:20, 151:21, 151:22
**tried** [4] - 46:2, 46:4, 47:6
**trip** [3] - 22:12, 44:22, 180:24
**true** [6] - 39:16, 113:4, 164:13, 175:2, 175:8, 207:1
**trunk** [2] - 23:21, 24:4
**Trust** [2] - 1:4, 2:20
**trust** [1] - 80:12
**truth** [2] - 56:25, 57:1
**try** [10] - 5:21, 31:18, 32:15, 32:16, 50:10, 96:12, 162:22, 185:18, 203:25, 227:3
**trying** [29] - 5:1, 13:10, 19:24, 22:14, 28:25, 29:10, 33:6, 50:17, 64:23, 84:12, 89:1, 91:23, 92:5, 96:9, 97:4, 98:7, 102:21, 113:2, 116:17, 120:2, 121:4, 122:2, 123:1, 125:3, 135:19, 163:6, 197:22, 230:8, 233:25
**Tuesday** [3] - 12:5, 236:12, 236:15
**turn** [8] - 61:25, 71:10,

71:16, 73:15, 73:19, 156:11
**turned** [10] - 51:1, 71:20, 71:23, 72:20, 74:3, 74:5, 149:13, 150:10, 152:8, 155:25
**turns** [1] - 218:24
**Twelve** [1] - 168:6
**Twenty** [3] - 189:8, 189:19, 190:2
**Twenty-three** [1] - 190:2
**Twenty-two** [2] - 189:8, 189:19
**two** [84] - 13:25, 14:18, 16:5, 18:3, 25:14, 29:8, 29:21, 29:22, 31:13, 33:9, 39:3, 39:4, 40:22, 41:11, 41:22, 42:6, 42:12, 42:16, 42:18, 43:3, 43:4, 43:19, 43:21, 44:6, 44:7, 44:17, 45:6, 49:7, 49:16, 53:11, 64:18, 70:8, 70:9, 76:22, 76:25, 81:13, 86:5, 87:7, 93:6, 110:17, 111:19, 117:16, 118:17, 120:11, 121:16, 121:22, 122:18, 123:11, 124:2, 124:8, 126:1, 130:6, 135:9, 135:16, 143:22, 146:19, 155:14, 161:17, 161:19, 164:8, 165:8, 167:14, 172:6, 172:7, 178:1, 183:1, 189:8, 189:19, 191:23, 206:5, 206:24, 215:8, 222:17, 222:18, 223:24, 225:19, 231:3, 231:9, 233:14, 233:16, 234:5, 234:10, 237:8
**Two** [2] - 180:12, 225:20
**type** [1] - 65:16
**types** [2] - 104:23, 106:21
**typical** [2] - 205:1, 205:2
**Tyson** [1] - 79:10

---

**U**

**U.S** [5] - 1:20, 149:5, 150:25, 200:17, 202:9
**ultimately** [4] - 45:8, 50:18, 75:9, 75:17
**unable** [4] - 14:17, 16:25, 17:1, 17:22
**unavailable** [1] - 226:9
**unaware** [2] - 133:9, 134:2
**unclear** [1] - 11:9
**Under** [1] - 208:12
**under** [14] - 6:7, 6:22, 14:4, 55:13, 68:15, 91:20, 106:1, 106:18, 149:25, 151:19, 175:7, 177:11, 200:6, 211:24
**underproduction** [1] -

111:4
**understood** [3] - 41:1, 99:19, 154:3
**undertaken** [1] - 77:22
**undertook** [3] - 12:1, 129:13, 160:17
**underway** [1] - 222:14
**unfair** [4] - 55:4, 56:9, 85:3, 105:11
**unfortunate** [2] - 7:22, 219:4
**Unfortunately** [1] - 162:23
**unfortunately** [1] - 7:13
**unit** [16] - 24:23, 24:25, 25:1, 25:4, 25:19, 25:21, 26:20, 26:22, 27:7, 30:21, 31:12, 34:18, 35:21, 36:15, 36:16, 48:9
**United** [9] - 65:22, 93:23, 94:6, 106:12, 106:19, 152:23, 197:1, 221:5, 226:3
**units** [3] - 43:4, 63:21, 64:12
**universe** [1] - 92:20
**unless** [6] - 62:12, 109:25, 140:9, 150:1, 178:6, 221:7
**Unless** [2] - 112:18, 112:19
**unlike** [1] - 180:4
**unloaded** [1] - 54:5
**unmitigated** [2] - 105:20, 105:23
**unnamed** [7] - 151:11, 151:12, 153:2, 162:16, 193:5, 193:6
**unpacked** [1] - 54:7
**unrelated** [1] - 135:17
**unsworn** [1] - 195:4
**untrue** [1] - 105:21
**unusual** [1] - 21:4
**up** [101] - 5:21, 7:11, 14:2, 19:9, 25:23, 42:21, 42:23, 42:24, 42:25, 43:10, 43:12, 44:25, 47:12, 47:20, 59:7, 73:7, 77:25, 78:4, 79:11, 80:21, 81:15, 81:18, 81:19, 82:3, 82:20, 82:21, 84:12, 84:13, 84:25, 85:13, 88:8, 88:15, 88:23, 89:22, 90:3, 95:14, 95:15, 95:19, 95:21, 96:22, 96:23, 97:2, 97:5, 97:19, 98:8, 98:17, 99:2, 99:7, 99:21, 99:23, 102:4, 102:8, 102:12, 102:23, 102:24, 103:25, 106:20, 107:18, 109:20, 109:23, 110:19, 111:7, 112:6, 116:8, 116:15, 116:16, 117:19, 117:25, 119:5, 119:16, 120:5, 123:19, 125:7, 125:22, 125:24, 126:11,

127:8, 128:5, 131:1, 131:17, 159:8, 159:16, 162:5, 168:20, 195:25, 204:17, 210:2, 214:11, 215:23, 216:4, 217:8, 221:7, 226:19, 228:21, 229:23, 230:4, 235:8
**Up** [2] - 73:20, 73:21
**up-to-date** [1] - 123:19
**urge** [1] - 5:1
**user** [4] - 116:19, 117:5, 118:1, 120:3
**uses** [1] - 116:18
**utility** [3] - 130:25, 131:16, 131:23

## V

**vacation** [6] - 162:23, 222:21, 222:24, 223:9, 224:21, 225:5
**vacationing** [1] - 227:1
**vacations** [1] - 222:25
**vague** [1] - 84:7
**validity** [2] - 136:25, 137:20
**various** [5] - 117:24, 169:8, 186:15, 195:3, 199:10
**varying** [8] - 210:12, 212:6, 212:10, 212:25, 213:1
**Vegas** [4] - 7:16, 203:4, 203:6, 224:1
**vehemently** [1] - 154:1
**Venables** [8] - 78:11, 80:16, 84:4, 99:11, 101:12, 108:8, 108:14, 109:4
**Venables'** [3] - 78:4, 108:17, 109:19
**vendor** [1] - 71:4
**venture** [1] - 233:7
**verbatim** [1] - 124:22
**versed** [1] - 8:2
**versions** [1] - 32:23
**versus** [8] - 2:6, 16:4, 24:23, 47:23, 69:17, 98:9, 126:8, 179:2
**via** [5] - 196:25, 197:1, 202:9
**view** [2] - 6:14, 127:2
**views** [1] - 233:9
**violate** [3] - 56:5, 56:10, 67:21
**violating** [1] - 153:8
**violation** [5] - 51:19, 51:20, 54:14, 228:20, 228:21
**Virginia** [1] - 1:23
**volume** [3] - 217:5, 217:10, 217:18
**volumes** [4] - 217:12, 217:22, 218:3, 218:9
**volunteer** [1] - 230:11

**vs** [1] - 1:6

## W

**wait** [2] - 93:24, 221:20
**Wait** [2] - 31:22, 236:20
**waiting** [3] - 8:24, 43:16, 92:25
**waived** [1] - 58:23
**waiver** [1] - 59:1
**waiving** [1] - 60:25
**wall** [1] - 215:21
**Wall** [24] - 113:22, 114:4, 142:3, 142:12, 168:21, 169:23, 170:16, 173:23, 176:13, 180:19, 181:3, 182:19, 189:22, 190:5, 191:15, 192:12, 192:22, 193:4, 194:6, 194:17, 195:7, 200:7, 202:21, 211:2
**wants** [9] - 32:15, 55:10, 56:12, 84:10, 85:21, 86:25, 185:21, 195:10, 196:1
**warrant** [4] - 9:19, 50:12, 62:5, 68:2
**WARREN** [1] - 1:8
**Warren** [18] - 78:10, 84:3, 90:7, 91:24, 94:16, 99:11, 101:3, 101:22, 101:23, 112:12, 159:16, 165:10, 180:22, 189:24, 191:11, 193:16, 206:25
**Warren's** [2] - 17:8, 78:3
**Washington** [24] - 24:21, 25:3, 25:4, 25:5, 25:10, 25:18, 27:22, 27:23, 30:4, 31:6, 31:9, 40:12, 41:18, 43:11, 148:23, 150:12, 156:17, 161:17, 162:22, 195:23, 215:9, 226:24, 229:21
**ways** [1] - 125:21
**wedge** [1] - 175:4
**Wednesday** [1] - 141:4
**week** [20] - 6:10, 8:6, 9:6, 92:13, 93:13, 224:2, 224:17, 225:2, 225:4, 225:8, 226:9, 228:6, 235:23, 235:25, 236:3, 236:9, 236:10, 236:11, 236:13
**week's** [2] - 222:12, 222:17
**weeks** [7] - 25:14, 64:18, 93:6, 143:22, 155:14, 164:8, 222:18
**weigh** [1] - 33:24
**welcome** [1] - 178:8
**Wells** [10] - 2:15, 52:17, 68:11, 68:13, 94:5, 215:25, 216:18, 225:24, 226:7,

238:12
**WELLS** [19] - 1:20, 52:18, 106:14, 106:16, 214:15, 214:25, 215:4, 215:6, 215:12, 215:16, 216:8, 216:15, 216:20, 217:1, 221:17, 225:25, 226:8, 235:6, 238:13
**whatsoever** [1] - 202:2
**whereabouts** [4] - 151:2, 151:10, 157:22
**Whoa** [1] - 94:20
**whoa** [1] - 94:20
**whole** [9] - 58:23, 81:21, 81:22, 84:25, 162:3, 162:7, 189:9, 193:17, 201:6
**Wilke** [28] - 190:5, 191:16, 192:12, 194:7, 194:9, 194:24, 194:25, 195:11, 195:13, 195:19, 195:21, 195:24, 196:3, 196:9, 197:5, 197:13, 197:17, 197:21, 200:7, 202:3, 202:6, 202:10, 202:25, 203:1, 203:9, 231:12, 231:15, 231:16
**Wilke's** [1] - 195:25
**Wilkie** [1] - 196:2
**willingness** [1] - 127:16
**wish** [3] - 35:7, 62:2, 229:17
**wished** [1] - 222:9
**wishes** [1] - 214:13
**WITNESS** [49] - 14:5, 15:12, 20:18, 20:21, 23:7, 30:23, 40:13, 58:21, 61:2, 61:15, 78:14, 78:16, 80:14, 91:21, 94:8, 94:14, 95:7, 96:11, 99:4, 100:19, 105:9, 105:21, 106:5, 109:2, 115:11, 117:16, 122:8, 128:17, 130:1, 130:9, 150:5, 167:13, 168:5, 170:12, 179:20, 187:25, 188:6, 188:10, 188:12, 191:5, 196:16, 199:17, 201:1, 201:6, 201:10, 203:16, 213:21, 217:15, 217:25
**witness** [19] - 3:16, 3:22, 8:25, 14:9, 30:20, 70:12, 72:10, 106:11, 125:5, 126:7, 160:15, 161:15, 161:16, 169:14, 187:20, 228:5, 231:13, 231:15, 232:14
**witness's** [1] - 127:14
**witnesses** [6] - 160:11, 231:11, 231:24, 232:7, 233:25, 237:18
**wondering** [2] - 18:3, 220:4
**word** [4] - 52:13, 89:12, 116:17, 207:25

27

**Word** [6] - 97:5, 97:8, 97:10, 97:12, 97:14, 116:21

**words** [6] - 116:20, 140:10, 172:9, 172:12, 176:1, 219:19

**worried** [2] - 108:2, 108:5

**wrap** [3] - 99:2, 107:18, 217:8

**wrapping** [1] - 216:4

**write** [1] - 118:25

**writing** [2] - 16:23, 17:3

**written** [3] - 143:3, 184:21, 224:5

**wrote** [2] - 30:10, 118:24

## Y

**Yarrow** [53] - 18:7, 18:9, 24:21, 26:1, 26:3, 26:4, 27:13, 27:15, 27:16, 27:23, 27:24, 29:11, 29:12, 29:16, 29:22, 30:14, 30:19, 31:7, 31:10, 37:24, 38:2, 38:5, 38:25, 39:3, 39:14, 39:18, 39:21, 39:24, 40:18, 40:20, 41:14, 41:21, 42:1, 42:11, 42:19, 43:12, 43:22, 44:7, 44:12, 45:2, 45:11, 45:19, 46:12, 46:15, 46:25, 47:18, 47:20, 47:24, 48:16, 48:18, 49:2, 53:22

**year** [8] - 85:5, 88:7, 89:1, 97:21, 124:5, 124:6, 156:7, 162:1

**years** [9] - 18:3, 85:3, 88:18, 98:14, 99:15, 133:25, 172:6, 172:7, 183:11

**yesterday** [3] - 5:24, 7:10, 7:16

**yesterday's** [1] - 5:9

**York** [1] - 190:6

**yourself** [3] - 15:2, 47:12, 200:4

## Z

**Zangara** [5] - 79:5, 79:9, 84:5, 99:12, 101:13

# EXHIBIT F

1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                           ---o0o---
3

4    DENNIS MONTGOMERY, ET AL.,    :  No. 3:06-cv-056-PMP-VPC
                                   :
5              Plaintiffs,         :  JUNE 10, 2008
                                   :
6         -vs-                     :  United States District Court
                                   :  400 S. Virginia Street
7    ETREPPID TECHNOLOGIES, ET     :  Reno, Nevada  89501
     AL.,                          :
8                                  :
               Defendants.         :
9    _____:

10

11

12             **TRANSCRIPT OF MOTION HEARING**
         **(Re:  Defendants' Motion for Order to Show Cause #634)**

13

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:       Deborah Klar
                              Tuneen Chisolm
16                            Mark Gunderson
                              Ellyn Garofalo
17                            Attorneys at Law

18   FOR DEFENDANT ETREPPID:  J. Stephen Peek
                              Jerry Snyder
19                            Attorneys at Law

20   FOR DEFENDANT ATIGEO:    Robert Rohde
                              Greg Schwartz
21
     FOR DEFENDANT SANDOVAL:  Bridgett Robb Peck
22                            Attorney at Law

23   FOR DEFENDANT SANDOVAL:  Jacquelyn Beatty
                              Attorney at Law
24
     FOR INTERESTED PARTY:    Carlotta Wells
25                            Raphael Gomez
                              U.S. Dept. Of Justice

1

2

3    Proceedings recorded by mechanical stenography produced by
     computer-aided transcript

4

5

6    Reported by:                        KATHRYN M. FRENCH, RPR, CCR
                                          NEVADA LICENSE NO. 392
7                                         CALIFORNIA LICENSE NO. 8536

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:23-mc-00073-CKK-MAU   Document 1-4   Filed 07/26/23   Page 311 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 3 of 220

3

1          RENO, NEVADA, TUESDAY, JUNE 10, 2008, 9:00 A.M.

2                            ---o0o---

3

4          THE COURT:  Good morning.  Please be seated.

5          THE CLERK:  This is the date and time set for

6    defendant's Motion For Order to Show Cause, number 634, in

7    case number 3:06-cv-056-PMP-VPC, Dennis Montgomery, and

8    Montgomery Family Trust, and others, versus eTreppid

9    Technologies, and others.

10         Present on behalf of plaintiffs, Dennis Montgomery

11   and Montgomery Family Trust, Mark Gunderson, Deborah Klar, and

12   Ellyn Garofalo.

13         Present on behalf defendants eTreppid

14   Technologies and Warren Trepp are Stephen Peek and

15   Jerry Snyder.

16         Present telephonically on behalf of

17   counter-defendant Atigeo, is Greg Schwartz.

18         Present telephonically on behalf of

19   counter-defendant Michael Sandoval is Jacquelyn Beatty.

20         And present on behalf of the  U.S. Department of

21   Justice are Carlotta Wells and Raphael Gomez.

22         THE COURT:  Good morning, again, everyone.

23         I can't see with this display here.  Whose is it?

24         MR. PEEK:  It's mine, Your Honor.  We can take

25   it down.

Case 3:23-mc-00053-GKK-MAC Document 1-2 Filed 07/28/23 Page 312 of 860
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 4 of 220

4

```
 1                    THE COURT:  I can't see, so --
 2                    MR. PEEK:  We can take it down or put it -- I
 3    don't if there's anyplace to move it.  If there isn't,
 4    there's --
 5                    THE COURT:  Why don't we --
 6                    MR. PEEK:  We have big screen as well,
 7    Your Honor.
 8                    THE COURT:  Why don't we move it over here so I
 9    can see.
10                    MR. PEEK:  That's fine.
11                    THE COURT:  Good.  Thank you.
12                    MR. PEEK:  Thank you, Your Honor.  Thanks,
13    Your Honor, for your indulgence.
14                    THE COURT:  All right.  Please just give me a
15    moment to organize my papers.
16                    MS. ROBB PECK:  Your Honor, I apologize for the
17    interruption, but I did want to make sure that my appearance
18    is noted for the record as well.  Bridgett Robb Peck on behalf
19    of both Atigeo and Michael Sandoval local counsel.  There's no
20    room at the inn, so I've been in the gallery.
21                    THE COURT:  All right.  Thank you very much,
22    Ms. Peck.
23            All right.  We are here this morning pursuant to
24    this Court's Order to show cause, docket number 646.  And I'll
25    take a moment, shortly, to review that Order.  But as counsel
```

1    may know, this morning, I met with Department of Justice

2    counsel because they had requested an in camera meeting.

3    And so I did have that meeting at 8:00 a.m. this morning

4    with them.

5         What I would first like to do, because it's

6    important that counsel, and Mr. Montgomery, who will be

7    testifying, all of us, be mindful of the U.S. Protective Order

8    that is in place in this case, docket number 253.  And that

9    Order contains two paragraphs which outline what is governed

10   by the U.S. Protective Order.  Paragraph 2 says:

11        "The parties shall not serve or take any discovery

12   relating to, or questioning the existence or non-existence of

13   any actual or proposed relationship, agreement, connection,

14   contract, transaction, communication, or meeting of any

15   kind between any entity and the intelligence community

16   as defined by the National Security Act of 1947, 50 USC

17   Section 401(a)(4), which includes intelligence elements of

18   the military services, or any current or former official

19   employee, or representative thereof, hereinafter collectively

20   referred to as intelligence agency and parties."

21        Paragraph 3 states:

22        "The party shall not serve or take any discovery

23   relating to, or questioning, any actual or proposed

24   intelligence, agency, interest in, application of, or use

25   of any technology software or Source Code owned or claimed

Case 1:23-mc-00073-CKK-MAU Document 1-42 Filed 07/26/23 Page 314 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 34 of 220

6

 1   by the parties."

 2          And so to the extent, and I suspect it would

 3   be inadvertent on anyone's part, that someone might

 4   inadvertently, as I said, venture into areas covered by the

 5   U.S. Protective Order, I've asked Ms. Wells and Mr. Gomez to

 6   alert the Court, immediately, as to any problem, so that line

 7   of questioning is not pursued.

 8          And to the extent, during the hearing, that counsel

 9   for the government believes it appropriate to have a side

10   bar with counsel concerning issues that might be relevant to

11   the U.S. Protective Order, they may request a side bar.  And

12   counsel, I guess, will somehow all try to fit ourselves over

13   there.

14          The problem will be for counsel appearing

15   telephonically, you will not be able to hear what's said

16   during that side bar, since it will be on mute.  But, there

17   it is.  That's the state of the technology that we have.

18          So, with that, I would now like to proceed with

19   the Order to Show Cause.  And I should say I think counsel

20   would find it helpful to know that I met with Judge Pro last

21   Thursday, and he is quite familiar with the status of this

22   case and the issues pending, not only today before this Court,

23   but just in general.  And so I thought that would be helpful

24   information for all of you to have.

25          All right.  This Order to Show Cause follows a

Case 1:23-mc-00075-GKK-MAU Document 1-4 Filed 07/26/23 Page 315 of 360
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 7 of 226

7

 1   series of orders this Court issued concerning a discovery
 2   dispute that's origins, really, date back to August of 2006.
 3   And it concerns two requests for production of documents.
 4   One, as I said, sent back in the summer of 2006.  And another
 5   sent more recently, in November 2007.
 6         This Court issued a series of orders concerning
 7   production of those documents that were requested, and granted
 8   the eTreppid's motion to compel production of some of those
 9   documents, denied it as to others, and so on.  And the Court
10   is not going to recount the entire chronology of events that
11   leads us here today.  Suffice it to say, that the documents
12   were not produced as ordered by the Court.  And most recently,
13   eTreppid filed a motion for sanctions, which this Court
14   elected to construe as an Order to Show Cause because the
15   failure of the Montgomery parties to comply with the Court's
16   Order is a matter for the Court, as opposed to opposing
17   counsel, or the opposing parties.
18         So, with that, I would ask Mr. Montgomery to please
19   be sworn in and take the witness stand.
20         MR. GUNDERSON:  Your Honor, could I
21   address the Court on one preliminary matter before we
22   swear Mr. Montgomery?
23         THE COURT:  You may.
24         MR. GUNDERSON:  Thank you, Your Honor.  And
25   Mark Gunderson, local counsel, for the record.

Case 1:23-cv-00075-CKK-MAU   Document 172   Filed 07/26/23   Page 316 of 860
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 36 of 220

8

 1          About four o'clock last night, I received from

 2   Michael Flynn a declaration that he's filed in this case and

 3   has been filed, purportedly, in opposition to Deborah Klar's

 4   response to the Court's Order.  Mr. Flynn's not a party to

 5   this case.  This is a fugitive document.  I would move to

 6   strike that document and not have that as a part of the

 7   record today.

 8          THE COURT:  Well, I'll take that into

 9   consideration, sir, your request, and think about it, and

10   decide what I'm going to do before the hearing concludes.

11          MR. GUNDERSON:  Thank you.

12          THE COURT:  So, thank you, sir.

13      Mr. Montgomery, please take the stand, sir.

14
                      **DENNIS L. MONTGOMERY**,
15             **was sworn and testified as follows:**

16          THE CLERK:  Please be seated.

17      Please state your full name for the record.

18          THE WITNESS:  Dennis Lee Montgomery.

19          THE CLERK:  Thank you.

20          THE COURT:  Thank you.

21      Good morning, Mr. Montgomery.

22          THE WITNESS:  Good morning.

23          THE COURT:  Mr. Montgomery, I have some

24   questions of you, since you are here pursuant to this Court's

25   Order to Show Cause.  And as my Order to Show Cause indicated,

Case 1:23-cv-00075-CKK-MAU   Document 142   Filed 07/26/23   Page 317 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 317 of 220

9

 1    you were directed to appear here personally this morning and,

 2    also, to produce documents that relate to the court orders

 3    that had been entered previously by this Court.  And, of

 4    course, the Court is aware that subsequent to these orders,

 5    Ms. Klar, on your behalf, asked that certain information

 6    concerning hard drives that you felt were governed by the

 7    U.S. Protective Order, that might be conceived as something

 8    you ought to be required to bring to this hearing pursuant

 9    to the Court Order, you felt were classified.  And, in fact,

10    Ms. Wells indicated in an e-mail that those ought not be

11    brought here to the courthouse today, and the Court agreed

12    with that, and understands that those are not here.

13         But what I would like to do is ask you some

14    questions, sir, concerning the chronology of events

15    leading  up to today's hearing.  And so I've prepared some

16    exhibits.  They are Court exhibits.  And all they are, for

17    the edification of counsel, are documents that are attached

18    to various pleadings, or they are the papers themselves

19    attached -- that were filed with the Court.

20         And I think, sir, if you look at the first item, it

21    is -- I think it's marked as the Court's exhibit -- is it one,

22    Miss Clerk?

23         THE CLERK:  Yes, Your Honor.

24         THE COURT:  All right.  And that document, for

25    the edification of counsel, is docket number 432.  They are

Case 3:23-mc-00053-CKM-MAU  Document 7-2  Filed 07/28/23  Page 318 of 800
Case 3:06-cv-00056-PMP-MAU  Document 732  Filed 07/08/08  Page 10 of 226

—10

```
 1    attachments to the Montgomery parties' brief concerning this
 2    discovery dispute.
 3              And just to help counsel sort of recall where we
 4    are, on February 15, counsel for the parties filed briefs
 5    concerning this discovery dispute.  And it concerned two
 6    requests for production that eTreppid propounded to the
 7    Montgomery parties.  And so the first exhibit is simply the
 8    request for production dated July 2006, that Mr. -- that
 9    eTreppid propounded on the Montgomery parties.
10              So that's, counsel, the document that I'm referring
11    to so that you know what we're talking about.
12              All right.  So, Mr. Montgomery, do you have
13    Exhibit 1?
14                   THE WITNESS:  Yes.
15                   THE COURT:  Okay.  Can you just identify what
16    the title of that document is, sir.
17                   THE WITNESS:  The Montgomery parties' brief
18    RE: Disputes, RE: ETreppid's request for production of
19    documents per Magistrate Judge Cooke's Order, filed
20    January 23rd, 2008, declaration of Tuneen Chisolm.
21                   THE COURT:  Okay.  And could you turn to page,
22    it's docket number 432-3.  Look at -- I'll help you out a
23    little bit there, sir.  If you look at the top --
24                   THE WITNESS:  I see it.
25                   THE COURT:  Do you see that, sir?
```

Case 3:23-mc-00053-SKK-MAU  Document 132  Filed 07/28/23  Page 319 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 319 of 326

—11

```
 1                    THE WITNESS:  Uh-huh.

 2                    THE COURT:  All right.  What I'm looking for,

 3    it's an attachment to that paper filed by your counsel.  And

 4    it's entitled, "First Set of Requests By Defendant eTreppid

 5    Technologies, LLC, For Production of Documents By Plaintiffs

 6    Dennis Montgomery and the Montgomery Family Trust."

 7              Do you see that, sir?

 8                    THE WITNESS:  No, I don't.

 9                    THE COURT:  It's the exhibit next in Order.  I

10    apologize, sir.

11                    THE WITNESS:  Oh.

12                    THE COURT:  I guess it's exhibit -- it would be

13    Exhibit 2.

14              LAW CLERK:  No.

15                    THE COURT:  Oh, it's exhibit B attached to

16    Exhibit 1.  Sorry.

17                    THE WITNESS:  Okay.  I see it.

18                    THE COURT:  Thank you, sir.

19              All right.  That's what I want to talk with you

20    about first, sir.  It's exhibit B, which is -- is it, sir,

21    the one you're looking at now, the first set of requests

22    by defendant eTreppid Technologies, LLC, production of

23    documents by plaintiffs Dennis Montgomery and so on?

24                    THE WITNESS:  Yes, it is.

25                    THE COURT:  Okay.  Very good.
```

Case 1:23-mc-00053-CKK-MAU  Document 7-2  Filed 07/28/23  Page 320 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 120 of 220

−12−

```
 1              All right.  Take a minute, if you would, sir, to
 2    just review that document.
 3                   THE WITNESS:  (Witness complies.)  It only goes
 4    to page 6, but I don't know if that's --
 5                   THE COURT:  Oh, okay.
 6                   THE WITNESS:  There it is right there.
 7                   THE COURT:  I was going to say that's
 8    unfortunate.  It should be 10 pages.
 9                   THE WITNESS:  Yeah.  Okay.
10                   THE COURT:  All right.  When did you, about
11    when -- obviously, approximately, when did you receive that
12    document from your attorneys?
13            Do you recall?
14                   THE WITNESS:  No, but I'll assume -- I don't
15    recall receiving this document.
16                   THE COURT:  Have you ever seen it?
17                   THE WITNESS:  Yes.
18                   THE COURT:  And if you look on the, I think
19    it's page 9, sir, of that document, what's the date of that
20    document?
21                   THE WITNESS:  July 25th, '06.
22                   THE COURT:  All right.  So given that it was
23    sent out July 25, 2006, when do you think you might have seen
24    it, or do you know?
25                   THE WITNESS:  I don't know.  I don't know.
```

```
 1                    THE COURT:  But you know you saw it sometime?
 2                    THE WITNESS:  Well, I believe I received it.
 3                    THE COURT:  Okay.  All right.
 4              So when did you begin to gather documents responsive
 5    to this document production request?
 6                    THE WITNESS:  I can't say specifically, but I
 7    will assume sometime around that time.
 8                    THE COURT:  Around July 2006?
 9                    THE WITNESS:  Well, if I recall, that was the
10    time in which my prior attorney and I had separated.
11                    THE COURT:  No, actually, it wasn't.  July 2006,
12    just to refresh your recollection, since I've become really
13    familiar with this file --
14                    THE WITNESS:  Right.  Sorry.
15                    THE COURT:  That's okay.  In July 2006, this
16    court, what happened was in September of 2006, this Court
17    stayed discovery in the civil case, because the search warrant
18    proceeding was pending, so Mr. Flynn continued to be your
19    attorney.
20                    THE WITNESS:  Okay.  I recall that.
21                    THE COURT:  So did that help you, sir?
22                    THE WITNESS:  Yes.
23                    THE COURT:  Okay.  So you began, so you
24    think you began -- is it your testimony you began gathering
25    documents responsive to these requests about the time you
```

Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 322 of 800
Case 3:06-cv-00056-PMP-MAU   Document 732   Filed 07/28/23   Page 322 of 800

-14-

1    received this document?

2              THE WITNESS:  I don't know if, exactly, at that

3    time.  This was about three months after the raid, or four

4    months.  And, at that time, I was still cleaning up all the

5    documents from the raid.

6              THE COURT:  Okay.

7              THE WITNESS:  So that took me some time.

8    After that, I think I started looking through for some of the

9    documents.

10             THE COURT:  Okay.  And so over -- since July,

11   you probably received this maybe sometime in August of 2006,

12   from then, from August 2006 until, say, the fall of 2007,

13   did you undertake to gather documents?  What did you do in

14   response to this document production request?

15             THE WITNESS:  Well, if I recall, the FBI was

16   still in possession of a number of documents that they had

17   taken from me, which I imagine fall, a lot of them fall under

18   this list.  And I was continuing to look for documents.

19             THE COURT:  Okay.  Well, let's -- Ms. High,

20   could you help Mr. Montgomery.  What I'm now looking for is

21   exhibit D, which is attached to docket 432, Exhibit 1.

22        Okay.  Do you have that, sir.

23             THE WITNESS:  Yes.

24             THE COURT:  All right.  Can you tell me what the

25   title of that document is?

Case 3:23-mc-00053-GMN-MAU   Document 7-32   Filed 07/28/23   Page 323 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 15 of 226

-15-

 1              THE WITNESS:  "Second Set of Requests By
 2  ETreppid Technology, Warren Trepp, Concerning Inspection of
 3  Documents, Intangible Things."
 4              MR. PEEK:  Your Honor, did you say that was
 5  exhibit C or D?
 6              THE COURT:  It's D, as in dog.
 7              MR. PEEK:  Thank you.
 8              THE COURT:  It's eTreppid's Second Request For
 9  Production of Documents.
10              MR. PEEK:  Thank you, Your Honor.
11              THE COURT:  That's what he's looking at.
12         All right.  Sir, just going back to the last page --
13  well, no, sorry page 10 of 11 -- what is the date of that
14  document?
15              THE WITNESS:  November 19th, 2007.
16              THE COURT:  All right.  So when did you
17  undertake to begin compiling documents responsive to this
18  request, second request for production of documents by
19  eTreppid?
20              THE WITNESS:  At that time.
21              THE COURT:  All right.  Now, let's see, the
22  next -- I would like you, sir, to look at Exhibit 2 that is
23  there.
24              THE WITNESS:  Okay.  I see that.
25              THE COURT:  All right.  And can you, please,

Case 3:23-mc-00053-CKK-MAU  Document 132  Filed 07/28/23  Page 324 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 16 of 226

-16-

```
 1   identify that for the record, sir.

 2              THE WITNESS:  The Minutes of the proceedings?

 3              THE COURT:  Uh-huh.

 4              THE WITNESS:  February 21st, 2008.

 5              THE COURT:  All right.

 6        All right.  So, counsel, for the record, what we're

 7   looking at is docket number 448, the February 21, 2008 Order

 8   of this court.

 9              So, sir, did you ever receive a copy of this Order

10   from your attorneys?

11              THE WITNESS:  I'm sure I did.

12              THE COURT:  Well, no, I --

13              THE WITNESS:  I don't recall specifically.

14              THE COURT:  All right.  Well, take a look at the

15   document and then tell me if you recognize it.

16              THE WITNESS:  (Witness complies.)

17         I don't recall it specifically, but --

18              THE COURT:  So you aren't sure if you received

19   it or not, sir?

20              THE WITNESS:  No.

21              THE COURT:  All right.

22         All right.  Well, let's go to page 2 of that Order.

23              THE WITNESS:  Okay.

24              THE COURT:  And on page 2 there is -- first,

25   it says one, it's in bold face, and it says, "eTreppid's First
```

Case 3:06-mc-00053-GMN-MAU   Document 132   Filed 07/28/23   Page 325 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 175 of 226

—17

1   Request For Production of Documents REP Number One, Request

2   Number Two."

3           Do you see that, sir?

4               THE WITNESS:  Yes.

5               THE COURT:  All right.  Now, request for

6   production number two, that is referenced in my Order that

7   you're looking at, says you are to produce all documents you

8   reviewed, or to which you referred in preparing the responses

9   to the interrogatories, sir, herewith.

10          So the Order, docket number 448, that I've just

11  referred to you, that's Exhibit 2, says:

12          "The Montgomery parties shall produce all

13  discoverable non-attorney/client protected documents,

14  or documents referred to in preparing responses to

15  interrogatories.  If there are documents that were identified

16  in response to requests number one that also respond to

17  number two, the Montgomery parties shall indicate such in

18  their response."

19          So when did you begin gathering documents in

20  response to this document production request that this Court

21  ordered you produce?

22              THE WITNESS:  At the time --

23              THE COURT:  All right.  And have you produced

24  all those documents, sir?

25              THE WITNESS:  To the best of my ability, I'm --

Case 3:23-mc-00053-GKS-MAU Document 132 Filed 07/28/23 Page 326 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 18 of 226

-18-

 1                    THE COURT:  Okay.

 2           All right.  Let's see, let's turn on -- I'm looking,

 3    sir, at docket 448.  That's Exhibit 2.  Let's turn, please, if

 4    you would, to page 4.

 5                    THE WITNESS:  This is the same document?

 6                    THE COURT:  Yes, sir.  It's docket number 448,

 7    the February 21 Order.

 8                    THE WITNESS:  Okay.  I got it.

 9                    THE COURT:  Got it.  Good.  And I'm looking at

10    item 3 on page 4.  It says:  "ETreppid's RFP one, request

11    number 10."

12           Do you see that, sir?

13                    THE WITNESS:  Yes.

14                    THE COURT:  All right.  So request for

15    production number 10 was all documents that relate to any

16    health insurance for you from 1998 through 2005.  This

17    includes, but is not limited to, all invoices, enrollment

18    forms, insurance cards, and evidence of payment of any

19    premiums.

20           And my Order says:  "The Montgomery parties shall

21    supplement their response to this request to state that the

22    only non -- the relevant nonprivileged documents are your

23    K-1s."

24           And I'm assuming -- do you have any idea whether

25    that was done or not, or I'm assuming your attorneys did that

Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 327 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 327 of 800

—19

1  for you.

2                    THE WITNESS:  I don't know where you're reading

3  the Order that you just read.

4                    THE COURT:  Oh, I'm sorry, sir.  I'm on page 4.

5          Are you on page 4?

6                    THE WITNESS:  Yeah.  Is it at the top -- oh, all

7  right.

8          I'm sorry.  Go ahead.

9                    THE COURT:  That's all right.

10         So this, if I -- and I just read -- you know,

11  Ms. High, it might be helpful, since I'm going back and forth

12  between my Order and the Request For Production of Documents,

13  could you find, at docket 432, the exhibit that's the first

14  for Mr. Montgomery.

15         Do you see what I'm saying?  So, I want you to be

16  able to refer back and forth in the way I am --

17                    THE WITNESS:  Okay.

18                    THE COURT:  -- so it will be more helpful to

19  you.

20                    THE WITNESS:  Yeah.

21                    THE COURT:  Okay.  So where we are is, where

22  we're looking at on Exhibit 1, we're looking at the first

23  request for production of documents.  And I'm on page 6.

24                    THE WITNESS:  Yeah, I see that.

25                    THE COURT:  So I was at request for production

Case 3:23-mc-00053-CKJ-MAU Document 132 Filed 07/28/23 Page 328 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 20 of 226

—20

1   number 10.

2           Do you see that?

3               THE WITNESS:  Yes, I do.

4               THE COURT:  Okay.  So, I think this will be

5   helpful.  So you were to produce health insurance and so on,

6   from 1998 to 2005, as set forth in that document production

7   request.  And I ordered you to supplement your response

8   to state that the only relevant nonprivileged documents

9   sufficient -- that you were to produce or state that the

10  only relevant nonprivileged document sufficient to demonstrate

11  that you obtained health insurance through eTreppid, are

12  your own K-1s.  And I guess I'm assuming that you probably

13  did that.

14          Do you believe that you did that?

15              THE WITNESS:  I'm not sure I understand the

16  question.  Are you, are you saying that I just needed to

17  produce my K-1s?

18              THE COURT:  No.  You just needed to say that's

19  all you had.

20              THE WITNESS:  I believe I did that.

21              THE COURT:  Okay.  All right.

22          Now, the next item refers to, if you look at request

23  for production number 11, it refers to all personal income tax

24  returns filed by you from 1998 to 2005.  And you were ordered

25  to produce those by my Order.

 1                  Do you see that?

 2                       THE WITNESS:  Yes.

 3                       THE COURT:  Okay.  So -- just a moment, sir.

 4                  So, you eventually produced those.  Did you have a

 5         little trouble getting those documents?

 6                       THE WITNESS:  Finding them, yes, Your Honor.

 7                       THE COURT:  Okay.  And when did you -- when

 8         you -- when did you begin assembling those documents, your

 9         income tax returns?

10                       THE WITNESS:  Around the same time of this

11         Order.

12                       THE COURT:  All right.  Let's turn -- the next

13         item is eTreppid's request for production one, items 13 and

14         14.  And these two document production requests sort of go

15         hand in hand, if you refer to them, sir.

16                       THE WITNESS:  Okay.

17                       THE COURT:  One is for any loans made to you by

18         Warren Trepp, or any entity controlled by Mr. Trepp.  And then

19         14 is documents relating to repayment of any loan made to you

20         by Warren Trepp.

21                  And so did you produce all of the documents

22         responsive to those two document production requests, sir?

23                       THE WITNESS:  All that I could find.

24                       THE COURT:  All right.  And the question I had,

25         if you turn, just to get an idea of time frames, if you turn

1    to page, the last page of my Order, docket 448, when does it

2    say all of these documents are due?

3                   THE WITNESS:  On March 14th.

4                   THE COURT:  So did you have them all by

5    March 14th?

6                   THE WITNESS:  I don't believe so.

7                   THE COURT:  Why not?

8                   THE WITNESS:  It was a lot to go through.

9                   THE COURT:  So -- right.  But, you've testified

10   that when you received these document production requests one,

11   back from July of 2006, and another dated November of 2007,

12   some four months prior -- or, well, actually by February 21,

13   it was, like, three months.

14        So you testified you began assembling these

15   documents in response to these document production requests

16   around the time you received them.  So, I'm a little unclear

17   about why they weren't produced by the date I set out in my

18   Order.  Maybe -- so if you would like to explain that, I would

19   be interested in knowing.

20                  THE WITNESS:  Well, a number of documents were

21   taken from me by the FBI in March of '06.  And I believe,

22   ultimately, returned on, I think it was March or April of '07.

23   I had a lot of documents to go through, my own personal.

24   Thousands of them.  And it just takes a lot of time to go

25   through that many documents, that many pieces of paper,

Case 3:06-mc-00053-PMP-VPC Document 732 Filed 07/28/08 Page 331 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/28/08 Page 331 of 220

—23

```
 1   looking for everything.

 2                   THE COURT:  All right.  Sir, if you would,

 3   please, turn back to Exhibit 1.  It's the exhibit that has

 4   the request for production of documents.

 5                   THE WITNESS:  Okay.

 6                   THE COURT:  I'm now on page 7, requests for

 7   production number 16.

 8                   THE WITNESS:  Okay.

 9                   THE COURT:  Now that request for production of

10   documents asks for:  "All documents that relate to eTreppid's

11   technology products and/or research and development efforts

12   including, but not limited to, any and all marketing

13   documents, business plans, PowerPoint presentations, white

14   papers, correspondence, and/or notes of meetings with

15   customers or potential customers."

16           And the Court, on February 21, if you look at docket

17   448 are, again, item 6 in that page 4, says:

18           "The Montgomery parties will produce documents

19   concerning products and/or research and development and

20   technology limited to marketing documents, business plans,

21   PowerPoint presentations, white papers, correspondence, and/or

22   notes of meetings with customers and potential customers.

23   This does not include Source Code information or executable

24   versions of software at issue in this action."

25           So, when did you -- did you do that, sir?  Did you
```

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 332 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 24 of 226

—24

 1   produce those documents?

 2                THE WITNESS:  Yes.

 3                THE COURT:  When?

 4                THE WITNESS:  I believe that was on the first

 5   set of drawings I produced.

 6                THE COURT:  The first set of drives.  And when

 7   did you produce those, sir?

 8                THE WITNESS:  I don't remember the exact date.

 9                THE COURT:  That's okay.  What I mean is within

10   the last two weeks, by March 14, 2008.

11                THE WITNESS:  It was in the last two weeks,

12   Your Honor.

13                THE COURT:  So these were due March 14.  Why

14   didn't you produce them then?

15                THE WITNESS:  There were millions of files to

16   go through.

17                THE COURT:  Do you know if your attorneys ever

18   asked the Court for any extensions of time concerning the

19   millions of files you had to go through, sir?

20                THE WITNESS:  I -- sure.  I had mentioned it.  I

21   don't know if they did or not.

22                THE COURT:  All right.  Let's turn, sir, to

23   page 5 of my Order, docket 448.

24                THE WITNESS:  Okay.

25                THE COURT:  And I'm looking at item 8.  It

Case 3:23-mc-00053-SKK-MAU Document 132 Filed 07/28/23 Page 333 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 25 of 226

25

 1  says:  "ETreppid's RFP one, request numbers 24 to 28."

 2         Do you see that, sir --

 3             THE WITNESS:  Yes.

 4             THE COURT:  -- that category.

 5         All right.  And then if you look back on the

 6  Exhibit 1, which is the original request for production of

 7  documents number one, those items relate to documents

 8  relating to your relationship with an entity known as

 9  ComputerMade, Inc.;

10             25 concerns Barrett Laboratories, Inc.;

11             26 concerns 3Net Systems, Inc.;

12             27 concerns Alternative Technology Resources, Inc.;

13             28 concerns National Healthcare Exchange Services,

14  Inc.

15             So, the Order states:

16         "The Court will allow limited production in

17  response to these requests after the first round of

18  document production requests.  ETreppid has leave to

19  propound additional requests for production of documents.

20         "Preliminarily, however, the Court directs the

21  Montgomery parties shall produce, apart from copyrighted

22  documents itself, any document related to, or connected

23  with, in any fashion, any communications, letters,

24  et cetera, that relate to copyright assignments for

25  ComputerMade, Inc.;

Case 1:23-mc-00053-GKK-MAU   Document 12   Filed 07/28/23   Page 334 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 16 of 226

—26

1           Barrett Laboratories;

2           3Net Systems, Inc.;

3           Alternative Technology Resources, Inc.; and

4           National Healthcare Exchange Services, Inc.,

5           "With respect to attorney/client privilege

6    documents, to the extent an issue arises with respect to

7    this document production, the Court shall allow the Montgomery

8    parties to reserve the right to interpose appropriate

9    objections."

10          So, basically, this production of documents, would

11   you agree with me, sir, was asking for documents concerning

12   your relationship with those entities I've described.

13                THE WITNESS:  Yes.

14                THE COURT:  Did you produce those documents?

15                THE WITNESS:  No.

16                THE COURT:  Why not?

17                THE WITNESS:  Well, regarding the first two,

18   ComputerMade, Barrett Laboratories and, I believe, 3Net, a

19   number of those documents was with my prior attorney.

20                THE COURT:  So you don't keep -- you didn't

21   keep those documents?  They're not in your custody, control,

22   or possession, is that your testimony?

23                THE WITNESS:  No.  When I was looking through

24   the documents for other requests, I was -- disk drives, I

25   was also looking for these documents.  And I believe I

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 335 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 335 of 800

-27-

```
 1   had produced a manual regarding, one of the manuals, at the

 2   preliminary injunction.  The prior year I didn't have it.  It

 3   was --

 4            THE COURT:  Right.

 5            THE WITNESS:  Yeah, they had it.  And I believe

 6   there was other documents, I'm not certain, that was also

 7   produced at that preliminary injunction that were kept, as

 8   far as I know, by the Court.  I don't have them.

 9            THE COURT:  Right.  They might be exhibits to

10   the preliminary injunction hearing.

11            THE WITNESS:  The originals.  Right.

12            THE COURT:  Or, perhaps, those are documents

13   that are part of Mr. Flynn's files.

14        Is that your testimony?

15            THE WITNESS:  Yes.

16            THE COURT:  Okay.  So what about everything else

17   responsive to those document production requests that relates

18   to those entities?  Where are they?

19            THE WITNESS:  I don't know the last two

20   companies, so I don't know who they are.

21            THE COURT:  So did you, when -- let me start

22   with this question.

23            THE WITNESS:  Yeah.

24            THE COURT:  So you were supposed to produce

25   these it documents by March 14th, 2008, and you didn't do
```

1    so, correct?

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.  Have you ever produced those,

4    any of these documents, apart from the ones that you contend

5    are either -- might be part of the state court preliminary

6    injunction hearing, or in the custody of Mr. Flynn.

7              THE WITNESS:  Well, I've not looked through all

8    of the drives.  They could be on those drives I've produced

9    already.  The documents could have easily been scanned and put

10   on there.

11             THE COURT:  Right.  So why haven't they been

12   produced?

13             THE WITNESS:  But I've produced the drives up

14   'til now.  I've produced 1,300,000 files which I, clearly,

15   could not get through all of those.

16             THE COURT:  Right.  So my question to you is

17   did you produce documents that respond to these document

18   production requests?

19             THE WITNESS:  Non-electronically?

20             THE COURT:  In any fashion.

21             THE WITNESS:  I don't know.

22             THE COURT:  And why don't you know?

23             THE WITNESS:  Because I've not looked through

24   1,300,000 files.

25             THE COURT:  So, when did you commence looking

Case 3:23-mc-00053-CKJ-MAU Document 132 Filed 07/28/23 Page 337 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 29 of 220

29

1    through 1,300,000 files?

2                    THE WITNESS:  Early February.

3                    THE COURT:  All right.

4           All right.  Let's look at the next one on my

5    Order.  I'm referring, now, sir, back to my Order, docket 448,

6    number 9:  ETreppid's RFP one, requests number 30 and 31.

7    And looking on Exhibit 1, those document requests are for --

8    30 is for:

9           "All documents that relate to any attempt,

10   successful or unsuccessful, by you to sell, license,

11   distribute or otherwise exchange for value, any interest

12   in software or other technology in the fields of data

13   compression, object tracking, pattern recognition, or

14   anomaly detection, from January 18, 2006 to the present."

15          Request 31 asks for:  "All documents relating

16   to any successful or unsuccessful attempt by you to sell,

17   license, distribute, or otherwise exchange for value, any

18   interest in software, other technology in the fields of data

19   compression, object tracking, pattern recognition, or anomaly

20   detection from February 8, 2006 to present."

21          Okay.  And this is what my Order says, if you're

22   following along, docket 448, sir.

23                    THE WITNESS:  Yes.

24                    THE COURT:  I say:  "The Montgomery parties

25   shall produce the documents regarding requests numbers 30

Case 1:23-mc-00053-CKK-MAU   Document 1-1   Filed 07/28/23   Page 338 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 30 of 220

-30-

1    and 31."

2              Do you see that?

3                    THE WITNESS:  Yes.

4                    THE COURT:  Did you do that?

5                    THE WITNESS:  My prior attorney is holding them.

6                    THE COURT:  That you -- so it is your testimony

7    today that every single document responsive to requests 30 and

8    31 are held by your former attorney, Mr. Flynn?

9                    THE WITNESS:  I only know of one document.

10                   THE COURT:  So would that be a yes?

11                   THE WITNESS:  Yes.

12                   THE COURT:  Okay.  So your testimony is that

13   you have no documents in your custody concerning any attempts

14   that you have made to sell, license, distribute, or otherwise

15   exchange for value and so on, technology in the fields of

16   data compression, object tracking, pattern recognition, and

17   anomaly detection, from January 18, 2006 to present.

18              Is that your testimony?

19                   THE WITNESS:  I believe so.

20                   THE COURT:  Now I want you to turn to, on that

21   request for production of documents, sir, I want you to turn

22   to page 5.

23              And maybe Ms. High could help.

24                   THE WITNESS:  Can I make an additional

25   statement?

Case 3:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 339 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 31 of 226

31

 1                    THE COURT:  Sure.

 2                    THE WITNESS:  There was a request made of the

 3   law firm, I believe that made the documents, that I signed.

 4   And those documents, I believe, were produced.

 5                    THE COURT:  Okay.

 6           All right.  Look at page 5 of docket number, it's

 7   docket number 432, please , exhibit 1.

 8           Miss High, I think you got it there.

 9                    LAW CLERK:  Page 5?

10                    THE COURT:  Yes.

11                    THE WITNESS:  Okay.

12                    THE COURT:  Okay.  Do you see item 12?  It says,

13   "You, your, yours."  It's just a definition.

14                    THE WITNESS:  No.

15                    THE COURT:  Miss High, what I'm looking for is,

16   I'm looking for the definition, "you, your, and yours."

17                    THE WITNESS:  Okay.  I see it.

18                    THE COURT:  That's all right.

19           All right.  Do you see paragraph 12, it defines

20   "you, your and yours."

21                    THE WITNESS:  Yes.

22                    THE COURT:  All right.  And it says that:

23           "Those terms refer to plaintiff Dennis Montgomery,

24   plaintiff The Montgomery Family Trust, and anyone acting or

25   authorized to act on behalf of any or all of them, including

Case 3:06-mc-00053-SKM-MAU Document 132 Filed 07/28/23 Page 340 of 800
Case 3:06-cv-00056-PMP-MAU Document 132 Filed 07/08/08 Page 32 of 226

32

 1    any representatives, employees, agents, servants, or attorneys

 2    and others who are in possession, or who have -- excuse me, or

 3    may have obtained information for you on your behalf.

 4            So, the reason that I wanted to read that definition

 5    into the record, sir, is that that might be important to your

 6    understanding of the scope of the document production.

 7            So your position is with respect to 30 and 31,

 8    that request for production 30 and 31 that we've been

 9    talking about, those are documents that relate to any

10    attempt to sell, distribute, license, and so forth, the

11    technology that -- are you with me?

12                    THE WITNESS:  Yes.

13                    THE COURT:  Okay.  My understanding of your

14    testimony is that the only documents that might be responsive

15    to this request are, one, in the possession of your former

16    counsel, Mr. Flynn, or that you did produce via a third

17    party -- is that Opspring?

18                    THE WITNESS:  Yes.

19                    THE COURT:  -- some documents you believe

20    are responsive.  But, other than that, you have no other

21    documents.

22                    THE WITNESS:  Well, I would hate to say ever.  I

23    mean, that's a pretty broad category.  Uh, I mean, are you

24    asking me if I called Mike Flynn and said, Mike Flynn, you got

25    to give me these documents?

Case 1:23-mc-00053-CKJ-MAU  Document 132  Filed 07/28/23  Page 341 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 33 of 226

-33

 1              THE COURT:  No.  I'm not asking you that.

 2   I'm just asking -- here's what I'm asking.  I issued -- I

 3   had a hearing.  I reviewed all of these document production

 4   requests.  I heard arguments from all the lawyers for a long

 5   time.  And then I entered this Order.  And it said what you

 6   had to produce.

 7              And so the issue here today is you haven't

 8   produced a lot of documents that were subject to the Court's

 9   orders.  So what I'm doing is I'm trying to ascertain in

10   these categories of documents, what you have in your custody,

11   control, and possession; and have produced, can't produce,

12   don't have, et cetera.  So, that's --

13              THE WITNESS:  But, Your Honor, uh, I'm kind

14   of in a position where my hands have been tied.  I have an

15   attorney who I can't show all documents to because of the

16   U.S. Protective Order.  And I only had clarification on that

17   recently;

18              I have a prior attorney who is refusing to produce

19   documents to me; and

20              I have to go through millions of files, not risking

21   of exposing any kind of government secrets.

22              THE COURT:  Yes.  I understand.

23              THE WITNESS:  It's an overwhelming burden.  I

24   mean, I've been on it every day, every night, nonstop.

25              THE COURT:  Okay.  So, is there anything more

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 342 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 342 of 226

-34-

```
 1   you want to say about your response to request for production
 2   30 and 31, sir?
 3               THE WITNESS:  Not at this time.
 4               THE COURT:  All right.  So we're going to skip
 5   to item 11, sir, on my Order, docket 448.
 6               THE WITNESS:  Okay.
 7               THE COURT:  We're at eTreppid's RFP one, request
 8   32 and 33.
 9          Do you see that, sir?
10               THE WITNESS:  Okay.  Yes.
11               THE COURT:  Okay.  Now, I'm, of course, going
12   back to the documents itself.
13               THE WITNESS:  I understand.
14               THE COURT:  Okay.  So request for production
15   32 says:
16          "Produce all documents under your control which
17   relate to Michael Sandoval, who resides in or near Portland,
18   Oregon, which date from January 18, 2006 to the present."
19          And request for production 33 says:  "Produce
20   all documents relating to any attempt, either successful
21   or unsuccessful, by you, and in conjunction with Michael
22   Sandoval, who resides in or near Portland, Oregon, to sell,
23   license, distribute or otherwise exchange for value any
24   interest in software or other technology in the fields of
25   data compression, object tracking, pattern recognition, or
```

Case 1:23-mc-00053-CKJ-MAU Document 132 Filed 07/28/23 Page 343 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 35 of 226

35

 1   anomaly detection from January 18, 2006 to present.

 2            And so turning back to my Order, it says, at

 3   item 11:  "Request numbers 32 and 33 have been resolved.

 4   They're subsumed in its rulings as it relates to RFP two,

 5   et cetera."

 6            So, I'm sorry, sir -- nevermind.  I was asking you

 7   questions about something that's been resolved.  So, pardon

 8   me.

 9                 THE WITNESS:  That was a trick question.

10                 THE COURT:  Well, you could think so but, no,

11   it's not.

12            All right.  Let's turn to -- Miss High, you might

13   want to help Mr. Montgomery.  I'm now going to request for

14   production number two.

15                 THE WITNESS:  Okay.

16                 THE COURT:  Thank you.

17            Okay.  I'm track my Order for 448, sir.  So go to

18   item 10, if you would, please, on docket 448.

19                 THE WITNESS:  Okay.

20                 THE COURT:  And you see it refers to requests

21   numbers 24, 25, 26 and 27?

22                 THE WITNESS:  Yes.

23                 THE COURT:  All right.  So those are on page 9.

24                 THE WITNESS:  Okay.

25                 THE COURT:  So those are, request 24:  "Provide

Case 3:23-mc-00053-CKM-MAU  Document 1-2  Filed 07/28/23  Page 344 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/28/08  Page 36 of 220

36

```
 1   all documents evidencing any payment made to you for any

 2   purpose whatsoever by Edra Blixseth, Opspring, Inc., Azimyth,

 3   Inc., Michael Sandoval, or Atigeo, between July 2005 and the

 4   present.

 5           Number 25 asks you to:  "Provide contracts,

 6   including but not limited to technology, licensing agreements,

 7   employment agreements, consulting agreements, technology

 8   sale agreements, or any kind of assignment of an interest in

 9   intellectual property between you, on the one hand, and Edra

10   Blixseth, Opspring, Inc., Azimyth, Inc., Michael Sandoval, or

11   Atigeo, on the other."

12           Document request 26 says --

13               THE WITNESS:  I'm not following where you're

14   at.

15               THE COURT:  Oh, I'm sorry.

16               THE WITNESS:  Is this 43 -- this document --

17   okay.

18               THE COURT:  Sorry.  Where did I lose you, sir?

19               THE WITNESS:  I don't know what number you were

20   on.  24, I think.

21               THE COURT:  Twenty-four.  I started with 24.

22   And that says:  "Produce documents evidencing payments."  And

23   then it identified --

24               THE WITNESS:  Yeah, I see it.

25               THE COURT:  -- companies or individuals.
```

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 345 of 800
Case 3:06-cv-00056-PMP-MAU   Document 732   Filed 07/08/08   Page 345 of 320

37

```
 1           Okay.  Then 25 says:  "Produce contracts,
 2   including but not limited to, technology, licensing
 3   agreements, employment, consulting, and so forth, between
 4   you, on the one hand, and Ms. Blixseth, Opspring, Azimyth,
 5   Michael Sandoval, or Atigeo, on the other.
 6           See that, sir?
 7               THE WITNESS:  Yes.  Yes.
 8               THE COURT:  All right.  Then requests for
 9   production number 26 says:  "Produce any and all documents,
10   including but not limited to, correspondence, e-mails in
11   native format, calendar notes, journal entry, phone messages
12   memorializing any communication between you or anyone acting
13   on your behalf and Edra Blixseth, Opspring, Inc., Azimyth,
14   Michael Sandoval, Atigeo, Inc."
15           Finally, 27 asks for:  "Production of documents,
16   including but not limited to, correspondence, e-mails in
17   native format, calendar notes, journal entries; PowerPoint
18   presentations, marketing materials, or phone messages
19   memorializing any communications between you or anyone acting
20   on your behalf, and any customer or prospective customer of
21   Opspring, Inc., or Azimyth, Inc."
22           So going back to my Order, I say that:  "Montgomery
23   parties shall produce the documents responsive to request
24   number 24.  As to request 25, 26, and 27, the term
25   'technology', as used in these requests, shall be limited
```

```
 1    to technology arising out of object detection, data

 2    compression, pattern recognition, and anomaly detection."

 3              Do you see that?

 4                   THE WITNESS:  Yes.

 5                   THE COURT:  Did you produce those documents,

 6    sir?

 7                   THE WITNESS:  I believe some were produced.

 8                   THE COURT:  When?

 9                   THE WITNESS:  I don't know the exact time frame.

10    I mean, within the last three weeks.

11                   THE COURT:  So, how many?

12                   THE WITNESS:  I -- you mean, pages?  I don't

13    know.

14                   THE COURT:  Have you -- you say that you've

15    now -- you've produced these documents responsive to these?

16                   THE WITNESS:  No.  I'm sorry.

17                   THE COURT:  That's all right.  Let me finish.

18    I may be mistaking it, so I want to give you an opportunity to

19    clarify, sir.  So, you certainly will have that.

20              So I ordered these documents to be produced by, I

21    think it was March 14th.  You didn't do it then, right?

22                   THE WITNESS:  That's correct.

23                   THE COURT:  Okay.  And so when did you do it?

24                   THE WITNESS:  I'm not sure of the exact date.

25              If there's any way I could speak to my counsel for a
```

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 347 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 39 of 226

—39

 1    few minutes?

 2                THE COURT:  Well, would it be -- I'm not asking

 3    you --

 4                THE WITNESS:  Last month.

 5                THE COURT:  Certainly you can take a recess and

 6    you can talk to your counsel if you like.

 7                THE WITNESS:  Yeah.

 8                THE COURT:   I'm not asking you for, you know,

 9    June 1.  I'm just saying, so would these documents responsive

10    to these document production requests have been produced, say,

11    in the last three weeks.

12                THE WITNESS:  I would have thought in the last

13    month.

14                THE COURT:  Okay.  The last four weeks.

15                THE WITNESS:  What documents I've produced, yes.

16                THE COURT:  Did you produce all of the documents

17    responsive to these four requests, sir?

18                THE WITNESS:  Well, I haven't looked through

19    everything, Your Honor.

20                THE COURT:  Okay.

21                THE WITNESS:  Is it possible to take a break,

22    Your Honor?

23                THE COURT:  Sure.  Probably the court reporter

24    could use a break, too.  So we'll take about, oh, a

25    five-minute recess.

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 348 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 40 of 226

−40

 1            Thank you.

 2            (RECESS TAKEN.)

 3                 THE COURT:  Please be seated.

 4            Miss Reporter, which number did we leave off at?

 5                 MR. PEEK:  It was number 10 on your Order, on

 6    page 5.

 7                 THE COURT:  Thank you, Mr. Peek.

 8                 MR. PEEK:  24, 25, 26 and 27 of RFP two.

 9                 THE COURT:  Thank you.  All right.

10            All right.  Mr. Montgomery, I would like you to look

11    at docket number 448, my Order, at page 6.  And under number

12    13 -- do you have that, sir?

13                 THE WITNESS:  Yes.  Yes.

14                 THE COURT:  Okay.  And let me get there.

15            And request for production of documents, the second

16    set, number two, requests 5, 6, and 7 concern forensic copies

17    of storage, electronic storage device, hard drives and disks

18    and so on.  And it also concerns production of forensic copies

19    of electronic storage devices and so forth that were in the

20    custody, control, and possession of the FBI.

21            And seven concerns copies of other electronically

22    stored information regarding Source Code that might have been

23    contained on all computer hard drives seized by the FBI and

24    returned to you.

25            Just representing that, so we can sort of cut

Case 3:23-mc-00053-CKK-MAU Document 1-2 Filed 07/28/23 Page 349 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 41 of 226

41

 1    through what's a pretty long request for production of

 2    documents.

 3               THE WITNESS:  This is number one, right?

 4               THE COURT:  Right.

 5               THE WITNESS:  Okay.

 6               THE COURT:  And then what it says in the second

 7    big paragraph, it says, requests, in my Order:  "Request

 8    number 6 and 7 also pertain to the computer disks, CDs the FBI

 9    seized.  And the Montgomery party shall, one, make a photocopy

10    of the face of each CD seized by the FBI;

11               "Two, produce a copy of every CD the FBI seized

12    which bears an eTreppid, or is understood to be eTreppid-

13    related property and/work routinely performed by eTreppid."

14          Do you see that, sir?

15               THE WITNESS:  Yes.

16               THE COURT:  Did you produce those computer disks

17    as set forth, the copies, the photocopy, and copy of the CD,

18    the discovery CD the FBI seized?

19               THE WITNESS:  No.

20               THE COURT:  Why not?

21               THE WITNESS:  Because I don't know every CD that

22    the FBI seized.

23               THE COURT:  So why is that, sir?

24               THE WITNESS:  Well, on the original seizure,

25    they were listed as generic.  On the search warrant -- on the

Case 3:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 350 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 42 of 226

42

```
 1   list of inventory that was taken from me, it would just say
 2   67 CDs, or 32 CDs, or a book, or whatever.
 3               THE COURT:  Right.
 4               THE WITNESS:  On the stuff that was returned,
 5   immediately after it was returned, they, the FBI took pictures
 6   of some of it.  Not all of it.  And I was in the process of
 7   reviewing everything, and the CDs got commingled with my own
 8   stuff, and I was unaware of which one was seized by the FBI,
 9   and which one was not.
10               And my prior attorney, I requested on more than one
11   occasion, to request from the FBI a copy of the pictures that
12   they took, so that I could compare them to the ones that I
13   have.  And I never got them.
14               My current attorney, I also requested them again.
15   And I've never received them.
16               THE COURT:  Go ahead.
17               THE WITNESS:  The second thing is that there
18   are several of the CDs that will fall under the states -- the
19   Protective Order.  So, I didn't think producing a copy of the
20   faceplate that violated the Protective Order would be the
21   right thing to do.
22               THE COURT:  All right.  Let me ask you
23   something, you just said.  You said, you testified that
24   items, some items that were returned by the FBI to you got
25   commingled.
```

Case 1:23-mc-00053-CKK-MAU   Document 7-2   Filed 07/28/23   Page 351 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 451 of 226

43

1          Is that your testimony?

2               THE WITNESS:  Yes.  I guess that's the best

3     term.

4               THE COURT:  Okay.  So, who picked up, or how did

5     you get the items that were returned from the FBI?  Did you

6     pick those up personally, sir?

7               THE WITNESS:  Yes.  There were people with me,

8     but --

9               THE COURT:  Who else was with you?

10              THE WITNESS:  Edra Blixseth, and Jack Scolia.

11              THE COURT:  Okay.  And where did go to pick up

12    the items that had been seized and returned to you?

13              THE WITNESS:  In Reno?

14              THE COURT:  Yes.

15              THE WITNESS:  At the FBI office.

16              THE COURT:  All right.  And then what did you do

17    with those items?

18              THE WITNESS:  I flew back to Palm Springs.

19              THE COURT:  Did you have those items with you

20    when you flew back to Palm Springs?

21              THE WITNESS:  Yes.

22              THE COURT:  They were in your possession at all

23    times?

24              THE WITNESS:  No.  Not at all times.  But, they

25    were in my possession.  I left them at my car.

Case 3:23-mc-00053-CKK-MAU Document 1-32 Filed 07/28/23 Page 352 of 800
Case 3:06-cv-00050-PMP-VPC Document 732 Filed 07/08/08 Page 44 of 226

44

```
 1              I mean when I got back to the Porcupine Creek, I
 2    left them in the car.  I mean, I looked at a few of them, but
 3    I left them in the car.  The car was locked.
 4              THE COURT:  All right.  Maybe you were just --
 5              THE WITNESS:  I'm not trying to be -- semantics.
 6              THE COURT:  No.  I think we're confusing one
 7    another.
 8              THE WITNESS:  Yeah.
 9              THE COURT:  So you came to Reno with
10    Miss Blixseth.
11              THE WITNESS:  Mr. Scolia.
12              THE COURT:  Mr. Scolia.  You picked up the
13    items that were seized by the FBI, correct?
14              THE WITNESS:  Yes.  Yes.
15              THE COURT:  And then I thought you testified,
16    and perhaps I'm incorrect, that you then took all of the items
17    seized by the FBI, that you now had returned to you, and you
18    got on a plane and you took them with you.
19         Is that correct?
20              THE WITNESS:  Yes.
21              THE COURT:  All right.  So when you got into
22    Southern California, wherever you landed --
23              THE WITNESS:  Uh-huh.
24              THE COURT:  -- what did you do with these items?
25              THE WITNESS:  Well, I spent the night there.  I
```

 1    kept them with me there.  I got a storage facility, and I put
 2    them in there.
 3                  THE COURT:  And is that where they are currently
 4    stored, sir?
 5                  THE WITNESS:  No.
 6                  THE COURT:  Where are they currently stored?
 7                  THE WITNESS:  Well, I mean, I have them in my
 8    possession, if that -- if I'm not saying that right.
 9                  THE COURT:  Right.  Where would that be?
10                  THE WITNESS:  Oh, I'm sorry.  In my office and
11    my home in Rancho Mirage, California.
12                  THE COURT:  Okay.  So how did these items get
13    commingled with your other property?
14                  THE WITNESS:  Well, I flew back two days later
15    and took, I would say half of it, with me back to Seattle.  I
16    lived in Seattle.  I didn't live here.
17                  THE COURT:  Right.
18                  THE WITNESS:  And I was, I believe at the time,
19    still looking for information that was responsive to the
20    Grand Jury's subpoena of me in Washington.  So, I had that
21    information which was given back to me, and other information
22    that I had that was not seized from the FBI from me, and they
23    just got put together over time.
24                  THE COURT:  All right.
25                  Now turning back, sir, to request for production

Case 3:23-mc-00053-CKK-MAU  Document 1-2  Filed 07/28/23  Page 354 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 46 of 226

-46-

 1    of documents, I'm looking at -- I'm on page 9 of the second

 2    request for production of documents at docket -- that's

 3    Exhibit 1.  I'm on page 9.

 4                    THE WITNESS:  Okay.

 5                    THE COURT:  There is a request for production

 6    number 22 and number 23.

 7              Do you see those?

 8                    THE WITNESS:  Yes.

 9                    THE COURT:  And 22 asks for:  "Documents you

10    have provided to NBC, Wall Street Journal, or any other

11    newspaper, television network, or other media outlet regarding

12    Warren Trepp, eTreppid, Jim Gibbons, or any other aspect of

13    the present litigation."

14          And request 23 says:  "Please provide all

15    correspondence between you, or anyone acting on your behalf,

16    and reporter John Wilke of the Wall Street Journal, reporter

17    David Johnson at the New York Times, and any other requests or

18    discussions that refers to Trepp, eTreppid, Jim Gibbons, or

19    any other aspect of the present litigation."

20          And then, sir, if you turn back to docket 448, my

21    Order, item 15, on page 6 --

22                    THE WITNESS:  Yes.

23                    THE COURT:  -- it says:  "The Court finds that

24    the Montgomery parties shall produce the documents sought by

25    request 22 and 23."

```
 1              Did you produce all of those documents?

 2                   THE WITNESS:  I produced what I had.

 3                   THE COURT:  So when you say that -- this is my

 4  question.  Did you -- have you produced all of the documents

 5  you have that are responsive to those document production

 6  requests?

 7                   THE WITNESS:  I presume you mean e-mails.

 8            I'm asking the Court that.

 9                   THE COURT:  Oh.  Well, I have to rely on what

10  the lawyers have asked for.  And the lawyers appear, in 22,

11  to be asking for documents that you might have provided to

12  those various media outlets.  Request number 23 asks for

13  correspondence --

14                   THE WITNESS:  Right.

15                   THE COURT:  -- between you, or anyone acting on

16  your behalf, and reporter John Wilke, and so forth.

17            So --

18                   THE WITNESS:  Other --

19                   THE COURT:  -- it would seem to me that it would

20  include e-mails.

21                   THE WITNESS:  Other than my attorney, Mr. Flynn?

22                   THE COURT:  Right.

23                   THE WITNESS:  I believe so.

24                   THE COURT:  All right.  And when did you produce

25  those, sir?
```

1                    THE WITNESS:  I thought in the last couple of

2      weeks.

3                    THE COURT:  Okay.

4                    All right.  Now, sir, I would like you to look

5      at Exhibit 3.

6                    THE WITNESS:  Is that an exhibit we have --

7                    LAW CLERK:  It's the next one.

8                    THE WITNESS:  Oh, I see it here.

9                    THE COURT:  Miss High, I'm not going to question

10     Mr. Montgomery on those first two exhibits anymore, so --

11           All right.  Exhibit 3, for the record, is this

12     Court's May 7, 2008 Order, docket 582.

13           Sir, have you ever seen that document?

14                   THE WITNESS:  I don't recall this one

15     specifically, but I'm not --

16                   THE COURT:  Well, take a minute and see.  I just

17     want to make sure if you've seen it, that you can tell me one

18     way or the other.

19                   THE WITNESS:  Yes.  I've seen it.

20                   THE COURT:  I'm sorry.  I'm looking for my copy.

21     Found it.

22           And when did you receive a copy of that Order?

23                   THE WITNESS:  Must have been at the time frame

24     that it was issued.

25                   THE COURT:  All right.  I'd like you to turn to

Case 1:23-mc-00052-CKK-MAU   Document 1-2   Filed 07/28/23   Page 357 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 49 of 226

49

1    page 2 of the Order.

2                    THE WITNESS:  Okay.

3                    THE COURT:  All right.  Item one concerns

4    production of Mr. Montgomery's tax returns for the years 1998

5    to 2005.

6            Do you see that, sir?

7                    THE WITNESS:  Yes.

8                    THE COURT:  All right.  And it says that you

9    didn't provide those on March 14, but produced them by

10   April 4, 2008.

11           Do you see that, sir?

12                   THE WITNESS:  Yes.

13                   THE COURT:  What was the delay?

14                   THE WITNESS:  I was searching through all the

15   files on the hard drives.

16                   THE COURT:  Which hard drives?

17                   THE WITNESS:  The ones that I've produced.

18                   THE COURT:  Well, here's my problem.  You've

19   testified that you started working on these document

20   production responses about the same time that you received

21   them and so on.  And I'm just struggling to understand how

22   you can't find your tax returns.

23           Can you tell me?

24                   THE WITNESS:  I believe two of them were taken

25   during the raid.

```
 1                THE COURT:  All right.  You got those documents
 2    back when?
 3                THE WITNESS:  March of '07.
 4                THE COURT:  Right.  So it's now May of '08,
 5    right?  It's -- actually, my Order said, a year later, my
 6    March 14 Order of 2008, ordered you to produce those.
 7                So, you got them back the year prior, the items
 8    seized by the FBI.  So, hence, my question.
 9                THE WITNESS:  Your Honor, I, I thought between
10    the time of the FBI raid, and the ultimate ruling that came
11    down on the FBI raid, there was a stay on the production of
12    documents.
13                THE COURT:  Right.
14                THE WITNESS:  And I can say I didn't look for
15    any.  But as you well know, during that time, there was a lot
16    of stuff going on.  And I've always been under the restriction
17    where I can't tell my attorneys everything -- I'm not saying
18    about my tax return, but of what I can tell people and what I
19    can't.  I mean, I --
20                THE COURT:  Right.  I understand that, sir.
21                THE WITNESS:  I mean, everyday you say am I
22    supposed to tell me attorney this?  I can't tell my attorney
23    this.  I have the government saying you can't disclose that
24    kind of information.  I mean, it's very confusing.
25                THE COURT:  So how -- I understand that.  I
```

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 359 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 51 of 220

—51

1    appreciate what you're saying.  Having been involved in

2    this case, and in the search warrant proceeding, I greatly

3    appreciate the complexity of where we are and what's occurred,

4    and the protocols that are in place.  I do understand that.

5           What I don't understand is how you can't produce

6    your tax returns.

7               THE WITNESS:  But I --

8               THE COURT:  That, I don't get.

9               THE WITNESS:  I'm sorry.

10              THE COURT:  So, tell me with the --

11              THE WITNESS:  But they were produced,

12   Your Honor.

13              THE COURT:  Yeah.  Eventually.

14              THE WITNESS:  I gave them to my attorney.  I

15   don't know the exact date I gave them to my attorney.  I'm not

16   saying I gave them on April 3rd.

17              THE COURT:  Do you know when you produced those?

18              THE WITNESS:  No.

19              THE COURT:  All right.

20          Well, let's look at number two:  "All documents

21   relating to loans Mr. Trepp, or any entity, understood to be

22   controlled by Mr. Trepp to Montgomery."

23          And I just want to make sure of this.  You state

24   there are only two canceled checks from 2001 responsive to

25   this production request, is that correct?

Case 1:23-mc-00053-CKK-MAU Document 132 Filed 07/28/23 Page 360 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 52 of 226

-52-

```
1                    THE WITNESS:  No.

2                    THE COURT:  Oh.

3                    THE WITNESS:  I mean, I would like to add

4       something.

5                    THE COURT:  Go ahead.

6                    THE WITNESS:  When I left the company, all my

7       records were kept there.  I, I haven't had access to any of

8       my records at the company.  We've, obviously, made production

9       requests multiple times on the company for, including my

10      business expenses, documents.  I haven't seen them.  To my

11      knowledge, they've never been produced.

12           So I don't know what they have, what was taken from

13      me during the FBI raid and never returned, and what -- am I

14      supposed to just start calling the banks and ordering every

15      check that was ever written?  I mean, it seems like all the

16      burden is put on me to get everything.  And I've been under

17      immense restrictions.

18                   THE COURT:  Well, let's talk about that,

19      Mr. Montgomery.

20           The U.S. Protective Order -- let's see, where is

21      that.  That's docket number 253 -- was issued in August

22      of 2007.  I'll just represent that to you.

23                   THE WITNESS:  Okay.

24                   THE COURT:  That's the date Judge Pro signed it.

25      And that's the Protective Order that says what is and is not
```

```
 1    covered by the Military States Secrets Privilege.  And it also

 2    tells everybody, in some detail, what you can produce.  There

 3    is a whole section in that Protective Order that says what can

 4    be produced.

 5              Did you read that Order?

 6              THE WITNESS:  Yes.

 7              THE COURT:  You've read that Order?

 8              THE WITNESS:  I've seen this.  Yes.

 9              THE COURT:  And so that was issued in October --

10    August of 2007.  It's now June 2008.  And you -- is it fair

11    to say that you have very serious concerns about producing

12    documents because you thought they might run afoul of the

13    Military States Secrets Privilege?

14              THE WITNESS:  I'm not saying all documents, but

15    I surely have concerns about that.

16              THE COURT:  Right.  All right.

17         And so between August 2007 and last week, did the

18    attorneys for the United States ever ask to meet with you?

19              THE WITNESS:  Yes.

20              THE COURT:  When?  How many times did they ask

21    you?

22              THE WITNESS:  To my knowledge, one.  And I don't

23    remember the date.  I just don't know the date.  But, they did

24    ask once.

25              THE COURT:  And what was your response, sir?
```

```
 1                    THE WITNESS:  That particular week I was

 2     unavailable.

 3                    THE COURT:  So it just didn't work with your

 4     calendar?

 5                    THE WITNESS:  Well, Your Honor, I -- I'm being

 6     honest with you.

 7                    THE COURT:  No --

 8                    THE WITNESS:  I just couldn't do it right then.

 9                    THE COURT:  Right.

10                    THE WITNESS:  Right that exact time.

11                    THE COURT:  Right.  That can certainly happen,

12     sir.

13               Did you suggest another date?

14                    THE WITNESS:  Well, Your Honor, up until, not

15     the week I met last Friday, but to the Friday or a time prior

16     to that, I'd never spoken to anybody regarding any of the

17     government agencies.  And it wasn't because I hadn't, you

18     know, no desire to comply with the Court, but I've got -- I'm

19     getting fired at from 12 different directions, as you well

20     know.  I mean, I have to keep helping with briefs on my prior

21     attorney who is continuously trying to submarine my case in

22     this court.  I've had to work on the current documents that

23     you have requesting for the Court for going forward.  I have

24     to review documents that are on hard drives.

25                    THE COURT:  Right.
```

Case 1:23-mc-00053-CKK-MAU   Document 13-2   Filed 07/28/23   Page 363 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 55 of 220

—55

```
 1                  THE WITNESS:  I mean, it's a lot of work that
 2     you can't tell your own attorney.  I'm restricted from giving
 3     my attorney information.
 4                  THE COURT:  I understand that, sir.
 5                  THE WITNESS:  Well, you get up every day not
 6     knowing who do you tell what to.  And if you say the wrong
 7     thing, you're going to be held accountable for it.
 8                  THE COURT:  Well, hence my question.  You've
 9     raised that point several times, and I've acknowledged that
10     it's a legitimate concern that you have, sir, about ensuring
11     that you comply with the terms of the U.S. Protective Order.
12     And because that would certainly be, if I were in your shoes,
13     a concern I would also have.
14                  My question is, you see, that was issued in
15     August of 2007.  It's now June 2008.  And, just last week,
16     you met with the government.  And during that time you had
17     the February 21 Order.  And, as we're going to shortly go
18     through, all of the subsequent orders ordering you to produce
19     documents.  And you did not do so.
20                  So, logically, it occurs to me that, to the extent
21     you had very legitimate concerns about not complying with the
22     U.S. Protective Order, why you would not have taken steps
23     to meet with the government -- and you're not to disclose any
24     discussions you've had with the government.  You and I both
25     know that -- and you didn't do that.
```

```
 1              THE WITNESS:  But I did --

 2              THE COURT:  Tell me why.

 3              THE WITNESS:  Okay.  But I did tell counsel.

 4   It's not like -- I mean, I didn't speak to Mrs. Wells

 5   directly.  I didn't even know if I was allowed to speak to

 6   Mrs. Wells directly.  Okay?

 7         There's just a lot of very complicated issues before

 8   this court.  And some days I'm supposed to work.  I have to

 9   make a living every day.  I mean, I got to pay the millions

10   for these legal fees that have been accumulating.

11         I can't do everything.  And I can't disclose

12   anything to my attorneys.  It makes an impossible situation.

13   I mean --

14              THE COURT:  All right.

15              THE WITNESS:  That's the truth, Your Honor.

16              THE COURT:  All right.  Well, let's see.

17   Let's look at docket number 582, my May 27 Order.  Item 3:

18         "Documents relating to eTreppid's technology,

19   including white papers, PowerPoint presentations, marketing

20   documents, and correspondence with potential customers."

21         Now, it was reported to me you produced nothing by

22   May 5.  Is that true?

23              THE WITNESS:  By May 5th?  Is that before --

24              THE COURT:  Excuse me.  May 7 is my Order.

25              THE WITNESS:  Is that before the drives were
```

```
 1    delivered, or after?
 2                 THE COURT:  Is it -- I'm sorry?
 3                 THE WITNESS:  Is that before or after the drives
 4    were delivered?
 5                 THE COURT:  The drives?
 6                 THE WITNESS:  Disk drives, two -- I don't
 7    remember the exact date.  On --
 8                 THE COURT:  Oh, I think you mean -- let's be
 9    clear for the record, sir.
10          You are referring to the disk drives that you
11    delivered to eTreppid's counsel recently?
12                 THE WITNESS:  Yes.
13                 THE COURT:  Oh, no, this was well before that.
14                 THE WITNESS:  Okay.  But as I testified, Your
15    Honor, I'm going through -- how many files can you go through
16    a day in two million or million one?
17                 THE COURT:  Tell me when you discovered that
18    there were two million or however many files that you needed
19    to go through.
20                 THE WITNESS:  Well, once the electronic -- the
21    what's the term for the electronic Order?  The --
22                 THE COURT:  The protocols?
23                 THE WITNESS:  The protocol for producing
24    documents electronically.
25                 THE COURT:  But I thought you said that when
```

Case 3:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 366 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 58 of 226

-58

1    you got these requests for production of documents at or near

2    the time they were propounded to you, you started work on

3    reviewing your files to produce documents, to the extent you

4    could.

5            Am I mistaken?

6            THE WITNESS:  No.

7            THE COURT:  So what does -- what do the

8    electronic protocols have to do with your --

9            THE WITNESS:  How was I --

10           THE COURT:  Let me finish my sentence, sir.

11           THE WITNESS:  Okay.

12           THE COURT:  -- with your obligation to respond

13   to discovery requests and the Court's orders.

14           THE WITNESS:  But I had to produce them

15   electronically.  That's the form they were in.

16           THE COURT:  All right.  So the first

17   opportunity, based on your testimony, you've had to produce

18   documents electronically, pursuant to the protocols, was

19   within the last two weeks or so, is that -- four weeks, two

20   to four weeks?

21           THE WITNESS:  No.

22           THE COURT:  No.  When was it?

23           THE WITNESS:  Uh, when the Grand Jury gave me a

24   subpoena to search everything that I had.

25           THE COURT:  When was that?

1           THE WITNESS:  I -- to be honest with you, I

2    don't know the date.

3           THE COURT:  Well, I'm sure -- just approximate,

4    sir.

5           THE WITNESS:  I want to say August of '07.  I

6    don't know that that's -- it might be earlier.  I don't recall

7    specifically the day it was entered.

8           THE COURT:  Right.  Right.  It was maybe the

9    late summer of '07?

10          THE WITNESS:  Right.

11          THE COURT:  Of 2007.  And I understand that

12   you're saying -- you're making your estimate of time.  That's

13   fine.

14          THE WITNESS:  Right.

15          THE COURT:  So, if you started producing those

16   documents in Order to comply with the Grand Jury subpoena --

17   and maybe I'm misunderstanding your testimony -- wouldn't

18   you have had them available to produce here?

19          THE WITNESS:  I, I believe you were looking for

20   two different things, Your Honor.

21          THE COURT:  Oh.  All right.  So, please clarify

22   then.

23          THE WITNESS:  Um, I have a question.

24          THE COURT:  Go ahead.

25          THE WITNESS:  Am I allowed to disclose

Case 3:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 368 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 60 of 226

—60

 1    Grand Jury information?

 2                  THE COURT:  No.  No.  Say nothing about the

 3    Grand Jury proceeding.

 4                  THE WITNESS:  Okay.

 5                  THE COURT:  I just -- you just raised it.

 6            Here's my problem.  I issued an Order on

 7    February 20th.  I said here's what you, Mr. Montgomery, are

 8    supposed to do.  You didn't do it.  And so motions were

 9    filed.  Trouble came.  Lawyers came in here, or argued lots

10    and lots of papers were filed.  And so then I issued this

11    Order on May 7th.  And I said -- I said I meant what I said

12    February 21; produce the documents.

13            So that's now two times I ordered these documents to

14    be produced.  And you're here today in a contempt hearing for

15    your failure to comply with these orders.  So what I'm trying

16    to understand is why.

17                  THE WITNESS:  Because there's only so much I can

18    do.  You can't go through one million three hundred files.  If

19    I went through three thousand a day, 30 days a week, that's

20    90,000 files.

21                  THE COURT:  Right.  But I understand that, sir.

22    I understand.  We've got lots of documents in this case.

23    Nothing compared to what you're discussing.

24            But what I'm not understanding is, it seems to me,

25    on the one hand you say to me, in your testimony here today,

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 369 of 800
Case 3:06-cv-00056-PMP-MAU   Document 732   Filed 07/28/08   Page 61 of 226

—61

```
 1    Judge Cooke, I started looking at these document production
 2    requests and started going through my files and so forth,
 3    and producing these documents, organizing -- not producing,
 4    because nothing was produced until quite recently.  I mean,
 5    there were some documents produced.  I should be careful
 6    about that -- but I'm just not understanding, if you have
 7    this ongoing, you know, you've got all of these electronic
 8    files -- I know some, sir, were subject to the search warrant
 9    proceeding and had been returned to you.  Those were returned
10    to you.  You got them back.  And if you want to be in a piece
11    of litigation like this, you have to produce the documents.
12    You have to do it when the Court tells you to do it.  And you
13    didn't do it.
14              THE WITNESS:  I can only do what's humanly
15    possible.  You're asking an impossible task.  You're asking me
16    to do more than a human can do.
17              THE COURT:  All right.  So when -- let me --
18    maybe this will -- when did you determine I was asking you to
19    do an impossible task, more than any human can possibly do?
20    Tell me the moment in time when this occurred to you.
21              THE WITNESS:  When you -- in the Order that said
22    hit the print button and dump it all out.  I don't remember
23    which Order that was.
24              THE COURT:  That was my May 7 Order.
25              THE WITNESS:  May 7th Order.
```

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

```
 1              THE COURT:  That's when it occurred to you that

 2   you had a lot of documents to produce?

 3              THE WITNESS:  Well, you want them printed out.

 4   Now you're stuck with the problem of printing millions of

 5   pages.  And I had serious concerns about whether documents

 6   that might fall under that privilege, that anyone would want

 7   printed out.  And I thought I was being more cautious.

 8              THE COURT:  All right.

 9              THE WITNESS:  It was surely my intent to help

10   the Court.  I am not here to hide anything.  Okay?  I'm being

11   as honest with you, judge, but the burden that has been put

12   on me is enormous.  It's not like I can give them to my

13   attorneys and say, attorneys, please review all this and make

14   sure you comply.  I have the government telling me I can't

15   give stuff to my attorneys.

16              THE COURT:  Okay.

17              THE WITNESS:  So, I mean --

18              THE COURT:  I understand.

19              THE WITNESS:  -- I want to respect the Court,

20   and I will do what the Court asks.  But, I'm trying the best

21   I can.

22              THE COURT:  Okay.  And so looking at item 4 in

23   my May 7th Order, sir, I'm on page 2.

24              THE WITNESS:  Yes, I see it.

25              THE COURT:  "Documents relating to any attempts
```

1    to sell, license..." these are a little bit redundant because

2    they go back to my February 21 Order.  So, is it correct that

3    you believe you've produced all of those documents responsive

4    to that request?

5              THE WITNESS:  I believe -- well, my attorneys

6    have.  I presume that's the same.

7              THE COURT:  Right.

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.  And turning to page 3,

10   "documents Mr. Montgomery provided to the Wall Street

11   Journal," and so on, you've provided all of those documents?

12             THE WITNESS:  I believe so.

13             THE COURT:  Okay.  "Photocopies of the faces

14   of all CDs seized, any CDs seized by the FBI is marked as an

15   exhibit, as an eTreppid CD, a copy of the CD."

16        Have you done that?

17             THE WITNESS:  No.

18             THE COURT:  Okay.  And why not?  Tell me again.

19             THE WITNESS:  I thought I reiterated earlier, I

20   believe some of the faces fall under privileged.

21             THE COURT:  All right.  Just let me take a

22   moment, sir.

23        Could you please turn to, I think it's docket number

24   604.  It's Exhibit 4, sir.

25             THE WITNESS:  Yeah.  Okay.

Case 1:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 372 of 800
Case 3:06-cv-00056-PMP-MAU   Document 732   Filed 07/08/08   Page 64 of 226

64

 1                    THE COURT:  It's entitled, "Emergency Request

 2   By Montgomery Parties For Status Conference to Address the

 3   Montgomery Parties Compliance With the Court's May 7, 2008

 4   Order."

 5          Do you see that?

 6                    THE WITNESS:  Yes.

 7                    THE COURT:  Okay.  Please turn to, let's see,

 8   page 1.

 9                    THE WITNESS:  Page 1.  Okay.

10                    THE COURT:  Starting at the paragraph that

11   starts at about line 14.  And just go ahead and read that

12   paragraph to yourself, sir.

13                    THE WITNESS:  The one that starts, "For

14   purposes"?

15                    THE COURT:  "For purposes", correct.

16                    THE WITNESS:  Okay.

17                    THE COURT:  Thank you.

18                    THE WITNESS:  (Witness complies.) Okay.

19                    THE COURT:  Okay.  So that paragraph states

20   that -- well, I might as well read it out loud so that counsel

21   can follow along:

22          "For purposes of responding to the May 7, 2008

23   Order, in good faith, the Montgomery parties interpret,

24   quote, eTreppid's technology, unquote, to refer not only to

25   the technology that the Montgomery parties contributed to

Case 3:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 373 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 65 of 220

65

1   eTreppid under the Contribution Agreement at issue in this

2   action, but all technology that eTreppid used to perform work

3   for any agency of the U.S. government, as to which eTreppid is

4   claiming ownership.

5          As the record in this action reflects, the

6   Montgomery parties contend the technology in the latter

7   category is not owned by eTreppid but is, instead, owned by

8   the Montgomery parties.

9          "For purposes of complying with this Court's May

10  Order, May, excuse me, May 7th, 2008 Order in God faith,

11  however, the Montgomery parties are interpreting the terms,

12  the terms eTreppid's technology to include all technology used

13  by eTreppid, irrespective of the issue of ownership."

14         So now I just need to clarify something.  At the

15  preliminary injunction hearing back in February 2006, you

16  testified, and I believe you testified that when you left

17  eTreppid, you didn't take anything, right?

18                THE WITNESS:  Correct.

19                THE COURT:  So --

20                THE WITNESS:  And I say correct, I remember.

21                THE COURT:  Right.  You remember that testimony.

22  Right.

23         Okay.  So, what is this information here that you're

24  referring to that's referred to in this paragraph?

25                THE WITNESS:  Your Honor, I don't know.  I mean,

```
 1    I don't know the legalese of what this means, to be honest
 2    with you.
 3                 THE COURT:  Okay.  Well, you go down on that
 4    same page, sir, paragraph starting at line 25, it says:
 5                 "Montgomery has hundreds of thousands of files
 6    that could reasonably characterize as documents relating to
 7    eTreppid's technology under the May 7, 2008 Order.  And it
 8    consists of files in multiple formats --"
 9                 THE WITNESS:  Right.
10                 THE COURT:  "-- including, but not limited --"
11    and then you reference all these formats and the gigabytes,
12    350 gigabytes, and so forth and so on.  This is, I guess, the
13    task we've been talking about that is so overwhelming.
14                 And you've discovered all of this, these statements
15    that are made in this court document that I just referenced?
16                 THE WITNESS:  That paragraph, you mean?
17                 THE COURT:  Yeah.
18                 THE WITNESS:  Yes.
19                 THE COURT:  Tell me, it was in the last four
20    weeks that you recognized the amount of documents and the
21    volume, is that correct, that you were going to have to
22    produce?
23                 THE WITNESS:  I thought I'd said February.
24                 THE COURT:  Oh, okay.  You said February.
25                 THE WITNESS:  When that -- when the -- whenever,
```

Case 3:23-mc-00053-CKK-MAU Document 132 Filed 07/28/23 Page 375 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 67 of 226

67

1    right before, right around the time of the electronic

2    protocol.

3                    THE COURT:  Are you familiar with the U.S.

4    Protective Order, sir.

5                    THE WITNESS:  Yes.

6                    THE COURT:  Let's see, that's Exhibit 5.

7    Just --

8                    THE WITNESS:  That's the one you read earlier?

9                    THE COURT:  Right.  It's docket 253.

10                    THE WITNESS:  Yes.

11                    THE COURT:  What's your understanding of how

12   that's supposed to work in terms of, if you believe there

13   might be something governed by the two paragraphs, I think

14   it's 2 and 3 of that Order, what do you understand is supposed

15   to happen procedurally?

16                    THE WITNESS:  Can I ask the government a

17   question?  I mean --

18                    THE COURT:  Well, I don't -- I'm just asking you

19   what you understand about -- I don't want you to talk about

20   anything governed by the State Secrets Privilege.

21           You know, in Order to answer that question, I'm just

22   asking you, it seems to me, if you read this Order, there's a

23   mechanism that's set out for reviewing documents that might be

24   subject to the States Secrets Privilege and what you do.

25   That's all.  I'm just looking --

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 376 of 800
Case 3:06-cv-00056-PMP-VPC   Document 752   Filed 07/08/08   Page 66 of 226

68

 1                    THE WITNESS:  I have a question first.

 2                    THE COURT:  Yes.

 3                    THE WITNESS:  When you say States Secrets

 4    Privilege, are you saying the States Secrets Privilege and

 5    the Protective Order are the same thing?

 6                    THE COURT:  I'm saying that this piece of paper

 7    here, docket 253, is the United States Protective Order, where

 8    Judge Pro said, yes, government, there are things I've decided

 9    that are protected by the States Secrets Privilege, and it's

10    properly invoked.  So, here is the procedure the parties in

11    this litigation are going to use, from now on, to make sure

12    that, during this lawsuit, information governed by the States

13    Secrets Privilege isn't disclosed.  That's the whole point of

14    this Order.

15         Does that answer your question?

16                    THE WITNESS:  Yeah, but it -- it's somewhat

17    confusing.

18                    THE COURT:  My answer or the Order?

19                    THE WITNESS:  No, no, the doc -- I understand

20    what you said, but the document is very confusing.  There

21    leaves a lot of unknown answers or questions, I should say.

22                    THE COURT:  Right.  I understand that.  But,

23    that's not my question.  Here's my question:

24         Do you agree that the U.S. Protective Order sets out

25    a procedure by which you would, if you thought a document

```
 1    might be covered by this Order, might be, there might --
 2    whatever, you have a piece of paper and you think, you know
 3    what, this might have something that's covered by the Military
 4    States Secrets Privilege, and it tells you what to do with
 5    that piece of paper, right?
 6                 THE WITNESS:  I believe it does.  Yes, Your
 7    Honor.
 8                 THE COURT:  Right.  Okay.  And this was entered
 9    in August of 2007, so it was intended, wouldn't you agree,
10    to kind of give everybody an idea about how everyone was to
11    proceed going forward with respect to documents that might be
12    governed by this Order?
13                 THE WITNESS:  Uh, yes.
14                 THE COURT:  Okay.  Here's my question.  You had
15    two document production requests from eTreppid.  And this
16    Order, the ultimate Protective Order was issued in August
17    of 2007.  And how is it that on May 14, this Court's advised
18    of all of these concerns about document review under the
19    U.S. Protective Order has to go on and we want, we, the
20    Montgomery parties, want to just hand everything over to
21    the government, have them take a look at it and so on?  That's
22    not -- that confuses me.
23                 THE WITNESS:  Well, knowing that I was going
24    to produce electronic files, and there was no protocol in
25    place up until February when the Order came into -- whatever
```

```
 1   that Order was that came into place, I didn't know what to

 2   ask the government, or not to ask the government.

 3                  THE COURT:  All right.  So turning to, I think

 4   it's, uh, Exhibit 6, docket 656.

 5                  THE WITNESS:  Exhibit 6?

 6                  THE COURT:  Yes, sir.

 7                  THE WITNESS:  Okay.

 8                  THE COURT:  I think it's --

 9                  MR. PEEK:  Your Honor, what is 656?

10                  THE COURT:  It is, "Plaintiff's Emergency

11   Request For Hearing, or Relief From Requirement to Bring

12   Hard Drive."

13                  MR. PEEK:  Thank you.

14                  THE COURT:  Sorry.  I need to find it.

15             Do you have that, sir?

16                  THE WITNESS:  I have Exhibit 6.

17                  THE COURT:  All right.  And is it entitled,

18   "Plaintiff's Emergency Motion Requesting Delaying Hearing

19   or, in the Alternative, Relief From the Requirement That

20   Montgomery Bring Hard Drives Containing Potentially Privileged

21   Information."

22             Is that the document you're speaking to?

23                  THE WITNESS:  Yes.

24                  THE COURT:  Okay.  Thank you.

25             I'm looking at page 1 of that document, sir.  At
```

1    line 16, it says:

2           "First, a delay in creating copies is outside

3    Montgomery's control.  Montgomery's storage media located in

4    California contained 2.87 million files."

5           Do you see that?

6                THE WITNESS:  Yes.

7                THE COURT:  Where are your storage media located

8    in California?  At Rancho Mirage?

9                THE WITNESS:  Yes.

10                THE COURT:   Is that the only place they're

11   located now?

12                THE WITNESS:  Yes.

13                THE COURT:  How are your files labeled?

14                THE WITNESS:  You mean the outside of the drive,

15   as an example?

16                THE COURT:  Yes.

17                THE WITNESS:  Some have labels on them.  Some

18   didn't.

19          Let me restate that.  The drives that I produced

20   already, I put a label on them --

21                THE COURT:  Well, let me --

22                THE WITNESS:  -- first.

23                THE COURT:  I think I am confusing you.  And I

24   apologize.

25          In that same sentence, you say, "There are about

Case 1:23-mc-00053-CKK-MAU Document 1-2 Filed 07/28/23 Page 380 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 32 of 226

72

1    2.87 million files."

2              Do you see that?

3                   THE WITNESS:  Yes.

4                   THE COURT:  Okay.  So I'm just speaking,

5    generally, how are your files labeled?  Not just the ones

6    that you produced.  How are you labels -- how are your files

7    labeled?

8                   THE WITNESS:  If the drive had what I believed

9    was nonsensitive information, it was written on the outside

10   as "nonsensitive."  If I believed the drive had sensitive

11   information on it, it was labeled "sensitive."

12                  THE COURT:  Do you have an index of all these

13   files?

14                  THE WITNESS:  No.  I guess the answer is no.

15   Because if you produce an index of 2.8 million files, you

16   know, it's hundreds of thousands of pages, so it's kind of

17   hard to produce an index.

18                  THE COURT:  So how do you search your files?

19                  THE WITNESS:  Prior to my meeting or after?  I

20   mean, prior to, how do I --

21                  THE COURT:  I'm just asking.

22                  THE WITNESS:  I would like to ask the government

23   a question.  I can tell you generally.

24                  THE COURT:  No.  I'm just asking generally.  I'm

25   not asking --

Case 3:06-mc-00053-PMP-VPC   Document 732   Filed 07/28/23   Page 381 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 381 of 220

73

```
1              THE WITNESS:  You put a computer drive, you put

2    a computer drive into a computer.  You bring up the operating

3    system.  And you give it a term to go search for.

4              THE COURT:  Well, let -- I would like you

5    to turn to, I guess, I guess it would be Exhibit 12, which

6    is docket number 657 for the record, the Declaration of

7    Dennis Montgomery in Support of Plaintiff's Emergency Motion

8    Requesting Delay in Hearing or, in the Alternative, Relief

9    From the Requirement That Montgomery Bring Hard Drives

10   Containing Potentially Privileged Information.

11             Do you have that, sir?

12             THE WITNESS:  Yes.

13             THE COURT:  I would like you to turn paragraph

14   15.

15             THE WITNESS:  Okay.

16             THE COURT:  Paragraph 15, you say:

17        "To explain how false negatives can occur, it's

18   necessary to understand search utility searches only text,

19   not images.  Thus, the search utility could not review

20   contents of the page, and anything in Word format could not

21   photograph of the same page maintained in, say, .TIF format.

22        "Approximately half of the 2.87 million files that

23   must be searched are image files.  Many of them have water

24   marks with text.  I anticipate that text will or may be -- may

25   include terms the government will ask me to include within my
```

1   search.  The only way for me to detect and remove these false

2   negatives from production, is to manually inspect each and

3   every image file.

4           Okay.  So, are you saying that half of the 2.8

5   million files are in some big folder unorganized and unlabeled

6   because they are image files?  What are you saying there?

7           THE WITNESS:  There are a series of images

8   on multiple drives.  So, drive A may have 200,000, or Drive B

9   may have 500,000, or Drive C may have -- I mean, they're not

10  in one giant Drive.  I guess that's the question.

11          THE COURT:  Yes.  Well, I guess it's -- so how

12  do you find documents in those image files, in those --

13          THE WITNESS:  You don't.  I mean --

14          THE COURT:  So you don't have any organization

15  to those at all?

16          THE WITNESS:  I'd rather -- if you want me to

17  explain it in more detail, I'd rather do it off the record or,

18  I mean, off --

19          THE COURT:  If you feel it's somehow --

20          THE WITNESS:  I don't want to slip and say

21  something --

22          THE COURT:  You feel it might be within the

23  purview of what's governed by the U.S. Protective Order?

24          THE WITNESS:  Yes.

25          THE COURT:  Then that's all right.  Thank you

1    for telling me that.

2              All right.  Now I would now like you to turn to

3    Exhibit 7, which is docket number 652.

4              MR. PEEK:  Six six two, Your Honor?

5              THE COURT:  Six five two.

6              MR. PEEK:  Six five.  Thank you.

7              THE COURT:  "Response to Court's Order to Show

8    Cause Why the Montgomery Parties Shall Not Be Held in Contempt

9    of Court For Failing to Comply With May 21, 2008 Order."

10             Do you have that document, Order?

11             THE WITNESS:  Yes.  There's writing on -- I

12   mean, I don't know if that's --

13             THE WITNESS:  Your Honor, what page?

14             THE COURT:  I haven't --

15             THE WITNESS:  Oh, okay.

16             THE COURT:  -- given you a page yet.

17             Let's see, please turn to page 4.

18             THE WITNESS:  Okay.  Okay.

19             THE COURT:  Item one it says, "The hard drives

20   produced to eTreppid on May 23rd, 2008."

21             Do you see that, sir?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.  It says, "On May 23, 2008,

24   the Montgomery parties produced a hard drive containing

25   Montgomery backup copies of eTreppid electronic files created

Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 384 of 800
Case 3:06-cv-00056-PMP-MAU   Document 732   Filed 07/28/23   Page 384 of 800

76

 1    or dated on or before December 31, 2002," and so on.

 2              When did you first look at the contents of these, of

 3    the hard drives you're talking about here?  About when?

 4              THE WITNESS:  I would guess February.

 5              THE COURT:  Okay.

 6              THE WITNESS:  I would like to qualify that.

 7              THE COURT:  Go ahead.

 8              THE WITNESS:  Am I allowed -- I can't say

 9    anything about the Grand Jury?

10              THE COURT:  (Shakes head from side to side.)

11              THE WITNESS:  Okay.  I can't say I haven't

12    previously looked on the drive for other things in response

13    to them.

14              THE COURT:  All right.

15              All right.  I'm going to take about a five-minute

16    recess.  Well, I'll make it 10, a 10-minute recess.  And we'll

17    resume shortly.

18              So, you can have a break.  Thank you.

19              THE WITNESS:  Am I allowed to ask the government

20    a question?

21              THE COURT:  Well, you and your attorneys can do

22    whatever you wish.

23              THE WITNESS:  Okay.

24         (Recess taken.)

25              THE CLERK:  Joining by phone now is counsel,

Case 1:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 385 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 385 of 220

77

```
 1    Tuneen Chisolm.

 2              I will get the judge.

 3              THE COURT:  Thank you very much.  Please be

 4    seated.

 5              The deputy clerk advises that Tuneen Chisolm,

 6    co-counsel for Ms. Klar, has now joined telephonically.

 7              Good morning, Ms. Chisolm.

 8              MS. CHISOLM:  Good morning, Your Honor.

 9              THE COURT:  All right.  Before we take a recess

10    for the noon hour, I would like to follow-up with a few

11    questions.

12              Let's see, if you would look at, let' see,

13    Exhibit 7, sir.  That is the Montgomery response to the Order

14    to Show Cause, docket 652.

15              Do you have that?

16              THE WITNESS:  Is that the one that I gave you

17    that had writing on it?

18              THE COURT:  I think it is.

19              THE WITNESS:  Yes.  I have it.

20              THE COURT:  Okay.  Thank you.

21              Pardon me.  Turn to page 7, please.

22              THE WITNESS:  Okay.

23              THE COURT:  I'm interested in section C, the

24    documents the Montgomery parties provided to the Wall Street

25    Journal and so on.  And you indicate that you produced, lines
```

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 386 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 386 of 800

—78

1    5 and 6 there, the documents were Bate stamped M-O-N-T 1

2    through 119.  So these are 119 pages of Wall Street Journal

3    documents, e-mails, that you produced after the May 21, 2008

4    Order, is that correct?  You produced them on May 21, correct?

5                    THE WITNESS:  I don't know if that was the date

6    specifically, but --

7                    THE COURT:  Well, I'm just reading and it says,

8    at line 4:  "As ordered on May 21, 2008, the Montgomery

9    parties produced e-mails to and from the Wall Street Journal."

10         So that's what it says, correct?

11                   THE WITNESS:  Yes.  Correct.

12                   THE COURT:  All right.  And in this court, you

13   might recall, we've gone through my orders, Mr. Montgomery, in

14   February of 2008.  I ordered that these be produced.  And so

15   why did you only just recently produce them?

16                   THE WITNESS:  I'm not sure I didn't give them

17   to my attorney earlier than they were produced.  I don't know

18   that for a fact.  I don't recall specifically.

19                   THE COURT:  So you don't know why they weren't

20   produced until May 21, 2008?

21         I'm not trying to put words in your mouth, but --

22                   THE WITNESS:  Right.  Right.

23                   THE COURT:  -- I just want to understand the

24   answer to the question, sir.

25                   THE WITNESS:  It may have been one of the files

Case 1:23-mc-00053-CKK-MAU Document 132 Filed 07/28/23 Page 387 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 39 of 226

79

1    on the hard drives.  I don't recall specifically.

2              THE COURT:  Okay.  Well, wouldn't you have had

3    possession of those 119 pages in February?

4              THE WITNESS:  Yes.

5              THE COURT:  Now, for the e-mails that you did

6    produce, did you produce them in native format with the

7    attachments, as eTreppid requested in their document

8    production request?

9              THE WITNESS:  No.

10             THE COURT:  Why not?

11             THE WITNESS:  Because -- is this referring to --

12   can I just read it again?

13             THE COURT:  Certainly.

14             THE WITNESS:  (Witness reviews document.) Okay.

15   I'm sorry.  What's the question?

16             THE COURT:  The question is for the e-mails that

17   you did produce, did you produce them in native format with

18   all of the attachments, as eTreppid had requested?

19             THE WITNESS:  No.

20             THE COURT:  Why not?

21             THE WITNESS:  Because those, I believe, I only

22   had in non-native form.

23             THE COURT:  All right.  Did you personally

24   provide any information to the Wall Street Journal, via e-mail

25   or otherwise; for example, in person, by phone or fax?

```
 1              THE WITNESS:  Are you asking if I've ever talked
 2   to the Wall Street Journal, or --
 3              THE COURT:  Well, I asked if you ever provided
 4   any information to the Wall Street Journal that is relevant to
 5   this document production request either by e-mail or fax.
 6              THE WITNESS:  I'm not trying to be coy, I just
 7   want to understand.
 8         Are you asking if I didn't call them and say you
 9   need to produce whatever you have to the Court?
10              THE COURT:  No, no.  I'm sorry.  I'm glad you
11   asked that question.
12         I'm asking if you, just in your relationship that
13   you had with anyone at the Wall Street Journal, did you
14   ever personally provide any information to someone at the
15   Wall Street Journal via e-mail, in person, by phone, by fax.
16              THE WITNESS:  I could have.  Yes.
17              THE COURT:  Then you say -- let's see, you say,
18   at page 7, at line 16, you say:  "The Montgomery parties are
19   preparing to produce all e-mails they believe may have been
20   provided to the media."
21         So, why weren't those included in the May 21
22   document production?
23              THE WITNESS:  Your Honor, I don't believe I've
24   actually sent e-mails to the media.
25              THE COURT:  Okay.  I'm not talking -- and I
```

1    think I may have confused you.  And I apologize.  Let me just

2    read this.  It says -- let's read together, page 7, line 13,

3    it says:

4              "However, unless the e-mails are addressed to or

5    received from a reporter, the Montgomery parties cannot

6    ascertain the universe of e-mails provided by Flynn.  Only

7    Flynn can provide this information.  However, the Montgomerys

8    are preparing to produce all e-mails they believe may have

9    been provided to the media.

10             "The Montgomery parties, however, cannot verify that

11   such e-mails were or were not actually provided by Flynn to

12   reporters."

13             And of course there's a reference to a retaining

14   lien and Mr. Flynn's files and so forth.

15                  THE WITNESS:  Yeah.

16                  THE COURT:  My question is just about the

17   production.

18                  THE WITNESS:  Right.

19                  THE COURT:  So --

20                  THE WITNESS:  I believe --

21                  THE COURT:  -- why weren't these produced by

22   May 21st, 2008?

23                  THE WITNESS:  Your Honor, the only thing I can

24   say is that I was trying to produce everything that you were

25   requesting.  And it's a very overwhelming job.  Maybe I took

```
 1   too much on, but I had no other options to try to do this
 2   with.  It surely is not my intent to insult you or the Court,
 3   or disrespect the Court.  But, there's only so much a person
 4   can do.
 5               THE COURT:  Well, true.
 6          My problem is this.  I have a hard time believing
 7   that the documents that were produced, or part of this
 8   whole Wall Street Journal media request for production, have
 9   any Protective Order implications, U.S. Protective Order
10   implications at all.  In other words, those documents would
11   be -- you might use the colloquial phrase, "a no brainer", to
12   say, oh, okay, well, yeah, here's this wedge of documents.  I
13   mean, you might want to check to see, out of an abundance of
14   caution, if they're covered by the Protective Order.  But,
15   maybe I'm missing something.
16               And that's why I'm asking you the question.  It
17   would seem that that would be a category that wouldn't be
18   implicated by the Protective Order.  Am I wrong or --
19               THE WITNESS:  Wrong, I don't --
20               THE COURT:  No, no.  Well, you, obviously,
21   don't want to say I'm wrong.  I understand.  But I don't
22   understand why these weren't produced.  That's what I'm
23   telling you, sir.
24               THE WITNESS:  But everything had a level of
25   importance.  You're asking for everything to be simultaneously
```

Case 3:23-mc-00053-CKK-MAU Document 132 Filed 07/28/23 Page 391 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 83 of 226

83

```
 1    produced.  You can only produce so much at a time.  I can't
 2    show them to my attorneys --
 3                 THE COURT:  You could show these to your
 4    attorneys.
 5                 THE WITNESS:  I believe that's not the case.
 6                 THE COURT:  Okay.  Well, maybe, maybe you may
 7    have reasons for saying that.  So, all right.
 8           Well, let's talk about the Len Gloguaer e-mail.
 9                 THE WITNESS:  Okay.
10                 THE COURT:  Everybody seems to have an interest
11    in that.  And I apologize for calling him Glen Gloguaer.  I
12    guess it's Len.
13           So, let's see -- let's see, I may have to just read
14    that to you, sir.  Let's see if I have it in my binder.
15                 THE COURT:  All right.  Docket number 662 is --
16    you don't have a copy of it, I don't believe.  I apologize,
17    Mr. Montgomery.  I don't have a copy for you.  It's called a
18    reply -- it's eTreppid's reply in support -- oh, you got it.
19           Do we have it Miss High?
20                 LAW CLERK:  Yes.
21                 THE COURT:  Oh, it's number 16.  Thank you.
22                 MR. PEEK:  Did you say court Exhibit 16,
23    Your Honor?
24                 THE COURT:  It's Exhibit 16.
25                 LAW CLERK:  662.
```

Case 3:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 392 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 84 of 220

84

```
 1                  THE COURT:  It's docket 662.

 2                  MR. PEEK:  Thank you.

 3                  THE WITNESS:  I got it.

 4                  THE COURT:  Good.  This is the Reply of ETreppid

 5      in Support of the Motion For Order to Show Cause.  All right?

 6           Please turn to page 9.

 7                  THE WITNESS:  Okay.  Let me find it.  Just a

 8      minute.

 9                  THE COURT:  It says here that you have not yet

10      produced the Gloguaer e-mail as ordered May 21.

11           Is that true?

12                  THE WITNESS:  I don't know if that's true or

13      not.

14                  THE COURT:  Well, have you produced it or not?

15                  THE WITNESS:  My understanding is it was

16      produced.

17                  THE COURT:  Okay.  Did you produce e-mail in

18      it's original format?

19                  THE WITNESS:  I believe so.

20                  THE COURT:  All right.  All right.  Thank you,

21      sir.

22           What we're going to do, it's close to the noon hour.

23      We're going to go ahead and take the noon recess.  I think,

24      probably, it would be fair to counsel and the parties to

25      reconvene at 1:30.
```

Case 1:23-mc-00073-CKK-MAU   Document 1-31   Filed 07/28/23   Page 393 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 85 of 220

85

1          So, we'll go ahead and reconvene here at 1:30.

2    Thank you all very much.  We're in recess.

3                  MR. PEEK:  Thank you, Your Honor.

4                  (Noon Recess Taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              RENO, NEVADA, TUESDAY, JUNE 10, 2008, 1:30 P.M.

 2                          ---OoO---

 3

 4              THE COURT:  Thank you.  Please be seated.

 5              Before, Mr. Montgomery, I continue with some

 6    questions I have of you, sir, and I should be wrapping

 7    things up in fairly short Order.  I did want to comment on

 8    Mr. Gunderson's request at the beginning of this hearing to

 9    strike, he made an oral motion to strike the Declaration of

10    Michael Flynn.  I believe it's docket 666.  And what I'm going

11    to do is allow the Montgomery parties to file a motion to

12    strike that document, and allow any opposition to be filed.

13    But, I will say that the information contained in that

14    declaration will not be the subject of any questions that

15    are posed this afternoon.

16              Yes, sir.

17              MR. PEEK:  Your Honor, may I be heard on that?

18              Because there is certainly one exhibit that is,

19    clearly, non-attorney/client information.  And that is the

20    exhibit in which Ms. Blixseth is reporting, on October 31st,

21    certain plans she has for marketing of the eTreppid

22    Technology.  It's not an attorney/client communication.  It

23    doesn't say Dennis -- it does say, sort of an enclosure to

24    Mr. Flynn from Mr. Montgomery, but it's clearly an e-mail

25    on which Mr. Flynn was copied, and which should have been
```

Case 1:23-mc-00053-CKM-MAU   Document 732   Filed 07/28/23   Page 395 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 87 of 226

87

 1  produced, and would certainly be critical evidence to this

 2  motion.

 3              THE COURT:  Mr. Gunderson.

 4              MR. GUNDERSON:  Part of the problem that

 5  we're facing is that this affidavit is nothing more than a

 6  fugitive document.  It's filed in opposition to Deborah Klar's

 7  declaration, as if Mr. Flynn were a party in this case.  I've

 8  not seen the attachments, and I've not seen  the exhibits that

 9  are attached to it.

10          That's the kind of document, Your Honor, that

11  either it is in or it is out.  We need the right, and have

12  the ability, just as you've noticed, to oppose it, put our

13  points and authorities in, do the proper kind of opposition,

14  the motion to strike, look at all of these documents, analyze

15  whether or not they really are privileged or there's a joint

16  defense privilege.  I don't know yet.

17          So, you know, to me, it's either one or the other.

18  It's either all in or all out.  And if it's all out, it ought

19  to be all out.

20              THE COURT:  Okay.  Thank you.  Well, I'm

21  going to let stand my prior Order with respect to the Flynn

22  declaration and any exhibits.

23          Some observations, I don't know that we'll finish

24  the entire proceedings here today.  I also know, however,

25  there is a case management conference set, I think it's next

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 396 of 800
Case 3:06-cv-00056-PMP-MAU   Document 732   Filed 07/28/08   Page 88 of 220

-88-

```
 1   week.  And so -- is that correct, Miss Clerk?

 2             THE CLERK:  Yes, Your Honor, on Tuesday.

 3             THE COURT:  So to the extent there might be

 4   more testimony -- I don't know.  We may finish today.  That

 5   may be fine.  But, in any case, there will be another

 6   opportunity to pursue that.  And so my Order is that the

 7   Montgomery parties, they file their motion to strike.

 8   Depending on the outcome of today's hearing, in terms of do we

 9   need to continue it, I'll make a decision at the end of the

10   day about a briefing schedule, so the parties have an

11   opportunity to respond and so forth.

12        All right.

13             MR. PEEK:  Your Honor, at that time, I guess, I

14   would be able to at least ask for a subpoena that Mr. Flynn be

15   issued, in case he would come for that next week hearing as

16   well?

17             THE COURT:  Yes.

18             MR. PEEK:  I mean, he's still, in some small

19   part -- I apologize I'm not at the lectern -- he's still in

20   some small part, a part of this proceeding.  And I think the

21   Court can't order him to appear, and I would ask the Court

22   order him to appear for that status conference as well, so

23   that we could take the testimony that might be consistent

24   with, some part of it consistent with the declaration.

25             THE COURT:  Well, I'll see about that.
```

Case 3:23-mc-00053-CKK-MAU   Document 132   Filed 07/28/23   Page 397 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 89 of 220

89

1          MR. PEEK:  Okay.

2          THE COURT:  I mean, we'll see about that.  I'm

3   not so sure that that's what I'm inclined to do.  I think

4   we're dealing with the Motion to Strike and the documents

5   attached thereto.  I don't know if it's going to turn into an

6   evidentiary hearing where Mr. Flynn is going to be called to

7   testify.  I'm a ways from thinking that might be something I

8   would be inclined to do.  But, we'll take that up at the

9   appropriate time.

10          All right.  Mr. Montgomery, I have just some

11   follow-up questions to you on some areas that we've discussed

12   this afternoon -- earlier this morning.  And just for your

13   ease of reference, sir, I'm going to ask you to refer to

14   Exhibit 16 and Exhibit 7.

15          Counsel, Exhibit 7 is the Montgomery parties

16   response to the Order to Show Cause, docket 652.  And

17   Exhibit 16 is eTreppid's reply in support of the motion for

18   Order to Show Cause.

19          Pardon me, sir?

20          THE WITNESS:  I'm sorry.  I was asking her.

21          THE COURT:  Oh.  All right.

22          Then at docket 662.

23          THE WITNESS:  All right.  I have them.

24          THE COURT:  Very good.  Before we turn to those

25   documents, sir, I just wanted to follow-up on some of my

1    questions concerning documents associated with the production

2    of Wall Street Journal and other media outlets.

3                    THE WITNESS:  Okay.

4                    THE COURT:  And if I am mischaracterizing your

5    testimony, preliminarily, I'm going -- just trying to

6    summarize it.  But if I do, and it's not correct, just

7    tell me and restate it.  That's fine.

8                    THE WITNESS:  Okay.

9                    THE COURT:  I believe you testified this morning

10   that you provided the information to the Wall Street Journal

11   at some point, even if it was an e-mail.  I think that's what

12   you testified.

13        So, my question is if that's in fact your testimony,

14   did you give representatives from the Wall Street Journal,

15   or other media outlets, documents via fax or in person at

16   anytime?

17                   THE WITNESS:  Uh, yes.

18                   THE COURT:  And, if so, did you produce --

19                   THE WITNESS:  Yes.

20                   THE COURT:  Your answer is yes.  Did you produce

21   those documents to eTreppid?

22                   THE WITNESS:  Well, I produced what I had.  And

23   I want to characterize my statement by saying I'm not certain

24   if I gave them, or my attorney gave them.

25                   THE COURT:  When I say you, I'm assuming,

Case 3:23-mc-00053-CKK-MAU   Document 7-2   Filed 07/28/23   Page 399 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 91 of 226

91

```
 1   obviously, that you didn't personally provide them to

 2   eTreppid.  That, certainly, you would have -- they would

 3   have been provided via your attorney.

 4               THE WITNESS:  No.  I meant the reverse.

 5               THE COURT:  Oh.

 6               THE WITNESS:  Actually, to the reporter that you

 7   had --

 8               THE COURT:  Oh.  So please explain again, sir.

 9   I'm sorry.

10               THE WITNESS:  I'm not certain if I actually gave

11   them to the person or my attorney, Mike Flynn, gave them.

12               THE COURT:  Oh, I see.

13         So to the extent you or Mr. Flynn gave the Wall

14   Street Journal representatives, or any media representatives

15   documents, my question is have you produced those documents

16   to eTreppid?

17               THE WITNESS:  Yes.  I believe so.

18               THE COURT:  All right.  Now, sir, I would

19   like to ask you a few questions, as I indicated, about

20   Exhibit 7 and Exhibit 16.  I would like to first turn to

21   Exhibit 7.  And, please, turn to page 6.

22               THE WITNESS:  I'm there.

23               THE COURT:  All right.  And I'm reading,

24   beginning on-line 14, it states as follows:

25               "The only documents even -- pardon me.  This, just
```

Case 3:06-mc-00078-PMP-VPC Document 131 Filed 07/28/23 Page 400 of 800
Case 3:06-cv-00056-PMP-VPC Document 131 Filed 07/28/08 Page 92 of 226

92

 1    for the record, this concerns documents related to, relating

 2    to any attempt by Montgomery parties to license, sell, or

 3    distribute any technology in the fields of data compression,

 4    pattern recognition, and so on, between January 18, 2006 and

 5    the present."

 6            And it goes on to state, at line 14:

 7            "The only documents even, arguably, responsive

 8    to this request are an agreement between Opspring and

 9    Montgomery.  Montgomery does not have possession of these

10    documents, which he believes are in the possession of his

11    former counsel of record, Michael Flynn.

12            "In an effort to comply with this request, however,

13    Montgomery obtained copies of the Opspring/Montgomery

14    agreements from Opspring's former counsel, Dorsey & Whitney.

15    These copies have been produced," and so forth.

16            "By producing the documents, Montgomery does not

17    intend and does not admit that he has possession, custody

18    or control of any other Opspring document."

19            Okay.  So were you ever -- you never received copies

20    or faxes or any of the documents concerning your relationship

21    with Opspring, is that correct?

22            THE WITNESS:  No.  When I signed the document,

23    they were provided to my attorney.  He has the original of my

24    documents.

25            THE COURT:  Right.  So I understand that you're

 1    saying that Mr. Flynn, your former counsel, has these

 2    documents.

 3              THE WITNESS:  Correct.

 4              THE COURT:  Okay.  So if he's got the formal

 5    documents, where he signed on the dotted line, this document

 6    production request isn't just asking for that document.

 7    It's asking for a much broader set of documents.  And it

 8    says, as I stated -- I'm just summarizing what's captioned

 9    in this paper filed by your counsel -- "documents relating

10    to any attempts by the Montgomery parties to license, sell,

11    distribute any technology in the fields of data compression,

12    pattern recognition, object tracking, or anomaly detection,

13    between January 18, 2006 and the present."

14              So that's not just the signed, whatever, agreement.

15    It's --

16              THE WITNESS:  I understand that.

17              THE COURT:  Okay.  So my question is you're

18    saying that that's the only document -- what -- so I guess

19    my question is are you saying you have no other e-mails,

20    drafts of documents, letters, faxes, anything in your

21    possession that concerns any of the items outlined in that

22    document production request?

23              THE WITNESS:  The data compression, pattern

24    recognition, object tracking?  That those four terms?

25              THE COURT:  Well, no -- true, yes, but it

Case 3:23-mc-00073-CKK-MAU  Document 132  Filed 07/28/23  Page 402 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 94 of 226

94

```
 1    says, "documents relating to any attempt by a Montgomery

 2    parties to license, sell, or distribute any technology in the

 3    fields of ..."  and then --

 4                    THE WITNESS:  Right.  Other than the documents

 5    that you just described, the ones that I had signed when I had

 6    joined the company, that's correct.

 7                    THE COURT:  All right.  And you have no copies

 8    of those documents?

 9                    THE WITNESS:  No, because those documents were

10    produced with my attorney, and he kept the original documents

11    and insisted on keeping them.

12                    THE COURT:  All right.  Okay.

13            Well, all right.  Let's step back a minute.

14            When you started your association with eTreppid

15    in September, I believe, of 1998, you recall signing a

16    contribution agreement?

17                    THE WITNESS:  Yes.

18                    THE COURT:  Did you keep a copy of it?

19                    THE WITNESS:  Yes.

20                    THE COURT:  Okay.

21                    THE WITNESS:  At eTreppid.

22                    THE COURT:  You had a copy?

23                    THE WITNESS:  Which I kept at eTreppid.

24                    THE COURT:  Right.  And I know you say now it's

25    there and you don't have it, right?
```

```
 1                    THE WITNESS:  Well, I'm -- that's correct.

 2                    THE COURT:  But, in other words, and so in

 3      your dealings with Opspring and anyone else, do you have a

 4      covenant not to compete?

 5                    THE WITNESS:  Not that I believe so -- actually,

 6      that's not the case.  I believe Opspring, I have a covenant

 7      not to compete.

 8                    THE COURT:  Well, where's that?

 9                    THE WITNESS:  I believe it was with Mike Flynn,

10      all the documents I signed.

11                    THE COURT:  All the documents.  There are no

12      drafts, no e-mails, no faxes, no copies that you ever kept,

13      and no correspondence concerning any of this that you even

14      have in your possession.

15                Is that your testimony?

16                    THE WITNESS:  That's correct.

17                    THE COURT:  Okay.

18                Okay.  Please, sir, look at Exhibit 16, which is

19      docket 662.

20                    THE WITNESS:  Okay.

21                    THE COURT:  And that's eTreppid's reply in

22      support of Motion for Order to Show Cause.  If you would,

23      sir, please turn to page 4.

24                    THE WITNESS:  Okay.

25                    THE COURT:  And if you look at lines 5
```

Case 1:23-mc-00053-CKK-MAU   Document 1-2   Filed 07/28/23   Page 404 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 96 of 226

96

```
 1   through 15.
 2                  THE WITNESS:  Okay.
 3                  THE COURT:  This concerns requests for
 4   production of documents concerning payments made to you by
 5   Sandoval, Blixseth, Opspring, Azimyth, or Atigeo.  Contracts
 6   that might exist between you and those same people, or
 7   entities, and correspondence or other communications that
 8   you might have between those individuals or other parties.
 9   And, all evidence of communications that you might have
10   between yourself and any customer, or potential customer of
11   Opspring or Azimyth.
12                  That's the universe of documents that I would like
13   to talk to you about now.
14                  THE WITNESS:  Okay.
15                  THE COURT:  Okay.  Do you e-mail Mr. Sandoval?
16                  THE WITNESS:  You mean presently or --
17                  THE COURT:  This -- well, it says, you know, at
18   the time these requests for production --
19                  THE WITNESS:  No.
20                  THE COURT:  -- were propounded.  You didn't
21   e-mail him ever?
22                  THE WITNESS:  Yes.  I e-mailed him.
23                  THE COURT:  Oh, you did.
24                  THE WITNESS:  Yes.
25                  THE COURT:  Okay.  And did you produce
```

Case 1:23-mc-00073-CKK-MAU   Document 7-32   Filed 07/28/23   Page 405 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 95 of 226

97

 1    those e-mails?

 2              THE WITNESS:  Um, no.

 3              THE COURT:  Why not?

 4              THE WITNESS:  Well, because the e-mails that

 5    I had, which was in Seattle, when Mr. Sandoval came into the

 6    company here, he moved all the e-mails, my e-mails.

 7              THE COURT:  How did he do that?

 8              THE WITNESS:  E-mail server, from the e-mail

 9    server.

10              THE COURT:  Uh, all right.  Do you have any

11    letters from Mr. Sandoval?

12              THE WITNESS:  Other than the documents that I

13    referred to originally when I signed the agreement, no.

14              THE COURT:  Do you have any phone messages?

15              THE WITNESS:  No.

16              THE COURT:  Do you have any faxes that you --

17              THE WITNESS:  No.

18              THE COURT:  -- that went between you and

19    Mr. Sandoval?  Nothing?

20              THE WITNESS:  I don't believe I ever faxed him.

21              THE COURT:  Okay.  Did you ever e-mail Edra

22    Blixseth?

23              THE WITNESS:  Edra.

24              THE COURT:  Edra.  Pardon me.

25              THE WITNESS:  Yes.

 1                THE COURT:  And have you produced those e-mails?

 2                THE WITNESS:  No.

 3                THE COURT:  Why is that?

 4                THE WITNESS:  Uh, because, currently, they're on

 5    a drive that has other things on the drive.

 6                THE COURT:  When you say that it has other

 7    things on the drive, are those items subject to what you

 8    believe, in good faith, to be subject to the U.S. Protective

 9    Order?

10                THE WITNESS:  Yes.

11                THE COURT:  And you can't segregate those out?

12                THE WITNESS:  No, I -- it's possible.  Yes.

13                THE COURT:  So why haven't you done that?

14                THE WITNESS:  Because I've been producing files,

15    and you can't do everything at once.  I'm only one person.  My

16    attorneys cannot be involved in it.

17                THE COURT:  All right.  Do you have any letters

18    between yourself and Ms. Blixseth.

19                THE WITNESS:  No.

20                THE COURT:  Any phone message, copies of phone

21    messages?

22                THE WITNESS:  No.

23                THE COURT:  Any faxes, facsimiles, letters, or

24    documents between you and Ms. Blixseth?

25                THE WITNESS:  No.

Case 3:20-mc-00078-CKJ-MAU   Document 32   Filed 07/28/23   Page 407 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 407 of 230

99

```
 1                THE COURT:  And have you -- I know you've told
 2    me today that because of the enormous volume of documents
 3    that you've described in the face of the U.S. Protective
 4    Order, plus the volume of documents, that this is a daunting
 5    task, but do you have a way to search your e-mail files to see
 6    what you've sent?
 7                THE WITNESS:  Yes.
 8                THE COURT:  Have you done that?
 9                THE WITNESS:  Yes.
10                THE COURT:  So --
11                THE WITNESS:  Your Honor, there are millions of
12    files.
13                THE COURT:  Right.
14                THE WITNESS:  I appreciate you think this is one
15    direct file that you should be able to deal with, but I have
16    to deal with the whole Order you gave.  It wasn't just this is
17    your one request.  This is all of your request.
18                THE COURT:  Right.
19                THE WITNESS:  So you got to deal with all of
20    this at once.  It takes a long time to do it.
21                THE COURT:  So when -- tell me, again, when
22    you started this enormous task you're describing.
23                THE WITNESS:  I believe I said sometime in
24    February.
25                THE COURT:  All right.
```

Case 3:22-mc-00078-GMK-WAU Document 734 Filed 07/28/23 Page 408 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 108 of 226

-100-

1          Sir, if you could please turn back to Exhibit 7,

2   docket six -- oh, pardon me -- yeah, no, that's what I want,

3   docket 652.

4               THE WITNESS:  Okay.

5               THE COURT:  Please turn to page 4.

6               THE WITNESS:  Okay.

7               THE COURT:  I'm just going to read into the

8   record, for the benefit of counsel, lines 7 through 15.  This

9   concerns hard drive produced to eTreppid on May 23rd, 2008:

10              "On May 23rd, 2008, the Montgomery parties produced

11  a hard drive containing Montgomery backup copies of eTreppid

12  electronic files created or dated on or before December 31,

13  2002, the pre-2003 electronic files.

14              "The Montgomery parties believe, in good faith,

15  that the pre-2003 electronic files do not contain information

16  subject to the United States Protective Order (The Protective

17  Order), or non-disclosure agreements between Montgomery

18  and agencies for the U.S. government (The Non-Disclosure

19  Agreements), because eTreppid did not beginning performing

20  any sensitive work for the government until 2003.

21              "Accordingly, it was unnecessary to undertake the

22  time consuming screening of these particular electronic files,

23  thereby permitting their prompt production."

24              Now, so, here's my question.  It seems to me that

25  you acknowledge in this statement that the pre-2003 documents

```
 1    didn't contain information that was subject to the

 2    U.S. Protective Order, correct?

 3                THE WITNESS:  I never checked all the files.  I

 4    just went under the assumption they did not.

 5                THE COURT:  Right.  Right.  Okay.

 6          So, why didn't you turn all of that information over

 7    on March 14, 2008?

 8                THE WITNESS:  Because I was searching it.

 9    And when it became an insurmountable task, and I was under a

10    court order in May to deliver it, or else, I just delivered

11    it.

12                THE COURT:  You just delivered it recently.

13                THE WITNESS:  Yeah.  But, Your Honor --

14                THE COURT:  All right.  No.  I understand you've

15    explained, repeatedly, the frustration you've had with the

16    amount of work that the Order has required you, the orders, I

17    should say, have required you to undertake.

18          Now, you've testified today that it's very difficult

19    to separate out files, any files.  That's the impression I'm

20    given.  If it's incorrect, please correct me.  But, that's my

21    impression.

22          So my question is how were you able to find the

23    pre-2003 files?

24                THE WITNESS:  You mean the drive?

25                THE COURT:  Uh-huh.
```

Case 3:22-mc-00076-PNK-VPC Document 732 Filed 07/08/23 Page 410 of 200
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 102 of 200

102

 1                     THE WITNESS:  By just looking on each of the

 2      drives to see, generally, what date range it fell within.

 3                     THE COURT:  So you didn't have to do a search,

 4      you could just look on the drive?

 5                     THE WITNESS:  You're making your best guess.

 6                     THE COURT:  Pardon me?

 7                     THE WITNESS:  You're making your best guess.

 8      That's correct.

 9                     THE COURT:  Okay.  I have a question, sir,

10      about -- I'm just looking for the number, Exhibit 12.  That

11      is docket 657, your declaration.

12                Do you have that, sir?

13                     THE WITNESS:  Yes.

14                     THE COURT:  Please turn to --

15                     THE WITNESS:  No, I don't.

16                     THE COURT:  You don't?

17                Ms. High, could you help Mr. Montgomery out, please.

18      It's Exhibit 12.

19                Sir -- whoever is typing, stop.

20                     MR. SCHWARTZ:  My apologies.

21                     THE COURT:  Thank you.

22                     THE WITNESS:  Okay.  I have it.

23                     THE COURT:  All right.  I'd like you to turn to

24      page 3, paragraph 8.

25                And you say, in paragraph 8, that you estimate that

Case 3:23-mc-00076-GMN-WGC   Document 731   Filed 07/08/08   Page 411 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 103 of 220

-103-

1    searching for --

2                    THE WITNESS:  I don't have --

3                    THE COURT:  Oh, I'm sorry.

4                    THE WITNESS:  Page 3, it's a title page -- oh,

5    the declaration.

6                    THE COURT:  I'm sorry.  Yes.  This is

7    Mr. Montgomery's declaration filed June 5th, 2008.

8                    THE WITNESS:  I got it.

9                    THE COURT:  All right.  At paragraph 8, you

10   state as follows on page 3:

11            "I estimate that searching for even a single term

12   will take approximately 60 hours.  I start the process by

13   transferring the files from the original storage media

14   to a larger and more modern drive.  This transfer speeds

15   the process, because the separate search process causes a

16   bottleneck in the speed and frequency of transfers between

17   the storage media and the computer's working memory.  The

18   more transfers that are necessary, and the slower each

19   transfer occurs, the longer the search will take."

20            So is it your testimony that in your daily business,

21   that in your daily work, that it takes you 60 hours to search

22   a term to get the files you need?

23                    THE WITNESS:  Yes.  Well, there's millions of

24   files.

25                    THE COURT:  So how do you get anything done?

1            THE WITNESS:  Well, that's, obviously, part of

2    the problem, Your Honor, is the --

3            THE COURT:  Well, I'm not talking about just

4    this document production response.  I'm just talking about

5    your daily work.

6            THE WITNESS:  Well, my daily work isn't normally

7    searching computer drives for terms.  This is a task that

8    you're searching a significant number of documents, under

9    an operating system that is not designed to accommodate that

10   many documents, and it's slow, or it fails.  If the document

11   search was started at ten o'clock at night and it failed at

12   two o'clock in the morning, and I'm not there, you got to

13   restart it.

14           THE COURT:  So this isn't your -- I had asked

15   the question, perhaps you didn't hear me when I asked the

16   question, I asked whether it was your testimony that in your

17   daily business it takes you 60 hours to search a term to get

18   a file that you need.  That was my question.

19           THE WITNESS:  I don't think I understand what

20   you're asking me.

21           THE COURT:  Well, I'm just -- it strikes me -- I

22   mean all of us use computers and will search for terms and do

23   searches, so I'm having a hard time understanding why this

24   takes you 60 hours.

25           THE WITNESS:  Because there's so many files,

 1    Your Honor.  You probably don't have a computer that's got

 2    five- or 600,000 files on it.  You probably got a computer

 3    that's got 20,000 or 30,000.  And under Windows, the more

 4    files you add, it exponentially increases the search time.

 5                    THE COURT:  All right.  Please turn to docket

 6    number, let's see, Exhibit 7, docket 652.

 7                    THE WITNESS:  Okay.

 8                    THE COURT:  And counsel, that is Montgomery

 9    party's response to Order to Show Cause.

10              Please turn to page 4, sir.

11                    THE WITNESS:  Okay.  I'm there.

12                    THE COURT:  And this concerns the hard drives

13    produced to eTreppid May 23rd, 2008.  You say -- well, the

14    document says:

15              "On May 23rd, 2008, the Montgomery parties

16    produced a hard drive containing Montgomery's backup

17    copies of eTreppid, eTreppid electronic files created or

18    dated on or before December 31, 2002, the pre-2003 electronic

19    files.  The Montgomery parties believe, in good faith, that

20    these electronic files don't contain information subject to

21    the U.S. Protective Order," and so on.

22              And I'm afraid I might have been repeating myself.

23    Hang on.

24              Oh, all right, and you've already -- "accordingly",

25    it goes on to say, "it was unnecessary to undertake the time

Case 3:23-mc-00053-CKK-MAU Document 732 Filed 07/08/08 Page 414 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 106 of 220

-106-

 1  consuming screening of these electronic documents" -- we

 2  talked about this.

 3          But then it goes on to say, Although the hard drive

 4  was timely produced" -- timely being a relative term.  That's

 5  just my editorial comment -- "eTreppid advised Montgomery

 6  party's counsel that it was not readable.  This problem may

 7  be due to viruses present in the original electronic files

 8  at the time that they were backed up.

 9          "It is possible that if eTreppid started up the

10  drive delivered on May 23rd, without taking precaution for

11  the possibility that some files contained viruses, many files

12  on the hard drive could have been rendered unreadable."

13          And I guess after -- so, let's see, 662.  So let me

14  have a moment here, sir.

15          I'm now looking, sir, at Exhibit 16, which is

16  eTreppid's reply.  It's docket 662.

17              THE WITNESS:  Yeah, I have it.

18              THE COURT:  Okay.  At page 3, sir, line 8 -- are

19  you there, sir?

20              THE WITNESS:  Yes, I am.

21              THE COURT:  It says:  "ETreppid's initial review

22  of the hard drives that Montgomery produced, shows that these

23  hard drives contain dozens of viruses which, if they had been

24  allowed to infect the networks of eTreppid or eTreppid's

25  counsel, could have caused significant damage to the network.

1          "Given the fact that, one, an anti-virus software is

2    ubiquitous on modern computers and, two, Montgomery is a

3    self-styled computer scientist who, presumably, would have

4    the ability to screen these viruses, the fact that viruses

5    existed on these hard drives delivered by Montgomery is

6    further evidence of the bad faith and gamesmanship of

7    which Montgomery has approached his discovery obligation."

8          And so I wanted to read both of those statements

9    by counsel into the record, because it appears that you knew

10   there might be viruses on the second set of hard drives you've

11   produced.

12         Is that correct?

13              THE WITNESS:  Yes.

14              THE COURT:  So why did you do that?

15              THE WITNESS:  Well, what was I supposed to do;

16   virus scan the drive for all the viruses, which would have

17   altered the original drive?  And then people would have gone

18   out and said I was changing the files on the drive.  Okay?

19              THE COURT:  So, did you, when you delivered this

20   second disk, did you, or your counsel, if you know, say, by

21   the way, we think you may have some problems with these --

22              THE WITNESS:  I put a label on the outside of

23   the drive that said, "This drive may contain a virus and be

24   cautious."

25              Your Honor, those are viruses that were put on those

1    drives in '99 and 2000.  And I didn't want to be accused of --

2    I mean, I had the same problem myself.

3                   THE COURT:  So what did you do?

4                   THE WITNESS:  I delivered the -- I mean I just

5    copies --

6                   THE COURT:  No.  Wait, wait.  My question is you

7    said you had the same problem yourself.  When you say that,

8    sir, are you saying that you, before you produced these, the

9    drives, you had to look at them, right?

10                  THE WITNESS:  No.  What I did is I simply copied

11   the drive and made a copy of it.

12                  THE COURT:  Have you ever -- have you looked at

13   these drives?

14                  THE WITNESS:  Uh, I got called by my counsel

15   saying they had a problem with the drive.  And when I put the

16   drive in, uh, somewhere down the list of it, I had a problem.

17   And I immediately recognized that.

18         There's other explanations other than a virus.  The

19   drive could have had a bad sector on it.  And when the bad

20   sector got copied -- I played no gamesmanship.  This was

21   done over Memorial Day weekend.  And I had to work everyday

22   to get it, because I knew the Court was going to be concerned.

23   I mean, I did everything I could humanly possible to get a

24   drive there next.

25                  THE COURT:  So, all right.  I just have a few

```
 1    more questions, sir.

 2                    THE WITNESS:  By the way, somebody has given

 3    me this document that has writing on it again.  I didn't

 4    realize it.  I didn't -- I mean -- I don't care.  I just

 5    didn't want.

 6                    THE COURT:  Thank you.

 7                    LAW CLERK:  I don't know where that one came

 8    from.

 9                    THE WITNESS:  I didn't write on it.

10                    THE COURT:  Oh, that's all right.  I didn't

11    think you did.

12            Well, we don't know what happened, so we're getting

13    another clean copy.

14                    THE WITNESS:  I thought you were the one that

15    highlighted it, so.

16                    THE COURT:  Well, I don't think it was me, but

17    I'm not sure.

18            So, which document was that, Miss High?

19                    LAW CLERK:  662.

20                    THE COURT:  And that's the one you've been

21    testifying from, sir, correct?

22                    THE WITNESS:  Well, I -- I mean, I didn't think

23    about it until I just saw the writing.

24                    THE COURT:  That's all right.

25            There you go.
```

```
 1                    THE WITNESS:  All right.

 2                    LAW CLERK:  Apologize.

 3                    THE COURT:  Is that a clean copy?

 4                    THE WITNESS:  Yes.

 5                    THE COURT:  Good.  I apologize.  I don't know

 6   what happened.

 7             So we're now at, I have a few questions, let's see,

 8   about these CDs.

 9                    THE WITNESS:  Okay.

10                    THE COURT:  Just generally, eTreppid asks for

11   two things with respect to the CDs that were the subject of

12   the search warrant and returned.  They asked for copies of

13   the faces of the CDs, and they asked for copies of the actual

14   CDs that had eTreppid indicia.  And that sort of the inference

15   by characterizing it as eTreppid indicia, is that it's pretty

16   obvious it was eTreppid-generated material.

17                    THE WITNESS:  Yeah, that's --

18                    THE COURT:  Go ahead.

19                    THE WITNESS:  -- that's not true.

20                    THE COURT:  All right.

21                    THE WITNESS:  Because when labels were made,

22   most of the time labels were made, and they were just used

23   from a prior label.  A perfect example of that is those CDs

24   that I produced that say, "Katie's documents and school work"

25   and, on the top of it, it says "eTreppid."  Well, that's
```

1  clearly my daughter's school work that was there.  But because

2  eTreppid was on top of it, I produced it.  But, there are

3  many CDs like that.  You can't depend on a label to prove

4  ownership of anything.

5              THE COURT:  So what are we supposed to do?

6              THE WITNESS:  I imagine you're going to look at

7  them.  I mean --

8              THE COURT:  Right.  So the problem then that

9  arises is perhaps the one you've just illustrated, is that

10  counsel and the Court have to try to discern what is on a disk

11  by how it's labeled, and there may be issues with that.

12              THE WITNESS:  But I'm not -- I will do

13  everything I can to help the Court make that happen.

14              THE COURT:  All right.  If you could, sir, turn

15  to docket 652.

16              THE WITNESS:  Okay.

17              THE COURT:  Okay.  And that's Exhibit 7.  Turn

18  to page 8, please.

19              THE WITNESS:  Okay.

20              THE COURT:  At line 3, it states as follows:

21         "In March, photocopies of 30 CDs were produced

22  to eTreppid.  Of those, 12 had an eTreppid indicia."

23         So, question one:  If you had those in March, why

24  didn't you produce them?

25              THE WITNESS:  Because, I was concerned that

```
 1    there might be States' Secrets on there.
 2                THE COURT:  Okay.  It goes on to state:  "Copies
 3    of those CDs will be produced to eTreppid forthwith --" which
 4    is why I asked the question.
 5           Now, this was filed on June 3rd before you met with
 6    government officials, correct?
 7                THE WITNESS:  Yes.
 8                THE COURT:  And then it goes on to say:  "10 of
 9    the 28 CDs for which photocopies were produced and may have
10    an eTreppid indicia, copies of those CDs will be produced
11    forthwith."
12           Why weren't those produced?
13                THE WITNESS:  I'm not sure they weren't.
14                THE COURT:  Okay.  Well, I guest Mr. Peek can
15    clarify that, or your counsel can.
16           All right.  Then turning back to Exhibit 16, docket
17    662.  I would like you to turn to page 7.
18                THE WITNESS:  Oh, yeah.  That's this one right
19    here.
20                THE COURT:  Do you have that one, sir?
21                THE WITNESS:  Yeah.  It's the one just made.
22                THE COURT:  Right.  And I've asked you to look
23    at page 7, and beginning at line 21, I'm just going to read
24    this into the record for benefit of counsel.  It says --  this
25    is, again, the eTreppid reply in support of Motion for Order
```

Case 3:22-mc-00073-CKK-WAU  Document 34  Filed 07/08/08  Page 121 of 200
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 421 of 800

—113

1    to Show Cause.  It says:  "Montgomery also cannot honestly

2    claim he has a good faith belief that a number of the CDs

3    returned to him have information written on their face which

4    may be classified.

5            "On Thursday, June 5, 2008, eTreppid obtained a

6    copy of photographs taken by the FBI of items returned to

7    Montgomery.  These photographs include photos of the

8    individual CDs that were returned to Montgomery.  By way of

9    example, the FBI photographed that CDs bearing the following

10   labels, inter alia, were returned to Montgomery."

11           And it lists:  "ETreppid, Giannna (phonetic)

12   documents, 6-2-02; eTreppid, Michael, 2-14-01; three CDs

13   labeled attorney/client privileged, identified as containing

14   voice messages from 12-03 to 7-04; a CD labeled DEO Warren

15   old e-mail.

16           "There are dozens of additional CDs that bear

17   labels that cannot possibly contain confidential information.

18   None of these CDs or even copies of the faces of these CDs

19   have been produced by Mr. Montgomery.  He cannot possibly

20   believe the information contained on the face of these CDs

21   could be subject to the United States Protective Order.

22   Instead, Montgomery's refusal to produce even copies of the

23   faces of these CDs appears to be a calculated attempt to

24   prevent eTreppid from discovering, for instance, the contents

25   of the, quote, Warren old e-mail, unquote, CD."

Case 3:22-mc-00076-PMP-VPC Document 734 Filed 07/08/08 Page 422 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 114 of 206
114

1          So, do you still have CDs responsive to this

2     document production request for the CDs that aren't covered

3     by the U.S. Protective Order?

4               THE WITNESS:  I don't have a list of what was

5     taken from me.  I said that at the very beginning.  And this

6     document refers that they were able to get a copy from the FBI

7     of what those CDs are.  I've asked for one.  I can surely be a

8     lot more responsive if I had a list of all the CDs.  But, I've

9     never been given one.

10              If you look on the return inventory, it says 38 CDs.

11    That's it.  And they're not CDs.  They could be CDs or DVDs.

12    The term is clearly interchanged.

13              So, he has the benefit of seeing the photographs.  I

14    don't have that benefit.

15              THE COURT:  And why is that?

16              THE WITNESS:  I've stated that my prior attorney

17    asked twice and I filed a motion in this court asking for an

18    evidentiary hearing to get a copy of it.

19              THE COURT:  No, I understand.  I recall the

20    testimony.

21              THE WITNESS:  It's not like I don't want to do

22    it.  And if somebody would give me that, I would surely be --

23    I would cooperate with the Court and do whatever I could.

24              THE COURT:  Well, I'm just looking at two

25    examples here:  Gianna documents dated 6-2-02; eTreppid,

1   Michael, 2-14-01.  Those are prior to any concerns you've

2   testified you might have had about something being within the

3   scope of the U.S. Protective Order, right?

4                   THE WITNESS:  The only way you're going to

5   determine that is to look on there.  If the label was wrong,

6   or misprinted, you would still have the exact same situation.

7                   THE COURT:  So did you look on these CDs?

8                   THE WITNESS:  No.  This is the first list I've

9   seen of these CDs -- I shouldn't say the first.  I don't know

10  when the date of this document is.

11                  THE COURT:  All right.  So did you bring

12  anything with you today, sir?

13                  THE WITNESS:  Yes.

14                  THE COURT:  Do you need to go down to counsel

15  table to get it?

16                  THE WITNESS:  Sure.

17                  THE COURT:  Go ahead.

18                  THE WITNESS:  Do I bring it up here?

19                  THE COURT:  Pardon me?

20                  THE WITNESS:  Do I bring it up here?

21                  THE COURT:  Yes.

22                  MS. KLAR:  Your Honor, do you also want what

23  counsel has brought as well?

24                  THE COURT:  Yes.

25                  THE WITNESS:  Your Honor, could I ask the

Case 3:23-mc-00073-CWK-WAU Document 731 Filed 07/08/03 Page 424 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 116 of 226

-116

1    government a question, or a side bar, whatever?

2              THE COURT:  You would like to, before you

3    produce.  So, why do you want to ask --

4              THE WITNESS:  Before I produce something --

5              THE COURT:  All right.

6              THE WITNESS:  -- that might fall under that

7    category.  I want to make absolutely certain.

8              THE COURT:  Sure.  Certainly.

9         We're going to take a very brief -- how long do you

10   think you need?

11             THE WITNESS:  Five minutes.

12             THE COURT:  Five minutes.  All right.  We'll

13   take five minutes.  Go ahead.

14             (Recess taken.)

15             THE COURT:  Thank you.  Please be seated.

16        Mr. Montgomery, did you have an opportunity to

17   confer with counsel for the government?

18             THE WITNESS:  Yes.

19             THE COURT:  All right.  And so are you ready to

20   proceed?

21             THE WITNESS:  Yes.

22             THE COURT:  All right.  So what do you have by

23   way of production of documents pursuant to this Court's Order

24   to Show Cause?  You can just tell me what you brought.

25             THE WITNESS:  Okay.  Uh, I brought 18 hard

Case 3:22-mc-00073-SWK-WAU Document 731 Filed 07/28/08 Page 425 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 117 of 226
—117

1    drives.  Some are copies of the prior work that they have

2    received.  Some of them are new drives.  In the new drives,

3    there is three disk drives that contain work that is

4    post-2003, both client files and work in progress files,

5    that I do not believe fall under the privilege.

6                 THE COURT:  All right.

7                 THE WITNESS:  There is probably another, I'd

8    say, 30 CDs that I believe were seized, and do not have

9    information on there that falls under the Protective Order.

10   Obviously, I have a copy of the faceplate of each of them.

11                THE COURT:  All right.

12                THE WITNESS:  That's all I brung -- that's what

13   I brought to court.  Excuse me.

14                THE COURT:  And Ms. Klar, you indicated that you

15   also have produced documents.

16                MS. KLAR:  Your Honor, basically what I have

17   brought with me are copies of everything that have -- has been

18   produced to -- sorry.  Everything that has been produced to

19   date.

20                THE COURT:  That's all right.

21                MS. KLAR:  I have the original hard drives

22   that have been made available for inspection to eTreppid,

23   the ones that have the serial numbers.  And what I am not a

24   hundred percent certain of, is I have CDs that may or may not

25   have been -- copies may or may not have been produced to

Case 3:23-mc-00075-RJK-WAU Document 734 Filed 07/08/23 Page 426 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 118 of 220
—118

1    eTreppid.  We had copies made by Fulcrom (phonetic).  And I

2    need to confirm with my office whether copies of these had

3    been sent out, but I suspect they may not have been.

4              THE COURT:  Please say again, Ms. Klar, you say

5    these are CDs --

6              MS. KLAR:  The ones that you have been talking

7    about with Mr. Montgomery.

8              THE COURT:  Oh, all right.  These are the CDs

9    that have been subject --

10             MS. KLAR:  I think, Your Honor, these are

11   ones where the photocopies were provided.  And I think

12   that there was a misunderstanding that was our fault, not

13   Mr. Montgomery's fault, with respect to getting copies of

14   these to eTreppid.  I think we thought this was all going to

15   happen at the time that eTreppid inspected the hard drives,

16   and eTreppid ultimately decided to get copies of the hard

17   drives, and somehow this got lost in the shuffle.

18         So I don't know if Mr. Snyder can tell us if he has

19   copies of these.  I'm happy to provide him with these if he

20   can tell me whether he does or he doesn't.

21             THE COURT:  Okay.  Is that it?

22             MS. KLAR:  Your Honor, just for the record, you

23   had asked Mr. Montgomery about documents that were responsive

24   to the original document request that was propounded on him

25   at the time that that he was represented by Mr. Flynn.  And I

1    think you referenced ComputerMade and some other companies.

2                    THE COURT:  Yes.

3                    MS. KLAR:  Hale Lane, at the outset of this

4    litigation, in February of 2008, provided Ms. Chisolm with

5    documents produced by Mr. Flynn.  And those are bates numbers

6    1 through 317.  And what I see in here are documents that

7    relate to those copyrights and to ComputerMade.  And so I

8    think, unbeknownst to Mr. Montgomery, these documents in fact

9    were produced.

10                   Now, if you'd like, I can go through the rest of

11   the documents and identify them for you in terms of what we

12   have produced and what we haven't produced, and the sources of

13   that production.  I think that there was a misunderstanding

14   with regard to the request that calls for the production of

15   communications between Mr. Montgomery and Mr. Sandoval and

16   Mr. Sandoval's counsel -- when I say Mr. Sandoval, I really

17   mean Opspring and/or Edra Blixseth.

18                   During one of the hearings, and I think it was on

19   February 21st, there is a reference, I think on page 115

20   through 116 of the transcript, that we interpret it to mean

21   that the only communications that were to be produced related

22   to communications about the technology.  And so what we have

23   done is produced those communications about the technology.

24   To the extent that we misunderstood, then we need to go

25   back through the e-mails that we do have, and produce any

1    additional documents.

2           There is also one other issue, and that relates to

3    an agreement that was executed by Mr. Montgomery and Opspring

4    relating to a common interest privilege.  And we received the

5    executed copy of that document when we got the documents from

6    Dorsey & Whitney.

7           So, we are in the process of preparing a privilege

8    log.  And to the extent that eTreppid challenges that

9    privilege, I guess that would be an issue that we will

10   have to take up with the Court.  But I would say, probably --

11   well, a substantial number of the e-mails that are exchanged

12   appear to fall within that category.

13           THE COURT:  All right.  Any further description

14   you would like to put on the record.

15           MS. KLAR:  With regard to the subject of the

16   e-mails, the eTreppid e-mails that were referred to in a

17   recent communication to us from eTreppid, when we produced

18   the communications on behalf of Mr. Montgomery to the press,

19   which the only ones that we have are from Mr. Flynn, there

20   were no attachments to those documents.  After we received

21   the information that we did for the inquiry or demand from

22   eTreppid, we went back and conducted a further investigation

23   and identified all of these eTreppid e-mails that we then

24   came to understand Mr. Montgomery believes were copies of

25   the e-mails that in fact were provided either by him or

Case 3:22-mc-00078-CMK-MAU  Document 734  Filed 07/08/08  Page 429 of 800
Case 3:06-cv-00056-MMR-VPC  Document 732  Filed 07/08/08  Page 129 of 200
-121

1    Mr. Flynn to the press.  And those were produced sometime in

2    the past week.

3                    THE COURT:  All right.

4                    MS. KLAR:  And as I think I mentioned to

5    Your Honor during the May 21st hearing, the documents that

6    we have that relate to the licensing distribution, that

7    category of documents, and/or falls in the same category,

8    are the agreements, are all documents that came from

9    Mr. Montgomery from Mr. Flynn.  And all of them are labeled

10   privileged and confidential.  That was the reason we went to

11   Dorsey & Whitney and asked them for their files.

12          In their files, there were drafts of those documents

13   provided to them by Mr. Flynn.  And so those documents,

14   clearly, would not be privileged.  And those drafts that are

15   marked, and Michael Flynn edits, or something to that effect,

16   those have been produced.

17          In addition, all the correspondence that was

18   exchanged in connection with the execution of those agreements

19   also has been produced.  And because Mr. Montgomery has been

20   so involved in trying to get the hard drives copied, these

21   are things that we have done independently, and I'm not

22   certain that he's completely aware of at this point.

23                    THE COURT:  All right.

24          Anything further?

25                    MS. KLAR:  I think that's it, Your Honor.

1          THE COURT:  All right.

2          All right.  Thank you very much, Ms. Klar.

3          And, yes, sir.

4          MR. GOMEZ:  Your Honor, Mr. Gomez for the

5    Department of Justice.  I believe that the -- there are

6    approximately 30 CDs that Mr. Montgomery has just identified

7    that the covers of which may be subject to the current

8    document production.  The United States has not reviewed

9    the content of those CDs, and they may be -- there may be

10   information subject to the U.S. Protective Order.  But the --

11   it is our understanding that -- and there will be a subsequent

12   review -- but it's our understanding that the covers of the

13   CDs that have been obtained, or obtained pursuant to the FBI

14   search warrant, could be produced to eTreppid.

15          So all I'm saying is that the covers of the CDs that

16   Mr. Montgomery just identified, about 30, that were subject to

17   the FBI search warrant, could, from the United States' point

18   of view, could be handed over to eTreppid.  But, the contents

19   of those CDs, would still need, require some kind of review.

20          THE COURT:  All right.

21          MR. GOMEZ:  Yes.

22          THE WITNESS:  Your Honor, there's actually about

23   80 CDs in there, not 30.  There's 50 in a binder.  And there's

24   30 outside the binder.

25          MR. GOMEZ:  And I was only aware of the 30,

Case 3:23-mc-00078-GMN-WGC  Document 734  Filed 07/28/08  Page 431 of 800
Case 3:06-cv-00056-PMP-VPC  Document 721  Filed 07/28/08  Page 121 of 220
123

1  Your Honor.

2              THE COURT:  All right.  And let me ask you,

3  Mr. Montgomery, did you review the contents of those CDs

4  pursuant to the U.S. Protective Order before you produced

5  them, to see whether any of the information contained in

6  any of those CDs might be subject to the Protective Order?

7              THE WITNESS:  I've seen them in the past.  I

8  didn't do it recently, if that's your question.  Um, it's very

9  confusing.  I would be suspicious that some may.

10             THE COURT:  Well, the reason I ask is that the

11  U.S. Protective Order tells both parties in this litigation

12  that --

13             THE WITNESS:  I have them in front of me.

14             THE COURT:  Well, here's a piece of paper.

15  Here's a document that eTreppid wants.  Before you hand it to

16  anybody, you have an obligation, under the Protective Order,

17  to read through it, and make a good faith effort to determine,

18  gee, is there anything in here that might be subject to the

19  U.S. Protective Order.  If you think it is, you then have an

20  obligation to give it to the United States and they can turn

21  it over.

22             The other layer of protection that the government

23  imposed, and Judge Pro authorized, pursuant to that Order, is

24  that even if that occurs, they still, the government still has

25  a right under the Protective Order to just review anything the

```
1    parties are exchanging at all.
2            So the reason I was asking the question is it's
3    important, from the Court's point of view, that everybody
4    understands his obligations under the U.S. Protective Order
5    to make affirmative effort to say to oneself, does this, is
6    anything here governed by the Protective Order?  That's step
7    one, and then so on.
8            And so that's why I asked you if you had done that
9    with respect to, it appears there are 80 CDs, is that --
10                   THE WITNESS:  There's, on the search warrant
11   they refer to yellow/gray binder.
12                   THE COURT:  Right.
13                   THE WITNESS:  There's 50 in it.
14                   THE COURT:  And are those included in that
15   document production?
16                   THE WITNESS:  Yes.  Yes.
17                   THE COURT:  All right.
18           So, Mr. Gomez, you, I understand, do not object, on
19   behalf of the government, to having copies made of the faces
20   of those CDs, but the government wishes to examine those CDs?
21                   MR. GOMEZ:  It's our --
22                   THE COURT:  You want to examine all 80.
23                   MR. GOMEZ:  It's our understanding that the only
24   items that are subject to the current discovery, under the
25   four categories, is just the covers of the CDs.  I believe
```

Case 3:22-mc-00073-GMK-WAU  Document 734  Filed 07/28/08  Page 433 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/28/08  Page 125 of 220
-125

 1    that -- oh, it's not?

 2                MR. PEEK:  No.  The content was also ordered,

 3    Your Honor.

 4                MR. GOMEZ:  Oh.

 5                MR. PEEK:  And there was no objection by the

 6    government at that time, when that Order was entered on

 7    February 21st, 2008, other than Mr. Montgomery's obligation,

 8    and ongoing obligation, to conduct a review and make a

 9    determination in good faith, and submit them in good faith to

10    the government.  But the Court, on February 21st, ordered the

11    fronts, as well as those that were clearly eTreppid CDs, that

12    the content of those CDs be produced.  They're always subject

13    to the United States Protective Order.

14                THE COURT:  Right.

15                MR. PEEK:  I understand that.

16                MR. GOMEZ:  Correct.  But, it's my

17    understanding that there are CDs that, according to

18    Mr. Montgomery, could have information on them that are

19    covered by the U.S. Protective Order.

20                MR. PEEK:  Well, what I just heard is that

21    Mr. Montgomery hadn't even looked.  So, I don't know how

22    he can make that good faith determination.  But, you know,

23    that's --

24                THE WITNESS:  Do you want me to answer your

25    question?

 1            MR. PEEK:  I haven't asked Mr. Montgomery

 2    a question.

 3            THE COURT:  No.  He can't ask you any questions

 4    until I tell him.

 5            MR. PEEK:  I haven't been.

 6            THE COURT:  He can't.

 7            MR. PEEK:  What I'm saying is he hasn't yet done

 8    that, Your Honor.

 9            THE COURT:  Right.

10         So you haven't -- so, you know, I used the analogy

11    of the piece of paper in looking to see if there have been

12    discrete categories outlined in the U.S. Protective Order.

13    Have you conducted a review of the contents of those CDs,

14    in anticipation of this production, to ascertain whether they

15    are governed by the Protective Order?

16            THE WITNESS:  Not recently.  And the reason I'm

17    saying that is because I just met last --

18            THE COURT:  Week.

19            THE WITNESS:  -- week.  And I'm under a contempt

20    hearing.  And I do not want to be held in contempt because

21    people are saying I'm holding information back when I'm trying

22    to produce it.

23            THE COURT:  All right.  So would it be correct,

24    Mr. Montgomery, you're saying, look, I don't want to be held

25    in contempt, here's all, here are the CDs.

 1              THE WITNESS:  Yes.

 2              THE COURT:  All right.

 3              MR. PEEK:  Your Honor, what's very troubling

 4     to me is that the Court relieved him of the obligation of

 5     bringing any disks, any electronic data with him that he said

 6     that would contain classified information.  The Court relieved

 7     him of that obligation.  The Court said you don't have to

 8     bring them because the government says don't bring them, if

 9     you have a good faith belief.

10              Now, he has done exactly what the Court asked the

11     Court to allow him not to do.  He has brought CDs that, if

12     they have that classified information, he had a good faith

13     belief, he should not have even brought them to court today,

14     pursuant to the relief that he requested.

15              So there's a little disingenuousness in what is

16     going on here, and rather Farcical, frankly, Your Honor, of

17     what is happening here, when he asked, by emergency motion,

18     to be relieved of the obligation to bring electronic data in

19     the form of disks with him to this court.  And then he did

20     exactly that, and now says it has classified information.

21              THE COURT:  Well --

22              MR. PEEK:  And I'm not saying it does or it

23     doesn't, Your Honor.  I just find this rather disingenuous.

24              THE COURT:  All right.  Thank you.

25              Ms. Klar.

Case 3:22-mc-00073-GMN-WMU Document 734 Filed 07/28/08 Page 436 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 128 of 220

—128

1          MS. KLAR:  Your Honor, I think that one of the

2    problems, and you can inquire of Mr. Montgomery, is that there

3    was a question as to whether or not the face of these CDs

4    could be copied.  And I think that that was the threshold

5    issue.  But, I think you have to ask him.

6          One thing that I omitted was because Mr. Montgomery

7    was not able to -- did not have the records that reflected

8    payments by Opspring, he has -- we prepared for him, and

9    submitted to eTreppid, a declaration which sets forth the

10   amount of the payments that he has received from Opspring

11   since he joined, first joined that company, I think sometime

12   in April, and the amount of the loans that he has received.

13          So, that was another document that we brought today.

14          THE COURT:  All right.  Thank you.

15          All right.  Mr. Gomez.

16          MR. GOMEZ:  Your Honor, again, the United

17   States does not object to the covers of the CDs being provided

18   to eTreppid.  However, under the U.S. Protective Order,

19   Mr. Montgomery is obligated to review those CDs and at least

20   make a determination of whether or not there is anything that

21   may be covered by the U.S. Protective Order.  Mr. Montgomery's

22   recollection, as I understand it, is that there may be some

23   information in some of these CDs.

24          Under no circumstances, would the government

25   agree that the content of CDs that may contain classified

Case 3:22-mc-00073-PMP-WGC Document 734 Filed 07/08/08 Page 127 of 200
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 127 of 200
—129

1    information should be provided to eTreppid, Your Honor.

2                    THE COURT:  I understand.

3            So, Mr. Montgomery --

4                    THE WITNESS:  Yes.

5                    THE COURT:  -- how many -- I think you or

6    Ms. Klar advised, I can't remember which, that there are

7    about 80 CDs.

8                    THE WITNESS:  Fifty in the book.  And I think

9    30 outside the book.

10                   THE COURT:  Okay.  Let's take the 30 outside the

11   book.  Do you have any idea what's on those CDs?

12                   THE WITNESS:  Yes.

13                   THE COURT:  All right.  Do you have a good

14   faith belief that there is nothing on those CDs covered by

15   the U.S. Protective Order?

16                   THE WITNESS:  That's correct.

17                   THE COURT:  So you think it's fine to produce

18   them?

19                   THE WITNESS:  Yes.

20                   THE COURT:  All right.  So, Mr. Gomez, as to

21   those, this is the 30 that he, Mr. Montgomery, has just

22   identified.  He says he has reviewed those.

23          What's government's position with respect to those

24   CDs, sir.

25                   MR. GOMEZ:  As long as Mr. Montgomery is making

```
1    a good faith determination that there's no information covered

2    by the U.S. Protective Order, it can be provided to eTreppid.

3    The government, of course, would review the CDs and make a

4    final determination on that.

5                 THE COURT:  All right.

6                 MR. GOMEZ:  They should not be generally

7    distributed.  But, that doesn't address the other CDs.

8                 THE COURT:  Right.  And I understand that.

9           So, that's 30.  So now we got these other 50 in the

10   yellow binder, yellow/gray binder.

11                THE WITNESS:  Right.  There's 15 of those in

12   that binder that also do not, I believe, relate to anything

13   to do with the Protective Order.

14                THE COURT:  Okay.  And do you, sir, know which

15   15 those are?

16                THE WITNESS:  Yeah.  They're all marked.

17   They're all marked two ways.  One way they're all marked, or

18   made reference to as eTreppid demo disks.  The remaining set

19   are all marked a different way.  And that is the set --

20                THE COURT:  That you're concerned with.

21                THE WITNESS:  Right.  I'm not -- I would like

22   to add something because Mr. Peek said I'm not concerned that

23   the outside faces --

24                THE COURT:  Right.  No, you're concerned about

25   the contents, correct?
```

```
 1                    THE WITNESS:  Right.  And you're talking about
 2   video.  Let's assume there's 30 minutes on there.  And there
 3   could be one second --
 4                    THE COURT:  I understand.
 5                    THE WITNESS:  -- that falls in the wrong range.
 6                    THE COURT:  Okay.
 7             All right.  So you say there are 15 CDs in the
 8   binder that are marked ET, eTreppid demo tapes or something?
 9                    THE WITNESS:  Right.  Demo disks.
10                    THE COURT:  Demo disks.  And you have a
11   good faith belief that those CDs are not subject to the
12   U.S. Protective Order, correct?
13                    THE WITNESS:  Correct.
14                    THE COURT:  So, Mr. Gomez, may those be
15   produced?
16                    MR. GOMEZ:  Yes, Your Honor.  And the government
17   would be prepared, if there's further difficulty for
18   Mr. Montgomery, to actually take possession of the remainder.
19   But, he can go through them.  That's an alternative, too.
20                    THE COURT:  Okay.  So then you've got -- so --
21                    THE WITNESS:  I could actually count them, if
22   you want me to, Your Honor.
23                    THE COURT:  Go ahead.
24                    MS. KLAR:   Your Honor, while Mr. Montgomery is
25   is counting them, we would just request an opportunity to get
```

Case 3:23-mc-00073-PMP-WGC Document 734 Filed 07/08/08 Page 440 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 132 of 220

-132-

```
 1   everything copied by Fulcrom, and then we will produce it

 2   immediately.  I think that the discovery about these disks was

 3   the result of the meeting on Friday, that there was a comfort

 4   level that these 15 could be produced.  So we would like to

 5   be --

 6                THE COURT:  Do you have of any objection,

 7   Mr. Peek, getting --

 8                MR. PEEK:  Your Honor, I have no objection,

 9   other than I know that it has taken us a long time to get

10   stuff from Fulcrom.  We Fed Ex'd, overnight, a check  for

11   $16,000 to Fulcrom last week, asking for the 30 hard drives

12   that they had copied, seven of which are clearly marked with

13   serial numbers that belong to us.  We still don't have those.

14   We're told that the originals of those are here in court

15   today, but we still don't have the copies from Fulcrom.  And

16   we sent them the money last week.  And it doesn't take this

17   long to copy.

18         So, I'm just concerned about where the hold-up is

19   with Fulcrom in getting things done expeditiously.

20                THE COURT:  Miss Klar.

21                MS. KLAR:  I will undertake, Your Honor,

22   first thing tomorrow morning, or depending on when we get

23   done tonight, to contact Fulcrom to find out what the hold-up

24   is, and to make certain that these things get transmitted by

25   Federal Express, hopefully, tomorrow.  Because my
```

Case 3:22-mc-00073-SKM-MAU Document 734 Filed 07/08/08 Page 441 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 441 of 800
-133-

 1    understanding is that they have the copies.

 2                THE COURT:  Wasn't Fulcrom -- was that the

 3    Montgomery party's vendor who was going to copy this?

 4                MS. KLAR:  Yes.

 5                MR. PEEK:  Yes, Your Honor.

 6                THE COURT:  All right.  Was it an agreed upon

 7    vendor?

 8                MS. KLAR:  Yes.

 9                THE COURT:  Is that --

10                MR. PEEK:  No.  It's just the vendor that they

11    used.  I mean, we didn't object to it, but they made us pay

12    for those.  We didn't -- we had no choice.  We could have

13    objected and then come to you, but we wanted to get them right

14    away.  We still don't think it's something we should have to

15    pay for, but we'll visit that at a later date.

16                THE COURT:  All right.  Well --

17            How are you doing there, Mr. Montgomery?

18                THE WITNESS:  Almost done, Your Honor.  Just two

19    seconds.

20            Okay.  Your Honor, there's 17 DVDs that have a

21    specific label on them.  I guess I can say the names on the

22    label.  It's called Divot, D-i-v-o-t.  And there are 230 CDs,

23    or DVDs, that do not have that label on them that, as far as

24    I know, are fine.

25                THE COURT:  All right.  So there -- what you're

Case 3:22-mc-00075-RCJ-WGC Document 734 Filed 07/08/08 Page 442 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 142 of 200

-134-

1    saying is there are 17 that you think need to be reviewed.

2                    THE WITNESS:  Yes.

3                    THE COURT:  Okay.  And there are 30, they are

4    either CDs or DVDs, that have no label that you have a good

5    faith belief have no material contained indicating the

6    U.S. Protective Order?

7                    THE WITNESS:  That's correct.

8                    THE COURT:  Okay.

9            Mr. Gomez, as to the 30 unlabeled CDs and DVDs, do

10   you have any objection to those being copied and produced,

11   sir, pursuant to the terms of the U.S. Protective Order?

12                   MR. GOMEZ:  Not based on Mr. Montgomery's

13   representation.

14                   THE COURT:  All right.  So we've got 17 DVDs or

15   CDs, is that correct, sir?  Or are they DVDs?

16                   THE WITNESS:  I didn't --

17                   THE COURT:  Or do you know?

18                   THE WITNESS:  No.  And there's no easy way to

19   look --

20                   THE COURT:  Right.

21                   THE WITNESS:  I presume in all these documents

22   that --

23                   THE COURT:  They're disks?

24                   THE WITNESS:  Yes.

25                   THE COURT:  So there are 17 disks left that

Case 3:08-cv-00056-MMF-VPC   Document 732   Filed 07/08/03   Page 135 of 226

-135

```
 1   have a specific label Divot, D-i-v-o-t, which causes you to

 2   believe, to have a good faith believe they may be covered by

 3   the U.S. Protective Order, correct?

 4               THE WITNESS:  The name doesn't --

 5               THE COURT:  No, I'm not.

 6               THE WITNESS:  Yes.  That's correct.

 7               THE COURT:  Forget the name.

 8               THE WITNESS:  Yes.  That's correct.

 9               THE COURT:  I'm talking about the content.

10               THE WITNESS:  Yes.

11               THE COURT:  All right.

12         And so those, sir --

13               MR. GOMEZ:  We're prepared to take possession of

14   those, Your Honor, and review them.

15               MR. PEEK:  Your Honor, may I -- would the Court

16   examine if it means, without my presence, when he last looked

17   at those.  Because he just said, and I know from Mr. Trepp,

18   that the Divot predates anything which would be covered by the

19   United States Protective Order.

20         So I want to know where this good faith belief came

21   from, when he last reviewed them, because he just said Divot

22   is not covered by the Protective Order, but maybe the content

23   is.  Because the content -- the Divot and the project and the

24   content would have all predated any United States Protective

25   Order time period.
```

Case 3:22-mc-00076-PMP-WPC Document 734 Filed 07/08/08 Page 444 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 136 of 226

-136

1                    THE COURT:  Okay.  Thank you.

2               Now, and I want -- you and I need to be careful

3        here.  All right?

4                    THE WITNESS:  I understand.

5                    THE COURT:  All right.  So when is the last --

6        when did you last review these 17 disks that are the

7        subject of what you may believe would be covered by the

8        U.S. Protective Order?

9                    THE WITNESS:  I believe when I got them back

10       from the FBI, which would have been April of '07, or late

11       March.

12                   THE COURT:  All right.  So you -- it's been

13       about a year then, correct?

14                   THE WITNESS:  Yes.

15                   THE COURT:  Over a year that you've taken a look

16       at them?

17                   THE WITNESS:  Yes.

18                   THE COURT:  All right.  Well --

19                   MR. GOMEZ:  Your Honor, the United States would

20       be concerned about having any further discussion about the

21       content of these disks.

22                   MR. PEEK:  I'm not going to go there.

23                   THE COURT:  Yes.

24                   MR. GOMEZ:  Because this individual, because

25       Mr. Montgomery has, is making a good faith representation that

Case 3:22-mc-00073-GMN-WGC Document 731 Filed 07/28/08 Page 445 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 137 of 220

137

1   the content may be --

2              THE COURT:  All right.  What I'm going to Order

3   then is that the 17 disks -- do you have any objection,

4   Mr. Gomez, to just the copies of the face -- the front of

5   them being copied?  May those be copied and produced?

6              MR. PEEK:  They've already been produced.

7              THE COURT:  Oh, well, okay.  Then, nevermind.

8   That's fine.

9         All right.  Then I'm going to Order that those 17

10  disks be given into the custody of the United States today,

11  to be examined under the U.S. Protective Order.  And pursuant

12  to those protocols, the government will report, will let the

13  Court know --

14             MR. GOMEZ:  Yes, Your Honor.  And we will make

15  an inventory of those 17.

16             THE COURT:  All right.

17        Miss Klar.

18             MS. KLAR:  Your Honor, I'm not certain that the

19  faces of those CDs have, in fact, been copied.

20             MR. PEEK:  They have been photographed, Your

21  Honor, and the photograph has been produced to me by the FBI,

22  as I understand it, in consultation with either Ms. Wells or

23  Mr. Gomez.  And they can confirm that.  I have photographs of

24  Divot, for example, and others.  I have photographs of 169

25  CDs, DVDs which the FBI, pursuant to my request, produced to

1    me last Friday.  And I know that both, either Ms. Wells or

2    Mr. Gomez were involved in that, and they've said it was okay.

3                MR. GOMEZ:  Your Honor, I think, just to ensure

4    that in terms of the inventory that the United States is

5    taking, that if we make a copy of those CDs and provide them,

6    the copy of the cover of the CDs and provide them to both

7    sides, we'll then know what they're actually taking.  And that

8    will be the end of it.

9                THE COURT:  All right.  And I think that makes

10   sense.  So, it will be ordered, notwithstanding who has a

11   photograph of what, for purposes of this hearing and the

12   United States' request, the Court will Order the faces of

13   those 17 CDs will be copied.  Copies will be provided to both

14   the Montgomery parties and eTreppid, and the CDs themselves

15   will be taken into the custody of the United States for

16   review, pursuant to the U.S. Protective Order, and their

17   inventory will follow.

18               All right.

19               MR. GOMEZ:  (Nodding head affirmatively.)

20               THE COURT:  All right.  We're going to take

21   about a ten-minute recess.  And I will then anticipate that --

22   as counsel are aware, this motion was originally brought as

23   a motion for sanctions, and the Court determined to construe

24   it as an Order to Show Cause -- I am going to allow counsel

25   for eTreppid to examine Mr. Montgomery.  And I will also, of

Case 3:22-mc-00073-GKF-WAU Document 731 Filed 07/08/08 Page 447 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 147 of 226

-139-

```
 1    course, allow eTreppid -- excuse me, Montgomery parties'

 2    counsel to ask any questions they may wish concerning the

 3    Order to Show Cause.

 4                    MR. PEEK:  Your Honor, as a matter of procedure,

 5    it seems to me the Order to Show Cause directs Montgomery, and

 6    they have the burden.  So I don't know whether I go first or

 7    Ms. Klar.

 8                    THE COURT:  Oh, I'm sorry.

 9                    MR. PEEK:  So I don't want to step on her toes

10    if, because it's her burden on the Order to Show Cause.

11                    THE COURT:  It is.  You're correct.

12                    MR. PEEK:  So, she would go first.  But I don't

13    know, if she doesn't want to go first, I'm happy to go.

14                    THE COURT:  Ms. Klar, what would you like to do?

15                    MS. KLAR:  Your Honor, Mr. Peek can go first,

16    Your Honor.

17                    MR. PEEK:  Well, that means she's done.

18                    THE COURT:  That's not what she said.

19                    MR. PEEK:  Well, then, Your Honor --

20                    THE COURT:  Everybody stop.

21            Ms. Klar, you're going first.

22            All right.  We're going to take a break, and we'll

23    be back in about 10 minutes.

24                    (Recess taken.)

25                    THE COURT:  Thank you.  Please be seated.
```

Case 3:22-mc-00078-GMN-WGC  Document 734  Filed 07/08/08  Page 448 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 140 of 220
-140-

```
 1              All right.  Ms. Klar, you may proceed.

 2                   MS. KLAR:  Thank you, Your Honor.

 3                        DIRECT EXAMINATION

 4   BY MS. KLAR:

 5    Q    Mr. Montgomery --

 6    A    Yes.

 7    Q    -- you testified earlier today, in response to a question

 8   from the Court, that you did not take anything from eTreppid

 9   at the time you left in January of 2006.

10              Do you remember that testimony?

11    A    Yes.

12    Q    Can you then explain how you then came into possession

13   of the backup drives that you have been in the process of

14   producing?

15    A    Warren wanted all the backup drives out of the building

16   and gave them to me to take out of the building.  He did not

17   want them left in the building.

18    Q    And when did he give you those backup drives to take out

19   of the building?

20    A    Over the years.

21    Q    Who was responsible for creating the backup drives?

22    A    Well, I, I backed up -- I mean, I backed up some work

23   stations.  Not all of them, but some.

24    Q    An so is it fair to say you routinely took those backup

25   drives to your home?
```

 1   A   Yes, because he didn't want them in the building.

 2   Q   Now, these backup drives are maintained on disk drives,

 3   is that correct?

 4   A   Yes.

 5   Q   And are these disk drives, are the files on these disk

 6   drives labeled in any way?

 7   A   No.

 8   Q   Now in connection with your recent production of these

 9   backup files, did you go through them to look for e-data that

10   was responsive to the various requests that are the subject

11   of this hearing, or did you just engage in the wholesale

12   production of the backup drives?

13   A   I just produced them.  I mean, I was suspicious of one

14   term, and I did put that term in and it, it did not appear.

15   But, that's all that was done.  There were too many files to

16   search in the limited time that I had.

17   Q   So you simply produced all of the backup files that you

18   had that you believed, in good faith, were not covered by the

19   Protective Order?

20   A   That's correct.

21           MS. KLAR:  I have no further questions,

22   Your Honor.

23           THE COURT:  All right.  Thank you.

24       Mr. Peek.

25           MR. PEEK:  It's going to take me a minute to get

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

Case 3:22-mc-00073-PMP-WAU Document 731 Filed 07/08/08 Page 459 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 142 of 226

142

1    setup.  May I have the Court's indulgence.  It's going to take

2    me a minute just to get setup.

3              THE COURT:  You may.

4                      **CROSS-EXAMINATION**

5    BY MR. PEEK:

6     Q   Mr. Montgomery, you did testify in the preliminary

7    injunction hearing in February of 2006, did you not?

8     A   Yes.

9     Q   And you were asked at that time by your counsel,

10   Mr. Flynn, whether or not you took any files or hard drives

11   or anything from eTreppid?

12    A   I don't recall that or not.

13    Q   You don't?

14              MR. PEEK:  Your Honor, I would like to mark just

15   one page -- I can provide the whole transcript, but I think

16   it's filed with the Court.

17              THE COURT:  It is filed with the Court.

18              MR. PEEK:  Just one page, Volume II, page 194.

19   And that would be Exhibit 1, Your Honor.

20         (Whereupon, exhibit 1 -- a document, was marked for

21   identification.)

22              THE WITNESS:  All right.  I got it.

23              MR. PEEK:  And do you have, Your Honor -- I

24   think I have a copy for the Court as well.

25         Do you remember during the preliminary hearing,

Case 3:22-mc-00073-PMP-VPC Document 731 Filed 07/28/08 Page 151 of 200
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 451 of 800
143

1    or the hearing on the preliminary injunction, you were

2    under oath?

3     A    Yes.

4     Q    And let me have you take a moment and look at page 194

5    from Volume II of the hearing of February 7, 2006, and ask

6    you whether or not this question and this answer were asked of

7    you on page 194, line 17 through 19:

8             "Question:  Did you destroy or take any files or

9    hard drives or anything from eTreppid Technologies?

10            "Answer:  No."

11            And that was your testimony then?

12    A    Yes.

13    Q    Your testimony now is that you did take files and

14   hard drives from eTreppid, is that correct?

15    A    I didn't take them.  Warren gave them to me to take out

16   of the building.  That's my testimony.

17    Q    Okay.  Well, you didn't tell Judge Perry that you had

18   permission to take certain of the backup, did you?

19    A    He didn't ask.

20    Q    You just were asked did you destroy or take any files or

21   hard drives or anything from eTreppid.  And your answer was

22   no.

23    A    I didn't take them.  I was told -- they were given to me

24   to take out of the building.

25    Q    But, you took them?

Case 3:22-mc-00073-GMK-WAU Document 734 Filed 07/28/08 Page 152 of 200
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 452 of 800

144

```
 1    A    Because they were given to me and told --

 2    Q    Sir, did you take files?

 3    A    Whatever was given to me, yes.

 4    Q    Thank you.

 5            Now, with respect to the hard drives which were

 6    produced, I believe your papers, which is court -- let's see

 7    if I can get the court exhibit right, Your Honor.  It's docket

 8    number 652.  I believe that's court exhibit 16, Your Honor.

 9                 THE COURT:  No.  It's court exhibit 7.

10                 MR. PEEK:  Is it 7?

11                 THE COURT:  Yes.

12    BY MR. PEEK:

13    Q    Do you still have court Exhibit 7?

14    A    I believe it's the one not marked.  Um, Reply in Support

15    of the Motion to Show Cause?

16                 LAW CLERK:  Yes.

17                 THE COURT:  Miss Clerk, would you go ahead and

18    remark this as court exhibit 7.

19                 THE COURT:  Ms. High, the clerk, will mark it.

20                 LAW CLERK:  Okay.

21                 THE WITNESS:  All right.

22    BY MR. PEEK:

23    Q    And on page 4 of Court's exhibit 7 --

24    A    Okay.

25    Q    -- beginning on line 7, your counsel writes:
```

 1          "On May 23rd, the Montgomery parties produced a hard

 2   drive containing Montgomery's backup copies of eTreppid

 3   electronic files -- "

 4    A    Hang on.  Hang on.  It's the wrong document.

 5               THE COURT:  Mr. Peek, can you tell me what page

 6   you're on, sir?  I'm sorry.

 7               MR. PEEK:  On page 4, Your Honor.

 8               THE COURT:  Thank you.

 9               MR. PEEK:  Line 7.

10   BY MR. PEEK:

11    Q    Do you have the right document now?  Sorry.

12          Mr. Montgomery, it is --

13    A    Yeah.

14    Q    -- it is response to Court's --

15    A    Yeah, yeah.

16    Q    Do you recognize this as your counsel's pleading?

17    A    Yes.  Correct.

18    Q    And you reviewed this with the Court already, did you

19   not?

20    A    I believe she asked me questions prior.

21    Q    And she actually asked you questions about this exact --

22    A    Yes.

23    Q    -- paragraph and sentence, did she not, sir?

24    A    Yes.

25    Q    And your counsel states that:  "On May 23rd, the

1    Montgomery parties produced a hard drive containing

2    Montgomery's backup copies of eTreppid electronic files,

3    created or dated on or before December 31, 2002."

4           Is that correct?

5    A    Yes.

6    Q    And that hard drive purports then to contain backup

7    copies of eTreppid electronic files, does it not?

8    A    Yes.

9    Q    And what would that consist of?

10   A    Files.

11   Q    What type -- I mean, would they be just eTreppid files?

12              MS. KLAR:  Objection, Your Honor.  Relevance.

13              THE COURT:  Mr. Peek.

14              MR. PEEK:  Your Honor, I will connect the

15   relevance as to what's on the files.  Because, in fact,

16   there is an awful lot of extraneous information that is not

17   eTreppid's.

18              THE COURT:  Okay.  Well, the objection is

19   overruled for now.  And then you can go ahead and make the

20   connection.

21              MR. PEEK:  I will make the connection,

22   Your Honor.

23   BY MR. PEEK:

24   Q    Was the only data on there eTreppid information?

25   A    I don't know for certain.

Case 3:22-mc-00073-CMK-WPC Document 734 Filed 07/08/08 Page 155 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 147 of 220
—147

1   Q   Well, you is said that this came from a drive, would that

2   be a hard drive that you had which was a backup of all of the

3   data that you took off of the premises?

4   A   You mean, the ones that Warren gave me to take off?

5   Q   Yes.  The ones you say Mr. Trepp gave you to take off.

6   A   What's the question?

7   Q   The question, is, sir, is it just eTreppid data?

8   A   I believe so.

9   Q   Does it include any other data besides eTreppid data?

10  A   It could.

11  Q   It could.  Like what?

12  A   Well, whatever was on Warren's hard drive.

13  Q   So this is whatever was on Warren's hard drive?

14  A   Or other peoples.

15  Q   Or other peoples.

16      Okay.  And before you produced this, did you review

17  it in any way at all?

18              MS. KLAR:  Objection, Your Honor.  Relevance.

19              MR. PEEK:  Your Honor, this goes to the

20  contempt.  If he --

21              THE COURT:  Overruled.

22          Go ahead.

23              THE WITNESS:  I started looking at some of the

24  files, and then it just became so voluminous.

25  \\\

Case 3:22-mc-00073-SWK-WAU Document 734 Filed 07/28/08 Page 456 of 800
Case 3:06-cv-00056-PMP-VPC Document 721 Filed 07/08/08 Page 148 of 226

148

1    BY Mr. PEEK:

2     Q    It became very voluminous for you?

3     A    Yes.

4     Q    Okay.  When was it, or tell me where this hard drive was

5    that you copied and produced to me on or about May 23rd?

6     A    What do you mean?

7     Q    Where was it located, from the time that you took it from

8    eTreppid, until May 23rd, 2008?

9                MS. KLAR:  Objection.  Mischaracterizes the

10   witness' testimony.

11                MR. PEEK:  He said he had a backup tape,

12   Your Honor.  He said that he maintained it.  He did it with

13   permission.  He's had it some place.  He then took it, copied

14   it, and produced it on May 23rd.  I just want to know where

15   it was.

16                THE COURT:  Objection overruled.

17          Go ahead.

18                THE WITNESS:  You mean starting from the time I

19   had it at my home, say, for example?

20   BY MR. PEEK:

21    Q    Okay.  So, you had it in your home?

22    A    Yeah.

23    Q    And that would be up until you left the premises in

24   January 2006?

25    A    Uh, probably.

1    Q    Okay.  Where was it after January 2006?

2    A    Probably in storage.

3    Q    Was it in the storage facility from which the FBI took --

4    took electronic files, including the CDs and DVDs, reviewed

5    here today, and other hard drives?

6              MS. KLAR:  Objection.  Relevance.

7              THE COURT:  Overruled.

8         I find these questions to be helpful to the Court.

9         So, go ahead.

10             MR. PEEK:  And I will connect them up,

11   Your Honor.

12             THE WITNESS:  I'm sorry.  What was the question?

13   BY MR. PEEK:

14   Q    Where was the hard drive?

15   A    Oh.

16   Q    Actually, the question was was it seized by the FBI.  And

17   I think you said you don't believe so.

18   A    No.

19   Q    So did it remain in your home after --

20   A    No.

21   Q    -- January 2006?

22   A    No.

23   Q    Did it remain in that storage facility then?

24   A    No.

25   Q    Where did it go after it was in the storage facility in

Case 3:23-mc-00073-PKH-MAU Document 731 Filed 07/28/23 Page 458 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 150 of 220
-150-

1    January 2006?

2                    MS. KLAR:  Same objection, Your Honor.

3                    THE COURT:  Overruled.

4            Go ahead.

5                    THE WITNESS:  Let me rephrase that.  It was in

6    my home or the storage facility shortly up to and before the

7    raid on my home.

8    Q    Okay.  And then where was it shortly up to or before the

9    raid on your home?

10   A    I'm --

11   Q    Or up to that?

12                   MS. KLAR:  Same objection, Your Honor.

13                   THE COURT:  Overruled.

14                   THE WITNESS:  They were in my car.

15   BY MR. PEEK:

16   Q    And did they remain in your car for the period of -- I

17   guess the raid occurred on or about March 1st or 2nd, 2006 --

18   did they remain in your car up until you produced them on

19   May 23rd?

20   A    No.

21   Q    Where did it go then?

22   A    Back into the storage place.

23   Q    The storage facility here in Reno?

24   A    Yes.

25   Q    And for how long did it remain there?

1           MS. KLAR:  Your Honor, can I have a continuing

2    objection to this line of questions.  I don't think it has

3    anything to do with the Order to Show Cause.

4           MR. PEEK:  I don't care if she does, Your Honor.

5    That's fine with me.

6           THE COURT:  Well, I know that.

7           MR. PEEK:  You want me to respond to the

8    objection again, Your Honor?

9           THE COURT:  Just for the record, Ms. Klar has

10   interposed a continuing objections.  Please state for the

11   record why you think this line of testimony will be relevant.

12          MR. PEEK:  Your Honor, it goes to a number of

13   things.  It goes to whether it's been any spoliation.  It

14   goes to whether or not these are, in fact, good faith

15   productions that have occurred.  I will connect up the data

16   that's actually on the file.  And the Court will see, from

17   the testimony that's coming out here, that there's not really

18   a good faith production in the hard drive.  And there is not,

19   as Mr. Montgomery recites to you, 1.3 million files, separate

20   independent discrete files.

21          THE COURT:  All right.  Well, I'm going to

22   recognize Ms. Klar's ongoing objection, continuing objection

23   to this line of questioning.  It is overruled.  And I will

24   allow Mr. Peek to continue.

25          THE WITNESS:  Okay.  Go ahead.

Case 3:22-mc-00073-PMP-VPC   Document 734   Filed 07/08/08   Page 460 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/08/08   Page 152 of 220
-152-

 1   BY MR. PEEK:

 2    Q    After the car, where did it go?

 3    A    Um, back in storage.

 4    Q    And where this time?

 5    A    Reno.  I mean, I think I said that.

 6    Q    So it went, storage, car, storage?

 7    A    Right.

 8    Q    Give me the time frames.

 9    A    Um, the month of, say, the month of April.  I had moved

10   it several times.

11    Q    Why were you moving it several times?

12    A    Because I was continuously being followed by the FBI.

13    Q    And you were concerned that this disk, which contained

14   eTreppid -- you acknowledge this is eTreppid property, do

15   you not?

16    A    No, I don't.

17    Q    Oh, you don't acknowledge that the backup files that you

18   took from eTreppid that are on this disk, are in fact eTreppid

19   property?

20    A    I've never looked at all the files.  I don't know.

21    Q    Well, is any of it eTreppid property?

22    A    I presume so.

23    Q    So the stuff you took off of Warren's hard drive, is that

24   eTreppid property?

25    A    I believe so.

Case 3:22-mc-00073-PMP-VPC Document 731 Filed 07/08/08 Page 461 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 461 of 800

—153

1    Q    The stuff that you took off of the other desktops, is

2    that eTreppid property?

3    A    Probably.

4    Q    And is that all that was on this disk that you kept

5    moving around in your car --

6    A    No.

7    Q    -- was backup?

8    A    My personal stuff and everything else.

9    Q    So there's personal stuff on that hard drive?

10   A    I have personal stuff.  Sure.

11   Q    Okay.  What type of personal stuff was on there?

12   A    Pictures of the cruises.  That type of stuff.

13   Q    Okay.  Anything else besides that?

14   A    I don't recall at the time.

15   Q    Okay.  Why didn't you -- why were you concerned that

16   the FBI might take this hard drive from you, if it contained

17   eTreppid property?

18   A    Well, they already tried -- they already tried a pretty

19   rough raid on me once.

20   Q    Sir, why did you think the FBI might want from you

21   property that belonged to eTreppid?

22   A    They didn't ask me for property that belonged to

23   eTreppid.

24   Q    You said you were sort of taking it around because the

25   FBI was following you.  Why did you have a concern that the

Case 3:22-cv-00073-SKK-WAU  Document 734  Filed 07/08/08  Page 462 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 154 of 226
154

```
 1   FBI might get access to this hard drive which had eTreppid

 2   property on it?

 3    A   I was more concerned that they were after me, not what

 4   they were after.

 5    Q   So it stayed in your car, went to storage.  How long did

 6   it stay in the storage facility in Reno?

 7    A   I would guess a month or two.

 8    Q   Then did it sort of remain in your custody and control

 9   then, all the way up until May 23rd?

10    A   Absolutely not.

11    Q   Absolutely not?

12    A   You're talking about May 23rd of this year?

13    Q   Yes.

14    A   Absolutely not.

15    Q   Where else was this hard drive with the, with eTreppid's

16   backup -- excuse me, eTreppid data on it?

17    A   Mr. Flynn insisted I give all of it to him.

18    Q   Okay.  So when did you give it to him?

19    A   I don't know the exact date, but I would say, roughly,

20   around the time period that I think I just -- two months after

21   the raid, let's say.

22    Q   Okay.  So two months after the raid, Mr. Flynn had it.

23   That would be June?  May, June?

24    A   Yes.

25    Q   And then how long did it remain in Mr. Flynn's
```

Case 3:23-mc-00076-CMK-WAU Document 734 Filed 07/08/08 Page 463 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 155 of 220

155

1    possession?

2    A    I would guess about a year.

3    Q    So that would be, now, June of 2007?

4    A    Maybe eight or nine months.  It would be more at the

5    end of 2006.

6    Q    Okay.  So --

7    A    No.  Let me rethink this.

8         At least seven months.  It could have been longer.

9    It could have been shorter.

10   Q    Okay.

11   A    No, it could have -- it was at least seven months, if not

12   longer.

13   Q    So sometime in the first quarter of 2007, it came back to

14   your possession, would that be --

15   A    I think it was actually December, now that I think of it.

16   Q    Okay.  So, December 2006 it came back into your

17   possession?

18   A    Yes.

19   Q    Is that correct?

20   A    Didn't come back into my possession.

21   Q    Into whose possession did it go?

22   A    His son's.

23   Q    Okay.  That's -- what's his name?

24   A    Michael Flynn, Junior.

25   Q    Okay.  And then, to your knowledge, how long did

Case 3:22-mc-00076-PKM-WAU Document 734 Filed 07/28/23 Page 464 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/23 Page 156 of 220

156

```
 1   Michael Flynn, Junior, have it?

 2    A    I would say probably six months, seven months.

 3    Q    And do you know for what reason Michael Flynn, Junior had

 4   this?

 5              MS. KLAR:  Objection to the extent it calls for

 6   attorney/client communication.

 7              THE COURT:  Well, Mr. Montgomery, to the

 8   extent -- you can go ahead and answer the question.  But, if

 9   it implicates any communication you had with your lawyer --

10              THE WITNESS:  It would.

11   BY MR. PEEK:

12    Q    Did Michael Flynn, Junior, tell you why he wanted it?

13    A    His father told him.

14    Q    His father told him?

15    A    I -- did I'm trying to do this without releasing --

16    Q    I understand.  But, his father told him?

17    A    Yes.

18              MR. PEEK:  Privileged waived, Your Honor.

19              THE COURT:  Well --

20              MR. PEEK:  His father told him, that's a waiver

21   of the privilege, Your Honor.  It's going to a non-party to

22   this proceeding, non-client, non-representative.

23              THE COURT:  Miss Klar.

24              MS. KLAR:  Your Honor, he has not revealed the

25   content of his conversation with Mr. Flynn on the subject.  He
```

Case 3:22-cv-00073-SKK-WAT Document 731 Filed 07/28/08 Page 465 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 157 of 226

-157-

1  had said that Mr. Flynn, Junior, said his father told him.

2  That's not the content of the communication.

3           MR. PEEK:  Sounds to me like it is, Your Honor,

4  but maybe I'll explore it a little further.

5           THE COURT:  I believe that he has not revealed

6  the content, so go ahead and perhaps --

7  BY MR. PEEK:

8  Q   What was it that did -- to your knowledge, was Mr. Flynn,

9  Junior, told why he was to get, to receive and keep the disk?

10  A   I don't recall or not.

11  Q   You don't know or you don't recall?

12  A   I don't recall.

13  Q   Did somebody tell you at sometime what was told to

14  Mr. Flynn, Junior?

15  A   No.

16  Q   Did you ever talk to Mr. Flynn, Junior, as to why he had

17  the disk?

18  A   Well, I saw him quite often.

19  Q   That's not my question.

20  A   I --

21  Q   Did you talk to him about why he had your disk?

22  A   No.

23  Q   Did he ever tell you why he had your disk?

24  A   No.

25  Q   Was there some reason, for security purposes, that

1  Mr. Flynn, Junior, had your disk?

2   A   I don't understand the question.

3           MS. KLAR:  Your Honor, I object to the extent it

4  calls for an attorney/client communication.

5           THE COURT:  Go ahead and ask, without discussing

6  any attorney/client communications, Mr. Montgomery.

7  BY MR. PEEK:

8   Q   Was there any security reason for Mr. Flynn, Junior, to

9  have it?

10   A   I don't know what you're asking.

11   Q   Well, for example, was there a concern that it might be

12  stolen from you?  Was there a concern that the FBI might be

13  after it?  Was there a concern that it might come into the

14  possession, pursuant to court proceedings, into eTreppid's

15  possession?

16           MS. KLAR:  Again, Your Honor, I would object to

17  the extent that it appears that Mr. Peek is trying to elicit

18  communications between Mr. Flynn and Mr. Montgomery.

19           MR. PEEK:  He asked me what I meant by security,

20  Your Honor.  I was trying to give him --

21           THE COURT:  I think that Mr. Flynn -- excuse me,

22  Mr. Peek, simply is trying to clarify what he meant when he

23  said did Mr. Flynn, Junior, have it for security reasons.

24  Mr. Montgomery said I don't understand.  What do you mean by

25  security.  Mr. Peek has given some examples.

1        To the extent you can answer that question,

2   Mr. Montgomery, without violating your attorney/client

3   privilege, reserving that, go ahead and answer.

4            THE WITNESS:  I don't think I can without

5   violating the privilege.

6   BY MR. PEEK:

7   Q   And so is it some time in that six or seven months later,

8   Michael Flynn, Junior, returned it to you, or returned it to

9   his father?  Do you know?

10  A   Me.

11  Q   Okay.  And so that would now be, what, June of 2007?

12  A   I believe it was sometime after the FBI returned the

13  material to me, in that time frame.

14  Q   That time frame, I think you told us, the FBI return the

15  material sometime in April 2007?

16  A   March, I think it was.

17  Q   So sometime after March?

18  A   Yes.

19  Q   Okay.  And then did it remain in your possession then

20  from, say, April, May 2007, until it was produced on or about

21  May 23rd?

22  A   You mean of this year?

23  Q   Yes.

24  A   Yeah.  Yes.

25  Q   Okay.  And I think you told the Court that, at some

1    time, you, at least, looked on that disk to see what was on

2    it and determined there was 1.3 million documents?  Did I

3    understand that?

4    A    Files.

5    Q    Files.  1.3 million files.

6         Did you attempt to determine what types of files

7    there were, what the universe was?

8    A    No.  I just copied the whole thing.

9    Q    You just copied the whole thing.

10        Now, when you copied it, when, when was -- first of

11   all, when was it that you went on to the disk to determine

12   that there were 1.3 million files on it?

13   A    I believe we're talking two disks, aren't we, not one?

14   Q    Yeah.  The two disks.

15   A    Yeah.  I would say -- I don't know the exact date, but

16   I'm going to -- March maybe.  April.

17   Q    Of what year?

18   A    This.

19   Q    And you knew, and I think you told the Court, that

20   you knew there was at least two outstanding requests for

21   production that would implicate that disk.  There was one in

22   August of '06, and one in November '07.

23        So, are you telling us you didn't begin to look at

24   it until March of '08?

25   A    No.  There was a stay on it.  I already -- in the 41(g)

Case 3:33-cv-00076-RMK-WAU Document 734 Filed 07/28/08 Page 169 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 169 of 226
-161-

1  matter -- and I said I looked at it occasionally, but I had

2  not --

3  Q   My question is so you said you first looked at it to

4  review it to determine the 1.3 million files in March of '08.

5  That's what you just told us.

6          Did I misunderstand you?

7  A   No.  I, I think that's probably --

8  Q   Okay.

9  A   -- accurate.

10 Q   But you understood, did you not, that you had an

11 outstanding document production of August of '06, and another

12 one in November of '07 that, at least as of November '07, when

13 the stay was lifted, required you to produce documents from

14 that, those two hard drives, or from the hard drives that you

15 say are backup documents.

16 A   I was concerned about the States Secrets Privilege.

17 Q   Okay.  Now, when -- so you didn't furth -- you were

18 concerned about it, but didn't further review that document,

19 the hard drive that you had, or drives that you had, until

20 March of '08?  That's right?

21 A   I can't say I never.  No.  That's not accurate.

22 Q   Well, are you -- have you seen this pleading filed by

23 the United States Government in May 21st, I think of this

24 year, at a May 21st hearing in which Ms. Wells represented

25 in a pleading that she had made two efforts, through your

Case 3:23-mc-00073-SMK-WAU  Document 734  Filed 07/08/23  Page 479 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 162 of 220

162

1   counsel, to meet with you last fall, early winter of '07, '08?

2   A   Are you referring to Mr. Flynn?

3   Q   No.  I'm referring to --

4   A   Oh.

5   Q   -- Ms. Wells saying to this court, on May 21st, that she,

6   through your counsel, Deborah Klar, had made two efforts in

7   November, and I believe December, January of '07, '08, to meet

8   with you.

9   A   I was aware of one of them.

10  Q   You were aware of only one.  You're not aware of two of

11  them?

12  A   That's correct.

13  Q   And what was your response to the inquiry by Ms. Wells to

14  meet with you?

15              MS. KLAR:  Your Honor, I would object to the

16  extent it calls for attorney/client communication.

17              THE COURT:  All right.  Answer the question, if

18  you can, without violating the attorney/client privilege.

19              THE WITNESS:  I don't think I could.

20              MR. PEEK:  Okay.

21  BY MR. PEEK:

22  Q   Are you aware that in a court pleading, Ms. Klar or --

23  excuse me, Ms. Wells has said that Ms. Klar refused to meet,

24  to have you meet with the government on those two occasions?

25  A   I can't answer that without disclosing attorney/client.

Case 3:23-mc-00076-GMN-WAU  Document 731  Filed 07/08/23  Page 471 of 800
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 163 of 200

-163

1    Q    Okay.  So you didn't see the pleading that Ms. Wells

2    filed?

3    A    I can't say that I didn't see it.

4    Q    And you're saying then, that you did not become aware,

5    and if you became aware, it was only through attorney/client

6    communication, is that right?

7    A    That was the only communication I had with the

8    government.

9    Q    Well, are you aware, today, that Ms. Wells has told this

10   court that she made two efforts to have the government meet

11   with you to review with you the States Secrets Privilege, and

12   your counsel, Ms. Klar, refused?

13              MS. KLAR:  Your Honor, again, I object to the

14   question, to the extent that it calls for attorney/client

15   communications.

16              MR. PEEK:  Aware of anything other than through

17   his attorney.

18              THE COURT:  Right.  Right.

19              As I understand Mr. Peek's question, the question

20   was are you aware that Ms. Wells told the Court that she

21   had attempted to arrange a meeting between you and government

22   officials to review the terms of the U.S. Protective Order

23   on two occasions, and that Ms. Wells told the Court -- so

24   this is what Ms. Wells is telling me, so that's not a

25   attorney/client issue, I don't think -- he's just asking if

-164-

 1   you knew that.

 2             MS. KLAR:  But, Your Honor, to the extent he

 3   knew that as a result of a communication with me, it's

 4   privileged.

 5             MR. PEEK:  I don't think that's even a

 6   confidential communication, Your Honor, that would even be

 7   covered by the attorney/client privilege.  That's where a

 8   court officer had an obligation to tell his or her client.

 9             THE COURT:  I don't see how that's covered by

10   the attorney/client privilege.

11        Ms. Klar.

12             MS. KLAR:  Your Honor, any conversations that I

13   have had with Mr. Montgomery with respect to what has occurred

14   in this litigation, and positions that have been taken by

15   other counsel, I view those communications as privileged.  I,

16   to the extent I had such a conversation, assuming I did, it

17   would be covered by the privilege.

18             THE COURT:  All right.  What --

19             MR. PEEK:  I could put Ms. Klar on the stand

20   and ask her if she was at least asked twice, and did she

21   refuse twice.  I'm happy to do that, Your Honor.  Or, she can

22   stipulate that that's what happened.  And then the Court can

23   draw its own inference as to whether or not she fulfilled her

24   obligation to her client of informing him of that.

25             If she's willing to give that stipulation, by

Case 3:22-mc-00078-CWK-WAU Document 732 Filed 07/08/22 Page 473 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 165 of 220

165

 1   agreement with Ms. Wells -- I don't want to put Ms. Wells on

 2   the stand.  I accept her pleading.  But I'm trying to at least

 3   prove that this man was given two opportunities to meet with

 4   the government, and did not do so and, therefore, that's why

 5   he now comes before you and says, oh, my gosh, Your Honor, I

 6   have 1.3 million files to review, and I as unaware, and I am

 7   overwhelmed by all of this.  That's the position he is taking

 8   today, and there may be nothing close to that.  He made no

 9   good faith effort to even look at it.  He never made a good

10   faith effort to meet with the government so he would

11   understand what his obligations were.

12            MS. KLAR:  Your Honor, I made a representation

13   to the Court at the May 21st hearing -- and I don't think

14   Ms. Wells disagreed with me -- at the time that we were

15   initially asked to meet with the government, there were

16   certain conditions that we requested that the government

17   would not agree to.  And subsequently, some time in May, we

18   had further discussions, and the government did agree to

19   those terms.  And we have, today, a document that confirms

20   what occurred at that meeting, which is what we were seeking

21   at the time that the initial request was made.

22            Now, to the extent that I have had communications

23   with my client with regard to these issues, in my view, those

24   conversations are clearly privileged.

25            MR. PEEK:  Your Honor, all I know is the Court

Case 3:22-mc-00076-GMN-WGC  Document 734  Filed 07/28/23  Page 474 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 166 of 200

166

1    ordered him to meet with the government.  And it wasn't until

2    the Court ordered Mr. Montgomery to meet with the government

3    that he did so.

4              MS. KLAR:  Your Honor, that is not correct.

5    We agreed to meet with the government before the May 21st

6    hearing.

7              THE COURT:  Ms. Wells, what was the -- and you

8    may not know this offhand.  I'm trying to search my docket

9    sheet.  I know you filed a statement.  Can you sort of recall

10   when?

11             MS. WELLS:  I believe there was an Order,

12   Your Honor, before the May 21st hearing, requiring that the

13   government and the eTreppid parties could weigh-in on the

14   subject matter of that hearing --

15             MR. PEEK:  Your Honor, it's docket 611.

16             MS. WELLS:  It might have been, if that was on

17   the 21st.

18             MR. PEEK:  It's actually May 19th.

19             MS. WELLS:  May 19th, is that --

20             MR. PEEK:  I'm not sure if that's the one,

21   Your Honor.

22             THE COURT:  Thank you.  Got it.

23             MR. PEEK:  Is this the one, Ms. Wells?  It's

24   footnote -- page 4, Your Honor, of that.

25             THE COURT:  All right.

Case 3:22-cv-00078-GNK-WPC Document 734 Filed 07/08/08 Page 475 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 167 of 226
—167

```
 1                    MR. PEEK:  And you read that -- actually,
 2      I think this became a court exhibit -- no, it didn't,
 3      Your Honor.
 4                    THE COURT:  I don't believe it did.
 5                    MR. PEEK:  That was me.  I apologize.  I turned
 6      it on at the break and didn't turn it off.
 7                    THE COURT:  Everybody else turn off your cell
 8      phones.
 9                    MR. PEEK:  So, all I know is what the pleading
10      says, Your Honor.
11                    THE COURT:  All right.  So why don't you go
12      ahead, sir, and just read that into the record.
13                    MR. PEEK:  On page 4 of docket 611, Ms. Wells, I
14      think, writes on line 8:
15           "As a means of providing assistance to Montgomery
16      in identifying more precisely the information covered either
17      by the United States Protective Order, or the NDA, government
18      counsel reminded Montgomery's counsel that on at least two
19      previous occasions, government counsel had offered to arrange
20      a meeting between Montgomery and appropriate government
21      officials.
22           "The purpose of such a meeting would have been to
23      provide Montgomery with an explanation of the parameters of
24      the United States Protective Order, a conversation that is
25      possible with Montgomery because of his government authorized
```

```
 1   access to protect the information, but not with his uncleared
 2   counsel."
 3          Then there's a footnote:  With respect to one of
 4   the prior occasions, government counsel offered to meet with
 5   Montgomery in Reno, Nevada, at a convenient time, before or
 6   after the December 2007 Discovery Status Conference, when
 7   such a meeting the government had proposed to counsel for
 8   Montgomery, was held with Warren Trepp."
 9          I don't see anything in here that refers to
10   Ms. Klar's conditions or anything else.  I'm just going by --
11              THE COURT:  No.  What I recall is that at the
12   May 21 hearing, that is when Ms. Klar stated on the record
13   the discussion about the arrangements that had quite recently
14   been made for the meeting between Mr. Montgomery and
15   government officials and so forth, which took place last
16   week.
17              MR. PEEK:  I'll move on, Your Honor.
18   BY MR. PEEK:
19    Q   So after, at least, March of 2008, did you conduct any
20   review at all of those disks that you said had kind of gone
21   through car, storage, Michael Flynn, Junior, Senior, Michael
22   Flynn, Junior, yourself, to determine whether or not you had
23   any good faith belief whether there was any United States
24   States Secret privilege on them, or States Secret classified
25   information on them?   Did you do that?
```

1    A    Yes.

2    Q    When did you do that?

3    A    I thought -- sorry.  I thought, I thought it was in March

4    sometime, going forward, February, March.

5    Q    And what did you determine when you reviewed it, in

6    either February or March 2008, as to whether it did or did

7    not contain States Secrets information on it?

8    A    I would say that I was suspicious it might.

9    Q    Okay.  And did you then, at that time, because of your --

10   did you feel there was a good faith belief that there was

11   State Secret Privilege on it?

12   A    I don't -- I don't understand the question.

13   Q    Did you believe that your suspicion was a good faith

14   belief that there was State Secrets Privilege on it?

15   A    I wasn't certain or not, but --

16   Q    Okay.  So when did you conduct a second or further review

17   to determine whether there was or was not States Secret

18   Privilege on there?

19   A    Late March, April.

20   Q    So late March, early April?

21   A    Yes.

22   Q    And what did you determine at that time?

23   A    Well, I wasn't certain what fell into the privilege, so I

24   wasn't -- I mean there's no way to know for certain.

25   Q    Okay.  So when did you then make the determination that

1    there was not States Secret Privilege information on it that

2    you could turn over?  When did you make that determination?

3     A    Regarding the drives?

4     Q    The ones that you turned over May 23rd and May 26th or

5    27th.

6     A    I didn't ever -- I didn't look at all those files to make

7    that determination.

8     Q    But you produced them to us?

9     A    Under the assumption that any work done after

10   January 1st --

11    Q    Correct.

12    A    -- might contain States Secrets.

13    Q    After January 1st of 2003?

14    A    Yes.

15    Q    Okay.  So you made that determination in March or April

16   of 2008?

17    A    I don't remember how it came about, but somebody had

18   determined, and maybe it was the Court documents, that, you

19   know, you can at least segregate the files by some --

20    Q    What court document did you look at that you can point

21   to today, sir?  This only happened a couple of months ago.

22   What court document can you point to where you saw that the

23   date, relevant date was December 31, 2002 and before?

24    A    I don't understand the question.

25    Q    What court pleading did you see?

1  A    I don't know.  I don't know.

2  Q    Well, was it a court pleading?

3  A    I don't know how.  Somebody had passed information on to

4  me saying this is some way --

5             MS. KLAR:  Mr. Montgomery, to the extent that

6  you may be revealing attorney/client communications, I would

7  object.

8             THE WITNESS:  Right.

9  BY MR. PEEK:

10  Q   Somebody passed on information to you, is that correct?

11            MS. KLAR:  Mr. Montgomery -- Your Honor, I would

12  object to the extent it calls for attorney/client

13  communications.

14            MR. GOMEZ:  And, Your Honor, the United States

15  is concerned at this point, when we're talking about dates,

16  that it may involve some information covered by the

17  U.S. Protective Order.  So, we need to be very careful as

18  to further questioning along these lines.

19            THE COURT:  All right.

20            MR. PEEK:  I'm not trying to trick him.

21            THE COURT:  No, no.

22        Here's my observation to everyone is I don't think

23  the parties, typically, intend to disclose information

24  governed by the U.S. Protective Order.  It often occurs

25  inadvertently.  So, Mr. Gomez is reminding us not to be

```
 1   inadvertent, and to be careful about what we say.  So, with
 2   that in mind --
 3   BY MR. PEEK:
 4    Q   In any event, you learned one way or another that there
 5   may be a date of December 31, 2002, and before, where any of
 6   that information would not be covered by the States Secret
 7   Privilege?
 8    A   I don't believe, to date, that statement is accurate
 9   still.
10    Q   Well, in any event, somehow you reached that conclusion,
11   even though you don't believe today it's accurate?
12    A   That's correct.
13    Q   Okay.  Now was all of the data on one or two or three
14   hard drive backups?
15    A   Multiple.
16    Q   Multiple backups?
17    A   Yes.
18    Q   How many?
19    A   On which drive?
20    Q   How many?
21    A   Oh, I'm sorry.
22    Q   How many drives contained the backup information that
23   belonged to eTreppid that you said you were given permission
24   to take?  How many drives is that?
25    A   Forty.  30 or 40.
```

 1   Q   So 30 to 40 hard drives?

 2   A   Yeah.

 3   Q   And where are those 30 to 40 hard drives today?

 4   A   I brought some of them to court.

 5   Q   Okay.  Would they be the ones -- none of which the FBI

 6   seized though?

 7   A   That's correct.  Oh, that's correct.

 8   Q   Okay.  Then which of those that you brought to court,

 9   which of those are here today?

10   A   Which of what?

11   Q   Where are the ones that you brought with you today?

12   A   I brought them with the CDs.

13   Q   Did you bring all 30 or 40?

14   A   No.

15   Q   How many did you bring?

16   A   I believe 20.

17   Q   And of those 20 that you brought, do they all pre-date

18   December 31, 2002?

19   A   No.

20   Q   Are they post-2002 then, I take it, obviously?

21   A   You mean, are all -- some of them are, yes.

22   Q   Some of them are.  Now, if there were 30 to 40, where are

23   the other 10 to 20?

24   A   In my home.

25   Q   Where?  In Rancho Mirage?

1   A   Yes.

2   Q   Okay.  And these also contain backup information of

3   eTreppid files on Mr. Trepp's computer and desktops of the

4   employees, correct?

5   A   Yes.

6   Q   Any other backups from any other sources other than the

7   desktop of employees and Mr. Trepp's?

8   A   My own.

9   Q   And your own.

10          Okay.  Any others?

11   A   Um, not that I can think of, no.

12   Q   And were you ever able to segregate from the 20 -- excuse

13   me, the 30 to 40 hard drives, that data which was backed up

14   from your -- backed up from your computer versus all of the

15   eTreppid computers?

16   A   No.

17   Q   There's no way -- was there anyway to segregate that

18   data?

19   A   Oh, yes.  You said did I.

20   Q   But there is a way to segregate that data?

21   A   Yes.

22   Q   And is it a difficult process --

23   A   Yes.

24   Q   -- to segregate that data.

25          How difficult is it?

1    A    What do you mean how difficult?

2    Q    Yeah, just is that a 40-hour job, a 30-hour job, a

3    50-hour job, 100-hour job?

4    A    I don't know.

5    Q    So the two disks that you produced, what did you do,

6    just go down and buy them some place and then copy them onto

7    those two disks?

8    A    Yes.

9    Q    Do you have to format those two disks beforehand?

10    A    Yeah.

11    Q    And how do you do that?

12    A    How do I do what?

13    Q    How do you format the disks before you --

14    A    I put them in the computer and type "format".

15    Q    Go to your computer and you type "format"?

16    A    Yeah.

17    Q    And what was the date on which the disks were formatted?

18    A    I, to be honest with you, I don't know if I used an

19    existing drive that I had, or I bought a new one.  I don't

20    recall.

21    Q    Okay.  But, in any event, those were formatted, correct?

22    A    Right.

23    Q    And what computer did you use?

24    A    My own.

25    Q    Your own laptop or --

Case 3:22-mc-00073-CKK-MAU Document 734 Filed 07/38/03 Page 484 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/28/08 Page 176 of 220

-176-

 1    A    No, a desktop.

 2    Q    Is it a desktop that is kept up-to-date current, with the

 3    current date on it?

 4    A    I doubt it.

 5    Q    What is the date on it today, if you know?

 6    A    I -- date of what?

 7    Q    What is the date that shows on your computer?  In other

 8    words, if you write something on your computer, it would show

 9    a date on it when you wrote it, what would that date be?

10    A    I have no idea.

11    Q    Would it be 6-10-2008?

12    A    It could be.  Yes.

13    Q    Would it be 6-10-2007?

14    A    No.

15    Q    Okay.  So it would be more likely it's the current date,

16    is that correct?

17    A    Unless it was a drive that was already formatted from the

18    past.

19    Q    Unless it was a drive that was already formatted,

20    correct?

21    A    Yes.

22    Q    Okay.  Are you aware that the disk drives that you

23    produced have formatting dates of 2003 and 2004?

24    A    No.

25    Q    You're not aware of that?

1    A    No.

2    Q    Would it surprise you to know that?

3    A    No.

4    Q    It wouldn't?  Why?

5    A    Why what?

6    Q    Why wouldn't it surprise you they have a format date

7    of 2003 and 2004?

8    A    I have no idea.

9    Q    Well, would you have formatted them in 2003 and 2004?

10   A    I can't remember the drive.  I don't think so.

11   Q    Okay.  Then why would they have a date of formatting

12   of 2003, 2004 on them?

13   A    I have no idea.

14   Q    Would it be because you told the commuter to put that

15   format date on there?

16   A    I didn't do that.

17   Q    Then, well, how else would that date get on there?

18   A    I have no idea.

19   Q    Well, Mr. -- you're a computer scientist.  You've been

20   represented here, throughout these proceedings, to be the

21   really topnotch commuter scientist.  And you can't tell us

22   how a format date, coming off of your computer, should have

23   the same date that it was formatted on your computer, as on

24   the hard drive, shouldn't they?  It should have the same date,

25   shouldn't it?

1    A    What's the question?

2    Q    The date that the hard drive is formatted should have the

3    same date as the date on which the computer formatted it,

4    shouldn't it?

5    A    It could.

6    Q    It should, should it not?

7    A    Not necessarily.

8    Q    When would it not have the same date as which the

9    computer date is when you type "format"?  Why would it be a

10   date other than the date on the time clock of the computer?

11   A    If you were cloning the drive, and that partition was

12   cloned across, it would have the date of the partition.

13   That's why.

14   Q    So are you telling us the date of the partition on a hard

15   drive that you were copying to it?

16   A    I believe so.  I don't --

17   Q    Okay.  Now, do you know when the hard drives were

18   manufactured that you used?

19   A    No.  One of them was a terabyte, so it's got to be fairly

20   recently.

21   Q    So they're post-2003, 2004, are they not?

22   A    Right.  I don't remember the other one.  I don't

23   remember.

24   Q    Both of them were manufactured after 2003, 2004, which is

25   the date they're shown as being formatted, are they not?

Case 3:23-mc-00073-PMP-VPC   Document 721   Filed 07/08/08   Page 487 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 173 of 226

                                                                        179

1   A    I don't recall.

2   Q    Okay.  And, again, as the computer scientist with this

3   knowledge, you don't have any idea of these disks and when

4   they, when they were manufactured, whether it was before or

5   after 2003, 2004?

6   A    Oh, I stated the terabyte, surely, was after 2000.  But,

7   I don't remember the size of the other drive.

8   Q    So it's represented to us that, as I said, those files

9   or those documents, excuse me, on those hard drives, are

10  responsive to documents representing eTreppid technology,

11  including PowerPoint presentations, marketing documents, and

12  correspond to potential customers, is that correct?  That's

13  what you represented?

14  A    I simply produced the drives and the backup copies.  That

15  may or may not contain those files.

16  Q    Well, but you were asked to do that, and you stated to

17  the Court in a pleading that:

18          "On May 23rd, the Montgomery parties produced a

19  hard drive containing Montgomery's backup copies of eTreppid

20  electronic files created or dated on or before December 31,

21  2002, parentheses, the pre-2003 electronic files."

22          And it is under the caption, "The Montgomery

23  Parties' Good Faith effort to comply with the Court's

24  May 21, 2008 Order, item 1."

25  A    You're on page 4?

Case 3:22-mc-00073-CKK-MAU  Document 734  Filed 07/08/08  Page 188 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 180 of 226
-180-

```
 1   Q   I'm on page 4, document 652, which I --

 2   A   No, I got it.

 3              THE COURT:  He's got it.

 4              MR. PEEK:  You got it?

 5              THE WITNESS:  Okay.  What's the question?

 6   BY MR. PEEK:

 7   Q   Would I expect to find, on that hard drive, documents

 8   containing or relating to eTreppid's technology, including

 9   white papers, PowerPoint presentations, marketing documents,

10   and correspondence to potential customers?

11   A   You could.

12   Q   I could or I would?

13   A   I didn't look at all the files.

14   Q   Would I expect to find employee information on there?

15   A   Since you backed up Sue Perez's computer, yes.  Since

16   Sue Perez's commuter is backed up.

17   Q   So you produced employee files on that, did you not?

18   A   I didn't look at it.  I simply was told that was one of

19   the machines.

20   Q   Would you expect there to be pictures of just the sky?

21   A   Probably.

22   Q   Okay.  Can we at least have some -- Your Honor, I would

23   like to -- this is Mr. Karzhmer who is going to show us some

24   of the files.

25              Do you have some of the employee files.
```

Case 3:22-mc-00073-GMN-VPC Document 734 Filed 07/28/08 Page 489 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 181 of 226

-181-

1           And this is an employee's name, and I'm not going

2    to read into the record, Your Honor, or the social security

3    number, but there's an employee file here, Mr. Barjinder Bal?

4    A   I see it.  Yeah.

5    Q   Okay.  And that's not responsive to any request, is it?

6    A   ETreppid files.

7    Q   That's not responsive to any requests regarding white

8    papers, PowerPoint presentations, marketing documents, and

9    correspondence for potential customers, is it?

10   A   Well, I understood it to be all the files.  Not just

11   those files.

12   Q   Sir, you -- I don't mean to be cute, but you can read and

13   write English, can you not, sir?

14   A   Yeah. I can read English.

15   Q   And understand?

16   A   Yes.

17   Q   You have a B.S. degree, do you not, sir?

18   A   What's your question?

19   Q   Do you have a B.S. degree as well?

20   A   No.

21   Q   Okay.  Do you have a B.A. degree?

22   A   No.

23   Q   You don't have any degree from college?

24   A   Yes.

25   Q   You have a degree from college.  Okay.  What is it?

Case 3:23-mc-00073-PMP-WMU  Document 731  Filed 07/38/28  Page 490 of 890
Case 3:06-cv-00056-PMP-VPC  Document 734  Filed 07/08/08  Page 182 of 220
182

1  A   A.S.

2  Q   A.S.  Okay.  And you certainly can write and read and

3  understand, can you not, the English Language?

4  A   Yes.

5  Q   You can understand where it says, "eTreppid technology,

6  including white paper, PowerPoint presentation, marketing

7  documents, and correspondence to potential customers"?

8  A   Yes.

9  Q   Is Mr. Barjinder Bal's bank account number, his social

10 security number, that kind of information?

11 A   I did not have time to go through every single file on

12 that disk.

13 Q   When you tell the Court there are 1.3 million files for

14 this, would there just be one file for each, or were these

15 duplicates of files?

16 A   Well, I'm sure there were plenty of duplicates.

17 Q   So, we might see, for example, Mr. Barjinder Bal's, this

18 same file duplicated 20 or 30 times?

19 A   However many times it was backed up.

20 Q   Okay.  So, that's why there are duplicates.

21          So, the 1.3 million files, we have a significant

22 number of duplicates, do we not?

23 A   I'm sure.

24 Q   So when you tell this court that you had this impossible

25 task of determining the files that were on there because

Case 3:23-mc-00073-SWF-VPC Document 734 Filed 07/08/08 Page 491 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 183 of 200
-183

1    there are 1.3 million.  Of the 1.3 million, actually, about

2    92 percent are duplicates, are they not, of the same thing?

3     A   How would I know this unless I went and I examined every

4    file?

5     Q   Well, I did it over the weekend and found it out.  It was

6    over a weekend that Mr. Karzhmer looked at this and found that

7    of the files, 92 percent were duplicates of eight percent.

8                   MS. KLAR:  Objection, Your Honor.  He's --

9                   MR. PEEK:  You could have done that, couldn't

10   you?

11                  MS. KLAR:  Your Honor, is Mr. Peek testifying?

12                  MR. PEEK:  Mr. Karzhmer will testify to that,

13   Your Honor.

14   BY MR. PEEK:

15    Q   You could have done that, could you not?

16    A   I simply back dated the --

17    Q   Could you have done that, sir?

18    A   And complied with everything else in the court, no.

19    Q   From March of 2008, when you said you first looked at it

20   and made a good faith determination that there was more than

21   likely wasn't information there that was subject to the States

22   Secret, you could have looked, as Mr. Karzhmer did over a

23   weekend, to determine that 92 percent of the files are

24   duplicates of eight percent?

25    A   Well, if I looked through every file.

```
 1                   MS. KLAR:  Objection.  Excuse me.

 2                   THE COURT:  Wait.  Stop.

 3                   MS. KLAR:  Objection.  Argumentative.

 4                   MR. PEEK:  It's not argumentative, Your Honor.

 5    I asked him a simple question:  Could he have done that or not

 6    done that.  He's had since March 2008, and Mr. Karzhmer did

 7    over a weekend.

 8                   THE COURT:  Could you have done that,

 9    Mr. Montgomery?

10                   THE WITNESS:  If that was the only thing I'm

11    doing, sure.

12                   MR. PEEK:  Thank you.

13    BY MR. PEEK:

14     Q   And you also have on there pictures -- or, excuse me,

15    information related to Parasol.  What's Parasol?

16     A   Warren's --

17                   THE COURT:  Mr. Trepp.

18                   THE WITNESS:  Mr. Trepp, excuse me,

19    Mr. Trepp's charity.

20    BY MR. PEEK:

21     Q   Mr. Trepp's 503 (c) charity, is it not?

22     A   Uh, I don't know if it's a 503.  But it's definitely his

23    charity.

24     Q   It's a charity.  And it's pictures of some of the events

25    of Parasol, are they not, on that?
```

Case 1:22-mc-00072-PKP-WAU Document 734 Filed 07/08/08 Page 493 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 493 of 826
185

1   A    Probably.  Yes.

2   Q    Okay.  And these pictures of Parasol events are not

3   responsive to the items or the documents relating to

4   eTreppid's technology, including white papers, PowerPoint

5   presentations, marketing documents, correspondence to

6   potential customers, is it?

7   A    Well, it was on the drive.

8   Q    Sir, it's not responsive to the request, is it?

9   A    I didn't --

10  Q    You just threw it out there?

11  A    Threw what out there?

12  Q    You just threw that file out there related to Parasol,

13  didn't you?

14  A    No.  That is not true.

15  Q    Well, now, you saw me just ask Mr. Karzhmer to pull up a

16  file related to Parasol.  He just got this disk drive last

17  Saturday.

18  A    Okay.

19  Q    You could have done the same thing, couldn't you?

20  A    And done nothing else?  No.

21  Q    Okay.  But you have had since March -- actually, you've

22  had since November of 2007 to do this, have you not?

23  A    I just told you they weren't in my possession during --

24  Q    In November 2007, you told us that they were in your

25  possession.

Case 3:22-mc-00073-GMK-WPC   Document 734   Filed 07/28/23   Page 494 of 800
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/28/08   Page 186 of 220

-186-

1    A    Okay.

2    Q    You said they came back to your possession shortly after

3    the FBI returned the property in March of 2007.

4    A    Okay.  That's correct.

5    Q    Okay.

6    A    Yeah.

7    Q    So you had them since November 2007, and you couldn't

8    have done what Mr. Karzhmer did over a weekend?

9    A    I mean, I have other things to do.  I did the best I

10   could.

11   Q    Well, you're the plaintiff in this case, are you not,

12   sir?

13              MS. KLAR:  Objection, Your Honor.

14   Argumentative.

15              THE COURT:  Sustained.

16        Go ahead.

17   BY MR. PEEK:

18   Q    And now would there also have been pictures of a dog on

19   this disk drive?

20              MS. KLAR:  Objection, Your Honor.

21              THE WITNESS:  I didn't look at the pictures.

22              MR. PEEK:  Would you --

23              THE COURT:  Wait.  Wait.  Ms. Klar has

24   interposed an objection.

25              MS. KLAR:  Your Honor, we have told the Court,

Case 3:22-mc-00075-GMK-WPC Document 731 Filed 07/08/08 Page 105 of 200
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 187 of 226

—187

```
 1   and we have told eTreppid, that we produced the backup drives
 2   in their entirety.  We stipulate that there is information on
 3   these drives that is not responsive.  We produced more, not
 4   less.
 5            So, I'm not sure why we're spending, you know, two
 6   hours, or an hour of the Court's time, and all the lawyer's
 7   time, going through this exercise.  We admit that's what we
 8   did.
 9            THE COURT:  Well, I think that what was produced
10   is relevant to the Court's inquiry concerning the Order to
11   Show Cause, and so I'll allow this testimony and --
12            MR. PEEK:  I just have a few more examples.
13            THE COURT:  -- questioning to continue.
14        Go ahead.
15   BY MR. PEEK:
16    Q   Could we see a picture of the dog.  Can you get it
17   larger?
18            Do you recognize that dog?
19    A   (Laughing.)
20    Q   Go back to the dog.
21            Is that your dog?
22    A   No.
23    Q   Who's dog was it?
24    A   I believe it was Cash and Monica's.
25    Q   Whose?
```

Case 3:23-mc-00073-PMP-WGC   Document 731   Filed 07/28/08   Page 496 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/28/08   Page 188 of 220
—188

1    A    Cash and Monica.

2    Q    Who are Cash and Monica?

3    A    Friends of Warren and Julie.

4    Q    And did this then come off of Mr. Trepp's computer or

5    Cash and Monica's computer?

6    A    It came off of the computer in the building.

7    Q    Okay.  And, again, because you did numerous backups,

8    there would be many, many copies of the picture of the dog,

9    wouldn't there?

10   A    Unless it changed.

11   Q    Unless it changed.  Okay.

12        Are you aware there are at least 535 pictures of

13   Shaina (phonetic) in this file name?

14   A    I could believe it.

15   Q    Okay.  And then pictures of sky.  Why would pictures of

16   sky be relevant to documents related to eTreppid's technology,

17   including white papers, PowerPoint presentations, marketing

18   documents, and correspondence with potential customers?

19   A    I don't know specifically.

20   Q    Were you using the picture of this skyline shown here --

21   I don't even know what the skyline is.  I apologize -- in any

22   way as a white paper PowerPoint presentation, marketing

23   document, and correspondence with potential customers?

24   A    Because their drive C was backed up and that was on it.

25   Q    That's not my question.

1            Were you using that skyline?

2   A   I don't recall that.  I don't recall that.

3   Q   Okay, how about files related to Rapscallion?  You know

4   the Rapscallion here in Reno?

5   A   Yes.

6   Q   And were those files related to Rapscallion documents

7   that were white papers, PowerPoint presentations, marketing

8   documents, and correspondence with potential customers?

9   A   Probably.

10  Q   Probably they were?

11  A   Yes.

12  Q   Okay.  Let's pull up some of the Rapscallion documents.

13  The wine list, for example.

14            What else do you have, Jonathan?

15            Directions to Rapscallion.

16            What else do you have, Jonathan?

17            Share your Rapscallion experience with us.  These

18  are all part of white papers, PowerPoint presentations,

19  marketing documents, and correspondence to potential

20  customers; the picture of the inside of the Rapscallion?

21  A   Obviously not.

22  Q   So none of those that you just saw, that I read off to

23  you, and this picture of the inside of the Rapscallion,

24  would be a document including the white paper, PowerPoint

25  presentation, marketing document, and correspondence with

1  potential customers.

2   A   I wouldn't say that.

3   Q   Okay.  Well, tell me how that would be?

4   A   Well, he surely took a lot of potential customers to the

5  restaurant.

6   Q   Oh, does Mr. Trepp own the restaurant?

7   A   As far as I know, he did.

8   Q   As far as you know, you believe Mr. Trepp owned the

9  Rapscallion?

10  A   I believe he owned it with Tom Clayfeld (phonetic).

11  Q   Okay.  And so he took his customers there and took

12  pictures of the interior of it?

13  A   I don't know that.

14  Q   Did you ever go to any of these meetings at the

15  Rapscallion?

16  A   I was there several times.

17  Q   With what potential customer did you go?

18  A   Many SoCom people.

19  Q   Many what?

20  A   Many SoCom people.  That's not a subject to the States

21  Secret Privilege.

22  A   SoCom.   Sorry.

23  Q   Southern Command?

24  A   Yes.

25  Q   The Air Force?

Case 3:22-mc-00073-CMK-VPC  Document 734  Filed 07/28/23  Page 499 of 800
Case 3:06-cv-00056-MMK-VPC  Document 734  Filed 07/28/23  Page 191 of 226
191

1    A    No.

2    Q    Okay.  And then you understand that that's covered or not

3    covered by the States Secrets Privilege?

4    A    I never --

5    Q    Well, I haven't seen the government step up, and they're

6    here.  I don't think it's covered by the privilege.

7    A    I might argue that.  I mean, I --

8    Q    You don't have -- you're not the one claiming the

9    privilege, are you, Mr. Montgomery?  You had that chance

10   at one time last year.

11   A    I do not want to divulge something that I can get held

12   accountable for.

13   Q    Well, we'll move on, because I don't want to either.

14        Things, like, book, books direct -- excuse me,

15   Books Direct to You, was that related to white papers,

16   PowerPoint presentations, marketing documents, and

17   correspondence with potential customers?

18   A    That particular company, no.

19   Q    Thank you.  How about Warren's social security number,

20   was that related to white papers, PowerPoint presentations,

21   marketing documents, and correspondence with potential

22   customers?

23   A    No.

24   Q    We won't put the number up, but you can see it was

25   actually repeated many, many times in the file, was it not?

Case 3:23-mc-00075-RJK-WAU Document 734 Filed 07/08/08 Page 500 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 192 of 226

-192-

1    A    I didn't look, but I'm sure it could have been.

2    Q    Okay.  But you knew that, as you told the Court here

3  today, that of the 1.3 million files, you talked about them

4  being just burdensome, but a significant number of them were

5  duplicates because they were backed up many, many, many times,

6  isn't that right?

7    A    That's right.  They were backed up many, many times.

8    Q    Which means there would be duplicates of the same

9  document over and over and over and over again, to make up

10  the 1.3 million files?

11    A    Not necessarily identical.

12    Q    Well, not necessarily identical?  A picture would be

13  identical.

14    A    I have no idea if those files were touched or not.

15    Q    And that's because you never looked, isn't that right?

16    A    No.  I started looking, and then the job became so large,

17  that I just turned everything over.

18    Q    And you started looking in March?

19    A    I started looking on the drives in February.  Whether I

20  hit that drive in March or not, I don't recall specifically.

21    Q    You started looking in February of 2008, correct?

22    A    Correct.

23    Q    Now, are there other -- what search tool did you use, by

24  the way?

25    A    Windows.

Case 3:23-cv-00073-GMK-WAU  Document 734  Filed 07/38/03  Page 501 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/03  Page 501 of 226
-193

1    Q    Are there search tools other than Windows that may have

2    been more -- would have been faster?

3    A    There could have been.

4    Q    Did you look --

5    A    No.

6    Q    -- to see if there were any?

7    A    No.

8    Q    And I think you told us that you looked to see whether or

9    not there were viruses, and you determined that there may be

10   viruses, is that correct?

11   A    When I got called and said there was a problem on the

12   drive is when I looked to determine if there were viruses on

13   the drive itself.

14   Q    So before you produced it you didn't look to see if there

15   were viruses?

16   A    We'd have to scan the whole drive to do that.

17   Q    Why didn't do you that?  You had the drive since March

18   of 2007?

19   A    Because then you would argue I changed the drives, or

20   files were deleted, and we would be having that argument.

21   Q    So you were concerned that counsel for eTreppid would

22   argue that you changed things, is that correct?

23   A    I didn't think altering them.  I thought warning people.

24   Q    Okay.  Well, in Order to warn people, you would have had

25   to gone into the drive to see if there were viruses on it,

Case 3:33-cv-00073-PMP-WPG Document 731 Filed 07/08/08 Page 502 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 194 of 226

194

1    wouldn't you?

2     A   Not necessarily.

3     Q   Well, when you accessed it in February, March 2007, to

4    look at it for the first time after, I guess, 2006, did you

5    see any viruses on it?

6     A   I probably had the virus turned off.

7     Q   Okay.  And you probably did, or you don't know?

8     A   I think I did.  I always turned it off.

9     Q   You always turned the virus off.  Okay.

10            Were the hard drives that you copied, to which you

11   copied this information, were they internal or external to the

12   desktop computer chasse?

13    A   Internal.

14    Q   When the drives were formatted, did you have someone else

15   partition them, or did you partition them yourself?

16    A   I don't recall.

17    Q   Well, you just did it about three weeks ago, and you

18   don't recall when you did it, whether you did the partition or

19   somebody else did?

20    A   Well, I mean, I don't understand your question.  You're

21   throwing out a computer term, but you're giving no explanation

22   with it.

23    Q   I just asked if you had someone else partition or format

24   the drives?

25    A   Oh, no.  No.

Case 3:22-mc-00073-GMR-WAU Document 734 Filed 07/38/28 Page 503 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 195 of 220

-195

1   Q    That's all I asked.

2   A    No.

3   Q    Okay.  And you don't know when you formatted them --

4   we've already gone over that.

5   A    That's correct.

6   Q    So you couldn't tell me if the drives were formatted or

7   what you did with them?

8   A    After they were formatted?

9   Q    Uh-huh.

10  A    You mean, like, I gave them -- put them in a box, gave

11  them to my attorney, is that what you're talking about?

12  Q    I mean, I don't know.  You just said you formatted them.

13  You said you don't know when you formatted them.  And then

14  sometime you pulled them out of a box and you hooked them into

15  your commuter, took these 20 to 30 hard drives, and copied the

16  pre-2003 data on them.

17          MS. KLAR:  Your Honor, I believe that

18  mischaracterizes the witness' testimony.  I would object to

19  the question.

20          MR. PEEK:  I don't think that does

21  mischaracterize his testimony.

22          THE COURT:  Well --

23          MR. PEEK:  I think it's a compound question.

24          THE COURT:  Please restate your question.

25          MR. PEEK:  I will, Your Honor.

Case 3:22-mc-00076-GMN-WGC   Document 731   Filed 07/28/23   Page 504 of 800
Case 3:06-cv-00056-MMD-VPC   Document 732   Filed 07/28/23   Page 196 of 220

196

1    THE COURT:  And to the extent, Mr. Montgomery,

2   that you need to clarify or inquire of Mr. Peek it isn't what

3   you said, just tell him.

4    Go ahead.

5    THE WITNESS:  Go ahead.

6    THE COURT:  No.  You go first, Mr. Peek.

7    MR. PEEK:  I'll go first.

8   BY MR. PEEK:

9    Q    You do not know when you formatted those hard drives, is

10   that correct?

11    A    I don't if the drive was already formatted first, or I

12   had formatted it already.

13    Q    That's my point.  You don't know when you did it?

14    A    That's correct.

15    Q    Okay.  And so when you copied the data, would that have

16   been just that week of May 23rd, which would have begun on

17   May 19th.  When did you copy them?

18    A    Oh.  Um, around May 5th, I believe.  I don't remember.

19   Or sometime before May 5th.  Late April -- late April.

20    Q    So you copied the data onto the hard drive pre-2002

21   before May 5th?

22    A    I think it was at the time that the Court Order -- I

23   don't remember the exact date.

24    Q    I just want to know when you did it, sir?

25    A    I don't know the exact date I did it.

```
 1   Q   Okay.  Why didn't you produce it on that date then when

 2   you copied it?

 3   A   I don't know.

 4   Q   You don't have any reason why you didn't do it?

 5   A   Why I don't have -- I don't recall why.

 6   Q   Okay.

 7           Now, when you -- you were trying to perform

 8   searches, were you not, on the hard drive?

 9   A   Yes.

10   Q   With Windows.  Which search terms were you using?

11   A   I can't disclose that.  I mean --

12   Q   Well -- oh, so, in other words, you were using search

13   terms that may have implicated the State Secret Privilege?

14   A   Before I'd met them I had put a few in.

15   Q   Okay.  Now you know how to do it correctly.

16           Okay --

17   A   Correct -- I don't understand what you just said.

18           What do you mean correctly?

19   Q   Now that you met with the government, you know exactly

20   what to do.  I apologize.  Maybe I said it wrong.  Before you

21   met with the government, you didn't know what to do?

22   A   I have a better idea.  That's for certain.

23   Q   Well, do you still have some uncertainty?  Do you need to

24   meet with the government again?

25   A   I definitely have uncertainty.
```

1    Q    Okay.

2              MR. PEEK:  Now I don't know what exhibit this

3    is, Your Honor, but I think the Court marked the State Secret

4    Privilege.

5              THE COURT:  That's Exhibit 5.

6              MR. PEEK:  Exhibit 5.  Can the witness --

7              THE COURT:  Docket 253.

8              MR. PEEK:  253.

9              THE COURT:  Yes, sir.

10             THE WITNESS:  All right.

11   BY MR. PEEK:

12   Q    And I believe that was entered in August 2007, was it

13   not?

14   A    I got it.

15   Q    And did you read it when it was given to you?

16   A    Yes.

17   Q    Did you understand from reading it that there was a

18   procedure in place for how the parties were to produce

19   documents and what they were to do when they had a question

20   about whether or not the States Secrets Privilege was

21   implicated?

22   A    I don't -- say the question again, please.

23   Q    Did you understand that the Protective Order contained

24   procedures --

25   A    Yes.

Case 3:23-cv-00073-SMK-WAU Document 734 Filed 07/08/08 Page 507 of 800
Case 3:08-cv-00073-SMK-VPC Document 734 Filed 07/08/08 Page 193 of 220

—199

1    Q   -- of what the parties were to do with respect to when

2    they had a document that they were requested to produce, and

3    the party believed that it may be -- excuse me, the States

4    Secrets Privilege may be implicated?

5              Did you understand that?

6    A   I think so.

7    Q   Okay.  So of those 20 to 30 hard drives -- or, excuse me,

8    those 30 to 40 hard drives, you knew that those were all

9    requested, did you not, as of November 2007?

10   A   Yes.

11   Q   Okay.  Then what steps did you take to follow the

12   procedures in the Protective Order, docket 256, that is Court

13   exhibit 5?

14   A   I was waiting for the electronic protocols, which

15   determined how that was going to get done.  And that didn't

16   get produced, to my understanding, until late February '08.

17   Q   Okay.  Then after February of '08, what steps did

18   you take -- well, first of all, did you take steps in

19   November 2007 to review the data on the 30 to 40 hard drives

20   to determine which of those, which data on those hard drives

21   was implicated by the States Secrets Privilege?

22   A   No.

23   Q   Why not?

24   A   Because I had a fairly good idea from who we had done

25   work for.  I guess I'm not supposed --

1   Q   You had an idea of what was on -- what was on there and

2   where it was on those 30 to 40.

3   A   Not where, but what.

4   Q   But what.

5          And was the data on all of the 30 to 40?

6   A   A lot of them.

7   Q   Okay.  So you had a good faith belief that some of the

8   data on there would be implicated by the States Secret

9   Privilege, correct?

10  A   I thought so.

11  Q   Whatever did you make, then, to sort the catalog on that,

12  either with a placeholder, or at least a notation that, on the

13  hard drive, I need to produce to the government this segment

14  of the hard drive for them to review?

15  A   I didn't even know that was an option, what you just

16  described.

17  Q   Well, did you understand that the party who was asking

18  to produce had an obligation to, one, review and make a good

19  faith determination as to whether or not there was or was

20  not data on there?  And then once it made that determination,

21  to give that data, only the subject of the State Secrets

22  Privilege, to the government?

23  A   Well, there was some discussion of that, but I

24  was unaware of who the individual was that you gave that

25  information to be copied.  I mean, I thought --

Case 1:23-mc-00073-CKK-MAU Document 731 Filed 07/08/23 Page 509 of 800
Case 3:08-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 201 of 220

-201-

1    Q    You mean there was a person in the government to give
2    that to.
3    A    Well, not just a person, but you would have to have the
4    drive copies, I presume, and who was allowed to do the copying
5    of those types of drives.
6    Q    And that was the vendor protocol that came up and got
7    resolved in February '08?
8    A    I don't remember when, but I know there was some protocol
9    that was in issue.
10   Q    And then once those vendor protocols were in place,
11   whatever did you make, then, to have those 30 to 40 hard
12   drives produced, by giving them, first, to the government,
13   only that data which is related to State Secret Privilege, and
14   then back?
15   A    But I have a number of conflicts.  I have people asking
16   me to produce hard drives for a court.  And I have the same
17   original hard drives I'm supposed to give the government to
18   peel off a piece of it.  And during all of this, I'm not
19   allowed to show it to any of my attorneys.
20   Q    I understand that.  Mr. Trepp has the same obligation.
21            But you didn't make -- in other words, what you're
22   saying is that it was not humanly for you, one person, to do
23   that?
24   A    I, I would say that surely characterizes it fairly.
25   Q    Okay.  That's understandable, as the Court has said.

Case 3:23-mc-00073-GKK-WAU  Document 731  Filed 07/08/08  Page 510 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 202 of 220

202

 1            Let's actually go back to the requests for

 2     production, because I want to make sure that I understand what

 3     you have and don't have.

 4                    MR. PEEK:  And I'm sorry, Your Honor.  I'm

 5     trying to find my copies of the document requests.

 6                    THE COURT:  All right.

 7     BY MR. PEEK:

 8      Q   And I know the Court has reviewed some of this with you,

 9     but let me ask some background questions.

10            I have seen, at least from some of the documents

11     you have produced, that you became a member of an LLC called

12     Opspring.

13      A   I've never become a member.

14      Q   You've never became a member of Opspring?

15      A   Just an employee.

16      Q   Just an employee.  So you hold no interest, no membership

17     interest whatsoever?

18      A   None.

19      Q   None.  And you're paid $100,000 a month?

20      A   That's correct.

21      Q   And is that still today, or is that just up to

22     December 31 of '07?

23      A   I don't remember when it ended.  I'm sorry.  I didn't

24     remember when it ended.

25      Q   Well, are you still employed today?

1   A   '07.  I'm sorry.

2   Q   Are you employed today?

3   A   Yes.

4   Q   By whom?

5   A   Lexware.

6   Q   I'm sorry?

7   A   Lexware, L-e-x-w-a-r-e.

8   Q   L-e-x-w-a-r-e?

9   A   Correct.

10  Q   What is that company?

11  A   It's a software company.

12  Q   And where is it located?

13  A   Rancho Mirage.

14  Q   And who's the owner of that company?

15  A   I'm not.

16  Q   That's not what I asked you, sir.  Who's the owner?

17  A   Edra Blixseth.

18  Q   Thank you.  And are you still being paid a hundred

19  thousand a month?

20  A   Yes.

21  Q   Okay.  And what was your position with Opspring?

22  A   A programmer.

23  Q   That's all you were, just a programmer?  Nothing else?

24  For $100,000 a month?

25          MS. KLAR:  Objection, Your Honor.

```
 1    Argumentative.
 2    BY MR. PEEK:
 3    Q    Is that -- you just were a programmer?
 4    A    Let's just say the chief scientist, how's that?
 5    Q    You were the chief scientist.  Okay.
 6              And what were your duties as the chief scientist?
 7    A    I worked on software.
 8    Q    And what did you do on software?
 9    A    Steganography.
10    Q    And what is that?
11    A    Uh, steganography --
12    Q    Well, describe what steganography is?
13    A    Deciphering.
14    Q    Okay.  Deciphering what?
15    A    Information.
16    Q    What kind of information?
17    A    Whatever information has been --
18    Q    That you're asked to decipher?
19    A    That would be an example.
20    Q    Any other duties besides steganography?
21    A    That's the one I've been working on the most.
22    Q    Okay.  Did you work on any data compression at Opspring?
23    A    No.
24    Q    Did you work on any object tracking at Opspring?
25    A    No.
```

1  Q   Did you work on any pattern recognition at Opspring?

2  A   No.

3  Q   Did you work on any anomaly detection at Opspring?

4  A   No.

5  Q   Did you transfer any technology that included anomaly

6  detection?

7  A   I don't think so.

8  Q   Now, wait a minute.  You don't think or you don't --

9  A   I don't recall.  I mean, I just don't --

10  Q   Well, you transferred technology to them, did you not?

11  A   Yes.

12             MS. KLAR:  Your Honor --

13             MR. PEEK:   What technology did you transfer to

14  them.

15             MS. KLAR:  Your Honor, I'm going object.  This

16  is far beyond the scope of the document.  What we're here to

17  discuss are the documents that have been produced.  Not,

18  necessarily, the substance of the documents.

19             MR. PEEK:  Your Honor, in Order to know whether

20  or not he would have had access to documents for marketing,

21  licensing, I need to know what -- whether or not he did

22  convey to Opspring in the area of data compression, pattern

23  recognition, object tracking, and anomaly detection, because

24  that would implicate the request for production to Opspring

25  and to Mr. Montgomery.

Case 3:23-mc-00076-GMN-VPC   Document 7-1   Filed 07/28/23   Page 514 of 800
Case 3:06-cv-00056-PMP-VPC   Document 734   Filed 07/08/08   Page 206 of 220
206

                    MS. KLAR:  We're not --

                    MR. PEEK:  We've at least been given some of

that in the form of the agreements that Mr. Montgomery has

with Opspring, and told that's all that there is.  But I need

to know what it was that he conveyed, in order to be  able to

then find out whether he has fully complied in providing us,

under the definition of "you," all marketing, all licensing,

all white papers, all correspondence, all of those requests,

the subject matter of 30 through 32, and RFP number one, and

in 24 through 27 in RFP number two.

                    MS. KLAR:  Your Honor, I think what's become

evident is that Mr. Peek would like to try his case this

afternoon.  He can simply ask -- he has the documents.  He

knows what was transferred because that is set forth in the

documents.  And if he wants to ask Mr. Montgomery whether or

not he produced all the documents, I think that's fair game.

          But in terms of what he actually, what work he is

actually doing, I don't think that's part of the Order to Show

Cause.  If he wants to ask him if he's done marketing, he can

ask him if he's done marketing.  He can ask him all those

questions.

          I would also note, for the record, that the Order

says the "Montgomery parties."  The Order does not say "you."

And so as I interpret the Order from this court, it is Mr. --

it was Mr. Montgomery's obligation to produce documents that

Case 3:22-mc-00073-GMN-WGC  Document 731  Filed 07/08/22  Page 515 of 800
Case 3:06-cv-00056-PMP-VPC  Document 734  Filed 07/08/08  Page 207 of 220
—207

 1   related to the Montgomery parties efforts to sell, license,

 2   distribute.

 3            And as we have pointed out in our papers, once

 4   Mr. Montgomery transferred whatever interest he had in these

 5   various technologies to Opspring, he no longer had the right

 6   to sell, license, or distribute.  And he's just testified

 7   that his job was chief scientist, not marketing.

 8            But I think, again, we have to get back to what

 9   we're here for, which is the documents, and whether all the

10   documents have been produced.  And I don't think that we're

11   here to discuss whether or not Opspring produced all the

12   documents.  The only documents that we obtained for purposes

13   of responding to the Court's Order were the documents from

14   Dorsey & Whitney as predecessor counsel.

15            THE COURT:  Well, the Court does find that

16   questions going into details about Mr. Montgomery's work at

17   Opspring, and that sort of thing, are a little bit beyond, I

18   think, what we're here for.

19            What I'm interested in is, to the extent, Mr. Peek,

20   that you have questions concerning those requests for

21   production, and whether Mr. Montgomery has in his possession,

22   or otherwise, documents that are responsive to that request,

23   and that if all he's got with, say, for example, with respect

24   to Opspring is an agreement, another law firm gratui -- you

25   know, voluntarily volunteered to provide, there's that.  But,

Case 3:23-mc-00073-CKK-WAU Document 734 Filed 07/08/08 Page 516 of 800
Case 3:08-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 208 of 220
208

     1    please limit your questions to the request for production

     2    of documents.

     3              MR. PEEK:  I would like to at least respond.

     4         The request for production, because Ms. Klar, I

     5    think, mischaracterizes the Court's Order.  The Court's Order

     6    of February 21 included request number 1, 30 through 32.

     7              THE COURT:  Yes, it did.

     8              MR. PEEK:  Okay.

     9              THE COURT:  It did.

    10              THE WITNESS:  Is there any way we could take a

    11    break so I could use the restroom?

    12              THE COURT:  Yes.  Well, it's quarter, about a

    13    quarter to 5:00.  And Mr. Peek -- well, I'll just tell counsel

    14    one of the thoughts that occurred to me is that we would be

    15    not finishing today.  And as I indicated, we do have a case

    16    management conference already set for June 20th.

    17         Is that correct?

    18              THE CLERK:  June 17, Your Honor.

    19              THE COURT:  Seventeen.

    20              THE CLERK:  At nine o'clock.

    21              THE COURT:  At nine o'clock a.m.  And perhaps --

    22    I don't know how much longer you have, Mr. Peek.  I sense you

    23    have more.

    24              MR. PEEK:  I do have more, Your Honor.

    25              THE COURT:  All right.

Case 3:22-mc-00076-GMN-WGC   Document 7-1   Filed 07/08/23   Page 517 of 800
Case 3:06-cv-00056-PMP-VPC   Document 732   Filed 07/08/08   Page 203 of 220

209

          1              MR. PEEK:  I certainly wouldn't finish if we

          2     took a 10-minute break, came back at 10 minutes to 5:00, and

          3     went to 5:00.  My sense would be to just break now, but I'm

          4     happy to go to 5:00.

          5              THE COURT:  How long do you think you have?

          6              MR. PEEK:  I think an hour-and-a-half to two

          7     hours, Your Honor.

          8              THE COURT:  All right.

          9          Ms. Klar.

         10              MS. KLAR:  Your Honor, with respect to the Case

         11     Management Conference on the 17th, I was planning to attend

         12     telephonically.  My nephew is getting married, and I was

         13     planning to be back East.  I will change those plans if I

         14     need to, but those are my plans for next week.

         15              THE COURT:  Well, the question is someone --

         16     will someone from your firm, apart from -- I know

         17     Mr. Gunderson is attending as local counsel, will someone

         18     be here in person to appear personally, aside from you?

         19              MS. KLAR:  I think that, Your Honor, I'm the

         20     only person who the client would want to have here.

         21              THE WITNESS:  Can I take a break, Your Honor?

         22              THE COURT:  Oh, I'm sorry.  Let's take a quick

         23     recess.

         24          All right.  We'll take a quick recess and come back.

         25     I'm sorry, Mr. Montgomery.

 1                 MR. PEEK:  We'll come back and talk about
 2      scheduling, Your Honor?
 3                 THE COURT:  Yes.
 4                 (Recess taken.)
 5                 THE COURT:  Thank you.  Please be seated.
 6            All right.  As I indicated, it sounded to me, and
 7      Mr. Peek confirmed that he has about an hour-and-a-half more
 8      of questioning, and I also may have some follow-up questions
 9      concerning this matter, and Ms. Klar has indicated that she
10      has a personal conflict on Tuesday, June 17th, and had planned
11      to appear telephonically.  And I'm not going to require
12      Ms. Klar to forgo her personal plans for this hearing, but
13      she may appear telephonically with respect to discovery
14      matters that the Court intends to take up on June 17th.
15            So, we now need to find a date for a continued
16      hearing in this matter.
17            Do counsel -- I'm first asking counsel who are
18      present if there are particular days --
19                 MR. PEEK:  Your Honor, I'm taking a two-week
20      vacation the 25th of June to the 5th of July.
21                 THE COURT:  All right.
22            Whoever that is, stop it, please.
23                 MR. SCHWARTZ:  Sorry.
24                 THE COURT:  Unless you're looking for your
25      calendar.

 1                     MR. SCHWARTZ:  I am, Your Honor.  This is

 2      Greg Schwartz in Seattle.

 3                     THE COURT:  Is that what you were doing, sir?

 4                     MR. SCHWARTZ:  Yes.

 5                     MR. PEEK:  He needs to learn to find his mute

 6      button on his phone since he's not talking.

 7                     THE COURT:  All right.  How about Friday -- I

 8      have a settlement conference that day in -- I could probably

 9      continue that.

10                     MR. PEEK:  Friday, the 20th, Your Honor?

11                     THE COURT:  Wait a minute.

12               I might be willing to do that.  Miss Clerk, you're

13      looking at me.

14                     THE CLERK:  No.  I apologize.

15                     MR. PEEK:  I had to turn on my BlackBerry to get

16      my calendar.

17                     THE COURT:  Ms. Klar, are you available on the

18      20th?

19                     MS. KLAR:  Yes, I am.

20                     MR. PEEK:  Let me just look quickly, Your Honor.

21                     THE COURT:  Mr. Gomez and Ms. Wells.

22                     MR. GOMEZ:  Yes, Your Honor.  We'll be present.

23                     THE COURT:  All right.  Let me just ask other

24      counsel.

25               Mr. Snyder, is that a problem for you, sir?

Case 3:23-mc-00073-CHK-VPC Document 734 Filed 07/08/08 Page 529 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 212 of 220
212

```
 1                    MR. SNYDER:  Not at all, Your Honor.

 2                    THE COURT:  Mr. Schwartz, is that a problem for

 3       you, sir.

 4                    MR. SCHWARTZ:  Lead counsel, Bob Rohde is out of

 5       the country on that date.  I can do it, but I would like to

 6       know am I required to be there in person, or can I do it

 7       telephonic?

 8                    THE COURT:  No, you may appear by phone.

 9                    MR. SCHWARTZ:  We can certainly participate.

10       We're talking June 20th?

11                    THE COURT:  Correct, sir.

12              And Ms. Beatty, what about you?

13                    MS. BEATTY:  Well, I don't have a dog in this

14       fight, as they say.  I actually am not available that day, but

15       I don't think you should not proceed, solely, on my account.

16       I'll have one of my associates listen by phone.

17                    THE COURT:  All right.

18                    MR. PEEK:  Thank you, Ms. Beatty.

19                    MR. SCHWARTZ:  Could I have some clarification?

20       Are we also going to be, on the 20th, addressing the Case

21       Management Schedule, Discovery deadlines, et cetera, or are we

22       only going to be finishing this Order to Show Cause hearing?

23                    THE COURT:  No.  Here's what we're doing -- good

24       question, sir.

25              On June 17th, Tuesday, okay, June 17th, 2008, we
```

Case 3:23-mc-00073-CKK-MAU Document 731 Filed 07/08/08 Page 521 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 213 of 220

213

1    have a monthly Case Management Conference.  There are -- the

2    parties have submitted -- well, there is the issue about

3    discovery, the discovery cutoff and related matters, and that

4    will be discussed on the 17th.  There are also outstanding

5    discovery matters that the Court intends to take up that day

6    as well, I think.

7            By way of quick background, this concerns eTreppid

8    and the Montgomery parties.  They were ordered to meet and

9    confer.  They did meet and confer in person.  They did report

10   to the Court.  The Court's reviewing those documents.  And the

11   Court will, typically, for those new counsel joining, requires

12   parties to file a Case Management Report prior to the hearing

13   so I know if there are any other issues, apart from the ones

14   I identified, that you wish to discuss at the Case Management

15   Hearing.  So, that's basically how that will work.

16           Does that help answer your question, sir.

17           MR. SCHWARTZ:  It does.

18           This is Greg Schwartz from Seattle, again.  If I

19   could just ask for clarification, lead counsel for Atigeo,

20   Bob Rohde, is going to be out of the country on that date.

21           THE COURT:  Right.

22           MR. SCHWARTZ:  So, I'm going to be appearing at

23   the Case Management Conference for him.

24           THE COURT:  Yes.

25           MR. SCHWARTZ:  Okay.  That's great.  And then

Case 3:23-mc-00073-SWK-WAU Document 734 Filed 07/08/08 Page 522 of 800
Case 3:08-cv-00056-LWK-VPC Document 732 Filed 07/08/08 Page 214 of 220

214

 1    the 20th works as well for the continued hearing.

 2                  THE COURT:  All right.

 3            So, Mr. Gunderson, is that a problem for you, sir?

 4    Are you available the 20th?

 5                  MR. GUNDERSON:  I am not.

 6                  THE COURT:  You are not.

 7            All right.  I don't know that that ought to be an

 8    impediment since Ms. Klar will be here.

 9            Ms. Klar, do you have a problem with that?

10                  MS. KLAR:  I, of course, would prefer if

11    Mr. Gunderson could be here, but I understand that

12    everybody else --

13                  THE WITNESS:  Is this something I have to be at?

14    Because I have a problem with that date.  I would like to tell

15    you why.

16                  THE COURT:  Oh.  What's your problem?  Sorry.

17                  THE WITNESS:  My daughter is seeing a

18    specialist.  She has a high risk pregnancy.  And that is the

19    day that she could get.  And she's waited three months to get

20    it.

21                  THE COURT:  Okay.

22            Ms. Klar, when are you back from your wedding?

23                  MS. KLAR:  I am back on the 18th.

24                  THE COURT:  Mr. Peek, when do you leave?

25                  MR. PEEK:  The 25th, Your Honor.  I'm available

                  KATHRYN M. FRENCH, RPR, CCR
                      (775) 786-5584

Case 3:22-mc-00073-CKK-MAU Document 734 Filed 07/28/23 Page 523 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 215 of 220

215

1    the 19th.

2                    THE COURT:  I can't.  I've got too many things

3    calendared that I can't change.

4             How about Monday June 23rd?  How is that for you,

5    Mr. Montgomery?

6                    THE WITNESS:  That's fine, Your Honor.  That's

7    fine.

8                    THE COURT:  Okay.

9                    MS. KLAR:  Your Honor, I have a conference

10   before Judge Baker in a federal district court action.  And

11   as lead counsel, I have to appear that day.  The hearing is

12   at 1:30.

13                   THE COURT:  How about Tuesday, June 24th?

14                   MR. PEEK:  I'm available, Your Honor.

15                   MS. KLAR:  I'm available.

16                   THE COURT:  Are you available, Mr Montgomery?

17                   THE WITNESS:  As far as I know, yes, Your Honor.

18                   THE COURT:  Ms. Klar?

19                   MS. KLAR:  Yes.

20                   MR. GOMEZ:  The government is available.

21                   THE COURT:  Pardon me, sir?

22                   MR. GOMEZ:  We're available.

23                   THE COURT:  Mr. Schwartz, can you or someone

24   from your firm appear by phone, sir?

25                   MR. SCHWARTZ:  Yes.

Case 3:22-mc-00073-GMK-WAU Document 731 Filed 07/28/08 Page 524 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 216 of 220

216

```
 1                    THE COURT:  Ms. Beatty?

 2                    MS. BEATTY:  Yes.  Someone from my firm can do

 3   it by phone.

 4                    THE COURT:  All right.

 5                    MR. PEEK:  Is lead counsel for Atigeo,

 6   Mr. Rohde, back that day?

 7                    THE CLERK:  Oh, on the 24th?  No.  But that's

 8   okay for this Order to Show Cause, counsel.

 9                    MR. PEEK:  Well, the reason I was asking was

10   that if he were back, I would have asked, and still ask if

11   Mr. Sandoval be here, because there were statements made that

12   Mr. Sandoval has destroyed e-mails -- excuse me.  I don't want

13   to make that accusations -- that he has somehow not allowed --

14   kept Mr. Montgomery from access to e-mails that Mr. Montgomery

15   sent to and received from Mr. Sandoval.

16                    MR. SCHWARTZ:  Are you calling Mr. Sandoval as a

17   witness?

18                    MR. PEEK:  That's why I was asking.

19                    THE COURT:  Wait a minute.  Everybody please be

20   quiet.

21                    All right.  I wish to set a hearing.  So, let me set

22   the hearing.

23                    I am going to -- I will vacate the matter set for

24   Tuesday, June 24, 2008, that I have set to accommodate the

25   continued Show Cause Hearing in this case.  By your silence,
```

Case 3:23-mc-00076-PMP-VPC Document 731 Filed 07/08/08 Page 525 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 217 of 220
—217

```
 1    you are telling me that, yes, you are available to appear on

 2    that date.  So if you have a problem with June 24, please say

 3    so now.

 4              MS. BEATTY:  This is Jacquelyn Beatty.  And I

 5    am  Mr. Sandoval's attorney.  And I actually don't think it

 6    would be appropriate, in the context of this hearing, which

 7    is between eTreppid and Montgomery, to require him to appears

 8    as a witness.  I am not available on that day.  I will be in

 9    Portland on another matter.  And Mr. Sandoval is in Europe at

10    this time.

11              THE COURT:  So someone from your firm would be

12    available if they would like to appear by phone on the 24th?

13              MS. BEATTY:  Yes.

14              THE COURT:  That's what we're going to do.

15    We are setting this, ladies and gentlemen, for Tuesday,

16    June 24th, 2008 at nine o'clock a.m.  And Ms. Klar will

17    appear in person.  Mr. Montgomery will appear.  Mr. Peek and

18    co-counsel, and Mr. Gomez and Ms. Wells have advised they

19    can be available that date.  Mr. Schwartz will be available

20    telephonically.  Ms. Beatty or someone, apparently, from

21    her -- on behalf of Mr. Sandoval will be available

22    telephonically for that hearing.

23              So given that, nobody -- Mr. Sandoval is not going

24    to be required to appear.  And, in addition, he's gone.  So,

25    that's what we are doing.
```

Case 3:23-mc-00076-SWK-MAU  Document 731  Filed 07/08/08  Page 526 of 800
Case 3:08-cv-00056-MMF-VPC  Document 731  Filed 07/08/08  Page 218 of 220

-218

1              Is there anything else?

2                   MR. PEEK:  There are couple things, Your Honor.

3                   THE COURT:  Go ahead.

4                   MR. PEEK:  One is I would like it make sure

5       Ms. Blixseth, who is in the courtroom today, is also here next

6       Tuesday -- two weeks from today, Tuesday, the 24th, because I

7       will call her as a witness.

8                   THE COURT:  Well, what are you asking me to do,

9       sir?

10                  MR. PEEK:  Order her to appear on that day.

11      She's here today.  Order her to appear.

12                  MS. KLAR:  Your Honor, we were supposed to

13      be prepared to go forward with our hearing today.

14      Mrs. Blixseth was not subpoenaed.  Because she happens to

15      appear in court today, I think it's inappropriate.  I think

16      the request is inappropriate.  If he wants to --

17                  MR. PEEK:  She lives, Your Honor, in

18      Palm Springs.  That's why I can't subpoena her to come to

19      hearings.  It's outside the boundaries of this court.

20                  MR. SCHWARTZ:  Your Honor, this is Greg Schwartz.

21      I'm loath to wade into this because, as Ms. Beatty says, we

22      don't have a dog in this fight.  But the more it becomes a

23      full scale evidentiary hearing on issues beyond the scope of

24      the Order to Show Cause, the more we possibly do, and would

25      need to prepare for it and, potentially, be there in person.

Case 3:23-mc-00073-CMK-WAU Document 734 Filed 07/08/08 Page 523 of 800
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 223 of 226

219

1         So, I am going to object on behalf of Atigeo to

2    expanding the scope of this hearing beyond --

3                   MR. PEEK:  I'm not expanding the scope,

4    Your Honor.  The Court will make that determination as to

5    whether or not the questions -- the questions that I ask of

6    Ms. Blixseth will be expanding the scope, and will make a

7    ruling that it is beyond the scope --

8                   MR. SCHWARTZ:  Excuse me.  Just one more point,

9    Your Honor.

10         The Order, as I read it, compelled Mr. Montgomery

11   to appear to testify and not other witnesses.  I don't

12   represent Ms. Blixseth, and I am not -- I don't want to appear

13   to be speaking on her behalf or for her interest.  My concern

14   is only the scope of this hearing.  So, I do submit it might

15   expand the scope if additional witnesses are called beyond

16   those you ordered to appear and testify.

17                  MR. PEEK:  Well, Your Honor, I plan on

18   calling Mr. Trepp.  I plan on calling Mr. Karzhmer.  I hope

19   Mr. Schwartz doesn't suggest I can't call other witnesses.

20                  THE COURT:  Well, no, but I am not going to,

21   at this time, Order Ms. Blixseth to appear at the hearing.

22   If she wishes to attend, she certainly may do so.  But the

23   person I ordered to appear at this Show Cause Hearing is

24   Mr. Montgomery.  He is the subject of this hearing, and the

25   discovery responses of the Montgomery parties.  And I'm not

 1   going to expand the scope of that.

 2            I understand that you may certainly wish to call

 3   Mr. Trepp or Mr. Karzhmer.  And that's fine.

 4                 MR. PEEK:  And, Your Honor, the problem I

 5   have is that I can't subpoena Miss Blixseth to come to this

 6   hearing.

 7                 THE COURT:  Right.

 8                 MR. PEEK:  And --

 9                 THE COURT:  I know.

10                 MR. PEEK:  And you well know that.  And I

11   think it is important and relevant to this proceeding that

12   Ms. Blixseth be a witness for purposes of determining whether

13   or not Mr. Montgomery has fully complied.  She's going to know

14   what e-mails, if any, or whether there were e-mails between

15   her and Mr. Montgomery, whether he was copied on them.  And

16   things of that nature.  So, those certainly are important in

17   terms of the production.

18            She was also present when the seized property was

19   picked up and taken to her residence in Porcupine Creek.  She

20   was also present when the NBC news crew, film crew, came to

21   her Porcupine Creek estate in November of 2006 and filmed the

22   NBC news article, which is a subject matter of discovery.  It

23   was in her home.

24                 THE COURT:  Ms. Klar.

25                 MS. KLAR:  Your Honor, Mrs. Blixseth has

Case 3:22-mc-00073-GKF-WAU Document 731 Filed 07/08/08 Page 529 of 800
Case 3:08-cv-00056-MHP-VPC Document 732 Filed 07/08/08 Page 221 of 226

221

 1   absolutely nothing to do with what documents are in the

 2   possession, custody, or control of the Montgomery parties,

 3   and/or what documents have or have not been produced.

 4            I think that, again, Mr. Peek is trying to make

 5   this into a mini trial.  And whether Mrs. Blixseth, for

 6   example, may have been present on property at Porcupine Creek

 7   at the time MSNBC interviewed somebody, has nothing to do

 8   with whether or not Mr. Montgomery or the Montgomery parties

 9   are  in custody or control of documents, and whether they have

10   been produced.

11            THE COURT:  All right.  Well, I am not going

12   to Order Miss Blixseth to appear at the June 24th hearing.

13            Now, Mr. Peek, if you want to make a motion and do

14   it on shortened time, and Ms. Blixseth's attorney -- who is

15   representing Ms. --

16            MR. PEEK:  Ms. Klar.

17            THE COURT:  Miss Klar, you are?

18            MS. KLAR:  Yes.

19            THE COURT:  Well, if that's something that you

20   want to pursue, I'll hear it on shortened time.  But, I'm not

21   going to do that today, at this point.

22            I understand the concerns that you raise, sir, and

23   the basis for your request.  But, I am also concerned that the

24   scope of this Show Cause Hearing be focused narrowly.  And I

25   know there are reasons why it can be broader, but I'm not

Case 3:22-mc-00078-GMN-WGC Document 731 Filed 07/28/23 Page 539 of 800
Case 3:06-cv-00056-MMD-VPC Document 734 Filed 07/08/08 Page 222 of 226

222

1    going to do it.

2              MR. PEEK:  Okay.  And you asked if there was

3    anything else, because there was some misunderstanding on the

4    part of Mr. Montgomery about producing e-mails in native

5    format.  I would ask that the Court Order that e-mails that

6    have been produced in this proceeding be produced in native

7    format.  These are the ones that were produced --

8              THE COURT:  That was what I ordered, wasn't it?

9              MR. PEEK:  Yes, it was.  And they haven't done

10   it.  I guess if he doesn't do it, he's still subject to the

11   sanction.  So, he still has until the 24th to purge himself.

12             THE COURT:  Well, that's a subject of this

13   Show Cause Hearing.  And one of the issues is the one you

14   identified.  And Mr. Montgomery's counsel can determine how

15   she wishes to proceed with respect to that issue.  She is

16   well aware of it, I am sure.

17             MS. KLAR:  Your Honor, we have one other

18   request.  And that is, that until we have an opportunity to

19   file a motion to strike the Flynn declaration, that document

20   be placed under seal, because it's replete with all kinds of

21   attorney/client communications.  And we would request that any

22   person who has a copy of that document treat it as a document

23   that is filed under seal.

24             THE COURT:  Mr. Peek, any comment?

25             MR. PEEK:  Your Honor, I don't think that that

Case 3:22-mc-00073-CKK-WAU   Document 734   Filed 07/08/08   Page 531 of 800
Case 3:08-cv-00056-MW-VPC   Document 732   Filed 07/08/08   Page 223 of 226

223

1    document should be filed under seal.  As I've said, is that,

2    respectfully, Mr. Montgomery and Ms. Blixseth, through

3    Ms. Klar, have put at issue Mr. Flynn's conduct, have sued

4    Mr. Flynn, and the last time I looked, when you sue a lawyer,

5    the privilege becomes waived.  That's number one.

6         Number two, there certainly is a very strong

7    inference to be drawn from all of the pleadings filed that

8    there has been a crime or fraud committed upon this court,

9    which waives any privilege that Mr. Montgomery may have.

10   And, certainly, that is clear from that last filing, as to the

11   way Mr. Montgomery acted towards this Court and this Court's

12   power about the obligation to produce documents.  And the

13   Court remembers the image that was placed on Mr. Montgomery's

14   e-mail about the Court.

15        THE COURT:  All right.  I'm not going to seal

16   it at this time.  But, what I am going to do is I know we

17   discussed a sched -- a briefing schedule for hearing that

18   matter on shortened time.  Today is June 10th.

19        Ms. Klar, when can you get a motion on file, a

20   motion to strike?

21        MS. KLAR:  Uh --

22        THE COURT:  I want -- I'm trying do this by an

23   expedited fashion --

24        MS. KLAR:  Appreciate it.

25        THE COURT:  -- so that we can address this

Case 3:22-mc-00076-GMK-WAU Document 734 Filed 07/08/08 Page 532 of 800
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 224 of 226

224

1    sooner rather than later.

2              MS. KLAR:  We will get something on file,

3    Your Honor, by Friday.

4              THE COURT:  Friday, March -- June, excuse me,

5    June.  Sorry.

6              MS. KLAR:  13th.

7              THE COURT:  By June 13th, 2008.  And any parties

8    wishing to respond may do so by Wednesday, June 18th.  And

9    if Montgomery's counsel wants to reply, they may do so by

10   June 20th.

11             MR. PEEK:  Does that include Mr. Flynn, too?

12             THE COURT:  I said -- and Mr. Flynn.

13             MR. PEEK:  Thank you.

14             THE COURT:  All right.

15        All right.  I think that we are concluded for today,

16   and the Court, this hearing will be in recess until June 24th.

17        Oh, wait.  Did the government --

18             MR. GOMEZ:  The government requests a brief side

19   bar with counsel.

20             THE COURT:  All right.

21        And sorry, counsel appearing telephonically, did you

22   hang up.

23             MS. CHISOLM:  No, I'm still here.

24   Tuneen Chisolm.

25             MS. BEATTY:  Jacquelyn Beatty.  I'm still here.

Case 3:22-mc-00073-CWK-WAU  Document 734  Filed 07/08/08  Page 533 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 225 of 226
225

```
 1   That other gentlemen, I guess, hung up.
 2                MR. PEEK:  Mr. Schwartz?
 3                THE COURT:  Yes.  As I indicated, our electronic
 4   capabilities do not allow you to hear the side bar.  So, I'm
 5   sorry.
 6           (Following is discussion at sidebar.)
 7                THE COURT:  Mr. Gomez, you had something?
 8                MR. GOMEZ:  We don't need --
 9                THE COURT:  Everybody is fine.  We're good.
10                MR. GOMEZ:   The United States is requesting
11   that the transcript for today's hearing be reviewed by the
12   United States first before it's forwarded to any of the
13   parties, in order to determine whether there is some
14   information that may need to be redacted pursuant to the
15   U.S. Protective Order.  And I don't believe the parties
16   object.
17                MR. PEEK:  I would ask that that be -- that
18   happen quickly, because we're going to be back here on the
19   24th, and I want to be able to have the transcript before we
20   begin on the 24th.
21                MR. GOMEZ:  And that should not be a problem for
22   the United States, but I believe that the court reporter may
23   have a scheduling issue.  So, that will have --
24                MR. PEEK:  How much time do you need?  She
25   should be able to turn it around by Friday.
```

Case 3:22-mc-00073-GMH-MAU  Document 734  Filed 07/08/08  Page 534 of 800
Case 3:06-cv-00056-PMP-VPC  Document 732  Filed 07/08/08  Page 226 of 226

226

```
 1                  THE COURT:  She's in trial.  She leaves tomorrow

 2    -- for Las Vegas tonight.  In fact, she leaves really soon.

 3                  MS. WELLS:  Right.  So depending when she

 4    provides the transcript to us, we should be able to do it

 5    quickly.

 6                  THE COURT:  All right.  Thank you.

 7             And I take it you wanted this to be over here so

 8    that it's not discussed by others.

 9             All right.  Thank you.

10             MR. PEEK:  Thank you.

11          (End of sidebar discussion.)

12                  THE COURT:  All right.  Thank you all very much.

13    We're adjourned.

14             (Court Adjourned.)

15

16                            -o0o-

17

18          I certify that the foregoing is a correct
            transcript from the record of proceedings
19          in the above-entitled matter.

20          Kathyryn M. French                        6-19-08

21          _____      _____

            KATHRYN M. FRENCH, RPR, CCR              DATE
22          Official Reporter

23

24

25
```

# EXHIBIT G

Case 1:23-mc-00075-CKK-MAU   Document 1-4   Filed 07/28/23   Page 536 of 800
Case 3:06-cv-00056-PMP-VPC   Document 634   Filed 09/03/08   Page 1 of 269
-151-

```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
 2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                           ---o0o---
 3

 4      Dennis Montgomery, et al.,    :  No. 3:06-cv-056-PMP-VPC
                                      :
 5                    Plaintiff,      :  August 19, 2008
                                      :
 6            -vs-                    :  United States District Court
                                      :  400 S. Virginia Street
 7      ETreppid Technologies,        :  Reno, Nevada  89501
        et al.,                       :
 8                                    :      VOLUME II
                      Defendant.      :
 9      _____:

10

11

12                          TRANSCRIPT OF
                    CONTINUED SHOW CAUSE HEARING

13

        A P P E A R A N C E S:
14

        FOR THE PLAINTIFF:           Randall Sunshine
15                                   Ellyn Garofalo
                                     Attorneys at Law
16

17      FOR DEFENDANT ETREPPID:      Stephen Peek
                                     Jerry Snyder
18                                   Attorneys at Law

19      FOR COUNTER-DEFENDANTS:      Bridgett Robb-Peck
                                     Gregory Schwartz
20                                   Attorneys at Law

21      FOR INTERESTED PARTY:        Carlotta Wells
                                     U.S. Department of Defense
22

23

24      Proceedings recorded by mechanical stenography produced by
        computer-aided transcript
25
```

Case 1:23-mc-00053-CKK-MAU  Document 34  Filed 07/28/23  Page 537 of 800
Case 3:06-cv-00056-PMP-VPC  Document 654  Filed 09/03/08  Page 2 of 269

152

1

2      Reported by:                    KATHRYN M. FRENCH, RPR, CCR
                                       NEVADA LICENSE NO. 392
3                                      CALIFORNIA LICENSE NO. 8536

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:23-mc-00075-GKK-MAJC Document 134 Filed 07/28/23 Page 538 of 800
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/03/08 Page 3 of 209

153

```
 1              Reno, Nevada, Tuesday, August 19, 2008, 9:00 a.m.

 2                              ---oOo---

 3

 4              THE COURT:  Thank you.  Please be seated.

 5              THE CLERK:  This is the date and time

 6   set for continued Show Cause Hearing in case number

 7   3:06-cv-056-PMP-VPC, Dennis Montgomery, and others, versus

 8   eTreppid Technologies, and others.

 9              Present on behalf of plaintiff, Ellyn Garofalo and

10   Randall Sunshine.

11              Present on behalf of defendant, Stephen Peek and

12   Jerry Snyder.

13              Present on behalf of counter-defendant,

14   Bridgett Robb-Peck.

15              Present on behalf of interested party,

16   Carlotta Wells.

17              THE COURT:  Good morning everybody.

18              Let the record reflect it is 9:08 a.m.  The Court

19   intends to start promptly nine o'clock a.m.  So I think

20   Mr. Peek may have been here early setting things up, but I

21   expect that we commence at nine o'clock sharp, just for

22   future reference.

23              Counsel.

24              MS. GAROFALO:  Good morning, Your Honor.  I

25   think the eight minutes late may have been well spent.
```

Case 1:23-cv-00075-GKK-MAC Document 134 Filed 07/28/23 Page 539 of 800
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/08/08 Page 54 of 269

154

1    Mr. Peek and I have been discussing what is one of the key

2    issues here, which I think we have reached a resolution on.

3            As the Court knows, there's been much talk about

4    the Glogauer e-mails and PST files, the original PST files.

5    The Glogauer PST files have now been received back from the

6    Washington attorneys, Scatton lawyers, who were using that in

7    the Grand Jury proceedings.  There is an issue with one, at

8    least one, e-mail chain which, in response to a word search,

9    does indicate that there may be some information subject to

10   the State Secret's Privilege on the Glogauer PST.

11           We've talked to Ms. Wells, who will be talking to

12   her client about the best way to handle it.  We've indicated

13   to Mr. Peek that we would prefer Mr. Montgomery remove those

14   files, necessarily open those files.  And we've come up with

15   several alternatives that, hopefully, by the end of the day,

16   we will be able to convey to the Court that we have resolved

17   the issue, and that those hard drives will be produced

18   forthwith to Mr. Peek.

19           THE COURT:  All right.  Very good.

20       Mr. Peek.

21           MR. PEEK:  I have nothing to say.  I appreciate

22   the proffer, Your Honor, and I've accepted.  And, certainly,

23   we're going to be speaking with Ms. Wells and see if we can't

24   find a way to expedite this.

25           THE COURT:  Thank you very much.

1           MS. GAROFALO:  Thank you.

2           THE COURT:  Thank you, counsel.

3       The other matter, counsel, we're just trying get

4  exhibits sorted out.  And I understand counsel can do that

5  later on today, toward the end of the afternoon.

6           Is that correct, counsel?

7           MR. SUNSHINE:  Yes, Your Honor.

8           THE COURT:  Okay.  Very good.

9       Correct, Mr. Peek?

10          MR. PEEK:  Yes, Your Honor.

11          THE COURT:  All right.  Mr. Peek, by my count,

12  you've got 4 hours and 17 minutes.

13          MR. PEEK:  That's about what I calculated, too,

14  Your Honor.

15          THE COURT:  All right.  So you may proceed, sir.

16          MR. PEEK:  Just need a witness, and we're ready

17  to go.

18          THE COURT:  All right.

19              **DIRECT EXAMINATION (resumed)**

20  BY MR. PEEK:

21   Q   Mr. Montgomery, I wanted to go back and clear up a few

22  things that I hadn't covered yesterday.  And I'm going to

23  start with, at least, the NBC and Wall Street Journal

24  communications.

25          One thing I have not seen in any production at

Case 1:23-mc-00075-GKK-MAC Document 1-4 Filed 07/28/23 Page 541 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 61 of 269

-156-

1   all, is any form of communications, whether it be cell phone

2   record or long distance phone call records of how NBC News was

3   contacted.

4           Did you contact NBC News?

5   A   No.

6   Q   Who did?

7   A   Tim Blixseth.

8   Q   Okay.  Did he do it -- do you know whether he did it by

9   telephone or by e-mail?

10  A   I believe phone.  I don't know for certain, but my

11  understanding was he was the one who had the contact with

12  them.

13  Q   And do you know at whose prompting Mr. Blixseth contacted

14  NBC News?

15  A   No.

16  Q   Was it at yours?

17  A   No.

18  Q   Did you tell Mr. Blixseth that you had certain e-mails

19  that would be of interest to NBC News?

20  A   I don't recall that I did or not.

21  Q   Well, why was it that he would contact NBC News, other

22  than to talk about the Jale Trepp and Glogauer e-mail?

23  A   You would have to ask him.

24  Q   Did you testify tell him about the Len Glogauer e-mail?

25  A   No.

Case 1:23-mc-00075-CKK-MAU   Document 134   Filed 07/28/23   Page 542 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 542 of 269
157

1    Q    Did you give him a copy?

2    A    No.

3    Q    Did you tell him about the Jale Trepp e-mail?

4    A    I don't recall if I did or not.

5    Q    The Wall Street Journal, did you contact John Wilke, or

6    did somebody else contact John Wilke?

7    A    I didn't.

8    Q    Okay.  And who did?

9    A    I don't know if it was Tim or Edra.

10   Q    Okay.  One of those two?

11   A    I want to say Tim, but I'm -- I'm not certain.

12   Q    Okay.  And do you know when he did that?

13   A    No.

14   Q    Do you know whether he did it by phone or by e-mail?

15   A    I don't know.

16   Q    And do you know why he did it?

17   A    No.

18   Q    Did you tell him something that caused him to -- that you

19   believe caused him to contact the Wall Street Journal?

20   A    I did talk with him, I think, on one occasion.

21   Q    I mean, for example, did you tell him that you had a

22   Len Glogauer e-mail?

23   A    I don't recall if I said that exactly or not.

24   Q    Did you tell him what you believed about the Jale Trepp

25   e-mail?

Case 1:23-mc-00075-CKK-MAU  Document 134  Filed 07/28/23  Page 543 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 3 of 269

-158-

1   A   I don't recall that one specific instance or not.

2   Q   Did you tell him that you had evidence that Mr. Trepp had

3   given casino chips and cash to Congressman Gibbons?

4   A   I told him I saw it.

5   Q   You told him you saw it.  Okay.

6           And did you tell him you saw it on one, or more than

7   one instance, or more than one instance?

8               MS. GAROFALO:  Your Honor, objection.  Relevance

9   based on the -- objection.  Relevance.

10              THE COURT:  Mr. Peek.

11              MR. PEEK:  Your Honor, what I'm trying to get at

12  is whether there are communications that Mr. Montgomery would

13  have that should have been produced.

14              MS. GAROFALO:  I'll withdraw the objection at

15  this time, Your Honor, but we are here to focus --

16              MR. PEEK:  And I'll do this quickly.  Sorry.

17              MS. GAROFALO:  -- to the core issues.  Not to

18  the underlying merits of the case.

19              THE COURT:  I agree.  Okay.

20          All right.  The Court does concur, to some extent,

21  with Mr. Montgomery's counsel about the focus.

22          So, go ahead, with that comment, Mr. Peek.

23  BY MR. PEEK:

24  Q   Did you provide any communications to Mr. Blixseth via

25  e-mail, for example?

Case 1:23-mc-00075-CKK-MAU   Document 34   Filed 07/28/23   Page 544 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 54 of 269
—159

1   A    I don't recall if I did or not.

2   Q    And if you did, those would be where, sir?

3   A    I mean, I don't have them.  If he has them -- maybe he

4   has them.  I don't know.

5   Q    When you say you don't have them, what efforts have you

6   made to look for them?

7   A    I've -- we went through this for four days.  I've looked

8   everywhere for everything you asked for, diligently.

9   Q    And you also told us yesterday that you believe if there

10  were any communications regarding your efforts to transfer,

11  sell, assign the data compression, anomaly detection, pattern

12  recognition, Object Tracking, Source Code, it would have been

13  on your computer, the computer that was seized by the FBI.

14          Do you remember that testimony from yesterday?

15  A    Yes, I -- yes.

16  Q    Okay.  And so that would be the only place that it would

17  be, or would it be other places?

18  A    I mean there could have been another copy of that drive,

19  or I mean --

20  Q    Well, you told us yesterday you thought there was another

21  copy of that drive because the video was on that.

22  A    Right.

23  Q    So was there another copy of that drive?

24  A    Not that I know of, but I've not looked through

25  everything.  There's still five drives left.  I've referred

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 545 of 800
Case 3:06-cv-00056-PMP-VPC   Document 534   Filed 09/08/08   Page 145 of 205

160

1    to this before.

2     Q    Okay.  And so it would be somewhere on those five drives?

3     A    It could be.  I mean, I have a number of CDs, which it

4    could have been on those too.

5     Q    Now, after -- well, there are certainly some e-mails that

6    I think you have produced.  I don't know whether you produced

7    them or somebody else produced them, but there are e-mails of

8    communications with respect to the transfer, assignment of the

9    Source Code, correct?

10    A    Yes.

11    Q    You've seen those?

12    A    Yes.

13    Q    Okay.  Now, the other thing that we know is that the

14   FBI seized your material on or about March 1st of 2006,

15   correct?

16    A    Yes.

17    Q    And that we also know from Exhibit 9, which you've seen

18   before, I believe.  I -- let me just make sure I got the right

19   exhibit.

20           Actually, it's exhibit 8.

21           Let me just refer you to Exhibit 8.  That is your

22   response to requests for production that came from Miss Klar,

23   or from the Liner Law Firm to us, on or about May 26th.

24           Do you see that e-mail in the first page of that?

25    A    Yes.

Case 1:23-mc-00053-CKK-MAU   Document 34   Filed 07/28/23   Page 546 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 115 of 205
161

```
 1   Q   And then attached to that are all the documents that are
 2   referenced in that e-mail.
 3            Do you see that?
 4   A   Yes.
 5   Q   Okay.  Do you recognize this production as something that
 6   you produced on or about May 26th, 2006 -- excuse me, 2008.
 7   A   No.  I mean, I -- I don't know that.
 8   Q   Okay.  Well, let me just then follow-up.
 9            Would you turn to a page that is marked MONT-184.
10   And these are in date numerical, ascending order.
11   A   Mine goes to 182 -- oh, no.  Then it starts with another
12   e-mail.
13            Oh, I see.  I got it.
14   Q   Okay.
15   A   Sorry.
16   Q   Do you see that e-mail there?
17   A   Yes.
18   Q   What's the address of Dennis Montgomery there?
19   A   Dennis@ncoder.net.
20   Q   Now, yesterday, you told us you didn't think you setup
21   that e-mail account in mid 2006.
22            Do you remember that testimony?
23   A   Yes.  Yes.
24   Q   You were wrong?
25   A   Yes.  Obviously.
```

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 547 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 17 of 200
162

1    Q    You were using the Montgomery@ncoder.net in March of

2    2006, were you not?

3    A    I didn't think so, but it may have been.

4    Q    Well, did you get this e-mail that was addressed to

5    Dennis@ncoder.net?

6    A    I'm believing you.  I see it.

7    Q    You don't have to believe me.

8    A    I'm saying I may -- maybe I set it up earlier.  I don't

9    recall.

10   Q    Okay.  But, anyway, this is an e-mail dated March 27th,

11   2006, is it not?

12   A    Yes.

13   Q    It's e-mail that wouldn't be on your home computer,

14   isn't it?

15   A    Correct.

16   Q    Because your e-mail, your e-mail was seized on or about

17   March 1st?

18   A    Yes.

19   Q    So, yesterday, when you told us all of those e-mail

20   communications that would be on your -- with respect to

21   transfer assignment of the Source Code would be on your home

22   computer that was seized by the FBI, that is now in hard drive

23   with the nine one one serial number ending -- do you remember

24   that from yesterday?

25   A    I didn't think I said exactly that.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 548 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 15 of 265
163

 1   Q   Well, that's what you told us yesterday.  If there were

 2   any e-mails, they would be on that hard drive.  You've given

 3   me everything.

 4   A   I didn't say there wouldn't be any.  I said there would

 5   be some.

 6   Q   Oh, okay.  So there are some at Dennisencoder.net, are

 7   there?

 8   A   You keep asking me that.  There are none.

 9   Q   There are none.  Well, here's one right here 184, is it

10   not?

11   A   I see that.

12   Q   It's on your e-mail.  It's on your e-mail, isn't it?

13   A   Yeah.  This could have shall be deleted a year ago.

14   Q   Okay.  So you deleted these e-mails?

15   A   No, I didn't.

16   Q   Well, they were deleted, correct?

17   A   I don't have that.  That's correct.

18   Q   Okay.  So these e-mails that you have that were produced,

19   didn't come from you, is that correct?  This e-mail, that

20   is --

21   A   I didn't --

22   Q   -- exhibit --

23   A   I don't -- I didn't have the agreements that I signed.

24   My attorney, Mike Flynn, did.  And he's never given them back

25   to me.  So, I couldn't have produced these signed documents

Case 3:06-mc-00053-6KK-MAU Document 134 Filed 07/28/23 Page 549 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/28/08 Page 549 of 800

164

 1   because Mr. Flynn is holding my documents -- like many other

 2   things.

 3    Q    Okay.  But you at least -- and you didn't have the

 4   e-mails either that are produced here?  Somebody else did.

 5    A    I don't know who produced this particular e-mail.  I

 6   mean, I don't know if Mike Flynn produced it.  I don't know.

 7    Q    Well, your -- you, through your lawyer, produced it.

 8   That's all I know.

 9    A    Okay.

10    Q    You don't know how they came into his possession, is that

11   your testimony?

12    A    I can't answer that without giving up attorney/client

13   privileged information.

14    Q    Well, did you provide e-mails to your attorneys that

15   covered the period of March 2006 through April 2006 that refer

16   to your transfer/assignment of the Source Code?

17    A    I didn't think -- the e-mails that I know of --

18    Q    Well --

19    A    Can I answer the question?

20    Q    It's a simple yes or no.

21         Did you or did you not provide --

22    A    I don't know specifically if that happened or not.

23    Q    Okay.  So you don't know whether you did provide these

24   e-mails that were produced by your counsel.

25         Is that your testimony?

Case 3:06-cv-00056-PMP-MAU   Document 834   Filed 09/28/08   Page 550 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/28/08   Page 550 of 800

165

1    A    That's correct.

2    Q    Okay.  And where would those e-mails be today?

3    A    I believe I gave e-mails between myself and Mike Flynn

4    that were privileged e-mails.

5    Q    That's not what I asked.

6              Where are the e-mails that are referenced here --

7    A    Oh.

8    Q    -- in Exhibit 8?

9    A    I don't know.  I don't know.

10   Q    Okay.  And there are actually, in Exhibit 8, a number of

11   them.  You can look at, you know, MONT-185.

12   A    Yeah, I see them.

13   Q    186.

14   A    Which they all refer to Mike Flynn.

15   Q    Okay.  Did they come from Mike Flynn?

16   A    God, knowing him, I don't know.  I don't know.

17   Q    You don't know the source of these, is that correct?

18   A    No, but I did give the e-mails that were -- I thought

19   I was supposed to give that were e-mails that were between

20   myself and Mike Flynn.

21   Q    Okay.  So you had some of those someplace then?

22   A    Yes, at some point.

23   Q    Where did you have those?

24   A    I think they were burned onto a CD.

25   Q    And so then would that be all of the e-mails you had

Case 3:06-cv-00056-PMP-MAU   Document 834   Filed 07/28/23   Page 551 of 800
Case 3:06-cv-00056-PMP-VPC   Document 534   Filed 05/03/08   Page 551 of 200

-166

1   between yourself and Mike Flynn that you burned on the CD?

2    A   I believe so.

3    Q   Okay.  And then you must have retained copies of those

4   e-mails in order to burn them onto a CD, is that correct?

5    A   No.  I gave them -- what I had, I burned them onto a CD.

6    Q   Right before you burned them onto a CD, you took them off

7   some other form of electronic media, did you not, sir?

8    A   I think there -- I didn't know what the original source

9   was.  I don't know whether it was a CD or disk drive.

10   Q   Well, how did they -- what source --

11              THE COURT:  Okay.  Stop.  Stop.

12              MR. PEEK:  -- or hard drive --

13              THE COURT:  I just want to admonish both

14   counsel, and you, Mr. Montgomery, the court reporter cannot

15   report accurately if you talk over one another.  So please

16   take care to not do that.

17              Go ahead, sir.  Start again.

18   BY MR. PEEK:

19   Q   From what media source did you obtain the e-mails between

20   you and Mike Flynn that you burned onto either a CD or a hard

21   drive?

22   A   An Outlet file.

23   Q   And where was that outlet file?

24   A   On a hard drive.

25   Q   And on whose hard drive was that?

Case 1:23-mc-00053-SKK-MAU   Document 134   Filed 07/28/23   Page 552 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 552 of 800

-167

1   A    Mine.

2   Q    Did the hard drive only save e-mails between you and

3   Mr. Flynn, or did it save all e-mails?

4   A    Just those.

5   Q    So did you setup one program in your computer that it

6   would only save e-mails between you and Mr. Flynn?

7   A    I don't remember if it was setup that way specifically

8   or not.

9   Q    Okay.  But for some reason or another, you kept only the

10  e-mails in your Outlook file between you and Mr. Flynn, but

11  not others, is that correct?

12  A    Yes.  Because Mr. Flynn was very adversarial to me.

13  Q    In 2006 he was?

14  A    Yes.

15  Q    Okay.  And that would be in March of 2006, he was very

16  adversarial to you?

17  A    No.  Not at the beginning.

18  Q    Well, when did you start saving your e-mails between you

19  and Mr. Flynn?

20  A    Well, since I knew Mr. Flynn.

21  Q    Okay.  And those are the only e-mails that you saved, is

22  that correct?  Is that your testimony?

23  A    I -- there were e-mails on Opspring's computers that

24  Michael Sandoval retained.

25  Q    But this is before Mr. Sandoval, in this Exhibit A, is

—168

```
 1   it not?
 2    A    Yeah, I know.  But, you're talking about a month before.
 3   This is the month of March.
 4    Q    I am talking about the month of March.
 5    A    I don't recall that, whether I did or not.
 6    Q    Okay.  And these were saved on your personal computer
 7   where the address is Dennis@ncoder.net, is that your
 8   testimony, the ones with Mr. Flynn?
 9    A    Yes.
10    Q    And you saved no others than the ones between you and
11   Mr. Flynn, is that your testimony as well?
12    A    I don't recall the others, if I did or not.
13    Q    And where are those e-mails today that -- just the ones
14   that you saved between you and Mr. Flynn?
15    A    My attorneys'.
16    Q    Okay.  And where are the ones that you had between you
17   and others?
18    A    Well, between Opspring, they were on Opspring's
19   computers, of which Mr. Sandoval retained.
20    Q    Okay.  And so Mr. Sandoval would have those?
21    A    I would say that's a good source.
22    Q    Okay.  And what about the others that were not the
23   Opspring e-mails?
24    A    Well, I just told you I had Opspring and Dennis@ncoder --
25    Q    I'm talking about the others that would be at
```

1    Dennis@ncoder, where are they?

2    A    I haven't seen them.  I will look for them.

3    Q    Okay.  So you think they may exist?

4    A    I don't think so, but I will surely look.

5    Q    Okay.  Is this -- have you looked before today?

6    A    I've been looking for five months.

7    Q    Have you looked before today?

8    A    Yes, I have.

9    Q    Okay.  And in your search, did you find any e-mails that

10   would be responsive to any requests for production where you

11   had the e-mail address at Dennis@ncoder.net?

12   A    I had looked, but I don't think I found them originally.

13   I mean I haven't seen them.

14   Q    Okay.  You believe they exist?

15   A    There's a possibility.

16   Q    So it's just only a possibility that they may exist?

17   A    I've looked through a lot of information for five months.

18   Q    Okay.  Well the request went out to you in November

19   of '07.  Did you begin looking in November of '07, sir?

20   A    Yes.

21   Q    And?

22   A    And I believe I sent things to my original attorney,

23   Mr. Flynn.

24   Q    Mr. Flynn was not your attorney in November of '07, sir.

25   A    November of '07.

Case 3:06-mc-00038-PMP-MAU   Document 134   Filed 07/28/23   Page 555 of 800
Case 3:06-cv-00038-PMP-MAU   Document 134   Filed 09/08/08   Page 205 of 255

170

```
 1    Q    That's correct, sir.

 2    A    Okay.  I'm sorry.  I thought I had that wrong.

 3    Q    Well, you did have it wrong.

 4    A    Yeah, I got it wrong.  Yeah.

 5         What was the question?

 6    Q    The question was you've had it since November of '07,

 7   when the request went out to you.  Did you begin looking in

 8   November of '07 when the requests were sent to you?

 9    A    Yes.  And I didn't find any at that time.

10    Q    So then you've been looking since November of '07, and

11   it's now August of '08.  So, that's approximately ten months.

12   Almost nine or ten -- eight, seven or eight months.

13    A    Is that a question?

14    Q    Yeah.  So you haven't found anything in this period of

15   time?

16    A    I have found stuff.

17    Q    November '07 --

18    A    I've produced four million files.  So, I can't say I

19   didn't find anything.  I have found something.

20    Q    Sir, my question was really related to the e-mails.

21   In November of '07, until today, August 19th, have you

22   found any e-mails, other than the ones that are between

23   you  and Mr. Flynn, that would be responsive to the requests

24   for production that would bear the e-mail address at

25   dennisncoder.net?
```

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 556 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 215 of 265

—171

1   A   And excluding my current attorneys?

2   Q   Yes, sir.

3   A   No.  I haven't found any.

4   Q   Okay.  And the request also required you to produce them

5   in native format.

6   A   Correct.

7   Q   With PST.  So, you haven't done that either, have you?

8   A   Well, if I find them, and they're in that format, I will

9   produce them.

10                  MR. PEEK:  I would offer exhibit 8, Your Honor.

11                  THE COURT:  Any objection?

12                  MS. GAROFALO:  No, Your Honor.

13                  THE COURT:  All right.  Exhibit 8, defendant's

14   Exhibit 8, is submitted.

15          (Whereupon, exhibit 8 -- document, was received in

16   evidence.)

17   BY MR. PEEK:

18   Q   Now, we talked yesterday about Mr. Visconti.

19          Do you remember that testimony yesterday of

20   Mr. Visconti?

21   A   That was the Chris Shockey e-mail?

22   Q   Yes.  Do you recall attending a meeting with Mr. Shockey

23   in December of 2007, in Bellevue, with yourself, Mr. Shockey,

24   Mr. Rhodes, Mr. Crisman, Mr. Visconti, Mr. Wehnt and

25   Mr. King?

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 557 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 22 of 200

—172

```
 1    A    No.

 2    Q    You don't have any recollection of that at all?

 3    A    No, I don't recognize the guy's name.

 4    Q    You do recognize the other names, Mr. Shockey and

 5   Mr. Rhodes, and Mr. Crisman, do you not?

 6    A    Yes.

 7    Q    And you don't recognize the names Mr. Wehnt and Mr. King

 8   then as well?

 9    A    No.

10    Q    And did you, during -- well, did you ever make a

11   presentation to Mr. Visconti, Mr. Wehnt, and Mr. King, in

12   which you provided a demonstration of the technology showing

13   a CD quality movie, and what Dennis, what you described, as

14   a 19 to 1 video compression?

15    A    No.

16    Q    You don't ever recall doing that?

17    A    No.

18    Q    Do you have or did you have a demonstration of technology

19   showing the CD quality movie in a 19 to 1 video compression

20   while you were at Opspring?

21    A    No.

22    Q    You did not?

23    A    No.

24    Q    Okay.  Following along with some of those marketing

25   efforts, would you take a moment and look at Exhibit 20.
```

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 558 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 23 of 203

173

```
 1              THE COURT:  What volume, sir?

 2              MR. PEEK:  It's Volume 5, Your Honor.

 3              THE WITNESS:  Okay.

 4   BY MR. PEEK:

 5    Q   Do you recognize that?

 6    A   Which number?  Exhibit 20?

 7              I don't know what this --

 8    Q   There's an entire exhibit.  Would you please take a

 9   moment and take a look at it.

10              THE COURT:  There's a second page.

11   BY MR. PEEK:

12    Q   Do recognize this as the exhibit you submitted?

13    A   Yes, sir.

14    Q   And you signed it under penalty of perjury, didn't you,

15   sir.

16    A   Yes.

17    Q   Now, would you turn to paragraph 12 on page 6 of that

18   exhibit.

19    A   Okay.

20    Q   Declaration number 6.

21    A   Yes, I see it.

22              Which one is it?

23    Q   Paragraph 12.

24    A   Yes, I see it.

25    Q   And you say in your declaration:  "Throughout the summer
```

Case 1:23-mc-00053-SK16-MAU Document 134 Filed 07/28/23 Page 559 of 800
Case 3:06-cv-00056-PMP-MAU Document 834 Filed 09/08/08 Page 24 of 260

-174

1    and fall of 2006, up to and including the present, I worked

2    with my current employers to improve my technology.  It is

3    significantly improved, and we have voluntarily used it in the

4    last 60 days to voluntarily provide intelligence information

5    to appropriate officials in, order to save American lives.

6    Even with its current limited use, it has specifically

7    diverted specific terrorist threats."

8            Was that your effort to market the technology to the

9    United States Government?

10   A    No.

11   Q    It was just a voluntary act on your part?

12   A    No.

13   Q    No effort to sell or market your --

14   A    Me?  No.

15   Q    Well, somebody at Opspring?

16   A    I didn't.  I wasn't involved.

17   Q    Did somebody at Opsprings do it, sir?

18   A    Well, you just asked me that question.

19   Q    Did somebody at Opsprings do it, sir; market the

20   technology to the United States Government?

21   A    I don't know if they did that specifically or not.

22   Q    Well, when you were providing these voluntary efforts to

23   the intelligence community of the United States Government,

24   were you doing so on behalf of Opsprings, or yourself, to

25   market the Source Code?

-175

```
 1   A    No.  I would like the ask the government a question
 2   before I answer this.
 3   Q    If you want to.  I mean, this has been redacted already
 4   by the government.
 5   A    So you want me just to answer the question, right?
 6   Q    No.  Go ahead and ask the government.
 7               MR. PEEK:  Your Honor, I don't want to --
 8               THE WITNESS:  I'm not sure -- the question you
 9   asked me again was what?
10   BY MR. PEEK:
11   Q    The question was when you provided this information
12   described in paragraph 12, was it an effort, by Opspring, to
13   market the technology to the United States Government?
14   A    I don't think so.
15   Q    Why was it done then?
16   A    Uh, we thought it would be helpful.
17   Q    Did you think it would also be helpful to provide them
18   this information in order to show the benefits of the Source
19   Code?
20   A    Well, we weren't giving them the Source Code.  We were
21   just giving the output.
22   Q    Well, sir, the benefits of the Source Code, which would
23   be the outputs, correct?
24   A    No.
25   Q    Right?
```

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 561 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 261 of 280

176

 1   A    No.

 2   Q    So this is not a marketing effort on your part?

 3   A    No.

 4   Q    Not a marketing effort on the part of Opspring, is that

 5   your testimony?

 6   A    Yes.

 7   Q    Is --

 8              MR. PEEK:  Your Honor, do I need to offer

 9   declarations, Your Honor, that are already part of the record?

10   I'll just refer to them in closing, but if I -- otherwise, I

11   would offer Exhibit 20.

12              THE COURT:  All right.  Well, let's go ahead,

13   since they're exhibits.

14        Do you have any objection, counsel, just to having

15   it admitted?  It's part of the record as --

16              MS. GAROFALO:  No, Your Honor.

17              THE COURT:  All right.  20 is admitted.

18        (Whereupon, exhibit 20 -- a document, was received

19   in evidence.)

20              MR. PEEK:  Thank you.

21   BY MR. PEEK:

22   Q    Now, we covered yesterday your affidavit, or your, excuse

23   me, your declaration that you gave where you said that did not

24   contain any classified information.

25              Do you remember that from yesterday?

 1    A    Yes.

 2    Q    Okay.  Now you've also made a representation to this

 3   court in pleadings that at least 60 to 80 percent of the

 4   technology data consists of files that are covered by the

 5   U.S. Protective Order.

 6         Do you remember that?

 7    A    Yes.

 8    Q    And is that still your testimony today?

 9    A    I don't know if it -- if it's that high.  But, it's a

10   sizeable number.

11    Q    Okay.  And of that so-called 60 to 80 percent of

12   the technology data, have you provided any of it to the

13   government?

14    A    Yes.

15    Q    Okay.  And that's in the form, I think you said, of two

16   hard drives that you gave up recently?

17    A    Three.

18    Q    Three hard drives very recently.  Okay.

19         And how much data was on that?

20    A    I don't know specifically.  I would think a terabyte or

21   two.

22    Q    You would think.  Okay.  You don't know then?

23    A    Well, one of them was a terabyte.  I think the

24   other two, one was on a 500, and one was on a 750.  That's

25   two-and-a-quarter terabytes, and they weren't all full.  So,

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 563 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 28 of 205

-178

1    I don't know.

2    Q   And how did you obtain this information, or this

3    information on these drives you gave to the government?

4    A   What do you mean how did I obtain it?

5    Q   Just exactly how did you obtain it?  Did you take it from

6    the eTreppid computers?

7    A   No.

8    Q   How did it come into your possession then, sir?

9    A   Government.

10   Q   Okay.  So the government gave you these hard drives,

11   first of all, and then you copied them from the government

12   onto something, some of your own media, is that correct, your

13   electronic --

14   A   I think so.  Yeah.

15   Q   You think so or you know, sir?

16   A   I -- I don't know specifically.  Are you talking about

17   the drives that I've given to the government?

18   Q   No, no, sir.  I'm not talking about --

19   A   Okay.

20   Q   --  I'm talking about the data on the hard drives.

21   A   Yeah.

22   Q   Did you obtain the data on the hard drives from eTreppid?

23   A   No.

24   Q   Okay.  You said you got it from the government.

25   A   Yes.

Case 1:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 564 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 29 of 280

179

1   Q   Okay.  When did the government give it to you

2   specifically?

3               MS. WELLS:  Your Honor, I would caution

4   Mr. Montgomery in providing that answer.  To take the terms

5   of the Protective Order into account.

6               MR. PEEK:  It's just a when.

7               MS. WELLS:  That could be a problem.

8               MR. PEEK:  A when has problems.  Okay.

9   BY MR. PEEK:

10   Q   When did you get if from the government?

11   A   When did I what?

12   Q   When did you get it from the government?

13   A   You want -- you say the date?

14   Q   No.  You can't say the date --

15               MS. WELLS:  No.

16   BY MR. PEEK:

17   Q   -- if it came from a source covered by the State Secrets

18   Privilege?

19   A   You already asked me --

20               THE COURT:  Stop.

21               MR. PEEK:  I'll let Ms. --

22               THE COURT:  Stop.

23               MS. GAROFALO:  Your Honor, I think we're in

24   direct jeopardy of trespassing on the U.S. Protective Order.

25               MR. PEEK:  He can --

Case 1:23-mc-00053-CKK-MAU   Document 34   Filed 07/28/23   Page 565 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 565 of 800

180

```
 1              MS. GAROFALO:  If we are going to proceed,
 2   I think we need to take a short break to confer with
 3   Mr. Montgomery.
 4              THE COURT:  All right.
 5              MR. PEEK:  But can Mr. Montgomery confer with
 6   the United States Government, Your Honor, before he answers
 7   that question?
 8              THE COURT:  Let me ask Ms. Wells.  She, as the
 9   attorney for the government, if it is, she who will tell all
10   of us what is covered or not under the Protective Order.
11         So, Ms. Wells, you understand the nature of
12   Mr. Peek's questions.  What do you recommend we do.
13              MS. WELLS:  I would recommend that
14   Mr. Montgomery not answer that question, Your Honor.
15              THE COURT:  All right.  She -- counsel for
16   the United States has directed that, pursuant to the terms
17   of the U.S. Protective Order, Mr. Montgomery not answer that
18   question.
19              MR. PEEK:  Your Honor, may I confer with
20   Ms. Wells for a moment, because there are other agencies that
21   aren't covered by the States Secrets Privilege.
22              THE COURT:  All right.  Why don't you just take
23   a moment and speak privately.  We're not going to take a
24   recess.  Just the two of you can chat.
25              (Mr. Peek and Ms. Wells confer.)
```

Case 1:23-mc-00073-PKM-MAU    Document 134    Filed 07/28/23    Page 566 of 800
Case 3:06-cv-00056-PMP-VPC    Document 834    Filed 05/08/08    Page 51 of 265

-181

```
 1              (Mr. Schwartz is now joined telephonically.)

 2                   THE CLERK:  Mr. Schwartz, are you there.

 3                   MR. SCHWARTZ:  I am.

 4                   THE COURT:  Thank you.

 5              Good morning, Mr. Schwartz.  This is Judge Cooke.

 6   We have commenced the Continued Order to Show Cause Hearing,

 7   and Mr. Peek is examining Mr. Montgomery.

 8                   Go ahead, Mr. Peek.

 9                   MR. SCHWARTZ:  Thank you.

10   BY MR. PEEK:

11    Q   You've had occasion to meet with the United States

12   Government, so you know which agencies are covered by the U.S.

13   Protective Order, is that correct?

14    A   That's correct.

15    Q   Okay.  Knowing that, and excluding that from the

16   question, did any data on the hard drives you provided to

17   the government come from an agency not covered by the United

18   States Protective Order?

19    A   I'm not certain.

20    Q   Okay.  So I guess if I ask the "when," knowing that

21   they're from an agency not covered by the Protective Order,

22   your answer is also that you're not certain?

23    A   That's correct.

24    Q   I wanted to at least get into the record, at least, where

25   you made the representation to the Court.  So, I'm going to
```

Case 1:23-mc-00053-CKM-MAU   Document 154   Filed 07/28/23   Page 567 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 52 of 265

182

```
 1    have you look at, if you would, Document 604, filed in this
 2    proceeding, page 3.
 3               May I approach, Your Honor?
 4                    THE COURT:  You may.
 5                    THE WITNESS:  Is this in this binder?
 6                    MR. PEEK:  It's not in the binder, but it's part
 7    of the court record.
 8                    THE WITNESS:  Okay.
 9    BY MR. PEEK:
10    Q    If you look at the paragraph and the representation you
11    made to this court --
12    A    The one that's highlighted?
13                    MS. GAROFALO:  I'm sorry, Your Honor.  But could
14    Mr. Peek please identify the document.
15                    THE COURT:  Could you, please.
16                    MR. PEEK:  Docket 604.
17    BY MR. PEEK:
18    Q    Could you read the title of it, since you have the title
19    of the document.
20    A    Emergency Request By Montgomery Parties For Status
21    Conference With the Montgomery Parties' Compliance With the
22    Court's Order May 7, 2008 Order.
23    Q    Okay.  And what representation did you make to the Court?
24    A    Do you want me to read it?
25    Q    Yes, sir.
```

1   A   "A substantial percentage, i.e. 60/80 of the technology

2   data consists of files the Montgomery parties reasonably

3   believe could fall within the provision of the U.S. Protective

4   Order, docket number 253, and the Non-Disclosure Agreements

5   executed by Dennis Montgomery, in connection with works

6   performed for the government of the protected data."

7   Q   Okay.  So of that 60, 80 percent -- you don't believe

8   it's that high today, is that correct?

9   A   It's probably not that high.

10  Q   Okay.  And have you submitted all of the 60 -- the amount

11  of data to the United States Government for their review?

12  A   No.

13  Q   And in May of 2007, you were telling the Court that

14  it existed.  Why have you not submitted that data to the

15  government in accordance with the procedures set forth in the

16  United States Protective Order?

17  A   Because for the last four months, I've been doing that.

18  Q   And all you found are just the three hard drives, is that

19  correct?

20  A   Yeah, with one million four hundred thousand files on it.

21  Q   Okay.  I understand what your testimony is.  All of

22  which you said was given to you personally by the United

23  States Government.

24  A   I said I believed that.

25  Q   Well, did it or did it not come to you directly from the

Case 3:23-mc-00053-GKM-MAU    Document 134    Filed 07/28/23    Page 569 of 800
Case 3:06-cv-00056-PMP-VPC    Document 834    Filed 09/08/08    Page 54 of 285

-184-

1    United States Government?  Or, did it come off of the

2    computers at eTreppid?

3     A    I can't remember right now everything that was on the

4    drive that was given to them, to be certain whether that's

5    correct or not.  I believe it is.  But, I'm not certain.

6     Q    Thank you.

7              Sir, when are you going to comply with the discovery

8    orders and the Protective Order, and deliver all of the data

9    that you believe is covered by the States Secrets Privilege to

10   the United States Government?

11    A    When it's all been segregated.

12    Q    When is that, sir?

13    A    Uh, by the end of the month.

14    Q    By the end of this month?

15    A    Yes.

16    Q    Correct?  Okay.

17             So you will deliver everything to the United States

18   Government, that you believe is covered by the States Secrets

19   Privilege, to the United States Government for their review,

20   on or before August 31st of 2008, is that correct?

21    A    Assuming I'm able to work on it, yes.

22    Q    Well --

23    A    Well, I've been in here.  I'm going to be here tomorrow.

24   I'm going to be here on Thursday.

25    Q    I just want to know the date certain.

Case 1:23-mc-00052-CKK-MAU   Document 34   Filed 07/28/23   Page 570 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/28/08   Page 35 of 285

185

 1   A   I will surely try by the end of this month.

 2   Q   Okay.  And if not by the end the month, what other date

 3   would you give us?

 4   A   I wouldn't think it would take more than a month to

 5   complete everything that's left.

 6   Q   Okay.  So that would be on or before September 19th would

 7   be the latest date?

 8   A   Yes.

 9   Q   But you will begin doing it when?

10   A   Well, I've been doing it.

11   Q   When will you begin?

12   A   Can I speak?

13   Q   Okay.

14   A   I've been doing it for the last four months.

15   Q   I'll -- sorry.

16   A   But when I got hit with the second OSC hearing order

17   under the Source Code, I stopped doing that to work on that.

18   Q   Okay.  Let me ask my question again.

19        When will you begin doing the review to provide the

20   government the information that you believe is covered by the

21   States Secrets Privilege?

22   A   As soon as I return home.

23   Q   And when will that be?

24   A   Hopefully on Friday.

25   Q   Okay.  Now, there are also two articles the Wall Street

Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/28/23 Page 571 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/08/08 Page 361 of 265

186

1    Journal -- another area I forgot -- one was in November '06

2    and one was in February of '07.

3             Do you remember that?

4    A    No.

5    Q    Okay.  Let me refresh your recollection then.

6             Let me hand the Court exhibits 31 and 32, which are

7    in Volume VI.

8             Do you recognize exhibit 31, sir?  It was an article

9    that appeared in or around --

10   A    Yes.

11   Q    And you recognize Exhibit 32 as an article that appeared

12   in the Wall Street Journal on or about February 15th 2007?

13   A    I don't remember this one, but it's obviously my picture,

14   so -- oh, the Wall Street Journal?

15   Q    Yes.

16   A    No.

17   Q    You don't remember this article as appearing --

18   A    You said the Wall Street Journal, I thought.

19   Q    That's what I'm talking about.  Exhibit 32 is an article

20   in the Wall Street Journal.  The date of it is --

21   A    I was looking at 33, so --

22   Q    Okay.

23   A    Um, no.

24   Q    You don't recall this article?

25   A    No.  I thought there was one.

Case 1:23-mc-00053-CKJ-MAU   Document 134   Filed 07/28/23   Page 572 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 05/08/08   Page 572 of 800

187

1   Q   Okay.  And in the article that appears on Exhibit 31,

2   there is no mention of a Jale Trepp e-mail is there?

3   A   Do you want me to read the article?

4   Q   If you need to, sir.

5   A   (Witness reviews document.)

6           No.

7   Q   Okay.  And is there mention of the Glogauer e-mail --

8   A   I didn't --

9           THE COURT:  Let him finish his question, sir.

10  BY MR. PEEK:

11  Q   Is there a mention of the Glogauer e-mail in this article

12  November 1st, 2006?

13  A   I didn't think so.

14  Q   Okay.  Do you know whether there was a second delivery of

15  e-mails to Mr. Wilke regarding Mr. Glogauer and Ms. Trepp

16  after the November 1st, 2006 article appeared?

17  A   I don't think so.

18  Q   Did you have any follow-up communications with Mr. Wilke

19  after the November 1st article appeared?

20  A   I spoke to him.  I -- I spoke to him.

21  Q   After November 1st, 2006, sir?

22  A   Yes.

23  Q   Did you do it by telephone?

24  A   Yes.

25  Q   Okay.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 573 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/28/08   Page 56 of 288

188

1    A    Um, yes.

2    Q    Did you ever do it personally?

3    A    I think I only met him once.

4    Q    Okay.

5    A    You asked me this -- my nose is bleeding.  I really need

6    to stop for a minute.

7                    THE COURT:  All right.

8                    THE WITNESS:  I got a tissue.

9                    THE COURT:  Do you want to take a recess, sir?

10                   THE WITNESS:  Yeah.  Just for a few minutes.

11                   THE COURT:  All right.  We'll take about a

12   five-minute recess.  And we will reconvene promptly, and I

13   mean promptly.  So, five minutes.

14                   (Recess taken.)

15                   THE CLERK:  Court is again in session.

16                   THE COURT:  Please be seated.

17                   THE WITNESS:  Sorry.

18                   THE COURT:  You may proceed, Mr. Peek.

19   BY MR. PEEK:

20   Q    When you spoke to Mr. Wilke after November 1st, and

21   before February 5th, November 1st, 2006 and before November --

22   excuse me, after November 1st, 2006, and before February 15th,

23   2007, did you discuss the existence of e-mails with Mr. -- the

24   Glogauer e-mail and the Jale Trepp e-mail?

25   A    I don't think so.

Case 1:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 574 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 574 of 800

189

1   Q   So it's your testimony that no other e-mails were

2   provided to Mr. Wilke after November 1st and before

3   February 15th?

4   A   I don't know the exact date that he got them, but that's

5   correct.

6   Q   Well, did he get them before November 1st --

7   A   No.

8   Q   -- 2006?

9   A   I think I answered that.  I don't know.

10  Q   Well --

11  A   I'm not certain of the exact date because I have said I

12  don't believe I'm the one that gave them to him.

13  Q   I know you say you don't believe that.  But, you don't

14  know for certain whether you did or did not, isn't that

15  correct, sir?

16  A   I don't know.  I guess.

17              MR. PEEK:  I'd offer 31 and 32, Your Honor.

18              THE COURT:  Any objection, counsel.

19              MS. GAROFALO:  Yes.  Hearsay.  They're not

20  authenticated.

21              MR. PEEK:  They're not being introduced for

22  the truth, Your Honor.  They're just being introduced to

23  show the articles and what was contained in them.  There are

24  e-mails that are referenced only in the February 15th and

25  not the November 1st.  And it shows, again, if you will, the

Case 3:23-mc-00053-CKM-MAU Document 134 Filed 07/28/23 Page 575 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/08/08 Page 475 of 265

—190

 1   credibility of this witness.  They're not being introduced for

 2   the truth.

 3                  MS. GAROFALO:  I think, Your Honor, that is

 4   for the truth as to whether or not the e-mails were provided

 5   or included in the article.  I still -- we still object on

 6   hearsay grounds.

 7                  THE COURT:  Well, the objection is overruled.

 8   I think for purposes of this hearing, these e-mails, I don't

 9   believe they're being offered for the truth of the matter

10   asserted in the e-mails.  I think it goes to trying to

11   ascertain, for purposes of this Order to Show Cause Hearing,

12   the extent to which documents, Mr. Montgomery and the

13   Montgomery parties have been ordered to produce have been

14   produced.  And it's really serving as a benchmark in the

15   chronology of the events that occurred in this litigation that

16   relate to the document production.

17                  Go ahead, Mr. Peek.

18                  MR. PEEK:  Thank you.

19   BY MR. PEEK:

20    Q   You still have, I think, Exhibit 20 there, which is in

21   Volume 5, do you not, sir?

22    A   No.  They took the binder.

23                  MR. PEEK:  Okay.  She'll get it back for you.

24                  Thank you Miss Clerk.

25                  THE COURT:  Exhibit 20, Mr. Peek?

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

Case 3:23-mc-00053-CKK-MAU  Document 334  Filed 07/28/23  Page 576 of 800
Case 3:06-cv-00056-PMP-VPC  Document 854  Filed 09/08/08  Page 415 of 205

-191

1                    MR. PEEK:  Yes, Your Honor.

2                    THE COURT:  Thank you.

3    BY MR. PEEK:

4    Q    Would you turn, sir, to page 3, paragraph 6.

5    A    Okay.

6    Q    And the sentence beginning on line 27.

7             Do you have that?

8    A    The one that says, "On that..."?

9    Q    Yes.

10   A    Yeah.

11   Q    And you wrote, at least in this declaration in February

12   of 2007, that:  "On that basis, and because of the failure of

13   our government to utilize my technology after my departure

14   from eTreppid, and because of Warren Trepp's attempts to steal

15   it with the raid on my home, my current employers engaged

16   in multiple meetings and conferences with high level Bush

17   administration officials beginning in May 2006, and continuing

18   to December 2006."

19             Is that correct?

20    A    Yes.

21    Q    And those were efforts to market the technology, were

22   they not?

23    A    No.

24    Q    Okay.  And then it says:  "In July 2006, they arranged a

25   meeting in Vice-President Cheney's office, which I attended

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 577 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 427 of 288

192

 1   with several individuals for the purpose of educating and

 2   explaining to the Vice-President that much of my work is so

 3   highly compartmentalized within, that it was likely that some

 4   high level official in the administration, even within the

 5   intelligence community, including certain Air Force officials

 6   aligned with Warren Trepp, potentially even the Director

 7   of National Intelligence, John MacHunting (phonetic),

 8   parentheses, whom certain distrusted, close parentheses,

 9   did not know or understand the full scope of its utilization

10   on the war on terror, and/or competing financial interests

11   aligned with Trepp, given this event."

12            That was an effort to market as well, wasn't it?

13   A    No.

14   Q    It was not an effort to license the technology?

15   A    No.

16   Q    Okay.  Now there's an attachment to this exhibit, is

17   there not, which is a letter, Exhibit 1, from Mr. Flynn to

18   Mr. Rumsfeld, Cherchoff, and Alberto Gonzales, is there

19   not?

20   A    Yes.  Well, there was a fourth person but, obviously,

21   it's redacted.

22   Q    And then would you turn to page four of seven of that

23   letter.

24   A    Okay.

25   Q    The bottom of the page.

```
 1    A    Yes.

 2    Q    Do you see the sentence beginning, "Mr. Montgomery..."

 3   the last sentence there.

 4    A    Yes.

 5    Q    "Mr. Montgomery desires to enter into an exclusive

 6   license agreement with the U.S. government as soon as

 7   possible."

 8             That's marketing the technology, the Source Code, is

 9   it not?

10    A    No.

11    Q    Okay.  The License agreement is not any effort by you to

12   license -- excuse me licensing the technology --

13    A    It's --

14    Q    -- is not an effort to market it?

15    A    This is the day they raided my home.

16    Q    I know that, sir.  I'm just asking --

17    A    Can I finish speaking?

18    Q    Sorry.

19    A    This is the day they raided my home.  And this letter was

20   originally -- Mr. Flynn had originally written the letter that

21   I had seen days, before that, that did not have some of this

22   in there.  He sent this letter the, the day that they were,

23   you know, when they were at my home raiding me.

24    Q    Okay.  I, I understand that.

25    A    So --
```

Case 3:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 579 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 44 of 205

194

1    Q    But are --

2    A    Yeah.

3    Q    -- you telling this Court then that licensing of the

4    technology is not marketing the technology, the Source Code?

5    A    No.  I'm not saying that.  I don't remember -- I just

6    remember a lot was going on on that day.  And why this was

7    sent with those exact words, I can't explain.

8    Q    And there were a number of meetings after March 1st in

9    order to license the technology with the government.

10   A    With me?  No.

11                MS. GAROFALO:  Objection, Your Honor.

12   Relevance.  If this is going to documentation, Mr. Peek

13   should get there.  But it does not appear to be focused on

14   the discovery issue.

15                MR. PEEK:  Your Honor, the discovery issue is

16   any documents with respect to licensing the technology.  It

17   would appear to me that there would be additional documents

18   that would have been utilized by those individuals meeting

19   in that six-month period of time described by, described in

20   the affidavit, or in the declaration by Mr. Montgomery.  He

21   described it.  We don't have any of those so-called documents.

22                MS. GAROFALO:  I would ask the Court to then

23   direct Mr. Peek to focus his questions on what documents

24   exist; whether documents related to these meetings actually

25   exist, rather than explore the nature, the number of

Case 3:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 580 of 800
Case 3:06-cv-00056-PMP-VAU   Document 854   Filed 09/08/08   Page 49 of 285

195

 1   participants and so forth at the meetings, which doesn't seem

 2   to be relevant to this proceeding.

 3              MR. PEEK:  I have to establish a predicate,

 4   Your Honor that it was for the purpose of marketing, in order

 5   then to get the documents.

 6              THE COURT:  Right.

 7              The objection is overruled.  The Court, of course,

 8   is keenly interested in moving things along, but recognizes

 9   that part of the request for production that is part of this

10   Order to Show Cause hearing is this particular category of

11   documents.  So the Court, in trying to establish the basis

12   for Mr. Peek's inquiries is part of it, but please move on,

13   sir --

14              MR. PEEK:  I will.

15              THE COURT:  -- in your questions.

16   BY MR. PEEK:

17   Q   And then in the last page of the letter, page --

18   actually, second of last page, page 6 of 7 --

19   A   Okay.

20   Q   -- there's another statement there at the end of the

21   sentence where you want to license the software technology of

22   Mr. Montgomery.

23              Do you see that sentence?

24   A   Where is it?

25              Oh, yes, I see it.  I see that.

Case 1:23-mc-00053-CMR-MAU   Document 34   Filed 07/28/23   Page 581 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/28/08   Page 461 of 265
-196

1    Q    And that's another effort to market, is it not?

2    A    Not really, no.  Why Michael put this in there when

3    they're raiding my home, I can't tell you.

4    Q    Okay.  Where are any of the documents relating to the

5    efforts to license the technology, first in March of 2006,

6    and then in that six-month period of time, or whatever period

7    of time it was in your declaration?  Where are those?

8    A    To my knowledge there are none, because no one did.

9    Q    Are you saying you didn't make any presentations --

10   A    I --

11   Q    -- then to the government from May 2006, and continued to

12   December 2006?

13   A    I went to one meeting, one time, in Washington.  That's

14   it.

15   Q    Okay.  And your current employer, that being Opspring,

16   also went on multiple times in May, between May of 2006 and

17   December 2006, did they not?

18   A    I think they only went one time initially.  And they were

19   with me on the one meeting I went to D.C.  To my knowledge,

20   there were no others.

21   Q    Okay.  Well, then when you signed this declaration under

22   penalty of perjury, were you lying?

23   A    Which declaration?

24   Q    The one that's Exhibit 20, where you said that your

25   employers engaged in multiple meetings and conferences with

Case 1:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 582 of 800
Case 3:06-cv-00056-PMP-MAU   Document 834   Filed 09/08/08   Page 47 of 285

—197

1    high level Bush administration officials, beginning May of

2    2006, to December 2006?  Is that a lie?

3     A   I just said -- no.  You just asked me multiple.  That's

4    two.  You asked me and I said there were two that I knew of.

5    Maybe they had others.  I can't tell you what Michael Sandoval

6    did.  You can talk to him.

7     Q   Okay.  Thank you.

8             Going back to the computers that you backed up, from

9    time to time.  You said that Mr. Trepp asked you to backup

10   computers as eTreppid, is that right?

11    A   Yes.

12    Q   Did he ask you to back up all the computers at eTreppid?

13    A   No.

14    Q   Or just the employees of eTreppid?

15    A   I don't know if he said all or both.  I don't recall

16   specifically.

17    Q   Well, one of the computers you backed up was

18   John Hughes, was it not?

19    A   Yes.

20    Q   Was John Hughes an employee of eTreppid?

21    A   I wouldn't know if he is or not.  I don't think he was.

22    Q   And why did you backup his computer?

23    A   Because it was failing, and he had to have another

24   laptop, so it had to be taken off his current laptop and put

25   on another laptop.

Case 3:23-mc-00053-CKM-MAU  Document 134  Filed 07/28/23  Page 583 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 05/08/08  Page 48 of 200
198

1  Q   And why did you retain the data on that?

2  A   I don't recall why I retained it.

3  Q   You recognize in the production that you made, you

4  provided, we have data related to Mr. Hughes, correct?

5  A   Yes.

6  Q   And that's not responsive to any request at all, is it?

7  A   Well, I wouldn't say that, because how did I know that he

8  didn't have something on his laptop that was responsive?

9  Q   Well, when you searched the data, did you look at

10  the John Hughes data to determine whether or not it was

11  responsive?

12  A   I don't recall if I did or not.

13  Q   Okay.  And then the e-mails, with respect to Jale Trepp,

14  that was on her computer, was it not?

15  A   I don't remember if it was or not, no.  I -- I'm not

16  certain.

17  Q   Well, we had e-mails that just appear to be only on Jale

18  Trepp's e-mail -- Jale Trepp's computer.  And we can go back

19  over that if you like in Exhibit 9.

20  A   Okay.  Go ahead.

21  Q   Okay.  Actually, it's Exhibit 8.  I apologize -- no.

22  It's Exhibit 9.

23      Do you know whether these e-mails that are set forth

24  in Exhibit 8, they're labeled at the top, Jale 1.  And then

25  there's some Jale 1-A, whether they came off of Jale Trepp's

 1   e-mail account, on her computer, or off of somebody else's?

 2   A   I don't know.  I'm sorry.  I don't recall.

 3   Q   Okay.  Did you in fact backup Jale Trepp's e-mail?

 4   A   Yes.

 5   Q   From her computer?

 6   A   I don't -- I don't remember -- the answer is yes.

 7   Q   And was that her home computer?

 8   A   Yes.

 9   Q   Were you directed to do that?

10   A   Yes.

11   Q   By whom?

12   A   Warren.

13   Q   And when were you directed to do that?

14   A   Multiple, multiple times.

15   Q   Okay.  Did he give you reasons why he wanted to do that?

16   A   I don't recall if he did or not.

17   Q   And where did you go to back this up?

18   A   It was at her house.

19   Q   Now you've also testified in this proceeding, have you

20   not, that you did not have access to any of the financial

21   information of eTreppid?

22   A   That's correct.

23   Q   And we have found on, at least your production, that

24   there are QuickBooks on the hard drives that you have

25   produced, are there not?

Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 07/28/23   Page 585 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 50 of 280
-200-

1    A    Yes.

2    Q    And those are the financial records of eTreppid that you

3    say you never had access to, aren't they?

4    A    Um, there are QuickBooks records on there.  Whether those

5    are those of eTreppid, I can't tell you.

6    Q    Well, you testified that you never were given access to

7    them, correct?

8    A    Access to what?

9    Q    To the financial information of eTreppid.

10   A    Yeah.  The paper, paper records.

11   Q    Well, were there -- so you were given the electronic form

12   of them off of Sue Perez's computer, or others in eTreppid's

13   offices that you backed up, correct?

14   A    I don't believe Sue Perez had QuickBooks.

15   Q    All right.  Did anybody have QuickBooks?

16   A    Monica, I believe, did.

17   Q    Okay.  So you backed up Monica?

18   A    Yes.

19   Q    And you had the access to that financial information that

20   was on Monica's computer, did you not?

21   A    I've seen it.  Yes.

22   Q    And it was QuickBooks, was it not?

23   A    I don't remember -- yes.

24   Q    And it contained a record of every receipt and

25   disbursement --

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 586 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 51 of 265

201

```
 1   A    Absolutely.

 2   Q    -- did it not?

 3   A    No.

 4   Q    So when you told the Court that you were never given

 5   access to any of the financial records of eTreppid, that was

 6   a lie, wasn't it?

 7   A    Nope.  No it wasn't.

 8   Q    But you had, at least, access to all these computers

 9   where there was electronic information regarding financials

10   of the company, did you not?

11   A    No.

12   Q    You did not?

13   A    No.

14   Q    Well, you backed it up, didn't you?

15   A    Yeah, but it's password locked.

16   Q    Oh.  All the QuickBooks are password locked?

17   A    I don't remember if all of them were, but one -- the one

18   I tried was.

19   Q    Which one did you dry?

20   A    I don't recall which one it was.

21              MS. GAROFALO:  Objection, Your Honor.

22   Relevance.  This does not seem to be going to documents or

23   the production or the responsiveness of production.  It just

24   seems to be examining Mr. Montgomery on his knowledge of

25   financial information.
```

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 587 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 52 of 205

-202

1           MR. PEEK:  I'll move on, Your Honor.

2           THE COURT:  All right.  The objection is

3    sustained.

4           MR. PEEK:  This is Exhibit 46, Your Honor.  It's

5    tabbed so that folks can put it in their binder.

6           THE CLERK:  Excuse me, Judge Cooke.  Yesterday,

7    Mr. Peek remarked defendant's 45 and defendant's 46.

8           MR. PEEK:  I apologize.  Then this should be 47.

9           THE CLERK:  Yes.

10          MR. PEEK:  I apologize for that.

11          THE COURT:  This is 47 then?

12          MR. PEEK:  Yes, Your Honor.

13        (Whereupon, exhibit 47 -- a document, was marked for

14   identification only.)

15          MR. PEEK:  Excuse me for the error.

16        Does the witness have it then?

17          THE CLERK:  Yes.

18   BY MR. PEEK:

19    Q   Mr. Montgomery, this is a letter from your counsel at

20   Liner, the Liner firm.

21        Did you see that?

22    A   You mean Gunderson?

23    Q   Mr. Gunderson then.

24    A   Okay.  Yeah.

25    Q   I apologize.  I thought it was from the -- and in the --

Case 1:23-mc-00052-CKK-MAU   Document 1-4   Filed 07/28/23   Page 588 of 800
Case 3:06-cv-00056-PMP-VPC   Document 434   Filed 05/03/08   Page 53 of 265

-203-

1    this is produced in all those 21 hard drives, is it not?

2     A    I'll believe you.  I don't know.

3     Q    And in the second page of that letter, it says:

4              "I understand these drives contain electronic files

5    responsive to eTreppid's RFP One request, number 16."

6              Do you see that?

7     A    Yes.

8     Q    And that's what you believed when you produced them?

9     A    Yes.

10    Q    Let me show you what is request for production number 16.

11   That's in -- I think it's already a Court document, but I'm

12   going to go ahead and mark it as -- or it's Exhibit 34 in

13   Volume VI.

14             If we could have that for a moment.

15    A    Which number?

16             THE CLERK:  It should be up there.

17             MR. PEEK:  It's 34.  She's going to hand it to

18   you.

19             THE CLERK:  It should be there.

20             THE WITNESS:  No, I think I have it.

21             MR. PEEK:  It's in Volume VI.

22          Do you have it there?

23             THE WITNESS:  Yes.

24   \\\

25   \\\

Case 3:23-mc-00053-CKK-MAU   Document 34   Filed 07/28/23   Page 589 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/28/08   Page 54 of 205

-204

 1  BY MR. PEEK:

 2   Q   Why don't you take a moment and look at page 7 of 10 in

 3  that.

 4   A   I don't -- which page?

 5   Q   Page 7 of 10.  It's marked at the bottom.

 6   A   That doesn't make sense to me.

 7   Q   It's Exhibit 34, please.

 8   A   Exhibit 34.  You didn't say which exhibit.

 9          Okay.  Okay.  (Witness reviews document.)

10          Okay.  Go ahead.

11   Q   And the request to you is:  "All documents that relate

12  to eTreppid's technology, products and/or research and

13  development efforts, parentheses, including but not limited

14  to any and all marketing documents, business plans,

15  PowerPoint presentations, white papers, correspondence,

16  and/or notes of any customers or potential customers.

17          Do you see that?

18   A   Yes.

19   Q   And these 21 hard drives are only responsive to that

20  request, are they not?

21   A   You mean as a result of all of these?

22   Q   Well, that's what your letter -- that's what your

23  counsel's letter says to me; that they're only responsive to

24  that request number 16.

25   A   I don't know if they're more responsive -- I mean, I

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 590 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 55 of 265

-205

1   would have to read every one of these.  I will, if you want.

2   Q   Well, it's only -- I'm just going by the letter.

3   A   Okay.

4   Q   The letter enclosed the hard drives and said they're

5   responsive to request number 16, does it not?

6   A   Yes.

7   Q   Okay.  And are there any documents on that, on those

8   21 hard drives that relate to the efforts by you -- you,

9   the defining term -- to market, or notes of meetings with

10  customers, or potential customers, after March of 2006?

11  A   I don't know if there are or not -- oh, after?  I'm

12  sorry.

13  Q   Yeah, after.

14  A   I don't know if there are or not.

15  Q   You represented that they were though, did you not, when

16  you gave them to us?

17  A   That there are not?

18  Q   No.  You represented that they were; that they did

19  contain marketing documents, business plans, PowerPoint

20  presentations, white papers, correspondence, and/or notes of

21  meetings with customers or potential customers.

22            MS. GAROFALO:  Objection, Your Honor, to the

23  extent that it misstates the document before Mr. Peek.  It's

24  from Mr. Gunderson, not from Mr. Montgomery.

25            MR. PEEK:  Excuse me.  You, as in your lawyer

Case 1:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 591 of 800
Case 3:06-cv-00056-PMP-MAU   Document 854   Filed 05/08/08   Page 56 of 200

-206

 1  represented that.

 2   A    Is that what he wrote in the letter?  You want me to read

 3  it?

 4   Q    That's what he wrote in the letter.  Yeah.

 5   A    Okay.

 6   Q    He had to have that information from some source?

 7                 MS. GAROFALO:  Objection.

 8                 MR. PEEK:  In order to make that representation,

 9  did he not?

10                 MS. GAROFALO:  Objection, to the extent that

11  calls for attorney/client communications.

12                 MR. PEEK:  If he represents that in a pleading,

13  Your Honor, or in a letter, then that's a waiver of the

14  privilege.

15                 THE COURT:  Okay.  I don't think -- the

16  objection is overruled.  I don't think Mr. Peek is asking

17  for any inquiry about any attorney/client communication.

18  Logically, one requests production of documents from one's

19  client.  The client responds to document production requests

20  and hands over documents that the client believes are

21  responsive to a particular document production request.  And

22  the attorney, in turn, sends them off to opposing counsel,

23  after having reviewed them.

24           So that's, generally, how it works.  So the attorney

25  has to, one, have relied on the client to have reviewed the

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 592 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 592 of 288

—207

 1   request for production to ascertain what documents or media

 2   might be responsive to the requests; and

 3           Two, upon receipt, the Attorney, generally,

 4   will review whatever is produced, and then pass it on to

 5   counsel.

 6           So --

 7           MS. GAROFALO:  That's generally correct, Your

 8   Honor.  But, in this case, it's a letter from Mr. Gunderson.

 9   There's no foundation as to whether Mr. Montgomery saw this

10   letter.  It may very well be just a typographical error in

11   the letter.  Mr. Gunderson -- at least no basis has been laid

12   for knowledge on Mr. Montgomery's part as to how the documents

13   were characterized by Mr. Gunderson.

14           THE COURT:  Well, that's true.  I suppose you

15   can ask Mr. Montgomery some questions about.

16   MR. PEEK:

17    Q   Well, you provided the hard drives to your counsel, did

18   you not?

19    A   Not to Mr. Gunderson.

20    Q   You provided them to the Liner firm?

21    A   Yes.

22    Q   And when you provided them, you believed they were

23   responsive to request number 16, did you not?

24    A   Yes.

25    Q   Okay.  So Mr. Gunderson's representation came, I guess,

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 593 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 58 of 269

-208

```
 1   indirectly from you, correct?
 2    A   I can't tell you.
 3    Q   Well, you represented it to your counsel, the Liner
 4   firm, who passed -- must have passed it on to Mr. Gunderson,
 5   correct?
 6    A   I can't say that.
 7            MS. GAROFALO:  Objection, to the extent that
 8   does implicate attorney --
 9            MR. PEEK:  Your Honor, they can't have the
10   games.  They can't have it both ways.  They can't say that
11   they represented to me that it's responsive to request
12   number 16, and then now stand here today in this courtroom
13   and say it's not.  I mean, either it is or it isn't, because
14   there's nothing on the hard drives that refers to post-2006
15   marketing efforts.  There's just more garbage.
16            THE COURT:  The objection is overruled.
17   BY MR. PEEK:
18    Q   Are there any files, any data at all on those 21
19   hard drives that are responsive to request number 16?
20    A   Yes.
21    Q   Okay.  Is there any data on there that is responsive to
22   request number 16 post-March 2006?
23    A   No.
24    Q   Where is that data?
25    A   I wasn't -- I told you that when you asked me that
```

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 594 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 05/08/08   Page 594 of 800

209

 1  before.  I wasn't involved in marketing business plans.

 2  Q    Okay.  So you gave us data that eTreppid already had?

 3  A    Well, I was required to give that to you.

 4  Q    And is everything on the 21 hard drives related to white

 5  papers, correspondence, marketing documents, business plans to

 6  customers or potential customers?

 7  A    Post?

 8  Q    No, pre.

 9  A    I wouldn't say everything.  I would say there's a lot.

10  Q    Okay.  How much of that would you say there is?

11  A    I, I have no idea.

12  Q    I mean, one percent of it?

13  A    No.  But, I'm sure you have a number.  I don't know.

14  Q    Okay.

15           MR. PEEK:  I believe that's all, Your Honor.  If

16  I could have just a moment to consult with my client and my

17  colleague.

18           THE COURT:  You may.

19           MR. PEEK:  May I approach?

20           THE COURT:  You may approach.

21           MR. PEEK:  I want to actually talk to Ms. Wells

22  for a minute.

23           THE COURT:  Oh, all right.

24       (Mr. Peek and Ms. Wells confer.)

25  \\\

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 595 of 800
Case 3:06-cv-00056-PMP-MAU   Document 834   Filed 05/08/08   Page 55 of 200
-210-

1   BY MR. PEEK:

2    Q   Before you produced the 21 hard drives, did you make any

3   effort to duplicate it?

4    A   There were two of them, or three of them that were bad

5   and that actually had problems in duplication.  So, the answer

6   is yes.

7    Q   And what efforts did you make to duplicate files there?

8    A   Well, the drive was bad.  Since the bad drive was copied,

9   I didn't want to get rid of the bad drives while these

10   hearings were going and someone accuse me of --

11    Q   Well, there was 21 hard drives.  Did you make an effort

12   with all 21 hard drives to deduplicate?

13    A   I believe they were all duplicated.

14    Q   No.  That's not what I asked, sir.

15    A   Oh.

16    Q   There are files that are on the drives themselves that

17   are multiple copies of the same thing.

18    A   That are duplicates, you mean?

19    Q   Yes.  Did you make any effort to deduplicate that?

20    A   To deduplicate that?

21    Q   Yes.

22    A   No.

23    Q   Okay.  Thank you.

24              MR. PEEK:  That's all I have, Your Honor.

25              THE COURT:  As I recall, at the commencement of

Case 3:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 596 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 61 of 200
-211

1    the Order to Show Cause hearing, Ms. Klar did have some brief

2    direct.  It was quite brief.

3              Do you wish to ask any questions on redirect?

4              MS. GAROFALO:  Uh, not at this time, Your Honor.

5    But, we do reserve the right to recall Mr. Montgomery.

6              THE COURT:  Okay.  Thank you.

7              Mr. Montgomery, you may step down, sir.

8              MR. PEEK:  And, Your Honor, I don't remember

9    exactly which exhibits were previously marked.  But since they

10   were identified previously, I would like to offer, if I could,

11   or get a list from the court.

12             THE CLERK:  Defendant's exhibits 1, 6, 9, 31,

13   45, 46, and 47 have all been marked.

14             MR. PEEK:  I would offer all of those,

15   Your Honor.

16             THE COURT:  Any objection?

17             MS. GAROFALO:  We have an objection to 45,

18   Your Honor.  It's hearsay, and has not been authenticated.

19   We object on those grounds.

20             Pending 45 admitted, we would ask the Court's

21   indulgence to address the other exhibits immediately after

22   lunch, or after the next break.

23             MR. PEEK:  Forty-five, I think, Your Honor, was

24   the e-mail.

25             THE CLERK:  Yes.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 597 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 05/08/08   Page 52 of 200

212

```
 1                    THE COURT:  Which binder is it in?

 2                    MR. PEEK:  I don't know.  I didn't put it in a

 3       binder.

 4                    MS. GAROFALO:  It wasn't in the binder.  It was

 5       a lone e-mail.

 6                    MR. PEEK:  It's the e-mail from Chris Shockey or

 7       Dennis@ncoder.net identified.

 8                    MS. GAROFALO:  And I'm sorry, Your Honor, but

 9       we also object to the e-mail as hearsay.  It has not been

10       authenticated.  We did not see the e-mail prior to yesterday,

11       so we would object on all of those bases.

12                    MR. PEEK:  It's not being offered for the truth,

13       Your Honor.  It's just being offered as another document that

14       he had the ability to produce and did not produce.

15            Dennis@ncoder.net was identified as his e-mail

16       address.  He identified Chris Shockey.  He identified all the

17       other recipients of that.

18                    MS. GAROFALO:  Your Honor, I believe he stated

19       he didn't know some of the parties involved.  He has not --

20       no recollection of seeing this e-mail.

21            I think we've all experienced e-mails that have been

22       directed to us that we have not received and, certainly, have

23       not reviewed.  The e-mail has not been authenticated and

24       should not be admitted.

25                    THE COURT:  Well, I'm going to go ahead and
```

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 598 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 65 of 285
213

 1  admit Exhibit 45.  I think it goes to, as I've indicated,

 2  the issues in this Order to Show Cause hearing concerning

 3  compliance.  It's not for the truth of the matter asserted,

 4  but compliance with the request for production of documents,

 5  and the extent to which Mr. Montgomery may or may not have

 6  done so.  So, it will be admitted notwithstanding the

 7  objection.

 8          (Whereupon, Exhibit 45 -- a document, was received

 9  in evidence.)

10          THE COURT:  And I understand, Ms. Garofalo, you

11  wish to reserve to take a look at the balance of the items

12  Mr. -- the exhibits Mr. Peek has sought to admit until after

13  the noon hour, is that correct?

14          MS. GAROFALO:  We would appreciate that, Your

15  Honor.

16          THE COURT:  All right.  Very well.

17          MS. ROBB-PECK:  Your Honor, just as point of

18  clarification.  Yesterday, if I recall correctly, there was

19  an issue that, potentially, there were documents that were, or

20  exhibits that were renumbered in the binders that we have here

21  today.

22          MR. PEEK:  She is correct.  And I, I think 31

23  was the only one that was mis-numbered.

24          Which one is that one?

25          Okay.  It's now 38 instead of 31, Miss Clerk.

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 599 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 54 of 265

214

1          MS. ROBB-PECK:  Thank you, Mr. Peek.  I just

2     wanted to see if that --

3          MR. PEEK:  Thank you.

4          THE COURT:  All right.  Thank you for that

5     clarification.  Why don't we take, before you continue, let's

6     go ahead and take a ten-minute recess.  It is 10:30.  I expect

7     everyone to be seated and ready to proceed promptly at 10:40.

8          We are in recess.

9          (Recess taken.)

10          THE CLERK:  Court is again in session.

11          THE COURT:  Thank you.  Please be seated.

12          MR. SNYDER:  Thank you, Your Honor.  ETreppid

13     calls Jonathan Karchmer, who is already on the stand.

14
                         **JONATHAN KARCHMER**,
15          called as a witness on behalf of the Defendant,
                   was sworn and testified as follows:
16

17          THE CLERK:  Please be seated.  Please state your

18     full name, spelling you last name for the record.

19          THE WITNESS:  Jonathan Karchmer,

20     K-a-r-c-h-m, like in Mike, e-r.

21          THE CLERK:  Thank you so much.

22          MR. SNYDER:  Thank you.

23                    <u>**DIRECT EXAMINATION**</u>

24     MR. SNYDER:

25      Q   Mr. Karchmer, could you explain to the Court what trade

Case 1:23-mc-00052-CKM-MAU   Document 1-4   Filed 07/28/23   Page 600 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/28/08   Page 60 of 285
215

         1    or occupation you are in.

         2     A    I'm a computer forensic examiner.

         3     Q    And how long have you been a computer forensic examiner?

         4     A    Almost eight years.

         5     Q    Was that eight years?

         6     A    Yes.  Almost eight.

         7     Q    What special training did you have to become a forensic

         8    examiner?

         9     A    Uh, I've taken a number of training courses provided by

        10    forensic software-makers and, actually, companies who are --

        11    have no affiliation with software.  I've taken training from

        12    Guidance Software.  I've also taken training provided by the

        13    Sands Institute.

        14     Q    And what is your -- what is your university education?

        15     A    I have a Bachelor of Arts in Management Information

        16    Systems.

        17     Q    Okay.  And where did you receive that?

        18     A    From the University of Arizona.

        19     Q    When?

        20     A    In December of 2000.

        21     Q    All right.

        22          Now, you explained that you had taken courses from

        23    both software manufacturers and independent providers?

        24     A    Correct.

        25     Q    How extensive has that technical education been?

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 601 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/03/08   Page 601 of 800

-216

 1    A    Um, I've taken at least one course a year since 2002, I

 2   believe.

 3    Q    Okay.  And do you have any certifications in the field of

 4   forensic examination and electronic information?

 5    A    I do.  I have an Encase Certified Examiner designation,

 6   which is ENCE.  I also have a Certified Computer Examiner

 7   designation.  That is CCE.  I also have a GCIH, or a -- that

 8   stands for GIAC, Certified Incident Handler.  I also have a

 9   GCFA or, which is also a GIAC Certified Forensic Analyst

10   designation.

11    Q    That's an awful lot of letters.  Tell me what an Encase

12   Certified Examiner is?

13    A    An Encase Certified Examiner, in order to get that,

14   you have to have, I believe, a minimum of, I think, 12 to

15   18 months of computer examination experience.  You also have

16   to have a base line level of forensic training and aptitude.

17   And you also must take a multiple choice exam.  I think it

18   was 180 questions or so.  And you must also complete a

19   practical examination of electronic media.

20    Q    What is Encase?

21    A    Encase is forensic software.  It's generally considered

22   to be the gold standard software used.  It's used by private

23   agencies, government agencies.

24    Q    Okay.  And the other certificates you mentioned, are

25   those provided by software makers, or are they, somehow,

Case 1:23-mc-00073-CKK-MAU  Document 1-34  Filed 07/28/23  Page 602 of 800
Case 3:06-cv-00056-PMP-MU  Document 854  Filed 05/08/08  Page 602 of 285

217

1   independent certificates?

2    A   Right.  The others are independent.  They're not

3   affiliated with software makers.

4    Q   In late June, did you have an opportunity to -- sorry,

5   early June, did you have an opportunity to review certain

6   hard drives that my firm provided you which we told you had

7   been provided by Mr. Montgomery?

8    A   I did.

9    Q   And this was a one terabyte drive and 500 gigabyte drive?

10   A   That's right.

11   Q   Okay.  What software did you use to examine these drives?

12   A   Initially, I used Encase software to examine the data on

13   the drives.

14   Q   Okay.  So your Encase certification is what really is

15   relevant to your examination of these drives?

16   A   Uh, I, I guess you could say that.  Sure.

17   Q   In addition to all your other training and knowledge?

18   A   Sure.

19   Q   Okay.  Explain, in general, what you did to begin your

20   analysis of these drives.  What, what steps did you walk

21   through in looking at the 500 gigabyte drive and one terabyte

22   drive?

23   A   Once I received the hard drives, I connected them to what

24   we refer to as a hardware write blocker.  That prevents our

25   examiner machines from altering the hard drives in any way.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 603 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 68 of 285

-218-

 1           I then used Encase software to look at the file

 2    system, and look at the files on each drive.

 3    Q    Is there anything that struck you about the file

 4    structure of the drives that were provided?

 5    A    Yes.  The drives contained hundreds of thousands of files

 6    but very few, if any, directories or folders which, generally,

 7    would impede one's review of the documents on the drive.

 8           In addition, the file names were something I've

 9    never seen before.  They were extremely long, very cryptic.

10    Not what I would call a normal file name.

11    Q    I'll get back to that.

12           But, in general, in your line of work, are you

13    involved with the production of documents in the context of

14    litigation?

15    A    Yes.

16    Q    Okay.  How much of your time do you spend involved in

17    litigation support?

18    A    Uh, sometimes up to 50 percent.

19    Q    Okay.  Characterize how you would typically expect

20    electronic information to produce, to be produced in

21    litigation -- well, first, I guess, just explain how you

22    would typically expect electronic information to be produced

23    in litigation?

24    A    Well, typically, one would expect to see some

25    documentation and/or chain of custody indicating where the

Case 1:23-mc-00053-CKK-MAU   Document 34   Filed 07/28/23   Page 604 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 604 of 200
—219

 1   data came from in the first place.  How it's been handled.

 2   You would also expect to see the data organized in a manner

 3   that communicates to the person receiving it, the original

 4   disposition of the data.

 5   Q   And what do you mean by the original disposition of the

 6   data?

 7   A   Where it came from, which custodians, if any, it came

 8   from.  What data sources from that custodian could have been

 9   a computer CD, other media.  Is it e-mail?  Does it come from

10   a user's home share on a network somewhere?  That kind of

11   thing.

12   Q   Was any of that information included with the one

13   terabyte and 500 gigabyte hard drive that you saw?

14   A   No.

15   Q   How would you expect the files to be organized on the, on

16   the hard drives if they were produced in litigation, or even

17   if they were, they were simply kept in the ordinary course of

18   business?

19   A   You would expect to see a folder structure that would

20   mirror the original disposition and location of the files.

21   Q   And can you explain what you mean by folder structure?

22   A   Sure.  In general, on a Windows file system, one's hard

23   drive would contain a folder path.  Something like documents

24   and settings, followed by, you know, your user name, followed

25   by a my documents folder.  One would expect to see paths such

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 605 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 05/08/08   Page 705 of 285

-220-

1    as this, or something different if the data came from

2    another location such as a server.  And there was none of

3    this standard folder structure on the two hard drives.

4     Q   Okay.  Was there anything peculiar about the way the

5    files were actually named?

6     A   Yes.  As I mentioned, the file names were incredibly long

7    and cryptic and, apparently, non-sensical.  I've never seen

8    files named quite like they are on those two drives.

9     Q   So, all the files were in one single folder; do I have

10   that right?

11    A   I believe on one of the drives, all of the files were

12   in a single folder.  And I believe on the other drive that

13   contained over one million files, they were distributed across

14   three directories.

15    Q   Were the directories named in such a way as to make it

16   appear they had been categorized by any type of files or

17   anything like that?

18    A   I believe only on the larger drive.  The three folders

19   that were present indicated a year such as 2003, 2004,

20   et cetera.  No other folders were present.

21    Q   Okay.  Now why is the name of a file important, other

22   than the obvious reason of being able to say, oh, you know,

23   this file relates to eTreppid's business plans or something.

24          Is there anything else the name of the file actually

25   tells you?

Case 3:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 606 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 915 of 280
-221

 1   A    Well, generally, from a review standpoint, the name of

 2   the file can help you ascertain whether or not it's even a

 3   document that can be reviewed or should be reviewed.   I

 4   think, generally, it helps organize oneself with regard to

 5   reviewing data.

 6   Q    Does the name also typically contain a folder path?

 7   A    No.   The full path would contain a file name.   The file

 8   name itself is just the file's name.

 9   Q    Okay.   With these documents that were provided, was the

10   original folder path preserved?

11   A    To my knowledge, no.   I couldn't tell.   I didn't see any

12   preservation of original folder structure.   And I had nothing

13   to indicate that any metadata was preserved either.

14   Q    Okay.   What do you mean by metadata?

15   A    Metadata simply means data about data.   Generally

16   speaking, it refers to date stamps and other information

17   about electronic files.

18   Q    So when you say you didn't see the metadata had been

19   preserved, what sort of metadata would you have been looking

20   for on the files contained on these hard drives?

21   A    Well, normally, you would expect to see the original

22   metadata.   You would have expected that to have been

23   preserved.   And by that, I mean you would expect to see the

24   original dates such as the file's creation date.   Its last

25   written date.   And you would expect to see a wide variety of

Case 1:23-mc-00053-CKK-MAU   Document 434   Filed 07/28/23   Page 607 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 72 of 205
222

 1    dates, depending on the date that that was being produced.

 2     Q    Okay.  I'm going to have you look at an exhibit here.  I

 3    think this is 47.

 4                    MR. PEEK:  No.  We're now at 48.

 5                    MR. SNYDER:  48.

 6             (Whereupon, exhibit 48 -- a document, was marked for

 7    identification only.)

 8    BY MR. SNYDER:

 9     Q    Could I have you take a look at the first page of

10    Exhibit 48 here.

11     A    Okay.

12     Q    Do recognize this document?

13     A    Yes.

14     Q    In fact, you've prepared this, right?

15     A    Yes.

16     Q    What I wanted you to focus on was the folder create date.

17     A    Yes.

18     Q    Tell us what that indicates.

19     A    The folder create date you're referring to is the date

20    and time at which the folder indicates that it was created;

21    meaning, first put on the hard drive.

22     Q    Okay.  And there's a hard drive in the far left-hand

23    column.  There's a hard drive date and time stamp.

24             Do you see that?

25     A    Yes.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 608 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 73 of 200

223

1    Q    Tell me what that indicates?

2    A    With regard to this document, that is the format date

3    that these hard drives show.

4    Q    And where does that date come from?

5    A    Uh, in -- with regard to these two hard drives, that

6    information comes from file system metadata.

7    Q    Okay.  So you would look on the hard drives themselves to

8    find that date?

9    A    That's correct.

10   Q    It's electronically stored on the hard drive?

11   A    That's correct.

12   Q    And how does it get there?

13   A    It gets put there automatically when a hard drive is

14   formatted.

15   Q    So if I hookup a hard drive to my laptop and format it,

16   the date that is on the laptop will be placed on the hard

17   drive?

18   A    That's correct.

19   Q    If my laptop says today's date, and I format a hard

20   drive, the format date will be today's date?

21   A    That's correct.

22   Q    Okay.  Now on this one terabyte drive, this shows that it

23   was formatted on 11-18-2003?

24   A    At 4:58 a.m., yes.

25   Q    Okay.  Is there anything odd about that?

```
 1    A    Yes.  One terabyte drives did not exist in 2003.  So when

 2    I saw this, I immediately knew that whomever formatted the

 3    hard drive did so using an inaccurate date on their system.

 4    Q    So their computer had a date that had been changed?

 5    A    Yes.

 6    Q    Or wasn't the current date?

 7    A    That is correct.

 8    Q    Now, the folder create date.

 9         Do you see that?

10    A    Yes.

11    Q    Obviously, that's very shortly after the hard drive

12    format date?

13    A    Immediately after.  Yes.

14    Q    What does that indicate to you?

15    A    It indicates to me that an individual formatted a drive

16    at some date and time and, immediately thereafter, created

17    two folders.  One being the backup folder seen here on this

18    document, and then a subfolder inside named 2003.

19    Q    Okay.  And then as you read over -- there's a start and

20    finish time and number of files copies and time elapsed.

21         Do you see that?

22    A    Yes.

23    Q    Can you explain to the Court what that means?

24    A    Those dates and times refer to the file creation times

25    of all of the files copied into the various subfolders seen
```

1    here.  What the file create date and time really is is just

2    the first date and time on which a file is saved to a hard

3    drive.

4              So, these dates and times indicate that immediately

5    after the hard drive was formatted, a folder was created and

6    documents were copied to that folder.

7    Q    So -- and even though these dates say 11-18-2003, we know

8    that that is really not possible because the one terabyte

9    drive was not available then?

10   A    That's correct.

11   Q    So, again, the computer that was used to make these had

12   the date stamp changed on it?

13   A    Yes.

14   Q    Okay?

15   A    The computer used to format the drive was the same

16   computer used to perform the copy, and stamped -- all the

17   files were stamped on this drive with the same date and time.

18   Q    Okay.  And the number of files copied, just briefly,

19   that's any one terabyte and a 500 gigabyte drive, a total of

20   about 1.8 -- or 1.38 million or so?

21   A    That's correct.

22   Q    Okay.  Now, does the manner in which all the files were

23   named have any impact on how the information is usable?

24             In other words, does it make it -- does it make it

25   easier to search, more difficult to search?  What does it do?

Case 1:23-mc-00053-CKK-MAU Document 34 Filed 07/28/23 Page 611 of 800
Case 3:06-cv-00056-PMP-VPC Document 854 Filed 09/28/08 Page 75 of 260

-226

1    A    Oh, certainly.  A file name might contain a key word of

2    interest in any electronic discovery matter.  It might help a

3    key word search.  Yes.

4    Q    Okay.  Did you form any belief as to how the files

5    contained on these drives came to have such peculiar names?

6    A    All I can -- all I can say is that I know somebody went

7    above and beyond a normal copy operation to put the files on

8    these hard drives.  Meaning, if the original files were copied

9    from source hard drive to a destination hard drive, one would

10   expect the file names to remain in tact.  It appears, on these

11   drives, that somebody undertook an effort to manipulate and

12   change and lengthen file names.

13           Now, whether that was done during the copy or after

14   the copy, I'm not sure.  But somebody went above and beyond a

15   standard file copy operation to put the files on these hard

16   drives.

17   Q    And do you have the means to show the Court on the screen

18   some examples of these names?

19   A    Sure.  Bear with me just for one minute.

20           I can show you the contents of the 500 gigabyte hard

21   drive at this time.  I've been -- my software has been working

22   to open the other drives since the break.  It just needs a few

23   more minutes because it's a very large case.

24   Q    That's fine.  The 500 gigabyte is fine.  I just want to

25   show the Court an example of how they're named.

Case 1:23-mc-00053-CKK-MAU   Document 334   Filed 07/28/23   Page 612 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/28/08   Page 612 of 800

227

1          THE COURT:  There you go.  Your screen should be

2    up.

3          THE WITNESS:  So as you can see here, the 500

4    gigabyte drive really only contains a single directory that

5    was called "backup".

6          Now, I've highlighted the folder on the left side

7    of the screen.  And on the right side, you're seeing all the

8    contents of that folder, each file being on one line.

9    Q   Okay.  And tell me what is, what is odd about those

10   names?

11   A   Well, the names, generally speaking, are much longer.  As

12   I scroll through, you can see they are much longer than one

13   expects to see.

14   Q   Could you slow down just a little bit.

15   A   Sure.  It's highly duplicative.

16   Q   Okay.

17         Now, you mentioned that it was highly duplicative.

18   In the context of forensic examination, do you often run

19   across duplicate copies of files, especially dealing with

20   backup tapes like this?

21   A   Occasionally.  Yes.

22   Q   Okay.  Is there any process you use to eliminate

23   duplication?

24   A   Yes.  Generally speaking, with regard to E-discovery and

25   document review, there are a few methods of deduplication.

Case 1:23-mc-00053-RJK-MAU   Document 134   Filed 07/28/23   Page 613 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 73 of 266

-228

 1   They generally involve doing what's called hashing a file, or

 2   applying a mathematical algorithm to a file, an electronic

 3   file, that results in a alphanumeric value.  That value we

 4   call a hash value.  And two identical files that have the

 5   same data content will have exactly the same hash value.  And

 6   we will use that value as a key to deduplicate files.

 7   Q   Okay.  So what does the hash value actually look like?

 8   Is that actually just a string of numbers?

 9   A   Yes.  I can show you.  It's, in this case, the hash

10   algorithm we used was the ND-5 algorithm.  And the hash value

11   is a 32 character alphanumeric string.

12          This column here shows you hash values for each

13   file.

14   Q   Okay.  And those values are unique to each file?  They're

15   like a fingerprint for each file?

16   A   They're sometimes referred to as a digital fingerprint.

17   That's correct.

18   Q   Just so we're clear.  If two files have the same hash

19   value, they are identical in every respect?

20   A   It just means they're identical with regard to data

21   content.  You can actually have files with different names.

22   But as long as they contain 100 percent of the same data,

23   they will have the same hash value.

24   Q   But if you change even one semicolon, it will have a

25   different hash value.

Case 1:23-mc-00053-CKM-MAU   Document 1-4   Filed 07/28/23   Page 614 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 79 of 200
229

 1   A    That's correct.

 2   Q    Okay.  Now, how -- I imagine in Encase software, if I

 3   wanted to go out and by a license, it's not terribly cheap.

 4   Is there shareware or readily available software that would

 5   generate a hash value?

 6   A    Yes.  There are a number of tools that can generate hash

 7   values for files, a number of free tools, a number of open

 8   source tools.  That's correct.

 9   Q    Okay.  And how, approximately -- I'm not asking for an

10   exact number -- but what sort of time frame would we be

11   looking at for someone to use one of these open source tools

12   to figure out, to determine hash values for the 1.3 million

13   files on these two drives.

14           Are we talking hours or days or weeks?

15   A    I would say several hours.  Possibly more than, I would

16   say, possibly 24 to 48 hours.

17   Q    Okay.  But basically, then, you'll have a list that shows

18   you all the documents that are duplicates, right?

19   A    That's correct.  Yes.

20   Q    And would you expect someone who is, say, a computer

21   scientist like Mr. Montgomery, would be able to, to go through

22   this exercise?

23   A    I'm not sure if he has specific knowledge of hashes,

24   per se.  I -- I've heard him say he's involved in

25   steganography, so I assume that he would.  Or if he didn't, he

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 615 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 85 of 265

-230-

1    could consult with somebody in the forensic rediscovery sector

2    to assist him in that regard.

3    Q    Okay.  You're aware that Mr. Montgomery has retained a

4    forensic expert in this case.  In fact, he had a forensic

5    expert who drafted a declaration in, in an issue you were

6    involved in earlier, right?

7    A    Right.

8    Q    Do you remember who that person was?

9    A    That was Scott Cooper.

10   Q    Okay.  And would you expect Scott Cooper to be able to

11   provide this kind of information to Mr. Montgomery if he had

12   asked?

13   A    Yes.

14   Q    Okay.  So when you work through this exercise and

15   generated the hash numbers, how -- what did you find in terms

16   of how much duplication there was?

17   A    Uh, well, if I can refer to the document.

18   Q    Yeah.  Go ahead and go to the second page of Exhibit 48.

19   A    With regard to the first two hard drives, the hash

20   analysis found that 92 percent of the date it was duplicative.

21   Q    Okay.  Meaning, that of the 1.3 million files, 92 percent

22   of them were duplicates of the other eight percent?

23   A    That's correct.

24   Q    So, only eight percent of that information was unique?

25   A    That's correct.

Case 1:23-mc-00052-CKK-MAU   Document 1-34   Filed 07/28/23   Page 616 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/28/08   Page 616 of 800

-231-

```
 1            Let me clarify.  The eight percent may also include

 2     documents that had no duplicates at all.

 3     Q    Sure.  Sure.  Okay.

 4            So how many total unique files were there out of

 5     1.3 million?

 6     A    There were 152,961 files that were unique.

 7     Q    Okay.  Then once you would -- once you had determined

 8     the number of unique files, what was the next step in your

 9     analysis?

10     A    Uh, my next step was to generally try and ascertain how

11     many of those files were reviewable.  In other words, were

12     they text searchable, and would they lend themselves to being

13     key word searched and that kind of thing.

14     Q    Okay.  And if you skip ahead a couple of pages, there is

15     a list of different file types.

16     A    Yes.

17     Q    Are those the types of reviewable files you determined?

18     A    These are, very generally, some reviewable files that we

19     saw.  This list also includes QuickBooks and Quicken data

20     files.

21     Q    Okay.  It also has PDF and TIF files?

22     A    That's correct.

23     Q    And tell me what type of information is typically in PDF

24     or TIF files?

25     A    I would say that PDFs or TIFs are just two different
```

Case 1:23-mc-00053-CKK-MAU  Document 1-4  Filed 07/28/23  Page 617 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/08/08  Page 617 of 800

—232

1  format of documents.  With PDFs and TIFs, specifically, they

2  might be scan documents.

3  Q   Okay.  Tell me, PPT is a PowerPoint file, is that right?

4  A   Yes.

5  Q   And D-O-C is typically a word file, am I right about

6  that?

7  A   That's right.

8  Q   Tell me what an MSG file is?

9  A   Uh, well, an MSG, typically speaking, is an outlook

10  e-mail message.  A single e-mail.  But, it can also be just a

11  normal text file that is included with installed applications

12  on one's computer.

13  Q   Okay.  Explain to the Court the difference between an

14  MSG file and a PST file?

15  A   An MSG, as I said, is an individual e-mail message.  The

16  PST is a store or a container.  It's like the e-mail box.

17  There's a single database file, and it contains all of the

18  e-mail messages and attachments.

19  Q   For purposes of forensic examination, is one of those

20  types of files more valuable than the other?

21  A   Yes.  For a forensic examination to be thorough and

22  complete, one would need a PST file, along with the original

23  media where the PST file originated.

24  Q   And why would you need the PST file to be complete?  What

25  information does that contain that, say, an MSG file would

 1   not?

 2    A   Well, when one extracts an MSG file from a PST, it will

 3   contain some embedded information that relates to the date and

 4   time it was extracted.

 5          In addition, a PST file contains a number of

 6   property tags and database properties that help to

 7   authenticate the e-mails therein.

 8    Q   Okay.  Now, skipping back a couple of pages, to the third

 9   page in this group, you have unique reviewables by file size.

10   And you have three different categories here.

11          Now, do you have that page in front of you?

12    A   I do.

13    Q   Okay.  First of all, the total amount of reviewable or

14   the total amount of unique information on these two drives was

15   how much?

16    A   Of unique information?

17    Q   Yes, of unique information, in terms of memory used.

18    A   Approximately 80 gigabytes.

19    Q   Okay.  And if you look at the unique reviewable, you

20   have -- the biggest piece of the pie here is what you have as

21   all other non-reviewables?

22    A   Yes.

23    Q   Explain -- and that's 36.8 gigs.  What kind of

24   information is in all other non-reviewables; what sort

25   of files?

Case 1:23-mc-00053-CKK-MAU    Document 134    Filed 07/28/23    Page 619 of 800
Case 3:06-cv-00056-PMP-MAU    Document 854    Filed 05/08/08    Page 84 of 265

-234-

1    A    Uh, non-reviewables are identified as files that do not

2    typically have extractable text.  Meaning, they might be

3    system files or executable files.  And as opposed to being

4    something like one's work product, documents, and e-mail items

5    like that that can be text searched.

6    Q    Okay.  So a white paper or a PowerPoint presentation or a

7    business plan, or something like that would not be included in

8    what you've categorized as all other non-reviewables?

9    A    That's correct.

10    Q    Okay.  Then there's 22 percent or 22 gigs that you have

11    as non-reviewable images.  What do you mean by that?

12    A    Those were still image file types, pictures on the hard

13    drives that don't contain extractable text.

14    Q    Okay.  Did you have occasion to look at any of these

15    pictures?

16    A    Uh, briefly.  Yes.

17    Q    Okay.  What sort of -- what sort of pictures did you

18    find?

19    A    Uh, they appear to be personal photographs of parties,

20    family events, pictures of somebody's dog, pictures associated

21    with the installation of certain applications.

22    Q    Could you call up on your screen, say, the first few

23    pictures that appear on your list of unique files?

24    A    I may have -- actually, bear with me one second.

25    Q    I understand there's about 44,000 unique image files.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 620 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 89 of 205

235

1    And, obviously, we don't want to go through all of those.

2    But, just to get some flavor, what kind of information is

3    there?

4    A    This may take just a minute.

5    Q    Can we continue to talk while you're doing that?

6    A    Certainly.

7    Q    Okay.  In the category of reviewable files, which --

8    okay.  So here's some of the types of photographs we have.

9    And these look like -- are these unique?

10   A    No, these are not.  These are just a list of the images

11   on the hard drive.

12   Q    Okay.  So, this is an example of both the type of the

13   picture and the extent of duplication that we had.

14   A    That's -- that's correct.

15   Q    Okay.  In the context of reviewable information, which

16   you state here is about 20 gigabytes of information on these

17   two hard drives --

18   A    I'm sorry?

19   Q    I'm looking -- I'm going back to your pie chart here.

20   A    Right.

21   Q    Where you show there's about 20.2 gigabytes that is

22   reviewable.

23   A    Right.

24   Q    And the first page shows by file size.  The second page

25   shows by file number.  And that's 23,300 files that are

1   reviewable?

2    A    That's right.

3    Q    Okay.  So if one were running a text search to find key

4   words of the information on this hard drive, if they were

5   looking at just the unique information on these two hard

6   drives, they would be looking at 28,373 files?

7    A    Generally, that's correct.  That total might expand a

8   little bit if there were container files that, incidentally,

9   contained other files.

10    Q    Okay.

11    A    But, yes.

12    Q    Okay.  So in -- when Mr. Montgomery -- you heard him

13   testify that he had to run searches on 1.3 million files.

14   It was really the searches were run on 28,000 unique

15   reviewable files.

16          Is that correct?

17    A    Well, I -- I'm not sure what Mr. Montgomery searched.

18    Q    Right.  Had he deduplicated and just looked at that, he

19   would have been looking at 28,000 files or so.

20    A    Well, the search I'm aware that Mr. Montgomery described,

21   was a Windows search performed against entire hard drives.

22    Q    Right.

23    A    And the effectiveness of a Windows search, and whether it

24   can perform a key word search, as well as a discovery tools or

25   forensic tools, I don't think they can compare.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 622 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 87 of 285

—237

1    Q   I certainly understand that.  The point I'm trying to get

2    at is had he gone through the deduplication process, the

3    number of files he would have been searching would have been

4    quite substantially smaller?

5    A   Well, that's absolutely right.

6    Q   Okay.  Now, on the next page, you have the list of file

7    types that you've included in the reviewable files.  We talked

8    about that, to some degree.  Tell me what an HTML file is.

9    A   HTM or HTML files are generally -- they're hypertexted

10   files that some are -- some could be -- they're generally

11   temporary internet files.  What that means is they are the

12   result of internet browsing, where these could be actual web

13   pages that have been cached or saved to the hard drive while

14   somebody was using an internet browser.

15   Q   Okay that's true for both the HTM or HTML files?

16   A   Yes, the two file types are basically interchangeable.

17   Q   And the total number of HTM and HTML files on these two

18   hard drives is in excess of 15,000 of the 28,000 reviewable

19   files?

20   A   Of unique files, yes.

21   Q   Okay.  And those are typically cached web pages, right?

22   A   Generally, yes.

23   Q   What is a TXT file?

24   A   A TXT file is a, just a text file.  It -- typically, you

25   will see them on the hard drive as being part of the hardware

Case 3:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 623 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 88 of 265

238

```
 1   installation.  They would include things like a "read me" file
 2   or directions, a list of directions for the user.
 3   Q    Okay.  Now, you also have QuickBooks files on here.
 4        Did you see that?
 5   A    Yes.
 6   Q    Did you run a search for QuickBooks files on these
 7   computers containing the terms "Drink Water Trust"?
 8   A    Yes.
 9   Q    And did you find a number of QuickBooks spreadsheets
10   relating to the Drink Water Trust?
11   A    I believe so.  Yes.
12   Q    Okay.  And how many total files were there that related
13   to the Drink Water Trust?
14   A    On the one terabyte drive, there were about 89 files that
15   can be Quicken or QuickBooks, that had the word Drink Water in
16   the file name.
17   Q    Okay.  And what about files related to an entity called
18   "Books Direct to You".  Did you look for those as well?
19   A    Yes.
20   Q    And what did you find there?
21   A    For Books Direct, there were about 174 files.
22   Q    That's just in Quicken or QuickBooks?
23   A    That's correct.
24   Q    Did you run a search through everything of how many
25   files, total, contained the word "Parasol"?
```

Case 3:23-mc-00053-6K16-MAU   Document 134   Filed 07/28/23   Page 624 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/28/08   Page 89 of 285

-239

```
 1    A    I did.

 2    Q    Okay.  And how many were those?

 3    A    On the one terabyte drive, there were 31,861.

 4    Q    And just so we're clear, that's before you deduplicated?

 5    A    That's right.

 6    Q    Out of the 1.3 million, there is 30,000 that were related

 7    to Parasol, that had the word Parasol in the name?

 8    A    That's correct.  And that's just on the one terabyte

 9    drive.  The 500 gigabyte drive may have others.

10    Q    Okay.  So of the 28,000 or so reviewable files, there's

11    approximately, if I'm reading this right, a total of about

12    16,000 that are either TXT, HTM, or HTML files.

13              Am I getting that right?

14    A    That's right.

15    Q    Are those type of files likely to have any user generated

16    information?

17    A    Uh, generally speaking, no.  But, they may.

18    Q    Okay.  Typically, they'll be something that just winds up

19    in your computer from surfing the web?

20    A    Generally, yes.

21    Q    Okay.  Now when -- of those 28,000 unique reviewable

22    files, 16,000 are in that category.  And of the 12,000

23    remaining, there's at least some number we looked at just

24    running two search terms that are related to entities other

25    than eTreppid, is that right?
```

Case 3:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 625 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 90 of 205

-240-

1    A    That's correct.

2    Q    Okay.  Now did you -- we talked about the image files.

3    You said in your declaration there were 44,000 unique image

4    files -- I'm sorry did I say in your declaration?

5    A    I think you did.

6    Q    I meant on this exhibit, if you look at the fourth page.

7    A    Right.

8    Q    It shows 44,000, or 29 percent of the hard drives were

9    image files of one form or another.

10   A    That includes only the four image types listed here, yes.

11   Q    Okay.  What are those four image types?

12   A    Uh, well, going down the list, the first JPG, refer to

13   that as a J. Peg, that's an image format commonly seen for

14   images on web pages.  It's also a common format used by

15   digital cameras.  GIF or GIF, the following file type is just

16   a different format.  Those are commonly seen with graphics

17   from the internet pages as well.  The same goes for DMP or

18   Dmat.  PST is related to the use of photo shop, an image appli

19   -- an imaging application use on computers.

20   Q    Okay.  And in these -- in these images of the 44,000

21   images, do you have an estimate as to how many you looked at?

22   A    Um, I would estimate several hundred.

23   Q    And in those, did you see any white papers or PowerPoint

24   presentations or business plans related to Trepp eTreppid?

25   A    No.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 626 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/28/08   Page 91 of 205

-241-

1   Q   Okay.  Now, just in the last few days, did you have an

2   opportunity to look at any additional hard drives?

3   A   Yes.

4   Q   Tell me, tell me how many hard drives you looked at?

5   A   I looked at a total of eight hard drives.

6   Q   Okay.  Did someone from your office try to look at

7   additional hard drives?

8   A   Yes.

9   Q   Okay.  What -- who was that?

10  A   Uh, I believe that person was Bashal Oza (phonetic) from

11  our Los Angeles office.

12  Q   So Montgomery delivered 21 hard drives to us and Bashal

13  looked at a number of them.

14  A   That's right.

15  Q   Did he report to you as to what he found?

16  A   Yes.  He said that the hard drives were simply stacked

17  together, with no packing material, in a large box.  And

18  likely due to the fact, or due to how they were shipped, a

19  large number of the drives that were shipped were basically

20  dead on arrival.  They would not -- they would not spin out.

21  They would not work.

22  Q   Okay.  Do you, you work at LECG.  I'm not sure I actually

23  asked you that, but the entity you work for is actually?

24  A   That's right.

25  Q   At LECG do you have a procedure you follow when you ship

Case 1:23-mc-00053-CKK-MAU   Document 1-34   Filed 07/28/23   Page 627 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 627 of 800

242

1    hard drives?

2     A    Yes.  Hard drives are very, very susceptible to shock.

3    So anytime we have to ship hard drives, we make sure that they

4    are packed extremely well.  We have our staff, literally,

5    shake the boxes they're in prior to sealing the boxes to make

6    sure that there's no movement in the box.

7              We have a saying in the lab:  We prefer drives to

8    be packed like fabriche eggs, because of how sensitive they

9    are.

10    Q    How, specifically, do you pack them?

11    A    We use a anti-static bubble bag that fits over the hard

12    drive itself.

13    Q    Is that one of these (indicating)?

14    A    That's correct.

15    Q    Okay.

16    A    In addition to that, to that small bag, we will add

17    enough packing material, foam, bubble wrap, et cetera, to

18    where the hard drives being shipped do not move in the box

19    they're in.

20    Q    Okay.  If you were shipping hard drives in a box like

21    this, and you packed them following your appropriate

22    procedures, how many would you expect you could pack in

23    that box?

24    A    I would estimate maybe, maybe three at the most.

25    Q    Okay.  I'll represent to you that we received 21 hard

Case 1:23-mc-00053-CKK-MAU   Document 434-1   Filed 07/28/23   Page 628 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 05/08/08   Page 93 of 205
-243

1   drives contained in this box.  Does that strike you as an

2   appropriate way to pack hard drives for shipment?

3    A   Absolutely not.

4    Q   In fact, if you got a box with 21 hard drives like this,

5   what would you expect to find when you opened them up?

6    A   I would be surprised if any of the hard drives worked.

7    Q   Okay.  Now the eight hard drives that you said did work,

8   what -- have those -- are those working well?  Are they in

9   good shape?

10   A   I would say no.  In my experience, these are drives that

11   are, I would say, they're on the way out or will die soon.

12   And to clarify, I mean, these are drives that are making a lot

13   of noise.  They're clicking.  They're grinding now if you try

14   to power them up, which just means the performance is going to

15   degrade and they will eventually not work.

16   Q   Okay.  Now, you've heard Mr. Montgomery testify that

17   these hard drives, or the information on the one terabyte and

18   the 500 gigabyte hard drive that you looked at first, as well

19   as these additional hard drives was derived from backups he

20   made of eTreppid's computers, do you recall that?

21   A   Yes.

22   Q   Explain to me, in general, what's the purpose of backing

23   up information on a company's computer system?

24   A   Generally speaking, the purpose of backing up data is for

25   disaster recovery.  Backups are done so that, you know, if

1    something were to occur and computers were to, you know, be

2    destroyed or suddenly stopped working, the company could go

3    to its backups and, quickly, you would be on-line once again.

4     Q    Okay.  With that in your mind, what kind of information

5    do you try to backup when you're performing these backups?

6     A    Well, generally, the backup procedures vary, of course.

7    But, they tend to include vital information such as an

8    employee's e-mail, as well as their work product, documents,

9    et cetera.

10    Q    Okay.  Would you expect PST files to be included in a

11   backup?

12    A    Um, yes.  If the organization used Outlook and stored

13   mail on PSTs, definitely.

14    Q    Okay.  And do you have any knowledge as to whether or not

15   eTreppid used outlook?

16    A    Yes, I do.

17    Q    And did you find any PST files in the one terabyte or

18   500 gigabyte drives?

19    A    There were none.

20    Q    Did you find any PST files in any of the other eight

21   drives that you looked at?

22    A    No.  There were none.

23    Q    So, in these backups, no, no backup e-mail?

24    A    That's correct.

25    Q    Okay.  Now with the, with the new drives that we got, the

Case 1:23-mc-00053-SKK-MAU   Document 134   Filed 07/28/23   Page 630 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 99 of 205
-245-

 1    additional eight drives you looked at, obviously, we got those

 2    recently, and you haven't had a chance to perform quite the

 3    degree of analysis.  But, were you able to determine how much

 4    duplicate information was on those drives?

 5     A    Yes.

 6     Q    Okay.  Go ahead and turn to the next page in this

 7    exhibit.

 8                    THE COURT:  Can you tell me which page, sir?  Is

 9    it --

10                    MR. SNYDER:  Yes.  I'll do my best.

11                    THE COURT:  Is it one of one?

12                    MR. SNYDER:  Yes.  It's labeled one of one.

13    It's actually the seventh page of the exhibit.  And just so

14    I can explain, the reason its labeled one of one is because

15    this was obviously generated after the previous one.

16                    THE COURT:  Right.  Does the top say file

17    account, hyphen, forensic software.

18                    MR. SNYDER:  That's it, Your Honor.

19                    THE COURT:  Thank you.

20                    MR. SNYDER:  Thank you.

21    BY MR. SNYDER:

22     Q    First of all, explain to me, with these eight additional

23    drives, when you, when you deduplicated it, what did you do

24    with that information?  In other words, is this -- did you

25    look at it independently, or did you put it in with the

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 631 of 800
Case 3:06-cv-00056-PMP-MAU   Document 834   Filed 09/28/08   Page 96 of 200

246

1  information on the previous drives?

2   A   We combined it with the information from the previous

3  two.

4   Q   Okay.  So this sheet reflects the universe of hard drives

5  that are the universe of information on the two hard drives we

6  looked at previously, and on these eight hard drives?

7   A   That's right.

8   Q   Okay.  And how many total files were there on these total

9  of ten hard drives?

10   A   There were over 2.8 million files on all eight drives

11  that we looked at so far.

12   Q   And, of those, how many were unique?

13   A   A little over 302,000.

14   Q   Okay.  So right around ten percent of the files on these

15  additional drives, or on the drives total were unique?

16   A   That's correct.

17   Q   Okay.  Now going to the next page -- I'm sorry.  I'm

18  skipping ahead two pages to the file types.

19        When, for instance, in the list of file types, where

20  it says on HTM files, there's 14,964 files on all ten drives

21  together.

22   A   Unique HTM files, yes.

23   Q   Thank you.  Unique HTM files.

24        On the two hard drives previously, there were

25  approximately 12,000 HTM files.

Case 1:23-mc-00053-CKK-MAU   Document 134   Filed 07/28/23   Page 632 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/08/08   Page 632 of 800

—247

1   A   Right.

2   Q   So I take it from that, on the eight additional hard

3   drives, there's about forty-nine hundred total unique

4   additional HTM files -- I'm sorry twenty-nine hundred

5   additional unique HTM files.

6   A   I would say 2000.

7   Q   Okay.  And looking at PowerPoints, comparing those -- and

8   for the Court's reference, what I'm comparing here is the

9   fifth page, the list on the fifth page that says file type

10  account with the list on the last page.

11              THE COURT:   Thank you.

12  BY MR. SNYDER:

13  Q   In terms of PowerPoint documents in the two drives

14  initially produced, there's a total of 50 unique PowerPoint

15  documents.  And on the eight additional drives, there's only

16  32 additional unique PowerPoint documents.

17  A   That's right.

18  Q   And in terms of word documents on the initial drives, the

19  initial two, there were four thousand word documents.  And on

20  the eight additional hard drives, there's only about 500

21  additional word documents.

22  A   That's right.

23  Q   Okay.  So even though these eight drives contain another

24  1.5 million files total, the actual amount of unique

25  reviewable files is, is pretty marginal, is that fair to

Case 1:23-mc-00053-SKK-MAU   Document 134   Filed 07/28/23   Page 633 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 98 of 265
248

1    say?

2     A   I would say so.  Yes.

3     Q   Okay.  Now were you able to, from looking at these

4    drives, were you able to tell, and I'm talking about the eight

5    additional drives, were you able to tell when the information

6    on those drives was put there?

7     A   Well, I can tell you that the hard drives, most of the

8    eight that we could see, appear to have been formatted in

9    December of 2002.  I can also tell you that they contained

10   data that was not created until 2003, 2004.

11          In addition to having been formatted with this

12   supposed 2002 date, again, the file creation date and times,

13   also, for most of the eight, I believe five of the eight

14   drives were also December of 2002, for all of the files.  Yet,

15   on more than one drive I identified, even though that a file

16   had a creation date of December of 2002, the file itself was

17   not created until later.

18    Q   Okay.

19    A   Which, of course, is not possible.

20    Q   So that provides more indication that someone was

21   creating files or formatting drives with a computer that

22   had a date that was set to a date that's inaccurate?

23    A   That's right.

24    Q   Okay.  Now, were you able to tell when the actual copies

25   that we received were burned?

Case 1:23-mc-00073-CKK-MAU   Document 34   Filed 07/28/23   Page 634 of 800
Case 3:06-cv-00056-PMP-VPC   Document 854   Filed 09/08/08   Page 99 of 265

-249

1    A    I can tell you when the forensic images were created.

2    Q    Okay.

3    A    Yes.

4    Q    Okay.  And when were those created?

5    A    They were all created in June or July of this year.

6    Q    Is there some reason you have confidence in that date?

7    A    Um, well, I have more confidence in that date because the

8    images were created by an individual named Jared Schultz at a

9    company called Fulcrom in Los Angeles.  I've spoken with

10   Mr. Schultz briefly about other topics, but the software he

11   used to image the drives was Encase software.  And the dates

12   of June and July of this year, I thought, made more sense and

13   were probably accurate.

14   Q    Okay.  So there were -- do you recall how many were in

15   June and how many were in July?

16   A    Of the eight, I believe -- I'm going from memory, but I

17   believe six of the eight were imaged in June.  And I believe

18   two were imaged in July.

19        And I should point out, also, now that I'm thinking

20   about it, the two drives with a July image date were 100

21   percent identical to one another.

22   Q    Okay.

23        Now we were sent these drives on August 14, 2008,

24   but what you're telling me is they were all imaged much

25   earlier, in June and July of 2008?

Case 3:22-mc-00073-GMK-WAU  Document 34  Filed 07/28/08  Page 635 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 07/28/08  Page 105 of 265
-250-

1   A    Yes.

2   Q    Okay.  And they were imaged by Mr. Schultz?

3   A    I believe so.  Yes.

4   Q    So when he imaged them, he had access to that

5   information, could have looked at it, could have done,

6   done whatever he needed to do with it?

7   A    Yes.

8   Q    Okay.  And now the other item I wanted to talk about

9   is a CD that I believe you examined that purported to contain

10  a Glogauer e-mail, an e-mail written by Len Glogauer in

11  September of 2003.

12           Do you recall that?

13  A    Yes.

14  Q    And did you, just to sum up, did you previously have

15  occasion to examine issues related to this e-mail?

16  A    Uh, I did.

17  Q    And, in fact, you submitted a declaration to the Court

18  about that, right?

19  A    That's right.

20  Q    Can you -- I don't want to -- this to be about your

21  previous examination in any kind of depth, but I do want you

22  to just summarize what you did in that previous examination

23  to explain to the Court why it was important that we have the

24  original native format PST file from Mr. Glogauer?

25  A    Uh, initially, I examined that e-mail message, an

-251-

 1   instance of that e-mail message as it existed within

 2   Mr. Trepp's mailbox -- I should say the mailbox on his

 3   computer.  And instances of his mailbox that had been

 4   backed up previously.

 5            My analysis included examining the PST file

 6   containing the message, and then identifying data base

 7   and property tags associated with that message in order to

 8   authenticate it, if I could.

 9            What I found was that dates inside these property

10   tags indicated to me that the message instances I examined

11   were authentic.

12   Q    Okay.  So the -- and the instances you examined did

13   not contain the phrase, "We'll take care of him like we

14   discussed," or words to that effect?

15   A    Right.

16   Q    Now the -- so, given that, why was it important to

17   receive from Montgomery, then, the original native format

18   PST file with that e-mail?

19   A    Well, as I mentioned, in order to authenticate e-mail to

20   a reasonable degree of certainty, one needs, of course, the

21   original PST and, hopefully, the original media on which that

22   PST resided, so that dates between the two can be analyzed and

23   compared.

24   Q    When you say the original PST, you referred to the PST

25   earlier as kind of a container.

1    A    Right.

2    Q    What, what would be in that container in the original

3    PST?

4    A    Uh, an original PST would contain all of the folders one

5    would normally see when they used their e-mail program, as

6    well as all of the e-mail messages and attachments and other

7    things that might be stored there.

8    Q    Okay.  So the original PST would have, would have all

9    your e-mail?

10   A    Correct.  All the e-mail, you know, at that point in

11   time.

12   Q    Right.

13   A    Right.

14   Q    And why, why is it important to have all those additional

15   e-mails if you're just looking at one?

16   A    Well, for the purposes of authentication, one would

17   need to compare the universe of data, PST, all the PST in

18   order to conclude to any reasonable degree of certainty that

19   whether -- I should say an e-mail message was authenticated.

20   Q    Okay.

21            MR. SNYDER:  I'm going to have the clerk mark

22   Exhibit 49.

23            (Whereupon, exhibit 49 -- a document, was marked for

24   identification only.)

25            MR. SNYDER:  Before I forget, I move to admit

Case 3:22-mc-00073-PKK-WPC   Document 34   Filed 07/28/23   Page 638 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/03/08   Page 103 of 205

-253-

1    Exhibit 48.

2                    THE COURT:  Ms. Garofalo, any -- Mr. Snyder has

3    moved to admit Exhibit 48.  Any objection?

4                    MS. GAROFALO:  No, Your Honor.

5                    THE COURT:  Exhibit 48 is admitted.

6            (Whereupon, exhibit 48 -- a document, was received

7    in evidence.)

8    BY MR. SNYDER:

9     Q    Mr. Karchmer, could I have you look at the exhibit that

10   we've marked as 49.

11    A    Yes.

12    Q    Can you explain to the Court what this portrays?

13    A    The first page of Exhibit 49 are a series of screen

14   captures that I created based on the CD you received that,

15   purportedly, contained the Glogauer e-mail message.

16    Q    Okay.

17    A    What these screen captures show, are the four files that

18   were on the CD.  Those four files were PST files.

19    Q    Okay.  So when you say there were four, on the CD

20   containing the Glogauer e-mail, there were four separate PST

21   files?

22    A    That's correct.

23    Q    Okay.  And what was in those PST files?

24    A    The PST files contained a single e-mail message.

25    Q    Okay.  And that single e-mail message was a Glogauer

Case 3:22-mc-00073-PMP-VPC   Document 34   Filed 07/28/08   Page 639 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 104 of 265

254

1    e-mail?

2     A    Right.

3     Q    So they didn't have the universe of e-mail messages you

4    would need to really authenticate?

5     A    That's correct.  Based on that, and based on the

6    A-typical structure of PSTs, I could immediately tell that

7    the PSTs provided to eTreppid were not the original PSTs.

8     Q    What do you mean by the A-typical structure of the PSTs?

9     A    These PST files that were provided contained, I believe,

10   only two of the standard directories one would normally see

11   in an Outlook PST file.

12            In other words, there are standard folders that,

13   in fact, have to be present for the PST file to work in

14   conjunction with a company's e-mail server.  In this case,

15   eTreppid's Microsoft exchange server.

16            The folders that would have to be in the mail box

17   would include things like the inbox, sent items folder,

18   deleted items folder, a drafts folder.  However, on the CD

19   that was provided, only two directories in each PST were even

20   present.  And I believe they were the, I believe, the deleted

21   items folder and the sent items folder.

22            So, again, based on that, I knew that these were not

23   the original PSTs and, in fact, these were something that had

24   been created or engineered at some point in time.

25    Q    Okay.  If you were just going to create a PST, say,

Case 3:22-mc-00078-PMP-WAU   Document 34   Filed 07/28/08   Page 640 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 109 of 205

-255-

1    open up and create a new PST file on a computer, and put one

2    message in it, how difficult would it be to have that message

3    be labeled with any date you wanted it to be labeled, or say

4    whatever you wanted it to say?

5    A    Well, it's -- as I've mentioned in my earlier

6    declaration, anybody can edit an e-mail message.  All one

7    would have to do is change the date on their computer if

8    they wanted the e-mail message to exhibit a certain date.

9    Afterwards, they could edit and save the e-mail message.

10   Q    And we've seen on these other hard drives you examined

11   that, in this case, dates on the computers have certainly been

12   changed?

13   A    That's right.

14   Q    Okay.  And so if you had the entire original PST file,

15   why would it make it more likely, or more, more readily

16   authenticated if you had that?

17   A    Well, if you have the original PST, as I said, you could

18   examine the entire PST in its entirety.  All of the property

19   tags associated with messages in the PST.  Ideally, you would

20   also need the original media or the hard drive where that PST

21   came into existence as well, so you can compare dates and

22   times and, generally, activity to authenticate the PST and any

23   e-mail messages inside.

24   Q    Okay.  Now, in going back to Exhibit 49, what does the

25   second page portray?

Case 3:22-mc-00073-SMK-WAU   Document 34   Filed 07/28/23   Page 641 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 07/03/08   Page 641 of 800

-256

1    A    The second page was created by, I assume, whoever

2   provided you with a CD.

3    Q    Okay.  So just, if I can stop you, the first page was,

4   that was a screen capture that you took from the CD.  In other

5   words, you opened up these files and did a screen capture and

6   included that on this page?

7    A    That's right.

8    Q    Okay.  And the second page was a screen capture already

9   on the CD, is that right?

10   A    That's right.

11   Q    Okay.  And what does a screen capture appear to you to

12   show?

13   A    Well, it appears to show screen captures for PST files.

14  And because there are, or were four of them, I assume these

15  were supposed to, in some way, reflect the four PSTs that were

16  provided on the CD.  Of course the difference between them,

17  if you flip between the pages, are the file sizes are

18  remarkably different.

19          On the first page, the PST sizes are all 265-K,

20  which is the standard size for an MD-PST file or, like, very

21  little information.

22   Q    Like one e-mail?

23   A    That's correct.

24   Q    Okay.

25   A    The second page shows a string captures of PSTs that are

1    much, much larger; being 165 megabytes.  I don't know why

2    these were included on the CD.  I, again, I assumed that

3    these were supposed to reflect, in some way, the PSTs they

4    delivered.  But, they do not match.

5     Q    Would you expect the original PST file -- obviously, you

6    don't know how much is in it -- but the original native format

7    PST file to be more on the scale of 165 megabytes, than on the

8    scale of a couple hundred kilobytes?

9     A    Yes.

10    Q    Okay.  So 165 megabytes is in the realm of what an

11    original PST file would be?

12    A    Certainly.

13    Q    Okay.  But the files that were actually on the disk were

14    not the 165 megabytes PST files.  It was the 265 kilobyte PST

15    file?

16    A    Correct.  The files on the CD were the 265 kilobyte PSTs

17    that contained only one e-mail message, and it did not contain

18    all of the standard PST folders one would expect to see.

19    Q    Okay.  At any rate though, on this second page, where

20    it shows 165 megabyte, presumably, the person who created this

21    screen shot is trying to indicate that they had a PST file

22    that was created Tuesday, April 5th, 2005, that contained

23    165 megabytes worth of information they had at the time they

24    made the screen shot?

25    A    I would believe so.  Yes.

-258-

```
1   Q   Okay.  Do the differing dates on this screen shot

2   indicate anything to you?  In other words, the top two are

3   created April 5, 2005, and the bottom two were created in

4   November of 2003.

5   A   Well, it's hard to say, being as how these screen shots

6   refer to files that were not delivered.

7   Q   Okay.  Okay.

8               MR. SNYDER:  Your Honor, if I may have just one

9   moment.

10              THE COURT:  You may.

11  BY MR. SNYDER:

12  Q   Now, a couple of other questions on this Exhibit 49 --

13  I'd move to admit Exhibit 49.

14              THE COURT:  Any objection?

15              MS. GAROFALO:  To the extent that this was not

16  included in the materials provided to us before today.

17              MR. SNYDER:  Your Honor, they produced this.

18              MS. GAROFALO:  We will withdraw the objection,

19  Your Honor, but this was not part of the -- a part of the

20  documentation provided in connection with Mr. Karchmer's

21  testimony.

22              THE COURT:  All right.  Thank you.

23          The objection is over -- it's withdrawn, so 49 is

24  admitted.

25              (Whereupon, exhibit 49 -- a document, was received
```

Case 3:23-mc-00073-PMP-WGC   Document 34   Filed 07/28/08   Page 644 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 105 of 205

259

1    in evidence.)

2    BY MR. SNYDER:

3    Q    Okay.  On this first page, do you see on the bottom the

4    dates, on the bottom two screen shots, there's the dates

5    accessed.  Do any of these dates, the created, modified, and

6    access dates indicate anything to you?

7    A    The access date on these particular screen shots could

8    actually be referring to when the PSTs were accessed by

9    our systems when we attempted to open them.  However, that

10   information, I should point out, would not be permanent with

11   regard to these PST files.

12            In other words, this could just be temporary

13   information, at least with regard to those dates of June 23,

14   2008.

15   Q    Okay.  Did you ultimately open up the e-mails contained

16   in this PST file?

17   A    Yes.

18   Q    Was there anything about that that was unusual?

19   A    Yes.  The e-mail on the CD that was present in each of

20   these four PST files was the Glogauer e-mail I had mentioned

21   earlier that I examined.  However, in this instance, it

22   appeared to have been taken from the sender, Mr. Glogauer.

23   And in addition, the e-mail did not contain the sentence, "We

24   need to take care of him."

25   Q    You mean on the one you first examined?

Case 3:22-mc-00076-CWK-VPC   Document 3-4   Filed 07/28/23   Page 645 of 800
Case 3:08-cv-00056-LWK-VPC   Document 334   Filed 07/28/08   Page 145 of 265

260

1    A    That's correct.  I misspoke.

2             The instances on this CD did contain the sentence,

3    "We need to take care of him."

4    Q    Were you able to tell whose, whose PST file, or whose

5    computer this was taken off of?

6    A    It appeared to have been taken from Mr. Glogauer's

7    computer.

8    Q    Okay.  Now based on your initial review, your initial

9    declaration in this -- in these matters relating to, to

10   authenticity of that e-mail, does -- and based upon your

11   examination of the PST file they provided, are you able to --

12   or what I'm asking is does the additional PST they provided

13   change any of the conclusions you arrived at in your initial

14   declaration?

15   A    No.  Absolutely not.  The PST that was provided, this PST

16   we're discussing was, as I've mentioned, something engineered

17   or created in order to only contain the single e-mail message,

18   as well as the folders that were present in the PST.

19             So, I have -- I have no, no way to authenticate that

20   e-mail message.

21   Q    Okay.  So, basically, this doesn't dispose of the issue

22   one way or another.

23   A    No.

24   Q    Okay.  But it doesn't give you any more confidence in the

25   e-mail he previously provided?

Case 3:23-mc-00073-CMK-VPC   Document 34   Filed 07/28/08   Page 646 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/03/08   Page 219 of 265
261

1    A    No.

2    Q    Okay.

3              MR. SNYDER:  I think that's it, Your Honor, but

4    let me confer here.

5    BY MR. SNYDER:

6    Q    Okay.  Now on the eight hard drives that you looked at --

7    I think you mentioned this earlier -- but you said there were

8    some files that were stored that indicated that they had been

9    created after the hard drive was formatted.

10             Could you explain that further?

11   A    I think you meant to say that the files I saw, files that

12   were created with a date in the future as compared to dates I

13   saw on the hard drive.

14   Q    Okay.  Explain that in more detail.

15   A    I, again, in my very cursory review of these hard drives,

16   I did see a couple of what I thought were anomalies with

17   regard to metadata, dates associated with the files.  One

18   example was an e-mail message that I believe had not been sent

19   until 2003.  I believe the date sent was somewhere in 2003.

20   However, the file representing this e-mail message had a file

21   creation date of 2002, consistent with when that hard drive

22   was formatted, as I mentioned.

23             So I, immediately, again, thought that dates had

24   been changed.

25   Q    Now, when you say an e-mail message, we talked about

Case 3:23-mc-00076-GMN-WGC  Document 34  Filed 03/28/23  Page 647 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 03/03/08  Page 117 of 205

262

1    there weren't any PST files.  What format was that e-mail

2    message in?

3    A    That particular e-mail message, I think, was HTM or HTML

4    file type.

5    Q    Does that indicate anything to you about how the e-mail

6    was sent?

7    A    No.  This was a special instance.  This e-mail was

8    created by software that -- I can go into more detail if you

9    like, but it was created by software that generated reports

10   for the user, and may have put e-mail into an HTML format for

11   the user.

12   Q    Okay.  So even though there was an e-mail message, that

13   doesn't indicate that it was -- there was no PST file.  There

14   was no, no, uh, no comprehensive e-mail storage?

15   A    That's, that's correct.

16   Q    And that's something I wanted to just be clear about.

17          On these hard drives, you did run into a few

18   instances of message files, a few hundred message files.  And

19   those, I believe you testified, could be e-mails or other text

20   files, is that correct?

21   A    Yes.  There were a few loose e-mail messages, yes.

22   Q    Okay.  How would a loose e-mail message windup in a

23   message file as opposed to a PST file?

24   A    Well, I mean, it really goes to the user activity, what

25   the user may have done to save the e-mail in that format.  One

Case 3:22-mc-00073-GMF-MAU   Document 34   Filed 07/28/23   Page 648 of 800
Case 3:06-cv-00056-MMF-VPC   Document 34   Filed 07/28/23   Page 248 of 265
263

  1    can drag a message out of Outlook, for example, to another

  2    location, another folder on their screen.  That would have the

  3    effect of exporting a message as an MSG file.

  4     Q   Okay.  And when one does that, you lose all the

  5    metadata associated with the PST, at least with regard to

  6    that message?

  7     A   Yes.

  8     Q   So to the extent there are e-mail messages, incidental

  9    MSG files that contain e-mail messages on these drives, there

 10    is not the PST metadata you would need to, to authenticate

 11    them?

 12     A   That's accurate.

 13     Q   Okay.

 14              MR. SNYDER:  I believe that is all I have at

 15    this time, Your Honor.

 16              THE COURT:  All right.  Thank you.

 17         The time is 11:58, and so I think it would be a good

 18    time to recess for lunch, and we'll return -- counsel, do

 19    you -- I'm happy to come back at 1:15.  Or if you need the

 20    full hour-and-a-half -- I mean, I'm happy to accommodate

 21    counsel.

 22              MS. GAROFALO:  We would like --

 23              THE COURT:  I can either start sooner or later.

 24              MS. GAROFALO:  We would like the full

 25    hour-and-a-half, Your Honor.

Case 3:23-mc-00073-GKF-MAU  Document 34  Filed 07/28/23  Page 649 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/03/08  Page 114 of 205

264

 1                 THE COURT:  All right.  That's fine.  Then we'll

 2     reconvene at 1:30.

 3                 MR. PEEK:  Your Honor, do you have my time per

 4     chance?

 5                 THE COURT:  Well, no, but I'll have it --

 6                 MR. PEEK:  At 1:30.

 7                 THE COURT:  -- in the afternoon.

 8                 MR. PEEK:  Thank you, Your Honor.

 9                 THE COURT:  Thank you.

10              (Noon recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:23-mc-00073-CKK-MAU Document 34 Filed 07/08/23 Page 650 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/03/08 Page 159 of 265

265

 1              Reno, Nevada, Tuesday, August 19, 2008, 1:30 p.m.

 2                             ---OoO---

 3

 4              THE COURT:  Thank you.  Please be seated.

 5              MR. SNYDER:  Your Honor, we would ask to reopen.

 6    I have just ten more minutes with Mr. Karchmer.  And opposing

 7    counsel indicated they would not object.

 8              THE COURT:  Okay.

 9         Is that correct, Ms. Garofalo?

10              MS. GAROFALO:  That is correct.

11              THE COURT:  Okay.  You may go ahead and take the

12    stand.  And as Mr. Karchmer is doing that, I just have a few

13    notations.

14         One, by my calculation, eTreppid has one hour and

15    48 minutes left for their examination.

16         And the other observation I would like to make is

17    that I noted, and I would like to note on the record, that at

18    the conclusion of Mr. Montgomery's testimony, he left the

19    courtroom.  He has not returned but for some time, a small

20    portion of time during Mr. Karchmer's testimony.  And my

21    concern about that is, I'm unclear why he's absent, and would

22    like to know why he's absent.

23         In addition to that, I'm also concerned that

24    there not be any claim later on in these proceedings that

25    Mr. Montgomery has waived -- I mean that he was not given

Case 3:22-mc-00076-GKF-MAU Document 34 Filed 07/28/23 Page 651 of 800
Case 3:06-cv-00056-PMP-VPC Document 854 Filed 07/28/08 Page 116 of 205
-266

1    notice of the testimony that was taken, or claims some other

2    loss of due process as a consequence of his voluntary decision

3    not to appear in the proceedings.

4           So, I just wanted to put that on the record.

5           MS. GAROFALO:  Okay.  Your Honor, just for

6    the Court's information, Mr. Montgomery is here.  He has

7    been out in the hallway.  We will have Mr. Montgomery sit

8    in for the remainder.  I don't think it will be a problem

9    with Mr. Montgomery asserting due process rights.  It was his

10   decision not to be seated here in the courtroom.

11          THE COURT:  All right.  Thank you.

12          You may go ahead and commence the few questions you

13   had, sir.

14          MR. SNYDER:  Thank you.

15          **DIRECT EXAMINATION (resumed)**

16   BY MR. SNYDER:

17   Q    Now, Mr. Karchmer, when you took a look at the Len

18   Glogauer CD -- do have an image of that CD on your hard drive

19   there?

20   A    I do.

21   Q    Okay.  Was there anything else on that that indicated

22   that it had been examined with forensic software by

23   Montgomery, or by someone producing the CD?

24   A    Possibly.  And I'll show you in just a second.

25          This would be the forensic image of the CD that

Case 3:22-mc-00073-PMP-WGC Document 34 Filed 07/28/08 Page 652 of 800
Case 3:06-cv-00056-PMP-VPC Document 824 Filed 07/03/08 Page 127 of 265
—267

1   was produced.

2    Q   Okay.

3    A   On the CD are four directories, each named, as you can

4   see here, PST, underscore, 1; PST, underscore, 2, 3, 4.   In

5   each one of these folders there is a PST file.  The PST files

6   we discussed.  And there are also these pictures or screen

7   captures for each PST.

8          Now, I provided on a piece of paper four screen

9   captures that look like this one.  This being the properties,

10  a dialogue for an individual PST file.  In addition to those

11  pictures are screen captures that come from Encase forensic

12  software.

13   Q   Okay.

14   A   And they appear to show the examination of a PST file.

15  I'm trying to open it up so it's a little bit bigger.  This

16  will just take a second.  This is a larger -- excuse me -- a

17  larger picture of that screen capture.

18   Q   Is there anything unusual about this screen capture?

19   A   Yes.  One thing that's unusual about it is that it's a

20  little hard to see, but there's a bar at the bottom of the

21  screen capture that is -- well, it's redacted.

22          What one would expect to see down here with Encase

23  forensic software is information about whatever is highlighted

24  or selected in the upper page.  That information, for whatever

25  reason, has been redacted from these screen shots.

1    Q    And what sort of information would that be?

2    A    It could include path information with regard to where

3    the PST is located logically in a folder structure.  It could

4    also contain information about the PST structure itself.

5    Q    Okay.  So the fact that that is -- is that something that

6    comes up automatically in Encase software?

7    A    That's correct.

8    Q    So someone, at some point, made a conscious choice to

9    redact that information from the Glogauer CD that was provided

10   to us?

11   A    That's correct.

12   Q    Okay.  Now one other thing I wanted to cover, just real

13   quickly.  I held up this box earlier.  Can we -- and I want

14   the record to reflect that it's approximately 5 inches on one

15   side, by 18 inches, by maybe 14 or 15 inches.

16              Can we mark this as an exhibit, Your Honor?

17              THE COURT:  Yes.

18              MR. SNYDER:  Okay.

19              THE CLERK:  It will be D-50.

20         (Whereupon, exhibit 50 -- a box, was marked for

21   identification only.)

22              MR. SNYDER:  I would also move to admit.

23              THE COURT:  Any objection?

24              MS. GAROFALO:  None, Your Honor.

25              THE COURT:  50 is admitted.

Case 3:22-mc-00076-PMP-VPC Document 34 Filed 07/28/08 Page 654 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 05/08/08 Page 119 of 265

269

1          (Whereupon, exhibit 50 -- a box, was received in

2     evidence.)

3     BY MR. SNYDER:

4      Q   Just one last question, Mr. Karchmer.

5          We talked about this Glogauer CD or the Glogauer

6     e-mail.  You spent a lot of time trying to authenticate it one

7     way or another.  What would you need to fully authenticate and

8     effectively authenticate this CD -- or I'm sorry, this e-mail?

9      A   Sure.  To effectively authenticate an e-mail, if you

10    know that e-mail to reside in a PST file, as I mentioned, you

11    would need the original media, the original hard drive that

12    contained that PST, and you would need the PST file itself.

13         So, in short, you would need the original hard

14    drive, or a forensic image of that hard drive.

15     Q   Okay.

16             MR. SNYDER:  Thank you, Your Honor.  Nothing

17    further.

18             THE COURT:  Ms. Garofalo --

19             MR. SNYDER:  Oh, just --

20             THE COURT:  Oh.

21             MR. SNYDER:  Okay.  Now one other question

22    on that.

23    BY MR. SNYDER:

24     Q   Based on what you heard in Mr. Montgomery's testimony

25    about the number of times that that has been copied, does that

Case 3:22-mc-00073-GNK-WAU Document 34 Filed 07/28/08 Page 655 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 07/23/08 Page 125 of 269

270

1    have any impact on what you think would be essential to look

2    at to authenticate it as completely as is possible?

3     A   Well, based on what I've heard, I have real concerns

4    about any forensic examiner being able to authenticate e-mail

5    in this matter, given what I've heard about the disposition,

6    the location, transferring, and possession of data.  I've

7    heard nothing, for example, with regard to whether or not due

8    care was exhibited in keeping chain of custody, maintaining

9    metadata, maintaining data data integrity.

10            So, I would have real concerns, even if I were to

11   receive what purports to be an original hard drive, given

12   the date changing and so forth that I've seen, I'd have

13   real concerns about any forensic examiner being able to

14   authenticate an e-mail to a real degree of certainty.

15   Q   Okay.  Thank you.

16            THE COURT:  All right.

17          Ms. Garofalo.

18                    **CROSS-EXAMINATION**

19   BY MS. GAROFALO:

20    Q   Good afternoon, Mr. Karchmer.

21            If the Court does not object, I would like to

22   conduct cross-examination from counsel table?

23            THE COURT:  You may.

24            MS. GAROFALO:  Okay.

25   \\\

Case 3:22-mc-00073-SWK-WAU  Document 34  Filed 07/28/08  Page 656 of 800
Case 3:06-cv-00056-MMF-VPC  Document 34  Filed 07/28/08  Page 121 of 205
271

 1   BY MS. GAROFALO:

 2    Q   Good afternoon, Mr. Karchmer.  My name is a

 3   Ellyn Garofalo.  As you may know, I represent

 4   Dennis Montgomery.  I have a few discrete questions for

 5   you on your testimony here this morning.

 6    A   Okay.

 7    Q   Preliminarily, can you tell me what your job title, so to

 8   speak, is.

 9    A   My job title is Managing Consultant.

10    Q   Okay.  Do you consider yourself a forensic consultant?

11    A   Correct.

12    Q   Is that the correct technical term?

13    A   Sure.

14    Q   Okay.  And what, exactly, does a forensic consultant do,

15   in somewhat general broad terms.

16    A   Generally, they are involved with the collection,

17   preservation, and analysis of data.

18    Q   Okay.  And you have a very impressive resume, so I am

19   accepting that you are well qualified to do just that.  And,

20   you also do litigation support as part of your job, is that

21   correct?

22    A   Can you be more specific.

23    Q   Well, I think you testified that about 40 to 50 percent

24   of your time is devoted to litigation support.

25    A   Well, at any one time, 50 percent of my time might be

```
 1    devoted to what I would call electronic discovery processing

 2    or production.  Sure.

 3     Q    So you are thoroughly familiar with the procedures and

 4    the protocols for the production of electronic discovery in

 5    litigation, is that correct?

 6     A    Sure.

 7     Q    And you are generally familiar with the procedures

 8    utilized by the federal courts, is that correct?

 9     A    I'm not sure if federal courts have anything specifically

10    different.  I'm not sure.

11     Q    Okay.  But you are thoroughly familiar with the ways in

12    which electronic discovery should be organized in connection

13    with production in civil litigation, is that correct?

14     A    I would say so.  Yes.

15     Q    Now, do you have any experience, or have you had any

16    experience dealing with national security issues?

17     A    I don't think so.  No.

18     Q    Okay.  So is this the first matter you've worked on which

19    may, to some extent, implicate national security issues?

20     A    Possibly.  Yes.

21     Q    Okay.  Now, Mr. Montgomery is what we've been calling a

22    computer scientist.  Are you familiar with that term as it's

23    been applied to Mr. Montgomery?

24     A    I believe so.

25     Q    And do you have any understanding of what that means to
```

Case 3:23-mc-00078-SKK-WAU  Document 34  Filed 07/28/08  Page 658 of 200
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/08  Page 123 of 205

273

 1  be a computer scientist of the kind Mr. Montgomery is?

 2   A   Generally, a computer scientist is responsible for

 3  co-development and programing.

 4   Q   Okay.  And that, I take it, would be a somewhat different

 5  skill set than a forensic analyst or consultant, is that

 6  correct?

 7   A   Sure.  Uh-huh.

 8   Q   Okay.  And would you expect a computer scientist, like

 9  Mr. Montgomery, to have the same knowledge and expertise

10  relating to electronic discovery, for example?

11   A   Not necessarily.  No.

12   Q   Okay.  And would you expect an individual like

13  Mr. Montgomery to maintain files, including electronic

14  files, in the same manner you might expect, a business, such

15  as an IBM, to maintain those files?

16   A   Could you be more specific.

17   Q   Sure.  Mr. Montgomery is an individual, is he not?

18   A   Yes.

19   Q   Okay.  And you testified a little bit -- and we'll get

20  back to this in a little more detail in a few minutes -- but

21  you testified generally about the document, the electronic

22  documents produced by Mr. Montgomery, how they did not conform

23  with what you're used to seeing in a business setting, is that

24  correct?

25   A   That's correct.

Case 3:22-mc-00076-SKM-VPC  Document 34  Filed 07/28/23  Page 659 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/23  Page 659 of 800
                                                                    274

 1   Q   Okay.  But Mr. Montgomery, unlike a business setting, is
 2   an individual, correct?
 3   A   Yes.  He is an individual.  Yes.
 4   Q   Okay.  And would you accept the same kind of organization
 5   of documents and files from an individual, as you would from a
 6   business that you were providing litigation services to?
 7   A   Well, generally, I have to say that I would expect some
 8   general organization in any electronic document production,
 9   whether it's from an individual or a business.
10   Q   Okay.  Now with respect to Mr. Montgomery's forensic
11   skills, do you have any reason to believe that Mr. Montgomery
12   is as skilled or knowledgeable as you are, for instance,
13   Mr. Karchmer?
14   A   I have no idea.
15   Q   Have you seen any evidence in the documents that you've
16   reviewed, that were produced by Mr. Montgomery, that he does
17   have your skills in maintaining, copying, and producing
18   documents?
19   A   I have not.
20   Q   Quite the contrary, is that correct?
21   A   That's correct.
22   Q   And that would not be unusual because he's a computer
23   scientist, as opposed to a forensic consultant, is that
24   correct?
25   A   I don't know if I can make that distinction.

1    Q    Okay.  Now, have you read -- you may or may not have

2    heard discussion about the United States Protective Order in

3    this case, have you?

4    A    Have I heard discussion, or have I read it?

5    Q    Yes.  Have you heard discussion about it.

6    A    Yes.

7    Q    Have you read it?

8    A    No.

9    Q    Did you read -- then you did not read the Protective

10   Order prior to reviewing the electronic documents produced by

11   Mr. Montgomery, correct?

12   A    I don't believe so.  No.

13   Q    And you did not consider the provisions of the Protective

14   Order then, in determining how long it should have taken

15   Mr. Montgomery to review the files that were produced in this

16   case, correct?

17   A    Could you repeat that?  I'm sorry.

18   Q    You did not then consider the provisions of the

19   Protective Order in considering how long it would take

20   Mr. Montgomery to produce -- strike that -- to locate and

21   produce files in this matter, is that correct?

22   A    I hadn't considered them specifically with

23   Mr. Montgomery's ability to solely collect and produce

24   data.  No.

25   Q    Okay.  Now are you aware that the Protective Order

Case 3:22-mc-00073-SMH-MAU   Document 34   Filed 07/38/23   Page 661 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 05/08/08   Page 226 of 269

276

```
 1    prohibited Mr. Montgomery from having a forensic analyst such
 2    as yourself review the files?
 3     A   I, I am aware of that.  Yes.  I have heard that.
 4     Q   Okay.  And can we agree that it might take someone like
 5    Mr. Montgomery, without your skills and experience, somewhat
 6    longer to review files than it might take you, for example?
 7     A   It may have been.  Yeah.
 8     Q   Are you also aware that the Protective Order required
 9    Mr. Montgomery to review, on his own, every file that he
10    was -- that was arguably subject to production in this case?
11     A   I believe I've been made aware of that.  Yes.
12     Q   Okay.  And did you take that into account in your
13    testimony today that Mr. Montgomery could have hashed, or by
14    hashing, eliminated duplicate files?
15     A   I don't think any provision in any Protective Order would
16    have prevented Mr. Montgomery from seeking outside assistance
17    to, perhaps, make his job a little faster.  And that would
18    include hashing.
19            And as I mentioned, had Mr. Montgomery, perhaps,
20    consulted with an outside party, not showing that outside
21    party any documents, mind you, but had he consulted with
22    anyone with regard to how to do this more quickly, or how
23    to do this more efficiently, I think, uh, anyone such as
24    Scott Cooper or anyone else, could have informed him about
25    tools, techniques, best practices he could have used.
```

Case 3:22-mc-00078-CMK-WAU   Document 34   Filed 07/28/08   Page 662 of 800
Case 3:06-cv-00056-MMC-VPC   Document 34   Filed 07/28/08   Page 127 of 265

277

1    Q   And as you sit here today, do you know whether

2    Mr. Montgomery conferred with anyone to find out if that

3    was an approach he should have taken in light of the U.S.

4    Protective Order?

5    A   I don't know.

6    Q   So you're just guessing that he -- strike that.

7            You also indicated that there were files that

8    Mr. Montgomery could have essentially breezed through, because

9    they contained such things as pictures, is that correct?

10   A   I'm not sure I follow the question.

11   Q   You indicated, through your testimony, that

12   Mr. Montgomery could have done the review of the documents

13   electronically, and produced much more quickly than he did,

14   correct?

15   A   I don't know if I indicated that specifically.

16   Q   Okay.  You talked about JPG files, for example.  Do you

17   recall that testimony?

18   A   Right.  Yes.

19   Q   And you indicated that JPG files were usually

20   photographs, is that correct?

21   A   Yes.

22   Q   Could there be anything else in a JPG file other than

23   photographs?

24   A   A JPG is a still image format.  It might be a photograph.

25   It might be a still image created electronically by some other

Case 3:33-cv-00073-PMP-WPU Document 334 Filed 07/28/08 Page 663 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 03/03/08 Page 128 of 209

—278

1   means.

2   Q   And do you know what Mr. Montgomery was required to look

3   for under the U.S. Protective Order?

4   A   Specifically, no.

5   Q   And do you understand, as you sit here today, that those

6   JPG files had to be reviewed prior to the production of this

7   material?

8   A   I believe I, I have been informed of that, yes.

9   Q   Okay.  So if we add the JPG files back into the number of

10  files which you identified as having original text, that would

11  increase the number of files that would have had to have been

12  reviewed prior to production, correct?

13  A   Well, a hash analysis, again, would have certainly helped

14  with the level of duplication, but -- I'm sorry.  Does that

15  answer your question?

16  Q   No.  I think we have two issues actually?

17  A   Okay.

18  Q   We have a hashing issue, which is about duplication,

19  correct?

20  A   Yes.

21  Q   And you felt that a lot of the files could have been

22  eliminated from the review by simply taking out the files that

23  were duplicative, correct?

24  A   I think I understand what you're saying.  Yes.

25  Q   Okay.  But you don't know whether Mr. Montgomery had the

Case 3:22-mc-00073-RMK-VPC Document 34 Filed 07/28/08 Page 664 of 800
Case 3:06-cv-00056-RMK-VPC Document 34 Filed 07/28/08 Page 129 of 265
279

 1   skill or the expertise to know how to hash and remove

 2   duplicate files, is that correct?

 3    A    I don't know that.  No.

 4    Q    And you also don't know whether Mr. Montgomery was

 5   concerned about whether removing files, duplicate files,

 6   would have caused the eTreppid parties to complain that the

 7   hard drives had somehow been altered or corrupted, is that

 8   correct?

 9    A    Well, generally speaking, with an electronic discovery

10   production, when you have duplicates, you never remove them,

11   in the sense that, you know, you just get rid of them or

12   something like that.  Instead, you developed a log so that,

13   one, you're reviewing unique documents instead of duplicates;

14   and, two, you have a log available such that if a document

15   is considered to be important, you go back and find all the

16   duplicates of that document so that you can produce them if

17   you have to.

18    Q    Okay.  And it's your complaint here that Mr. Montgomery

19   did not do that, thereby, making your job much harder in this

20   case, is that correct?

21    A    I don't think I've made any such complaint.

22    Q    Okay.  Let's go to -- we've talked about JPG files.

23   Let's talk about TIF files.  Typically, what's contained in a

24   TIF file?

25    A    A TIF file is, again, generally, a still image format.

Case 3:22-mc-00073-SKK-WPC Document 34 Filed 07/28/23 Page 665 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 07/28/23 Page 290 of 265

-280-

1    But TIFs can also be used with regards to document scanning

2    and text extraction.

3    Q   So it's possible to find text or text-related information

4    in a TIF file, correct?

5    A   Sometimes.  Yes.

6    Q   And in your opinion, would that have to be -- strike

7    that.

8            Is that material, to the best of your knowledge,

9    that would have to be reviewed in connection with the U.S.

10   Protective Order?

11   A   You're asking if information in TIF files would have to

12   be reviewed per the Protective Order?

13   Q   Correct.

14   A   Possibly.  I'm not sure.

15   Q   Okay.  So you don't know whether or not, as you sit here

16   today, because you haven't read the Protective Order, whether

17   Mr. Montgomery had to review that information, correct?

18   A   I believe he had to review all of the data he thought

19   could be responsive.

20   Q   And you don't know whether or not, in Mr. Montgomery's

21   mind, the data contained in TIF files may have been responsive

22   to the U.S. Protective Order.

23   A   I have no idea what Mr. Montgomery's thought or he

24   thinks.

25   Q   And if you add the number of TIF files back into the mix

Case 3:22-mc-00073-CKH-VPC   Document 34   Filed 07/28/23   Page 666 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 07/28/08   Page 291 of 205
—281

1    of the files that had to be reviewed, along with the JPG

2    files, do you know how many files we would have been up to at

3    that point?

4     A    I do not.

5     Q    But, considerably more files.  And you've identified at

6    least 28,000 files as having text information or readable

7    information, is that correct?

8     A    It may have increased the number.  Again, but the

9    information was highly duplicative.  And I think to try to

10   review each and every document, when you have millions of

11   documents, it simply can't be done, which is why duplication

12   is always used in electronic discovery.

13    Q    But, in this case, it was done by Mr. Montgomery.  Are

14   you aware of that?

15    A    I -- are you saying Mr. Montgomery reviewed over, looked

16   at over one million files?

17    Q    Let's assume, for a moment, that Mr. Montgomery did

18   indeed review over one million files.  Can you estimate how

19   long that review might take?

20    A    I have no idea.

21    Q    So you did not do an analysis of the number of files and

22   how long it would take an individual such as Mr. Montgomery,

23   without the assistance of a forensic analyst or consultant, to

24   review that number of files?

25    A    I did no analysis of how long a review might take if you

Case 3:22-mc-00073-PKH-MAU Document 34 Filed 07/28/23 Page 667 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 07/03/08 Page 282 of 269
282

1   had to look at over one million files, a population of

2   duplicates, no.

3   Q   So, as you sit here today, you can't dispute

4   Mr. Montgomery's testimony as to the amount of time it

5   took him to review these files prior to production, is

6   that correct?

7   A   I'm not sure I can, I can opine on that.

8   Q   Let me ask you basically the same question about HDML

9   files.  What do those usually include, according to your prior

10  testimony?

11  A   They usually include temporary internet files and cached

12  web pages.

13  Q   And can the cached web page file include information

14  other than that that's publically available on the internet?

15  A   Sometimes that's true.

16  Q   And can you, in your opinion, and what you know about

17  the U.S. Protective Order, not having read the U.S.

18  Protective Order, would that information have to be reviewed

19  by Mr. Montgomery prior to its production?

20  A   I assume so.

21  Q   Okay.  And how many files, if you know, would

22  Mr. Montgomery have to had to review, if he included the

23  JPG files, TIF files, HTML files, along with the files that

24  had text or readable information?

25  A   I'm sorry.  Can you repeat.

Case 3:23-mc-00076-GMN-WGC Document 34 Filed 07/28/08 Page 668 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/28/08 Page 198 of 265

283

1    Q   How long would it have taken Mr. Montgomery, in your

2   opinion, to review the files, if we included back in the HTML

3   files, the JPG files, the TIF files?

4    A   I -- as I said before, I have no idea.

5    Q   Would you consider that it would be a lengthy process?

6    A   I, I would consider it to be lengthy and difficult.

7   So, yes.

8    Q   Okay.  It would be a very difficult process, would it

9   not?

10   A   To look at thousands, hundreds of images and documents,

11   simply by opening each one, using those practices, yes.  That

12   would be extremely difficult.

13   Q   Okay.  And as you sit here today, could you tell us

14   whether or not there was a simpler way for Mr. Montgomery to

15   review each and every file that had to be reviewed under the

16   U.S. Protective Order before being produced in this case?

17   A   Well, as I mentioned, deduplication would have assisted.

18   Q   Okay.  Anything else?

19   A   With regard to?

20   Q   To simplify the process that Mr. Montgomery used.

21   A   Just off the top of my head, deduplication would have,

22   obviously, reduced his review time by 90 percent.

23   Q   By 90 percent.  How much duplication was there on the

24   files?

25   A   90 percent.

1    Q    90 percent duplication.  And that's without removing HTML

2    files, J. Peg files, and TIF files?

3    A    That's with removing every duplicate.  He would have only

4    had to review ten percent of the total data he delivered, had

5    he deduplicated data.

6    Q    And if he had deduplicated data, what would that have

7    done to the integrity of the hard drives?

8    A    Nothing.  I think you might -- we might be talking apples

9    and oranges.

10   Q    Explain to me why we would be talking apples and oranges.

11   A    First, I don't -- I'm not sure where these hard drives

12   came from, so the hard drive integrity, as you refer to it, I

13   don't have an opinion on at this time.

14          Now, were deduplication to occur, and a deduplicated

15   set of data to be delivered, along with a log showing all

16   duplicates and their locations on the original media from

17   which they resided, one would have a more, at least somewhat

18   more defensible means of communicating to parties how much

19   data they have, where it is and the volume.

20   Q    Okay.  Now, you're familiar with false negatives and

21   false positives?

22   A    Sure.

23   Q    And a false negative is where you run a search, it

24   comes up -- you run a word search and it comes up negative,

25   correct?

1    A    Correct.

2    Q    Now, if Mr. Montgomery just searched using word searches,

3    it was possible that he would come up with false negatives, is

4    that correct?

5    A    Could you describe word searches?

6    Q    Montgomery runs a search saying, "Plan to blowup the

7    World Trade Center."  Okay?  Searches World Trade Center, for

8    example.  It comes up negative.

9    A    Can you be more specific about what tools were used to

10   run the search, and how the search was run?

11   Q    Just a Windows search, like Mr. Montgomery conducted in

12   this case.

13   A    You're asking whether a Windows' search could yield false

14   negatives?

15   Q    Correct.

16   A    I suppose that's true.

17   Q    Okay.  So in a case like this, where there is a

18   Protective Order and there is sensitive information, it

19   would be -- the possibility of a false negative could cause

20   Mr. Montgomery to overlook information that was protected by

21   the U.S. Protective Order, correct?

22   A    Uh, it may have.

23   Q    Okay.  So --

24   A    Yeah.

25   Q    By the way, can Encase yield false negatives?

1   A   Well, it depends on how the search is run.  It would need

2   to be run by somebody who understands the software.

3   Q   Okay.  So my question is, in this case, just a word

4   search could yield false negatives that would result in the

5   disclosure of State Secret information, is that correct?

6   A   I would say maybe that's possible.

7   Q   Okay.  And a word search would have been a quicker way

8   to review the information produced in this case than going

9   through each e-mail, e-mail by e-mail, or document by

10  document, correct?

11  A   You're comparing a word search to opening a document at a

12  time, is that accurate?

13  Q   Correct.

14  A   Then, generally, yes.  A word search would be faster.

15  Q   But in a case like this, where there is privileged

16  information, highly privileged information involved, a word

17  search would not exactly be the most secure way to conduct

18  the search, is that correct?

19  A   I'm not sure.  Probably not.

20  Q   But as you sit here today, you can't -- other than

21  eliminating the duplicates, you can't tell us about any

22  process or approach that Mr. Montgomery could have taken to

23  make his search of these documents quicker?

24  A   Well, actually, another comes to mind, and that is

25  indexing.  The Windows search tool is not what I would call an

Case 3:22-mc-00078-GMK-WAU Document 34 Filed 07/28/23 Page 672 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/03/08 Page 137 of 205
287

 1    efficient means to search the volume of data that we've been

 2    discussing in this case.  And I believe I read a declaration

 3    from Mr. Montgomery indicating that he had problems with a

 4    Windows search, crashes and so forth.

 5            Were the data to be deduplicated and indexed,

 6    that would have made searching, using another tool, a more

 7    efficient tool used with indexes.  His searches would have

 8    been instantaneous, basically.

 9    Q    And someone with your skills would know how to do the

10    indexing that you've just described, correct?

11    A    That's correct.

12    Q    But, Mr. Montgomery didn't have the possibility of using

13    an expert such as yourself to conduct this review, isn't that

14    correct?

15    A    I don't know if that's correct.

16    Q    Okay.  Well, under the U.S. Protective Order,

17    Mr. Montgomery had to conduct the search on his own.  He

18    could not use forensic experts.

19            Are you aware of that, Mr. Karchmer?

20    A    Oh, I understand he had to do it alone.  Yes.

21    Q    Okay.  Let me just talk to you a minute about the

22    shipping of the 21 hard drives, 13 of which, apparently, were

23    unreadable.

24            You recall your testimony in that regard?

25    A    Yes.

```
 1   Q   And I believe you said that it is, at your company at
 2   least, the saying is that they should be treated, packed like
 3   fabriche eggs, correct?
 4   A   Yes.
 5   Q   Would a non -- your company specializes in such things,
 6   does it not?
 7   A   Well, only a very small practice within my company
 8   specializes.
 9   Q   Do you think it's common knowledge to layperson, so to
10   speak, that these hard drives have to be packed or treated
11   like fabriche eggs?
12   A   Could you be more specific about lay people.
13   Q   Yes.  If somebody who wasn't a computer specialist,
14   forensic consultant, were to ship hard drives, is it possible
15   they would not know that extra precaution had to be taken in
16   order to keep the hard drives from being damaged?
17   A   I would say that the knowledge that hard drives are
18   sensitive expands beyond the fields of people you just
19   mentioned; being, computer forensic examiners and data
20   discovery specialists.  I think, generally, people know that
21   hard drives are fragile.
22   Q   You base that understanding on what information?
23   A   Uh, well, when you purchase the hard drive, there's --
24   the instructions are to -- there's an instruction to plug it
25   in correctly.  And then the second thing it always says is
```

Case 3:22-mc-00073-GMK-WPC Document 34 Filed 07/08/08 Page 674 of 800
Case 3:06-cv-00056-PMP-VPC Document 854 Filed 05/03/08 Page 139 of 209

—289

1    drop.  Hard drives are susceptible to shock.

2    Q   And that's the basis for your opinion that persons other

3    than professionals might know that, is that correct?

4    A   They might.

5    Q   Okay.  Do you know who packed and shipped these hard

6    drives?

7    A   I have no idea.

8    Q   And do you know if the person -- strike that.

9         Do you know whether Mr. Montgomery did it?

10   A   I have -- as I said, I have no idea.

11   Q   And do you know if the person who did it had any

12   experience whatsoever in shipping the hard drives?

13   A   No.

14   Q   Okay.  Is it possible it was just a mistake?

15   A   Yes.

16   Q   Okay.  So you don't read anything particularly evil

17   into the fact that the hard drives were not packaged like

18   fabriche eggs?

19   A   I wouldn't say evil.  No.

20   Q   If the hard drives were replaced within 24, 48 hours in

21   readable form, I take it, it would not in any way impede your

22   ability to do the analysis required in this case?

23   A   Probably not.

24   Q   I'd like to go back to the testimony that you began with,

25   Mr. Karchmer, which was about the one terabyte drive.

 1          Do you recall that?

 2    A    Yes.

 3    Q    And I believe you questioned the authenticity of the date

 4    based on the fact that it preceded the availability of one

 5    terabyte hard drives, is that correct?

 6    A    That's correct.

 7    Q    Is there any circumstance which you can think of, as you

 8    sit here today, under which that kind of anomaly might have

 9    been created without an intentional effort to manipulate the

10    data?

11    A    Well, you can copy or clone file system metadata from

12    drive to drive.  But, I'm led to believe that a cloning did

13    not occur, at least for a couple of reasons:

14          One, all of the copying on many of these drives was

15    done in a manner -- or excuse me, was done immediately after

16    the format date.  So if a hard drive, if a source drive was

17    cloned to a destination drive, that would mean that your

18    source drive has the same anomaly;

19          Secondly, the terabyte drive, as I've discussed,

20    wasn't available in 2003.  So, a terabyte worth of information

21    couldn't have been cloned to another terabyte drive.

22    Q    It could not have been cloned -- or strike that.

23          An older -- information on an older drive could not

24    have been cloned or overlaid onto a newer one terabyte drive?

25          Is that your testimony?

Case 3:23-mc-00073-CMK-VPC  Document 34  Filed 07/28/23  Page 676 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 03/03/08  Page 141 of 205

-291

1   A    The manner in which files were copied to the one terabyte

2   drive indicates that they were copied in rapid succession,

3   consecutively.  That is not consistent with   drive cloning.

4   Q    How is that inconsistent with drive cloning?

5   A    Well, a drive cloning, you would see the original -- you

6   might see the original file system's dates and times.  A

7   transfer from your original drive to your destination drive,

8   depending on how the cloning was done, software, hardware

9   used, et cetera.  In this case, with the terabyte drive, it's

10  a terabyte worth of information that, where all of the files

11  are copied within the span of a couple three hours.  So to

12  clone, as I think you might be suggesting, from a source drive

13  to a destination one terabyte drive, would suggest that you

14  had a source drive of one terabyte to begin with, with dates

15  of 2003, or whatever it was, to begin with.

16  Q    And when you say the information might be transferred, it

17  also might not be transferred, correct?

18  A    You're asking whether file system metadata is always

19  transferred during a cloning?

20  Q    Correct.

21  A    Again, it goes to the manner and methods used in the

22  cloning.

23  Q    Okay.  But as you sit here today, you really don't know

24  whether information was cloned onto that one terabyte drive,

25  do you Mr. Karchmer?

1    A    I don't think it was, no.

2    Q    Okay.  Do you know whether it was, Mr. Karchmer?

3    A    No.  As I said, I don't know that it was.  But, I have

4    reason to believe that it was not.

5    Q    Okay.  In other words then, what you've just described,

6    do you have any other reason to believe that the information

7    on the one terabyte drive was not cloned from an earlier

8    smaller drive?

9    A    As I sit here, not readily.  But, I could look into the

10   files and dates more, if given more time.  But, up to now,

11   that's my opinion.

12   Q    And I may have understood you, but one of your first

13   comments was, "I understand that, in this case, the

14   information was not cloned."  Other than what you've just

15   described, did somebody provide you with information

16   indicating that the one terabyte drive did not contain  cloned

17   information?

18   A    Have I been provided information that the one terabyte

19   drive has not been cloned?

20   Q    Strike that.  I'll make that a lot simpler.

21        Anybody tell you that it was not cloned?

22   A    No.

23   Q    So this is just based on your analysis, the analysis that

24   you just discussed?

25   A    It's based on the data I have available on the one

Case 3:22-mc-00076-GWF-WAU   Document 34   Filed 07/28/08   Page 678 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 178 of 800
293

1   terabyte drive.

2   Q   Okay.  How do you know, by the way, that all the files

3   were copied in rapid succession?

4   A   That goes to the file create date.  Again, all of the

5   files were created or saved to that drive in rapid succession,

6   immediately following the date and time in which the hard

7   drive was formatted.

8   Q   Okay.  And why is that inconsistent with cloning?

9   A   Well, cloning, again, suggests that you're copying the

10  file system itself from one drive to another.  That is, if

11  you have formatted a drive with a 2003 date, and you clone it

12  to this one terabyte drive, that's certainly possible.

13          The fact here is, though, that almost a terabyte of

14  information wound up on that drive.  So -- I'm not sure if

15  that answers your question.

16  Q   And what does rapid succession mean?

17  A   Uh, the file creation dates and times, again, are

18  milliseconds or seconds apart; meaning, generally speaking,

19  a forensic examiner can tell that files were copied to the

20  drive in mass.

21  Q   Okay.  And would it make any -- would it make any

22  difference to your analysis if a tool, such as Partition Magic

23  had been used in cloning the information?

24  A   I'm not sure it would.

25  Q   Okay.  Are you familiar --

1    A    Sure.

2    Q    -- with such tools?

3         And that would not, in any way, affect your

4    analysis?

5    A    My analysis?  Can you be more specific?  I'm not sure

6    what your --

7    Q    That it's unlikely that cloning was done here because of

8    the rapid succession of the information transferred?

9    A    I'm not sure it would.

10   Q    But you're not sure if it wouldn't?

11   A    I'm not sure.

12   Q    And is it your testimony that all of the files were

13   created within seconds of one another?

14   A    No, not --

15   Q    Milliseconds.  I'm sorry.  Milliseconds, I believe is the

16   word you used.

17   A    No.  I don't have the exhibit right in front of me, but

18   the exhibit that was passed out earlier has the dates and

19   times.

20   Q    And that's Exhibit 48?

21   A    I believe it was.  But, again, I don't have a copy in

22   front of me.

23   Q    Okay.  And what would we see on Exhibit 48 that

24   would tell us -- do you have Exhibit 48 before you now,

25   Mr. Karchmer?

Case 3:13-mc-00078-SKK-WAU  Document 34  Filed 07/28/08  Page 680 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 07/03/08  Page 245 of 265
295

1   A    I do.

2   Q    And can you tell me where in Exhibit 48 I would see that

3   information?

4   A    The start and finish and dates and times alluded to the

5   earliest and latest file created dates within each folder.

6   Q    I may be reading these incorrectly, Mr. Karchmer -- and

7   I'm sure that you will correct me -- but it seems that there

8   were -- that we're not talking about milliseconds, but hours,

9   on the start to finish times.

10          Can you take a look at those columns, the fifth and

11  sixth column on the chart.

12  A    Yes, I see those.

13  Q    Okay.  And would that reflect milliseconds to you?

14  A    Well, milliseconds aren't seen on this exhibit, but I --

15  I will represent that the file creation times might be

16  milliseconds, or one second apart from one another for all 1.3

17  million files.

18  Q    Did you make that analysis --

19  A    Or, excuse me, 1 million files on a one terabyte drive.

20  Q    Did you make that analysis?

21  A    Did I make that analysis?  I'm not sure I understand the

22  question.

23  Q    Okay.  Sitting here today, can you know whether or

24  not files were transferred within milliseconds, all of the

25  files?

 1    A    No.  It took 14 hours to copy all the files to the one

 2   terabyte drive.

 3    Q    So you've just divided,  essentially, the number of files

 4   by the time it took?

 5    A    No.  As I recall, when looking at the hard drive, the

 6   file creation dates and times were very close to one another

 7   with regard to consecutive list of files.

 8    Q    Okay.  Were they different from the times we see

 9   reflected here in Exhibit 48?

10    A    No.  These were the create times.

11    Q    So you're not looking at anything different than

12   what we're looking at from the start and finish times on

13   Exhibit 48, is that correct?

14    A    Well, that is correct.  But, if you do want to see

15   milliseconds, I do have an image of the hard drive I

16   can show.

17    Q    And where does it show on the image of the hard drive?

18    A    In the file create date and time.

19    Q    Okay.  And was that information produced to your counsel

20   in connection with your testimony here today?

21    A    I'm not sure I follow you.

22    Q    Did you provide any information reflecting the

23   milliseconds that it took to transfer these files to your

24   counsel, to the eTreppid lawyers, in connection with your

25   appearance here today?

Case 3:22-mc-00076-SMK-WAU  Document 34  Filed 07/28/08  Page 682 of 800
Case 3:06-cv-00056-MMK-VPC  Document 34  Filed 07/28/08  Page 247 of 265
297

1    A    I'm -- I think you -- I might -- you might be

2  misunderstanding my use of the milliseconds.  What I meant

3  was, and what I thought was clear, and I apologize if  it

4  wasn't, but when a file, generally speaking, is copied to  a

5  hard drive, that file, when it hits the destination drive, is

6  assigned a creation time by the file system on that hard

7  drive.  Okay?  That is going to be a date and time value.

8          If I copy ten files from one hard drive to a

9  separate hard drive, the destination drive is going to

10  contain, or going to record ten file create dates and times

11  for the ten files I'm copying.

12          Now, when files are copied in mass, or transferred

13  in mass, they are assigned closely sequential file creation

14  dates and times.  So, that's what I meant by milliseconds.  I

15  did not mean that it took milliseconds to copy one terabyte of

16  data from one drive to another.

17    Q    Okay.  So the time it took to copy is reflected on

18  Exhibit 48, to the best of your knowledge, is the correct

19  amount of time, from start to finish, is that correct?

20    A    From what I can tell, yes.

21    Q    Okay.  And you say that as though you're not able to

22  tell with any certainty.  Is there any information you're

23  missing that prevented you from being able to testify with

24  certainty that that is in fact the time it took to copy

25  the files?

1    A    Well, without a clearer understanding of how the data

2    came to be in the first place, where it originated -- and none

3    of that is actually clear to me -- no.

4    Q    And you don't know, as you sit here today, where it came

5    from, correct?

6    A    I am informed and believe it came from eTreppid in the

7    form of backups.

8    Q    Going back to Mr. Montgomery's review of the files to

9    glean out information protected under the U.S. Protective

10   Order, do you know how many files were provided to the

11   government for its review?

12   A    No.

13   Q    Okay.  So do you know how much material was actually

14   extracted from the drives that you reviewed?

15   A    No.

16   Q    Okay.  Do you have any information at all concerning the

17   type of information that Mr. Montgomery was searching for

18   under the U.S. Protective Order?

19   A    I'm not sure.  No.

20   Q    Do you think any of that information might have been

21   relevant to your analysis of how long it should have taken

22   Mr. Montgomery to complete his review?

23   A    I think you may have asked that question a different way

24   earlier.  I think you're asking me whether or not items in the

25   Protective Order, or restrictions in the Protective Order

Case 3:22-cv-00073-CWD-MAU Document 34 Filed 07/28/08 Page 684 of 800
Case 3:06-cv-00056-PMP-VPC Document 824 Filed 07/28/08 Page 249 of 265

-299

1    affected Mr. Montgomery's, what we're calling review.

2         Is that --

3    Q    I'm asking you whether or not you considered, in

4    formulating your opinion as to how Mr. Montgomery might

5    have expedited his search, the number of files that had to

6    be reviewed and extracted from the materials?

7    A    Well, I mean I certainly considered it with regard to

8    there were, as you can see, hundreds of thousands of files

9    produced.

10        Now, anyone, generally speaking, would look for

11   ways to try to expedite that.  So I don't know what the

12   Protective Order said was allowed and was not allowed -- I

13   understand Mr. Montgomery had to go it alone -- but I did

14   consider the fact that he had trouble with the Windows search

15   crashing, different things not working for him.  I have

16   considered that.

17   Q    Okay.  And the fact that the Windows searches caused the

18   systems to crash would have delayed his ability to complete

19   his review of the documents, is that not correct?

20   A    It may have.  Certainly.

21   Q    And do you think that Mr. Montgomery, in some way, caused

22   the crashes deliberately to impede the search?

23   A    Oh, no.  I hope I didn't make you think that that's what

24   my opinion is.

25   Q    Okay.  So Mr. Montgomery had over a million files to

1  review, correct?

2   A   That's correct.

3   Q   Had to review them pursuant to the terms of the

4  U.S. Protective Order, which you have not read, is that

5  correct?

6   A   I guess that's correct.

7   Q   Had to -- had to review each document individually, the

8  material that was subject to the United States Protective

9  Order, correct?

10  A   Uh, he may have.  That's correct.

11  Q   Okay.  But you don't know, do you?

12  A   I don't know.

13  Q   And you don't know how much material had to be reviewed

14  and screen out of the materials ultimately produced, do you?

15  A   No.

16  Q   Okay.  So you really don't know how long it could have

17  taken -- or strike that.

18        You really don't know how long it should have

19  taken Mr. Montgomery to complete the search and produce the

20  documents called for in this litigation, do you?

21  A   I'm sorry.  Can you repeat that?

22  Q   You really don't know how long it should have taken

23  Mr. Montgomery to complete the search and produce the

24  documents responsive to the requests in this case.

25  A   I wouldn't say that I know how long it should have taken

Case 3:22-cv-00073-PMP-VPC   Document 34   Filed 03/28/08   Page 686 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 03/28/08   Page 151 of 265

-301

1    him.  No.

2     Q    So you don't know whether it took him longer than it

3    should have taken, do you?

4     A    Well, I believe that it most likely did take longer than

5    it should have.

6     Q    Just based on the duplicative files, is that correct?

7     A    Mainly the duplicates and, also, the methods by which

8    files were sought out and reviewed.

9     Q    I'd like to move to what we've been calling the

10   Glogauer e-mail.

11          You're familiar with that term, I take it,

12   Mr. Karchmer?

13    A    Sure.

14    Q    Okay.  Where did you find PST files at eTreppid that you

15   reviewed?

16    A    Uh, there was one PST file on Mr. Trepp's computer in

17   which the hard drive was imaged.  There were, I believe, a

18   couple of other instances of a PST that eTreppid had archived

19   or backed up.

20    Q    Where did you find those archived or backed up files?

21    A    I think they were on a server.

22    Q    Okay.  Who pointed you to that server?

23    A    I don't remember.  I don't remember specifically.  It

24   was -- it could have been, I'm not sure, somebody at eTreppid.

25    Q    Okay.  Just going back for a minute to the PST file that

Case 3:23-mc-00073-PMP-VPC   Document 34   Filed 07/28/08   Page 687 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 152 of 265

302

1   you found on Mr. Trepp's computer.

2   A   Correct.

3   Q   Was that a dead file, or was that still a live file?

4   A   Could you be more specific?  I'm not sure I understand --

5   Q   Do you know the difference?

6   A   -- dead or live.

7   Q   Do you know the difference -- do you know what a dead

8   file is, PST file?

9   A   As you're using  the term dead file, no.  That's why I'm

10   asking.

11   Q   Was it still interacted?  Was it still being used?

12   A   Uh, I believe it was, yes.

13   Q   Okay.  And it was on, when you say it was on Mr. Trepp's

14   computer --

15   A   Right.

16   Q   Was it a laptop, was it a computer hooked up to a server?

17   What kind of --

18   A   I think it was a desktop computer.

19   Q   Was it hooked up to the eTreppid server?

20   A   I'm pretty sure it was.

21   Q   You're not sure?

22   A   Well, in order for him to receive e-mail, I believe it

23   was.

24   Q   Okay.  Now, let's go back to the other.  I think you said

25   there were hard drives that you were given with PST files?

1    A    Hard drives that I was given that contained the Glogauer

2    e-mail.

3    Q    Where else did you find the Glogauer e-mail, other than

4    Mr. Trepp's computer?

5    A    There was instances of the Glogauer e-mail and archived

6    off-line PSTs.

7    Q    How were they stored?

8    A    I believe they were stored on a server as loose PSTs.

9    Q    Okay.  Did you look at anything on those servers, on this

10   archived documents, other than the Glen Glogauer -- Len

11   Glogauer e-mails?

12   A    Do you mean -- are you asking whether I looked at

13   anything on the server besides the PST file or --

14   Q    Yes.

15   A    -- are you -- I'm sorry.  That was the question?

16   Q    Yes.  That was the question.

17   A    Could you be more specific?

18   Q    Do you know if there was anything else on the server

19   other than the Glogauer PST file?

20   A    Oh, I'm sure there was.

21   Q    Did you look at it?

22   A    Did I review -- are you asking if I reviewed all the

23   contents of the server?

24   Q    I'm asking you if you know what else was on the server?

25   A    Just generally, I know that there were other files and

Case 3:22-mc-00073-SWK-WAU Document 34 Filed 07/28/23 Page 689 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 07/28/23 Page 154 of 265

—304

 1  folders.

 2  Q   Okay.  Do you know the time period for the Glogauer PST

 3  file that you found on those archived servers?

 4  A   I, I need you to be a little bit more specific.  I'm not

 5  sure I understand what you mean by "time period".

 6  Q   Fair enough.

 7          You found -- you had the PST file from Mr. Trepp's

 8  computer, correct?

 9  A   Yes.

10  Q   And you had Glogauer PST files that had been archived,

11  correct?

12  A   I may have misspoke.  I apologize.

13          The instances of PST files that I found that contain

14  what we're calling the Glogauer e-mail, were all on the

15  recipient side or Mr. Trepp's PSTs.  I believe you may have

16  said Glogauer PSTs.  I just want to be clear that all the

17  instances I found preserved and analyzed were instances of

18  Mr. Trepp's mailbox.

19  Q   Okay.  So it was all on Mr. Trepp's computer, right?

20  A   No.  That's not what I said.  Mr. Trepp has a PST on his

21  desktop.  His desktop computer hard drive was forensically

22  imaged.  That's one source.  The other PST sources were

23  archives, off-line PSTs that were on a server.

24  Q   Okay.  And you don't know, as you sit here today, what

25  else was stored on that server, correct?

Case 3:23-mc-00076-KK-WAU Document 34 Filed 07/28/23 Page 690 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 195 of 265

305

1    A    As I said, generally, there was some other files stored

2    on the server.

3    Q    Okay.  But the files that you reviewed were Mr. Trepp's

4    PST files, correct?

5    A    Yes.

6    Q    Okay.  So you didn't -- you did not review anything that

7    was the Glogauer PST file, is that correct?

8    A    Oh, no.  That's incorrect.  We did look at the Glogauer's

9    PST file.

10   Q    Okay.  Where did you find Glogauer's PST file?

11   A    On Mr. Glogauer's computer, I believe.  Excuse me.

12   Q    Okay.  So you looked at Mr. Glogauer's computer --

13   A    Yes.

14   Q    -- for his PST file; Mr. Trepp's computer for his PST

15   file; and then at some archived documents that included

16   Mr. Trepp's PST?

17   A    Yes.  I think that's right.

18   Q    Okay.  You're not sure what was on the archived server?

19   A    Um, I'm not sure I follow the question.

20   Q    Okay.  The documents that were archived on the separate

21   server --

22   A    Right.

23   Q    -- what was on that server that you reviewed?

24   A    The PST files I've been talking about.  Off-line

25   PST files.

1    Q    Whose PST files?

2    A    Mr. Trepp's.

3    Q    Just Mr. Trepp's?

4    A    I believe so.  Yes.

5    Q    Okay.  Mr. Glogauer's were not on that server?

6    A    Uh, I don't think so.  No.

7    Q    Okay.  And on that separate server that held the archive

8    backup files, again, do you know if there was anything else on

9    that server?

10   A    I, I'm trying to be clear.  Yes, there, there were files

11   and folders on that server.

12   Q    And do you know anything -- strike that.

13           Can you identify any of the other files or folders

14   on the server that had the archived materials?

15   A    I'm -- I'm trying to follow you.  I need you to maybe

16   restate that.

17   Q    What else was on that separate server, other than

18   Mr. Trepp's PST file that had been archived?

19   A    I apologize if I'm not -- I'm trying to answer your

20   question.  As I said, I saw other files and folders stored

21   on that server.  It was a file server of some kind.

22   Q    Okay.  Do you recall, as you sit here today, the names of

23   any of the other files or folders?

24   A    No.

25   Q    And do you have any idea what general subject matter they

Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 692 of 800
Case 3:06-cv-00056-MMD-VPC   Document 34   Filed 05/28/08   Page 197 of 209
—307

1   may have covered?

2    A   No.

3                   MR. SNYDER:  Your Honor, I'm going to object

4   as to relevance.  We're running pretty far afield of what

5   Montgomery's obligations to produce for this Show Cause

6   Hearing are.

7                   MS. GAROFALO:  Your Honor, we're trying to

8   determine the basis for Mr. Karchmer's testimony on the

9   Glogauer e-mail; how he analyzed that e-mail; and how he

10   reached the conclusions he's testified to.  It's tied

11   directly to the direct examination of Mr. Karchmer.

12                   THE COURT:  All right.  I'll overrule the

13   objection.  But I'll just say my understanding on the

14   archived server, the server that had archives, he just looked

15   at the Warren Trepp PST file.  And probably knew there were,

16   or recognized in his examination of that, of that server, that

17   there were other files on it.

18                   So, anyway, that's what I understand.  Perhaps I'm

19   incorrect.

20                   MS. GAROFALO:  All right.

21                   THE COURT:  But, go ahead, please.

22   BY MS. GAROFALO:

23    Q   How do you know it was Mr. Trepp's PST on the server that

24   held the archived files?

25    A   I believe I was directed to it.  And I believe the file

1   name indicated that it belonged to Mr. Trepp.

2   Q   Okay.  And did you take any steps to authenticate the PST

3   file on the server that held the archived documents?

4   A   Yes.  The PST that was archived, if I understand you

5   correctly, we authenticated e-mails in that PST against

6   e-mails that came from the PST on Mr. Trepp's desktop.

7   Q   Now did you search any place else for Glogauer e-mail?

8   A   No.  And the reason our search was performed in the

9   manner it was, was that the eTreppid e-mail server, at least

10  at the time, was configured to physically pop e-mail from the

11  server to client desktops and laptops; meaning, e-mail was

12  never physically stored on a live exchange server.

13          After that point, users could, of course, perform

14  backups or archive the PSTs if they wanted to.

15  Q   Okay.  Now, did you make any effort to determine the

16  chain of custody on the server that held the archive

17  documents?

18  A   I'm -- I'm not sure I follow you.

19  Q   What period of time did documents, the archive documents

20  on the separate server cover?

21  A   Uh, as I sit here, I'm not sure.

22  Q   Do you have any recollection of the period of time?

23  A   I mean some of the years past two or three, I'm really

24  not sure.

25  Q   Do you know how long the server had been out of use?

Case 3:23-mc-00053-GKF-WAU  Document 34  Filed 07/28/23  Page 694 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/03/08  Page 159 of 205
—309

1   A   Out of use?  It was in use.

2   Q   Right.  Separate server.  As I understood you, there was

3   a separate server that was no longer being used on which you

4   found Mr. Trepp's PST files.

5           Is that correct?

6   A   I don't know if I ever said it wasn't being used.  I

7   referred to the PST files as having been off-line.  I think

8   that's what you might mean.  And to be more to the point, all

9   I was trying to say was that those PST were archived; meaning,

10  they did not receive e-mail on a regular basis from the live

11  exchange server -- if that's helpful.

12  Q   By the way, did anybody ask you to review the e-mails

13  in any of the PST files to see if they were subject to the

14  U.S. Protective Order?

15          MR. SNYDER:  Objection, Your Honor.  That's --

16  the U.S. Protective Order was not entered at the time this

17  analysis was conducted.

18  BY MS. GAROFALO:

19  Q   When did you conduct this analysis?

20  A   I believe there -- bear with me.  We initially collected

21  data at eTreppid, I think, in February of '07 or -- I can't

22  actually remember.  I'm sorry.  If it was -- I apologize.  I

23  can't remember if it was February '06 or '07 that we first

24  went.  I think it was '07.

25          MR. PEEK:  Your Honor, I'll represent to the

Case 3:22-mc-00073-GMN-WAU  Document 34  Filed 03/28/23  Page 695 of 800
Case 3:06-cv-00056-PMP-VPC  Document 534  Filed 03/28/08  Page 195 of 269

-310

1   Court that his opinion which was proffered to this court was

2   in July of 2007.  The U.S. Protective Order wasn't entered

3   until August or September of 2007.  I think if we go back and

4   look at the docket, you'll see his opinion and declaration,

5   which is dated in July 2007.

6             MR. SNYDER:  June.

7             MR. PEEK:  June of 2007.  Excuse me.

8             THE COURT:  Thank you.

9   BY MS. GAROFALO:

10   Q   Other than the archive documents, Mr. Trepp's PST file

11   that had been archived, Mr. Trepp's PST file on Mr. Trepp's

12   computer at eTreppid, did you find any other copies or

13   information relating to the Glogauer e-mail in any other

14   location?

15   A   No.  We, we examined -- we may have collected more

16   e-mail, other than Mr. Trepp's and Mr. Glogauer's computer,

17   and maybe a couple of the archive PSTs we've been discussing.

18   I don't, as I sit here, I don't have a complete inventory in

19   front of me, but we did not find what we're calling the

20   Glogauer e-mail anywhere, except for on Mr. Trepp's computer,

21   on his PST file, and in the archived PSTs that were saved on

22   the server sharer that belonged to Mr. Trepp.

23   Q   Okay.  And you, as you sit here today, do you recall any

24   other PSTs that you saw in any of those locations that you did

25   not look at, any other PST files?

Case 3:22-mc-00073-PKH-MAU  Document 34  Filed 07/28/23  Page 696 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/23  Page 101 of 200

-311

1    A    No.  I'm -- well, we certainly looked at Mr. Glogauer's

2   as well.  But in case I wasn't clear, the e-mail was not found

3   in Glogauer's e-mail box as well.  We looked at all the e-mail

4   we collected for that message.

5    Q    How was it possible the e-mail wasn't on Mr. Glogauer's

6   PST file?

7    A    It may have been deleted between the time that it was

8   sent, and the time we came on-site to collect data.

9    Q    Did you make any effort to find out who deleted that

10  e-mail?

11   A    I, I don't know how the message would not be there, if it

12  was deleted or removed by some other means.  So, I'm not sure

13  I can answer that specific question.

14   Q    Okay.  I just want to make sure that I understand you.

15         On the Glogauer PST, what we've been terming the

16  Glogauer e-mail is missing?

17   A    That's correct; that the e-mail message was not found in

18  Mr. Glogauer's mailbox.

19   Q    Did you make any effort to determine why that message was

20  no longer in Mr. Glogauer's mailbox?

21   A    Well, I think we just thought it could have been deleted.

22   Q    Did you ask anyone?

23   A    I'm trying to remember.

24         I'm not even sure -- I'm not even sure if I met

25  Mr. Glogauer when I was out there at first.  I think our --

 1   I think it was a general understanding that it probably was

 2   deleted.

 3   Q   How did you obtain the general understanding that it was

 4   probably deleted?

 5   A   Well, one would either expect to see an e-mail in a

 6   sender's mailbox, if they knew that sender had sent an e-mail.

 7   If it's not there, the other logical conclusion was that it

 8   could have been deleted.

 9   Q   Well, aren't you concerned that an important e-mail such

10   as the one we're describing as the Glogauer e-mail was missing

11   from Mr. Glogauer's mailbox?

12   A   I had no idea about, or no opinion of the message's

13   relevance, if any.  So, no, I don't think that would be

14   accurate.

15   Q   The only place that you found the Glogauer e-mail, if I'm

16   correct, is on Mr. Trepp's computer, correct?

17   A   No.  We also found it on -- inside PST files that had

18   been archived.

19   Q   Mr. Trepp's PST files, correct?

20   A   Correct.

21   Q   Can PST files -- strike that.

22          Can documents in PST files be altered?

23   A   Sure.  Absolutely.

24   Q   Not a problem, right?

25   A   No.

Case 3:22-mc-00076-KNK-WAU Document 34 Filed 07/28/08 Page 698 of 800
Case 3:06-cv-00056-PMP-VPC Document 334 Filed 07/08/08 Page 103 of 209

313

1    Q   And what steps did you take to authenticate the document

2    as it was found on Mr. Trepp's computer and in the archived

3    documents?

4    A   Well, the archived documents matched perfectly with the

5    e-mail we found on Mr. Trepp's computer.

6    Q   And that's it?  You took no other steps to determine

7    whether or not it was possible that the e-mail, the Glogauer

8    e-mail, as found on Mr. Trepp's computers, had been doctored

9    or altered, is that correct?

10   A   Well, I'm of the opinion that that's less likely, given

11   that one would need to understand that modifying an Outlook

12   item requires you to understand the manner in which the date

13   and time for an Outlook item is stored.  You have to know what

14   it is.  And you would have to, you know, set your clock -- you

15   would have to make the change, would you have to save it, you

16   would have to hope the change would be reflected with the date

17   and time you wished to put in there.

18          And I don't know that given that these PST files

19   were archived whenever they were to a server, I didn't think

20   that eTreppid would have manipulated that one message and

21   necessarily saved copies of it -- if that answer your

22   question.

23   Q   So it's missing from Mr. Glogauer's mailbox, and you find

24   it only in Mr. Trepp's computer.  And it is possible, in fact,

25   to alter the e-mail, but you don't think it happened because

1    you just don't think so?

2     A    Well, no, that's not what I said.

3                    MR. SNYDER:  Your Honor, again, we've spent

4    45 minutes on a declaration that's not relevant to these

5    proceedings directly.

6            The question here is the extent to which

7    Mr. Montgomery has produced the Glogauer e-mail.  It is

8    not -- the question is not the facts underlying Mr. Karchmer's

9    June 2007 declaration.  So, I think that this line of

10   questioning has gone on quite some time, and it is not

11   relevant to what's at issue in these proceedings.

12                   MS. GAROFALO:  Your Honor, we've made relevance

13   objections on this line of questioning all throughout these

14   proceedings, and those objections have been overruled.  And

15   there has been significant evidence suggesting, purportedly

16   evidencing, the fact that Mr. Montgomery somehow altered or

17   tampered with these e-mails.

18           It is now directly relevant, and it's been made

19   so by the eTreppid parties.  And we ought to be allowed to

20   continue to examine their own witness who's testified as to

21   potential alterations to this e-mail on the subject raised by

22   the eTreppid parties.

23                   THE COURT:  The objection is overruled.

24           Proceed.

25   BY MS. GAROFALO:

1 Q   Okay.  Now, did you match the archive PST of Mr. Trepp's

2 archived PST with the PST that you found on Mr. Trepp's

3 computer?

4 A   Yes.  I believe they were pretty duplicative of one

5 another.

6 Q   Okay.  When you say "pretty duplicative," were there any

7 differences?

8 A   Well, I'm sure his current mailbox had newer messages as

9 compared to the archive that was saved on the server sometime

10 earlier.

11 Q   Okay.  Other than the fact that the server, the

12 information input into that server was cutoff at a particular

13 point in time, were there any other differences between

14 the information PST file found on the server with the archived

15 information, and the one that Mr. Trepp was using, I presume,

16 at the time you obtained a PST file from it?

17 A   I'm not sure.  There could have been a difference, as I

18 said, in message content between the two, and that we noted.

19 But, that was all.

20 Q   Okay.  By message content, you mean messages, later

21 dated messages on the computer Mr. Trepp was using, or are

22 you talking about a difference in text where you have the same

23 e-mail on both?

24 A   No.  No differences of text.  If there were any

25 differences, it would be that there was some overlap between

 1   the two PSTs.  And, of course, each PST would have unique

 2   messages unto themselves as well.

 3   Q    Okay.  And other than the fact that the server was not

 4   actively in use, if I may use that term, the one that had the

 5   archived information, other than the fact that it had fewer

 6   e-mails, it didn't have the more recent e-mails, were there

 7   any differences between the e-mails that you found on the

 8   server with the archived e-mails, and the e-mails that you

 9   found on Mr. Trepp's computer?

10   A    Other than message content, as I've said, no, I don't

11   think so.

12   Q    So did you -- was there an analysis done -- strike that.

13        Was there a perfect match between all e-mails you

14   found on the server, with those e-mails that corresponded on

15   Mr. Trepp's computer?

16   A    I, I don't know how else to say it.  There was probably a

17   difference in message content; e-mails that were in one PST

18   and not the other.  Apart from that, I don't recall any

19   differences.

20   Q    Okay.  But there was, to your recollection, a difference

21   in some of the message, some of the content, correct?

22   A    I believe so, yes.

23   Q    Okay.  And with respect to the Glogauer e-mail, was there

24   any difference between the one you found on the server with

25   the archived material, and the one that you found on

Case 3:22-mc-00076-CMK-WAU Document 34 Filed 07/28/08 Page 702 of 800
Case 3:06-cv-00056-PMP-VPC Document 334 Filed 05/03/08 Page 167 of 209

—317

1   Mr. Trepp's computer?

2   A   No.  Every version of the Glogauer message, e-mail

3   message we found, was identical.

4   Q   And how about the metadata?

5   A   That's, uh -- yes.  That would mean that the messages

6   were identical.

7   Q   Okay.  Now, your February, your February declaration

8   filed in this case mentions three hard drives, I believe,

9   found in a cabinet.

10          Do you recall that?

11  A   It may.  I don't have the declaration in front of me.

12  Q   Oh, do you recall having three hard drives that were

13  located in a cabinet?

14  A   I believe so.  Yes.

15  Q   And did you search those hard drives?

16  A   I believe so.  Yes.

17  Q   And who, uh -- were you the one who found the hard drives

18  in the cabinet?

19  A   I believe somebody at eTreppid had found them sometime

20  after our first visit to eTreppid, and then they called

21  counsel, who called us.

22  Q   Okay.  Now did you review those three hard drives?

23  A   I don't know if we reviewed them in detail.  If I recall

24  correctly, we would have looked on those drives for the e-mail

25  message we're discussing.  And I believe we didn't find any.

1    Q   Okay.  Are you certain you didn't find it on any of those

2   three drives?

3    A   Uh, I'm reasonably sure we didn't.  I believe the only

4   sources that we had of the Glogauer e-mail, if I recall

5   correctly, were Mr. Trepp's computer and the archive -- some

6   archived PSTs.

7    Q   And if you know, where are those three drives now?

8    A   I believe we were asked to ship our copies of that data

9   to a vendor being used by the eTreppid parties.

10   Q   And who is that vendor?

11   A   I don't remember their name off the top of my head.

12   Q   Okay.  Actually, you referenced, in paragraph 7 of your

13  declaration, which is --

14              MR. PEEK:  Might we have the declaration?

15              MS. GAROFALO:  -- Document 199.

16              MR. PEEK:  Could we have the declaration if

17  we're going to refer to it?

18              THE WITNESS:  I don't have it in front of me.

19              MS. GAROFALO:  I don't think it's necessary.

20  BY MS. GAROFALO:

21   Q   You reference four hard drives.  Do you recall now that

22  it was three, or it was indeed four hard drives?

23   A   I don't recall.  I would have to take a look.  But if you

24  say that it says three, then I certainly believe you.  It's

25  three.

Case 3:22-mc-00073-GMK-VPC Document 34 Filed 07/08/08 Page 704 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/08/08 Page 105 of 205

                                                                        319

1   Q    And did you draft your declaration?

2   A    Uh, I may have.  I believe so.

3   Q    Did you read the declaration before it was submitted?

4   A    Yes.

5   Q    And would you not have signed the declaration unless all

6   of the information contained in the declaration was accurate,

7   is that correct?

8   A    That's correct.

9   Q    Okay.  Going to Exhibit 49, which I believe is the last

10  exhibit marked by the eTreppid parties, if I could just ask

11  you to look at the second page of Exhibit 49.

12  A    Uh-huh.

13  Q    And you testified on this exhibit.  I just want to ask

14  you a couple of very quick questions.

15           If you would just look at the first, the first box

16  up in the left, in the left upper side.

17  A    All right.

18  Q    Where it says, "accessed" -- hold on one second.

19           Okay.  It says, "accessed April 5, 2005,"  do you

20  see that?

21  A    Yes.

22  Q    And what does that mean?

23  A    This -- I have no idea.  I don't know what these

24  screen shots represent.

25  Q    Okay.  But, generally, what does it mean if there is a

Case 3:22-mc-00073-GMK-WAU   Document 34   Filed 07/28/08   Page 705 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 705 of 800
320

1   date and time next to the word "accessed"?

2    A   Uh, it means that a file was accessed by a process or

3   user, generally.

4    Q   Okay.  Generally, the last time somebody looked at that

5   file, is that correct?

6    A   Generally, yes.

7    Q   Okay.  If I could ask you to look at the first page.

8   Look at the same box up in the upper left-hand corner.

9           Do you see that, Mr. Karchmer?

10   A   Yes.

11   Q   Okay.  And it says "accessed".

12          Do you see that?

13   A   Yes.

14   Q   And the date on that?

15   A   Yes.

16   Q   What is the date?

17   A   June 23rd of 2008.

18   Q   Okay.  And do you know who accessed this document on

19   June 23rd, 2008?

20   A   Oh, yeah.  I testified about that.  I did it.

21   Q   Okay.  So that's the date that you accessed the document?

22   A   That's correct.

23   Q   And it changes the screen to show the date that it was

24   last accessed?

25   A   Yes.  It may change these property pictures you're

1    referring to.  But as I pointed out in my testimony, I

2    accessed these files from a CD.  And I thought it was clear,

3    and I apologize if I wasn't, but my accessing the file

4    would not change any of the data that was provided to us.

5    Q   That was actually my next question.

6           So nothing else changed, except the date that's

7    reflected for the document having been accessed, correct?

8    A   I think you're asking me if my viewing the PSTs, and

9    then producing the screen shots you see on Exhibit 49, would

10   change anything but the access date on Exhibit 49.  No.

11   Q   Okay.  So the access date isn't necessarily something you

12   would consider in determining the authenticity of an e-mail in

13   a PST file, is that correct?

14   A   Well, it may be.  The purpose, if this is helpful,

15   behind Exhibit 49 was just to contrast the data that we had

16   been shipped, along with the screen shots provided with the

17   data that, I assumed, were supposed to match up to the PST

18   files we were sent.

19   Q   Okay.  But if I understand you correctly, for your

20   analysis of a particular e-mail or a particular document on

21   a PST file, you don't really need to see when that document

22   was last accessed, isn't that correct?

23   A   I would say all the dates are helpful certainly.

24          Again, with regard to authenticating an e-mail

25   message, which is an intimated database file, where a file

1    resides on a hard drive, you would want dates from all of

2    those things, the hard drive, the files, the applications.

3    You generally need to not look at the e-mail itself, but

4    everything surrounding it to be able to authenticate it to

5    any degree of certainty.

6    Q    But to do your analysis here, that access date, the fact

7    that that access date reflected June 23rd, 2008, didn't in any

8    way affect your analysis, correct?

9    A    No, of course not.

10   Q    Okay.

11           MS. GAROFALO:  All right.  I think I have no

12   further questions.

13           THE COURT:  All right.

14        Anything on redirect?

15           MR. SNYDER:  Just a few questions, Your Honor.

16                   **REDIRECT-EXAMINATION**

17   BY MR. SNYDER:

18   Q    Mr. Karchmer, you talked about the duplication of files

19   and Mr. Montgomery's review.  If Mr. Montgomery had, as you

20   had suggested, consulted with an expert in forensics and

21   deduplicated these files -- and I reference you to Exhibit 48.

22   A    Okay.

23   Q    Do you have that in front of you?

24   A    I do.

25   Q    Okay.  How many total image files would he have had to

1   review?

2    A    I believe he would have reduced the population to

3   something around forty-five or forty-six thousand unique

4   still images.

5    Q    Okay.  And in terms of the other category of reviewable

6   documents, how many of those would there have been to review?

7    A    As I'm looking at the list, maybe nineteen or -- nineteen

8   thousand?

9    Q    I'd refer you to --

10   A    Oh, I'm sorry.

11   Q    -- to the fourth page of the exhibit.  It's a pie chart

12   with the numbers.

13   A    Yes.  You're asking about reviewable files specifically?

14   Q    Right.

15   A    The unique population was 28,373.

16   Q    So we have 28,373 reviewables, and 44,000 image files?

17   A    Ah, yes.

18   Q    If he had deduplicated, he would have had that number to

19   review?

20   A    That's correct.

21   Q    Approximately 75,000 files rather than 1.3 million files.

22          Is that correct?

23   A    That's correct.

24   Q    And that would have taken substantially less time than

25   reviewing 1.3 million files?

Case 3:23-mc-00076-GMK-WAU  Document 34  Filed 07/28/08  Page 709 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/08/08  Page 174 of 265
324

 1   A    I believe so.  Yes.

 2   Q    Okay.  Now, if he in fact reviewed every photograph on

 3  these drives, he would have come across a lot of photos of

 4  people's dogs and Parasol images, and those things we talked

 5  about, right?

 6   A    Sure.

 7   Q    But those were produced anyways, is that right?

 8   A    That's correct.

 9   Q    Okay.  We talked about packing the hard drives.  I

10  believe you had testified that there was some indicia on the

11  hard drives that a forensic image had been made of those

12  eight hard drives by -- or they had been duplicated by a

13  fellow named Schultz, is that correct?

14   A    I believe so.  That indicia was not, if I remember

15  correctly, it wasn't on a hard drive itself.  There was a

16  label on a hard drive indicating that it was a copy.  But the,

17  I guess the originator, or the person responsible for imaging

18  it, that information was actually found on, in data on the

19  hard drive.

20   Q    Okay.  And who was that person again?

21   A    I believe it was Gerald Shultz.

22   Q    Is that someone who you know?

23   A    I don't know him.  No.

24   Q    Did you have any indicia on the hard drive of what entity

25  he is connected with or --

 1   A   I know he's connected with a company called Fulcrom.  And

 2  I know that because I was -- I believe we had a conversation

 3  about providing data to him in this matter.

 4   Q   Okay.  And what, what business is Fulcrom in?

 5   A   I believe they are a consulting firm with a forensic

 6  practice.

 7   Q   And would you expect Fulcrom to understand how to pack a

 8  hard drive?

 9   A   Yes.

10   Q   And would you expect a computer scientist to know how to

11  pack a hard drive?

12   A   Yes, I would.

13   Q   Okay.  So, now, these hard drives, I think, you said

14  indicated that Schultz had done what he did to them in June,

15  had duplicated them in June and July?

16   A   That's correct.

17   Q   All right.

18   A   The images were made in June and July.

19   Q   Mr. Schultz would have known how to deduplicate the

20  images on a hard drive, wouldn't he?

21   A   I would assume.

22   Q   That's his business?

23   A   I would assume.  Yes.

24   Q   So even by the time he got them, presumably,

25  Mr. Montgomery had had -- determined that there were no

Case 3:23-mc-00076-GKF-MAU  Document 34  Filed 07/28/08  Page 711 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 07/28/08  Page 714 of 800

—326

1    states secrets, potentially, documents on those, to give to

2    Mr. Schultz.  At that point, Mr. Schultz could have

3    deduplicated prior to production to eTreppid, right?

4     A    That's my understanding.  Yes.

5     Q    Okay.  But, apparently, that wasn't done because there's

6    still 90 percent duplicated images on these files, right?

7     A    Correct.

8                   MR. SNYDER:  Okay.  Thank you.

9                   THE COURT:  Any recross?

10                  MS. GAROFALO:  Very briefly, Your Honor.

11                     **RECROSS-EXAMINATION**

12   BY MS. GAROFALO:

13    Q    If Mr. Schultz had de-duped the hard drives, would it

14   have had, in any way, reduced the amount of time it took

15   Mr. Montgomery to review those hard drives to extract the

16   information subject to the U.S. Protective Order?

17    A    You mean if Mr. Montgomery performed the review he

18   performed, and then gave the data to Mr. Schultz?

19    Q    Correct; for copying.

20    A    Then, no.

21    Q    Okay.  So it would have not made any difference how long

22   it took Mr. Montgomery to review the files, correct?

23    A    Correct.

24    Q    Have you reviewed the document requests in this case?

25    A    I've looked at some of them.

Case 3:23-mc-00076-GNK-WPC Document 34 Filed 07/28/28 Page 712 of 800
Case 3:06-cv-00056-MN-VPC Document 34 Filed 07/28/08 Page 712 of 265

327

1    Q   Okay.  Are you familiar with the full scope of the

2    document requests?

3    A   I'm not aware of all the details in each document

4    request.

5                  MR. SNYDER:  Objection Your Honor.  This is

6    beyond the scope --

7                  MS. GAROFALO:  I'm going to --

8                  MR. SNYDER:  -- of redirect.

9                  MS. GAROFALO:  I'm finished, Your Honor.  Thank

10   you.

11                 THE COURT:  All right.

12                 MS. GAROFALO:  Thank you, Mr. Karchmer.

13                 THE COURT:  Thank you.  You may step down, sir.

14                 MR. PEEK:  Your Honor, my next witness would be

15   Mr. Glogauer.

16                 THE COURT:  All right.

17                 MR. PEEK:  Give Mr. Karchmer a moment to take

18   his laptop, Your Honor.

19                 THE COURT:  All right.

20

21                         **LEONARD GLOGAUER**,
            called as a witness on behalf of the Defendant,
                was sworn and testified as follows:

22

23                 THE CLERK:  Please be seated.

24           Please state your full name for the record.

25                 THE WITNESS:  It's Leonard Glogauer.

```
 1                    THE CLERK:   Spelling the last name.

 2                    THE WITNESS:  G-l-o-g-a-u-e-r.

 3                    THE CLERK:   Thank you.  Please be seated.

 4                    DIRECT EXAMINATION

 5   BY MR. PEEK:

 6    Q    Mr. Glogauer, where do you reside?

 7    A    In Genoa, Nevada.

 8    Q    During the period -- well, have you had a relationship

 9   with eTreppid?

10    A    Yes.

11    Q    And what is that?

12    A    Uh, I was the Vice-President of Business Development and

13   Industry Relations.

14    Q    During what period of time?

15    A    2000, summer of 2002 up until current.  However, today,

16   I'm working as a contractor rather than a full-time employee.

17    Q    Do you know Dennis Montgomery?

18    A    I do.

19    Q    When and where did you first meet Mr. Montgomery?

20    A    When I first hired on to eTreppid.

21    Q    That's, I think you said mid 2002?

22    A    Yes.

23    Q    Okay.  And when you met Mr. Montgomery, how was he

24   introduced to you?  I mean, what -- how was he described

25   to you?
```

1    A    He was a key player in the organization, and the inventor

2    of the technology that was described.

3    Q    Did, from time to time, did Mr. Montgomery backup your

4    computer?

5    A    Yes, he did.

6    Q    And do you know -- do you recall how often that would

7    happen during the period of 2002 until he left in 2005?

8    A    Sometimes it was on a weekly basis.  Sometimes maybe

9    every other week.  Certainly more than twice a month.

10   Q    And at the times that he would backup your computer,

11   would you tell me the procedures that he would use.

12   A    Typically, he would do it when I was out to lunch, so he

13   wouldn't interrupt my work.  Frequently, I would come back

14   from lunch and there would be a DOS screen on my computer that

15   was streaming file names through, as the information on the

16   hard drive was being moved to wherever he was storing it on

17   the server.

18   Q    Could you tell, during the time this process was

19   occurring, whether or not any applications were open?

20   A    None were open at that time.

21   Q    And then were there times when you were present when

22   Mr. Montgomery asked you if he would backup your computer?

23   A    Yes.

24   Q    And would you tell me what happened in those occasions?

25   A    Basically the same process.  I would either stand across

Case 3:22-mc-00073-CKK-WAU  Document 34  Filed 03/28/23  Page 715 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/03/08  Page 145 of 269
330

1    the room or go do something else.

2    Q    And what would happen, if anything, to the applications?

3    A    They would all close down.

4    Q    And who would close them down?

5    A    Either I would close them out before, or Dennis would

6    close them.

7    Q    Did you observe him closing out the applications?

8    A    A number of times.

9    Q    And during the time that you would close them out, did he

10   instruct you to close out the applications?

11   A    Certainly.

12   Q    And were you present during any other times when he took

13   backups of other employees at eTreppid?

14   A    Yes.

15   Q    And do you know what process was employed by

16   Mr. Montgomery during those times?

17   A    Basically, the same process.  There were times when I

18   shared an office with Patty Gray.  And he would do the same

19   thing with her computer.  And there were times when I was back

20   in the, back in the back room on the second floor where the

21   programmers were, where the word would go out, everybody get

22   off your computer.  Shut off your operations.  We're going to

23   do a backup.

24   Q    So would you hear Mr. Montgomery give instructions to the

25   employees that they were to close out their computers prior to

Case 3:23-mc-00073-SMK-WAU  Document 34  Filed 07/28/23  Page 716 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/23  Page 131 of 205
331

 1   backup?

 2    A   Yes.

 3    Q   Did you also hear him give instruction to Ms. Gray as

 4   well, to close out her computer?

 5    A   Yes.

 6    Q   And close out the applications?

 7    A   Yes.

 8    Q   And were you also present when he gave instructions to

 9   others, besides -- other employees, besides the programmers

10   you described?

11    A   Not all of them, but the ones -- and I know for sure the

12   ones up in the back room there.

13    Q   Okay.  And the ones up front, that would just be

14   yourself and Ms. Gray which, when you observed him perform

15   backups and --

16    A   Uh-huh.

17    Q   -- telling people to close out applications?

18    A   Yes.

19    Q   Was there any time he did not tell you to?

20    A   Not that I know of.  But there were times that I was

21   gone to lunch and I would come back, and I could see that the

22   Windows applications had been shutdown, or a DOS screen was

23   left there, and I would have to restart my applications.

24    Q   Was there ever a time when you observed that your backup

25   was performed on your computer when there were no -- when

```
 1   there were applications that were open?

 2    A   I would have no way to tell at that point.

 3    Q   But every time you observed it, whether it was coming

 4   back from lunch, applications were closed?

 5    A   Yes.

 6    Q   And every time he told you he was going to perform a

 7   backup, he would?

 8    A   Absolutely.

 9    Q   And with respect to, I think there is a Glogauer e-mail

10   that's been at issue in this one here?

11    A   I've heard that.

12    Q   You've heard of that.  And you see how it's been reported

13   in the press, as to how it has been represented that you made

14   a statement, "We need to take care of Jim"?

15    A   Yes.

16    Q   Did you ever write that?

17    A   No, I didn't.

18    Q   And are you aware of whether or not that e-mail is or is

19   not on your computer?

20    A   I know for sure it's not on my computer because, when

21   I first was aware of it, it was from a phone call from a

22   Wall Street Journal reporter who read it to me over the phone.

23   And I recalled the first sentence of the e-mail, and was

24   shocked at the second, because I knew I didn't write that.

25    Q   And then --
```

333

```
 1    A    And -- I'm sorry to answer your question --

 2    Q    Did you then try to find the e-mail?

 3    A    I immediately tried to find the e-mail.  And it wasn't on

 4   the computer.

 5    Q    And did you -- so somebody had deleted it?

 6    A    Obviously.

 7    Q    Did you delete it?

 8    A    No, I didn't.

 9    Q    Do you have any idea who did delete it?

10    A    Somebody who had access to my computer.

11    Q    And whom would that be?

12    A    It could be anybody, but --

13    Q    But, uh --

14    A    I have no way of knowing for sure who it was.

15    Q    From time to time, did Mr. Montgomery delete data on your

16   computer?

17    A    I have -- I don't know.

18    Q    Okay.

19              MR. PEEK:  That's all I have.  Thank you.

20              THE COURT:  All right.

21                        CROSS-EXAMINATION

22   BY MS. GAROFALO:

23    Q    Good morning, Mr. Glogauer.  I'm Ellyn Garofalo.

24   Mr. Montgomery's lawyer.  I just have very few questions

25   for you.
```

```
 1          How long have you been employed by eTreppid?
 2   A    Uh, since, like I said, since the late summer of 2002.
 3   Q    Okay.  And you're still employed by eTreppid, correct?
 4   A    As a contractor.
 5   Q    Okay.  And did you know Mr. Trepp prior to your
 6   employment with eTreppid?
 7   A    I did.
 8   Q    How long did you know Mr. Trepp prior to 2002 when you
 9   became employed by eTreppid?
10   A    I first met him in 1996.
11   Q    Okay.  Did you work for him prior to 2002?
12   A    No, I didn't.
13   Q    Do you work for -- do you provide services to anyone else
14   other than eTreppid or Mr. Trepp at this point in time?
15   A    Yes, I do.
16   Q    Okay.  How much of your income is eTreppid responsible
17   for?
18   A    Currently, 100 percent.
19   Q    Excuse me?
20   A    Currently, 100 percent.
21   Q    One hundred percent?
22   A    The other projects I was working on have been completed.
23   Q    Okay.  Thank you, Mr. Glogauer.
24          You mentioned that Mr. Montgomery would backup your
25   computer files approximately once a week.
```

1          Is that correct?

2     A    I believe I said frequently.  Sometimes it was once a

3    week.  Sometimes it was once every two weeks.

4     Q    Okay.

5     A    Generally, more than at least twice a month.

6     Q    And as you sit here today, can you recall the period in

7    which Mr. Montgomery worked at eTreppid?

8     A    Yes.

9     Q    And what -- what was the date range that Mr. Montgomery

10    was employed at eTreppid?

11    A    I'm not sure when he started, but I know that he left

12    in -- prior to January of 2006.

13    Q    Uh --

14    A    I think it was December of '05.

15    Q    Okay.  Would it be fair to say that Montgomery worked for

16    eTreppid for approximately five to six years?

17    A    I have no way of knowing.

18    Q    Does that sound right to you, as you sit here?

19    A    I have no way of knowing.

20    Q    More than one year?

21    A    More than one year, certainly.

22    Q    More than two years?

23    A    Since I was there.  I know he was there the time I was

24    there, between late 2002 and when he departed.

25    Q    Okay.  And can you approximate the number of times during

336

 1   his employment that he backed up your computer?

 2   A    Well, I could do the math.

 3        I would assume if we're talking about a five-year

 4   period, and he did it approximately twice a month, then we're

 5   looking at -- what would that be, 60 times?

 6   Q    Okay.  And did you -- did he have permission to backup

 7   your computer?

 8   A    Certainly.

 9   Q    Do you know who gave him the authority to do that?

10   A    I don't know.  I'm assuming his boss.

11   Q    Okay.  Do you know how you came by your understanding

12   that he had permission to backup your computer files?

13   A    It was a given.  He was a senior person.  He was the, uh,

14   computer scientist, and did a lot of the I.T. work at the

15   place, and as I.T., I.T. was his job to do that, as far as I

16   was -- as far as I understood.  I didn't argue.

17   Q    Okay.  So at no time did you hear anybody at eTreppid

18   say that Mr. Montgomery did not have the authority to backup

19   computers such as yours?

20   A    That's correct.

21   Q    And you assumed, in fact, that he did have such

22   authority?

23   A    I assumed that.  Yes.

24   Q    Okay.  Now, assuming -- assuming, just for purposes of

25   this question, that Mr. Montgomery backed up your files

```
 1   60 times during the duration of his stint at eTreppid --

 2    A   That's an estimate.

 3    Q   I understand that, Mr. Glogauer.  Do you recall, on each

 4   and every occasion, that all applications were closed at the

 5   time of the backup?

 6    A   I recall that was the procedure that we were to follow.

 7   I can't attest to whether it was followed every single time.

 8    Q   Okay.

 9    A   But it was the established procedure.

10    Q   So, generally, that's the way it was done?

11    A   Yes.

12    Q   But you cannot state the date, the day that it was done

13   in every instance, is that correct?

14    A   I can state that it was done in most instances.

15    Q   Okay.  Now, going to what's become infamously known as

16   the Glogauer e-mail --

17    A   Unfortunately.

18    Q   -- you testified a few moments ago that the second

19   sentence in the e-mail you testified that you did not write

20   that sentence?

21    A   I did not write that sentence.

22    Q   And is it correct that you did write the first sentence?

23    A   Yes, it is.

24    Q   And do you actually remember drafting the e-mail which

25   contained the first sentence?
```

Case 3:22-mc-00073-PMP-VPC Document 34 Filed 07/28/08 Page 723 of 800
Case 3:06-cv-00056-PMP-VPC Document 84 Filed 07/28/08 Page 723 of 800

—338

1    A    I do.

2    Q    Okay.  Do you remember deleting that e-mail from your

3   file?

4    A    I distinctly remember not deleting it.

5    Q    Okay.  Do you have -- strike that.

6         Other than Mr. Montgomery, who had access to your

7   computer?

8    A    I think anybody that was in the building that would

9   wander into my office, when I was away from my computer and

10  hadn't shut it down.

11   Q    And your computer was hooked up to the company server,

12  is right?

13   A    Yes, it was.

14   Q    And who had access to that server, do you know?

15   A    Primarily Sloan Venables.  And I'm sure that Dennis

16  Montgomery had access to it.

17   Q    And after Mr. Montgomery's departure, do you know who had

18  access in addition to Mr. Venables?

19   A    To the server?

20   Q    Correct.

21   A    I don't believe anybody, other than Mr. Venables had

22  access to it.

23   Q    Do you have any knowledge of the time at which the

24  Glogauer e-mail was deleted from your file?

25   A    I can tell you when I first noticed that it wasn't there.

```
 1   And that was when I first heard that it had been -- or was
 2   going to be published in the Wall Street Journal.
 3   Q   Okay.  But you don't know at what time prior to that
 4   call from --
 5   A   I have no way of knowing.  I, I have lots of e-mails in
 6   my file that I keep in a structured file format, and I -- by
 7   category, by folder.  But there, there's such a number of them
 8   there, I don't check how many, or which ones are there from
 9   one time to another.
10   Q   Does your office have -- strike that.
11           At the time the Glogauer e-mail was created, did
12   your office have a lock on the door?
13   A   Yes, it did.
14   Q   And do you generally -- is it your general practice to
15   lock your office --
16   A   No.
17   Q   -- when you leave the office?
18   A   No.
19   Q   Do you leave your office unlocked at night?
20   A   Yes.
21   Q   And always did?
22   A   Yes.
23   Q   And the company server, do you know where it's
24   maintained?
25   A   I do.  Yes.
```

1    Q    Where is it maintained?

2    A    It's maintained in a room off of Sloan Venables office.

3    Q    And is the room in which the server is maintained locked?

4    A    Yes, it is.

5    Q    Okay.  Who has key to that room, if you know?

6    A    I have no idea.  I assume Sloan does.

7    Q    Now, I believe you testified that your recollection is

8    Mr. Montgomery left sometime in December '06, January --

9    December '05 or January '06, is that correct?

10   A    I believe that's correct.  Yeah.

11   Q    Okay.  And I take it it's your recollection that

12   Mr. Montgomery's parting was not amicable?

13   A    Well, that was the impression that I was under.

14   Q    Shortly after Mr. Montgomery's departure, is it not true

15   that certain employees of eTreppid were given significant

16   bonuses?

17   A    Well, that would be news to me.  I mean, we haven't seen

18   a bonus there for quite a while.

19   Q    Did you receive a distribution, or any kind of payment in

20   or about December of '05, or January of '06, at the time that

21   Mr. Montgomery left eTreppid?

22   A    I don't believe so.

23   Q    Okay.

24              MS. GAROFALO:  All right.  I have no further

25   questions.

Case 3:22-mc-00076-GNK-VPC Document 34 Filed 07/28/08 Page 726 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/03/08 Page 131 of 205
-341-

1           MR. PEEK:  No redirect, Your Honor.

2           THE COURT:  All right.

3           MR. PEEK:  My next witness is Sloan Venables.

4           MS. GAROFALO:  Your Honor, we object to this

5  witness, to the extent this witness was not identified on the

6  witness list in this matter.

7           MR. PEEK:  Your Honor, the significance of

8  Mr. Venables only came up recently in terms of the e-mail

9  addresses of Mr. Montgomery.

10           THE COURT:  All right.  Well, I think that that

11  issue is relevant to the inquiry, based on Mr. Montgomery's

12  testimony.  And I'll go ahead and allow it.

13                          **SLOAN VENABLES**,
14           called as a witness on behalf of the Defendant,
                 was sworn and testified as follows:
15

16           THE CLERK:  Please be seated.

17           Please state your full name and spell it for the

18  record.

19           THE WITNESS:  Sloan S. Venables,

20  V-e-n-a-b-l-e-s.

21           THE CLERK:  Thank you.  Please be seated.

22

23                    <u>**DIRECT EXAMINATION**</u>

24  BY MR. PEEK:

25   Q   Mr. Venables, you work for eTreppid?

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

 1   A    That's correct.

 2   Q    And for how long have you worked for eTreppid?

 3   A    Since December of 1999.

 4   Q    And what has been your position at eTreppid during the

 5   period of time that you've worked there?

 6   A    Title-wise, it's shifted over time but, currently,

 7   director of it.

 8   Q    And had you been asked to look at e-mail addresses that

 9   Mr. Montgomery used on his computer at eTreppid?

10   A    Yes, I was.

11   Q    And what have -- and have you found certain e-mail

12   addresses on that computer?

13   A    I found several.  I provided a list to you guys earlier.

14   I think there was probably six -- five or six.

15   Q    Do you need that list in order to refresh your

16   recollection what they are?

17   A    Uh, probably.

18            MR. PEEK:  May I approach, Your Honor?

19        I don't have a copy, counsel.  I apologize.

20   BY MR. PEEK:

21   Q    Is that the list that you typed up and brought with you

22   today?

23   A    Yes, it is.

24   Q    And what are the varying e-mail addresses that you found

25   that Mr. Montgomery was using while at eTreppid, at least?

Case 3:22-mc-00076-PMP-VPC   Document 34   Filed 07/08/08   Page 728 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/08/08   Page 138 of 209
343

1   A   At the time he was at eTreppid, uh, they of course used

2   the Dennis@eTreppid.com.  He also used the Ncoder@earthlink.

3   net; Ncoder@hotmail.com; Ncoder@ mindstring.com; and, also,

4   an Smartin666@hotmail.com, which was used as an alias under

5   David Martin.

6   Q   Okay.  And did you also find another e-mail address that

7   was registered, or used by Mr. Montgomery, other than those

8   you just described to us?

9   A   Since -- after leaving eTreppid, I had found that he had

10  been using Dennis@ncoder.net.

11  Q   Did you find anything unusual about the

12  Dennis@ncoder.net?

13  A   I found that it's currently an inactive domain.  But,

14  originally, the domain was registered in Australia, under

15  a company called Moniker.  And that it was registered

16  anonymously, so that the original registrant wasn't made

17  known to the public.

18  Q   Do you know whether that is an active --

19  A   I had checked it today and it's currently inactive.

20  There are no mail records, no mail servers, or DNS domain name

21  servers responding to that domain.

22  Q   And did you find that unusual that it was an Australian

23  company?

24            MS. GAROFALO:  Objection.  Lacks foundation.

25            MR. PEEK:  I can go into, you know, his I.T.

Case 3:22-mc-00078-GMK-WAU Document 34 Filed 07/28/08 Page 729 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/28/08 Page 134 of 265

—344

1    background, Your Honor, if I need to.

2              THE COURT:  Well, I think it's not necessary.

3    The objection is overruled.

4          Go ahead.

5              THE WITNESS:  Well, domains are generally

6    registered in a handful of different places since they've

7    been allowed to be registered outside the initial I-can who

8    controls all domain handlers.  The registering them in

9    Australia is usually done by somebody in Australia, not by

10   somebody that's in the United States.

11   BY MR. PEEK:

12    Q   Would that be a way to hide it?

13    A   Possibly.

14              MR. PEEK:  That's all I have.  Thank you.

15              THE COURT:  Thank you.

16          Anything on cross-examination?

17              MS. GAROFALO:  Yes, Your Honor.  Again, very

18   briefly.

19                      **CROSS-EXAMINATION**

20   BY MS. GAROFALO:

21    Q   Mr. Venables, where did you search to come up with the

22   list of e-mail addresses purportedly used by Mr. Montgomery?

23    A   I found them within the PST files that were left behind

24   by Mr. Montgomery.

25    Q   Okay.  Do you have Mr. Montgomery's PST file from the

Case 3:22-mc-00073-PMP-VPC Document 234 Filed 03/28/08 Page 730 of 800
Case 3:06-cv-00056-PMP-VPC Document 324 Filed 03/03/08 Page 139 of 205
345

 1  time he was at eTreppid?

 2   A   Do you want me to describe where I found the PSTs, or do

 3  I currently have them?

 4   Q   Where did you find the PSTs?

 5   A   On one of Dennis' machines that had been deleted.  We

 6  used recovery software and recovered six PSTs that had been

 7  deleted.

 8   Q   Okay.  And when you talk about a machine, was it a

 9  desktop or laptop?

10   A   It was desktop station than was in the warehouse that

11  Dennis used.

12   Q   And when did you discover that desktop?

13   A   It had been there for at least two years in use by

14  Dennis.

15   Q   When -- I'm sorry, Mr. Venables.  Maybe I wasn't clear.

16        When did you discover the existence of that desktop?

17   A   I had seen him use that desktop for at least two years

18  prior to him leaving.

19   Q   So you always knew where that desktop was, is that

20  correct?

21   A   That's right.

22   Q   So the desktop was never lost, misplaced, out of sight,

23  is that correct?

24   A   Only time it was out of sight was when the -- I believe

25  it was the Office of Special Investigations came and took it,

Case 3:23-mc-00073-PMP-WGC   Document 34   Filed 07/28/08   Page 731 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 05/28/08   Page 194 of 209
346

1  after I had recovered these PSTs.  And then they've since

2  returned it to us this -- I would say earlier this year.

3  Q   The PSTs had been copied onto hard drives outside of the

4  desktop?

5  A   They were imaged by the LACG people.  So, they have a

6  copy.

7  Q   Anybody else have a copy?

8  A   I believe our lawyers have copies.  There's probably

9  several copies.

10  Q   Okay.  And do you -- strike that.

11        I think you mentioned that the, that deleted files

12  had been reconstructed, is that correct?

13  A   They were recovered using a software called Emergency

14  Undelete, which recovers files that have been deleted on the

15  hard drive.

16  Q   And when was that process undertaken, if you know?

17  A   That was done, uh, about a week, or no more than two

18  weeks after Dennis left, in the early 2006.

19        MS. GAROFALO:  Thank you.  I have no further

20  questions.

21        THE COURT:  Thank you.

22      Anything further, Mr. Peek?

23        MR. PEEK:  Just some follow-up.  And I

24  apologize, Your Honor.  This really goes to Mr. Glogauer.

25            **REDIRECT EXAMINATION**

Case 3:23-mc-00073-PMP-VPC Document 34 Filed 07/28/08 Page 732 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/03/08 Page 192 of 265
347

1    BY MR. PEEK:

2    Q    Who had access to the servers in the building at eTreppid

3    besides yourself?

4    A    During what time?

5    Q    During the period of 1999 through 2000, 2005?

6    A    Uh, just Dennis and I.

7    Q    Okay.  And were the computers that were used by the

8    individuals, password protected?

9    A    You mean all the computers?

10   Q    Yes.

11   A    For all the users in the company?

12   Q    Yes.

13   A    They all had passwords on them.

14   Q    And who had those passwords besides the user?

15   A    Dennis.

16            MR. PEEK:  Thank you.  That's all I have.

17            THE COURT:  Anything else?

18            MS. GAROFALO:  I have no further questions,

19   Your Honor.

20            THE COURT:  Thank you.

21            MR. PEEK:  Your Honor, I'd next call

22   Warren Trepp.

23            THE COURT:  All right.  Let's go ahead, it's

24   3:25.  Let's go ahead and take about a ten-minute break.

25   We'll return at 3:35.

Case 3:23-mc-00073-CKK-MAU  Document 34  Filed 07/28/08  Page 733 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/08  Page 198 of 265

348

```
 1              (Recess taken.)

 2              THE CLERK:  Court is again in session.

 3              THE COURT:  Thank you.  Please be seated.

 4         All right.  Mr. Peek, you may proceed.

 5              MR. PEEK:  Thank you, Your Honor.  My next

 6   witness is Mr. Trepp.

 7                       WARREN TREPP,
 8         called as a witness on behalf of the Defendant,
              was sworn and testified as follows:
 9

10              THE CLERK:  Please be seated.

11         Please state your name for the record.

12              THE WITNESS:  Warren Trepp.

13              THE CLERK:  Thank you.  Please be seated.

14                   DIRECT EXAMINATION

15   BY MR. PEEK:

16    Q    Mr. Trepp, do you know Dennis Montgomery?

17    A    I do.

18    Q    And how long have you known Dennis Montgomery?

19    A    Since, uh, I believe 1997 or 1998.

20    Q    Did there come a time when you and Mr. Montgomery worked

21   together in a company called eTreppid?

22    A    Yes.

23    Q    And for what period of time was that?

24    A    Starting the end of '98 through two thousand -- January

25   of 2006.
```

Case 3:22-mc-00078-GKF-MAU  Document 34  Filed 07/28/08  Page 734 of 800
Case 3:06-cv-00056-PMP-VPC  Document 354  Filed 07/28/08  Page 194 of 265

-349-

1    Q   And during that period of time, he had the title of Chief

2    Technology Officer, did he not?

3    A   That's correct.

4    Q   Did you ever ask Mr. Montgomery to perform any backups

5    of the individual computers used by other employees at

6    eTreppid?

7    A   No.

8    Q   Did you ever ask him to backup your wife's computer?

9    A   Abso --

10   Q   At your residence?

11   A   Absolutely not.

12   Q   Did you ever ask him to backup non-employees of eTreppid

13   such as Mr. Hughes?

14   A   Absolutely not.

15   Q   Did you ever give Mr. Montgomery hard drives to perform a

16   backup?

17   A   Absolutely not.

18   Q   Did you ever know that Mr. Montgomery was performing

19   backups of the individual computer stations at eTreppid?

20   A   No.

21   Q   When did you first learn that?

22   A   During this hearing.

23   Q   That would have been starting on or about June 10th?

24   A   I believe that's correct.

25   Q   Did you have a secure storage where you would keep

Case 3:23-mc-00075-GKF-VPC   Document 34   Filed 07/28/08   Page 735 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 07/03/08   Page 735 of 200

-350-

1    backups, or some -- you know, that type of important data?

2     A    I have a number of safe deposit boxes where I would keep

3    important documents for my wife and myself.

4     Q    And did you also use that for anything related to

5    eTreppid?

6     A    I did.  I asked Mr. Montgomery, over the years, to give

7    me copies of what he purported to be our proprietary Source

8    Code, which I kept in those safe deposit boxes.

9     Q    And he would give that to you from time to time?

10    A    That is correct.

11    Q    And did you maintain those -- were they hard drives?

12    A    Uh, they were first CDs, then DVDs, then hard drives.

13    Q    And have you had a chance to look at any of that

14    material?

15    A    Yes.  I had an analysis done on it all.

16    Q    And did you find that there were any backups of

17    individual computers of the other employees?

18    A    Zero.

19    Q    Zero?

20    A    Zero.

21    Q    Uh-huh.

22         Now, with respect to Len Glogauer's e-mail.  You

23    remember receiving it?

24    A    Yes.

25    Q    And we heard from Mr. Karchmer about how it was analyzed

Case 3:22-mc-00073-PMP-WAU Document 34 Filed 07/28/08 Page 736 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/28/08 Page 701 of 205
351

```
 1   on your computer.

 2    A   That is correct.

 3    Q   And analyzed on another storage of, I believe a server?

 4    A   An archived version.  Yes, I did.

 5    Q   An archive.  Did you ever alter that e-mail?

 6    A   Absolutely not.

 7    Q   Did you ever delete that e-mail off of Mr. Glogauer's

 8   computer?

 9    A   Absolutely not.

10    Q   Did you ever instruct anybody to delete the e-mail

11   purporting to contain the language, "We need to take care of

12   Jim," off of Mr. Glogauer's?

13    A   Absolutely not.

14              MR. PEEK:  That's all I have.

15              THE COURT:  Thank you.

16         Anything on cross?

17              MS. GAROFALO:  Good morning, Mr. Trepp -- good

18   afternoon, Mr. Trepp.  It's been a long-day.

19              THE WITNESS:  Good afternoon.

20                  CROSS-EXAMINATION

21   BY MS. GAROFALO:

22    Q   Mr. Montgomery ever backup your computer?

23    A   Not that I can recall.

24    Q   You don't recall Mr. Montgomery backing up your computer?

25    A   No.
```

1   Q   Okay.  How, during Mr. Montgomery's tenure at eTreppid,

2   about how much of your time during the work week did you spend

3   in the office?

4   A   The bulk of it.

5   Q   How big are the offices?

6   A   I'm not sure I understand the question.

7   Q   Five floors?  Two floors?  One floor?  Three offices?

8   A   Oh, there were two floors, with approximately 10 or 12

9   offices.

10  Q   Okay.  Was Mr. Montgomery's office on your floor?

11  A   For some period of time, Mr. Montgomery had an office

12  next to mine.  For a substantial amount of time, he did a lot

13  of work out of the warehouse, which was not in the office

14  area.

15  Q   Okay.  And Mr. Glogauer, was his office on the same floor

16  as yours?

17  A   Yes.

18  Q   And Ms. Perez?

19  A   Uh, Ms. Perez's office was on the first floor.

20  Q   Okay.  And during the six or so years that Mr. Montgomery

21  was at eTreppid, you did not know that he was backing up

22  the computers on a regular basis of you and other eTreppid

23  employees?

24  A   No, I did not.

25  Q   And you didn't know that until you came to these hearings

1   this week, is that your testimony?

2    A   Yes.

3    Q   Okay.  And --

4    A   Well, excuse me.  There was testimony about the backups,

5   either June 10th or -- but it was during this hearing when I

6   first heard about him saying he was doing these backups.

7    Q   And no other employee at eTreppid was -- Mr. Glogauer, or

8   nobody ever informed you that Mr. Montgomery was backing up

9   their computers?

10   A   Not that I remember.

11   Q   Okay.  And I believe your -- you just testified that

12   Mr. Montgomery backed up your wife's computer without

13   authority, is that correct?

14   A   No.  I believe the question was did I give authority to

15   Mr. Montgomery to backup my wife's computer.  And the answer

16   to that question was no.

17   Q   Okay.  Do you know whether Mr. Montgomery backed up your

18   wife's computer?

19   A   I don't, but I heard him testify that he did.

20   Q   Okay.  And your wife maintained her computer at home, at

21   your home?

22   A   That's correct.

23   Q   Did Mr. Montgomery have access to your home?

24   A   Whenever I would allow him in there.

25   Q   Okay.  Did Mr. Montgomery have access to your home when

1    you were not present?

2    A    No.

3    Q    Did he have a key to your house?

4    A    No.

5    Q    Do you have any explanation as to how he could have

6    backed up Mrs. Montgomery's (sic.) computer without your

7    knowing about it?

8    A    You mean my wife's?

9    Q    Your wife's.  Excuse me.  Mrs. Trepp.

10   A    Thank you.  He could have easily done it on one of the

11   occasions where I asked him to come to my house to either fix

12   a problem with her printer, or a problem we were having with

13   her machine.  It could have been any number of reasons.

14   Q    Okay.  So you did, on occasion, invite him to the house

15   to address computer issues --

16   A    Correct.

17   Q    -- that you or your wife were having, correct?

18   A    Correct.

19   Q    Okay.  You just mentioned safe deposit boxes, correct,

20   where you kept important information?

21   A    That's correct.

22   Q    Okay.  And you mentioned, I believe, that certain Source

23   Code information was maintained in those safety deposit boxes,

24   is that correct?

25   A    Purported Source Code.

-355-

1    Q    Okay.  And you're still in possession of that Source Code

2  that you believe to be purported Source Code?

3    A    It's not in my safety deposit boxes anymore, but I have

4  access to it.

5    Q    Do you know whether or not that information has been

6  produced in this litigation?

7    A    I don't know.

8    Q    Okay.  Did you give that material to your lawyers?

9    A    Uh, I believe I did.  I believe I did.

10   Q    Are you certain that you did?

11   A    No.

12   Q    Okay.  Where else could that information be?

13   A    In eTreppid's offices.

14   Q    Okay.  And how, how is that information stored -- strike

15 that.

16         On what kind of media is that information stored?

17   A    I've already testified it started on CDs, went to DVDs,

18 was then put onto hard drives.

19   Q    Okay.  Who actually transferred the information from the

20 DVDs to hard drive?

21   A    I never said it was transferred from DVD to a hard drive.

22   Q    Okay.  How did it get from a DVD to a hard drive?

23   A    I think you asked the same question twice, and I've

24 answered it twice.

25   Q    I'm sorry.  I did misunderstand your question.  Let me

1    then ask you a different series of questions.

2            Do you still have the DVDs?

3    A    I believe I have all of the purported Source Code that

4    Montgomery gave me to store in my safe deposit boxes.  I

5    believe they're currently in eTreppid's offices.

6    Q    Okay.  So that would be CDs, correct?

7    A    Originally CDs.

8    Q    Do you know how many CDs?

9    A    I don't know exactly.

10   Q    Okay.  And DVDs?

11   A    I don't know -- the number is what you're asking for?

12   Q    You have DVDs, right?

13   A    Yes.

14   Q    Do you know how many?

15   A    No.

16   Q    Okay.  And the same with respect to hard drives.  How

17   many?

18   A    I don't know the exact number.

19   Q    Okay.  Do you know approximately how many CDs?

20   A    Uh, three or four.

21   Q    And how many DVDs?

22   A    Approximately three or four.

23   Q    Okay.  Same question for hard drives.

24   A    Three to five.

25   Q    Okay.  Has anybody else, other than you, had access to

1    the hard drives?

2    A    Yes.

3    Q    Who were they?

4    A    Excuse me.  The hard drives or all of the media?

5    Q    Right now I'm asking about the hard drives?

6    A    Has anybody else had access; what do you mean by access?

7    Q    Has anybody else had the ability to view the material on

8    the hard drives?

9    A    Yes.

10   Q    Who?

11   A    Sloan Venables.

12   Q    Anybody else?

13   A    You would have to ask Sloan who else helped him do the

14   review of the data.

15   Q    I'm just asking you if you know.

16   A    I don't know.

17   Q    Okay.  Same question for DVDs; do you know who had access

18   other than you?

19   A    Same answer.

20   Q    And I assume the same answer for the CDs?

21   A    Correct.

22   Q    Any of the CDs, the CD we've been talking about as

23   CD-1?

24   A    I have never received CD-1.

25   Q    Okay.  Thank you.

Case 3:22-cv-00073-GMN-VPC Document 34 Filed 07/28/08 Page 743 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/08/08 Page 743 of 800
358

1   A    I do not believe CD-1 ever existed.

2   Q    Thank you.

3                MS. GAROFALO:  I have no further questions.

4                THE COURT:  Okay.

5            Any further redirect, sir?

6                        **REDIRECT EXAMINATION**

7   BY MR. PEEK:

8   Q    Was any so-called Source Code found on any of the CDs,

9   DVDs, or hard drives?

10  A    There was a portion of Source Code that was worthless,

11  that was found on one of the medium.  Everything else was

12  total garbage.

13  Q    What do you mean total garbage?

14  A    Had no relationship to Source Code of anything.

15  Q    Nothing related to data compression?

16  A    Zero.

17  Q    Nothing related to anomaly detection?

18  A    Zero.

19  Q    Nothing related to object tracking.

20  A    Zero.

21  Q    Nothing related to pattern recognition?

22  A    Absolutely not.

23               MR. PEEK:  Thank you.  That's all I have.

24               THE COURT:  Anything on recross?

25               MS. GAROFALO:  No, Your Honor.

Case 3:23-mc-00073-PMP-VPC   Document 34   Filed 07/28/08   Page 744 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/03/08   Page 744 of 800

359

1          THE COURT:  Thank you.

2      Thank you, sir.  You may step down.

3          THE WITNESS:  Thank you, Your Honor.

4          MR. PEEK:  Your Honor, that concludes the

5   testimonial side of my presentation.  I do have a number of

6   exhibits, most of which are either court pleadings or document

7   productions or a declaration regarding document productions

8   that I would offer.  I can do that now, or -- because I know

9   that counsel wants to look at some of those, I can do it

10  later.  But, I don't want to close my presentation until I

11  have the opportunity to make the offer of admission of the

12  various exhibits.

13          THE COURT:  Any -- Ms. Garofalo?  How would you

14  like to proceed?

15          MS. GAROFALO:  I think, Your Honor, that perhaps

16  the most expedient way to proceed -- at this point in time,

17  we only anticipate calling one witness.  I don't expect the

18  testimony to be terribly long.  Perhaps we can finish, and

19  then we can address the issues relating to the exhibits.

20          THE COURT:  All right.  And Mr. Peek has made

21  his record, so I think that's fine.

22      All right.

23          MS. GAROFALO:  We would like to call to the

24  stand Scott Cooper.

25  \\\

1                         **SCOTT COOPER**,
2          called as a witness on behalf of the Plaintiff,
           was sworn and testified as follows:
3

4

5                   THE CLERK:  Please be seated.

6              Please state your full name for the record.

7                   THE WITNESS:  Scott Cooper.

8                   THE CLERK:  Please be seated.

9                    <u>**DIRECT EXAMINATION**</u>

10   MS. GAROFALO:

11    Q    Good afternoon, Mr. Cooper.

12              Mr. Cooper, can you tell us your occupation?

13    A    I am an expert in computer forensics and computer

14   systems.

15    Q    Okay.  And when did you start working with computers,

16   Mr. -- when did you start working with computers?

17    A    1972.  So, that would be 36 years ago.

18    Q    Okay.  And did you have any undergraduate education

19   relating to computers?

20    A    Yes.  And graduate.

21    Q    Okay.  Let's start with the undergraduate.  Where did you

22   attend undergraduate school?

23    A    I started at the University of San Francisco, and I was

24   taking business classes.  I then went to the University of

25   California, Berkeley, for engineering, physics and calculus

1    type stuff.  I then went to the University of Colorado, where

2    I finished my undergraduate degree in the College of Business.

3    The major was computer-based information systems, which is

4    basically computers from a business perspective.

5              I then went on and did graduate work at University

6    of Colorado, College of Engineering, Department of Computer

7    Science.  So then it's computers from the engineering

8    perspective.

9    Q    Okay.  Since leaving graduate school, have you had any

10   further training in computer science or forensics?

11   A    Regularly.  I attend conferences and seminars.  I also

12   give seminars and conferences, both paid conferences, uh

13   membership organizations, monthly meetings, quarterly

14   meetings, annual meetings, in country, out of country.

15   Q    And do you have any certifications relating to your work

16   in computers?

17   A    I have a -- I am a Certified Management Consultant from

18   the Institute of Management Consultants.  So although it's

19   not specifically a forensic certification, it's a consulting

20   certification.

21   Q    Any other professional organizations to which you belong?

22   A    Many.

23   Q    Can you name a few?

24   A    There is a well-known national organization called the

25   High Tech Crime Investigation Association.  It is -- excuse

1    me, it's an international organization that is about -- that

2    is, uh, about half law enforcement, half private sector,

3    for the purpose of learning and sharing information about

4    examining and understanding high tech data and high tech

5    crimes.

6              I was the most recent past president of the

7    Los Angeles Chapter of the HDCIA.  And I think the Los Angeles

8    Chapter was one of the largest in the world.  I am also a

9    member of the American Society For Industrial Security, ASIS;

10   the Forensic Expert Witness Association, FEWA.  There is an

11   organization called, it's a Secret Service based organization,

12   dealing with high tech crime.  There's an FBI organization

13   that requires FBI credentials, that deals with the FBI and

14   private sector people, certain people being able to share

15   information about Homeland Security in the high tech crime

16   focus.

17             Those are many.  But, I don't think it's all.

18   Q    And where are you currently employed Mr. Cooper?

19   A    I am employed at FTI Consulting.

20   Q    And what are your responsibilities at FTI Consulting?

21   A    First, let me put into perspective of what FTI does.  And

22   then I'll identify my responsibilities.

23             FTI is a large company, traded on the New York Stock

24   Exchange.  We have offices in, I think, 25 countries around

25   the world.  Approximately 5000 employees.  The company is an

1    event-driven consulting firm.  We react to events.  We help

2    companies deal with events, whether it's financial analysis,

3    economic damage.  And in virtually all of those situations,

4    there is some component of electronic data that is often

5    relevant to a matter.

6           We have an electronic evidence consulting practice,

7    that is a global practice.  I am the Senior Managing Director

8    of the Electronic Evidence Consulting, EEC practice.  And I am

9    the senior-most person, across the globe, for that practice.

10   Q    And how long have you been in that role at FTI?

11   A    I joined FTI last year.  I had been running a company

12   prior to that for 24 years.  That was an I.T. consulting firm

13   that had two specialization areas.  One was what we called

14   our automation practice, which dealt with the computers,

15   computer systems, networks, applications, and helping

16   companies implement those.

17          The second practice area was what we called our

18   forensics practice, which was the focus on electronic

19   discovery and computer forensics.  And after 24 years there,

20   we were basically brought into the -- our company, the

21   forensics practice was brought into the FTI corporate

22   structure.

23   Q    Prior to Insync (phonetic), where were you employed?

24   A    Prior to InSync, uh, the most immediate position before

25   that was the Director of Information Systems at I.T. service

1   bureau.  Prior to that, I was at KPMG, Pete Morrick

2   (phonetic), in their Consulting Department, in the information

3   systems services group dealing with I.T. and computer systems

4   for large companies.

5   Q   And have you ever provided services to a court in

6   connection with litigation?

7   A   Many times.

8   Q   What kind of services have you provided at the request of

9   the court?

10  A   I have been a Special Master.  I've been a court

11  appointed referee, also granted with quasi-judicial immunity

12  on occasion, helping courts, judges, federal and state, and

13  other Special Masters understand technology as it's being

14  utilized for cases, and electronic discovery matters, systems,

15  et cetera.

16  Q   I would like to mark two exhibits at this time.  But,

17  first -- I believe we're up to Exhibit 50, is the Minutes of

18  Proceeding in this case, dated May 21st, 2008.  It's docket

19  number 628; and

20          Number 51 is the U.S. Protective Order, which is

21  docket number 253.

22          May I approach Your Honor?

23              THE COURT:  You may.

24              MR. PEEK:  I think this is 51 and 52.

25              MS. GAROFALO:  51 and 52.

Case 3:22-mc-00076-SKK-WAU Document 34 Filed 07/28/23 Page 759 of 800
Case 3:08-cv-00076-MMT-VPC Document 34 Filed 07/28/23 Page 759 of 800
365

 1                THE CLERK:  We're at defendant 50.  So if these

 2     are your first exhibits, it will be plaintiff's 1 and 2.

 3                MS. GAROFALO:  Correction.  They'll be marked as

 4     plaintiff's 1 and 2.

 5                (Whereupon, exhibits 1 and 2 -- documents, were

 6     marked for identification only.)

 7     BY MS. GAROFALO:

 8      Q    Mr. Cooper, I would like to have you look at the document

 9     we've marked as plaintiff's exhibit 1, which is captioned,

10     Minutes of Proceedings.

11                Do you see that --

12      A    I do.

13      Q    -- document?

14                Have you seen this document before today?

15      A    (Witness reviews document.)

16                I have.

17      Q    Okay.  And have you had the chance to review this

18     document prior to your testimony here today?

19      A    I have.

20      Q    Okay.  And I would like to draw your attention to page 2

21     of 3, bottom of the document, paragraph 4.

22                Do you see that?

23      A    I do.

24      Q    Okay.  And have you seen that paragraph before today?

25      A    I have.

-366-

```
 1    Q    And what does that paragraph say to you?

 2                   MR. PEEK:  Your Honor, is the question just --

 3    is he going to read it, or is he going to interpret it?

 4                   THE WITNESS:  I understood it to be the

 5    interpretation of the paragraph.

 6                   MS. GAROFALO:  That's correct.

 7                   MR. PEEK:  Then I object, Your Honor.  His

 8    interpretation is improper here.  I mean the Court's words

 9    are the Court's words, and the Court's order is the Court's

10    order.  Somebody else's interpretation is meaningless here.

11                   MS. GAROFALO:  Your Honor, he's providing expert

12    testimony.  He's going to provide expert testimony on the

13    subject of PST versus native files.  And I'm simply asking

14    whether he understands that that's what the Court ordered him

15    to -- that that's what the Court ordered to be produced in

16    this case.

17                   MR. PEEK:  Your Honor, this is another way, by

18    the plaintiffs, to rewrite the Court's orders.  And this is

19    just their effort to rewrite a court order.

20              What this gentleman's interpretation of this is, is

21    meaningless.  It's what, at least Ms. Klar, who heard this,

22    and what Mr. Montgomery, who heard this, what they understood

23    that they were required to do, and what the discovery required

24    them to do.

25                   THE COURT:  All right.  Well, I'm going to --
```

Case 3:23-mc-00076-CKK-MAU  Document 34  Filed 07/28/23  Page 752 of 800
Case 3:06-cv-00056-PMP-VPC  Document 854  Filed 07/28/08  Page 752 of 800

—367

 1    as I understand the question, first of all, it shouldn't be

 2    Glen Glogauer.  It should be Len, which was the Court's error

 3    in item four of docket 628, which has been marked as

 4    plaintiff's exhibit 1.

 5            So, I mean, if you're just asking, Ms. Garofalo,

 6    if he's read this order, has he read item four on page 2,

 7    go ahead and ask him that.  And he can tell us what he was

 8    directed to do as a consequence of reading, or having reviewed

 9    that, as someone, I presume, retained by the Montgomery

10    parties to respond to that discovery request.

11            I take it that's where you're going.

12    BY MS. GAROFALO:

13     Q   Have you read, Mr. Cooper, paragraph 4 of Plaintiff's

14    Exhibit 1?

15     A   I have.

16     Q   Okay.  And do you believe you understood paragraph 4 of

17    plaintiff's number 1?

18     A   I do.

19     Q   Okay.  I would like you to look, for a moment, to

20    plaintiff's number 2, which is the United States Protective

21    Order in this case.

22            Do you see that document?

23     A   I do.

24     Q   And have you seen this document before today?

25     A   I have.

—368

```
 1   Q   And did you review this document before coming here to
 2   testify today?
 3   A   I did.
 4   Q   Okay.  You've heard testimony -- strike that.
 5            You were present for Mr. Karchmer's testimony, is
 6   that correct?
 7   A   Yes.
 8   Q   In which Mr. Karchmer discussed, to some extent, the
 9   length of time needed to review documents to be produced
10   today.
11            Do you recall that testimony?
12   A   Yes.
13   Q   Okay.  And you -- have you reviewed the Protective Order
14   in connection with forming an opinion as to the length of time
15   it would take Mr. Montgomery to review the documents that have
16   been produced in this case?
17   A   Yes.
18   Q   And have you come to any conclusions about the difficulty
19   in reviewing documents, in light of the U.S. Protective Order?
20   A   Yes.
21   Q   And what is that opinion?
22   A   That --
23            MR. PEEK:  Your Honor, I'm going to object.
24   He's not qualified in time and motion studies.  He's
25   qualified, certainly, in forensic analysis.  But, I don't
```

```
 1   believe the gentleman is qualified in terms of time, motion,
 2   and human elements.  And that's what this opinion is asking.
 3                MS. GAROFALO:  Mr. Karchmer testified as to the
 4   time it should have taken, what he believes Mr. Montgomery
 5   should have done, whether it would have been reasonable to
 6   delete certain items, duplicate items in order to shorten that
 7   time, on the suggestion that it took far too long given the
 8   task at hand.
 9        If the Court would like me to breakdown the
10   questions, we can go through it question by question and
11   approach the issue that way.  The issue is certainly relevant.
12   And this witness is certainly competent to testify what a
13   review of these materials would entail.
14                MR. PEEK:  I'm happy to hear questions about
15   deduplicating and what it would take to deduplicate.  I'm
16   happy to hear questions that would relate to 1.3 million
17   files, and 92 percent of which are duplicates of eight
18   percent, whether he has an opinion about that.  But, those
19   are the kinds of things you do.  The other rest of it is just
20   human elements, and time and motion studies.
21                THE WITNESS:  We --
22                THE COURT:  Well, I --
23                THE WITNESS:  May I make a comment?
24                MR. PEEK:  Your Honor, the witness is not --
25                THE COURT:  No.
```

1          MR. PEEK:  -- does not have any question in

2     front of him.

3          THE COURT:  Actually it might be helpful, but

4     no.

5          What I'm going to do is this:  I mean if he wants

6     to proffer an opinion at this time, that's fine.  I'm going

7     to allow him to do that.  Obviously, the Court has listened

8     to Mr. Karchmer's testimony and his cross-examination, and

9     is aware of the issues raised, and would expect, as a

10    consequence, that not only would this witness, Mr. Cooper, can

11    give an opinion, but that he will substantiate that opinion.

12          MS. GAROFALO:  Thank you, Your Honor.

13          THE COURT:  So, please proceed.

14          MS. GAROFALO:  Okay.

15    BY MS. GAROFALO:

16     Q   Mr. Cooper, you understand that the United States

17    Protective Order required Mr. Montgomery to review files

18    that were required to be produced in this case prior to

19    production.

20     A   Yes.

21     Q   Okay.  And do you have an understanding, based on your

22    expertise, as to how that review was to be conducted?

23     A   Yes.

24     Q   And what is your understanding of what was entailed in

25    the review of materials to be produced in this case, as made

1    necessary by the U.S. Protective Order?

2    A    There are several parts to my understanding to that

3    process.  The first is that the U.S. Protective Order asked

4    Mr. Montgomery to review documents himself, and not get

5    assistance in the review; as well as to look for specific

6    documents that would contain what I'll, generically, call

7    confidential information or privileged information.  I believe

8    the term that was used was State's Secrets.  I understand

9    that his work related to national security issues, so he was

10   instructed to produce those things that were not confidential.

11          In order to do that, it required Mr. Montgomery to

12   review, I believe, every single file that existed, whether it

13   was duplicated or not.

14   Q    Why would Mr. Montgomery have to produce -- or have to

15   review files that were merely duplicates of other files?

16   A    We first have to understand the environment that he

17   was working in.  In listening to Mr. Karchmer's testimony, it

18   was clear to me that the scenarios that Mr. Karchmer was

19   addressing dealt with the scenario of if this was being done

20   by a forensically knowledgeable, or forensically skilled

21   person.

22          The forensic process -- I would like to describe

23   the forensic process before I describe the process that

24   Mr. Montgomery went through, because they are different.

25          The forensic process, typically, would have someone

1  take all the hard drives and all the pieces of media that

2  Mr. Montgomery had, make forensic images of each and every

3  one of them, assimilate all of those forensic images into one

4  great big image, then apply search criteria through a forensic

5  program, to filter and find certain file extensions, certain

6  words, certain file types, and extract that out.

7       That process would take weeks, or a month or so, to

8  do forensically, with forensic skills or tools.

9       It's my understanding that -- it's my understanding

10 that Mr. Montgomery did not have forensic tools, did not have

11 forensic skills, did not have forensic knowledge.  He took a

12 commonsensical approach, a computer scientist approach, a CTO

13 approach to working with the media that he had.  To do that, I

14 understand that he took each hard drive and looked through it

15 using the Windows search tool.  That Windows search tool is

16 woefully inadequate to search the scope and magnitude of the

17 data that he had, for the things that he's looking for.

18      There's an additional underlying problem in all of

19 this, an additional time consuming problem in all of this.

20 And that's the topic of false positives and false negatives.

21      When doing a search, irrespective of method,

22 whether it's a forensic method or non-forensic method, a false

23 negative means searching and not finding what you're looking

24 for, but it being there.  It means you missed it.  No search

25 mechanism I've ever seen, that I've ever been aware of, will

 1    guarantee no false negatives.  The mechanism Mr. Montgomery

 2    used was prone to having false negatives.

 3              In cases that I've been involved with, and I've been

 4    involved with many cases, sometimes a false negative isn't a

 5    big deal.  You miss it.  Well, if you got it all, it's pretty

 6    good.  If you accidently turn something over to the opposing

 7    party that you shouldn't have, maybe it's not too damning and

 8    maybe you can get it back.

 9              But in this particular case, this a national

10    security.  And I believe some of the language in the U.S.

11    Protective Order talked about grave consequences to the

12    security of the United States.  Having a false negative

13    means that if Mr. Montgomery allowed a false negative to

14    occur, he would have then been turning over potentially

15    gravely serious data to the public.  My understanding is

16    that he desired to be rigorous and careful in this process,

17    and eliminate false negatives.

18              Additionally, false positives are also a problem.

19    If you are looking for a term that might be important, it's,

20    virtually, a hundred percent of the time, that false positives

21    also occur, which means you wind up hitting and finding more

22    things than are completely relevant.  But when you get a false

23    positive, you then need to look at it and say is it relevant

24    or not.

25              Then we get into the dilemma of how does one

1    determine relevance?  I know that there is the legal

2    interpretation of relevance of is it responsive, is it in

3    scope?  But, here, we've got an issue of, in addition to

4    the legal side, the U.S. Protective interests.  And it just

5    complicates the process to have to go through, deal with

6    false negatives, false positives, manual steps, non-forensic

7    methods, an non-forensic skills.

8     Q   If I may summarize, by a very simplistic way, the only

9    way to really be sure that all of the material covered by the

10   U.S. Protective Order was screened out, was to look at each

11   and every item on the hard drives.

12            Isn't that correct, Mr. Cooper?

13    A   Yes.

14    Q   Okay.

15    A   Can I elaborate a little bit?

16    Q   You may.

17    A   There's been a lot of conversation about file extensions.

18   And Mr. Karchmer created a 42-page document that listed

19   file he extensions, and there was conversation about the

20   unnecessary need to look at certain extensions like JPGs and

21   TXTs and EXEs.  In a normal forensic -- using normal forensic

22   tools, you can skip over those.  But, in this case, you

23   cannot.

24            And Mr. Karchmer also, under cross-examination,

25   agreed, that an HTML file, for instance, normally is a web

—375

1    page.  But it can also be a word document.  And it can also

2    be something completely different.  He even commented that he

3    found some e-mail messages that were tagged at HTML, which

4    means that he even found instances where the extension is not

5    what it normally is.

6              There is a mechanism, in the forensic community, to

7    do signature hash analysis, which is different than the

8    already MD-5 hash analysis that's been discussed.  But, again,

9    that's a sophisticated forensic mechanism to go through.

10             So, absent having those forensic tools and methods,

11   I really don't see any other way for Mr. Montgomery to have

12   complied, other than to manually look at each and every file.

13   Q    Now, given the tools that Mr. Montgomery was using, in

14   your opinion, is the testimony that there were frequent

15   crashes of the computer plausible?

16   A    Quite.

17   Q    Okay.  What and why would that be?

18   A    As I understand it, Mr. Montgomery was looking through

19   millions and millions of files.  The tool that he used was

20   Windows Search.  It is not intended to be applied to such a

21   large corpus.  He's limited to then -- he was then limited to

22   using a regular PC computer, not a forensic computer, looking

23   through a forensic quantity of data, using a tool that was not

24   intended for such a large problem.  Having it crash, or take

25   hours and hours to run, is highly probable, and highly likely.

Case 3:22-mc-00073-GMK-WAU Document 34 Filed 07/28/08 Page 761 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/28/08 Page 726 of 265
—376

 1         Would it have caused crashes every time?  No.  Is it

 2    likely to have crashed frequently?  Yes.

 3    Q   And, again, in my very simple way, the question is those

 4    crashes would also slow-up the process, would they not?

 5    A   Most certainly.

 6    Q   You have not, by the way, reviewed the material that

 7    Mr. Montgomery produced, have you, Mr. Cooper?

 8    A   You're correct.

 9    Q   And you have not -- including the Glogauer e-mail, is

10    that correct, Mr. Cooper?

11    A   Also correct.

12    Q   Okay.  I would like to ask you just a couple of simple

13    questions relating to PST files.

14         There has been some testimony by Mr. Karchmer

15    relative to what you can discern, what you can't discern

16    from PST files.

17         You were here for that testimony, correct?

18    A   Yes.

19    Q   Okay.  The first thing I would like to ask you is there

20    has been some mention of MSG versus PST files.  Is -- what

21    information would you -- strike that.

22         If an MSG version of an e-mail were produced,

23    as opposed to a PST version of the e-mail, is there any

24    information that would be missing from the MSG version that

25    would be found in the PST version?

1    A    The e-mail message itself is the same, whether it's in

2    an MSG form or the PST form.  However, there are additional

3    information beyond the e-mail itself, that is 99 percent

4    present on an MSG.

5              So, I'll state it differently.  Comparing an MSG

6    to a PST, the MSG e-mail information is identical.  Then

7    secondarily to that, is the peripheral information that

8    related it to the e-mail.  And in that case, 99 percent of

9    it is present on the MSG.  There is only one small piece of

10   the peripheral secondary information that's not in the MSG

11   that could be found in the PST.

12   Q    And what piece of information is that, Mr. Cooper?

13   A    That is the third piece of date and time information that

14   was on the print screens of Exhibit 58 or 48?

15   Q    49, I believe.

16   A    49.  That listed the access date, where Mr. Karchmer, I

17   believe mentioned on cross-examination that it wasn't

18   necessary for him to look at that piece of information to

19   draw his conclusions.

20   Q    And that would be the only difference between the MSG

21   version of an e-mail and the PST version of the e-mail, is

22   that what you're telling us, Mr. Cooper?

23   A    Yes.  That's assuming that the MSG was a Microsoft e-mail

24   MSG, as opposed to the other types of MSGs that could exist

25   that are not e-mail messages from Microsoft.

1   Q   Okay.  Are you telling us, then, that Mr. Karchmer was

2   wrong when he said the MSG version of the e-mail would lack

3   any metadata?

4   A   He was.

5   Q   And can you be more specific in how Mr. Karchmer was

6   incorrect?

7   A   So a mechanism that Mr. Karchmer described in his

8   testimony was to look at the PST file, and realizing that the

9   PST file contains lots of e-mail messages.  He described that

10  you can drag an e-mail message out of the PST and make an MSG

11  out of it.  And that is a proper mechanism.

12         By doing so, which is a proper mechanism, the

13  metadata of the e-mail message itself stays with the e-mail

14  message.  And I would like to elaborate just a little bit.

15         An e-mail message has three parts:  One is the body

16  of the e-mail.  The body of the e-mail are the words:  Dear

17  Fred, let's have lunch.  Signed Wilma;

18         The second part of an e-mail message is the, what

19  I call header information.  And it's also referred to as the

20  message header.  It's the to and from and CC and subject and

21  date;

22         The third part of an e-mail message is what I call

23  the routing information.  That's also referred to as the

24  internet headers.  The internet headers are pure metadata.

25  And there are two types of metadata.  There was traditional

1    metadata, and what I call extended metadata, or the pure

2    metadata.  This pure metadata is not affected by users'

3    activities.  Pure metadata in an e-mail message contains when

4    the e-mail was sent, and if it left your computer and went to

5    your server, a time stamp.  And if it then left your e-mail

6    server to go out to the AOL server, there's another time stamp

7    and piece of metadata added into the internet header section.

8    That internet header section accumulates information during

9    the life of the e-mail.

10         When you drag an e-mail message out of a PST into

11    an MSG, all three of those pieces carryover.  So, in that

12    respect, when he said there was no metadata carried over, he

13    was incorrect.

14    Q   Okay.  So when you're working in Outlook and you drag, as

15    Mr. Karchmer described, an e-mail, a PST file over into a --

16    drag it over and it becomes an MSG file, you basically take

17    all the meta -- strike that -- most of the metadata with you.

18         Is that correct?

19    A   You take 100 percent of the metadata that's in the e-mail

20    message, and you take most of the metadata that's peripheral

21    to it.

22    Q   Now in terms of -- in terms of a one e-mail PST, in your

23    opinion, would the production of a one e-mail PST be compliant

24    with the order which we've marked as Exhibit 51, paragraph

25    four, which directs Mr. Montgomery to produce the material in

Case 1:22-mc-00073-CKK-MAU Document 34 Filed 07/28/23 Page 765 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/03/08 Page 736 of 265

380

1    PST or native format?

2                    MR. PEEK:  Objection, Your Honor.

3                    THE WITNESS:  Your question --

4                    MR. PEEK:  Excuse me.  I have an objection to

5    this, Mr. Cooper.  You're familiar with the procedures.

6            I'm going to object, Your Honor.  This is not within

7    the province of this witness to interpret, again, the Court's

8    order and determine to give a legal opinion whether this is or

9    is not in compliance with the Court's order.

10                    MS. GAROFALO:  I can rephrase the question,

11   Your Honor.

12                    THE COURT:  All right.

13                    MS. GAROFALO:  Okay.

14   BY MS GAROFALO:

15    Q   Is there something in a one e-mail PST, that's missing

16   from the e-mail as it's viewed in the entire PST file?

17    A   I don't think so.  But a one e-mail PST is not the same

18   as having the entire PST that had the e-mail in it.

19            However, it's my understanding, and it would be my

20   interpretation of the instructions that Mr. Montgomery was

21   given, he was not allowed to provide the entire PST.  So,

22   he did the thing that he was instructed to provide, in my

23   understanding of what's here.

24    Q   Okay.  An MSG, a copy of an e-mail in MSG format can be

25   manipulated, is that correct?

```
 1   A    Yes.

 2   Q    Okay.  And Mr. Karchmer testified that it was also

 3   possible to manipulate an e-mail that's in PST format.

 4            Was Mr. Karchmer correct?

 5   A    No.

 6   Q    And why not?

 7   A    Assuming that you are a normal user, and are using the

 8   application in a normal fashion; i.e., you're not a forensic

 9   person using forensic tools, it is my understanding that it

10   is not possible to edit an e-mail inside a PST.  You can drag

11   it out, edit it, and drag it back.  You can manipulate it

12   forensically, but you cannot just change it while it's sitting

13   inside a PST.

14   Q    The fact that an e-mail is found in a PST file is not

15   necessarily conclusive that the e-mail has not been somehow

16   altered, is that correct?

17   A    Correct.

18   Q    Okay.  And, obviously, the same with an MSG.  Wherever

19   that e-mail is found, it's possible it was altered.

20            Is that correct?

21   A    Correct.

22   Q    So there's really no format which is absolutely

23   foolproof, correct?

24   A    Correct.

25   Q    I just want to talk a little bit about the issue that
```

1   Mr. Karchmer discussed early in his testimony, about this one

2   terabyte drive.

3        Do you recall hearing that testimony?

4   A   Yes.

5   Q   Okay.  And Mr. Karchmer testified that there was

6   something wrong with the dates on the drive because it

7   appeared that the hard drive was created before one terabyte

8   drives were available for purchase.

9        Is that correct?

10  A   Correct.  I believe his language was the dates were -- I

11  forget his exact words.  I believe they were manipulated was

12  his words.

13  Q   Okay.  Do you have any understanding in this case how the

14  date on the one terabyte, on the one terabyte drive came to

15  precede the actual availability of a one terabyte drive?

16  A   Yes.

17  Q   And what is your understanding of the process?

18  A   My understanding of the process is that Mr. Montgomery

19  used cloning software.  Using the term that Mr. Karchmer used,

20  he used cloning software to clone a small drive, an old, or

21  older small drive, onto a newer large drive.  And when you

22  clone an entire drive, you carry with it all of its metadata.

23        The scenario -- which means that if you have an old

24  hard drive that's from 2002, and you have a new hard drive

25  from 2007, if you clone the '02 drive onto the '07 drive, and

```
 1   you then look at the '07 drive, it will look like the '07

 2   drive was formatted in '02, the data was from '02 or '03, as

 3   the case may be.

 4          The scenario that Mr. Karchmer didn't consider in

 5   his talking about the cloning process, is he made mention that

 6   since the target-cloned drive -- and the word target means

 7   where you copy onto.  So there's the source drive, which is

 8   the original and the target where you copy to -- Mr. Karchmer

 9   said that since there was no terabyte drive in '02, he

10   couldn't understand how a terabyte drive would have been

11   filled up through a clone.

12          He's correct.  That if you were to clone an entire

13   terabyte drive, since it didn't exist.  However, he was also

14   wrong.  He failed to consider the scenario where -- and this

15   is what I understood that Mr. Montgomery did -- Mr. Montgomery

16   had a small old hard drive, and he created a partition that

17   matched the size of the old drive on the new large drive.  He

18   cloned -- I forget the exact size -- he cloned 300 gigabytes

19   from an old drive, into a 300 gigabyte partition on the new

20   drive.  He then expanded that partition afterwards, which then

21   makes it look like I have cloned onto a one terabyte drive,

22   and it was dated from '02 or '03.

23          MS. GAROFALO:  Thank you.  I have no further

24   questions.

25          THE COURT:  All right.  Mr. Peek.
```

Case 3:22-mc-00073-SMK-WAU   Document 34   Filed 07/08/08   Page 769 of 800
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 07/03/08   Page 794 of 205
-384-

1          MR. PEEK:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3    BY MR. PEEK:

4    Q   Let me just start with the cloning process, because it's

5    easier for me to go that way.

6              I think you said that you learned from

7    Mr. Montgomery that he used cloning software?

8    A   Yes.

9    Q   What is the name of that cloning software?

10   A   I recall that he told me he used Partition Magic.

11   Q   Partition Magic?

12   A   I'm not sure if that's the only piece of software that

13   he used.

14   Q   When did he tell you he used Partition Magic?

15   A   Within the last week.

16   Q   Okay.  And so within the last week -- and was that in an

17   interview you had with him?

18   A   A conversation.

19   Q   A conversation.  You were asking him questions about how

20   he went through the process?

21   A   I don't recall if I was asking him if he went -- how he

22   went through the process, or he was telling me.

23   Q   Okay.

24   A   But it was in a conversation he and I were having.

25   Q   Who else was present?

1   A   I don't recall if that conversation was over the phone or

2   in person.

3   Q   Okay.

4   A   During the last week, there have been several

5   conversations with him.  During most of them, Peter Branston

6   was either on the phone or in our presence.

7   Q   Okay.  So he told you that he used a cloning software

8   called Partition Magic?

9   A   Not exactly.  He said that he used cloning software.  And

10  he also discussed Partition Magic.  I don't remember if there

11  was another piece of software.  Only --

12  Q   So you just concluded that that may have been one of the

13  softwares that he used?

14  A   Well, I know that I -- I am clear that he said he used

15  Partition Magic to expand the partition.  He, from my

16  recollection, he would have used Partition Magic to create

17  the partition.  I don't recall if he used Partition Magic to

18  clone.

19  Q   Well, wouldn't it be important to you, to your

20  understanding of what he did, to know what the software was?

21  A   No.

22  Q   It wasn't important to you to know what that software was

23  in order to know exactly whether or not that software he was

24  using would perform as he described?

25  A   I accepted his statement.

Case 3:23-mc-00073-GWF-VPC   Document 34   Filed 07/28/08   Page 731 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/28/08   Page 736 of 800
-386

1    Q    You accepted his statement.  Okay.

2    A    Well, I accepted his statement that he used cloning

3    software.

4    Q    But without finding out what that cloning software was --

5    A    I believe he told me.  I just don't recall.

6    Q    Okay.  And that was just in the last week, and you don't

7    recall that?

8    A    Correct.

9    Q    And you've been testifying as an expert for a lot of

10   years.

11   A    You bet.

12   Q    And it's requiring you to remember what your client tells

13   you, and what information you have in order to formulate your

14   opinion, isn't it?

15   A    Yes.

16   Q    And you don't remember this one key element of what

17   software he used?

18   A    Wasn't so key for me.

19   Q    It wasn't important to you?

20   A    I didn't say it wasn't important.  You asked me if it was

21   key.

22   Q    Was it important to you to know what cloning software he

23   used?

24   A    No.

25   Q    Okay.  Have you asked?

1    A    I'm sorry.  I just don't remember.

2    Q    Ahh, okay.

3    A    That's what I've been saying.

4    Q    But, again, that's part of the your job as an expert to

5    remember facts like that, isn't it?

6    A    It's not -- to me, it's not such an important fact in

7    this process.

8    Q    You certainly were present in the proceedings in June on

9    this matter, were you?

10   A    I'm sorry?

11   Q    You weren't present during any of the proceedings?

12   A    You're correct.

13   Q    Have you read any of the transcripts of those

14   proceedings?

15   A    I don't think so.

16   Q    Do you know what his testimony was when asked about

17   the dates and how they came to be on the terabyte drive of

18   November 2003, and I think the other one was 2002?

19   A    I don't believe I know that.

20   Q    You don't know that.  So you're not aware that when

21   asked about how those dates got there, he never told this

22   court that he used cloning software, and that's the reason for

23   the dates?

24   A    I'm unaware of that.

25   Q    Would that be important to you to know whether he did or

Case 3:22-mc-00076-GMN-WGC  Document 34  Filed 07/08/08  Page 773 of 800
Case 3:06-cv-00056-PMP-VPC  Document 84  Filed 07/03/08  Page 738 of 200
-388-

1    did not use cloning software, as to what he testified under

2    oath in this proceeding as to how he would explain the dates?

3     A    All I know is what he told me.

4     Q    Now, are you aware that Mr. Karchmer was here during

5    Mr. Montgomery's entire testimony?

6     A    Not aware of that.

7     Q    And he heard what Mr. Montgomery said about how the dates

8    got onto the terabyte drive and the 500 gigabyte drive.  He

9    was here for that --

10    A    So to help me understand --

11    Q    -- sworn testimony.

12    A    So to help me understand that, can you tell me what

13   Mr. Montgomery said?

14    Q    He had no explanation, whatsoever, as to how those dates

15   got there, other than it was imprinted off of the computer

16   from which it was gotten.

17    A    It's correct answer.

18    Q    But he would have had to give a full explanation to say

19   he used cloning software in order to provide -- to say the

20   date would have matched it, wouldn't he, to be completely

21   truthful and honest?

22    A    If he was asked what was the mechanism, I suppose --

23    Q    I asked him that question many, many times what the

24   mechanism was.  He never told us he used cloning software,

25   sir, under oath.

Case 3:23-mc-00073-CWK-VPC Document 34 Filed 07/28/23 Page 734 of 800
Case 3:06-cv-00056-PMP-VPC Document 34 Filed 07/28/08 Page 735 of 805

-389

1    A    Okay.

2    Q    And when you were examining him, he wasn't under oath,

3    was he?

4    A    No.

5    Q    So he told you something different, not under oath, than

6    he told this court, correct?

7    A    If you say that's what he said, and your statements are

8    correct, then yes.

9    Q    Now when you put a hard drive into your computer to

10   format it, do you type the word "format"?

11   A    It's one mechanism you can use.

12   Q    And what other mechanisms do you use?

13   A    When you type in your premise, you said if you type the

14   word "format", that presumes that you are using the DOS

15   operating system, and using the DOS command format.  There

16   are other DOS commands that you can use besides format.

17   There's quick format.  There are other DOS tools that allow

18   you to format.  And then there's the Windows environment.

19          Assuming we're talking about Windows, you would --

20   you can click an icon to format.  You can issue command line

21   instructions.  There's a lot of ways --

22   Q    But you have to give a command of some type to format the

23   hard drive, do you not?  In other words, you don't just plug

24   and play.

25   A    Well, to some degree, I believe that when some -- there's

Case 3:22-mc-00073-SKK-WAU  Document 34  Filed 07/28/23  Page 775 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/08  Page 775 of 800

390

1   a possibility that the computer can come up and say, do you

2   want to format?  And all you have to do is hit, click on yes.

3   I don't know if you want to call that issuing a command.  You

4   are issuing some sort of instruction.

5   Q   Right.

6   A   I'm unaware of any computer that will format by itself.

7   Q   Okay.  And is it your testimony that when you use the

8   cloning software, that the command format, however it's given,

9   gives the date off of the clone, or does it give the date that

10  it actually occurred?

11  A   The word "date" is a little vague.  But if I understand

12  your question, I believe that depending on the cloning

13  software that you used, and the switches or the choices or

14  options that you invoke, it will either keep old dates, or not

15  keep old dates, but I believe the default for the cloning

16  process is to keep old dates.

17  Q   Okay.  But you don't know what software he used to be

18  able to tell us if that was in fact what happened in this

19  instance?

20  A   You're correct.

21  Q   And are all cloning softwares the same?

22  A   No.

23  Q   And some would just use the date that you've actually put

24  the hard drive in to be copied?

25  A   I didn't say that.  And I don't know that that exists.  I

Case 3:22-mc-00073-CWR-MAU Document 34 Filed 07/23/23 Page 776 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/23/08 Page 776 of 800
-391

1   believe it's a choice, but I believe the default, if you don't

2   do anything to change the default, you wind up with an old

3   date.

4   Q    Which software would you know that has that default,

5   which cloning software?

6   A    There are -- there's a drive copy utility --

7   Q    Is that what it's called, Drive Copy Utility?

8   A    Well, utility is an adjective, so I believe that it was

9   called Drive Copy.

10  Q    Okay.

11  A    And it's a utility.

12  Q    And it's used for cloning software?

13  A    It's used to copy a drive.  It's an old DOS -- Encase has

14  a component; I believe FTK has a component.  It's a common,

15  fairly common activity.

16  Q    Okay.  And each of those, as far as you know, the default

17  is you give the format, provide the format date as the date

18  from which the drive being copied has?

19  A    I believe so.  I have not used drive cloning in many

20  years.

21  Q    And why would you use cloning software in a document

22  production?  Or, did Mr. Montgomery tell you why he used a

23  cloning software in order to maintain these dates?

24  A    It wasn't a conversation that I was having about trying

25  to maintain dates or not.  This was -- the maintaining of

Case 3:22-mc-00078-CWD-WAU  Document 34  Filed 07/08/08  Page 777 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 07/03/08  Page 777 of 800

-392-

1   dates was a conversation that occurred today.

2   Q   Oh, okay.  That was just today then?

3   A   Yes.

4   Q   Okay.

5   A   The issue about the dates, and the changing of the dates,

6   my recollection, was today.  Maybe yesterday also.

7   Q   Okay.  So it was just during the course of this testimony

8   yesterday and today, from Mr. Montgomery, that he told you

9   about using cloning software?

10  A   No.

11  Q   Okay.

12  A   That wasn't -- that wasn't my answer.  He told me about

13  using cloning software within the last week.  Your question,

14  that I understood it, was about how cloning software affected

15  dates.

16  Q   Ahh, I apologize.  My fault.  My mistake, Mr. Cooper.

17          Have you ever used cloning software for purposes of

18  document productions?

19              MS. GAROFALO:  Objection.  Lacks foundation.

20              MR. PEEK:  Well, I can make foundation as to

21  whether he's been involved in document production.  But I

22  thought given his vast experience over the 36 years, that he

23  would have had some involvement.  I can go over his list.

24  But, I can make a foundation if she wants me to.

25              THE COURT:  I believe that through Mr. Cooper's

```
 1   testimony about his experience, he can go ahead and answer the

 2   question.

 3              The objection is overruled.

 4              THE WITNESS:  Yes.

 5   BY MR. PEEK:

 6    Q    And do you use it often?

 7    A    Yes.

 8    Q    And why?

 9    A    When we produce data in a, in a litigation matter,

10   because data these days has gotten to be large and will no

11   longer fit on floppies, CDs, or DVDs, we produce it often on

12   a hard drive.  We keep a clone of that hard drive to keep in

13   our files to keep track of what we produced.

14    Q    I'm talking about what you actually produced, not what

15   you keep.

16    A    That's a different question.

17    Q    Well, I'm talking about what you produce.  I said -- I

18   understand you keep a copy of what you produce.

19    A    Sure.  We clone frequently, also.

20    Q    And provide the hard drives as cloned copies, showing an

21   earlier date than when the files were created?

22    A    Most definitely.

23    Q    Okay.  Now, would you expect in using the cloned software

24   that all of the dates of each of the files would remain the

25   same, or just the dates that they were actually imported or
```

1  exported onto the new hard drive?

2   A   I think I understand your question.

3   Q   I'm not sure I do.  But, go ahead.

4   A   My expectation is that when we clone a drive, exactly

5  what was on drive one, is exactly what winds up on drive two;

6  all dates, all files.  It's meant to be an exact clone, using

7  the metaphor of the dahli clone of -- down to the DNA level.

8   Q   Okay.  So in this case, we have the date on, I think it's

9  the 500 gigabyte drive -- I need my exhibit.

10          The 500 gigabyte drive, the format date was on

11  four -- 11-18-2003 at 4:58.  And it ran until 15:34 on

12  11-18-2003.

13   A   Can you repeat that for me a little more slowly.

14   Q   The format date was 11-18-2003 at 4:58 a.m.  And the

15  completion date of all of the transfer was at 11-18-2003 at

16  15:34 or 3:34 in the afternoon.

17          Now --

18   A   Excuse me.

19          THE COURT:  Excuse me.  Would you just give him

20  the exhibit --

21          MR. PEEK:  Does he have the exhibit?

22          THE COURT:  -- 48, please.

23      Thank you.

24          MR. PEEK:  That way -- I apologize.  I'm not

25  trying to make this a test of memory.

Case 3:23-mc-00073-SKK-WAU  Document 34  Filed 07/28/23  Page 780 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/08/08  Page 749 of 200

395

```
 1              THE COURT:  It's on that first page, is it not,
 2    Mr. Peek.
 3    BY MR. PEEK:
 4     Q   Yes, it is.  First one is the one terabyte drive that I
 5    just read?
 6     A   Mr. Peek, these times that you're giving me, are they
 7    local times or GMT times?
 8     Q   I don't know.
 9     A   Okay.  Go ahead.
10     Q   Because -- I don't know because it's a clone software, so
11    it's taking the date off of the clone.  So I don't know what
12    the date is on the clone.
13              That's what you told me.  These dates come off the
14    clone.  I would assume you would know that from talking to
15    Mr. Montgomery.
16     A   Uh, I understand this exhibit to have been created by
17    your expert.
18     Q   Correct.  These are the dates and times that showed on
19    the terabyte.  As to the first one, is the date that the
20    one terabyte drive was formatted.  That's 11-18-2003 at 4:58.
21    And then the copying, or the exporting of the data began on
22    11-18-2003, moments later, at 4:58.
23     A   To help me understand your question, when your expert
24    created this document for you, did your expert convey that the
25    times that they put on here, were they using GMT times or
```

Case 3:22-mc-00076-SWK-WAU   Document 34   Filed 03/28/08   Page 781 of 800
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 03/03/08   Page 246 of 265
396

```
 1   local times?

 2    Q    I don't know that because I only know what you've told

 3   me, that the clone software would give the date and time.

 4    A    That actually wasn't my question.

 5    Q   I know that.

 6    A    Okay.

 7    Q    But I know what GMT time is.  Greenwich Mean Time.  I

 8   know that.  It's about nine hours ahead of where we are in

 9   Reno here today.  So, it doesn't matter in terms of whether

10   it was GMT or not for your, for purposes of this interrogation

11   -- or does it?

12    A   To me, it does.

13    Q    Okay.  Why does it matter if it's GMT or not?

14    A    So whether it's GMT or local, the elapse time is the

15   same.  But, if I know that a process starts at four in the

16   morning or three in the morning, versus three in the

17   afternoon, it tells me about the likelihood of somebody

18   monitoring it, or going to sleep after something starts.

19          It's a process I've gone through many times.

20    Q    Well, didn't you find that information from

21   Mr. Montgomery, as to whether he started it at a five in the

22   morning, or five in the afternoon --

23    A    No.

24    Q    -- the previous day?

25    A    No.
```

1    Q    Okay.  But if it's GMT time, it would be in the evening,

2    would it not, nine hours earlier?

3    A    Correct.

4    Q    And --

5    A    Approximately.  It's either nine or eight.

6    Q    I don't know if it's nine or eight, but it could be

7    seven.  We're on Daylight Savings Time?

8    A    For the conversation purposes, we'll call it eight.

9    Probably closer.

10   Q    Okay.  So if we're at eight, so he would have started

11   instead of 5:00 a.m. in the morning -- I'm just rounding it

12   off -- it would have started at about nine o'clock the

13   previous night?

14   A    Yes.

15   Q    So does that matter which one?  Whether he stayed up

16   and monitored it all night, or he got up early and monitored

17   it all day, for purposes of my question, is that important?

18   A    I haven't heard the rest of the question yet.

19   Q    You're the one that said GMT was important to you, so I'm

20   just trying to find out.

21   A    I'm just trying to understand the premise of the

22   question.

23   Q    Okay.  My question, really is, sir, does the GMT -- or

24   does the time here, you're telling me it comes off of the

25   clone, does it not?  That's what you told me.

Case 3:22-mc-00076-SKK-VPC Document 34 Filed 07/08/08 Page 733 of 200
Case 3:06-cv-00056-MMK-VPC Document 34 Filed 07/08/08 Page 748 of 265
-398

1   A    I'm not able to tell you where this document gets its

2   time from.  I don't know how this document was populated

3   with --

4   Q    It came off of the terabyte drive.

5   A    Okay.  So are you telling me that the data that's in this

6   spreadsheet was manually entered by someone, or was it an

7   electronic dump from some tool's analysis of the cloned drive?

8   Q    Well, I guess, I guess, you don't know one way or the

9   other, because you haven't looked at the terabyte drive, have

10  you?

11  A    I have not.

12  Q    So you wouldn't be able to even know what these times

13  are, when this began, when it ended, can you?

14  A    Correct.

15  Q    Because you never looked at it --

16  A    Correct.

17  Q    -- for purposes of this examination here today?

18  A    Correct.

19  Q    And wouldn't it be important for you to know this

20  information, as opposed to asking me questions?

21       I mean you heard Mr. Karchmer's testimony.  Did you

22  not understand what he said when he said when it started and

23  when it ended?

24  A    When he talked about it today?

25  Q    Yes.  Did you not understand what he said?

Case 3:23-mc-00073-SKK-WPU  Document 34  Filed 07/28/08  Page 784 of 800
Case 3:08-cv-00056-PMP-VPC  Document 34  Filed 07/08/08  Page 749 of 265

-399

 1   A   I understood what he said.

 2   Q   Okay.  And was what he said not understandable by you or

 3   not complete?

 4   A   I sort of feel like you're arguing with me.

 5   Q   I'm not trying to, sir.  I'm trying to understand what

 6   you did and the conclusions that you've reached, and the fact

 7   that you're telling me that cloning software was used, and

 8   your lack of information from the previous testimony, and

 9   I'm just trying to understand how these dates get on there

10   with cloning software?

11   A   Okay.  So how dates get on with cloning software is not

12   related to how dates got on this document.  That's what I'm --

13   Q   Oh, okay.  I'm sorry.  Then these dates -- because we

14   were trying to find out the reason that Mr. Karchmer testified

15   about these dates, is he said these are the dates that came

16   off of the hard drive, as the date on which the transport of

17   information, or the export of information off of one media

18   went onto the one terabyte drive.  And he found that to be

19   unusual, because he said they didn't have terabyte drives

20   in 2003.

21        That was his purpose of giving that testimony and

22   why he was showing us these dates and times.

23   A   Correct.

24   Q   And he took those dates and times off of the terabyte

25   hard drive as to the date it first was formatted, and the

Case 3:23-mc-00073-PMP-WGC  Document 34  Filed 07/28/08  Page 785 of 800
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 07/28/08  Page 785 of 800
-400-

 1   dates on which the data was exported from one media to the

 2   one terabyte hard drive.

 3   A   Correct.  And when I heard him say that this is unusual

 4   because the dates of format on the terabyte drive preceded the

 5   existence of terabyte drive --

 6   Q   Right.

 7   A   -- I thought it was unusual.  And my comment to myself

 8   when I heard that for the first time today, was this is

 9   consistent with someone using Partition Magic to create a

10   partition, cloning into the partition, and stretching the

11   partition.  And I believe that if Mr. Karchmer thought about

12   that scenario, he might not conclude this is so odd.

13   Q   I understand then.  That's really what your conclusion

14   is, is that you believe that Mr. Montgomery, based upon what

15   he told you, used both cloning software and Partition Magic.

16   And that's the explanation as to the dates, as opposed to

17   manipulation of dates?

18   A   Yes.

19   Q   Okay.  But you don't -- but you also know that Mr. -- you

20   don't know what Mr. Montgomery testified to June 10th and

21   June 24th?

22   A   Also correct.

23   Q   Okay.  And you didn't hear the testimony of

24   Mr. Montgomery about the process that he used to export

25   information onto the one terabyte and the 500 gigabyte drive,

1   did you?

2   A   His testimony prior to yesterday?

3   Q   Correct?

4   A   I did not hear that.

5   Q   And you didn't hear any explanation yesterday of it

6   either, did you?

7   A   I don't remember.

8   Q   Okay.  I take it that you also haven't looked at the 500

9   gigabyte drive either, have you?

10  A   Correct.

11  Q   And you've been a consultant to Mr. Montgomery since

12  June of 2007, have you not -- or to the Liner firm.  Excuse

13  me.

14  A   I don't believe that's correct.

15  Q   Well, you gave an affidavit in this proceeding, did you

16  not?

17  A   I wrote a declaration.

18  Q   You wrote a declaration.

19  A   My recollection is that declaration was from much earlier

20  this year, but I don't believe it's a whole year ago.

21  Q   Maybe I'm mistaken.  I know Mr. Karchmer's declaration

22  was in June of 2007.  That's why I thought yours would have

23  been following on maybe July or August, when they had to file

24  an opposition.

25  A   Could somebody just show me the declaration?

Case 3:22-mc-00076-SKK-VPC  Document 34  Filed 07/08/08  Page 787 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/08/08  Page 787 of 800
—402

 1                    MR. SNYDER:  It's January '08.

 2                    MR. PEEK:  Oh, it's here.  It is January '08.

 3             So, you've been a consultant since January '08?

 4                    THE WITNESS:  Yes.

 5  BY MR. PEEK:

 6   Q   Did you first come on board January '08, or did you come

 7  on board in December of '07?

 8   A   If you'll tell me the date of the declaration --

 9   Q   I will.  And I'll actually give it to you.

10   A   I can answer your question a little differently.  I think

11  I was engaged maybe a week or two, or three, before that

12  declaration.

13   Q   Okay.  Let --

14   A   So if it's the end of January, it would be the beginning

15  of January.  Or if it's at the beginning January, it would be

16  the end of December.

17                    MR. PEEK:  May I approach, Your Honor?

18                    THE COURT:  You may.

19                    MR. PEEK:  Let me just hand this to you.  This

20  is docket 397, Mr. Cooper.  I'm just trying to get to your

21  signature.

22             Yeah, it was January 11th you executed it.  There it

23  is.

24                    THE WITNESS:  Thank you.

25

BY MR. PEEK:

Q   So about a week before January 11th of 2008, was when you were retained by Mr. Montgomery?

A   No.  I said two -- one or two or three weeks.

Q   Okay.  So somewhere between the end of December-ish, to the first of December-ish.  Okay?

A   I can't -- you're trying to pin me down to specific dates.  It was within two to three weeks prior to.

Q   At least seven-and-a-half months?

A   Yeah.

Q   Because we're in the eighth month, in the middle of the month.

Seven-and-a-half months?

A   Yes.

Q   Okay.

A   For conversational purposes, if you want to say that I was engaged on January 2nd, it's probably as good a date as any.

Q   I -- that's fine with me.  I'm sure your time records would show.

A   Absolutely.

Q   And did you meet Mr. Montgomery in January of 2008?

A   No.

Q   When was the first time you met him?

A   Yesterday.

Case 3:23-mc-00073-CWK-WAU Document 34 Filed 03/28/23 Page 789 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 03/28/08 Page 794 of 265

-404-

 1   Q    Okay.  And when was the first time you spoke to him?

 2   A    I think Friday of last week.

 3   Q    So that would be the 15th of August?

 4   A    Give or take a day.

 5   Q    And we're now on the 20th.  So, five days ago?

 6   A    Yes.

 7   Q    And was it then on this Friday that you talked to him

 8   about the cloning software?

 9   A    I don't recall if it was Thursday or Friday, if you're

10   trying to pick the day.  But, towards the end of last week.

11   Q    Okay.  On the first day --

12   A    Yes.

13   Q    So it would be Thursday or Friday.  Was that the day in

14   which you talked to him about the cloning software?

15   A    I think so.  But I wasn't talking to him about the

16   cloning software.  It wasn't an interview.  It was -- it

17   was more of a conversation and cloning came up in the

18   conversation.  I did not have a list of questions.

19   Q    And then you confirmed the use of cloning software

20   with respect to the terabyte drive sometime today with

21   Mr. Montgomery?

22   A    I know that we discussed it.  I believe we discussed it

23   today.  Maybe yesterday.

24            This has been a compressed time frame over the last

25   four or five days, so I'm having a hard time recalling which

Case 3:23-mc-00073-CWR-MAU  Document 34  Filed 07/08/08  Page 790 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/08/08  Page 795 of 260
-405

1   conversation on which day.  If it matters the exact day, we

2   can talk about it more.  But if it's okay with you to just say

3   within the last five days, it makes my answers a lot faster.

4   Q   Okay.  That's fine.

5           The U.S. Protective Order, when did you first see

6   that?

7   A   Again, within the last week.

8   Q   Last five days?

9   A   In the last five days.

10  Q   Okay.

11  A   Approximately.

12  Q   Okay.  But you don't know whether it was prior to the

13  weekend or after the weekend?

14  A   Maybe on the weekend.

15  Q   Well, most of the experts with whom I work keep, maintain

16  logs of when they receive documents on which they're going to

17  opine.

18          Do you do that as well?

19  A   I don't keep a log per se, but I have e-mails.

20          So if it was e-mailed to me, my e-mail would show

21  me.  I do keep time records.  And if I put in the time record,

22  "discussed Protective Order", it would be in there.  It's

23  possible it was sent to me and said go look at this.  And I

24  looked at it after.

25          But, again, if you can accept the 5-day window, I

Case 3:22-mc-00078-PMP-WGC Document 34 Filed 07/28/08 Page 791 of 800
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 07/23/08 Page 796 of 205
—406

1    can answer your questions quickly.  And I'll assume that if

2    you ask me something more precise, you're trying to drill down

3    the exact day or hour and I'll --

4    Q    I am trying to drill down to the exact day.

5    A    On the Protective Order?  Did.

6    Q    Yes, sir.  Do you have e-mails on your computer here

7    today?

8    A    I do.  I would have to connect up.  It's not connected

9    right now, but I can do that.

10   Q    That's all right.  I don't want to take that extra time,

11   unless it doesn't take very long to do it.

12   A    So it would take a few minutes.  But we've also been

13   experiencing some internet problems in the courtroom.

14   Q    Okay.  We won't worry about it.

15         So sometimes in the last 5 days you got it, and

16   sometime in the last 5 days you got the Minutes of the

17   proceedings?

18   A    Yes.

19   Q    When you were hired, what were you directed -- what was

20   your direction from counsel or from Mr. Montgomery?  What were

21   you asked to do?

22   A    For my work back in January or the work --

23   Q    The work currently, sir.

24   A    Now?

25   Q    Yes, sir.  For this testimony here today.

```
 1   A   It was to participate in these proceedings, to provide my

 2   knowledge, and listen to  responses to the topics that were

 3   going to be discussed and addressed.

 4   Q   Okay.  When did you first become aware that there were

 5   1.3 million files on the one terabyte hard drive?

 6   A   You -- I think yesterday.

 7   Q   Okay.  And when did you become aware that there were,

 8   similarly, I think, fewer files on the 500, but I think there

 9   were -- I think it's 285 -- 1.3 million files total on both

10   of them.  The first time you became aware of that was

11   yesterday?

12   A   I recall that number being discussed yesterday.

13   Q   Okay.

14   A   I'm not sure if it was over the weekend, but I think it

15   was yesterday.

16   Q   And when were you first retained for this court

17   proceeding?

18   A   Well, we weren't retained, and I wasn't retained for this

19   proceeding.  We were retained back in January.

20   Q   When were you retained to come here?  When did you first

21   know that you were going to be a witness?

22   A   I think Friday.

23   Q   Friday?

24   A   Yes.

25   Q   Are you aware that you were disclosed about a month
```

1    earlier?

2    A    I'm not.

3    Q    Okay.  So the first time you became aware of the

4    assignment was last Friday?

5    A    No.  It might have been on Thursday.

6    Q    Thursday or Friday?

7    A    In the last week.

8    Q    Okay.  And so we talked a little bit about the document

9    review of Mr. Montgomery --

10   A    I need to clarify that last answer.

11   Q    Okay.

12   A    I recall someone in my office mentioning to me that,

13   about a month ago, there was some conversation about an

14   upcoming proceeding.  But when did I know that I would coming

15   here?  I didn't know until Thursday or Friday.

16   Q    Okay.  So somebody at FTK may have known -- or FTI may

17   have known you were going to come here, but nobody every told

18   you about it until last Thursday or Friday?

19   A    It wasn't confirmed until Thursday or Friday night.

20   Q    So wouldn't have done anything in preparation until you

21   were notified until last Thursday or Friday?

22   A    I didn't know I was coming, so I didn't do anything --

23   Q    Right.

24   A    -- prior to knowing I was coming.

25   Q    And with respect to the U.S. Protective Order and the

1   review of documents, you've opined about what one would have

2   to do, which is look at every one of the documents, correct?

3   A    Yes.

4   Q    Okay.  And do you know whether or not there is a

5   requirement under the U.S. Protective Order that there be a

6   good faith belief as to whether or not there are or are not

7   documents on, electronically stored documents that are

8   potentially being produced?  There has to be a good faith

9   basis that there are documents that are covered by the

10  U.S. Protective Order?  Are you aware of that?

11  A    I'm not following your question.  I don't recall wording

12  in the Protective Order that used the words good faith belief

13  of something.  It may have been there.  I don't recall those

14  words.

15  Q    Okay.  And because you haven't been involved in these

16  proceedings, you're not aware of all of the many times that

17  folks have stood up and said there has to be a good faith

18  belief, both by from the government and others?

19  A    Correct.

20  Q    And are you aware of whether or not Mr. Montgomery,

21  during the course of the review of the 1.3 million files, he

22  found any files whatsoever which he delivered to the United

23  States Government?

24  A    I'm sorry.  Can you repeat the question.

25  Q    Are you -- you said that Mr. Montgomery was going to look

Case 3:22-mc-00076-RJK-WPC   Document 34   Filed 07/28/23   Page 795 of 200
Case 3:06-cv-00056-PMP-VPC   Document 34   Filed 07/03/08   Page 795 of 200
-410-

 1   at the 1.3 million files, had to look at, one by one, every

 2   one of them.  And if he found something, he would have to turn

 3   it over to the government, correct?

 4    A   My understanding is that 1.3 million files were turned

 5   over to the government.

 6    Q   No.  They were turned over to me.

 7    A   Okay.  So my understanding is that there were far more

 8   files that exist that he has been looking through.  So, the

 9   sum total of the files that were turned over to you --

10    Q   Uh-huh.

11    A   -- plus the number of files that were turned over to the

12   government that weren't turned over to you --

13    Q   Uh-huh.

14    A   -- would be the total number of files that he's turned

15   over.

16    Q   Do you know whether or not, from his review of any of the

17   data that he transferred into the terabyte, he produced any of

18   that to the government?

19    A   I don't know.

20    Q   You haven't found that information out, uh?

21    A   I don't know.

22    Q   And because you're not aware of what's on the terabyte

23   drive, you would, I guess, would be unaware of all of the

24   duplicates, correct, other than what Mr. Karchmer has

25   testified to?

```
 1   A   So --

 2   Q   You're not aware, because you haven't reviewed it, that

 3   92 percent of what's on there is a duplicate of the other

 4   eight percent?

 5   A   So I'm glad that you asked me about that.

 6   Q   Go ahead.  I always like to get good grades on asking

 7   good questions.

 8   A   Mr. Karchmer testified that his calculation of duplicates

 9   was based on the MD-5 hash calculation of the files.  And his

10   description is that the MD-5 hash calculation tells you if the

11   content is the same.  And he said that if the file name or the

12   file location was different, you could still get a hash match.

13            As a forensic expert, I almost always, if not

14   always, want to see all of the data possible.  Knowing where a

15   file is, even if it's a duplicate, can be often important.

16            So although the content may have hash matched, the

17   location, and presence, and number of instances can and does

18   have forensic value.  So even though there may have been some

19   high percentage number of content matches, it's not the full

20   story.

21   Q   Okay.  But you don't know what the full story is, because

22   you haven't done it.

23   A   Correct.

24   Q   You don't have any reason to believe, do you, as an

25   expert, that Mr. Karchmer is not correct in his statement that
```

1   92 percent of the data is a duplicate of the other eight

2   percent?

3    A   Well, I'm confident that if he did a hash calc and

4   determined that 92 percent are hash matched, that he's -- that

5   he is saying that the file content is hash matched, but not

6   the file location, not the file name.  And all of that

7   knowledge becomes relevant.

8           For instance, if an e-mail exists as an MSG and it

9   exists in five places, but the content hash matches and you

10  throw out four of them, you've lost the knowledge that the

11  other four people knew about it, and had done something with

12  it, and had seen it.

13          So, there's an example where discarding the hash

14  match, hash matches, would lose a lot of forensic knowledge.

15  And we'll call it data, because it's the analysis and

16  understanding of what that data environment is telling you.

17          THE COURT:  Mr. Peek, I'm sorry to interrupt

18  you.  It is five minutes after five o'clock, and I think that

19  we need to conclude for today.

20          So you can undertake continued cross-examination

21  of Mr. Cooper tomorrow morning, based upon whatever time

22  allocation you have remaining.

23          MR. PEEK:  What is my time?

24          THE CLERK:  Forty-two minutes.

25          THE COURT:  She has 42 minutes.

Case 3:22-mc-00073-CKK-MAU  Document 34  Filed 07/28/08  Page 798 of 800
Case 3:06-cv-00056-PMP-VPC  Document 34  Filed 07/28/08  Page 798 of 269

413

1            MR. PEEK:  Thank you.

2            THE COURT:  All right.  What I'm going to advise

3    counsel, we still have a matter of exhibits to attend to.  I

4    expect you to be here tomorrow morning by 8:30 a.m. to meet

5    and confer and work with the clerk of court to figure out

6    what exhibits are admitted or not.  We will begin promptly at

7    nine o'clock a.m.

8            Thank you.  We're in recess.

9            MR. PEEK:  Thank you, Your Honor.

10           (Court Adjourned.)

11

12

13                          -o0o-

14

15        I certify that the foregoing is a correct
          transcript from the record of proceedings
16        in the above-entitled matter.

17    \s\ Kathryn M. French              August 29, 2008

18    _____          _____

19    KATHRYN M. FRENCH, RPR, CCR              DATE
      Official Reporter

20

21

22

23

24

25

1          **I N D E X**

2

3    **DEFENSE'S WITNESSES:**                        **PAGE:**

4

5    1)   **DENNIS MONTGOMERY (cont')**

          Direct Examination By Mr. Peek           155

6

7    2)   **JONATHAN KARCHMER**

          Direct Examination By Mr. Snyder         214

8         Cross-examination By Ms. Garofalo        270
          Redirect Examination By Mr. Snyder       322

9         Recross-examination By Ms. Garofalo      326

10   3)   **LEONARD GLOGAUER**

11        Direct Examination By Mr. Peek           328
          Cross-examination By Ms. Garofalo        333

12

13   4)   **SLOAN VENABLES**

          Direct Examination By Mr. Peek           341

14        Cross-examination By Ms. Garofalo        344
          Redirect Examination By Mr. Peek         347

15

16   5)   **WARREN TREPP**

          Direct Examination By Mr. Peek           348

17        No Cross-examination

18   **PLAINTIFF'S WITNESSES:**

19   1)   **SCOTT COOPER**

20        Direct Examination By Ms. Garofalo       360
          Cross-examination By Mr. Peek            384

21

22

23

24

25

Case 1:22-mc-00073-CKK-MAU   Document 34   Filed 07/28/23   Page 200 of 200
Case 3:06-cv-00056-PMP-VPC   Document 84   Filed 07/23/08   Page 265 of 265

415

1                  I N D E X   O F   E X H I B I T S

2

3    **EXHIBIT NUMBER**:                        **MARKED**        **RECEIVED**

4    Exhibit 8 -- document                                       171

5    Exhibit 20  -- document                                     176

6    Exhibit 47  -- document                    202

7    Exhibit 45  -- document                                     213

8    Exhibit 48  -- document                    222              253

9    Exhibit 49  -- document                                     259

10   Exhibit 50  -- box                         268

11

12

13   **PLAINTIFF'S EXHIBITS**:

14   Exhibits 1 and 2  -- documents             365

15

16

17

18

19

20

21

22

23

24

25

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584