# EXHIBIT I

Dennis Lee Montgomery  -  November 18, 2010

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

In re:  Dennis and Kathleen )
Montgomery                   )
                             )
Michael J. Flynn,            )
                             )
          Plaintiff,         )
                             )
             vs.             ) Case No.: 2:10-bk-18510-bb
                             )
Dennis Lee Montgomery and    )
Brenda Kathleen Montgomery,  )
                             )
          Defendants.        )
_____)


Videotaped Deposition of:  DENNIS LEE MONTGOMERY
Date:                      November 18, 2010
Reported by:               Stephanie P. Borthwick
                           C.S.R. No. 12088

Dennis Lee Montgomery  -  November 18, 2010

```
 1          Deposition of DENNIS LEE MONTGOMERY, taken on

 2    behalf of the Plaintiff, before Stephanie P.

 3    Borthwick, a Certified Shorthand Reporter,

 4    commencing at the hour of 9:20 a.m., Thursday,

 5    November 18, 2010, at the offices of Yates Court

 6    Reporters, 74967 Sheryl Avenue, Palm Desert,

 7    California.

 8    APPEARANCES:

 9          For the Plaintiff:

10              CONANT LAW, LLC

11              Attorneys at Law

12              BY:  CHRISTOPHER J. CONANT, ESQ.

13              730 17th Street

14              Suite 200

15              Denver, Colorado  80202

16              (303) 298-1800

17          For the Defendants:

18              DION-KINDEM & CROCKETT

19              Attorneys at Law

20              BY:  WILLIAM E. CROCKETT, ESQ.

21              LNR Warner Center

22              21271 Burbank Boulevard

23              Suite 100

24              Woodland Hills, California  91367-6667

25              (818) 883-4400
```

Page 2

Dennis Lee Montgomery   -   November 18, 2010

1        For the United States of America:

2            U.S. DEPARTMENT OF JUSTICE

3            CIVIL DIVISION

4            BY:   CARLOTTA P. WELLS, Senior Counsel

5            Federal Programs Branch

6            20 Massachusetts Avenue, NW

7            Room 7150

8            Washington, DC   20530

9            (202) 514-4522

10       Also Present:

11           Michael J. Flynn, Esq.

12           Sharon Raya, Paralegal to Ms. Wells

13           Tom (last name withheld), U.S. Government

14           Morgan (last name withheld), U.S.

15           Government

16       Videographer:

17           Jesse Navarro, Orravan Video Litigation

18           Services

19

20

21

22

23

24

25

Dennis Lee Montgomery  -  November 18, 2010

```
 1                          INDEX

 2

 3    Deposition of DENNIS LEE MONTGOMERY

 4         Taken on November 18, 2010

 5

 6    Examination By:                        Page

 7    MR. CONANT                              24

 8

 9    Information Requested:

10        (None)

11

12    Questions Instructed Not to Answer:   Page Line

13    Q.   Has your attorney, to your         45    3

14         knowledge, been in contact with any

15         agency of the United States

16         government concerning your personal

17         property that's listed on these

18         schedules?

19    Q.   Is it your testimony,             46    9

20         Mr. Montgomery, that you have no

21         personal property that falls within

22         the description of this paragraph

23         here on page 22-9?

24    ///

25    ///
```

YATES COURT REPORTERS      800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| | | | | |
|---|---|---|---|---|
| 1 | Q. | Have you ever described to anyone in | 53 | 3 |
| 2 | | any form a noise filtering | | |
| 3 | | technology that you had created? | | |
| 4 | Q. | You don't recall if it's true or | 77 | 25 |
| 5 | | not, Mr. Montgomery? | | |
| 6 | Q. | You mean to tell me that you met | 82 | 21 |
| 7 | | with someone in the vice president's | | |
| 8 | | office and you can't recall what it | | |
| 9 | | was about, Mr. Montgomery? | | |
| 10 | Q. | This is about the source code, isn't | 85 | 15 |
| 11 | | it, Mr. Montgomery? | | |
| 12 | Q. | Do you understand the English | 99 | 19 |
| 13 | | language, Mr. Montgomery? | | |
| 14 | Q. | Well, so you visited the vice | 107 | 12 |
| 15 | | president's office, but you don't | | |
| 16 | | recall the nature of the meeting? | | |
| 17 | Q. | What would cause your attorney to | 112 | 16 |
| 18 | | put a statement like that on your | | |
| 19 | | bankruptcy schedule? | | |
| 20 | Q. | Can you explain to me your | 119 | 6 |
| 21 | | conversations with Edra Blixseth | | |
| 22 | | concerning -- | | |
| 23 | Q. | -- the preparation of this document? | 119 | 11 |
| 24 | /// | | | |
| 25 | /// | | | |

Page 5

Dennis Lee Montgomery  -  November 18, 2010

```
 1    Q.  Mr. Montgomery, can you please        123    15
 2        explain to me your conversation with
 3        Ms. Montgomery concerning the
 4        preparation of this document, which
 5        is marked as Plaintiff's Exhibit
 6        No. 7.
 7    Q.  Isn't it true, Mr. Montgomery, that    125    8
 8        you worked with Ms. Blixseth to help
 9        her kill the sale of the Yellowstone
10        Club to Cross Harbor?
11    Q.  Mr. Montgomery, is this statement in   140    7
12        here regarding -- where it says
13        Dennis Montgomery and Demaratech, it
14        has been their desire from the first
15        contact to try and sell their
16        technology to various institutions
17        of the Israeli government, including
18        Mossad and Army Intelligence --
19    Q.  Is this a true statement,             141    15
20        Mr. Montgomery, in any sense?  Has
21        it ever been your desire to sell
22        technology to various institutions
23        within the Israeli government?  Is
24        that a true statement,
25        Mr. Montgomery?
```

Dennis Lee Montgomery  -  November 18, 2010

| | | | | |
|---|---|---|---|---|
| 1 | Q. | Have you defrauded Mr. Kennedy in | 144 | 25 |
| 2 | | connection with his investment in | | |
| 3 | | Demaratech, LLC? | | |
| 4 | Q. | Did -- Mr. Montgomery, during | 148 | 10 |
| 5 | | President Obama's inauguration in | | |
| 6 | | January of 2009, were you the cause | | |
| 7 | | of any form of terror -- heightened | | |
| 8 | | terror alert in the Washington, | | |
| 9 | | D.C., area? | | |
| 10 | Q. | Do you ever monitor PACER in | 150 | 20 |
| 11 | | Montana, U.S. District Court -- U.S. | | |
| 12 | | Bankruptcy Court in the District of | | |
| 13 | | Montana? | | |
| 14 | Q. | What attorney-client communications | 151 | 18 |
| 15 | | would lead Mr. Flynn to believe that | | |
| 16 | | you were causing terror threats in | | |
| 17 | | or around January of 2009? | | |
| 18 | Q. | When did Mr. Flynn cease to be your | 152 | 4 |
| 19 | | attorney? | | |
| 20 | Q. | So you're suggesting that you didn't | 157 | 12 |
| 21 | | write that, Mr. Montgomery? | | |
| 22 | /// | | | |
| 23 | /// | | | |
| 24 | /// | | | |
| 25 | /// | | | |

Page 7

Dennis Lee Montgomery  -  November 18, 2010

```
 1   Q.   Why would Edra tell you, "With all     165    12

 2        going on, much of which you

 3        encouraged me to move forward with,

 4        why are you doing this at this

 5        time?"

 6   Q.   Mr. Montgomery, how does your          166    2

 7        relationship with Edra Blixseth

 8        implicate you in any criminal

 9        proceeding?

10   Q.   Do you know why the Israeli            171    24

11        government would be?

12   Q.   Why would Edra say, "You are the key   180    5

13        to our success"?

14   Q.   Is it hard to recall what a person     227    25

15        does with $800,000, Mr. Montgomery?

16   Q.   You had a plan, because you knew the   232    5

17        software was always bogus and you

18        knew that the only way to get out

19        from the sanction was to get rid of

20        the litigation so you settled by

21        executing the $25 million judgment.

22        You knew at the time that you could

23        never satisfy the $25 million

24        judgment, so you knew the only way

25        to get out from the $25 million
```

Page 8

Dennis Lee Montgomery  -  November 18, 2010

 1       judgment was to file for bankruptcy.

 2       And the whole time before that you

 3       knew that the software was

 4       fraudulent, yet you're getting paid

 5       $1.2 million a year for this

 6       fraudulent software.  So the whole

 7       time you're hoarding away this cash

 8       that you're getting, the

 9       $1.2 million a year you're getting,

10       because you know at some -- you know

11       it's all going to collapse when

12       you're discovered that your software

13       is a complete fraud.

14   Q.  Didn't you know the whole time the        233    17

15       software was bogus, that you were

16       pedaling bogus software?

17   Q.  The source code that we're been           234    3

18       referring to all day today in the

19       Plaintiff's Exhibit 3, in these

20       emails, the source code, you knew it

21       was bogus didn't you,

22       Mr. Montgomery?

23   ///

24   ///

25   ///

Page 9

Dennis Lee Montgomery - November 18, 2010

| 1 | Exhibits: | | |
|---|---|---|---|
| 2 | 1 | 36-page U.S. Bankruptcy Court | 33 |
| 3 | | Summary of Schedules filed | |
| 4 | | 7/13/09 | |
| 5 | 2 | Six-page Plaintiff's Second | 49 |
| 6 | | Set of Requests for Production | |
| 7 | | of Documents | |
| 8 | 3 | 23-page Sealed Declaration of | 54 |
| 9 | | Dennis Montgomery in Support | |
| 10 | | of his Oppositions to DOD's | |
| 11 | | and ETreppid's Motions for | |
| 12 | | Protective Orders | |
| 13 | 4 | Six-page Dennis Montgomery's | 61 |
| 14 | | Responses to Plaintiff's | |
| 15 | | Requests for Production of | |
| 16 | | Documents, Set Two | |
| 17 | 5 | Three-page Second Declaration | 90 |
| 18 | | of SA Michael A. West | |
| 19 | 6 | November 8, 2007, redacted | 114 |
| 20 | | letter to Timothy Blixseth on | |
| 21 | | the letterhead of U.S. | |
| 22 | | Department of Justice | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 1 | 7 | December 12, 2007, letter to | 116 |
| 2 | | Timothy Blixseth on the | |
| 3 | | letterhead of the U.S. | |
| 4 | | Department of Justice | |
| 5 | 8 | 56-page printout of back | 132 |
| 6 | | records for Demaratech, LLC | |
| 7 | 9 | Two-page June 30, 2010, email | 137 |
| 8 | | from Concerned Citizen to | |
| 9 | | Michael.west@ic.fbi.gov re | |
| 10 | | Montgomery | |
| 11 | 10 | February 26, 2009, email | 155 |
| 12 | | string, top email from | |
| 13 | | LearG2@aol.com to | |
| 14 | | dennis@ncoder.net et al., re | |
| 15 | | Blxware | |
| 16 | 11 | Six pages of indictments | 166 |
| 17 | 12 | Email string dated November | 169 |
| 18 | | 11, 2010, between George | |
| 19 | | Birnbaum and Tim Blixseth re | |
| 20 | | Montgomery | |
| 21 | 13 | Email string, top email dated | 175 |
| 22 | | February 26, 2009, from | |
| 23 | | LearG2@aol.com to | |
| 24 | | dennis@ncoder.net, et al., re | |
| 25 | | Installation | |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 1 | 14 | Two-page email from | 177 |
| 2 | | LearG2@aol.com to | |
| 3 | | dennis@ncoder.net, et al., re | |
| 4 | | Ratheon and other | |
| 5 | | opportunities | |
| 6 | 15 | One-page email string, top | 189 |
| 7 | | email from LearG2@aol.com to | |
| 8 | | dennis@ncoder.net, et al., re | |
| 9 | | Secret Service | |
| 10 | 16 | Six-page article entitled The | 195 |
| 11 | | Man Who Conned the Pentagon | |
| 12 | 17 | Eight-page email and | 201 |
| 13 | | attachment dated August 23, | |
| 14 | | 2007, from Patricia Yarborough | |
| 15 | | to Jory Russell re Dennis | |
| 16 | | Montgomery | |
| 17 | 18 | 143 pages of bank records | 219 |
| 18 | 19 | 15 pages of a Wells Fargo | 285 |
| 19 | | Portfolio Management Account | |
| 20 | | for January 2007 | |
| 21 | 20 | 36 pages of bank records of | 303 |
| 22 | | Istvan Burgyan, Bates | |
| 23 | | Nos. 00349-384 | |
| 24 | /// | | |
| 25 | /// | | |

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 1  | 21 | 19-page Wells Fargo PMA | 306 |
|----|----|----|----|
| 2  |    | Package of Istvan Burgyan, | |
| 3  |    | Bates Nos. 00552-70 | |
| 4  | 22 | Five pages of Istvan Burgyan's | 309 |
| 5  |    | bank records, Bates | |
| 6  |    | Nos. 00943-47 | |
| 7  | 23 | Two-page Bank of America | 312 |
| 8  |    | statement of Istvan Burgyan, | |
| 9  |    | Bates Nos. 00933-34 | |
| 10 | 24 | One page of photocopied | 313 |
| 11 |    | documents including a | |
| 12 |    | cashier's check paid to | |
| 13 |    | Caesar's Casino and Wells | |
| 14 |    | Fargo Bank records. | |
| 15 | 25 | 18 pages of MontBleu Resort | 315 |
| 16 |    | Memo Reports | |
| 17 | 26 | Three-pages of win/loss | 324 |
| 18 |    | documents | |
| 19 | 27 | 37 pages of Customer | 328 |
| 20 |    | Transaction Inquiries | |
| 21 | 28 | 11 pages of miscellaneous | 330 |
| 22 |    | casino documents | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery - November 18, 2010

| 09:15:31 | 1 | THE VIDEOGRAPHER: Good morning. Here |
| | 2 | begins Media No. 1 in the video deposition of Dennis |
| | 3 | Lee Montgomery in the matter of Michael J. Flynn |
| | 4 | versus Dennis Lee Montgomery, et al., in the |
| 09:19:59 | 5 | United States Bankruptcy Court of California, Case |
| | 6 | No. 2:10-bk-18510-bb. |
| | 7 | Today's date is November 18th, 2010. The |
| | 8 | time is 9:20 a.m. This deposition is being taken at |
| | 9 | 74967 Sheryl Avenue, Palm Desert, California, and |
| 09:20:18 | 10 | was made at the request of Mr. Christopher Conant of |
| | 11 | the law offices of Conant Law, LLC. |
| | 12 | The videographer is Jesse Navarro here on |
| | 13 | behalf of Orravan Video Litigation Services, |
| | 14 | Indian Wells, California. |
| 09:20:32 | 15 | Would counsel and all present please |
| | 16 | identify yourselves and state whom you represent. |
| | 17 | MR. CONANT: Christopher Conant for the |
| | 18 | plaintiff, Michael J. Flynn. |
| | 19 | MR. FLYNN: And Michael J. Flynn in |
| 09:20:41 | 20 | persona. |
| | 21 | MS. WELLS: Carlotta Wells on behalf of the |
| | 22 | United States and with the United States Department |
| | 23 | of Justice. Sharon Raya is with me from my office. |
| | 24 | With me, also, are Morgan and Tom, who are with the |
| 09:20:54 | 25 | government and I can't disclose anything further |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 09:20:58 | 1 | because to do so would violate the terms of the |
| | 2 | United States protective order, which all the |
| | 3 | parties to the bankruptcy proceeding have agreed to. |
| | 4 | MR. CROCKETT:  Bill Crockett on behalf of |
| 09:21:07 | 5 | Dennis Montgomery. |
| | 6 | THE WITNESS:  Dennis Montgomery. |
| | 7 | THE VIDEOGRAPHER:  Would the court reporter |
| | 8 | please swear in the witness. |
| | 9 | THE REPORTER:  Please raise your right |
| 09:21:12 | 10 | hand. |
| | 11 | Do you solemnly state under penalty of |
| | 12 | perjury that the testimony you will give in this |
| | 13 | matter will be the truth, the whole truth, and |
| | 14 | nothing but the truth? |
| 09:21:22 | 15 | THE WITNESS:  Yes. |
| | 16 | THE REPORTER:  Thank you. |
| | 17 | MR. CONANT:  Okay.  Thank you. |
| | 18 | Before we start examining the witness, I |
| | 19 | want to state for the record that there are present |
| 09:21:33 | 20 | in the room four representatives from the U.S. |
| | 21 | Government, two of which apparently have no last |
| | 22 | name. |
| | 23 | We'll ask on the record of Ms. Wells to |
| | 24 | provide their last names and the government agency |
| 09:21:47 | 25 | that they purportedly work for. |

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:21:51 | 1 | MS. WELLS:  And I cannot, because to do so |
| | 2 | would violate the terms of the United States |
| | 3 | protective order. |
| | 4 | MR. CONANT:  Ms. Wells, do you have a copy |
| 09:21:57 | 5 | of the protective order in front of you? |
| | 6 | MS. WELLS:  I do.  Do you have one? |
| | 7 | MR. CONANT:  I have a copy in front of me. |
| | 8 | I'd like to actually get it admitted as an exhibit |
| | 9 | in this deposition. |
| 09:22:10 | 10 | Let me -- while I work on getting extra |
| | 11 | copies to admit as an exhibit, Ms. Wells, can you |
| | 12 | review the protective order and identify which |
| | 13 | specific portion of the protective order you're -- |
| | 14 | MS. WELLS:  Am I a witness now?  All I can |
| 09:22:28 | 15 | tell you is it's pretty self-evident from the face |
| | 16 | of the United States protective order what's |
| | 17 | protected, what isn't. |
| | 18 | The information that's protected is set |
| | 19 | forth in paragraphs 2 and paragraphs 3. |
| 09:22:42 | 20 | MR. CONANT:  How does those pertain |
| | 21 | specifically to the identities of these gentlemen |
| | 22 | and why they're here today? |
| | 23 | MS. WELLS:  I think it's self-evident and |
| | 24 | if you want to read those paragraphs into the |
| 09:22:50 | 25 | record, feel free to. |

YATES COURT REPORTERS    800.669.1866

| 09:22:51 | 1 | MR. CONANT:  I don't -- well -- |
| | 2 | MS. WELLS:  Paragraphs 2 and 3 of the |
| | 3 | United States protective order, which is |
| | 4 | Document 253, District of Nevada Case File 30656. |
| 09:23:02 | 5 | MR. CONANT:  Ms. Wells, who is making the |
| | 6 | decision regarding what is -- why these gentleman |
| | 7 | are here? |
| | 8 | Who in the government made a decision why |
| | 9 | these gentlemen are here?  Who in the government |
| 09:23:07 | 10 | made a decision for these two gentlemen to be here |
| | 11 | today? |
| | 12 | MS. WELLS:  This particular deposition is |
| | 13 | being handled in the manner that all information |
| | 14 | related to this case has been handled.  It's been a |
| 09:23:25 | 15 | joint decision between those attorneys representing |
| | 16 | the United States' interests and the agencies whose |
| | 17 | information we're protecting. |
| | 18 | That's all I'm going to say. |
| | 19 | MR. CONANT:  Were these gentleman at all |
| 09:23:38 | 20 | involved in any way in the litigation in Nevada? |
| | 21 | MS. WELLS:  I'm not going to go any further |
| | 22 | than what I've already said. |
| | 23 | MR. CONANT:  Were you meeting with Judge |
| | 24 | Pro in the U.S. District Court for the district of |
| 09:23:49 | 25 | Nevada yesterday? |

Dennis Lee Montgomery - November 18, 2010

| 09:23:51 | 1 | MS. WELLS: At Judge Pro's insistence, yes. |
| | 2 | We met with him in his chambers yesterday. |
| | 3 | MR. CONANT: Who is "we"? |
| | 4 | MS. WELLS: The people representing the |
| 09:23:57 | 5 | United States Department of Justice and the United |
| | 6 | States in this case. |
| | 7 | MR. CONANT: Who were those? I'm asking |
| | 8 | for the identities, Ms. Wells. |
| | 9 | MS. WELLS: All I'm saying is that people |
| 09:24:07 | 10 | from the government met with him and I mean it |
| | 11 | actually -- if you really need to know, it was the |
| | 12 | four of us here. |
| | 13 | MR. CONANT: Did Judge Pro -- when did |
| | 14 | Judge Pro contact you to meet with him? |
| 09:24:20 | 15 | MS. WELLS: I'm not going to say anything |
| | 16 | more other than we're complying with the terms of |
| | 17 | the order that Judge Pro entered, I believe it was |
| | 18 | October 30th, and we were there because of that |
| | 19 | order. |
| 09:24:32 | 20 | MR. CONANT: What order? |
| | 21 | MS. WELLS: Let's see. |
| | 22 | It was the order dated October 28th, 2010, |
| | 23 | Docket No. 1172, same case, Montgomery versus |
| | 24 | eTreppid Technology. |
| 09:25:00 | 25 | MR. CONANT: Were there any documents |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
09:25:01    1    reviewed in connection with your meeting with Judge

            2    Pro that were -- that originated from my client

            3    Michael Flynn?

            4              MS. WELLS:  This is not the subject of this
09:25:12    5    deposition.  We're not here to talk about this.  If

            6    Mr. Flynn wants to have a conversation with me about

            7    this we can have it, but it's not appropriate for

            8    the record.

            9              MR. CONANT:  It is appropriate for the
09:25:21   10    record.  You are --

           11              MS. WELLS:  It does -- what does that have

           12    to do with the information we're here to protect

           13    now?  The long and the short of it is that there

           14    were documents, as you know, from the Order that the
09:25:26   15    court in Montana sent to Judge Pro.

           16              He asked the United States to take a look

           17    at them to determine the extent to which there's

           18    information that may or may not be protected under

           19    the United States protective order.
09:25:35   20              Upon the limited review that we did in his

           21    chambers yesterday, we determined that there was

           22    enough of a question there that we need to take the

           23    documents back with us to Washington to do a more

           24    thorough review.  That's it.
09:25:50   25              MR. CONANT:  What documents did you review?
```

YATES COURT REPORTERS    800.669.1866

| | | |
|---|---|---|
| 09:25:51 | 1 | MS. WELLS:  The documents that the court in |
| | 2 | Montana sent. |
| | 3 | MR. CONANT:  What documents were those? |
| | 4 | MS. WELLS:  I didn't take a list.  It's not |
| 09:25:59 | 5 | a very big -- it's a small pile, not even an inch |
| | 6 | thick. |
| | 7 | MR. FLYNN:  This is Michael Flynn.  I'm |
| | 8 | going to put a statement on the record. |
| | 9 | The documents that were given to David |
| 09:26:08 | 10 | Cotner, counsel for the trustee in the Montana |
| | 11 | bankruptcy proceeding, were very limited and I |
| | 12 | specifically reviewed them before giving them to |
| | 13 | Cotner. |
| | 14 | They were apparently subsequently given to |
| 09:26:24 | 15 | Judge Kirscher and they had all been previously |
| | 16 | reviewed by the federal government, Department of |
| | 17 | Justice, and approved.  And except for the Sandoval |
| | 18 | complaint, they are publicly on file in the Nevada |
| | 19 | District Court and can be picked up online. |
| 09:26:43 | 20 | So unless documents were added that I don't |
| | 21 | know about -- and I don't know about any of the |
| | 22 | documents, I don't have the identity of the |
| | 23 | documents that were given to Judge Kirscher or |
| | 24 | subsequently conveyed to Judge Pro -- there are no |
| 09:26:57 | 25 | documents that do not comply with the US protective |

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 09:27:02 | 1 |

1  order in any way.

2        So if either documents were added by

3  someone or there has been a change in the position

4  of the Department of Justice with regard to the

09:27:13  5  scope of the protective order, then there is nothing

6  in any of the documents given to Cotner, apparently

7  passed on to Judge Kirscher, which would violate the

8  terms of the U.S. protective order.

9        MR. CONANT:  Do you have a copy, Ms. Wells,

09:27:29  10  of the letter or whatever communication there was

11  between Judge Kirscher and Judge Pro?

12        MS. WELLS:  No.

13        MR. CONANT:  Who at the government have you

14  been talking to regarding the matter involving the

09:27:41  15  letter from Judge Kirscher to Judge Pro?

16        MS. WELLS:  I'm not here to answer these

17  questions.  I'm here to enforce the terms of the

18  United States protective order and only people with

19  the United States have that authority and the

09:27:53  20  ability to determine what's protected and what isn't

21  and that's all we're here for.

22        It's a very limited role that we're

23  playing, it's a very limited role, and I can tell

24  you on the record that what we're doing here today

09:28:03  25  is entirely consistent with what we've done ever

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

```
09:28:07    1   since we first got involved in this case and ever

            2   since Judge Pro acknowledged there was information

            3   to be protected.

            4           That's all I'm going to say and I'll keep

09:28:12    5   saying the same thing over and over again.

            6           MR. FLYNN:  It's completely inaccurate.

            7   For the record, these gentlemen, however nice

            8   gentleman they may be, never participated and never

            9   appeared in courtrooms in any of the Nevada

09:28:25   10   proceedings, Ms. Wells, and you know it and I know

           11   it.

           12           So this four-person deluge from the

           13   Department of Justice in Dennis Montgomery's

           14   deposition is apparently being done for some reasons

09:28:40   15   completely extraneous to the materials in the

           16   protective order, but why don't we get started.

           17           MR. CONANT:  I just want to state one last

           18   thing for the record.  When I deposed Istvan Burgyan

           19   in this very case on September 22nd, the U.S.

09:28:54   20   Government showed no interest in this matter.

           21           I had to call Mr. Gomez at his office in

           22   D.C. halfway through the deposition, because there

           23   became an issue regarding the protective order.

           24   Mr. Gomez was completely indifferent regarding this

09:29:08   25   case and now, for some reason, we have four people
```

Page 22

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
09:29:11    1    here from the US government, two of who, apparently,

            2    have no last names and are from some unidentified

            3    agency with the government.

            4            And for the record, Ms. Wells is not

09:29:22    5    indicating how their involvement is at all

            6    implicated in the protective order.  The protective

            7    order only governs issues concerning intelligence

            8    agencies as defined in the National Security Act and

            9    we have no indication of what agencies these

09:29:39   10    gentlemen are with and whether they're with an

           11    intelligence agency or whether it's an

           12    administrative branch of the government that's not

           13    included within the National Security Act as an

           14    intelligence agency.

09:29:52   15            So we simply don't know what is -- what is

           16    purportedly being protected by the protective order

           17    or not.

           18            MR. FLYNN:  We think -- at this juncture

           19    I'll put on the record that I believe -- I didn't

09:30:07   20    believe it during the Nevada proceedings, I thought

           21    there were legitimate interests to be protected in

           22    terms of identities of intelligence agency

           23    individuals, but at this point I believe that the

           24    Department of Justice has gone far beyond that and

09:30:23   25    is now using, under the guise of national security
```

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery   -   November 18, 2010

09:30:26    1   for reasons related to the facts that I put in the

            2   emails to you, Carlotta, has gone far beyond the

            3   scope of national security in an effort to cover up

            4   or conceal the fraudulent activities of

09:30:40    5   Mr. Montgomery as I've repeatedly said in emails.

            6          So why don't we just start.

            7                    EXAMINATION

            8   BY MR. CONANT:

            9      Q.    Okay.   All right.   Turning to

09:30:47   10   Mr. Montgomery.   Mr. Montgomery, let's start

           11   something.

           12          Can you state your name for the record.

           13      A.    Dennis Montgomery.

           14      Q.    What's your -- do you have a middle name?

09:30:58   15      A.    Lee.

           16      Q.    Do you understand what it means to take a

           17   deposition, Mr. Montgomery?

           18      A.    Yes.

           19      Q.    What do you understand that to mean?

09:31:04   20      A.    You're going to ask me questions; I'm going

           21   to answer them.

           22      Q.    Do you know -- do you understand that your

           23   testimony today is under the penalty of perjury?

           24      A.    Yes.

09:31:13   25      Q.    Do you understand what that means?

Page 24

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 09:31:14 | 1 | A. Yes. |
| | 2 | Q. What does it mean to you? |
| | 3 | A. You've got to tell the truth. |
| | 4 | Q. What happens if you don't tell the truth? |
| 09:31:20 | 5 | A. You get in trouble. |
| | 6 | Q. What kind of trouble? |
| | 7 | A. Whatever. |
| | 8 | Q. What does that mean? |
| | 9 | MR. CROCKETT: Calls for speculation. Next |
| 09:31:26 | 10 | question, Counsel. |
| | 11 | BY MR. CONANT: |
| | 12 | Q. Mr. Montgomery, I'll represent to you that |
| | 13 | if you do not tell the truth and you unintentionally |
| | 14 | do not tell the truth you could be prosecuted by the |
| 09:31:37 | 15 | federal government for lying under oath and that |
| | 16 | carries with it all sorts of criminal penalties, |
| | 17 | which I'm sure your attorney can advise you about. |
| | 18 | Mr. Montgomery, have you brought any |
| | 19 | documents with you today to this deposition? |
| 09:31:51 | 20 | A. No. |
| | 21 | Q. All right. Mr. Montgomery, are you a |
| | 22 | United States citizen? |
| | 23 | A. Yes. |
| | 24 | Q. Can you briefly describe to me your |
| 09:32:00 | 25 | background, your educational background, and your |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:32:02 | 1 | work background? |
| | 2 | A.    Go on? |
| | 3 | I went to Grossmont College as a -- I got |
| | 4 | an AA in biomedical technology. |
| 09:32:15 | 5 | Is that what you want, me to go forward |
| | 6 | from there? |
| | 7 | Q.    Yeah.  What year did you graduate from |
| | 8 | Grossmont? |
| | 9 | A.    I don't recall.  I think '73, '74. |
| 09:32:24 | 10 | Q.    Yeah, please. |
| | 11 | A.    I went to San Diego State for a year -- I |
| | 12 | believe, I don't remember the exact time -- and then |
| | 13 | I began working as a biomedical technician at local |
| | 14 | hospitals. |
| 09:32:35 | 15 | Q.    Okay.  From what years did you work as a |
| | 16 | biomedical -- |
| | 17 | A.    I think '73 to, I would say, '76, '77.  I |
| | 18 | don't recall specifically the exact date. |
| | 19 | Q.    Okay.  When did you -- what did you do |
| 09:32:48 | 20 | after you worked in the hospital? |
| | 21 | A.    I went to work as a consultant. |
| | 22 | Q.    What does that mean, "consultant"? |
| | 23 | A.    I was just trying to get work. |
| | 24 | Q.    What kind of work? |
| 09:33:00 | 25 | A.    Computer. |

Page 26

08-Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 28 of 1046
61970 RBK Doc 21-15 filed 01/14/11 entered 01/14/11 14:22:06 Page 28 of
345
Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:33:01 | 1 | Q.    Doing what with computers? |
| | 2 | A.    Biomedical work. |
| | 3 | Q.    Mr. Montgomery, what kind of biomedical |
| | 4 | work with computers were you doing? |
| 09:33:13 | 5 | A.    Electrocardiogram, blood gas analysis, |
| | 6 | pulmonary function, those kinds of functions. |
| | 7 | Q.    Functions. |
| | 8 | How does that relate to -- what would you |
| | 9 | do with computers?  Would you code software |
| 09:33:28 | 10 | programs? |
| | 11 | A.    Yes. |
| | 12 | Q.    And what is your background in software |
| | 13 | development? |
| | 14 | A.    Well, I started it then, at that period of |
| 09:33:39 | 15 | time.  The hospital had bought a number of computers |
| | 16 | and were trying to do at that time, I believe, |
| | 17 | automated EKG analysis and I was working with a |
| | 18 | group of cardiologists to do it. |
| | 19 | Q.    So at some point along the line is it fair |
| 09:33:55 | 20 | to say that you learned how to program computer |
| | 21 | software? |
| | 22 | A.    Yes. |
| | 23 | Q.    How did you learn that? |
| | 24 | A.    I just learned it. |
| 09:34:04 | 25 | Q.    Did you read books about it? |

Page 27

Dennis Lee Montgomery  -  November 18, 2010

09:34:08  1      A.    I mean that's 30 years ago.  Yes, I'm sure

2    I read books.

3      Q.    Do you have any formal training in --

4      A.    I think there were computer programming

09:34:20  5    classes that were offered with the program.  I don't

6    recall at the time, because the PC wasn't available

7    yet.  They didn't come out to '81.

8            MR. FLYNN:  Did you take any of these

9    classes.

09:34:28  10   BY MR. CONANT:

11     Q.    Did you take any of these classes?

12     A.    I don't recall specifically.

13     Q.    So you don't recall whether you've ever

14   taken any class where you can learn how to program

09:34:38  15   computer software?

16     A.    I don't remember the list of classes.  I

17   just don't recall.

18     Q.    Have you ever taken a class?

19     A.    I don't -- at times I had to have, yes,

09:34:51  20   because there were classes that I took -- at the

21   time those computers were Hewlitt Packard.  They

22   were not IBM-based and I know I went to Hewlitt

23   Packard classes.

24     Q.    So you took some classes offered my Hewlitt

09:35:06  25   Packard?

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:35:08 | 1 | A.    By the people making the computers. |
| | 2 | Q.    What years were those? |
| | 3 | A.    Same time frame we discussed, between the |
| | 4 | time while I was going to Grossmont College and |
| 09:35:16 | 5 | San Diego State and then, I would say, up until even |
| | 6 | after I left as a consultant. |
| | 7 | Q.    I'm looking for some specific years. |
| | 8 | A.    '73 to '80 I guess, let's just say. |
| | 9 | Q.    Okay.  So how many classes in computer -- |
| 09:35:33 | 10 | A.    I'm sorry. |
| | 11 | Q.    Let me just back up here, so we can get |
| | 12 | this out on the record that for the court reporter |
| | 13 | it's challenging when we speak over each other, so I |
| | 14 | will try to not interrupt you, if you could try not |
| 09:35:45 | 15 | to start your answer before I finish my question. |
| | 16 | A.    All right. |
| | 17 | Q.    Okay.  So how many classes in software |
| | 18 | programming have you taken from, say, 2010 until, |
| | 19 | say, 1970? |
| 09:36:02 | 20 | A.    What do you mean by "classes"? |
| | 21 | Q.    Were there -- where you had an instructor |
| | 22 | who's teaching you how to, you know, create software |
| | 23 | code. |
| | 24 | MR. CROCKETT:  Question is vague. |
| 09:36:13 | 25 | Ambiguous.  Lacks foundation. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:36:15 | 1 | BY MR. CONANT: |
| | 2 | Q.   Do you understand the question, |
| | 3 | Mr. Montgomery? |
| | 4 | A.   Well, I'm not certain if you've ever asked |
| 09:36:20 | 5 | me that I ever went to a class on computers. |
| | 6 | Q.   Yeah, correct. |
| | 7 | A.   Class meaning one time a week?  I don't -- |
| | 8 | Q.   I don't know.  That's what I'm asking.  I |
| | 9 | just want to know how much training, formal or |
| 09:36:37 | 10 | informal, you have in programming computer software. |
| | 11 | A.   What type of computers are you referring |
| | 12 | to? |
| | 13 | Q.   I don't know.  I'm not an expert in |
| | 14 | computers.  I'm a lawyer.  I'm not a -- I'm not a |
| 09:36:49 | 15 | computer guy, so that's why I'm asking. |
| | 16 | MR. CROCKETT:  Have you -- |
| | 17 | MR. CONANT:  Mr. Crockett, please, let me |
| | 18 | finish my question. |
| | 19 | MR. CROCKETT:  Go right ahead.  Is your |
| 09:36:56 | 20 | question finished? |
| | 21 | Is your question finished?  Is your |
| | 22 | question finished? |
| | 23 | You're asking me to wait. |
| | 24 | MR. FLYNN:  Just ask if any instructor ever |
| 09:37:05 | 25 | taught him how to write code. |

Page 30

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 09:37:08 | 1 |  BY MR. CONANT: |
| | 2 |     Q.    Has any instructor ever taught you how to |
| | 3 |  write computer code, Mr. Montgomery? |
| | 4 |     A.    What do you mean "computer code"? |
| 09:37:18 | 5 |         MR. CROCKETT:  I will object to the |
| | 6 |  question on the grounds as vague. |
| | 7 |         MR. CONANT:  I'm objecting to the fact that |
| | 8 |  your client is evading the question. |
| | 9 |         MR. CROCKETT:  Well, if you want to object |
| 09:37:26 | 10 |  to your questions, knock yourself out. |
| | 11 |         MR. FLYNN:  Ask him -- |
| | 12 |  BY MR. CONANT: |
| | 13 |     Q.    Do you know what source code is, |
| | 14 |  Mr. Montgomery? |
| 09:37:32 | 15 |         MR. CROCKETT:  I'm sorry, I want to enter |
| | 16 |  an objection right here.  This gentleman is not |
| | 17 |  admitted as an attorney in the case.  He is the |
| | 18 |  plaintiff.  He's not admitted pro hoc.  He's not |
| | 19 |  licensed in the state of California. |
| 09:37:42 | 20 |         Is he asking the questions or -- |
| | 21 |         MR. CONANT:  Mr. Crockett, I'll conduct the |
| | 22 |  deposition in the manner I feel appropriate.  He's |
| | 23 |  the plaintiff here.  He can -- |
| | 24 |         MR. CROCKETT:  You want to sit in his lap? |
| 09:37:53 | 25 |         MR. CONANT:  Let me finish, please. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:37:54 | 1 | He can participate in this deposition in |
| | 2 | any manner that I feel appropriate. |
| | 3 | MR. CROCKETT:  Okay. |
| | 4 | MR. CONANT:  He's not harassing the |
| 09:38:01 | 5 | witness.  He's not doing anything unethical. |
| | 6 | I'll conduct the deposition, thank you. |
| | 7 | MR. CROCKETT:  Is there a question pending? |
| | 8 | BY MR. CONANT: |
| | 9 | Q.  Do you know, Mr. Montgomery, what source |
| 09:38:11 | 10 | code is? |
| | 11 | A.  Yes. |
| | 12 | Q.  What does the word source code mean to you? |
| | 13 | A.  A language used by a compiler to generate |
| | 14 | source code, to generate an executable code. |
| 09:38:23 | 15 | Q.  I don't understand what any of that means. |
| | 16 | Can you explain to me what a compiler is? |
| | 17 | A.  It's a program written by a person that |
| | 18 | makes a development, a system development, for a |
| | 19 | computer language and gives you a number of tools by |
| 09:38:43 | 20 | which you are to generate programs to run on that |
| | 21 | platform. |
| | 22 | Q.  Have you ever had any training in how to |
| | 23 | develop source code? |
| | 24 | A.  I'm sure I have. |
| 09:38:55 | 25 | Q.  What is that training? |

Page 32

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 09:38:57 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:39:12 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:39:19 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:39:41 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:39:59 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 09:40:21 | 25 |

1    A.    I don't recall specifically.

2    Q.    Okay.  So is it fair to say,

3  Mr. Montgomery, that you know how to write source

4  code, but you don't recall how you ever learned to

5  write it?

6         MR. CROCKETT:  Question's vague and

7  ambiguous.  Lacks foundation.  May assume facts not

8  in evidence.

9         You think you can answer it as it's

10  phrased, go ahead.

11         THE WITNESS:  You kind of just learn it

12  over the years.  As the technology develops, so do

13  you kind of with it.  That's my answer.

14         MR. CONANT:  Mr. Montgomery, I'm going to

15  hand to you what will be marked as --

16         You're going to have to help me keep track

17  here.  We'll be on Exhibit 1.

18         I only have three copies here.  I only

19  have -- the suitcase is only so big, so I'll hand

20  one to you; if you want the copy --

21         You'll mark the one that the witness has?

22         THE REPORTER:  Yeah.

23         (Exhibit 1 was marked for identification.)

24         MR. CONANT:  Mr. Crockett.

25         MR. CROCKETT:  Are you starting with 1?

YATES COURT REPORTERS    800.669.1866

| 09:40:25 | 1 | MS. WELLS:  Can I see a copy, just take a |
| | 2 | look at it for a second? |
| | 3 | MR. FLYNN:  We're going to go to the part |
| | 4 | where the technology is listed. |
| 09:40:37 | 5 | MS. WELLS:  That's fine. |
| | 6 | BY MR. CONANT: |
| | 7 | Q.  Mr. Montgomery, can you please review this |
| | 8 | document that I've handed you. |
| | 9 | A.  Okay. |
| 09:40:45 | 10 | Q.  Let me know when you're reviewed it to your |
| | 11 | satisfaction. |
| | 12 | MR. FLYNN:  I'll mark the technology |
| | 13 | section for the declaration. |
| | 14 | MR. CONANT:  Okay. |
| 09:42:31 | 15 | THE WITNESS:  Okay. |
| | 16 | BY MR. CONANT: |
| | 17 | Q.  Okay.  Thank you, Mr. Montgomery.  Now |
| | 18 | before I forget, I just had a few questions I want |
| | 19 | to ask and then we'll move on to the schedule. |
| 09:42:41 | 20 | Can you tell me the last time you |
| | 21 | communicated with Edra Blixseth? |
| | 22 | A.  I think it was in the last week. |
| | 23 | Q.  What did you communicate with her? |
| | 24 | A.  I don't recall. |
| 09:42:51 | 25 | Q.  How did you communicate with her? |

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:42:53 | 1 | A.    I talked on the phone. |
| | 2 | Q.    On the phone? |
| | 3 | A.    Yeah. |
| | 4 | Q.    You talk about this deposition? |
| 09:43:00 | 5 | A.    I don't believe so. |
| | 6 | Q.    Did you talk about anything regarding |
| | 7 | Mr. Blixseth, Timothy L. Blixseth? |
| | 8 | A.    I don't recall. |
| | 9 | Q.    Anything regarding Mr. Flynn? |
| 09:43:09 | 10 | A.    I don't recall. |
| | 11 | Q.    So you had a conversation with Ms. Blixseth |
| | 12 | a week ago, but you don't recall anything about the |
| | 13 | conversation; is that accurate, Mr. Montgomery? |
| | 14 | A.    I don't recall specifically what we talked |
| 09:43:18 | 15 | about. |
| | 16 | Q.    That wasn't it.  That didn't answer my |
| | 17 | question. |
| | 18 | A.    Okay.  I'm sorry. |
| | 19 | Q.    Is it fair to say you talked to |
| 09:43:25 | 20 | Ms. Blixseth a week ago, but you have no idea what |
| | 21 | you talked to her about? |
| | 22 | MR. CROCKETT:  That mischaracterizes what |
| | 23 | he said.  He said he didn't recall. |
| | 24 | MR. CONANT:  I'm asking him to answer my |
| 09:43:31 | 25 | question. |

YATES COURT REPORTERS    800.669.1866

```
09:43:32    1            THE WITNESS:  I just did.  I already did.

            2    I said I don't recall.

            3    BY MR. CONANT:

            4        Q.    It was a yes-or-no question.

09:43:37    5        A.    Well, if I don't recall I guess the answer

            6    is no, I don't recall.

            7        Q.    You don't recall.

            8              Mr. Montgomery, yesterday you were in

            9    Las Vegas, were you not?

09:43:51   10        A.    Yes.

           11        Q.    What were you doing in Las Vegas yesterday?

           12        A.    I'm going to take the -- I'm going invoke

           13    my right to the Fifth Amendment.

           14        Q.    Mr. Montgomery, are you aware of any

09:44:03   15    criminal proceedings against you at this time?

           16        A.    I'm going to invoke my right under the

           17    Fifth Amendment.

           18        Q.    Well, I'm not asking you to tell me

           19    anything about what you may have done.  I'm asking

09:44:16   20    you are you aware of any criminal proceedings

           21    against you at this time?

           22              MR. CROCKETT:  Counsel, he has advised you

           23    and I will advise you that he is taking his Fifth

           24    Amendment privilege and he's not going to answer

09:44:30   25    that question.
```

Dennis Lee Montgomery  -  November 18, 2010

```
09:44:30    1              And if you have a difficulty with it, I'm

            2   sure we can take it up with a judge.

            3              MR. CONANT:  Did he answer it -- well, did

            4   he answer it by taking the Fifth Amendment,

09:44:36    5   Mr. Crockett?

            6              MR. CROCKETT:  Did he answer what, the last

            7   question?

            8              MR. CONANT:  My last question.

            9              MR. CROCKETT:  You heard him do that and

09:44:44   10   it's on the record, Counsel.

           11   BY MR. CONANT:

           12       Q.   Mr. Montgomery, so you're taking the Fifth

           13   Amendment -- you're pleading the Fifth Amendment in

           14   response to my question about whether you're aware

09:44:53   15   of any criminal proceedings against you; is that

           16   correct?

           17       A.   I've already answered the question.

           18              MR. CROCKETT:  Asked and answered, Counsel.

           19   Next question.

09:45:00   20   BY MR. CONANT:

           21       Q.   Mr. Montgomery, I understand that you have

           22   paid to the Clark County district attorney in Nevada

           23   approximately $450,000; is that correct?

           24       A.   I'm taking the Fifth Amendment.

09:45:14   25       Q.   Where did you get the money to pay the
```

YATES COURT REPORTERS     800. 669. 1866

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 09:45:16 | 1 | Clark County D.A. this approximately $450,000? |
| | 2 | A.    I'm asserting my right under the Fifth |
| | 3 | Amendment. |
| | 4 | MR. FLYNN:  Did you get it from Istvan |
| 09:45:21 | 5 | Burgyan. |
| | 6 | BY MR. CONANT: |
| | 7 | Q.    Did you get it from Istvan Burgyan, |
| | 8 | Mr. Montgomery? |
| | 9 | A.    I'm asserting my right under the Fifth |
| 09:45:28 | 10 | Amendment. |
| | 11 | MR. FLYNN:  Did you give money to Istvan |
| | 12 | Burgyan. |
| | 13 | BY MR. CONANT: |
| | 14 | Q.    Have you ever given money to Istvan |
| 09:45:33 | 15 | Burgyan? |
| | 16 | A.    I'm asserting my right under the Fifth |
| | 17 | Amendment. |
| | 18 | Q.    Okay.  Mr. Montgomery, do you now or have |
| | 19 | you ever maintained an office in Palm Desert or this |
| 09:45:55 | 20 | general area? |
| | 21 | A.    I'm asserting my right under the Fifth |
| | 22 | Amendment. |
| | 23 | Q.    Mr. Montgomery, you had within this office |
| | 24 | a large amount of -- strike that. |
| 09:46:16 | 25 | You've had in this office computer |

Page 38

Dennis Lee Montgomery  -  November 18, 2010

```
09:46:19    1    equipment, have you not?
            2          MR. CROCKETT:  Which office are you talking
            3    about?
            4          Which office are you talking about?  I'll
09:46:25    5    object to the question as vague and ask you to
            6    rephrase it.
            7          MR. FLYNN:  Within 300 yards of here.
            8    BY MR. CONANT:
            9      Q.   Within 300 yards of here, Mr. Montgomery,
09:46:30   10    you've maintained an office, have you not?
           11      A.   I'm asserting my right under the Fifth
           12    Amendment.
           13      Q.   What happened with the equipment that was
           14    stored in that office?
09:46:42   15      A.   I'm asserting my right under the Fifth
           16    Amendment.
           17      Q.   That was computer equipment, was it not,
           18    Mr. Montgomery, that you maintained in that office?
           19      A.   I'm asserting my right under the Fifth
09:46:50   20    Amendment.
           21      Q.   Wasn't that computer equipment that you
           22    obtained from Edra Blixseth, Mr. Montgomery?
           23      A.   I'm asserting my right under the Fifth
           24    Amendment.
09:46:57   25      Q.   Wasn't that equipment you obtained from a
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| 09:47:00 | 1 | company called Blxware, Mr. Montgomery? |
| | 2 | A.   I'm asserting my right under the Fifth |
| | 3 | Amendment. |
| | 4 | MR. CROCKETT:   Why don't you just sit in |
| 09:47:07 | 5 | his lap. |
| | 6 | MR. CONANT:   Thank you, Mr. Crockett.  I |
| | 7 | appreciate you keeping your comments to yourself. |
| | 8 | If you're not going to object or advise your client, |
| | 9 | then you can keep your comments to yourself. |
| 09:47:13 | 10 | MR. CROCKETT:   I object to him continually |
| | 11 | asking questions. |
| | 12 | MR. CONANT:   He's not asking any questions, |
| | 13 | Mr. Crockett. |
| | 14 | MR. CROCKETT:   Of course not. |
| 09:47:21 | 15 | A little louder, then he won't have to |
| | 16 | repeat it. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.   Mr. Montgomery, the computer equipment that |
| | 19 | you took out of this office that's 300 yards away |
| 09:47:44 | 20 | from here, that was computer equipment that you |
| | 21 | listed on your schedule; isn't that correct? |
| | 22 | MR. CROCKETT:   Object to the question. |
| | 23 | Assumes facts not in evidence. |
| | 24 | Go ahead. |
| 09:47:52 | 25 | THE WITNESS:   I assert my right under the |

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:47:54 | 1 | Fifth Amendment. |
| | 2 | BY MR. CONANT: |
| | 3 | Q. Mr. Montgomery, turn with me to your |
| | 4 | schedules, which have been marked as Exhibit 1, and |
| 09:48:06 | 5 | let's go ahead and lay the foundation for these |
| | 6 | first. |
| | 7 | Mr. Montgomery, do you recognize this |
| | 8 | document here that's marked as Exhibit No. 1? |
| | 9 | A. Yeah. Yes. |
| 09:48:14 | 10 | Q. What do you recognize this document to be? |
| | 11 | A. Looks like my bankruptcy filing. |
| | 12 | Q. Can you clarify that for me, your |
| | 13 | bankruptcy filing? |
| | 14 | A. Looks like a document that was used in my |
| 09:48:30 | 15 | bankruptcy filing. |
| | 16 | Q. Okay. Can you turn to the last page for me |
| | 17 | of Exhibit 1. Up at the, I guess, the top half of |
| | 18 | the document purports to be a signature of Dennis |
| | 19 | Lee Montgomery. |
| 09:48:46 | 20 | Do you see that, Mr. Montgomery? |
| | 21 | A. Yes. |
| | 22 | Q. Is that your signature? |
| | 23 | A. It appears to be. |
| | 24 | Q. Do you recall signing a document that |
| 09:48:52 | 25 | looked like this, Mr. Montgomery? |

YATES COURT REPORTERS     800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:48:54 | 1 | A.   I signed a bankruptcy document. |
| | 2 | Q.   Do you recall signing this document? |
| | 3 | A.   If this is my bankruptcy document. |
| | 4 | Q.   Is that a yes or a no? |
| 09:49:05 | 5 | A.   Yes. |
| | 6 | Q.   Turn with me to -- one, two, three, four -- |
| | 7 | the fifth page of this, of your bankruptcy |
| | 8 | Schedule B. |
| | 9 |     MR. CROCKETT:  For the record, this would |
| 09:49:25 | 10 | be page 22-5 as it's been handwritten in the lower |
| | 11 | right-hand corner of the document. |
| | 12 | BY MR. CONANT: |
| | 13 | Q.   Turn with me to the -- |
| | 14 |     MR. CROCKETT:  Is that correct, Counsel?  I |
| 09:49:34 | 15 | want to make sure we're on the same page. |
| | 16 |     MR. CONANT:  I'm going to clarify this |
| | 17 | here. |
| | 18 | Q.   Turn with me to the following page that |
| | 19 | your counsel just identified to line number 35.  Do |
| 09:49:46 | 20 | you see that down at the bottom, "Other personal |
| | 21 | property of any kind not already listed"? |
| | 22 |     Do you see that row I'm referring to? |
| | 23 | A.   Yes. |
| | 24 | Q.   Do you see that row identifies |
| 09:49:58 | 25 | approximately $38 million worth of personal |

Dennis Lee Montgomery  -  November 18, 2010

```
09:50:01   1    property, Mr. Montgomery?

           2         A.    Yes.

           3         Q.    Okay.  Now flip with me to what is

           4    identified down at the bottom right-hand corner as

09:50:12   5    22-8.  I'm looking at line 20 or Entry No. 22.

           6              It's identified as Patents, Copyright and

           7    other Intellectual Property.  Do you see that,

           8    Mr. Montgomery?

           9         A.    Yes.

09:50:33  10         Q.    Look over at the right-hand column there,

          11    there purports to be a value of $10 million.

          12              Do you see that?

          13         A.    Yes.

          14         Q.    Can you explain to me what that $10 million

09:50:44  15    item of intellectual property is, Mr. Montgomery?

          16         A.    I'm asserting my right under the Fifth

          17    Amendment.

          18         Q.    All right.  Flip with me to the following

          19    page identified at the bottom right-hand corner as

09:51:00  20    page 22-9.

          21              Mr. Montgomery, are you at that page?

          22         A.    Yes.

          23         Q.    Do you see that bottom paragraph on this

          24    page that begins with "In addition"?

09:51:12  25         A.    Yes.
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:51:12 | 1 | Q.    Can you read that paragraph for the record, |
| | 2 | please. |
| | 3 | MR. CROCKETT:  Go ahead. |
| | 4 | THE WITNESS:  "In addition, Dennis |
| 09:51:17 | 5 | Montgomery is the holder of certain intellectual |
| | 6 | property rights which are subject to the National |
| | 7 | Security Act 1947, 11 U.S.C. Section 401(a) et |
| | 8 | seq" -- I guess -- I don't know what that means. |
| | 9 | BY MR. CONANT: |
| 09:51:35 | 10 | Q.    Et seq. |
| | 11 | A.    -- "et seq., and is by such Act prohibited, |
| | 12 | without the express consent of the United States |
| | 13 | Department of Justice and certain other agencies of |
| | 14 | the United States of America from making any |
| 09:51:47 | 15 | disclosures with respect thereto. |
| | 16 | "Any requested information with respect |
| | 17 | thereto must be directed to Raphael Gomez, |
| | 18 | United States Department of Justice, Civil Division, |
| | 19 | Senior Trial Counsel, 950 Pennsylvania Avenue, |
| 09:52:02 | 20 | Northwest, Washington, D.C., 20530, (202) 514-1318." |
| | 21 | Q.    Thank you. |
| | 22 | Mr. Montgomery, have you had any |
| | 23 | discussions within the prior year with any |
| | 24 | government agency concerning the intellectual |
| 09:52:25 | 25 | property that you just described? |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

09:52:27  1      A.    I assert my right under the Fifth

         2  Amendment.

         3      Q.    Has your attorney, to your knowledge, been

         4  in contact with any agency of the United States

09:52:36  5  government concerning your personal property that's

         6  listed on these schedules?

         7          MR. CROCKETT:  I'll object to the question.

         8  It's plainly calling for attorney-client

         9  communication.

09:52:47 10          Instruct him not to answer.

        11          MR. FLYNN:  Have him describe the

        12  intellectual --

        13  BY MR. CONANT:

        14      Q.    Mr. Montgomery, can you briefly describe to

09:52:53 15  me the intellectual property that we're discussing

        16  here that you just described in your schedules as

        17  being subject to the National Security Act?

        18          MR. CROCKETT:  Ms. Wells, do you have any

        19  objection to him answering this question?

09:53:10 20          MS. WELLS:  No.

        21          MR. FLYNN:  See, we're on the same side.

        22          THE WITNESS:  I don't believe -- I

        23  didn't -- I don't believe I put this segment on

        24  there.  I could be wrong.  I don't recall that

09:53:18 25  specifically.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 09:53:21 | 1 | BY MR. CONANT: |
| | 2 | Q.   Mr. Montgomery, you signed these -- you |
| | 3 | signed your schedules under penalty of perjury, did |
| | 4 | you not? |
| 09:53:27 | 5 | A.   Yes. |
| | 6 | Q.   So is it your testimony, Mr. Montgomery, |
| | 7 | that you have no personal property that is subject |
| | 8 | to -- I'm sorry, strike that. |
| | 9 | Is it your testimony, Mr. Montgomery, that |
| 09:53:49 | 10 | you have no personal property that falls within the |
| | 11 | description of this paragraph here on page 22-9? |
| | 12 | MR. CROCKETT:  I'll object to the question. |
| | 13 | It's argumentative.  It assumes facts not in |
| | 14 | evidence. |
| 09:53:58 | 15 | Would you like to rephrase it, Counsel? |
| | 16 | MR. CONANT:  No.  I want him to answer the |
| | 17 | question. |
| | 18 | MR. CROCKETT:  I'll instruct him not to |
| | 19 | answer. |
| 09:54:05 | 20 | BY MR. CONANT: |
| | 21 | Q.   Mr. Montgomery, do you have any personal |
| | 22 | property that falls within the description -- |
| | 23 | MR. FLYNN:  Intellectual. |
| | 24 | MR. CONANT:  I'm sorry.  Thank you, |
| 09:54:13 | 25 | Mr. Flynn. |

Page 46

Dennis Lee Montgomery  -  November 18, 2010

09:54:14  1       Q.    Do you have any personal property that

       2   falls within the category of intellectual property

       3   that is described here on the bottom paragraph of

       4   22-9?

09:54:24  5             MR. CROCKETT:  Well, I'll object to the

       6   question again as it assumes facts not in evidence.

       7   It may require him to draw a legal conclusion.

       8             Why don't you define for him what you mean

       9   by intellectual property in context of the question?

09:54:35 10             MR. CONANT:  I'm asking --

      11             MR. CROCKETT:  Let me finish, Counsel.

      12   Thank you.

      13             MR. CONANT:  Are you done?

      14             MR. CROCKETT:  Yes.

09:54:41 15             MR. CONANT:  Thank you.

      16       Q.    There's a straightforward question here,

      17   Mr. Montgomery.  This bottom paragraph of your

      18   bankruptcy schedule identifies you as the holder of

      19   certain intellectual property.

09:54:56 20             Do you see that, Mr. Montgomery?

      21             MR. FLYNN:  Describe intellectual property.

      22   Please describe the intellectual property.

      23   BY MR. CONANT:

      24       Q.    Can you answer the question,

09:55:07 25   Mr. Montgomery?

Dennis Lee Montgomery  -  November 18, 2010

```
09:55:08   1              MR. CROCKETT:  Read the question back,
           2    please, would you, Ms. Reporter.
           3              MR. CONANT:  I'll just ask the question
           4    again.
09:55:16   5       Q.   Mr. Montgomery, do you see this bottom
           6    paragraph on the page identified as 22-9?
           7       A.   Yes.
           8       Q.   Do you see that it says Dennis Montgomery
           9    is the holder of certain intellectual property
09:55:32  10    rights?
          11              Do you see that, Mr. Montgomery?
          12       A.   Yes.
          13       Q.   Describe those intellectual property rights
          14    to me.
09:55:38  15       A.   I assert my right under the Fifth
          16    Amendment.
          17              MR. FLYNN:  I'm glad these gentlemen
          18    stayed.
          19              MR. CROCKETT:  Can we go off the record for
09:56:04  20    a moment, please.  I need to talk to my client.
          21              MR. CONANT:  You can go off the record.
          22              MR. CROCKETT:  Thanks.
          23              THE VIDEOGRAPHER:  Going off the record.
          24    The time is 9:56 a.m.
09:57:36  25              (Recess taken.)
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:00:29 | 1 | THE VIDEOGRAPHER:  The time is 10 a.m. |
| | 2 | We're back on the record. |
| | 3 | MR. CONANT:  All right.  Mr. Montgomery, |
| | 4 | I'm going to hand you what is going to be marked as |
| 10:00:38 | 5 | Plaintiff's Exhibit 2. |
| | 6 | You'll want a copy of this, Ms. Wells. |
| | 7 | Do you need a copy?  I'm sorry, your name |
| | 8 | again? |
| | 9 | THE REPORTER:  Stephanie. |
| 10:01:00 | 10 | MR. CONANT:  Stephanie. |
| | 11 | Do you need a copy, Stephanie, or are you |
| | 12 | going to get -- |
| | 13 | THE REPORTER:  I can use his if he leaves |
| | 14 | them there. |
| 10:01:05 | 15 | MR. CONANT:  Okay. |
| | 16 | THE REPORTER:  Could you identify them for |
| | 17 | the record as we go through for me, please.  Thanks. |
| | 18 | MR. CONANT:  Yeah. |
| | 19 | (Exhibit 2 was marked for identification.) |
| 10:01:16 | 20 | BY MR. CONANT: |
| | 21 | Q.  Mr. Montgomery, I've handed you what is |
| | 22 | going to be marked as Plaintiff's Exhibit 2.  These |
| | 23 | are Plaintiff's Second Set of Requests for |
| | 24 | Production of Documents that were served on your |
| 10:01:26 | 25 | counsel in this case by me. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:01:32 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:01:51 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:02:04 | 10 |

10:01:32    1         Would you turn to page 2.  It's marked --

2    at the bottom it's actually the third page of the

3    document, but it's labeled as page 2.  Request for

4    Production No. 1 asks you produce the source codes.

10:01:51    5    If you look above Request for Production No. 1

6    you'll see the definition of source codes.

7         Do you see that, Mr. Montgomery, where it

8    defines source codes?

9         A.    Yes.

10:02:04    10         Q.    Can you read that for me where it defines

11    source codes?

12         A.    "Source codes means those computer software

13    codes that you were ordered to produce by the

14    United States District Court for the District of

10:02:18    15    Nevada for which you were sanctioned by the Court in

16    the amount of $2500 per day to compel your

17    production of those codes and which are referenced

18    in Docket Entry No. 815 in Case No. 3:06-cv-0056 in

19    the" United -- "in the U.S. District" for the "Court

10:02:41    20    for the District of Nevada and which is attached

21    hereto as Exhibit 1."

22         Q.    All right.  Can you turn to Exhibit No. 1

23    which is on the back of this document,

24    Mr. Montgomery.

10:02:58    25         Can you review that docket entry, Docket

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:03:02 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:03:55 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:04:05 | 10 |

```
10:03:02    1    Entry No. 815 and let me know when you have reviewed
            2    it to your satisfaction.
            3             (Witness complies.)
            4             THE WITNESS:  All right.  I've read it.
10:03:55    5    BY MR. CONANT:
            6        Q.    Thank you, Mr. Montgomery.
            7             Now if you recall, Mr. Montgomery, you were
            8    sanctioned by the U.S. District Court for the
            9    District of Nevada to the tune of $2500 a day until
10:04:05   10    you produced the source code as referenced in
           11    Exhibit 1; isn't that correct?
           12        A.    I didn't recall that.  I recall there was a
           13    sanction of some type.  I don't remember
           14    specifically that.
10:04:18   15        Q.    Do you recall the sanction was to compel
           16    you to produce the source codes referenced in this
           17    Exhibit 1?
           18        A.    I thought it was more than that.
           19        Q.    What else did you think it involved, the
10:04:28   20    sanction order?
           21        A.    I thought it was just a general production.
           22        Q.    Did you ever produce the source codes
           23    identified in this Exhibit 1, Mr. Montgomery?
           24             Let me clarify:  Did you ever produce the
10:04:45   25    source codes as you were ordered to do by the U.S.
```

YATES COURT REPORTERS    800.669.1866

08-Gase01RBM-cD0073-CkSk-MAL Document 1E7-Filed 07/28/231-Page 53 of 1046
08-cv-01570-RBM  Doc#: 21-5  Filed 01/14/11  Entered 01/14/11 14:22:06  Page 53 of
345
Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:04:48 | 1 | District Court for the District of Nevada? |
| | 2 | A.    I'm not certain. |
| | 3 | Q.    You're not certain whether you ever |
| | 4 | produced them, Mr. Montgomery?  Is that the answer |
| 10:05:08 | 5 | to the question? |
| | 6 | A.    I'm not certain.  That's my answer. |
| | 7 | Q.    Did you ever produce noise filtering codes |
| | 8 | Mr. Montgomery? |
| | 9 | A.    I don't know what you mean. |
| 10:05:24 | 10 | Q.    Have you ever discussed noise filtering |
| | 11 | technology to -- let me back up. |
| | 12 | Have you ever described, in any declaration |
| | 13 | or affidavit that you've signed, noise filtering |
| | 14 | technology? |
| 10:05:44 | 15 | A.    I'm not certain. |
| | 16 | Q.    Now these source codes here, these were |
| | 17 | source codes for software that purportedly decrypted |
| | 18 | transmissions being broadcast by Al-Jazeera? |
| | 19 | MR. CROCKETT:  Is that a question? |
| 10:06:08 | 20 | MR. CONANT:  Yeah. |
| | 21 | THE WITNESS:  I thought that was a |
| | 22 | statement you were making. |
| | 23 | BY MR. CONANT: |
| | 24 | Q.    Have you ever -- |
| 10:06:14 | 25 | MR. FLYNN:  Have you ever described to |

Page 52

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 54 of 1046

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:06:15 | 1 |

```
10:06:15   1    anyone --

           2    BY MR. CONANT:

           3        Q.   Have you ever described to anyone in any

           4    form a noise filtering technology that you had

10:06:22   5    created?

           6             MR. CROCKETT:  Technology different from

           7    software?  Object to the question as vague,

           8    ambiguous, not calculated to lead to the discovery

           9    of admissible evidence.

10:06:35   10   BY MR. CONANT:

           11       Q.   When I refer to technology, Mr. Montgomery,

           12   I refer to the word in the broadest sense, but as

           13   relevant here it'll refer primarily to software,

           14   computer software.

10:06:51   15            MR. CROCKETT:  What else does it refer to,

           16   Counsel?

           17            MR. CONANT:  I want Mr. Montgomery to

           18   explain.

           19            MR. CROCKETT:  Explain --

10:06:58   20            MR. CONANT:  He's represent --

           21            MR. CROCKETT:  Excuse me, may I finish?

           22            MR. CONANT:  No, let me finish.

           23            MR. CROCKETT:  You had finished the

           24   question.  You interrupted me, Mr. Conant.

10:07:04   25            MR. CONANT:  Thank you, Mr. Crockett.
```

Page 53

Dennis Lee Montgomery  -  November 18, 2010

10:07:06    1          MR. CROCKETT:  You're welcome and I'll

            2   continue to speak, if I may, because you're asking

            3   him now to define what you mean by the use of the

            4   word technology and I'll instruct him not to answer

10:07:16    5   to the extent there's any question pending and ask

            6   you to rephrase.

            7          MR. FLYNN:  That's your copy.  That's their

            8   copy.  I'll make sure we've got the same one.

            9          MR. CONANT:  Is it --

10:07:32   10          MR. FLYNN:  Yeah, that's his.

           11          MR. CONANT:  We have four of these.

           12          MR. FLYNN:  That's yours, Mr. Crockett.

           13   That's yours, Carly.

           14          MS. WELLS:  Thank you.

10:07:43   15          MR. CONANT:  Mr. Montgomery, I'm handing

           16   you what's going to be marked as Plaintiff's Exhibit

           17   No. 3.

           18          (Exhibit 3 was marked for identification.)

           19   BY MR. CONANT:

10:08:14   20      Q.   Mr. Montgomery, I've handed you what's

           21   going to be marked as Plaintiff's Exhibit No. 3.

           22   The title of this document is Sealed Declaration of

           23   Dennis Montgomery in Support of his Oppositions to

           24   DOD's and eTreppid's Motion for Protective Orders.

10:08:28   25          Do you see that on the first page,

| 10:08:29 | 1 | Mr. Montgomery? |
| | 2 | A.    Yes. |
| | 3 | Q.    Turn with me, Mr. Montgomery, to the second |
| | 4 | to last page of this document.  Do you see where it |
| 10:08:41 | 5 | says Dennis Montgomery on the signature line, |
| | 6 | Mr. Montgomery? |
| | 7 | A.    Yes. |
| | 8 | Q.    Is that your signature, Mr. Montgomery? |
| | 9 | A.    It appears so. |
| 10:08:53 | 10 | Q.    Mr. Montgomery, turn with me to page No. 4. |
| | 11 | A.    4 at the bottom or the fourth page? |
| | 12 | Q.    Page No. 4 at the bottom, meaning the |
| | 13 | number 4 appears at the bottom the page. |
| | 14 | A.    Yeah.  Okay. |
| 10:09:10 | 15 | Q.    I'm going to read line No. 1 here beginning |
| | 16 | with the sentence, "I have."  Please read along with |
| | 17 | me:  "I have provided the," quote -- |
| | 18 | A.    I'm not on the right page then.  You're |
| | 19 | talking 4 on the bottom? |
| 10:09:24 | 20 | Q.    Page 4 on the bottom. |
| | 21 | A.    What line number? |
| | 22 | Q.    Line No. 1. |
| | 23 | MR. FLYNN:  You're there. |
| | 24 | THE WITNESS:  My line says, "The local." |
| | 25 | /// |

Dennis Lee Montgomery - November 18, 2010

| | | |
|---|---|---|
| 10:09:31 | 1 | BY MR. CONANT: |
| | 2 | Q. I'm starting with the first full sentence. |
| | 3 | A. Oh, I'm sorry. Okay. |
| | 4 | Q. "I have provided the 'output' from my |
| 10:09:39 | 5 | decoding programs without compensation to our |
| | 6 | government in order to stop terrorist attacks and |
| | 7 | save American lives. |
| | 8 | "My source codes for this decoding |
| | 9 | technology, which derives from my 'ODS' are what |
| 10:09:51 | 10 | Trepp and several government officials were |
| | 11 | attempting to steal from me when they raided my |
| | 12 | home." |
| | 13 | Is that your statement, Mr. Montgomery? |
| | 14 | MR. CROCKETT: Document speaks for itself. |
| 10:10:02 | 15 | BY MR. CONANT: |
| | 16 | Q. Mr. Montgomery, can you answer the |
| | 17 | question, please. |
| | 18 | A. What's the question? |
| | 19 | Q. Is that your statement? |
| 10:10:10 | 20 | A. It's written on that piece of paper. |
| | 21 | Q. Which you signed; is that correct, |
| | 22 | Mr. Montgomery? |
| | 23 | MR. CROCKETT: Counsel, this is really |
| | 24 | argumentative. You know that this is a statement |
| 10:10:22 | 25 | out of a declaration that he signed October 30th, |

Dennis Lee Montgomery  -  November 18, 2010

10:10:26   1   2006.

           2   BY MR. CONANT:

           3      Q.    Mr. Montgomery, is that a truthful

           4   statement on your part?

10:10:34   5           MR. CROCKETT:  At what point in time,

           6   Counsel?  The question is vague and ambiguous.

           7   BY MR. CONANT:

           8      Q.    When you wrote it, Mr. Montgomery.

           9           MR. CROCKETT:  That also assumes facts not

10:10:44  10   in evidence.

          11           MR. CONANT:  I'm sorry, let me back up.

          12      Q.    When you signed this document, was this a

          13   truthful statement on your part?

          14      A.    I'm going to assert my right under the

10:11:03  15   Fifth Amendment.

          16      Q.    Mr. Montgomery, describe what this decoding

          17   program is and what you -- sorry.

          18           Describe what you mean on this line 1 by

          19   "decoding programs."

10:11:30  20      A.    I'm going to assert my right under the

          21   Fifth Amendment.

          22      Q.    Mr. Montgomery, describe what you mean on

          23   line 2, starting with the first full sentence on

          24   line 2, quote, "My source codes."

10:11:41  25           Please describe to me what "my source

Dennis Lee Montgomery - November 18, 2010

| | | |
|---|---|---|
| 10:11:48 | 1 | codes" refers to? |
| | 2 | A. I'm going to assert my right under the |
| | 3 | Fifth Amendment. |
| | 4 | Q. These, quote, unquote, "source codes," are |
| 10:11:56 | 5 | they not the same source codes that you identified |
| | 6 | on your bankruptcy schedules on -- and then turn |
| | 7 | back to -- we have Plaintiff's Exhibit 1, which is |
| | 8 | the bankruptcy schedules. |
| | 9 | MR. FLYNN: Did you read the whole thing |
| 10:12:21 | 10 | into the record? |
| | 11 | BY MR. CONANT: |
| | 12 | Q. All right. Before you answer that |
| | 13 | question, let me go back, Mr. Montgomery. |
| | 14 | A. Go back to what? |
| 10:12:43 | 15 | Q. We're going to go back to Plaintiff's |
| | 16 | Exhibit -- |
| | 17 | Stephanie, what Plaintiff's exhibit are we |
| | 18 | on right now? |
| | 19 | THE REPORTER: 3. |
| 10:12:55 | 20 | MR. CROCKETT: Are we marking the |
| | 21 | declaration? |
| | 22 | MR. CONANT: Yeah, start marking these |
| | 23 | things. |
| | 24 | Let me go -- can we go off the record here |
| 10:13:02 | 25 | for a second so I can get the exhibits straightened |

Page 58

Dennis Lee Montgomery  -  November 18, 2010

```
10:13:05    1   out here.
            2           THE VIDEOGRAPHER:  Going off the record.
            3   The time is 10:13 a.m.
            4           (Break in the proceedings.)
10:13:58    5           THE VIDEOGRAPHER:  The time is 10:14 a.m.
            6   We're back on the record.
            7   BY MR. CONANT:
            8       Q.  All right.  Mr. Montgomery, I wanted to
            9   back up.  Before we went off the record, I wanted to
10:14:07   10   back up to my questioning pertaining to Exhibit
           11   No. 3, which is the Sealed Declaration of Dennis
           12   Montgomery in Support of his Oppositions to DOD's
           13   and eTreppid's Motions for Protective Order, which
           14   is a declaration you signed under penalty of
10:14:23   15   perjury.
           16           Turn with me to the page identified at the
           17   bottom as page No. 4 of this document.  And, just to
           18   clarify, the paragraph I'm reading from begins on
           19   line 1, goes to line 4 to 5.
10:14:45   20           MR. CROCKETT:  Actually, the paragraph
           21   begins on line 25 of the preceding page, Counsel.
           22           MR. CONANT:  I'm reading from line 1 of
           23   page 4 at the very beginning of the first full
           24   sentence.
10:14:55   25           MR. FLYNN:  Read the entire --
```

Page 59

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:14:57 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:15:07 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:15:23 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:15:37 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:15:49 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:16:16 | 25 |

BY MR. CONANT:

    Q.    And please follow along, Mr. Montgomery.

    "I have provided the 'output' from my decoding programs without compensation to our government in order to stop terrorist attacks and save American lives.  My source codes for this decoding technology which derives from my 'ODS' are what Trepp and several government officials were attempting to steal from me when they raided my home.

    MR. FLYNN:  Did you ever create any source code that was used to stop terrorist attacks?

BY MR. CONANT:

    Q.    Mr. Montgomery, have you ever created any source code that was used to stop terrorist attacks?

    A.    I'm going to assert my right under the Fifth Amendment.

    MR. FLYNN:  All right.

    MR. CONANT:  I'm going to keep going.

    Q.    All right.  Mr. Montgomery, turn with me back to Plaintiff's Exhibit No. 2.

    All right.  We'll go look at Request for Production No. 1 where you are requested to produce the source codes.  I'm going to hand you what will be marked as Plaintiff's Exhibit No. --

Dennis Lee Montgomery - November 18, 2010

| | |
|---|---|
| 10:16:34 | 1 |

           1         THE REPORTER:  -- 4.

           2         MR. CONANT:  -- 4.

           3         I got it.

           4         All right.  Mr. Montgomery, I've handed you

10:16:55    5  what's marked as Plaintiff's Exhibit No. 4.  This is

           6  Dennis Montgomery's Responses to Plaintiff's

           7  Requests for Production of Documents, Set Two.

           8         (Exhibit 4 was marked for identification.)

           9  BY MR. CONANT:

10:17:09  10    Q.   Turn with me to what's identified as page 3

         11  on the bottom of -- on the bottom of page 3,

         12  Response to -- I'm reading, "Response to Request for

         13  Production No. 1."

         14         Your response, Mr. Montgomery, if you read

10:17:29  15  with me beginning on line 20 says, "Subject to and

         16  without waiving the foregoing objections, Defendant

         17  responds as follows:  After diligent search and

         18  reasonable inquiry, the source codes are not in the

         19  possession, custody or control of the Defendant.

10:17:47  20         "Defendant believes the source codes may be

         21  in the possession, custody or control of the

         22  United States Government."

         23         Do you see that, Mr. Montgomery?

         24    A.   Yes.

10:17:56  25    Q.   Is that a truthful statement,

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
10:17:57    1    Mr. Montgomery?

            2        A.   Well, there's several statements there.

            3    Which one?

            4            MR. CROCKETT:  I'll object.  Compound.

10:18:04    5    BY MR. CONANT:

            6        Q.   The source codes are in the possession of

            7    the government.

            8        A.   I turned 12 drives over to the Liner law

            9    firm as part of the discovery order that was issued

10:18:17   10    by Judge Cook.  I believe it was in June of '09.

           11            No, excuse me, May of '09.  May of '0- --

           12    yes, May of '09, prior to my bankruptcy filing.

           13        Q.   Mr. Montgomery, is your testimony that

           14    these source codes, which you've identified as worth

10:18:51   15    $500 million, are no longer in your possession?

           16            MR. CROCKETT:  Sir, if you're referring to

           17    a document or a statement that he's made --

           18            THE WITNESS:  I don't --

           19            MR. CROCKETT:  -- I'll object.  Assumes

10:19:01   20    facts not in evidence.  Lacks foundation.  Vague.

           21    Ambiguous.  And if you'd read it back, I think it's

           22    confusing too, but let's read it back.

           23            MR. FLYNN:  What is your --

           24            MR. CONANT:  As long as he's talking, she

10:19:15   25    can't read the question back, because she's required
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

10:19:20    1    to take down every word that's said in this room,

            2    Mr. Conant.

            3              THE REPORTER:  That I can hear.

            4              MR. CROCKETT:  That you can hear.  Well --

10:19:30    5    BY MR. CONANT:

            6        Q.    Mr. Montgomery, what is your evaluation --

            7              MR. CROCKETT:  Are you withdrawing the

            8    prior question?

            9              MR. CONANT:  I'm continuing on with the

10:19:38   10    deposition.

           11        Q.    Mr. Montgomery, what is your evaluation of

           12    these source codes that you refer to here in

           13    Response to Request for Production No. 1?

           14              MR. CROCKETT:  Well, the question lacks

10:19:48   15    foundation.  It's vague.  It's ambiguous.  It may be

           16    compound.

           17              Can you answer it as it's phrased or should

           18    he rephrase it?

           19              THE WITNESS:  I don't understand what

10:20:01   20    you're asking me.

           21    BY MR. CONANT:

           22        Q.    Mr. Montgomery, these source codes that are

           23    referred to in these requests for production of

           24    documents, these are included within the

10:20:17   25    intellectual property you identify in your

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:20:19 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:20:36 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:20:59 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:21:20 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:21:29 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:21:46 | 25 |

1   bankruptcy schedules, are they not?

2       A.    I don't understand that question.

3       Q.    The source codes --

4            MR. FLYNN:  Start here where he says --

5            MR. CONANT:  All right.

6       Q.    All right.  We're going to withdraw the

7   prior line of questioning.  We'll go back to Exhibit

8   No. 3.

9            MR. FLYNN:  Read it into record.

10  BY MR. CONANT:

11      Q.    All right.  Mr. Montgomery, turn to page

12  No. 5 of this document.  I'm looking at the

13  beginning of paragraph No. 8 or labeled as paragraph

14  No. 8.

15           Do you see that, Mr. Montgomery, begins

16  with, "In September 2005"?

17      A.    I see the paragraph.

18      Q.    Okay.  I'm going to read into the record

19  the first sentence of that paragraph.

20           "In September 2005 Trepp told me that the

21  government had appropriated $100 million for the

22  coding technology but he was demanding

23  $500,000,000."

24           Do you see that sentence, Mr. Montgomery?

25      A.    The quote by Trepp?

Dennis Lee Montgomery  -  November 18, 2010

```
10:21:49    1            MR. CROCKETT:  It's a yes-or-no question.

            2   BY MR. CONANT:

            3       Q.   The whole sentence that I just read, the

            4   whole first sentence of paragraph No. 8,

10:21:55    5   Mr. Montgomery.

            6       A.   I see it.

            7       Q.   Was that a truthful statement when you made

            8   that, Mr. Montgomery?

            9            MR. CROCKETT:  So we're clear, are you

10:22:04   10   asking is it truthful that Trepp told him that?

           11            MR. CONANT:  I'm asking is the sentence

           12   true.

           13            MR. CROCKETT:  That in September 2005 Trepp

           14   told him the following information?

10:22:14   15            MR. CONANT:  Yes.

           16            THE WITNESS:  It's on the declaration.

           17            MR. FLYNN:  Where is the decoding

           18   technology.

           19   BY MR. CONANT:

10:22:20   20       Q.   Where is the decoding technology,

           21   Mr. Montgomery?

           22       A.   Is this Mr. Flynn asking me or you?

           23       Q.   I'm asking you.  There's a question

           24   pending.

10:22:29   25            Where is the decoding technology that you
```

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| 10:22:32 | 1 | reference in the sentence that I just read? |

1     reference in the sentence that I just read?

2                    MR. CROCKETT:  If you know.

3                    THE WITNESS:  I don't recall.

4                    MR. FLYNN:  Do you have possession of it

5     now.

6     BY MR. CONANT:

7          Q.     Do you have possession of this technology

8     now, Mr. Montgomery?

9          A.     What technology?

10         Q.     The decoding technology referenced in the

11    sentence I just read.

12         A.     That was used in what time frame?

13                   MR. CROCKETT:  I'm going to object to the

14    entire line of questioning, because this is all

15    based on decoding technology as described by Warren

16    Trepp in this declaration and perhaps you should ask

17    Mr. Trepp what he meant and get that on the record

18    so we can then have his --

19                   MR. FLYNN:  That's false.  The decoding

20    technology was referenced earlier by him.

21                   MR. CROCKETT:  If he's Geppetto, what does

22    that make you?

23                   MR. FLYNN:  Statement.

24                   MR. CONANT:  The document speaks for

25    itself.

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:23:18 | 1 | MR. CROCKETT:  Yes, it does. |
| | 2 | MR. CONANT:  Are you testifying, |
| | 3 | Mr. Crockett, or is your client testifying? |
| | 4 | MR. CROCKETT:  Is he asking questions or |
| 10:23:26 | 5 | are you? |
| | 6 | MR. CONANT:  It doesn't matter, |
| | 7 | Mr. Crockett.  It frankly doesn't matter.  I don't |
| | 8 | understand. |
| | 9 | If you want to get into this whole -- |
| 10:23:34 | 10 | MR. FLYNN:  Just ignore him. |
| | 11 | Do you have any source code technology in |
| | 12 | your possession as described in your bankruptcy |
| | 13 | schedule. |
| | 14 | MR. CONANT:  Let's take a -- we're going to |
| 10:23:44 | 15 | take a brief recess and go off the record here. |
| | 16 | THE VIDEOGRAPHER:  Going off the record. |
| | 17 | The time is 10:23 a.m. |
| | 18 | (Recess taken.) |
| | 19 | THE VIDEOGRAPHER:  The time is 10:29 a.m. |
| 10:29:34 | 20 | We're back on the record. |
| | 21 | MR. FLYNN:  Truth always triumphs. |
| | 22 | THE WITNESS:  Ha ha, from you. |
| | 23 | MR. FLYNN:  Just depends on the body count |
| | 24 | to get there. |
| | 25 | /// |

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:29:55 | 1 | BY MR. CONANT: |
| | 2 | Q.    All right.  Mr. Montgomery -- |
| | 3 | We're back on the record, Stephanie? |
| | 4 | Thank you. |
| 10:30:00 | 5 | Turn with me to Plaintiff's Exhibit No. 3, |
| | 6 | if you would, page No. 2 and, just to be clear, |
| | 7 | there's -- going forward on this deposition if |
| | 8 | there's a document with a page number at the bottom, |
| | 9 | when I refer to the page number I'm referring to the |
| 10:30:17 | 10 | actual number identified at the bottom of the page. |
| | 11 | Do you understand, Mr. Montgomery? |
| | 12 | A.    Yes.  Yes. |
| | 13 | Q.    Great. |
| | 14 | Look with me, page No. 2 right between |
| 10:30:31 | 15 | lines 18 and 19. |
| | 16 | MR. FLYNN:  20, read it. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.    I'm going to read here this paragraph that |
| | 19 | starts, "Multiple software programs developed, |
| 10:30:51 | 20 | owned, possessed and used exclusively by me derived |
| | 21 | from my 'ODS' between 1984 and December 31, 2002, |
| | 22 | some of the source codes for which are direct |
| | 23 | derivative of my copyrights and which, beginning in |
| | 24 | November 2002, I began to adapt to military |
| 10:31:13 | 25 | applications on behalf of the Department of Defense, |

Page 68

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

10:31:15    1    the Navy, the Air Force and" redacted, "mostly

             2    utilized in the war on terror between March 2003 and

             3    the present."

             4            MR. FLYNN:  Is that a truthful statement?

10:31:32    5    BY MR. CONANT:

             6        Q.  Is that a truthful statement,

             7    Mr. Montgomery?

             8            MR. CROCKETT:  I'm going to object to the

             9    question, because it's compound because there are

10:31:40   10    multiple statements in there.

            11            So are you asking him the entirety or you

            12    want to break it down?

            13            MR. FLYNN:  Any part.

            14    BY MR. CONANT:

10:31:48   15        Q.  Is there any part of what I just read

            16    that's not true, Mr. Montgomery?

            17        A.  Is there any part that's not true?

            18            Which -- is there any -- it's like a double

            19    negative you're asking me.

10:32:03   20            MR. CROCKETT:  Yeah.

            21    BY MR. CONANT:

            22        Q.  Is there anything -- is there anything

            23    that's not true in there, Mr. Montgomery?

            24            You wrote that, I want to know --

10:32:09   25        A.  Actually, Mr. Flynn wrote it; I didn't.

YATES COURT REPORTERS    800.669.1866

10:32:12  1     Q.    You signed it.

2     A.    Mr. Flynn wrote it.  Mr. Flynn wrote all of

3  this.  Let's make it clear.

4     Q.    You signed it.

10:32:19  5     A.    Mr. Flynn wrote this.

6           MR. FLYNN:  Just say is any part of it

7  untrue.

8           THE WITNESS:  Mr. Flynn, you wrote it as my

9  attorney.  Did you or did you not write it?

10:32:30  10          He's here.  Let's just --

11  BY MR. CONANT:

12    Q.    He's not --

13    A.    But he has no problem asking questions,

14  have him answer it.  Did you write this?  Did you

10:32:36  15  write this?

16          MR. FLYNN:  Next question.

17          THE WITNESS:  Yeah.

18  BY MR. CONANT:

19    Q.    This is a deposition of you,

10:32:40  20  Mr. Montgomery.  The questions are being asked of

21  you, not of anybody else in here.

22          MR. FLYNN:  Is any part of that untrue --

23          THE WITNESS:  Are you asking the question

24  or your attorney?

25  ///

Page 70

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:32:47 | 1 | BY MR. CONANT: |
| | 2 | Q.   Mr. Montgomery, is any part of that |
| | 3 | statement untrue which I just read into the record? |
| | 4 | MR. CROCKETT:  Well, I'll object. |
| 10:32:55 | 5 | THE WITNESS:  I don't know what's redacted. |
| | 6 | Maybe if you tell me what's redacted I could tell |
| | 7 | you. |
| | 8 | BY MR. CONANT: |
| | 9 | Q.   What I read, is there anything in here |
| 10:33:02 | 10 | that's not true, Mr. Montgomery? |
| | 11 | A.   Is there anything in here that's not true? |
| | 12 | MR. CROCKETT:  Are you asking as of today? |
| | 13 | As of the date it was signed?  What?  It's vague as |
| | 14 | to time.  It's also compound and I object on that |
| 10:33:13 | 15 | basis. |
| | 16 | BY MR. CONANT: |
| | 17 | Q.   When Mr. Montgomery signed this under |
| | 18 | penalty of perjury -- |
| | 19 | A.   You mean the document that Mr. Flynn wrote. |
| 10:33:19 | 20 | MR. CROCKETT:  Just listen to the question. |
| | 21 | BY MR. CONANT: |
| | 22 | Q.   Mr. Montgomery, when you signed that |
| | 23 | document under penalty of perjury, is there anything |
| | 24 | in that statement that is untrue? |
| 10:33:27 | 25 | A.   I'm not certain. |

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| 10:33:33 | 1 | MR. FLYNN:  Just read the entire thing. |

2     BY MR. CONANT:

3          Q.    All right.  Turn with me to page No. 4,

4     line 16, Mr. Montgomery, and we're again on

| 10:33:45 | 5 | Plaintiff's Exhibit No. 3. |

6               I'm going to start reading from the first

7     full paragraph of line 16, "No person at eTreppid is

8     able" --

9          A.    Oh, wait, I'm sorry.  Page 4?

| 10:34:01 | 10 | Q.    Correct. |

11         A.    I'm sorry, go ahead.

12         Q.    "No person at eTreppid is able, to my

13    knowledge, to create the source codes that I have

14    created having multiple applications in the war on

| 10:34:11 | 15 | terror and other military uses. |

16              "Conclusive proof on this issue is

17    established by the recent interception of the

18    attempts by terrorists operating out of London to

19    blow up jetliners originating in London and bound

| 10:34:26 | 20 | for the U.S. |

21              "I gave the appropriate authorities within

22    the U.S. Government accurate and very specific

23    intelligence regarding this terrorist plot from 'my

24    decoding software,' as I had done in the past, weeks

| 10:34:38 | 25 | prior to the arrest by the London authorities -- |

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:34:38 | 1 |

without compensation."

2      I'm going to continue on to paragraph 7.

3   "Neither Warren Trepp nor eTreppid Technologies nor

4   any person working there have ever owned, possessed

10:34:52   5   or processed 'output' from my source codes using the

6   special government contracts.

7      "Other eTreppid individuals, as well as

8   government officials identified herein, had access

9   to the output only after I had processed it."

10:35:10   10   Moving on to the following paragraph, "In

11   September 2005, Trepp told me that the government

12   had appropriated $100 million for the 'decoding

13   technology' but he was demanding $500 million."

14      MR. FLYNN:  Is any part of that untrue?

10:35:29   15   BY MR. CONANT:

16      Q.   Mr. Montgomery, is any part of what I read,

17   from page 4 starting at line 16 and continuing on to

18   page 5 ending on line 4 and a half, untrue?

19      MR. CROCKETT:  I'll object to the question

10:35:43   20   as assuming facts not in evidence.  It's also

21   argumentative.

22      You've taken statements out of context.

23   You're taking partial statements from a declaration

24   he signed under penalty of perjury and you haven't

10:35:55   25   established the appropriate foundation to do that.

Dennis Lee Montgomery  -  November 18, 2010

```
10:36:01   1          In addition to which the document that is

           2   in front of him is redacted by someone other than us

           3   and I believe, based on his prior testimony, he's

           4   not certain of the statements that have been

10:36:12   5   redacted and therefore presents a difficult problem

           6   for him to try to answer the question as you phrased

           7   it.

           8          You want to try to rephrase it?

           9          MR. CONANT:  No.  Mr. Crockett, for the

10:36:22  10   record, none of what I just read was redacted from

          11   the document.

          12          No. 2, I'll remind you your client is

          13   testifying, not you.  You're coaching the witness

          14   and you're obstructing his testimony, for the

10:36:33  15   record.

          16          MR. CROCKETT:  For the record, that's --

          17   you've made your statement.

          18          THE WITNESS:  I don't know.  What's the

          19   question?

10:36:41  20          MR. FLYNN:  Is any part of it untrue.

          21          THE WITNESS:  Is he asking it or you?

          22          MR. CROCKETT:  For the record, who's asking

          23   the questions, Counsel?

          24          THE WITNESS:  There's two people asking

10:36:49  25   questions.
```

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:36:50 | 1 |

```
10:36:50    1              MR. CROCKETT:  Which one should we listen

            2    to?

            3    BY MR. CONANT:

            4       Q.    Mr. Montgomery, is any part of that

10:36:53    5    statement untrue?

            6              MR. CROCKETT:  Any part of what statement,

            7    Counsel?

            8              THE WITNESS:  Which one?

            9              MR. CONANT:  Again, Mr. Crockett --

10:36:56   10              (Simultaneous colloquy.)

           11              THE REPORTER:  One at a time, please.

           12              MR. CONANT:  For the record, Mr. Montgomery

           13    and Mr. Crockett have felt it necessary to raise

           14    their voices during this exchange for whatever

10:37:08   15    reason.

           16              Now there's a question pending here.  Was

           17    any of the statement, which I've identified as

           18    beginning on page 4, line 16, continuing to page 5,

           19    line 4 and a half, is any of that untrue,

10:37:21   20    Mr. Montgomery?

           21              MR. CROCKETT:  The question is vague.  It's

           22    ambiguous.

           23              MR. CONANT:  You've already objected.

           24    Thank you, Mr. Crockett.

10:37:27   25              MR. CROCKETT:  You've interrupted me again
```

| 10:37:29 | 1 | and the next time we'll adjourn the depo, if you |
| | 2 | like, and go take this to a judge.  I'd be glad to |
| | 3 | put this record in front of a judge and let the |
| | 4 | judge decide whether or not what you're doing here |
| 10:37:37 | 5 | is appropriate. |
| | 6 | MR. CONANT:  Very good. |
| | 7 | MR. CROCKETT:  Now if you'd like to let me |
| | 8 | finish my objection, I will, and if you want to cut |
| | 9 | me off, just say so. |
| 10:37:43 | 10 | MR. FLYNN:  Get an answer. |
| | 11 | BY MR. CONANT: |
| | 12 | Q.   I want an answer. |
| | 13 | A.   Is he asking the question or are you? |
| | 14 | MR. CROCKETT:  Can you read the question |
| 10:37:50 | 15 | back that he's supposed to be answering, please. |
| | 16 | THE WITNESS:  Yeah. |
| | 17 | MR. CONANT:  I'll just read it again. |
| | 18 | Q.   Mr. Montgomery -- |
| | 19 | A.   Starting on what page? |
| 10:38:12 | 20 | Starting on what page?  Bottom of page 4? |
| | 21 | MR. CROCKETT:  He said he's going to ask |
| | 22 | the question again. |
| | 23 | BY MR. CONANT: |
| | 24 | Q.   Mr. Montgomery, is any part of your |
| 10:38:25 | 25 | statements on page 4, beginning at line 16, and |

Dennis Lee Montgomery  -  November 18, 2010

10:38:31   1   continuing to page 5, line 4 and a half, untrue?

           2         MR. CROCKETT:  Sorry, the reference again?

           3   Page what to what?

           4         MR. CONANT:  We're looking, again, at

10:38:45   5   Plaintiff's Exhibit No. 3.

           6         MR. CROCKETT:  I understand the exhibit.  I

           7   want to make sure I've got the right --

           8         MR. CONANT:  For I think the sixth time now

           9   I'll identify the statement made by Mr. Montgomery

10:38:56  10   beginning on page 4, line 16, and going on to page

          11   5, line 4 and a half.

          12         THE WITNESS:  Well, the statement was made

          13   by Mr. Flynn.  I signed the declaration.  This was

          14   written by Mr. Flynn.  We got it?

10:39:09  15         MR. CROCKETT:  Just --

          16         THE WITNESS:  I don't recall.

          17         MR. CROCKETT:  The sentence that starts at

          18   page 4, line 16, and you want it ended at

          19   paragraph 8 on page 5 at line 7; is that right,

10:39:25  20   Counsel?

          21         MR. CONANT:  It's on the record the lines

          22   that I want him to identify.

          23         THE WITNESS:  Yeah, I don't recall.

          24   BY MR. CONANT:

10:39:30  25      Q.   You don't recall if it's true or not,

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery - November 18, 2010

```
10:39:32   1   Mr. Montgomery?
           2        MR. CROCKETT:  That's argumentative.  Don't
           3   answer.
           4   BY MR. CONANT:
10:39:36   5        Q.   Mr. Montgomery -- okay.  Let's narrow down
           6   the details here.  Did you provide conclusive proof
           7   that -- I'm sorry.  Let me back up.
           8        Did you provide the U.S. Government with
           9   information -- with information concerning attempts
10:40:02  10   by terrorists to blow up jetliners?
          11        MR. CROCKETT:  At any point in time?
          12   BY MR. CONANT:
          13        Q.   With respect to reference to the statement.
          14        A.   I don't recall if I did.
10:40:18  15        Q.   The statement where it says, "No person at
          16   eTreppid is able, to my knowledge, to create the
          17   source codes that I have created," what are these
          18   source codes that you have created, Mr. Montgomery?
          19        Can you please describe those.
10:40:39  20        A.   In regard to what?  ODS?
          21        Q.   Mr. Montgomery, I'm asking -- I'm reading
          22   beginning on page 4, line 16, first full sentence
          23   beginning on line 16, "No person at eTreppid is
          24   able, to my knowledge, to create the source codes
10:41:00  25   that I have created."
```

Page 78

10:41:01  1          What are those source codes that you have

2    created that you're referring to right there?

3          A.   I don't recall specifically.

4          Q.   You don't recall what those source codes

10:41:11  5    are, Mr. Montgomery?

6          A.   Be specific.

7          Q.   Have you created source codes for use by

8    the U.S. Government, Mr. Montgomery?

9          A.   Yes.

10:41:18  10          Q.   Can you describe the source codes that

11    you've created for use by the U.S. Government?

12          A.   During what time frame?

13          MR. FLYNN:   Any time.

14    BY MR. CONANT:

10:41:27  15          Q.   Any time frame.

16          A.   I would have to violate the U.S. protective

17    order to do that.

18          Q.   Mr. Montgomery, according to the U.S.

19    protective order, only the U.S. Government has the

10:41:37  20    right to --

21          A.   Okay, I'm sorry.

22          Q.   -- to invoke protection under the

23    protective order.

24          A.   But if I don't tell the Government I'm

10:41:40  25    going to violate the protective order then I would

Page 79

YATES COURT REPORTERS     800.669.1866

08-CasePO1RBK mc-0007312SKsMALL Document 1E7 Filed 07/28/23 Page 81 of 1046
Case 1:23-cv-01116 Document 1 Entered 07/24/23 14:20:06 Page 81 of 345
Dennis Lee Montgomery - November 18, 2010

| | | |
|---|---|---|
| 10:41:42 | 1 | violate it, wouldn't I? |
| | 2 | Q. I would want you to answer the question. |
| | 3 | A. I just -- |
| | 4 | Q. Continue with your answer. |
| 10:41:49 | 5 | A. I've answered it. |
| | 6 | Q. Mr. Montgomery, for the record, the |
| | 7 | protective order -- |
| | 8 | MR. FLYNN: Don't go there. |
| | 9 | MR. CONANT: All right. |
| 10:41:57 | 10 | MR. FLYNN: Ask him if he gave -- |
| | 11 | MR. CONANT: Let me -- |
| | 12 | MR. FLYNN: -- very specific intelligence |
| | 13 | regarding decoding -- did he give that information. |
| | 14 | Did he give that information. |
| 10:42:13 | 15 | BY MR. CONANT: |
| | 16 | Q. Read with me, Mr. Montgomery, on page 4, |
| | 17 | line 21, beginning with the first full sentence. |
| | 18 | MR. FLYNN: This the Cheney office. |
| | 19 | BY MR. CONANT: |
| 10:42:23 | 20 | Q. "I gave the appropriate authorities within |
| | 21 | the U.S. Government accurate and very specific |
| | 22 | intelligence regarding this terrorist plot from my |
| | 23 | decoding software, as I have done in the past, weeks |
| | 24 | prior to the arrests by the London authorities -- |
| 10:42:35 | 25 | without compensation." |

Page 80

Dennis Lee Montgomery  -  November 18, 2010

```
10:42:38   1            MR. FLYNN:  Did you do that.
           2   BY MR. CONANT:
           3      Q.    Did you give -- did you give the U.S.
           4   Government this -- this very specific intelligence
10:42:46   5   that you're referring to here?
           6      A.    I'm going to assert my right under the
           7   Fifth Amendment.
           8      Q.    Isn't it true, Mr. Montgomery, that this,
           9   quote, unquote, "decoding software" that you
10:42:58  10   reference on line 22 is just a complete fraud?
          11            MR. CROCKETT:  Hold it.
          12            Go ahead.
          13            THE WITNESS:  I'm going to assert my right
          14   under the Fifth Amendment.
10:43:14  15            I couldn't hear Mr. Flynn's question.
          16            MR. CONANT:  That's fine.  I'll repeat it.
          17            THE WITNESS:  Okay.
          18   BY MR. CONANT:
          19      Q.    Beginning on line 21, going to line 24 and
10:43:22  20   a half where you reference this very specific
          21   intelligence regarding the terrorist plot that you
          22   got from your decoding software regarding these
          23   arrests in London, isn't that the same information
          24   you and Edra Blixseth provided to a person within
10:43:39  25   Dick Cheney's office?
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:43:42 | 1 | MR. CROCKETT:  I'll object to the question. |
| | 2 | It lacks foundation.  It assumes facts not in |
| | 3 | evidence.  It may be argumentative, I'm not sure.  I |
| | 4 | don't know enough about the question. |
| 10:43:50 | 5 | Can you answer it the way it's phrased? |
| | 6 | THE WITNESS:  No. |
| | 7 | I don't understand what you're asking me. |
| | 8 | BY MR. CONANT: |
| | 9 | Q.  Did you provide -- have you ever talked to |
| 10:43:55 | 10 | anyone within Dick Cheney's office regarding -- |
| | 11 | regarding your decoding software? |
| | 12 | A.  I went to their office.  I don't recall |
| | 13 | that specifically. |
| | 14 | Q.  Can you explain to me what your visit to |
| 10:44:13 | 15 | Dick Cheney's office was about? |
| | 16 | A.  No. |
| | 17 | Q.  Why can you not explain it? |
| | 18 | A.  I can't recall. |
| | 19 | MR. FLYNN:  Did you give him a CD. |
| 10:44:20 | 20 | BY MR. CONANT: |
| | 21 | Q.  You mean to tell me that you met with |
| | 22 | someone in the vice president's office and you can't |
| | 23 | recall what it was about, Mr. Montgomery? |
| | 24 | MR. CROCKETT:  Don't answer that question. |
| 10:44:29 | 25 | It's argumentative. |

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:44:29 | 1 | I'll object and instruct him not to answer. |
| | 2 | MR. FLYNN:  Did you give him a CD with the |
| | 3 | alleged terrorist plots. |
| | 4 | BY MR. CONANT: |
| 10:44:33 | 5 | Q.  Did you give anyone in Dick Cheney's office |
| | 6 | a CD regarding alleged terrorist plots? |
| | 7 | THE WITNESS:  I don't recall. |
| | 8 | MR. FLYNN:  Did you give it to Tim Blixseth |
| | 9 | instead?  Did you give the CD to Tim Blixseth? |
| 10:44:43 | 10 | BY MR. CONANT: |
| | 11 | Q.  Did you give the CD to Tim Blixseth? |
| | 12 | A.  Is this Mr. Blixseth and you are both |
| | 13 | Mr. Blixseth's attorneys?  Is this a Blixseth |
| | 14 | question or a Flynn question? |
| 10:44:52 | 15 | Q.  I'm asking the questions, Mr. Montgomery. |
| | 16 | A.  Yeah. |
| | 17 | MR. CROCKETT:  Let's let him get it out on |
| | 18 | the record. |
| | 19 | Go ahead. |
| 10:44:58 | 20 | BY MR. CONANT: |
| | 21 | Q.  Have you given any information about |
| | 22 | terrorist plots to Tim Blixseth, Mr. Montgomery? |
| | 23 | MR. CROCKETT:  At any point in time. |
| | 24 | THE WITNESS:  I don't recall. |
| | 25 | /// |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:45:07 | 1 |

BY MR. CONANT:

2        Q.    You don't recall if you have or not?

3        A.    That's correct.  That's my answer.

4        Q.    So you've got -- I'm reading this

10:45:12   5    declaration of yours, Mr. Montgomery --

6        A.    The one that Mr. Flynn wrote.

7        Q.    -- you're referencing all this source code.

8              What is the source code all about?  Can you

9    tell me about it?

10:45:22  10        A.    I don't recall specifically.

11        Q.    You don't recall what all this source code

12    is about concerning terrorist attacks?

13              MR. CROCKETT:  Question is argumentative.

14    I'll object.

10:45:34  15              THE WITNESS:  Ever?

16    BY MR. CONANT:

17        Q.    Yes.

18        A.    Ever.  Violates the United States

19    protective order.

10:45:39  20              MR. CONANT:  Ms. Wells, is there anything

21    in my question that would violate the U.S.

22    protective order?

23              MS. WELLS:  Can you please read the

24    question to me.

25    ///

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:45:48 | 1 | BY MR. CONANT: |
| | 2 | Q.    Mr. Montgomery, the source code -- |
| | 3 | MR. CROCKETT:  You're withdrawing the prior |
| | 4 | question? |
| 10:45:53 | 5 | MR. CONANT:  I'm rephrasing it. |
| | 6 | Q.    Is there anything -- okay.  Let's back up |
| | 7 | here and stay with me, if you can, Mr. Montgomery. |
| | 8 | A.    I'll try. |
| | 9 | Q.    Okay.  There's lots of references in this |
| 10:46:03 | 10 | declaration about your source code, isn't there? |
| | 11 | A.    You want me to read the whole thing? |
| | 12 | MR. CROCKETT:  Document speaks for itself. |
| | 13 | Next question. |
| | 14 | BY MR. CONANT: |
| 10:46:11 | 15 | Q.    This is about the source code, isn't it, |
| | 16 | Mr. Montgomery? |
| | 17 | MR. CROCKETT:  What's "this"? |
| | 18 | MR. CONANT:  The document I'm referring to. |
| | 19 | The document, Plaintiff's Exhibit 3. |
| 10:46:18 | 20 | MR. CROCKETT:  The document speaks for |
| | 21 | itself and the question is argumentative as well. |
| | 22 | Don't answer it. |
| | 23 | Ask another one, Counsel. |
| | 24 | BY MR. CONANT: |
| 10:46:26 | 25 | Q.    Mr. Montgomery, what is the source code |

Page 85

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 10:46:29 | 1 | that you refer to throughout this declaration? |
| | 2 | A.   I would have to read it again. |
| | 3 | Q.   I just want -- we've read what we already |
| | 4 | read. |
| 10:46:40 | 5 | A.   You've read 10 lines out of 30 pages. |
| | 6 | Q.   Is there not -- have we not read |
| | 7 | representations by you about software -- |
| | 8 | MR. CROCKETT:  Who's raising their voice |
| | 9 | now, Counsel. |
| 10:46:51 | 10 | BY MR. CONANT: |
| | 11 | Q.   Is there not -- |
| | 12 | MR. FLYNN:  Decoding software.  Is there |
| | 13 | any decoding software. |
| | 14 | BY MR. CONANT: |
| 10:46:59 | 15 | Q.   Mr. Montgomery, let's look at line 22, |
| | 16 | page 4. |
| | 17 | A.   I'm there. |
| | 18 | Q.   All right.  Look at the phrase "decoding |
| | 19 | software" in quotes. |
| 10:47:09 | 20 | A.   I see it. |
| | 21 | Q.   Was there any such decoding software? |
| | 22 | A.   Ever? |
| | 23 | Q.   Yes. |
| | 24 | A.   Yes. |
| 10:47:18 | 25 | Q.   Does it exist? |

Page 86

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

10:47:19    1        A.    Did it exist?

             2        Q.    Does it exist?

             3              MR. CROCKETT:  He's asking you as of today,

             4     if you know.

10:47:24    5              THE WITNESS:  To what time are you

             6     referring to?

             7     BY MR. CONANT:

             8        Q.    Does it exist?

             9              MR. CROCKETT:  That would be as of today;

10:47:30   10     correct, Counsel?

            11              MR. FLYNN:  As referenced in your

            12     schedules.

            13     BY MR. CONANT:

            14        Q.    Yes, today.

10:47:39   15        A.    I don't recall.

            16        Q.    You don't recall --

            17        A.    You just asked me the question.  I answered

            18     it.

            19        Q.    Did it ever exist, Mr. Montgomery?

10:47:45   20        A.    It could have.

            21              MR. FLYNN:  Is it referenced --

            22     BY MR. CONANT:

            23        Q.    Is this decoding software referenced in

            24     your bankruptcy schedule, Mr. Montgomery?

10:47:52   25        A.    Is the decoding -- I don't know.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| 10:47:57 | 1 | Q.   What -- what intellectual property is |
| | 2 | referenced in your bankruptcy schedules? |
| | 3 | A.   Which exhibit would that be Mr. -- |
| | 4 | Q.   Let's go back to Exhibit No. 1. |
| 10:48:08 | 5 | A.   Okay. |
| | 6 | Q.   I believe we're back to page 22-9. |
| | 7 | A.   22-9.  Okay. |
| | 8 | Q.   All right.  Bottom paragraph that you read |
| | 9 | previously, "In addition, Dennis Montgomery is the |
| 10:48:24 | 10 | holder of certain intellectual property rights." |
| | 11 | What is that?  What are those intellectual |
| | 12 | property rights, Mr. Montgomery? |
| | 13 | A.   I have to ask a question, because I'm not |
| | 14 | certain of something. |
| 10:48:44 | 15 | MR. CROCKETT:  Well, on that ground I'll |
| | 16 | object to the question.  It's vague and ambiguous |
| | 17 | and assumes facts not in evidence and ask you to |
| | 18 | rephrase. |
| | 19 | MR. FLYNN:  What rights you're referring to |
| 10:48:52 | 20 | in your schedule. |
| | 21 | MR. CONANT:  Yeah. |
| | 22 | Q.   Mr. Montgomery, describe all intellectual |
| | 23 | property rights that you're referring to here in |
| | 24 | your bankruptcy schedule. |
| 10:48:58 | 25 | A.   That's his question or yours? |

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:49:00 | 1 | Q.    It's a question to you, Mr. Montgomery. |
| | 2 | A.    He's the one that said it. |
| | 3 | Q.    Fine. |
| | 4 | A.    I'm just wondering how long you're going to |
| 10:49:08 | 5 | parrot what he keeps saying. |
| | 6 | Q.    As long as I need to. |
| | 7 | A.    I got it. |
| | 8 | What -- okay.  So I'm sorry, again, what |
| | 9 | was -- ask it again, please. |
| 10:49:16 | 10 | Q.    What is this intellectual property that you |
| | 11 | reference here in your bankruptcy schedule? |
| | 12 | A.    Okay.  You're referring to the paragraph on |
| | 13 | the bottom of this document.  Is that what you're |
| | 14 | referring to? |
| 10:49:27 | 15 | Q.    Correct. |
| | 16 | A.    Okay.  I would like to ask you a question, |
| | 17 | because I'm not certain of something.  So I don't |
| | 18 | remember specifically that paragraph on the bottom |
| | 19 | of the original document that I filed.  I'm not |
| 10:49:41 | 20 | saying it's not, but I'm not certain. |
| | 21 | Q.    All right. |
| | 22 | A.    So if somebody has my original or whatever, |
| | 23 | I'd like to see it. |
| | 24 | Q.    What do you mean by -- |
| 10:49:54 | 25 | A.    I mean I don't remember that specifically, |

YATES COURT REPORTERS    800.669.1866

08-Case 1:23-mc-00073-CKK-MAU  Document 1-7  Filed 07/28/23  Page 91 of 1046

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 10:49:56 | 1 |

1  me putting this on there.  Okay.  That's what I'm

2  saying.  I'm not saying it wasn't on there, I'm not

3  saying it wasn't put on there, but I don't remember

4  specifically me putting that on there.

10:50:10  5      Q.    All right.  Would it make sense -- I mean

6  do you have intellectual property, though, that is

7  subject to the National Security Act of 1947?

8             MR. CROCKETT:  It's a yes-or-no question.

9             THE WITNESS:  I'm not certain.

10:50:23  10             MR. FLYNN:  Mark this next exhibit.

11             MR. CONANT:  All right.

12             MR. FLYNN:  Mark it.  Copy for

13  Mr. Crockett.

14             MR. CONANT:  We're going to mark what's

10:50:34  15  going to be identified as Plaintiff's Exhibit No. 5,

16  which is the Second Declaration of SA Michael A.

17  West.

18             (Exhibit 5 was marked for identification.)

19             MR. CONANT:  Do you have a copy for me?

10:50:54  20             MR. FLYNN:  Yeah.

21             Read this entire paragraph into the record.

22             MR. CONANT:  6?

23             MR. FLYNN:  Yeah, read the entire paragraph

24  into the record.  Read it.

10:51:05  25             MR. CROCKETT:  Yeah, yeah, yeah.

Dennis Lee Montgomery  -  November 18, 2010

```
10:51:06   1            THE WITNESS:  Okay.

           2            MR. FLYNN:  All right.  Terrorist regarding

           3    Al-Jazeera, ask him.  Ask him if he said -- ask him

           4    about the noise.

10:51:23   5    BY MR. CONANT:

           6       Q.   All right.  Mr. Montgomery -- well, let me

           7    back up.

           8            I'll represent this is -- Plaintiff's

           9    Exhibit 5 is the Second Declaration of SA Michael A.

10:51:34  10    West.  I understand SA to refer to Special Agent

          11    Michael West.  This was a document filed in Case

          12    No. -06-263 [sic] in the United States District

          13    Court for the District of Nevada, Docket No. 76-2.

          14            Mr. Montgomery, turn with me to page 2,

10:51:48  15    paragraph 6, and read along.  "On August 10,

          16    2006" --

          17       A.   No. 2, I'm sorry.

          18            MR. CROCKETT:  Page 2, paragraph 6.

          19            THE WITNESS:  Okay.

10:52:01  20    BY MR. CONANT:

          21       Q.   "On August 10, 2006, I received a telephone

          22    call from Special Agent Gabriel Gunderson of the

          23    Seattle FBI office who advised me that his office

          24    received information from Azimyth, a company located

10:52:11  25    in Bellevue, Washington, which had discovered
```

Page 91

Dennis Lee Montgomery  -  November 18, 2010

```
10:52:15    1    terrorist threat-related information.

            2           "Special Agent Gunderson related that

            3    Michael Sandoval, chief executive officer of

            4    Azimyth, had contacted a retired Central

10:52:24    5    Intelligence Agency former chief of station residing

            6    in Washington and offered to provide the U.S.

            7    Government terrorist threat-related information.

            8           "Special Agent Gunderson further related

            9    that Dennis L. Montgomery was the Azimyth employee

10:52:39   10    who located the information.  Special Agent

           11    Gunderson advised me in a subsequent conversation

           12    that Mr. Montgomery had reported that he located

           13    increased noise in recent Al-Jazeera video

           14    transmissions."

10:52:53   15           Do you see that sentence?

           16           MR. CROCKETT:  Which sentence?  There are

           17    multiple sentences there.

           18           MR. CONANT:  I'm sorry.

           19       Q.    Did you read that paragraph,

10:53:05   20    Mr. Montgomery?

           21       A.    I listened when you read it.

           22       Q.    Okay.  Is it true that you reported that

           23    you located increased noise in recent Al-Jazeera

           24    video transmissions?

10:53:12   25       A.    You'd have to ask Mr. West.  He signed
```

Page 92

Dennis Lee Montgomery  -  November 18, 2010

```
10:53:14   1   this; I didn't.

           2        Q.    I'm asking you.

           3        A.    Well, I don't recall.

           4        Q.    Have you ever reported to anyone in the

10:53:20   5   United States Government about things you've heard

           6   or saw in Al-Jazeera video transmissions?

           7             MR. CROCKETT:  That's mischaracterizes

           8   what's in this document.  It's also confusing.  It

           9   also lacks foundation and it's not limited as to

10:53:36  10   time.

          11             With all those objections in place, do you

          12   understand the question?

          13             THE WITNESS:  You mean noise?  Is that what

          14   you mean?  I'd have to take the -- it would violate

10:53:46  15   the U.S. protective order.

          16   BY MR. CONANT:

          17        Q.    Mr. Montgomery --

          18             Ms. Wells --

          19             MR. FLYNN:  No.

10:53:52  20             MR. CONANT:  I withdraw the question.

          21             MR. FLYNN:  Did you provide at any time

          22   after --

          23             THE WITNESS:  I can't hear him.  Can you

          24   speak up, please.

10:54:03  25             MR. CONANT:  I'll repeat the question.
```

Page 93

| | | |
|---|---|---|
| 10:54:06 | 1 | THE WITNESS:  Oh. |
| | 2 | MR. FLYNN:  -- any information in the |
| | 3 | summer of 2006 through this -- relating to |
| | 4 | Al-Jazeera video transmissions. |
| 10:54:13 | 5 | BY MR. CONANT: |
| | 6 | Q.  In the summer of 2006, Mr. Montgomery -- |
| | 7 | A.  I don't think that's what he just said. |
| | 8 | Q.  Thank you. |
| | 9 | Mr. Montgomery, in the summer of 2006 did |
| 10:54:21 | 10 | you advise or contact Special Agent Gunderson |
| | 11 | regarding any information you got from Al-Jazeera |
| | 12 | video transmissions? |
| | 13 | MR. FLYNN:  Did he give it to Sandoval. |
| | 14 | THE WITNESS:  Is that your question or his? |
| 10:54:40 | 15 | I'm confused.  He just asked did I give it to |
| | 16 | Sandoval and you asked me a question.  I'm confused |
| | 17 | as to who I'm supposed to be answering. |
| | 18 | BY MR. CONANT: |
| | 19 | Q.  My question, Mr. -- |
| 10:54:50 | 20 | A.  Okay.  Well, now I forgot it because he |
| | 21 | asked me one. |
| | 22 | Q.  Have you provided -- in the summer of 2006 |
| | 23 | did you provide anybody with any information |
| | 24 | regarding things you were hearing or learning from |
| 10:55:00 | 25 | Al-Jazeera video transmissions? |

Page 94

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:55:03 | 1 | A.   I believe it said "noise," didn't it? |
| | 2 | Noise. |
| | 3 | MR. CROCKETT:  I think this is a different |
| | 4 | question. |
| 10:55:08 | 5 | BY MR. CONANT: |
| | 6 | Q.   My question, Mr. Montgomery. |
| | 7 | A.   I'm sorry.  I thought you were referring to |
| | 8 | paragraph 6 again. |
| | 9 | Q.   My question, Mr. Montgomery. |
| 10:55:14 | 10 | A.   Okay. |
| | 11 | MR. CONANT:  Can you read my question back |
| | 12 | for Mr. Montgomery, Ms. Borthwick. |
| | 13 | MR. FLYNN:  And then did he claim he was |
| | 14 | decrypting. |
| 10:55:22 | 15 | THE WITNESS:  Can you please speak up.  I |
| | 16 | can't hear you, Mr. Flynn.  Speak up. |
| | 17 | THE REPORTER:  Question, "In the summer of |
| | 18 | 2006 did you provide anybody with any information |
| | 19 | regarding things you were hearing or learning from |
| 10:55:40 | 20 | Al-Jazeera video transmissions?" |
| | 21 | THE WITNESS:  What's that, I didn't hear |
| | 22 | you.  Oh. |
| | 23 | MR. CONANT:  Ms. Borthwick's question. |
| | 24 | THE WITNESS:  I'm sorry. |
| 10:55:49 | 25 | I can't recall. |

Page 95

Dennis Lee Montgomery  -  November 18, 2010

10:55:52   1          MR. FLYNN:  Did you ever decrypt al-Qaida

         2    from Al-Jazeera video.

         3    BY MR. CONANT:

         4        Q.   Have you ever represented to anyone that

10:56:01   5    you could decrypt Al-Jazeera video transmissions?

         6        A.   I don't know what the term "decrypt" means.

         7        Q.   Did you ever represent to anyone that there

         8    were messages hidden in Al-Jazeera video

         9    transmissions?

10:56:16  10        A.   What do you mean "messages"?

        11        Q.   The common use.

        12        A.   No, what's the common use?  I don't

        13    understand.

        14        Q.   Messages, Mr. Montgomery.

10:56:23  15          MR. FLYNN:  Or recordings.

        16          THE WITNESS:  Is he asking the question or

        17    are you?

        18    BY MR. CONANT:

        19        Q.   Did you represent to anyone that you could

10:56:28  20    identify target coordinates being transmitted in

        21    Al-Jazeera?

        22        A.   That I, personally, could?  That me could?

        23    I don't recall.

        24        Q.   All right.  Same question, did you ever

10:56:39  25    represent to anyone that software you had created

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

10:56:42    1    could find hidden messages within Al-Jazeera video

2    transmissions?

3              MR. CROCKETT:  That's a different question.

4              THE WITNESS:  What do you mean "hidden"?

10:56:51    5              MR. CROCKETT:  We were talking about target

6    coordinates before.  We're back to messages?

7              MR. CONANT:  The question.  The question I

8    just asked.

9              MR. CROCKETT:  I'm just --

10:56:57   10              MR. CONANT:  Mr. Crockett, you are

11    interfering with Mr. Montgomery's testimony.

12              MR. CROCKETT:  No, I'm not.  I'm doing my

13    job, Mr. Conant, and if you don't understand that

14    I'm sorry.  I get to listen to your question, I get

10:57:07   15    to object and I get to finish my objection.

16              If you read the question back, please, I'll

17    file my objections.

18              THE WITNESS:  You want to -- I can't hear,

19    because you're talking too loud, Mr. Flynn.  Please

10:57:16   20    stop.  I can't hear what's going on.  You're

21    interfering with my right -- ability to give an

22    accurate deposition and to do a deposition.

23              Please stop doing what you're doing.  I

24    don't like it.

10:57:26   25              MR. CONANT:  Ms. Borthwick, can you --

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
10:57:28    1            MR. FLYNN:  We're going to get to the

            2    truth, Mr. Montgomery.

            3            THE WITNESS:  Unfortunately, your warped

            4    perception of the truth to benefit your client,

10:57:35    5    Mr. Tim Blixseth, and violating my attorney-client

            6    privileges to do it is outrageous.  That's what's

            7    outrageous.

            8            MR. CROCKETT:  May we have the question

            9    back please, Ms. Reporter.

10:57:48   10            THE WITNESS:  You're a real piece of work.

           11            MR. CROCKETT:  Easy.

           12            MR. FLYNN:  Target coordinates.

           13            THE WITNESS:  I can't -- speak up if you're

           14    going to talk.

10:57:58   15            I can't hear him.

           16            MR. CROCKETT:  Mr. Flynn, every time --

           17            And, Ms. Reporter, I would like you,

           18    please, to record as much of Mr. Flynn as you can

           19    hear.

10:58:05   20            But, Mr. Flynn, every time you speak she

           21    has to stop and start taking down what you're

           22    saying.  I'd asked for the question to be read back.

           23    Can we have that happen, please.

           24            MR. CONANT:  Ms. Borthwick, can you read

10:58:14   25    back my most recent question to Mr. Montgomery.
```

Page 98

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:58:36 | 1 | THE REPORTER:  Question, "All right.  Same |
| | 2 | question, did you ever represent to anyone that |
| | 3 | software you had created could find hidden messages |
| | 4 | within Al-Jazeera video transmissions?" |
| 10:58:38 | 5 | MR. CROCKETT:  I'll object to the question |
| | 6 | on the grounds it assumes facts not in evidence, |
| | 7 | that it is vague and ambiguous as to the use of the |
| | 8 | term "messages" in the context of the question. |
| | 9 | In addition, it is not in the record and |
| 10:58:50 | 10 | there's no evidence providing a foundation as to |
| | 11 | what you mean by "Al-Jazeera broadcasts." |
| | 12 | BY MR. CONANT: |
| | 13 | Q.   Can you answer the question? |
| | 14 | A.   I'm confused.   No, I'm confused. |
| 10:59:02 | 15 | "Messages," I don't understand what you mean. |
| | 16 | Q.   What do you understand a message to be, |
| | 17 | Mr. Montgomery? |
| | 18 | A.   You tell me.   I'm confused. |
| | 19 | Q.   Do you understand the English language, |
| 10:59:12 | 20 | Mr. Montgomery? |
| | 21 | MR. CROCKETT:  It's argumentative. |
| | 22 | Don't answer. |
| | 23 | MR. CONANT:  I'm asking him a question. |
| | 24 | THE WITNESS:  I can't hear him talk, |
| 10:59:16 | 25 | Mr. Flynn, when you keep interrupting and going over |

Page 99

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 10:59:16 | 1 | his voice.  Please stop it. |
| | 2 | MR. FLYNN:  The record speaks for itself. |
| | 3 | THE WITNESS:  I know it does, but I can't |
| | 4 | hear him when you keep talking to him. |
| 10:59:26 | 5 | What's the question? |
| | 6 | MR. FLYNN:  Decoding coordinates. |
| | 7 | THE WITNESS:  I can't hear, Mr. Flynn, |
| | 8 | when -- |
| | 9 | Go ahead. |
| 10:59:35 | 10 | BY MR. CONANT: |
| | 11 | Q.    Do you understand the English language, |
| | 12 | Mr. Montgomery? |
| | 13 | A.    Yes. |
| | 14 | Q.    What do you understand the word "message" |
| 10:59:41 | 15 | to mean within the English language? |
| | 16 | A.    It could mean anything. |
| | 17 | MR. CROCKETT:  As a noun or a verb? |
| | 18 | BY MR. CONANT: |
| | 19 | Q.    So you don't understand. |
| 10:59:45 | 20 | A.    It could mean anything. |
| | 21 | Q.    That's what I'm asking. |
| | 22 | A.    I got a message in a bottle.  That could be |
| | 23 | a message.  I got a message from my wife, a text |
| | 24 | message.  I got an email.  That could be a message. |
| 10:59:54 | 25 | Q.    Some form of communication then, |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

```
10:59:55   1   Mr. Montgomery?

           2       A.    Some form of communi- -- it could be, yes.

           3       Q.    That's what you understand a message to be?

           4       A.    No.  That's what you told me it meant.

11:00:03   5       Q.    I'm asking you:  Do you understand the word

           6   "message" to mean some form of communication?

           7       A.    It could mean that, yes.

           8       Q.    Now have you ever told anyone that you had

           9   software that could decode messages within

11:00:15  10   Al-Jazeera video transmissions?

          11       A.    I'd violate the U.S. protective order in

          12   answering that.

          13           MR. CONANT:  For the record, Ms. Wells

          14   raised no objection --

11:00:24  15           THE WITNESS:  Okay.

          16           MR. CONANT:  -- to a violation --

          17           THE WITNESS:  Okay.

          18           MR. CONANT:  -- with respect to the U.S.

          19   protective order.

11:00:30  20       Q.    Mr. Montgomery, have you ever told

          21   anyone -- strike that.

          22           Have you ever told Edra Blixseth that you

          23   had software that could decode target coordinates in

          24   communicating with an Al-Jazeera broadcast?

11:00:44  25       A.    I don't recall if I did or not.
```

Dennis Lee Montgomery  -  November 18, 2010

11:00:45  1      Q.    Did you ever -- Mr. Montgomery, did you

2    ever tell Tim Blixseth that you had created software

3    that could decode target coordinates hidden within

4    Al-Jazeera transmissions?

11:00:59  5      A.    I don't recall I did or not.

6            Are you Tim Blixseth's attorney?

7      Q.    Mr. Montgomery, I'm the one asking the

8    questions.

9      A.    I'm just curious.  I'd like to know.

11:01:06  10      Q.    Well, I'm not going to answer that.

11      A.    Okay.

12            I don't recall if I did or not.

13      Q.    All right.  Mr. Montgomery, did you ever

14    tell Michael Sandoval that you had created software

11:01:15  15    that could decode target coordinates hidden within

16    Al-Jazeera transmissions?

17      A.    That's different than the question you just

18    asked me.

19      Q.    That's okay.

11:01:25  20      A.    I don't recall if I did or not.

21      Q.    Did you ever create any software that could

22    detect terrorist communications?

23      A.    I wouldn't know.  What do you mean

24    "terrorist communications"?

11:01:34  25      Q.    Do you know what a terrorist is,

Dennis Lee Montgomery  -  November 18, 2010

| 11:01:35 | 1 | Mr. Montgomery? |
| | 2 | A.   No.  Why don't you describe it? |
| | 3 | Q.   I think you described it. |
| | 4 | A.   No, I just used the word. |
| 11:01:42 | 5 | Q.   Well, when you used the word -- let's look |
| | 6 | here. |
| | 7 | A.   What document are we looking at? |
| | 8 | Q.   Give me a second, please, Mr. Montgomery. |
| | 9 | All right.  Let's look at page 4, line 19 |
| 11:01:55 | 10 | and a half, of Plaintiff's Exhibit No. 3. |
| | 11 | A.   Got it. |
| | 12 | Which page? |
| | 13 | Q.   Page 4. |
| | 14 | A.   Yeah. |
| 11:02:08 | 15 | Okay.  Which line? |
| | 16 | Q.   Let's look at line 19 and a half. |
| | 17 | A.   Okay. |
| | 18 | Q.   Let's see -- one, two, three, four -- the |
| | 19 | fifth word over from the left margin I see the word |
| 11:02:22 | 20 | "terrorist." |
| | 21 | Do you see that, Mr. Montgomery? |
| | 22 | A.   Yes. |
| | 23 | Q.   What do you understand the word "terrorist" |
| | 24 | to mean, Mr. Montgomery? |
| 11:02:28 | 25 | MR. CROCKETT:  In that sentence -- |

Page 103

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 11:02:30 | 1 | THE WITNESS:  I'm confused.  What do you |
| | 2 | mean? |
| | 3 | MR. CROCKETT:  -- or are you speaking |
| | 4 | generally?  I'll object to the question.  It lacks |
| 11:02:36 | 5 | foundation.  It's vague and ambiguous.  It's not |
| | 6 | clear what you're referring to. |
| | 7 | BY MR. CONANT: |
| | 8 | Q.  All right.  Mr. Montgomery, let's ask it |
| | 9 | both ways since we're confused.  Generally, what do |
| 11:02:45 | 10 | you understand the word "terrorist" to mean? |
| | 11 | A.  A bad person. |
| | 12 | Q.  A bad person? |
| | 13 | Am I a terrorist, Mr. Montgomery? |
| | 14 | MR. CROCKETT:  Are you asking him to answer |
| 11:02:56 | 15 | that? |
| | 16 | BY MR. CONANT: |
| | 17 | Q.  Yes. |
| | 18 | A.  No. |
| | 19 | Q.  Now let's look at -- well, let's look now |
| 11:03:00 | 20 | at line 19 and a half, page 4. |
| | 21 | MR. FLYNN:  Did you uncover terrorist -- |
| | 22 | THE WITNESS:  I can't hear him, Mr. Flynn, |
| | 23 | when he -- |
| | 24 | MR. CROCKETT:  Be quiet so she can write |
| 11:03:12 | 25 | down what he said. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 11:03:13 | 1 | BY MR. CONANT: |
| | 2 | Q.   Line 19 and a half, "terrorist," do you see |
| | 3 | that word on line 19 and a half? |
| | 4 | A.   Yes. |
| 11:03:19 | 5 | Q.   What do you mean the word "terrorist" to |
| | 6 | mean there? |
| | 7 | MR. CROCKETT:   The document speaks for |
| | 8 | itself, Counsel.  I'll object to the question. |
| | 9 | THE WITNESS:   Mr. Flynn wrote this at the |
| 11:03:29 | 10 | time.  You'd have to ask him. |
| | 11 | BY MR. CONANT: |
| | 12 | Q.   When you signed this declaration, |
| | 13 | Mr. Montgomery, what did you understand the word |
| | 14 | "terrorist" to mean? |
| 11:03:38 | 15 | A.   I don't recall at the time. |
| | 16 | Q.   All right.  Look at line 2, same page. |
| | 17 | A.   Line 2, okay. |
| | 18 | Q.   Well, actually, let's go up to line 1. |
| | 19 | A.   Got it. |
| 11:03:48 | 20 | Q.   First sentence, quote, "I provided the |
| | 21 | 'output' from my decoding programs without |
| | 22 | compensation to our government in order to stop |
| | 23 | terrorist attacks and save American lives," end of |
| | 24 | the sentence -- |
| 11:04:04 | 25 | MR. FLYNN:   Did he do that? |

YATES COURT REPORTERS    800.669.1866

| | | |
|---|---|---|
| 11:04:04 | 1 | BY MR. CONANT: |
| | 2 | Q. -- unquote. |
| | 3 | Did you do that, Mr. Montgomery? |
| | 4 | A. I don't recall specifically. |
| 11:04:10 | 5 | Q. You don't, okay. |
| | 6 | What did you mean by the word "terrorist" |
| | 7 | in line 2 right there? |
| | 8 | A. Mr. Flynn wrote that. You'd have to ask |
| | 9 | him. |
| 11:04:19 | 10 | Q. When you signed this declaration -- |
| | 11 | A. I signed it, but I didn't write it. |
| | 12 | Mr. Flynn wrote it, the man sitting next to you that |
| | 13 | is your client and also Mr. Blixseth's attorney. |
| | 14 | Ask him. He wrote it. |
| 11:04:33 | 15 | Q. What did you mean -- when you signed this |
| | 16 | declaration, what did you understand that word, |
| | 17 | "terrorist," to mean Mr. Montgomery? |
| | 18 | A. I signed -- I signed the declaration. I |
| | 19 | don't remember at the time exactly. |
| 11:04:44 | 20 | Q. Mr. Montgomery, the word -- |
| | 21 | MR. FLYNN: Did Mr. Flynn go with you to |
| | 22 | Dick Cheney's office. |
| | 23 | THE WITNESS: That one. |
| | 24 | BY MR. CONANT: |
| 11:04:54 | 25 | Q. Mr. Montgomery, when you visited Dick |

| 11:04:56 | 1 | Cheney's office, did Mr. Flynn accompany you? |
| | 2 | A.   I don't believe so. |
| | 3 | Q.   Who did accompany you? |
| | 4 | A.   I think it was Edra and Jack Kemp, Edra |
| 11:05:16 | 5 | Blixseth and Jack Kemp, although I'm not certain it |
| | 6 | was Jack Kemp but I can't remember at the time. |
| | 7 | Q.   What was the purpose of you visiting |
| | 8 | Mr. Cheney's office? |
| | 9 | A.   I don't recall. |
| 11:05:29 | 10 | MR. FLYNN:  End of -- |
| | 11 | BY MR. CONANT: |
| | 12 | Q.   Well, so you visited the vice president's |
| | 13 | office, but you don't recall the nature of the |
| | 14 | meeting? |
| 11:05:38 | 15 | MR. CROCKETT:  Asked and answered and |
| | 16 | argumentative. |
| | 17 | Don't answer the question. |
| | 18 | Next question, please, Mr. Conant. |
| | 19 | BY MR. CONANT: |
| 11:05:46 | 20 | Q.   Now let's look at the last sentence of the |
| | 21 | first paragraph on page 4, beginning on line 2, |
| | 22 | quote, "My source codes for this decoding technology |
| | 23 | which derives from my 'ODS' are what Trepp and |
| | 24 | several government officials were attempting to |
| 11:06:08 | 25 | steal from me when they raided my home." |

Dennis Lee Montgomery  -  November 18, 2010

```
11:06:12   1              Mr. Montgomery, what does the word "ODS"
           2    mean?
           3         A.   I don't know.
           4         Q.   Okay.  Let's look at "my source codes,"
11:06:21   5    line 2.
           6         A.   Same page?
           7         Q.   Yes.
           8         A.   Yeah.
           9         Q.   What are your source codes, Mr. Montgomery?
11:06:28  10         A.   I don't recall specifically how that
          11    comment was used, line was used.
          12         Q.   So have you ever created any source codes
          13    that were used in -- well, let me strike that.
          14              Did you ever create any source codes that
11:06:45  15    were used to detect terrorist attacks,
          16    Mr. Montgomery?
          17         A.   I don't recall.
          18         Q.   All right.  Now I want to go back here.
          19              Now, Mr. Montgomery, I'm having a hard time
11:07:26  20    figuring out what's going on here with your
          21    bankruptcy schedule, because you've list -- you
          22    state here on Plaintiff's Exhibit No. 1, bottom of
          23    page 22-9, "Dennis Montgomery is a holder of certain
          24    intellectual property rights."
11:07:47  25              I want to know what those intellectual
```

YATES COURT REPORTERS    800.669.1866

| | | |
|---|---|---|
| 11:07:48 | 1 | property rights are, Mr. Montgomery. |
| | 2 | A. I believe I answered that question saying I |
| | 3 | don't believe at the time that I put that on. And I |
| | 4 | was asking you, since I don't have any bankruptcy |
| 11:07:59 | 5 | schedule with me, and -- and -- I don't recall |
| | 6 | putting this on there, me, personally. That's what |
| | 7 | I'm saying. |
| | 8 | I'm not saying it's not there. I'm not |
| | 9 | saying it wasn't on there. I just don't know. |
| 11:08:12 | 10 | Q. Well, okay. Is it true that you are the |
| | 11 | holder of certain intellectual property rights, |
| | 12 | Mr. Montgomery? |
| | 13 | A. I don't recall. I just told you I don't |
| | 14 | know where this paragraph came from. |
| 11:08:25 | 15 | Q. Are you done with your answer, |
| | 16 | Mr. Montgomery? |
| | 17 | A. I just don't recall. |
| | 18 | Q. Okay. I'm asking you: Generally, are you |
| | 19 | the holder of certain intellectual property rights, |
| 11:08:32 | 20 | Mr. Montgomery? |
| | 21 | MR. CROCKETT: To the extent that he's in |
| | 22 | bankruptcy, the answer would be no, Counsel, and |
| | 23 | you'd know that because they'd be assets of the |
| | 24 | trustee. |
| | 25 | /// |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
11:08:41    1   BY MR. CONANT:

            2       Q.    All right.  Let me ask you this:

            3   Immediately preceding your filing for bankruptcy,

            4   were you the holder of any intellectual property

11:08:49    5   rights?

            6       A.    I'm not certain.

            7       Q.    So then, Mr. Montgomery, is it an

            8   untruthful statement here on your bankruptcy

            9   schedules that you are the holder of certain

11:09:06   10   intellectual property rights?

           11       A.    Well, no, because -- that's a double

           12   negative you just asked me again.  Ask it straight.

           13   Your question is confusing.

           14       Q.    Is it a true statement?  Is this --

11:09:18   15       A.    Don't yell at me.  Quit yelling.

           16       Q.    I apologize.  I get very excited sometimes.

           17   I don't mean it to be yelling, so I apologize.

           18       A.    Yeah.

           19       Q.    Is this on your bankruptcy schedules,

11:09:29   20   page 22-9, is it a true statement that -- let me

           21   back up.

           22             At the same time that you signed these

           23   bankruptcy schedules that we're looking at here, is

           24   it true -- is it a true statement that you were the

11:09:43   25   holder of certain intellectual property rights,
```

Dennis Lee Montgomery  -  November 18, 2010

```
11:09:45    1    Mr. Montgomery?

            2         A.   Yes.

            3         Q.   Can you -- why was that a true statement,

            4    Mr. Montgomery?

11:09:50    5         A.   Well, I listed some source code that was, I

            6    believe, these copyrights.

            7              MR. CROCKETT:  If you turn to the prior

            8    page, Counsel, it clearly sets out patents,

            9    copyrights and other intellectual properties, giving

11:10:04   10    particulars.

           11              MR. CONANT:  Thank you.  Mr. Montgomery is

           12    testifying, not you, Mr. Crockett.

           13              MR. CROCKETT:  But, apparently, you haven't

           14    read the document, Counsel.

11:10:12   15              MR. CONANT:  I was asking a question,

           16    Mr. Crockett.

           17              THE WITNESS:  But I just answered it.  I

           18    just said there's the list.

           19    BY MR. CONANT:

11:10:18   20         Q.   So why would this bottom paragraph here,

           21    "In addition, Dennis Montgomery is the holder of

           22    certain intellectual property rights," how would

           23    that end up on your bankruptcy schedules,

           24    Mr. Montgomery?

11:10:28   25         A.   I just answered that question and I don't
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 11:10:30 | 1 | remember putting that on there, me, personally.  I'm |
| | 2 | not saying it wasn't put on there.  I don't recall |
| | 3 | typing that out and putting that on there. |
| | 4 | Q.    Did you attorney -- did you direct your |
| 11:10:39 | 5 | attorney to put that on there? |
| | 6 | A.    I don't recall. |
| | 7 | Q.    Who prepared these bankruptcy schedules, |
| | 8 | Mr. Montgomery? |
| | 9 | A.    My -- myself and my attorney. |
| 11:10:48 | 10 | Q.    So you -- okay.  So did your attorney just |
| | 11 | unilaterally put that statement on there, |
| | 12 | Mr. Montgomery? |
| | 13 | MR. CROCKETT:  Calls for speculation. |
| | 14 | Object. |
| 11:11:01 | 15 | BY MR. CONANT: |
| | 16 | Q.    What would cause your attorney to put a |
| | 17 | statement like that on your bankruptcy schedule? |
| | 18 | MR. CROCKETT:  Calls for speculation.  I'll |
| | 19 | object. |
| 11:11:09 | 20 | And instruct you not to answer. |
| | 21 | BY MR. CONANT: |
| | 22 | Q.    Were you ever at any time the holder of |
| | 23 | certain intellectual property rights which are |
| | 24 | subject to the National Security Act of 1947? |
| 11:11:26 | 25 | A.    Yes. |

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

11:11:26    1         Q.    And what are those intellectual property

            2    rights, Mr. Montgomery?

            3         A.    Well, there were patents filed in the

            4    eTreppid matter, I believe.  And you said "ever," I

11:11:38    5    believe, didn't you?

            6              Maybe I misunderstood your question.

            7              You said did I ever own any; right?

            8              There was work at eTreppid and there were

            9    patents filed in my name that surely would fall

11:11:52   10    under that statement you made.

           11         Q.    And what kind of -- what were those patents

           12    for?

           13         A.    I don't remember.  I just know there were

           14    multiple patents filed.

11:12:00   15         Q.    Was it related to national security?

           16         A.    You mean the patents specifically or what

           17    it was used for?

           18         Q.    What it was used for.

           19         A.    I don't recall specifically if it was or

11:12:13   20    not.

           21              Can we take a break or is that -- what time

           22    is it?  I don't even know what time it is.  What

           23    time is it?

           24              MR. CONANT:  It's 11:12.

11:12:30   25              MR. FLYNN:  Take five minutes.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
11:12:31    1              MR. CONANT:  We can take a five-minute
            2    break if you want.
            3              THE VIDEOGRAPHER:  This marks the end of
            4    Media No. 1.  The time is 11:12 a.m.  We're off the
11:12:43    5    record.
            6              (Recess taken.)
            7              THE VIDEOGRAPHER:  This marks the beginning
            8    of Media No. 2.  The time is 11:19 a.m.  We're back
            9    on the record.
11:19:53   10              (Exhibit 6 was marked for identification.)
           11    BY MR. CONANT:
           12        Q.   All right.  Mr. Montgomery, I'm going to
           13    hand you what we've marked as Plaintiff's Exhibit
           14    No. 6.
11:20:09   15              MR. FLYNN:  Speaking of -- these are the
           16    two target letters.
           17              THE WITNESS:  I see it.
           18              MR. CONANT:  All right.  Just for the
           19    record, Plaintiff's Exhibit No. 6 is a purported
11:20:27   20    letter from the U.S. Department of Justice
           21    Environment and Natural Resources Division dated
           22    November 8, 2007, to Timothy Blixseth.
           23        Q.   Mr. Montgomery, do you recognize this
           24    document?
11:20:47   25        A.   I'm not certain.
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 11:20:49 | 1 | Q.    Have you ever seen this document before? |
| | 2 | A.    I'm not certain. |
| | 3 | MR. FLYNN:  Document like it. |
| | 4 | BY MR. CONANT: |
| 11:20:55 | 5 | Q.    Have you ever seen a document like it, |
| | 6 | Mr. Montgomery? |
| | 7 | A.    I'm not certain. |
| | 8 | MR. FLYNN:  Did you get this document -- |
| | 9 | BY MR. CONANT: |
| 11:21:03 | 10 | Q.    Did you provide this document to Timothy |
| | 11 | Blixseth, Mr. Montgomery? |
| | 12 | MR. CROCKETT:  You're asking my client if a |
| | 13 | letter that's addressed to Mr. Blixseth was provided |
| | 14 | to him by Mr. Montgomery? |
| 11:21:14 | 15 | Are you asking Mr. Montgomery if he signed |
| | 16 | the letter? |
| | 17 | MR. CONANT:  I'm asking Mr. Montgomery to |
| | 18 | answer my question. |
| | 19 | MR. CROCKETT:  It's argumentative. |
| 11:21:20 | 20 | If you can answer it, go ahead. |
| | 21 | THE WITNESS:  I don't recall specifically. |
| | 22 | BY MR. CONANT: |
| | 23 | Q.    Isn't it true, Mr. Montgomery, that you |
| | 24 | gave a copy of this letter to Mr. Blixseth? |
| 11:21:35 | 25 | A.    I'm going to assert my right under the |

Dennis Lee Montgomery  -  November 18, 2010

| 11:21:39 | 1 | Fifth Amendment. |
| | 2 | Q.    Mr. Montgomery, have you ever had a |
| | 3 | discussion with Mr. Blixseth regarding any form of |
| | 4 | target letter by the grand jury of the |
| 11:21:49 | 5 | United States? |
| | 6 | A.    I'm going to assert my right under the |
| | 7 | Fifth Amendment. |
| | 8 |        MR. FLYNN:  Did he prepare it. |
| | 9 | BY MR. CONANT: |
| 11:21:55 | 10 | Q.    Mr. Montgomery, did you prepare this target |
| | 11 | letter that we're looking at? |
| | 12 | A.    I'm going to assert my right under the |
| | 13 | Fifth Amendment. |
| | 14 | Q.    Did you ever give a copy of this target |
| 11:22:06 | 15 | letter to Edra Blixseth, Mr. Montgomery? |
| | 16 | A.    I'm going to assert my right under the |
| | 17 | Fifth Amendment. |
| | 18 | Q.    Can you explain your involvement, |
| | 19 | Mr. Montgomery, with this target letter? |
| 11:22:16 | 20 | A.    I'm going to assert my right under the |
| | 21 | Fifth Amendment. |
| | 22 |        MR. CONANT:  All right.  I'm going to hand |
| | 23 | to you what's going to be marked as Plaintiff's |
| | 24 | Exhibit No. 7. |
| 11:22:38 | 25 |        (Exhibit 7 was marked for identification.) |

Page 116

Dennis Lee Montgomery   -   November 18, 2010

| 11:22:41 | 1 | MR. CONANT:  Mr. Crockett, No. 7. |
| | 2 | Q.   Mr. Montgomery, can you please review this |
| | 3 | document. |
| | 4 | A.   I did. |
| 11:22:51 | 5 | MR. CONANT:  Okay.  For the record, |
| | 6 | Plaintiff's Exhibit No. 7 is a purported letter from |
| | 7 | the U.S. Department of Justice Criminal Division |
| | 8 | dated December 12, 2007, addressed to Mr. Timothy |
| | 9 | Blixseth, and signed -- purportedly signed by a |
| 11:23:10 | 10 | Mr. Ronald Sharpe. |
| | 11 | Q.   Mr. Montgomery, do you recognize this |
| | 12 | document? |
| | 13 | A.   I'm going to assert my right under the |
| | 14 | Fifth Amendment. |
| 11:23:20 | 15 | Q.   How do you recognize this document |
| | 16 | Mr. Montgomery? |
| | 17 | A.   I'm going to assert my right under the |
| | 18 | Fifth Amendment. |
| | 19 | Q.   Isn't it true, Mr. Montgomery, you provided |
| 11:23:26 | 20 | a copy of this document to Edra Blixseth? |
| | 21 | A.   I'm going to assert my right under the |
| | 22 | Fifth Amendment. |
| | 23 | Q.   Isn't it true, Mr. Montgomery, that you |
| | 24 | prepared this letter? |
| 11:23:33 | 25 | A.   I'm going to assert my right under the |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 11:23:35 | 1 | Fifth Amendment. |
| | 2 | MR. FLYNN:  Forged the signature. |
| | 3 | BY MR. CONANT: |
| | 4 | Q.  Mr. Montgomery, isn't it true that you |
| 11:23:40 | 5 | forged the signature of Ronald Sharpe? |
| | 6 | A.  I'm going to assert my right under the |
| | 7 | Fifth Amendment. |
| | 8 | MR. FLYNN:  Describe all the circumstances |
| | 9 | under which you prepared the document. |
| 11:23:47 | 10 | BY MR. CONANT: |
| | 11 | Q.  Can you describe all the facts and |
| | 12 | circumstances concerning your preparation of this |
| | 13 | document, Mr. Montgomery? |
| | 14 | MR. CROCKETT:  Object to the question. |
| 11:23:51 | 15 | Assumes facts not in evidence.  Lacks foundation. |
| | 16 | MR. FLYNN:  -- discussions with Edra |
| | 17 | regarding the sale of -- and giving it to Edra to |
| | 18 | kill the sale of the -- |
| | 19 | MR. CONANT:  Ms. Borthwick, can you repeat |
| 11:24:08 | 20 | my last question, please. |
| | 21 | THE REPORTER:  Question, "Can you describe |
| | 22 | all the facts and circumstances concerning your |
| | 23 | preparation of this document?" |
| | 24 | THE WITNESS:  I'm going to assert my right |
| 11:24:24 | 25 | under the Fifth Amendment. |

| | | |
|---|---|---|
| 11:24:25 | 1 | BY MR. CONANT: |
| | 2 | Q.   Mr. Montgomery, can you explain to me -- |
| | 3 | I'm sorry.  Let me back up. |
| | 4 | MR. FLYNN:  Conversations with Edra. |
| 11:24:34 | 5 | MR. CONANT:  Yeah. |
| | 6 | Q.   Can you explain to me your conversations |
| | 7 | with Edra Blixseth concerning -- |
| | 8 | MR. FLYNN:  -- preparation of this |
| | 9 | document. |
| 11:24:38 | 10 | BY MR. CONANT: |
| | 11 | Q.   -- the preparation of this document? |
| | 12 | MR. CROCKETT:  I'm going to object to this |
| | 13 | entire line of questioning unless you can explain to |
| | 14 | me the relevance to the bankruptcy in which this |
| 11:24:47 | 15 | deposition has been noticed. |
| | 16 | It sounds to me like you're trying to take |
| | 17 | discovery in aid of your proceedings in Montana. |
| | 18 | MR. FLYNN:  Motion for summary judgment. |
| | 19 | THE WITNESS:  I can't hear you. |
| 11:24:56 | 20 | MR. CONANT:  Mr. Crockett, relevance to |
| | 21 | motion for summary motion in this case, this is not |
| | 22 | the time to argue relevance. |
| | 23 | MR. CROCKETT:  I'm not arguing relevance, |
| | 24 | I'm asking you to tell me what the relevance is, |
| 11:25:09 | 25 | because I don't understand how a letter addressed to |

Dennis Lee Montgomery  -  November 18, 2010

| 11:25:13 | 1 | your client, Mr. Blixseth, from three years ago has |
|---|---|---|
| | 2 | anything to do -- that doesn't mention |
| | 3 | Mr. Montgomery or has anything to do with him, has |
| | 4 | any relevance to this proceeding. |
| 11:25:21 | 5 | I'm open to an explanation. |
| | 6 | MR. FLYNN:  I'll jump in. |
| | 7 | MR. CROCKETT:  No, sir, you won't. |
| | 8 | MR. CONANT:  I'll give -- |
| | 9 | MR. FLYNN:  I'm free to jump in. |
| 11:25:30 | 10 | The explanation is that Mr. Montgomery, in |
| | 11 | January-February 2008 with Edra Blixseth prepared |
| | 12 | these two documents for the purpose of trying to |
| | 13 | kill the Yellowstone Club sale by Tim Blixseth for |
| | 14 | $455 million to Samuel Byrne and CrossHarbor Capital |
| 11:25:47 | 15 | Partners. |
| | 16 | They prepared this document and gave it to |
| | 17 | Mr. Byrne so Mr. Byrne would pass it on to the |
| | 18 | investors that were putting up the money for the |
| | 19 | $455 million acquisition so that it would kill the |
| 11:26:00 | 20 | sale. |
| | 21 | In fact, these documents were given in late |
| | 22 | January, early February, by Mr. Montgomery to Edra |
| | 23 | Blixseth who then passed them on to Samuel Byrne and |
| | 24 | it, in fact, killed the sale. |
| 11:26:14 | 25 | The documents are complete fabrications. |

YATES COURT REPORTERS    800.669.1866

```
11:26:17   1   There was no grand jury investigation at the time.

           2   Mr. Byrne passed them on to his investors and, in

           3   fact, the investors withdrew and didn't go through

           4   with the sale.

11:26:28   5        It was all planned by Mr. -- Ms. Blixseth

           6   and Mr. Montgomery to kill the sale.  Mr. Byrne then

           7   turned around and made a deal with Edra Montgomery

           8   [sic] in which he basically got the Yellowstone Club

           9   and Porcupine Creek, $700 million in marital

11:26:44  10   community assets for roughly $35 million through the

          11   bankruptcy proceedings in Montana.

          12        That's the relevance and the relevance is

          13   that Mr. Montgomery participated in these criminal

          14   acts which will prevent him from being discharged in

11:27:01  15   his bankruptcy.

          16        MR. CROCKETT:  Well, then based on your

          17   explanation, which until the last sentence had

          18   nothing --

          19        MR. FLYNN:  He won't be discharged --

11:27:10  20        MR. CROCKETT:  Excuse me.

          21        MR. FLYNN:  -- for all those reasons and

          22   all those criminal acts --

          23        THE WITNESS:  Just more threats.

          24        MR. FLYNN:  -- Mr. Crockett.

11:27:16  25        Let's move on.
```

```
11:27:17    1              MR. CROCKETT:  No, no.  Let's -- okay.

            2          Yeah, let's move on.

            3   BY MR. CONANT:

            4      Q.   Answer the question, please,

11:27:20    5   Mr. Montgomery.

            6              MR. CROCKETT:  No.  I'm going to instruct

            7   him not to answer on the grounds that it may violate

            8   his right to be free of self-incrimination, because

            9   of the explanation that your counsel -- or your

11:27:30   10   whatever he is has just given us, which is that

           11   these documents in his opinion and, apparently,

           12   yours are evidence of some sort of criminal

           13   conspiracy.

           14              And based on that statement, I'm going to

11:27:43   15   tell you he will be instructed not to answer

           16   anything relating to this document.

           17              MR. CONANT:  On what grounds?

           18              MR. FLYNN:  You're not allowed to instruct

           19   him, he's been doing it.

11:27:52   20          So good, get the invitation.  Go ahead.

           21   BY MR. CONANT:

           22      Q.   Mr. Montgomery, please answer the question.

           23      A.   The one he just asked?

           24              MR. CONANT:  Ms. Borthwick, can you read

11:27:57   25   back my question.  My last question to --
```

Page 122

Dennis Lee Montgomery  -  November 18, 2010

| 11:28:00 | 1 | MR. FLYNN: Withdraw. Withdraw. Start |
| | 2 | asking -- |
| | 3 | MR. CONANT: All right. I'll withdraw my |
| | 4 | previous question. |
| 11:28:05 | 5 | Q. Mr. Montgomery, please explain to me your |
| | 6 | conversations with Ms. Blixseth concerning the |
| | 7 | preparation of this document here, Plaintiff's -- |
| | 8 | MR. CROCKETT: I'm going to instruct him |
| | 9 | not to answer the question on the grounds of the |
| 11:28:14 | 10 | Fifth Amendment. |
| | 11 | MR. CONANT: I wasn't done with my |
| | 12 | question. Let me rephrase the question. |
| | 13 | MR. CROCKETT: Sure. |
| | 14 | BY MR. CONANT: |
| 11:28:18 | 15 | Q. Mr. Montgomery, can you please explain to |
| | 16 | me your conversation with Ms. Montgomery concerning |
| | 17 | the preparation of this document, which is marked as |
| | 18 | Plaintiff's Exhibit No. 7. |
| | 19 | MR. CROCKETT: Given the predicate for the |
| 11:28:29 | 20 | examination as stated by Mr. Flynn, I'm going to |
| | 21 | instruct Mr. Montgomery not to answer any questions |
| | 22 | relating to this document or anything associated |
| | 23 | with it. |
| | 24 | MR. CONANT: On what grounds? |
| 11:28:43 | 25 | MR. FLYNN: No. No. Just get the -- |

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 11:28:45 | 1 | BY MR. CONANT: |
| | 2 | Q.    Can you please answer the question. |
| | 3 | A.    His question? |
| | 4 | Q.    My -- |
| 11:28:49 | 5 | A.    Well, I don't know yours.  He just asked |
| | 6 | another one.  I remember his, not yours. |
| | 7 | Q.    Mr. Montgomery, please describe to me your |
| | 8 | conversations with Ms. Blixseth concerning the |
| | 9 | preparation of this document which is marked as |
| 11:28:59 | 10 | Plaintiff's 7. |
| | 11 | A.    I invoke my right under the Fifth |
| | 12 | Amendment. |
| | 13 | Q.    Okay.  Please explain to me your |
| | 14 | conversations with Ms. Blixseth concerning your |
| 11:29:06 | 15 | preparation of Plaintiff's Exhibit No. 6. |
| | 16 | A.    Is that the letter? |
| | 17 | I invoke my right under the Fifth |
| | 18 | Amendment. |
| | 19 | Q.    Did you discuss with Ms. Blixseth the |
| 11:29:24 | 20 | preparation of this document in order to assist her |
| | 21 | in killing the sale of the Yellowstone Club to |
| | 22 | CrossHarbor Capital Partners? |
| | 23 | MR. CROCKETT:  Object to the question as |
| | 24 | argumentative.  Assumes facts not in evidence.  In |
| 11:29:35 | 25 | addition, as I previously stated, any questions |

YATES COURT REPORTERS      800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 11:29:37 | 1 | relating to these documents I'm going to instruct |
| | 2 | him not to answer on the grounds of the Fifth |
| | 3 | Amendment. |
| | 4 | BY MR. CONANT: |
| 11:29:45 | 5 | Q.    What's your answer, Mr. Montgomery? |
| | 6 | A.    He just answered it.  I invoke my right |
| | 7 | under the Fifth Amendment. |
| | 8 | Q.    Isn't it true, Mr. Montgomery, that you |
| | 9 | worked with Ms. Blixseth to help her kill the sale |
| 11:30:03 | 10 | of the Yellowstone Club to Cross Harbor? |
| | 11 | MR. CROCKETT:  I'll object.  It has -- |
| | 12 | you're now conducting discovery. |
| | 13 | THE WITNESS:  It's Tim Blixseth.  It's Tim |
| | 14 | Blixseth's attorney. |
| 11:30:16 | 15 | MR. CROCKETT:  You're now conducting |
| | 16 | discovery.  It's obvious you're conducting discovery |
| | 17 | which is unrelated to Mr. Montgomery's bankruptcy |
| | 18 | and is in aid of the discovery your client, |
| | 19 | Mr. Blixseth, seeks and on those grounds I'll advise |
| 11:30:27 | 20 | and instruct Mr. Montgomery not to answer. |
| | 21 | In addition to which you continued the line |
| | 22 | of questions relating to what you purport to be a |
| | 23 | criminal conspiracy and on those separate grounds I |
| | 24 | will instruct Mr. Montgomery not to answer the |
| 11:30:41 | 25 | question. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 11:30:41 | 1 | BY MR. CONANT: |
| | 2 | Q.    What's your answer? |
| | 3 | A.    I'm not going to answer the question.  I'm |
| | 4 | doing what my attorney told me to. |
| 11:30:47 | 5 | Q.    Are you going to invoke the Fifth |
| | 6 | Amendment? |
| | 7 | A.    My attorney just answered the question. |
| | 8 | Q.    No.  I need your answer, Mr. Montgomery. |
| | 9 | A.    To what?  I can't even remember now. |
| 11:30:55 | 10 | What's the question? |
| | 11 | Q.    Were you involved with Ms. Blixseth to help |
| | 12 | her kill the sale of the Yellowstone Club to |
| | 13 | CrossHarbor? |
| | 14 | A.    I invoke my right under the Fifth |
| 11:31:04 | 15 | Amendment. |
| | 16 | Q.    And for the record, there's nothing |
| | 17 | established on the record, to be clear, that I |
| | 18 | represent Tim Blixseth. |
| | 19 | A.    Well, there's -- |
| 11:31:11 | 20 | Q.    Secondly -- |
| | 21 | A.    Yeah, there is.  There's plenty of PACER |
| | 22 | documents where you're his attorney.  You're Western |
| | 23 | Capital's attorney, Mr. Flynn -- |
| | 24 | MR. CROCKETT:  It's such a silly statement |
| 11:31:20 | 25 | it doesn't deserve an answer. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| 11:31:22 | 1 | Go ahead. |

2  BY MR. CONANT:

3      Q.   I'm stating what's on the record in this

4  case.

11:31:25   5      A.   I misunderstood you.

6           MR. CONANT:   For the record, Mr. Crockett's

7  objection mischaracterizes the line of questioning.

8           MR. FLYNN:   Get into his payments by --

9  $100,000.

11:31:35   10  BY MR. CONANT:

11      Q.   Mr. Montgomery, isn't it true that one of

12  Edra Blixseth's entities was paying you

13  approximately $100,000 a month at one time?

14           MR. FLYNN:   During the whole period.

11:31:46   15           THE WITNESS:   Which question, the one he

16  just asked?

17  BY MR. CONANT:

18      Q.   The one I --

19      A.   Well, he asked another one.

11:31:49   20           MR. CONANT:   Ms. Borthwick, can you read

21  back my most recent question to Mr. Montgomery.

22           THE REPORTER:   Question, "Mr. Montgomery,

23  isn't it true that one of Edra Blixseth's entities

24  was paying you approximately $100,000 a month at one

11:31:53   25  time?"

YATES COURT REPORTERS      800.669.1866

11:32:10    1           THE WITNESS: I invoke my right under the

2  Fifth Amendment.

3  BY MR. CONANT:

4     Q.  Isn't it true that you started getting paid

11:32:14    5  by Ms. Blixseth's entities beginning in April of

6  2006?

7           MR. FLYNN: 100,000 a month.

8           THE WITNESS: I'm sorry, your question,

9  Mr. Flynn?

11:32:26   10  BY MR. CONANT:

11     Q.  There's no question outstanding by

12  Mr. Flynn.

13     A.  Well, I'm confused. You both ask questions

14  at the same time.

11:32:34   15     Q.  Mr. Montgomery, when did Edra Blixseth's

16  entities begin paying you a hundred thousand dollars

17  a month?

18           MR. CROCKETT: Objection. Lacks

19  foundation. Assumes facts not in evidence. Based

11:32:44   20  on Mr. Flynn's statement, I will advise

21  Mr. Montgomery to invoke his rights under the Fifth

22  Amendment.

23           THE WITNESS: I invoke my right under the

24  Fifth Amendment.

25  ///

Dennis Lee Montgomery  -  November 18, 2010

11:32:51   1    BY MR. CONANT:

           2       Q.   Isn't it true that Ms. Blixseth's

           3    entities -- and when I refer to Ms. Blixseth's

           4    entities, it's either Blxware, LLC, Opspring, LLC --

11:33:04   5    well, Opspring, LLC, or Blxware, LLC.

           6            Isn't it true they began paying you a

           7    hundred thousand dollars a month in April of 2006?

           8            MR. CROCKETT:  Same objection.  Same

           9    instruction.

11:33:13  10            THE WITNESS:  I invoke my right under the

          11    Fifth Amendment.

          12    BY MR. CONANT:

          13       Q.   Isn't it true that Ms. Blixseth, through

          14    her entities, was paying you a hundred thousand

11:33:22  15    dollars a month to facilitate her computer hacking

          16    into the emails of Tim Blixseth and Michael Flynn?

          17            MR. CROCKETT:  Same instruction.

          18            THE WITNESS:  I invoke my right under the

          19    Fifth Amendment.

11:33:36  20            These are just sound bites he's making for

          21    his next article.  That's all this is about.

          22            MR. CROCKETT:  I know.

          23    BY MR. CONANT:

          24       Q.   What was Ms. Blixseth, through her

11:33:42  25    entities, paying you a hundred thousand dollars a

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 11:33:44 | 1 | month for? |
| | 2 | A.  I invoke my right under the Fifth |
| | 3 | Amendment. |
| | 4 | MR. FLYNN:  How much in total -- |
| 11:33:49 | 5 | BY MR. CONANT: |
| | 6 | Q.  How much in total have you received -- I'm |
| | 7 | sorry.  Let me back up.  Strike that. |
| | 8 | How much money, total, have you received |
| | 9 | from Ms. Blixseth through her entities? |
| 11:33:59 | 10 | MR. CROCKETT:  I object.  Assumes facts not |
| | 11 | in evidence.  Lacks foundation.  It's argumentative |
| | 12 | and it's compound. |
| | 13 | Based on Mr. Flynn's statement I instruct |
| | 14 | Mr. Montgomery to invoke his rights under the Fifth |
| 11:34:11 | 15 | Amendment. |
| | 16 | THE WITNESS:  I invoke my right under the |
| | 17 | Fifth Amendment. |
| | 18 | BY MR. CONANT: |
| | 19 | Q.  Isn't it true that Ms. Blixseth, through |
| 11:34:17 | 20 | her entities, has paid you at least $6 million since |
| | 21 | April of 2006? |
| | 22 | MR. CROCKETT:  Same objections.  Same |
| | 23 | instruction. |
| | 24 | THE WITNESS:  I'm invoking my right under |
| 11:34:27 | 25 | the Fifth Amendment. |

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

```
11:34:27    1   BY MR. CONANT:

            2       Q.    Mr. Montgomery, where did the $6 million

            3   that you received through Edra Blixseth go?

            4            MR. CROCKETT:  Same objections.  Same

11:34:37    5   instruction.

            6            THE WITNESS:  I invoke my right under the

            7   Fifth Amendment.

            8   BY MR. CONANT:

            9       Q.    Okay.  Mr. Montgomery, do you know who

11:34:43   10   Istvan Burgyan is?

           11       A.    Yes, my son-in-law.

           12       Q.    Did you know that I deposed Mr. Burgyan in

           13   September of this year?

           14       A.    I knew he had a deposition.

11:34:56   15       Q.    Did you talk to Mr. Burgyan about his

           16   deposition?

           17       A.    No.

           18       Q.    Right.

           19            Mr. Montgomery, are you familiar with a

11:35:02   20   company called Demaratech, LLC?

           21       A.    I'm going to invoke my right under the

           22   Fifth Amendment.

           23       Q.    All right.  Let me go --

           24            MR. FLYNN:  On the record I withdraw all my

11:35:37   25   objections to the presence of any of the Department
```

Page 131

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 11:35:39 | 1 |

1    of Justice gentlemen and ladies that are in

2    attendance.

3              THE WITNESS:  Wow.

4              MR. CONANT:  Let's see here.  All right.

11:35:52  5    I'm going to hand -- I'm going to hand to you what's

6    going to be marked as Plaintiff's Exhibit No. 8.

7              All right.  Do you want a copy,

8    Mr. Crockett?

9              MR. CROCKETT:  Thank you.

11:36:32  10             MR. FLYNN:  Do you have a copy for them?

11             MR. CONANT:  I do not.

12             (Exhibit 8 was marked for identification.)

13             MR. CONANT:  For the record, I've handed

14    Mr. Montgomery what's been marked as Plaintiff's

11:36:41  15    Exhibit No. 8 which is a printout of bank records

16    for a company called Demaratech, LLC.

17             And, for the record, during Mr. Istvan's

18    [sic] deposition, he represented that -- he

19    confirmed that these were the accounts, that this

11:37:01  20    was a bank account held at El Paseo Bank for

21    Demaratech, LLC.

22             MR. FLYNN:  I don't think this has anything

23    to do with them.

24             MR. CONANT:  Yeah, doesn't have anything to

11:37:15  25    do with them.  Not yet anyway.

Dennis Lee Montgomery  -  November 18, 2010

```
11:37:19   1        Q.    Now, Mr. Montgomery, can you turn with me

           2    to what's going to be marked on my copy as

           3    page 3-22 --

           4             MR. FLYNN:   On the lower right-hand corner.

11:37:37   5    BY MR. CONANT:

           6        Q.    -- on the lower right-hand corner.

           7        A.    Okay.

           8        Q.    Do you see -- I want to make sure we're on

           9    the same page.  It appears we are.

11:37:46  10             Do you see this appears to be,

          11    Mr. Montgomery, images of checks written on a

          12    Demaratech, LLC, account?

          13             Do you see that, Mr. Montgomery?

          14        A.    Yes.

11:37:56  15        Q.    Do you see up in the upper left-hand corner

          16    Check No. 1520, Mr. Montgomery?

          17        A.    Yes.

          18        Q.    It says, "Pay to the order of Dennis

          19    Montgomery."

11:38:05  20             Do you see that, Mr. Montgomery?

          21        A.    Yes.

          22        Q.    Is that you, Mr. Montgomery?

          23        A.    I believe so.

          24        Q.    Do you see that it purports to be a check

11:38:11  25    made out to you in the amount of $12,500?
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 11:38:14 | 1 | A.    Yes. |
| | 2 | Q.    Did you receive that $12,500 from |
| | 3 | Demaratech? |
| | 4 | A.    I'm going to invoke my right under the |
| 11:38:21 | 5 | Fifth Amendment. |
| | 6 | Q.    Mr. Montgomery, can you explain to me what |
| | 7 | you did at Demaratech, LLC? |
| | 8 | A.    I'm going to invoke my right under the |
| | 9 | Fifth Amendment. |
| 11:38:33 | 10 | Q.    When I deposed Mr. Burgyan, I asked him |
| | 11 | about the source codes -- or intellectual property |
| | 12 | listed on your bankruptcy schedules and I asked him |
| | 13 | if Demaratech was using in its business any of that |
| | 14 | intellectual property that you listed on your |
| 11:38:48 | 15 | bankruptcy schedules. |
| | 16 | Now, he said no, but he said something |
| | 17 | curious.  He said that the -- it was derived.  The |
| | 18 | software that Demaratech was using was derived from |
| | 19 | your intellectual property. |
| 11:39:06 | 20 | Does that sound accurate to you, |
| | 21 | Mr. Montgomery? |
| | 22 | A.    I'm going to invoke my right under the |
| | 23 | Fifth Amendment. |
| | 24 | Q.    In what way is the software that Demaratech |
| 11:39:15 | 25 | is using different than the intellectual property |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
11:39:19    1    you listed on your bankruptcy schedule?

            2        A.    I'm going to invoke my right under the

            3    Fifth Amendment.

            4        Q.    Okay.

11:39:26    5            MR. FLYNN:  Did he get that money for the

            6    use of -- that's listed in the bankruptcy schedule.

            7    BY MR. CONANT:

            8        Q.    Mr. Montgomery, did you receive this

            9    $12,500 for using the -- let me strike that.

11:39:44   10            Is this $12,500 that you received some form

           11    of compensation for Demaratech using your

           12    intellectual property, Mr. Montgomery?

           13        A.    I'm going to invoke my right under the

           14    Fifth Amendment.

11:40:00   15        Q.    All right.  I'm going to turn now to

           16    page 3-29.

           17            MR. FLYNN:  Did you say the date of that

           18    last check?  Put the date on the record.

           19            MR. CONANT:  All right.  For the record,

11:40:15   20    the date of the last check on page dash 3 -- 3-22

           21    Check No. 1520 is dated March 3, 2010.

           22        Q.    Now if you turn with me, Mr. Montgomery, to

           23    page 3-29, if you look on the left-hand column

           24    there's a check, Check No. 5038.

11:40:45   25            Do you see that, Mr. Montgomery?
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 11:40:46 | 1 | A.    Yes. |
| | 2 | Q.    It's made out to Dennis Montgomery. |
| | 3 | Is that you, Mr. Montgomery? |
| | 4 | A.    I presume so. |
| 11:40:51 | 5 | Q.    It's made out in the amount of $12,500. |
| | 6 | Do you see that? |
| | 7 | A.    Yes. |
| | 8 | Q.    Did you receive that $12,500? |
| | 9 | A.    I'm going to invoke my right under the |
| 11:41:00 | 10 | Fifth Amendment. |
| | 11 | Q.    What did you do with that $12,500? |
| | 12 | A.    I'm going to invoke my right under the |
| | 13 | Fifth Amendment. |
| | 14 | Q.    Isn't that $12,500 money you received |
| 11:41:09 | 15 | compensation for use by Demaratech of the |
| | 16 | intellectual property you listed on your bankruptcy |
| | 17 | schedule, Mr. Montgomery? |
| | 18 | A.    I'm going to invoke my right under the |
| | 19 | Fifth Amendment. |
| 11:41:18 | 20 | Q.    Mr. Montgomery, are you aware of any |
| | 21 | efforts by anyone at Demaratech to sell software |
| | 22 | technology to Israel? |
| | 23 | A.    I'm going to invoke my right under the |
| | 24 | Fifth Amendment. |
| 11:41:38 | 25 | MR. CONANT:  I'm going to introduce what's |

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 11:41:40 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:41:57 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:42:10 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:42:26 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:42:39 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 11:43:01 | 25 |

going to be marked as Plaintiff's Exhibit No. 9.

(Exhibit 9 was marked for identification.)

MR. CROCKETT:  Mr. Conant, we don't need to
take a break, but the deponent would like some water
and there doesn't appear to be any more in the room.

MR. CONANT:  There does not appear.

Ms. Wells, you're going to want a copy.

MR. FLYNN:  You're not getting mine,
Mr. Crockett.

MR. CROCKETT:  Not asking for it.

Mr. Conant, we don't need to take a break,
an adjournment, but the deponent would like to have
some water and there isn't any more in the room.

MR. CONANT:  We can recess.

MR. CROCKETT:  Then we'll take a break and
we're getting some water.

THE REPORTER:  Mr. Montgomery, your --
your --

THE WITNESS:  I'm sorry.

MR. CROCKETT:  Get some water and come on
back.

MR. CONANT:  Go off the record.

THE VIDEOGRAPHER:  Going off the record.
The time is 11:43 a.m.

(Break in the proceedings.)

Page 137

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 11:45:12 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:45:19 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:45:36 | 10 |

THE VIDEOGRAPHER:   The time is 11:45 a.m.
We're back on the record.
BY MR. CONANT:
    Q.   All right.  Mr. Montgomery, I don't know if
you've had a chance to review Plaintiff's Exhibit 8,
but, if you haven't --
    A.   You mean 9.
    Q.   I'm sorry, is it Plaintiff's Exhibit 9 now?
         Do you know who George Birnbaum is?
    A.   I don't recall the name specifically.
    Q.   Have you ever contacted -- have you ever
been in contact with anyone associated with the
government of Israel to sell software?
    A.   I'm going to invoke my right under the
Fifth Amendment.
    Q.   Can you please review Plaintiff's Exhibit
No. 9.
    A.   I did.
    Q.   All right.  Now I'm going to read -- I'm
going to represent that this, Plaintiff's Exhibit
No. 9, is an email dated June 30, 2010, from an
email address from Concerned Citizen to Michael
West, who's an FBI agent.
         I'll represent that the Concerned Citizen
email is from a gentleman by the name of George

YATES COURT REPORTERS    800.669.1866

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/20/23 Page 140 of 1046
08-cv-01570-RBK Doc#: 2135-5 Filed 01/14/11 Entered 01/14/11 21:00:40 Page 140 of
345

Dennis Lee Montgomery  -  November 18, 2010

```
11:46:23   1    Birnbaum who is associated with the government of

           2    Israel.

           3        A.   I'm sorry.  I didn't hear that.  That was

           4    my mistake.  What did you say?

11:46:33   5        Q.   Simply describing what this document is,

           6    it's an email from Concerned Citizen to Michael

           7    West, who is an FBI agent.

           8             Concerned Citizen -- the Concerned Citizen

           9    email address is the email address of George

11:46:46  10    Birnbaum.

          11             MR. CROCKETT:  Do you know the source of

          12    this document, counsel?

          13             MR. CONANT:  I do.

          14             MR. CROCKETT:  What is it?

11:46:52  15             MR. CONANT:  I'm not going to -- I'm not

          16    going to state.

          17             MR. CROCKETT:  Then any question you ask is

          18    going to lack foundation until you can explain where

          19    you got this document, which appears to be an email

11:47:03  20    to an FBI agent.

          21             MR. CONANT:  We'll continue on.

          22             MR. CROCKETT:  We will.

          23    BY MR. CONANT:

          24        Q.   It says, "Dear Agent West, per my

11:47:11  25    conversation with Tim Blixseth I'm forwarding to you
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
11:47:11   1    a brief timeline of the events regarding my contact

           2    with Dennis Montgomery and Demaratech.

           3         "It has been their desire from the first

           4    contact to try and sell their technology to various

11:47:19   5    institutions within the Israeli government,

           6    including the Mossad and Army Intelligence."

           7         Mr. Montgomery, is this statement in here

           8    regarding -- where it says Dennis Montgomery and

           9    Demaratech, it has been their desire from the first

11:47:40  10    contact to try and sell their technology to various

          11    institutions of the Israeli government, including

          12    Mossad and Army Intelligence --

          13         MR. CROCKETT:  I'm going to object to the

          14    question and any other question relating to this

11:47:47  15    document.  It is -- the questions lack foundation.

          16    It appears to be argumentative.

          17         This may well be a document that you

          18    fabricated for purposes of these depositions and

          19    unless and until you can identify the source of the

11:48:01  20    document and provide some basis for us to understand

          21    that it's legitimate, you might as well go get a

          22    book of fairy tales and ask him questions out of

          23    those.

          24         I'm going to instruct him not to answer.

11:48:14  25         MR. FLYNN:  I'll authenticate it.  It was
```

Page 140

08-Case-1:23-mc-00973-CKK-MAU-d-Document-1e7-Filed-07/20/23-1-Page-142-af-1046
08-61570-RBK-Doc#: 2135-5-Filed-01/14/11-Entered-01/14/11-23:00:44-Page-142-of-345

Dennis Lee Montgomery  -  November 18, 2010

11:48:16    1    given to us by George Birnbaum from Israel who dealt

            2    directly with Mr. Montgomery and the document

            3    accurately recites, according to Mr. Birnbaum, his

            4    dealings with Mr. Montgomery.

11:48:26    5         The source of the document is George

            6    Birnbaum, government of Israel.

            7         MR. CROCKETT:  I'm delighted to have your

            8    statement, Mr. Flynn, and I will make sure that you

            9    repeat it when you are under oath, but for the

11:48:36   10    moment you're not.

           11         And my objection stands and I'll instruct

           12    him not to answer.

           13         MR. FLYNN:  Keep going.

           14    BY MR. CONANT:

11:48:43   15         Q.   Is this a true statement, Mr. Montgomery,

           16    in any sense?  Has it ever been your desire to sell

           17    technology to various institutions within the

           18    Israeli government?  Is that a true statement,

           19    Mr. Montgomery?

11:48:59   20         MR. CROCKETT:  I'm going to object to the

           21    question on the grounds previously stated and

           22    instruct Mr. Montgomery not to answer.

           23         MR. CONANT:  This is a question of fact.

           24         Q.   Is it -- have you ever had the desire to

11:49:10   25    sell any form of technology to the Israeli

Dennis Lee Montgomery - November 18, 2010

| | | |
|---|---|---|
| 11:49:14 | 1 | government? |
| | 2 | A. I don't recall. |
| | 3 | MR. FLYNN: Did you try to sell it. |
| | 4 | BY MR. CONANT: |
| 11:49:20 | 5 | Q. Did you ever try to sell it? |
| | 6 | THE WITNESS: I can't hear you, Mr. Flynn. |
| | 7 | Can you speak up, please. |
| | 8 | MR. FLYNN: Did you ever try to sell any |
| | 9 | type of -- |
| 11:49:29 | 10 | BY MR. CONANT: |
| | 11 | Q. Did you ever try to sell any form of |
| | 12 | technology to the Israeli government? |
| | 13 | A. Are you referring to this letter? |
| | 14 | Q. I'm asking -- |
| 11:49:38 | 15 | A. Oh. I thought you were referring to this |
| | 16 | exhibit, I'm sorry. |
| | 17 | Q. I'm asking you: Is it a true -- |
| | 18 | A. I don't recall. |
| | 19 | Q. You don't recall. Okay. |
| 11:49:39 | 20 | MR. FLYNN: Have you talked to George |
| | 21 | Birnbaum? |
| | 22 | BY MR. CONANT: |
| | 23 | Q. Have you ever talked to George Birnbaum? |
| | 24 | A. I don't recall. |
| 11:49:42 | 25 | Q. Have you ever talked to anyone associated |

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 11:49:43 | 1 |

with the Israeli government?

2          MR. CROCKETT:  At any point in time about

3    anything?

4          MR. FLYNN:  No, about selling his

11:49:50  5    decoding/decrypting technology.

6    BY MR. CONANT:

7       Q.    About selling -- have you ever talked to

8    anyone at any point in time about selling your

9    decoding or decrypting software to the Israeli

11:50:02  10   government?

11      A.    I'm going to assert my right under the

12   Fifth Amendment.

13          MR. FLYNN:  Did he possess during these

14   dates --

11:50:08  15          THE WITNESS:  Speak up.  If you're going

16   to -- I mean I can't hear him.

17          MR. FLYNN:  Did he have any of this in his

18   possession.  This is a fraud.

19          THE WITNESS:  "This is a fraud."

11:50:17  20   BY MR. CONANT:

21      Q.    Mr. Montgomery, during the month of May did

22   you have in your possession any form of decoding

23   software?

24          MR. CROCKETT:  You're talking about May of

11:50:24  25   this year?  May of what?

Dennis Lee Montgomery  -  November 18, 2010

```
11:50:26    1    BY MR. CONANT:

            2        Q.    May of this year, 2010.

            3        A.    You said May.

            4              I'm going to assert my right under the

11:50:32    5    Fifth Amendment.

            6        Q.    Okay.  Do you know who Leo Josh Kennedy is,

            7    Mr. Montgomery?

            8        A.    I'm going to assert my right under the

            9    Fifth Amendment.

11:50:41   10        Q.    Is Mr. Kennedy the current CEO and

           11    financial backer of Demaratech?

           12              MR. CROCKETT:  Calls for speculation.

           13              THE WITNESS:  Going to assert my right

           14    under the Fifth Amendment.

11:50:52   15              MR. FLYNN:  Did you defraud him.

           16              THE WITNESS:  Is that a statement you just

           17    made?  I can't hear you, Mr. Flynn.  If you're going

           18    to make a statement about fraud about me, say it

           19    loud enough so everybody can hear it; okay?  I'm

11:51:03   20    sick and tired of it.

           21              MR. CROCKETT:  That's enough.

           22              THE WITNESS:  Go ahead.

           23              MR. CROCKETT:  What's the question?

           24    BY MR. CONANT:

11:51:07   25        Q.    Have you defrauded Mr. Kennedy in
```

YATES COURT REPORTERS    800.669.1866

```
11:51:11   1   connection with his investment in Demaratech, LLC?

           2        MR. CROCKETT:  I'll object to the question

           3   as argumentative.  Assumes facts not in evidence.

           4   Calls for speculation.  It may call for a legal

11:51:18   5   conclusion.

           6        I'll instruct the witness not to answer.

           7        MR. FLYNN:  Did he get money from --

           8        THE WITNESS:  Excuse me.

           9   BY MR. CONANT:

11:51:26  10        Q.   Answer the question.

          11        MR. CROCKETT:  No.  I've instructed him not

          12   to answer.

          13        THE WITNESS:  He told me not to answer.

          14   BY MR. CONANT:

11:51:30  15        Q.   So you're not answering the question.

          16        Did you get Mr. Kennedy to invest money in

          17   Demaratech based on representations by you that you

          18   had some special software that could decode

          19   terrorist communications?

11:51:49  20        MR. CROCKETT:  Object to the question as

          21   hopelessly confused.  It assumes facts not in

          22   evidence.  It is lacking in foundation.

          23        Read it back.

          24        I think I have more.

11:52:01  25        Can you read it back, please.
```

Dennis Lee Montgomery  -  November 18, 2010

```
11:52:15    1           THE REPORTER:  Question, "Did you get

            2    Mr. Kennedy to invest money in Demaratech based on

            3    representations by you that you had some special

            4    software that could decode terrorist

11:52:15    5    communications?"

            6           MR. CROCKETT:  I think I stated all my

            7    objections.

            8           THE WITNESS:  I'm asserting my right under

            9    the Fifth.

11:52:27   10    BY MR. CONANT:

           11      Q.   Let's look at this Plaintiff's Exhibit

           12    No. 9.

           13           All right.  Paragraph dated -- starts with

           14    May 14, 2010.

11:52:38   15      A.   Okay.

           16      Q.   I'll read it.  "I was contacted by Dennis

           17    Montgomery for the purpose of walking me through a

           18    presentation showing the potential applications of

           19    various technologies."

11:52:49   20           Mr. Montgomery, on or around May 14, 2010,

           21    were you ever in contact with anyone to give them a

           22    presentation about showing potential applications of

           23    various technologies?

           24      A.   I don't recall.

11:53:04   25      Q.   All right.  Let's look down at the next
```

Dennis Lee Montgomery  -  November 18, 2010

| 11:53:06 | 1 | paragraph, May 18, 2010.  "Dennis Montgomery set up |
| | 2 | a temporary FTP site to which I was directed in |
| | 3 | order for him to show me various applications of his |
| | 4 | technology.  I had to cut the demonstration short |
| 11:53:20 | 5 | and reschedule for May 20." |
| | 6 | Mr. Montgomery, have you ever -- |
| | 7 | A.    Who is "I"?  Who is "I" in this? |
| | 8 | Q.    We've previously represented and |
| | 9 | established on the record that the I refers to |
| 11:53:32 | 10 | George Birnbaum. |
| | 11 | A.    Okay.  I don't recall. |
| | 12 | Q.    All right.  Next paragraph, May 20, 2010, |
| | 13 | "Dennis Montgomery walked me through a very long |
| | 14 | demonstration of the technology applications he |
| 11:53:44 | 15 | wished to have me bring to the attention of the |
| | 16 | Mossad and Israeli military intelligence. |
| | 17 | "They were as follows:  One, decrypting |
| | 18 | Al-Jazeera broadcasts for the purpose of reading |
| | 19 | transmitted messages between Islamic terrorits." |
| 11:54:01 | 20 | It's a typo. |
| | 21 | "Two, identify various cameras via the |
| | 22 | unique footprint of the lenses.  Three, identify |
| | 23 | anomalies from a still photograph such as a |
| | 24 | submarine in the ocean.  Four, ability to identify |
| 11:54:11 | 25 | weapons and faces from video footage of a drone |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
11:54:14    1   aircraft."

            2           Do you see that -- those paragraphs,

            3   Mr. Montgomery?

            4       A.    I heard it.

11:54:20    5       Q.    Is any of that true?  Did you ever contact

            6   anyone to walk them through demonstrations regarding

            7   this type of technology?

            8       A.    I assert my right under the Fifth

            9   Amendment.

11:54:31   10       Q.    Did -- Mr. Montgomery, during President

           11   Obama's inauguration in January of 2009, were you

           12   the cause of any form of terror -- heightened terror

           13   alert in the Washington, D.C., area?

           14           MR. CROCKETT:  Question clearly calls for

11:54:53   15   speculation, unless you're -- are you asking him if

           16   he invoked --

           17           MR. FLYNN:  Did he create.

           18           THE WITNESS:  Did I what?  Speak up,

           19   Mr. Flynn.  What did you say?

11:55:03   20           MR. CROCKETT:  I'm going to instruct him

           21   not to answer the question on the grounds it's

           22   without foundation.  It's argumentative.  Lacks any

           23   factual basis.

           24           Well, I understand --

11:55:17   25           And -- yeah.
```

YATES COURT REPORTERS    800.669.1866

| | |
|---|---|
| 11:55:20 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:55:29 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:55:43 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:55:52 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:56:00 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1           THE WITNESS:  Go ahead.  I'm sorry.

2  BY MR. CONANT:

3      Q.    Mr. Montgomery, in January 2009 did you do

4  anything to create a terror threat within the

5  Washington, D.C., area?

6      A.    No.

7           You are a very ill man.  You are.

8           MR. CROCKETT:  Easy.

9           THE WITNESS:  You really are.  You've taken

10  all of attorney-client information and just handed

11  it to Mr. Blixseth and this attorney.  You have no

12  respect for an attorney-client privilege.  Really.

13  You're a real piece of work.

14           Continue.

15           MR. CONANT:  For the record,

16  Mr. Montgomery's comments were directed toward

17  Mr. Flynn.

18           THE WITNESS:  I'm sorry, you're right.

19           You sit there and accept attorney-client

20  privileged information from my attorney who is now

21  representing Tim Blixseth, it's unbelievable.  It's

22  really unbelievable.

23           I hope there is a show-cause hearing in

24  Montana for who you really represent.

25  ///

Dennis Lee Montgomery  -  November 18, 2010

```
11:56:14   1    BY MR. CONANT:

           2         Q.    Why would it be in Montana, Mr. Montgomery?

           3         A.    I already discussed it.

           4               MR. FLYNN:  How does he know about it?

11:56:21   5               THE WITNESS:  It was on PACER.

           6    BY MR. CONANT:

           7         Q.    Do you monitor PACER?

           8         A.    I've looked at it from time to time.

           9         Q.    How recently did you look at PACER?

11:56:22  10         A.    I don't recall.

          11         Q.    PACER in which jurisdiction,

          12    Mr. Montgomery?

          13         A.    Mine.

          14               MR. FLYNN:  Did he get it from Edra?

11:56:28  15    BY MR. CONANT:

          16         Q.    What do you mean "mine"?

          17         A.    My bankruptcy.

          18         Q.    Your bankruptcy.

          19         A.    Yeah.

11:56:31  20         Q.    Do you ever monitor PACER in Montana, U.S.

          21    District Court -- U.S. Bankruptcy Court in the

          22    District of Montana?

          23               MR. CROCKETT:  This is so far --

          24               MR. CONANT:  You're obstructing,

11:56:38  25    Mr. Crockett.
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 11:56:39 | 1 | THE WITNESS:  I'm not going to answer. |
| | 2 | MR. CROCKETT:  This is so far beyond the |
| | 3 | scope of any relevance to the bankruptcy proceedings |
| | 4 | that I will instruct him not to answer and invite |
| 11:56:47 | 5 | you to take this to the court. |
| | 6 | MR. CONANT:  Mr. Crockett -- |
| | 7 | MR. FLYNN:  Throughout the bankruptcy |
| | 8 | proceeding Mr. Montgomery has been engaged in |
| | 9 | wholesale fraud involving this nonexistent |
| 11:56:57 | 10 | technology, including the attempted sale of a |
| | 11 | purported bankruptcy asset belonging to the trustee |
| | 12 | to the government of Israel. |
| | 13 | THE WITNESS:  That was Mr. Flynn who made |
| | 14 | that statement. |
| 11:57:10 | 15 | MR. CROCKETT:  The record will show that. |
| | 16 | MR. FLYNN:  Correct. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.   What attorney-client communications would |
| | 19 | lead Mr. Flynn to believe that you were causing |
| 11:57:22 | 20 | terror threats in or around January of 2009? |
| | 21 | MR. CROCKETT:  Let me -- you're asking him |
| | 22 | to tell you what the attorney-client communications |
| | 23 | were? |
| | 24 | MR. CONANT:  I'm asking -- |
| 11:57:31 | 25 | MR. CROCKETT:  I'm going to instruct him |

Page 151

Dennis Lee Montgomery  -  November 18, 2010

```
11:57:32   1   not to answer the question.  It's also
           2   argumentative.
           3   BY MR. CONANT:
           4       Q.   When did Mr. Flynn cease to be your
11:57:38   5   attorney?
           6            MR. CROCKETT:  Calls for a legal
           7   conclusion.  Don't answer the question.
           8   BY MR. CONANT:
           9       Q.   When did Mr. Flynn withdraw from being your
11:57:44  10   attorney?
          11            MR. CROCKETT:  Calls for speculation,
          12   unless you have documents in front of you and the
          13   best documents would be the documents by which he
          14   did that.
11:57:53  15            MR. CONANT:  I'm asking Mr. Montgomery the
          16   question.
          17            MR. CROCKETT:  If you have any idea, answer
          18   it.
          19            THE WITNESS:  What's that?
11:57:59  20   BY MR. CONANT:
          21       Q.   When did Mr. Flynn cease being your
          22   attorney?
          23       A.   I don't know specifically the time frame.
          24       Q.   Was it before January 2009 or after
11:58:05  25   January 2009?
```

Page 152

| 11:58:06 | 1 | MR. CROCKETT: Well, this now calls for |
|---|---|---|
| | 2 | speculation. When did he cease representing his |
| | 3 | interest? When did he begin to violate his duty of |
| | 4 | loyalty to him and cease effectively being his |
| 11:58:15 | 5 | attorney? Which are you referring to? |
| | 6 | THE WITNESS: Why are you looking at her? |
| | 7 | MR. CONANT: Mr. Montgomery's question was |
| | 8 | directed towards Mr. Flynn. |
| | 9 | THE WITNESS: Mr. Flynn, I'm sorry. |
| 11:58:27 | 10 | BY MR. CONANT: |
| | 11 | Q. Did you have any involvement with the |
| | 12 | heightened terror alert -- may I finish the |
| | 13 | question, please. |
| | 14 | A. Sorry. |
| 11:58:33 | 15 | Q. Did you have any involvement with the |
| | 16 | heightened terror alert surrounding President |
| | 17 | Obama's inauguration in January of 2009? |
| | 18 | MR. CROCKETT: Are you representing there |
| | 19 | was a heightened terror alert? |
| 11:58:46 | 20 | MR. CONANT: I'm asking a question, |
| | 21 | Mr. Crockett. |
| | 22 | MR. CROCKETT: I object to the question. |
| | 23 | Assumes facts not in evidence. Lacks foundation. |
| | 24 | MR. FLYNN: This could be answered with |
| 11:58:47 | 25 | information on a website. |

Dennis Lee Montgomery  -  November 18, 2010

```
11:58:50   1   BY MR. CONANT:
           2       Q.    Let me ask my previous question:  Did you
           3   have any involvement with the heightened terror
           4   alert surrounding President Obama's inauguration in
11:59:00   5   January 2009?
           6            MR. CROCKETT:  Question is vague.
           7   Ambiguous.  It lacks foundation.  Assumes facts not
           8   in evidence and it's argumentative.
           9   BY MR. CONANT:
11:59:15  10       Q.    What's your answer, Mr. Montgomery?
          11       A.    He told me not to answer the question.
          12       Q.    You refuse to answer the question?
          13       A.    No, I didn't refuse.  My attorney
          14   instructed me not to answer.
11:59:23  15       Q.    What is your answer, Mr. Montgomery?
          16       A.    I don't recall.
          17            MR. CONANT:  You don't recall.
          18            '04, what have we elsewhere where we've got
          19   emails -- whoever praising Mr. Montgomery for his
11:59:47  20   help around the D.C -- in the D.C. area in January
          21   of 2009?
          22            MR. FLYNN:  We'll have to get them during
          23   the break.
          24            MR. CONANT:  Yeah, we'll get them during
11:59:56  25   the break.
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 11:59:57 | 1 | All right. |
| | 2 | MR. FLYNN:  You don't have them.  That's |
| | 3 | not it. |
| | 4 | MR. CONANT:  I've got them somewhere.  I |
| 12:00:05 | 5 | have to find it. |
| | 6 | All right.  I'm going to hand you what's |
| | 7 | going to be marked as Plaintiff's Exhibit No. 10. |
| | 8 | (Exhibit 10 was marked for identification.) |
| | 9 | MR. FLYNN:  Have you got a copy of that? |
| 12:00:37 | 10 | BY MR. CONANT: |
| | 11 | Q.   All right.  Mr. Montgomery, I've handed you |
| | 12 | what's been marked as Plaintiff's Exhibit No. -- |
| | 13 | THE REPORTER:  -- 10. |
| | 14 | BY MR. CONANT: |
| 12:00:49 | 15 | Q.   -- 10.  Do you know -- are you familiar |
| | 16 | with the email address LearG2@AOL.com? |
| | 17 | A.   Yes. |
| | 18 | Q.   Whose email address do you understand that |
| | 19 | to be? |
| 12:00:59 | 20 | A.   Edra's. |
| | 21 | Q.   Edra who? |
| | 22 | A.   Blixseth, sorry. |
| | 23 | Q.   Do you recognize the email address |
| | 24 | Dennis@ncoder.net, Mr. Blixseth -- Mr. Montgomery? |
| 12:01:05 | 25 | A.   Yes. |

Page 155

Dennis Lee Montgomery  -  November 18, 2010

```
12:01:05    1         Q.    Is that your email address?
            2         A.    Yes.
            3         Q.    This is an email dated February 26, 2009,
            4    sent approximately 5:43 p.m. -- well, strike that.
12:01:22    5              The date of the portion I'm about to read,
            6    I think, was sent at a different time.
            7         A.    What?
            8              MR. CROCKETT:  Just let him.
            9    BY MR. CONANT:
12:01:33   10         Q.    "I'm resigning my position within Blxware,
           11    LLC, effective immediately.  I will be leaving D.C.
           12    tonight for California.  I encourage you to talk to
           13    Joe L. directly on how to move Blxware forward
           14    within the government if you desire to do that."
12:01:47   15              Do you see that, Mr. Montgomery?
           16         A.    I saw it.
           17         Q.    Do you recall writing that, Mr. Montgomery?
           18         A.    No.
           19              MR. FLYNN:  Was Edra producing the source
12:01:56   20    codes the next day for her examination.
           21              THE WITNESS:  What's that?  I can't --
           22              MR. CROCKETT:  It's okay.  Let him repeat
           23    it.
           24    BY MR. CONANT:
12:02:02   25         Q.    Do you know what this paragraph is
```

Page 156

Dennis Lee Montgomery  -  November 18, 2010

12:02:03   1   referring to, Mr. Montgomery?

           2       A.    No.

           3       Q.    So it appears to be an email written on

           4   February 26, 2009, from a dennis@ncoder.net, right,

12:02:18   5   and below that, "I'm resigning my position with

           6   Blxware, LLC, effective immediately."

           7           You just testified that's your email

           8   address dennis@ncoder.net.

           9       A.    Yeah, but I have no --

12:02:31  10           MR. CROCKETT:   There's no question pending.

          11   BY MR. CONANT:

          12       Q.    So you're suggesting that you didn't write

          13   that, Mr. Montgomery?

          14           MR. CROCKETT:   That completely

12:02:36  15   misrepresents what he said and it's argumentative.

          16           Don't respond.

          17   BY MR. CONANT:

          18       Q.    Mr. Montgomery, are you suggesting that you

          19   have no connection with this communication here

12:02:46  20   regarding -- that starts with, "I'm resigning my

          21   position with Blxware, LLC, effective immediately"?

          22           MR. CROCKETT:   I'm going to suggest to you

          23   that this appears to be a forgery, because it says,

          24   "In a message dated 2/26/09," and then appears to be

12:02:59  25   a forward of some sort.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 12:03:01 | 1 | What is this?  Where did you get it? |
| | 2 | MR. CONANT:  You're testifying, |
| | 3 | Mr. Crockett. |
| | 4 | MR. CROCKETT:  No, I'm asking questions. |
| 12:03:07 | 5 | MR. CONANT:  It's not important for the |
| | 6 | record. |
| | 7 | MR. FLYNN:  As an officer of the court, |
| | 8 | Mr. Crockett, are you testifying that in your |
| | 9 | opinion this document is a forgery? |
| 12:03:16 | 10 | Would you say that? |
| | 11 | MR. CROCKETT:  I'm not testifying at all, |
| | 12 | Mr. Flynn. |
| | 13 | MR. FLYNN:  Did you suggest this document |
| | 14 | was a forgery? |
| 12:03:22 | 15 | MR. CROCKETT:  I'm suggesting that it |
| | 16 | appears to me to be of an uncertain origin and I've |
| | 17 | asked and been told that I can't know where it came |
| | 18 | from. |
| | 19 | MR. FLYNN:  It was forensically recovered |
| 12:03:35 | 20 | from Jory Russell's computer after Jory Russell on |
| | 21 | the instructions of Edra Blxware attempted to |
| | 22 | destroy the contents of the computer.  It was |
| | 23 | forensically recovered from the Russell computer. |
| | 24 | MR. CROCKETT:  Great. |
| | 25 | /// |

Page 158

YATES COURT REPORTERS      800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 12:03:46 | 1 | BY MR. CONANT: |
| | 2 | Q.    Mr. Montgomery, are you telling me that you |
| | 3 | have no connection with this communication here, |
| | 4 | "I'm resigning my position with Blxware, LLC, |
| 12:03:57 | 5 | effective immediately"? |
| | 6 | A.    I just said I don't recall. |
| | 7 | Q.    Did you -- |
| | 8 | A.    I mean this looks like email fragments that |
| | 9 | you've taken off.  I don't recall.  There's my |
| 12:04:07 | 10 | answer.  That is my answer. |
| | 11 | Q.    Did you ever resign your position with |
| | 12 | Blxware, LLC? |
| | 13 | A.    I don't recall. |
| | 14 | Q.    What does it mean, "I encourage you talk to |
| 12:04:15 | 15 | Joe L. directly on how to move Blxware forward |
| | 16 | within the government if you desire to do that"? |
| | 17 | A.    I don't recall. |
| | 18 | Q.    Do you know who Joe L. is? |
| | 19 | MR. FLYNN:  Did he get -- hundred thousand |
| 12:04:35 | 20 | dollars in connection with -- |
| | 21 | BY MR. CONANT: |
| | 22 | Q.    Do you know who Joe L. is? |
| | 23 | A.    I don't know.  In that reference I'm not |
| | 24 | certain what that means. |
| 12:04:44 | 25 | Q.    Do you know who Joe Libertore is, |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
12:04:45   1    Mr. Montgomery?

           2        A.    Yes.

           3        Q.    Who is Joe Libertore?

           4        A.    A person in the government.

12:04:56   5        Q.    And in what way do you know Mr. Libertore?

           6        A.    I'm going to invoke my right under the

           7    Fifth.

           8        Q.    Wasn't Mr. Libertore a contact within the

           9    United States Air Force that you were working with

12:05:08  10    to sell -- I'm sorry.

          11            Don't you understand Joe Libertore to be a

          12    contact within the United States Air Force?

          13        A.    I'm going to invoke my right under the

          14    Fifth Amendment.

12:05:20  15        Q.    Were you in contact with Mr. Libertore in

          16    connection with your employment at Blxware?

          17        A.    I'm going to invoke my right under the

          18    Fifth Amendment.

          19        Q.    Look down at the paragraph below the

12:05:33  20    paragraph I just read, "Dennis, with all going on,

          21    much of which you encouraged me to move forward

          22    with, why are you doing this at this time?  We had a

          23    plan of action.  You're the key to getting this all

          24    done.

12:05:46  25            "I don't understand.  It is the last thing
```

Page 160

Dennis Lee Montgomery  -  November 18, 2010

| 12:05:49 | 1 | that I thought I would be having to deal with in the |
| | 2 | middle of all this, Edra." |
| | 3 | Do you see that, Mr. Montgomery? |
| | 4 | A.    Yes. |
| 12:05:58 | 5 | Q.    Doesn't this paragraph I just read |
| | 6 | represent a communication by Edra Blixseth to you? |
| | 7 | A.    I wouldn't know.  I mean is it part of that |
| | 8 | email?  I don't know. |
| | 9 | Q.    It is part of that email. |
| 12:06:11 | 10 | A.    Is that what you're representing? |
| | 11 | Q.    I am representing. |
| | 12 | A.    And the middle part -- so I understand |
| | 13 | this, what you're telling me is this is all one |
| | 14 | email?  Is that what you're saying? |
| 12:06:20 | 15 | Q.    This represents a correspondence, email |
| | 16 | correspondence. |
| | 17 | A.    So all the correspondence that's in the |
| | 18 | middle of this document refers to that very specific |
| | 19 | email? |
| 12:06:28 | 20 | MR. FLYNN:  This exhibit, I'm -- |
| | 21 | THE WITNESS:  Wait.  I'm listening to him, |
| | 22 | not -- |
| | 23 | MR. FLYNN:  I'm going to make a |
| | 24 | representation. |
| 12:06:33 | 25 | THE WITNESS:  I don't care what you make. |

Page 161

Dennis Lee Montgomery  -  November 18, 2010

```
12:06:33   1   I'm listening to him, not you.

           2          MR. FLYNN:   This exhibit represents exactly

           3   as depicted what was on the Jory Russell computer.

           4          THE WITNESS:   During Tim Blixseth's

12:06:42   5   discovery?

           6          During Tim Blixseth's discovery?

           7          MR. CROCKETT:   Counsel -- Counsel --

           8          MR. FLYNN:   Taken off the computer by

           9   9th Circuit certified forensic examiner.

12:06:49  10          THE WITNESS:   Can I know the name?  Can I

          11   know the name of that person?

          12          MR. CROCKETT:   Counsel, I need you to

          13   control your client.

          14          MR. FLYNN:   No, you need to control yours,

12:06:54  15   Mr. Crockett.

          16          (Simultaneous colloquy.)

          17          MR. CROCKETT:   The reality of this is that

          18   you're being instructed on how to ask these

          19   questions by a lawyer who is not licensed to

12:07:09  20   practice in this state and is not an attorney in the

          21   case.

          22          If you want him to ask the questions, go

          23   get him admitted pro hoc.

          24          MR. FLYNN:   I'm going to --

12:07:21  25          MR. CONANT:   I don't care what you think
```

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
12:07:21    1   the reality is.  We're moving on.

            2          MR. CROCKETT:  That would be delightful.

            3   Move on.

            4          MR. CONANT:  Never mind.  Never mind.

12:07:29    5    Q.    Okay.  Mr. Montgomery, this represents --

            6   this exhibit here, Exhibit 10, represents a

            7   correspondence between you and Edra Blixseth.

            8          Your representation is, "I'm resigning my

            9   position within Blixseth, LLC, effective

12:07:43   10   immediately."  That is your representation in that

           11   paragraph.

           12          Immediately below that is her communication

           13   back to you, "Dennis, with all going on, much of

           14   which you encouraged me to move forward with, why

12:07:51   15   are you doing this at this time?"  That is her

           16   communication to you.

           17          This is how -- the way that this exhibit

           18   lays out this correspondence is how it was recovered

           19   and printed off of Jory Russell's hard drives.

12:08:04   20          Do you understand that?

           21          MR. CROCKETT:  Yes or no?

           22          THE WITNESS:  No.

           23   BY MR. CONANT:

           24    Q.    Why don't you understand that?

12:08:09   25    A.    By who?  Who recovered it?  Who recovered
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
12:08:12   1   it off Jory Russell's computer?

           2        Q.   Mr. Flynn and --

           3        A.   Mr. Flynn recovered it?

           4        Q.   It came through --

12:08:22   5             MR. FLYNN:  It was sent to the -- hard

           6   drives were sent to that examiner who recovered

           7   that.

           8             MR. CONANT:  Yeah.

           9        Q.   I will represent this was forensically

12:08:31  10   recovered through -- through a third-party guided

          11   software, if I recall correctly, recovered this,

          12   amongst other emails off hard drives recovered from

          13   Jory Russell's laptop computer.

          14             MR. FLYNN:  Is he challenging the

12:08:48  15   authenticity --

          16             THE WITNESS:  You are asking me that or he

          17   is?

          18   BY MR. CONANT:

          19        Q.   I'm asking you.

12:08:59  20        A.   Oh.

          21        Q.   Are you challenging -- are suggesting that

          22   this is a forgery?

          23        A.   I never said it was a forgery.  I would

          24   have no way of knowing that.

12:09:00  25        Q.   Are you representing this is not an
```

Page 164

```
12:09:01    1    authentic communication between you and Edra

            2    Blixseth?

            3        A.   I don't recall.

            4        Q.   You don't recall if you ever had this

12:09:08    5    communication?

            6             MR. CROCKETT:  Asked and answered, Counsel.

            7             MR. CONANT:  All right.

            8             THE WITNESS:  You just keep asking the same

            9    question until you get an answer you want.  I've

12:09:15   10    answered it three times.  I don't recall.

           11    BY MR. CONANT:

           12        Q.   Why would Edra tell you, "With all going

           13    on, much of which you encouraged me to move forward

           14    with, why are you doing this at this time?"

12:09:24   15             MR. CROCKETT:  Calls for speculation.  I'll

           16    instruct him not to answer.

           17    BY MR. CONANT:

           18        Q.   I'm asking you:  You have a relationship

           19    with Edra Blixseth, do you not, Mr. Montgomery?

12:09:31   20        A.   I know Edra Blixseth.

           21        Q.   Can you explain to me your prior business

           22    relationship with Edra Blixseth?

           23        A.   No.

           24        Q.   Why can you not --

12:09:35   25        A.   I'll take the Fifth.  I'll assert the right
```

Page 165

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 12:09:38 | 1 |

under the Fifth.

2    Q.    Mr. Montgomery, how does your relationship

3  with Edra Blixseth implicate you in any criminal

4  proceeding?

12:09:46    5         MR. CROCKETT:  Don't answer that question.

6  BY MR. CONANT:

7    Q.    Mr. Montgomery, you are under indictment by

8  the Clark County D.A. for the state of Nevada, are

9  you not?

12:09:54   10    A.    I'll assert my right under the Fifth

11  Amendment.

12         What, are you upset because I asserted my

13  right?  I'm still going to assert it.

14         MR. FLYNN:  C.J., let's break for lunch.

12:10:07   15         MR. CONANT:  Want to break for lunch?  Let

16  me just finish this last one.

17         I'm going to hand Mr. Montgomery what's

18  going to be marked as Plaintiff's Exhibit No. 11.

19         (Exhibit 11 was marked for identification.)

12:10:23   20         THE WITNESS:  Thank you.

21         MR. CONANT:  All right.  Plaintiff's

22  Exhibit No. 11 is represented to be a Summons issued

23  by the District Court for Clark County, Nevada.  I

24  will represent that I received this document in its

12:10:46   25  form, in the current -- in its current form from

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery - November 18, 2010

```
12:10:48   1   Mr. Montgomery's counsel Steve Skirvin.
           2           Why there appears to be three separate
           3   copies of the same indictment, I don't know, but
           4   this is the way I received it from Mr. Skirvin.
12:11:02   5       Q.   Mr. Montgomery, isn't it true you are under
           6   indictment by the Clark County district attorney for
           7   obtaining money under false pretenses?
           8       A.   I'll going to assert my right under the
           9   Fifth Amendment.
12:11:14  10       Q.   All right.  Theft, Mr. -- are you under
          11   indictment by the Clark County DA for theft?
          12       A.   I'll assert my right under the Fifth
          13   Amendment.
          14       Q.   Are you under indictment for drawing and
12:11:20  15   passing a check without sufficient funds in drawee
          16   bank with intent to defraud?
          17       A.   I'm going to assert my right under the
          18   Fifth Amendment.
          19       Q.   Are you aware -- okay.  So we're aware of
12:11:29  20   this indictment against you, Mr. Montgomery.
          21           Are you aware of any other criminal
          22   proceedings against you?
          23       A.   I'll assert my right under the Fifth
          24   Amendment.
12:11:39  25       Q.   Can you explain to me your current
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 12:11:42 | 1 | relationship with Edra Blixseth? |
| | 2 | A.   I'll assert my right under the Fifth |
| | 3 | Amendment. |
| | 4 | MR. CONANT:  Let's break for lunch. |
| 12:11:47 | 5 | THE VIDEOGRAPHER:  Going off the record. |
| | 6 | The time is 12:11 p.m. |
| | 7 | (Luncheon recess.) |
| | 8 | THE VIDEOGRAPHER:  The time is 1:17 p.m. |
| | 9 | We're back on the record. |
| 13:17:19 | 10 | MR. CONANT:  All right.  Mr. Montgomery. |
| | 11 | Can we just -- do we need to swear him back |
| | 12 | in? |
| | 13 | THE REPORTER:  No. |
| | 14 | BY MR. CONANT: |
| 13:17:28 | 15 | Q.   Where do you currently reside, |
| | 16 | Mr. Montgomery? |
| | 17 | A.   My address? |
| | 18 | Q.   Yes. |
| | 19 | A.   6 Toscana Way West, Rancho Mirage, |
| 13:17:35 | 20 | California. |
| | 21 | Q.   Where do you currently work? |
| | 22 | A.   Out of my home. |
| | 23 | Q.   What do you do, currently? |
| | 24 | A.   I'm unemployed. |
| 13:17:47 | 25 | Q.   Do you have any form of income right now, |

YATES COURT REPORTERS     800.669.1866

```
13:17:49   1   Mr. Montgomery?

           2       A.    No.

           3       Q.    All right.  All right.  Let's go back and

           4   talk about Mr. Birnbaum.

13:18:02   5            Do you remember our discussion with

           6   Mr. Birnbaum, Mr. Montgomery?

           7       A.    Not really.

           8       Q.    Have you ever talked to George Birnbaum?

           9            MR. CROCKETT:  Asked and answered.

13:18:23  10   BY MR. CONANT:

          11       Q.    So your answer, Mr. Montgomery?

          12       A.    Asked and answered.

          13            MR. CONANT:  All right.  I'm going to

          14   hand -- well, I'll hand it to the court reporter so

13:18:33  15   she can mark it Plaintiff's Exhibit --

          16            THE REPORTER:  12.

          17            MR. CONANT:  -- 12.

          18            (Exhibit 12 was marked for identification.)

          19            MR. CONANT:  Copy for you.

13:18:51  20            MR. FLYNN:  Copy for --

          21            MS. WELLS:  Is this ours to work with?

          22            MR. FLYNN:  C.J., you got something to work

          23   with?

          24            MR. CONANT:  I'll wing it.

13:19:04  25            Find my copy here.
```

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:19:06 | 1 | Q. Can you review that email, Mr. Montgomery? |
| | 2 | A. Yeah, I did. |
| | 3 | Q. All right. Did you read down at the bottom |
| | 4 | where -- I'll represent this is an email |
| 13:19:15 | 5 | correspondence between Tim Blixseth and George |
| | 6 | Birnbaum dated, approximately, November -- well, let |
| | 7 | me pull up my copy here. |
| | 8 | All right. Now at the bottom, |
| | 9 | Mr. Montgomery, you'll see the email correspondence |
| 13:19:51 | 10 | begins down at the bottom dated November 11, 2010. |
| | 11 | Tim Blixseth writes to George Birnbaum, "George, he |
| | 12 | was indicted yesterday. Best regards, Tim |
| | 13 | Blixseth." The subject in this email is |
| | 14 | "Montgomery." |
| 13:20:09 | 15 | George Birnbaum writes, "Happy days. The |
| | 16 | guy is bad news. I know the Israelis helped Feds |
| | 17 | here. One of the reasons I had to go dark on the |
| | 18 | issue. All the best." |
| | 19 | Mr. Montgomery, do you have any reason -- |
| 13:20:29 | 20 | do you know why Mr. Birnbaum would be -- would you |
| | 21 | have knowledge of your involvement with the Israeli |
| | 22 | government? |
| | 23 | MR. CROCKETT: I'll object to the question. |
| | 24 | There's no foundation for this document. There is |
| 13:20:42 | 25 | no factual basis that you've established that he |

Dennis Lee Montgomery   -   November 18, 2010

| 13:20:46 | 1 | would have any reason to understand what this email |
| | 2 | is about.  It calls for speculation. |
| | 3 | If you can answer the question, go ahead. |
| | 4 | THE WITNESS:  I don't recall. |
| 13:20:58 | 5 | BY MR. CONANT: |
| | 6 | Q.   You don't recall? |
| | 7 | A.   I don't -- I don't understand this |
| | 8 | document. |
| | 9 | Q.   Do you know -- do you know why the Israeli |
| 13:21:04 | 10 | government would be investigating you, |
| | 11 | Mr. Montgomery? |
| | 12 | MR. CROCKETT:  Are you representing that |
| | 13 | they are? |
| | 14 | THE WITNESS:  You are? |
| 13:21:15 | 15 | MR. CONANT:  I'm asking a question if he |
| | 16 | knows. |
| | 17 | MR. CROCKETT:  If he knows why they would |
| | 18 | be? |
| | 19 | MR. CONANT:  Yeah. |
| 13:21:18 | 20 | MR. CROCKETT:  That would presume that they |
| | 21 | are.  Do you know that they are?  Are you |
| | 22 | representing that they are? |
| | 23 | BY MR. CONANT: |
| | 24 | Q.   Do you know why the Israeli government |
| 13:21:26 | 25 | would be? |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
13:21:27   1        MR. CROCKETT:  Oh, Lord.  Calls for
           2   speculation and it's argumentative.  I'll instruct
           3   you not to answer.
           4        THE WITNESS:  My attorney said not to
13:21:33   5   answer; I'm not going to answer.
           6        MR. CONANT:  Mr. Crockett, you're -- you
           7   are, in effect, trying to replace your testimony for
           8   Mr. Montgomery's testimony.
           9        MR. CROCKETT:  Would you like to adjourn
13:21:44  10   and we'll take this to the judge?  Would you like
          11   to?  I'd be delighted to do that.
          12        MR. CONANT:  I would like you to stop
          13   obstructing --
          14        MR. CROCKETT:  I'm going to do what I think
13:21:55  15   I need to do.  Counsel, if you don't like it, you're
          16   welcome to take it to the court.
          17        MR. CONANT:  You feel it appropriate to
          18   obstruct your client from answering.
          19        MR. CROCKETT:  Just like the last question
13:22:00  20   that you asked, you are assuming things that aren't
          21   true and that you haven't any evidence of.
          22        Now if you'd like to ask a question, go
          23   ahead.
          24        MR. CONANT:  Mr. Crockett, you understand
13:22:10  25   the difference between being in trial and asking a
```

13:22:14   1   witness questions at trial versus asking a

2   witness --

3          MR. CROCKETT:  Do you have a question for

4   the witness?

13:22:20   5          MR. CONANT:  I'm not done with my

6   statement.

7          Do you understand the difference between

8   examining a witness in trial and examining a witness

9   at a deposition, Mr. Crockett?

13:22:29  10          MR. CROCKETT:  Counsel, I'm not to going to

11  dignify that with a response.  If you have a

12  question, you can ask it.

13          MR. CONANT:  So you have -- you do not

14  understand the difference, Mr. Crockett?

13:22:34  15          MR. CROCKETT:  I understand what I

16  understand.  You need to be asking questions of the

17  witness, not of me, Counsel.

18          MR. CONANT:  Great.

19          MR. CROCKETT:  If you don't understand

13:22:41  20  that, you must not have ever taken a deposition

21  before.

22  BY MR. CONANT:

23      Q.   Okay.  Mr. Montgomery, have you ever had

24  any contact with the Israeli government concerning

13:22:52  25  any form of software that you own?

13:22:55  1      A.    I'm going to invoke my right under the

2      Fifth Amendment.

3      Q.    Are you aware of any federal investigation

4      of you concerning your attempts to sell software to

13:23:03  5      the Israeli government?

6      A.    I'm going to invoke my right under the

7      Fifth Amendment.

8      Q.    Have you told anyone in the Israeli

9      government in any form of words that you were having

13:23:15  10     your name cleared by the United States government?

11     A.    I'm going to invoke my right under the

12     Fifth Amendment.

13     Q.    Mr. Montgomery, has Edra Blixseth made any

14     effort to connect you to the Israeli government in

13:23:42  15     an effort to sell your software?

16          MR. CROCKETT:  Calls for speculation.

17     Assumes facts not in evidence.  Lacks factual

18     predicate.

19          THE WITNESS:  I'm going to assert my right

13:23:57  20     under the Fifth Amendment.

21     BY MR. CONANT:

22     Q.    And has Ron Burkle had any involvement in

23     you getting connected with the Israeli government in

24     an attempt to sell your software to the government?

13:23:59  25     A.    I don't even know who that is.

Dennis Lee Montgomery - November 18, 2010

| | | |
|---|---|---|
| 13:24:14 | 1 | Q. Have you ever discussed Ron Burkle with |
| | 2 | Edra Blixseth? |
| | 3 | A. I just told you I don't who that person is. |
| | 4 | Q. Have you ever heard the name Ron Burkle? |
| 13:24:25 | 5 | A. I don't -- I don't know. |
| | 6 | MR. CONANT: All right. I'm going to -- |
| | 7 | let's see. I'm going to introduce Plaintiff's |
| | 8 | Exhibit No. -- |
| | 9 | 13? |
| 13:25:16 | 10 | THE REPORTER: Yes. |
| | 11 | (Exhibit 13 was marked for identification.) |
| | 12 | THE WITNESS: Thanks. |
| | 13 | THE REPORTER: Welcome. |
| | 14 | BY MR. CONANT: |
| 13:25:32 | 15 | Q. All right. Mr. Montgomery, I'm going to |
| | 16 | represent this is a copy of an email that we pulled |
| | 17 | off of Jory Russell's computer. |
| | 18 | A. Okay. |
| | 19 | Q. Again, at the top you'll see a From |
| 13:25:47 | 20 | LearG2@aol.com below that the To line |
| | 21 | dennis@ncoder.net below that beginning of a |
| | 22 | sentence, "In a message dated 2/26/09 |
| | 23 | dennis@ncoder.net writes, Joe L., facility |
| | 24 | installation is scheduled for tomorrow. He has |
| 13:26:11 | 25 | waited two months for it. I just told him to cancel |

Page 175

| | | |
|---|---|---|
| 13:26:14 | 1 | it and I'm going home. |
| | 2 | "Brian is having a baby (scheduled |
| | 3 | C-section) tomorrow. I was going to stay and work |
| | 4 | on the installation since it has taken two months to |
| 13:26:22 | 5 | get the right people here, but not now." |
| | 6 | Do you see that, Mr. Montgomery? |
| | 7 | A. Yes. |
| | 8 | Q. Did you write that, Mr. Montgomery? |
| | 9 | A. I don't recall. |
| 13:26:29 | 10 | Q. Do you understand the context for that -- |
| | 11 | what I just read? |
| | 12 | A. Well, if the Brian is my son, that must |
| | 13 | have been when his son was born, I guess. |
| | 14 | Q. So who is the Joe L. that you're referring |
| 13:26:41 | 15 | to? |
| | 16 | A. I don't recall writing this. You just |
| | 17 | asked me that. |
| | 18 | Q. Would it be Joe Libertore? |
| | 19 | A. It could be. |
| 13:26:47 | 20 | Q. What would "facility installation" refer |
| | 21 | to? |
| | 22 | MR. CROCKETT: Are you asking him to |
| | 23 | speculate? |
| | 24 | MR. CONANT: I'm asking him to answer the |
| 13:26:55 | 25 | question, Mr. Crockett. |

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery - November 18, 2010

|  |  |  |
|--|--|--|
| 13:26:56 | 1 | THE WITNESS: I don't recall. You asked me |
|  | 2 | if I wrote this, I said I don't recall. You're |
|  | 3 | referencing you got it off a hard drive, so I've |
|  | 4 | answered it. |
| 13:27:01 | 5 | BY MR. CONANT: |
|  | 6 | Q. Is that not your email address, |
|  | 7 | dennis@ncoder.net? |
|  | 8 | A. Yeah. Sure. You asked me that, I said |
|  | 9 | yes. |
| 13:27:09 | 10 | Q. And then below that paragraph I just |
|  | 11 | wrote -- I just read it says, "Why Dennis?" |
|  | 12 | A. You asked me if I recall this email. I |
|  | 13 | said I don't, so why that's on there I don't know. |
|  | 14 | Q. Do you recognize the "why Dennis" as being |
| 13:27:23 | 15 | from Edra Blixseth? |
|  | 16 | A. You mean those two words, "Why Dennis?" |
|  | 17 | Ever used in my life, ever, or only in this email? |
|  | 18 | Q. I'm asking the "Why Dennis," right here in |
|  | 19 | this email? |
| 13:27:34 | 20 | A. I have no idea. |
|  | 21 | MR. CONANT: All right. I'm going to |
|  | 22 | introduce what's going to be marked as Plaintiff's |
|  | 23 | Exhibit 14. |
|  | 24 | (Exhibit 14 was marked for identification.) |
| 13:28:11 | 25 | MR. CONANT: Actually -- yeah. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:28:14 | 1 | I don't have a copy for them. |
| | 2 | MR. FLYNN:  You're going to need this; |
| | 3 | right? |
| | 4 | MR. CONANT:  Uh-huh. |
| 13:28:31 | 5 | Q.   All right.  Have you had a chance to read |
| | 6 | this email, Mr. Montgomery? |
| | 7 | A.   No. |
| | 8 | MR. FLYNN:  While he's reading it, let them |
| | 9 | read. |
| 13:28:42 | 10 | (Witness reads.) |
| | 11 | THE WITNESS:  Okay. |
| | 12 | BY MR. CONANT: |
| | 13 | Q.   All right. |
| | 14 | All right.  Do you recall -- this is an |
| 13:29:19 | 15 | email that purports to be from LearG2@aol.com and |
| | 16 | you recognize that's Edra Blixseth's email? |
| | 17 | A.   Yes. |
| | 18 | Q.   And it's to dennis@ncoder.net. |
| | 19 | Do you see that, Mr. Montgomery? |
| 13:29:32 | 20 | A.   Yes. |
| | 21 | Q.   And that's your email address, isn't it? |
| | 22 | A.   Yes. |
| | 23 | Q.   It's dated August 27, 2008? |
| | 24 | MR. CROCKETT:  Document speaks for itself. |
| 13:29:40 | 25 | THE WITNESS:  Yes. |

YATES COURT REPORTERS    800.669.1866

```
13:29:40    1   BY MR. CONANT:
            2       Q.   Okay.  Now -- so this is an email that you
            3   received from Edra Blixseth; is that correct?
            4       A.   I don't know if I received it or not, but I
13:29:47    5   see who sent it.
            6       Q.   Do you -- okay.
            7            Now I want to read the first full paragraph
            8   of the text starting with the first full sentence
            9   from Edra, "We are going over numbers and ways to
13:30:04   10   make this start paying for itself."
           11       A.   Where is this at?
           12            MR. CROCKETT:  What?
           13   BY MR. CONANT:
           14       Q.   First full paragraph of text in the email,
13:30:11   15   second sentence.
           16            MR. CROCKETT:  First full paragraph starts,
           17   "Dennis."
           18            THE WITNESS:  "Dennis, I wanted to write."
           19   BY MR. CONANT:
13:30:19   20       Q.   All right.  Correction, second full
           21   paragraph.
           22       A.   Okay.
           23       Q.   "We are going over numbers and ways to make
           24   this start paying for itself.  You, as always, are
13:30:26   25   the key to our success."
```

Page 179

Dennis Lee Montgomery  -  November 18, 2010

13:30:29   1          Now above that she says, "Dennis, I wanted

2      to write as I'm very excited about what might be

3      doors we can get open now and start monetizing

4      Blxware."

13:30:40   5          Why would Edra say, "You are the key to our

6      success"?

7              MR. CROCKETT:  Your question by its nature

8      calls for speculation and is objectionable on that

9      basis.

13:30:48  10          I'll instruct you not to answer.

11     BY MR. CONANT:

12         Q.   Mr. Montgomery, answer the question,

13     please.

14         A.   My attorney told me not to answer the

13:30:55  15     question.

16         Q.   Mr. Montgomery, have you ever had any

17     conversation with Ms. Blixseth about you being the

18     key to Blxware's success?

19         A.   I don't know.

13:31:07  20         Q.   Why would Edra Blixseth say such a thing to

21     you?

22              MR. CROCKETT:  Calls for speculation.

23     Lacks factual predicate and lacks foundation.

24     BY MR. CONANT:

13:31:18  25         Q.   Mr. Montgomery, please explain to me your

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:31:21 | 1 | prior business relationship with Edra Blixseth. |
| | 2 | MR. CROCKETT:  Asked and answered. |
| | 3 | BY MR. CONANT: |
| | 4 | Q.    Can you refresh my memory as to the answer, |
| 13:31:29 | 5 | Mr. Montgomery? |
| | 6 | A.    I've already answered it. |
| | 7 | Q.    Isn't it true that you worked for Blxware, |
| | 8 | Mr. Montgomery? |
| | 9 | A.    Yes. |
| 13:31:35 | 10 | Q.    Isn't if true that Edra Blixseth owned |
| | 11 | Blxware? |
| | 12 | A.    I believe so. |
| | 13 | Q.    So you had a business relationship with |
| | 14 | Edra Blixseth, did you not? |
| 13:31:46 | 15 | MR. CROCKETT:  Sounds like he had a |
| | 16 | business relationship with Blxware. |
| | 17 | THE WITNESS:  Are you waiting for his |
| | 18 | question? |
| | 19 | BY MR. CONANT: |
| 13:31:57 | 20 | Q.    No, I'm actually waiting for you. |
| | 21 | A.    What was the question?  I was waiting for |
| | 22 | his.  I got excited, distracted me as usual. |
| | 23 | So what was the question? |
| | 24 | Q.    So you had a business relationship with |
| 13:32:08 | 25 | Ms. Blixseth, didn't you? |

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:32:10 | 1 | A.    I'm going to assert my right under the |
| | 2 | Fifth Amendment. |
| | 3 | Q.    And you had a business relationship with |
| | 4 | Ms. Blixseth -- I'm sorry, strike that. |
| 13:32:17 | 5 | You had a business relationship with |
| | 6 | Blxware, didn't you? |
| | 7 | A.    I'm going to assert the right under the |
| | 8 | Fifth. |
| | 9 | Q.    Mr. Montgomery, weren't you the key |
| 13:32:26 | 10 | software developer for Blxware? |
| | 11 | A.    I'm going to assert my right under the |
| | 12 | Fifth. |
| | 13 | Q.    Weren't you the most valuable asset for |
| | 14 | Blxware in that regard? |
| 13:32:39 | 15 | A.    I'm going to assert the right under the |
| | 16 | Fifth. |
| | 17 | Q.    All right.  Now let's read this, I guess, |
| | 18 | third full paragraph from Edra to you.  "We need the |
| | 19 | source code, (not about court about our business,)" |
| 13:32:53 | 20 | end quote -- or I'm sorry.  Let me start over. |
| | 21 | "We need the source code, (not about court |
| | 22 | about our business,) so we can have it in the proper |
| | 23 | safe place to be evaluated and then we can monetize" |
| | 24 | your "work"? |
| 13:33:08 | 25 | A.    I thought it said "our." |

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:33:10 | 1 | Q.   I'm sorry, you're right, "our work." |
| | 2 | This is, "This has to be done before we |
| | 3 | can.  I know you know this and have been saying we |
| | 4 | can get it done, but now we simply have to, Dennis." |
| 13:33:28 | 5 | Did Ms. Blixseth ever ask you for the |
| | 6 | source code, Mr. Montgomery? |
| | 7 | MR. CROCKETT:  Question is vague and |
| | 8 | ambiguous as to the use of the term "source code." |
| | 9 | What source code are you referring to? |
| 13:33:39 | 10 | MR. CONANT:  I'm asking for the source code |
| | 11 | referenced in this email. |
| | 12 | MR. CROCKETT:  He didn't write this email. |
| | 13 | Calls for speculation.  I'll object on that basis. |
| | 14 | MR. CONANT:  You're instructing the witness |
| 13:33:50 | 15 | on how to testify, Mr. Crockett, for the record. |
| | 16 | MR. CROCKETT:  I'm objecting, for the |
| | 17 | record, Counsel, because after you clarified your |
| | 18 | question it became obvious you were calling upon him |
| | 19 | to speculate. |
| 13:34:04 | 20 | If you can answer, go ahead. |
| | 21 | THE WITNESS:  I'd have to speculate.  I |
| | 22 | don't know. |
| | 23 | MR. CONANT:  I think the coaching of the |
| | 24 | witness was clear there. |
| 13:34:11 | 25 | MR. CROCKETT:  Once again, Mr. Conant, I'm |

Dennis Lee Montgomery  -  November 18, 2010

13:34:13   1   delighted to go in front of a judge with this

2   transcript.

3          MR. CONANT:  Have you told your client yet,

4   Mr. Crockett, that the judge has already said he

13:34:21   5   and, probably, you will be paying Mr. Flynn's

6   attorney's fees for us having to file a motion to

7   compel?

8          MR. CROCKETT:  Is that question?

9          MR. CONANT:  Yes.  Have you told your

13:34:31  10   client that, Mr. Crockett?

11          MR. CROCKETT:  When you take my deposition

12   I'll be glad to answer.

13          MR. CONANT:  Wonderful.  (Inaudible.)

14          THE WITNESS:  I'm sorry, I didn't hear

13:34:36  15   that.

16          MR. CONANT:  Ms. Borthwick, did you hear

17   that?

18          THE REPORTER:  No.

19          THE WITNESS:  I thought it was something

13:34:40  20   you were saying to me.

21   BY MR. CONANT:

22      Q.   Now this source code, Mr. Montgomery, was

23   this the decoding software that we previously read

24   about?

13:34:52  25      A.   I'd have no way of knowing.

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:34:54 | 1 | Q.   Did Blxware ever use or attempt to use the |
| | 2 | decoding software that we read about in the -- I |
| | 3 | believe Plaintiff's Exhibit 3? |
| | 4 | A.   It's very distracting when he does this, |
| 13:35:10 | 5 | when you stop, continuously, let Flynn ask the |
| | 6 | question. |
| | 7 |     I'm sorry, go ahead. |
| | 8 | Q.   You can go ahead and answer. |
| | 9 | A.   I don't even remember the question.  When |
| 13:35:19 | 10 | you do that, you distract me and then I forget. |
| | 11 | Q.   Oh, I apologize. |
| | 12 | A.   Okay.  I appreciate that. |
| | 13 | Q.   In August of '08, Mr. Montgomery, did you |
| | 14 | have the decoding software that Ms. Blixseth was |
| 13:35:39 | 15 | demanding of you here in this email? |
| | 16 |     MR. CROCKETT:  I believe that |
| | 17 | mischaracterizes this document. |
| | 18 |     MR. CONANT:  I'll rephrase. |
| | 19 |     MR. CROCKETT:  Show me where it says |
| 13:35:48 | 20 | "decoding source code." |
| | 21 | BY MR. CONANT: |
| | 22 | Q.   Remember, Mr. Montgomery, when we were |
| | 23 | looking through Plaintiff's Exhibit 3 and there was |
| | 24 | all this reference to decoding code? |
| 13:35:58 | 25 | A.   What's Exhibit 3? |

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:35:59 | 1 | Q.    Your declaration where you make a bunch of |
| | 2 | representations about having decoding software. |
| | 3 | A.    Oh. |
| | 4 | Q.    All right.  Let me go back and just |
| 13:36:46 | 5 | rephrase it. |
| | 6 | In August of 2008 did you have any source |
| | 7 | code in your possession that Edra Blixseth was |
| | 8 | demanding that you provide her? |
| | 9 | A.    I don't recall. |
| 13:36:57 | 10 | I don't have that exhibit.  I don't know |
| | 11 | where it is. |
| | 12 | THE REPORTER:  It's in there. |
| | 13 | THE WITNESS:  Is it?  I just was going in |
| | 14 | reverse order.  I didn't -- |
| 13:37:06 | 15 | MR. CROCKETT:  It's the large one. |
| | 16 | THE WITNESS:  Yeah, I know. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.    Mr. Montgomery, did you ever provide any |
| | 19 | source code to Blxware, LLC? |
| 13:37:19 | 20 | A.    You mean did I write any? |
| | 21 | Q.    Did you provide Blxware, LLC, with any |
| | 22 | source code? |
| | 23 | A.    As of when? |
| | 24 | Q.    Any time you were working for Blxware. |
| 13:37:35 | 25 | A.    Did I ever write any source code any time I |

Page 186

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:37:37 | 1 | ever worked for Blxware?  Is that the question?  I'm |
| | 2 | confused, so I want to make sure I understand it. |
| | 3 | Q.    Okay.  Did you ever provide any -- did you |
| | 4 | ever write any source code for Blxware while you |
| 13:37:46 | 5 | were working for Blxware? |
| | 6 | A.    Yes. |
| | 7 | Q.    What was that source code? |
| | 8 | A.    I don't recall specifically. |
| | 9 | Q.    Did you ever assign any of your rights in |
| 13:37:57 | 10 | any source code to Blxware, LLC? |
| | 11 | A.    Did I ever assign. |
| | 12 | I don't -- I'm not certain. |
| | 13 | Q.    Isn't it true that in August of 2008 Edra |
| | 14 | Blixseth was asking you to provide her with your |
| 13:38:17 | 15 | source code? |
| | 16 | A.    I don't recall. |
| | 17 | Q.    Notwithstanding this email here where she |
| | 18 | says we need the source code, you don't recall, |
| | 19 | Mr. Montgomery? |
| 13:38:30 | 20 | A.    I don't recall specifically in 2008 on that |
| | 21 | date where I met or where we were at. |
| | 22 | It's very distracting when he does that. |
| | 23 | Q.    I apologize. |
| | 24 | A.    Okay.  You've apologized, but he keeps |
| 13:38:44 | 25 | doing it.  It's hard to give a deposition when he's |

Page 187

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:38:47 | 1 | doing what he's doing and you're asking me |
| | 2 | questions. |
| | 3 | Q.    Mr. Montgomery -- |
| | 4 | A.    I'm listening. |
| 13:38:52 | 5 | Q.    -- has Ms. Blixseth ever asked you to |
| | 6 | provide Blxware with any source code ever? |
| | 7 | A.    I don't recall. |
| | 8 | Q.    Isn't it true that you've never provided |
| | 9 | Blxware with any sort of source code? |
| 13:39:05 | 10 | A.    No. |
| | 11 | Q.    Isn't it true that the purpose of -- let me |
| | 12 | strike that. |
| | 13 | Were you trying -- I'm sorry.  Let me |
| | 14 | strike that. |
| 13:39:25 | 15 | When you were at Blxware was Blxware |
| | 16 | attempting to procure a hundred million dollar |
| | 17 | contract from the United States Government? |
| | 18 | A.    I'm going to assert my right under the |
| | 19 | Fifth Amendment. |
| 13:39:36 | 20 | Q.    Were you involved in trying to get a |
| | 21 | hundred million dollar contract from the |
| | 22 | United States Government? |
| | 23 | A.    Going to assert my right under the Fifth |
| | 24 | Amendment. |
| 13:39:43 | 25 | Q.    Didn't Blxware receive approximately |

Page 188

```
13:39:45   1    $2.5 million from the United States Government,

           2    Mr. Montgomery?

           3        A.   I'm going to assert my right under the

           4    Fifth Amendment.

13:39:52   5        Q.   Wasn't that $2.5 million Blxware received

           6    paid as compensation to Blxware for fraudulent

           7    software?

           8        A.   I'm going to assert my right under the

           9    Fifth Amendment.

13:40:04  10        Q.   Isn't it true that Blxware never had any

          11    software that purported to do what Blxware was

          12    representing it would do to the United States

          13    Government?

          14        A.   I'm going to assert my right under the

13:40:18  15    Fifth Amendment.

          16            MR. CONANT:  All right.  I'm going to hand

          17    you what's going to be marked as Plaintiff's

          18    Exhibit 15.

          19            (Exhibit 15 was marked for identification.)

13:40:35  20            MR. CONANT:  If you can hand it back --

          21            MR. CROCKETT:  Well, it's short and sweet.

          22            MR. CONANT:  Are you still looking at the

          23    email?

          24            MR. FLYNN:  Try to get me to --

          25    ///
```

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:41:30 | 1 | BY MR. CONANT: |
| | 2 | Q. Mr. Montgomery, in approximately February |
| | 3 | of 2009, were you ever scheduled to have dinner with |
| | 4 | the Secret Service? |
| 13:41:40 | 5 | A. Not that I recall. |
| | 6 | MR. FLYNN: Was Edra. |
| | 7 | BY MR. CONANT: |
| | 8 | Q. Was Edra Blixseth ever scheduled to have |
| | 9 | dinner with the Secret Service? |
| 13:41:50 | 10 | A. I have no idea. |
| | 11 | Q. Can you, Mr. Montgomery, tell me about any |
| | 12 | discussions you had with Edra Blixseth regarding the |
| | 13 | Blxware software? |
| | 14 | A. What's the Blxware software? |
| 13:42:05 | 15 | Q. Wasn't Blxware -- wasn't Blxware producing |
| | 16 | some form of software product? |
| | 17 | A. Yes. |
| | 18 | Q. And did you ever have discussions with Edra |
| | 19 | Blixseth regarding that software? |
| 13:42:18 | 20 | A. Which specific piece of software are you |
| | 21 | referring to? |
| | 22 | Q. Any software. |
| | 23 | A. I'm sure at some point I must have. |
| | 24 | Q. Was there any software that Blxware was |
| 13:42:27 | 25 | developing to decode Al-Jazeera communications? |

Dennis Lee Montgomery  -  November 18, 2010

| 13:42:34 | 1 | A.    I'm going to assert my right under the |
| | 2 | Fifth Amendment. |
| | 3 | Q.    Was there any software that Blxware was |
| | 4 | purporting to develop that was to be used to detect |
| 13:42:38 | 5 | terrorist attacks? |
| | 6 | A.    I'm going to assert my right under the |
| | 7 | Fifth Amendment. |
| | 8 | Q.    Now you chuckled there. |
| | 9 | A.    Well, because I'm tired of you making these |
| 13:42:47 | 10 | outrageous allegations against me.  It's really |
| | 11 | getting old. |
| | 12 | MR. FLYNN:  Then why are you taking the |
| | 13 | Fifth. |
| | 14 | BY MR. CONANT: |
| 13:42:54 | 15 | Q.    Then why are you taking the Fifth? |
| | 16 | THE WITNESS:  Is he asking me that or you, |
| | 17 | Mr. Flynn? |
| | 18 | BY MR. CONANT: |
| | 19 | Q.    It doesn't really matter. |
| 13:43:01 | 20 | A.    Yeah, it does.  I thought you were the |
| | 21 | people asking me the questions but he keeps trying |
| | 22 | to get me agitated and throw his weight around in |
| | 23 | this deposition and cause a problem. |
| | 24 | Q.    Mr. Montgomery, we're just trying to get to |
| 13:43:13 | 25 | the truth here and when -- so however we get to |

Dennis Lee Montgomery  -  November 18, 2010

| 13:43:15 | 1 | that -- |
| | 2 | A.   I got it.  I got it.  Okay. |
| | 3 | Q.   It's very, very challenging. |
| | 4 | A.   Go ahead. |
| 13:43:23 | 5 | Q.   Now why did you chuckle, Mr. Montgomery, |
| | 6 | when I asked you that? |
| | 7 | A.   I don't recall. |
| | 8 | Q.   So what was -- |
| | 9 | A.   Mr. Flynn's facial expressions, I guess I'm |
| 13:43:33 | 10 | getting tired of them and you let him keep doing |
| | 11 | them. |
| | 12 | Q.   Why would it be absurd for us to suggest |
| | 13 | that this software that Blxware was creating to |
| | 14 | detect terrorist attacks was, you know, phoney? |
| 13:43:46 | 15 | Why would it be absurd for us -- |
| | 16 | A.   I'm going to assert my right under the |
| | 17 | Fifth. |
| | 18 | Q.   Because if you turn back to Plaintiff's |
| | 19 | Exhibit 3 here -- |
| 13:43:53 | 20 | A.   The one that Mr. Flynn wrote. |
| | 21 | Q.   I believe you -- I believe you signed this |
| | 22 | declaration, Mr. Montgomery.  We've established that |
| | 23 | on the record. |
| | 24 | A.   Yeah. |
| 13:44:09 | 25 | Q.   Now if you turn with me to page 2 of this |

Page 192

13:44:13    1    declaration --

            2          A.    Bottom 2 or the second page?

            3          Q.    Label No. 2.

            4          A.    Okay.

13:44:17    5          Q.    -- line 18 and a half --

            6          A.    Uh-huh.

            7          Q.    -- "Multiple" --

            8          A.    Wait a minute.

            9                Okay, I'm sorry.  Go ahead.

13:44:26   10          Q.    Line 18 and a half, "Multiple software

           11    programs developed, owned, possessed and used

           12    exclusively by me, derived from my ODS between 1994

           13    and December 31, 2002, some of the source codes for

           14    which are direct derivatives of my copyrights and

13:44:41   15    which beginning in November of 2002 I began to adapt

           16    to military applications on behalf of the Department

           17    of Defense, the Navy, the Air Force and the,"

           18    redacted, "mostly utilized in the war on terror

           19    between March 2003 and the present."

13:44:58   20                Now weren't these -- this software you're

           21    referring to here, the decoding -- the software to

           22    decode Al-Jazeera communications, Mr. Montgomery?

           23          A.    I'll assert my right under the Fifth

           24    Amendment.

13:45:12   25          Q.    Why would it be -- why would you get upset

Dennis Lee Montgomery  -  November 18, 2010

13:45:15   1   when we would suggest that this software is fake?

           2        A.   I'm going to assert my right under the

           3   Fifth Amendment.

           4        Q.   Isn't it true that this software was never

13:45:23   5   legitimate?

           6        A.   I'm going to assert my right under the

           7   Fifth Amendment.

           8        Q.   Isn't it true it's just a complete fraud on

           9   the United States Government, Mr. Montgomery?

13:45:30  10        A.   I'm going to assert my right under the

          11   Fifth Amendment.

          12        Q.   How many terrorist attacks have you helped

          13   thwart?

          14        A.   I'm going to assert my right under the

13:45:39  15   Fifth Amendment.

          16        Q.   How many American lives do you believe

          17   you've saved through your software?

          18        A.   I'm going to assert my right under the

          19   Fifth Amendment.

13:45:40  20        Q.   How many times have you contacted the

          21   government to alert them to some form of terrorist

          22   attack?

          23        A.   I'm going to assert my right under the

          24   Fifth Amendment.

13:45:48  25        Q.   Isn't it true, Mr. Montgomery, that you

13:45:49   1   would create terror threats yourself,

2   Mr. Montgomery?

3        A.    That is absurd.

4        Q.    Why is that absurd?

13:45:57   5        A.    That is absolutely absurd and I'm tired of

6   you and him making outrageous allegations against

7   me.

8        Q.    Why is it absurd?

9        A.    Period.  That's my answer.

13:46:11  10        Q.    Have you read, Mr. Montgomery, the -- it's

11   a Playboy article entitled The Man who Conned the

12   Pentagon?

13        A.    I've read it.

14        MR. CONANT:  I'm going to introduce this as

13:46:24  15   Plaintiff's Exhibit No. 16.

16        (Exhibit 16 was marked for identification.)

17        THE WITNESS:  Mr. Flynn's handiwork.

18   BY MR. CONANT:

19        Q.    All right.  Now this Plaintiff's Exhibit

13:46:50  20   No. 16, which I'll represent is an article that ran

21   in Playboy magazine.  I, unfortunately, don't know

22   the exact date.

23        Now Mr. Montgomery, you say you're familiar

24   with this article?

13:47:04  25        A.    Yeah, I've read it.

Dennis Lee Montgomery  -  November 18, 2010

```
13:47:05    1        Q.    Can you explain to me what this article is

            2    about?

            3        A.    It was --

            4            MR. CROCKETT:  The document speaks for

13:47:11    5    itself, Counsel.

            6            MR. CONANT:  I'm trying to establish a

            7    foundation, Mr. Crockett, to show that

            8    Mr. Montgomery is familiar with the article.

            9            MR. CROCKETT:  He stated that.

13:47:18   10            THE WITNESS:  I said I was.  I read it.

           11    BY MR. CONANT:

           12        Q.    So what is it about, Mr. Montgomery?

           13        A.    Allegations that -- I'd have to read it

           14    again, specifically -- that I was working with a

13:47:31   15    certain organization and employees of eTreppid made

           16    allegations in it.  That's basically --

           17        Q.    Doesn't this article suggest that you were

           18    creating -- that you were behind the creation of

           19    software that could detect terrorist attacks,

13:47:53   20    Mr. Montgomery?

           21        A.    I'd have to read it again.  If you want me

           22    to, I will.

           23        Q.    When you read this article, do you recall

           24    anything in this article that wasn't true,

13:48:02   25    Mr. Montgomery?
```

| 13:48:04 | 1 | A.    Do I recall it. |
| | 2 | Do you want me to read it again? |
| | 3 | MR. CONANT:  No, we don't have that sort of |
| | 4 | time. |
| 13:48:36 | 5 | All right.  All right.  Do you want to do |
| | 6 | this, get into this? |
| | 7 | MR. FLYNN:  Just ask -- between |
| | 8 | November 19th -- did you manufacture any data |
| | 9 | leading to an alleged terror attack. |
| 13:49:40 | 10 | BY MR. CONANT: |
| | 11 | Q.    Mr. Montgomery, between November 19, 2008, |
| | 12 | and the inauguration of President Obama in January |
| | 13 | of 2009, did you produce any data which discussed |
| | 14 | there would be a terrorist attack in connection with |
| 13:50:00 | 15 | Mr. Obama's inauguration? |
| | 16 | A.    I don't recall. |
| | 17 | Q.    What about an assassination on Mr. Obama? |
| | 18 | A.    That is just -- you just produce sound |
| | 19 | bites. |
| 13:50:11 | 20 | MR. CROCKETT:  Just answer the question, |
| | 21 | Dennis. |
| | 22 | THE WITNESS:  No. |
| | 23 | BY MR. CONANT: |
| | 24 | Q.    No? |
| 13:50:16 | 25 | Why is it absurd? |

13:50:16   1         A.   Because you just produce sound bites so the

           2    reporter can use them in another article that he

           3    instigated.

           4         Q.   Mr. Montgomery, if you recall back to

13:50:26   5    Plaintiff's Exhibit No. 3 there's a lot of

           6    discussion in here about you detecting terrorist

           7    attacks, so I don't know why it's absurd for me to

           8    ask --

           9         A.   You said just said assassination.  You just

13:50:38  10    said assassination of the President.  That's -- I'm

          11    speechless.

          12              MR. CROCKETT:  Stay that way.

          13    BY MR. CONANT:

          14         Q.   So it would be less egregious to suggest

13:50:48  15    that it was a terrorist attack instead of an

          16    assassination?

          17         A.   You're being funny.

          18         Q.   No.  I'm asking a question, because --

          19         A.   I don't understand what you're trying to

13:50:56  20    say.

          21         Q.   I'm asking a question.

          22              Why is it absurd to suggest there would be

          23    an assassination on President Obama that you

          24    detected versus just a terrorist attack in

13:51:04  25    connection with his inauguration?

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:51:07 | 1 | A.    I didn't say either. |
| | 2 | Q.    You didn't say either what? |
| | 3 | MR. FLYNN:  That he didn't recall. |
| | 4 | THE WITNESS:  Are you answering for me now? |
| 13:51:16 | 5 | MR. CROCKETT:  Dennis. |
| | 6 | BY MR. CONANT: |
| | 7 | Q.    Let's look at page 10, Plaintiff's Exhibit |
| | 8 | No. 3, paragraph 20. |
| | 9 | A.    Yeah. |
| 13:51:23 | 10 | Q.    By June, September -- "By June through |
| | 11 | September 2003 my ODS had attracted the interest |
| | 12 | of," redacted, "in connection with using Predator to |
| | 13 | detect and track specific al-Qaida operatives" -- |
| | 14 | A.    Where are we?  Where are we?  I don't know |
| 13:51:42 | 15 | where we're at. |
| | 16 | MR. CROCKETT:  I don't either. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.    Page 10, paragraph 20. |
| | 19 | A.    Okay.  Sorry. |
| 13:51:47 | 20 | Got it. |
| | 21 | Q.    Paragraph entitled "Tracking al-Qaida, |
| | 22 | USSOCOM and" blank. |
| | 23 | A.    Yeah. |
| | 24 | Q.    "By June through September 2003 my ODS had |
| 13:51:55 | 25 | attracted the interest of," blank, "and USSOCOM in |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
13:52:02    1    connection with using Predator to detect and track

            2    specific al-Qaida operatives in the field, including

            3    al-Zarqawi, and specific objects related to him,

            4    such as cars and vans with live video feeds encoded

13:52:14    5    and scanning for objects and people in real time.

            6            "My object tracking was placed on a

            7    specific number of DV laptops and used by SOCOM

            8    and," blank, "in the field.  I interacted on a

            9    regular basis with these operatives in the

13:52:28   10    connection with the use and application of my

           11    technology.

           12            "Special servers were installed in the POC,

           13    Predator Operation Command, at Nellis Air Force Base

           14    and at Fort Bragg to look for, detect and track

13:52:40   15    specific objects which were, in fact, positively

           16    identified."

           17            Now is that true?  Is that a true

           18    statement, Mr. Montgomery, that you --

           19            MR. FLYNN:  -- had the technology that did

13:52:51   20    that.

           21    BY MR. CONANT:

           22        Q.    -- that you had the technology that did

           23    that?

           24        A.    It's very distracting when Mr. Flynn does

13:52:56   25    that and it's very hard to keep focused on your
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
13:53:01    1   question when he keeps interrupting it and adding
            2   his piece in the middle of it.
            3       Q.    Okay.  Do you need to read line 13 through
            4   to 20 again?
13:53:07    5       A.    I read it.
            6             I'm going to assert my right under the
            7   Fifth.
            8             I'm going to assert my right, Mr. Flynn,
            9   under the Fifth.
13:53:16   10             MR. FLYNN:  Okay.
           11             MR. CONANT:  All right.  All right.
           12             All right.  I'm going to hand you -- hand
           13   the reporter, what's going to be marked as
           14   Plaintiff's Exhibit No. --
13:53:42   15             THE REPORTER:  17.
           16             MR. CONANT:  -- 17.
           17             (Exhibit 17 was marked for identification.)
           18             THE WITNESS:  Thank you.
           19   BY MR. CONANT:
13:54:11   20       Q.    All right.  Mr. Montgomery, I've handed you
           21   what's been marked Plaintiff's Exhibit No. 17.  This
           22   is an employment -- well, the first page, purports
           23   to be an email from Patricia Yarborough to Jory
           24   Russell says, "Hi, Jory.  Here's Dennis's employment
13:54:29   25   agreement.  Let me know if you need anything else."
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
13:54:33   1            Do you see that?

           2      A.    Yes.

           3      Q.    Turn to the second page of the document,

           4   Opspring, LLC, dated April 5, 2006.

13:54:40   5      A.    The second, you mean the -- okay.

           6      Q.    Second page.

           7      A.    Yeah, bottom one.  Okay.

           8      Q.    All right.  Do you understand what this

           9   document is, Mr. Montgomery?

13:54:49  10      A.    I'd have to look through it.

          11      Q.    Please take a second to look through it.

          12      A.    Yeah.

          13            (Witness complies.)

          14            THE WITNESS:  All right, got it.

13:55:15  15   BY MR. CONANT:

          16      Q.    All right.  Are you familiar with this

          17   document, Mr. Montgomery?

          18      A.    Not specifically, but I know the gist of

          19   it.

13:55:21  20      Q.    Let's turn to -- well, the first page, down

          21   at the bottom left-hand corner says Montgomery's

          22   initials.

          23            Do you see that?

          24      A.    Yes.

13:55:28  25      Q.    Are those your initials, Mr. Montgomery?
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 13:55:30 | 1 | A.    They might be. |
| | 2 | Q.    Do you recall executing this document, |
| | 3 | Mr. Montgomery? |
| | 4 | THE WITNESS:  Mr. Flynn, you're very |
| 13:55:40 | 5 | distracting when I'm trying to look at something and |
| | 6 | answer a question.  Please stop doing that. |
| | 7 | Will you please have him stop doing that, |
| | 8 | Mr. Conant? |
| | 9 | MR. FLYNN:  Mr. Montgomery, I was talking |
| 13:55:52 | 10 | to the Government trying to find an exhibit for |
| | 11 | them. |
| | 12 | THE WITNESS:  Ah.  Yeah. |
| | 13 | I don't recall this one specifically, |
| | 14 | but -- |
| 13:56:04 | 15 | BY MR. CONANT: |
| | 16 | Q.    But you have no reason to doubt that you |
| | 17 | signed this, Mr. Montgomery? |
| | 18 | A.    No. |
| | 19 | Q.    Is that your signature, if you turn to the |
| 13:56:09 | 20 | last two pages of the document? |
| | 21 | A.    It appears to be. |
| | 22 | Q.    Okay.  Now on the first page of the actual |
| | 23 | contract under the heading Compensation and |
| | 24 | Benefits, your compensation will be $1.2 million per |
| 13:56:31 | 25 | year. |

Page 203

Dennis Lee Montgomery  -  November 18, 2010

```
13:56:33    1            Was your compensation by Opspring, LLC,

            2    $1.2 million per year, Mr. Montgomery?

            3        A.   I'm going to assert my right under the

            4    Fifth.

13:56:41    5        Q.   So when did -- so beginning in April of

            6    2006 you were getting paid $1.2 million per year.

            7    How long were you -- how long was this contract in

            8    effect?

            9        A.   I'm going to assert my right under the

13:56:53   10    Fifth.

           11        Q.   So isn't it true that in approximately

           12    March of 2009 you stopped getting paid by -- you

           13    stopped getting paid by -- you stopped getting paid

           14    your compensation under this contract,

13:57:09   15    Mr. Montgomery?

           16        A.   I don't recall that specifically.

           17        Q.   Do you know when you stopped getting paid

           18    by Opspring, LLC, or Blxware, LLC, Mr. Montgomery?

           19        A.   No.

13:57:18   20        Q.   Who was paying you, was it Opspring, LLC,

           21    or Blxware, LLC?

           22        A.   I'm not certain.

           23        Q.   Can you describe the relationship between

           24    Opspring, LLC, and Blxware, LLC?

13:57:32   25            I'll reask the question, can you describe
```

Page 204

| | | |
|---|---|---|
| 13:57:34 | 1 | to me the difference between Opspring, LLC, and |
| | 2 | Blxware, LLC? |
| | 3 | THE WITNESS:  Isn't that the same question? |
| | 4 | MR. CROCKETT:  No. |
| 13:57:42 | 5 | THE WITNESS:  I'm sorry, I thought it was. |
| | 6 | I'm going to assert my right under the |
| | 7 | Fifth. |
| | 8 | MR. FLYNN:  Each them get the 50,000, get |
| | 9 | the 50,000 each of them. |
| 13:57:57 | 10 | BY MR. CONANT: |
| | 11 | Q.   All right.  Let's look at the first |
| | 12 | heading -- or, I'm sorry, second heading down on the |
| | 13 | first page, Loans to Montgomery.  "As discussed, the |
| | 14 | company has agreed to provide you with a $1 million |
| 13:58:09 | 15 | loan, the first loan." |
| | 16 | A.   I see that. |
| | 17 | Q.   Did you get $1 million from Opspring, LLC? |
| | 18 | A.   I'll assert my right under the Fifth. |
| | 19 | Q.   If you look down at the first bullet point |
| 13:58:21 | 20 | under that first full paragraph -- I'm sorry, let me |
| | 21 | give context here. |
| | 22 | If you go to the last sentence of that |
| | 23 | paragraph that I just read from -- |
| | 24 | A.   Uh-huh. |
| 13:58:29 | 25 | Q.   -- "Additionally, the company has agreed to |

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 13:58:31 | 1 | provide you with additional loans, collectively with |
| | 2 | the first loan, called "The Loans" in the following |
| | 3 | amount at the following time subject to you |
| | 4 | continuing to be an employee of the company at the |
| 13:58:42 | 5 | relevant time." |

13:58:31    1    provide you with additional loans, collectively with
            2    the first loan, called "The Loans" in the following
            3    amount at the following time subject to you
            4    continuing to be an employee of the company at the
13:58:42    5    relevant time."
            6            You see that, Mr. Montgomery?
            7        A.   Yes.
            8        Q.   All right.  First bullet point, "$500,000
            9    on the first day you begin working full-time in the
13:58:50   10    company's offices in Bellevue, Washington."
           11            Do you see that, Mr. Montgomery?
           12        A.   Yes.
           13        Q.   Did you get $500,000 from Opspring, LLC --
           14        A.   I'm sorry.
13:58:59   15        Q.   -- under this -- under this first bullet
           16    point?
           17        A.   I thought you were done.
           18            Assert my right under the Fifth.
           19        Q.   Where did that $500,000 go?
13:59:07   20        A.   I assert my right under the Fifth.
           21        Q.   In fact, backing up, where did the
           22    $1 million go that you got that's referenced under
           23    that first paragraph?
           24        A.   I'm confused.  I'm trying to -- I'm
13:59:19   25    confused.  I don't know if the first sentence refers

YATES COURT REPORTERS    800.669.1866

08-Case:1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 208 of 1046

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 13:59:24 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 13:59:38 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 14:00:03 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 14:00:22 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 14:00:38 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 14:00:58 | 25 |

1   to those two five hundreds.  I don't know.  I guess

2   it does.

3          Your question's confusing.  Reask it.

4       Q.   Okay.  Let's go back up.  The $1 million

5   loan referred to as "the First Loan" --

6       A.   Uh-huh.

7       Q.   -- where did that money go?

8       A.   I don't recall specifically.

9       Q.   The $1 million -- strike that.

10          Isn't it true, Mr. Montgomery, that with --

11   with this $1 million you would launder that -- did

12   you launder that money through casinos,

13   Mr. Montgomery?

14       A.   I'll assert my right under the Fifth.

15       Q.   Mr. Montgomery, have you ever told anyone

16   that you had a practice of using chip brokers in

17   Las Vegas to help you hide your transactions with --

18   with the -- your monetary transactions?

19       A.   No.

20       Q.   Would you ever have a practice of using

21   middlemen to help you -- in Las Vegas who would take

22   casino chips to -- in any form of using third

23   parties through using casino chips to help you hide

24   your monetary transactions?

25       A.   No.

14:01:01  1      Q.    Did you ever use street brokers in

2   Las Vegas to help you launder money?

3      A.    What is a "street broker"?  I'm confused.

4      Q.    A street broker is someone who would -- a

14:01:11  5   party who's seeking to hide monetary transactions

6   would go give a bunch of money to a street broker, a

7   person on the street going to Las Vegas, who would

8   then go take that cash into a casino, take the

9   chips, go cash -- go exchange that cash for casino

14:01:32  10   chips and then give those chips back to you so you

11   can then, essentially, hide the trail of money

12   started with you.

13           MR. CROCKETT:  There's no question pending.

14           THE WITNESS:  That was a statement, wasn't

14:01:43  15   it?

16           MR. CROCKETT:  Right.

17           So is there a question?

18           MR. FLYNN:  He would take the chips to the

19   street broker and then slip them in little by

14:01:51  20   little.

21           MR. CONANT:  All right.

22      Q.    So are familiar with a street broker?  Do

23   you know what I --

24      A.    No, I didn't.

25      Q.    Okay.  You understand -- you know what I

14:01:54

Dennis Lee Montgomery   -   November 18, 2010

14:01:57   1   mean by "street broker"?

2       A.   No.

3       Q.   Would you ever take casino chips, buy

4   casino chips from casinos, give them to third

14:02:04   5   parties who would then go exchange those chips for

6   cash and give that cash back to you?

7       A.   No.

8       Q.   Did you ever use --

9       MR. FLYNN:   Ask if he realizes he's under

14:02:21   10   oath.

11   BY MR. CONANT:

12       Q.   Do you realize you're under oath,

13   Mr. Montgomery?

14       A.   Yes.

14:02:24   15       Q.   Did you ever tell any third party you were

16   engaged in any practice related to using casinos to

17   launder money?

18       A.   I have no idea.

19       Q.   You have no idea if you told --

14:02:35   20       A.   I don't recall.

21       Q.   You don't recall if you told someone that.

22   Okay.

23       MR. FLYNN:   Are you finished with the

24   $500,000?

14:02:49   25       MR. CONANT:   Yes.

YATES COURT REPORTERS   800.669.1866

14:02:49   1        Q.    All right.  Mr. Montgomery, if you flip

           2   with me to the -- do you need me to repeat the

           3   question?

           4        A.    No, I heard.

14:02:55   5        Q.    If you flip with me to the second page of

           6   the actual contract --

           7        A.    Yeah, okay.

           8        Q.    -- labeled 5-3, the first bullet point up

           9   at the top you would be purported to get $500,000

14:03:08  10   within five business days after your family moves

          11   permanent residence to the Puget Sound area of

          12   Washington State.

          13              Do you see that, Mr. Montgomery?

          14        A.    Yes.

14:03:19  15        Q.    Did you get that $500,000 that's referred

          16   to right there?

          17        A.    I don't recall, but I did move.

          18        Q.    You don't recall if you got the $500,000.

          19              Let's look at the next bullet point,

14:03:33  20   $500,000 within five business days after Opspring

          21   receives its first compensation from an independent

          22   third party for sale or license of intellectual

          23   property by you as the company's employee.

          24              Did you ever get that $500,000 referred to

14:03:49  25   there?

Dennis Lee Montgomery  -  November 18, 2010

14:03:50    1        A.    I'm going to assert my right under the

            2    Fifth.

            3        Q.    What was the -- what were you giving to

            4    Blxware in exchange for this -- for entering into

14:03:56    5    this employment agreement?

            6        A.    I'm going to assert my right under the

            7    Fifth.

            8        Q.    So you won't tell me what services you were

            9    providing to Blxware in exchange for this -- your

14:04:07   10    employment with Blxware?

           11        A.    I just stated my answer to the question.

           12        Q.    Or, I should say, Opspring, since it's an

           13    Opspring contract.

           14            MR. FLYNN:  Were there any actual loan

14:04:17   15    documents.

           16    BY MR. CONANT:

           17        Q.    Were there any actual loan documents that

           18    were executed in connection with all these "loans"

           19    referenced here in this employment agreement?

14:04:25   20        A.    I don't recall if there was or not.

           21        Q.    All right.  Last bullet point, $300,000

           22    upon the company's receipt --

           23            MR. FLYNN:  Did he report these amounts on

           24    his tax return.

           25    ///

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 14:04:34 | 1 | BY MR. CONANT: |
| | 2 | Q.    $300,000 upon the company's receipt of at |
| | 3 | least $1 million compensation in the aggregate from |
| | 4 | one or more independent third parties, did you ever |
| 14:04:44 | 5 | get that? |
| | 6 | A.    I don't recall. |
| | 7 | Q.    Do you recall Blxware getting paid -- I'm |
| | 8 | sorry. |
| | 9 | If I say Blxware, I mean -- I alternatively |
| 14:04:53 | 10 | mean Opspring, LLC, since -- |
| | 11 | A.    Well, you've been saying Blxware for the |
| | 12 | last five -- I think for the last bunch of |
| | 13 | questions. |
| | 14 | Q.    Well, all right.  Well, for purposes of the |
| 14:05:00 | 15 | deposition, I'll refer to them interchangeably, |
| | 16 | because my understanding they were operating |
| | 17 | interchangeably. |
| | 18 | Now do you recall at any time when Blxware |
| | 19 | or Opspring was paid approximately $2.5 million from |
| 14:05:13 | 20 | the United States Government? |
| | 21 | A.    I'm not going to answer the question.  I'll |
| | 22 | take the Fifth. |
| | 23 | MR. FLYNN:  All the monies they've got on |
| | 24 | the contract -- |
| | 25 | /// |

Page 212

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
14:05:23    1    BY MR. CONANT:
            2        Q.    Now all this money that you received on
            3    this employment agreement, did you ever report those
            4    funds on your tax returns, Mr. Montgomery?
14:05:32    5        A.    I'm going to assert my right under the
            6    privilege.
            7        Q.    What privilege?
            8        A.    Fifth.
            9        Q.    Fifth Amendment privilege.
14:05:39   10        A.    Excuse me.
           11        Q.    All right.  If you look down here, bullet
           12    point -- I'm sorry, heading Intellectual Property
           13    Assignment Agreement.
           14              It reads, "Based on your representations
14:05:50   15    and warrantees and our discussions" --
           16        A.    Excuse me.  Which page?  The bottom --
           17        Q.    Well, really in the middle --
           18        A.    Okay.  Okay.  I got it, yeah.
           19        Q.    -- under the heading Intellectual Property
14:06:01   20    Assignment Agreement.
           21              "Based on your representations and
           22    warrantees and our discussions, it is our
           23    understanding that you personally and exclusively
           24    own and control certain intellectual property and
14:06:08   25    technology rights that will be crucial to the
```

Page 213

Dennis Lee Montgomery   -   November 18, 2010

14:06:11   1    development of our business.

2                "Accordingly, as a condition precedent to

3    your employment in the company entering into this

4    letter agreement with you and providing you with the

14:06:20   5    compensation and benefits hereunder and the loan,

6    you and the Montgomery Family Trust will be required

7    to sign and deliver the Intellectual Property

8    Assignment Agreement provided to you which relates

9    to the assignment of this intellectual property and

14:06:34   10   technology to the company.

11               "You agree and acknowledge that without

12   your entering into the IP agreement the company

13   would not employ you, enter into the letter

14   agreement or the Common Interest Agreement with you

14:06:43   15   or provide you with the compensation or benefits

16   hereunder for the loan."

17               Do you see that, Mr. Montgomery?

18       A.    I heard you read it, yes.

19       Q.    Did you ever execute the IP agreement?

14:06:54   20       A.    I don't recall.

21       Q.    Mr. Montgomery, did you ever deliver the

22   intellectual property to Opspring that's

23   contemplated within this paragraph I just read?

24       A.    I'll assert my right under the Fifth

14:07:10   25   Amendment.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 14:07:12 | 1 | MR. CONANT:  All right.  I'm going to |
| | 2 | hand -- we'll mark the -- |
| | 3 | Want to mark the whole booklet as an |
| | 4 | exhibit? |
| 14:07:45 | 5 | MR. FLYNN:  Yeah. |
| | 6 | MR. CONANT:  They're not Bates stamped. |
| | 7 | MR. FLYNN:  Okay.  You just have to -- |
| | 8 | you'll just have to adequately describe each page. |
| | 9 | These are Wells Fargo bank records that are -- |
| 14:08:07 | 10 | amounts referenced in the employment agreement -- |
| | 11 | THE WITNESS:  Can I take a break and use |
| | 12 | the rest room? |
| | 13 | MR. CONANT:  Yes. |
| | 14 | THE WITNESS:  Okay. |
| 14:08:16 | 15 | MR. CONANT:  We'll go off the record. |
| | 16 | THE VIDEOGRAPHER:  This marks the end of |
| | 17 | Media No. 2.  The time is 2:08 p.m.  We're off the |
| | 18 | record. |
| | 19 | (Recess taken.) |
| 14:15:19 | 20 | THE VIDEOGRAPHER:  This marks the beginning |
| | 21 | of Media No. 3.  The time is 2:15 p.m.  We're back |
| | 22 | on the record. |
| | 23 | BY MR. CONANT: |
| | 24 | Q.  Mr. Montgomery, we're going to go into |
| 14:15:27 | 25 | these bank records here in a second, but before I do |

Page 215

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

14:15:30   1    I want to ask a couple of quick questions.

         2             Have you ever hacked into the email of Tim

         3    Blixseth?

         4         A.    No.

14:15:38   5         Q.    Do you understand what I mean by "hacking"?

         6         A.    Well, Mr. Flynn's made allegations and

         7    multiple statements, so the answer is no.

         8         Q.    By hacking I mean, any form of unauthorized

         9    access, access to emails, computers, computer

14:16:00  10    systems, anything like that.

        11             Have you ever engaged in any hacking?

        12         A.    No.

        13         Q.    What about Mr. Flynn's email?

        14         A.    No.

14:16:08  15         Q.    What about my emails?

        16         A.    No.

        17         Q.    Do you know if Edra Blixseth has engaged in

        18    any form of computer hacking?

        19         A.    I have no way of knowing.

14:16:17  20         Q.    All right.  Let's turn to these bank

        21    statements.   Now these bank statements were -- let's

        22    turn to Tab No. 1, Mr. Montgomery.

        23         A.    Okay.

        24         Q.    It says Account Statement -- at the top,

14:16:34  25    Account Statement December 10 through January 11,

Dennis Lee Montgomery  -  November 18, 2010

14:16:37    1    2006.

            2          Do you see that?

            3    A.    Yes.

            4    Q.    Do you see the name of it, Montgomery

14:16:41    5    Family Trust, Dennis Montgomery, Trustee, Brenda

            6    Montgomery, Trustee?

            7          Do you see that?

            8    A.    Yes.

            9    Q.    Do you recognize these bank statements,

14:16:48   10    Mr. Montgomery?

           11    A.    I'm going to assert my right under the

           12    Fifth.

           13    Q.    Now, for the record, these are bank

           14    statements that Mr. Flynn received in connection

14:17:00   15    with the Nevada litigation when -- when he was to

           16    take your debtor's exam of you in connection with

           17    the judgment he has against you.

           18          Do you recall that, Mr. Montgomery?

           19    A.    Well, I produced stuff for Liner so --

14:17:18   20    Q.    Do you recall producing these bank

           21    documents?

           22    A.    No.

           23    Q.    You don't recall.

           24          Do you remember having to produce your bank

14:17:26   25    records in connection with the Nevada litigation?

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 14:17:29 | 1 | A.    No.  I just know stuff was given to Liner. |
| | 2 | Q.    Who would have given it to Liner? |
| | 3 | MR. CROCKETT:  Calls for speculation. |
| | 4 | If you can answer, go ahead. |
| 14:17:38 | 5 | THE WITNESS:  I don't know. |
| | 6 | BY MR. CONANT: |
| | 7 | Q.    Did you ever give any of your bank records |
| | 8 | to Liner in connection with the Nevada litigation? |
| | 9 | A.    Yes. |
| 14:17:46 | 10 | Q.    Did you put these bank records on a compact |
| | 11 | disk? |
| | 12 | A.    I don't recall. |
| | 13 | Q.    But do you recall getting your bank records |
| | 14 | to the Liner firm? |
| 14:17:56 | 15 | A.    Well, you said any documents, didn't you, |
| | 16 | or am I confused? |
| | 17 | Q.    All right.  Let's ask it both ways:  Did |
| | 18 | you ever give any documents to the Liner firm in |
| | 19 | connection with the Nevada litigation? |
| 14:18:07 | 20 | A.    I believe so. |
| | 21 | Q.    And what would those documents consist of? |
| | 22 | A.    I don't recall. |
| | 23 | Q.    Would they consist of your bank records? |
| | 24 | A.    I don't recall. |
| 14:18:15 | 25 | MR. CONANT:  All right.  Well, for the |

14:18:15   1   record, these are documents that Mr. Flynn received

2   in connection with the Nevada litigation when he was

3   to take your debtor's exam and he would have

4   received these from --

14:18:28   5        -- the Liner firm, Mr. Flynn?

6        They were put on a CD.

7        MR. FLYNN:  According to emails from the

8   Liner firm, they were put on the CD and they were

9   given to me.

14:18:43  10        MR. CONANT:  Mr. Flynn will represent that

11   according to the emails that he's received,

12   Mr. Montgomery put these on a CD -- and put these

13   documents on a CD and then Liner firm produced them

14   to him.

14:18:51  15        (Exhibit 18 was marked for identification.)

16        THE WITNESS:  That's a question?

17        MR. CONANT:  No, I'm stating for the

18   record.

19        THE WITNESS:  Oh, okay.

14:18:57  20        MR. FLYNN:  Look at this.

21        MR. CONANT:  What's the date on that,

22   March 10th?

23        March 10th.

24        MR. FLYNN:  No.

14:19:06  25        MR. CONANT:  March 10th at the top.

Dennis Lee Montgomery  -  November 18, 2010

```
14:19:10    1        Q.    All right.  Turn with me, Mr. Montgomery,

            2   to tab 2.

            3        A.    Okay.

            4        Q.    Now just to refresh our memory here, we

14:19:24    5   just went through Plaintiff's Exhibit No. 17, which

            6   was your employment agreement dated April '06, where

            7   you purported to get a "million dollar," quote,

            8   unquote, loan from Opspring.

            9             Now if you'll turn with me to Plaintiff's

14:19:48   10   Exhibit 18, Tab 2, page 2 of 6 --

           11        A.    Say that again.  Which page?

           12        Q.    Tab 2 in Plaintiff's Exhibit 18 --

           13        A.    Yeah.

           14        Q.    -- page 2 of 6.

14:20:02   15        A.    Okay.

           16        Q.    All right.  Now you see here on the first

           17   row of information, Activity Detail, Deposits and

           18   Interest.  I'm looking at an entry dated April 6

           19   with a million dollar deposit.

14:20:19   20             Do you see that, Mr. Montgomery?

           21        A.    Yes.

           22             MR. FLYNN:  Read into the record.

           23   BY MR. CONANT:

           24        Q.    And the reference or the description of

14:20:25   25   this deposit says "WT" sequence or "seq58261" and
```

YATES COURT REPORTERS    800.669.1866

14:20:34   1   then I see "Azimyth LLC/org=Azimyth."

          2          Do you see that, Mr. Montgomery?

          3      A.   Yes.

          4          MR. FLYNN:  It's --

14:20:44   5   BY MR. CONANT:

          6      Q.   Do you know if "WT," the description "WT"

          7   in here, refers to wire transfer, Mr. Montgomery?

          8      A.   I have no idea.

          9      Q.   Do you know if this was a wire transfer

14:20:54  10   into your bank account, Mr. Montgomery?

         11      A.   I have no idea.

         12      Q.   Do you recall receiving a million dollar

         13   deposit in April of 2006?

         14      A.   I'm going to assert my right under the

14:21:05  15   Fifth.

         16      Q.   Mr. Montgomery, isn't this million dollars

         17   that was deposited here deposited in connection with

         18   your employment agreement that we just discussed?

         19      A.   I'm going to assert my right under the

14:21:14  20   Fifth.

         21          MR. FLYNN:  Did he transfer the money out.

         22   BY MR. CONANT:

         23      Q.   And where did this --

         24          (Mr. Conant and Mr. Flynn confer.)

14:21:57  25          THE WITNESS:  I take it this is not a

14:21:59   1   question.

          2            MR. CROCKETT:  No.

          3            THE WITNESS:  No.

          4            MR. CROCKETT:  It's called colloquy.

14:22:10   5   BY MR. CONANT:

          6        Q.   All right.  Mr. Montgomery --

          7             Right.

          8             All right.  If you go -- if you look down

          9   at the next deposit entry for April 6, there's a

14:22:23  10   similarly described deposit only this one is for a

         11   hundred thousand dollars.

         12             Do you know what -- what was the hundred

         13   thousand dollars deposit for?

         14        A.   I'm going to assert my right under the

14:22:33  15   Fifth.

         16        Q.   Wasn't that for -- wasn't this in

         17   connection with the employment agreement we just

         18   discussed?

         19        A.   I'm going to assert my right under the

14:22:38  20   Fifth.

         21        Q.   All right.  Now I see the next deposit

         22   dated April 6 for $300,000 immediately below that.

         23             Do you see that, Mr. Montgomery?

         24        A.   Yes.

14:22:50  25        Q.   What were the source of those -- that

Dennis Lee Montgomery  -  November 18, 2010

```
14:22:51    1    $300,000?

            2        A.    I'm going to assert my right under the

            3    Fifth.

            4        Q.    What was the source of the $20,000 deposit

14:22:57    5    immediately below that one dated April 11?

            6        A.    I'm going to assert my right under the

            7    Fifth.

            8        Q.    Wasn't this all -- these deposits all in

            9    connection with your employment or purported

14:23:08   10    employment with Opspring, Mr. Montgomery?

           11        A.    I'm going to assert my right under the

           12    Fifth.

           13        Q.    All right.  Now flip with me to page 4 of 6

           14    where we have withdrawals.  See there's a withdrawal

14:23:31   15    dated April 6, online transfer to -- references an

           16    account number in the amount of $800,000.

           17              Do you see that Mr. Montgomery?

           18        A.    Yes.

           19              MR. FLYNN:  Where did you transfer and

14:23:46   20    where did it go.

           21    BY MR. CONANT:

           22        Q.    Mr. Montgomery, I see that you got a

           23    million dollar deposit on April 6; now on April 6

           24    I'm seeing an outflow of $800,000.

14:23:55   25              Where did that $800,000 go?
```

YATES COURT REPORTERS    800.669.1866

14:23:57  1      A.    I'm going to assert my right under the

2     Fifth.

3            MR. FLYNN:  Ask him if it went to any

4     foreign countries.

14:24:02  5     BY MR. CONANT:

6      Q.    Did any of that money go to any foreign

7     country, Mr. Montgomery?

8      A.    No.

9      Q.    Did any of that money go into an account of

14:24:09  10    your relative?

11     A.    I'm going to assert my right under the

12    Fifth.

13     Q.    Did you get a cashier's check when you took

14    that money out, Mr. Montgomery?

14:24:21  15           I'm sorry.  Strike that question.

16           What relative of yours did that $800,000 go

17    to, Mr. Montgomery?

18     A.    I didn't say it did go to a relative.

19     Q.    Did it or did it not?

14:24:34  20     A.    I'm going to going to assert my right under

21    the Fifth.

22     Q.    Wasn't this -- let me strike that.

23           Go down to the next withdrawal, April 6,

24    the reference is withdrawal made in a branch store,

14:24:48  25    amount $200,000.

Dennis Lee Montgomery  -  November 18, 2010

```
14:24:50    1              Do you see that, Mr. Montgomery?

            2        A.    Yes.

            3        Q.    When you withdrew that money, didn't you

            4   withdraw that in the form of a cashier's check,

14:24:59    5   Mr. Montgomery?

            6        A.    I'm going to assert my right under the

            7   Fifth.

            8        Q.    What branch store did you go into to make

            9   that withdrawal?

14:25:04   10        A.    I have no way of knowing.

           11              MR. FLYNN:  Why would he buy a cashier's

           12   check.

           13   BY MR. CONANT:

           14        Q.    Why would you withdraw this money in the

14:25:13   15   form of a cashier's check, Mr. Montgomery?

           16        A.    I don't recall.

           17        Q.    Wasn't the purpose of withdrawing this a

           18   cashier's check to hide the money trail?

           19        A.    No.

14:25:22   20        Q.    Then what was the purpose?

           21        A.    I don't recall.

           22              MR. FLYNN:  Where did you cash this

           23   $200,000.

           24   BY MR. CONANT:

14:25:27   25        Q.    Where did you cash this $200,000 check that
```

Dennis Lee Montgomery  -  November 18, 2010

```
14:25:27   1   you took out, that $200,000?

           2       A.   I -- I'm sorry.

           3            I don't recall.

           4       Q.   Did you take that cashier's check to a

14:25:35   5   casino, Mr. Montgomery?

           6       A.   I don't recall.

           7       Q.   I see here --

           8            MR. FLYNN:  Did he buy chips.

           9   BY MR. CONANT:

14:25:40  10       Q.   Did you buy any chips, any casino chips,

          11   with that $200,000?

          12       A.   I don't recall.

          13       Q.   Did you use that money to pay back any

          14   casino debts, Mr. Montgomery?

14:25:48  15       A.   You know, I'm just going to -- I'm going to

          16   assert the Fifth.

          17       Q.   To what question?

          18       A.   The last one.

          19       Q.   Was any of this money that you withdrew

14:26:06  20   here, was any of this money still in the form of

          21   cash at the time that you filed for bankruptcy,

          22   Mr. Montgomery?

          23       A.   No.

          24       Q.   Was any of this money being held by any

14:26:19  25   friend or family of yours at the time you filed for
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 14:26:22 | 1 | bankruptcy? |
| | 2 | A.   That's on that list? |
| | 3 | Q.   I'm sorry. |
| | 4 | A.   You're talking about the list -- whatever |
| 14:26:26 | 5 | this is?  Are we referring to page 4? |
| | 6 | Q.   We are. |
| | 7 | A.   No. |
| | 8 | Q.   Okay.  Let's be specific about a |
| | 9 | withdrawal.  I see a withdrawal for $800,000, below |
| 14:26:37 | 10 | that a withdrawal for $200,000, below that another |
| | 11 | withdrawal for $200,000, below that another |
| | 12 | withdrawal for $200,000 and then a withdrawal for |
| | 13 | $23,000 below that followed by another withdrawal |
| | 14 | for $11,000 followed by another withdrawal for |
| 14:26:56 | 15 | $10,000. |
| | 16 | A.   And your question was? |
| | 17 | Q.   These are all the withdrawals that I'm |
| | 18 | referring to. |
| | 19 | MR. CROCKETT:  For the record, Counsel, |
| 14:27:03 | 20 | that mischaracterizes what the document says. |
| | 21 | BY MR. CONANT: |
| | 22 | Q.   Where did all of this money that you |
| | 23 | withdrew go, Mr. Montgomery? |
| | 24 | A.   I don't recall. |
| 14:27:13 | 25 | Q.   Is it hard to recall what a person does |

Page 227

Dennis Lee Montgomery  -  November 18, 2010

14:27:16   1   with $800,000, Mr. Montgomery?

          2          MR. CROCKETT:  Argumentative.

          3          Don't answer it.

          4          MR. CONANT:  It just seems odd that -- all

14:27:23   5   right.

          6      Q.    Mr. Montgomery, the time that you were

          7   buying cashier's checks, whether referred to in this

          8   bank statement or others, did you have a plan to

          9   hide your money in the form of cash to evade

14:27:49  10   creditors, Mr. Montgomery?

         11      A.    I'm going to assert my right under the

         12   Fifth.

         13      Q.    Mr. Montgomery, any of the money -- now we

         14   looked at this employment agreement where you're

14:28:11  15   making $1.2 million a year from Opspring beginning

         16   in 2006 --

         17          MR. FLYNN:  In addition to all the amounts.

         18   BY MR. CONANT:

         19      Q.    -- in addition to all of the amounts, the

14:28:22  20   loan -- quote, unquote, "loan amounts" also

         21   represented in this agreement.

         22          Where did all this money go,

         23   Mr. Montgomery, the $1.2 million a year that you're

         24   receiving?

14:28:34  25      A.    Well, Mr. Flynn, I can tell you, got a good

Dennis Lee Montgomery - November 18, 2010

| 14:28:37 | 1 | chunk of it. |
| | 2 | Q. Where did the rest of it go? |
| | 3 | A. Well, I don't know, but I know he got a |
| | 4 | good chunk and so did the other law firm and so did |
| 14:28:41 | 5 | Mr. Stillman. Stillman (phonetic), Flynn and Logar |
| | 6 | (phonetic) as attorneys got a good chunk of money. |
| | 7 | I don't recall if it's that specific one. |
| | 8 | Why are you shaking your head? Sure you |
| | 9 | did. |
| 14:28:52 | 10 | MR. FLYNN: You know the money came from |
| | 11 | Sandoval. These monies are different, |
| | 12 | Mr. Montgomery. You know that. |
| | 13 | THE WITNESS: April of '06? |
| | 14 | You keep perpetuating falsities against me |
| 14:29:05 | 15 | and my family and it is destroying us and you know |
| | 16 | you're lying when you're doing it. You're doing it |
| | 17 | to benefit Mr. Blixseth. You know what you're |
| | 18 | doing. You're doing it for sound bites for |
| | 19 | Mr. Roston. I know what you're doing. |
| 14:29:16 | 20 | MR. FLYNN: I'm doing it to get the truth |
| | 21 | out, sir. |
| | 22 | THE WITNESS: You don't even know what the |
| | 23 | truth is. That's the problem. |
| | 24 | MR. CROCKETT: That's enough. |
| 14:29:22 | 25 | MR. FLYNN: I know -- |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 14:29:23 | 1 |

```
14:29:23    1              THE WITNESS:  It's what your version is.

            2              MR. FLYNN:  I know you conned me and you

            3    conned the U.S. Government.  You conned Edra

            4    Blixseth to an extent.  You're a computer hacker and

14:29:29    5    you're a fraud, Mr. Montgomery.

            6              THE WITNESS:  You're outrageous, Mr. Flynn.

            7    You're outrageous.

            8              MR. CROCKETT:  Dennis, let's get through

            9    this.

14:29:37   10              MR. FLYNN:  And you conned me, sir, that's

           11    why we're here.

           12              THE WITNESS:  Yeah.  No, it isn't.

           13              Okay.  I don't know if there was a question

           14    on the table.

14:29:48   15              MR. CROCKETT:  There isn't.

           16    BY MR. CONANT:

           17       Q.    Let's flip to Tab No. 3.  Mr. Montgomery,

           18    let's take a break from the bank statement for a

           19    second.

14:30:07   20              You recall signing a confession of judgment

           21    where you -- a couple of confessions of judgment in

           22    connection with the Nevada litigation?

           23       A.    I'm going to assert my right under the

           24    Fifth.

14:30:20   25       Q.    It's a public document, Mr. Montgomery.  Do
```

Page 230

Dennis Lee Montgomery  -  November 18, 2010

14:30:21  1   you not -- I'm asking if you recall executing this

         2   confession of judgment?

         3        A.   Well, I know there was something signed in

         4   the Trepp matter, if that's what you're referring

14:30:29  5   to.  Is that --

         6        Q.   Do you recall that --

         7        A.   Right.

         8        Q.   -- there were confessions of judgment

         9   totaling approximately $25 million?

14:30:34 10        A.   Yes.

        11        Q.   Now didn't you execute those confessions of

        12   judgment for $25 million because you knew -- because

        13   at the time you were under a $2500-a-day sanction to

        14   turn over the source codes and you knew that the

14:30:49 15   source codes were fraudulent or didn't exist, so to

        16   get out of the $2500-a-dollar sanction you executed

        17   a $25 million confession of judgment?

        18        Then six months later, approximately six

        19   months later, you filed for bankruptcy to get out

14:31:09 20   from under the $25 million judgment that you knew

        21   you could never satisfy.

        22        MR. CROCKETT:  And the question is?

        23        MR. CONANT:  I'm asking:  Didn't he do

        24   that?

14:31:16 25        THE WITNESS:  You made a statement.  I

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 14:31:18 | 1 | didn't realize. |
|---|---|---|
| | 2 | BY MR. CONANT: |
| | 3 | Q.    Wasn't that your plan, Mr. Montgomery? |
| | 4 | A.    No. |
| 14:31:21 | 5 | Q.    You had a plan, because you knew the |
| | 6 | software was always bogus and you knew that the only |
| | 7 | way to get out from the sanction was to get rid of |
| | 8 | the litigation so you settled by executing the |
| | 9 | $25 million judgment. |
| 14:31:33 | 10 | You knew at the time that you could never |
| | 11 | satisfy the $25 million judgment, so you knew the |
| | 12 | only way to get out from the $25 million judgment |
| | 13 | was to file for bankruptcy. |
| | 14 | And the whole time before that you knew |
| 14:31:45 | 15 | that the software was fraudulent, yet you're getting |
| | 16 | paid $1.2 million a year for this fraudulent |
| | 17 | software. |
| | 18 | So the whole time you're hoarding away this |
| | 19 | cash that you're getting, the $1.2 million a year |
| 14:31:55 | 20 | you're getting, because you know at some -- you know |
| | 21 | it's all going to collapse -- |
| | 22 | MR. CROCKETT:  Don't say a word. |
| | 23 | BY MR. CONANT: |
| | 24 | Q.    -- when you're discovered that your |
| 14:32:04 | 25 | software is a complete fraud. |

Page 232

YATES COURT REPORTERS    800.669.1866

```
14:32:07    1              MR. CROCKETT:  Object to the question.

            2    Instruct him not to answer.  It's argumentative.

            3    Compound.  Hypothetical.  It's inconceivable that

            4    you'd consider that to be a legitimate question.

14:32:19    5              THE WITNESS:  Why are both of you laughing?

            6              MR. CROCKETT:  It's okay.

            7    BY MR. CONANT:

            8         Q.   Let's look at Tab No. 3.

            9              By the way, what was your answer to that

14:32:30   10    question?

           11              MR. CROCKETT:  I instructed him not to

           12    answer.

           13    BY MR. CONANT:

           14         Q.   Mr. Montgomery, what's your response?

14:32:35   15         A.   I'm doing what my attorney advised me to

           16    do.

           17         Q.   Didn't you know the whole time the software

           18    was bogus, that you were pedaling bogus software?

           19              MR. CROCKETT:  That's two questions, so

14:32:51   20    it's compound.  It's also argumentative.  It also

           21    assumes facts not in evidence and conclusory.

           22              And I will, again, instruct you not to

           23    answer it.

           24              THE WITNESS:  I'm doing what my attorney --

14:33:00   25              MR. CROCKETT:  And, I'm sorry, not to
```

14:33:02  1    answer them.

        2    BY MR. CONANT:

        3       Q.    The source code that we're been referring

        4    to all day today in the Plaintiff's Exhibit 3, in

14:33:09  5    these emails, the source code, you knew it was bogus

        6    didn't you, Mr. Montgomery?

        7            MR. CROCKETT:  Same objection.  Same

        8    instruction.

        9            THE WITNESS:  I'm not answering the

14:33:21  10   question under advice of my counsel.

        11   BY MR. CONANT:

        12      Q.    Why not?

        13      A.    He just told me not to.

        14      Q.    So you're refusing to answer whether or not

14:33:28  15   the source code that we've been referring to all day

        16   is fraudulent; is that --

        17      A.    I'm answering my attorney told me not to

        18   answer the question; I'm not answering the question.

        19      Q.    So you're refusing to answer, okay.

14:33:42  20      A.    I'm not refusing.  I'm doing what my

        21   attorney's asked me not to do.

        22      Q.    That's fine.

        23            You realize under the Bankruptcy Code,

        24   Mr. -- all right.  We'll move on.

14:33:53  25            Tab No. 3, Plaintiff's Exhibit No. 18,

Case 1:08-cr-00073-CKK-MAU Document 17 Filed 07/29/23 Page 236 of 1046
08-61570-RBK Doc#: 1145-5 Filed: 01/04/11 Entered: 01/04/11 14:29:06 Page 236 of 345

Dennis Lee Montgomery  -  November 18, 2010

14:33:55   1   we'll look at page 2 of 6 on the account -- account

           2   statement dated April 12 through May 9, 2006.

           3        A.   I'm there.

           4        Q.   All right.  Deposit -- first deposit there

14:34:14   5   we see listed, $175,000 on April 12, '06.

           6             Where did that money come from,

           7   Mr. Montgomery?

           8        A.   I don't know.

           9        Q.   Where did it go?

14:34:29  10        A.   Can I ask my attorney a question?

          11             MR. CONANT:   Sure.  We'll go off the record

          12   for a sec.

          13             THE VIDEOGRAPHER:   Going off the record.

          14   The time is 2:34 p.m.

14:38:18  15             (Recess taken.)

          16             THE VIDEOGRAPHER:   The time is 2:38 p.m.

          17   We're back on the record.

          18   BY MR. CONANT:

          19        Q.   All right.  Mr. Montgomery, turning to the

14:38:31  20   page we were at previously, I believe my last

          21   question was in relation to the first deposit entry

          22   dated April 12 in the amount of $175,000, and we're

          23   on Tab 3, page 2 of 6, of -- well page 2 of 6 of

          24   Tab 3, Plaintiff's Exhibit 18.

14:38:51  25             Do you see that $175,000 entry,

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

```
14:38:53    1   Mr. Montgomery?
            2       A.   Yes.
            3       Q.   What was the source of those funds?
            4       A.   The source?
14:38:59    5       Q.   Yes.
            6       A.   I'm not certain.
            7       Q.   Was that money you received in connection
            8   with your employment at Opspring or Blxware?
            9       A.   It could have been.
14:39:08   10       Q.   It could have been.
           11            Where did that $175,000 go, Mr. Montgomery?
           12       A.   Well, I think that reference is showing a
           13   transfer to, isn't it?
           14       Q.   It is, but I'm asking you:  What would you
14:39:24   15   do with $175,000 that was deposited into your
           16   account?
           17       A.   Well, I'm was looking at that number and
           18   I'm wondering if that number is just a savings
           19   account of ours and I'm transferring it out of the
14:39:31   20   checking account and putting it into savings account
           21   and that number reflects the savings account.
           22            I don't know that for a fact, but I know
           23   that Wells Fargo had some -- so that was my
           24   question -- my answer.
14:39:46   25       Q.   So it went into a savings account, maybe.
```

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

```
14:39:48    1    Where would it go from there?

            2         A.   I don't know.  Pay bills, I presume.

            3         Q.   Do you still have that $175,000?

            4         A.   No.

14:39:56    5         Q.   All right.  Next one, April -- next big

            6    deposit below that another one for $175,000.

            7              Do you see that, Mr. Montgomery?

            8         A.   Yes.

            9         Q.   What was that -- what was the source of

14:40:07   10    those funds?

           11         A.   I'm not certain.

           12              MR. FLYNN:  Put the dates in.

           13              MR. CONANT:  That was referring to a

           14    deposit dated April 14, 2006.

14:40:16   15              THE WITNESS:  Yeah, I saw it.

           16    BY MR. CONANT:

           17         Q.   Okay.  Let's see.  Right below that, ATM

           18    deposit dated April 18 in the amount of $65,916, and

           19    it looks to be a deposit in Reno, Nevada.

14:40:36   20              How did you go about depositing $65,916 at

           21    an ATM, Mr. Montgomery?

           22         A.   I presume it was a check.

           23         Q.   For what?  What was the check for?

           24         A.   I don't know.

14:40:48   25         Q.   Was it --
```

Page 237

Dennis Lee Montgomery  -  November 18, 2010

14:40:49    1              MR. FLYNN:  Where did it come from.

         2    BY MR. CONANT:

         3        Q.    Where did that $65,000 go?

         4        A.    He said come and you said go.  That's

14:40:57    5    what's confusing, you hear them both at the same

         6    time.

         7              I don't know.

         8        Q.    Below that $500,000 deposit dated April 25

         9    and, again, the description purports to be from

14:41:09   10    Azimyth, LLC.

        11              Was that -- what was that deposit for,

        12    Mr. Montgomery?

        13        A.    For?

        14        Q.    What was it for?

14:41:16   15        A.    It's coming from Azimyth.

        16        Q.    In connection with what?  Why would Azimyth

        17    deposit $500,000 into your account?

        18        A.    There was a time at which I was going to

        19    buy a house and I don't know if this was the time.

14:41:29   20    I just don't recall.

        21        Q.    How would a deposit from Azimyth be related

        22    to your purchase of a house?

        23        A.    Because in my original agreement there was

        24    something that referenced that they would loan me

14:41:43   25    the money so that I could make a deposit on a house.

Dennis Lee Montgomery  -  November 18, 2010

| 14:41:49 | 1 | Q.  Did you -- is this $500,000 entry dated |
| | 2 | April 25 one of the $500,000 entries referenced -- |
| | 3 | or I'm sorry -- loans referenced in your employment |
| | 4 | agreement? |
| 14:41:59 | 5 | A.  It could be. |
| | 6 | Q.  Did you ever pay back that loan, |
| | 7 | Mr. Montgomery? |
| | 8 | A.  No. |
| | 9 | Q.  Did you ever report that $500,000 then on |
| 14:42:11 | 10 | your income taxes? |
| | 11 | A.  I don't recall. |
| | 12 | Q.  All right.  Next deposit dated April 25 in |
| | 13 | the amount of $250,000.  Do you know what that |
| | 14 | deposit was from, Mr. Montgomery? |
| 14:42:30 | 15 | A.  From or was it just a transfer from another |
| | 16 | account, from the savings account? |
| | 17 | I don't know. |
| | 18 | Q.  What was the source of the $250,000? |
| | 19 | A.  I don't know. |
| 14:42:40 | 20 | Q.  All right.  Did you report -- well, never |
| | 21 | mind. |
| | 22 | All right.  Next deposit, April 28, in the |
| | 23 | amount of $96,880.50. |
| | 24 | Do you see that Mr. Montgomery? |
| 14:42:54 | 25 | A.  Yes. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 14:42:54 | 1 | Q.    Again, another -- appears to be another |
| | 2 | deposit from Azimyth, LLC -- |
| | 3 | A.    Uh-huh. |
| | 4 | Q.    -- or, in this case, Opspring also, it |
| 14:43:02 | 5 | appears. |
| | 6 | Why did Azimyth or Opspring pay you that |
| | 7 | $96,880? |
| | 8 | A.    I'm sorry. |
| | 9 | I don't recall. |
| 14:43:13 | 10 | Q.    Was it in connection with your employment |
| | 11 | with Azimyth? |
| | 12 | A.    I don't know. |
| | 13 | Q.    You don't.  So -- |
| | 14 | A.    It's an odd amount.  That's the reason I |
| 14:43:17 | 15 | don't know. |
| | 16 | Q.    Well, why would Azimyth, of all |
| | 17 | companies -- or Opspring, of all companies, deposit |
| | 18 | $96,880 in your account? |
| | 19 | A.    Maybe that was Mr. Flynn's legal fees being |
| 14:43:30 | 20 | paid again.  I don't know. |
| | 21 | Q.    Was it -- so -- all right.  So you can't |
| | 22 | explain -- was that in connection with your |
| | 23 | employment with Azimyth? |
| | 24 | A.    I don't know.  You've asked that; I've |
| 14:43:37 | 25 | given you my best answer. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

14:43:39   1      Q.   Do you know if you reported that amount of
          2   money on your income taxes, Mr. Montgomery?
          3      A.   I don't recall.
          4      Q.   All right.  Next large deposit May 5 in the
14:43:49   5   amount of $104,000.
          6           Do you see that Mr. Montgomery?
          7      A.   Yes.
          8      Q.   What was the source of that $104,000?
          9      A.   Well, I keep seeing the same account
14:43:59  10   number, which keeps telling me it's a transfer from
         11   a savings account into my checking account.  That's
         12   what it looks like to me.
         13           And you keep adding these up as if they're
         14   progressive and I don't know if it was just money
14:44:13  15   that was put into a savings account and transferred
         16   back into the checking account.
         17      Q.   Well, we're on the deposits, so I'm asking
         18   about the deposits.
         19      A.   I just gave you my answer.
14:44:23  20      Q.   So you don't know the source of that money?
         21      A.   Well, it says from 6013222.  I'm
         22   wondering -- and I don't have my bank statement, so
         23   I have no way of knowing if that was just a savings
         24   account.
14:44:33  25      Q.   How much of this money was cashed out at

Page 241

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| 14:44:37 | 1 | casinos? |
| | 2 | A.   I don't know. |
| | 3 | Q.   Was any of it cashed out at casinos? |
| | 4 | A.   I don't know. |
| 14:44:43 | 5 | Q.   Would any of it have been cashed out in |
| | 6 | casinos? |
| | 7 | A.   I don't know. |
| | 8 | Q.   All right.  Turn to page 3 of 6, |
| | 9 | withdrawals. |
| 14:44:54 | 10 | A.   Okay. |
| | 11 | Q.   All right.  I'm looking under Withdrawals |
| | 12 | category dated April 14, withdrawal made in a |
| | 13 | branch, amount $155,000. |
| | 14 | Isn't that a cashier's check that you |
| 14:45:12 | 15 | purchased from a branch in the amount of $155,000, |
| | 16 | Mr. Montgomery? |
| | 17 | A.   I wouldn't -- I don't know. |
| | 18 | Q.   Did you ever buy cashier's checks from bank |
| | 19 | branches at Wells Fargo? |
| 14:45:24 | 20 | A.   Have I ever gotten cashier's checks? |
| | 21 | Yes. |
| | 22 | Q.   Have you ever gotten any large cashier's |
| | 23 | checks in the amount of, say, over $50,000? |
| | 24 | A.   I don't know. |
| 14:45:50 | 25 | Yeah.  I mean it could be.  It's -- |

Dennis Lee Montgomery  -  November 18, 2010

14:45:53    1         Q.    So withdrawal made at a branch store,

            2    that's where you walk into a branch and purchase a

            3    $155,000 cashier's check, isn't that right,

            4    Mr. Montgomery?

14:46:03    5         A.    I don't know.  From that description I

            6    don't know.

            7         Q.    What else would it be, Mr. Montgomery?

            8         A.    I'm not going to speculate.  I don't know.

            9         Q.    How would -- what would cause a transaction

14:46:11   10    description to show up on your own bank account

           11    showing withdrawal made in a branch store, $155,000?

           12         How would that get there, Mr. Montgomery?

           13         A.    Well, the bank obviously put it there.

           14         Q.    Did you authorize the bank to do that?

14:46:24   15         A.    Yes, but I don't -- I think your point is

           16    you're asking me what's it for.  I don't know.

           17         Q.    Well, no, I'm not.

           18         A.    I thought you did just previously.  I'm

           19    sorry.

14:46:35   20              MR. FLYNN:  What was in his mind.

           21    BY MR. CONANT:

           22         Q.    As you're walking into a branch store to

           23    buy a $155,000 cashier's check, what are you

           24    thinking about when you're --

14:46:46   25         A.    I don't know at the time.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 14:46:47 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 14:46:59 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 14:47:09 | 10 |

1    Q.   What would you -- you're telling me that --
2 is it a normal occurrence for you to walk into one
3 of your banks and ask for a cashier's check in the
4 amount of $155,000?

5    A.   I'm not certain.

6    Q.   You're not certain?

7    A.   I don't know if that is a cashier's check
8 or not.  You've asked me every way around that.  I
9 don't know.  I see the same description you see.  I
10 don't know what that is.

11    Q.   I just -- for me, I don't go into my bank
12 every day purchasing large cashier's checks.  I'm
13 wondering what causes a person like you to do so and
14 you're not disputing that this was an authorized
15 transaction by you, so I'm curious, you know, why
16 we're getting $155,000 cashier's check on
17 April 14th?

18        MR. CROCKETT:  There's no question pending.

19        THE WITNESS:  I know.  It was just a
20 statement.

21        Is there?  I'm sorry, I thought --

22 BY MR. CONANT:

23    Q.   So isn't this you going into a branch store
24 cashing -- I'm sorry.

25        Isn't this you -- doesn't this represent

14:47:42   1   that you're going into a bank branch and purchasing

2   a cashier's check in the amount of $155,000?

3          MR. CROCKETT:  You're asking for

4   speculation.  It says what it says.  The document

14:47:53   5   speaks for itself.

6          MR. FLYNN:  Cashier's checks or cash.

7   BY MR. CONANT:

8      Q.   Would you have gotten this in a cashier's

9   check or in cash, Mr. Montgomery?

14:48:02  10      A.   I don't know what that description is

11   referring to.  You see the same thing I do.

12      Q.   Have you ever walked into a bank branch and

13   bought a check, a cashier's check, or asked the bank

14   for cash in the amount of $155,000?

14:48:13  15      A.   That's two questions.

16      Q.   I'm asking you to answer it as best you

17   can, Mr. Montgomery.

18      A.   But you asked me two questions.  You asked

19   me about a cashier's check or you asked me about

14:48:24  20   cash.

21      Q.   I'm asking you to answer in the

22   alternative.  Do you want me to spend the time and

23   go through?

24      A.   If you're going to ask me both those

14:48:30  25   questions, yes.

Dennis Lee Montgomery  -  November 18, 2010

14:48:31  1      Q.     Have you ever gone into a bank branch and

2      bought a cashier's check for $155,000?

3      A.     I might have.

4      Q.     Do you dispute that's what this represents?

14:48:42  5      A.     I don't know what that 155- is referring

6      to, a cashier's check or not.

7      Q.     So the only other alternative would be that

8      you got this money in cash?

9      A.     Never.  No.  The answer to that is no.

14:48:50  10          Please stop making signs when I'm trying to

11     talk to him.

12     Q.     So when you would buy this cashier's check,

13     where would you intend to cash it?

14     A.     I don't recall.

14:49:03  15     Q.     Would you cash it in a casino?

16     A.     I don't recall.

17     Q.     Would you give it to your five-year-old, if

18     you have one?

19          MR. CROCKETT:  I'll object at this point

14:49:13  20     and you're still assuming facts not in evidence and

21     now you've passed far into the realm of being

22     argumentative, Counsel.

23     BY MR. CONANT:

24     Q.     Did you ever endorse any of your cashier's

14:49:21  25     checks -- did you endorse this cashier's check for

Page 246

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 14:49:24 | 1 |

14:49:24    1    $155,000 to any of your family members?

2         MR. CROCKETT:  I'll object.  It assumes

3    facts not in evidence.  Lacks foundation.

4         If you can answer the question as it's

14:49:33    5    phrased, go ahead.

6         THE WITNESS:  I don't recall.

7    BY MR. CONANT:

8    Q.    Would you ever and did you ever endorse any

9    cashier's checks that you bought at banks over to

14:49:43    10    your family members?

11    A.    I don't recall.

12    Q.    Have you ever given any sum of money in

13    excess of a hundred thousand dollars to any of your

14    relatives, Mr. Montgomery?

14:49:52    15    A.    I don't recall.

16    Q.    Wouldn't your intent be when you got these

17    cashier's checks to go cash them at casinos,

18    Mr. Montgomery?

19         MR. CROCKETT:  Well, it's compound and it

14:50:04    20    calls for speculation and lacks foundation, assumes

21    facts not in evidence and it's argumentative.

22         MR. CONANT:  Great.

23    Q.    Mr. Montgomery, can you answer the question

24    please.

14:50:13    25    A.    I'm not certain what the question is.  Ask

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

14:50:15   1   it again.

           2         Q.   When you bought these cashier's checks

           3   at --

           4         A.   You keep saying cashier's checks; right?  I

14:50:22   5   don't see where that says cashier's checks.  Show me

           6   on this where it says cashier checks.

           7         Q.   What else would it be, Mr. Montgomery?

           8         A.   I would have no way of knowing.  Ask the

           9   bank, but I don't know that that's a cashier's

14:50:34  10   check, yes or no.

          11         Q.   You told me --

          12         A.   You keep saying it is, but I don't know

          13   that.

          14         Q.   You told me it's not cash.  You know that;

14:50:41  15   right?

          16         A.   I've never taken that out.  That's correct.

          17         Q.   Okay.  And you don't dispute that this is

          18   an authorized transaction on your part; right

          19   Mr. Montgomery?

14:50:48  20         A.   I mean it's on the bank statement.  I see

          21   it.

          22         Q.   So you authorized it, Mr. Montgomery?

          23         A.   It's obviously on the bank statement, so

          24   it's there.  So was that transaction done?

14:50:56  25   Probably, yes.

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 14:50:59 | 1 | I'm not disagreeing. |
| | 2 | Q.    And who has control over this account, |
| | 3 | Mr. Montgomery? |
| | 4 | A.    Obviously I do. |
| 14:51:08 | 5 | You're asking me about a check -- |
| | 6 | MR. CROCKETT:    Enough. |
| | 7 | BY MR. CONANT: |
| | 8 | Q.    All right.  April 14, I see a withdrawal in |
| | 9 | the amount of $67,000. |
| 14:51:20 | 10 | MR. CROCKETT:    I don't. |
| | 11 | BY MR. CONANT: |
| | 12 | Q.    Do you see that? |
| | 13 | A.    No, I don't see that. |
| | 14 | Q.    April 14th -- I'm sorry, April 19th. |
| 14:51:27 | 15 | A.    Oh, that one.  Yes. |
| | 16 | Q.    $67,000, where did that money go to? |
| | 17 | A.    Well, according to this it looks like it's |
| | 18 | going back into the savings account 6013320, |
| | 19 | whatever, that's what it looks like to me, not a |
| 14:51:41 | 20 | withdrawal. |
| | 21 | Q.    What was the source of that $67,000? |
| | 22 | A.    Well, according to this it's coming out of |
| | 23 | this checking account that had this money put in it |
| | 24 | and it looks like to me it's going back in the |
| 14:51:51 | 25 | savings account. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

14:51:52    1        Q.    What was the source of your income during

            2   this time period, Mr. Montgomery?

            3        A.    Opspring.

            4        Q.    Exclusively?

14:52:11    5        A.    I can't be certain.  I don't recall.

            6        Q.    Were there any -- did you have any other

            7   sources of meaningful income?

            8        A.    I don't recall.

            9        Q.    You didn't have any other jobs during this

14:52:27   10   time, did you, Mr. Montgomery?

           11        A.    I'm not certain.

           12        Q.    Were you selling software to third parties

           13   outside of Opspring or Blxware, Mr. Montgomery?

           14        A.    Was I selling -- not that I recall.

14:52:41   15        Q.    Were you making software for anyone else

           16   other than Opspring or Blxware?

           17        A.    Which transaction are we referring to?

           18        MR. CROCKETT:  We're not referring to a

           19   transaction.  It's a different question.  Listen to

14:52:52   20   it and answer it.

           21        THE WITNESS:  Oh, I'm sorry.  Ask it again.

           22   BY MR. CONANT:

           23        Q.    Were you making software for anyone else at

           24   this time?

14:53:00   25        A.    Well, I ended my relationship with

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
14:53:02   1    eTreppid, so I don't recall.  I don't recall.

           2         Q.    Were you making any software -- would you

           3    have been making any software directly for the

           4    government?

14:53:09   5         A.    I don't recall.

           6         Q.    All right.  Go down to the withdrawal dated

           7    April 25 in the amount of $490,000.

           8         A.    Yeah.

           9         Q.    Do you see that?

14:53:18  10         A.    Yes.

          11         Q.    Where did that -- where did $490,000 go,

          12    Mr. Montgomery?

          13         A.    To me it looks like it's going right back

          14    to the savings account.

14:53:26  15         Q.    Then from there where would it go?

          16         A.    Okay.  Well, you mean that 490-, I don't

          17    know.

          18         Q.    Do you have it -- do you still have it?

          19         A.    No.

14:53:37  20         Q.    Do any of your family members have it?

          21         A.    No.

          22         Q.    Do any of your family members have any

          23    money that you ever earned during the time of your

          24    employment with any of Edra Blixseth's entities?

14:53:49  25         A.    What do you mean "Edra Blixseth's
```

Page 251

Dennis Lee Montgomery  -  November 18, 2010

14:53:51   1   entities"?

           2        Q.   Opspring, Blxware, Azimyth.

           3        A.   Okay.  Well -- and now restate the

           4   question.  I'm sorry, I was distracted on that

14:53:59   5   statement.

           6        Q.   All right.  When I refer to Edra Blixseth's

           7   entities I'm going to refer to Azimyth, Opspring,

           8   Blxware and I have to because I've asked you to

           9   explain the relationship of all of them and I can't

14:54:11  10   get an answer from you.

          11        A.   Okay.

          12        Q.   So, do any of your family members -- and by

          13   family members I mean wife, children, inlaws, any

          14   manner of family member you can think of -- do any

14:54:26  15   of your family members have any of the money that

          16   you earned from any of Edra Blixseth's entities?

          17        A.   You mean have I ever given them money?

          18             MR. CROCKETT:  That's not the question.

          19             THE WITNESS:  Well, then I'm concerned I

14:54:39  20   don't understand the question then.

          21   BY MR. CONANT:

          22        Q.   Do any of your family members currently

          23   have any of the money that you earned while working

          24   for Ms. Blixseth's entities?

14:54:50  25             MR. CROCKETT:  Calls for speculation.

Page 252

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|--|--|--|
| 14:54:51 | 1 | If you can answer, go ahead. |
| | 2 | THE WITNESS:  No. |
| | 3 | BY MR. CONANT: |
| | 4 | Q.    Do any of your family members hold any of |
| 14:54:56 | 5 | your money or assets in your behalf? |
| | 6 | A.    They're holding no money.  I don't know |
| | 7 | what you mean "assets."  In other words, you talking |
| | 8 | about couches or cars or something or what?  I don't |
| | 9 | understand. |
| 14:55:12 | 10 | Q.    Property, any assets that are yours -- |
| | 11 | A.    Yeah. |
| | 12 | Q.    -- do any of your family members hold those |
| | 13 | on your behalf? |
| | 14 | A.    I cosigned for a house for Ish in -- in |
| 14:55:25 | 15 | Washington.  So when you say "have," you know what |
| | 16 | I'm saying?  I mean that's -- does that make sense? |
| | 17 | That's the only thing I know. |
| | 18 | Q.    You cosigned? |
| | 19 | A.    Yeah. |
| 14:55:36 | 20 | Q.    Is your name on the title to that property? |
| | 21 | A.    I don't know if it is or not.  I don't |
| | 22 | think so.  I don't know.  I don't know. |
| | 23 | Q.    Are you -- |
| | 24 | A.    I know. |
| 14:55:49 | 25 | Q.    Did you ever give any amounts of money that |

Page 253

14:55:52  1    you earned from Edra Blixseth's entities in the

          2    amount of -- let me rephrase it.

          3         If you take the money that you earned from

          4    Edra Blixseth's entities, did you ever transfer

14:56:04  5    amounts greater than $10,000 to any of your family

          6    members?

          7         A.   I don't recall if I've done it or not.

          8         Q.   All right.  Let's turn to page 4 of 6,

          9    April 25 --

14:56:20  10        A.   Okay.

          11        Q.   -- top entry, withdrawal made in a branch,

          12   another $155,000 withdrawal made in a branch.  Can

          13   you explain to me why we're seeing -- we've seen two

          14   withdrawals made in a branch, two entries described

14:56:42  15   as draw made in a branch in the amount of $155,000.

          16        A.   No.

          17        Q.   You authorized this withdrawal, did you

          18   not?

          19        A.   I don't -- I must have, I guess.

14:56:58  20        Q.   So why would you have gone -- what were you

          21   going to do with that $155,000 that you withdrew

          22   from the branch?

          23        A.   I don't recall what it was for.

          24        Q.   Why would you go -- why would you go

14:57:10  25   directly into a bank to get this $155,000 instead of

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 14:57:14 | 1 | doing a wire transfer?  Writing a check? |
| | 2 | I mean why would you -- why would you do it |
| | 3 | this way, Mr. Montgomery, if you needed to get your |
| | 4 | hands on $155,000? |
| 14:57:26 | 5 | A.    What do you mean "get my hands on"?  What |
| | 6 | does that term mean. |
| | 7 | Q.    Access $155,000. |
| | 8 | A.    I don't recall. |
| | 9 | Q.    Don't recall. |
| 14:57:39 | 10 | All right.  Look -- the 50,000 -- April 25 |
| | 11 | transaction right below that, $50,000 -- |
| | 12 | A.    I see it. |
| | 13 | Q.    -- you see that? |
| | 14 | What was that money used for? |
| 14:57:54 | 15 | A.    I don't recall. |
| | 16 | Q.    Didn't you cash that money?  Didn't you |
| | 17 | take that money to a casino, Mr. Montgomery? |
| | 18 | A.    I don't recall. |
| | 19 | Q.    All right.  The $20,000 transfer to -- or |
| 14:58:06 | 20 | dated April 25 and it references an account number. |
| | 21 | What was that transfer for? |
| | 22 | A.    I don't know.  I can't see the account |
| | 23 | number, so I don't know. |
| | 24 | Q.    All right.  What about if you go down to |
| 14:58:18 | 25 | April 28, $63,000 withdrawal, what was that money |

Page 255

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

14:58:22   1    for?

           2        A.   I don't know.

           3        Q.   Where did it go, Mr. Montgomery?

           4        A.   I don't recall.

14:58:26   5        Q.   All right.  May 5, withdrawal made in a

           6    branch $104,000.  Again, another withdrawal on a

           7    branch.  Why are you going into these branches,

           8    making these withdrawals within the branch,

           9    Mr. Montgomery?

14:58:39  10        A.   I don't recall.

          11        Q.   Is it -- your experience, is it normal for

          12    a person to go into a bank like that and make large

          13    withdrawals of cash, Mr. Montgomery?

          14        A.   I don't have an opinion.

14:58:52  15        Q.   Do you know other people who do that,

          16    Mr. Montgomery?

          17        A.   I don't have an opinion.

          18        Q.   I'm not asking if you have an opinion, I'm

          19    just asking if you know other people who do that,

14:59:01  20    engage in that sort of banking practice?

          21        A.   I don't know.

          22        Q.   You don't know if you know people or you

          23    don't know people?

          24        A.   You keep asking me to speculate.  I don't

14:59:10  25    know.

YATES COURT REPORTERS    800.669.1866

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/29/23 Page 258 of 1046
08-cv-01570-RBK Doc#: 215-5 Filed 01/04/11 Entered 01/04/11 14:20:05 Page 258 of
345

Dennis Lee Montgomery  -  November 18, 2010

14:59:10    1        Q.    No.  I'm asking you:  Do you know anyone
           2   who engages in this type of banking practice?
           3        A.    Of going in and getting a cashier's check
           4   out of their account?
14:59:20    5        Q.    Getting cashier's checks in large
           6   increments of money.
           7        A.    You keep implying those are cashier's
           8   checks.  I've always said I don't really know.
           9        Q.    All right.  Going into a branch and
14:59:25   10   extracting $104,000, $155,000, $50,000 in some form,
          11   I mean that's not -- that's -- do you know anyone
          12   else who engages in that sort of banking practice?
          13        A.    I don't have an opinion.
          14        Q.    That's not the question.
14:59:42   15             Do you know anyone?
          16        A.    Not off the top of my head, but people
          17   don't share with me their banking transactions so I
          18   wouldn't know.
          19        Q.    All right.
15:00:01   20             MR. FLYNN:  It's somewhere in here.  Yeah.
          21   I'm looking for it.  All right.
          22             THE WITNESS:  That's what he said.
          23             MR. FLYNN:  I know.  I know.
          24             MR. CONANT:  All right.
15:00:22   25        Q.    All right.  Let's go to Tab No. 4, May 10

Page 257

Dennis Lee Montgomery  -  November 18, 2010

15:00:26    1    through June 9.

2        A.    Tab No. 4, okay.

3        Q.    Tab 4, page 2 of 6, Tab 4.

4        A.    Okay.

15:00:36    5        Q.    All right.  Looking at the first deposit

6    here, 5/10, May 10 that is, purported deposit from

7    Azimyth, LLC, or Opspring in the amount of $150,000.

8             What did you get that $150,000 for,

9    Mr. Montgomery.

15:00:52   10        A.    I believe to pay Mr. Flynn.

11        Q.    Are you telling me that was not money --

12        A.    Oh, I'm sorry.  I'm mistaken.  You're

13    asking me how did it come in.

14        Q.    Yes.

15:01:03   15        A.    I'm sorry.

16             Okay.  What's -- what's your question

17    again?

18        Q.    What was that $150,000 for?

19        A.    I don't know if it was a loan or not.  I

15:01:13   20    don't recall what that one specifically related to.

21        Q.    Was there a note?  If it was a loan, would

22    there have been a note executed in connection with

23    that loan?

24        A.    I don't know.

15:01:23   25        Q.    Did you report this $150,000 on your income

Page 258

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 15:01:26 | 1 | taxes? |
| | 2 | A.   I don't recall. |
| | 3 | Q.   All right.   The May 11 online transfer in |
| | 4 | the amount of $50,000, what's $50,000 going into |
| 15:01:38 | 5 | your account for on May 11? |
| | 6 | A.   Looks like the money that was put in, the |
| | 7 | 150-, there were two $50,000 transfers into a |
| | 8 | savings account back into the savings account. |
| | 9 | Q.   Where did it go from there? |
| 15:01:50 | 10 | A.   I don't -- at some point back to the |
| | 11 | checking account. |
| | 12 | Q.   Then where -- where did this money go, |
| | 13 | Mr. Montgomery? |
| | 14 | A.   I just told you. |
| 15:01:57 | 15 | Q.   I'm seeing -- I'm seeing large volumes of |
| | 16 | money going into checking accounts and I'm not |
| | 17 | seeing where they're accounted for in cash and |
| | 18 | you're now in bankruptcy, so, obviously, it went |
| | 19 | somewhere, so the question is:   Where did this money |
| 15:02:10 | 20 | go? |
| | 21 | A.   Well, I know in that time frame I paid -- |
| | 22 | over a year I paid Michael Flynn, what, 1.2 million. |
| | 23 | He got 1.2 million of money that came in from |
| | 24 | Azimyth and went into his account. |
| 15:02:23 | 25 | Q.   You're telling me your entire salary for |

Dennis Lee Montgomery  -  November 18, 2010

15:02:25    1    one year went to go pay attorney's fees?

2        MR. CROCKETT: That's not what he said at

3    all. Completely misrepresents what he said and it's

4    argumentative.

15:02:36    5        You want to try to rephrase it?

6        MR. CONANT: No. I want -- because we have

7    an employment agreement showing him earning

8    $1.2 million a year and he's telling me he's

9    spending his entire salary --

15:02:41    10        MR. CROCKETT: That's not what he said at

11    all. He said he paid Flynn $1,200,000.

12        MR. CONANT: Which is his entire salary for

13    a year with Opspring, is it not?

14        MR. CROCKETT: I don't know if it is or it

15:02:53    15    isn't.

16        THE WITNESS: Say that again? I'm

17    confused, your question.

18    BY MR. CONANT:

19        Q. You're getting paid $1.2 million --

15:03:00    20        A. Yeah.

21        Q. -- annually, are you not, from Opspring?

22        A. Well, it says that. Did I actually get

23    that? I'm not certain.

24        Q. All right. Well, let's look at this entry

15:03:08    25    May 15, hundred thousand dollars. Is that part of

Dennis Lee Montgomery   -   November 18, 2010

```
15:03:12   1    your income from Azimyth or Opspring?

           2        A.    No.    That's another example where it came

           3    out of the checking account and went back into the

           4    savings account.    That's what that is.

15:03:25   5        Q.    Where did it go from the savings account,

           6    Mr. Montgomery?  What were you spending large --

           7    this is a lot of money coming in.    What did you --

           8        A.    I just told you.    He charged me

           9    $1.2 million for the work.    That's a lot of money to

15:03:36  10    charge a client.

          11        Q.    Aren't you hiding this money, this cash,

          12    away somewhere else, Mr. Montgomery?

          13        A.    No, absolutely not.    Absolutely not.

          14            MR. FLYNN:    Ask him if all the -- came from

15:03:48  15    him in his bank accounts.

          16    BY MR. CONANT:

          17        Q.    Where would --

          18            THE WITNESS:    Why do you say that and then

          19    smile at the government?  I don't get why you do

15:03:56  20    that.

          21            MR. CROCKETT:    Dennis.

          22            THE WITNESS:    It's very -- it's very

          23    distracting.

          24            MR. CONANT:    For the record, that comment

15:04:01  25    was directed toward Mr. Flynn, just for the record.
```

Page 261

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 15:04:04 | 1 | THE WITNESS:  Okay.  Go ahead. |
| | 2 | MR. FLYNN:  Go ahead.  Ask him. |
| | 3 | BY MR. CONANT: |
| | 4 | Q.    Isn't it true, though, Mr. Flynn's |
| 15:04:12 | 5 | attorneys fees were not being paid out of your |
| | 6 | checking account or your savings account; isn't that |
| | 7 | right, Mr. Montgomery? |
| | 8 | A.    No, that's not true.  Now you're asking me |
| | 9 | to release attorney-client information.  That's what |
| 15:04:22 | 10 | you're asking me to do, go on the record and start |
| | 11 | releasing attorney-client privileged information. |
| | 12 | Isn't that what he's asking me? |
| | 13 | MR. CROCKETT:  Don't argue with him. |
| | 14 | THE WITNESS:  Okay.  Okay. |
| 15:04:32 | 15 | BY MR. CONANT: |
| | 16 | Q.    How much money was paid to Mr. Flynn out of |
| | 17 | your accounts, Mr. Montgomery? |
| | 18 | A.    I don't recall specifically if I had to go |
| | 19 | get a cashier's check and give it to him or they |
| 15:04:43 | 20 | transferred money in and then I subsequently |
| | 21 | transferred it right back out to him.  I don't |
| | 22 | recall specifically if it was one, both or some |
| | 23 | combination. |
| | 24 | Q.    That wasn't the question. |
| 15:04:53 | 25 | MR. FLYNN:  For the record, Michael Flynn. |

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
15:04:54   1   None of four attorneys working for me at the time
           2   ever received a cashier's check from Dennis
           3   Montgomery.
           4           THE WITNESS:  Okay.  What about a check --
15:05:04   5           MR. FLYNN:  Go ahead.  Ask him.
           6   BY MR. CONANT:
           7       Q.   How much, Mr. Montgomery?  My question
           8   wasn't how --
           9           MR. CROCKETT:  Just because he makes a
15:05:09  10   statement, doesn't mean you have to respond.
          11           THE WITNESS:  Well, he just asked.
          12           MR. CROCKETT:  Keep going.
          13   BY MR. CONANT:
          14       Q.   My question wasn't how you paid Mr. Flynn,
15:05:16  15   my question was how much did you pay Mr. Flynn out
          16   of your own account?
          17       A.   I thought I answered that.  I thought
          18   during that period of time he received -- from the
          19   beginning to when, you know, until -- I thought he
15:05:32  20   received around 1.2 million.
          21       Q.   From your account, from your checking
          22   account or savings account?
          23       A.   I don't know if it was just mine or the
          24   initial money -- the initial payment they wired to
15:05:41  25   him and then from then on I paid him, but I know
```

YATES COURT REPORTERS     800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

15:05:46  1    every month he demanded money.

2            I called them and they gave me the money

3       and then I transferred to him because I had to send

4       a check to him.

15:05:52  5         Q.    Who is "them"?

6           A.    What do you mean?

7           Q.    You said "them," you had to call "them."

8           A.    Sandoval.

9           Q.    Sandoval?  Who is Sandoval?

15:05:59  10        A.    You don't know who Michael Sandoval is?

11          Q.    I'm asking.  The question is for you.

12          A.    I'm sorry.

13                Michael Sandoval at the time, I believe,

14      was the CEO of both Opspring and Azimyth at the

15:06:14  15    time.  I believe that's the case.

16          Q.    What was your -- all right.  Well -- all

17      right.

18                So is it your testimony that $1.2 million

19      was paid to Michael Flynn out of your checking

15:06:42  20    account?

21          A.    I can't say it was paid exclusively out of

22      my account because -- there was occasions at the end

23      and --

24                MR. CROCKETT:  Just answer the question.

15:06:54  25                THE WITNESS:  I can't say it was

Dennis Lee Montgomery  -  November 18, 2010

15:06:56   1   exclusively, no.

           2   BY MR. CONANT:

           3       Q.    Do you know how much?

           4       A.    No.

15:07:03   5       Q.    All right.  May 19, back to page 2 of

           6   Tab 4, Opspring, LLC, payroll, $48,272.24.

           7           What was that money for, that $48,000 for,

           8   Mr. Montgomery?

           9       A.    I don't know if that was my paycheck, if

15:07:32  10   that was it or there were expenses reimbursements in

          11   there.  I just don't know.

          12       Q.    How were you paid?  I mean how were you

          13   paid by Opspring?  Were you paid monthly?  Were you

          14   paid every two weeks?  Twice a month?

15:07:46  15       A.    I don't know if it was every two weeks or

          16   twice a month.  It was one of those two, I believe.

          17       Q.    Was it month -- but it was not monthly?

          18       A.    I don't believe so.

          19       Q.    All right.  I see May 31 a deposit in the

15:08:07  20   amount of $31,282.95.  Do you see that,

          21   Mr. Montgomery?

          22       A.    Yes.

          23       Q.    What was that amount for?

          24       A.    Well, it says "payroll," so I don't know.

15:08:20  25   I mean it says "payroll" on it, so I presume that

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 267 of 1046

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:08:22 | 1 | was my check. |
| | 2 | MR. CROCKETT:  I'm sorry.  I think you're |
| | 3 | referring to the one underneath. |
| | 4 | You're referring to the 531 -- in the |
| 15:08:31 | 5 | deposit of $31,282.95? |
| | 6 | MR. CONANT:  Right. |
| | 7 | MR. CROCKETT:  Right. |
| | 8 | THE WITNESS:  It may have been to reimburse |
| | 9 | for expenses. |
| 15:08:37 | 10 | BY MR. CONANT: |
| | 11 | Q.    What kind of expenses were you incurring at |
| | 12 | Azimyth? |
| | 13 | A.    I was buying equipment. |
| | 14 | Q.    What kind of equipment? |
| 15:08:44 | 15 | A.    Computer. |
| | 16 | Q.    Where is that equipment now, |
| | 17 | Mr. Montgomery? |
| | 18 | A.    I believe the sheriff is holding it. |
| | 19 | Q.    What sheriff? |
| 15:08:49 | 20 | A.    In Washington. |
| | 21 | Q.    Did any equipment you ever buy [sic] for |
| | 22 | these companies ever end up in your possession down |
| | 23 | here in the desert, Mr. Montgomery? |
| | 24 | A.    I'm not going to answer the question. |
| 15:09:02 | 25 | Q.    Why not? |

Page 266

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:09:03 | 1 | A.    Take the Fifth. |
| | 2 | Q.    Did Ms. Blixseth ever -- let me rephrase |
| | 3 | that. |
| | 4 | Did Ms. Blixseth ever personally or through |
| 15:09:15 | 5 | her entities ever give you any computer equipment |
| | 6 | that was owned by Opspring or Blxware or Azimyth, |
| | 7 | Mr. Montgomery? |
| | 8 | A.    I'm going to invoke my right under the |
| | 9 | Fifth. |
| 15:09:27 | 10 | Q.    Do you have still have possession of any of |
| | 11 | the computer equipment that you worked on while you |
| | 12 | were employed for Ms. Blixseth's entities? |
| | 13 | A.    I'm going to invoke my right under the |
| | 14 | Fifth. |
| 15:09:38 | 15 | Q.    Do you still have the hardware that you |
| | 16 | used to create the source code that you were -- that |
| | 17 | we reference in Plaintiff's Exhibit 3? |
| | 18 | A.    I'm going to invoke my right under the |
| | 19 | Fifth. |
| 15:10:01 | 20 | Q.    Don't you still have copies of all the |
| | 21 | source code that you were trying sell to the |
| | 22 | government, Mr. Montgomery? |
| | 23 | A.    I'm going to invoke my right under the |
| | 24 | Fifth. |
| 15:10:12 | 25 | Q.    Did you have possession of the source code |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery - November 18, 2010

```
15:10:14   1   when you were attempting to sell it to Israel couple
           2   months ago, Mr. Montgomery?
           3       A.   I'm sorry.
           4            I'm going to invoke my right under the
15:10:22   5   Fifth.
           6       Q.   Now the source code that we've just been
           7   discussing, that's the same intellectual property
           8   that's listed in your bankruptcy schedules,
           9   Mr. Montgomery?
15:10:43  10       A.   I think you've asked me that question
          11   multiple times and I've answered it.
          12       Q.   I don't think I've ever gotten a very clear
          13   answer, Mr. Montgomery.
          14       A.   I told you I wasn't aware that I wrote that
15:10:45  15   piece at the bottom of that particular document.
          16   The source code and intellectual property referred
          17   to in that schedule were copyrights filed with the
          18   U.S. Copyright Office.
          19       Q.   Do you have -- I mean is that your personal
15:10:59  20   property, that intellectual property that's subject
          21   to the National Security Act that's listed in your
          22   schedule?
          23            Was that your personal property at the time
          24   you filed your bankruptcy schedule?
15:11:09  25       A.   I'm not going answer the question.  I don't
```

```
15:11:11   1   know what that reference made to at the bottom -- I
           2   don't recall putting that on there.  I think I
           3   testified to that; okay?
           4       Q.   But is it untruthful, that statement that's
15:11:22   5   in your bankruptcy schedules?
           6            THE WITNESS:  I thought that you had that
           7   thing.  It's No. 3.
           8            MR. CROCKETT:  Yeah, it's right here.
           9            THE WITNESS:  Here it is.
15:11:35  10            I'm going to invoke my right under the
          11   Fifth.
          12   BY MR. CONANT:
          13       Q.   Now the source code that we referred --
          14   that's referred to throughout Plaintiff's Exhibit 3,
15:11:47  15   that's your source code, is it not, Mr. Montgomery?
          16       A.   I'm going to invoke my right under the
          17   Fifth.
          18       Q.   Have you ever -- what have you transferred
          19   to Blxware, LLC, in the form of your intellectual
15:12:12  20   property, Mr. Montgomery?
          21       A.   I don't recall specifically.
          22       Q.   Have you transferred anything to Blxware?
          23       A.   I don't -- I don't recall specifically.
          24       Q.   You don't recall ever transferring any
15:12:23  25   intellectual property to Blxware?
```

Page 269

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:12:24 | 1 | A.   You've asked me the same question three |
| | 2 | times; I've answered it three times.  I don't recall |
| | 3 | specifically. |
| | 4 | Q.   Have you -- okay. |
| 15:12:33 | 5 | MR. FLYNN:  What did you transfer -- |
| | 6 | BY MR. CONANT: |
| | 7 | Q.   If you look back at your employment |
| | 8 | agreement, Mr. Montgomery, at Plaintiff's |
| | 9 | Exhibit 17, I believe -- |
| 15:12:42 | 10 | A.   Yeah. |
| | 11 | Q.   -- 5, okay.  Look at page 5-3 under the |
| | 12 | heading Intellectual Property Assignment Agreement. |
| | 13 | A.   Yeah. |
| | 14 | Q.   What did you transfer to Opspring in |
| 15:12:57 | 15 | connection with this employment agreement? |
| | 16 | A.   Is he asking me?  I can't hear him. |
| | 17 | Q.   My question -- |
| | 18 | A.   Okay.  I'm sorry. |
| | 19 | Q.   Do you recall my question? |
| 15:13:06 | 20 | A.   Yeah, I heard it, but I also heard his and |
| | 21 | I wasn't -- |
| | 22 | I don't have the original agreements, which |
| | 23 | I've testified to, because Mr. Flynn has been |
| | 24 | holding all of my agreements along with, I presume, |
| 15:13:16 | 25 | Liner, but I know Mr. Flynn because he's the one |

YATES COURT REPORTERS     800.669.1866

15:13:20   1   that made them up.

           2          MR. FLYNN:  For the record, I've never made

           3   up any of the agreements and I have never had any of

           4   the originals.  Mr. Montgomery signed them in the

15:13:32   5   state of Washington with the Sandoval parties.

           6          You just lied, Mr. Montgomery, and you know

           7   it.

           8   BY MR. CONANT:

           9      Q.    Mr. Montgomery, did you transfer any of

15:13:39  10   your intellectual property in connection with all

          11   this money you received as referenced in the

          12   employment agreement?

          13      A.    Without seeing the agreement I don't

          14   recall.

15:13:49  15      Q.    What would you have -- what did this

          16   agreement contemplate you transferring,

          17   Mr. Montgomery?

          18      A.    I don't recall.

          19      Q.    So your testimony is that you entered into

15:13:57  20   an employment agreement where you're getting paid

          21   $1.2 million a year and you're getting loans in the

          22   amount of -- what was that, $2.3 million -- yeah,

          23   $2.3 million and you don't recall what was

          24   contemplated in connection with that agreement?

15:14:16  25      A.    You didn't ask me that agreement.  You said

Dennis Lee Montgomery  -  November 18, 2010

```
15:14:18   1    that assignment that's referred to here.

           2         Q.   Yeah.   What was contemplated?

           3         A.   Oh, okay.

           4              I don't recall specifically.

15:14:25   5         Q.   You don't recall what kind of --

           6         A.   You've asked me four times.  I'm going to

           7    answer the same way.

           8         Q.   It just seems incredible that you're

           9    engaging in this bargain for exchange for millions

15:14:36  10    of dollars and you don't recall what you're giving

          11    up in exchange for it.

          12         A.   Okay.

          13              MR. CONANT:  I'm sorry, I correct the

          14    record.  It's actually $3.3 million in loans, plus

15:14:44  15    the $1.2 million annually.

          16              MR. FLYNN:  What did you give them.

          17              MR. CONANT:  Yeah.

          18         Q.   What did you give them in exchange for all

          19    that money, Mr. Montgomery?

15:14:52  20         A.   You asked me that and I'm not going to

          21    answer it again.  I don't recall what was on that

          22    assignment.  You asked me; now I've answered.

          23         Q.   I'm not asking you the assignment.  I'm

          24    asking you:  What was contemplated in connection

15:15:02  25    with this agreement?
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

15:15:04  1    A.    I don't recall.

         2    Q.    Generally speaking, did it have to do with

         3  software?

         4    A.    I don't recall.

15:15:10  5         MR. FLYNN:  Was it encoding --

         6  BY MR. CONANT:

         7    Q.    Was it the decoding software for the

         8  Al-Jazeera transmissions that were contemplated as

         9  part of this agreement, Mr. Montgomery?

15:15:22 10    A.    I don't recall.

        11    Q.    You just don't recall.

        12    A.    That's correct.

        13         MR. CROCKETT:  There wasn't a question.

        14  BY MR. CONANT:

15:15:27 15    Q.    So in front of -- okay.

        16         MR. FLYNN:  At the time did that decoding

        17  software even exist.

        18  BY MR. CONANT:

        19    Q.    At the time that you entered into this

15:15:37 20  agreement did the decoding software even exist?

        21    A.    And I invoke my right under the Fifth.

        22    Q.    Did you ever satisfy your obligations under

        23  this agreement, Mr. Montgomery?

        24         MR. CROCKETT:  Well, that calls for a legal

15:15:54 25  conclusion.  There are multiple obligations set

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:15:56 | 1 | forth in this.  I don't think the question as it's |
| | 2 | phrased can be answered and I'll object. |
| | 3 | MR. CONANT:  It's withdrawn.  It's |
| | 4 | withdrawn. |
| 15:16:07 | 5 | Q.  All right.  Let's -- all right.  Let's -- |
| | 6 | we're on page 4 of 6.  Flip to page 4 of 6, Tab 4. |
| | 7 | All right.  Let's look at this entry on |
| | 8 | 5/11, withdrawal made in a branch, another $90,000 |
| | 9 | withdrawal made in a branch. |
| 15:16:44 | 10 | Can you shed some light on what that |
| | 11 | withdrawal was for, Mr. Montgomery? |
| | 12 | A.  No. |
| | 13 | Q.  You cannot shed -- do you recall what it |
| | 14 | was for? |
| 15:16:52 | 15 | MR. CROCKETT:  Asked and answered, Counsel. |
| | 16 | THE WITNESS:  I don't recall. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.  All right.  The $150,000 transferred into |
| | 19 | this account on 5/10, April 10, what was that |
| 15:17:01 | 20 | $150,000 for? |
| | 21 | A.  I don't recall. |
| | 22 | MR. CROCKETT:  Actually, it's a withdrawal, |
| | 23 | I believe. |
| | 24 | MR. CONANT:  Oh, it's a withdrawal.  Oh, I |
| 15:17:08 | 25 | apologize, withdrawal. |

Dennis Lee Montgomery  -  November 18, 2010

15:17:08    1              MR. CROCKETT:  $300,000.

            2   BY MR. CONANT:

            3       Q.    Where was that withdrawal -- why did you

            4   withdraw that money from that account?

15:17:14    5       A.    I don't -- I don't recall.

            6       Q.    All right.  May 15, online transfer,

            7   $14,000.  Any idea what that transfer was for?

            8       A.    I need to stop and take some medication.

            9              MR. CROCKETT:  There's a question pending.

15:17:38   10              THE WITNESS:  I'm sorry.  I didn't know

           11   what it was.

           12   BY MR. CONANT:

           13       Q.    Mr. Montgomery, did you -- have you filed

           14   your 2007, 2008, 2009 tax returns, any of those tax

15:17:50   15   returns?

           16       A.    I've taken extensions on the last two.  I

           17   don't know if the previous one was filed or not.

           18       Q.    What do you mean by "previous one"?

           19       A.    You said "three years," didn't you?

15:18:01   20       Q.    Well, let's take those.  Have you filed

           21   your 2007 tax returns?

           22       A.    I don't -- I don't know which years.  I

           23   don't know.  The answer is I don't know.

           24       Q.    Which --

15:18:15   25              MR. FLYNN:  How much did he report as

```
15:18:16    1    income.

            2    BY MR. CONANT:

            3        Q.    Do you recall what you reported as your

            4    income for the year 2006, Mr. Montgomery?

15:18:21    5        A.    No.

            6        Q.    Do you recall what you reported as your

            7    income for 2007?

            8        A.    No.

            9        Q.    For 2008 do you recall?

15:18:26   10        A.    No.

           11        Q.    Did you have -- have you filed your income

           12    tax returns for the year 2006, Mr. Montgomery?

           13        A.    I don't know if I -- I think that one I

           14    did.  I suspect I did.

15:18:41   15              When you say for the year 2006, isn't that

           16    your 2007 --

           17        Q.    I'm asking your tax year 2006 returns.

           18        A.    Okay.  Is that what you're asking me all

           19    along?

15:18:54   20        Q.    Well, I'll clarify it now.

           21              So your 2006, your tax year 2006 returns,

           22    you filed, you believe?

           23        A.    I believe so.

           24        Q.    What about your tax year 2007 returns?

15:19:03   25        A.    I thought I did, but I'm not certain.
```

Dennis Lee Montgomery  -  November 18, 2010

```
15:19:06    1        Q.    What about your 2008, your tax year 2008,

            2    tax returns?

            3        A.    No.

            4        Q.    And your tax year 2009 tax returns?

15:19:15    5        A.    I've taken extensions on both of them, I

            6    believe.

            7              I'd like to stop and take some medication.

            8              MR. CONANT:  Fine.  We'll go off the

            9    record.

15:19:25   10              THE VIDEOGRAPHER:  Going off the record.

           11    The time is 3:19 p.m.

           12              (Recess taken.)

           13              THE VIDEOGRAPHER:  The time is 3:28 p.m.

           14    We're back on the record.

15:28:20   15              MR. CONANT:  All right.  Back on the

           16    record.  We're on Tab 4 of Plaintiff's Exhibit 18,

           17    page 4 of 6.

           18              I'm trying to remember where we left --

           19    Stephanie, can you recall for us what the last

15:28:40   20    transaction -- the date of the last entry that we

           21    questioned Mr. Montgomery about was?

           22              You know what, Stephanie?  We got it.

           23        Q.    All right.  Mr. Montgomery, entry dated

           24    5/17, $20,000 withdrawal, can you explain to me

15:29:02   25    where that money went?
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

```
15:29:03    1        A.   I don't recall.

            2        Q.   The 5/19 transfer -- or withdrawal of

            3   $41,000, do you -- do you recall where that money

            4   went?

15:29:14    5             MR. CROCKETT:  Since you changed it from

            6   withdrawal to trans- -- from transfer to withdrawal,

            7   I'll say mischaracterizes, because it says it's a

            8   transfer, online transfer.

            9             MR. CONANT:  It's within the withdrawal

15:29:24   10   category.

           11             MR. CROCKETT:  It is that.  I would agree.

           12   BY MR. CONANT:

           13        Q.   Mr. Montgomery, the 5/19 $41,000

           14   withdrawal, do you know where that money went?

15:29:33   15        A.   It looks like it went back in that savings

           16   account, if that's what that account is.

           17        Q.   Where would that money have gone from

           18   there?

           19        A.   I don't recall.

15:29:40   20        Q.   All right.  The 5 -- May 22 withdrawal made

           21   in a branch store in the amount of $75,000, again,

           22   one of these curious withdrawals made in a branch

           23   store.

           24             Can you describe what that money was used

15:29:54   25   for?
```

Page 278

Dennis Lee Montgomery  -  November 18, 2010

```
15:29:55    1           MR. CROCKETT:  I'm going to object to your
            2    characterization of it as curious.
            3           And, Dennis, with that if you can, answer
            4    the question.
15:30:01    5           THE WITNESS:  I don't recall.
            6    BY MR. CONANT:
            7      Q.    All right.  The 5/22 withdrawal in the
            8    amount of $25,000, do you know what that money was
            9    ultimately used for, Mr. Montgomery?
15:30:13   10      A.    I don't recall.
           11      Q.    And the May 30 withdrawal in the amount of
           12    $30,000, do you recall where that money --
           13      A.    I don't recall.
           14      Q.    -- went?
15:30:24   15           Same question for the May 31 transfer in
           16    the amount of $17,000.
           17      A.    Don't recall.
           18      Q.    Same question for the June 5 $23,000
           19    withdrawal?
15:30:36   20      A.    Don't recall.
           21      Q.    Let's go to Tab 5.  Now before we go --
           22    let's get a break from the numbers.
           23           Mr. Montgomery, when you got -- when you
           24    delivered these bank account statements to your
15:30:56   25    attorneys at the Liner firm, do you recall redacting
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery - November 18, 2010

| 15:31:05 | 1 | pages from these account statements? |
| | 2 | Meaning did you pull certain statements |
| | 3 | from these account statements before you handed them |
| | 4 | over to Liner firm? |
| 15:31:16 | 5 | A. I don't recall if I did or not. |
| | 6 | Q. Would those pages that you don't recall |
| | 7 | pulling out, would those have reflected transfers of |
| | 8 | money to -- |
| | 9 | MR. CROCKETT: Do you have those pages that |
| 15:31:31 | 10 | you're referring to? |
| | 11 | MR. CONANT: That's the problem. We never |
| | 12 | got them. There's large omissions. |
| | 13 | MR. CROCKETT: The statements appear to be |
| | 14 | pages 1, 2, 3, 4, 5 and 6. |
| 15:31:41 | 15 | MR. CONANT: We'll get to that. We'll get |
| | 16 | to that eventually. |
| | 17 | MR. CROCKETT: That might be more useful, |
| | 18 | wouldn't it to -- |
| | 19 | MR. CONANT: And I'm just asking |
| 15:31:48 | 20 | Mr. Montgomery if he recalls right now doing that. |
| | 21 | MR. CROCKETT: And he's answered he doesn't |
| | 22 | recall doing that. |
| | 23 | BY MR. CONANT: |
| | 24 | Q. Mr. Montgomery, in these bank account |
| 15:31:55 | 25 | statements that you get from Wells Fargo, you're |

Page 280

15:31:57   1   familiar with your bank account statements, I'd

2   assume, are you not?

3       A.   Yes.

4       Q.   In these bank statements do you get pages

15:32:06   5   which show photocopies of checks that have been

6   cashed?

7       A.   No.

8       Q.   Checks -- when I may refer to "checks,"

9   checks that you've drawn on this account.

15:32:17   10      A.   Right.   You mean like all the check numbers

11   and everything.   No.   No.

12           You're referring specifically to these

13   Wells Fargo accounts; correct?

14      Q.   Correct.

15:32:27   15      A.   I believe at the time you had to ask for

16   them; they didn't produce them.

17      Q.   All right.   Mr. Montgomery --

18           Mr. Montgomery, on the pages on the bank

19   account statements that you produced in connection

15:33:15   20   with the Nevada district court order compelling you

21   to produce your bank records, isn't it true that on

22   some of your bank account statements you

23   intentionally pulled out certain pages from those

24   statements before you handed them over to your

15:33:30   25   attorneys?

Dennis Lee Montgomery   -   November 18, 2010

15:33:32   1    A.   I don't recall doing that.

2    Q.   Do you recall pulling out roughly pages 6

3    and 7 of your account statements and 17 and 18 --

4    No.   Strike that question.

15:34:02   5         Mr. Montgomery, when you were producing

6    your Wells Fargo bank account statements in

7    connection with the Nevada district court order

8    compelling you to produce your bank records, isn't

9    it true that you were -- from all the bank

15:34:17   10   statements that you produced that you pulled out,

11   roughly, pages 6 and 7 and then pages 18 and 19 --

12   17, 18 and 19 -- 17 -- 6 through, roughly, pages --

13   6 and 7 through, roughly, page 18 and 19?

14        MR. CROCKETT:   Are you referring to these

15:34:35   15   statements?

16        MR. CONANT:   I'm asking him about the Wells

17   Fargo statements that he produced in connection with

18   the order to compel issued by the Nevada court.

19        MR. CROCKETT:   And I want to make sure I'm

15:34:47   20   clear.   You, I think, previously represented that

21   that's what these were; isn't that right?

22        MR. CONANT:   I'm asking him a question

23   regarding what he did and whether they're related to

24   these documents or not is a question.

15:34:59   25        MR. FLYNN:   I'll jump in here.   Every

Page 282

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
15:35:01   1   Wells Fargo Bank statement produced by
           2   Mr. Montgomery between April of '06, roughly until
           3   March '09, every bank statement he extracted the
           4   pages that ran roughly from page 6 to 7 to page 17
15:35:22   5   to 18.  Uniformly all those pages were taken out.
           6            MR. CROCKETT:  And I hear what you're
           7   saying.  I'm just looking --
           8            MR. FLYNN:  Each statement is roughly 28 or
           9   29 pages long.
15:35:34  10            MR. CROCKETT:  I'm looking at the account
          11   statements that we have in this Exhibit 18 and it
          12   appears to me that they all state on the first page
          13   page 1 of X and in each instance that I've looked
          14   at, which I don't represent to be all of them, that
15:35:47  15   there's all X pages in each month are there.
          16            So you must be referring to something else,
          17   I guess, is my comment.  But in any event, if you
          18   read the question back --
          19            MR. FLYNN:  No, we're not referring to
15:35:58  20   anything else.
          21            MR. CROCKETT:  Okay.
          22            MR. FLYNN:  Ask that question I just put on
          23   the record.
          24            THE WITNESS:  That was a question?
15:36:04  25            MR. CROCKETT:  No, no, no, no.  Let --
```

Page 283

Dennis Lee Montgomery  -  November 18, 2010

15:36:06    1         MR. FLYNN:  Did he extract roughly ten

           2    pages from the bank statment.

           3    BY MR. CONANT:

           4      Q.    Mr. Montgomery, did you extract roughly ten

15:36:13    5    pages from each bank statement, each Wells Fargo

           6    Bank statement that you produced in connection with

           7    an order from the Nevada federal court?

           8         THE WITNESS:  I don't recall.

           9         MR. CONANT:  Can we go off the record for a

15:36:47   10    second?

          11         THE WITNESS:  Going off the record.  The

          12    time is 3:36 p.m.

          13         (Recess taken.)

          14         THE VIDEOGRAPHER:  The time is 3:43 p.m.

15:43:24   15    We're back on the record.

          16    BY MR. CONANT:

          17      Q.    All right.  Mr. Montgomery, before you took

          18    a break there was some discussion about large

          19    numbers of pages being redacted from the bank

15:43:41   20    statements that you were ordered to produce in the

          21    Nevada litigation.

          22         MR. FLYNN:  Every bank statement.

          23    BY MR. CONANT:

          24      Q.    And I will -- while we were taking the

15:43:51   25    break Mr. Flynn was able to locate the original

Dennis Lee Montgomery  -  November 18, 2010

```
15:43:54    1   production that we received -- or that he received

            2   in the Nevada litigation, the production of your

            3   bank statements, Wells Fargo bank statements, that

            4   you produced in the Nevada litigation.

15:44:04    5         And I will introduce as an examplar of the

            6   volume of bank statements we received Plaintiff's

            7   Exhibit No. 20.

            8         Correct?

            9         THE REPORTER:  19.

15:44:32   10         MR. CONANT:  We're at 19?

           11         (Exhibit 19 was marked for identification.)

           12         MR. CONANT:  We don't have multiple copies

           13   of these.  Those are the only ones we have.

           14   Q.    Mr. Montgomery, if you could start at the

15:44:40   15   beginning of those bank statements and find, I

           16   believe in the upper right-hand corner, where it

           17   gives the page designation, 1 of whatever, 28, I

           18   believe.

           19   A.    Right, I see it.

15:44:53   20   Q.    So can you just count through the page

           21   count on there going from 1 of --

           22   A.    Okay.  This one says 1 of 29.  You want me

           23   to count them.  Is that what you're saying?

           24   Q.    Yeah, just give me a counting.

15:45:10   25         No, verbally.  Can you count --
```

Dennis Lee Montgomery  -  November 18, 2010

15:45:12  1      A.     Sorry.

2              MR. FLYNN:   Recite the pages, like on that

3      one, 8 to --

4              THE WITNESS:   1, 2, 3, 4 --

15:45:22  5      BY MR. CROCKETT:

6      Q.     What is the of, 4 of what?

7      A.     29.

8      Q.     Okay.   Keep going.

9      A.     5 of 29.   Is that what you want me to read?

15:45:30  10     Q.     Yeah, just keep going on.

11     A.     6 of 29, 21 of 29.

12     Q.     Okay.   Now -- thank you.

13             So designated in the production that

14     Mr. Flynn received, pages 6 through 21 --

15:45:45  15             MR. FLYNN:   -- through 20.

16     BY MR. CONANT:

17     Q.     -- through 20 --

18     A.     Uh-huh.

19     Q.     -- or 7 through 20 are missing.

15:45:52  20             MR. FLYNN:   In every statement.

21             MR. CROCKETT:   And your point is what or

22     the question is what?

23             MR. CONANT:   That in the production and

24     every statement that Mr. Flynn received in this

15:46:00  25     regard for the years --

YATES COURT REPORTERS    800.669.1866

08-Case0-RSK=Doc#:2e3r5-5MAU=DoPumel1t4E7teFiked-O7W2K231-PageP288el-1046 of 345
Case 1:23-mc-00073-CKK-MAU   Document 1-7   Filed 07/28/23   Page 288 of 1046

15:46:01    1            MR. CROCKETT:  To the extent, Counsel --

            2            MR. CONANT:  Mr. Crockett, let me finish.

            3            MR. CROCKETT:  Please.

            4            MR. CONANT:  Every statement that Mr. Flynn

15:46:08    5    received for the years -- for the relevant years

            6    2006 to -- 2000- --

            7            MR. FLYNN:  -- '-9.

            8            MR. CONANT:  '-9 have similar redactions

            9    from them and these are the documents that Mr. Flynn

15:46:18   10    received in the Nevada litigation.

           11            MR. FLYNN:  And in our motion to compel

           12    they're obligated to produce and they've never

           13    produced them.

           14            MR. CONANT:  And Mr. Flynn received these

15:46:32   15    from Mr. Montgomery's attorneys in connection with

           16    the motion to compel, the order on the motion to

           17    compel that Mr. Montgomery was under in the Nevada

           18    litigation.

           19            THE WITNESS:  Do you have the order?

15:46:43   20            MR. CROCKETT:  Stop, Dennis.

           21            MR. FLYNN:  And in this litigation,

           22    Mr. Crockett, you are obligated to produce the same

           23    missing pages and you've never produced them.

           24            MR. CROCKETT:  Whatever our obligation is

15:46:54   25    in this litigation, I will attempt to comply with to

                    YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

15:46:59   1   the best of my ability.

2              My objection here is that if you think this

3   was an improper production in other litigation in

4   another state, it seems to me that the appropriate

15:47:11   5   form to raise that issue would be in that court in

6   that litigation.

7              MR. CONANT:  Mr. Montgomery filed for

8   bankruptcy before we could ever raise that

9   objection.  He was produced -- to produce these in

15:47:25  10   connection with the debtor's exam he was ordered to

11   attend in Nevada.  On the eve of the debtor's exam

12   Mr. Montgomery filed the bankruptcy to avoid his

13   obligations thereunder.

14              MR. FLYNN:  And you're obligated to produce

15:47:38  15   them here, Mr. Crockett, and they've never been

16   produced.

17              As I represented before, every Wells Fargo

18   statement from April through March '09 has missing

19   pages from roughly 6 or 7 to, roughly, page 18, 19,

15:47:52  20   20.

21              And I believe that those missing pages are

22   the copies of canceled checks which would show where

23   the monies went.

24              MR. CROCKETT:  And the question is?

25   ///

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
15:48:05    1    BY MR. CONANT:

            2        Q.    Mr. Montgomery, those are your bank

            3    statements, are they not?

            4        A.    Well, you just said that so --

15:48:19    5            MR. CONANT:  We introduced these to

            6    establish Mr. Montgomery has not previously -- has

            7    previously concealed the location and nature of his

            8    assets by redacting these bank statements.

            9            MR. CROCKETT:  Are these the bank

15:48:34   10    statements that you saw by subpoena from

           11    Wells Fargo?

           12            MR. CONANT:  No.  As we've already

           13    established, these are the bank statements that

           14    we've received -- that Mr. Flynn received in

15:48:43   15    connection with his -- in connection with the Nevada

           16    litigation.

           17            MR. CROCKETT:  Right.  But you separately

           18    subpoenaed Wells Fargo directly.

           19            MR. FLYNN:  Right.  And they want about

15:48:52   20    $7,000 to produce those pages and you're obligated

           21    to produce them, so before I pay the $7,000 I want

           22    you to produce them, Mr. Crockett.

           23            MR. CROCKETT:  Right.

           24            THE WITNESS:  Do you want this back or --

15:49:08   25            MR. CONANT:  No.  That's an exhibit for the
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:49:08 | 1 | court reporter. |
| | 2 | THE WITNESS:  I'm sorry. |
| | 3 | MR. FLYNN:  But, Stephanie, we're going to |
| | 4 | need that copied and then returned to my original |
| 15:49:12 | 5 | stack. |
| | 6 | MR. CONANT:  Caught up.  Very good. |
| | 7 | Q.  So let's go back to Plaintiff's Exhibit 18, |
| | 8 | Tab 5, page 2 of 2. |
| | 9 | A.  Page 2 of 2? |
| 15:49:32 | 10 | Q.  I'm sorry, 2 of 6. |
| | 11 | A.  Yeah.  Okay. |
| | 12 | Q.  All right.  Deposit Entry No. 1, June 15, |
| | 13 | $53,000, purportedly from Azimyth.  Can you explain |
| | 14 | what the nature of that deposit was for, |
| 15:49:46 | 15 | Mr. Montgomery? |
| | 16 | A.  I would -- I believe it's for expenses. |
| | 17 | Q.  $53,000 in expenses? |
| | 18 | A.  Yeah. |
| | 19 | Q.  That wasn't payroll. |
| 15:49:58 | 20 | A.  No, because payroll it says payroll on it I |
| | 21 | notice. |
| | 22 | Q.  Okay.  All right.  The $30,000 right below |
| | 23 | that from some account, can you explain where |
| | 24 | that -- what the source of that money was and where |
| 15:50:12 | 25 | it went, Mr. Montgomery? |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

15:50:26  1    A.    Can I look back at something first?

         2    Q.    Sure.

         3    A.    Can I see the document that you just --

         4          Okay.  Okay.  Go ahead.  I'm sorry.

15:51:39  5    Q.    For the record, Mr. Montgomery, you asked

         6  for a --

         7    A.    Yeah, I'm sorry.

         8    Q.    -- to review another document.  What

         9  document was it that you asked to review?

15:51:47 10    A.    I don't know the number on it.  Is there a

        11  number on it?  I don't know.

        12          Oh, there is one.  I'm sorry.  19.

        13    Q.    Plaintiff's Exhibit 19.

        14    A.    Yeah.

15:51:54 15    Q.    Okay.  All right.  So I asked about the

        16  source and use of the $30,000 which appears to be

        17  deposited -- was deposited on June 15.

        18          And I'm looking on page 2 of 6 of Tab

        19  No. 5.

15:52:16 20    A.    I'm looking at something.  If you just give

        21  me a minute, please.

        22          MR. FLYNN:  I mean there's so many, there

        23  must have been some --

        24  BY MR. CONANT:

15:53:00 25    Q.    All right.  Let's just skip,

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:53:00 | 1 | Mr. Montgomery. |
| | 2 | A. Okay. |
| | 3 | MR. FLYNN: This is -- |
| | 4 | MR. CONANT: What's that? |
| 15:53:08 | 5 | MR. FLYNN: August of 06. |
| | 6 | BY MR. CONANT: |
| | 7 | Q. All right. Skip with me to Tab No. 7. |
| | 8 | A. Okay. |
| | 9 | MR. FLYNN: Ask him -- ask him -- July 1, |
| 15:53:36 | 10 | '07, did you get -- |
| | 11 | MR. CONANT: W-9? 1040? |
| | 12 | MR. FLYNN: 1040. July 10. What's the |
| | 13 | reporting document? |
| | 14 | MR. CONANT: W-9. That's a W-9. |
| 15:54:21 | 15 | MR. FLYNN: No. |
| | 16 | MR. CONANT: Let's go off the record. You |
| | 17 | want to go off the record? |
| | 18 | Let's go off the record for a sec, but |
| | 19 | we're not going to -- |
| 15:54:31 | 20 | THE VIDEOGRAPHER: Going off the record. |
| | 21 | The time is 3:54 p.m. |
| | 22 | (Break in the proceedings.) |
| | 23 | THE VIDEOGRAPHER: Back on the record. The |
| | 24 | time is 3:54 p.m. |
| 15:54:46 | 25 | MR. FLYNN: Does it seem like I'm directing |

Page 292

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 15:54:47 | 1 |

1    here?

2           MR. CONANT:   All right.   Let's look at the

3    August -- Tab 7 is the August statement.

4           Thank you, Mike, for pointing that out.

5           MR. FLYNN:   You're doing a great job.

6           MR. CONANT:   Thanks, Mike.   I appreciate

7    that.

8       Q.   All right.   Let's look at page 5 of 28.

9    You see on the deposits and interest portion of

10   that --

11      A.   Uh-huh.

12      Q.   -- it says an amount, $372,000.   Do you see

13   that, Mr. Montgomery?

14      A.   Yes.

15      Q.   Why did you get -- why did you get an

16   amount of $372,000 deposited into your account on

17   August 1 of 2006?

18      A.   I don't recall.

19      Q.   Was that in connection with your -- with

20   your employment at Opspring?

21      A.   This is July -- I don't recall that.   It

22   must have been.

23      Q.   Would you have any idea where you -- where

24   that 300-something-thousand dollars went?

25      A.   Yeah.

15:55:02    5
15:55:15   10
15:55:23   15
15:55:56   20
15:56:31   25

YATES COURT REPORTERS    800.669.1866

|  |  |  |
|---|---|---|
| 15:56:31 | 1 | Q.    Where would -- where did it go? |
|  | 2 | A.    Deposit for the house in Washington. |
|  | 3 | Q.    That the deposit for the house in |
|  | 4 | Washington? |
| 15:56:37 | 5 | A.    I suspect it is.  I'm not certain, but |
|  | 6 | that's the timeframe. |
|  | 7 | Q.    Okay.  Turning to page 19 of 28 -- |
|  | 8 | A.    Okay. |
|  | 9 | Q.    So is this a different account?  I see here |
| 15:56:56 | 10 | it says Advantage Plus Checking, Wells Fargo.  Is |
|  | 11 | this a different checking account of yours, |
|  | 12 | Mr. Montgomery, at Wells Fargo? |
|  | 13 | A.    Than? |
|  | 14 | Q.    Does this reflect a different account than |
| 15:57:10 | 15 | the page we just looked at which appears to be PMA |
|  | 16 | Prime Checking Account? |
|  | 17 | Do you see -- if you flip back to |
|  | 18 | page 528 -- |
|  | 19 | A.    Right. |
| 15:57:21 | 20 | Q.    -- it appears that the title of this |
|  | 21 | account that we just looked at with the $372,000 |
|  | 22 | deposit appears to be titled PMA Prime Checking |
|  | 23 | Account. |
|  | 24 | Do you see that? |
| 15:57:31 | 25 | A.    Yeah, I see it. |

Page 294

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 15:57:32 | 1 | Q.    Okay.  Now -- well, since we're on that |
| | 2 | page, I see an online transfer of $500,000 on that |
| | 3 | account. |
| | 4 |        What was that -- what was that deposit of |
| 15:57:40 | 5 | $500,000 for? |
| | 6 | A.    If you just give me a minute, I want to |
| | 7 | look at this. |
| | 8 | Q.    Okay. |
| | 9 | A.    Okay.  I got it. |
| 15:58:16 | 10 | Q.    Okay.  Mr. Montgomery, were you ready to |
| | 11 | answer? |
| | 12 | A.    I can give you what I think. |
| | 13 | Q.    All right.  What do you think? |
| | 14 | A.    I think the PMA Prime Checking Account is |
| 15:58:30 | 15 | actually a savings account and I believe the 53 -- |
| | 16 | the 933 account which you referred to -- wherever, I |
| | 17 | can't remember where it was right now. |
| | 18 | Q.    The Advantage Plus Checking Account on |
| | 19 | page 19. |
| 15:58:41 | 20 | A.    Right, that was my standard checking |
| | 21 | account, regular checking account. |
| | 22 | Q.    Okay. |
| | 23 | A.    And during that time frame, which is around |
| | 24 | August of '06 -- |
| 15:58:53 | 25 | MR. FLYNN:  He gave 500,000 on an 8/31 wire |

Page 295

Dennis Lee Montgomery - November 18, 2010

```
15:58:56   1   transfer on Azimyth.
           2          MR. CROCKETT:  Let us know when you're
           3   ready, Mr. Conant.
           4          MR. CONANT:  He can answer.  It's going on
15:59:03   5   the record.
           6          THE WITNESS:  Okay.  Well, you need -- it
           7   looks like money was taken out of savings account
           8   and put into a checking account.  That's what it
           9   looks like to me.
15:59:09  10   BY MR. CONANT:
          11      Q.   Okay.  Where did it -- so can we trace that
          12   $500,000 to your checking account?
          13      A.   I don't know.
          14      Q.   All right.  Well, then flip with me to
15:59:18  15   page 20 of 28 --
          16      A.   Okay.
          17      Q.   -- where you receive deposits of $500,000
          18   from Azimyth.
          19      A.   Right.
15:59:26  20      Q.   So is it fair to say that $500,000 that we
          21   see on page 1 derives itself from the payment from
          22   Azimyth and Opspring?
          23          MR. FLYNN:  That's another 500K.
          24          MR. CROCKETT:  Sorry, Counsel, so we're
15:59:47  25   clear, so the references are the 8/31 online
```

Page 296

Dennis Lee Montgomery  -  November 18, 2010

15:59:51  1   transfer reference and so on of $500,000, it's on

2   page 5 of 28 and the 8/31, what appears to be, wire

3   transfer, WT, Azimyth $500,000 on page 20 of 28; is

4   that correct?

16:00:07  5          MR. CONANT:  Mr. Crockett, I'm asking -- I

6   believe the question was:  Is that $500,000 on

7   page 20 deposited on August 31, is that the same

8   $500,000 that's reflected on page 5 of 28 as a

9   deposit of $500,000?

16:00:26  10          THE WITNESS:  It looks like it to me.  I

11   mean it looks like it's just one deposit.

12   BY MR. CONANT:

13      Q.   Do you know if you got another $500,000

14   deposit during this time period from Azimyth or

16:00:36  15   Opspring?

16      A.   No, because -- I don't believe so.

17          MR. FLYNN:  July of '07 he got a total --

18   April of '06.

19   BY MR. CONANT:

16:00:53  20      Q.   All right.  Mr. Montgomery, did you ever

21   get a W-2 from -- did you get a W-2 from Azimyth or

22   Opspring showing a deposit of -- or showing income

23   to you in -- let me step back.

24          In July of 2007 did you get a W-2 from

16:01:14  25   Azimyth or Opspring showing income to you of

Page 297

| 16:01:17 | 1 | approximately -- |
| | 2 | MR. FLYNN: 3.8 million. |
| | 3 | BY MR. CONANT: |
| | 4 | Q. -- $3.8 million? |
| 16:01:24 | 5 | A. I don't recall. |
| | 6 | Q. All right. The -- if you turn to page 19 |
| | 7 | of 28 I see an August 4 deposit from Opspring and |
| | 8 | Azimyth in the amount of a hundred thousand dollars. |
| | 9 | Was that hundred thousand dollars part of |
| 16:01:48 | 10 | your normal salary from Opspring or Azimyth, |
| | 11 | Mr. Montgomery? |
| | 12 | A. No. That's usually when Michael Flynn |
| | 13 | wanted his hundred thousand and that's when the |
| | 14 | money came in from the company and was sent to him. |
| 16:02:03 | 15 | Q. So the money being paid to Michael Flynn, |
| | 16 | that was in addition to your normal salary of a |
| | 17 | hundred thousand dollars a month; isn't that |
| | 18 | correct, Mr. Montgomery? |
| | 19 | A. I don't recall specifically. |
| 16:02:12 | 20 | Q. So you were getting -- but you were getting |
| | 21 | paid as salary a hundred thousand dollars a month |
| | 22 | from either Opspring or Azimyth; isn't that correct, |
| | 23 | Mr. Montgomery? |
| | 24 | A. I never got paid by Azimyth. |
| 16:02:22 | 25 | Q. So can you correct -- |

Dennis Lee Montgomery  -  November 18, 2010

16:02:25   1        A.    I don't know why -- you're referring to the

           2    way it's written that way, Azimyth, Opspring on the

           3    wire?

           4        Q.    During this time period were you getting

16:02:34   5    paid a hundred thousand dollars a month from any

           6    entity?

           7        A.    Yes.

           8        Q.    Which entity was that?

           9        A.    I believe I answered that already, didn't

16:02:41  10    I, already?

          11        Q.    I don't recall.  We've taken --

          12        A.    I don't recall.  I mean the answer is I was

          13    getting paid a paycheck from Opspring.  The hundred

          14    thousand doesn't look like that's my paycheck.

16:02:59  15        Q.    How much was your normal paycheck from

          16    Opspring?

          17        A.    I don't recall, because there's no taxes

          18    taken out of it and that's an even number, so I'm

          19    suspecting since above it and below it has got

16:03:10  20    34,000, you know, within a few cents, that was a

          21    payment made and that's about what I thought Michael

          22    Flynn got paid every time that he asked for a

          23    hundred thousand dollars.

          24        Q.    Now -- but you were getting paid a salary

16:03:23  25    of a hundred thousand dollars a month from Opspring;

Dennis Lee Montgomery  -  November 18, 2010

```
16:03:26   1   right?

           2        A.   I don't remember the exact amount.

           3        Q.   Is that approximate?

           4        A.   You just asked me.  I don't --

16:03:34   5             MR. FLYNN:  Casino.  Casino, right.

           6   BY MR. CONANT:

           7        Q.   All right.  We'll put the bank statements

           8   away briefly.

           9        A.   Okay.

16:04:11  10        Q.   Okay.

          11        A.   Well, I know I didn't say it was --

          12             MR. CROCKETT:  Okay.

          13   BY MR. CONANT:

          14        Q.   Mr. Montgomery, what is your best estimate

16:04:19  15   of the total amount of money you received from Edra

          16   Blixseth's entities between April of '06 and March

          17   of 2009?

          18        A.   I don't recall.

          19        Q.   I'm asking not for what you recall, I'm

16:04:33  20   asking for your best estimate.

          21        A.   I don't know.  I don't recall.

          22             MR. FLYNN:  Go amounts more or less than

          23   1 million, more or less than 2 million, more or less

          24   than 3 million.

          25   ///
```

Page 300

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:04:45 | 1 | BY MR. CONANT: |
| | 2 | Q.   Mr. Montgomery, the amounts you received |
| | 3 | from Ms. Blixseth's entities between April of '06 |
| | 4 | and March of '09, was it less than $1 million or |
| 16:04:54 | 5 | more than $1 million? |
| | 6 | A.   I'm going to assert the Fifth.  I don't |
| | 7 | recall.  I don't know specifically.  I'm not going |
| | 8 | to get into it. |
| | 9 | MR. FLYNN:  2 million, 3 million. |
| 16:05:09 | 10 | THE WITNESS:  I don't know the exact |
| | 11 | amounts. |
| | 12 | BY MR. CONANT: |
| | 13 | Q.   Isn't it -- |
| | 14 | A.   I just don't know the amounts. |
| 16:05:13 | 15 | Q.   I'm asking for your best estimate.  Best |
| | 16 | estimate less that $1 million; more than $1 million? |
| | 17 | A.   Total ever? |
| | 18 | Q.   Let me rephrase it. |
| | 19 | Your best estimate of the total money you |
| 16:05:27 | 20 | received from Edra Blixseth's entities between April |
| | 21 | of '06 and March of '09, was it less than $1 million |
| | 22 | or more than $1 million? |
| | 23 | A.   Are you counting the 1.2 million Mr. Flynn |
| | 24 | got paid?  I don't know.  I mean it must have been |
| 16:05:46 | 25 | over a million, because he got paid a million-two. |

Page 301

16:05:52   1     Q.   Exclusive of any payments made to

2  Mr. Blixseth [sic], as part of your salary with

3  bonuses, with loans, was it less than $1 million or

4  more than $1 million?

16:06:03   5     A.   More.

6     Q.   Was it less than $2 million or more than

7  $2 million?

8     A.   More.

9     Q.   Was it less than $3 million or more than

16:06:07  10  $3 million.

11     A.   More.

12     Q.   Less than $4 million or more than

13  $4 million dollars?

14     A.   I don't recall at this point.  I don't know

16:06:12  15  past that.  I assumed it was over that, but I don't

16  know past that.

17     Q.   More than 6 million?

18     A.   I don't recall.

19     Q.   More than 5 million?

16:06:20  20     A.   I don't recall.

21     MR. FLYNN:  Okay.

22     MR. CONANT:  All right.  Let's shift gears

23  once again.

24     All right.  I'm going to mark Plaintiff's

16:06:45  25  Exhibit --

Dennis Lee Montgomery  -  November 18, 2010

```
16:06:46    1              Are we at 20, Stephanie?

            2              THE REPORTER:  Yes.

            3              MR. CONANT:  -- Plaintiff's Exhibit 20.

            4              It's just more bank records from Istvan

16:07:03    5    Burgyan.  I don't know if you have any interest in

            6    reviewing them.

            7              (Exhibit 20 was marked for identification.)

            8    BY MR. CONANT:

            9        Q.    Mr. Montgomery, can you just refresh our

16:07:22   10    memory as to your relationship with Istvan Burgyan?

           11        A.    My son-in-law.

           12        Q.    Was he involved with operating Demaratech,

           13    LLC?

           14        A.    Yes.

16:07:31   15        Q.    Have you ever lent money to Mr. Burgyan?

           16        A.    I'm going to assert my right under the

           17    Fifth Amendment.

           18        Q.    Has Mr. Burgyan ever lent money to you?

           19        A.    I'm going to assert my right under the

16:07:42   20    Fifth Amendment.

           21        Q.    Does Mr. Burgyan currently have any -- let

           22    me strike that.

           23              Does Mr. Burgyan ever -- strike that again.

           24              Does Mr. Burgyan currently hold any of your

16:07:55   25    assets on your behalf?
```

Page 303

```
16:07:57    1         A.    I'm going to assert that on the Fifth

            2    Amendment.

            3         Q.    All right.

            4               MR. FLYNN:   Get a copy of the casino cash.

16:08:07    5    BY MR. CONANT:

            6         Q.    Has Mr. Burgyan ever accompanied you to any

            7    casinos?

            8         A.    Yes.

            9         Q.    Which casinos has he accompanied you --

16:08:15   10         A.    I don't recall.

           11         Q.    And casinos in California or casinos in

           12    Nevada?

           13         A.    Nevada.

           14         Q.    Do you ever -- do you ever gamble at Rancho

16:08:28   15    Morongo [sic] casino here in Palm Springs?

           16         A.    I'm going to assert my right under the

           17    Fifth Amendment.

           18         Q.    All right.  Can you explain to me what

           19    Demaratech's relationship with Cardiac Network,

16:08:48   20    Inc., is Mr. Montgomery?

           21         A.    I'm going to assert my right under the

           22    Fifth Amendment.

           23         Q.    Were you -- I see here on Bates stamp

           24    No. 352 of Plaintiff's Exhibit 20 a deposit in the

16:09:07   25    amount of $200,000 into Istvan's bank account from
```

Dennis Lee Montgomery  -  November 18, 2010

16:09:11   1   Cardiac Network, Inc.

2           Do you see that, Mr. Montgomery?

3       A.   Yes.

4       Q.   Do you know why Cardiac Network, Inc.,

16:09:22   5   would be depositing $200,000 into Istvan Burgyan's

6   account?

7       A.   I'm going to assert my right under the

8   Fifth Amendment.

9       Q.   Isn't it true that Demaratech was -- well,

16:09:35   10   strike that.

11           Isn't it true that Cardiac Network entered

12   into some arrangement with Istvan Burgyan in

13   exchange for technology that you were -- you had

14   created?

16:09:52   15       A.   I'm going to assert my right under the

16   Fifth Amendment.

17       Q.   Isn't that same technology the same

18   technology listed in your bankruptcy schedule,

19   Mr. Montgomery?

16:10:02   20       A.   I'm going to assert my right under the

21   Fifth Amendment.

22       Q.   Isn't it true that for a number of years

23   you were funneling money to Mr. Burgyan to conceal

24   cash from your creditors, Mr. Burgyan -- I mean

16:10:16   25   Mr. Montgomery?

Dennis Lee Montgomery  -  November 18, 2010

```
16:10:17   1         A.    I'm going to assert my right under the

           2   Fifth Amendment.

           3         Q.    Okay.  All right.  Let's -- let me go --

           4   let's put that one away for now.  That's fine.

16:10:31   5               Let's go to -- I'm going to hand you

           6   Plaintiff's Exhibit 21.

           7               (Exhibit 21 was marked for identification.)

           8   BY MR. CONANT:

           9         Q.    All right.

16:11:06  10               All right.  Mr. Montgomery, if you look at

          11   Bates stamp No. 558 on Plaintiff's Exhibit 21 --

          12         A.    558, okay.

          13               MS. WELLS:  For the record, are these more

          14   bank records?

16:11:30  15               MR. CONANT:  Yeah, for the record.

          16         Q.    -- I see a deposit 12/14 into Istvan

          17   Burgyan's bank account in the amount of $130,000

          18   from Backhouse Fiduciary Services.

          19               Do you know -- are you familiar with

16:11:46  20   Backhouse Fiduciary Services, Mr. Montgomery?

          21         A.    I'm going to assert my right under the

          22   Fifth Amendment.

          23         Q.    Isn't Backhouse Fiduciary Services

          24   connected with Josh Kennedy?

16:11:53  25         A.    I'm going to assert my right under the
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

16:11:55   1 | Fifth Amendment.

2 |     Q.    And isn't Josh Kennedy a funder of

3 | Demaratech, LLC?

4 |     A.    I'm going to assert my right under the

16:12:02   5 | Fifth Amendment.

6 |     Q.    Wasn't -- didn't Josh Kennedy invest this

7 | money in Demaratech based on representations by you

8 | that you had software that you could -- you could

9 | sell to a government agency?

16:12:13  10 |     A.    I'm going to assert my right under the

11 | Fifth Amendment.

12 |         He's very distracting talking on the phone

13 | over there.

14 |         I guess it doesn't matter.

16:12:26  15 |     Q.    All right.  Mr. Montgomery, can you turn to

16 | Bates stamp No. 559.

17 |     A.    Yeah, okay.

18 |     Q.    I see a deposit dated 12/15 in the amount

19 | of -- I'm sorry, it's a withdrawal in the amount of

16:12:43  20 | a hundred thousand dollars.

21 |     A.    I see that.

22 |     Q.    Do you see that?

23 |     A.    Yes.

24 |     Q.    And the -- the description appears to be

16:12:49  25 | David Z. Chesnoff.

YATES COURT REPORTERS    800.669.1866

| 16:12:52 | 1 | Mr. Montgomery, who is David Chesnoff? |
| | 2 | A.   I'm going to assert my right under the |
| | 3 | Fifth Amendment. |
| | 4 | Q.   Isn't he your criminal defense counsel in |
| 16:13:03 | 5 | Clark County, Nevada? |
| | 6 | A.   I'm going to assert my right under the |
| | 7 | Fifth Amendment. |
| | 8 | Q.   Didn't he appear for you yesterday at your |
| | 9 | arraignment, Mr. Montgomery? |
| 16:13:06 | 10 | A.   I'm going to assert my right under the |
| | 11 | Fifth Amendment. |
| | 12 | Q.   Speaking of the arraignment yesterday in |
| | 13 | Clark County, what did the judge give you a two-week |
| | 14 | extension for? |
| 16:13:16 | 15 | A.   I'm going to assert my right under the |
| | 16 | Fifth Amendment. |
| | 17 | Q.   Did he give you an extension to arrange |
| | 18 | some sort of financing to pay off the DA, |
| | 19 | Mr. Montgomery? |
| 16:13:25 | 20 | A.   I'm going to assert my right under the |
| | 21 | Fifth Amendment. |
| | 22 | Q.   Mr. Montgomery, you've paid the DA |
| | 23 | $450,000 -- |
| | 24 | We've asked this question.  I'll move on. |
| 16:13:32 | 25 | Now I'm looking back at this 12/15 |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

16:13:36    1    withdrawal from Istvan Burgyan's account to what

            2    appears to be David Chesnoff who is your criminal

            3    counsel.

            4         Why would Istvan Burgyan pay a hundred

16:13:48    5    thousand dollars to your criminal counsel?

            6         A.   I'm going to assert my right under the

            7    Fifth Amendment.

            8         Q.   Isn't it true this is really your hundred

            9    thousand dollars, Mr. Montgomery?

16:13:57   10         A.   I'm going to assert my right under the

           11    Fifth Amendment.

           12              MR. CONANT:  All right.  Let's hand you

           13    what we've marked as Plaintiff's Exhibit No. 22.

           14              (Exhibit 22 was marked for identification.)

16:14:38   15    BY MR. CONANT:

           16         Q.   All right.  Mr. Montgomery, who do you --

           17    do you pay your mortgage, Mr. Montgomery?

           18         A.   Ever you mean?

           19         Q.   Who do you have -- who do you currently

16:14:49   20    have -- what banks do you currently have to pay

           21    mortgage payments to, Mr. Montgomery?

           22         A.   Bank of America.

           23         Q.   You just have one mortgage that you pay?

           24         A.   No.  Aurora Home Loans, I don't know the

16:15:03   25    name of the bank but --

Dennis Lee Montgomery  -  November 18, 2010

```
16:15:04    1        Q.    You think it's Aurora Loan Services?

            2              THE REPORTER:  Sorry?

            3              THE WITNESS:  Aurora.

            4    BY MR. CONANT:

16:15:10    5        Q.    Aurora Loan, okay.

            6              I'm sorry, Mr. Montgomery, I didn't mean to

            7    cut you off.

            8              All right.  If you look at me [sic] with

            9    Bates stamp No. 944, there is a withdrawal in the

16:15:25   10    amount -- dated June 1, in the amount of $15,000.

           11              Do you see that, Mr. Montgomery?

           12        A.    Yes.

           13        Q.    And the description is wire transfer out,

           14    JMBM retainer, and then it says Joseph A.

16:15:46   15    Eisenberg -- or Gisenberg, PC.

           16              Do you know who Joseph Gisenberg is,

           17    Mr. Montgomery?

           18        A.    I'm going to assert my right under the

           19    Fifth Amendment.

16:15:59   20        Q.    Isn't he your counsel in your main

           21    bankruptcy case, Mr. Montgomery?

           22        A.    I'm going to assert my right.

           23        Q.    Why would Mr. Burgyan pay $15,000, a

           24    $15,000 retainer, to your bankruptcy counsel,

16:16:11   25    Mr. Montgomery?
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

16:16:12    1        A.    I'm going to assert my right under the

            2    Fifth Amendment.

            3        Q.    Isn't it true that this $15,000 is really

            4    your money, Mr. Montgomery?

16:16:18    5        A.    I'm going to assert my right under the

            6    Fifth Amendment.

            7        Q.    Now you said a minute ago, Mr. Montgomery,

            8    that one of your mortgage payments is to Aurora Loan

            9    Services.

16:16:29   10        A.    That's correct.

           11        Q.    Okay.  I see now, if you look down to

           12    June 4 --

           13        A.    I see.

           14        Q.    -- you have a withdrawal in the amount of

16:16:39   15    $8,104.40.

           16              Do you see that, Mr. Montgomery?

           17        A.    Yes.

           18        Q.    That's to Aurora Loan Services,

           19    Mr. Montgomery?

16:16:48   20        A.    Yes.

           21        Q.    Isn't that a mortgage payment,

           22    Mr. Montgomery, for one of the mortgages that you

           23    owe money to?

           24              Or -- let me rephrase it.

16:17:00   25              This $8100 payment to Aurora Loan Services,

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

16:17:05    1    isn't that a payment for one of -- on a mortgage

            2    payment that you're responsible for, Mr. Montgomery?

            3        A.    I'm going to assert my right under the

            4    Fifth Amendment.

16:17:14    5        Q.    It's really your -- so Mr. Burgyan is

            6    really paying -- strike that.

            7            All right.  Let's hand you what we've

            8    marked as Plaintiff's Exhibit 23.

            9            (Exhibit 23 was marked for identification.)

16:17:46   10    BY MR. CONANT:

           11        Q.    All right.  If you look here at the

           12    statement Bates stamp No. 934, again this is a

           13    checking account of Istvan Burgyan.  Now all of

           14    these -- Mr. Burgyan laid the foundation for all

16:18:06   15    these statements in his exam -- or deposition.

           16            Could you look at the -- do you see,

           17    Mr. Montgomery, a withdrawal in the amount of

           18    $30,000 dated August -- August 3?

           19        A.    Yes.

16:18:21   20        Q.    Now I see here that it's -- again in the

           21    description we have another reference to David Z.

           22    Chesnoff and then, again, the last word in this

           23    description is Dennis.

           24            What was that $30,000 paid for?

16:18:38   25        A.    I'm going to assert my right under the

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/20/23 Page 314 of 1046
08-cv-01570-RBK Doc#: 2135-5 Filed 01/14/11 Entered 01/14/11 22:06:14 Page 314 of
345

Dennis Lee Montgomery  -  November 18, 2010

16:18:40  1   Fifth Amendment.

2        Q.   Isn't it -- those were funds paid to your

3   criminal counsel, are they not, Mr. Montgomery?

4        A.   I'm going to assert my right under the

16:18:48  5   Fifth Amendment.

6        Q.   Isn't that, in fact, your money,

7   Mr. Montgomery, that's going to Mr. Chesnoff?

8        A.   I'm going to assert my right under the

9   Fifth Amendment.

16:19:01  10            We need to stop.  I need to go to the rest

11   room.

12            MR. CONANT:  Okay.

13            THE VIDEOGRAPHER:  This marks the end of

14   Media No. 3.  The time is 4:19 p.m.  We're off the

16:19:13  15   record.

16            (Recess taken.)

17            THE VIDEOGRAPHER:  This marks the beginning

18   of Media No. 4.  The time is 4:23 p.m.  We're back

19   on the record.

16:23:04  20            MR. CONANT:  All right.  Mr. Montgomery,

21   I'm going to hand you what'll be marked as

22   Plaintiff's Exhibit 24.

23            (Exhibit 24 was marked for identification.)

24   BY MR. CONANT:

16:23:20  25        Q.   All right.  Mr. Montgomery, take a second

YATES COURT REPORTERS    800.669.1866

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/20/23 Page 315 of 1046
08-cv-01570-RBK Doc#: 2135-5 Filed 01/04/11 Entered 01/24/13 14:29:06 Page 345 of 345
Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 16:23:22 | 1 | to review this document. |

16:23:22   1   to review this document.
           2        A.   Okay.
           3        Q.   I'm going to represent that this is a --
           4   this is a document we got from a casino in relation
16:23:34   5   to a subpoena.
           6        Does this -- did you -- is this your
           7   cashier's check, Mr. Montgomery, that you -- I'm
           8   sorry.  Let me back up.
           9        Is this one of the cashier's checks that
16:23:47  10   you got from Wells Fargo Bank on April 25, 2006?
          11        A.   I'm going to assert my right under the
          12   Fifth Amendment.
          13        Q.   What did you do with this -- did you bring
          14   this cashier's check and cash it with -- I shouldn't
16:24:02  15   say "cash it."  Let me strike that.
          16        Did you submit this cashier's check to
          17   Caesar's Casino?
          18        A.   I'm going to assert my right under the
          19   Fifth Amendment.
16:24:10  20        Q.   What did you do -- what was the purpose of
          21   giving Caesar's Casino this $50,000 cashier's check?
          22        A.   I'm going to assert my right under the
          23   Fifth Amendment.
          24        Q.   Didn't you take this money out,
16:24:20  25   Mr. Mont- -- take this check to the casino and get

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:24:22 | 1 | cash with it, Mr. Montgomery? |
| | 2 | A.  I'm going to assert my right under the |
| | 3 | Fifth Amendment. |
| | 4 | Q.  What did you do with the cash that you got |
| 16:24:28 | 5 | from the casino, Mr. Montgomery? |
| | 6 | A.  I'm going to assert my right under the |
| | 7 | Fifth Amendment. |
| | 8 | Q.  Do you still have this $50,000 in cash, |
| | 9 | Mr. Montgomery? |
| 16:24:38 | 10 | A.  I'm going to assert my right under the |
| | 11 | Fifth Amendment. |
| | 12 | MR. CONANT:  All right.  I'm going to hand |
| | 13 | you what we've marked as Plaintiff's Exhibit 25. |
| | 14 | (Exhibit 25 was marked for identification.) |
| 16:25:15 | 15 | THE WITNESS:  That's it. |
| | 16 | MR. CONANT:  Sorry. |
| | 17 | BY MR. CONANT: |
| | 18 | Q.  Mr. Montgomery, can you tell me what -- can |
| | 19 | you tell me what casinos you've gambled at since |
| 16:25:30 | 20 | 2006? |
| | 21 | A.  I'm going to assert my right under the |
| | 22 | Fifth Amendment. |
| | 23 | Q.  Between 2006 -- within the year 2006, can |
| | 24 | you tell me how much money you've won gambling or |
| 16:25:42 | 25 | how much you money you've lost gambling? |

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| 16:25:44 | 1 | A.   I'm going to assert my right under the |
| | 2 | Fifth Amendment. |
| | 3 | Q.   I'll ask you the same question for 2007. |
| | 4 | Can you tell me how much money you won gambling or |
| 16:25:54 | 5 | lost gambling? |
| | 6 | A.   I'm going to assert my right under the |
| | 7 | Fifth Amendment. |
| | 8 | Q.   I'm asking for net.  When I'm asking how |
| | 9 | much you won, how much you lost, I'm asking net for |
| 16:26:04 | 10 | the year. |
| | 11 | A.   I'm going to assert my right under the |
| | 12 | Fifth Amendment. |
| | 13 | Q.   Isn't it true that -- well, let me back up. |
| | 14 | For the year 2008 can you tell me how much |
| 16:26:11 | 15 | you won gambling or how much you lost gambling? |
| | 16 | A.   I'm going to assert my right under the |
| | 17 | Fifth Amendment. |
| | 18 | Q.   Same question for 2009. |
| | 19 | A.   Same answer. |
| 16:26:21 | 20 | Q.   Isn't it true that for the years 2008 |
| | 21 | through 2009 you've won more money gambling than |
| | 22 | lost? |
| | 23 | A.   I'm going to assert my right under the |
| | 24 | Fifth Amendment. |
| 16:26:32 | 25 | Q.   Approximately how much money have you |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

16:26:33   1   borrowed in one form or another, Mr. Montgomery,

           2   from casinos --

           3        A.   I'm going to assert my right under the

           4   Fifth Amendment.

16:26:38   5        Q.   Let me finish the question.

           6             Between the years 2006, 2009, how much

           7   money have you borrowed from casinos,

           8   Mr. Montgomery?

           9        A.   I'm going to assert my right under the

16:26:49  10   Fifth Amendment.

          11             MR. FLYNN:   When he was getting those

          12   millions of dollars of cash from Edra Blixseth, was

          13   he putting second mortgages on his homes.

          14   BY MR. CONANT:

16:26:57  15        Q.   Mr. Montgomery, we just reviewed all your

          16   bank statements where you received a large amount of

          17   money from Edra Blixseth's entities.

          18             During that time period, were you taking

          19   out second mortgages on real estate?

16:27:13  20        A.   I'm going to invoke my right under the

          21   Fifth Amendment.

          22        Q.   What did you do with all the cash you took

          23   out on these mortgages on your real estate?

          24        A.   I'm going to invoke my right under the

16:27:24  25   Fifth Amendment.

YATES COURT REPORTERS   800.669.1866

| 16:27:25 | 1 | Q.   All right.  Did you put second mortgages on |
| | 2 | each piece of real estate that you owned during this |
| | 3 | time period? |
| | 4 | A.   I'm going to invoke my right under the |
| 16:27:42 | 5 | Fifth Amendment. |
| | 6 | Q.   All right.  Mr. Montgomery, do you not want |
| | 7 | to file your tax returns for '08 and '09 because you |
| | 8 | don't want to report your wins from gambling? |
| | 9 | A.   I'm going to assert my right under the |
| 16:28:35 | 10 | Fifth Amendment. |
| | 11 | Q.   All right.  Let me see here. |
| | 12 | Have you ever reported to a casino that you |
| | 13 | were robbed of a large amount of money, |
| | 14 | Mr. Montgomery? |
| 16:28:42 | 15 | A.   I'm going to assert my right under the |
| | 16 | Fifth Amendment. |
| | 17 | Q.   Okay.  Were you, in fact, robbed of any |
| | 18 | money at any time, Mr. Montgomery? |
| | 19 | A.   I'm sorry. |
| 16:28:54 | 20 | Are you done? |
| | 21 | Q.   I'm trying to find it.  It's in here.  I'm |
| | 22 | just trying to find the exact reference to it, |
| | 23 | because there's an interesting -- yeah.  I just want |
| | 24 | to find it. |
| 16:29:50 | 25 | All right.  Mr. Montgomery, on -- are |

Page 318

Dennis Lee Montgomery  -  November 18, 2010

```
16:29:51   1   you --
           2        A.    25.
           3        Q.    On 25.
           4              Can you flip with me to -- it's going to be
16:29:59   5   the -- one, two, three, four, five, six, seven --
           6   the eighth page from the back.
           7        A.    What's the top say?
           8        Q.    Well, MontBleu Resort.
           9        A.    How about memo ID, which number is it?
16:30:22  10        Q.    Memo ID 30936.
          11        A.    Okay.  I see it.
          12        Q.    All right.  On the right-hand column it
          13   says, "Memo Title:  Customer robbed.  Memo Text:
          14   4/6/6," I assume 4/6/2006, April 6, 2006, "Customer
16:30:42  15   visit today, he was robbed of $300,000 down in Reno.
          16   Was not hurt.  Brought in $100K cashier's check to
          17   take care of half his outstanding markers.  Says he
          18   will pay the remainder within" seven -- I'm sorry,
          19   "within three weeks.nan  Tickled remaining" hundred
16:31:02  20   thousand to 5/7/06 [sic].
          21              I'll represent to you these are documents
          22   that we received in connection with subpoenas we
          23   served on the MontBleu Resort.
          24              Is that true, Mr. Montgomery?  Did you tell
16:31:12  25   a casino that you were robbed of $300,000 in Reno?
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

16:31:18   1        A.    Assert my right under the Fifth Amendment.

           2              MR. FLYNN:  Here's how he did it, by making

           3     it look like --

           4     BY MR. CONANT:

16:31:41   5        Q.    How much money -- well, let's go back to --

           6     how much money, approximately, were you borrowing?

           7              Let me back up.  Do you understand what a

           8     marker is in casino parlance?

           9        A.    I'm going to assert my right under the

16:31:54  10     Fifth Amendment.

          11        Q.    Isn't a marker kind of like a note that the

          12     casino advances you money in some manner and you,

          13     essentially, have to pay it back?

          14        A.    I'm going to assert my right under the

16:32:05  15     Fifth Amendment.

          16        Q.    So weren't you taking out markers to

          17     gamble, you'd win, but then not pay back the marker?

          18        A.    I'm sorry.  Are you done?

          19        Q.    I'm done.

16:32:16  20        A.    I'm going to assert my right under the

          21     Fifth Amendment.

          22        Q.    Now I notice that this memo text, 4/6/2006,

          23     this is the same day that you were receiving, I

          24     think, based on your records, over a million dollars

16:32:30  25     from Opspring; is it not, Mr. Montgomery?

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:32:35 | 1 | THE WITNESS:  I despise that he keeps |
| | 2 | looking at the government and smiling and winking. |
| | 3 | It's just annoying. |
| | 4 | MR. CROCKETT:  Almost done.  Almost done. |
| 16:32:44 | 5 | THE WITNESS:  I'm going to assert my right |
| | 6 | under the Fifth Amendment. |
| | 7 | BY MR. CONANT: |
| | 8 | Q.   So you were robbed -- you were purportedly |
| | 9 | robbed of $300,000, but at the same time it appears |
| 16:32:52 | 10 | that you still had outstanding markers owed to the |
| | 11 | casinos. |
| | 12 | In fact, this memo says brought in -- you |
| | 13 | brought in a hundred K cashier's check to take care |
| | 14 | of his -- "to take care of half his outstanding |
| 16:33:05 | 15 | markers." |
| | 16 | So you had roughly $200,000 in outstanding |
| | 17 | markers and you paid down a hundred thousand dollars |
| | 18 | of those, but the very same day you're being paid |
| | 19 | over a million dollars from -- you receive over a |
| 16:33:22 | 20 | million dollars from Edra's entities. |
| | 21 | So the question is why didn't you just pay |
| | 22 | off all your markers with all the money you were |
| | 23 | receiving from Edra's entities? |
| | 24 | A.   I'm going to assert my right under the |
| 16:33:36 | 25 | Fifth Amendment. |

YATES COURT REPORTERS     800.669.1866

| | | |
|---|---|---|
| 16:33:42 | 1 | MR. FLYNN: He's hired an accountant to go |
| | 2 | through all of his records to determine what his |
| | 3 | wins and losses were at the casinos. |
| | 4 | BY MR. CONANT: |
| 16:33:52 | 5 | Q. Now, Mr. Montgomery, you said you haven't |
| | 6 | yet filed your tax returns for '08 or '09. Have you |
| | 7 | hired an accountant to help you determine your wins |
| | 8 | and your losses from the various casinos? |
| | 9 | A. I assert my right under the Fifth |
| 16:34:06 | 10 | Amendment. |
| | 11 | Q. What I mean hired an accountant, I mean |
| | 12 | hired an accountant to help you prepare your tax |
| | 13 | returns? |
| | 14 | A. I'm going to going to assert my right under |
| 16:34:16 | 15 | the Fifth Amendment. |
| | 16 | Q. All right. Now, Mr. Montgomery, if you |
| | 17 | flip to the next page here, September 1, '06, Memo |
| | 18 | ID 42710, "Memo Text: Customer requests increase to |
| | 19 | 300k, denied at this point. Keep at 200k per Mike |
| 16:34:50 | 20 | Jones." |
| | 21 | Who's Mike -- do you know who Mike Jones is |
| | 22 | that they're referring to here? |
| | 23 | A. I'm going to assert my right under the |
| | 24 | Fifth Amendment. |
| 16:34:57 | 25 | Q. Were you asking casinos for extensions of |

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:35:01 | 1 | credit, Mr. Montgomery, during this time period? |
| | 2 | A.   I'm going to assert my right under the |
| | 3 | Fifth Amendment. |
| | 4 | Q.   How much cash -- what is a -- what is a -- |
| 16:35:13 | 5 | what is a casino -- how does a casino operate with |
| | 6 | respect to how much money they're willing to extend |
| | 7 | to you on credit? |
| | 8 | MR. CROCKETT:  Calls for speculation. |
| | 9 | BY MR. CONANT: |
| 16:35:22 | 10 | Q.   In your experience with the casinos, |
| | 11 | Mr. Montgomery, how do you get -- how did you |
| | 12 | establish a line of credit with all these casinos, |
| | 13 | Mr. Montgomery? |
| | 14 | A.   I'm going to assert my right under the |
| 16:35:31 | 15 | Fifth Amendment. |
| | 16 | MR. CONANT:  All right. |
| | 17 | All right.  Just got to get through some of |
| | 18 | these.  The amount, the volume, of documents here |
| | 19 | you see from casinos is -- one point just absolutely |
| 16:36:33 | 20 | overwhelming, so we've had to get through some of |
| | 21 | this. |
| | 22 | All right.  Mr. Montgomery, I'm going to |
| | 23 | hand you what will be marked as Plaintiff's Exhibit |
| | 24 | No. 26. |
| 16:37:51 | 25 | Are we at 26? |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
16:37:53   1              THE REPORTER:  Yes.

           2              (Exhibit 26 was marked for identification.)

           3              MR. CONANT:  All right.  I'll represent

           4    these are documents we have received in response to

16:38:13   5    subpoenas.

           6              MR. CROCKETT:  When were these subpoenas

           7    served, counsel?

           8              MR. CONANT:  When?

           9              MR. CROCKETT:  Yes.

16:38:18  10              MR. CONANT:  I don't recall.  You received

          11    notice of service.

          12              MR. CROCKETT:  I don't believe we did.

          13              MR. CONANT:  Your firm received notice of

          14    service of the subpoenas.

16:38:26  15              MS. WELLS:  Can you identify for the record

          16    what these documents are, please.

          17              MR. CONANT:  Yeah.  These are letters

          18    written to Dennis Montgomery from Caesar's Tahoe

          19    asking for his win/loss records.

16:38:46  20         Q.   Mr. Montgomery, I see here on the first

          21    page below -- the first page, "Dear Dennis, below is

          22    your estimated win and/or loss information per your

          23    request for the period September 2005 through

          24    December 31, '05," and then it appears that your

16:39:01  25    total win/loss is $83,400.
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

16:39:07   1          Do you recall why you requested this

          2   information from the casino, Mr. Montgomery?

          3      A.   I'm going to assert my right under the

          4   Fifth Amendment.

16:39:14   5      Q.   Did you report this $83,000 win on your

          6   2005 tax returns -- or your tax year 2005 tax

          7   returns, Mr. Montgomery?

          8          MR. CROCKETT:  Sorry, Counsel, all three of

          9   these letters are dated September 16th and yet they

16:39:31  10   deal with years 2005, '-6 and '-7 and this is the

         11   way they were produced to me.

         12          MR. CONANT:  This is the way they were

         13   produced to me.  I haven't altered these documents

         14   in any way.

16:39:45  15      Q.   Mr. Montgomery?

         16      A.   I'm sorry, rephrase the question.

         17          MR. CROCKETT:  I'm sorry, read the question

         18   back, please.

         19   BY MR. CONANT:

16:39:50  20      Q.   Did you report this $83,400 win on your tax

         21   year 2005 tax returns?

         22      A.   I don't recall.  I don't recall.

         23      Q.   Mr. Montgomery, isn't it true that part of

         24   your entire scheme was to horde away a bunch of cash

16:40:28  25   and then file bankruptcy and claim that you lost all

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 16:40:35 | 1 | your money gambling, Mr. Montgomery? |
| | 2 | A.   Assert my right under the Fifth Amendment. |
| | 3 | Q.   All right.  Mr. Montgomery, I'm looking at |
| | 4 | the second page of this exhibit here, "Dear Dennis, |
| 16:40:45 | 5 | below is your estimated win and/or loss information |
| | 6 | per your request for the period January 2006 through |
| | 7 | December 31, 2006," and then it shows a loss of |
| | 8 | $132,600. |
| | 9 | Mr. Montgomery, do you recall why you |
| 16:41:00 | 10 | requested your win/loss record for this -- for the |
| | 11 | MontBleu Resort? |
| | 12 | A.   I'm going to assert my right under the |
| | 13 | Fifth Amendment. |
| | 14 | Q.   Did you report that $132,000 loss on your |
| 16:41:10 | 15 | taxes, Mr. Montgomery? |
| | 16 | A.   I'm going to assert my right. |
| | 17 | Q.   Did you really lose $132,600, |
| | 18 | Mr. Montgomery? |
| | 19 | A.   I'm going to assert my right under the |
| 16:41:17 | 20 | Fifth Amendment. |
| | 21 | Q.   Does that include money that was borrowed? |
| | 22 | Does the $132,000 included in this lawsuit, does |
| | 23 | that include money that was borrowed by you from the |
| | 24 | resort, Mr. Montgomery? |
| 16:41:28 | 25 | A.   I'm going to assert my right under the |

Dennis Lee Montgomery  -  November 18, 2010

16:41:30   1   Fifth Amendment.

           2        Q.    All right.  And then last page,

           3   January '07 through December 31, '07, this document

           4   purports to show that you lost 36,800.

16:41:44   5             Is that accurate, Mr. Montgomery?

           6        A.    I'm going to assert my right under the

           7   Fifth Amendment.

           8        Q.    Did you report that loss on any of your tax

           9   returns?

16:41:53  10        A.    I'm going to assert my right under the

          11   Fifth Amendment.

          12        Q.    All right.  Moving on.

          13             MR. FLYNN:  Does he have an estimate of how

          14   much he lost, how much he lost gambling --

16:42:07  15   BY MR. CONANT:

          16        Q.    Mr. -- Mr. Montgomery, do you have an

          17   estimate of the net amount of money you've lost

          18   gambling between April '06 and March of 2009?

          19        A.    I'm going to assert my right under the

16:42:18  20   Fifth Amendment.

          21             MR. FLYNN:  Same thing on wins.

          22   BY MR. CONANT:

          23        Q.    Same question with respect to how much

          24   you've won, net, between April '06 and March of

16:42:28  25   2009?

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

```
16:42:29    1         A.    Same answer.

            2               MR. CONANT:  All right.

            3               All right.  Okay.  Mr. Montgomery, I'm

            4     going to hand you what's going to be marked as

16:43:32    5     Plaintiff's Exhibit 27, I believe.

            6               (Exhibit 27 was marked for identification.)

            7               THE WITNESS:  Thank you.

            8               MR. CONANT:  I don't have an extra copy.

            9               All right.  I'll represent this is a

16:44:14   10     printout from -- in response to a subpoena I served

           11     on -- unfortunately which casino is not obvious, but

           12     I can find the copy here.

           13               Yes, Peppermill.  This is in response to a

           14     subpoena I served on the Peppermill Resort -- or

16:44:46   15     Casino, I should say.

           16         Q.    Now, Mr. Montgomery, I see here that on

           17     August 6, 2010, first entry here, says amount

           18     $5,000, that they received a payment from you in the

           19     amount of $5,000.

16:45:08   20               Do you recall making a payment to any

           21     casino in the amount of $5,000 on or about August 6,

           22     2010?

           23         A.    I assert my right under the Fifth

           24     Amendment.

16:45:20   25         Q.    And I see here for July 16 another payment
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

| | | |
|---|---|---|
| 16:45:25 | 1 | in the amount of $5,000. |
| | 2 | Do you see that, Mr. Montgomery? |
| | 3 | A.   I see it. |
| | 4 | Q.   Okay.  Do you recall making that payment, |
| 16:45:32 | 5 | Mr. Montgomery? |
| | 6 | A.   I assert my right under the Fifth |
| | 7 | Amendment. |
| | 8 | Q.   What are -- the source of the funds for |
| | 9 | that payment, Mr. Montgomery? |
| 16:45:40 | 10 | A.   I assert my right under the Fifth |
| | 11 | Amendment. |
| | 12 | Q.   Is this -- is this payment here part of an |
| | 13 | arrangement with the casino or the DA to prevent |
| | 14 | being indicted by any casino? |
| 16:45:53 | 15 | A.   I assert my right under the Fifth |
| | 16 | Amendment. |
| | 17 | Q.   Does this represent any arrangement with |
| | 18 | you -- or between you and a casino or the Clark |
| | 19 | County DA to avoid criminal sanctions, |
| 16:46:04 | 20 | Mr. Montgomery? |
| | 21 | A.   Assert my right under the Fifth Amendment. |
| | 22 | Q.   What's the source of these funds that |
| | 23 | you're making payments with to the casino, |
| | 24 | Mr. Montgomery? |
| 16:46:15 | 25 | A.   I assert my right under the Fifth |

YATES COURT REPORTERS   800.669.1866

```
16:46:17   1   Amendment.

           2        Q.   Aren't these -- aren't these pre funds that

           3   you stored away prior to filing for bankruptcy,

           4   Mr. Montgomery?

16:46:23   5        A.   I assert my right under the Fifth

           6   Amendment.

           7        Q.   Okay.

           8             MR. FLYNN:  Ask him about the money he got

           9   from Edra.

16:46:55  10             MR. CONANT:  Mr. Montgomery, I'm going to

          11   hand you what's been marked as Plaintiff's

          12   Exhibit 28.

          13             (Exhibit 28 was marked for identification.)

          14             MR. CROCKETT:  Do you have extra copies of

16:47:04  15   these?

          16             MR. CONANT:  I do of this one.

          17             MR. CROCKETT:  I'd like a copy of this

          18   before we leave.

          19             THE WITNESS:  Well, actually --

16:47:11  20             MR. CROCKETT:  There's only one 27 and I'd

          21   like a copy of it.

          22             THE WITNESS:  Okay.

          23   BY MR. CONANT:

          24        Q.   Mr. Montgomery, I ask you to flip to the --

16:47:32  25   one, two, three -- I believe the third --
```

Dennis Lee Montgomery  -  November 18, 2010

16:47:41    1            MS. WELLS:  Do you mind identifying this

          2    for the record, please.

          3            MR. CONANT:  You'll probably want a copy of

          4    this.  It's a -- this is another document that we

16:47:52    5    received in response to a subpoena -- sorry.

          6            This one was on, I believe, again, the

          7    Peppermill Resort.

          8    Q.    All right, Mr. Montgomery looking at a page

          9    that --

16:48:13   10    A.    Well, just tell me which one.

         11    Q.    I'm trying to see how they identify this

         12    here.

         13            It says -- on the description says -- well,

         14    let me just count it again -- one, two, three -- the

16:48:29   15    fourth page, the fourth page, and the description

         16    under the section Additional Remarks begins --

         17    A.    This page 4; right?

         18    Q.    I believe so.

         19            It says, "Last two 5K payments," do you see

16:48:48   20    that, Mr. Montgomery?

         21    A.    Yes.

         22    Q.    I'll read what's on this page.  "Last two

         23    5K payments posted are from checks received from"

         24    Dennis Montgomery -- "Dennis's attorney, Scott

16:49:01   25    Freeman.  Mr. Freeman keeps in touch with Rob Erwin

                                                        Page 331

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:49:02 | 1 | and let's him know when he is sending a check. |
| | 2 | "Recently Mr. Freeman told Rob that Dennis |
| | 3 | is in Europe meeting with companies that may be |
| | 4 | interested in buying some of his software.  Rob |
| 16:49:14 | 5 | spoke with Dennis's attorney, Scott Freeman," 10 -- |
| | 6 | then we have the number 10/28. |
| | 7 | "Freeman told Rob that Dennis is currently |
| | 8 | in Paris signing contracts.  Maybe some money coming |
| | 9 | to us from this," question mark, question mark. |
| 16:49:32 | 10 | Do you see this description, |
| | 11 | Mr. Montgomery? |
| | 12 | A.    Yes.  I see what you read. |
| | 13 | MR. FLYNN:  Ask him what software he was |
| | 14 | pedaling. |
| 16:49:40 | 15 | BY MR. CONANT: |
| | 16 | Q.    Now, the way I read this you've got two |
| | 17 | dates going down the right-hand column 2/16/2010 |
| | 18 | then -- well, 11/20/09 and then below that 10/21/09 |
| | 19 | and my understanding of how these read is the date |
| 16:49:57 | 20 | for each line in the remarks section, each line |
| | 21 | corresponds to the date in the right-hand column for |
| | 22 | that line. |
| | 23 | So on February 16th, 2010, it appears that |
| | 24 | an attorney was representing to a representative of |
| 16:50:13 | 25 | this casino that you were in Europe meeting with |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| 16:50:17 | 1 | companies that may be interested in buying some of |
|----------|---|----|

16:50:17   1   companies that may be interested in buying some of

2   your software.

3       Do you see that, Mr. Montgomery?

4       A.   Yes.

16:50:22   5   Q.   Is that an accurate statement,

6   Mr. Montgomery?

7       A.   I'm going to assert my right under the

8   Fifth Amendment.

9       Q.   Were you in Europe trying to sell software?

16:50:29  10   A.   I'm going to assert my right under the

11   Fifth Amendment.

12       Q.   Was that software that was listed in your

13   bankruptcy schedule, Mr. Montgomery?

14       A.   I'm going to assert my right under the

16:50:35  15   Fifth Amendment.

16       Q.   Is this the same software that we saw

17   referred to everywhere in Plaintiff's Exhibit 3, the

18   source code that could detect terrorist attacks,

19   Mr. Montgomery?

16:50:46  20       A.   I'm going to assert my right under the

21   Fifth Amendment.

22       Q.   Is this when you were meeting with Israel

23   to try and sell them software?

24       A.   I'm going to assert my right under the

16:50:54  25   Fifth Amendment.

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

16:50:54   1       Q.    Mr. Montgomery, I'm going to now talk --

2    turn to the part dated November 20, '09.

3       A.    Okay.

4       Q.    "Rob spoke with Dennis's attorney, Scott

16:51:02   5    Freeman.   Freeman told Rob that Dennis is currently

6    in Paris signing contracts."

7            Were you in Paris signing contracts in

8    approximately in November of '09?

9       A.    I'm going to assert my right under the

16:51:15  10    Fifth Amendment.

11       Q.    What contracts would those be referring to?

12       A.    I'm going to assert my right under the

13    Fifth Amendment.

14       Q.    And weren't those contracts associated with

16:51:20  15    property listed on your bankruptcy schedule,

16    Mr. Montgomery?

17       A.    I'm going to assert my right under the

18    Fifth Amendment.

19       Q.    At the same time were you attempting to

16:51:31  20    sell this software to the federal government?

21       A.    I'm going to assert my right under the

22    Fifth Amendment.

23       Q.    And when I mean "software," I mean the

24    software referenced in the dates for February 16,

16:51:45  25    2010.

Dennis Lee Montgomery  -  November 18, 2010

16:51:45   1          A.    I'm going to assert my right under the

2    Fifth Amendment.

3          Q.    Now did you have possession of this

4    software that you were supposedly in Europe meeting

16:51:53   5    with potential buyers?

6          A.    I'm going to assert my right under the

7    Fifth Amendment.

8          Q.    All right.

9                All right.  Turn to the next page.

16:52:10  10          A.    I have to leave at 5 o'clock.

11          Q.    We'll be done by 5 o'clock.

12          A.    Oh, okay.

13                Okay.

14          Q.    All right.  I see here first line under

16:52:39  15    additional remarks first full sentence, "Rob had

16    been told by him he would call Rob to let him know

17    about a payment to Dennis."

18                That was -- I'm sorry.  That was

19    October 21, '09, entry.

16:52:52  20                I'm looking now at September 18, '09,

21    entries.  "We received a call from local attorney

22    Scott Freeman about a month ago.  He said he's

23    working with Dennis's attorney in Las Vegas and

24    wanted to know if we had turned this over to the

16:53:10  25    DA's office.

Page 335

Dennis Lee Montgomery  -  November 18, 2010

```
16:53:11    1            "Rob spoke with Scott and sounded as if
            2    Dennis may want to make a payment arrangement.
            3    Scott was going to get back to us."
            4            Is that true, Mr. Montgomery, were you
16:53:23    5    trying to make a payment arrangement with the
            6    Peppermill Casino?
            7        A.   I'm asserting my right under the Fifth
            8    Amendment.
            9        Q.   How would you -- how would you make such a
16:53:32   10    payment arrangement, Mr. Montgomery, at this time in
           11    September 18 of 2009?
           12        A.   I'm asserting my right under the Fifth
           13    Amendment.
           14        Q.   All right.  Okay.
16:54:11   15            All right.  If you flip with me to -- oh,
           16    on the right-hand side dates dated -- remarks dated
           17    October of '06, October 16, '06.
           18        A.   '06?
           19        Q.   Yeah.
16:54:26   20        A.   Which, which period of time?
           21            MR. CROCKETT:  Same exhibit.
           22            THE WITNESS:  Oh, okay.
           23            MR. FLYNN:  1099.
           24    BY MR. CONANT:
16:54:54   25        Q.   All right.  Mr. Montgomery, between the
```

YATES COURT REPORTERS    800.669.1866

| 16:54:59 | 1 | years of -- well, between April '06 and March of |
|---|---|---|
| | 2 | 2009, how -- what did -- what is reflected as your |
| | 3 | income in W-2s issued to you by Edra Blixseth's |
| | 4 | entities? |
| 16:55:19 | 5 | A.    I don't recall. |
| | 6 | Q.    For any year? |
| | 7 | A.    I don't recall. |
| | 8 | Q.    Less than a million dollars or more than a |
| | 9 | million dollars? |
| 16:55:27 | 10 | A.    For what period? |
| | 11 | Q.    Let's start with year -- tax year 2006. |
| | 12 | A.    Tax year or calendar year? |
| | 13 | Q.    Tax year -- for tax year 2006, what would |
| | 14 | be reflected in your W-2 for that tax year? |
| 16:55:41 | 15 | A.    I don't recall. |
| | 16 | Q.    For 2007, would it be -- I'm talking about |
| | 17 | tax year 2006 now, would it be less than a million |
| | 18 | dollars or more than a million dollars? |
| | 19 | A.    I believe we went already went through this |
| 16:55:54 | 20 | same exact question. |
| | 21 | Q.    I asked you how much -- |
| | 22 | A.    I don't recall. |
| | 23 | Q.    What would be reflected in your tax year |
| | 24 | 2007 W-2 -- |
| 16:56:00 | 25 | A.    I don't recall -- I'm sorry. |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery - November 18, 2010

| | | |
|---|---|---|
| 16:56:00 | 1 | Q. -- as your income from Ms. Blixseth's |
| | 2 | entities? |
| | 3 | A. I don't recall. |
| | 4 | Q. Less than a million dollars or more than a |
| 16:56:06 | 5 | million dollars? |
| | 6 | A. For 2007? |
| | 7 | Q. Yes. |
| | 8 | A. I would think less. |
| | 9 | Q. And for 2008, what would be reflected in |
| 16:56:23 | 10 | your tax year 2008 W-2s? |
| | 11 | A. I want to make sure I don't get in trouble. |
| | 12 | MR. CROCKETT: I think you've confused both |
| | 13 | of us. |
| | 14 | THE WITNESS: Yeah. You've changed. Which |
| 16:56:35 | 15 | one are you talking about? The easiest way to tell |
| | 16 | me is just that year. |
| | 17 | Tax year, isn't that the next year? |
| | 18 | BY MR. CONANT: |
| | 19 | Q. Well, if you're getting a W-2 for tax year |
| 16:56:48 | 20 | 2008 -- |
| | 21 | MR. CROCKETT: For calendar year 2008. |
| | 22 | THE WITNESS: You mean calendar year. |
| | 23 | MR. CONANT: Calendar year is -- for |
| | 24 | individuals is same for -- it's the same for -- |
| 16:56:57 | 25 | MR. CROCKETT: Hold on. I lost my |

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:56:58 | 1 | microphone. |
| | 2 | All right.  Sorry. |
| | 3 | THE WITNESS:  I'm confused.  I thought the |
| | 4 | tax year was the next -- the next year that reported |
| 16:57:07 | 5 | the previously year's. |
| | 6 | BY MR. CONANT: |
| | 7 | Q.    Right. |
| | 8 | So your W-2 that reflects your taxes -- |
| | 9 | your income for 2008.  If I'm asking for your tax |
| 16:57:17 | 10 | year 2008 W-2, I want the W-2 -- |
| | 11 | A.    -- for 2007? |
| | 12 | Q.    No, the W-2 that refers to your 2008 |
| | 13 | income. |
| | 14 | MR. CROCKETT:  Which would be the one that |
| 16:57:29 | 15 | you would receive by January 31st, 2009. |
| | 16 | THE WITNESS:  Right.  Right.  Right. |
| | 17 | Right. |
| | 18 | I don't recall. |
| | 19 | What's the previous question you asked me |
| 16:57:39 | 20 | regarding 2007?  I want to -- I may have answered -- |
| | 21 | I want to make sure. |
| | 22 | BY MR. CONANT: |
| | 23 | Q.    Sure. |
| | 24 | A.    Can you repeat it? |
| 16:57:44 | 25 | Q.    Yeah, for tax year 2007, what is reflected |

Page 339

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 16:57:48 | 1 | on your W-2 for that tax year? |
| | 2 | A.    I don't recall. |
| | 3 | MR. FLYNN:  Same question 1099s. |
| | 4 | BY MR. CONANT: |
| 16:57:55 | 5 | Q.    Did you receive any 1099s from any of |
| | 6 | Ms. Blixseth's entities? |
| | 7 | A.    At one point I was getting W-2s and at one |
| | 8 | point I was getting 1099s.  I don't remember when. |
| | 9 | Q.    Do you recall how much your income was |
| 16:58:10 | 10 | reflected on any 1099 that you received for any tax |
| | 11 | year? |
| | 12 | A.    I don't recall, no. |
| | 13 | Q.    And when I say -- I'm referring to 1099s |
| | 14 | issued by Ms. Blixseth's entities. |
| 16:58:20 | 15 | A.    I understood the question. |
| | 16 | I don't -- I'm not certain.  I don't recall |
| | 17 | is my point.  I don't recall what I got on either a |
| | 18 | W-2 or a 1099. |
| | 19 | Q.    So it's safe to say that with respect to |
| 16:58:32 | 20 | 1099s or W-2s for tax years 2006 through 2009 for |
| | 21 | income you received from Edra Blixseth's entities, |
| | 22 | you just don't recall what would be on those? |
| | 23 | A.    I don't have my taxes on them and you've |
| | 24 | been hitting me for eight straight hours and I'm |
| 16:58:48 | 25 | tired. |

YATES COURT REPORTERS    800. 669. 1866

Dennis Lee Montgomery  -  November 18, 2010

| 16:58:49 | 1 | MR. CROCKETT:  Answer the question. |
|---|---|---|
| | 2 | THE WITNESS:  I don't know. |
| | 3 | MR. CONANT:  That's all I wanted to know. |
| | 4 | MR. CROCKETT:  Because the documents are |
| 16:58:52 | 5 | the best evidence anyway. |
| | 6 | THE WITNESS:  I know. |
| | 7 | It's 5.  I really need to leave at |
| | 8 | 5 o'clock and it's 5 o'clock. |
| | 9 | Or is it not maybe. |
| 16:59:02 | 10 | MR. CONANT:  I have two minutes. |
| | 11 | Anything further? |
| | 12 | THE WITNESS:  Are these ours to take? |
| | 13 | THE REPORTER:  No. |
| | 14 | THE WITNESS:  These are yours? |
| 16:59:22 | 15 | MR. CROCKETT:  These are -- |
| | 16 | BY MR. CONANT: |
| | 17 | Q.   Mr. Montgomery, the reference that we just |
| | 18 | saw on these casino records, your attempts to sell |
| | 19 | your software to countries overseas, did Edra |
| 16:59:34 | 20 | Blixseth have any involvement at all with your |
| | 21 | efforts in that regard? |
| | 22 | A.   I've answered the Fifth. |
| | 23 | MR. CONANT:  It's 5 o'clock. |
| | 24 | Mr. Montgomery needs to go, as does his attorney. |
| 16:59:56 | 25 | I'm going to hold -- I'll reserve the right to |

Dennis Lee Montgomery  -  November 18, 2010

16:59:58   1   continue this deposition subject to Judge Bluebon's

2   (phonetic) rulings on the propriety of any refusal

3   to answer in the case that there's no privilege, his

4   refusal to produce documents that we've requested

17:00:15   5   he's hid behind the Fifth Amendment privilege for.

6           THE WITNESS:  Okay.

7           MR. CONANT:  So with that, I think we'll go

8   off the record.

9           THE VIDEOGRAPHER:  This concludes today's

17:00:26  10   proceeding in the video deposition of Dennis Lee

11   Montgomery.  The total number of media used was

12   four.

13           We're going off the record.  The time is

14   5 p.m.

17:00:35  15           THE REPORTER:  Copies?

16           MS. WELLS:  Yes.

17           MR. CROCKETT:  You better send me one.

18           (The deposition was concluded at 5 p.m.)

19

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

YATES COURT REPORTERS    800.669.1866

 1          I hereby declare under penalty of perjury

 2   under the laws of the State of California that I

 3   have read the foregoing deposition and that the

 4   testimony contained therein is a true and correct

 5   transcript of my testimony given at said time and

 6   place.

 7          Dated this _____ day of _____,

 8   2010, at _____, _____.

 9

10

11                    _____

12                              Signature of Witness

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                      CERTIFICATE

 3                          OF

 4             CERTIFIED SHORTHAND REPORTER

 5

 6             I, Stephanie P. Borthwick, Certified

 7    Shorthand Reporter of the State of California, do

 8    hereby certify:

 9             That the foregoing deposition was taken

10    before me at the time and place therein set forth,

11    at which time DENNIS LEE MONTGOMERY was duly sworn

12    by me;

13             That the testimony of the witness and all

14    objections made at the time of the examination were

15    recorded stenographically by me and thereafter

16    transcribed, said transcript being a true copy of my

17    shorthand notes thereof, and a true record of the

18    testimony given by the witness.

19             In witness whereof, I have subscribed my

20    name this date:  December 7th, 2010.

21

22

23             _____

24             STEPHANIE P. BORTHWICK, CSR

25             Certificate No. 12088
```

# Exhibit 69

B6 Summary (Official Form 6 - Summary) (12/07)

# United States Bankruptcy Court
## Central District Of California

In re  Dennis L. Montgomery &
Brenda K. Montgomery
_____
Debtor

Case No.  6:09-bk-24322

Chapter  7

# SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts of all claims from Schedules D, E, and F to determine the total amount of the debtor's liabilities. Individual debtors also must complete the "Statistical Summary of Certain Liabilities and Related Data" if they file a case under chapter 7, 11, or 13.

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | Yes | 1 | $ 3,707,000.00 | | |
| B - Personal Property | Yes | 6 | $ 49,518,540.81 | | |
| C - Property Claimed as Exempt | Yes | 1 | | | |
| D - Creditors Holding Secured Claims | Yes | 4 | | $ 4,263,014.13 | |
| E - Creditors Holding Unsecured Priority Claims (Total of Claims on Schedule E) | Yes | 6 | | $ 543,863.00 | |
| F - Creditors Holding Unsecured Nonpriority Claims | Yes | 11 | | $ 7,234,417.57 | |
| G - Executory Contracts and Unexpired Leases | | | | | |
| H - Codebtors | | | | | |
| I - Current Income of Individual Debtor(s) | | | | | $ |
| J - Current Expenditures of Individual Debtors(s) | | | | | $ |
| TOTAL | | 0 | $ 53,225,540.81 | $ 12,041,294.70 | |

**Plaintiff's Exhibit 22**
**Depo of Istvan A. Burgyan**
**September 22, 2010**
Pamela J. Leja-Romjue, CSR 12368

36 PGS

American LegalNet, Inc.
www.FormsWorkflow.com

22-1

[] EXHIBIT: 1
DEPONENT: D. MONTGOMERY
PAGES: 36
DATE:  November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

Form 6 - Statistical Summary (12/07)

# United States Bankruptcy Court
### Central District Of California

In re Dennis L. Montgomery & Brenda K. Montgomery
Debtor

Case No. 6:09-bk-24322

Chapter 7

## STATISTICAL SUMMARY OF CERTAIN LIABILITIES AND RELATED DATA (28 U.S.C. § 159)

If you are an individual debtor whose debts are primarily consumer debts, as defined in § 101(8) of the Bankruptcy Code (11 U.S.C. § 101(8)), filing a case under chapter 7, 11 or 13, you must report all information requested below.

☐ Check this box if you are an individual debtor whose debts are NOT primarily consumer debts. You are not required to report any information here.

This information is for statistical purposes only under 28 U.S.C. § 159.

Summarize the following types of liabilities, as reported in the Schedules, and total them.

| Type of Liability | Amount |
|---|---|
| Domestic Support Obligations (from Schedule E) | $ |
| Taxes and Certain Other Debts Owed to Governmental Units (from Schedule E) | $ 543,863.00 |
| Claims for Death or Personal Injury While Debtor Was Intoxicated (from Schedule E) (whether disputed or undisputed) | $ |
| Student Loan Obligations (from Schedule F) | $ |
| Domestic Support, Separation Agreement, and Divorce Decree Obligations Not Reported on Schedule E | $ |
| Obligations to Pension or Profit-Sharing, and Other Similar Obligations (from Schedule F) | $ |
| TOTAL | $ 543,863.00 |

State the following:

| | |
|---|---|
| Average Income (from Schedule I, Line 16) | $ 66,800.00 |
| Average Expenses (from Schedule J, Line 18) | $ 78,485.00 |
| Current Monthly Income (from Form 22A Line 12; OR, Form 22B Line 11; OR, Form 22C Line 20 ) | $ 0.00 |

State the following:

| | | |
|---|---|---|
| 1. Total from Schedule D, "UNSECURED PORTION, IF ANY" column | | $ 531,362.29 |
| 2. Total from Schedule E, "AMOUNT ENTITLED TO PRIORITY" column. | $ | |
| 3. Total from Schedule E, "AMOUNT NOT ENTITLED TO PRIORITY, IF ANY" column | | $ 0.00 |
| 4. Total from Schedule F | | $ 7,234,417.57 |
| 5. Total of non-priority unsecured debt (sum of 1, 3, and 4) | | $ 7,765,779.86 |

22-2

American LegalNet, Inc.
www.FormsWorkflow.com

B6A (Official Form 6A) (12/07)

In re Dennis L Montgomery & Brenda K Montgomery,    Case No. 6:09-bk-24322
                          Debtor    (If known)

# SCHEDULE A - REAL PROPERTY

    Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether the husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under " Description and Location of Property."

    Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

    If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

    If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C – Property Claimed as Exempt.

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM * |
|---|---|---|---|---|
| Primary Residence - 6 Toscana Way Rancho Mirage, CA 92270 | Fee | J | 952,000.00 | 1,095,471.70 |
| House - 3812 94th Av NE Yarrow Point, WA 98004 | Fee | J | 2,150,000.00 | 2,477,813.65 |
| House - 12720 Buckthorn Lane Reno, NV 89511 | Fee | J | 605,000.00 | 661,556.21 |
| * In addition, Warren Trepp may have Judgment liens encumbering one or more of these real properties | | | | |
| | | Total ➤ | 3,707,000.00 | |
| | | (Report also on Summary of Schedules.) | | |

22-3

American LegalNet, Inc.
www.FormsWorkflow.com

B6B (Official Form 6B) (12/07)

In re Dennis L Montgomery & Brenda K Montgomery,    Case No. 6:09-bk-24322
_____
Debtor    (If known)

# SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether the husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property." If the property is being held for a minor child, simply state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| TYPE OF PROPERTY | N O N E | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND,WIFE,JOINT, OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1. Cash on hand. | X | | | Nominal |
| 2. Checking, savings or other financial accounts, certificates of deposit or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | See Attached Rider | J | 10,036.89 |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | Ordinary and necessary household goods and furnishings | J | 8,000.00 |
| 5. Books; pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles. | | CD Juke Box | J | 1,100.00 |
| 6. Wearing apparel. | | Ordinary and necessary wearing apparel | J | 4,540.00 |
| 7. Furs and jewelry. | | See Attached Rider | J | 98,902.80 |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | | Term Life Aviva Life and Annuity Company Policy#2250801 | J | 0.00 |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c); Rule 1007(b)). | X | | | |

American LegalNet, Inc.
www.FormsWorkflow.com

22-4

B6B (Official Form 6B) (12/07) — Cont.

In re Dennis L Montgomery & Brenda K Montgomery,          Case No. 6:09-bk-24322
                    Debtor                                        (If known)

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | N O N E | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT, OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | | IRA | J | 26,402.00 |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | | Nevada Security Bank Stock, 1000 shares | J | 859.00 |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 16. Accounts receivable. | | Blxware Payroll 42765 Dunes View Road Rancho Mirage, CA 92270 | H | 526,204.00 |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |

American LegalNet, Inc.
www.FormsWorkflow.com

22-5

B6B (Official Form 6B) (12/07) -- Cont.

In re Dennis L Montgomery & Brenda K Montgomery,    Case No. 6:09-bk-24322
    Debtor    (If known)

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT, OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 22. Patents, copyrights, and other intellectual property. Give particulars. | | See Attached Rider | H | 10,000,000.00 |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41 A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | | See Rider | H | 32,610.00 |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | X | HP Printer, All in One Fax, Desk and Lamp | | 875.00 |
| 29. Machinery, fixtures, equipment, and supplies used in business. | X | | | |
| 30. Inventory. | X | | | |
| 31. Animals. | X | | | |
| 32. Crops - growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |
| 35. Other personal property of any kind not already listed. Itemize. | X | See Attached Rider | | 38,809,011.12 |

_____ continuation sheets attached    Total ➤    $    49,518,540.81
(Include amounts from any continuation
sheets attached. Report total also on
Summary of Schedules.)

American LegalNet, Inc.
www.FormsWorkflow.com

22-6

SCHEDULE B - PERSONAL PROPERTY RIDER

| TYPE OF PROPERTY | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|
| 2. Checking, Savings or other financial accounts, certificates of deposit or shares in banks, savings, and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, and cooperatives. | Wells Fargo - 0933 - Checking<br>P.O. Box 6995<br>Portland, OR 97228 | J | $2,027.22 |
| | Wells Fargo - 2525 - Checking<br>P.O. Box 6995<br>Portland, OR 97228 | J | $430.67 |
| | Wells Fargo - 5878 - Checking<br>P.O. Box 6995<br>Portland, OR 97228 | J | $240.10 |
| | Bank of America - 6796 - Checking<br>P.O. Box 25118<br>Tampa, Fl 33622 | J | $856.67 |
| | Bank of America - 9911 - Checking<br>P.O. Box 25118<br>Tampa, Fl 33622 | J | $3,275.56 |
| | Chase Bank - 4273 - Checking<br>36101 Bob Hope Drive Ste G-1<br>Rancho Mirage, CA 92270 | J | $3,206.67 |
| | | | $10,036.89 |

227

SCHEDULE B - PERSONAL PROPERTY RIDER

| TYPE OF PROPERTY | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|
| 7. Furs and Jewelery | LDS 18K Y/G DIAMOND EARRINGS STUD | W | $8,087.40 |
| | LDS DIAMOND NECKLACE WITH 66 BAUGETTE | W | $19,605.60 |
| | LDS DIA BRACLT W/66 RBC DIAS OF 3.00CT TW | W | $2,586.00 |
| | LDS DIAMOND BRACELET CONTAINING 35 ROUND | W | $13,822.20 |
| | LDS DIAMOND WEDDING RING ONE 2.01CT | W | $22,915.20 |
| | LDS DIA EARRINGS, PIERCED-POST-STUD | W | $25,883.40 |
| | GIORGIO ARMANI WATCH | H | $6,003.00 |
| | | | $98,902.80 |
| 22. Patents, copyright, and other intellectual property. Give partculars. | US Copyright Registrations - Published by Dennis Montgomery 1982 - 2006 | | $10,000,000.00 |
| | Source Code IBM PC CORTEX #V3536D361 Updated 2006 | H | |
| | Source Code IBM PC BLOOD GAS #V3536D581 Updated 2006 | H | |
| | Source Code Anatomic Pathology TX0002095009 Publish 1987 | H | |
| | Source Code MIND for IBM PC TX000200234 Publish 1986 | H | |
| | Source Code Anatomic Pathology TX0002095009 Publish 1987 | H | |
| | Source Code MIND for IBM PC TX000200234 Publish 1986 | H | |
| | Source Code IBM PC BLOOD GAS #TU000098727 Publish 1982 | H | |
| | Source Code IBM PC BLOOD GAS #TU000098728 Publish 1982 | H | |
| | Source Code IBM PC BLOOD GAS #TU000098018 Publish 1982 | H | |
| | Source Code IBM PC BLOOD GAS #TU000098713 Publish 1982 | H | |
| | Source Code IBM PC MICROBIOLOGY #TU0002083750 Publish 1987 | H | |

22-8

SCHEDULE B - PERSONAL PROPERTY RIDER

| TYPE OF PROPERTY | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|
| 22. Patents, copyright, and other intellectual property. Give partculars. | US Copyright Registrations - Published by Dennis Montgomery 1982 - 2006 | | |
| | Source Code IBM PC CLINICAL MIND #TU0002034758 Publish 1986 | H | |
| | Source Code IBM PC CORTEX #TU0001983147 Publish 1986 | H | |
| 25. Automobiles, Trucks, Trailers, and other vehicles and accessories. | All vehicles are located at 6 Toscana Way W. Rancho Mirage, CA 92270 | | |
| | 2006 K1500 Chevy Silverado Pickup | J | $9,845.00 |
| | 2003 Chevy Tahoe | J | $8,915.00 |
| | 2005 Cadillac STS | J | $13,850.00 |
| | | | $32,610.00 |
| 35. Other personal property of any kind not already listed. Itemize. | Per court order entered in this proceeding in the US Federal Court, Reno, NV - Case #306-cv-00056-PMP-VPC. | | $2,104,600.12 |
| | Debtor is entitled to reimbursement of legal fees from the United States of America for wrongful conduct of the Federal Bureau of Investigation. | | |
| | Claim against the Liner Firm, Teri Pham, and Deborah Klar for indemnification regarding sanction order in Federal Court Reno, NV Case No. 306-cv-0056-PMP-VPC | | $204,411.00 |
| | Claims for legal malpractice against Liner firm, Terri Pham, Deborah Klar, Tuneen Chisolm, Shannon Anderson, Robert Oliver, Richard Mooney, Ryan Lapine, Robert Shore, Stuart A. Liner, Peter Bransten, Ellen Garofalo, and Randal Sunshine in Federal Court Reno, NV Case No. 306-cv-0056-PMP-VPC | | $10,000,000.00 |
| | Claims for misrepresentaions against Edra Blixseth and the Liner Law Firm for settlement agreement with Warren Trepp and Etreppid Technologies on 09/08. | | $26,500,000.00 |
| | Montgomery Parties still do not have a signed settlement agreement from Warren Trepp, Etreppid Technologies, and Edra Blixseth with signatures. | | |
| | | | $38,809,011.12 |

IN ADDITION, DENNIS MONTGOMERY IS THE HOLDER OF CERTAIN INTELLECTUAL
PROPERTY RIGHTS WHICH ARE SUBJECT TO THE NATIONAL SECURITY ACT OF 1947,
11 U.S.C. SECTION 401(a) et seq., AND IS, BY SUCH ACT, PROHIBITED, WITHOUT THE
EXPRESS CONSENT OF THE UNITED STATES DEPARTMENT OF JUSTICE AND
CERTAIN OTHER AGENCIES OF THE UNITED STATES OF AMERICA
FROM MAKING ANY DISCLOSURES WITH RESPECT THERETO. ANY REQUESTED
INFORMATION WITH RESPECT THERETO MUST BE DIRECTED TO RAPHAEL
O. GOMEZ, US DEPARTMENT OF JUSTICE - CIVIL DIVISION
SENIOR TRIAL COUNSEL - 950 PENNSYLVANIA AVENUE, NW
WASHINGTON, D.C. 20530. (202) 514-1318.

22-9

B6C (Official Form 6C) (12/07)

In re <u>Dennis L Montgomery &amp;
Brenda K Montgomery,</u>
               **Debtor**

Case No. <u>6:09-bk-24322</u>
          **(If known)**

# SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

Debtor claims the exemptions to which debtor is entitled under:
(Check one box)
- ☐ 11 U.S.C. §522(b)(2)
- ☐ 11 U.S.C. §522(b)(3)

☐ Check if debtor claims a homestead exemption that exceeds $136,875.

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|---|
| Ordinary and necessary household goods and furnishings, including audio, video, and computer equipment | CCP Section 703.140(b)(3) and CCP Section 703.140(b)(6) | 21,065.00 | |
| Ordinary and necessary books; pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles | CCP Section 703.140(b)(3) | 3,188.00 | |
| Ordinary and necessary, wearing Apparel | CCP Section 703.140(b)(3) | 4,540.00 | |
| Jewelry | CCP Section 703.140(b)(4) | 1,225.00 | |
| Interest in IRA | CCP Section 703.140(b)(10)(E) | 26,402.00 | |
| Equity in 2006 Chevy Silverado | CCP Section 703.140(b)(2) | 2,975.00 | |
| Wildcard Applied to wedding ring and other jewelry | CCP Section 703.140(b)(1)and (5) | 18,675.00 | |

American LegalNet, Inc.
www.FormsWorkflow.com

ZZ-10

B6D (Official Form 6D) (12/07)

In re Dennis L Montgomery &
Brenda K Montgomery _____        Case No. 6:09-bk-24322 _____
                Debtor                                              (If known)

## SCHEDULE D – CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND AN ACCOUNT NUMBER *(See Instructions Above)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. | | | | | | | | |
| Michael J Flynn One Center Plaza Ste. 240 Boston, MA 02129 | X | C | See attached Rider | | | X | | 0.00 |
| | | | VALUE $ See Attached Rider | | | | | |
| ACCOUNT NO. | | | | | | | | |
| Michael J Flynn One Center Plaza Ste. 240 Boston, MA 02129 | X | C | See Attached Rider | | | X | | 0.00 |
| | | | VALUE $See Attached Rider | | | | | |
| ACCOUNT NO. | | | | | | | | |
| | | | VALUE $0.00 | | | | | |

 2  continuation sheets
       attached

Subtotal ►
(Total of this page)      $         0.00    $         0.00

Total ►
(Use only on last page)   $                $

(Report also on Summary of Schedules.)   (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.)

American LegalNet, Inc.
www.FormsWorkflow.com

Z2-11

B6D (Official Form 6D) (12/07) – Cont.

In re  Dennis L Montgomery &
Brenda K Montgomery,
　　　　　　　　　　　Debtor

Case No  6:09-bk-24322
　　　　　　　　　　　(If known)

## SCHEDULE D – CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND AN ACCOUNT NUMBER (See Instructions Above) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 130901408-0 <br> Country Wide Home Loans <br> P.O. Box 650070 <br> Dallas, TX 75265-0070 | | J | First Mortgage incurred on 11/01/06 on home located at: 3812 94th. Avenue NE Yarrow Point, WA 98004 <br><br> VALUE $2,150,000.00 | X | | | 2,279,159.65 | 129,159.65 |
| ACCOUNT NO. 501695781-2 <br> Flag Star <br> P.O. Box 371891 <br> Pittsburgh, PA 15250-7891 | | J | Second Mortgage incurred on 10/01/07 on home located at: 6 Toscana Way Rancho Mirage, CA 92270 <br><br> VALUE $952,000.00 | | | | 120,526.73 | 120,526.73 |
| ACCOUNT NO. 085-9066-27687 <br> GMAC <br> P.O. Box 78234 <br> Phoenix, AZ 85062-8234 | | J | 2003 Chevy Tahoe financed on 01/10/05 with GMAC Financial <br><br> VALUE $8,915.00 | | | | 3,845.25 | |
| ACCOUNT NO. 611-9076-90560 <br> GMAC <br> P.O. Box 78234 <br> Phoenix, AZ 85062-8234 | | J | 2005 Cadillac STS financed on 01/28/05 with GMAC Financial <br><br> VALUE $13,850.00 | | | | 17,471.25 | 3,621.25 |
| ACCOUNT NO. 0000-3000-582-713 <br> US Bank Consumer Finance <br> Brokered Loan Sales Center <br> P.O. Box 790179 <br> St. Louis, MO 63179-0179 | | J | Second Mortgage incurred on 10/01/07 on home located at: 3812 94th. Avenue NE Yarrow Point, WA 98004 <br><br> VALUE $2,150,000.00 | | | | 249,262.62 | 249,262.62 |

Sheet no. __1__ of __2__ continuation sheets attached to Schedule of Creditors Holding Secured Claims

Subtotal ► (Total of this page)　　$ 2,670,265.50　　$ 502,570.25

Total ► (Use only on last page)　　$　　　$

(Report also on Summary of Schedules.)

(If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.)

American LegalNet, Inc.
www.FormsWorkflow.com

22-12

B6D (Official Form 6D) (12/07) — Cont.                                                      2

In re <u>Dennis L Montgomery & Brenda K Montgomery</u>,    Case No. <u>6:09-bk-24322</u>
          Debtor                                                 (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND AN ACCOUNT NUMBER (See instructions Above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 40874612 Aurora Loan Service P.O. Box 78111 Phoenix, AZ 85062-8111 | | J | First Mortgage incurred on 10/01/07 on home located at: 6 Toscana Way Rancho Mirage, CA 92270 <br><br> VALUE $952,000 | X | | | 974,945.04 | $22,945.04 |
| ACCOUNT NO. 628967630 Washington Mutual P.O. Box 78148 Phoenix, AZ 85062-8148 | | J | First Mortgage incurred on 01/16/99 on home located at: 12720 Buckthorne Lane Reno, NV 89511 <br><br> VALUE $605,000 | X | | | 412,293.59 | |
| ACCOUNT NO. 6546 5407 309600001 Wells Fargo Home Equity Payment P.O. Box 31557 Billings, MT 59107-9900 | | J | Second Mortgage incurred on 02/01/01 on home located at: 12720 Buckthorne Lane Reno, NV 89511 <br><br> VALUE $605,000 | X | | | 198,654.00 | 5,847.00 |
| ACCOUNT NO. 049-783-04 Washoe County Treasurer P.O. Box 11130 Reno, NV 89520-0027 | | | Property taxes for tax year 2008 on property located at 12720 Buckthorn Lane Reno, 89511 <br><br> VALUE $6,856.00 | | | | $6,856.00 | |
| ACCOUNT NO. Warren Trepp & eTreppid Technologies LLC 755 Trademark Drive Reno, NV 89521 | | | See attached Rider <br><br> VALUE $ | | | | $ Undetermined | |
| Sheet no. 2 of 2 continuation sheets attached to Schedule of Creditors Holding Secured Claims | | | Subtotal ▶ (Total of this page) | | | | $1,592,748.63 | $28,792.04 |
| | | | Total ▶ (Use only on last page) | | | | $4,263,014.13 | $531,362.29 |
| | | | | | | | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.) |

22-13

SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND AN ACCOUNT NUMBER | CODEBTOR | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|
| Michael J Flynn<br>One Center Plaza Ste. 240<br>Boston, MA 02129 | X | On, 12/16/08 Reno Federal Judge orders all prior legal bills to be paid to Michael J. Flynn.<br>Reno Federal Case #306-cv-00056-PMP-VPC<br>Value: $628812.15 | | | X | Undetermined | |
| Michael J Flynn<br>One Center Plaza Ste. 240<br>Boston, MA 02129 | X | On, 03/01/09 Reno Federal Judge sanctions Montgomery and the Liner law firm in the Mike Flynn fee dispute.<br>Reno Federal Case #306-cv-00056-PMP-VPC<br>Value: $204,411.00 | | | X | Undetermined | |
| Warren Trepp<br>Etreppid Technologies, LLC<br>755 Trademark Drive<br>Reno, NV 89521 | X | On, 12/15/08 Trepp parties file Confessions of Judgement against Montgomery Parties in NV, WA, and CA.<br>Reno Federal Case #306-cv-00056-PMP-VPC<br>Value: $26,5000,000 | | | X | Undetermined | |

22-14

B6E (Official Form 6E) (12/07)

In re <u>Dennis L Montgomery & Brenda K Montgomery</u>,   Case No. <u>6:09-bk-24322</u>
         Debtor                                                      (if known)

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name, mailing address, including zip code, and last four digits of the account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition. Use a separate continuation sheet for each type of priority and label each with the type of priority.

The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H-Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife ,Joint, or Community." If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

Report the total of amounts entitled to priority listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all amounts entitled to priority listed on this Schedule E in the box labeled "Totals" on the last sheet of the completed schedule. Individual debtors with primarily consumer debts report this total also on the Statistical Summary of Certain Liabilities and Related Data.

Report the total of amounts not entitled to priority listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all amounts not entitled to priority listed on this Schedule E in the box labeled "Totals" on the last sheet of the completed schedule. Individual debtors with primarily consumer debts report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

TYPES OF PRIORITY CLAIMS (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐ **Domestic Support Obligations**

Claims for domestic support that are owed to or recoverable by a spouse, former spouse, or child of the debtor, or the parent, legal guardian, or responsible relative of such a child, or a governmental unit to whom such a domestic support claim has been assigned to the extent provided in 11 U.S.C. § 507(a)(1).

☐ **Extensions of credit in an involuntary case**

Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(3).

☐ **Wages, salaries, and commissions**

Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $10,950* per person earned within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Contributions to employee benefit plans**

Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(5).

American LegalNet, Inc.
www.FormsWorkflow.com

22-15

B6E (Official Form 6E) (12/07) — Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>                    Case No. <u>6:09-bk-24322</u>
            Debtor                                                                            (if known)

☐ **Certain farmers and fishermen**

  Claims of certain farmers and fishermen, up to $5,400* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(6).

☐ **Deposits by individuals**

  Claims of individuals up to $2,425* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(7).

☒ **Taxes and Certain Other Debts Owed to Governmental Units**

  Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to Maintain the Capital of an Insured Depository Institution**

  Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507 (a)(9).

☐ **Claims for Death or Personal Injury While Debtor Was Intoxicated**

  Claims for death or personal injury resulting from the operation of a motor vehicle or vessel while the debtor was intoxicated from using alcohol, a drug, or another substance. 11 U.S.C. § 507(a)(10).

* Amounts are subject to adjustment on April 1, 2010, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

_____ continuation sheets attached

American LegalNet, Inc.
www.FormsWorkflow.com

22-16

B6E (Official Form 6E) (12/07) — Cont.

| In re | Dennis L Montgomery & Brenda K Montgomery, | Case No. | 6:09-bk-24322 |
| | Debtor | | (If known) |

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
### (Continuation Sheet)

Type of Priority for Claims Listed on This Sheet

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER *(See instructions above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM | AMOUNT ENTITLED TO PRIORITY | AMOUNT NOT ENTITLED TO PRIORITY, IF ANY |
|---|---|---|---|---|---|---|---|---|---|
| Account No. 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<br><br>Internal Revenue Service<br>United States Attorney's Office<br>Tax<br>300 N. Los Angeles St. Ste. 7211<br>Los Angeles, CA 90012-3342 | | J | 2005-2006 Tax Year | | | X | 203,000 | 203,000 | 0 |
| Account No. 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<br><br>State Board of Equalization<br>Supervisor of Collection<br>P.O. Box 942879<br>Sacramento, CA 95808 | | J | 2007 Tax Year | | | X | 127,406 | 127,406 | 0 |
| Account No. 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<br><br>Internal Revenue Service<br>United States Attorney's Office<br>Tax<br>300 N. Los Angeles St. Ste. 7211<br>Los Angeles, CA 90012-3342 | | J | 2008 Tax year | | | X | 213,457 | 213,457 | |
| Account No. | | | | | | | | | |

Sheet no. 1 of 4 continuation sheets attached to Schedule of
Creditors Holding Priority Claims

| | Subtotals▷<br>(Totals of this page) | $ 543,863 | $ 543,863 | 0.00 |
|---|---|---|---|---|
| | Total▷<br>(Use only on last page of the completed Schedule E. Report also on the Summary of Schedules.) | $ 543,863 | | |
| | Totals▷<br>(Use only on last page of the completed Schedule E. If applicable, report also on the Statistical Summary of Certain Liabilities and Related Data.) | | $ 543,863 | $ |

American LegalNet, Inc.
www.FormsWorkflow.com

22-17

B6E (Official Form 6E) (12/07) – Cont.

In re Dennis L Montgomery & Brenda K Montgomery,                     Case No. 6:09-bk-24322
_____                             _____
                Debtor                                                      (If known)

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
### (Continuation Sheet)

Type of Priority for Claims Listed on This Sheet

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER *(See instructions above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM | AMOUNT ENTITLED TO PRIORITY | AMOUNT NOT ENTITLED TO PRIORITY, IF ANY |
|---|---|---|---|---|---|---|---|---|---|
| **Account No.**<br>Department of Benefit Payments<br>Collection Section<br>800 Capitol Mall<br>Sacramento, CA 95814 | | | Notice Only | | | | | | |
| **Account No.**<br>Internal Revenue Service<br>Spcl Proc Collection Division<br>Rm 4062 - Federal Bldg<br>(Stop 5022)<br>Los Angeles, CA 900012 | | | Notice Only | | | | | | |
| **Account No.**<br>Internal Revenue Service<br>United States Attorney's Office<br>Tax Division<br>300 N Los Angeles St, Ste 7211<br>Los Angels, CA 90012-3342 | | | Notice Only | | | | | | |
| Sheet no. 2 of 4 continuation sheets attached to Schedule of Creditors Holding Priority Claims | | | Subtotals▶<br>(Totals of this page) | | | | $          0.00 | $          0.00 | 0.00 |
| | | | Total▶<br>(Use only on last page of the completed Schedule E. Report also on the Summary of Schedules.) | | | | $ | | |
| | | | Totals▶<br>(Use only on last page of the completed Schedule E. If applicable, report also on the Statistical Summary of Certain Liabilities and Related Data.) | | | | | $ | $ |

22-18

American LegalNet, Inc.
www.FormsWorkflow.com

B6E (Official Form 6E) (12/07) — Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>                    Case No. <u>6:09-bk-24322</u>
          **Debtor**                                                                      **(If known)**

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
(Continuation Sheet)

Type of Priority for Claims Listed on This Sheet

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (*See instructions above.*) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM | AMOUNT ENTITLED TO PRIORITY | AMOUNT NOT ENTITLED TO PRIORITY, IF ANY |
|---|---|---|---|---|---|---|---|---|---|
| **Account No.** <br> Franchise Tax Board <br> PO Box 942867 <br> Sacramento, CA 94267-0001 | | | Notice Only | | | | | | |
| **Account No.** <br> State Board of Equalization <br> Supervisor of Collection <br> PO Box 942879 <br> Sacramento, CA 94279-0001 | | | Notice Only | | | | | | |
| **Account No.** <br> Franchise Tax Board <br> Special Procedures Section <br> PO Box 2952 <br> Sacramento, CA 95812-2952 | | | Notice Only | | | | | | |
| **Account No.** <br> County of Riverside Treasurer and Tax Collector <br> 4080 Lemon St <br> Riverside, CA 92501-3609 | | | Notice Only | | | | | | |

Sheet no. <u>3</u> of <u>4</u> continuation sheets attached to Schedule of Creditors Holding Priority Claims

| | | | |
|---|---|---|---|
| Subtotals▶ (Totals of this page) | $     0.00 | $     0.00 | 0.00 |
| Total▶ (Use only on last page of the completed Schedule E. Report also on the Summary of Schedules.) | $ | | |
| Totals▶ (Use only on last page of the completed Schedule E. If applicable, report also on the Statistical Summary of Certain Liabilities and Related Data.) | | $ | $ |

American LegalNet, Inc.
www.FormsWorkflow.com

ZZ-19

B6E (Official Form 6E) (12/07) — Cont.

In re Dennis L Montgomery & Brenda K Montgomery,    Case No. 6:09-bk-24322
_____              _____
                    Debtor                              (If known)

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
(Continuation Sheet)

Type of Priority for Claims Listed on This Sheet

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM | AMOUNT ENTITLED TO PRIORITY | AMOUNT NOT ENTITLED TO PRIORITY, IF ANY |
|---|---|---|---|---|---|---|---|---|---|
| Account No. County of Clark Treasurer and Tax Collector Clark County Government Center 500 South Grand Central Parkway P.O. Box 551220 Las Vegas, Nevada 89155-1220 | | | Notice Only | | | | | | |
| Account No. | | | | | | | | | |
| Account No. | | | | | | | | | |
| Account No. | | | | | | | | | |

Sheet no. 4 of 4 continuation sheets attached to Schedule of Creditors Holding Priority Claims

| | Subtotals▶ (Totals of this page) | $ 0.00 | $ 0.00 | 0.00 |
|---|---|---|---|---|
| | Total▶ (Use only on last page of the completed Schedule E. Report also on the Summary of Schedules.) | $ 543,863 | | |
| | Totals▶ (Use only on last page of the completed Schedule E. If applicable, report also on the Statistical Summary of Certain Liabilities and Related Data.) | | $ 543,863 | $ 0.00 |

American LegalNet, Inc.
www.FormsWorkflow.com

Z2-20

B6F (Official Form 6F) (12/07)

In re Dennis L Montgomery & Brenda K Montgomery,                    Case No. 6:09-bk-24322
_____                              _____
                      **Debtor**                                          **(If known)**

# SCHEDULE F- CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER *(See instructions above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 77585141482065 AT&T P.O. Box 989045 W. Scaramento, CA 95798-9045 | | J | Monthly Recurring | | | | 67.00 |
| ACCOUNT NO. 436046369196 AT&T Mobility P.O. Box 515188 Los Angeles, CA 90051-5188 | | J | Monthly Recurring | | | | 225.00 |
| ACCOUNT NO. 119618165 AT&T Mobility P.O. Box 60017 Los Angeles, CA 90060-0017 | | J | Monthly Recurring | | | | 225.00 |
| ACCOUNT NO. Dunphy's ExtermaPest Inc. P.O. Box 2317 Cathedral City, Ca 92235 | | J | Monthly Recurring | | | | 98.00 |
| | | | | | Subtotal> | $ | 615.00 |
| | | | | | Total > (Use only on last page of the completed Schedule F.) (Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.) | $ | |

X continuation sheets attached

American LegalNet, Inc.
www.FormsWorkflow.com

22-21

B6F (Official Form 6F) (12/07) - Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>              Case No. <u>6:09-bk-24322</u>
               Debtor                                                                (If known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 4147341018006654 <br> Bank of America <br> P.O. Box 851001 <br> Dallas, TX 75285-1001 | | J | Credit Card | | | | 15,059.59 |
| ACCOUNT NO. 1379388 <br> Caesars <br> 1 Caesars Palace Drive <br> Las Vegas, NV 89109 | | H | 09/27/08 | | | | 990,000.00 |
| ACCOUNT NO. 5443760010512799 <br> Chase - Card Member Services <br> P.O. Box 94014 <br> Palatine, IL 60094-4014 | | J | Credit Card | | | | 3,998.65 |
| ACCOUNT NO. 40536207002 <br> Coachella Valley Water District <br> P.O. Box 5000 <br> Coachella, CA 92236-5000 | | J | Monthly Recurring | | | | 105.00 |
| ACCOUNT NO. 5410654141959814 <br> Citicards <br> P.O. Box 6940 <br> The Lakes, NV 88901-6940 | | J | Credit Card | | | | 39,687.01 |

Subtotal ▷ $     1,048,850.25

Sheet no. <u>1</u> of <u>10</u> continuation sheets attached to

Schedule of Creditors Holding Unsecured
Nonpriority Claims

Total ➤ $
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable on the Statistical
Summary of Certain Liabilities and Related Data.)

American LegalNet, Inc.
www.FormsWorkflow.com

22-22

B6F (Official Form 6F) (12/07)

In re <u>Dennis L Montgomery & Brenda K Montgomery</u>,                Case No. <u>6:09-bk-24322</u>
                 Debtor                                                                    (if known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 862132<br>Edra Blixseth<br>42765 Dunes View Road<br>Rancho Mirage, CA 92270 | | H | Loans | | | X | 2,100,000.00 |
| ACCOUNT NO. 4302<br>Gunderson Law Firm<br>3895 Warren Way<br>Reno, NV 89509 | X | H | Legal Bills | | | | 46,705.28 |
| ACCOUNT NO. 012526-110238541806<br>Verizon CA<br>P.O. Box 9688<br>Mission Hills, CA 91346-9688 | | J | Monthly Recurring | | | | 214.00 |
| ACCOUNT NO. 277-528-972<br>Victoria's Secret<br>P.O. Box 659728<br>San Antonio, TX 78265-9728 | | J | Credit Card | | | | 455.72 |

|  |  |
|---|---|
| | $2,147,375.00 |
| Total ▶<br>(Use only on last page of the completed Schedule F.)<br>(Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.) | $ |

22-23

B6F (Official Form 6F) (12/07) - Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>          Case No. <u>6:09-bk-24322</u>
          Debtor                                                                              (if known)

## SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER *(See instructions above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 1379388 <br><br>Harrah's Lake Tahoe Casino<br>50 Hwy 50<br>Stateline, NV 89449 | | H | 11/23/08 | | | | 540,000 |
| ACCOUNT NO. 38 <br><br>Irish Green Lawns<br>510 Twin Lakes Drive<br>Reno, NV 89523 | | J | Monthly Recurring | | | | 265.00 |
| ACCOUNT NO. 12240 <br><br>La Toscana<br>c/o Personal Property Mgmt<br>68-950 Adelina Road<br>Cathedral City, CA 92234 | | J | Monthly Recurring | | | | 390.00 |
| ACCOUNT NO. 39641 <br><br>Liner Grode Stein Yankelevitz<br>Sunshire Regenstreif & Taylor LLP<br>1100 Glendon Avenue 14th. Floor<br>Los Angeles, CA 90024-3503 | X | J | 08/2007 – 07/2009 | | | X | 1,457,73 5.83 |

Sheet no. _3_ of _10_ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ► $1.998,390.83

Total ►
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary
of Certain Liabilities and Related Data.)

$

22-24

B6F (Official Form 6F) (12/07) - Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>     Case No. <u>6:09-bk-24322</u>
　　　　　　　　　　　　Debtor　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(if known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (*See instructions above.*) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO.<br><br>Logar and Pulver<br>225 So. Arlington Avenue Ste. A<br>Reno, NV 89501 | X | H | 09/19/08 | | | | 107,316.69 |
| ACCOUNT NO. 48-014-516-894-4<br><br>Macy's<br>P.O. Box 6938<br>The Lakes, NV 88901-6938 | | J | Credit Card | | | | 7,402.17 |
| ACCOUNT NO.<br><br>Michael Martinez Design<br>2317 N. Gower Street<br>Los Angeles, CA 90068 | | J | Design work for 6 Toscana Way W, Rancho Mirage CA 92270 home. | | | | 1,000 |
| ACCOUNT NO. 1000021241601728425<br><br>NV Energy<br>P.O. Box 30065<br>Reno, NV 89520 | | J | Monthly Recurring | | | | 215.00 |

Sheet no. __4__ of __10__ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ▶ | $115,933.86

Total ▶ | $

(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary of
Certain Liabilities and Related Data.)

22-25

B6F (Official Form 6F) (12/07) - Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>  Case No. <u>6:09-bk-24322</u>
         Debtor                                               (if known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. <br> Pacific Landscape Management, Inc. <br> 16541 Redmond Way, 319C <br> Redmond, WA 98052 | | J | Monthly Recurring | | | | 1,350.51 |
| ACCOUNT NO. 003123310 <br> Pallazo <br> 3355 Las Vegas Blvd So. <br> Las Vegas, NV 89109 | | H | 09/27/08 | | | | 802,000 |
| ACCOUNT NO. 010954399 <br> Peppermill <br> 2707 South Virginia Street <br> Reno, NV 89502 | | H | 11/23/08 | | | | 375,000 |
| ACCOUNT NO. 1100059435 <br> Porsche Payment Center <br> P.O. Box 740724 <br> Cincinnati, OH 45274-0724 | | J | Lease | | | | 4,312.94 |

Sheet no. __5__ of __10__ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ▶  $808,038.45

Total ▶  $
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary
of Certain Liabilities and Related Data.)

22-26

B6F (Official Form 6F) (12/07) - Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>          Case No. <u>6:09-bk-24322</u>
Debtor                                                                    (if known)

## SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER *(See instructions above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 199-238-603-5 <br><br> Puget Sound Energy <br> BOT-01H, P.O. Box 91269 <br> Bellevue, WA 98009-9269 | | J | Monthly Recurring | | | | 276.00 |
| ACCOUNT NO. 425-467-1218-710R <br><br> Qwest <br> P.O. Box 91155 <br> Seattle, WA 98111-9255 | | J | Monthly Recurring | | | | 214.00 |
| ACCOUNT NO. 7841-242-584 <br><br> Saks Fifth Avenue <br> P.O. Box 60151 <br> City of Industry, CA 91716-0151 | | J | Credit Card | | | | 6,261.92 |
| ACCOUNT NO. 7775-431-955 <br><br> Saks Fifth Avenue <br> P.O. Box 60151 <br> City of Industry, CA 91716-0151 | | J | Credit Card | | | | 2,815.58 |

Sheet no. __6__ of __10__ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ► $9,567.50

Total ► $
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.)

B6F (Official Form 6F) (12/07) - Cont.

In re Dennis L Montgomery & Brenda K Montgomery,
                Debtor

Case No. 6:09-bk-24322
             (if known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. <br> Skadden Arps Slate Meagher & Flom LLP & Affiliates <br> 1440 New York Avenue NW <br> Washington, DC 20005 | X | H | Legal Bills | | | X | 834,204.00 |
| ACCOUNT NO. 2-29-793-6973 <br> Southern CA Edison <br> P.O. Box 600 <br> Rosemead, CA 91771-0001 | | J | Monthly Recurring | | | | 715.00 |
| ACCOUNT NO. 326462984 <br> Sprint <br> P.O. Box 105243 <br> Atlanta, GA 30348-5243 | | J | Monthly Recurring | | | | 122.00 |
| ACCOUNT NO. 1048-2795-12 <br> State Farm Insurance <br> P.O. Box 680001 <br> Dallas, TX 75368-0001 | | J | Monthly Recurring | | | | 103.00 |

Sheet no. _7_ of _10_ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ►    $835,144.00

Total ►    $
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary
of Certain Liabilities and Related Data.)

ZZ-28

B6F (Official Form 6F) (12/07) - Cont.

In re Dennis L Montgomery & Brenda K Montgomery,          Case No. 6:09-bk-24322
                                    Debtor                                           (if known)

## SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 1041-6294-15<br><br>State Farm Insurance<br>P.O. Box 680001<br>Dallas, TX 75368-0001 | | J | Monthly Recurring | | | | 675.00 |
| ACCOUNT NO.<br><br>Steve Stratton Pool Service<br>P.O. Box 1355<br>Palm Desert, CA 92261 | | J | Monthly Recurring | | | | 120.00 |
| ACCOUNT NO. 059-932-7918-0<br><br>The Gas Company<br>P.O. Box C<br>Monterey Park, CA 91756 | | J | Monthly Recurring | | | | 115.00 |
| ACCOUNT NO. 8340-51-006-0329810<br><br>Time Warner Cable<br>P.O. Box 60506<br>City of Industry, CA 91716-0506 | | J | Monthly Recurring | | | | 212.00 |

Sheet no. __8__ of __10__ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ► $1,122.00

Total ► $
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary
of Certain Liabilities and Related Data.)

22-29

B6F (Official Form 6F) (12/07) - Cont.

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>          Case No. <u>6:09-bk-24322</u>
                Debtor                                              (if known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER *(See instructions above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 5450-8120-4753-3502<br><br>US Bank<br>P.O. Box 790408<br>St. Louis, MO 63179-0408 | | J | Monthly Recurring | | | | 4,713.50 |
| ACCOUNT NO. 4037 6973 4100 6098<br><br>US Bank<br>P.O. Box 790408<br>St. Louis, MO 63179-0408 | | J | Monthly Recurring | | | | 5,298.32 |
| ACCOUNT NO. 10001437-20002709<br><br>Washoe County Treasurer<br>P.O. Box 30085<br>Reno, NV 89520-3085 | | J | Monthly Recurring | | | | 118.00 |
| ACCOUNT NO. 4037-6973-4100-6098<br><br>Wells Visa –Card Member Services<br>P.O. Box 790408<br>St. Louis, MO 63179-0408 | | J | Credit Card | | | | 264,905.22 |

Sheet no. <u>9</u> of <u>10</u> continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ► | $265,995.68

Total ► | $7,234,417.57
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary of
Certain Liabilities and Related Data.)

22-36

Case 2:10-bk-18510-BB    Doc 9    Filed 07/13/09   Entered 07/13/09 16:37:31   Desc
Main Document      Page 31 of 36

B6F (Official Form 6F) (12/07)

In re <u>Dennis L Montgomery & Brenda K Montgomery,</u>          Case No. <u>6:09-bk-24322</u>
                               Debtor          (if known)

# SCHEDULE F – CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. <br><br> J. Stephen Peek, Esq. <br> Hale, Lane, Peek, Dennison and Howard <br> 3930 Howard Hughes Parkway <br> Fourth Floor <br> Las Vegas, NV 89169 | | | Notice <br> Attorneys for Warren Trepp | | | | |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |

Sheet no. __10__ of __10__ continuation sheets attached
To Schedule of Creditors Holding Unsecured
Nonpriority Claims

Subtotal ►

Total ►
(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.)

$7,234,417.57

22-31

B6G (Official Form 6G) (12/07)

In re  Dennis L Montgomery &  
Brenda K Montgomery  
_____  
Debtor

Case No.  6:09-bk-24322  
_____  
(if known)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| Porsche Payment Center P.O. Box 740724 Cincinnati, OH 45274-0724 Acct. # 1100059435 | Automobile Lease with Porsche Financial starting on 07/2008 ending on 07/2011 |
| Opspring 42-765 Dunes View Road Rancho Mirage, Ca 92270 | 5 Year Contract starting 04/5/06 to 04/5/11 with Opspring, LLC. Edra Blixseth has a 5 year loan attached to this contract, which is reflected in schedule F. Contract was transferred to BLXware 01/08. Company has breached the contract, and currently owes back pay and expenses. |
|  |  |
|  |  |
|  |  |

American LegalNet, Inc.  
www.FormsWorkflow.com

B6H (Official Form 6H) (12/07)

In re Dennis L Montgomery & Brenda K Montgomery     Case No.   6:09-bk-24322
        Debtor                                                      (if known)

## SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by the debtor in the schedules of creditors. Include all guarantors and co-signers. If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the eight-year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state, commonwealth, or territory. Include all names used by the nondebtor spouse during the eight years immediately preceding the commencement of this case. If a minor child is a codebtor or a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian. "Do not disclose the child's name, See, 11 U.S.C. Section 112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no codebtors

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
| Edra Blixseth<br>42-765 Dunes View Road<br>Rancho Mirage, Ca 92270 | Warren Trepp & eTreppid Technologies LLC<br>755 Trademark Drive<br>Reno, NV 89521 |
| Opspring<br>42-765 Dunes View Road<br>Rancho Mirage, Ca 92270 | Warren Trepp & eTreppid Technologies LLC<br>755 Trademark Drive<br>Reno, NV 89521 |
| Blxware<br>42-765 Dunes View Road<br>Rancho Mirage, Ca 92270 | Warren Trepp & eTreppid Technologies LLC<br>755 Trademark Drive<br>Reno, NV 89521 |
| Liner Law Firm<br>1100 Glendon Avenue 14th Floor<br>Los Angeles, Ca 90024-3503 | Michael J Flynn<br>One Center Plaza Ste. 240<br>Boston, MA 02129 |
| Deborah Klar<br>Liner Law Firm<br>1100 Glendon Avenue 14th Floor<br>Los Angeles, Ca 90024-3503 | Michael J Flynn<br>One Center Plaza Ste. 240<br>Boston, MA 02129 |
| Terri Pham<br>Liner Law Firm<br>1100 Glendon Avenue 14th Floor<br>Los Angeles, Ca 90024-3503 | Michael J Flynn<br>One Center Plaza Ste. 240<br>Boston, MA 02129 |

American LegalNet, Inc.
www.FormsWorkflow.com

22-33

B6I (Official Form 6I) (12/07)

In re Dennis L Montgomery & Brenda K Montgomery____    Case No.  6:09-bk-24322
           Debtor                                                              (if known)

# SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by every married debtor, whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. Do not state the name of any minor child. The average monthly income calculated on this form may differ from the current monthly income calculated on From 22A, 22B, or 22C.

| Debtor's Marital Status: M | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| | RELATIONSHIP: | AGE(S): | |

| Employment: | DEBTOR | SPOUSE | |
|---|---|---|---|
| Occupation | Programmer | Home maker | |
| Name of Employer | Blxware | | |
| How long employed | 3yrs | | |
| Address of Employer | 42-765 Dunes View Rancho Mirage, Ca 92270 | | |

Income: (Estimate of average or projected monthly income at time case filed)

| | | DEBTOR | SPOUSE |
|---|---|---|---|
| 1. | Current monthly gross wages, salary, and commissions (Prorate if not paid monthly.) | $ 100,000.00 | $ 0.00 |
| 2. | Estimated monthly overtime | $ | $ |
| 3. | SUBTOTAL | $ 100,000.00 | $ 0.00 |
| 4. | LESS PAYROLL DEDUCTIONS | | |
| | a. Payroll taxes and social security | $ 33,200.00 | $ |
| | b. Insurance | $ | $ |
| | c. Union dues | $ | $ |
| | d. Other (Specify: ____ ) | $ | $ |
| 5. | SUBTOTAL OF PAYROLL DEDUCTIONS | $ 33,200.00 | $ 0.00 |
| 6. | TOTAL NET MONTHLY TAKE HOME PAY | $ 66,800.00 | $ 0.00 |
| 7. | Regular income from operation of business or profession or farm (Attach detailed statement) | $ 0.00 | $ |
| 8. | Income from real property | $ 0.00 | $ |
| 9. | Interest and dividends | $ 0.00 | $ |
| 10. | Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above. | $ 0.00 | $ |
| 11. | Social security or other government assistance (Specify): _____ | $ 0.00 | $ |
| 12. | Pension or retirement income | $ 0.00 | $ |
| 13. | Other monthly income (Specify): _____ | $ 0.00 | $ |
| | | $ 0.00 | $ |
| | | $ 0.00 | $ |
| 14. | SUBTOTAL OF LINES 7 THROUGH 13 | $ 0.00 | $ 0.00 |
| 15. | AVERAGE MONTHLY INCOME (Add amounts shown on lines 6 and 14) | $ 66,800.00 | $ 0.00 |
| 16. | COMBINED AVERAGE MONTHLY INCOME: (Combine column totals from line 15; if there is only one debtor repeat total reported on line 15) | $ 66,800.00 | |

(Report also on Summary of Schedules and, if applicable, on Statistical Summary of Certain Liabilities and Related Data)

17. Describe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document:
Debtor has not received approximate payroll in five months. Debtor is currently owed $520,000 in back pay, and expenses.

American LegalNet, Inc.
www.FormsWorkflow.com

22-34

B6J (Official Form 6J) (12/07)

In re Dennis L Montgomery & Brenda K Montgomery ,
      Debtor

Case No. 6:09-bk-24322
      (if known)

# SCHEDULE J – CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

Complete this schedule by estimating the average or projected monthly expenses of the debtor and the debtor's family at time case filed. Prorate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate. The average monthly expenses calculated on this form may differ from the deductions from income allowed on Form22A or 22C.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | | |
|---|---|---:|
| 1. Rent or home mortgage payment (include lot rented for mobile home) | | $ 26,815.00 |
| a. Are real estate taxes included? Yes_____ No __X__ | | |
| b. Is property insurance included? Yes_____ No __X__ | | |
| 2. Utilities: a. Electricity and heating fuel | | $ 1,705.00 |
| b. Water and sewer | | $ 365.00 |
| c. Telephone | | $ 720.00 |
| d. Other _____ | | $ _____ |
| 3. Home maintenance (repairs and upkeep) | | $ 1,850.00 |
| 4. Food | | $ 800.00 |
| 5. Clothing | | $ 600.00 |
| 6. Laundry and dry cleaning | | $ 300.00 |
| 7. Medical and dental expenses | | $ 900.00 |
| 8. Transportation (not including car payments) | | $ 1,400.00 |
| 9. Recreation, clubs and entertainment, newspapers, magazines, etc. | | $ 200.00 |
| 10. Charitable contributions | | $ 0.00 |
| 11. Insurance (not deducted from wages or included in home mortgage payments) | | |
| a. Homeowner's or renter's | | $ 855.00 |
| b. Life | | $ 1,064.00 |
| c. Health | | $ 1,675.00 |
| d. Auto | | $ 820.00 |
| e. Other _____ | | $ _____ |
| 12. Taxes (not deducted from wages or included in home mortgage payments) | | |
| (Specify) Home | | $ 9,201.00 |
| 13. Installment payments: (In chapter 11, 12, and 13 cases, do not list payments to be included in the plan) | | |
| a. Auto | | $ 4,215.00 |
| b. Other _____ | | $ _____ |
| c. Other _____ | | $ _____ |
| 14. Alimony, maintenance, and support paid to others | | $ 0.00 |
| 15. Payments for support of additional dependents not living at your home | | $ 9,200.00 |
| 16. Regular expenses from operation of business, profession, or farm (attach detailed statement) | | $ 3,400.00 |
| 17. Other Support for family members. | | $ 16,400.00 |
| 18. AVERAGE MONTHLY EXPENSES (Total lines 1-17. Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.) | | $ 78,485.00 |

19. Describe any increase or decrease in expenditures reasonably anticipated to occur within the year following the filing of this document:
Decrease in expenditures since we will only be maintaining one home.
_____
_____

20. STATEMENT OF MONTHLY NET INCOME

| | |
|---|---:|
| a. Average monthly income from Line 15 of Schedule I | $ 0 |
| b. Average monthly expenses from Line 18 above | $ 78,485.00 |
| c. Monthly net income (a. minus b.) | $ -78,485.00 |

American LegalNet, Inc.
www.FormsWorkflow.com

22-35

B6 Declaration (Official Form 6 - Declaration) (12/07)

In re     Dennis L. Montgomery &
          Brenda K. Montgomery                    ,                    Case No.    6:09-bk-24322
                        Debtor                                                            (If known)

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 35 sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Date   7/13/2009                                     Signature
                                                                                            Debtor
                                                              Dennis L. Montgomery

Date   7/13/2009                                     Signature
                                                                                    (Joint Debtor, if any)
                                                              Brenda K. Montgomery
                                                              [If joint case, both spouses must sign.]

### DECLARATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h) and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required by that section.

_____          Social Security No. _____
Printed or Typed Name and Title, if any,                    (Required by 11 U.S.C. § 110.)
of Bankruptcy Petition Preparer

If the bankruptcy petition preparer is not an individual, state the name, title (if any), address, and social security number of the officer, principal, responsible person, or partner who signs this document.

_____
_____
_____
Address

X _____                    _____
  Signature of Bankruptcy Petition Preparer                    Date

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document, unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.

### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the _____ [the president or other officer or an authorized agent of the corporation or a member or an authorized agent of the partnership ] of the _____ [corporation or partnership] named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____ sheets (Total shown on summary page plus 1), and that they are true and correct to the best of my knowledge, information, and belief.

Date _____          Signature: _____

                                                       _____
                                                       [Print or type name of individual signing on behalf of debtor.]

[An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.]

Penalty for making a false statement or concealing property: Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

American LegalNet, Inc.
www.FormsWorkflow.com

22-36

# Exhibit 70

1    Christopher J. Conant, Cal Bar No. 244597
     730 17th Street, Suite 200
2    Denver, CO 80202
     Telephone: (303) 298-1800
3    Fax: (303) 298-1804
     cconant@conantlawyers.com
4
     Attorney for Plaintiff Michael J. Flynn
5

6

7

8

9                UNITED STATES BANKRUPTCY COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11                  LOS ANGELES DIVISION

12

13    In re:                      CASE NO.: 2:10-bk-18510 bb

14    DENNIS LEE MONTGOMERY, and      Chapter 7
     BRENDA KATHLEEN
15    MONTGOMERY                Adversary No. 2:10-AP-01305 BB

16             Debtors

17

18    MICHAEL J. FLYNN, an individual,      PLAINTIFF'S SECOND SET OF

19            Plaintiff               REQUESTS FOR PRODUCTION OF
                                 DOCUMENTS
20
     v.
21
     DENNIS MONTGOMERY,
22    BRENDA MONTGOMERY,

23            Defendants.

24

25

26    **PROPOUNDING PARTY:**      **MICHAEL J. FLYNN, PLAINTIFF**

27    **RESPONDING PARTY:**      **DENNIS LEE MONTGOMERY, DEFENDANT**

28    **SET NUMBER:**               **2**

TJ EXHIBIT: 2
DEPONENT: D. MONTGOMERY
PAGES: 6
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

PLAINTIFF'S 2ND SET OF REQUESTS FOR PRODUCTION OF DOCUM

1

2      In accordance with Federal Rule of Bankruptcy Procedure 7034, Dennis Lee Montgomery

3 is hereby requested to produce and identify the writings and other things as described below. You

4 are requested to produce such writings and/or other things as requested in person, unless

5 permission is granted in writing by Plaintiff's counsel, within 30 days of service at the hour of 5

6 p.m. at the office of counsel for Plaintiff at Conant Law LLC, 730 17th Street, Suite 200, Denver,

7 CO 80202. Production of the documents described below may also be by electronic means with

8 appropriate arrangements are made with Plaintiff's counsel prior to production. Any use of the

9 word "or" herein shall be interchangeable with the word "and" and vice versa.

10

11                    **DEFINITIONS**

12      For the purpose of this discovery demand, the following definitions shall apply:

13      "DOCUMENT" means a writing, as defined in Federal Rule of Evidence 1001 and

14 includes, without limitation, the original and all copies of handwriting, typewriting, printing,

15 photostating, photographing, electronic and every other means of recording upon any tangible

16 thing and form of communication or representation, including letters, words, pictures, sounds, or

17 symbols, or combinations thereof, and any record created of such writings created, regardless of

18 the manner in which the record has been stored.

19      "FACTS" shall mean any form of acts, omissions, events, occurrences, conversations,

20 correspondence, or understandings and shall include the dates of those acts, omissions, events,

21 occurrences, conversations, correspondence or understandings and shall be construed as liberally

22 as possible.

23      "IDENTIFY" (with regard to DOCUMENTS) shall mean to state the type of document

24 (letter, contract, email, memo, etc.), and provide the date, author, recipient, subject matter, name

25 and address of each person having possession of the original or any copy of the DOCUMENT.

26 "IDENTIFY" (with regard to PERSONS or witnesses) shall mean to state their names, address

27 information, email address, phone number, and place of employment.

28

PLAINTIFF'S 2ND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

2-2

1    "MONETIZE" means the act of obtaining monetary value from an asset, good, technology

2  or the like and includes, without limitation, selling, leasing, or licensing any such asset.

3    "PERSON" includes an individual, corporation, business association or entity, or any

4  other form of similar organization.

5    "SOURCE CODES" means those computer software codes that YOU were ordered to

6  produce by the United States District Court for the District of Nevada and for which you were

7  sanctioned by that court in the amount of $2,500 per day to compel your production of those

8  codes and which are referenced in Docket Entry # 815 in Case No. 3:06-cv-0056 in the U.S.

9  District Court for the District of Nevada and which is attached hereto as **Exhibit 1**.

10    "YOU" or "YOUR" refers to Responding Party.

11

12                    **REQUEST FOR PRODUCTION OF DOCUMENTS**

13  **REQUEST FOR PRODUCTION NO. 1:**

14    Produce the SOURCE CODES.

15  **REQUEST FOR PRODUCTION NO. 2:**

16    Produce any and all DOCUMENTS, including source codes, reflecting or representing

17  any and all changes in the SOURCE CODE between the date of YOU filing YOUR bankruptcy

18  petition and the present date.

19  **REQUEST FOR PRODUCTION NO. 3:**

20    Produce all DOCUMENTS, including emails, representing communications by YOU or

21  anyone acting on YOUR behalf or in partnership with YOU or on behalf of Demaratech LLC to

22  MONETIZE the SOURCE CODES or any technology derived from the SOURCE CODES.

23  **REQUEST FOR PRODUCTION NO. 4:**

24    Produce all DOCUMENTS in your possession or control representing communications

25  with government representatives of the United States or of any foreign government relating to any

26  attempt to MONETIZE the SOURCE CODES or technology derived from the SOURCE CODES.

27

28    Dated this 24th day of September, 2010

2·3

1

2

3   CONANT LAW LLC

4

5   By: /s/ Christopher J. Conant
    Christopher J. Conant, Esq.
6   Attorneys for Michael J. Flynn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2-4

APPEAL

# United States District Court
## District of Nevada (Reno)
## CIVIL DOCKET FOR CASE #: 3:06-cv-00056-PMP-VPC

Montgomery et al v. eTreppid Technologies et al

Assigned to: Judge Philip M. Pro
Referred to: Magistrate Judge Valerie P. Cooke
Demand: $75,000
Member case: (View Member Case)
  Cases: 3:09-cv-00422-ECR-RAM
         3:06-cv-00145-PMP-VPC
Case in other court: 9th Circuit, 09-15134
              9th Circuit, 10-15958
              9th Circuit, 10-15960
Cause: 17:504 Copyright Infringement

Date Filed: 01/31/2006
Jury Demand: Plaintiff
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

| Date Entered | # | Docket Text |
|---|---|---|
| 08/25/2008 | 815 | MINUTES OF PROCEEDINGS – Case Management Conference and Show Cause Hearing held on 8/18/2008 before Judge Philip M. Pro and Judge Valerie P. Cooke. Crtm Administrator: *LGM*; Pla Counsel: *Randall Sunshine, Ellyn Garofalo, and Mark Gunderson*; Def Counsel: *Stephen Peek and Jerry Snyder; Counsel for Counter Defendant(s): Robert Rohde, Gregory Schwartz, Roland Tellis, and Bridgett Robb Peck; Counsel for Interested Party: Carlotta Wells*; Court Reporter/FTR #: *Kathryn M. French*; Time of Hearing: *10:04 a.m.*; Courtroom: *1*; The District Court addresses the parties regarding the purpose of this hearing. A first phase of depositions shall include the depositions of Dennis Montgomery, Warren Trepp, Edra Blixseth, and Michael Sandoval, in that order, and shall be taken and completed by 10/31/2008. Counsel shall meet and confer and file a joint proposal concerning potential Alternative Dispute Resolution options by no later than 8/29/2008. Mr. Sunshine advises the Court that the Montgomery parties will produce all souce code it their possession by no later than 9/8/2008. IT IS ORDERED that a monetary contempt sanction is imposed against Dennis Montgomery in the amount of two thousand five hundred dollars per day from the date of the failure to comply, July 23, 2008, through the date the production actually occurs. IT IS FURTHER ORDERED that this sanction shall remain in place until a declaration by Dennis Montgomery and his counsel file a declaration with the Clerk of the Court certifying that the source code production is complete. The Court shall allow eTreppid's counsel to file a motion and declaration for attorney's fees and costs addressing the efforts made since Magistrate Judge Cooke's May 29, 2008 order to produce source code discovery. IT IS SO ORDERED. See the attached order for specifications. (Copies have been distributed pursuant to the NEF – LGM) Modified on 8/26/2008 to reflect the correct due date for the joint proposal concerning potential Alternative Dispute Resolution options (LGM). (Entered: 08/25/2008) |



1

## PROOF OF SERVICE

2      I, Christopher J. Conant, declare:

3      I am a resident of the State of Colorado and over the age of eighteen years, and not a party to the within action. My business address is 730 17th Street, Suite 200, Denver, CO 80202. On September 24, 2010, I served the within document(s):

4

5      PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

6

7      ☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date.

8      ☑ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Denver, Colorado addressed as set forth above.

9

10     ☐ I caused such envelope to be delivered via overnight delivery addressed as indicated on the attached service list. Such envelope was deposited for delivery by _____ following the firm's ordinary business practices.

11

12     ☐ via electronic/e-mail service. The document(s) listed above were served via e-mail to the addressees listed.

13

14     Steven R Skirvin                    Raphael O. Gomez
       Dion-Kindem & Crockett              U.S. Department of Justice
15     21271 Burbank Blvd Ste 100          20 Massachusetts Av NW/PO
       Woodland Hills, CA 91367            Box 883
16     Attorneys for Defendants            Washington, DC 20044
                                           Attorney for U.S. Gov't
17

       Thomas H Casey
18     22342 Avenida Empresa Ste 260       U.S. Trustee
       Rancho Santa Margarita, CA 92688    United States Trustee (LA)
19     Attorney for Chapter 7 Trustee      725 S Figueroa St., 26th Floor
                                           Los Angeles, CA 90017
20

21     I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

22

23

24     I declare under penalty of perjury under the laws of the State of [State] that the foregoing is true and correct.

25

26     Executed on August 24, 2010 at Denver, Colorado.

27                              /s/ Christopher J. Conant

28                              Christopher J. Conant

                                POS

PLAINTIFF'S 2ND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS            2-6

Exhibit 71

1  Ronald J. Logar, Esq., Nevada Bar No.: 0303
2  Eric A. Pulver, Esq., Nevada Bar No.: 7874
   **Law Office of Logar & Pulver, PC**
3  225 S. Arlington Ave., Ste A
   Reno, NV 89501
4  Phone: 775-786-5040; Fax: 775-786-7544
   Michael J. Flynn, Esq., Mass. State Bar No.: 172780
5  Philip H. Stillman, Esq., California State Bar No.: 152861
6  **Flynn & Stillman**
   P.O. Box 690
7  Rancho Santa Fe, CA 92067
   Phone: 858-775-7624; Fax: 858-759-0711
8  *Admitted Pro Hac Vice*

9               **UNITED STATES DISTRICT COURT**

10           **FOR THE DISTRICT OF NEVADA, RENO**

11

12  ETREPPID TECHNOLOGIES, INC., a California     CASES Nos.: 3:06-cv-N-00145-BES-VPC &
13  Corporation,                                  3:06-cv-N-06-00056-BES-VPC

14                    Plaintiff,

15          vs.

16  DENNIS MONTGOMERY, an individual,             **SEALED DECLARATION OF DENNIS**
17  MONTGOMERY FAMILY TRUST, a California          **MONTGOMERY IN SUPPORT OF HIS**
    Trust and DOES 1 THROUGH 20,                   **OPPOSITIONS TO DOD'S AND ETREPPID'S**
18                                                 **MOTIONS FOR PROTECTIVE ORDERS**

19                    Defendants.

20  ───────────────────────────────
    DENNIS MONTGOMERY, an individual; and
21  MONTGOMERY FAMILY TRUST, a                     **THIS DECLARATION IS FILED UNDER**
    California Trust,                              **SEAL, EX PARTE, AND MAY BE VIEWED**
22                    Plaintiffs,                  **AND/OR READ ONLY BY U.S. DISTRICT**
                                                   **JUDGE BRIAN E. SANDOVAL**
23          vs.

24  eTREPPID TECHNOLOGIES, INC.,
25  a Nevada LLC; WARREN TREPP, an
    individual; DEPARTMENT OF DEFENSE
26  of the UNITED STATES OF AMERICA
    and DOES 1 through 10,
27                    Defendants.

28

TT EXHIBIT: 3
DEPONENT: D. MONTGOMERY
PAGES: 23
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

## SEALED DECLARATION OF DENNIS MONTGOMERY

I, Dennis Montgomery, declare:

1.      I am over age 18 and a party to two civil lawsuits involving Warren Trepp and my company eTreppid Technologies.   I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to them.

## BACKGROUND

2.      I have been  a computer programmer since approximately 1978  developing software programs and the source codes for the programs in thousands of different and varied applications, but mostly involving thousands of different programs for "data compression," "pattern recognition," anomaly detection and an "Object Detection System." [1]  These include but are not limited to the following:

a.  Software programs applicable to medicine, mostly involving "anomaly detection"; and  "pattern recognition" and mostly developed between 1981 and 1996. These are  my copyrights and/or my copyright derivatives.

b.  An "Object Detection System" ("ODS")  derived from my copyrights involving anomaly detection and pattern recognition, but having far more universal application and adaptability to many areas other than medicine, mostly developed between 1994 and 1998. These programs constitute the basis for my work on certain special military contracts. There are thousands of software developers who have worked for decades attempting to develop an "ODS" comparable to mine; and I am unaware of anyone who has successfully created such software.

---

[1] I use these terms generically to define the broadest possible genus of software programs relating to this area of software development - sort of like saying "automobiles" as a category of "four wheel powered vehicles." But the different types of "anomaly detection" and "pattern recognition" programs are vastly greater than the types of "automobiles" currently in existence worldwide.

c.  Data compression developed between 1996 and 1998 - conveyed to eTreppid on "CD No.1"; and adapted for use in casino surveillance between 1998 and 2002, pursuant to our business plan at eTreppid.

d.  Data compression and pattern recognition programs, developed by me as an independent contractor at eTreppid between 1998 and December 31, 2001 consisting of a part of eTreppid's work relating to casino surveillance  - some involving patents assigned by me derived from "CD No. 1"; and other programs not derived from CD No. 1 licensed to eTreppid pursuant to promises made to me by Warren Trepp.

e.  Data streaming compression for movies, not contained on "CD No. 1" and mostly developed by me between 1994 and 1998. I discussed these programs with Trepp before execution of the Sept. 28, 1998 "Contribution Agreement" and offered them for Five Million Dollars, which he rejected; and which we again discussed years later in 2002 and 2003 and which he again rejected for Five Million Dollars. In 2003 we also had several conversations about a sale for Ten Million Dollars and/or promises by Trepp of licensing the software as described in my answers to interrogatories attached to my opposition to the Government's and Trepp's motions for protective orders.

f.  Multiple  software programs developed, owned, possessed and used exclusively by me derived from my "ODS" between 1994 and December 31, 2002, some of the source codes for which are direct derivatives of my copyrights. and which, beginning in November, 2002 , I began to adapt to military applications on behalf of the Department of Defense, the Navy,  the Air Force, and the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ mostly utilized  in the war on terror between March 2003 and the present.

3    The software programs and the source codes owned, possessed and  used exclusively by me on behalf of the foregoing Government agencies all derive from  my exclusive copyrights generally relating to "anomaly detection" and "pattern recognition," and more specifically relating to

1    the source codes used in my "ODS;" and derivatives thereof which enabled me to ███████

2    ████████████████████████████████████████████████████████████████

3    Presumably, the sealed Government declaration informs and educates this Court with respect to this

4    aspect of my software technology.

5         4    Over the 25 years I have been developing software programs, I have collected and

6    stored thousands of different computer files and programs on my computers and on many different

7    types of computer storage media. Some of this collection was stored at my storage facility and

8    some of that was taken and/or damaged by the FBI. I generally store some of the programs and

9    codes I have developed and/or am working on on the computers I am currently using. The

10   Government took my computers during it's raid on my home and storage facility on March 1 and

11   March 3, 2006; and the government's retention of my computers and computer storage files from my

12   home and storage facility has caused me, and will continue to cause me, irreparable harm because

13   its retention affects my livelihood and ability to work. Additionally, as a result of the Government's

14   unconstitutional raid, I do not have access to computer files which would enable me at this time to

15   provide a more detailed chronology of events relating to the SAP I worked on and at issue in these

16   cases. However, since my departure from eTreppid, as recited below, I have been able to

17   reconstruct on new computers specific software programs that I previously used in the ███████

18   ████████████████████████████████████████████████████████████████

19   ████████    I assume this work product or "output" from my software programs, together with my

20   daily interaction with ███████████████████████    is one of the concerns which *must* be

21   recited at least obliquely in the sealed Government declaration.

22        5.    More recently, notwithstanding the unconstitutional raid perpetrated on my home and

23   storage by Warren Trepp using his political influence with James Gibbons, (Gibbons has admitted

24   making "phone calls" to initiate criminal action against me on behalf of Trepp), Daniel Bogden and

-3-

the local FBI, I have provided the "output" from my decoding programs, without compensation, to our Government in order to stop terrorist attacks and save American lives. My source codes for this decoding technology which derives from my "ODS" are what Trepp and several Government officials were attempting to steal from me when they raided my home.

6. The Government has now held my computers and storage media for over six months knowing I do not have possession of any "classified information" and knowing that all of the source codes used on the special Government contracts worked on by me at eTreppid Technologies are owned by me. No other person within our Government or at eTreppid has ever had access to the source codes used on the special Government contracts. Anyone who swears under oath to the contrary is lying and/or committing perjury. Obviously, if they did have access to this technology, Trepp would have licensed and/or sold it to the Government for hundreds of millions of dollars. I completely and zealously guarded the secrecy and confidentiality of my source codes used on the special Government contracts at eTreppid, both from the Government, including ████ and from eTreppid, as the exclusive owner and sole possessor. No person at eTreppid is able, to my knowledge, to create the source codes that I have created having multiple applications in the war on terror and other military uses. Conclusive proof on this issue is established by the recent interception of the attempts by terrorists operating out of London to blow up jetliners originating in London and bound for the US. I gave the appropriate authorities within the US Government accurate and very specific intelligence regarding this terrorist plot, from my "decoding software" as I have done in the past, weeks prior to the arrests by the London authorities - without compensation.

7. Neither Warren Trepp, nor eTreppid Technologies, nor any person working there have ever owned, possessed or processed "output" from my source codes used in the special Government contracts. Other eTreppid individuals, as well as Government officials identified herein,

1    had access to the "output" only after I had processed it.

2        8.    In September, 2005, Trepp told me that the Government had appropriated One

3    Hundred Million Dollars for the "decoding technology", but he was demanding Five Hundred Million

4    Dollars. Trepp instructed me to stop processing ████████████████ "output" on

5    two occasions - first in September, 2004, saying to stop temporarily until he made a deal with the

6    Government to sell a portion of the technology for Five Hundred Million dollars, which I refused.

7    Secondly, about a year later in September 2005, when my conflict with Trepp greatly intensified.

8    On the latter occasion, I told him it was a "hold-up". I refused on both National Security grounds

9    and over Trepp's failure to pay me licensing fees and to resolve our conflict over the split of the

10   proceeds derived from any sale. Trepp had previously acknowledged my ownership of the

11   technology in numerous conversations and promised "to work things out." In September-October,

12   2005, Trepp said that "our deal" would have to wait because he had other obligations and began to

13   threaten me as our conflict intensified. This ultimately resulted in my departure from eTreppid in

14   January, 2006. Since then I have given the highest levels of our Government vital national security

15   information free of charge while Trepp and his local Government cronies have raided my home and

16   storage and tried to get me indicted.

17       9.    I was an independent contractor throughout my time at eTreppid, notwithstanding

18   Trepp's attempt to change my status for tax reasons in January 2003. Before that eTreppid even

19   treated me as an independent contractor. But his tax changes attempting to make me an

20   "employee" only reflect what we both knew and what is now obvious to any impartial observer. I

21   owned the technology, it was not developed while I was at eTreppid, and I exclusively controlled it.

22   He was attempting to steal what he refused to pay for, his modus operandi for his entire adult life, as

23   shown by his position as Head Trader for Michael Milken in the "junk bond" scam. While at

24   eTreppid, I fulfilled all of the indicia of an independent contractor even after January, 2003 when

-5-

1   Trepp realized the value of the technology in the war on terror.  No one controlled, instructed,

2   supervised, or directed my work in the slightest manner - not one aspect of my work was controlled

3   etc by anyone or anything. Not one part of the source codes I used on "Special Access Programs"

4   ("SAP") was ever created at eTreppid or on eTreppid computers. All codes used on the special

5

6   military contracts were created by me at my home or elsewhere. None of the source codes used on

7   SAP were ever on the premises at eTreppid, nor were any of them ever contained in eTreppid

8   computers. Almost all of my work on the SAP was done by me in an area occupied by me alone.

9   Any adaptation or changes to any of the source codes was done at my home.

10                          **The Negroponte Declaration**

11

12      10.        I have not read the "sealed declaration" filed by the DoD. Therefore, I obviously do not

13   know it's contents. I have read John Negroponte's "public" declaration. I agree that the facts

14   involved herein relating to specific military contracts - the "Special Access Programs", ( the "SAP");

15   and that my software technology used to "process" data and create "output" from that data in "SAP",

16   involve vital national security concerns, the disclosure of which would cause "exceptionally grave

17   damage to the national security of the United States." I can only presume that the "sealed

18   declaration" relates to work I did on SAP, probably without referencing specific individuals that I

19   worked with from ▮▮▮▮ and without describing precisely what I did. I expect, given the

20   Government's failure to use certain information that I processed which turned out to be accurate, but

21

22   on which the Government failed to act, resulting in multiple civilian and military casualties, that such

23   information is not in the sealed declaration. As to the information I provided which succeeded ▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I hope that the Government has

25   alerted this  Court to the exceptional and grave importance of the use of my technology in the war on

26   terror.

27

28      11.        However, I vigorously dispute whether any of the applicable protocols for properly

-6-

classifying either the data I received from the Government, the "processing" I performed, or the
"output" I created, was ever properly designated "classified information" by an "Original
Classification Authority" pursuant to "The National Security Industrial Program Operating Manual"
(The "Manual") *while it was in my exclusive possession, custody and control at eTreppid*. Much of
the work I did was simply too urgent and the "output" too vital to conform to any of the Manual
protocols, the eTreppid personnell were too incompetent to implement the protocols, the cost was
too great, and ▇▇▇▇▇▇▇▇▇▇ I dealt with did not trust anybody at eTreppid but me - at least that
is what several of them said.

12.    For security reasons, and because I zealously protected the secrecy of my software
source codes from everyone, no other eTreppid employee had access to anything I was working on
in connection with "SAP". Indeed, it was commonly discussed with ▇▇▇▇▇▇▇▇▇▇ that any
leak to anyone at eTreppid would cause serious damage to national security. In general, eTreppid
employees were too incompetent to be involved, including Sloan Venables and Patty Gray. Nor did
▇▇▇▇ or other Government official have access to the software programs that I used to create the
"output" on "SAP." They repeatedly tried to gain access to the source codes and failed; including
attempts to "reverse engineer" the "output" but failed. In December, 2003, certain ▇▇▇▇▇▇
talked about "just taking it" after I had ▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as hereinafter described. But I informed them that the
programs would self-destruct and that I would "stop processing" the encrypted data from ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇ Because of the statements about "just taking it," I informed Warren Trepp and
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
immediately flew to Reno and signed the "Agreement" attached hereto as Exhibit 1, agreeing not to
attempt to seize the technology.

13.    Much of the "output" was personally hand delivered by me to ▇▇▇▇▇▇▇▇
some of whom flew directly to Reno to pick up the "output", and personally watched me "process"

data, some of which they brought with them. Several of the ████████████ scrutinized me for

months and attempted to "look over my shoulder" in order to gain access to the programs I used

and how I "processed" the data. Their efforts also failed.

14.     Several of the ████████████ told me repeatedly that they did not trust Warren

Trepp and that I should never allow him or anyone working for him to gain access to any of the

source codes for the programs. They recommended that I insert intrusion devices in to the programs

in order to prevent anyone from gaining access to the programs. On several occasions, several████

████████████ who I worked with for long and intense weeks at a time, ████████████

██ told me that they did not trust the FBI, or the National Security Agency, and/or Paul Haraldsen.

They knew that I had begun to trust Haraldsen (which proved to be a mistake) and warned me about

him. They told me that anyone with "close ties inside the Government" with Warren Trepp was

"suspect" because the technology was worth "hundreds of millions" of dollars in the war on terror. At

one point, ████████removed the local FBI from eTreppid's building, and asked them not to return.

15.     As to how the Government "classified" it's reports concerning my "output" after it left my

possession, I do not know. Presumably, given what I know about the "output" I gave, the

Government has internally classified this data without ever giving me copies of that "classified

information." I do not have possession of any of those reports.

16      Mr. Negroponte never personally observed the "processing" of data or the creation of

my "output." Presumably, he has received either the "output" I created on some form of electronic

storage media or reports concerning the same. I was told by numerous officials that the results from

my "output" were included in regular  "briefings to the President."

17.     The work I performed pursuant to "Special Access Programs" on specified military

contracts required that I have a "Top Secret" Security Clearance with access to "Special Information

Compartmentalized." ("SIC").

**The Application of my "ODS" Technology to Special Access Programs**

-8-

18. **Predator Project, USAF - November, 2002;**  In October - November, 2002, I developed a software program from my data streaming technology, *not* contained on "CD No. 1" and obviously created when even eTreppid treated me as an independent contractor, for use on the unmanned aerial vehicle, the "Predator." This program enabled the Predator to stream video at a much lower band width than it then used. The work was done pursuant to Contract # 209545S originating in a Top Secret area at Eglin Air Force Base. My contacts included Colonel Rhys Macbeth, Thayne Wescoatt, Debora Moffitt, and Chris Crutchfield. I will need depositions of each of these individuals and others, together with all of the documentation used on the project in order to prove my ownership, possession, custody and control of the technology used, how it was used, how it differed from then existing technology I had transferred to eTreppid "contained on CD No. 1"; and how I adapted my software to the specific application used on Predator. The adaptation process is proof of my ownership and exclusive possession. The foregoing individuals watched me as I demonstrated the application of the technology in the Predator program.

19. **Pointer, Predator, USAF - February, 2003.**  Between November 2002 and March, 2003, as a result of my work on the above Predator project, I discussed my object detection system ("ODS") with and/or interacted with numerous Air Force officers, consultants agents and officials, including but not limited to Major Paul Hastert, Capt. Robert Lyons, Col. Rhys Macbeth, Peter Wiedemann, Col. Felder, Matt Belmonte, David Whigham and others in connection with testing to detect and/or track objects while streaming compressed unmanned aerial vehicle "Pointer" video for Predator. Warren Trepp also advised these and other officials that I had developed an "ODS" which could fulfill their tests. Between November, 2002 and January-February, 2003, Trepp explicitly requested me to use my "ODS," which obviously was then completely developed, (when even Trepp treated me as an independent contractor) to prove to the Air Force that I could detect and track objects inside streaming video. He agreed that if I passed the tests, he would "make a deal" with me either to purchase or license my "ODS" technology. The tests were 90% successful. I adapted my

"ODS" system to use compressed streaming video on an unmanned aerial vehicle "Pointer" to the ground and then to a central location while detecting and  tracking objects on the ground. The validation tests were conducted in February, 2003 at Eglin Air Force Base. The dates, results, and testing procedures, together with all of the related documentation and involvement of Government officials  all prove my exclusive ownership and possession of the technology. I will require the depositions of at least ten of the Government officials involved, including Col. High of "Big Safari" together with all of the documentation and test results in order to prove my ownership, custody, possession and control of the "ODS". It has a value in excess of Five Hundred Million Dollars.  If this case is to proceed, I will provide the specific names of all individuals involved in this project, generally named "USAF UAV Battlelab, Contracts: F08651-03-P- 0182 and 0129. These contracts extended from March 26, 2003 until September 30, 2005, when my conflict with Trepp erupted.

20.    **Tracking al Qaeda, USSOCOM and ████ - September, 2003.**  By June - September, 2003, my "ODS" had attracted the interest of ████ and USSOCOM in connection with using Predator to detect and track specific al Qaeda operatives "in the field", including al Zarquawi, and specific objects related to him such as cars and vans, with "live" video feeds encoded and scanning for objects and people in "real time." My object tracking was placed on a specific number of "DV laptops" used by SOCOM and ████ in the field. I interacted on a regular basis with these operatives in connection with the use and application of my technology. Special servers were installed in the "POC" Predator Operation Command at Nellis Air Force Base and at Fort Bragg to "look for", detect and track specific objects, which were, in fact, positively identified. I worked with many people in "special groups" in ████ at Nellis, at Fort Bragg, at Eglin etc in connection with my object tracking system. I will require all of the documentation, and depositions of at least twenty individuals associated with this project, including General Brown, Scott Allen, Mark Race, Michael Holland, Jerry Dvorak, Kenneth Johns, Snake, Lance Lombardo, Sue Griffin, Merv Leavitt. Eric Barnes and Robert Dailey . The contracts, USZA28-03-P-3294 and H92222-04-0006/DO-0001 to

0004 extended from September, 19, 2003 until September 30, 2005 when my conflict with Trepp erupted.

21. ████████████████████████████████ - October 28, 2003. In September, 2003, ████████████████████████████████ to me and asked if I could ████████████████████████████████ with my technology. I said I would try. In October 2003, I detected ████████████████████ and on or about October 28, 2003, I broke the encryption. Soon after I broke the encryption, ████████████ ████████████████████████████ as described below.

a. ████████████████████ - November 8, 2003. On October 28, 2003, the same day I broke the encryption, I gave this "output" to ████████ That "output" consisted of ████████████ ████████████████████████████████████████████████ with the associated date of November 8, 2003. On that date, hours before a suicide attack, the US State Department, using my data, issued an urgent warning about an imminent attack. A suicide bomber driving a truck detonated a bomb outside the Complex killing and wounding over one hundred people. I was later told ████████████████ that "we" had either failed to follow through quickly enough or that the Saudi's had failed to act. But I have always questioned why the State Department made an urgent public warning just hours before the attack when ████████ knew at least 10 days before the attack?

b. **Miscellaneous Targets and Dates - November 2003 to October, 2004.** Within days of the ████████████████████████████████ came to me and asked me to start processing all of the data that they had. ████████ gave me a list of it's operatives who I dealt with and could call any time day or night. There are 18 names on the list with their home, office cell and pager phone numbers. I will require the depositions of all 18 of these individuals in order to prove my exclusive ownership, custody, possession and preservation of the secrecy of my software. Over the next several months, I undertook the arduous and time consuming task of extracting data from ████████

-11-



1    ██████████████████████ I decoded ████████████████████████████████

2    ███████████████ But ██████ mostly concentrated on ████████ I was told

3    by several ███████ that the "output" I gave them prevented several terrorist attacks in the US.

4    I have a list of the ████████████████████████████████████████████ I

5    also specifically gave ██████████████████████████████████████████████

6    ██████████████ in those locations. I gave ███████████████████████

7    ██████████████████████████████████████████████ I know what

8    documents and electronic media exist in order to prove that my technology decoded the targets well

9    in advance of the bombings. I do not know why the attacks were not prevented. The pressure on me

10   to "process" was extreme. I was openly watched day and night by ████████████ for over a year.

11

12   c.  **The World Trade Center** █████████████████████ **- January 4, 2004.**   In December,

13   2003, ███████████████████████ without disclosing any details ███████. I did so

14   and decoded a specific target coordinate in New York. I later learned that ██████ consisted of

15   ████████████████████████████ 2001 and the location I decoded was the World Trade

16   Center in New York. Immediately upon decoding the tape, ███████████████ told me to

17   destroy all of the work that I had done ██████████ and to never discuss it with anyone, particularly

18   Warren Trepp. ██████ told me that ██████ was concerned that if any leak occurred, I would be

19   subpoened by the 9/11 Commission. He warned me never to trust Trepp, never to give him or his

20   employees access to any of my technology or the "output", and to protect my technology from him

21   at all costs. After I ████████████████████████ told me that the technology was so

22   vital to national security that I could never copyright or patent it, and that ██████ was considering

23   "just taking it". At that time, around Christmas, 2003, I placed "intrusion devices" into my software

24   programs to protect them from both the Government and Trepp. Around the same time, the FBI

25   brought in "blade servers" to accelerate the "processing" time. But the FBI got into a conflict with the

26   █████ over "control" of the entire operation and ████████ forced the FBI to leave the building. I did

27

28

-12-

Inform Trepp of the "just taking it" conversation with███████ As a result,███████

███████████████████████████ flew to Reno and signed the letter dated

January 4, 2004, attached hereto as Exhibit 1. At that time,███████said████would

purchase the technology. Trepp then gave him the price of Five Hundred Million Dollars.

███████████said to keep "processing" and that he would initiate a purchase plan.

d. ███████████████████ In February, 2004, working with rotating██

███████ I started taking data directly from███████████████████████

████████████████████████████████████████████████████████████

████████████ I had discussions with███████ including Peter Wiedemann and others,

including Paul Haraldsen (who I believed at that time was some sort of liason between███and

NSA) about██████████████████████████████and I explained in

detail what I believed was the technique used, and a specific technique that would make the

encoding even harder to break. Shortly after one of these discussions,███████████

████████████████████ which I again broke. These changes were explicitly discussed with

Wiedemann,███████and Paul Haraldsen. On June 28, 2004,██████████████

███████ matching the exact technique that was discussed four months earlier. I discussed these

matters in detail with Haraldsen.

22.   **Paul Haraldsen and the Air Force Take Over - The Christmas Eve Bombing.**

Between June 2004 and December, 2004, Paul Haraldsen emerged as my primary contact.

Haraldsen repeatedly informed me that it was very difficult to know "who to trust", that he worked

directly for the "highest level" of our Government, that he worked with General Bath, and to trust him

alone. He told me that there was a conflict "on the inside" and that the Air Force would be taking

over the project at the end of 2004. After June, 2004, Haraldsen told me that I should give him all of

my "output", which I did on a weekly basis. On December 14, 2004, I provided "output" to Haraldsen

and Paul Allen from USSOCOM with target coordinates and the date of December 24th, 2004 -

Christmas Eve - for a specific location in the middle of one of our military bases in Mosul, Iraq. I

then picked up repeated patterns for that location, so on December 20, 2004, I called my contact

directly in Iraq and warned him of an impending attack at that location. I repeatedly stressed to

Haraldsen that I thought an attack was imminent. On December 24, 2004, a suicide bomber

detonated a device on the base killing over 20 people. Around that time, Haraldsen told me that all

future funding would come from the Air Force and that a "buy out" would be coordinated by him and

other Air Force officials, including General Bath. At one time, he mentioned that One Hundred

Million Dollars had already been approved and that he and Bath "were working with Trepp". Later, in

mid 2005, I informed him that I did not trust Trepp, that the technology was mine, that the

Government needed to deal with me, not Trepp, and that I wanted to participate in any discussions.

Haraldsen said he would take it up with the right people inside the Air Force.

23.    **Independent Corroboration of** ████████████████████ In early 2005, the Air

Force contracted with an independent consulting contractor who verified that there was, in fact,

████████████████████████████, but that the consultant was unable to decode

the encryptions. Some months later, Haraldsen informed me that the "buy out" would go forward and

that I would participate.

24.    **The "Eagle Vision" Contract, James Gibbons, and "LLH & Associates".** In early

2005, James Gibbons, working with General Bath procured a military contract, the only contract

referenced in eTreppid's "Trade Secret" law suit against me, but merely one of many contracts I

worked on with my technology. The project was named "Eagle Vision" and involved the

compression of digital satellite streams. LLH & Associates was the primary contractor on this

contract, which sub-contracted the work to eTreppid. I believe the contract was a "Secret" contract.

In order to prove my exclusive ownership of the technology involved in Eagle Vision and differentiate

it from any of the technology on "CD No. 1," I will require the depositions of all individuals involved in

this project, together with all of the documentation. I believe that Trepp probably identified this sole

contract in his Complaint without specifically identifying it as a military contract, but as an "LLH" contract because during this time frame Trepp was actively using other eTreppid employees to attempt to gain access to my codes through reverse engineering and our conflict was rapidly intensifying. The national security concerns expressed in the Negroponte declaration apply to "Eagle Vision."

25. **Detecting and Tracking Submarines.**  In mid 2005, I was approached by Michael Carter from the Naval Research Center. He provide me several high altitude satellite photographs of the ocean and asked if I could detect any "anomalies" with my "ODS". The area covered approximately 100 square miles of ocean. I detected two objects in the photographs and reported them to Carter and to Paul Salvatori who reported them to other Navy officials. Carter and Salvatori told me that this was the first time software technology had detected a "submarine under water". They then told me that the Navy would set up a series of tests and that the most difficult test would be in September, 2005. Between September and October, 2005, I used my technology to perform the tests. I was told that the tests were "remarkably accurate" and that the Navy intended to purchase the technology as soon as possible.  In October, 2005, Paul Haraldsen informed me that he was negotiating with Trepp and understood that Trepp and I were in some type of conflict. He assured me that my interests would be protected and acknowledged that the technology was mine. Haraldsen said One Hundred Million Dollars had already been approved for the technology. In September through December, 2005, Trepp began to pressure me for the source codes for my "ODS", which, of course, I had always protected from everyone. When I refused to give Trepp the codes, he began to threaten me with using his "political influence" with Gibbons to "bury me"; and to use his "connections" to the Bonnano family, as hereinafter described. A detailed description of my conflict with Trepp is contained in my answers to Trepp's interrogatories, attached to my opposition to the motion for a protective order.

26. In order to prove my *exclusive ownership,* possession, custody and control of my

technology used with ▮▮▮▮ the Air force, the Navy and USSOCOM, and the preservation of the secrecy of the technology from Trepp, the Government and all eTreppid employees, and in order to defend against Trepp's spurious Trade Secret claims requiring preservation of the secrecy of the "trade secret", *by me alone*, I will have to discover all of the relevant documents, and depose all of the involved individuals from ▮▮▮▮ the Air Force, USSOCOM, and the Navy relating to the use and application of my technology as recited above. These include but are not limited to: Paul Haraldsen, ▮▮▮▮▮▮▮▮▮▮▮▮, Peter Wiedemann, all individuals listed on the list given to me by ▮▮▮▮▮▮▮▮▮ and all of my contacts in Iraq and in the US relating to the London, Madrid and the Iraq bombings, James Gibbons, Ronald Bath, individuals inside the Air Force involved with Bath and Gibbons and all others inside the Government who tried to steal my technology at the behest of Trepp, Bath, Haraldsen and Gibbons. I will require the "regular briefings" given to the President in order to determine how my technology was described and characterized, how it was used and applied, and to calculate all my damages resulting from the failure of the Government to pay me royalties knowing it belonged to me.

### The DoJ's Use of the "Big Safari" Contract to Permit Discovery is a Ruse.

27.    The DoJ and Ms. Wells in their motion for a protective order, refer to their agreement to allow discovery in connection with the "Big Safari " contract. This is just a ruse. That contract and the discovery they plainly intend to allow relates to the purchase of air conditioners for the "blade servers" brought in by the FBI. That contract has no national security implications and none relating to the ownership and possession of my technology. Referencing it as an example of how and why discovery can proceed in these matters is disinguous in the extreme.

### Sealed Search Warrant Matters Relevant to National Security Issues

28.    Each and every relevant and material  fact in Agent West's affidavit filed in Court to obtain a search warrant to raid my home and storage are materially false either by intentional deletion, omission,  mis-statement, or outright fabrication.  The local Reno FBI raided my home on

-16-

the pretext that I had unlawfully taken "classified information" which posed a threat to our "national security." This was just a bold-faced fabrication to justify the theft of the technology I have described herein. Paul Haraldsen knew that the so-called "palm trees" tapes - the pretext for the raid - were neither "classified" or "taken" by me. The FBI, Haraldsen, and Trepp all knew that I had only conveyed to eTreppid - the Company I own with Trepp, and now others, (that Trepp has mysteriously and questionably brought in, including Michael Milken), the data compression technology "contained on CD No. 1". Yet West deleted this phrase from his affidavit, then omitted the very next paragraph reciting that none of my other technologies were conveyed. Then he explicitly deleted the phrase in eTreppid's "Operating Agreement" proving that I was not subject to a non-compete agreement and stated in his affidavit that I was. Then he swore under oath that I was an "employee" from 2000 to November, 2001 when I "assigned" the patents he lists - a complete falsehood; and he recites that Venables had access to my source codes when Venables had admitted under oath three weeks before that he didn't. Now, the Government is asserting the state secrets privilege in the civil cases after admitting in the criminal matter that no "classified information" was "stored" at eTreppid" and thus, I was not in possession of any. Yet, in these civil cases it is representing to the Court that "information" involved in these cases involves an "exceptionally grave danger to the national security of the United States." I do not believe that the upper levels of our Government, including John Negroponte, have been fully advised of the machinations and illegal conduct of Gibbons, Trepp and the local FBI, or of the issues involved in these matters, and that the local Nevada Government authorities aided my home because of the political influence of Trepp. Perhaps, this explains the apparent discrepancy between the Negroponte "public declaration" and the DoJ's motion for a protective order. I raise these search matter issues herein as an explanation for the discrepancy. I have potential claims arising out of the misconduct of the local Nevada officials.

29.    Agent West falsely led the Court issuing the search warrants to believe that there was a

non-compete agreement then in existence preventing me from using *my* source codes "in competition" with eTreppid, knowingly deleting the explicit phrase stating that there was no non-compete agreement. Again, this conduct was material and intentional to steal my technology.

30.    I have never received any form of notice whatsoever from any Governmental agency that my "Top Secret SIC" security clearance has been suspended or revoked. My security clearance can only be revoked by the appropriate Governmental agency. Yet, Agent West falsely stated in his search affidavit that my clearance had been suspended and that eTreppid possessed a clearance to store "classified information". These compounded falsehoods were manufactured by Trepp, Patty Gray, Sloan Venables and West in order to raid my home on the false allegation that I "unlawfully retained classified information". After being challenged with my Rule 41 (g) Motion, as stated above, the Government then admitted that there was no "classified information" taken by me or in the possession of eTreppid. In the event these cases proceed, I will continue to make decisions and utilize the "information" referenced in paragraph 11 of the Negroponte declaration based on my possession of a "Top Secret SIC" security clearance.

31.    I view the search warrant lies and illegal conduct by my Government to be a result of the local political "connections" between Trepp, James Gibbons, Daniel Bogden, and Ronald Bath, but I do not know how far this corruption rises inside our Government. I have reason to believe that certain high level Government officials, including, the President, Vice-President, Mr. Negroponte and others have *not* been influenced by the political power of Trepp; but I also have reason to believe that some Air Force officials have been influenced by Ronald Bath, and that they have influenced others in the DoJ.

32.    Warren Trepp is an extremely powerful and "connected" individual in Nevada due to his large political contributions. I have attended functions, a cruise, dinners, etc with Trepp and James Gibbons. I have observed Trepp, once heavily intoxicated on a cruise, give Gibbons very large amounts of casino chips and cash. I have heard them discuss "funneling" money in $10,000

-18-

dollar increments to Gibbons thru Trepp's various entities. I have heard Gibbons say words to the effect that given Trepp's questionable background and the "source" of his donations, the less people identify Trepp as one of his donors the better.

33.     Trepp is also a long term close associate of the Bonanno Family of the New Jersey mob family bearing that name - dating back to at least Trepp's Drexel days when Trepp and Michael Milken, who went to prison in connection with his "junk bond" scams, "invested" money for the Bonannos. Trepp threatened me with the Bonannos and I have fears for my life because of that association. The Bonanno's have close ties to Jack Abramoff, the Republican fund raiser, as does Warren Trepp.

34.     I have participated in numerous meetings with Air Force General Ronald Bath, Trepp's "consultant" and Trepp.  Gibbons and Bath, both Air Force and Nevada Air National Guard pilots are the basis for Trepp's political influence in Nevada and within the Air Force. In November, 2005, in one of my many fights with Trepp over licensing my technology used in the special Government contracts,  Trepp threatened to " bury me" with his political influence over Bath and Gibbons. I believe the  FBI/Air Force raid on my home and property was the result of that influence to steal my technology for Trepp. Gibbons has admitted that he initiated the criminal investigation against me.

### Claims I Intend to Bring Not Yet Filed

35.     The fact that Trepp and Gibbons improperly influenced the FBI to raid my home and that they have continued to conduct "surveillance" on me, including what I believe to be illegal physical and electronic surveillance, including  eavesdropping and wiretapping, leads me to believe  that they have used their secret surveillance program on AT&T customers to intercept my phone records. I have been an AT&T customer. If this litigation is to proceed, I will intervene in the case of *Hepting* v *AT&T* as a Plaintiff against AT&T and the Government. I will also bring claims similar to those brought in the AT&T case in this Court. In that action, I understand that the Government intervened and sought to dismiss the case based on the state secrets privilege.

-19-

36.     I also intend to bring claims under the "Federal Tort Claims Act"; and  I  intend to file claims against various state and federal officers and employees in connection with the matters set forth herein.

37.     At this point, given the unconstitutional raid on my home, which had a severely damaging effect on my wife of 32 years and three children, I do not trust the State of Nevada, I do not trust the US Government or any of it's branches, agencies, divisions or departments. I am certain that Gibbons, Bath, Haraldsen and others have used their political influence to corrupt the system; but I am hopeful that the Judges hearing this matter will follow the law and apply the law to the facts

I declare under penalty of perjury under the laws of the United States and the State of Nevada that the foregoing is true and correct.  Signed this 30th day of October, 2006 in Seattle, Washington..

_____

Dennis Montgomery

-20-

38.   I also intend to bring claims under the "Federal Tort Claims Act"; and I intend to file claims against various state and federal officers and employees in connection with the matters set forth herein.

37.   At this point, given the unconstitutional raid on my home, which had a severely damaging effect on my wife of 32 years and three children, I do not trust the State of Nevada, I do not trust the US Government or any of it's branches, agencies, divisions or departments. I am certain that Gibbons, Bath, Haraldsen and others have used their political influence to corrupt the system; but I am hopeful that the Judges hearing this matter will follow the law and apply the law to the facts.

I declare under penalty of perjury under the laws of the United States and the State of Nevada that the foregoing is true and correct.  Signed this 30th day of October, 2006 in Seattle, Washington.

Dennis Montgomery

-20-



# eTreppid Technologies, LLC

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

January 12, 2004

To whom it may concern,

For about four months eTreppid Technologies, LLC (the "Company") has been providing assistance and information (including that related to the Company's technology, know-how, business and processes) pursuant to an agreement with ▮▮▮▮ (the "Government"). As part of the consideration for providing such assistance and information, the Government agreed that eTreppid Technologies' identity as a contractor and source of the assistance and information as well as the information supplied by the Company would be kept confidential, would only be disclosed to individuals within the government on a need to know basis only, and would not be revealed to the public under the Freedom of Information Act or otherwise. The purpose of this letter agreement is to confirm in writing the understanding between the parties.

It is our current intent to continue to work with the Government with regard to this matter. This will confirm that the U.S. Government agrees not to make any attempt to unilaterally use or otherwise take technology, intellectual property or other property or assets owned by eTreppid Technologies. In addition, the Government agrees that it will negotiate in good faith an agreement that sets forth future services (including technology and intellectual property) to be provided by the Company and the compensation to be paid for such future services as well as services already rendered.

eTreppid Technologies, LLC

By: Warren Trepp, CEO

US Government

By:


*"bringing digital to life"*

# Exhibit 72

1   WILLIAM E. CROCKETT (SBN 129383)
    STEVEN R. SKIRVIN (SBN 179946)
2   **DION-KINDEM & CROCKETT**
    21271 Burbank Boulevard, Suite 100
3   Woodland Hills, CA 91367
    Telephone: (818) 883-4400
4   Facsimile: (818) 676-0246

5   Attorneys for Defendants
    Dennis and Brenda Montgomery
6

7

8               UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
9                  LOS ANGELES DIVISION

10

11  In re:                              )  Case No.: 2:10-bk-18510 BB
                                        )
12  DENNIS LEE MONTGOMERY and           )  Chapter 7
    BRENDA KATHLEEN MONTGOMERY,         )
13                                      )  Adv. No. 2:10-AP-01305 BB
         Debtors.                       )
14  ──────────────────────────────      )  **DENNIS MONTGOMERY'S RESPONSES
                                        )  TO PLAINTIFF'S REQUESTS FOR
15  MICHAEL JOSEPH FLYNN,               )  PRODUCTION OF DOCUMENTS, SET
                                        )  TWO**
16       Plaintiff,                     )
                                        )
17  v.                                  )
                                        )
18  DENNIS LEE MONTGOMERY, et al.,      )
                                        )
19       Defendants.                    )
                                        )
20                                      )
                                        )
21                                      )
                                        )
22                                      )
                                        )
23                                      )
                                        )
24

25  PROPOUNDING PARTY:    Plaintiff Michael Flynn

26  RESPONDING PARTY:     Defendant Dennis Montgomery

27  SET NUMBER:           Two (2)

28

                              1

JT EXHIBIT: 4
DEPONENT: D. MONTGOMERY
PAGES: 6
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

1    Defendant Dennis Montgomery ("Defendant") hereby responds to the Interrogatories,

2   Set Two, propounded by Plaintiff Michael Flynn ("Plaintiff") as follows:

3                                **GENERAL OBJECTIONS**

4    Defendant responds to Plaintiff's Second Set of Requests for Production of Documents

5   ("Request for Production") subject to the accompanying objections, without waiving, but

6   expressly preserving all such objections.

7    Defendant also submits this response subject to, without waiving, but expressly

8   preserving: (a) any objections as to the competency, relevance, materiality, privileges or

9   admissibility of any of the responses or any of the documents identified in any response hereto;

10  (b) the right to object to other discovery procedures involving and relating to the subject matter

11  of the responses stated herein; and (c) the right at any time to revise, correct, supplement or

12  clarify any of the responses herein.

13   Additionally, Defendant has not completed his investigation and has not completed his

14  discovery in this matter and thereby reserves the right to amend, revise, correct, supplement or

15  clarify any of the responses herein pursuant to any facts or information gathered at any time

16  subsequent to the date of this response to the Request for Production. Moreover, Defendant's

17  response to the Request for Production is made to the best of Defendant's present knowledge,

18  information and belief. The response is at all times subject to such additional or different

19  information that discovery or further investigation may disclose and, while based on the present

20  state of current recollection is subject to such refreshing of recollection and such additional

21  knowledge of facts, as may result from further discovery or investigation. Defendant reserves

22  the right to make any use of, or to introduce at any hearing and at trial, documents responsive to

23  the Request for Production discovered subsequent to the date of Defendant's production,

24  including, without limitation, any documents obtained in discovery herein.

25   Defendant further objects to each and every request to the extent they seek, or appear to

26  seek, documents protected from disclosure by the attorney-client and attorney work product

27  privileges. Defendant further objects to each and every request to the extent they seek, or

28

DION-KINDEM & CROCKETT
21271 Burbank Boulevard, Suite 100
Woodland Hills, CA 91567
(818) 885-4400   Fax: (818) 676-0246

2

4-2

DION·KINDEM & CROCKETT
21271 Burbank Boulevard, Suite 100
Woodland Hills, CA 91367
(818) 885-4400   Fax: (818) 676-0246

1   appear to seek, documents in the possession, custody or control of the requesting party, or are

2   publicly available.

3        Defendant further objects to each and every request to the extent they seek or purport to

4   seek the identification and production of documents that are privileged, confidential, prepared

5   in anticipation of litigation and/or trial or are otherwise immune from discovery, or

6   inadmissible as settlement communications.  Discovery is continuing.

7        Defendant objects to each and every request to the extent they seek documents

8   protected by his or third parties' rights of privacy.

9        Defendant objects to each and every request to the extent that it seeks documents that

10  are in the possession, custody or control of the United States Department of Justice.  Defendant

11  has no control over such documents.

12       Each of the foregoing general objections are incorporated into the responses below.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

14       Defendant hereby incorporates his General Objections.  Defendant further objects that

15  the SOURCE CODES are not relevant to any issue in this case and not reasonably calculated to

16  lead to the discovery of admissible evidence.  Defendant further objects on the grounds that it is

17  inappropriate and not permitted by the Federal Rules of Civil Procedure or Federal Rules of

18  Bankruptcy Procedure to conduct discovery in one case for the purpose of using the discovery

19  in a different case.  Defendant further objects on the grounds that this request violates the

20  automatic stay of 11 U.S.C. § 362.  Subject to and without waiving the foregoing objections,

21  Defendant responds as follows: After a diligent search and reasonable inquiry, the SOURCE

22  CODES are not in the possession, custody or control of the Defendant.  Defendant believes the

23  SOURCE CODES may be in the possession, custody or control of the United States

24  Government.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

26       Defendant hereby incorporates his General Objections. This request seeks documents

27  that are not relevant to any issue in this case and not reasonably calculated to lead to the

28  discovery of admissible evidence. This request seeks confidential and proprietary information

4-3

1  from third parties over whom Defendant has no control. Defendant has no authority to obtain

2  documents from Demaratech, LLC. Subject to and without waiving the foregoing objections,

3  Defendant responds as follows: To the best of Defendant's knowledge, no such documents

4  exist.

5  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

6      Defendant hereby incorporates his General Objections. Defendant further objects that

7  this request is overbroad as to time in that it contains no time limitation whatsoever. This

8  request seeks documents that are not relevant to any issue in this case and not reasonably

9  calculated to lead to the discovery of admissible evidence. This request seeks confidential and

10  proprietary information from third parties over whom Defendant has no control. Defendant

11  further objects on the grounds that he has no authority to obtain documents from Demaratech,

12  LLC. Subject to and without waiving the foregoing objections, Defendant responds as follows:

13  From August 18, 2008, the date of the hearing in Exhibit 1 to the Request for Production to the

14  present, to the best of Defendant's knowledge, no such documents exist.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

16      Defendant hereby incorporates his General Objections. Defendant further objects that

17  this request is overbroad as to time in that it contains no time limitation whatsoever. This

18  request seeks documents that are not relevant to any issue in this case and not reasonably

19  calculated to lead to the discovery of admissible evidence. This request seeks confidential and

20  proprietary information from third parties over whom Defendant has no control. Defendant

21  further objects to this request to the extent this request seeks documents that are subject to the

22  United States Protective Order. To the extent there are any documents that may fall within the

23  purview of the United States Protective Order, those documents will not be produced. Subject

24  to and without waiving the foregoing objections, Defendant responds as follows: From August

25  18, 2008, the date of the hearing in Exhibit 1 to the Request for Production to the present, to the

26  best of Defendant's knowledge, no such documents exist.

27

28

DION-KINDEM & CROCKETT
21271 Burbank Boulevard, Suite 100
Woodland Hills, CA 91367
(818) 885-4400   Fax: (818) 676-0246

4

4-4

1    AS TO OBJECTIONS ONLY:

2    DATE:  November 1, 2010                    DION-KINDEM & CROCKETT

3

4                                               By:

5                                                  WILLIAM E. CROCKETT
                                                   STEVEN R. SKIRVIN
6                                                  Attorneys for Dennis and Brenda Montgomery

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DION-KINDEM & CROCKETT
21271 Burbank Boulevard, Suite 100
Woodland Hills, CA 91567
(818) 885-4400  Fax: (818) 676-0246

4-5

# PROOF OF SERVICE
## 1013A (3) CCP Revised 1/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California in the office of a member of the bar of this Court at whose direction the service was made. I am over the age of 18 and not a party to the within action. My business address is 21271 Burbank Boulevard, Suite 100, Woodland Hills, California 91367.

On November 2, 2010, I served the foregoing document described as:

**MONTGOMERY'S RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET TWO**

on the interested parties in this action.

[X]    by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed to:

**Christopher J. Conant
Conant Law LLC
730 17th Street, Suite 200
Denver, CO 80202**

[ ] [BY OVERNIGHT MAIL] I deposited such envelope to be delivered overnight mail via Federal Express at Woodland Hills, California.

[ ] [BY ELECTRONIC MAIL] I caused the foregoing document to be delivered via electronic mail to the addresses identified on the attached service list.

[X] [BY MAIL] I deposited such envelope in the mail at Woodland Hills, California. The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

Executed on November 2, 2010 at Woodland Hills, California.

[X] (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

KRISTEN ANTILLON

4-6

# Exhibit 73

1  DANIEL G. BOGDEN
   United States Attorney
2  PAUL L. PUGLIESE
   Assistant United States Attorney
3  100 W. Liberty Street, Suite 600
   Reno, Nevada 89501
4  Tel:  (775) 784-5438
   Attorneys for Plaintiff

   **FILED**

   SEP 21 2006
   U.S. MAGISTRATE JUDGE
   DISTRICT OF NEVADA
   BY_____
   _____DEPUT

6              UNITED STATES DISTRICT COURT

7                   DISTRICT OF NEVADA

8  IN THE MATTER OF THE SEARCH OF:    )    No. 3:06-CV-0263-BES-VPC
                                      )
9  The Residence Located at 12720     )
   Buckthorne Lane, Reno, Nevada, and )    SECOND DECLARATION OF
10 Storage Units 136, 140, 141, 142, and 143, )  SA MICHAEL A. WEST
   Double R. Storage, 888 Maestro Drive, )
11 Reno, Nevada                        )
                                      )
12 _____     )

13                    DECLARATION

14      I, MICHAEL A. WEST, do hereby say that:

15      1. I am a Special Agent with the Federal Bureau of Investigation. My duties include the

16 investigation of alleged violations of federal statutes that occur in Northern Nevada. As part of my

17 regularly assigned duties, I have been assigned to the instant matter and to investigate allegations of

18 theft of trade secrets and the unlawful retention of information relating to the national defense.

19      2. Revealing the redacted portions of the February 28, 2006, and March 3, 2006, Affidavits

20 filed in support of search warrant applications for 12720 Buckthorne Lane, Reno, and Storage Units

21 136, 140, 141, 142, and 143, Double R. Storage, 888 Maestro Drive, Reno, Nevada, would expose

22 investigative techniques and cooperating witnesses used in this ongoing investigation.

23      3. During my investigation, Warren Trepp, Chief Executive Officer, eTreppid Technologies,

24 LLC, told me that the most recent US Government contract negotiations were with the U.S. Air

25 Force to continue eTreppid's software development efforts in multiple areas, to include the continued

26 development of software ████████████████████████████

27 ████████████████

28 \\\

TT EXHIBIT: 5
DEPONENT: D. MONTGOMERY
PAGES: 3
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

76

1       4. In July 2006, Mr. Trepp advised me that Laura Koehnen, an Account Manager for Scion

2  Technologies, had been requested by Dennis L. Montgomery to set up meetings with individuals

3  who may be interested in purchasing Mr. Montgomery's software technology. Koehnen described to

4  Trepp's Attorney, Douglas Frye, what Mr. Montgomery had described or shown to Koehnen which

5  Mr. Trepp believes to be the same software technology Mr. Montgomery worked on while employed

6  at eTreppid, and the same software technology that eTreppid was negotiating with the U.S. Air

7  Force.

8       5. On or about July 27, 2006, Mr. Trepp advised me that he had preliminary information that

9  Mr. Montgomery had gone to work for a company in Washington state and may have sold or

10  contributed the software removed and deleted from eTreppid to his new employer. Mr. Trepp is

11  working to identify this company and obtain any documents relating to the conditions or terms of Mr.

12  Montgomery's employment at this new company.

13       6. On August 10, 2006, I received a telephone call from Special Agent Gabriel Gunderson of

14  the Seattle FBI Office who advised me that his office received information from Azimyth, a

15  company located in Bellevue, Washington, which had discovered terrorist threat related information.

16  Special Agent Gunderson related that Michael Sandoval, Chief Executive Officer of Azimyth, had

17  contacted a retired Central Intelligence Agency former Chief of Station residing in Washington and

18  offered to provide the U.S. Government terrorist threat related information. Special Agent

19  Gunderson further related that Dennis L. Montgomery was the Azimyth employee who located the

20  information. Special Agent Gunderson advised me in a subsequent conversation that Mr.

21  Montgomery had reported that he located increase noise in recent Al-Jazeera video transmissions.

22       7. In the 41(g) Motion Hearing, I was provided two binders by Mr. Montgomery's counsel

23  containing numerous exhibits. While testifying regarding the contents of Exhibit 13, "Montgomery

24  Copyrights", I observed a fax document from the Library of Congress, U.S. Copyright Office, to

25  Dennis L. Montgomery with the fax header reading "Jun 28 2006 9:48PM AziMyth 4256376950".

26  On 08/17/2006, Dennis L. Montgomery signed a Second Declaration in support of the motion under

27  F.R. Crim. P. 41(g) to unseal search warrant and return his property. In this declaration in paragraph

28  3, Mr. Montgomery states "No person at eTreppid is able, to my knowledge, to create source codes

1   that I have created having multiple applications in the war on terror and other military uses.

2   Conclusive proof on this issue is established by the recent interception within the last several weeks

3   of the attempts by terrorists operating out of London to blow up jetliners originating in London and

4   bound for the US. I gave the appropriate authorities within the US Government accurate and very

5   specific intelligence regarding this terrorist plot, as I have done in the past, prior to the arrests by the

6   London authorities - without compensation." Further, in paragraph 11, Mr. Montgomery states that

7   he had been processing vital national security output involving ███████████████████████

8   in September 2005, while working for Mr. Trepp at eTreppid..

9        8. It appears Mr. Montgomery has solicited others to find purchasers of software in his

10   possession and that Mr. Montgomery has gained employment at Azimyth in Washington state and

11   may be attempting to sell the software developed at eTreppid and subsequently deleted from

12   eTreppid computers.

13        9. Exposing the remaining redacted portions of my Affidavit in support the search warrants

14   would expose investigative techniques and limit the Governments ability to collect additional

15   evidence through additional consensually monitored calls, use of cooperating witness, and the use of

16   surveillance techniques in this ongoing investigation.

17

18   I Declare under Penalty of Perjury that the Foregoing is True and Correct.

19

20   Executed this _14_ September, 2006, in Reno, Nevada

21

22

  Michael A. West

23   Special Agent, Federal Bureau of Investigation

24

25

26

27

28

# Exhibit 74



U.S Department Of Justice

Environment and Natural Resources Division

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

November 8, 2007

Timothy Blixseth
42765 Dunes View Road
Rancho Mirage, CA 92270

This office has convened an audit and investigation into numerous land exchanges that you have participated in the past fifteen years. Specifically, the land exchanges known as Gallitan II and in the Payette River Canyon.

Questions have arisen regarding favoritism with regard to political contributions, actual vs reported land valuations, relationships with U.S. Forest Service, Congressmen and Senators, and transactions in Idaho, Montana, Colorado and Washington. There are also allegations of interest hidden from the public, the NEPA, the U.S Forest Service and the U.S. Bureau of Land Management.

Your full cooperation in this matter is requested and expected.

Cordially,



Darlene
Assistant United States Attorney





TI EXHIBIT: 6
DEPONENT: D. MONTGOMERY
PAGES: 1
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

# Exhibit 75

U.S. Department of Justice

Criminal Division

Office of the United States Attorney                          *Washington, D.C. 20530*

December 12, 2007

Mr. Timothy Blixseth
71-534 Sahara Road
Rancho Mirage, CA 92270

This letter is supplied to a witness scheduled to appear before the federal Grand Jury in order to provide helpful background information about the Grand Jury. The Grand Jury consists of from sixteen to twenty-three persons from the District of Columbia. It is their responsibility to inquire into federal crimes which may have been committed.

As a Grand Jury witness you will be asked to testify and answer questions, and to produce records and documents. Only the members of the Grand Jury, attorneys for the United States and a stenographer are permitted in the Grand Jury room while you testify.

We advise you that the Grand Jury is conducting an investigation of possible violations of federal criminal laws involving, buy not necessarily limited to 18 U.S.C. § 1959, § 1344. Bank fraud, § 201 Bribery of public officials and witnesses. You are advised that the destruction or alteration of any document required to be produced before the grand jury constitutes serious violation of federal law, including but not limited to Obstruction of Justice.

You are advised that you are a target of the Grand Jury's investigation. You may refuse to answer any question if a truthful answer to the question would tend to incriminate you. Anything that you do or say may be used against you in a subsequent legal proceeding. If you have retained counsel, who represents you personally, the Grand Jury will permit you a reasonable opportunity to step outside the Grand Jury room and confer with counsel if you desire.

Cordially,

Ronald Sharpe
Assistant United States Attorney

IT EXHIBIT: 7
DEPONENT: D. MONTGOMERY
PAGES: 1
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

# Exhibit 76

**Plaintiff's Exhibit 12**
**Depo of Istvan A. Burgyan**
**September 22, 2010**
Pamela J. Leja-Romjue, CSR 12368
2 pgs

**From:** Concerned Citizen <concernedcitizen194894@yahoo.com>
**Date:** June 30, 2010 1:33:08 PM PDT
**To:** michael.west@ic.fbi.gov
**Subject: montgomery**

Dear Agent West,

Per my conversation with Tim Blixseth, I am forwarding to you a brief timeline of the events regarding my contact with Dennis Montgomery and Demaratech. It has been their desire from the first contact to try and sell their technology to various institutions within the Israeli government including the Mossad and Army Intelligence. For obvious reasons I have created this email account specifically to communicate with you. Should you have any questions, you can reach me via this email or the phone number Mr. Blixseth gave you...

Please keep in mind that this is a truncated version of the contact history.

May 3, 2010 - I was first contacted by Leo Josh Kennedy. The current CEO and financial backer of Demaratech. He shared with me his desire to present a unique technology to the Israeli security services. He was open in saying they had tried once before but were not sure they had a "fair hearing".

May 4, 2010 - Had a conference call with Mr. Kennedy in order to describe to me in greater detail the technology.

May 14, 2010 - I was contacted by Dennis Montgomery for the purpose of walking me through a presentation showing the potential applications of various technologies.

May 18, 2010 - Dennis Montgomery set up a temporary FTP site to which I was directed in order for him to show me various applications of his technology. I had to cut demonstration short and rescheduled for May 20

May 20, 2010 - Dennis Montgomery walked me through a very long demonstration of the technology applications he wished to have me bring to the attention of the Mossad and Israeli Military Intelligence. They were as follows:

 1) Decrypting of Al Jazeera broadcasts for the purpose of reading transmitted messages between Islamic terrorits.
 2) Identifying various cameras via the unique footprint of the lenses
 3) Identifying anomalies from a still photograph such as a submarine in the ocean
 4) Ability to identify weapons and faces from video footage of a drone aircraft

May 24, 2010 - Had conference call with Mr. Kennedy to discuss next steps in presenting technology to Israeli officials as well as proposed financial terms to me to help move the process along.

May 31, 2010 - Dennis Montgomery forwarded a decoded transmission to me allegedly showing the movement of VX gas and Anthrax through Syria and the Golan Heights into Israel.

IT EXHIBIT: 9
DEPONENT: D. MONTGOMERY
PAGES: 2
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

-1

June 1, 2010 - Had follow up call with Mr. Kennedy to see how call with Dennis went and to see if we could move forward with Israeli government

June 2, 2010 - Had follow up call with Dennis where he reiterated all the applications of his technology and the need to get this in front of the Israelis ASAP.

June 14, 2010 - Was made aware by Israeli government officials of similar approach by Dennis Montgomery several years earlier

June 29, 2010 - Contacted Tim Blixseth after his family name was raised in conversations here in Israel

June 29, 2010 - Received call from an irate Dennis Montgomery claiming government conspiracies and proclaiming his innocence.

Agent West, a few things are clear. Mainly, Demaratech made it very clear to me their desire to sell this proposed technology to the Israeli government. I do NOT have any information if Mr. Kennedy is aware of Mr. Montgomery's swindling although he is aware of all the allegations.

Please let me know if I can be of further assistance.

12-2

# Exhibit 77

Page 1 of 1

## Jory Russell

| | |
|---|---|
| **From:** | LearG2@aol.com |
| **Sent:** | Thursday, February 26, 2009 5:43 PM |
| **To:** | dennis@ncoder.net |
| **Cc:** | Jory Russell; nickolasrhodes@yahoo.com; egarofalo@linerlaw.com |
| **Subject:** | Re: Blxware |

In a message dated 2/26/09 12:19:11 PM, dennis@ncoder.net writes:

> I am resigning my position within BLXware, LLC. effective immediately. I will be leaving DC tonight, for California.
> I encourage you talk to Joe L directly, on how to move BLXWARE forward within the government if you desire to do that.

Dennis - With all going on, much of which you encouraged me to move forward with, why are you doing this at this time? We had a plan of action. You are the key to getting this all done. I don't understand. It is the last thing that I thought I would be having to deal with in the middle of all of this. Edra

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

***************
A Good Credit Score is 700 or Above. See yours in just 2 easy steps! (http://pr.atwola.com/promoclk/100126575x1218822736x1201267884/aol?redir=http:%2F%2Fwww.freecreditreport.com%2Fpm%2Fdefault.aspx%3Fsc%3D668072%26hmpgID%3D62%26bcd%3DfebemailfooterNO62)

JT EXHIBIT: 10
DEPONENT: D. MONTGOMERY
PAGES: 1
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

Plaintiff's Exhibit 15
Depo of Istvan A. Burgyan
September 22, 2010
Pamela J. Leja-Romjue, CSR 12368
I Pg.

# Exhibit 78

# ORIGINAL

1  **SUMM**
2  DAVID ROGER
   Clark County District Attorney
3  Nevada Bar #002781
   CHRIS OWENS
4  Assistant District Attorney
   Nevada Bar #001190
5  200 Lewis Avenue
   Las Vegas, Nevada 89155-2212
6  (702) 671-2500
   Attorney for Plaintiff
7  STATE OF NEVADA

8                    DISTRICT COURT

9              CLARK COUNTY, NEVADA

10                                    )
11  THE STATE OF NEVADA,              )
                                      )
12              Plaintiff,            )    Case No.   C-10-268764-1
                                      )    Dept. No.  XX
13          -vs-                      )
                                      )
14  DENNIS LEE MONTGOMERY,            )
    #2733977                          )
15                                    )
                Defendant.            )
16                                    )

17          **S U M M O N S  (I N D I C T M E N T)**

18          DATE OF HEARING: 11|17|10

19          TIME OF HEARING: 9:00AM in DC20

20  THE STATE OF NEVADA TO: DENNIS LEE MONTGOMERY
                            C/O RICHARD SCHONFELD, ESQ.
21                          520 S 4TH ST
                            LAS VEGAS, NV 89101
22

23          YOU ARE HEREBY SUMMONED to appear before the Eighth Judicial District

24  Court, Arraignment Court, Las Vegas, Clark County, Nevada, at 9:00Am , on the

25  17th day of November, 2010, to answer charge(s) of (2) CTS - OBTAINING

26  MONEY UNDER FALSE PRETENSES, (Felony - NRS 205.380); (2) CTS - THEFT

27  (Felony - NRS 205.0832, 205.0835, 205.132, 205.380) and (2) CTS - DRAWING AND

28  PASSING A CHECK WITHOUT SUFFICIENT FUNDS IN DRAWEE BANK WITH

JT EXHIBIT: 11
DEPONENT: D. Montgomery
PAGES: 6
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

1    INTENT TO DEFRAUD, PRESUMPTIONS OF INTENT TO DEFRAUD (Felony - NRS

2    205.130, 205.132).

3        DATED this 3rd day of November, 2010.

4

5

6                                    DISTRICT JUDGE

7    STATE OF NEVADA      )

                         ) ss:

8    COUNTY OF CLARK     )

9        I hereby certify that pursuant to N.R.C.P. 5(b), I have served the within Summons on

10   the 3RD day of November , 2010, by placing said Summons in the United States

11   Mails, postage prepaid, addressed as noted above.

12

13

14                                District Attorney's Office

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                               2    I:\GRNDJURY\SUMMONS\91189601 - MONTGOMERY.doc

6-2

1   **SUMM**
    DAVID ROGER
2   Clark County District Attorney
    Nevada Bar #002781
3   CHRIS OWENS
    Assistant District Attorney
4   Nevada Bar #001190
    200 Lewis Avenue
5   Las Vegas, Nevada 89155-2212
    (702) 671-2500
6   Attorney for Plaintiff
    STATE OF NEVADA

7

8                     DISTRICT COURT

9                 CLARK COUNTY, NEVADA

10                                 )

11   THE STATE OF NEVADA,        )

12                Plaintiff,    )    Case No.    C-10-268764-1
                                )    Dept. No.    XX

13       -vs-                   )

14   DENNIS LEE MONTGOMERY,    )
    #2733977                    )

15                Defendant.    )

16                                   )

17              **S U M M O N S (I N D I C T M E N T)**

18             DATE OF HEARING: <u>11/17/10</u>

19             TIME OF HEARING: <u>9:00 Am</u> in DC 20

20   THE STATE OF NEVADA TO:  DENNIS LEE MONTGOMERY

21                                   C/O RICHARD SCHONFELD, ESQ.
                                  520 S 4TH ST

22                                   LAS VEGAS, NV 89101

23       YOU ARE HEREBY SUMMONED to appear before the Eighth Judicial District

24 Court, Arraignment Court, Las Vegas, Clark County, Nevada, at <u>9:00 Am</u>, on the

25 <u>17th</u> day of November, 2010, to answer charge(s) of (2) CTS - OBTAINING

26 MONEY UNDER FALSE PRETENSES, (Felony - NRS 205.380); (2) CTS - THEFT

27 (Felony - NRS 205.0832, 205.0835, 205.132, 205.380) and (2) CTS - DRAWING AND

28 PASSING A CHECK WITHOUT SUFFICIENT FUNDS IN DRAWEE BANK WITH

                                                  6-3

1 INTENT TO DEFRAUD, PRESUMPTIONS OF INTENT TO DEFRAUD (Felony - NRS
2 205.130, 205.132).

3      DATED this 3rd day of November, 2010.

4

5                                   _____
6                                     DISTRICT JUDGE

7 STATE OF NEVADA      )
                       ) ss:
8 COUNTY OF CLARK   )

9      I hereby certify that pursuant to N.R.C.P. 5(b), I have served the within Summons on
10 the 3RD day of November , 2010, by placing said Summons in the United States
11 Mails, postage prepaid, addressed as noted above.

12

13                                 _____
14                           District Attorney's Office

15

16

17

18

19

20

21

22

23

24

25

26

27

28

           2    I:\GRNDJURY\SUMMONS\91189601 - MONTGOMERY.doc

6-4

| 1 | **SUMM** |
| 2 | DAVID ROGER<br>Clark County District Attorney |
| 3 | Nevada Bar #002781<br>CHRIS OWENS |
| 4 | Assistant District Attorney<br>Nevada Bar #001190 |
| 5 | 200 Lewis Avenue<br>Las Vegas, Nevada 89155-2212 |
| 6 | (702) 671-2500<br>Attorney for Plaintiff |
| 7 | STATE OF NEVADA |

8              DISTRICT COURT

9          CLARK COUNTY, NEVADA

| 10 | |  |
|----|---|---|
| 11 | THE STATE OF NEVADA, | ) |
| 12 | Plaintiff, | ) Case No.   C-10-268764-1<br>) Dept. No.   XX |
| 13 | -vs- | ) |
| 14 | DENNIS LEE MONTGOMERY,<br>#2733977 | ) |
| 15 | Defendant. | ) |
| 16 | | ) |

17          <u>**S U M M O N S (I N D I C T M E N T)**</u>

18          DATE OF HEARING: 11/17/10

19          TIME OF HEARING: 9:00 Am in DC20

20    THE STATE OF NEVADA TO:  DENNIS LEE MONTGOMERY
21                             C/O RICHARD SCHONFELD, ESQ.
22                             520 S 4TH ST
                              LAS VEGAS, NV 89101

23          YOU ARE HEREBY SUMMONED to appear before the Eighth Judicial District

24    Court, Arraignment Court, Las Vegas, Clark County, Nevada, at 9:00 Am , on the

25    17th day of November, 2010, to answer charge(s) of (2) CTS - OBTAINING

26    MONEY UNDER FALSE PRETENSES, (Felony - NRS 205.380);  (2) CTS - THEFT

27    (Felony - NRS 205.0832, 205.0835, 205.132, 205.380) and (2) CTS - DRAWING AND

28    PASSING A CHECK WITHOUT SUFFICIENT FUNDS IN DRAWEE BANK WITH

1   INTENT TO DEFRAUD, PRESUMPTIONS OF INTENT TO DEFRAUD (Felony - NRS

2   205.130, 205.132).

3         DATED this 3rd day of November, 2010.

4

5

6                                                 DISTRICT JUDGE

7   STATE OF NEVADA      )

                         ) ss:

8   COUNTY OF CLARK    )

9         I hereby certify that pursuant to N.R.C.P. 5(b), I have served the within Summons on

10   the 3RD day of November , 2010, by placing said Summons in the United States

11   Mails, postage prepaid, addressed as noted above.

12

13

14                                     District Attorney's Office

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                         2   I:\GRNDJURY\SUMMONS\91189601 - MONTGOMERY.doc

# Exhibit 79

**Yates Court Reporters**

| | |
|---|---|
| **From:** | Christopher Conant [cconant@conantlawyers.com] |
| **Sent:** | Thursday, November 18, 2010 8:39 AM |
| **To:** | Yates Court Reporters |
| **Subject:** | FW: MONTGOMERY |

?
?
?

**From:** George Birnbaum <gebintl@gmail.com>
**Date:** November 11, 2010 1:13:46 PM PST
**To:** Tim Blixseth <timblixseth@aol.com>
**Subject: Re: MONTGOMERY**

Happy days. The guy is bad news. I know the Israelis helped Feds here. One of the reasons I had to go dark on the issue. All he best

George E. Birnbaum
CEO, GEB International Inc.
Web: ?www.gebinternarional.com
Email: gebintl@gmail.com
Phone: 404-459-0168
Mobile: 404-514-6466
Sent from my iPhone

On Nov 11, 2010, at 15:55, Tim Blixseth <timblixseth@aol.com> wrote:

George, He was indicted yesterday,

?

Best Regards, Tim Blixseth Sent from my iPad

Internal Virus Database is out of date.
Checked by AVG - www.avg.com
Version: 9.0.864 / Virus Database: 271.1.1/3222 - Release Date: 10/26/10 22:34:00

TT EXHIBIT: 12
DEPONENT: D. MONTGOMERY
PAGES: 1
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

# Exhibit 80

## Jory Russell

**From:** LearG2@aol.com
**Sent:** Thursday, February 26, 2009 5:39 PM
**To:** dennis@ncoder.net
**Cc:** nickolasrhodes@yahoo.com; Jory Russell
**Subject:** Re: Installation

In a message dated 2/26/09 12:44:06 PM, dennis@ncoder.net writes:

> Joe L, facility installation is scheduled for tomorrow.  He has waited 2 months for it.  I just told him
> to cancel it, and I am going home.  Brian is having a baby (scheduled C-Section) tomorrow, I was going to stay and
> work on the installation, since it has taken two months to get the right people here, but not now.

Why Dennis?

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************
A Good Credit Score is 700 or Above. See yours in just 2 easy steps!
(http://pr.atwola.com/promoclk/100126575x1218822736x1201267884/aol?redir=http:%2F%2Fwww.freecreditreport.com%2Fpm%2Fdefault.aspx%3Fsc%3D668072%26hmpgID%3D62%26bcd%3DfebemailfooterNO62)

6/20/2009

TI EXHIBIT: 13
DEPONENT: D. MONTGOMERY
PAGES: 1
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

Exhibit 81

**From:** LearG2@aol.com
**Sent:** Wednesday, August 27, 2008 10:27 AM
**To:** dennis@ncoder.net
**Cc:** Nick Rhodes (External Email); Jory Russell
**Subject:** Ratheon and other opportunities

Plaintiff's Exhibit 16
Depo of Istvan A. Burgyan
September 22, 2010
Pamela J. Leja-Romjue, CSR 12368
2 PgS.

Dennis - I wanted to write as I am very excited about what might be doors we can get open now and start monetizing Blxware, even with all the Reno stuff on going. These are separate products.

I met with Nick and Jory yesterday in LA. We are going over numbers and ways to make this start paying for it's self. You, as always, are the key to our success. I know you have all the court things going on and the penalty is mounting each day, so I want you to get that done. But, we really need to get our business in order, to start capitalizing on things coming our way. We can't afford to continue the way we have here.

We need the source code (not about court about our business) so we can have it in the proper, safe place, to be evaluated and then we can monetize our work. This has to be done before we can. I know you know this and have been saying we can get it done, but now we simply have to Dennis.

I also brought up our streaming venue. We have to know that we have that and it works, we have the source code and we can move forward on it, or I want to cut the overhead of this for now.

Through no blame or finger pointing, except to Flynn and Toxic, we have now reached a point of between what the burn rate is for Blxware, the last long two years and legal, we need to know what we really have and find a way to monetize it. This is the only way that we are ever going to recover the investment, the legal cost and make money for all concerned.

I am trying to figure out a way to get things settled with Warren. The note I sent to Prim was the first step. There has to be away that we can cut the pie, even if we are totally right about what they own and what we own. Right now, there is no pie to go after and it is just a cash drain AND is putting you personally through too much for nothing.

I have to leave for Paris on Saturday to get Farchville sale closed. I will be back as soon as that happens, but most likely it will be just after the 15th. Right after my return, I want to have a Blxware meeting, real evaluation of what we have that we can move forward on and what we don't have right now. I'd like to set aside the 16 or 17 for that. By then we need to have the source code in place with the guys that we feel safe about in Seattle. We need to understand and

[] EXHIBIT: 14
DEPONENT: D. MONTGOMERY
PAGES: 2
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

know the streaming side and what we really have separate from what we hope to develop. I have asked Jory to make a full budget of all on going monthly cost so we can do some real work on a proper business evaluation, including all personal cost.

I feel good about where we can take this now, even if it's a different direction then what we had thought, but it's now time to look at it from a real business going forward and not a start up.

Dennis, you did not deserve the Bloomberg article. You have not deserved a Mike Flynn turning on you. The Liner situation is beyond words. But, it is what it is and that is what we have to deal with here. I am behind you 100% as always. In order to figure out how we get our revenge on this guys, which the best revenge is always success, we have to know the true lay of the land. Between now and our meeting on the 16 or 17, we need all the cards on the table so we know the hand we are holding.

Call me if you want. The last few lines of the jerks article were true, I will continue to be persistent in our fight for you and for Blxware. I just need your help to mount it properly. Edra


\*\*\*\*\*\*\*\*\*\*\*\*\*\*

It's only a deal if it's where you want to go. Find your travel deal here. (http://information.travel.aol.com/deals?ncid=aoltrv00050000000047)

16-2

# Exhibit 82

## Jory Russell

| | |
|---|---|
| **From:** | LearG2@aol.com |
| **Sent:** | Thursday, February 26, 2009 5:38 PM |
| **To:** | dennis@ncoder.net; nickolasrhodes@yahoo.com |
| **Cc:** | Jory Russell |
| **Subject:** | Re: Secret Service |

In a message dated 2/26/09 12:46:15 PM, dennis@ncoder.net writes:

> I was to have dinner with the Secret Service tonight, at their request. I have cancelled the dinner, and will assume one of you guys will follow up with them

Why did you cancel your dinner and what do we need to folow up on?

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

***************
A Good Credit Score is 700 or Above. See yours in just 2 easy steps!
(http://pr.atwola.com/promoclk/100126575x1218822736x1201267884/aol?redir=http:%2F%
2Fwww.freecreditreport.com%2Fpm%2Fdefault.aspx%3Fsc%3D668072%26hmpgID%3D62%
26bcd%3DfebemailfooterNO62)

TI EXHIBIT: 15
DEPONENT: D. MONTGOMERY
PAGES: 1
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

Plaintiff's Exhibit 14
Depo of Istvan A. Burgyan
September 22, 2010
Pamela J. Leja-Romjue, CSR 12368
( Pg .

Exhibit 83

Plaintiff's Exhibit 11
Depo of Istvan A. Burgyan
September 22, 2010
Pamela J. Leja-Romjue, CSR 12368

6 pgs

# MAN WHO CONNED THE PENTAGON

## DENNIS MONTGOMERY CLAIMED HE COULD INTERCEPT SATELLITE TRANSMISSIONS BEING SENT TO AL QAEDA AGENTS. FOR A WHILE HE HAD THE U.S. GOVERNMENT BELIEVING HE WAS RIGHT BY ARAM ROSTON

The weeks before Christmas brought no hint of terror. But by the afternoon of December 21, 2003, police stood guard in heavy assault gear on the streets of Manhattan. Fighter jets patrolled the skies. When a gift box was left on Fifth Avenue, it was labeled a suspicious package and 5,000 people in the Metropolitan Museum of Art were herded into the cold.

It was Code Orange. Americans first heard of it at a Sunday press conference in Washington, D.C. Weekend assignment editors sent their crews up Nebraska Avenue to the new Homeland Security offices, where DHS secretary Tom Ridge announced the terror alert. "There's continued discussion," he told reporters, "these are from credible sources—about near-term attacks that could either rival or exceed what we experienced on September 11." *The New York Times* reported that intelligence sources warned "about some unspecified but spectacular attack."

The financial markets trembled. By Tuesday the panic had ratcheted up as the Associated Press reported threats to "power plants, dams and even oil facilities in Alaska." The feds forced the cancellation of dozens of French, British and Mexican commercial "flights of interest" and pushed foreign governments to put armed air marshals on certain flights. Air France flight 68 was canceled, as was Air France flight 70. By Christmas the headline in the *Los Angeles Times* was SIX FLIGHTS CANCELED AS SIGNS OF TERROR PLOT POINT TO L.A. Journalists speculated over the

ILLUSTRATION BY PHIL HALE



IT EXHIBIT: 16
DEPONENT: D. MONTGOMERY
PAGES: 6
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

EXHIBIT 27

11-1



DENNIS MONTGOMERY (CENTER) CLAIMED THERE WERE SECRET BAR CODES IN AL JAZEERA'S BROADCASTS THAT GAVE TERRORISTS DETAILS OF THEIR NEXT MISSION. HE HELPED BUILD A THRIVING BUSINESS IN RENO (LOWER LEFT) AND HAD POWERFUL BACKERS SUCH AS EDRA BLIXSETH (TOP LEFT) AND WARREN TREPP (WITH MONTGOMERY AT AN ETREPPID CHRISTMAS PARTY IN 2003, RIGHT).

basis for these terror alerts. "Credible sources," Ridge said. "Intelligence chatter," said CNN.

But there were no real intercepts, no new informants, no increase in chatter.

## THE CIA TEAM WENT TO RENO TO WORK WITH ETREPPID'S CHIEF TECHNOLOGY OFFICER.

And the suspicious package turned out to contain a stuffed snowman. This was, instead, the beginning of a bizarre scam. Behind that terror alert, and a string of contracts and intrigue that continues to this date, there is one unlikely character.

The man's name is Dennis Montgomery, a self-proclaimed scientist who said he could predict terrorist attacks. Operating with a small software development company, he apparently convinced the Bush White House, the CIA, the Air Force and other agencies that Al Jazeera—the Qatari-owned TV network—was unwittingly transmitting target data to Al Qaeda sleepers.

•

An unusual team arrived in Reno, Nevada in 2003 from the Central Intelligence Agency. They drove up Trademark Drive, well south of the casinos, past new desert warehouses. Then they turned into an almost empty parking lot, where a sign read ETREPPID TECHNOLOGIES. It was an attractively designed building of stone tile and mirrored windows that had once been a sprinklerhead factory.

ETreppid Technologies was a four-year-old firm trying to find its way. Some of its employees had been hired to design video games. One game under construction was *Roadhouse*, based on the 1989 movie in which Patrick Swayze

plays a bouncer in a dive bar. Other programmers worked on streaming video for security cameras.

When the liaison team stepped into eTreppid's office, the CIA man in charge introduced himself as Sid but didn't give his last name. He was tall and in his 50s, with a well-ironed shirt, a paunch and a mildly robotic politeness. "We called him Sid Vicious," one eTreppid technician explained, "because he was anything but."

Sid's team set up on the first floor in an unused office and had special cipher locks installed. Workers carted in a heavy-duty paper shredder that could transform classified documents to dust in seconds. They set up impenetrable safes with combination locks protected by privacy screens so bystanders couldn't steal the code.

The CIA team was there to work with Dennis Montgomery, at the time eTreppid's chief technology officer and part owner. Then 50 years old, with a full head of gray hair, the street-smart Montgomery stood at about five feet eight inches. Other eTreppid workers, hearing the buzz about the spooks in town, peered through their blinds and watched as Montgomery worked at his desk at the north end of the building. He wore his usual jeans and Tommy Bahama shirt.

He could be seen handing off reams of paper to Sid and the CIA. "They would sit in the room and review these numbers or whatever the heck Dennis was printing out," one former eTreppid employee, Sloan Venables, told me. "We called them Sid's guys, and no one knew what the hell they did."

Montgomery called the work he was doing noise filtering. He was churning out reams of data he called output. It consisted of latitudes and longitudes and flight numbers. After it went to Sid, it went to Washington, D.C. Then it found its way to the CIA's seventh

floor, to Director George Tenet. Eventually it ended up in the White House. Montgomery's output was to have an extraordinary effect. Ridge's announcement, the canceled flights and the holiday disruptions were all the results of Montgomery's mysterious doings.

•

He is an unusual man. In court papers filed in Los Angeles, a former lawyer for Montgomery calls the software designer a "habitual liar engaged in fraud." Last June Montgomery was charged in Las Vegas with bouncing nine checks (totaling $1 million) in September 2008 and was arrested on a felony warrant in Rancho Mirage, California. That million is only a portion of what he lost to five casinos in Nevada and California in just one year. That's according to his federal bankruptcy filing, where he reported personal debts of $12 million. The FBI has investigated him, and some of his own co-workers say he staged phony demonstrations of military technology for the U.S. government.

Montgomery has no formal scientific education, but over the past six years he seems to have convinced top people in the national security establishment that he had developed secret tools to save the world from terror and had decoded Al Qaeda transmissions. But the communications Montgomery said he was decrypting apparently didn't exist.

Since 1996 the Al Jazeera news network had been operating in the nation of Qatar, a U.S. ally in the war on terror. Montgomery claimed he had found something sinister disguised in Al Jazeera's broadcast signal that had nothing to do with what was being said on the air: Hidden in the signal were secret bar codes that told terrorists the terms of their next mission, laying out the latitudes and longitudes of targets, sometimes even flight numbers and dates. And (continued on page 164)

11-2

# CON

(continued from page 72)

he was the only man who had the technology to decrypt this code.

As strange as his technology appeared to be, it was nevertheless an attractive concept. Montgomery was as persuasive as some within the intelligence community were receptive. Al Jazeera was an inspired target since its pan-Arabic mission had been viewed with suspicion by those who saw an anti-American bias in the network's coverage. In 2004 Secretary of Defense Donald Rumsfeld accused Al Jazeera of "vicious, inaccurate and inexcusable" reporting. Will Stebbins, Al Jazeera's Washington bureau chief, told *The Washington Post*, "There was clearly an attempt to delegitimize Al Jazeera that came during a period of a lot of national hysteria and paranoia about the Arabic world." ("It is unfortunate," an Al Jazeera spokesperson told PLAYBOY when asked for comment, "that a select few people continue to drag up these completely false conspiracy theories about Al Jazeera, which were generated by the previous U.S. administration.") Over the years Montgomery's intelligence found its way to the CIA, the Department of Homeland Security, Special Forces Command, the Navy, the Air Force, the Senate Intelligence Committee and even to Vice President Dick Cheney's office.

•

Back in 2003, just before the terror alert caused by Montgomery's technology, eTreppid held a Christmas party in a ballroom at the Atlantis Casino in Reno. Employees gathered at round tables to dine and drink. Even a CIA man showed up, a lanky fellow wearing a button-down shirt with an oxford collar. By the end of the night, employees noticed Montgomery and eTreppid chief executive Warren Trepp talking closely. A photo snapped by an employee shows Montgomery with his jacket off and a Christmas ribbon wrapped around his head like a turban with a rose tucked into it. He was hugging Trepp, who sobbed into his shoulder. The festivities were a rare break for Montgomery, who had been busy churning out terrorist target coordinates for the CIA.

On Sunday, January 4, 2004 a British Airways flight out of Heathrow was delayed for hours for security reasons, and FBI agents demanded that hotels in Vegas turn over their guest lists. It was also the day a top CIA official flew to the eTreppid office in Reno. There, on eTreppid letterhead, the CIA official promised the company's name would not be revealed and that the government would not "unilaterally use or otherwise take" Montgomery's Al Jazeera technology.

Back in Washington, few insiders in government knew where the intelligence was coming from. Aside from Tenet and a select few, no one was told about eTreppid's Al Jazeera finds. Even veteran intelligence operatives within the CIA could only wonder. "These guys were trying to hide it like it was some little treasure," one former counterterrorist official told me.

The reason the whole thing worked was because Montgomery's CIA contact was with the agency's Directorate of Science and Technology. That's the whiz-bang branch of the intelligence service, where employees make and break codes, design disguises and figure out the latest gadgets. S&T was eventually ordered by CIA brass to reveal its source to small groups from other parts of the agency. And when some experienced officers heard about it, they couldn't believe it. One former counterterrorism official remembers the briefing: "They found encoded location data for previous and future threat locations on these Al Jazeera tapes," he says. "It got so emotional. We were fucking livid. I was told to shut up. I was saying, 'This is crazy. This is embarrassing.' They claimed they were breaking the code, getting latitude and longitude, and Al Qaeda operatives were decoding it. They were coming up with airports and everything, and we were just saying, 'You know, this is horseshit!'" Another former officer, who has decades of experience, says, "We were told that, like magic, these guys were able to exploit this Al Jazeera stuff and come up with bar codes, and these bar codes translated to numbers and letters that gave them target locations. I thought it was total bullshit."

The federal government was acting on the Al Jazeera claims without even understanding how Montgomery found his coordinates. "I said, 'Give us the algorithms that allowed you to come up with this stuff.' They wouldn't even do that," says the first officer. "And I was screaming, 'You gave these people fucking money?'"

Despite such skepticism, the information found its way to the top of the U.S. government. Frances Townsend, a Homeland Security advisor to President George W. Bush, chaired daily meetings to address the crisis. She now admits that the bar codes sounded far-fetched. And, she says, even though it all proved to be false, they had no choice but to pursue the claim. "It didn't seem beyond the realm of possibility," she says. "We were relying on technical people to tell us whether or not it was feasible. I don't regret having acted on it." The feds, after all, had a responsibility to look into the technology. "There were lots of meetings going on during the time of this threat," says Townsend. "What were we going to do and how would we screen people? If we weren't comfortable we wouldn't let a flight take off." Eventually, though Montgomery continued to crank out his figures, cooler heads prevailed. The threat was ultimately deemed "not credible," as Townsend puts it.

A former CIA official went through the scenario with me and explained why sanity finally won out. First, Montgomery never explained how he was finding and interpreting the bar codes. How could one scientist find the codes when no one else could? More implausibly, the scheme required Al Jazeera's complicity. At the very least, a technician at the network would have to inject the codes into video broadcasts, and every terrorist operative would need some sort of decoding device. What would be the advantage of this method of transmission?

A branch of the French intelligence services helped convince the Americans that the bar codes were fake. The CIA and the French commissioned a technology company to locate or re-create codes in the Al Jazeera transmission. They found definitively that what Montgomery claimed was there was not. Quietly, as far as the CIA was concerned, the case was closed. The agency turned the matter over to the counterintelligence side to see where it had gone wrong.

•

Born in Mena, Arkansas, Dennis Montgomery graduated in 1971 from Grossmont College near San Diego with a two-year associate's degree in medical technology. He worked a few years as a hospital medical technician. And then, it appears, he shifted gears. He says he designed technology to analyze blood gas and became a consultant to some of the biggest companies in America. He maintains he invented and secured copyrights for various technologies related to "pattern recognition," "anomaly detection" and "data compression." Montgomery had attained some success with his media-compression software.

By the late 1990s Montgomery was in Reno, where he had a meeting at the Eldorado Hotel Casino downtown with a financier named Warren Trepp. Trepp had been head trader at Drexel Burnham Lambert in the 1980s, when it was led by junk-bond fraudster Michael Milken. During that time Trepp was a big spender, riding around in his white Rolls-Royce Corniche. He sat at Milken's right hand and eventually earned $25 million a year. In a 1997 SEC decision, an administrative law judge described Trepp's "violations" as "egregious, recurring and intentional." But the case against Trepp was dismissed, and by the time he met Montgomery, he was legally in the clear.

Montgomery convinced Trepp he had invented a remarkable technology. He could compress data, he said, a whole movie to just a fraction of the space it took up on a drive. He impressed his patron with his demonstration, using software to highlight images from the 1939 film *Gunga Din*. It was enough for them to launch their operation. Montgomery contributed his technological breakthrough, and Trepp invested $1.3 million to start. Montgomery soon hired Sloan Venables, a video-game designer, as one of his first employees. Venables had helped design the *Ted Nugent Wild Hunting Adventure* video game. From the beginning, Venables realized things were odd and doubted Montgomery knew much about software programming. One day at a Chinese restaurant at the same Eldorado Hotel Casino, Montgomery told him about the time he'd been abducted by a UFO. "He told me about his encounter with aliens," Venables says. "He went to his uncle's or grandfather's or great uncle's barn in the middle of the night, and a spaceship

164

P L A Y B O Y

descended on him. They wanted him to go with them, and he was abducted. Then he came back with his extra knowledge." Venables started laughing at the story, he says.

Montgomery was prone to temper tantrums, according to Venables. Once he hurled a steak at a waitress. As volatile as he was at times, Venables says, he was at other times warm and confiding. When Venables threatened to quit after Montgomery threw a can of grape soda at him, Montgomery took Venables's dying mother to dinner. Every Friday he would take all his employees skeet and trapshooting at a desert range.

Venables brought in a childhood friend to work at eTreppid. Jim Bauder, who was in his 20s, was soon working on the video games eTreppid was trying to design. Bauder and Venables say Montgomery ran the place, and they saw little of Trepp but were aware of his background. They also say they saw Milken at eTreppid. "I saw him come in once, and he had this entourage of five or six people with him," says Bauder. "They came walking down the hallway, and he looked at me and smiled, introduced himself and then went on down the hall."

ETreppid landed its first big contract from General Electric in 2002 for use of its video compression technology in gaming surveillance. The company eventually got a contract with the Air Force dealing with aspects of video shot by unmanned Predator drones. Montgomery claimed his software could automatically recognize weapons and faces. In 2004 the U.S. Special Operations Command gave eTreppid a $30 million no-bid contract for "compression" and "automatic target recognition." Venables and Bauder acknowledge they can't be certain that no "anomaly detection" or "pattern recognition" software existed, but they doubt it did. In fact, eTreppid workers later told the FBI they thought Montgomery had developed little if any original software.

Montgomery and eTreppid did, over time, receive five patents for various inventions and theoretical methods related to video and data. These included a "method and apparatus for storing digital video content provided from a plurality of cameras" and a "method and apparatus for detecting and reacting to occurrence of an event." But Montgomery said these patents had nothing to do with his government work, and they never seemed to lead to business or profit.

●

FBI reports indicate Montgomery rigged tests to make government officials think his software could detect weapons in video streams. Apparently it was all part of Montgomery's claim to have developed "automatic target recognition" software. Imagine how useful it would be if a computer could pick out AK-47s in enemy hands. That's how eTreppid got at least one contract. One former employee told agents he helped fake as many as 40 demonstrations.

Bauder says he helped once, unwittingly. He told his story to the FBI, and he told it to me. In his demonstrations Montgomery often used a plastic toy bazooka that he said a computer could recognize as a weapon. He would do the demonstration in scrubland behind eTreppid's offices. "Some military guys were walking around the office," says Bauder. Montgomery suddenly came to him, he says, "and takes me back to his office. He closes the door and closes the blinds and was like, 'Need you to do something for me. Don't worry; we are just doing a demo. It's all good.'" Bauder was concerned about the secrecy. "I was like, 'But what's with the doors and blinds?'" Montgomery looked up at Bauder and told him it was okay. They would communicate via an open cell phone line. He told Bauder to listen to the phone. "'When you hear the tone, I want you to hit the space bar on the keyboard.'" Bauder, in other words, would be secretly communicating with Montgomery while the military guys watched the supposed software demo on another computer.

Montgomery ran off to do his demonstration outside. Bauder watched the computer screen, seeing what the camera saw. Montgomery held the toy bazooka in one hand while his other hand was hidden. When Bauder heard the tone, he says, "I hit the space bar. A little square encircled his image through the camera on the screen. He was running around with the fake plastic bazooka." Bauder figured Montgomery had rigged the computer screen so it seemed as if the square was tracking the bazooka. In reality, the square was brought up on the screen when Bauder hit the space bar.

ETreppid needed security clearances to get classified contracts. In 2004 Venables was selected as the firm's facilities security officer. He flew to Baltimore for Department of Defense training. It was an arduous process, with the Defense Security Service probing everyone's background.

Montgomery received an "interim secret" clearance in May 2003, according to records later released in a federal case. In February 2004 he got a top-secret clearance from the Defense Industrial Security Clearance Office. At eTreppid, Montgomery appears to have taken a curious approach to secrecy. Venables and Bauder say Montgomery had his own way of classifying items at the company. "He had rolls of CLASSIFIED stickers," Bauder says, "and he would just put them on random garbage."



11-4

The CIA was an eTreppid customer, as was SOCOM and the Air Force. Soon the Navy started coming by. Montgomery said he had another "filter" to identify underwater submarines by scanning a giant satellite photo of the ocean. Although Montgomery claimed he was using his software, Bauder and Venables say he appeared to be doing it by eye.

The pattern recognition, anomaly detection and compression work were nice, but it was the Al Jazeera stuff—the "noise filtering"—that had cash potential. Even though the CIA had abandoned Montgomery in 2004 after determining the bar codes didn't exist, he and eTreppid continued to try to sell it.

Trepp later told a judge in a federal lawsuit that he'd asked the government for $100 million. Montgomery has also cited that figure in sworn declarations—though he also claimed Trepp wanted $500 million for the "decoding technology." He would tell his lawyers and investors that the money was "appropriated" as part of the "black budget." ETreppid did have powerful friends and lobbyists on Capitol Hill. It had strong connections on the House Permanent Select Committee on Intelligence. The local congressional representative, Republican Jim Gibbons—soon to be governor of Nevada—was on the committee. But by late 2005 things were falling apart between Montgomery and Trepp. There were indications Montgomery was losing big at the blackjack tables. According to an FBI investigation, he borrowed $275,000 from Trepp "to pay down casino and other debts." Trepp told FBI agents he'd made him sign a note that he'd pay it back—Trepp had loaned him more than $1.3 million over the years.

One eTreppid employee told the FBI that she notified Trepp about the faked bazooka tests. Evidently Trepp hadn't known. She informed Trepp she didn't think Montgomery had written "any significant software" for the company. Trepp heard from others that Montgomery didn't have the technical skills he claimed to have.

For his part, Montgomery was grumbling. Trepp had not adequately shared the tens of millions in government funds he had made. "Warren is screwing me out of the money," Montgomery said to Venables. In January 2006 Montgomery left eTreppid. He asked Bauder to help load his big Chevy twin-cab truck on a Saturday. When he left, according to eTreppid, the company's software had been deleted and the source code wiped out. Even the surveillance videotapes were blank. If eTreppid was a store, its inventory was gone. It couldn't do government contracts, video games or compression.

Trepp believed he had backup. After all, Montgomery had assured him he'd give him daily backups of his material. So Trepp went to his outside safe where he kept whatever Montgomery had given him. He gave the material to his security officer, Sloan Venables. Venables says the entire backup for the multimillion-dollar eTreppid operation consisted of three CDs and two hard drives. Venables looked at the disks and drives and turned back to Trepp. "'In seven years, that's all? Three CDs and two hard drives?' I said, 'Don't you think that's weird?'"

Venables ran the supposed backup files through his computer. "There was nothing on them," he says. "There were a couple of zip files, and the hard drives had some source codes for an interface." It wasn't anything that could run as a program.

•

Trepp called the FBI. Not only was the company software gone and its tapes erased, but, he told them, classified tapes were missing. In January 2006 the U.S. government suspended Montgomery's security clearance. (Montgomery, however, later stated he was unaware his clearance had been suspended.)

Montgomery's phone rang on February 16. The voice on the other end was someone he trusted: Paul Haraldsen, an agent of the Air Force Office of Special Investigations. For years Haraldsen had reassured him the government was still interested in the Al Jazeera intercepts. "Hey, Dennis—Paul, how are you?" What Montgomery didn't know was that Haraldsen was working with the FBI on the investigation and was recording the call. Montgomery railed against Trepp and bragged about his bizarre intelligence work. "I did something very good for this country," he said. Montgomery boasted that even if the CIA didn't believe in him, the work he did was

> "Paul," Montgomery said, "why does it have to stop because [Trepp] is a prick?" The government money could flow even if it went to him rather than to eTreppid.

"100 percent accurate—more accurate than people will ever know." (The agency's name is blacked out in the court transcript, but it is clear what he means.) Haraldsen apparently tried to lure him in. Money might be available, he said. "You know, we had money loaded in a pipeline," Haraldsen said to Montgomery. He could go back to his bosses in Washington and let them know whether to spend it or not.

"Paul," Montgomery said, "why does it have to stop because [Trepp] is a prick?" The government money could flow even if it went to him rather than to eTreppid. Haraldsen tried to egg him on with promises he'd tell Washington to buy more of the Al Jazeera information. "Where do I go from here?" Haraldsen asked. "What do I tell the people back in D.C.? Do I tell them to forget about the money and put it away?" "Absolutely not," Montgomery said.

Montgomery and Trepp were soon in a no-holds-barred federal lawsuit. Each sued the other. Trepp obviously believed Montgomery's technology was real because he pursued the lawsuit with a vengeance. Montgomery, on the other hand, accused Trepp of trying to steal his inventions. Montgomery claimed he needed to bring the U.S. intelligence establishment into the case. He went so far as to name the Department of Defense as a defendant.

Eventually Director of National Intelligence John Negroponte weighed in. What secrets—what embarrassments—could be exposed if Montgomery and Trepp were to depose intelligence and military officials? Negroponte issued a declaration that warned of "serious, and in some cases exceptionally grave, damage to the national security of the United States." He invoked the state secrets privilege. The judge in the case issued a protective order; the secrets of eTreppid's government business would remain untold.

•

Trepp had deep pockets and a collection of associates who could bankroll him, but Montgomery had a new patron, someone with tremendous financial resources and connections in Washington, D.C. Her name was Edra Blixseth, wife of billionaire developer Tim Blixseth. The Blixseths had made their reputations as founders of the exclusive Yellowstone Club in Montana, a resort for the fabulously wealthy. Membership cost a quarter of a million dollars, but once there, vacationers like Bill Gates or Dan Quayle could enjoy "private powder" in the company of other elites.

The Blixseths lived in a $200 million estate called Porcupine Creek in Rancho Mirage, California. It had a private golf course and a 30,000-square-foot mansion set among manicured gardens. This is where Montgomery pursued the next stage of his career as a software programmer.

A document in Superior Court in California—now unsealed—reveals how Montgomery explained his inventions and intelligence work for the U.S. government to Blixseth, her lawyers and her partners. He would pull out his laptop, demonstrate his software and brag how he was "decoding Al Jazeera broadcasts and using it for other 'top secret' programs." He found a new lawyer for his case against Trepp. He told him he had been "intercepting Al Qaeda 'target coordinates' for proposed terrorist attacks sent to its field operatives via digital Al Jazeera satellite TV network transmissions." Montgomery also told his lawyer the Department of Defense "paid approximately $30 million in contracts and appropriated another $100 million in their 'black budget.'"

In July 2006 Montgomery and Blixseth pitched their technology to an aide to Vice President Cheney. "I met for several hours with Samantha Ravich, deputy assistant to the vice president in charge of national security," Montgomery asserted in a sworn statement. His word may be suspect, but there is corroborating evidence. Ravich listened to Montgomery and Blixseth, but she was—even in Montgomery's recollection—unimpressed by his claims.

Still, Montgomery hailed his meeting as a victory. He claimed he provided Cheney's office with new output data on terror that would validate his work. He said the data, which had been encrypted in Al Jazeera, were the keys that allowed investigators to crack the liquid-bomb plot in London. On August 9, 2006 British police rounded up two dozen suspects and announced they'd halted a plan to bomb several transcontinental flights at once. Montgomery swore his warning was "used in the disruption of that threat." In 167

11-5

another declaration he said he "provided the output from [his] decoding programs, without compensation, to our government in order to stop terrorist attacks and save American lives."

Montgomery was now making $100,000 a month as a software programmer. He worked for companies with different names, but they all received funding from Edra Blixseth. Montgomery had a home in a serene gated community in Rancho Mirage not far from Blixseth's estate. He drove a $70,000 Porsche Cayenne GTS, and his home was near the gambling tables at the Agua Caliente Casino, where he lost $422,000 in one day.

Blxware, the company through which Blixseth was doing business, had lofty connections. With the aid of Nevada senator Harry Reid's office, Montgomery's technology found its way to the Senate Intelligence Committee staff. This is no routine achievement: The committee staff, operating in a special office of the Dirksen Senate building, constitutes an elite sector in Washington. Normal lobbyists cannot walk in to see staffers because their offices are protected, with special access and guards. When intel staffers talk, the intelligence community listens because they hold the reins—they control oversight.

Montgomery claimed he was reading secret messages about three Americans who had been grabbed in the Sunni triangle. Signals were coming out "related to the recent hostage-taking of our three soldiers," Montgomery told the staffers. He warned them that something was up. The staffers didn't know what to make of it.

In 2007 things were looking up for Montgomery. He finally got some interest, this time from an agency he couldn't name in public. Reading between the lines, one can presume it was the National Security Agency. But then Montgomery had a strange reaction. He had just "purged" the software, he said, and it would take time to redo it. He wanted $4 million from the U.S. government to get started.

The FBI investigation of Montgomery went nowhere. First, his new lawyer challenged the FBI searches, and the judge found in his favor. Then Montgomery went

on the offensive, accusing his accuser. He went public with allegations that Trepp had committed bribery by paying off Nevada congressman Jim Gibbons. *NBC News* did an exclusive interview with Montgomery at Blixseth's house. He was dressed in a suit and tie and said he saw the bribe take place. He claimed Trepp had given Gibbons "casino chips and cash" worth about $100,000. Montgomery backed this up with e-mails he said he'd taken off the eTreppid server. Trepp and Gibbons found themselves under a grand jury's scrutiny. They, not Montgomery, were targeted. But Montgomery's allegations fell apart after a forensic expert for eTreppid alleged in court papers that one crucial e-mail had been doctored. The Department of Justice later dropped the case, and Gibbons was cleared.

•

By 2008 things seemed to have resolved themselves in the epic litigation between Montgomery and his old moneyman Warren Trepp. There was a glitch at first: Montgomery was supposed to produce a key CD with the breakthrough software he claimed he'd invented, the very heart of this case. But he couldn't find the disk, he said, and he claimed he couldn't re-create the lost and precious secret. He lashed out at the FBI in a court document. It was the agents who had ruined everything anyway, he said. The FBI had "damaged and in some cases destroyed" his property.

That backfired, but the parties all seemed to come to a temporary agreement. By the fall, Montgomery settled his long-standing suit with Warren Trepp. Terms weren't released at the time, but Trepp let Montgomery and his new financier, Edra Blixseth, keep the "software." Court records indicate Montgomery and Blixseth would now owe $26.5 million to Trepp.

One can only assume it hit Montgomery hard: Four days after the settlement he spent his day at Caesars Palace on the Las Vegas Strip. He was a blackjack player by preference, according to all accounts, and so he presumably sat at the high roller's blackjack tables on September 27. He was, in the parlance of the gambling hall, a "whale." He

took out his checkbook and tore out check after check, making them out to Caesars Palace Hotel and Casino, and buying cash and chips. The first check was for $10,000, then $100,000 and on and on. That's blackjack for you. In fact, Montgomery bought a cool million dollars' worth from the casino that day. Caesars won't comment on individual players, but prosecutors say Montgomery's checks later bounced. (In October 2009 Montgomery came up with $250,000 in restitution, which kept him from being prosecuted.)

•

But Montgomery and the U.S. government were apparently still working together. The CIA had discredited the embarrassing Al Jazeera technology, but it was all still secret, still classified. Few people even in the government knew about the old scandal. Montgomery and his patron somehow found a new federal buyer willing to hand over taxpayer funds. In this case it was $3 million for "research, development, test and evaluation." It was written in the dense language of federal procurement law and revived all the terms Montgomery had bandied about. The contract was so heavily redacted that even the name of the Air Force office is blacked out. I read through a version of the document, and at the end I found the nondisclosure agreement. "This agreement is entered into between the United States Air Force and Dennis Montgomery." He signed it January 29, 2009.

Montgomery did not cooperate with this story, but I managed to reach the Air Force program manager, Joseph Liberatore. "How do I want to say this?" he said. "We were testing some of the software. We were just looking at it to see if there was anything there. If there is anything there we wanted to make sure there was due diligence and it was looked at by the U.S. government."

I asked the Air Force how this could have happened. The chief of the Air Force press desk, Andrew Bourland, said Blxware represented its software as "innovative and transformational." But the results of the evaluation were "inconclusive" and discussions were over. The first taxpayer transfer was a $2 million payment on February 5, 2009. That same month, Blxware paid Dennis Montgomery $600,000.

In June, four months after collecting all that money, Montgomery and his wife declared personal bankruptcy. One of his assets, he claimed, was the $10 million value of his "copyrights"—all that software. His bankruptcy lawyer tells me the technology Montgomery claimed to have invented is an asset in the bankruptcy proceedings. "It'll be between the government authorities and Dennis," he says.

So in the end, was there ever any software designed by Montgomery? Sloan Venables and Jim Bauder say they doubt it. They shrug and laugh. "I never saw it," says Venables. But if it's all bogus, why is it still classified? And if Montgomery's claims have any truth, why can't anyone else find what he found? Did that $100 million appropriation ever exist? And who will Dennis Montgomery reach out to with his next scheme?



"It's been done."

11-6

# Exhibit 84

| | |
|---|---|
| **From:** | Patricia Yarborough [pyarborough@socal.rr.com] |
| **Sent:** | Thursday, August 23, 2007 11:38 AM |
| **To:** | Jory Russell |
| **Subject:** | Dennis Montgomery |
| **Attachments:** | Dennis Montgomery.pdf |

Hi Jory,
Here's Dennis' Employment Agreement/Letter.
Let me know if you need anything else.
Pat.

*Patricia Yarborough*
*PO Box 1035*
*Manhattan Beach CA 90267-1035*
*(310) 953-7918*
*(310) 971-8087*
*(213) 596-5751 Fax*

JT EXHIBIT: 17
DEPONENT: D. MONTGOMERY
PAGES: 8
DATE: November 18, 2010
STEPHANIE P. BORTHWICK
CSR 12088

**Plaintiff's Exhibit 5**
**Depo of Istvan A. Burgyan**
**September 22, 2010**
Pamela J. Leja-Romjue, CSR 12368
8 PGS

5-1

1

# OPSPRING LLC

600 - 106th Avenue NE, Suite 210
Bellevue, WA 98004-5043

April 5, 2006

Dennis Montgomery
12720 Buckthorn Lane
Reno, NV 89511

Dear Mr. Montgomery:

We are excited to offer you a position at Opspring LLC, a Washington limited liability company (the "Company"). This confirms our offer to you of the position of Chief Scientist. As we discussed, this is a full-time position located in Bellevue, Washington, with employment commencing on April 5, 2006, and continuing with the Company. You will report to the Company's Chief Executive Officer, Michael Sandoval, or such other person as directed by the CEO from time to time.

Compensation and Benefits

Your compensation will be $1,200,000 per year, less deductions and withholdings required or authorized by law, paid in accordance with the Company's regularly established policies. This is an exempt position and you will not receive overtime compensation. You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans in effect from time to time.

Loans to Montgomery

As discussed, the Company has agreed to provide you with a $1,000,000 loan (the "First Loan") on the date that your employment with the Company commences, which will be evidenced by the form of Promissory Note provided to you for your execution (the "Note"). Additionally, the Company has agreed to provide you with additional loans (collectively with the First Loan, the "Loans") in the following amounts at the following times, subject to you continuing to be an employee of the Company at the relevant time:

- $500,000 on the first day you begin working full time in the Company's offices in Bellevue, Washington;
- $500,000 within five (5) business days after you have developed for and delivered to the Company, as its employee, demonstrable new software source code that is reasonably acceptable to you and the Company;

Montgomery's initials

Opspring LLC's initials

1

CONFIDENTIAL

5-2

- $500,000 within five (5) business days after your family moves its permanent residence to the Puget Sound area of Washington state and ceases to maintain a residence in Nevada;
- $500,000 within five (5) business days after Opspring receives its first compensation from an independent third party (i.e., not an affiliate of the Company) for the sale or license of intellectual property developed by you as the Company's employee; and
- $300,000 upon the Company's receipt of at least $1,000,000 of compensation in the aggregate from one or more independent third parties (i.e., not affiliates of the Company).

Each Loan shall be evidenced by the form of Note, bear interest at 7%, and be due and payable upon the earlier of (i) three years from the time of the Loan and (ii) the date that you cease being employed by the Company for any reason, other than the Company terminating your employment without Cause (as defined below). Among other conditions precedent to the Company providing you with each Loan (including your signing and delivering to the Company the IP Agreement (as defined below), the Proprietary Information Agreement (as defined below) and the Common Interest Agreement (as defined below)), you will be required to sign and deliver the form of Note with respect to the applicable Loan prior to the Company making such Loan to you.

<u>Intellectual Property Assignment Agreement</u>

Based on your representations and warranties and our discussions, it is our understanding that you personally and exclusively own and control certain intellectual property and technology rights that will be crucial to the development of our business. Accordingly, as a condition precedent to your employment and the Company entering into this letter agreement with you and providing you with the compensation and benefits hereunder and the Loan, you and the Montgomery Family Trust will be required to sign and deliver the Intellectual Property Assignment Agreement provided to you (the "IP Agreement"), which relates to the assignment of this intellectual property and technology to the Company. You agree and acknowledge that without your entering into the IP Agreement, the Company would not employ you, enter into this letter agreement or the Common Interest Agreement with you, or provide you with the compensation or benefits hereunder or the Loan.

<u>Proprietary Information Agreement</u>

Due to the confidential nature of many aspects of our business, as a condition precedent to your employment and the Company entering into this letter agreement with you and providing you with the compensation and benefits hereunder and the Loan, you are also required to sign and deliver the Proprietary Information, Inventions and Noncompetition Agreement provided to you (the "Proprietary Information Agreement"). You agree and acknowledge that without your entering into the Proprietary Information Agreement, the

2

**Montgomery's initials**                                    **CONFIDENTIAL**

**Opspring LLC's initials**

5-3

Company would not employ you, enter into this letter agreement, the IP Agreement or the Common Interest Agreement with you, or provide you with the compensation or benefits hereunder or the Loan.

Common Interest, Confidentiality and Cooperation Agreement

Because of your pending litigation with eTreppid Technologies, LLC ("eTreppid") and various other parties, as a condition precedent to your employment and the Company entering into this letter agreement with you and providing you with the compensation and benefits hereunder and the Loan, you and the Montgomery Family Trust will be required to sign and deliver the Common Interest, Confidentiality and Cooperation Agreement provided to you (the "Common Interest Agreement"). You agree and acknowledge that without your entering into the Common Interest Agreement, the Company would not employ you, enter into this letter agreement or the IP Agreement with you, or provide you with the compensation or benefits hereunder or the Loan.

Company Policies and Procedures

You agree to comply with all of the terms and conditions contained in the Company's policies and procedures, as they may be implemented or amended by the Company from time to time, and any employee handbook of the Company that may be implemented or amended by the Company from time to time.

At-will Employment Relationship

Notwithstanding anything to the contrary in this letter agreement, this is an at-will employment relationship, and either you or the Company may terminate the relationship for any reason, with or without cause, and with or without advance notice.

Potential Severance

If the Company terminates your employment without Cause prior to the end of three years from the commencement of your employment (the "Severance Period"), the Company shall pay you a severance amount equal to your regular salary over the remainder of the Severance Period at the same payment intervals as you would be paid if the employment relationship had not terminated, less deductions and withholdings required or authorized by law. For example, if the Company terminates your employment without Cause after two years of employment, subject to the terms of this letter agreement, the Company shall pay you your regular salary for one year at the same payment intervals as you would be paid if your employment relationship had not terminated, less deductions and withholdings required or authorized by law.

You shall only be entitled to such severance pay if you and the Montgomery Family Trust first sign and deliver to the Company (and then you and the Montgomery Family Trust do

3

Montgomery's initials                                    **CONFIDENTIAL**

Opspring LLC's initials

5-4

not rescind, as may be permitted by law) a general release of claims in a form acceptable to the Company. Additionally, you shall not be entitled to any severance whatsoever if you terminate your employment for any reason or the Company terminates your employment for Cause.

For purposes of this letter agreement, "Cause" shall mean any of the following: (i) any material breach of any of the Agreements by you or the Montgomery Family Trust which are not remedied by you within 30 days after your receipt of written notice; (ii) any failure or refusal to perform assigned job responsibilities that continues unremedied for a period of ten (10) days after written notice to you by the Company; (iii) your failure to fully develop and deliver to the Company the new intellectual properties and/or technologies to be developed by you as an employee of the Company on the schedule reasonably set by the Company, as determined in the sole judgment of the Company, provided, however, that said schedule shall give you a 30 day grace period in which to develop and deliver said intellectual properties and/or technologies; (iv) your or the Montgomery Family Trust's intentional obstruction of the Company's utilization of the intellectual property transferred to the Company pursuant to the IP Agreement (the "IP"); (v) any judgment, decree, settlement, order or other restriction imposed on you, the Montgomery Family Trust or the Company that materially restricts or negatively affects or impacts your employment with the Company or your ability to fully perform your intellectual property and technology development services as the Chief Scientist of the Company, and that remains unremedied for a period of 60 days after your receipt of written notice; (vi) any judgment, decree, settlement, order or other restriction imposed on you, the Montgomery Family Trust or the Company that materially restricts or negatively affects or impacts the Company's ownership, use or commercialization of the IP, and that remains unremedied for a period of 60 days after you have received written notice; (vii) conviction of a felony or misdemeanor or failure to contest prosecution for a felony or misdemeanor; (viii) the Company's reasonable belief that you engaged in a violation of any statute, rule or regulation, any of which in the sole judgment of the Company is harmful to the business of the Company or to the Company's reputation and which remains unremedied for a period of 30 days after you have received written notice; (ix) the Company's reasonable belief that you engaged in unethical practices, dishonesty or disloyalty and which remains unremedied for a period of 30 days after you have received written notice; or (x) any reason that would constitute cause under the laws the State of Washington and which remains unremedied for a period of 30 days after you have received written notice.

<u>No Third Party Confidential Information or Intellectual Property</u>

Notwithstanding anything to the contrary whatsoever in this letter agreement or otherwise, as we have discussed on a number of occasions, it is absolutely critical that you continue to refrain from providing us with any confidential or proprietary information or intellectual property of eTreppid or any other third party. Accordingly, you and the Montgomery Family Trust represent and warrant to the Company that you (i) are not in possession of any technical or intellectual property information or any technology or

4

Montgomery's initials

Opspring LLC's initials

**CONFIDENTIAL**

5-5

intellectual property (including without limitation any software or source or object code) of eTreppid, and (ii) have not at any time provided the Company or any of its representatives or affiliates with any confidential or proprietary information or intellectual property of eTreppid or any other third party. Any business or technology that we build together must be built strictly based on our collective general knowledge and experiences and absolutely not on any confidential or proprietary information or intellectual property of eTreppid or any other third party.

<u>Dispute Resolution</u>

This letter agreement shall be governed and construed in accordance with the laws of the State of Washington (without regard to its choice of law rules). Except for the right of the Company and you to seek injunctive relief in court, in the event of any dispute arising from or related to your employment, including without limitation local, state, and federal statutory civil rights and discrimination claims, those disputes will be resolved exclusively by final and binding arbitration conducted by a neutral arbitrator appointed by Judicial Dispute Resolution LLC ("JDR") of Seattle, Washington. If JDR is unable or unwilling to so act, then it shall be substituted with the Seattle office of Judicial Arbitration and Mediation Services, Inc. ("JAMS"). The only parties to the arbitration shall be you and the Company. Reasonable discovery will be permitted and the arbitrator may decide any issue as to discovery. The arbitrator shall prepare a written award stating the findings of fact and conclusions of law that form the basis for that award. Each party may be represented by counsel at the arbitration. The location of the arbitration shall be Seattle, Washington. Judgment upon the award may be entered by any court having jurisdiction of the matter. The arbitrator's fees will be paid in equal portions by the Company and you, unless the Company agrees to pay all such fees. The substantially prevailing party is entitled to recover its reasonable attorneys' fees and expenses in conjunction with the arbitration award.

This letter agreement, the Note, the IP Agreement, the Proprietary Information Agreement, the Common Interest Agreement, and any other agreements contemplated by this letter agreement (collectively, the "Agreements") constitute the complete agreement between you and the Company, contain all of the terms of your employment with the Company and supersede any prior agreements, representations or understandings (whether written, oral or implied) between you and the Company. You and the Montgomery Family Trust acknowledge and agree that neither you nor the Montgomery Family Trust are members of the Company, have any right to become a member or acquire a membership interest of the Company or have been promised any equity or membership interest in the Company. This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company. Any such amendment shall be binding on you, the Montgomery Family Trust and the Company.

You and the Montgomery Family Trust consent to a deduction from any amounts the Company owes you and/or the Montgomery Family Trust from time to time (including

5

____ **Montgomery's initials**                                     **CONFIDENTIAL**

____ **Opspring LLC's initials**

5-6

without limitation amounts owed to you as wages or other compensation, fringe benefits, or severance, as well as any other amounts owed to you by the Company), to the extent of the amounts you and/or the Montgomery Family Trust owe to the Company under any of the Agreements or otherwise.

You and the Montgomery Family Trust shall indemnify and hold harmless the Company, and the Company's directors, officers, employees, members, contractors, agents and representatives from any claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses, arising from or related to any material breach by you or the Montgomery Family Trust of any of the Agreements; provided that the Company promptly notifies you in writing of any Claim (however, the failure by the Company to give such notice shall not relieve you of your obligations under this paragraph, except to the extent that the failure results in the failure of actual notice and you are damaged as a result of the failure to give notice).

As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States.

Please acknowledge your receipt and review of this letter agreement and acceptance of these terms by signing one copy below and returning it to me. Notwithstanding any signature or initials of the Company or its representative to this letter agreement, none of this letter agreement, the Agreements or any of the transactions set forth in this letter agreement or the Agreements shall be binding on the Company unless and until all of the relevant Agreements have been signed and delivered by you, the Montgomery Family Trust and the Company and all of the other conditions described in this letter agreement have been satisfied to the sole satisfaction of the Company.

Again, congratulations on your prospective employment. We all look forward to working with you.

Sincerely,

Opspring LLC

By: _____
Michael Sandoval, CEO

I understand and agree to the above terms.

Date: April 5, 2006

_____
Dennis Montgomery

6

Montgomery's initials

Opspring LLC's initials

CONFIDENTIAL

5-7

Accepted and agreed:

Montgomery Family Trust

By: _____
     Dennis Montgomery, Co-Trustee

By: _____
     Brenda Montgomery, Co-Trustee

7

**CONFIDENTIAL**

Montgomery's initials

Opspring LLC's initials

5-8

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY

        Plaintiff,

    v.

JAMES RISEN, ET AL.,

        Defendants.

Civil Action No. 1:15-cv-20782-JEM

## <u>DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION CHALLENGING FLORIDA JURISDICTION AND VENUE</u>

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that the following is true and correct:

1) I am over the age of 18 years old and I make this affidavit on personal knowledge and belief. I am mentally and legally competent to make this affidavit sworn under oath, despite having suffered a brain aneurism and serious related health issues. *See* Exhibits 9, 10, 11, attached to this affidavit.

2) Reporter James Risen of <u>The New York Times</u> and publisher Houghton Mifflin Harcourt Publishing Company published a book <u>Pay Any Price: Greed, Power and Endless War</u> in October 2014 (hereafter "the Book").

3) In Chapter 2 of the Defendants' Book, James Risen and Houghton Mifflin Harcourt Publishing Company lie about me and my work and libel me extensively.

4) Chapter 2 involves me and James Risen focuses almost exclusively on defaming me alone to sell copies of the Book in marketing interviews. Having read the book, I am

its centerpiece, that is, Defendants "punching boy" to sell books. Risen conspicuously ignores the many other events and incidents in the Book and focuses almost exclusively on me when promoting his book for sales in Florida and elsewhere.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all. I lost my house in foreclosure. The Defendants will be able to afford to litigate the claims in Florida.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants' published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair reporting of their sources or public records. The defamation is specifically false and misleading in factually verifiable terms, including in that:

   a. Defendants published defamatory material and statements from confidential government sources in the intelligence and military communities. The false and misleading statements did not result from fair reporting of previously published material. They admit this on page ix of the Book stating, "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of may current

and former government officials and other individuals who were willing to
discuss sensitive matters only on the condition of anonymity." Indeed, this is a
big selling point of Defendants' book. It publishes new information, however
defamatory, that had not been accessible or published before. This is why the
Book is a bestseller in Florida and elsewhere, particularly given that Florida is
at the center of U.S. Government counterterrorism military and intelligence
operations, as I testify to below.

b. The Defendants actually know that their U.S. Government sources are the
ones who will bear the public blame for their own poor decisions if they do
not shift the blame implausibly to me with the Defendants' concerted help.

c. Defendant James Risen intentionally omitted several important facts while
fabricating defamatory statements and stories about me.

d. The Defendants actually knew that Warren Trepp received most of the money,
yet accuse me of fraud to obtain money while excusing politically-connected
Warren Trepp who took and kept the money and controlled the company.

e. The Defendants' falsely and misleadingly state that I fabricated intelligence to
make money. In fact, eTreppid was paid for software work and analysis, not
contingent upon results or conditional upon finding any terrorist threats. Our
work was complete and payment due merely for doing the analysis the CIA
and other Government officials asked us to do.

f. My software and technology did work, does work, and is still being used
successfully by the U.S. Government today.

g. The Defendants actually know that Warren Trepp has never paid back any of

the $30 million that eTreppid received from the U.S. Government nor offered to pay any of it back nor has the U.S. Government asked for any of the money back. Therefore, James Risen actually knows that his defamation of me is false and misleading. If eTreppid received $30 million from the U.S. Government for the use of my software and technology that was a purported fraud or a hoax, eTreppid would have to pay the money back to the U.S. Government. But the U.S. Government knows that my software and technology actually worked and works and is valuable, which is why eTreppid does not have to pay any of the $30 million back.

h. In fact, the Defendants ignore and intentionally omit my ten (10) patent applications, which attest to and show my expertise.

i. The U.S. Government independently tested and verified the results of my software and technology and did not rely upon my word alone. The U.S. Government officials sought me and my technology out.

j. The data detected by my software and technology did predict actual terrorist incidents and/or meetings in advance.

k. I could not have fabricated intelligence from my work, as Defendants defame me, without being certain that no one else would independently verify my work in any number of other ways available to the CIA, NSA, and military.

l. I and the companies I worked with had equal or better opportunities to provide my services to private sector companies, and had no need to work for the U.S. Government to make the same amount of money or less.

m. I was motivated by patriotism, not greed, in turning down equivalent

4

opportunities to provide services to the private sector to answer requests for help in the war on terror by the U.S. Government.

n. The Central Intelligence Agency ("CIA") wanted experts to analyze Al Qaeda videos.

o. It was the CIA who proposed to eTreppid that we would analyze Al Qaeda videos. The defamation of me states that I fraudulently sold the CIA and U.S. Government on a fantasy using fabricated intelligence. In fact, the CIA and the U.S. Government approached us with what they wanted analyzed.

p. The Defendants actually knew that Warren Trepp closed the "sales" of contracts by persuading the U.S. Government, yet falsely accuse me of selling a fantasy of fabricated intelligence to the U.S. Government, while excusing Trepp, as a fraudulent scheme to obtain money.

q. Defendants' falsely state that I persuaded the President George W. Bush to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft. However, I never provided any interpretation of what the hidden data we uncovered meant. We merely provided the uncovered data to the U.S. Government experts for their interpretation. Even when pressed, I refused to offer any national security interpretation of the data.

r. As obvious from the records and documents that the Defendants rely upon, the Defendants' so-called sources Michael Flynn, Tim Blixseth, and Warren Trepp went to extraordinary and expensive legal and extra-legal (self help) efforts to furiously get ownership of my work as being extremely valuable,

while simultaneously stating that my work had no value.

s.  Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke

the fraud exception to bankruptcy laws to invalidate my bankruptcy, and

therefore the Defendants knew that they had motives to fabricate or embellish

their false statements against me.

t.  The public records that the Defendants claim to be relying upon – though

voluminous – overwhelmingly contradict the Defendants defamation of me.

u.  On September 28, 1998, I and Warren Trepp co-founded eTreppid

Technologies ("eTreppid") based on a "Contribution Agreement" of that date

in which we agreed to own the LLC in equal 50% shares. Trepp put up money

and I conveyed his "software compression technology contained on CD No.

1" to eTreppid. The business plan of eTreppid and the application of the

"compression technology" were to compress VHS videotapes used for

surveillance in casinos for archiving and more efficient storage.  Over the

preceding 20 years I developed and copyrighted other types of software

technology, including but not limited to "Object Detection Software" which is

a crucial component of, among other things, colorizing black and white

movies.  In order for the computer to add color, it must be able to recognize

individual objects in the movie which are moving in three dimensions, (that is

moving toward or away from the camera and changing in apparent size),

aspect angle, orientation, etc.  This was not conveyed to eTreppid and which,

per the terms of the "Contribution Agreement", was expressly excluded.

Shortly after the formation of eTreppid, I offered to sell one part of his

6

"Object Detection System" ("ODS") software to Warren Trepp for the sum of

$10 million dollars, which Trepp rejected.

v.  As reflected in a form SF-95 Attachment A prepared by me with my then

attorney Michael Flynn for presentation to the Government, "Beginning on or

about November 2002, on behalf of the US Air Force, Montgomery began

work on military applications of his technology at Eglin Air Force base [in

Florida] to demonstrate the application of his technologies in the war on

terror."

w.  Defendants make the technically absurd and false statement that "The French

company said that there were simply not enough pixels in the broadcasts to

contain hidden bar codes or unseen numbers," only by falsely misrepresenting

that the data was contained only in the "crawl" at the bottom of the screen.

This falsified and misleading misdirection and deception to focus only on the

crawl is deceptive.  It is patently unbelievable, which Defendant Risen should

have known as an expert in national security, that a television signal could not

contain such simple data as latitude and longitude coordinates, consisting of

only six numbers and two letters (East or West longitude, North or South

latitude).

8)  I am a citizen of the State of Florida, with a residence in an apartment community in

Miami, Florida. I have a Florida telephone number in this district. I am reporting my

address and Miami-Dade, Florida phone number under seal.

9)  I am registered to vote in Florida, as shown in Exhibit 1, attached to this affidavit. I

previously had a temporary address while settling on the permanent address that I

have now.  I have updated my voter registration to reflect my current Miami address.

10) I have reviewed the affidavit of defense counsel Laura Handman attached to the Defendants' motion stating that I had not registered to vote in Florida.  The Defendants' affidavit is false.  I am registered to vote in the State of Florida, and am now updating my voter registration with my new address. I was registered to vote in Florida when Ms. Handman signed her affidavit. She misled this Court.

11) I found on the website of the publisher Houghton Mifflin Harcourt, that Houghton Mifflin Harcourt Publishing Company maintains permanent and general offices in Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. Exhibit 2, attached to this affidavit, which I downloaded from the Defendant publisher's website at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the Defendants about themselves.

12) On the website of the Florida Department of State Division of Corporations, I found that Defendant Houghton Mifflin Publishing Company is registered to do business in Florida through the Florida Department of State Division of Corporations. Exhibit 3, attached to this affidavit, which I downloaded from the Florida Department of State's website.

13) As shown in those Florida Government documents, in 2008 Defendant changed its name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing Company." *Id.*  These are statements made by Defendants about themselves.

14) My research of the publisher also uncovered that Defendants rely significantly upon sales in the Southeast of the United States through a company "Amazon" for very substantial sales over the internet.  Amazon's regional distribution centers or

"fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County. *See* Exhibit 4, attached to this affidavit.

15) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

16) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command ("SOCOM") from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA. While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. Exhibit 18, attached to this affidavit.

17) SOCOM is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. SOCOM is headquartered at MacDill Air Force Base in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

18) U.S. Central Command ("CENTCOM") is a theatre-level Unified Combatant Command of the U.S. Department of Defense, established in 1983. CENTCOM Area of Responsibility includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American

presence in many military and intelligence operations. It is headquartered in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

19) The Defendant author James Risen actually knew or should have known that most of my work was with U.S. Government organizations in Florida and the contracting offices for my work are in Florida. A competent Pulitzer Price winning <u>New York Times</u> reporter who wrote the Book over a four-year period from 2011 through 2014 would have reviewed the <u>Wall Street Journal</u> article from November 1, 2006, attached, which includes the explanation:

### Source of Secret Funds

**One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.**

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by <u>The Wall Street Journal</u>. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

10

> For Mr. Trepp, eTreppid's success at winning multimillion-dollar
> federal contracts marks a comeback from his Drexel days. He sat at
> Mr. Milken's right arm on the firm's famous X-shaped trading desk
> in Beverly Hills, sometimes trading as much as $2 billion in
> securities a day. Federal regulators filed a civil securities-fraud
> claim against him in 1995, and a Securities and Exchange
> Commission administrative judge found that his violations had
> been "egregious, recurring and intentional." But she dismissed the
> proceeding against him, noting that the allegations were old and he
> had left the securities business years earlier. (Emphasis added).

20) This article and dozens of others, as well as court documents, caused Risen to know

or he should have known upon reasonable inquiry over four years that Warren Trepp

was furiously trying to take ownership of my software and technology, which directly

calls into question his self-serving false statements that the software and technology

he was trying to acquire rights to was worthless. The same article also reports:

> Mr. Gibbons also got other, unreported gifts of cash and casino
> chips from Mr. Trepp, according to sworn testimony in a civil
> lawsuit brought by a former executive at eTreppid, Dennis
> Montgomery. The suit, filed in February in federal court in Reno,
> involves a dispute between Messrs. Trepp and Montgomery over
> the rights to certain software code . . .

> The suit has raised alarms in Washington because of concern that
> national secrets will be revealed if it goes to trial. For example, one
> of the entities that funded eTreppid is code-named Big Safari and
> is a classified program, documents in the case show. The nation's
> top intelligence official, John D. Negroponte, recently filed a
> statement with the court seeking to seal the case. He wrote that
> after personally reviewing the matter, he has concluded that
> disclosure of some information connected with the case could do
> "exceptionally grave damage" to national security.

21) My greatest opportunities for employment, business, and/or an income are at either

Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton

Beach, Florida, which is at the center of U.S. Government intelligence and

counterterrorism operations. *See* Exhibit 12, attached to this affidavit.

22) As a result, I have settled in Florida not just for professional reasons but also because of my failing health and desire to enjoy Florida at this stage in my life. Florida has no personal income tax as well as a Homestead exception should I buy a home. Florida is a great place to live.

23) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE. This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company. I set up the articles of incorporation, paid for and set up this company. Judy Crowhurst is the woman I chose to run it. Exhibit 17, attached to this affidavit.

24) Exhibit 5, attached to this affidavit, presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

25) As an expert in national security issues, Defendant James Risen knows that the war in Afghanistan was and is run largely from Florida electronically and by drone controllers located in Florida. For instance, following September 11, 2001, General Tommy Franks rarely set foot in Afghanistan and fought the war from U.S. Air Force Bases in Florida, including from SOCOM and CENTCOM. This explains my work with SOCOM and CENTOM in large part and why it continued there.

26) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida. Because U.S. military servicemen can choose their state of residence despite being deployed elsewhere, Florida's lack of an income tax

makes Florida a very attractive State for U.S. servicemen, often poorly paid. As a result, most of the nation's top military leaders, current and former servicemen, chose Florida as their residency.

27) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including Florida's significant military and intelligence and counterterrorism personnel, with many retirees (including retired U.S. Government employees in the military and intelligence fields) with more time to read books than the average American. For instance, former Secretary of Defense Donald Rumsfeld now lives in Florida, as well as former Chairman of the U.S. Senate Intelligence Committee and CIA Director Porter Goss, who lives in Miami.

28) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in Florida**. I have video showing the work. The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases. However, I cannot identify here the exact units stationed at those bases, which is classified information. Exhibit 19, attached to this affidavit.

29) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret. *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

30) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special

Operations Command of the U.S. military at Macdill Air Force Base, Florida.

31) SOCOM of the U.S. military is located at 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida. *See* Exhibit 6, attached to this affidavit.

32) CENTCOM of the U.S. military is located at MacDill Air Force Base near Tampa, Florida. *See* Exhibit 7, attached to this affidavit.

33) Relating to my work conducting surveillance of international communications, major fiber optics cables run from Florida across the ocean, which is partly why my work opportunities for my experience and capabilities are in Florida.

34) I intend to call witnesses who can testify that my defamed software and technology does indeed work and is not a hoax. These witnesses are personnel based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where I did a lot of his work. The organizational units housed at Macdill and Eglin used my software, technology, and work extensively during the time period addressed by Defendants' defamation of me. Those witnesses will testify and thus help me prove that the defamatory statements about me are indeed false and misleading.

35) Relevant officials at Macdill and Eglin (and all facilities that my work has provided services to anywhere) make their own contracting decisions and do not rely upon contracting offices in Washington, D.C., nor even at the CIA in Langley, Virginia, the Pentagon in Arlington, Virginia, or the NSA in Fort Meade, Maryland.

36) Many of the witnesses in this case, with whom I have worked, are largely in Florida, including, but not limited to:

    Goss, Porter, former Director of CIA, now in Miami, Florida

Johns, Ken, Macdill AFB, Florida

Lyons, XXXXX, Macdill AFB, Florida

Macbeth, W. Rhys, Eglin AFB, Florida

Nazelrod, Craig, Eglin AFB, Florida

Pipes, XXXXX, Macdill AFB, Florida

Roche, James, Macdill, Florida

Rumsfeld, Donald, now in Florida

Stillman, Phillip, Attorney for Dennis Montgomery, now in Miami, Florida

Madden, Tom, Boca Raton, Florida

Olivia, Adrian, Eglin AFB, Florida

Bartholomew, Mary L, Eglin AFB, Florida

Fiamengo, Nicholas A, Eglin AFB, Florida

Freeman, Gregory J, Eglin AFB, Florida

Savage, Cynthia, Eglin AFB, Florida

McCool, John C, Eglin AFB, Florida

Temple, James K, Eglin AFB, Florida

Griffin, Susan M., Macdill AFB, Florida

Russell, Deborah, Macdill AFB, Florida

Nettelhorst, Doug M, Macdill AFB, Florida

Stallworth, Hugh T, Macdill AFB, Florida

Bob McCaskey, Macdill AFB, Florida

Crutchfield, Chris, Macdill AFB, Florida

Melnyk, Michael S., Macdill AFB, Florida

> Lopez, Tina M, Macdill AFB, Florida
>
> Cerny, Jeffrey D., Macdill AFB, Florida
>
> Muccio, Anthony B., Eglin AFB, Florida
>
> McKinney, Scott E Lt.Col., Eglin AFB, Florida
>
> Purvis, Brad Civ, Eglin AFB, Florida
>
> 'Kirsch, Jim', Eglin AFB, Florida
>
> Hughes, Stacey L, Eglin AFB, Florida (*See* Exhibit 13, attached to this affidavit).

37) Ultimately, I became aware that James Risen had published these false reports in the Book and that Risen was conducting a nationwide publicity campaign to sell the Book.

38) I heard and watched James Risen repeatedly in national  and radio interviews discussing his book but primarily about me, mostly ignoring and intentionally omitting the rest of his Book in those interviews while attacking and defaming me as a private individual.

39) In radio, television, and newspaper interviews, James Risen mainly focused on slandering me in order to sell the Book in Florida and elsewhere.

40) Risen's appearances on radio and television were not just commentary but attempts to stimulate the sale of books inside Florida and elsewhere.

41) Risen was speaking on the radio and television shows in order to move books off of Florida bookstore shelves and to the checkout counters in Florida and elsewhere.

42) The defamation by Defendants of me is not a criticism of the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as an innocent and unsuspecting victim, while blaming me. Therefore, the U.S. Government has not

suffered harm within Washington, D.C.

43) I had relatively little contact with the U.S. Government in Washington, D.C., Maryland or Virginia. It was the companies that I worked under, eTreppid and later BLXWARE, who contracted with regional offices at various U.S. Government bases or facilities. I interacted almost entirely with technical people pursuant to the contracts.

44) It was Warren Trepp and later Edra Blixseth who used their contacts with the U.S. Government to seek and arrange contracts for our work. I did not persuade the U.S. Government to hire me, Trepp and Blixseth did. My own interaction with offices or officials in Washington, D.C. was very limited because I was not the one running the companies nor primarily interacting with the U.S. Government.

45) Starting as early as 2011, I was contacted by James Risen asking about my secret work under contract for the U.S. Government in support of anti-terrorism efforts.

46) I see that in James Risen's Declaration attached to the Defendants' Motion to Dismiss, Risen states that he has been working on the Book since 2011.

47) I continually provided numerous warnings, in writing, to James Risen that the false statements he mentioned and later published in October 2014 in the Book are false.

48) However, James Risen attempted to blackmail me by demanding that I provide classified documents and information to him or else he would publish the false and misleading statements that he later did publish in the Book. That is, when I warned him that the reports were false and misleading, James Risen responded to me by telling me that he would not publish those false statements if instead I provided him with classified information and documents. That is, James Risen demanded that I

commit multiple crimes as the price for Risen not publishing the false and misleading reports about me. Of course, I refused to be blackmailed into breaking the law as the price for not being defamed.

49) Writers Aram Roston and James Risen were both after John Brennan's information. They both knew that I had worked for John Brennan. Both wanted his emails.

50) Roston and Risen published false and defamatory information about me to try to pressure me into releasing classified information about John Brennan and others in the war on terror to them as the price for them telling the truth.

51) However, Roston and Risen knew that my work was real and legitimate, because they sought to obtain secret and classified information from Brennan from me.

52) Roston and Risen published defamation about me to punish and pressure me for not illegally disclosing classified information and material to them.

53) In both cases, I told Risen and Roston I would have to turn over classified information, a road I wasn't willing to go down. I was never what they were after. They were writing these stories to hurt me so that I would provide classified information about the various administrations. I was just their pawn.

54) Attached to this affidavit as Exhibit 8 are a few of my communications to James Risen informing him in advance of the publication of the Book that his statements were not only false but preposterous and that his sources were clearly unreliable.

55) In fact, on November 1, 2012, discussing the Book that he was then writing, I warned James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money. *See* Exhibit 8, attached to this affidavit.

56) Risen also promised in that same email thread: "If you give us the Brennan emails, we will write a story." *See* Exhibit 8, attached to this affidavit.

57) However, this response was in the context of a long back-and-forth discussion concerning the falsehood of Risen's false and misleading statements against me.

58) Risen also promised in the attached email thread: "As I said on the phone, I protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth. Jim"

59) So Risen admitted that it was his professional responsibility to determine that the sources he used to defame me are telling the truth. But Risen did not do that. The sources he relied upon were obviously not telling the truth, as is patently obvious.

60) I warned James Risen concerning the falsehood of his reporting in that November 1, 2012, email thread, attached:

> There is a reason the CIA and NSA were there, you must know that.
>
> Do you really think the government invoked the State Secrets Privilege from being embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.
>
> They government never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.
>
> I don't see you ever publishing that information? *See* Exhibit 8[1],

attached to this affidavit.

---

[1] While my counsel turned over these initial disclosures to Defendants' counsel, Defendants did not turn over initial disclosure documents to my counsel in violation of the Court's Order of April 1, 2015. I have asked my counsel to file a motion for order to show cause.

61) Furthermore, this November 1, 2012, exchange concerning Risen's plans writing the Book which was eventually published on October 14, 2014, was seven (7) months before the revelations by Edward Snowden that mass surveillance of Americans was occurring. Therefore, Risen actually knew in 2013 that I was telling the truth and was being lied about by his so-called sources. My discussions with James Risen on November 1, 2012, were proven true in mid-2013. Therefore, Risen had actual knowledge that I was indeed a whistleblower and that the sources he relied upon were falsely discrediting me to cover up wrong-doing. In this, of course, Pulitzer Prize winning <u>New York Times</u> reporter James Risen intentionally and falsely omitted the real story.

62) I made it clear to James Risen, in the phone call referenced in the email, that the Obama administration used mass surveillance technology to alter the 2012 election *in* **Florida**, and that they will use the technology again in 2016.

63) In June of 2012, in a telephone call, I told James Risen and Eric Lichtblau that their information about me in their 2011 <u>New York Times</u> story was incorrect, and they needed to correct it. I also made it clear that I was under a federal court Protective Order in Nevada, and a State Secrets Privilege order by the Director of National Intelligence not allowing me to discuss my work. In addition, there were sealed documents still in the Nevada case. I also made it clear, that the State secrets privilege was also issued, to protect the work I did on domestic surveillance. I told them I knew they met with my ex attorney Mike Flynn, for several days, in regards to their story, and suggested, he had other motives for his conduct.

64) I also made it clear in June of 2012 that I had a brain aneurysm that was going to be

repaired soon, and a risky procedure, and wanted my name cleared in case I died.

65) Therefore, the Defendants believed they could get away with their defamation because I would probably die in the meantime.

66) In 2013, going over Risen's and Lichtblau's heads, I sent emails directly to the editors of The New York Times telling them their story was wrong and to retract it.

67) I sent an email to the Editors of The New York Times, demanding that they correct the false reporting about me in 2012.

68) I believe that The New York Times conveyed my emails requesting a retraction of the false statements to James Risen.

69) In 2012-2014, on at least 10 different occasions I made it clear to Aram Roston of Playboy that his story was wrong and told him to retract it.

70) Carlotta Wells, a U.S. Department of Justice attorney assigned to matters involving me, told me that if I talk to the press or leaked information, I will be charged with treason for disclosing my work with the NSA and CIA. She told me when I signed my Top Secret clearance, I forfeited my right to protect my first amendment rights.

71) Carlotta Wells additionally said that "If the US Government wants to leak false information to the press to hide successful work, and to confuse terrorist groups, they will do it irrespective of my rights. Deal with it!"

72) Carlotta Wells also stated to me and Jack Kemp, about my legal matters with the CIA that "I [Carlotta Wells] am just a foot solder doing what I am told of to do from the White House. I don't agree with their strategy, but that is the way it is." Jack Kemp replied, "You are a senior litigation attorney for the DOJ, hard for me to believe that you were listening to them." Carlotta Wells in turn replied "Take it up with you

friend George Bush."

73) I am personally aware that, through my counsel, two separate letters were sent to executives at Houghton Mifflin requesting a retraction of the false and misleading publication.

74) The first letter was sent on January 14, 2015 to Linda K. Zecher, President and Chief Executive Officer and Director of Houghton Mifflin Harcourt, William Bayers, Executive Vice President and General Counsel, and Houghton Mifflin Harcourt located in Boston. *See* Exhibit 14, attached to this affidavit.

75) The second letter was sent on February 13, 2015, pursuant to Florida Statute § 770.02 again requesting a retraction of the false and misleading published statements. *See* Exhibit 15, attached to this affidavit.

76) On January 20, 2015, I, through my counsel, received a letter from David Eber, cc'ing James Risen and William Bayers, declining to redact the false and misleading statements and also declining to meet my counsel to resolve matters amicably. *See* Exhibit 16, attached to this affidavit.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my personal knowledge and belief:

April 27, 2015

//Dennis Montgomery//

Mr. Dennis Montgomery

# Exhibit 1

State of Florida Voter Lookup | Voter Detail                    Page 1 of 1

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 490 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/24/2015 Page 25 of 150



Voter Registration as of: 4/7/2015    Republican: 4,183,006    Democrat: 4,613,370    Other: 3,212,454    Total: 12,008,830

# Check Your Voter Status

# Verifique su estado como votante

**Below is your voter information as it appears on your voter record.**

**A continuación encontrará sus datos de votante según nuestros registros.**

Full Name
Nombre completo : **DENNIS LEE MONTGOMERY**

Street Address
Dirección : ▮▮▮▮▮▮▮▮▮

City
Ciudad : **MIAMI**

Zip Code
Código postal : ▮▮▮▮

County Name
Condado : **MIAMI-DADE**

Voter Gender
Género del votante : **Male**

Date Of Registration
Fecha de inscripción : **02/23/2015**

Party
Partido : **Republican Party Of Florida**

Voter Status
Calificación como votante : **Active\***

**The following 2 links will take you to your County's Supervisor of Elections Website where you can get additional information on:**

**Los siguientes dos vínculos lo conectarán con el Sitio de su Supervisor de Elecciones del Condado para obtener información sobre:**

Your Absentee Ballot Status. /
Estado como votante en ausencia.

Your Precinct Location. /
Localización de su Distrito.

*An active voter refers to a registered voter who is eligible to vote.
*El votante activo es un votante inscrito en el padrón, que cumple con los requisitos necesarios para votar.

New Search / Nueva búsqueda

If you are experiencing a problem with this web site please email BVRS Help for assistance.
Si tiene problemas con esta página web por favor contáctese por correo electrónico BVRS Help con la División de Elecciones.
Florida Department of State  Division of Elections  Accessibility  Privacy Policy  Contact Us

# Exhibit 2



# Corporate Headquarters

**Boston**
222 Berkeley Street
Boston, MA 02116
(617) 351-5000

# United States Offices

**Austin**
10801 North Mopac Expressway
Austin, TX 78759
(512) 721-7000

**Denver**
5680 Greenwood Plaza Blvd
Suite 550
Greenwood Village, CO 80111
(303) 504-9312

**Evanston**
909 Davis St # 300
Evanston, IL 60201
(847) 869-2300

**Geneva**
1900 South Batavia Avenue
Geneva, IL 60134-3399
(630) 232-2550

**Indianapolis**
2700 North Richart Avenue
Indianapolis, IN 46219

**Itasca**
761 District Drive
Itasca, IL 60143

**New York City**
215 Park Ave S # 12
New York, NY 10003-1621
(212) 420-5800

345 Seventh Avenue
New York, NY 10001

**Orlando**
9400 Southpark Center Loop
Orlando, FL 32819
(407) 345-2000

**Portsmouth**
361 Hanover Street
Portsmouth, NH 03801

**Puerto Rico**
B7 Calle Tabonuco, Suite 1410
Guaynabo, PR 00968-3003
(787) 520-9599/9585

**Rolling Meadows**
3800 Golf Road
Rolling Meadows, IL 60008
(630) 467-7000

**Troy**
465 South Lincoln Drive
Troy, MO 63379
636-528-8110

**Wilmington**
181 Ballardvale Street
Wilmington, MA 01887
(978) 661-1300

# International Offices

**Canada**
4200 Boulevard St. Laurent
Suite 1203
Montreal, Qc H2W 2R2
Tel: (514) 598-0444

**China**
59 A Zhongguancun Street
Haidian District
Room 1004
HMH
Beijing, 100872
Tel: 86 10 62602236

**Dubai**
Standard Chartered Tower, Level 5
PO 35482, Emaar Square,
Downtown Burj Khalifa
Dubai
United Arab Emirates

**Ireland**
152 – 160 Pearse Street
Dublin 2
Ireland
Tel: +353 1 240 5900

**Singapore**
67 Ubi Road 1
#05-08 Bizhub
Singapore 408730
Tel: +65 6635 6825

**South Korea**
#501 KGIT SangAm Center
1601, SangAm-dong
Mapo-gu, Seoul
123-913, S. Korea
Tel: +82 (0)2 6393
5790/5792

# Exhibit 3

Division of Corporations

**8 0 3 6 9 5**

Page 1 of 1

## Florida Department of State
### Division of Corporations
### Public Access System

Electronic Filing Cover Sheet

---

**Note! Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.**

(((H08000044388 3)))



H080000443883ABC2

**Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.**

---

To:
    Division of Corporations
    Fax Number    : (850)617-6380

From:
    Account Name   : C T CORPORATION SYSTEM
    Account Number : FCA000000023
    Phone          : (850)222-1092
    Fax Number     : (850)878-5926

## COR AMND/RESTATE/CORRECT OR O/D RESIGN

### HOUGHTON MIFFLIN COMPANY

| Certificate of Status | 0 |
|---|---|
| Certified Copy | 0 |
| Page Count | 03 |
| Estimated Charge | $35.00 |

Electronic Filing Menu    Corporate Filing Menu    Help

G. Scalletta   FEB 2 1 2008

https://efile.sunbiz.org/scripts/efilcovr.exe

2/20/2008

# PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO
## APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

(Pursuant to s. 607.1504, F.S.)

### SECTION I
(1-3 MUST BE COMPLETED)

8621.95

(Document number of corporation (if known))

1. HOUGHTON MIFFLIN COMPANY

(Name of corporation as it appears on the records of the Department of State)

2. Massachusetts

(Incorporated under laws of)

3. 03/27/1930

(Date authorized to do business in Florida)

### SECTION II
(4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of

its jurisdiction of incorporation? 12/12/2007

5. Houghton Mifflin Harcourt Publishing Company

(Name of corporation after the amendment, adding suffix "corporation," "company," or "incorporated," or appropriate abbreviation, if not contained in new name of the corporation)

(If new name is unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

6. If the amendment changes the period of duration, indicate new period of duration.

(New duration)

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

(New jurisdiction)

8. Attached is a certificate or document of similar import, evidencing the amendment, authenticated not more than 90 days prior to delivery of the application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the laws of which it is incorporated.

(Signature of a director, president or other officer - if in the hands of a receiver or other court appointed fiduciary, by that fiduciary)

Kathleen Rideaut

(Typed or printed name of person signing)

Asst Secretary

(Title of person signing)



*The Commonwealth of Massachusetts*

*Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

William Francis Galvin
Secretary of the
Commonwealth

**February 14, 2008**

TO WHOM IT MAY CONCERN:

I hereby certify that

## HOUGHTON MIFFLIN COMPANY

appears by the records of this office to have been incorporated under the General Laws of this Commonwealth on May 18, 1908.

I also certify that by Articles of Amendment filed here **December 12, 2007**, the name of said corporation was changed to

## HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY

I also certify that so far as appears of record here, said corporation still has legal existence.



Processed By crm

In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

# Exhibit 4

Case 1:23mc00673-CKK-MAU  Document 1-7  Filed 07/28/23  Page 499 of 1046



# Amazon confirms fulfillment centers in Ruskin, Lakeland

  **Susan Thurston, Times Staff Writer**

**Tuesday, October 22, 2013 4:56pm**

TAMPA — Online retailer Amazon confirmed Tuesday that it will open a 1-million-square-foot distribution center in Hillsborough County and announced plans for a second, similar warehouse about an hour away in Polk County.

The announcement came nearly two weeks after Hillsborough officials said the retailer had completed a real estate deal for a center in Ruskin, and it ended speculation about whether Amazon wanted two facilities so close to each other.

Amazon said the centers will process different kinds of orders from customers.

The Ruskin center will pick, pack and ship small items, including books, electronics and consumer goods. A center to be located on Lakeland will ship large goods such as kayaks and televisions.

Seattle-based Amazon said it would create more than 1,000 full-time jobs at the centers with health care, stock awards and other benefits. It didn't say when the distribution centers would open or when they would start hiring.

Site work has already begun on the Hillsborough location at Interstate 75 and State Road 674, and at the Lakeland location at 1760 County Line Road.

"We appreciate the state, city and county officials who have worked with us to bring these fulfillment centers to Florida," said a statement from Mike Roth, Amazon's vice president of North America operations. "We're excited to join the community, bringing great jobs and investment to the area."

Gov. Rick Scott announced in June that Amazon would invest $300 million in new warehouses and hire 3,000 people as part of a deal that would eventually require Amazon to charge Florida customers sales tax on purchases. Currently, those taxes are not collected on purchases because Amazon doesn't have a physical presence in the state.

But the issue of online sales taxes is being debated in other states and could be resolved nationally by Congress or courts.

In a statement Tuesday, Scott applauded Amazon for choosing Florida for its new warehouses, known as fulfillment centers.

"I would like to thank Amazon for recognizing that Florida's business-friendly environment we've helped create is the perfect place for their latest expansion," he said.

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 500 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/24/2015 Page 35 of
150

Amazon spokeswoman Kelly Cheeseman said the centers combined would employ more than 1,000 full-time workers but didn't have an exact figure. Amazon prefers to hire full-time workers but may employ part-timers who request it, she said.

Thousands more could work at the centers as seasonal employees to handle the holiday shopping rush.

Both Hillsborough and Polk counties lured Amazon with financial incentives. Hillsborough approved $6.4 million in property tax breaks over seven years and $1.1 million in payments to Amazon for bringing 375 above-average paying jobs. Polk okayed a $4.5 million package that would require Amazon to create at least 100 high-paying jobs and make a minimum investment of $10 million.

Founded by Jeff Bezos, Amazon is expected to post $75 billion in revenue this year — but not a lot of profit.

Despite its stock reaching a record high, Amazon lost money last year. Analysts expect another loss when the company releases third-quarter results Thursday.

By contrast, McDonald's restaurants this week reported a $1.52 billion profit for the quarter.

*Information from the New York Times supplemented this report.*

**Amazon confirms fulfillment centers in Ruskin, Lakeland 10/22/13**
**Photo reprints | Article reprints**

© 2015 Tampa Bay Times

80      Tweet   6            86

Commenting Guidelines   Abuse Policy

Ads by Adblade

# Articles and offers from around the Web

Exhibit 5



🖶 Print

## legalzoom

### RECEIPT

**Order Confirmation Number:** 27340424
**Date of Purchase:** 09-01-2011
**Grand Total:** $612.00

| Order Summary | Amount |
|---|---|
| **Express Gold LLC – Alex James LLC** | $359.00 |
|     Filed Articles of Organization | Included |
|     Operating Agreement | Included |
|     Corporate Kit | Included |
|     Priority Rush Service | Included |
|   FL State-required filing fee | $155.00 |
|   Tax ID Obtainment | $49.00 |
|   Two-Day Delivery (Two Business Days) | $0.00 |
| **30-Day Trial of Business Advantage Pro** | $0.00 |
|     BAP Member Center Access | Included |
|     Access to Forms Library | Included |
| **State Tax ID** | $49.00 |
|   Standard Shipping | $0.00 |
| **Registered Agent Fee (One Month Free)** | $0.00 |
| **Total Charges:** | $612.00 |

| Contact Info | Shipping Info |
|---|---|
| Dennis Montgomery | Dennis Montgomery |
| 760.799.5908 | 760.799.5908 |
| dennis@ncoder.net | dennis@ncoder.net |
| 75180 Mediterranean | 75180 Mediterranean |
| Palm Desert, CA 92211 | Palm Desert, CA 92211 |

### Payments & Credits

| Date | Transaction | Payment Method | Payment Status | Amount |
|---|---|---|---|---|
| 9/1/11 | Initial Payment | Charge To Visa Card xxxx0790 | Approved | $612.00 |
| | | | **Total Payment/Credits:** | $612.00 |
| | | | **Customer Balance Due:** | $0.00 |

# Exhibit 6

Search

ABOUT          FORCE & FAMILY          NEWS & PUBS          CARE COALITION          ACQUISITION







### Healing Afghanistan: A Soldier's Story

JUNCTION, Texas – More than 10,000 miles away from home, four Afghan National Army wounded soldiers sit with their sergeant major and some American men and women in the heart land of America for a weeklong seminar, March 31- April 3, 2015, to learn skills that will better enable them to take care of their Afghan brothers wounded in combat.











CULTURAL SUPPORT PROGRAM          THE PARA-COMMANDOS          PRESERVATION OF THE FORCE & FAMILY







Headquarters, United States Special Operations Command
7701 Tampa Point Boulevard
MacDill Air Force Base, Florida 33621

SERVICE LINKS
Army | Navy | Air Force | Marines

USSOCOM LINKS
Contact | Employment | FOIA | Accessibility/Section 508 | Privacy Policy

COMMON ACCESS CARD (CAC) REQUIRED LINKS
SOF Portal | USSOCOM Web Mail | Concord Residences | USSOCOM Lessons Learned | SO-P Equipment Help Desk | SOCOM Training Portal

# Exhibit 7

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 506 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/29/2015 Page 41 of
150

# UNITED STATES CENTRAL COMMAND

EN | EGYPT | IRAN | IRAQ | JORDAN | KAZAKHSTAN | KUWAIT | KYRGYZSTAN
SYRIA | TAJIKISTAN | TURKMENISTAN | U.A.E. | UZBEKISTAN | SAUDI ARABIA

Home | Contact Us

## Contact Us

**U.S. Central Command**

*Address:*

7115 South Boundary Boulevard

MacDill AFB, FL

33621-5101

USA

*MacDill AFB Base Operator*

(813) 828-1110

*MacDill AFB Base Locator:*

(813) 828-2444

**Central Command Communications Integration Public Affairs (CCCI PA)**

*For Public Affairs*

(813) 529-0214

DSN: (312) 529-0214

*For Media Queries*

(813) 529-0220

(813) 529-0213

After hours: (813) 966-8937

*For Community Relations Questions*

(813) 529-0235

(813) 529-0218

**CENTCOM Reserve Affairs**

Army: (813) 529-1074

Air Force: (813) 529-1004

Marine Corps: (813) 529-1088

Navy: (813) 529-1098

**CENTCOM Inspector General**

(813) 529-0275

**MacDill AFB Public Affairs**

(813) 828-2215

**ISAF Public Affairs**

*ISAF HQ Public Affairs Office in Kabul*

pressoffice@hq.isaf.nato.int

+93 (0) 700 13 - 2114 / 2928 / 2482

*ISAF Joint Command Public Affairs Office*

ijc.media@afghan.swa.army.mil

jcmediaopsnu@apod-kaia.isaf.nato.int

+93 (0) 799 51 3999 (Wait For Voice Prompt) 688-4441/4447

+93 (0) 701 13 2000 (Wait For Voice Prompt) 318-449-9244/9153/9154

*NATO Public Information Office*

Media Operations Center

NATO Headquarters

Blvd Leopold III

1110 Brussels, Belgium

moc.web@hq.nato.int

---

**U.S. Department of Defense**

*Public Affairs*

703-697-5131

# Exhibit 8

| | |
|---|---|
| From: | james risen |
| To: | Sectec Astronomy |
| Subject: | Re: Agency |
| Date: | Thursday, November 01, 2012 1:44:59 PM |

If you give us the Brennan emails, we will write a story

On Thu, Nov 1, 2012 at 4:34 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Hard to imagine that you guys would ever report on anything negative regarding Obama?

DM made it clear who was at the building, and why they were all there. There is a reason the CIA and NSA were there, you must know that.

Do you really think the government invoked the State Secrets Priviledge from beiing embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.

They governemnt never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.

I don't see you ever publishing that information?

---

Date: Thu, 1 Nov 2012 16:07:07 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Hi. As you recall, we had a very long phone conversation recently where we discussed how it would be good to report on many of the things that we didn't report on previously. I would like to include all of the points that you have raised in my book, and also to write about many of these issues in the newspaper. For the newspaper, I am particularly interested in the issue of Brennan, and his emails and related documents, which you said when we last talked that you might be willing to share with me. So I am open to discussing everything with you.
Jim

On Thu, Nov 1, 2012 at 3:58 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

You didn't answer my question:

*You reported on FBI documents, as if they were accurate, when that the Judge tossed out all of the claims in their report. The FBI refused to produce any of the people in their report for examination by the court. That include Daniel Bogden, who was reinstated by Obama as the US Attorney for Nevada.*

*Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials? Judge Cooke reported that DM had his 4th admendment constituional rights violated?*

How can I ever trust that you will report accurate information when your prior story was based on information provided to you by Mike Flynn my ex attorney?

---

Date: Thu, 1 Nov 2012 15:21:02 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried West and Venables. I am writing a chapter in my book about all this largely because we weren't able to tell much of the story in the paper. I would like your input, and your voice in the chapter.

On Thu, Nov 1, 2012 at 3:16 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

> DM doesn't need another hachet job on him. Have you tried Agent West or Sloan Venables?
>
> You reported on FBI documents, as if they were accurate, when that the Judge tossed out all of the claims in their report. The FBI refused to produce any of the people in their report for examination by the court. That include Daniel Bogden, who was reinstated by Obama as the US Attorney for Nevada.
>
> Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials? Judge Cooke reported that DM had his 4th admendment constituional rights violated?
>
> This is so much you guys missed.

---

Date: Thu, 1 Nov 2012 14:54:31 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Well, I would like to write more about him and everyone else involved in my book now.

On Thu, Nov 1, 2012 at 12:51 PM, Sectec Astronomy
<theagencyinsider@hotmail.com> wrote:

His role?  He is the CEO of eTreppid.  He got all
of the money.  Why was he not in your story?

Date: Thu, 1 Nov 2012 12:36:09 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried to talk to Warren Trepp. If you
have any information about his role, I would
like to talk to you about it.

On Thu, Nov 1, 2012 at 12:18 PM, Sectec
Astronomy <theagencyinsider@hotmail.com>
wrote:

Why have you not chased the
money, and contacted Warren
Trepp who kept all of the money?
I don't get that?

Date: Thu, 1 Nov 2012 11:41:01 -
0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Both. We discussed how you have
information that would be very
good for a story about his
involvement.
But I also want to talk to you more
generally about your experiences
and work during the war on terror.
On Thu, Nov 1, 2012 at 10:55 AM,
Sectec Astronomy
<theagencyinsider@hotmail.com>
wrote:

Is talking to me or
Brennan emails what
your after?

What other information
are you after?

Date: Wed, 31 Oct
2012 23:25:56 -0400

Subject: Re: Agency
From:
jrisen31@gmail.com
To:
theagencyinsider@hotmail.com

I thought what we
discussed before was
really interesting, and I
would like to continue
our discussion. As I
mentioned, I am
writing about it in my
book, and I would like
to talk to you for
that.But I would also
like to talk about what
you said about
Brennan and the White
House.

On Wed, Oct 31, 2012
at 7:06 PM, Sectec
Astronomy
<theagencyinsider@hotmail.com
> wrote:

> Regarding?
> So DM
> get attack
> in another
> article?

> ──────────

> Date: Wed,
> 31 Oct
> 2012
> 16:47:58 -
> 0400

> Subject:
> Re:
> Agency
> From:
> jrisen31@gmail.com

> To:
> theagencyinsider@hotmail.com

Hi. Can we talk?
Jim Risen

On Fri, Oct 5, 2012 at 6:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

I guess you can investigate what I disclosed and then decide.

Date: Fri, 5 Oct 2012 18:47:34 -0400

Subject: Re: Agency

From: jrisen31@gmail.com

To: theagencyinsider@hotmail.com

As I said on the phone, I

protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth.

Jim

On Fri, Oct 5, 2012 at 5:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Before documents are sent,

you
agree
that
you
will
protect
Dennis
Montgomery
as
a
protected
source.
If
the
US
Government
attacks
Dennis
Montgomery
you,
and
your
organization
will
do
everything
possible
to protect
and
defend
Dennis
Montgomery.
Agreed.

Date:
Fri,
5
Oct
2012
17:32:30
-
0400

Subject:
Re:
Agency

From:
jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

got
it,
thanks

Jim
Risen

On
Fri,
Oct
5,
2012
at
5:11
PM,
Sectec
Astronomy
<theagencyinsider@hotmail.com
>
wrote:

> This
> is
> my
> email
> address…

# Exhibit 9



**SWEDISH** MEDICAL CENTER

May 27, 2014

Re: Dennis Lee Montgomery (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery underwent aneurysm surgery on 5/16/2014 that was unfortunately complicated by multi-infarct strokes with resultant severe left sided weakness and impaired vision. He is currently on the Swedish inpatient rehab unit and will be here until at least late June 2014. He will not be able to testify out of state as a result of his current disability.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

# Exhibit 10



**SWEDISH** MEDICAL CENTER

January 6, 2015

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery unfortunately sustained recent multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He completed Swedish inpatient rehab unit under my guidance on 6/21/2014.  He is now in outpatient PT, OT to work on ongoing left sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.  He has severe left shoulder pain impacting his stroke recovery.  He will also undergo neuropsychological testing to evaluate his cognitive strengths and weakness.

Lastly, he is having false visual imagery related to his stroke and is being followed by neuro-ophthalmology with Dr. Eugen May.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

# Exhibit 11

# Joe Eskridge, M.D.

Swedish  Neuroscience Institute
550 17th Ave #500
Seattle WA 98122
206.320.4144

June 27, 2014

To Whom It May Concern

Dear Sirs,

I, Dr. Joe Eskridge recently treated Dennis Montgomery who is a 60 year old man who suffered from a cerebral aneurysm.  His aneurysm was detected in 2011.  He does not smoke and does not have any congenital blood vessel diseases that contribute to aneurysm development.

High blood pressure can accelerate aneurysm growth and increase the risk of rupture and stroke.  Stress can increase blood pressure and contribute to aneurysm growth.  On a more probable than not basis stress related hypertension caused the development and growth of his aneurysm.

I have performed over 5000 brain artery repair and embolization procedures over the past 30 years.  I was Professor of Radiology and Neurosurgery at the University of Washington Medical School from 1987-2004.

Sincerely yours,

Joe Eskridge, M.D.

# Exhibit 12

4/27/2015
Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 524 of 1046
Case 1:25-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/24/2025 Page 59 of 150

# United States Special Operations Command

From Wikipedia, the free encyclopedia

The United States Special Operations Command (USSOCOM or SOCOM) is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. USSOCOM is headquartered at MacDill Air Force Base in Tampa, Florida.

The idea of a unified special operations command had its origins in the aftermath of Operation Eagle Claw, the disastrous attempted rescue of hostages at the American embassy in Iran in 1980. The ensuing investigation, chaired by Admiral James L. Holloway III, the retired Chief of Naval Operations, cited lack of command and control and inter-service coordination as significant factors in the failure of the mission.[2] Since its activation on 16 April 1987, U.S. Special Operations Command has participated in many operations, from the 1989 invasion of Panama to the ongoing Global War on Terrorism.[3][4]

USSOCOM conducts several covert and clandestine missions, such as direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare, psychological warfare, civil affairs, and counter-narcotics operations. Each branch has a Special Operations Command that is unique and capable of running its own operations, but when the different special operations forces need to work together for an operation, USSOCOM becomes the joint component command of the operation, instead of a SOC of a specific branch.[5]



| United States Special Operations Command (USSOCOM) | |
|---|---|
| United States Special Operations Command Emblem | |
| Active | April 16, 1987 – present[1] |
| Country | United States of America |
| Type | Special operations |
| Role | Provide fully capable special operations forces to defend the United States and its interests and plan and synchronize operations against terrorist networks[1] |
| Size | 63,000[1] |
| Part of | Department of Defense |
| Garrison/HQ | MacDill AFB, Florida, U.S. |
| Nickname | "USSOCOM", "SOCOM" |
| Engagements | Operation Earnest Will Invasion of Panama Persian Gulf War Unified Task Force Operation Gothic Serpent |
| | • Battle of Mogadishu |
| | Operation Uphold Democracy Global War on Terrorism |
| | • War in Afghanistan • Iraq War |
| Commanders | |
| Current commander | General Joseph L. Votel[1] |

## Contents

- 1 History
  - 1.1 Operation Earnest Will
  - 1.2 Somalia
  - 1.3 Iraq
- 2 Current role
  - 2.1 War in Afghanistan
  - 2.2 Global presence
- 3 Subordinate Commands
  - 3.1 Joint Special Operations Command
  - 3.2 Special Operations Command – Joint Capabilities
  - 3.3 Army
  - 3.4 Navy
  - 3.5 Air Force
  - 3.6 Marine Corps
- 4 List of USSOCOM Combatant Commanders
- 5 USSOCOM medal
- 6 See also
- 7 References
  - 7.1 Citations
  - 7.2 Bibliography
- 8 External links

## History

The unworkable command and control structure of separate U.S. military special operations forces (SOF), which led to the failure of Operation Eagle Claw in 1980, highlighted the need within the Department of Defense for reform and reorganization. Since the incident, the Army Chief of Staff, General Edward C. "Shy" Meyer, called for a further restructuring of special operations capabilities, eventually helping to create the U.S. Delta Force.[6] Although unsuccessful at the joint level, Meyer nevertheless went on to consolidate Army SOF units under the new 1st Special Operations Command in 1982, a significant step to improve the U.S. Army's SOF.

By 1983, there was a small but growing sense in the Congress for the need for military reforms. In June, the Senate Armed Services Committee (SASC) began a two-year-long study of the Defense Department, which included an examination of SOF spearheaded by Senator Barry Goldwater (R-AZ). With concern mounting on Capitol Hill, the Department of Defense created the Joint Special Operations Agency on 1 January 1984; this agency, however, had neither operational nor command authority over any SOF.[7][8] The Joint Special Operations Agency thus did little to improve SOF readiness, capabilities, or policies, and therefore was insufficient. Within the Defense Department, there were a few staunch SOF supporters. Noel Koch, Principal Deputy Assistant Secretary of Defense for International Security Affairs, and his deputy, Lynn Rylander, both advocated SOF reforms.[9]

At the same time, a few on Capitol Hill were determined to overhaul United States Special Operations Forces. They included Senators Sam Nunn (D-GA) and William Cohen (R-ME), both members of the Armed Services Committee, and Representative Dan Daniel (D-VA), the chairman of the United States House Armed Services Subcommittee on Readiness. Congressman Daniel had become convinced that the U.S. military establishment was not interested in special operations, that the country's

4/27/2015
Case 1:23-cv-20762-JEM Document 1-7 Entered on FLSD Docket 02/24/2023 Page 60 of 150
Case 1:23-cv-20762-JEM Document 1-7 Filed 07/28/23 Page 525 of 1046

capability in this area was second rate, and that SOF operational command and control was an endemic problem.[9] Senators Nunn and Cohen also felt strongly that the Department of Defense was not preparing adequately for future threats. Senator Cohen agreed that the U.S. needed a clearer organizational focus and chain of command for special operations to deal with low-intensity conflicts.[7]



In October 1985, the Senate Armed Services Committee published the results of its two-year review of the U.S. military structure, entitled "Defense Organization: The Need For Change."[10] Mr. James R. Locher III, the principal author of this study, also examined past special operations and speculated on the most likely future threats. This influential document led to the Goldwater-Nichols Defense Reorganization Act of 1986.[11][12] By spring 1986, SOF advocates had introduced reform bills in both houses of Congress. On 15 May, Senator Cohen introduced the Senate bill, co-sponsored by Senator Nunn and others, which called for a joint military organization for SOF and the establishment of an office in the Defense Department to ensure adequate funding and policy emphasis for low-intensity conflict and special operations.[13] Representative Daniel's proposal went even further—he wanted a national special operations agency headed by a civilian who would bypass the Joint Chiefs and report directly to the Secretary of Defense; this would keep Joint Chiefs and the Services out of the SOF budget process.[8]

Senator Barry Goldwater, Former Chairman of the Senate Armed Services Committee

Congress held hearings on the two bills in the summer of 1986. Admiral William J. Crowe Jr., Chairman of the Joint Chiefs of Staff, led the Pentagon's opposition to the bills. He proposed, as an alternative, a new Special Operations Forces command led by a three-star general. This proposal was not well received on Capitol Hill—Congress wanted a four-star general in charge to give SOF more clout. A number of retired military officers and others testified in favor of the need for reform.[9] By most accounts, retired Army Major General Richard Scholtes gave the most compelling reasons for change. Scholtes, who commanded the joint special operations task force in Grenada, explained how conventional force leaders misused SOF during the operation, not allowing them to use their unique capabilities, which resulted in high SOF casualties. After his formal testimony, Scholtes met privately with a small number of Senators to elaborate on the problems that he had encountered in Grenada.[14]

Both the House and Senate passed SOF reform bills, and these went to a conference committee for reconciliation. Senate and House conferees forged a compromise. The bill called for a unified combatant command headed by a four-star general for all SOF, an Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict, a coordinating board for low-intensity conflict within the National Security Council, and a new Major Force Program (MFP-11) for SOF (the so-called "SOF checkbook").[15][16] The final bill, attached as a rider to the 1987 Defense Authorization Act, amended the Goldwater-Nichols Act and was signed into law in October 1986. Congress clearly intended to force DOD and the Administration to face up to the realities of past failures and emerging threats. DOD and the Administration were responsible for implementing the law, and Congress subsequently had to pass two additional bills to ensure proper implementation.[9] The legislation promised to improve SOF in several respects. Once implemented, MFP-11 provided SOF with control over its own resources, better enabling it to modernize the force. Additionally, the law fostered interservice cooperation: a single commander for all SOF promoted interoperability among the forces assigned to the same command. The establishment of a four-star Commander in Chief and an Assistant Secretary of Defense for Special Operations and Low Intensity Conflict eventually gave SOF a voice in the highest councils of the Defense Department.[17]



Implementing the provisions and mandates of the Nunn-Cohen Act, however, was neither rapid nor smooth. One of the first issues to surface was appointing an ASD (SO/LIC), whose principal duties included monitorship of special operations activities and low-intensity conflict activities of the Department of Defense. The Congress even increased the number of assistant secretaries of defense from 11 to 12, but the Department of Defense still did not fill this new billet. In December 1987, the Congress directed Secretary of the Army John O. Marsh to carry out the ASD (SO/LIC) duties until a suitable replacement was approved by the Senate. Not until 18 months after the legislation passed did Ambassador Charles Whitehouse assume the duties of ASD (SO/LIC).[17]

Meanwhile, the establishment of USSOCOM provided its own measure of excitement. A quick solution to manning and basing a brand new unified command was to abolish an existing command. United States Readiness Command (USREDCOM), with an often misunderstood mission, did not appear to have a viable mission in the post Goldwater-Nichols era, and its Commander in Chief, General James Lindsay, had had some special operations experience. On 23 January 1987, the Joint Chiefs of Staff recommended to the Secretary of Defense that USREDCOM be disestablished to provide billets and facilities for USSOCOM. President Ronald Reagan approved the establishment of the new command on 13 April 1987. The Department of Defense activated USSOCOM on 16 April 1987 and nominated General Lindsay to be the first Commander in Chief Special Operations Command (USCINCSOC). The Senate accepted him without debate.[9]

General James Lindsay the first Commander in Chief, Special Operations Command

## Operation Earnest Will

USSOCOM's first tactical operation involved SEALs, Special Boat Teams (SBT), and 160th Special Operations Aviation Regiment (Airborne) ("Night Stalkers") aviators working together during Operation Earnest Will in September 1987. During Operation Earnest Will, the United States ensured that neutral oil tankers and other merchant ships could safely transit the Persian Gulf during the Iran–Iraq War. Iranian attacks on tankers prompted Kuwait to ask the United States in December 1986 to register 11 Kuwaiti tankers as American ships so that they could be escorted by the U.S. Navy. President Reagan agreed to the Kuwaiti request on 10 March 1987, hoping it would deter Iranian attacks.[9] The protection offered by U.S. naval vessels, however, did not stop Iran, which used mines and small boats to harass the convoys steaming to and from Kuwait. In late July 1987, Rear Admiral Harold J. Bernsen, commander of the Middle East Force, requested NSW assets. Special Boat Teams deployed with six Mark III Patrol Boats and two SEAL platoons in August.[9] The Middle East Force decided to convert two oil servicing barges, Hercules and Wimbrown VII, into mobile sea bases. The mobile sea bases allowed SOF in the northern Persian Gulf to thwart clandestine Iranian mining and small boat attacks.



MH-60 landing on Hercules

On 21 September, Nightstalkers flying MH-60 and Little Birds took off from the frigate USS Jarrett to track an Iranian ship, the Iran Ajr. The Nightstalkers observed the Iran Ajr turn off its lights and begin laying mines. After receiving permission to attack, the helicopters fired guns and rockets, stopping the ship. As the Iran Ajr's crew began to push mines over the side, the helicopters resumed firing until the crew abandoned ship. Special Boat Teams provided security while a SEAL team boarded the vessel at first light and discovered nine mines on the vessel's deck, as well as a logbook revealing areas where previous mines had been laid. The logbook implicated Iran in mining international waters.[9]

Within a few days, the Special Operations forces had determined the Iranian pattern of activity; the Iranians hid during the day near oil and gas platforms in Iranian waters and at night they headed toward the Middle Shoals Buoy, a navigation aid for tankers. With this knowledge, SOF launched three Little Bird helicopters and two patrol craft to the buoy. The Little Bird helicopters arrived first and were fired upon by three Iranian boats anchored near the buoy. After a short but intense firefight, the helicopters sank all three boats. Three days later, in mid-October, an Iranian Silkworm missile hit the tanker Sea Isle City near the oil terminal outside Kuwait City. Seventeen crewmen and the American captain were injured in the missile attack.[9][18] During Operation Nimble Archer, four destroyers shelled two oil platforms in the Rostam oil field. After the shelling, a SEAL platoon and a demolition unit planted explosives on one of the platforms to destroy it. The SEALs next boarded and searched a third platform 2 miles (3 km) away. Documents and radios were taken for intelligence purposes.

On 14 April 1988, 65 miles (100 km) east of Bahrain, the frigate USS Samuel B. Roberts (FFG-58) hit a mine, blowing an immense hole in its hull.[19] Ten sailors were injured. During Operation Praying Mantis the U.S. retaliated fiercely, attacking the Iranian frigate Sahand and oil platforms in the Sirri and Sassan oil fields.[18] After U.S. warships bombarded the Sirri platform and set it ablaze, a UH-60 with a SEAL platoon flew toward the platform but was unable to get close enough because of the roaring fire. Secondary explosions soon wrecked the platform.[9] Thereafter, Iranian attacks on neutral ships dropped drastically. On 3 July 1988, the USS Vincennes shot down an Iranian civilian airliner, Iran Air Flight 655, killing all 290 people on board, including 66 children. On 18 July, Iran accepted the United Nations cease fire; on 20 August 1988, the Iran–Iraq War ended. The remaining SEALs, patrol boats, and helicopters then returned to the United States.[9] Special operations forces provided critical skills necessary to help CENTCOM gain control of the northern Persian Gulf and balk Iran's small boats and minelayers. The ability to work at night proved vital, because Iranian units used darkness to conceal their actions. Additionally, because of Earnest Will operational requirements, USSOCOM would acquire new weapons systems—the patrol coastal ships and the Mark V Special Operations Craft.[9]

## Somalia



Special Operations Command first became involved in Somalia in 1992 as part of Operation Provide Relief. C-130s circled over Somali airstrips during delivery of relief supplies. Special Forces medics accompanied many relief flights into the airstrips throughout southern Somalia to assess the area. They were the first U.S. soldiers in Somalia, arriving before U.S. forces who supported the expanded relief operations of Restore Hope.[9][20][21] The first teams into Somalia were CIA Special Activities Division paramilitary officers with elements of JSOC. They conducted very high risk advanced force operations prior to the entry of the follow on forces. The first casualty of the conflict came from this team and was a Paramilitary officer and former Delta Force operator name Larry Freedman. Freedman was awarded the Intelligence Star for "extraordinary heroism" for his actions.[22]

One of two Iranian oil platform set ablaze after shelling by American destroyers.

The earliest missions during Operation Restore Hope were conducted by Navy SEALs. The SEALs performed several hydro-graphic reconnaissance missions to find suitable landing sites for Marines. On 7 December, the SEALs swam into Mogadishu Harbor, where they found suitable landing sites, assessed the area for threats, and concluded that the port could support offloading ships. This was a tough mission because the SEALs swam against a strong current which left many of them overheated and exhausted. Furthermore, they swam through raw sewage in the harbor, which made them sick.[9] When the first SEALs hit the shore the following night, they were surprised to meet members of the news media. The first Marines came ashore soon thereafter, and the press redirected their attention to them. Later, the SEALs provided personal security for President George Bush during a visit to Somalia.[9][21] In December 1992, Special Forces assets in Kenya moved to Somalia and joined Operation Restore Hope. January 1993, a Special Forces command element deployed to Mogadishu as the Joint Special Operations Forces-Somalia (JSOFOR) that would command and control all special operations for Restore Hope. JSOFOR's mission was to make initial contact with indigenous factions and leaders; provide information for force protection; and provide reports on the area for future relief and security operations. Before redeploying in April, JSOFOR elements drove over 26,000 miles (42,000 km), captured 277 weapons, and destroyed over 45,320 pounds (20,560 kg) of explosives.[9]



In August 1993, Secretary of Defense Les Aspin directed the deployment of a Joint Special Operations Task Force (JSOTF) to Somalia in response to attacks made by General Mohamed Farrah Aidid's supporters upon U.S. and UN forces. The JSOTF, named Task Force (TF) Ranger, was charged with a mission named Operation Gothic Serpent to capture Aidid. This was an especially arduous mission, for Aidid had gone underground, after several Lockheed AC-130 air raids and UN assaults on his strongholds.[9][23][24]

Bravo Company, 3rd Battalion of the 75th Ranger Regiment in Somalia, 1993.

While Marines from the 24th MEU provided an interim QRF (Force Recon Det and helicopters from HMM-263), the task force arrived in the country, and began training exercises. The Marines were asked to take on the Aidid snatch mission, but having the advantage of being in the area for more than two months, decided after mission analysis that the mission was a "no-go" due to several factors, centered around the inability to rescue the crew of a downed helicopter (re: the indigenous forces technique of using RPGs against helicopters and blocking the narrow streets in order to restrict the movement of a ground rescue force). This knowledge was not passed on to the Rangers, due to the Marines operating from the USS Wasp and the Rangers remaining on land. TF Ranger was made up of operators from Delta Force, 75th Ranger Regiment, 160th SOAR, Air Force special tactics units, and SEALs from the Naval Special Warfare Development Group.[9][23] During August and September 1993, the task force conducted six missions into Mogadishu, all of which were successes. Although Aidid remained free, the effect of these missions seriously limited his movements.[24]

On 3 October, TF Ranger launched its seventh mission, this time into Aidid's stronghold the Bakara Market to capture two of his key lieutenants. The mission was expected to take only one or two hours.[23] Helicopters carried an assault and a ground convoy of security teams launched in the late afternoon from the TF Ranger compound at Mogadishu airport. The TF came under increasingly heavy fire, more intense than during previous missions. The assault team captured 24 Somalis including Aidid's lieutenants and were loading them onto the convoy trucks when a MH-60 Blackhawk was hit by a rocket-propelled grenade (RPG).[9][24] A small element from the security force, as well as an MH-60 assault helicopter and an MH-60 carrying a fifteen man combat search and rescue (CSAR) team, rushed to the crash site.[9][23][24] The battle became increasingly worse. An RPG struck another MH-60, crashing less than 1 mile (1.6 km) to the south of the first downed helicopter. The task force faced overwhelming Somali mobs that overran the crash sites, causing a dire situation.[23] A Somali mob overran the second site and, despite a heroic defense, killed everyone except the pilot, whom they took prisoner. Two defenders of this crash site, Master Sergeant Gary Gordon and Sergeant First Class Randall Shughart, were posthumously awarded the Medal of Honor.[9][24] About this time, the mission's quick reaction force (QRF) also tried to reach the second crash site. This force too was pinned by Somali fire and required the fire support of two AH-6 helicopters before it could break contact and make its way back to the base.[9]

The assault and security elements moved on foot towards the first crash area, passing through heavy fire, and occupied buildings south and southwest of the downed helicopter. They fought to establish defensive positions so not to be pinned down by very heavy enemy fire, while treating their wounded, and worked to free the pilot's body from the downed helicopter. With the detainees loaded on trucks, the ground convoy force attempted to reach the first crash site. Unable to find it amongst the narrow, winding alleyways, the convoy came under devastating small arms and RPG fire. The convoy had to return to base after suffering numerous casualties, and sustaining substantial damage to their vehicles.

Reinforcements, consisting of elements from the QRF, 10th Mountain Division soldiers, Rangers, SEALs, Pakistan Army tanks and Malaysian armored personnel carriers, finally arrived at 1:55 am on 4 October. The combined force worked until dawn to free the pilot's body, receiving RPG and small arms fire throughout the night.[9] All the casualties were loaded onto the armored personnel carriers, and the remainder of the force was left behind and had no choice but to move out on foot.[23] AH-6 gunships raked the streets with fire to support the movement. The main force of the convoy arrived at the Pakistani Stadium-compound for the QRF-at 6:30 am,[23] thus concluding one of the bloodiest and fiercest urban firefights since the Vietnam War. Task Force Ranger experienced a total of 17 killed in action and 106 wounded. Various estimates placed Somali casualties above 1,000.[23] Although Task Force Ranger's few missions were successes, the overall outcome of Operation Gothic Serpent was deemed a failure because of the Task Force's failure to complete their stated mission, capturing Mohamed Farrah Aidid.[23] Most U.S. forces pulled out of Somalia by March 1994.

4/27/2015
Case: 1:23-mc-00073-GKK-MJN Document: 10-1 Filed on TESD Docket 04/24/2015 Page 62 of 150
Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 527 of 1046

The withdrawal from Somalia, was completed on March 1995.[9] Even though Operation Gothic Serpent failed, USSOCOM still made significant contributions to operations in Somalia. SOF performed reconnaissance and surveillance missions, assisted with humanitarian relief, protected American forces and conducted riverine patrols. Additionally, they ensured the safe landing of the Marines and safeguarded the arrival of merchant ships carrying food.[9][18]

## Iraq

USSOCOM's 10th Special Forces Group, elements of JSOC and CIA/SAD Paramilitary Officers linked up again and were the first to enter Iraq prior to the invasion. Their efforts organized the Kurdish Peshmerga to defeat Ansar Al Islam in Northern Iraq before the invasion. This battle was for control of a territory in Northeastern Iraq that was completely occupied by Ansar Al Islam, an ally of Al Qaeda. This was a very significant battle and led to the termination of a substantial number of terrorists and the uncovering of a chemical weapons facility at Sargat. These terrorists would have been in the subsequent insurgency had they not been eliminated during this battle. Sargat was the only facility of its type discovered in the Iraq war. This battle may have been the Tora Bora of Iraq, but it was a sound defeat for Al Qaeda and their ally Ansar Al Islam. This combined team then led the Peshmerga against Saddam's northern Army. This effort kept Saddam's forces in the north and denied the ability to redeploy to contest the invasion force coming from the south. This effort may have saved the lives of hundreds if not thousands of coalition service men and women.[25]

At the launch of the Iraq War dozens of 12-member Special Forces teams infiltrated southern and western Iraq to hunt for Scud missiles and pinpoint bombing targets. Scores of Navy SEALs seized oil terminals and pumping stations on the southern coast.[26] Air Force combat controllers flew combat missions in MC-130H Combat Talon IIs and established austere desert airstrips to begin the flow of soldiers and supplies deep into Iraq. This was a far cry from the Persian Gulf war of 1991, where Special Operations forces were kept largely on the sidelines. But it would not be a replay of Afghanistan, where Army Special Forces and Navy SEALs led the fighting. After their star turn in Afghanistan, many special operators were disappointed to play a supporting role in Iraq. Many special operators felt restricted by cautious commanders.[27] From that point, USSOCOM has since killed or captured hundreds of insurgents and Al-Qaeda terrorists. It has conducted several foreign internal defense missions successfully training the Iraqi security forces.[28][29]

# Current role

United States Special Operations Command played a pivotal role in fighting the former Taliban government in Afghanistan in 2001[30] and toppling it thereafter, as well as combating the insurgency and capturing Saddam Hussein in Iraq. USSOCOM in 2004 was developing plans to have an expanded and more complex role in the global campaign against terrorism,[31] and that role continued to emerge before and after the killing of Osama bin Laden in Pakistan in 2011.[32][33] In 2010, "of about 13,000 Special Operations forces deployed overseas, about 9,000 [were] evenly divided between Iraq and Afghanistan."[32]

Map of the main battle sites during the Battle of Mogadishu.

## War in Afghanistan

In the initial stages of the War in Afghanistan, USSOCOM forces linked up with CIA Paramilitary Officers from Special Activities Division to defeat the Taliban without the need for large-scale conventional forces.[34] This was one of the biggest successes of the global War on Terrorism.[35] These units linked up several times during this war and engaged in several furious battles with the enemy. One such battle happened during Operation Anaconda the mission to squeeze life out of a Taliban and Al-Qaeda stronghold dug deep into the Shah-i-Kot mountains of eastern Afghanistan. The operation was seen as one of the heaviest and bloodiest fights in the War in Afghanistan.[36] The battle on an Afghan mountaintop called Takur Ghar featured special operations forces from all 4 services and the CIA. Navy SEALs, Army Rangers, Air Force Combat Controllers, and Pararescuemen fought against entrenched Al-Qaeda fighters atop a 10,000-foot (3,000 m) mountain. Subsequently, the entrenched Taliban became targets of every asset in the sky. According to an executive summary, the battle of Takur Ghar was the most intense firefight American special operators have been involved in since 18 U.S. Army Rangers were killed in Mogadishu, Somalia, in 1993.[37][38][39] During Operation Red Wings on 28 June 2005, four Navy SEALs, pinned down in a firefight, radioed for help. A Chinook helicopter, carrying 16 service members, responded but was shot down. All members of the rescue team and three of four SEALs on the ground died. It was the worst loss of life in Afghanistan since the invasion in 2001. The Navy SEAL Marcus Luttrell alone survived.[40][41] Team leader Michael P. Murphy was awarded the Medal of Honor for his actions in the battle.



A 7th SFG Special Forces medic in Kandahar Province, Afghanistan, in September 2008.

## Global presence

SOC chief Olson said in 2011 that SOCOM "is a microcosm of the Department of Defense, with ground, air, and maritime components, a global presence, and authorities and responsibilities that mirror the Military Departments, Military Services, and Defense Agencies."[33] In 2010, special operations forces were deployed in 75 countries, compared with about 60 at the beginning of 2009.[32] In 2011, SOC spokesman Colonel Tim Nye (Army[42]) was reported to have said that the number of countries with SOC presence will likely reach 120 and that joint training exercises will have been carried out in most or all of those countries during the year. One study identified joint-training exercises in Belize, Brazil, Bulgaria, Burkina Faso, Germany, Indonesia, Mali, Norway, Panama, and Poland in 2010 and also, through mid-year 2011, in the Dominican Republic, Jordan, Romania, Senegal, South Korea, and Thailand, among other nations. In addition, SOC forces executed the high profile killing of Osama bin Laden in Pakistan in 2011.[33]

Wikileaks' releases of cables from the U.S. Embassy, Pakistan, revealed the presence of a detachment of SOCOM (or possibly United States Army Special Operations Command) referred to as SOC(FWD)-PAK (09ISLAMABAD2449, 9 August 2010). This unit or headquarters may be, in full form, Special Operations Command (Forward)-Pakistan. It seems unlikely that the – symbol refers to the minus sign that sometimes means that the unit or headquarters is operating at less than full strength. The unit or headquarters includes a Military Information Support Team (MIST [1] (http://www.africom.mil/getArticle.asp?art=4866)).[43] Another story that reported on JSOC/Blackwater anti-terrorist operations in Pakistan was Jeremy Scahill's "The Secret U.S. War in Pakistan" (http://www.thenation.com/article/secret-us-war-pakistan), in the 7 November 2009, issue of The Nation.

In 2010, White House counterterrorism director John O. Brennan said that the United States "will not merely respond after the fact" of a terrorist attack but will "take the fight to al-Qaeda and its extremist affiliates whether they plot and train in Afghanistan, Pakistan, Yemen, Somalia and beyond." Olson said, "In some places, in deference to host-country sensitivities, we are lower in profile. In every place, Special Operations forces activities are coordinated with the U.S. ambassador and are under the operational control of the four-star regional commander."[32]

The conduct of actions by SOC forces outside of Iraq and Afghan war zones has been the subject of internal U.S. debate, including between representatives of the Bush administration such as John B. Bellinger III, on one hand, and the Obama administration on another. The United Nations in 2010 also "questioned the administration's authority under international law to conduct such raids, particularly when they kill innocent civilians. One possible legal justification – the permission of the country in question – is complicated in places such as Pakistan and Yemen, where the governments privately agree but do not publicly acknowledge approving the attacks," as one report put it.[32]

## Subordinate Commands



Special Operations Command Structure (Media:U.S. Special Operations Command.png).

### Joint Special Operations Command

[44] Joint Special Operations Command is a component command of the USSOCOM and is charged to study special operations requirements and techniques to ensure interoperability and equipment standardization, plan and conduct special operations exercises and training, and develop Joint Special Operations Tactics.[1] It was established in 1980 on recommendation of Col. Charlie Beckwith, in the aftermath of the failure of Operation Eagle Claw.[45]

Units

- The U.S. Army's 1st Special Forces Operational Detachment-Delta, popularly known as Delta Force, is the first of the two primary counter-terrorist units of JSOC and SOCOM.[46] Modeled after the British Special Air Service, Delta Force is regarded as one of the premier special operations forces in the world.[47] This is because of Delta's stringent training and selection process. Delta recruits primarily from the most talented and highly skilled operators in the Army Special Forces and the 75th Ranger Regiment although Delta will take anyone and everyone that can pass their screening.[23][47] Recruits must pass a rigid selection course before beginning training. Delta has received training from numerous U.S. government agencies and other tier one SOF and has created a curriculum based on this training and techniques that it has developed.[47] Delta conducts clandestine and covert special operations all over the world.[47] It has the capability to conduct myriad special operations missions but specializes in counter-terrorism and hostage rescue operations.[23][46][48]

The Joint Special Operations Command insignia

- The Naval Special Warfare Development Group (DEVGRU, SEAL Team Six) is the second of the two primary counter-terrorist units of JSOC and SOCOM.[46] DEVGRU is Naval Special Warfare's counterpart to Delta. Like Delta, DEVGRU recruits the best operators from the best units in its branch, the Navy SEALs. DEVGRU is capable of performing any type of special operations mission, but trains especially for counter-terrorist and hostage rescue operations.[23][46]

- The Intelligence Support Activity (ISA, The Activity) is the support branch of JSOC and USSOCOM. Its primary missions are to provide Human Intelligence (HUMINT) and Signal Intelligence (SIGINT) mainly for Delta and DEVGRU's operations.[46][49] Before the establishing of the Strategic Support Branch in 2001, the ISA needed the permission of the CIA to conduct its operations, which sometimes caused it to be less effective in its support of JSOC's primary units.[46][50][51]

- The Air Force 24th Special Tactics Squadron (24th STS) is the AFSOC component of JSOC. The 24th STS usually operates with Delta and DEVGRU because of the convenience of 24th STS ability to synchronize and control the different elements of air power and enhance air operations deep in enemy territory.[23]

Portions of JSOC units have made up the constantly changing special operations task force, operating in the U.S. Central Command area of operations. The Task Force 11, Task Force 121, Task Force 6-26 and Task Force 145 are creations of the Pentagon's post-11 September campaign against terrorism, and it quickly became the model for how the military would gain intelligence and battle insurgents in the future. Originally known as Task Force 121, it was formed in the summer of 2003, when the military merged two existing Special Operations units, one hunting Osama bin Laden in and around Afghanistan, and the other tracking Sadaam Hussein in Iraq.[52][53]

### Special Operations Command – Joint Capabilities

Special Operations Command – Joint Capabilities (SOC-JC) was transferred to USSOCOM from the soon to be disestablished United States Joint Forces Command.[54]

Primary Mission: SOC-JC trains conventional and SOF commanders and their staffs, supports USSOCOM international engagement training requirements, and supports implementation of capability solutions in order to improve strategic and operational Warfighting readiness and joint interoperability. SOC-JC must also be prepared to support deployed Special Operations Joint Task Force (SOJTF) Headquarters (HQ).

As a joint sub-unified command under USSOCOM, SOC-JC's core function is to enhance the interoperability of conventional and Special Operations Forces (SOF) commanders and staffs through robust strategic and operational level joint training. In coordination with the USSOCOM J3, J7/9 and Joint Special Operations University (JSOU), SOC-JC provides excellent training and support to the education for SOF and Conventional Forces (CF) worldwide. Additionally, SOC-JC supports the joint SOF capabilities development process while maintaining the flexibility to support emerging initiatives.

4/27/2015
Case 1:23-mc-00073-GKK-MSH Document 1-7 Filed 07/28/23 Page 529 of 1046
Case 1:25-cv-20762-JEM Document 40-1 Entered on FLSD Docket 04/24/2025 Page 64 of 150

## Army

On 1 December 1989 the United States Army Special Operations Command (USASOC) activated as the 16th major Army command. These special operations forces have been America's spearhead for unconventional warfare for more than 40 years. USASOC commands such units as the well known Special Forces (SF, or the "Green Berets") and Rangers, and such relatively unknown units as the Psychological Operations Group (PSYOP) and Civil Affairs Brigade (CA). These are one of the USSOCOM's main weapons for waging unconventional warfare and counter-insurgency. The significance of these units is emphasized as conventional conflicts are becoming less prevalent as insurgent and guerrilla warfare increases.[55][56]



USASOC patch.

### Units

- The 75th Ranger Regiment (U.S. Army Rangers) is the premier light-infantry unit of the United States Army and is headquartered at Fort Benning, Georgia. The 75th Ranger Regiment's mission is to plan and conduct special missions in support of U.S. policy and objectives.[57] The Rangers are a flexible and rapid-deployable force. Each battalion can deploy anywhere in the world within 18 hours notice. The Army places much importance on the 75th Ranger Regiment and its training; it possesses the capabilities to conduct conventional and most special operations missions. Rangers are capable of infiltrating by land, sea, or air and direct action operations such as conducting raids or assaulting buildings or airfields.[58]

- United States Army Special Forces (SF) aka Green Berets perform several doctrinal missions: unconventional warfare, foreign internal defense, special reconnaissance, direct action and counter-terrorism. These missions make Special Forces unique in the U.S. military, because they are employed throughout the three stages of the operational continuum: peacetime, conflict and war.[59] Foreign internal defense operations, SF's main peacetime mission, are designed to help friendly developing nations by working with their military and police forces to improve their technical skills, understanding of human rights issues, and to help with humanitarian and civic action projects. Special Forces unconventional warfare capabilities provide a viable military option for a variety of operational taskings that are inappropriate or infeasible for conventional forces. Special Forces are the U.S. military's premier unconventional warfare force.[60] Foreign internal defense and unconventional warfare missions are the bread and butter of Special Forces soldiers. For this reason SF candidates are trained extensively in weapons, engineering, communications and medicine. SF soldiers are taught to be warriors first and teachers second because they must be able to train their team and be able to train their allies during a FID or UW mission.[59][61] Often SF units are required to perform additional, or collateral, activities outside their primary missions. These collateral activities are coalition warfare/support, combat search and rescue, security assistance, peacekeeping, humanitarian assistance, humanitarian de-mining and counter-drug operations.[62]

- The 160th Special Operations Aviation Regiment (Night Stalkers) headquartered at Fort Campbell, Kentucky provides aviation support to units within USSOCOM. The Regiment consists of MH-6 and AH-6 light helicopters, MH-60 helicopters and MH-47 heavy assault helicopters. The capabilities of the 160th SOAR (A) have been evolving since the early 1980s. Its focus on night operations resulted in the nickname, the "Night Stalkers."[63] The primary mission of the Night Stalkers is to conduct overt or covert infiltration, exfiltration, and resupply of special operations forces across a wide range of environmental conditions.[64]

- 4th Military Information Support Group (Airborne) and 8th Military Information Support Group (Airborne) Soldiers use persuasion to influence perceptions and encourage desired behavior.[65][66] PSYOP soldiers supports national objectives at the tactical, operational and strategic levels of operations. Strategic psychological operations advance broad or long-term objectives; global in nature, they may be directed toward large audiences or at key communicators. Operational psychological operations are conducted on a smaller scale. 4th PSYOP Gp is employed by theater commanders to target groups within the theater of operations. 4th PSYOP Gp purpose can range from gaining support for U.S. operations to preparing the battlefield for combat. Tactical psychological operations are more limited, used by commanders to secure immediate and near-term goals. In this environment, these force-enhancing activities serve as a means to lower the morale and efficiency of enemy forces.[67]

Special Forces on a patrol in Afghanistan.

- 95th Civil Affairs Brigade (Airborne) specialists identify critical requirements needed by local citizens in war or disaster situations. They also locate civilian resources to support military operations, help minimize civilian interference with operations, support national assistance activities, plan and execute noncombatant evacuation, support counter-drug operations and establish and maintain liaison with civilian aid agencies and other nongovernmental organizations. In support of special operations, these culturally oriented, linguistically capable Soldiers may also be tasked to provide functional expertise for foreign internal defense operations, unconventional warfare operations and direct action missions.[68]

- Sustainment Brigade (Special Operations) (Airborne) (SBSO(A)) has a difficult mission supporting USASOC. In their respective fields, signal and support soldiers provide supplies, maintenance, equipment and expertise allowing Special Operation Forces to "shoot, move and communicate" on a continuous basis. Because USASOC often uses Special Operations Forces-unique items, soldiers assigned to these units are taught to operate and maintain a vast array of specialized equipment not normally used by their conventional counterparts. SBSO(A) also provides the USASOC with centralized and integrated material management of property, equipment maintenance, logistical automation and repair parts and supplies.[69]

- John F. Kennedy Special Warfare Center (USAJFKSWCS) trains USSOCOM and Army Special Operations Forces through development and evaluation of special operations concepts, doctrines and trainings.[70]

## Navy

The United States Naval Special Warfare Command (NAVSPECWARCOM, NAVSOC, or NSWC) was commissioned April 16, 1987, at Naval Amphibious Base Coronado in San Diego as the Naval component to the United States Special Operations Command. Naval Special Warfare Command provides vision, leadership, doctrinal guidance, resources and oversight to ensure component special operations forces are ready to meet the operational requirements of combatant commanders.[71] Today, SEAL Teams and Special Boat Teams comprise the elite combat units of Naval Special Warfare. These teams are organized, trained, and equipped to conduct a variety of

missions to include direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare and support psychological and civil affairs operations. Their highly trained operators are deployed worldwide in support of National Command Authority objectives, conducting operations with other conventional and special operations forces.

Units

- United States Navy SEALs have distinguished themselves as an individually reliable, collectively disciplined and highly skilled special operations force. The most important trait that distinguishes Navy SEALs from all other military forces is that SEALs are maritime special operations, as they strike from and return to the sea. SEALs (SEa, Air, Land) take their name from the elements in and from which they operate. SEALs are experts in direct action and special reconnaissance missions. Their stealth and clandestine methods of operation allow them to conduct multiple missions against targets that larger forces cannot approach undetected. Because of the dangers inherent in their missions, prospective SEALs go through what is considered by many military experts to be the toughest training regime in the world.[72][73]


United States Naval Special Warfare Command emblem.

- Naval Special Warfare Development Group (DEVGRU), referred to as SEAL Team Six, the name of its predecessor which was officially disbanded in 1987.
- SEAL Delivery Vehicle Teams are SEAL teams with an added underwater delivery capability who use the SDV MK VIII and the Advanced SEAL Delivery System (ASDS), submersibles that provides NSW with an unprecedented capability that combines the attributes of clandestine underwater mobility and the combat swimmer.[74][75]
- Special Warfare Combatant-craft Crewmen (SWCC) operate and maintain state-of-the-art surface craft to conduct coastal patrol and interdiction and support special operations missions. Focusing on infiltration and exfiltration of SEALs and other SOF, SWCCs provide dedicated rapid mobility in shallow water areas where larger ships cannot operate. They also bring to the table a unique SOF capability: Maritime Combatant Craft Aerial Delivery System—the ability to deliver combat craft via parachute drop.[1] Like SEALs, SWCCs must have excellent physical fitness, highly motivated, combat-focused and responsive in high stress situations.[76]


SEALs emerge from the water during a demonstration.

## Air Force

Air Force Special Operations Command was established May 22, 1990, with headquarters at Hurlburt Field, Florida. AFSOC is one of the 10 Air Force Major Commands or MAJCOMs, and the Air Force component of United States Special Operations Command. It contains the Twenty-Third Air Force and holds operational and administrative oversight of subordinate special operations wings and groups in the regular Air Force, Air Force Reserve Command and the Air National Guard.

AFSOC provides Air Force special operations forces for worldwide deployment and assignment to regional unified commands. The command's SOF are composed of highly trained, rapidly deployable airmen, conducting global special operations missions ranging from precision application of firepower via airstrikes or close air support, to infiltration, exfiltration, resupply and refueling of SOF operational elements.[77] AFSOC's unique capabilities include airborne radio and television broadcast for psychological operations, as well as aviation foreign internal defense instructors to provide other governments military expertise for their internal development.


Air Force Special Operations Command emblem.

The command's core missions include battlefield air operations; agile combat support; aviation foreign internal defense; information operations; precision aerospace fires; psychological operations; specialized air mobility; specialized refueling; and intelligence, surveillance and reconnaissance.[27][78][79]

Units

- Combat Controllers (CCT) are ground combat forces specialized in a traditional pathfinder role while having a heavy emphasis on simultaneous air traffic control, fire support (via airstrikes, close air support and command, control, and communications in covert or austere environments.[80][81]
- Pararescuemen (PJ) are the only Department of Defense specialty specifically trained and equipped to conduct conventional and unconventional personnel recovery operations. A PJ's primary function is as a personnel recovery specialist with emergency trauma medical capabilities in humanitarian and combat environments.
- Special Operations Weather Technicians (SOWT) gather, assess, and interpret weather and environmental intelligence from forward deployed locations, working alongside special operations teams.

Organization

- The 1st Special Operations Wing (1 SOW) is located at Hurlburt Field, Florida. Its mission focus is unconventional warfare: counter-terrorism, combat search and rescue, personnel recovery, psychological operations, aviation assistance to developing nations, "deep battlefield" resupply, interdiction and close air support. The wing's core missions include aerospace surface interface, agile combat support, combat aviation advisory operations, information operations, personnel recovery/recovery operations, precision aerospace fires, psychological operations dissemination, specialized aerospace mobility and specialized aerial refueling.[82] Among its aircraft is the MC-130 Combat Talon II, a low-level terrain following special missions transport that can evade radar detection and slip into enemy territory at a 200-foot (61 m) altitude for infiltration/exfiltration missions, even in zero visibility, dropping off or recovering men or supplies with pinpoint accuracy. It also operates the AC-130 Spooky and Spectre gunships that provide highly accurate airborne gunfire for close air support of conventional and special operations forces on the ground.[46]
- The 24th Special Operations Wing (24 SOW) is located at Hurlburt Field, Florida. It's composed of the 720th Special Tactics Group, 724th Special Tactics Group, Special Tactics Training Squadron and 16 recruiting locations across the United States.[83][84] The Special Tactics Squadrons, under the 720th STG and 724th STG, are made up of Special Tactics Officers, Combat Controllers, Combat Rescue Officers, Pararescuemen, Special Operations Weather Officers and Airmen, Air Liaison Officers, Tactical Air Control Party operators, and a number of combat support airmen which comprise 58 Air Force specialties.[84]

4/27/2015                                                                                                                                                                                                                        8/12
Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 591 of 1046
Case 1:23-cv-20762-JEM Document 440-1 Entered on FLSD Docket 04/24/2015 Page 66 of 150

- The 27th Special Operations Wing (27 SOW) is located at Cannon AFB, New Mexico. Its primary mission includes infiltration, exfiltration and re-supply of special operations forces; air refueling of special operations rotary wing and tiltrotor aircraft; and precision fire support. These capabilities support a variety of special operations missions including direct action, unconventional warfare, special reconnaissance, counter-terrorism, personnel recovery, psychological operations and information operations.[85]

- The 193d Special Operations Wing (193 SOW) is an Air National Guard (ANG) unit, operationally gained by AFSOC, and located at Harrisburg International Airport/Air National Guard Station (former Olmsted Air Force Base), Pennsylvania. Under Title 32 USC, the 193 SOW performs state missions for the Governor of Pennsylvania as part of the Pennsylvania Air National Guard. Under Title 10 USC, the 193 SOW is part of the Air Reserve Component (ARC) of the United States Air Force. Its primary wartime and contingency operations mission as an AFSOC-gained unit is psychological operations (PSYOP). The 193 SOW is unique in that it is the only unit in the U.S. Air Force to fly and maintain the Lockheed EC-130J Commando Solo aircraft.



- The 919th Special Operations Wing (919 SOW) is an Air Force Reserve Command (AFRC) unit, operationally gained by AFSOC, and located at Eglin AFB Auxiliary Field #3/Duke Field, Florida. The 919 SOW flies and maintains the MC-130E Combat Talon I and MC-130P Combat Shadow special operations aircraft designed for covert operations.

- The 352d Special Operations Wing (352 SOW) at RAF Mildenhall, United Kingdom serves as the core to United States European Command's standing Joint Special Operations Air Component headquarters. The squadron provides support for three flying squadrons, one special tactics squadron and one maintenance squadron for exercise, logistics, and war planning; aircrew training; communications; aerial delivery; medical; intelligence; security and force protection; weather; information technologies and transformation support and current operations.[86]

Air Force Special Operators on a training mission.

- The 353d Special Operations Group (353 SOG) is the focal point for all U.S. Air Force special operations activities throughout the United States Pacific Command (USPACOM) theater. Headquartered at Kadena AB, Okinawa, Japan the group is prepared to conduct a variety of high-priority, low-visibility missions. Its mission is air support of joint and allied special operations forces in the Pacific. It maintains a worldwide mobility commitment, participates in Pacific theater exercises as directed and supports humanitarian and relief operations.[87]

- The United States Air Force Special Operations School (USAFSOS) at Hurlburt Field, Florida is a primary support unit of the Air Force Special Operations Command. The USAFSOS prepares special operations Airmen to successfully plan, organize, and execute global special operations by providing indoctrination and education for AFSOC, other USSOCOM components, and joint/interagency/ coalition partners.[88]

## Marine Corps

In October 2005, the Secretary of Defense directed the formation of United States Marine Corps Forces Special Operations Command, the Marine component of United States Special Operations Command. It was determined that the Marine Corps would initially form a unit of approximately 2500 to serve with USSOCOM. On February 24, 2006 MARSOC activated at Camp Lejeune, North Carolina. MARSOC initially consisted of a small staff and the Foreign Military Training Unit (FMTU), which had been formed to conduct foreign internal defense. FMTU is now designated as the Marine Special Operations Advisor Group (MSOAG).[89]

As a service component of USSOCOM, MARSOC is tasked by the Commander USSOCOM to train, organize, equip, and deploy responsive U.S. Marine Corps special operations forces worldwide, in support of combatant commanders and other agencies. MARSOC has been directed to conduct foreign internal defense, direct action and special reconnaissance. MARSOC has also been directed to develop a capability in unconventional warfare, counter-terrorism, and information operations. MARSOC deployed its first units in August 2006, six months after the group's initial activation. MARSOC reached full operational capability in October 2008.[90]



United States Marine Corps Forces Special Operations Command emblem

### Units

- Marine Special Operations "Raider" Regiment (MSOR) consists of a Headquarters Company and three Marine Special Operations Battalions, the 1st, 2nd and 3rd MSOB. The Regiment provides tailored military combat-skills training and advisor support for identified foreign forces in order to enhance their tactical capabilities and to prepare the environment as directed by USSOCOM as well as the capability to form the nucleus of a Joint Special Operations Task Force. Marines and Sailors of the MRR train, advise and assist friendly host nation forces – including naval and maritime military and paramilitary forces – to enable them to support their governments' internal security and stability, to counter subversion and to reduce the risk of violence from internal and external threats. MRR deployments are coordinated by MARSOC, through USSOCOM, in accordance with engagement priorities for Overseas Contingency Operations.

- Marine Intelligence Battalion (MIB) trains, sustains, maintains combat readiness, and provides intelligence support at all operational levels in order to support MARSOF training and operations worldwide with mission-specific intelligence capability.

- Marine Special Operations Support Group (MSOSG) trains, equips, structures, and provides specially qualified Marine forces, including, operational logistics, intelligence, Military Working Dogs, Firepower Control Teams, and communications support in order to sustain worldwide special operations missions as directed by Commander, U.S. Marine Corps Forces Special Operations Command (COMMARFORSOC).



DA/SR Operators from 1st SOB (Special Operations Battalion) respond to enemy fire in Afghanistan

- The Marine Special Operations School (MSOS) performs the screening, recruiting, training, assessment and doctrinal development functions for MARSOC. It includes two subordinate Special Missions Training Branches (SMTBs), one on each coast.
  - The Special Mission Training Branch—East provide special operations training in tactics, techniques and procedures, and evaluation and certification of MARSOC forces to specified conditions and standards for SOF. The Marines of MSOS are operators with the training, experience and mature judgment to plan,

Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 532 of 1046

Case 1:15-cv-20782-JEM Document 404-1 Entered on FLSD Docket 04/24/2015 Page 67 of 150

coordinate, instruct and supervise development of SOF special reconnaissance and direct action skills.[91]

## List of USSOCOM Combatant Commanders

| No. | Image | Name | Branch | Start of Term | End of Term | Time in office |
|---|---|---|---|---|---|---|
| 1. | | GEN James J. Lindsay | USA | 16 April 1987 | 27 June 1990 | 1,168 days |
| 2. | | GEN Carl W. Stiner | USA | 27 June 1990 | 20 May 1993 | 1,058 days |
| 3. | | GEN Wayne A. Downing | USA | 20 May 1993 | 29 February 1996 | 1,015 days |
| 4. | | GEN Henry H. Shelton | USA | 29 February 1996 | 25 September 1997 | 574 days |
| (Acting) | | RADM Raymond C. Smith, Jr. | USN | 25 September 1997 | 5 November 1997 | 41 days |
| 5. | | GEN Peter J. Schoomaker | USA | 5 November 1997 | 27 October 2000 | 1,087 days |
| 6. | | GEN Charles R. Holland | USAF | 27 October 2000 | 2 September 2003 | 1,040 days |
| 7. | | GEN Bryan D. Brown | USA | 2 September 2003 | 9 July 2007 | 1,406 days |
| 8. | | ADM Eric T. Olson | USN | 9 July 2007 | 8 August 2011 | 1,491 days |
| 9. | | ADM William H. McRaven | USN | 8 August 2011 | 28 August 2014 | 1,116 days |
| 10. | | GEN Joseph L. Votel | USA | 28 August 2014 | Present | days |

## USSOCOM medal

The United States Special Operations Command Medal was introduced in 1994 to recognize individuals for outstanding contributions to, and in support of, special operations. Since it was created, there have been more than 50 recipients, four of which are not American. Some of which includes: General broni Włodzimierz Potasiński (Poland, 2010, posthumously),[92][93] Kaptein Gunnar Sønsteby (Norway, 2008), Generał brygady Jerzy Gut (Poland, June 2014)[94] and Generał dywizji Piotr Patalong (Poland, October 2014).[95]

## See also

# References

## Citations

1. SOCOM Public Affairs (2013). SOCOM Fact Book 2013 (http://www.socom.mil/News/Documents/USSOCOM_Fact_Book_2013.pdf). SOCOM Public Affairs.
2. "Biography of Admiral James L. Holloway III, US Navy (Ret.)" (http://www.history.navy.mil/bios/holloway_j.htm). June 2006. Retrieved 21 March 2008. |first1= missing |last1= in Authors list (help)
3. Rother, Larry (6 December 1996). "With a Bang, Panama Is Erasing House of Horrors". The New York Times.
4. Shanker, Thom (12 February 2004). "Regime Thought War Unlikely, Iraqis Tell U.S". The New York Times.
5. "USSOCOM Posture Statement" (http://web.archive.org/web/20080227010822/http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) (PDF). USSOCOM. 2007. Archived from the original (http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) on 27 February 2008. Retrieved 12 February 2008.
6. Delta: America's Elite Counterterrorist Force. Terry Griswold, D. M. Giangreco. Zenith Imprint, 2005. ISBN 0-7603-2110-8. p. 35
7. Sloan, Stephen (October 1992). Beating International Terrorism: An Action Strategy for Preemption and Punishment. Diane Pub Co. ISBN 1-56806-104-8.
8. Daniel, W.C. (September 1986). "H.R.5109". A bill to establish a National Special Operations Agency within the Department of Defense to have unified responsibility for all special operations forces and activities within the Department.
9. "USSOCOM Command History" (http://fas.org/irp/agency/dod/socom/2007history.pdf) (PDF). Retrieved 12 October 2014.
10. Goldwater, Barry; Sam Nunn. "S.CON.RES.80". A concurrent resolution to authorize the printing of 2,000 additional copies of the Committee Print of the Committee on Armed Services (99th Congress, 1st Session) entitled "Defense Organization: The Need for Change".
11. Nichols, Bill; Barry Goldwater (1986). "H.R.3622". A bill to amend title 10, United States Code, to strengthen the position of Chairman of the Joint Chiefs of Staff, to provide for more efficient and effective operation of the Armed Forces, and for other purposes.
12. Lederman, Gordon Nathaniel (November 1999). Reorganizing the Joint Chiefs of Staff: The Goldwater-Nichols Act of 1986. Greenwood Press. ISBN 0-313-31085-8.
13. Cohen, William (May 1986). "S.2453". A bill to enhance the capabilities of the United States to combat terrorism and other forms of unconventional warfare.
14. Taubman, Philip (5 December 1984). "U.S. Military tries to catch up in fighting terror". New York Times.
15. "Special Operations/Low Intensity Conflict & Interdependent Capabilities (ASD SO/LIC & IC)" (http://www.defenselink.mil/policy/sections/policy_offices/solic/). DoD. Retrieved 19 March 2008. |first1= missing |last1= in Authors list (help)
16. Giles, James E.; Altizer, Harrell B.; Glass, David V. Parker, Robert W. (March 1989). "Providing Resources for Special Operations Forces: Completing the Transition" (http://stinet.dtic.mil/oai/oai?verb=getRecord&metadataPrefix=html&identifier=ADA210951). Retrieved 19 March 2008.
17. Lewis, Paul (1 July 2001). "Charles S. Whitehouse, 79, Diplomat and C.I.A. Official". New York Times.
18. Andrew Kelley, Stephen (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
19. Peniston, Bradley (July 2006). No Higher Honor: Saving the USS Samuel B. Roberts in the Persian Gulf. United States Naval Institute Press. ISBN 1-59114-661-5.
20. "A Big Second Step in Somalia". New York Times. 4 May 1993.
21. "Two Tough Tracks in Somalia". New York Times. 10 December 1992.
22. The Book of Honor: Cover Lives and Classified Deaths at the CIA by Ted Gup, 2000
23. Bowden, Mark (2001). Black Hawk Down: A Story of Modern War. Signet. ISBN 0-451-20393-3.
24. Eversmann, Matt; Dan Schilling (July 2006). The Battle of Mogadishu: Firsthand Accounts from the Men of Task Force Ranger. Presidio Press. ISBN 0-345-46668-3.
25. Plan of Attack, Bob Woodward, 2004
26. Dao, James (22 March 2003). "The Commandos; Navy Seals Easily Seize 2 Oil Sites". New York Times.
27. Dao, James (28 April 2003). "Aftereffects: Special Operations Forces; War Plan Drew U.S. Commandos From Shadows". The New York Times.
28. Kruzel, John (26 May 2007). "Navy SEALs share war stories from Anbar province". American Forces Press Service.
29. R. Gordon, Michael (13 June 2003). "After The War: The Allies; In Major Assault, U.S. Forces Strike Hussein Loyalists". New York Times.
30. D. Kozaryn, Linda (14 December 2001). "U.S. Special Operations Forces Change "Face of War"". American Forces Press Service.
31. Thom Shanker, Eric Schmitt (2 August 2004). "The Reach of War: Military; Special Warriors Have Growing Ranks and Growing Pains in Taking Key Antiterror Role" (http://www.nytimes.com/2004/08/02/world/reach-war-military-special-warriors-have-growing-ranks-growing-pains-taking-key.html). The New York Times. Retrieved 11 March 2008.
32. DeYoung, Karen, and Greg Jaffe, "U.S. 'secret war' expands globally as Special Operations forces take larger role" (http://www.washingtonpost.com/wp-dyn/content/article/2010/06/03/AR2010060304965.html?nav=emailpage), Washington Post, 4 June 2010. Retrieved 6 August 2010.
33. Turse, Nick, "A Secret War in 120 Countries: The Pentagon's New Power Elite" (http://counterpunch.org/turse08042011.html), CounterPunch, 4 August 2011. Retrieved 5 August 2011.
34. Washington Post op-ed, John Lehman former Secretary of the Navy, October 2008
35. Waller, Douglas (3 February 2003). "The CIA Secret Army" (http://www.time.com/time/magazine/article/0,9171,1004145,00.html). Time Magazine (Washington). Retrieved 28 September 2009.
36. "Operation Anaconda" (http://www.time.com/time/covers/1101020318/popup/). Time. 10 March 2002.
37. Garamone, Jim. "The Battle of Takur Ghar" (http://www.defenselink.mil/news/newsarticle.aspx?id=44020). American Forces Press Service.
38. Executive Summary of the Battle of Takur Ghar (http://www.defenselink.mil/news/May2002/d20020524takurghar.pdf) (PDF). |first1= missing |last1= in Authors list (help)
39. MacPherson, Malcolm (2006). Roberts Ridge: A Story of Courage and Sacrifice on Takur Ghar Mountain, Afghanistan. Dell. ISBN 0-553-58680-7.
40. Luttrell, Marcus; Patrick Robinson (2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
41. Blumenfield, Laura (11 June 2007). "The Sole Survivor" (http://www.washingtonpost.com/wp-dyn/content/article/2007/06/10/AR2007061001492.html). Washington Post.
42. Naylor, Sean D., "McRaven tapped to lead SOCOM" (http://www.armytimes.com/news/2011/03/military-mcraven-picked-to-lead-socom-030111/), Army Times, 1 March 2011 16:53:04 EST. Retrieved 5 August 2011.
43. http://www.imgc-global.com/testimonials.html. Retrieved February 2012.
44. Risen, James (20 September 1998). "The World: Passing the Laugh Test; Pentagon Planners Give New Meaning to 'Over the Top'". New York Times.
45. Emerson 1988, p. 26.
46. Emerson, Steven (13 November 1988). "Stymied Warriors". New York Times.
47. L. Haney, Eric (August 2005). Inside Delta Force: The Story of America's Elite Counterterrorist Unit. Delta. ISBN 0-385-33936-4.
48. Mark Mazzetti (13 January 2007). "Pentagon Sees Move in Somalia as Blueprint". New York Times.

49. Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.

50. Gellman, Barton (23 January 2005). "Secret Unit Expands Rumsfeld's Domain". Washington Post.

51. Gerth, Jeff; Philip Taubman (8 June 1984). "U.s. military creates secret units for use in sensitive tasks abroad". New York Times.

52. Schmitt, Eric (19 March 2006). "In Secret Unit's 'Black Room,' a Grim Portrait of U.S. Abuse". New York Times.

53. E. Sanger, David (29 February 2004). "New U.S. Effort Steps Up Hunt For bin Laden". New York Times.

54. SOCJFCOM transitions to USSOCOM and becomes Special Operations Command – Joint Capabilities (http://www.jfcom.com/newslink/storyarchive/2011/pa050211.html), 2 May 2011

55. "USASOC overview" (http://www.soc.mil/sofinfo/story.html). Retrieved 8 January 2008.

56. Schmitt, Eric; Michael R. Gordon (21 September 2001). "A Nation Challenged: The Military: Top Air Chief Sent". New York Times.

57. "75th Ranger Regiment website" (http://web.archive.org/web/20080127071358/http://www.soc.mil/75thrr/75th_home.htm). Archived from the original (http://www.soc.mil/75thrr/75th_home.htm) on 27 January 2008. Retrieved 12 February 2008.

58. "75th Ranger Regiment website" (http://web.archive.org/web/20080208083040/http://www.soc.mil/75thrr/75thrrfs.html). Archived from the original (http://www.soc.mil/75thrr/75thrrfs.html) on 8 February 2008. Retrieved 12 February 2008.

59. Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.

60. Shanker, Thom (21 January 2002). "A Nation Challenged: Battlefield; Conduct of War Is Redefined By Success of Special Forces". New York Times.

61. Schmitt, Eric; Thom Shanker (2 March 2008). "U.S. Plan Widens Role in Training Pakistani Forces in Qaeda Battle". New York Times.

62. "USASF mission" (http://web.archive.org/web/20071211221352/http://www.soc.mil/SF/mission.htm). Archived from the original (http://www.soc.mil/SF/mission.htm) on 11 December 2007. Retrieved 8 January 2008.

63. "Night Stalkers fact sheet" (http://web.archive.org/web/20071217230457/http://www.soc.mil/160soar/soar_home.htm). Archived from the original (http://www.soc.mil/160soar/soar_home.htm) on 17 December 2007. Retrieved 8 January 2008.

64. "160th SOAR,MH-60 Black Hawk Helicopter Fact Sheet" (http://www.soc.mil/160soar/Blkhawk.html). Retrieved 12 February 2008.

65. "PSYOP Recruiting website" (http://web.archive.org/web/20080204120503/http://www.bragg.army.mil/psyop/psyopintro.htm). Archived from the original (http://www.bragg.army.mil/psyop/psyopintro.htm) on 4 February 2008. Retrieved 12 February 2008.

66. "Army Civil Affairs, Psychological Operations Soldiers Deploy in Support of Tsunami Relief Efforts" (http://www.defenselink.mil/home/articles/2005-01/a010705tj1.html) (Press release). Department of Defense. 7 January 2005. Retrieved 14 March 2008.

67. "PSYOP fact sheet" (http://web.archive.org/web/20080203103530/http://www.soc.mil/psyop/psyop_default.htm). Archived from the original (http://www.soc.mil/psyop/psyop_default.htm) on 3 February 2008. Retrieved 12 February 2008.

68. "95th Civil Affairs Fact Sheet" (http://web.archive.org/web/20080119211323/http://www.soc.mil/ca/ca_default.htm). Archived from the original (http://www.soc.mil/ca/ca_default.htm) on 19 January 2008. Retrieved 21 January 2008.

69. "SOSCOM Home Page" (http://web.archive.org/web/20080119210555/http://www.soc.mil/soscom/soscom_default.htm). Archived from the original (http://www.soc.mil/soscom/soscom_default.htm) on 19 January 2008. Retrieved 12 February 2008.

70. "USAJFKSWCS" (http://web.archive.org/web/20080119211345/http://www.soc.mil/swcs/swcs_default.htm). Archived from the original (http://www.soc.mil/swcs/swcs_default.htm) on 19 January 2008. Retrieved 19 February 2008.

71. "NAVSOC info website" (https://www.navsoc.navy.mil/). Retrieved 8 January 2008.

72. "Official U.S. Navy SEAL Info Website" (http://199.208.208.41/seal/introduction.aspx). Retrieved 11 January 2008.

73. Couch, Dick (October 2001). The Warrior Elite: The Forging of SEAL Class 228. Crown. ISBN 0-609-60710-3.

74. "Navy SEALs insertion/extraction page" (http://www.navyseals.com/insertion-extraction). Retrieved 11 January 2008.

75. Tiron, Roxana (February 2002). "New Mini-Sub Gives SEALs Extra Speed, Range, Payload". National Defense Magazine.

76. "Official U.S. Navy SWCC Info Website" (http://www.seal.navy.mil/swcc/introduction.aspx). Retrieved 11 January 2008.

77. Steven Lee Meyers, Thom Shanker (16 October 2001). "A Nation Challenged: The Offensive; Special Operations Gunship Being Used Against Taliban". New York Times.

78. "AFSOC" (http://www2.afsoc.af.mil/). Retrieved 11 January 2008.

79. Meyers, Steven Lee; Thom Shanker (17 October 2001). "A Nation Challenged: Air War; Pilots Told to Fire at Will in Some Zones". New York Times.

80. "Combat Control Fact Sheet" (http://archive.is/8rCmr). Air Force Special Operations Command. United States Air Force. Archived from the original (http://www.af.mil/information/factsheets/factsheet.asp?id=174) on 21 February 2013. Retrieved 13 January 2013.

81. "Combat Control career description" (http://www.airforce.com/careers/detail/combat-control-males-only/). Retrieved 12 January 2013.

82. "1st SOW Fact Sheet" (http://www2.hurlburt.af.mil/library/factsheets/factsheet.asp?id=3485). AFSOC. Retrieved 20 January 2008.

83. "Air Force launches first special tactics wing" (http://archive.is/Do72). 2012-06-13. Archived from the original (http://www.af.mil/news/story.asp?id=123305724) on December 12, 2012. Retrieved January 15, 2013.

84. "24th SOW Factsheet" (http://www.afsoc.af.mil/library/factsheets/factsheet.asp?id=19566). Retrieved January 15, 2013.

85. "N.M. Delegation Welcomes 27th Special Ops. Wing to Cannon" (http://bingaman.senate.gov/news/record.cfm?id=281393) (Press release). 29 August 2007. Retrieved 21 March 2008.

86. "352nd Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=224). AFSOC. Retrieved 21 January 2008.

87. "353rd SOG Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=225). AFSOC. Retrieved 21 January 2008.

88. "USAFOS website" (http://web.archive.org/web/20080109132212/http://www.af.mil/factsheets/factsheet.asp?id=186). Archived from the original (http://www.af.mil/factsheets/factsheet.asp?id=186) on 9 January 2008. Retrieved 21 January 2008.

89. Kenyon, Henry (May 2006). "Marine Corps Special Operations Command Hits the Beach" (http://www.afcea.org/signal/articles/templates/SIGNAL_Article_Template.asp?articleid=1123&zoneid=182). Signal Magazine. Retrieved 10 April 2008.

90. "MARSOC" (http://www.marsoc.usmc.mil/). Retrieved 8 January 2008.

91. "MARSOC, MSOS Info website" (http://web.archive.org/web/20080209195131/http://www.marsoc.usmc.mil/msos.html). Archived from the original (http://www.marsoc.usmc.mil/msos.html) on 9 February 2008. Retrieved 21 January 2008.

92. USSOCOM Medal recipients (http://www.shadowspear.com/friends/united-states-special-operations-command-medal-to-lt-gen-wlodzimierz-potasiński.6197/)

93. "NEWS | USSOCOM Commander visits POLSOCOM | Dowództwo Wojsk Specjalnych" (http://www.wojskaspecjalne.mil.pl/45,more,129-ussocom_commander_visits_polsocom.html?ln=en). Wojskaspecjalne.mil.pl. 2010-05-14. Retrieved 2013-04-22.

94. "Amerykańskie dowództwo Operacji Specjalnych docenilo polskiego generała" (http://www.wojsko-polskie.pl/pl/z-zycia-wojska/30655,amerykanskie-dowodztwo-operacji-specjalnych-docenilo-polskiego-generala.html). wojsko-polskie.pl. 2014-06-03. Retrieved 2014-06-03.

95. "Medal USSOCOM dla polskiego generała" (http://mon.gov.pl/aktualnosci/artykul/najnowsze/2014-10-29-medal-dowodztwa-operacji-specjalnych-usa-dla-polskiego-generala/). mon.gov.pl. 2014-10-29. Retrieved 2014-10-29.

Bibliography

- Briscoe, Charles (2001). Weapon of Choice: ARSOF in Afghanistan. Combat Studies Institute Press.
- Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.
- Couch, Dick (2006). Down Range: Navy SEALs in the War on Terrorism. New York, New York: Three Rivers Press. ISBN 1-4000-8101-7.
- Kelley, Stephen Andrew (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
- Luttrell, Marcus; Patrick Robinson (June 2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
- Pirnie, Bruce R. (August 1998). Assessing Requirements for Peacekeeping, Humanitarian Assistance and Disaster Relief. RAND Corporation. ISBN 0-8330-2594-5.
- Pushies, Fred (2007). U.S. Air Force Special Ops. Osceola, Wisconsin: MBI Publishing Company. ISBN 0-7603-0733-4.
- Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.
- Sweetman, Jack (March 1999). Great American Naval Battles. Naval Institute Press. ISBN 1-55750-794-5.
- David Tucker, Christopher J. Lamb (2007). United States Special Operations Forces. Columbia University Press. ISBN 0-231-13190-9.
- Wise, Harold Lee (May 2007). Inside the Danger Zone: The U.S. Military in the Persian Gulf, 1987–1988. US Naval Institute Press. ISBN 1-59114-970-3.

Web

- USDOD. U.S. DOD Dictionary of Military Terms (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- USDOD. U.S. DOD Dictionary of Military Terms: Joint Acronyms and Abbreviations (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- Talmadge, Eric (27 February 2008). "New US Submarines Trade Nukes for SEALs" (http://www.foxnews.com/wires/2008Feb27/0,4670,StealthatSea,00.html). Fox News. Associated Press.
- Eric Schmitt, Michael R. Gordon (4 February 2008). "Leak on Cross-Border Chases From Iraq" (http://www.nytimes.com/2008/02/04/washington/04rules.html?_r=1&scp=3&sq=Army+Rangers&st=nyt&oref=slogin). New York Times.
- von Zielbauer, Paul (27 April 2007). "Criminal Charges Are Expected Against Marines, Official Says" (http://www.nytimes.com/2007/04/27/world/asia/27abuse.html?scp=1&sq=MARSOC&st=nyt). New York Times.
- Graham, Bradley (2 November 2005). "Elite Marine Unit to Help Fight Terrorism" (http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110102069.html). Washington Post. Retrieved 27 May 2010. Check date values in: |year= / |date= mismatch (help)

## External links

- U.S. Special Operations Command (http://www.socom.mil/)
- Air Force Special Operations Command (http://www2.afsoc.af.mil/)
- U.S. Army Special Operations Command (http://www.soc.mil/)
- U.S. Naval Special Warfare Command (http://www.navsoc.navy.mil/)
- U.S. Marine Corps Forces Special Operations Command (http://www.marines.mil/unit/marsoc/Pages/default.aspx)
- Department of Defense (http://www.defenselink.mil/)
- Joint Special Operations University (https://jsou.socom.mil/)



Wikimedia Commons has media related to United States Special Operations Command.

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Special_Operations_Command&oldid=656910583"

Categories: Special operations commands of the United States Armed Forces │ Military units and formations in Florida │ Counter-terrorism

---

- This page was last modified on 17 April 2015, at 15:26.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

4/27/2015
Case 1:23-mc-00073-CKK-MAU Document 17 Filed 07/28/23 Page 536 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/24/2015 Page 71 of 150

# United States Central Command

From Wikipedia, the free encyclopedia

The United States Central Command
(USCENTCOM or CENTCOM) is a theater-level
Unified Combatant Command of the U.S. Department
of Defense, established in 1983, taking over the 1980
Rapid Deployment Joint Task Force (RDJTF)
responsibilities.

The CENTCOM Area of Responsibility (AOR)
includes countries in the Middle East, North Africa, and
Central Asia, most notably Afghanistan and Iraq.
CENTCOM has been the main American presence in
many military operations, including the Persian Gulf
War, the War in Afghanistan (2001–present), and the
Iraq War. As of 2015 CENTCOM forces are deployed
primarily in Iraq and Afghanistan in combat roles and
have support roles at bases in Kuwait, Bahrain, Qatar,
the United Arab Emirates, Oman, Pakistan, and central
Asia. CENTCOM forces have also been deployed in
Jordan, and Saudi Arabia in the past, with a small
presence remaining there.as of 2009.

As of 22 March 2013 CENTCOM's commander is
General Lloyd J. Austin, U.S. Army.

Of all 6 American regional unified combatant
commands CENTCOM is among the three with
headquarters outside its area of operations.
CENTCOM's main headquarters is located at MacDill
Air Force Base, in Tampa, Florida. A forward
headquarters was established in 2002 at Camp As
Sayliyah in Doha, Qatar, which in 2009 transitioned to a
forward headquarters at Al Udeid Air Base in Qatar to
serve American strategic interests. On 12 January,
2015, CENTCOM's Twitter and YouTube accounts
were hacked.[2]



United States Central Command

Emblem of the United States Central Command.

| | |
|---|---|
| Active | 1983–present |
| Country | 🇺🇸 United States of America |
| Type | Unified Combatant Command |
| Headquarters | MacDill Air Force Base Tampa, Florida, U.S. |
| Nickname | CENTCOM |
| Engagements | Persian Gulf War Iraq War War in Afghanistan |
| Commanders | |
| Combatant Commander | General Lloyd Austin, USA |
| Deputy Commander | Vice Admiral Mark Fox, USN [1] |
| Notable commanders | General David Petraeus Admiral William Fallon General John Abizaid General Tommy Franks General Anthony Zinni General James Mattis |

## Contents

- 1 History
- 2 Structure
  - 2.1 War planning

4/27/2015
Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 07/28/23 Page 537 of 1046
Case 1:15-cv-20782-JEM Document 46-1 Entered on FLSD Docket 04/24/2015 Page 72 of 150

- 3 Geographic scope
- 4 Commanders
  - 4.1 Unit decorations
- 5 See also
- 6 References
- 7 External links

General Norman Schwarzkopf
Insignia

Shoulder sleeve insignia (US Army only)

# History

In 1983, U.S. Central Command was established to succeed the Rapid Deployment Joint Task Force, formed at MacDill AFB, Florida on 1 March 1980, to handle US national security interests in Southwest Asia, Central Asia and the Persian Gulf.[3]

On 17 May 1987, the USS Stark (FFG-31), conducting operations in the Persian Gulf during the Iran-Iraq War, was struck by Exocet missiles fired by an Iraqi aircraft, resulting in 37 casualties. Soon afterward, as part of what became known as the "Tanker War", the Federal government of the United States reflagged and renamed 11 Kuwaiti oil tankers. In Operation Earnest Will, these tankers were escorted by USCENTCOM's Middle East Force through the Persian Gulf to Kuwait and back through the Strait of Hormuz.[3]

With the 1990 Invasion of Kuwait and the subsequent Operation Desert Shield, hundreds of thousands of troops were transferred to Saudi Arabia. Islamists objected to non-Muslim troops in Saudi Arabia, and their use in Operation Desert Storm; this with other attacks on Iraq became a key rallying cry for opposition movements in Saudi Arabia and elsewhere. By the late 1990s, Central Command gradually moved troops to other countries, particularly Bahrain, Kuwait, Qatar, Oman, and the United Arab Emirates.

Exercise Internal Look has been one of CENTCOM's primary planning events. It had frequently been used to train CENTCOM to be ready to defend the Zagros Mountains from a Soviet attack and was held annually.[4] In autumn 1989, the main CENTCOM contingency plan, OPLAN 1002-88, assumed a Soviet attack through Iran to the Persian Gulf. The plan called for five and two-thirds US divisions to deploy, mostly light and heavy forces at something less than full strength (apportioned to it by the Joint Strategic Capability Plan [JSCAP]). The strategy of the original plan called for these five and two-thirds divisions to march from the Persian Gulf to the Zagros Mountains and prevent the Soviet Ground Forces from seizing the Iranian oil fields.[5] After 1990 Norman Schwarzkopf reoriented CENTCOM's planning to fend off a threat from Iraq and the exercise moved to a biennial schedule. The exercise has been employed for explicit war planning on at least two occasions: Internal Look '90, which dealt with a threat from Iraq,[4] and Internal Look '03, which was used to plan what became Operation Iraqi Freedom.

From April to July 1999 CENTCOM conducted Exercise Desert Crossing 1999 centered on the scenario of Saddam Hussein being ousted as Iraq's dictator. It was held in the McLean, Virginia, offices of Booz Allen.[6]:6-7 The exercise concluded that unless measures were taken, "fragmentation and chaos" would ensue after Saddam Hussein's overthrow.

In January 2015, CENTCOM's Twitter feed was reported to have been hacked on 11 January by ISIS sympathizers.[7] for less than one hour. No classified information was posted and "none of the information posted came from CENTCOM's server or social media sites",[8] however, some of the slides came from federally funded Lincoln Laboratory at MIT.[7]

# Structure

CENTCOM headquarters staff directorates include personnel, intelligence, operations, logistics, plans & policy, information systems, training & exercises, and resources, and other functions. The intelligence section is known as Joint Intelligence Center, Central Command, or JICCENT, which serves as a Joint Intelligence Center for the co-ordination of intelligence. Under the intelligence directorate, there are several divisions including the Afghanistan-Pakistan Center of Excellence.

CENTCOM directs four "service component commands" and one subordinate unified command and no fighting units directly subordinate to it:

The United States Army Central (USARCENT), and the United States Air Forces Central Command (USAFCENT), both headquartered at Shaw Air Force Base in South Carolina, the U.S. Marine Forces Central Command (USMARCENT), headquartered at MacDill Air Force Base, Florida and the U.S. Naval Forces Central Command (USNAVCENT), headquartered at Naval Support Activity Bahrain in the Kingdom of Bahrain. MacDill Air Force Base also hosts a Sub-unified command called the Special Operations Command Central (USSOCCENT).

Two major subordinate multi-service commands reporting to Central Command were responsible for Afghanistan: Combined Joint Task Force 180 and Combined Forces Command Afghanistan (CFC-A). CFC-A was disestablished in February 2007.[9] From that point onward, the International Security Assistance Force directed most U.S. forces in Afghanistan, and a U.S. general, General Dan K. McNeill, assumed command of ISAF that same month.[10]

Temporary task forces include the Central Command Forward - Jordan (CF-J), established in Jordan after 2011. The reason for its establishment has been reported as to seize Syrian WMD if necessary.[11]

On 1 October 2008 Combined Joint Task Force - Horn of Africa at Camp Lemonnier in Djibouti was transferred to United States Africa Command (USAFRICOM).[12] The United States Forces – Iraq or USF-I, was a major subordinate multi-service command during the Iraq War order of battle until it was disestablished in 2011.

Elements of other Unified Combatant Commands, especially United States Special Operations Command (USSOCOM), operate in the CENTCOM area. It appears that SOCCENT does not direct the secretive Task Force 77, the ad-hoc grouping of Joint Special Operations Command 'black' units such as Delta Force and Army Rangers, which is tasked to pursue the most sensitive high value targets such as Al Qaeda and the Taliban leadership since 11 September 2001. Rather TF 77, which started out as Task Force 11 and has gone through a number of name/number changes, reports directly to Joint Special Operations Command, part of USSOCOM.

# War planning

The following code names are known to have been associated with was planning per William Arkin:[13]:46

- CENTCOM OPORDER 01-97, Force Protection
- SOCEUR SUPPLAN 1001-90, 9 May 1989
- CENTCOM CONPLAN 1010, July 2003
- CENTCOM CONPLAN 1015-98, possibly support to OPLAN 5027 for Korea, 15 March 1991
- CENTCOM 1017, 1999
- CONPLAN 1020
- CONPLAN 1067, for possible Biological Warfare response
- CENTCOM CONPLAN 1100-95, 31 March 1992

Globalsecurity.org also lists OPLAN 1002 (Defense of the Arabian Peninsula).

# Geographic scope

With the 1983 establishment of CENTCOM Egypt, Sudan, Kenya, Ethiopia, Somalia and Djibouti came within the area of responsibility (AOR). Thus CENTCOM directed the 'Natural Bond' exercises with Sudan, the 'Eastern Wind' exercises with Somalia, and the 'Jade Tiger' exercises with Oman, Somalia, and Sudan. Exercise Jade Tiger involved the 31st Marine Expeditionary Unit with Oman from 29 November 82-8 Dec 82.[13]:404


CENTCOM Area Of Responsibility

The Area of Responsibility extends to 27 countries: Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Oman, Pakistan, Qatar, Saudi Arabia, Syria, Tajikistan, Turkmenistan, United Arab Emirates (UAE), Uzbekistan, and Yemen. International waters included are the Red Sea, Persian Gulf, and western portions of the Indian Ocean.[14] Syria and Lebanon were transferred from the United States European Command on 10 March 2004.

Israel is surrounded by CENTCOM countries but remains in United States European Command (EUCOM). General Norman Schwarzkopf expressed the position over Israel frankly in his 1992 autobiography: 'European Command also kept Israel, which from my viewpoint was a help: I'd have had difficulty impressing the Arabs with Central Command's grasp of geopolitical nuance if one of the stops on my itinerary had been Tel Aviv.'[4]:318

On 7 February 2007, plans were announced for the creation of a United States Africa Command which transferred strategic interest responsibility for all of Africa to the new USAFRICOM, except for Egypt. On 1 October 2008, the Africa Command became operational and Combined Joint Task Force - Horn of Africa, the primary CENTCOM force on the continent, started reporting to AFRICOM at Stuttgart instead of CENTCOM in Tampa.

The U.S. armed forces use a variable number of base locations depending on its level of operations. With ongoing warfare in Iraq and Afghanistan in 2003, the United States Air Force used 35 bases, while in 2006 it used 14, including four in Iraq. The United States Navy maintains one major base and one smaller installation, with extensive deployments afloat and ashore by U.S. Navy, U.S Marine Corps and U.S. Coast Guard ships, aviation units and ground units.

# Commanders

As of March 2013, GEN Lloyd Austin is commander. He took command from General James Mattis, USMC. Mattis took command from [15][16][17] Lieutenant General John R. Allen, USMC, the deputy commander since July 2008, who took temporary command when the previous commander, General David Petraeus, USA, left to take command of the International Security Assistance Force (ISAF) in Afghanistan on 23 June 2010.[18]

| No. | Image | Name | Service | Start | End | Time in office |
|---|---|---|---|---|---|---|
| 1. | | GEN Robert Kingston | United States Army | 1 January 1983 | 27 November 1985 | 1,061 days |
| 2. | | Gen George B. Crist | United States Marine Corps | 27 November 1985 | 23 November 1988 | 1,092 days |
| 3. | | GEN H. Norman Schwarzkopf | United States Army | 23 November 1988 | 9 August 1991 | 989 days |
| 4. | | Gen Joseph P. Hoar | United States Marine Corps | 9 August 1991 | 5 August 1994 | 1,092 days |
| 5. | | GEN J. H. Binford Peay III | United States Army | 5 August 1994 | 13 August 1997 | 1,104 days |
| 6. | | Gen Anthony Zinni | United States Marine Corps | 13 August 1997 | 6 July 2000 | 1,058 days |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7. | | GEN Tommy Franks | United States Army | 6 July 2000 | 7 July 2003 | 1,096 days |
| 8. | | GEN John Abizaid | United States Army | 7 July 2003 | 16 March 2007 | 1,348 days |
| 9. | | ADM William J. Fallon | United States Navy | 16 March 2007 | 28 March 2008 | 378 days |
| (Acting) | | LTG Martin E. Dempsey | United States Army | 28 March 2008 | 31 October 2008 | 217 days |
| 10. | | GEN David H. Petraeus | United States Army | 31 October 2008 | 30 June 2010 | 607 days |
| (Acting) | | LtGen John R. Allen | United States Marine Corps | 30 June 2010 | 11 August 2010 | 42 days |
| 11. | | Gen James Mattis | United States Marine Corps | 11 August 2010 | 22 March 2013 | 954 days |
| 12. | | GEN Lloyd Austin | United States Army | 22 March 2013 | Incumbent | Expression error: Unexpected number. days |

## Unit decorations

The unit awards depicted below are for Headquarters, US Central Command at MacDill AFB. Award for unit decorations do not apply to any subordinate organization such as the service component commands or any other activities unless the orders specifically address them.

| Award streamer | Award | Dates | Notes |
|---|---|---|---|
|  | Joint Meritorious Unit Award | 2 August 1990 – 21 April 1991 | Department of the Army General Order (DAGO) 1991-22 & 1992-34[19] |
|  | Joint Meritorious Unit Award | 1 August 1992 – 4 May 1993 | DAGO 1994-12 & 1996-01 |
|  | Joint Meritorious Unit Award | 8 October 1994 – 16 March 1995 | DAGO 2001–25 |
|  | Joint Meritorious Unit Award | 1 September 1996 – 6 January 1997 | Joint Staff Permanent Order (JSPO) J-ISO-0012-97 |
|  | Joint Meritorious Unit Award | 1 October 1997 – 15 July 1998 | JSPO J-ISO-0241-98 |
|  | Joint Meritorious Unit Award | 16 July 1998 – 1 November 1999 | JSPO J-ISO-0330-99 / DAGO 2001–25 |
|  | Joint Meritorious Unit Award | 2 November 1999 – 15 March 2001 |  |
|  | Joint Meritorious Unit Award | 11 September 2001 – 1 May 2003 | DAGO 2005–09 |
|  | Joint Meritorious Unit Award | 2 May 2003 – 31 December 2005 |  |
|  | Joint Meritorious Unit Award | 1 January 2006 – 1 March 2008 | JSPO J-ISO-0061-08 |
|  | Joint Meritorious Unit Award | 2 March 2008 – 1 July 2010 |  |
|  | Joint Meritorious Unit Award | 2 July 2010 – 31 July 2012 |  |

# See also

- Strategic Army Corps

# References

1. http://www.centcom.mil/en/about-centcom-en/leadership-en
2. "Centcom hacked: This was no more harmful than a teenager's prank" (http://www.telegraph.co.uk/news/worldnews/islamic-state/11342416/Centcom-hacked-This-was-no-more-harmless-than-a-teenagers-prank.html). The Telegraph. Retrieved 12 January 2015.
3. Anthony Cordesman, USCENTCOM Mission and History (http://csis.org/files/media/csis/pubs/uscentcom3%5B1%5D.pdf), Center for Strategic and International Studies, August 1998
4. Norman Schwarzkopf (1993). It Doesn't Take a Hero. Bantam Books paperback edition. pp. 331–2,335–6. ISBN 0-553-56338-6.Harold Coyle's novel Sword Point gives an impression of what such planning envisaged, by a U.S. Army officer who would have had some idea of the general planning approach.
5. Richard Moody Swain, Lucky War: Third Army in Desert Storm, U.S. Army Command and General Staff College Press via Google Books, 6.
6. Michael R. Gordon, Bernard E. Trainor(2012). The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama. New York: Pantheon Books. ISBN 978-0-307-37722-7.
7. "U.S. Central Command Twitter feed appears hacked by Islamic State sympathizers" (http://www.reuters.com/article/2015/01/12/us-cybersecurity-centcom-hack-idUSKBN0KL1UZ20150112). Reuters. 12 January 2015. Retrieved 12 January 2015.
8. CHRIS GOOD, JOSHUA COHAN and LEE FERRAN (12 January 2015). "Home> International 'Cybervandalism': ISIS Supporters Hijack US Military Social Media Accounts" (http://abcnews.go.com/International/us-military-twitter-account-apparently-hijacked-isis-supporters/story?id=28170963). ABC (ABC news Internet Venture). Retrieved 12 January 2015.
9. Jan Goldman Ph.D., The War on Terror Encyclopedia: From the Rise of Al-Qaeda to 9/11 and Beyond, 100-101.
10. Auerswald and Saideman, 2014, 96f
11. Nicola Nasser (5 September 2013). "Jordan Invites US Targets for Syrian Retaliation" (http://www.globalresearch.ca/jordan-invites-us-targets-for-syrian-retaliation/5348258). Centre for Research on Globalization.
12. "Africans Fear Hidden U.S. Agenda in New Approach to Africom" (http://www.foxnews.com/story/0,2933,430564,00.html). Associated Press. 2008-09-30. Retrieved 2008-09-30.
13. Arkin, William (25 January 2005). Code Names: Deciphering U.S. Military Plans, Programs and Operations in the 9/11 World (First ed.). Steerforth. ISBN 1586420836.
14. "Central Command" (http://www.globalsecurity.org/military/agency/dod/centcom.htm). Global Security.org. n.d. Retrieved 13 January 2015.
15. "Mattis takes over Central Command, vows to work with Mideast allies in Afghanistan, Iraq" (http://www.foxnews.com/us/2010/08/11/mattis-takes-central-command-vows-work-mideast-allies-afghanistan-iraq/). Fox News Channel. Associated Press. 11 August 2010. Retrieved 15 March 2012.
16. Mitchell, Robbyn (12 August 2010). "Mattis takes over as CentCom chief" (http://www.tampabay.com/news/article1114800.ece). St. Petersburg Times. p. 1. Retrieved 12 August 2010.
17. "Mattis assumes command of CENTCOM" (http://www.centcom.mil/news/mattis-assumes-command-of-centcom). U.S. Central Command. 11 August 2010. Retrieved 12 August 2010.

18. "Lt. Gen. Allen named CENTCOM acting commander" (http://www.centcom.mil/en/press-releases/lt-gen-allen-named-centcom-acting-commander) (Press release). U.S. Central Command. 30 June 2010. Retrieved 2 July 2010.

19. "Department of the Army General Orders" (http://armypubs.army.mil/epubs/da_general_orders_1.html). United States Army Publications Directorate. Retrieved 30 April 2011. (Army Knowledge Online account may be required.)

# External links

- U.S. Central Command official website (http://www.centcom.mil/)
- Multi-National Force – Iraq.com mnf-iraq.com (http://www.mnf-iraq.com) (English)
- Multi-National Force – Iraq (http://www.shurakaal-iraq.com) shurakaal-iraq.com (Arabic)
- Combined Joint Task Force – Horn of Africae official site (http://www.hoa.centcom.mil/)
- Spiegel, Peter (5 January 2007). "Naming New Generals A Key Step In Shift On Iraq" (http://articles.latimes.com/2007/jan/05/nation/na-generals5). Los Angeles Times.
- Foreign Policy, Pentagon Ups the Ante in Syria Fight (http://foreignpolicy.com/2015/03/30/the-pentagon-ups-the-ante-in-syria-fight-iraq-islamic-state-delta-force/)
- http://www.armytimes.com/story/military/pentagon/2014/12/30/iraq-1st-infantry-funk/21062071/ - Combined Joint Forces Land Component Command - Iraq

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Central_Command&oldid=655960119"

Categories: Military units and formations in Florida | Organizations based in Tampa, Florida | Unified combatant commands of the United States Armed Forces | Military units and formations established in 1983 | 1983 establishments in the United States

- This page was last modified on 11 April 2015, at 11:43.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

4/27/2015                                        Police show off Homeland Security intelligence center
Case 1:23-mc-00073-CKK-MAU   Document 1-7   Filed 07/28/23   Page 546 of 1046
Case 1:15-cv-20782-JEM   Document 40-3   Entered on FLSD Docket 04/24/2015   Page 81 of 150

# Police show off Homeland Security intelligence center

By **Linda Trischitta**
Sun Sentinel

MARCH 20, 2015, 12:15 AM   |   DORAL

A t a secret location in Miami-Dade County, analysts and investigators tasked with preventing terrorist attacks study tips about possible plots that could be carried out between Key West and Palm Beach.

They are part of the Southeast Florida Fusion Center, one of 78 centers in the United States and Guam, Puerto Rico and the U.S. Virgin Islands that make sure federal and local police agencies talk to one another about pending threats.

On Thursday, the center promoted its "See Something, Say Something" campaign to engage residents of Monroe, Miami-Dade, Broward and Palm Beach counties in its efforts.

Before the Sept. 11, 2001 al-Qaeda attacks when nearly 3,000 died, some of the terrorists trained at Florida air fields before flying jets into the World Trade Center, a field in Pennsylvania and the Pentagon in Washington, D.C.

"There was information out there that wasn't being shared," said Lt. Mario Hernandez of Miami-Dade police, the agency that manages the eight-year-old center. "One agency had a piece of the puzzle, another agency had a piece of the puzzle, nobody had the whole puzzle. We're trying to prevent that from happening again."

Besides crime analysis, they help local authorities prepare for big national events that South Florida frequently hosts and will lend equipment such as cameras to monitor crowds.

The center's director, acting Maj. Janna Bolinger-Heller, of Miami-Dade Police, said she could not disclose most of its success stories or the number of terrorism incidents that have been thwarted.

But officials said they helped investigate Raees Alam Qazi, 22, and his brother Sheheryar Alam Qazi, 32, of Oakland Park, who pleaded guilty March 12 to federal terrorism charges and admitted they plotted a terrorist attack on New York City landmarks.

The center coordinated in 2014 with Miami Gardens police, U.S. Customs and Border Protection and Interpol in an investigation of two Bahamian men here illegally. One was sought in his country for the murder of a U.S. citizen; Bahamian authorities took him into custody. The other man was deported, according to Homeland Security.

An example of what Bolinger-Heller called "unintended benefits" was how the center's cameras that had been lent _____ ounty Fair helped recover lost children.

_____ ban Beach Week in Miami Beach, a camera placed on a causeway showed police racing to a _____ and a burglary suspect jumping off a backyard dock into Biscayne Bay, she said. The camera _____ s to the swimming suspect.

_____ price on the kinds of resources we have here and how we can use them to benefit the

SEARCH

SUBSCRIBE    LOG IN

MEMBER CENTER

NEWS

CLASSIFIED

BROWARD

PALM BEACH

SPORTS

ENTERTAINMENT

BUSINESS

LIFESTYLE

HEALTH

TRAVEL

OPINION

WEATHER

SF PARENTING

CARS & TRUCKS

VIDEOS & PHOTO

r-Heller said.

ort Lauderdale's air show or a Super Bowl, the center will begin its threat assessment months the other centers in the country for intelligence reports, Lt. Margarita Varela said.

cal criminal activity, concerns for police and public safety in their preparations. Regardless of orts, Varela said, "the bottom line for the public is we can't do it alone. We have to work hand rder to prevent criminal activity or a terrorism attack from happening in our hometown. Our e, our families work here, we go to the malls here, we celebrate here."

center's tip lines — iwatchsouthflorida.com, seffc@mdpd.com and 855-352-7233 — to be Stoppers.

ype of person being reported on," Varela said. "Look at the behavior. Was a vehicle or item left e could walk by and not even challenge those things. In today's society, we can't. Bring this authorities and let us follow up on it."

### gns of Terrorism

one recording or monitoring activities, taking notes, drawing diagrams, marking maps or ther visual devices.

or individuals seeking information in person or by mail, phone or email about military ies or personnel.

Attempts to measure reaction times by police to security breaches; efforts to go through onitor procedures to assess strengths and weaknesses.

s transactions involving large cash payments, withdrawals or deposits; asking for money for or criminal activities.

ng or stealing explosives, weapons or ammunition; acquiring military uniforms, decals, flight lges or equipment to make them and other items.

eople who don't seem to belong, whether in a workplace, neighborhood, business or at border onation of law enforcement, military or corporate employees.

people in place and moving them according to a plan without actually committing a terrorist is activity includes mapping routes and timing traffic lights and flow.

e and supplies getting into position to commit an act. This is the last chance for someone to e a terrorist event happens.

lorida Fusion Center

Ltrischitta@Tribune.com, 954-356-4233 or Twitter @Linda Trischitta

Copyright © 2015, Sun Sentinel

## FROM AROUND THE WEB

Sponsored Links by Taboola

4/27/2015
Case 1:23-mc-00073-CKK-MAU Document 1-7 Filed 05/28/22 Page 548 of 1046
Case 1:15-cv-20782-JEM Document 46-1 Entered on FLSD Docket 04/24/2015 Page 83 of 150

1 Dirty Little Secret To Eliminate 15 Years Of Mortgage Payments
LowerMyBills

7 Outrageous Credit Cards For Those Of Us That Have Excellent Credit
NextAdvisor

This $15 Product is Changing a $13 Billion Industry
Harry's

Ex-Microsoft exec is disrupting the traditional broker model
Yahoo! Finance | Motif Investing

Kate Upton and Tracy Morgan's Super Bowl Touchdown Dance
Vogue

30 Highest Paid Performers In The World
Forbes

Why You Should Be Getting Your Wine Online
Betches Love This | Lot 18

Russell Wilson Disagrees With Aaron Rodgers, Says God Does Care About Football
ThePostGame

4/27/2015

Case 1:23-mc-00078-CKK-MAU Document 1-7 Filed 07/08/23 Page 549 of 1046
Case 1:15-cv-20782-JEM Document 40-5 Entered on FLSD Docket 04/24/2015 Page 84 of 150



POLITICS

# Sheriff Joe vs. Uncle Sam

Joe Arpaio, America's most flamboyant lawman, hired a private detective to investigate the wife of a federal judge considering whether he was in contempt of court.



Ross D. Franklin / AP

**DAVID A. GRAHAM**
**APR 25, 2015**

---

Lots of conservatives talk a good game about how citizens should resist federal control and devolve power to local governments. Few of them are willing to put their convictions into action in quite the same way that Sheriff Joe Arpaio is.

The man who calls himself "America's toughest sheriff" was already in trouble with Uncle Sam, on trial for contempt of court in a U.S. district court.

It was only once that was under way that Arpaio and his lawyer apparently had the idea to sic a private investigator on the wife of the federal judge hearing his case. That shows toughness. It shows a willingness to use unorthodox tactics to resist federal interference. It's also not especially bright.

Reporters in the courtroom describe a somewhat shocking scene. Lawyers had completed their questioning when Judge Murray Snow announced he had some questions for Arpaio. After a series of queries, Snow asked: "Are you aware that I've been investigated by anyone?"

The sheriff then admitted that his former attorney had hired the private investigator to look into a tipster's allegation that Snow's wife had told someone at a restaurant that Snow wanted to prevent Arpaio from being reelected. Arpaio's amazing rationalization: "We weren't investigating you. We were investigating some comments that came to our attention."

**RELATED STORY**



Sheriff Joe Arpaio: The Most Lawless Lawman in America

The sheriff was on trial for, well, thumbing his nose at the federal government. In 2011, Judge Murray Snow issued a ruling demanding that Arpaio stop anti-immigration patrols arresting people solely on suspicion of being in the country illegally, while Snow continued to consider whether they

4/27/2015    Case 1:23-cv-20762-CKK-MAU - Sheriff Joe vs. Uncle Sam - The Atlantic    Entered on FLSD Docket 04/24/2015    Page 86 of 150

Case 1:23-cv-20762-CKK-MAU    Document 16-7    Filed 07/08/23    Page 551 of 1046

constituted illegal racial profiling. (In 2013, Snow finally ruled that they did, forcing Arpaio to drop the patrols permanently.) Arpaio simply disregarded the order for 18 months—as he now acknowledges. The question is whether that was intentional or not; if the judge decides it's the former, he could find Arpaio in contempt. The sheriff's somewhat improbable explanation is that he simply didn't realize that a federal judge had issued the order.

"I have a deep respect for the courts," Arpaio said. "It really hurts me after 55 years to be in this position. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

There are two problems with that. One is that a deputy testified this week that Arpaio had personally instructed him to continue enforcing federal immigration laws, in defiance of the judge's order. The second is that hiring a PI to investigate the judge who's considering whether you're in contempt of court isn't what most people would consider deep respect.

"It is contemptuous behavior on its face," a former U.S. attorney told The Arizona Republic. "And it is information deserving of further investigation to determine if other criminal misconduct occurred here."

Intimidating or trying to improperly influence a federal judge is in fact a crime. But this isn't the first time Arpaio has pulled a stunt like this—and in fact, he has a long history of launching investigations into political opponents. In 2012, a federal grand jury concluded a three-year investigation into abuse-of-power allegations without charging Arpaio.

The U.S. Department of Justice also has a civil-rights lawsuit pending against the sheriff accusing him of retaliating against critics. In a bizarre Spy vs. Spy moment, Arpaio also admitted to Snow that he had used county funds in 2013 to launch an investigation into … the Justice Department. Elsewhere during the questioning, Arpaio "conced[ed] that the agency employed

unreliable informants, private investigators and an unknown amount of public funds to investigate Arpaio's political enemies," as the *Republic* put it.

Arpaio's current attorney pushed back on the big revelation after the hearing, telling reporters: "These been no evidence that the sheriff ordered the judge's wife to be investigated." But his client's use of the first-person plural ("we were investigating some comments that came to our attention") would seem to contradict that.

Courts have already found that Arpaio violated the law, and there's no longer any question that other aspects of his behavior—even those not yet adjudicated for legality—are outlandish. The law isn't especially conflicted on many of the issues about which he's outspoken. The federal government has authority to enforce immigration laws; Arpaio's racial profiling was unlawful; intimidating a judge, if that's what he's found to be doing, is unlawful too; and yes, Barack Obama was born in the United States.

## "I have a deep respect for the courts. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

But there's a conflict between rule of law and rule of the people, and between the federal government and local authority. Arpaio has won six elections, never by less than six points. The closest was in 2012, when his legal trouble was already underway and well into his ill-advised birther crusade against Obama, but in 2008 he won by a comfortable 13 points. The point is: Maricopa County voters like Arpaio and have kept returning him to office, even as his M.O. has become abundantly clear. Maybe Washington doesn't want him enforcing federal immigration laws, but a majority of Phoenix-area voters apparently do. Besides, not all of the raps on Arpaio have stuck—

witness the federal grand jury that didn't charge him (though that may have been mostly because of a challenging burden of proof).

This conflict between federal and local authority, never far from the surface in American history, has seen a resurgence in recent years, as conservative governments—mostly at the state level—have reacted to legislation passed by Democrats and backed by Obama by attempting to nullify or reject federal law. On issues from Obamacare to gun control, state legislators have even tried to write laws that would make enforcing federal statutes illegal. Few of these laws have passed, though, and if they did, they'd have little chance of surviving judicial review.

What's interesting about Arpaio is that unlike lawmakers who have pursued doomed legislative attempts to stop the liberal agenda, the sheriff is fighting back using his own executive authority, mixed with street-fighting moves. And when the federal judiciary has smacked him down, he's simply ratcheted up those efforts.

Perhaps investigating a federal judge's wife will be one step too far and spell his demise. If not, he could run for a seventh time in 2016. There's some precedent for voters punishing anti-federal pols in Arizona—they tossed State Senator Russell Pearce, the major proponent of Arizona's controversial illegal-immigration bill, after he seemed to have gone too far. Don't assume the same rules will apply to Joe Arpaio that apply to everyone else, though— he certainly doesn't think they do.

---

**ABOUT THE AUTHOR**



**DAVID A. GRAHAM** is a staff writer at *The Atlantic*, where he covers political and global news. He previously reported for *Newsweek*, *The Wall Street Journal*, and *The National*.

🐦 @GrahamDavidA   ✉ Email

# U.S. Air Force Intel Unit Helped Kill 1,200 People in a Year

## 361st Intelligence, Surveillance and Reconnaissance Group fed information to commandos

by DAVID AXE

A secretive group of U.S. Air Force intelligence specialists flying aboard American spy planes helped U.S. military commandos kill more than a thousand enemy combatants in just a single year back in 2012.

That's one startling revelation in the official annual history for 2012 of the Air Force's Intelligence, Surveillance and Reconnaissance Agency, a heavily-redacted copy of which War Is Boring obtained through the Freedom of Information Act.

Linguists and analysts from the 361st Intelligence, Surveillance and Reconnaissance Group at Hurlburt Field in Florida flew on at least 31,180 combat sorties in 2012, supporting no fewer than 960 separate operations that resulted in Special Operations Forces detaining more than 3,980 people and killing at least 1,210, according to the history.

That single year's kill tally probably makes the 361st one of the deadliest individual organizations in the entire U.S. military.



The 361st began as an aerial mapping unit during World War II. In 2008, the Air Force revived the unit as part of a massive expansion of intel units to support counterterrorism operations and the wars in Iraq and Afghanistan.

4/27/2018                Case 1:23-mc-00078-CKK-MAU    Document 40-1    Filed 07/28/23    Page 555 of 1046
Case 1:15-cv-20782-JEM    Document 46-1    Entered on FLSD Docket 04/24/2015    Page 90 of
150

Between 2008 and 2012, the Pentagon grew its fleet of spy planes and
surveillance drones by 238 percent—until they accounted for half of all Air
Force aircraft, according to the ISR Agency history. By 2012 the Defense
Department was spending $67 billion a year on intelligence and
surveillance.



*Above—a U.S. Air Force MC-12W. At top—airmen from the Air Force's ISR Agency at work. Air Force photos*

Many intel flights require specialists to fly aboard the aircraft to quickly
analyze the video the plane is shooting or translate the communications
between enemy fighters that the aircraft's receivers pick up.

The intelligence personnel can then pass the information they gather to
troops on the ground. The info might include the locations and strength of
enemy fighters.

4/27/2018
Case 1:23-mc-00078-CKK-MAU Document 1-7 Filed 07/28/22 Page 556 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/24/2016 Page 91 of 150

The 361st—which oversees two smaller units of linguists and analysts, the 19th and 25th Intelligence Squadrons—provides the specialists for spy flights supporting Special Operations Forces. The group "is heavily tasked around the world," the Air Force stated in a fact sheet.

Tech. Sgt. Brandi Fast from the 25th Intelligence Squadron was the Defense Department's Language Professional of the Year in 2013. That year she deployed twice to Southwest Asia—Afghanistan, presumably—and helped during a mission to rescue 14 crew from a coalition helicopter that crashed.

*Fast has a 16,000-word vocabulary in three languages, according to the Air Force.*

Lt. Col. John Shirley, the 361st's commander since April 2014, called his people "the best and brightest America and the Air Force has to offer."



*A U.S. Air Force U-28. Air Force photo*

The planes the 361st's specialists ride in could include special commando aircraft belonging to the Air Force or the Army. The Air Force's few public releases concerning the 361st specifically mention U-28 and MC-12W spy planes, which are heavily-modified turboprop transports sporting sophisticated sensors.

The MC-12W was a fixture in Afghanistan until recently. The U-28s spend much of their time in Africa.

The 361st's intel personnel also support drone flights, presumably by sitting in the robot planes' command trailers and analyzing video and communications intercepts the drones pipe in. In 2012, 19 percent of the 31,180 sorties the 361st's people supported were drone flights, according to the ISR Agency history.

Case 1:23-mc-00078-CKK-MAU Document 1-7 Filed 07/28/23 Page 558 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/24/2018 Page 93 of 150

*Based on the more than 1,200 people the 361st helped to kill in 2012, the group's work is certainly deadly to the bad guys. But the unit has also suffered casualties of its own.*

On Feb. 18, 2012, a U-28 crashed in Djibouti in East Africa, killing Senior Airman Julian Scholten from the 25th Intelligence Squadron.

And the 361st's Staff Sgt. Richard Dickson, who operated signals-intercepting gear, died in Afghanistan on April 27, 2013, when his MC-12W went down in hostile territory.



4/27/2015
Case 1:23-mc-00078-CKK-MAU Document 1-7 Filed 07/28/23 Page 559 of 1046
Case 1:15-cv-20782-JEM Document 40-3 Entered on FLSD Docket 04/24/2015 Page 94 of 150









4/27/2015

Case 1:23-mc-00078-GKK-MAU Document 1-7 Filed 07/28/23 Page 560 of 1046
Case 1:15-cv-20782-JEM Document 46-1 Entered on FLSD Docket 04/24/2015 Page 95 of 150

## The NSA Listened as Chinese MiGs Shot Down American Warplanes

Declassified docs detail Vietnam War air clashes

medium.com

## The U.S. Is Sending Specialists to Iraq to Keep Tabs on Iran's Agents

Counterintelligence troops help guard against spies

medium.com

## The Pentagon Deployed Scent Warfare in Vietnam

Electronic sniffers literally smelled for the enemy

medium.com

# Exhibit 13

**IN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 15-cv-20782-Martinez

DENNIS MONTGOMERY,

              Plaintiff,

v.

RISEN, ET AL.

              Defendants.

_____/

**PLAINTIFF'S REVISED INITIAL DISCLOSURE WITNESS LIST**

Montgomery, Dennis
Miami, Florida
Software Validation and all issues relevant to the Complaint

Risen, James
Maryland
Book, defamatory statements, actual malice, communications with Dennis Montgomery and all issues relevant to the Complaint

**FRCP Rule 30(b)(6) witnesses of corporate Defendants**

Mr. William Bayers, Esq.
General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, no journalistic standards, Florida contacts and sales, fact checking and all issues relevant to the Complaint

Linda K. Zecher
President, Chief Executive Officer and Director
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, fact checking, Florida contacts and sales and all issues relevant to the Complaint

David Eber
Vice President and Associate General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, all issues relevant to the Complaint

Brook Colangelo
VP Houghton Mifflin Harcourt
White House Network Email and Network Infrastructure
all issues relevant to the Complaint

Houghton Mifflin Harcourt Publishing Company
Boston, Massachusetts 02116
all issues relevant to the Complaint

Rosemary Moseley
Lake Placid, Florida
Purchase of Book in Florida
all issues relevant to the Complaint

Kimberly Hines
Ft. Lauderdale, Florida
Montgomery Reputation, Purchase of Book in Florida
all issues relevant to the Complaint

Goss, Porter
Director of CIA
Miami, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Johns, Ken
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Lyons, XXXXX
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Macbeth, W. Rhys
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Nazelrod, Craig
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Pipes, XXXXX

Macdill AFB, Florida
Reputation Damage
all issues relevant to the Complaint

Roche, James
Macdill, Florida
Software Validation, White House and Congressional Briefing, CIA Visits, eTreppid Visits
all issues relevant to the Complaint

Rumsfeld, Donald
Florida
Software Validation, White House and Congressional Briefing, CIA Visits, Reputation damage
all issues relevant to the Complaint

Stillman, Phillip
Attorney Dennis Montgomery
Miami, Florida
Dennis Montgomery Legal Briefs, Whistleblower complaints
all issues relevant to the Complaint

Madden, Tom
Boca Raton, Florida
Reputation, damage to reputation in FL
all issues relevant to the Complaint

Olivia, Adrian
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bartholomew Mary L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Fiamengo, Nicholas A
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Freeman, Gregory J
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Savage Cynthia

Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McCool John C
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Temple James K
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Griffin Susan M.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Russell, Deborah
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Nettelhorst Doug M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Stallworth Hugh T
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bob McCaskey
Macdill AFB, Florida
Northrop Grumman TASC
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Crutchfield, Chris
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Melnyk, Michael S.

Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Lopez Tina M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings

Cerny, Jeffrey D.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Muccio Anthony B
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McKinney Scott E LtCol
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Purvis Brad Civ
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

'Kirsch, Jim'
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Hughes Stacey L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Abramson, Jill
Former New York Times Editor in Chief
New York, NY
Dennis Montgomery Reputation, James Risen, Eric Lichtblau
all issues relevant to the Complaint

Anderson, Jesse
Employee eTreppid Technologies

Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Azzinaro, Neil
2006 Search Warrant
Las Vegas, Nevada
2006 Search Warrant
all issues relevant to the Complaint

Bauder, Jim
Employee eTreppid Technologies
Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Blixseth, Edra
Beverly Hills, CA
760-831-1982
Software Works
all issues relevant to the Complaint

Blixseth, Tim
Medina, WA 98004
760-333-9024
Software Works
all issues relevant to the Complaint

Frye, Doug
Malibu, CA
Government Contracts, Montgomery Reputation, eTreppid Bank Accounts
all issues relevant to the Complaint

Sandoval, Michael
Bellevue, WA
Software Functionality, Mass Surveillance Technology, Congressional Briefing, Mike Flynn

Snowden, Edward
Somewhere in Russia
Mass Surveillance Technology, NSA and CIA Briefing
all issues relevant to the Complaint

Trepp, Warren
Reno, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Venables, Sloan
Virginia City, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Wiedermann, Peter
Contractor USAF
Kirkland, WA
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

- This is an initial disclosure witness list and Plaintiff reserves the right to supplement it as this case proceeds to discovery and trial.

Dated: April 27, 2015                    Respectfully submitted,

                                         */s/ Larry Klayman*
                                         Larry Klayman, Esq.
                                         Klayman Law Firm
                                         FL Bar No. 246220
                                         7050 W Palmetto Park Rd.
                                         Suite 15-287
                                         Boca Raton, FL 33433
                                         (310) 595-0800
                                         leklayman@gmail.com
                                         Attorney for Plaintiff

# Exhibit 14

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 ⓘ **URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:     Dennis Montgomery
        James Risen

# Exhibit 15

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ®   Telephone: (310) 595-0800 ®   leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price: Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc: Dennis Montgomery

# ATTACHMENT A

## LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS

### DEFAMATION *PER SE*

1.    The following statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a judge will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933). [1]

2.    **First, on Page 32 of the Book, Risen writes: [2]**

> "Consider the example of Dennis Montgomery. He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

3.    As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue intelligence operation with little or no adult supervision and that he was "someone who has been accused of being a con artist."

---

[1]    Examples of defamation *per se* include those that hurt one's profession, business or trade; falsely state that a person has a socially unacceptable illness or disease; or falsely state that a person has been involved in some kind of criminal activity. *Lawnwood Medical Center Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

[2]    Note that several statements may qualify under different theories, but are presented in full for proper context. Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

4.      **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who
understood how best to profit from America's decade of fear. He saw
the post-9/11 age for what it was, a time to make money. Montgomery
was the maestro behind what many current and former U.S. officials
and others familiar with the case now believe was one of the most
elaborate and dangerous hoaxes in American history, a ruse that was so
successful that it nearly convinced the Bush administration to order
fighter jets to start shooting down commercial airliners filled with
passengers over the Atlantic. Once it was over, once the fever broke
and government officials realized that they had been taken in by a
grand illusion, they did absolutely nothing about it**.** The Central
Intelligence Agency buried the whole insane episode and acted like it
had never happened. The Pentagon just kept working with
Montgomery. Justice Department lawyers fanned out across the country
to try to block any information about Montgomery and his schemes
from becoming public, invoking the state secrets privilege in public, a
series of civil lawsuits involving Montgomery.  It was as if everyone in
Washington was afraid to admit that the Emperor of the War on Terror
had no clothes."

5.      As libel *per se*, Risen asserted Montgomery's work "many current and former

U.S. officials and others familiar with the case now believe was one of the most elaborate and

dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the

Bush administration to order fighter jets to start shooting down commercial airliners filled with

passengers over the Atlantic."

6.      As libel *per se*, Risen asserted about the Montgomery that "once the fever broke

and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

7.      **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software
expert with no experience whatsoever in national security affairs,
Dennis Montgomery almost singlehandedly prompted President
Bush to ground a series of international commercial flights based
on what now appears to have been an elaborate hoax. Even after it
appeared that Montgomery had pulled off a scheme of amazing

scope, he still had die-hard supporters in the government who
steadfastly refused to believe the evidence suggesting that
Montgomery was a fake, and who rejected the notion that the
super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

"Montgomery was an overweight, middle-aged, incorrigible gambler,
a man who liked to play long odds because he was convinced that he
could out-think the house. He once boasted to a business partner that
he had a system for counting an eight-deck blackjack shoe, quite a
difficult feat for even the best card sharks, and he regularly tested his
theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $ 1 million in bad checks at
Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.     ***Fifth,*** **on Page 36 of the Book, Risen writes:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

14. As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15. **Sixth, on Page 37 of the Book, Risen writes:**

"By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."

16. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17. **Seventh, on Page 37 of the Book, Risen writes:**

"After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

18.     As libel *per se*, Risen asserted about Montgomery that he committed fraud

including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

19.     **Eighth, on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities
> as well as the agency's woeful lack of understanding about al
> Qaeda and Islamic terrorism. He was able to convince the CIA that
> he had developed a secret new technology that enabled him to
> decipher al Qaeda codes embedded in the network banner
> displayed on the broadcasts of Al Jazeera, the Qatar-based news
> network. Montgomery sold the CIA on the fantasy that al Qaeda
> was using the broadcasts to digitally transmit its plans for future
> terrorist attacks. And only he had the technology to decode those
> messages, thus saving America from another devastating attack.
> The CIA— more credulous than Hollywood or Las Vegas— fell
> for Montgomery's claims. In short, he convinced CIA officials that
> he could detect terrorist threats by watching television."

20.     As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the

CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for

future terrorist attacks."

21.     As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22.     **Ninth, on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not
> actually have a contract with eTreppid at the time Montgomery was
> providing data from the Al Jazeera videotapes. While they were
> working closely together during the final months of 2003, the CIA
> had not yet started paying Montgomery, the official said. The
> agency never finalized a contract with him because agency staff
> eventually realized they had been conned, according to this official.
> But that does not diminish the fact that for a few crucial months, the
> CIA took Montgomery and his technology very seriously."

23.     As libel *per se*, Risen asserted about Montgomery that "agency staff eventually

realized they had been conned, according to this official."

24.     **Tenth,** on Page 46 of the Book, the Risen writes:

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

25.     As libel *per se*, Risen asserted about Montgomery that "the whole thing"

(Montgomery's work) "was a hoax" and a "fabrication."

26.     **Eleventh,** on Page 46 of the Book, the Risen writes:

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27.     As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28.     **Twelfth,** on Page 47 of the Book, the Risen writes:

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29.     As libel *per se*, Risen asserted about Montgomery that "That meant that

Brennan's office was responsible for circulating Montgomery's fabricated intelligence to

officials in the highest reaches of the Bush administration."

30.     **Thirteenth,** on Page 50 of the Book, Risen writes:

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

6

Montgomery needed new government contracts for Blxware, and
Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis

Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in

BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     ***Fourteenth,*** on November 6, 2014, James Risen appeared as an interview guest

on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart.

Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue

between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time

nationwide across the United States of America through cable television and satellite television

on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast

on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.    And so they finally [non-verbal

Case 1:23-mc-00073-CKK-MAU Document 17 Filed 07/28/23 Page 584 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/29/2015 Page 119 of
150

interruption]. They finally got the information. The French told them
this is a hoax. This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing
up, and refused to ever talk about it. And Montgomery kept getting
more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack
about to happen. You really have to be a pretty sophisticated
consumer of intelligence after several years to begin to realize what's
real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in

2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that

corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this

is a hoax. This is a fabrication. And as soon as the CIA agreed with them, they covered the

whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts

after that." The statement that "the CIA agreed with them" is Risen's assertion about

Montgomery's work that "this is a hoax. This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole

thing up, and refused to ever talk about it," as a way of saying that the CIA had been conned.

38.     **Fifteenth,** on October 13, 2014, James Risen gave a television interview [3] with

Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS). In

that interview, James Risen made the following statements for broadcast on television, and Judy

Woodruff repeated many points from James Risen's book which Risen agreed with and

endorsed. Much of the interview involved other chapters not relevant here.

---

[3]     http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:  Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:  It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:  Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]     Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.      As libel *per se*, Risen asserted about Montgomery that "you write about millions
of dollars spent on programs that were completely fraudulent.  One was run by a man named
Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion
is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.      As libel *per se*, Risen asserted about Montgomery that "When actually there was
nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen
confirms by saying "Right.  Right."

41.      As libel *per se*, Risen asserted about Montgomery that "There were cases in
which people said that he was fooling the military and the CIA about his operations and how...
what kind of techniques and technologies he had."

42.      **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy
Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book
Review: James Risen's 'Pay Any Price'"** which is accessible at that website address.  [5]  In this
interview  "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014,
James Risen stated for national broadcast:

PAMELA PAUL:  How do we count and account for the costs of the
government's war on terror.  We'll talk to  James Risen, author of Pay
Any Price:  Greed, Power, and Endless War.

---

[5]      See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams,
<u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-
podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's
book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

Case 1:23-mc-00073-CKK-MAU Document 17 Filed 07/28/23 Page 588 of 1046
Case 1:13-cv-20782-UEM-3 Document 40-1 Entered on FLSD Docket 04/29/2015 Page 123 of
150

war on terror had been turned for other uses, and become a....
something that you could never tell what the truth and what was
not the truth.  And that to me was at the heart of the problems with the
war on terror, that you could never tell what's real and what was
concoction today.

[The discussion then covers how Risen went about researching the
book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting
that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The
Emperor of the War on Terror, about Dennis Montgomery who
[laughs] who's a strange character, who I'd done a story about him for
the New York Times along with Eric Lichtbau my colleague there at
the Times.  He's one of the most fascinating characters in the war on
terror.  He...  He was a computer software expert who convinced the
CIA that he could decipher secret codes from Al Qaeda in the Al
Jazeera news broadcasts.  And that he could tell the CIA numbers and
letters that corresponded with flights that Al Qaeda wanted to attack.
And the CIA took this so seriously that they grounded, that the Bush
Administration grounded a bunch of international flights in Christmas
2003 based on what this guy was telling them.  And when they
realized it was a hoax, they covered the whole thing up and never did
anything about it.  So I had done a story for the Times with....  about
that and then expanded on that and got a lot more information for the
book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we
wrote about it.  But I had also, even before he was written about by
other people, I had heard from people in the CIA that there was this
crazy operation that nobody wanted to talk about, that they were all
embarrassed by.  To me that, it was like a case study in just how crazy
the war on terror has become. And the only thing that makes sense
about why it's gotten so crazy, is I think we kind of have deregulated
national security and we took all, you know, Cheney said we're going
to take the gloves off.  And that means we deregulated national
security at the same time we poured hundreds of billions of dollars
into counter-terrorism.  And so it's had enormous unintended
consequences from what is essentially a national security crisis that is
kind of like the banking crisis.

12

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.     As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.     The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.     ***Seventeenth,*** James Risen sat for a nationwide television news interview on the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014. On this nationwide television news broadcast, the conversation turned to:

> **AMY GOODMAN:** Dennis Montgomery?
>
> **JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.
>
> **AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?
>
> **JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

13

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.    As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.    As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

15

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.    As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.    As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.    As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.    ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video.  And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]      https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.    As libel *per se*, Risen asserted about Montgomery that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

53.    As libel *per se*, Risen asserted about Montgomery that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon. And he was continuing, he continued to operate for several years. It's really a remarkable story."

## GENERAL DEFAMATION

54.     In addition, Risen also made additional defamatory statements that are explicit defamation under Florida law.

55.     ***Nineteenth,*** **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as defamation by implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

Case 1:23-mc-00073-GKK-MAU Document 17 Filed 07/28/23 Page 595 of 1046
Case 1:13-cv-20782-JEM-3 Document 401-1 Entered on FLSD Docket 04/29/2015 Page 130 of
150

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

have been married to unlimited rivers of cash to create a climate in
which someone who has been accused of being a con artist was able to
create a rogue intelligence operation with little or no adult supervision.
Crazy became the new normal in the war on terror, and the original
objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the ***Eleventh*** example of libel**, on

Page 46 of the Book,** states that:

"The CIA never investigated the apparent hoax nor examined how it
had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the ***Nineteenth*** example of libel**, on

Page 49 of the Book,** states that:

"Trepp was furious. According to court documents, he told the FBI
that Montgomery had stolen the software eTreppid had used on secret
Pentagon contracts. As federal investigators moved in to investigate
the alleged theft of the technology, they heard from Trepp and others
that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72.     **_Twentieth,_** **on the Preface Page of the Book, Risen writes:**

> "I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"
>
> -- Rudyard Kipling, _The Man Who Would be King._

73. As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in _The Man Who Would be King._

74. **_Twenty-first,_** **in the Prologue on Page xiv of the Book, Risen writes:**

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were _contingent_ upon results, and false results at that.

76.     **_Twenty-second,_** **in the Prologue on Page xv of the Book, Risen writes:**

Case 1:23-mc-00073-CKK-MAU Document 17 Filed 07/28/23 Page 598 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/20/2015 Page 133 of
150

"Thus, the creation of a homeland security complex at a time
of endless war has bequeathed us with the central narrative of the war
on terror – modern tales of greed joined hand in hand with stories of
abuse of power.  It was inevitable that those wise in the ways of the
world would flock to Washington to try to cash in on the war on terror
gold rush – and they have.  This book offers just a few of those
stories. But those trying to monetize America's obsession with
terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more
than just greed.  Ambition and a hunger for power, status, and glory
have become great engines of post-9/11 opportunism as well.  The
more troubling stories here concern abuses of power that have
extended across two presidencies for well over a decade.  After 9/11,
the United States deregulated national security, stripping away the
post-Watergate intelligence reforms of the 1970's that had
constrained executive power for thirty years.  The results are morally
challenging – and continue to this day."

77.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

78.     **_Twenty-third,_ in the Prologue on Page xvii of the Book, Risen writes:**

"Washington's global war on terror is now in its second decade,
thanks to the bipartisan veneer it has gained under Bush and Obama.
It shows no signs of slowing down, hustlers and freebooters continue
to take full advantage, and the war's unintended consequences
continue to pile up.  All too often, things are not what they seem."

79.     As libel by implication, Risen implies that Montgomery – one of the key objects

of the Book – is a "hustler" and a "freebooter."

80.     **_Twenty-fourth,_ Part 1 of the Book,** including Chapter 2 which is focused entirely

on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.     Thus, by placing the chapter focused on Dennis Montgomery under a label for the

section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by

greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82. **Twenty-fifth,** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery: "Chapter 2: The Emperor of the War on Terror."

83. By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84. **Twenty-Sixth, on Page 40 of the Book, Risen writes:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. **Twenty-Seventh, on Page 42 of the Book, Risen writes:**

> "Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. **Twenty-Eighth, on Page 42 of the Book, Risen writes:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government with a hoax. It would of course be entirely clear "how Montgomery was able to convince all of them" if Montgomery's work and technology are legitimate.

90. *Twenty-Ninth,* **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud and that his work is a scam and a hoax.

92. *Thirtieth,* **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and said he had heard from 'various federal agencies thanking us' for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive contracts is due to Montgomery's ability to defraud the government (and stupidity of government officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. *Thirty-First,* **on Page 31 of the Book, Risen writes:**

Case 1:23-mc-00073-GKK-MAU Document 17 Filed 07/28/23 Page 601 of 1046
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/29/2015 Page 136 of
150

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. *Thirty-Second,* on Page 33 of the Book, Risen writes:

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. *Thirty-Third,* on Page 33 of the Book, Risen writes:

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. *Thirty-Fourth,* on Page 33 of the Book, Risen writes:

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why
Montgomery had to guard his technological innovations so
carefully. They came to believe that at least some of the
technology didn't really exist."

101.     As libel by implication, Risen implies that Montgomery committed fraud.

102.     ***Thirty-Fifth,*** **on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him,
and had put out the word to his friends at the casinos that he
frequented the most. A year later, Montgomery and Trepp were in
business together. Trepp was one of the first, but hardly the last, to
be beguiled by Montgomery's claims that he had achieved
breakthroughs in computer technology of historic significance."

103.     As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp

by committing fraud.

104.     ***Thirty-Sixth,*** **on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis
Montgomery and eTreppid so enraptured certain key government
officials that it was considered the most important and most sensitive
counterterrorism intelligence that the Central Intelligence Agency had
to offer President Bush. Senior officials at the CIA's Directorate of
Science and Technology began to accept and vouch for Montgomery
to officials at the highest levels of the government. Montgomery's
claims grew ever more expansive, but that only solidified his position
inside the national security arena. His technology became too
impossible to disbelieve."

105.     As libel by implication, Risen imply that Montgomery committed fraud and is a

con man.

106.     ***Thirty-Seventh,*** **on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer
technology could detect hidden bar codes broadcast on Al Jazeera,
which had been embedded into the video feed by al Qaeda. Allegedly,
al Qaeda was using that secret method to send messages to its terrorist
operatives around the world about plans for new attacks. Montgomery
convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of

claims that are not (were not) true.

108.     ***Thirty-Eighth,* on Page 42 of the Book, Risen writes:**

> "Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

110.     ***Thirty-Ninth,* on Page 42 of the Book, Risen writes:**

> "One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

112.     ***Fortieth,* on Page 47 of the Book, Risen writes:**

> "Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.    As libel by implication, Risen implies that Montgomery continued to defraud,

con, and scam the government, rather than concluding that the U.S. Government recognized the

legitimacy of Montgomery's work.

114.    ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115.    As libel by implication, Risen implies that the Montgomery engaged in fraud and

a hoax by keeping details mysterious.

116.    ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117.    As libel by implication, Risen imply that Montgomery again repeated his fraud

and hoax against a new government agency.

118.    ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

> CHAPTER 3:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11.  But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented.  In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119.    As libel by implication, Risen implies that Montgomery engaged in fraud and a

hoax motivated by greed.

Exhibit 16



**Houghton
Mifflin
Harcourt**

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006-1811
leklayman@gmail.com

           **Re: *Pay any Price*, by James Risen**

Dear Mr. Klayman:

       We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at
Houghton Mifflin Harcourt Publishing Company ("HMH").

       We deny your allegations that *Pay any Price* contains defamatory statements concerning your
client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and
vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review
processes.

                              Sincerely,

                              David Eber

cc:    William Bayers
       James Risen

# Exhibit 17

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

## Article I

The name of the Limited Liability Company is:

ALEX JAMES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US 33305

The mailing address of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US 33305

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

UNITED STATES CORPORATION AGENTS, INC.
13302 WINDING OAK COURT
SUITE A
TAMPA, FL, 33612

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature: MATT PFLEGING, US CORP. AGENTS

## Article V

The name and address of managing members/managers are:

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

Title: MGRM
JUDY CROWHURST
1797 N.E. 15TH ST.
FORT LAUDERDALE, FL. 33305 US

Signature of member or an authorized representative of a member

Electronic Signature: MATT PFLEGING, LEGALZOOM.COM, INC.

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Exhibit 18

# SOCOM & CIA
# Visit 03/20/12

Location:

75180 Mediterranean
Palm Desert, CA 92211



Chris Pipes SOCOM

# Exhibit 19

# ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

| | | Form Approved OMB No. 0704-0187 Expires June 30, 1997 | PAGE | | OF | |
|---|---|---|---|---|---|---|
| | | | 1 | | 2 | |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.
SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. PRIORITY |
|---|---|---|---|---|
| H92222-04-D-0006 | 0001 | 16-FEB-2004 | 1SP50040420100 | DO-C9 |

| 8. ISSUED BY | CODE | H92222 | 7. ADMINISTERED BY (if other than 6) | S0507A | 8. DELIVERY FOB |
|---|---|---|---|---|---|

HQ US Special Operations Command
ATTN: SOAL-KB (Holland)
7701 Tampa Point Blvd
Macdill AFB, FL 33621

DCMA San Francisco Lathrop Office
700 E. Roth Rd
French Camp, CA 95231

X DEST

☐ OTHER

(See Schedule if other)

| 9. CONTRACTOR | CODE | 3C5X0 | FACILITY CODE | | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|---|

NAME AND ADDRESS
e'Treppid Technologies, LLC
755 Trademark Dr
Reno, NV 89521

TEL:
FAX:

SEE SCHEDULE

12. DISCOUNT TERMS

13. MAIL INVOICES TO See Section G

☐ SMALL
☐ SMALL DISAD-VANTAGED
☐ WOMEN OWNED

| 14. SHIP TO | CODE | H92222 | 15. PAYMENT WILL BE MADE BY | HQ0339 | |
|---|---|---|---|---|---|

UQ USSOCOM/SOAL-SP (Mohr)
7701 Tampa Point Blvd
MacDill AFB, FL 33621

DFAS-Columbus - West Entitlement Operations
PO Box 182381
Columbus, OH 43218

MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER

ATTENTION: SOAL-SP (Brad Mohr)

| 16 | DELIVERY | X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|---|
| TYPE | | Reference your. | furnish the following on terms specified herein |
| OF ORDER | PURCHASE | | ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

ETREPPID TECHNOLOGIES, LLC
NAME OF CONTRACTOR

SIGNATURE

WARREN TREPP, CEO
TYPED NAME AND TITLE

040216
DATE SIGNED (YYMMDD)

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 974/60300 56SF SD4 52SP 54X000 SP10 525700 F25700     $325,125.00

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

| *If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle. | 24. UNITED STATES OF AMERICA BY   SUSAN M GRIFFIN | CONTRACTING/ORDERING OFFICER | 25. TOTAL | $325,125.00 |
|---|---|---|---|---|
| | | | 29. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| ☐ INSPECTED  ☐ RECEIVED  ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | | | |
| | ☐ PARTIAL  ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| | 31. PAYMENT | | 34. CHECK NUMBER |
| DATE    SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | ☐ COMPLETE | | |
| 36. I certify this account is correct and proper for payment | ☐ PARTIAL  ☐ FINAL | | 35. BILL OF LADING NO. |

| DATE    SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | | |
|---|---|---|---|---|
| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD FORM 1155, JUN 94     PREVIOUS EDITION MAY BE USED

H92222-04-D-0006
Task Order 0001
Page 2 of 2

Continuation Sheet

1. **CONTRACT LINE ITEMS**:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---------|-------------------|--------------|------|-----------|-----------|
| 0001AA | | 1 | Each | $25,000.00 | $25,000.00 |
| | Falconview (PFPS) Maps - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |
| 0001AB | | 1 | Each | $40.00 | $40.00 |
| | Falconview (PFPS) Maps - Plug-in Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |
| 0001AC | | 1 | Each | $25,000.00 | $25,000.00 |
| | Still Image Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |
| 0001AD | | 1 | Each | $10.00 | $10.00 |
| | Still Image Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |
| 0001AE | | 1 | Each | $50,000.00 | $50,000.00 |
| | Video Imagery w/ Audio - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |
| 0001AF | | 1 | Each | $25.00 | $25.00 |
| | Video Imagery w/ Audio - Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |
| 0001AN | | 1 | Each | $125,000.00 | $125,000.00 |
| | Generic Data Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |

| 0001AP | | 1 | Each | $50.00 | $50.00 |
|---|---|---|---|---|---|

Generic Data Decompressor
FFP
1 Each = 1 CPU that this software is installed on.

FOB:  Destination

| 0001AQ | | 1 | Each | $100,000.00 | $100,000.00 |
|---|---|---|---|---|---|

Detection of Human and Non-Human Objects
FFP
1 Each = 1 CPU that this software is installed on.

FOB:  Destination

2.  **GOVERNMENT FURNISHED PROPERTY**.

a) The Government will furnish one laptop computer to:
         eTreppid Technologies
         755 Trademark Dr
         Reno NV  89521.

b) Upon receipt of the Government-furnished laptop, the Contractor shall load the software ordered on the task order and return the laptop to:
         HQ USSOCOM
         ATTN: SOAL-SP (Brad Mohr)
         7701 Tampa Point Blvd
         MacDill AFB, FL  33621.

3.  **DELIVERY TIMEFRAME**.  The contract shall have 14 days from the receipt of the Government-furnished laptop to load the software and return the laptop to the Government.  If the 14th day falls on a weekend or federal holiday, the due date shall automatically extend to the next business day.

//nothing follows//

# EXHIBIT K



March 20, 2023

**VIA PERSONAL SERVICE**
Carlotta Wells
9301 Garden Court
Potomac, MD 20854

*Re:*   *Smartmatic USA Corp. et al., v. Michael J. Lindell and My Pillow, Inc.*
         Court File No.: 22-cv-0098-WMW (JFD)

Dear Ms. Wells:

Enclosed and served upon you is a subpoena issued by The United States District
Court for the District of Minnesota in connection with a lawsuit brought by
Smartmatic USA Corp. and others against My Pillow, Inc. and Michael Lindell.
The enclosed subpoena requires you to present yourself on April 10, 2023, at 9:00
A.M. (Eastern Daylight Time) at the Veritext offices, located at 36 S Charles St
#2002, Baltimore, MD 21201.

Also attached is a copy of a Protective Order in this matter.

If you have any questions, please contact Andrew Parker at parker@parkerdk.com.

Sincerely,

*/s/ Andrew D. Parker*

Andrew D. Parker

ANDREW D. PARKER

CHRISTOPHER M. DANIELS

JESSE H. KIBORT

ELIZABETH S. WRIGHT

ALEC J. BECK

LORI A. JOHNSON

MATTHEW R. ESLICK

JOSEPH A. PULL

RYAN P. MALONE

JORDON C. GREENLEE

ABRAHAM S. KAPLAN

GREGORY N. ARENSON

REGINALD W. SNELL


FREDERICK C. BROWN
  OF COUNSEL


888 Colwell Building
123 Third Street North
Minneapolis, MN 55401

parkerdk.com

Tel: 612.355.4100
Fax: 612.355.4101

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | |
|---|---|
| Smartmatic USA Corp., et al | ) |
| *Plaintiffs* | ) |
| v. | ) |
| Michael J. Lindell and My Pillow, Inc., | ) |
| *Defendants* | ) |

Civil Action No.    22-cv-0098-WMW-JFD

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:     Carlotta Wells, 9301 Garden Court, Potomac, MD 20854

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place Veritext, 36 S Charles St #2002, Baltimore, MD 21201 **A video conference link will be provided for remote attendance.** | Date and Time:  April 10, 2023  at 9:00 am (EDT) |
|---|---|

The deposition will be recorded by this method:   Stenographic transcription and video recording

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

Attached to this subpoena are Exhibit 1, a protective order entered by the Court, and Exhibit 2, a statement pursuant to *Touhy v. Regan*, 340 U.S. 462 (1951), if applicable.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  March 20, 2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | */s/ Andrew D. Parker* |
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants
Michael J. Lindell and My Pillow, Inc.                                           , who issues or requests this subpoena, are:
Andrew D. Parker, 123 North Third Street, Suite 888, Minneapolis, Minnesota 55401, parker@parkerdk.com, 612-355-4100

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  22-cv-0098-WMW-JFD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT  1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

SMARTMATIC USA CORP., SMARTMATIC
INTERNATIONAL HOLDING B.V. and SGO
CORPORATION LIMITED,

               Plaintiffs,

                                    Case No. 22-cv-00098- WMW-JFD

      v.

MICHAEL J. LINDELL and MY PILLOW, INC.,

               Defendants.

## PROTECTIVE ORDER GOVERNING THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

The Court enters the following Protective Order in this case,

Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited (collectively, "Smartmatic") and Defendants Michael J. Lindell and My Pillow, Inc., (collectively, "Defendants"; Smartmatic and Defendants are collectively the "Parties") are engaged in discovery proceedings, which include, among other things, taking depositions, answering interrogatories, and producing documents. The Parties believe that certain information they have produced or will produce may contain information that is proprietary, commercially sensitive, or non-public. Under Federal Rules of Civil Procedure 5.2 and 26(c), this Order Governing the Production and Exchange of Confidential Information (the "Order") will govern the handling of documents, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, and responses to requests for documents, and any other information or

1

material produced, given, or exchanged, including any information contained therein or derived therefrom ("Discovery Material"), by or among any Party or non-Party providing Discovery Material (each a "Producing Party") in the above-captioned action (the "Litigation") to the party receiving the Discovery Material ("Receiving Party").

1.    Any Producing Party may designate any Discovery Material as "Confidential Discovery Material" under the terms of this Order where such Party in good faith believes that such Discovery Material contains trade secrets, proprietary business information, competitively sensitive information or other information the disclosure of which would, in the good faith judgment of the Party or, as appropriate, non-party designating the material as confidential, be detrimental to the conduct of that Party's or non-party's business or the business of any of that Party's or non-party's customers or clients.

2.    Any Producing Party may designate any Discovery Material as "Attorneys' Eyes Only Discovery Material" under the terms of this Order where such Party in good faith believes that such Discovery Material contains Attorneys' Eyes Only Discovery Material. Attorneys' Eyes Only Discovery Material is defined as Confidential Discovery Material containing information such that disclosure other than as provided in this Order could reasonably be expected to cause irreparable harm to the Producing Party. To the extent source code is discoverable, the Parties will meet and confer regarding terms and entry of a separate protective order for the source code before any is permitted to be inspected.

3.    Any Confidential Discovery Material and Attorneys' Eyes Only Discovery Material produced in the Litigation will be used, except by the Producing Party, solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted in

this Litigation. Notwithstanding the limitations in the preceding sentence, any Party may use Discovery Material lawfully obtained independently of this Litigation for any purpose consistent with any other limitations placed on that Discovery Material.

4.    Notwithstanding any other provision of this Order, no Receiving Party may provide Discovery Material designated as Confidential Material or Attorneys' Eyes Only Material to any person or entity involved in the Litigation unless and until that person or entity confirms their understanding of, and agreement to, abide by the terms of this Order.

5.    The designation of Discovery Material as Confidential Discovery Material or Attorneys' Eyes Only Discovery Material will be made in the following manner:

a.    In the case of documents or other written materials (including affidavits and declarations but not pre-trial deposition or other pre-trial testimony: (i) by affixing the legend "Confidential" or "Attorneys' Eyes Only" to each page containing any Confidential or Attorneys' Eyes Only Discovery Material; or (ii) in the case of electronically stored information produced in native format by affixing the legend "Confidential" or "Attorneys' Eyes Only" to the media containing the Discovery Material (e.g., CD, DVD, thumb drive, external hard drive, or secure file transfer).

b.    In the case of testimony: (i) by a statement on the record, by counsel, at the time of such disclosure or, in the case of a deposition or other pre-trial oral testimony, before the conclusion of the deposition or pre-trial testimony; or (ii) by written notice, sent to all Parties within 15 business days of receipt of the final deposition transcript or other pre-trial testimony; provided that only those portions of the transcript designated as Confidential or

Attorneys' Eyes Only Discovery Material will be deemed Confidential or Attorneys' Eyes Only Discovery Material. Each deposition will be deemed to be Attorneys' Eyes Only Discovery Material until 15 business days after counsel receive a copy of the final transcript, after which the deposition will be treated in accordance with its confidentiality designation, if any. The Parties may modify this procedure for any particular deposition, through agreement in writing before, or on the record at, such deposition, without further order of the Court.

c. In the case of any other Discovery Material, by written notice that the Discovery Material constitutes Confidential or Attorneys' Eyes Only Discovery Material.

6. The designation of Discovery Material as Confidential or Attorneys' Eyes Only Discovery Material will constitute a representation that such Discovery Material has been reviewed by an attorney representing the Party making the designation and that there is a good faith basis for such designation.

7. Inadvertent failure to designate Discovery Material as Confidential or Attorneys' Eyes Only Discovery Material does not constitute a waiver of such claim and may be corrected. A Producing Party may designate as Confidential or Attorneys' Eyes Only any Discovery Material that has already been produced, including Discovery Material that the Producing Party inadvertently failed to designate as Confidential or Attorneys' Eyes Only, (i) by notifying in writing the Receiving Party to whom the production has been made that the Discovery Material constitutes Confidential or Attorneys' Eyes Only Discovery Material, and (ii) providing a replacement copy of the Discovery Material marked in a manner consistent with Paragraph 5.

After receiving such notice, the Parties will treat the Discovery Material so designated as Confidential or Attorneys' Eyes Only Discovery Material, and such Discovery Material will be fully subject to this Order from the date of such supplemental notice forward. The Party receiving such notice will make a reasonable, good -faith effort to ensure that any analyses, memoranda, notes, or other such materials generated that include or are based upon such newly designated information are immediately treated as Confidential or Attorneys' Eyes Only Discovery Material. In addition, after receiving such notice, any receiving Party that disclosed the Discovery Material before its designation as "Confidential" or "Attorneys' Eyes Only" will exercise its best efforts to ensure (i) the return or destruction of such Discovery Material, if it was disclosed to anyone not authorized to receive it under this Order, (ii) that any documents or other materials derived from such Discovery Material are treated as if the Discovery Material had been designated as "Confidential" or "Attorneys' Eyes Only" when originally produced, (iii) that such Discovery Material is not further disclosed except in accordance with the terms of this Order, and (iv) that any such Discovery Material, and any information derived therefrom, is used solely in accordance with this Order.

8.     Confidential Discovery Material may be disclosed, summarized, described, characterized, or otherwise communicated, orally or in writing, or made available in whole or in part only to the following persons for use in connection with the Litigation and in accordance with this Order:

    a.     The Parties' current employees who are assisting with or making decisions concerning this Litigation, to the extent deemed reasonably necessary by counsel of record for the purpose of assisting in the prosecution or defense of the Litigation;

b.      Counsel for the Parties in the Litigation (including in-house counsel), and the partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such counsel (including outside copying and litigation support services) who are assisting with the Litigation;

c.      Experts, consultants, or independent litigation support services assisting counsel for the Parties, and partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such experts or consultants (including outside copying services and outside support services) who are assisting with the Litigation;

d.      Persons who appear as an author or recipient on the face of the document to be disclosed;

e.      Witnesses or deponents, and their counsel, but only to the extent necessary to conduct or prepare for depositions or testimony in the Litigation, and only if furnished, shown, or disclosed in accordance with this Order;

f.      The Court, persons employed by the Court, translators, videographers, and court reporters who are recording and transcribing any hearing, trial, or deposition in the Litigation or any appeal therefrom;

g.      A videographer, translator, court reporter, or transcriber who reports, tapes, translates, or transcribes testimony in this Litigation at a deposition and agrees by a statement on the record, before recording or transcribing any such testimony constituting Confidential Discovery Materials, that all such testimony and information revealed at the deposition is and will remain

confidential and will not be disclosed by such translator, videographer, reporter, or transcriber except to the attorneys for each Party and any other person who is present while such testimony is being given, and that copies of any transcript, reporter's notes or any other transcription records of any such testimony will be retained in confidentiality and safekeeping by such videographer, translator, reporter, or transcriber or will be delivered to the undersigned attorneys;

h.  Jury consultants and mock jurors, if any, provided each such person executes the form attached as Exhibit A; or

i.  Any other person only upon (i) order of the Court entered upon notice to the Parties, or (ii) written stipulation or statement on the record of agreement by the Producing Party who provided the Discovery Material being disclosed, provided that such person signs an undertaking in the form attached as Exhibit A hereto;

9.  Except with the prior written consent of the Producing Party or by Order of the Court, Attorneys' Eyes Only Discovery Material shall not be furnished, shown, or disclosed to any person or entity except to those identified in Paragraph 8(b)–8(i).

10.  Confidential or Attorneys' Eyes Only Discovery Material may be provided to persons listed in Paragraph 8(c) only to the extent necessary for such expert or consultant to prepare a written opinion, to prepare to testify, or to assist counsel in the Litigation, provided that such expert or consultant (i) is not a current or former employee of Smartmatic or Defendants subject to a non-disclosure agreement, (ii) is not a current competitor of Smartmatic or Defendants, an employee of a current competitor of Smartmatic or Defendants, or advising or discussing

employment with, or a consultant to, a current competitor of Smartmatic or Defendants, (iii) agrees to use, and does use, the Discovery Material solely in connection with the Litigation and (iv) agrees to be bound by the terms of this Order by signing an undertaking in the form attached as Exhibit A hereto. Counsel for the Party showing, providing, or disclosing Confidential or Attorneys' Eyes Only Discovery Material to any person required to execute an undertaking under this Paragraph will be responsible for obtaining such signed undertaking and retaining the original, executed copy thereof. "Competitors" are persons or entities endeavoring to engage in the same or similar lines of business, who provide the same or similar services, who sell the same or similar products, or who operate in the same markets, as well as any persons who are engaged in any of these activities.

11. Should the need arise for any Party or non-party to disclose Confidential or Attorney's Eyes Only Discovery Material during any hearing or trial before the Court, including through argument or the presentation of evidence, such Party or non-party may do so only after taking such steps as the Court, upon motion of the Producing Party, deems necessary to preserve the confidentiality of such Confidential or Attorneys' Eyes Only Discovery Material.

12. This Order shall not preclude counsel for any Party from using during any deposition in this action any Documents or Testimony which has been designated as Confidential or Attorneys' Eyes Only Discovery Material under the terms hereof. Any deposition witness who is given access to Confidential or Attorney's Eyes Only Discovery Material shall, prior thereto, be provided with a copy of this Order and shall execute a written agreement, in the form of Exhibit A attached hereto, to comply with and be bound by its terms. Counsel for the Party obtaining the certificate shall supply a copy to counsel for the other Parties and, as appropriate, a non-party that is a Producing Party. If, after being presented with a copy of this Order, a witness refuses to be

bound by this Order, the Court shall, upon application, enter an order directing the witness's compliance with the Order.

13. Every person to whom Confidential or Attorneys' Eyes Only Discovery Material is disclosed, summarized, described, characterized, or otherwise communicated or made available, orally or in writing, in whole or in part, will be advised that the information is being disclosed subject to the terms of this Order and may not be disclosed or used for purposes other than those permitted hereunder. Each such person will maintain the Confidential or Attorneys' Eyes Only Discovery Material, or information derived therefrom, in a manner reasonably calculated to prevent unauthorized disclosure. Any Party issuing a subpoena to a non-Party will enclose a copy of this Order and notify the non-Party that the protections of this Order will apply to Discovery Materials of such non-Party.

14. Any pleading, brief, memorandum, motion, letter, affidavit, declaration, or other document filed with the Court that discloses, summarizes, describes, characterizes, or otherwise communicates Confidential or Attorneys' Eyes Only Discovery Materials (a "Confidential Filing") must be filed with the Court under seal in accordance with Local Rule 5.6.

15. If a Party objects to the designation of Discovery Material as Confidential or Attorneys' Eyes Only Discovery Material, that Party ("the Objecting Party") will send written notice to the Designating Party that includes a date and time for a meet and confer to discuss the disputed designation. The Objecting Party and the Designating Party will thereafter meet and confer either at the suggested date and time or, to the extent the Designating Party is unavailable at the suggested date and time, at some other agreed date and time. If the meet and confer procedure does not resolve the dispute, the Objecting Party may, within seven (7) days of the meet and confer, file a motion with the Court to strike the designation. The Producing Party may, within

fourteen (14) days, file a response, and the Objecting Party may file a reply within seven (7) days, after which the matter will be fully briefed and ripe for the Court to resolve the dispute. A hearing may be held at the discretion of the Court. While such an application is pending, the Discovery Material or testimony in question will be treated as Confidential or Attorneys' Eyes Only Discovery Material pursuant to this Order. The burden of establishing that any Discovery Material was properly designated as Confidential or Attorneys' Eyes Only Discovery Material is on the Designating Party. If an Objecting Party seeking to challenge any designation of Discovery Material or testimony as Confidential or Attorneys' Eyes Only fails to object and propose a meet and confer as described in this paragraph, then the Objecting Party will be deemed to have permanently waived its right to challenge the designation of the disputed Discovery Material as Confidential or Attorneys' Eyes Only.

16. The Parties have the right to apply under Federal Rules of Civil Procedure 5.2(e) and 26 for an order seeking additional safeguards with respect to the use and handling of Discovery Material or to modify the terms of this Order.

17. Entering into this Order, or agreeing to or producing or receiving Discovery Material or otherwise complying with the terms of this Order, will not:

    a. prejudice in any way the rights of any Party to (i) seek production of any documents or information in discovery, or (ii) object to the production of any documents or information on the ground that it is not subject to discovery;

    b. operate as an admission by any Party that any particular Discovery Material constitutes Confidential or Attorneys' Eyes Only Discovery Material or

contains or reflects trade secrets or any other type of confidential information;

c.    prejudice in any way the rights of any Party to (i) petition the Court for a further protective order relating to any purportedly Confidential or Attorneys' Eyes Only Discovery Material, or (ii) seek a determination by the Court whether any Discovery Material or Confidential or Attorneys' Eyes Only Discovery Material should be subject to the terms of this Order;

d.    prevent any Producing Party from agreeing in writing to alter or waive the provisions or protections provided herein with respect to their designation of any particular Discovery Material;

e.    prejudice in any way the rights of any Party to object to the relevance, authenticity, use, or admissibility into evidence of any document, testimony, or other evidence subject to this Order;

f.    preclude any Party from objecting to discovery that it believes to be otherwise improper; or

g.    operate as a waiver of any attorney-client, work product, business strategy, trade secret or other privilege.

18.    This Order has no effect upon, and will not apply to, a Producing Party's use or disclosure of its own Discovery Material for any purpose. Nothing herein will prevent a Producing Party from disclosing its own Discovery Material.

19.    If Discovery Material that is subject to a claim of attorney-client privilege, attorney work product, or any other applicable privilege or ground on which production of that information should not be made to any Party ("Inadvertent Production Material") is inadvertently produced by

a Producing Party or Parties, such inadvertent production will in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client privilege, work product, or other applicable privilege.

    a.    A claim of inadvertent production will constitute a representation by the Party claiming inadvertent production that the Inadvertent Production Material has been reviewed by an attorney for the Party claiming inadvertent production and that there is a good faith basis for the claim of inadvertent production.

    b.    If a claim of inadvertent production is made under this Order, with respect to Discovery Material then in the custody of another Party, the Party possessing the Inadvertent Production Material will: (i) refrain from any further examination or disclosure of the claimed Inadvertent Production Material; and (ii) if requested, promptly make a good faith effort to destroy all such claimed Inadvertent Production Material (including summaries and excerpts) and all copies thereof, and certify in writing to that fact. Once a claim of inadvertent production is made, no Party may use the Inadvertent Production Material for any purpose until further order of the Court.

    c.    The Party claiming inadvertent production and a Receiving Party will follow the same procedure set forth in this order for challenging the designation of Inadvertent Production Material; while any motion relating to the Inadvertent Production Material is pending, the Inadvertent Production Material in question will be treated in accordance with Paragraph 7. A Receiving Party may not assert as a ground for challenging

privilege the fact of the inadvertent production, nor may it include or otherwise disclose in any filing relating to the challenge, as an attachment, exhibit, or otherwise, the Inadvertent Production Material (or any portion thereof).

20.     Nothing herein will be deemed to waive any applicable common law or statutory privilege or work product protection.

21.     In the event additional Parties join or are joined in the Litigation, they will not have access to Confidential or Attorneys' Eyes Only Discovery Material until the newly joined Party by its counsel has executed this Order and filed with the Court its agreement to be fully bound by it.

22.     Subject to the requirements of Federal Rules of Civil Procedure 5.2(e) and 26, the provisions of this Order will, absent written permission of the Designating Party or further order of the Court, continue to be binding throughout and after the conclusion of the Litigation, including, without limitation, any appeals therefrom, except as provided in Paragraph 24.

23.     In the event that any Confidential or Attorneys' Eyes Only Discovery Material is used in open court during any court proceeding or filed, marked, or offered as a trial exhibit, the material will lose its confidential status and become part of the public record, unless the Designating Party applies for and obtains an order from this Court specifically maintaining the confidential status of particular material. Before any court proceeding in which Confidential or Attorneys' Eyes Only Discovery Material is to be used, counsel will confer in good faith on such procedures that may be necessary or advisable to protect the confidentiality of any such Discovery Material.

24.     Within 60 days after receiving notice of the entry of an order, judgment, or decree finally disposing of the Litigation, or any other proceeding in which Confidential or Attorneys' Eyes Only Discovery Material is permitted to be used, including the exhaustion of all possible appeals, and upon the written request of the Designating or Producing Party, all persons having received Confidential or Attorneys' Eyes Only Discovery Material will either (i) make a good faith and reasonable effort to return such material and all copies thereof (including summaries, excerpts, and derivative works) to counsel for the Producing Party; or (ii) make a good-faith and reasonable effort to destroy all such Confidential or Attorneys' Eyes Only Discovery Material, and certify to that fact in writing to counsel for the Designating or Producing Party. However, counsel for the Parties will be entitled to retain court papers, trial transcripts, and attorney work product containing Confidential or Attorneys' Eyes Only Discovery Material, provided that such counsel, and employees of such counsel, will maintain the confidentiality thereof and will not disclose such court papers, trial transcripts, or attorney work product containing Confidential or Attorneys' Eyes Only Discovery Material to any person except under a court order or agreement by the Designating and Producing Party or except as otherwise required by law. All materials returned to the Parties or their counsel by the Court likewise will be disposed of in accordance with this paragraph.

25.     If any person in possession of Confidential or Attorneys' Eyes Only Discovery Material receives a subpoena or other compulsory process seeking the production or other disclosure of Confidential or Attorneys' Eyes Only Discovery Material the person neither produced nor designated (collectively, a "Demand"), the person will give written notice to counsel for the Designating and Producing Parties within three business days of receipt of such Demand (or if a response to the Demand is due in less than three business days, at least 24 hours prior to the deadline for a response to the Demand), identifying the Confidential or Attorneys' Eyes Only

Discovery Material sought and enclosing a copy of the Demand, and must object to the production of the Confidential or Attorneys' Eyes Only Discovery Material on the grounds of the existence of this Order. The burden of opposing the enforcement of the Demand will fall on the Designating Party. Nothing herein will be construed as requiring the person receiving the Demand or anyone else covered by this Order to challenge or appeal any order requiring production of Confidential or Attorneys' Eyes Only Discovery Material covered by this Order, or to subject itself to any penalties for noncompliance with any legal process or order, or to seek any relief from this Court or any other court. Compliance by the person receiving the Demand with any court order directing production under a Demand of any Confidential or Attorneys' Eyes Only Discovery Material will not constitute a violation of this Order.

26.     Absent a court order, no person who is not a party to the Litigation who receives Confidential or Attorneys' Eyes Only Discovery Material as permitted under the terms of this Order ("a Non-Party") will reveal any Confidential or Attorneys' Eyes Only Discovery Material or the information contained therein, to anyone not entitled to receive such Confidential or Attorneys' Eyes Only Discovery Material under the terms of this Order. In the event that Confidential or Attorneys' Eyes Only Discovery Material is disclosed to any person other than in the manner authorized by this Order, or that any information comes to the non-party's attention that may indicate there was or is likely to be a loss of confidentiality of any Confidential or Attorneys' Eyes Only Discovery Material, the non-party responsible for the disclosure or loss of confidentiality will immediately inform the Designating and Producing Party of all pertinent facts relating to the disclosure or loss of confidentiality, including, if known, the name, address, and employer of each person to whom the disclosure was made. The non-party responsible for the disclosure or loss of confidentiality will also make reasonable efforts to prevent disclosure of

Confidential or Attorneys' Eyes Only Discovery Material by each unauthorized person who receives the information.

27.　　The production of any Discovery Material by any non-party is subject to and governed by the terms of this Order.

28.　　If a Party violates this Order by intentionally releasing or otherwise disclosing Confidential or Attorneys' Eyes Only Discovery Material to persons or entities not entitled to such material under this Order or learns of the disclosure of such material and does not immediately inform the Designating and Producing Party, the Court may impose sanctions under Federal Rule of Civil Procedure 37(b)(2)(A)(i)-(vi).

29.　　The Court will retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any violation thereof.

Dated: November 3, 2022

　　　　　　　　　　　　　　　　　　*s/ John F. Docherty*
　　　　　　　　　　　　　　　　　　JOHN F. DOCHERTY
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

## EXHIBIT A

*Smartmatic USA Corp., et al., v. Lindell, et al.*, Case No. 22-cv-0098-WMW-JFD

I have read the Protective Order Dated _____, 2022 in this action (the "Order") and undertake to access and use Discovery Material, Confidential Material, and Attorneys' Eyes Only Material only as the Order permits.

Signed this ____ day of _____, 2022.

_____
[Name]

# EXHIBIT 2

<u>*Touhy* Summary of Information Sought and Relevance to Proceeding</u>

To the extent that the Department of Justice *Touhy* regulations may apply to the attached subpoena, the importance and the relevance of the information the issuing party intends to seek through the deposition of Carlotta Wells is as follows.

The testimony sought from Ms. Wells is of major importance to the defenses of Michael J. Lindell and My Pillow, Inc. in the captioned proceeding, *Smartmatic USA Corp. et al. v. Michael J. Lindell and My Pillow*, no. 22-cv-00098-WMW-JFD in the U.S. District Court for the District of Minnesota. The plaintiffs' claims in that action allege that Mr. Lindell made false statements about the 2020 election. One of Mr. Lindell's defenses is that his statements were based in significant part upon information he received from and about a former government contractor named Dennis Montgomery, including information about technology developed by Mr. Montgomery and provided to the Central Intelligence Agency to hack/penetrate electronic election systems, and otherwise gather related internet traffic that could impact election systems. Ms. Wells interacted extensively with Mr. Montgomery concerning his work for the government. Mr. Lindell's and My Pillow, Inc.'s defenses include the defense that the allegedly defamatory statements were true, and the defense that the statements were plausible. Ms. Wells can provide information showing that Mr. Lindell's reliance on Mr. Montgomery and the information he stated he possessed was reasonable.

Ms. Wells's testimony will support the defenses of Mr. Lindell and My Pillow by showing the following:

(1) The United States Government asked a federal district to enter a protective order restricting inquiry into certain information in litigation between Mr. Montgomery and his former employer, *Montgomery v. ETreppid Techs., Inc.*, no. 06-cv-56 (D. Nev. Aug. 29, 2007). *See* attached Exhibit A.

(2) The United States Government seized boxes of documents related to Mr. Montgomery from the offices of Mr. Montgomery's former attorney. *See* attached Exhibit B.

(3) Ms. Wells attended a deposition of Mr. Montgomery together with two federal agents whose names she refused to provide. See attached Exhibit C. Ms. Wells attended the deposition for purposes related to the protective order in *Montgomery v. ETreppid*. At that deposition, Ms. Wells had certain conversations with Mr. Montgomery, not recorded on the transcript, which demonstrate the nature of the work Mr. Montgomery performed for the government, on which the defendants are relying for their defense in the *Smartmatic v. My Pillow* litigation.

(4) Ms. Wells attended a court hearing in 2008 in which she instructed Mr. Montgomery not to answer several questions on the basis of the state secrets privilege related to work performed by Mr. Montgomery for the United States government. *See* attached Exhibit D.

(5) Ms. Wells attended a court hearing in 2008 in which she asked the district court to allow her to remove and redact information from exhibits related to Mr. Montgomery, on the basis of the state secrets privilege. *See* attached Exhibit E.

(6) Ms. Wells had additional conversations and dealings with Mr. Montgomery in connection with Mr. Montgomery's work for the United States Government.

Importantly, Mr. Lindell and My Pillow do not intend to ask Ms. Wells to disclose the substance of attorney-client communications or work product material generated in the course of her representation of the United States. The information they seek concerns non-privileged matters.

Ms. Wells's testimony will support the Mr. Lindell's and My Pillow, Inc.'s defenses that the information Mr. Lindell received about and from Mr. Montgomery was accurate, credible, and reasonable to rely upon in making the statements for which the Smartmatic plaintiffs are suing him in the lawsuit for which this subpoena is issued. Ms. Wells's testimony is additionally expected to support the factual conclusions that Mr. Montgomery's account of his past activities is true, that Mr. Montgomery performed work for the United States government, and that Mr. Montgomery's work was relied upon and used by the United States Government.

Lindell and My Pillow, Inc. have a right to gather the evidence of Ms. Wells's knowledge concerning Mr. Montgomery's activities to support their defenses concerning Mr. Lindell's reliance on Mr. Montgomery, and to defend against any attacks the Smartmatic plaintiffs may assert against Mr. Montgomery's credibility.

Disclosure of Ms. Wells's testimony is appropriate as part of discovery in the *Smartmatic USA Corp. et al., v. Michael J. Lindell and My Pillow, Inc.* action, which is open and ongoing. The testimony sought is not privileged, no statute would be violated by disclosure of it, and it would not require disclosure of classified information, reveal any confidential source or investigation, or improperly reveal trade secrets.  To the extent Ms. Wells's testimony is deemed sensitive or confidential, the testimony could be designated as confidential under the Protective Order entered by the District Court in this action, attached to the subpoena. Mr. Lindell and My Pillow, Inc. believe that Ms. Wells's testimony concerning Mr. Montgomery can be taken without creating any issue of state secrets, because the testimony concerns events from long ago and because the testimony can be given in a general way as to avoid any lingering concerns over classified information.

Mr. Lindell and My Pillow, Inc. seek testimony that (1) Mr. Montgomery worked on U.S. government programs that involved information protected by the State Secrets Privilege; (2) the federal government undertook active measures to prevent Mr. Montgomery from disclosing state secrets, including seizing documents from his attorney, attending his deposition, and attending court hearings at which he testified; (3) Ms. Wells engaged in conversations with Mr. Montgomery on multiple occasions regarding the State Secrets Privilege and what information Mr. Montgomery was permitted to disclose or prohibited from disclosing; (4) the United States Government's desire to protect State Secret information held by Mr. Montgomery continues today; (5) Exhibits A, B, C, D, and E accurately reflect the events they describe.

4

# EXHIBIT A

1  PETER D. KEISLER
   Assistant Attorney General
2  DANIEL G. BOGDEN
   United States Attorney
3  District of Nevada
   GREG ADDINGTON
4  Assistant United States Attorney
   Nevada Bar 6875
5  100 West Liberty, Suite 600
   Reno, Nevada 89501
6  VINCENT M. GARVEY
   Deputy Branch Director
7  CARLOTTA P. WELLS
   Senior Trial Counsel
8  Federal Programs Branch
   Civil Division - Room 7150
9  U.S. Department of Justice
   20 Massachusetts Ave., NW/P.O. Box 883
10 Washington, D.C. 20044

                    **UNITED STATES DISTRICT COURT**
11                      **DISTRICT OF NEVADA**

12 ETREPPID TECHNOLOGIES, LLC,        )
                                      )
13          Plaintiff,                )
                                      )
14 v.                                 )        CV-N- 06-00145 (BES)(VPC)
                                      )
15 DENNIS MONTGOMERY, et al.,         )
                                      )
16          Defendants.               )
   _____)
17 DENNIS MONTGOMERY, et al.,         )
                                      )
18          Plaintiffs,               )
                                      )
19 v.                                 )        CV-N-06-00056 (BES)(VPC)
                                      )
20 ETREPPID TECHNOLOGIES, INC.,       )
   et al.,                            )
21                                    )
            Defendants.               )
22 _____)

23              **NOTICE OF MOTION AND MOTION FOR**
           **PROTECTIVE ORDER BY THE UNITED STATES**
24

25          TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: Please take notice that,

26 pursuant to Federal Rule of Civil Procedure 26(c), defendant, the United States Department of

   Defense (DoD), hereby submits its motion for a protective order to prevent disclosure of
27
   information that could harm the national security interests of the United States.  In addition, DoD
28

moves to stay its discovery obligations during the pendency of its motions to dismiss all claims against the government in these cases. The motion is based on this notice of motion and motion and the following memorandum of points and authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF UNITED STATES' MOTION FOR PROTECTIVE ORDER**

**INTRODUCTION**

The United States seeks a protective order in these cases pursuant to Rule 26(c)[1] to prevent the disclosure of information relating to (1) the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services; and (2) any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits. The basis for the protective order is that the information is protected by the military and state secrets privilege. That privilege, as properly asserted by the United States here, acts as an absolute bar when disclosure of the material would harm national security, regardless of a party's need for the information. As explained in the declarations accompanying this motion, because the disclosure of information at issue in this litigation reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to national security, <u>see</u> Declaration of John D. Negroponte (Negroponte Dec.), attached

---

[1]   The United States Department of Defense (DoD) has been named a party to this litigation, but has moved to dismiss the claims against it on jurisdictional grounds. Even if DoD is dismissed as a party, the United States' interest in protecting national security information would remain and, if appropriate, the government could file a statement of interest pursuant to 28 U.S.C. § 517. That statute provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or District in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

1    hereto as Exhibit 1; see also Classified Declaration to be submitted in camera ex parte,[2] the

2    United States' interest in preserving its state secrets is overriding and must be safeguarded, even

3    if a party is thereby precluded from establishing its legal position in these cases.

4        The assertion of the privilege does not mean that there is actually a relationship between

5    the intelligence community and any individual or entity involved in these cases.  Rather, as Mr.

6    Negroponte explains, in order to protect from disclosure those instances where there is a

7    relationship,  the United States must prevent the disclosure of information that would tend to

8    either confirm or deny that any relationship or connection exists even in cases where there is no

9    such relationship.  See Negroponte Dec. ¶ 12.  To do otherwise would inevitably lead to the

10   compromise of national security information, because if the United States were forced to deny

11   relationships where none existed, the United States' refusal to respond to future allegations in

12   other cases would, as one district court explained, "be tantamount to a confirmation."  See

13   Maxwell v. First National Bank of Maryland, 143 F.R.D. 590, 595 (D. Md. 1992).  For these

14   reasons, the Court should uphold the United States' assertion of the military and state secrets

15   privilege and enjoin the disclosure of any information that might tend to confirm or deny the

16   existence or non-existence of any relationship (including any communication, meeting or

17   transaction) between the U.S. intelligence community and any individual or entity associated

18   with the underlying events giving rise to these suits, as well as any actual or proposed interest in,

19   application, or use by any intelligence agency other than the United States Air Force of any

20   technology, software, or source code owned or claimed by any  individuals or entities associated

21   with these lawsuits.

22       Further, on June 21, 2006, DoD filed motions to dismiss all of the claims against it as

23   asserted in these cases.  Etreppid filed its notices of non-opposition on July 10, 2006.

24

25       [2]  The classified in camera, ex parte declaration can be made available for review by the
     Court at its convenience.  Because of the declaration's classification level, however, it must be
26   stored at all times, except when being reviewed by appropriate personnel, in a Sensitive
     Compartmented Information Facility (SCIF).
27

28                                          -3-

Montgomery's opposition were filed, under seal, on September 15, 2006. Defendant has not yet been served with discovery requests, although the deadline for the parties to produce their initial disclosures was, by stipulation of the parties, August 14, 2006. In its motions to dismiss, DoD argued that the Court should dismiss these actions as to DoD for lack of subject matter jurisdiction. If the Court grants the government's motions, it will dispose of the claims against DoD in their entirety. Therefore, in the interests of judicial economy, the Court should exercise its discretion under Rule 26(c) of the Federal Rules of Civil Procedure and stay all discovery relating to DoD pending its ruling on the government's motions to dismiss.[3]

Counsel for the parties conferred in an attempt to reach agreement on the issues raise in this motion, but were unable to do so.

### **BACKGROUND**

A.    Factual Statement

The instant litigation is comprised of two actions, Civil Action No. 06-00056 (hereinafter referred to as the "Federal Case") and Civil Action No. 06-00145 (hereinafter referred to as the "Removed Case"). Dennis Montgomery, et al. (Montgomery) and eTreppid Technologies, Inc. (eTreppid) have filed countersuits relating, *inter alia,* to claims involving copyright infringement, misappropriation of trade secrets, breach of contract, and breach of fiduciary duty. Montgomery also has filed claims against DoD in both suits, seeking declaratory relief in both as well as relief for copyright infringement in the Federal Case. The dispute between the private parties primarily concerns the ownership of source codes and their derivatives, *see* Federal Case Complaint ¶¶ 11-14; Removed Case Complaint ¶¶ 31-33; Removed Case Countercomplaint ¶ 23.

In a complaint originally filed in state court, eTreppid has asserted a claim of entitlement to protect and recover trade secrets from Montgomery. Removed Case Complaint ¶ 35. Montgomery, a former employee, officer, and director of the company, filed a counter-complaint

---

[3] DoD does not take a position with respect to whether discovery between eTreppid and Montgomery should proceed notwithstanding the pendency of the government's motion to dismiss.

as well as a federal court action, alleging that eTreppid had infringed his copyright interests. Montgomery claims that he is an inventor and software developer who developed software for which he was granted copyrights in 1982. Removed Case Counter-complaint ¶ 8; Federal Case Complaint ¶ 8. Montgomery asserts that, after registration of the copyrights, he developed derivative works based on the copyrighted technology. Removed Case Counter-complaint ¶ 9; Federal Case Complaint ¶ 9. In September 1998, Montgomery and counter-defendant Warren Trepp formed eTreppid. Removed Case Counter-complaint ¶ 10; Federal Case Complaint ¶ 10. Pursuant to an agreement entered into between Montgomery and Trepp, Montgomery alleges he contributed certain technology in exchange for a 50 percent interest in eTreppid. *Id.*

The dispute between Montgomery and eTreppid stems from the issue of the extent to which Montgomery retained the sole interest in the derivative works based on the copyrighted technology. Removed Case Counter-complaint ¶¶ 11-14; Federal Case Complaint ¶¶ 11-14. Montgomery alleges that, in 2003, eTreppid "began sublicensing the Derivative Works to various entities, including the United States government and collecting licensing fees for the sublicenses," without having a license to take such action. Removed Case Counter-complaint ¶¶ 16-18; Federal Case Complaint ¶¶ 16-18. Further, Montgomery claims that, to the extent eTreppid had "an oral nonexclusive license to exploit the Derivative Works," such oral license was terminated in January 2006. Removed Case Counter-complaint ¶¶ 17-18; Federal Case Complaint ¶¶ 17-18. For its part, eTreppid claims that Montgomery has misappropriated trade secrets, violated the terms of his contracts with eTreppid, and improperly converted confidential information for his own use. Removed Case Complaint ¶¶ 36, 43, 46.

Montgomery also has asserted a claim against DoD. Montgomery alleges that he is prevented from fully disclosing the information he needs to present his case because he signed a "secrecy contract" with the United States government relating to the nature of the work that he performed on behalf of the government while associated with eTreppid and that disclosure of such information could subject him to criminal prosecution. Federal Complaint ¶¶ 69, 71;

Removed Case Counter-complaint ¶ 24.  Montgomery claims that he can neither defend against

eTreppid's claims nor prosecute his own without revealing the "nature of the technology, the type

of work he has performed on the government contracts using his technology versus that of

eTreppid, and the capabilities of his technology . . . in performing work for certain government

agencies."  Federal Case Complaint ¶¶ 71; Removed Case Counter-complaint ¶¶ 24.  *Accord*

Federal Case Complaint ¶¶ 72; Removed Case Counter-complaint ¶¶ 25.   Montgomery therefore

seeks, in both cases, a declaration that disclosure of such information will not constitute a

violation of the "the contract between Montgomery and the United States to maintain [] secrets,

and/or a declaration of immunity for Montgomery from the United States."  Federal Case

Complaint ¶ 73; Removed Case Counter-complaint ¶ 26.

Montgomery signed a Classified Information Nondisclosure Agreement (Nondisclosure

Agreement), which was executed with the Defense Security Service, an agency within the DoD,

on September 16, 2003.  Exhibit 2.  Pursuant to the terms of the Nondisclosure Agreement,

Montgomery *inter alia*: (1) accepted certain obligations in exchange for being granted access to

classified information (para. 1); (2) agreed never to divulge classified information to anyone

unless authorized under the terms of the agreement and to comply with all laws prohibiting the

unauthorized disclosure of classified information (para. 3); (3) stated he had been advised that

the unauthorized disclosure of classified information could violate certain criminal statutes (para.

4); (4) stated he understood that the United States government may seek any remedy available to

it to enforce the terms of the agreement, including but not limited to seeking a court order to

prohibit the unauthorized disclosure of classified information (para. 6); (5) stated he understood

that the classified information to which he would have or obtain access to was and would remain

the property and under the control of the United States government (para. 7); and (6) agreed that

the conditions and obligations imposed upon him under the agreement apply unless and until he

is relieved of such obligations in writing by an authorized representative of the United States

government (para. 8).  *Id.*

B.    Terms of the Proposed Protective Order

The proposed protective order (Exhibit 3) states that certain intelligence information that may or may not be relevant to the claims and defenses of the parties to this litigation is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States (para. 1).  The proposed order then defines the categories of information that shall not be discussed, mentioned or otherwise subject to discovery or disclosure during all proceedings in this action:

> 2.  The parties to these actions shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services [hereinafter referred to as "any intelligence agency"], or any current or former official, employee, or representative thereof, and any individuals or entities associated with these lawsuits, or any current or former officer or employee thereof.
>
> 3.  The parties to these actions shall not serve or take any discovery relating to or questioning any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

*Accord* paragraphs 5 and 6.

In addition, the proposed order (para. 4) delineates issues relating to the parties' interactions with the government that would not be precluded.  The areas in which questions or discovery would not be precluded include:

> a.  The existence and nature of the "Big Safari" contract [hereinafter referred to as "the contract"] between eTreppid, Inc. and the United States Air Force, including but not limited to the fact that the contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the contract involved image identification technology;
>
> b.  The fact that the contract required employees and/or officers of eTreppid, Inc. to sign secrecy agreements with the Department of Defense;
>
> c.  The technical specifications relating to any technology, owned or claimed by any non-government individual or entity associated with these lawsuits, used under the terms of the contract or any other contract, relationship, agreement, connection, contract, transaction, communication, or meeting of any

-7-

kind, unless covered by paras. 2 and 3 above;

    d. Any actual or potential commercial or government applications of any technology owned or claimed by any non-government individual or entity associated with these lawsuits at any time, except to the extent that any application is covered by paragraph 2 and/or 3 above; and

    e. Facts relating to the issue of ownership, by any non-government individual or entity associated with these lawsuite, of any right or interest in the source code, software, or other technology owned or claimed by the parties to these lawsuits, except to the extent that any application is covered by paragraph 2 and/or 3 above.

The proposed order also states that, to the extent information or documents are sought by the private parties that would implicate the information defined in paragraphs 2 and 3 of the proposed order, then such requests shall be deemed, without the need for objection, not to require a response that would include any such information (paras. 7 and 8). The proposed order further sets forth measures by which the United States can ensure that the classified information is protected against disclosure by, for example, requiring service upon attorneys representing the government of all discovery and motions (para. 10), requiring notice to the government's attorneys of all decisions and notices for hearings in this litigation (para 11), authorizing attendance by attorneys for the United States at all depositions and proceedings as well as their right to make objections as necessary to protect national security information (para. 12), and authorizing the participation by attorneys for the United States in any proceeding in this litigation (para. 13).

Finally, as noted above, the proposed protective order also provides that the government is excused from its Rule 26 obligations during the pendency of DoD's motion to dismiss. The obligations that are to be stayed include complying with the obligation to produce initial disclosures as all well as all discovery obligations.

**ARGUMENT**

I.  The Standard Of Review Is A Narrow One, And A Properly Invoked
    Claim Of The State Secrets Privilege Is An Absolute Bar To Disclosure

The military and state secrets privilege is a unique privilege, with constitutional underpinnings,[4] which permits the Government to protect against the unauthorized disclosure in litigation of information that may adversely affect national security interests. See United States v. Reynolds, 345 U.S. 1, 7-8 (1953); Black v. United States, 62 F.3d 1115, 1118 (8th Cir. 1995), cert. denied, 517 U.S. 1154 (1996); Ellsberg v. Mitchell, 709 F.2d 51, 56 (D.C. Cir. 1983), cert. denied, 465 U.S. 1038 (1984). The privilege is not limited to military secrets, but is "both expansive and malleable." Ellsberg, 709 F.2d at 57. Thus, it includes within its scope information that would result in "'impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.'" Black, 62 F.2d at 1118 (quoting Ellsberg, 709 F.2d at 57).[5]

---

[4] National security information is subject to the exclusive control of the President and the Executive Branch of the U.S. Government, pursuant to the President's powers under Article II of the Constitution. Department of Navy v. Egan, 484 U.S. 518, 527 (1988). Justice Stewart observed in his concurring opinion in New York Times Co. v. United States, 403 U.S. 713, 728-29 (1971), as follows:

> If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully.

[5] See, e.g., Reynolds, 345 U.S. at 5 (Air Force crash investigation report containing national security information was privileged); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1242-43 (4th Cir. 1985) (expert testimony on Navy marine mammal research programs was precluded as privileged); Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 400-402 (D.C. Cir. 1984) (Department of Defense documents containing national security information, including communications with foreign governments and intra-government letters, were privileged); Halkin v. Helms, 690 F.2d 977, 990, 993 (D.C. Cir. 1982) (information concerning diplomatic relations with foreign governments and intelligence-gathering methods and capabilities was privileged).

The military and state secrets privilege is invoked when the government makes [1] a "formal claim of privilege, [2] lodged by the head of the department which has control over the matter, after [3] actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8 (footnotes omitted); Black, 62 F.3d at 1118. The privilege is asserted to protect against the unauthorized disclosure of information that may adversely affect national security interests, regardless of how the person who has the information or seeks its disclosure is related to the Government. See generally 2 S. Stone & R. Taylor, Testimonial Privileges § 9.12 at 9-37 (2d ed. 1995). Thus, "the privilege may be invoked only by the government and may be asserted even when the government is not a party to the case." Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 546 (2d Cir. 1991) (citing Fitzgerald, 776 F.2d 1236 (4th Cir. 1985)).

The standard of review of a military and state secrets privilege claim is a "narrow one," and "[c]ourts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978); see also Reynolds, 345 U.S. at 10; Black, 62 F.3d at 1119. The role of the court is to assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure will harm national security. Zuckerbraun, 935 F.2d at 546-47. "[T]he government need not demonstrate that injury to the national interest will inevitably result from disclosure; a showing of 'reasonable danger' that harm will ensue is sufficient." Ellsberg, 709 F.2d at 58 (footnote omitted). In this regard, courts have been "willing[] to credit relatively speculative projections of adverse consequences [of disclosure]." Id. at 58 n.35.

In considering the claim of military and state secrets privilege, the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect," Reynolds, 345 U.S. at 8, although it is appropriate for the court to consider in camera and ex parte declarations or other submissions of the Government explaining why a matter should be protected, Black, 62 F.3d at 1119. See, e.g., Kasza v. Browner, 133 F.3d 1159, 1169 (9th Cir. 1998); Farnsworth Cannon,

Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980) (en banc)); Maxwell, 143 F.R.D. at 595.[6]

Likewise, a judicial opinion on a claim of military and state secrets privilege "should not strip the

veil from state secrets even if ambiguity results in a loss of focus and clarity." Black, 62 F.3d at

1119; see also Ellsberg, 709 F.2d at 59 n.41 (open, detailed discussion by a court of the

application of general principles to particular facts is impossible in this area of the law).

A properly invoked claim of privilege is an absolute bar to disclosure, no matter how

compelling the need for the information, or relevance thereof, to a proper resolution of the case.

Reynolds, 345 U.S. at 11; Black, 62 F.3d at 1119; Fitzgerald, 776 F.2d at 1240; Northrop, 751

F.2d at 399. In other words, if the court determines that there exists a showing of harm which

might reasonably flow from disclosure, the privilege cannot be overcome by "even the most

compelling necessity." Reynolds, 345 U.S. at 11; In re Under Seal, 945 F.2d at 1288 n.2 ("Upon

proper invocation by the head of the affected department, the privilege renders the information

unavailable regardless of the other party's need in furtherance of the action"); Halkin, 690 F.2d at

---

[6] In a number of contexts, national security concerns require ex parte, in camera review of classified information, including any classified state secrets declarations submitted by the government, to protect such information from unauthorized disclosure. See e.g., Ellsberg, 709 F.2d at 61 ("It is well settled that a trial judge called upon to assess the legitimacy of a state secrets privilege claim should not permit the requester's counsel to participate in an in camera examination of putatively privileged material. The rationale for this rule is that our nation's security is too important to be entrusted to the good faith and circumspection of a litigant's lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of secrecy) or to the coercive power of a protective order"); In re Eisenberg, 654 F.2d 1107, 1112 (5th Cir. 1981) ("Our adversarial legal system generally does not tolerate ex parte determinations on the merits of a civil case. . . . An exception to this principle is made when countervailing government interests dictate that information sought to be discovered should remain secret. Privilege questions are determined on the basis of in camera, ex parte examinations of the evidence."); In re Under Seal, 945 F.2d 1285 (4th Cir. 1991) (classified in camera affidavit reviewed by both the district court and court of appeals without being disclosed to plaintiff's counsel); Stillman v. CIA, 319 F.3d 546, 549 (D.C. Cir. 2003) (same); Crater Corp. v. Lucent Technologies, Inc., 255 F.3d 1361, 1370 n. 4 (Fed. Cir. 2001)(rejecting claims of improper ex parte communications between the district court and the government in a case between two private parties but involving classified information).

-11-

990.

If the consequent unavailability of the information precludes either party from establishing its legal position on the ultimate issues in the case, then the case must be dismissed. See Black, 62 F.3d at 1119 (case was properly dismissed where privileged information was at the core of plaintiff's claims); see also Fitzgerald, 776 F.2d at 1241-42 ("in some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters"); Farnsworth, 635 F.2d at 281 ("any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation"); Tilden v. Tenet, 140 F. Supp. 2d 623, 627 (E.D. Va. 2000) (case would be dismissed where there was no way in which lawsuit could proceed without disclosing state secrets).[7]

II.   The United States Has Properly Invoked The Privilege, And The Court Should Issue A Protective Order Barring Disclosure Of The Information In Question

The United States has properly asserted the military and state secrets privilege in these cases. The current head of the U.S. Intelligence community, Director of National Intelligence John D. Negroponte, after personal consideration of the matter, has formally invoked the privilege on behalf of the United States with respect to the information described in his declaration. See Reynolds, 345 U.S. at 7-8; Negroponte Dec. ¶¶ 3, 9 (Exhibit 1).[8]   As Mr.

---

[7]   Notwithstanding the need to protect certain information from disclosure, the scope of the information that would be protected by the state secrets privilege in these cases is relatively limited in scope. For this reason, the government's proposed protective order specifically identifies issues relating to the parties' interactions with the government that would not be precluded. As a result of the fact that privilege covers only some but not all of the information relating to the government's interactions with eTreppid and Montgomery, it appears at this point that the underlying litigation should be able to proceed in some fashion.

[8]   The public declaration is sufficient to establish the United States' military and state secrets privilege claim in this case. See Reynolds, 345 U.S. at 8 (the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect"). Moreover, while "the court should not jeopardize the security which the privilege is meant to protect by insisting upon an

-12-

Negroponte explains, the information to be protected from disclosure includes information concerning the existence or non-existence of any actual or proposed relationship involving any U.S. intelligence agency and any individuals and/or companies associated with these lawsuits and any actual or proposed interest in, application of, discussion of, or use by any intelligence agency of any technology owned or claimed by individuals and/or companies associated with these lawsuits. Negroponte Dec. ¶ 11. The disclosure of this information, which may or may not be relevant to the parties' claims and defenses in their lawsuits relating to copyright ownership and trade secrets, could reasonably be expected to damage the national security. Id. at ¶¶ 9, 12; see also Classified Declaration submitted in camera ex parte.

Based on the assertion by the head of the United States intelligence community that damage to national security could reasonably be expected to result from any disclosure of information that would tend to confirm or deny the existence or non-existence of any relationship between the United States intelligence community and the private parties as well as the application by a member of the U.S. intelligence community of software or technology that the parties claim to own, the United States' claim of privilege is valid. It therefore meets the narrow standard of review to which the state secrets claim is subject, and the Court should accord it the utmost deference. See Halkin v. Helms, 598 F.2d at 9; see also Black, 62 F.3d at 1119. In view of the United States' showing that unauthorized disclosure of the information described in Mr. Negroponte's declaration could reasonably be expected to cause serious, and in some cases exceptionally grave, damage to national security, whether in response to the parties' discovery requests or otherwise, disclosure of that information is completely barred, no matter how

examination of the evidence, even by the judge alone, in chambers," id. at 10, a more detailed description of the national security concerns at issue in this case is contained in a classified declaration which the United States has already prepared. Because that declaration is classified, it can only be presented for the Court's ex parte, in camera review. The Department of Justice Security Office can arrange for this Court's ex parte, in camera review of the classified declaration in a secure setting at the Court's convenience.

-13-

compelling any party's alleged need for the information.  Reynolds, 345 U.S. at 11; Northrop, 751 F.2d at 399; Halkin, 690 F.2d at 990.

That the assertion of the military and state secrets privilege might leave a party to litigate "in the dark" is nothing extraordinary or unusual.  Such was the case in Farnsworth, 635 F.2d at 281, where plaintiff's counsel was left unaware of the scope of excluded information, as well as in Maxwell, 143 F.R.D. at 599-600, where plaintiff's counsel was rebuffed in his attempts to discover matters with respect to which the privilege had been asserted.  In such instances, the Government simply has an "overriding interest."  See Farnsworth, 635 F.2d at 281.  Accordingly, the Court should issue a protective order prohibiting the disclosure of the information at issue in these cases.

III.     In the Interest of Judicial Economy, the Court Should Enter a Protective Order Staying
         Discovery Until Resolution of DoD's Motion to Dismiss.

Courts have broad discretion under the Federal Rules of Civil Procedure to regulate the discovery process, Herbert v. Lando, 441 U.S. 153, 177 (1979), including the discretion to deny discovery.  See Fed. R. Civ. P. 26(c); Jarvis v. Regan, 833 F.2d 149, 155 (9th Cir. 1987) ("A district court's decision to allow or deny discovery is reviewable only for abuse of discretion."); Petrus v. Bowen, 833 F.2d 581, 583 (5th Cir. 1987) ("trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined"); B.R.S. Land Investors v. United States, 596 F.2d 353, 356 (9th Cir. 1979) ("A district court may properly exercise its discretion to deny discovery where . . . it is convinced that the plaintiff will be unable to state a claim upon which relief can be granted.").

Exercise of the Court's discretion to stay discovery is especially appropriate where a dispositive motion is pending and the discovery sought is not necessary to resolve the issues raised by that motion.  See Alaska Cargo Transport, Inc. v. Alaska R.R. Corp., 5 F.3d 378, 383 (9th Cir. 1993) (stay of discovery was proper where the discovery sought was not relevant to "whether or not the court ha[d] subject matter jurisdiction"); Jarvis v. Regan, 833 F.2d at 155 (district court properly stayed discovery that was not needed to resolve motion to dismiss); Wood

-14-

v. McEwen, 644 F.2d 797, 801 (9th Cir. 1981) ("A district court may limit discovery 'for good cause' and may continue to stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief.") (citation omitted). "Indeed, such a procedure is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." Coastal States Gas Corp. v. Department of Energy, 84 F.R.D. 278, 282 (D. Del. 1979).

These are just such cases. Allowing discovery would impose significant and unnecessary burdens on DoD (and potentially the Court, if there are discovery disputes) at a time when significant issues have been raised regarding the Court's jurisdiction over this matter. Discovery is not needed to resolve those jurisdictional issues and, thus, a stay of discovery is warranted in these circumstances. See Jarvis, 833 F.2d at 155 ("Discovery is only appropriate where there are factual issues raised by a Rule 12(b) motion."); Rae v. Union Bank, 725 F.2d 478, 481 (9th Cir. 1984) (district court properly stayed discovery where plaintiff "failed to point to any specific information obtainable through discovery that would have enabled" plaintiff to withstand motion to dismiss). Given the dispositive jurisdictional issues DoD has raised, the principle of judicial economy favors a stay of discovery until the Court has ruled on the pending motions to dismiss.

## CONCLUSION

For the foregoing reasons, the United States' assertion of the military and state secrets privilege should be upheld, discovery involving the government should be stayed pending the disposition of DoD's motions to dismiss, and the government's motion for a protective order should be granted.

DATED: September 25, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney
District of Nevada

-15-

GREG ADDINGTON
Assistant United States Attorney
Nevada Bar 6875
100 West Liberty, Suite 600
Reno, Nevada 89501

VINCENT M. GARVEY
Deputy Branch Director


 /s/ Carlotta P. Wells
CARLOTTA P. WELLS
Senior Trial Counsel
Federal Programs Branch
Civil Division - Room 7150
U.S. Department of Justice
20 Massachusetts Ave., NW
P.O. Box 883
Washington, D.C. 20044

Counsel for Counter-Defendant,
United States Department of Defense

IT IS SO ORDERED

Date: _____, 2006          _____
                                      UNITED STATES DISTRICT JUDGE


### CERTIFICATE OF SERVICE

I hereby certify that I am an employee in the office of the United States Department of Justice, Civil Division in Washington DC and I am of such age and discretion as to be competent to serve papers. On September 25, 2006, I served copies of the United States Notice of Motion and Motion for Protective Order, with the accompanying Memorandum of Points and Authorities, by placing said copies in postpaid envelopes addressed to the persons named below at the places and addresses stated below and by depositing said envelopes and contents in the United States mail at the United States Department of Justice, 20 Massachusetts Avenue, Washington D. C. 20001.

-16-

Ronald J.  Logar, Esq.
Eric A. Pulver, Esq.
LAW OFFICES OF LOGAR & PULVER, PC
255 S. Arlington Avenue, Suite A
Reno, NV 89501

Michael J. Flynn, Esq.
Philip H. Stillman, Esq.
FLYNN & STILLMAN
224 Birmingham Drive, Suite 1A4
Cardiff, CA 92007

Stephen J. Peek, Esq.
Jerry M. Snyder, Esq.
HALE LANE PEEK DENNISON AND HOWARD
5441 Kietzke Lane, Second Floor
Reno, NV 89511


David A. Jakopin, Esq.
Jonathan D. Butler, Esq.
PILLSBURY WINTHROP SHAW PITTMAN, L.L.P.
2475 Hanover Street
Palo Alto, CA 94304-1114


/s/ Carlotta P. Wells
Carlotta P. Wells
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice

-17-

**UNITED STATES' MOTION FOR
PROTECTIVE ORDER**

**EXHIBIT 1**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| ETREPPID TECHNOLOGIES, LLC, a California Corporation, | ) ) ) |
| Plaintiff | ) ) |
| v. | ) ) |
| DENNIS MONTGOMERY, et. al., | ) ) ) |
| Defendants. | ) ) |

CV-N-06-00415(BES)(VPC)

|  |  |
|---|---|
| DENNIS MONTGOMERY, et. al., | ) ) |
| Plaintiffs | ) ) |
| v. | ) ) ) |
| ETREPPID TECHNOLOGIES, INC., et. al. | ) ) ) ) |
| Defendants. | ) ) |

CV-N-06-00056(BES)(VPC)

## DECLARATION AND FORMAL CLAIM OF
## STATE SECRETS AND STATUTORY PRIVILEGES
## BY JOHN D. NEGROPONTE,
## DIRECTOR OF NATIONAL INTELLIGENCE

I, JOHN D. NEGROPONTE, hereby declare as follows:

1.  I am the Director of National Intelligence (DNI) of the United States. I have held this position since April 21, 2005. From June 28, 2004, until my appointment as DNI, I served as the United States Ambassador to Iraq.

From September 18, 2001, until my appointment in Iraq, I served as the United States Permanent Representative to the United Nations. I have also served as Ambassador to Honduras (1981-1985), Mexico (1989-1993), and the Philippines (1993-1996), and as Deputy Assistant to the President for National Security Affairs (1987-1989).

2. The statements made herein are based on my personal knowledge, as well as on information provided to me in my official capacity as DNI, and on my personal evaluation of that information. In personally considering this matter, I have read the information contained in the separate classified declaration filed *in camera* and *ex parte* in this case.

3. The purpose of this declaration is to assert formally, in my capacity as DNI and head of the United States Intelligence Community, the state secrets privilege to protect intelligence information ("state secrets privilege"), as well as a statutory privilege under the National Security Act, 50 U.S.C. § 403-1(i)(1), to protect intelligence sources and methods from unauthorized disclosure. Unauthorized disclosure of information covered by the state secrets and statutory privileges reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the

United States, and such information should therefore be
excluded from any use in this litigation.

## I.  STATUTORY AND EXECUTIVE ORDER AUTHORITIES

4.  The position of Director of National Intelligence
was created by the Intelligence Reform and Terrorism
Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a),
1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending
sections 102 through 104 of Title I of the National
Security Act of 1947).  Subject to the authority,
direction, and control of the President of the United
States, the DNI serves as the head of the United States
Intelligence Community and as the principal advisor to the
President, the National Security Council, and the Homeland
Security Council for matters related to intelligence and
national security.  *See*, 50 U.S.C. § 403 (b)(1),(2).

5.  The "United States Intelligence Community"
includes the Office of the Director of National
Intelligence; the Central Intelligence Agency; the National
Security Agency; the Defense Intelligence Agency; the
National Geospatial-Intelligence Agency; the National
Reconnaissance Office; other offices within the Department
of Defense for the collection of specialized national
intelligence through reconnaissance programs; the
intelligence elements of the military services, the Federal

3

Bureau of Investigation, and the Department of Energy; the Office of Intelligence and Analysis of the Department of the Treasury; the Drug Enforcement Administration's Intelligence Division; the Bureau of Intelligence and Research of the Department of State; elements of the Department of Homeland Security concerned with the analysis of intelligence information (including the Office of Intelligence of the Coast Guard); and such other elements of any other department or agency as the President may designate, or as may be jointly designated by the DNI and the head of the department or agency concerned, as an element of the United States Intelligence Community. *See,* 50 U.S.C. § 401(a)(4).

6. The responsibilities and authorities of the DNI, enumerated in the National Security Act, as amended, at 50 U.S.C. § 403-1, include ensuring that national intelligence is provided to the President, the heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof. 50 U.S.C. § 403-1(a)(1). The DNI is also charged with establishing the objectives of, determining the requirements and priorities for, and managing and directing the tasking, collection, analysis, production, and

dissemination of national intelligence by elements of the United States Intelligence Community. 50 U.S.C. § 403-1(f)(1)(A)(i), (ii). The DNI is responsible for developing and determining, based on proposals submitted by heads of agencies and departments within the United States Intelligence Community, an annual consolidated budget for the National Intelligence Program for presentation to the President, and for ensuring the effective execution of the annual budget for intelligence and intelligence-related activities, including managing and allotting appropriations for the National Intelligence Program. *Id.* § 403-1(c)(1)-(5).

7. In addition, the National Security Act of 1947, as amended, provides that "The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Consistent with this responsibility, the DNI establishes and implements the guidelines of the United States Intelligence Community for the classification of information under applicable law, Executive Orders, or other Presidential directives, and access and dissemination of intelligence. *Id.* § 403-1(i)(2)(A), (b). In particular, the DNI is responsible for the establishment of uniform standards and procedures for granting access to Sensitive

Compartmented Information to any officer or employee of any agency or department of the United States and for ensuring consistent implementation of those standards throughout such departments and agencies. *Id.* § 403-1(j)(1),(2).

8. By virtue of my position as the DNI, and unless otherwise directed by the President, I have access to all intelligence related to national security that is collected by any department, agency, or other entity of the United States. Pursuant to Executive Order 12958, as amended,[1] the President has authorized me to exercise original TOP SECRET classification authority. After personal consideration of the matter, I have determined that the classified *ex parte*, *in camera* declaration which accompanies this assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods is properly classified under § 1.3 of E.O. 12958, because the unauthorized public disclosure of information contained in that declaration reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the foreign policy and national security of the United States.

---

[1] Executive Order 12958 was amended by Executive Order 13292. *See* Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19825 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

## II. ASSERTION OF THE STATE SECRETS AND STATUTORY PRIVILEGES

9. After careful and actual personal consideration of the matter, I have determined that the unauthorized disclosure of certain information that may be implicated by the parties' claims in this matter, as set forth here and described in more detail in the classified *ex parte, in camera* declaration which accompanies this declaration, reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the United States, and thus must be protected from disclosure and excluded from this case. Therefore, I formally invoke and assert the state secrets privilege to prevent the disclosure of that information.

10. Through this declaration, I also invoke and assert a statutory privilege held by the DNI under the National Security Act, as amended, to protect the intelligence sources and methods implicated by this case. *See*, 50 U.S.C. § 403-1(i)(1). My assertion of this statutory privilege for intelligence sources and methods is coextensive with my state secrets privilege assertion.

11. With my assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods, I respectfully ask the Court to prevent any

SEP. 19. 2006 11:48AM

party from testifying, eliciting testimony, producing,
disclosing, entering into evidence or making any other use
in discovery, at trial, or in any other way in connection
with this case, information concerning: (a) the existence
or non-existence of, any actual or proposed relationship,
agreement, connection, contract, transaction, communication,
or meeting of any kind between any entity in the United
States Intelligence Community, or any current or former
official, employee, or representative thereof, and any
individuals or entities associated with this lawsuit, on
any current or former officer or employee thereof; and (b)
any actual or proposed interest in, application, or use by
any entity in the United States Intelligence Agency, or any
current or former official, employee, or representative
thereof, of any technology, software, or source code owned
or claimed by any individuals or entities associated with
this lawsuit.

12. I have determined that any unauthorized
disclosure of the information described in Paragraph 11
reasonably could be expected to cause serious, and in some
case exceptionally grave damage to national security since
the United States can neither confirm nor deny such
information without compromising the effectiveness of
intelligence sources and methods. Public disclosure of

8

information that confirms the use of particular intelligence sources and methods compromises the effectiveness of those sources and methods by alerting likely targets to their use, while public denial of the use of particular intelligence sources and methods reveals to adversaries that some practices are secure. Any truthful response to confirm or deny allegations related to intelligence sources or methods informs hostile foreign intelligence agencies about the manner in which the United States collects intelligence information, and could result in a loss of valuable intelligence when our adversaries are able to take countermeasures. Similarly, if the United States government was required to admit or deny allegations made in litigation concerning its classified contracting process, then classified contract relationships could be exposed, which would cause harm to the national security. The precise nature of the harm that would ensue from the disclosure of the information protected by the state secrets privilege and statutory privilege to protect intelligence sources and methods is set forth in detail in the *in camera, ex parte* declaration.

## CONCLUSION

13.    I respectfully request that the Court grant the Department of Defense's motion for a protective order.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this __19th__ day of September 2006.


JOHN D. NEGROPONTE
DIRECTOR OF NATIONAL INTELLIGENCE

UNITED STATES' MOTION FOR
PROTECTIVE ORDER


EXHIBIT 3

1  PETER D. KEISLER
   Assistant Attorney General
2  DANIEL G. BOGDEN
   United States Attorney
3  District of Nevada
   GREG ADDINGTON
4  Assistant United States Attorney
   Nevada Bar 6875
5  100 West Liberty, Suite 600
   Reno, Nevada 89501
6  VINCENT M. GARVEY
   Deputy Branch Director
7  CARLOTTA P. WELLS
   Senior Trial Counsel
8  Federal Programs Branch
   Civil Division - Room 7150
9  U.S. Department of Justice
   20 Massachusetts Ave., NW
10 P.O. Box 883
   Washington, D.C. 20044

11                 **UNITED STATES DISTRICT COURT**

12                     **DISTRICT OF NEVADA**

13 ETREPPID TECHNOLOGIES, LLC,          )
                                        )
14            Plaintiff,                )
                                        )
15 v.                                   )        CV-N- 06-00145 (BES)(VPC)
                                        )
16 DENNIS MONTGOMERY,                   )
   et al.,                              )
17                                      )
              Defendants.               )
18 _____ )
   DENNIS MONTGOMERY, et al.,           )
19                                      )
              Plaintiffs,               )
20                                      )        CV-N-06-00056 (BES)(VPC)
   v.                                   )
21                                      )
   ETREPPID TECHNOLOGIES, INC.,         )
22 et al.,                              )
                                        )
23            Defendants.               )
   _____ )
24

25            **UNITED STATES' PROPOSED PROTECTIVE ORDER**

26         Pursuant to Federal Rule of Civil Procedure 26, in order to protect the classification,

27 confidentiality and the rights to information and documents developed and disclosed in

28 connection with this litigation, and to facilitate discovery by and among the parties to this action

   and from third parties, the United States hereby proposes entry of the following protective order.

IT IS HEREBY ORDERED as follows:

1.  Certain intelligence information that may or may not be relevant to the claims and defenses of the parties to this litigation, as delineated in paragraphs 2 and 3 below, is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States. Such information shall not be subject to discovery or disclosure by any of the above-captioned parties during all proceedings in these actions, and shall be excluded from evidence at trial.

2.  The parties to these actions shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services [hereinafter referred to as "any intelligence agency"], or any current or former official, employee, or representative thereof, and any individuals or entities associated with these lawsuits, or any current or former officer or employee thereof.

3.  The parties to these actions shall not serve or take any discovery relating to or questioning any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

4.  This Order does not preclude the parties to these actions from serving or taking any discovery from other parties or non-parties relating to, or questioning, the following:

    a.  The existence and nature of the "Big Safari" contract [hereinafter referred to as "the contract"] between eTreppid, Inc. and the Unites States Air Force, including but not limited to the fact that the contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the contract involved image identification technology;

    b.  The fact that the contract required employees and/or officers of eTreppid, Inc. to sign secrecy agreements with the Department of Defense;

c. The technical specifications relating to any technology, owned or claimed by any non-government individual or entity associated with these lawsuits, used under the terms of the contract or any other contract, relationship, agreement, connection, contract, transaction, communication, or meeting of any kind, unless covered by paras. 2 and 3 above;

d. Any actual or potential commercial or government applications of any technology owned or claimed by any non-government individual or entity associated with these lawsuits at any time, except to the extent that any application is covered by paragraph 2 and/or 3 above.

e. Facts relating to the issue of ownership, by any non-government individual or entity associated with these lawsuits, of any right or interest in the source code, software, or other technology owned or claimed by the parties to these lawsuits, except to the extent that any application is covered by paragraph 2 and/or 3 above.

5. The parties shall not discuss, mention, question, or introduce as evidence, either at trial or in any pleading, or motion, any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any intelligence agency, or any current or former official, employee, or representative thereof, and any individuals or entities associated with these lawsuits, or any current or former officer or employee thereof.

6. The parties shall not discuss, mention, question, or introduce as evidence, either at trial or in any pleading, or motion, any actual or proposed interest in, application of, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

7. Every question asked and every document requested by the parties in discovery or at trial, whether or not on its face such question or request relates to or concerns any intelligence agency, shall be deemed, without the need for objection, not to require a response that would include any information relating to or implicating the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting

of any kind between any intelligence agency, or any current or former official, employee, or representative thereof, and any individual or entity associated with these lawsuits, or any current or former employees thereof.

8. Every question asked and every document requested by the parties in discovery or at trial, whether or not on its face such question or request relates to or concerns any intelligence agency, shall be deemed, without the need for objection, not to require a response that would include any information relating to or implicating any actual or proposed interest in, application of, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

9. The military and state secrets privilege can only be invoked by the United States. It cannot be asserted by a private individual or entity.

10. All parties shall serve the attorneys for the United States with (a) a copy of all notices of depositions, (b) a copy of all requests for discovery and responses thereto, and (c) a copy of all pleadings and motions filed together with supporting memoranda [hereinafter collectively referred to as the "documents"], unless such documents request or relate to information covered by paras 2 and 3 herein. If the documents request or relate to information covered by paras. 2 and 3 herein, the parties shall submit the documents to the United States for classification review prior to service or filing.

11. The Clerk of the Court shall send attorneys for the United States a copy of all future decisions and notices for hearings in these cases.

12. As the United States deems necessary, attorneys for the United States may attend all depositions and proceedings in this case and may make objections as necessary to protect national security information. If attorneys for the United States assert an objection based on the need to protect national security information with respect to either witness testimony or documents introduced or otherwise relied upon during a deposition, then the witness shall be precluded from testifying with respect to the line of inquiry that engendered the objection and the

-4-

1  document shall be withdrawn from the record pending an order of the Court with respect to the

2  scope of the government's national security objection.

3      13.  To protect the United States' interests, attorneys for the United States may participate

4  in any proceeding in these cases, including but not limited to motions hearings, all pre-trial

5  proceedings, or trial by making and opposing motions, submitting briefs, and participating in

6  arguments.

7      14.  The United States shall be excepted from all party discovery during the pendency of

8  its motions to dismiss the claims against the Department of Defense.

9

10  SO ORDERED: _____

11

12                                                    _____

13                                                United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

| From: | Eisenberg, Joseph, |
|---|---|
| To: | Terry, Billie; |
| Cc: | Dennis |
| Subject: | FW: Review of former counsel files at Liner firm by United States |
| Date: | Monday, May 24, 2010 1:08:10 PM |
| Attachments: | Liner Document Inventory.pdf |
| | Liner Hard Drive Inventory.pdf |
| | Liner CD Inventory.pdf |

-----Original Message-----
From: Gomez, Raphael (CIV) [mailto:Raphael.Gomez@usdoj.gov]
Sent: Monday, May 24, 2010 12:57 PM
To: Ellyn S. Garofalo; Kathleen Goldberg; Eisenberg, Joseph; Michael Flynn
Cc: Wells, Carlotta (CIV); Raya, Sharon M. (CIV)
Subject: Review of former counsel files at Liner firm by United States

Counsel,

As we orally have informed you, the United States has conducted an initial review of the 210 boxes of former counsel files at the Liner firm.         o e       er  s  minus the documents and media  u e for further security review, require no further review by the United States.

Please find attached an inventory of the hard copies, hard drives, and CD's/DVD's that have been pulled from boxes 101 through 210 (please note that the first 100 boxes were discovery produced by eTreppid to Montgomery in the eTreppid case and were released by the United States in late January 2010).

We will forward a projected date for completion of the review of the pulled hard copies, hard drives and CD's/DVD's.

If you have any questions, please email or call.

Raphael Gomez
Carlotta Wells

202 514-1318
202 514-4522

| CD No. | ADDITIONAL INFO |
|---|---|
| **BOX 101** | |
| CD - 000001 | |
| CD - 000002 | |
| CD - 000003 | |
| CD - 000004 | DVD |
| CD - 000005 | |
| CD - 000006 | |
| CD - 000007 | |
| CD - 000008 | |
| CD - 000009 | |
| CD - 000010 | |
| CD - 000011 | DVD |
| CD - 000012 | DVD |
| CD - 000013 | |
| CD - 000014 | |
| CD - 000015 | DVD |
| CD - 000016 | DVD |
| CD - 000017 | DVD |
| CD - 000018 *Microsoft XP | |
| CD - 000019 *Dancing w/ the stars | DVD |
| CD - 000020 *Dancing w/ the stars | DVD |
| CD - 000021 | |
| CD - 000022 | |
| CD - 000023 | DVD |
| CD - 000024 | DVD |
| CD - 000025 | DVD |
| CD - 000026 | DVD |
| CD - 000027 | DVD |
| CD - 000028 | DVD |
| CD - 000029 | DVD |
| CD - 000030 | DVD |
| CD - 000031 | DVD |
| CD - 000032 | |
| CD - 000033 | |
| CD - 000034 | DVD |
| CD - 000035 | |
| CD - 000036 | |
| CD - 000037 | |
| CD - 000038 | DVD |
| CD - 000039 | DVD |
| CD - 000040 | |
| CD - 000041 | |
| CD - 000042 | DVD |
| CD - 000043 | DVD |
| CD - 000044 | DVD |
| CD - 000045 | |

| | |
|---|---|
| CD - 000046 | |
| CD - 000047 | |
| CD - 000048 | |
| CD - 000049 | |
| CD - 000050 | |
| CD - 000051 | |
| CD - 000052 | |
| CD - 000053 | DVD |
| CD - 000054 | |
| CD - 000055 | DVD |
| CD - 000056 | DVD |
| CD - 000057 | |
| CD - 000058 | |
| CD - 000059 | DVD |
| CD - 000060 | DVD |
| CD - 000061 | DVD |
| CD - 000062 | |
| CD - 000063 | DVD |
| CD - 000064 | DVD |
| CD - 000065 | DVD |
| CD - 000066 | DVD |
| CD - 000067 | DVD |
| CD - 000068 | |
| CD - 000069 | |
| CD - 000070 | DVD |
| CD - 000071 | DVD |
| CD - 000072 | DVD |
| CD - 000073 | DVD |
| CD - 000074 | |
| CD - 000075 | |
| CD - 000076 | DVD |
| CD - 000077 | DVD |
| CD - 000078 | DVD |
| CD - 000079 | DVD |
| CD - 000080 | |
| CD - 000081 | |
| CD - 000082 | |
| CD - 000083 | |
| CD - 000084 | |
| CD - 000085 | DVD |
| CD - 000086 | DVD |
| CD - 000087 | DVD |
| CD - 000088 | DVD |
| CD - 000089 | |
| CD - 000090 | |
| CD - 000091 | DVD |
| CD - 000092 | |

| CD - 000093 | DVD |
|---|---|
| CD - 000094 | DVD |
| CD - 000095 | DVD |
| CD - 000096 | DVD |
| CD - 000097 | DVD |
| CD - 000098 | |
| CD - 000099 | |
| CD - 000100 | DVD |
| CD - 000101 | DVD |
| CD - 000102 | |
| CD - 000103 | DVD |
| CD - 000104 | DVD |
| CD - 000105 | DVD |
| CD - 000106 | DVD |
| CD - 000107 | DVD |
| CD - 000108 | DVD |
| CD - 000109 | DVD |
| CD - 000110 | DVD |
| CD - 000111 | DVD |
| CD - 000112 | DVD |
| CD - 000113 | DVD |
| CD - 000114 | DVD |
| CD - 000115 | |
| CD - 000116 | DVD |
| CD - 000117 | DVD |
| CD - 000118 | |
| CD - 000119 | |
| CD - 000120 | DVD |
| CD - 000121 | DVD |
| CD - 000122 | |
| CD - 000123 | |
| CD - 000124 | |
| CD - 000125 | |
| CD - 000126 | |
| CD - 000127 | |
| CD - 000128 | |
| CD - 000129 | |
| CD - 000130 | |
| CD - 000131 | |
| CD - 000132 | |
| CD - 000133 | DVD |
| CD - 000134 | |
| CD - 000135 | |
| CD - 000136 | |
| CD - 000137 | |
| CD - 000138 | |
| CD - 000139 | |

| | |
|---|---|
| CD - 000140 | |
| CD - 000141 | |
| CD - 000142 | |
| CD - 000143 | |
| CD - 000144 | |
| CD - 000145 | |
| CD - 000146 | |
| CD - 000147 | |
| CD - 000148 | |
| CD - 000149 | |
| CD - 000150 | |
| CD - 000151 | |
| CD - 000152 | |
| CD - 000153 | |
| CD - 000154 | |
| CD - 000155 | |
| CD - 000156 | |
| CD - 000157 | |
| CD - 000158 | |
| CD - 000159 | |
| CD - 000160 | |
| CD - 000161 | |
| CD - 000162 | |
| CD - 000163 | |
| CD - 000164 | |
| CD - 000165 | |
| CD - 000166 | |
| CD - 000167 | |
| CD - 000168 | |
| CD - 000169 | |
| CD - 000170 | |
| CD - 000171 | |
| CD - 000172 | |
| CD - 000173 | |
| CD - 000174 | |
| CD - 000175 | |
| CD - 000176 | |
| CD - 000177 | |
| CD - 000178 | |
| CD - 000179 | |
| CD - 000180 | |
| CD - 000181 | |
| CD - 000182 | |
| CD - 000183 | |
| CD - 000184 | |
| CD - 000185 | |
| CD - 000186 | |

| | |
|---|---|
| CD - 000187 | |
| CD - 000188 | |
| CD - 000189 | |
| CD - 000190 | |
| CD - 000191 | |
| CD - 000192 | |
| CD - 000193 | |
| CD - 000194 | |
| CD - 000195 | |
| CD - 000196 | |
| CD - 000197 | |
| CD - 000198 | |
| CD - 000199 | DVD |
| CD - 000200 | DVD |
| CD - 000201 | DVD |
| **BOX - 105** | |
| CD - 000223 *Fire Connect | |
| CD - 000224 | |
| CD - 000225 | |
| CD - 000226 | |
| CD - 000227 *Dark City (Movie) | DVD |
| CD - 000228 *School of Rock (Movie) | DVD |
| CD - 000229  *Lost in Trans (Movie) | DVD |
| CD - 000230 *After the Sunset (Movie) | DVD |
| CD - 000231 | DVD |
| CD - 000232 | DVD |
| CD - 000233 | DVD |
| CD - 000234 | DVD |
| CD - 000235 | DVD |
| CD - 000236 *Windows XP | |
| CD - 000237 | DVD |
| CD - 000238 | DVD |
| CD - 000239 *Sync master | |
| CD - 000240 * Windows XP | |
| CD - 000241 | DVD |
| CD - 000242 *Video Capture Software | |
| CD - 000243 *Windows XP | |
| CD - 000244 | DVD |
| CD - 000245 *Video Capture Software | |
| CD - 000246 *Windows XP | |
| CD - 000247 | DVD |
| CD - 000248 | DVD |
| CD - 000249 | DVD |
| CD - 000250 | DVD |
| CD - 000251 | |
| CD - 000252 | DVD |
| CD - 000253 | DVD |

| | |
|---|---|
| CD - 000254 | |
| CD - 000255 | |
| CD - 000256 | DVD |
| CD - 000257 | DVD |
| CD - 000258 | DVD |
| CD - 000259 | |
| CD - 000260 | DVD |
| CD - 000261 | DVD |
| CD - 000262 | DVD |
| CD - 000263 | DVD |
| CD - 000264 | DVD |
| CD - 000265 | |
| CD - 000266 | DVD |
| CD - 000267 | |
| CD - 000268 | DVD |
| CD - 000269 | DVD |
| CD - 000270 | DVD |
| CD - 000271 | DVD |
| CD - 000272 | |
| CD - 000273 | |
| CD - 000274 | DVD |
| CD - 000275 | DVD |
| CD - 000276 | |
| CD - 000277 | |
| **BOX 106** | |
| CD - 000219 | |
| **BOX 114** | |
| CD - 000278 | |
| CD - 000279 | DVD |
| CD - 000280 | |
| CD - 000281 | DVD |
| CD - 000282 | |
| CD - 000283* (IBM Commercial) | |
| CD - 000284 | |
| CD - 000285 | |
| CD - 000286 | |
| CD - 000287 | |
| CD - 000288 | DVD |
| CD - 000289 | |
| CD - 000290 | |
| CD - 000291 | |
| CD - 000292 | |
| CD - 000293 | |
| CD - 000294 | |
| CD - 000295 | |
| CD - 000296 | |
| CD - 000297* (Adobe) | |

| CD - 000298 | |
| CD - 000299 | |
| CD - 000300 | |
| CD - 000301 | |
| CD - 000302 | |
| CD - 000303 | |
| CD - 000304 | |
| CD - 000305 | DVD |
| CD - 000306 | |
| CD - 000307 | |
| CD - 000308 | |
| CD - 000309* (Music) | |
| CD - 000310* (Win 95) | |
| CD - 000311 | |
| CD - 000312 | |
| CD - 000313 | |
| CD - 000314 | |
| CD - 000315 | DVD |
| CD - 000316 | |
| CD - 000317* (WIN 95) | |
| CD - 000318 | DVD |
| CD - 000319 | |
| CD - 000320 | |
| CD - 000321 | |
| CD - 000322 | |
| CD - 000323 | |
| CD - 000324* (Old Windows Upd.) | |
| CD - 000325 | |
| CD - 000326 | |
| CD - 000327 | |
| CD - 000328 | |
| CD - 000329* (Elvis pt. 2) | |
| CD - 000330 | |
| CD - 000331 | |
| CD - 000332 | |
| CD - 000333 | |
| CD - 000334 | |
| CD - 000335 | |
| CD - 000336 | |
| CD - 000337 | |
| CD - 000338 | |
| CD - 000339 | |
| CD - 000340 | |
| CD - 000341 | |
| CD - 000342 | |
| CD - 000343 | |
| CD - 000344 | |

| | |
|---|---|
| CD – 000345 | |
| CD – 000346 | |
| CD – 000347 | |
| CD – 000348 | |
| CD – 000349 | |
| CD – 000350 | |
| CD – 000351 | |
| CD – 000352 | |
| CD – 000353 | |
| CD – 000354 | |
| CD – 000355 | |
| CD – 000356 | |
| CD – 000357 | |
| CD – 000358 | DVD |
| CD – 000359 | |
| CD – 000360** (Unreadable 360-370) | DVD |
| CD – 000361 | |
| CD – 000362 | |
| CD – 000363 | |
| CD – 000364 | |
| CD – 000365 | |
| CD – 000366 | |
| CD – 000367 | DVD |
| CD – 000368 | |
| CD – 000369 | |
| CD – 000370** | |
| CD – 000371* (Dolby Test Files) | |
| CD – 000372 | |
| CD – 000373* (Kodak Frames) | |
| CD – 000374* (Partition Magic 8.02) | |
| CD – 000375 | |
| CD – 000376* (HP) | DVD |
| CD – 000377* (ADP) | |
| CD – 000378 | |
| CD – 000379 | DVD |
| CD – 000380 | |
| CD – 000381* (Win XP) | |
| CD – 000382 | |
| CD – 000383 | DVD |
| CD – 000384* (Mic Office 2003) | |
| CD – 000385* (Mic XP) | |
| CD – 000386* (Dancing w/ Stars) | DVD |
| CD – 000387* (Dancing w/ Stars) | DVD |
| CD – 000388 | DVD |
| CD – 000389 | |
| CD – 000390 | |
| CD – 000391 | DVD |

| | |
|---|---|
| CD - 000392 | DVD |
| CD - 000393 | DVD |
| CD - 000394 | |
| CD - 000395 | |
| CD - 000396* (Symantec) | |
| CD - 000397* (Mic XP) | |
| CD - 000398 | DVD |
| CD - 000399* (Mic Office 2003) | |
| CD - 000400* (Mic XP) | |
| CD - 000401* (Dancing w/ Stars) | DVD |
| CD - 000402* (Dancing w/ Stars) | DVD |
| CD - 000403 | DVD |
| CD - 000404 | |
| CD - 000405 | |
| CD - 000406 | DVD |
| CD - 000407 | DVD |
| CD - 000408 | DVD |
| CD - 000409 | |
| CD - 000410 | |
| CD - 000411* (Symantec) | |
| CD - 000412* (Microsoft XP) | |
| CD - 000413 | DVD |
| CD - 000414* (Mic Office 2003) | |
| CD - 000415* (Mic XP) | |
| CD - 000416* (Dancing w/ Stars) | DVD |
| CD - 000417* (Dancing w/ Stars) | DVD |
| CD - 000418 | DVD |
| CD - 000419 | |
| CD - 000420 | |
| CD - 000421 | DVD |
| CD - 000422 | DVD |
| CD - 000423 | DVD |
| CD - 000424 | |
| CD - 000425 | |
| CD - 000426*(Symantec) | |
| CD - 000427* (Mic XP) | |
| **BOX 117** | |
| CD - 000220 | |
| **BOX 131** | |
| CD - 000217 | |
| **BOX 145** | |
| CD - 000218 | |
| **BOX 165** | |
| CD - 000431 | |
| CD - 000432 | |
| **BOX 180** | |
| CD - 000221 | |

| BOX 181 | |
|---|---|
| CD - 000202 | |
| CD - 000203 | |
| CD - 000204 | |
| CD - 000205 | DVD |
| CD - 000206 | DVD |
| CD - 000207 | |
| CD - 000208 | DVD |
| CD - 000209 | |
| CD - 000210 | |
| CD - 000211 | |
| CD - 000212 | DVD |
| CD - 000213 | DVD |
| CD - 000214 | |
| CD - 000215 | |
| CD - 000216 | |
| CD - 000430 | DVD |
| BOX 188-1 | |
| CD - 000222 | |
| BOX 189 | |
| CD - 000428 | |
| BOX 190 | |
| CD - 000429 | |
| BOX 207 | |
| CD - 000433 | |
| CD - 000434 | |
| CD - 000435 | |

**LINER FILES: DOCUMENT INVENTORY**

| Present | BOX | CONTENTS | DESCRIPTION | RELEASED | PULL DETAILS |
|---|---|---|---|---|---|
| N/A | 1 | DISCOVERY | N/A | Y | |
| N/A | 2 | DISCOVERY | N/A | Y | |
| N/A | 3 | DISCOVERY | N/A | Y | |
| N/A | 4 | DISCOVERY | N/A | Y | |
| N/A | 5 | DISCOVERY | N/A | Y | |
| N/A | 6 | DISCOVERY | N/A | Y | |
| N/A | 7 | DISCOVERY | N/A | Y | |
| N/A | 8 | DISCOVERY | N/A | Y | |
| N/A | 9 | DISCOVERY | N/A | Y | |
| N/A | 10 | DISCOVERY | N/A | Y | |
| N/A | 11 | DISCOVERY | N/A | Y | |
| N/A | 12 | DISCOVERY | N/A | Y | |
| N/A | 13 | DISCOVERY | N/A | Y | |
| N/A | 14 | DISCOVERY | N/A | Y | |
| N/A | 15 | DISCOVERY | N/A | Y | |
| N/A | 16 | DISCOVERY | N/A | Y | |
| N/A | 17 | DISCOVERY | N/A | Y | |
| N/A | 18 | DISCOVERY | N/A | Y | |
| N/A | 19 | DISCOVERY | N/A | Y | |
| N/A | 20 | DISCOVERY | N/A | Y | |
| N/A | 21 | DISCOVERY | N/A | Y | |
| N/A | 22 | DISCOVERY | N/A | Y | |
| N/A | 23 | DISCOVERY | N/A | Y | |
| N/A | 24 | DISCOVERY | N/A | Y | |
| N/A | 25 | DISCOVERY | N/A | Y | |
| N/A | 26 | DISCOVERY | N/A | Y | |
| N/A | 27 | DISCOVERY | N/A | Y | |
| N/A | 28 | DISCOVERY | N/A | Y | |
| N/A | 29 | DISCOVERY | N/A | Y | |
| N/A | 30 | DISCOVERY | N/A | Y | |
| N/A | 31 | DISCOVERY | N/A | Y | |
| N/A | 32 | DISCOVERY | N/A | Y | |
| N/A | 33 | DISCOVERY | N/A | Y | |

LINER FILES: DOCUMENT INVENTORY

| N/A | 34 | DISCOVERY | N/A | | Y | |
|-----|----|-----------|-----|--|---|--|
| N/A | 35 | DISCOVERY | N/A | | Y | |
| N/A | 36 | DISCOVERY | N/A | | Y | |
| N/A | 37 | DISCOVERY | N/A | | Y | |
| N/A | 38 | DISCOVERY | N/A | | Y | |
| N/A | 39 | DISCOVERY | N/A | | Y | |
| N/A | 40 | DISCOVERY | N/A | | Y | |
| N/A | 41 | DISCOVERY | N/A | | Y | |
| N/A | 42 | DISCOVERY | N/A | | Y | |
| N/A | 43 | DISCOVERY | N/A | | Y | |
| N/A | 44 | DISCOVERY | N/A | | Y | |
| N/A | 45 | DISCOVERY | N/A | | Y | |
| N/A | 46 | DISCOVERY | N/A | | Y | |
| N/A | 47 | DISCOVERY | N/A | | Y | |
| N/A | 48 | DISCOVERY | N/A | | Y | |
| N/A | 49 | DISCOVERY | N/A | | Y | |
| N/A | 50 | DISCOVERY | N/A | | Y | |
| N/A | 51 | DISCOVERY | N/A | | Y | |
| N/A | 52 | DISCOVERY | N/A | | Y | |
| N/A | 53 | DISCOVERY | N/A | | Y | |
| N/A | 54 | DISCOVERY | N/A | | Y | |
| N/A | 55 | DISCOVERY | N/A | | Y | |
| N/A | 56 | DISCOVERY | N/A | | Y | |
| N/A | 57 | DISCOVERY | N/A | | Y | |
| N/A | 58 | DISCOVERY | N/A | | Y | |
| N/A | 59 | DISCOVERY | N/A | | Y | |
| N/A | 60 | DISCOVERY | N/A | | Y | |
| N/A | 61 | DISCOVERY | N/A | | Y | |
| N/A | 62 | DISCOVERY | N/A | | Y | |
| N/A | 63 | DISCOVERY | N/A | | Y | |
| N/A | 64 | DISCOVERY | N/A | | Y | |
| N/A | 65 | DISCOVERY | N/A | | Y | |
| N/A | 66 | DISCOVERY | N/A | | Y | |
| N/A | 67 | DISCOVERY | N/A | | Y | |

LINER FILES: DOCUMENT INVENTORY

| N/A | 68 | DISCOVERY | N/A | Y | |
|-----|-----|-----------|-----|---|---|
| N/A | 69 | DISCOVERY | N/A | Y | |
| N/A | 70 | DISCOVERY | N/A | Y | |
| N/A | 71 | DISCOVERY | N/A | Y | |
| N/A | 72 | DISCOVERY | N/A | Y | |
| N/A | 73 | DISCOVERY | N/A | Y | |
| N/A | 74 | DISCOVERY | N/A | Y | |
| N/A | 75 | DISCOVERY | N/A | Y | |
| N/A | 76 | DISCOVERY | N/A | Y | |
| N/A | 77 | DISCOVERY | N/A | Y | |
| N/A | 78 | DISCOVERY | N/A | Y | |
| N/A | 79 | DISCOVERY | N/A | Y | |
| N/A | 80 | DISCOVERY | N/A | Y | |
| N/A | 81 | DISCOVERY | N/A | Y | |
| N/A | 82 | DISCOVERY | N/A | Y | |
| N/A | 83 | DISCOVERY | N/A | Y | |
| N/A | 84 | DISCOVERY | N/A | Y | |
| N/A | 85 | DISCOVERY | N/A | Y | |
| N/A | 86 | DISCOVERY | N/A | Y | |
| N/A | 87 | DISCOVERY | N/A | Y | |
| N/A | 88 | DISCOVERY | N/A | Y | |
| N/A | 89 | DISCOVERY | N/A | Y | |
| N/A | 90 | DISCOVERY | N/A | Y | |
| N/A | 91 | DISCOVERY | N/A | Y | |
| N/A | 92 | DISCOVERY | N/A | Y | |
| N/A | 93 | DISCOVERY | N/A | Y | |
| N/A | 94 | DISCOVERY | N/A | Y | |
| N/A | 95 | DISCOVERY | N/A | Y | |
| N/A | 96 | DISCOVERY | N/A | Y | |
| N/A | 97 | DISCOVERY | N/A | Y | |
| N/A | 98 | DISCOVERY | N/A | Y | |
| N/A | 99 | DISCOVERY | N/A | Y | |
| N/A | 100 | DISCOVERY | N/A | Y | |
| N/A | 101 | OTHER | **1 Pull:**<br>Pull 1: CDs that appear to be discovery materials | Y | |

**LINER FILES: DOCUMENT INVENTORY**

| N/A | 102 | OTHER | N/A | Y | |
|-----|-----|-------|-----|---|---|
| YES | 103 | OTHER | **4 Pulls:**<br>Pull 1: 6/19/06 Flynn Email (001-005)<br>Pull 2: 7/19/06 Flynn Email (001-004)<br>Pull 3: 8/14/06 Flynn Email (001-014)<br>Pull 4: 9/26/06 Mongtomery Email (001-016) | N | |
| YES | 104 | OTHER | **1 Pull:**<br>Pull 1: 3/1/06 Flynn Ltr (001-008) | N | |
| N/A | 105 | OTHER | Hard drives and CDs | N | |
| N/A | 106 | OTHER | **1 Pull:**<br>Pull 1: CD | Y | |
| YES | 107 | PLEADINGS | **6 Pulls:**<br>Pull 1: 3/11/06 Dec of Flynn (001-004);<br>Pull 2: 3/11/06 Dec of Flynn (001-004);<br>Pull 3: 4/3/06 Reply Memo (001-029);<br>Pull 4: 4/21/08 Reply Memo (001-035);<br>Pull 5: 3/11/06 Dec of Flynn (001-006);<br>Pull 6: 4/3/06 Reply Memo (001-029) | Y | |
| YES | 108 | PLEADINGS | **2 Pulls:**<br>Pull 1:Flynn Declaration (001-007)<br>Pull 2: 3/17/07 Email (001-002) | Y | |
| YES | 109 | OTHER | **2 Pulls:**<br>Pull 1: 2/26/07 Email (001);<br>Pull 2: 2/13/07 Email (001) | Y | |
| N/A | 110 | OTHER | N/A | Y | |
| N/A | 111 | OTHER | N/A | Y | |
| N/A | 112 | OTHER | N/A | Y | |
| YES | 113 | OTHER | **5 Pulls:**<br>Pull 1: 2/13/07 Email (001-009);<br>Pull 2: 2/26/07 Email (001-004);<br>Pull 3: 3/16/07 Email (001-012);<br>Pull 4: 3/16/07 Email (001-008);<br>Pull 5: 3/24/07 Email (001-003) | N | |
| N/A | 114 | OTHER | CDs for review | N | |
| N/A | 115 | PLEADINGS | N/A | Y | |
| N/A | 116 | OTHER | Hard drives | N | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | | |
|---|---|---|---|---|---|
| YES | 117 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** 3/11/06 Dec of Flynn; **(001-004)**<br>**Pull 2:** 4/3/06 Reply Mem **(001-029)**;<br>**Pull 3:** CD pulled;<br>**Pull 4:** List of T. Pham file pulled **(001-014)** | Y | |
| YES | 118 | PLEADINGS | **1 Pull:**<br>**Pull 1:** 3/11/06 Dec of Flynn **(001-004)** | Y | |
| YES | 119 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** 5/21/08Reply Memo **(001-035)**;<br>**Pull 2:** 3/11/06 Dec of Flynn **(001-010)**;<br>**Pull 3:** 4/3/06 Reply Memo **(001-029)**; *<br>**Pull 4:** **(001-004)** 3/11/06 Dec of Flynn **(001-004)** | Y | |
| YES | 120 | OTHER | **3 Pulls:**<br>**Pull 1:** 9/26/06 Montgomery Email **(001)**<br>**Pull 2:** 9/26/06 Montgomery Email **(001)**<br>**Pull 3:** 9/26/06 Montgomery Email **(001)** | <u>Y</u> | |
| N/A | 121 | OTHER | N/A | Y | |
| N/A | 122 | OTHER | N/A | Y | |
| N/A | 123 | OTHER | N/A | Y | |
| YES | 124 | OTHER | **1 Pull:**<br>**Pull 1:** Montgomery Discovery (not Bates labeled by parties) **(001-120)** | Y | |
| YES | 125 | OTHER | **20 Pulls:**<br>**Pull 1:** 5/4/07 Flynn Ltr **(001-013)**;<br>**Pull 2:** 5/5/07 Flynn Ltr **(001-013)**;<br>**Pull 3:** 9/23/06 SF.95.doc **(001-013)**;<br>**Pull 4:** 8/24/06 Interrogatories **(001-018)**;<br>**Pull 5:** 3/1/06 Draft Rumsfield, et al. Ltr **(001-046)**;<br>**Pull 6:** 6/3/07 Flynn Email **(001)**<br>**Pull 7:** 6/3/07 Flynn Email **(001-008)**<br>**Pull 8:** 6/6/07 Flynn Email **(001)**<br>**Pull 9:** 6/10/07 Flynn Email **(001)**<br>**Pull 10:** Exhibit Listing and Description **(001-002)**<br>**Pull 11:** 6/23/07 Flynn Email **(001-004)**<br>**Pull 12:** 6/23/07 Flynn Email **(001-003)**<br>**Pull 13:** 6/23/07 Flynn Email **(001-004)**<br>**Pull 14:** 6/23/07 Flynn Email **(001-002)**<br>**Pull 15:** 4/13/07 Flynn Ltr **(001-010)**<br>**Pull 16:** Draft Flynn Ltr **(001-015)**<br>~~**Pull 17:** 5/8/07 Flynn Email (001-002)~~ | **Pull 18:** 5/9/07 Flynn Email **(001-003)**<br>**Pull 19:** Rumsfeld Ltr **(001-008)**<br>**Pull 20:** 4/9/07 Flynn Email **(001-002)**<br><br>N | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | | |
|---|---|---|---|---|---|
| YES | 126 | OTHER | **17 Pulls:**<br>**Pull 1:** 5/8/07 Mont Email **(001-002);**<br>**Pull 2:** 3/1/06 Rumsfield Ltr **(001-007;**<br>**Pull 3:** Etreppid legal spreadsheet **(001-033);**<br>**Pull 4:** 6/10/07 Email **(001-003);**<br>**Pull 5:** 6/10/07 Email**(001-002);**<br>**Pull 6:** 6/10/07 Email **(001-002);**<br>**Pull 7:** 6/10/07 Emai **(001-002I;**<br>**Pull 8:** 6/10/07 Email **(001-003);**<br>**Pull 9:** 6/6/07 Email **(001-002);**<br>**Pull 10:** 6/4/07 Email **(001-003);**<br>**Pull 11:** 6/3/07 Email **(001-017);**<br>**Pull 12:** 6/11/07  Montgomery Declaration **(001-004);**<br>**Pull 13:** 6/10/07 Email **(001-021);**<br>**Pull 14:** 3/11/06 Declaration **(001-009);**<br>**Pull 15:** Reply Memo Buckthorne **(001-037);**<br>**Pull 16:** 4/18/06  Email **(001-004);**<br>**Pull 17:** Montgomery Objection to DOD (06-cv-056 Dkt# 125) **(001-010)** | N | |
| N/A | 127 | OTHER | Hard drives | N | |
| N/A | 128 | OTHER | N/A | Y | |
| N/A | 129 | OTHER | N/A | Y | |
| N/A | 130 | OTHER | N/A | Y | |
| N/A | 131 | OTHER | **1 Pull:**<br>**Pull 1:** CD | Y | |
| N/A | 132 | OTHER | N/A | Y | |
| N/A | 133 | OTHER | N/A | Y | |
| YES | 134 | OTHER | **4 Pulls:**<br>**Pull 1:** 7/5/06 Email **(001-014);**<br>**Pull 2:** 5/30/06 Email **(001-002);**<br>**Pull 3:** Notes **(001-007);**<br>**Pull 4:** 9/26/06 Flynn Email **(001-008)** | N | |
| YES | 135 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** Montgomery Declaration **(001-004)**<br>**Pull 2:** Response to DOD Motion **(001-202)**<br>**Pull 3:** Montgomery Declaration **(001-023)**<br>Pull 4: 10/30/06 Sealed Montgomery Decl. in Response to DOD Motion for Protective Order -Signed- **(001-023)** | | Pull 1:001-004<br>Pull 2: 001-202 |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | | |
|---|---|---|---|---|---|
| YES | 136 | OTHER | **4 Pulls:**<br>Pull 1: 7/5/06 Email (001);<br>Pull 2: Contract Documents (001-010);<br>Pull 3: Negroponte Questions (001-005)<br>Pull 4: Montgomery Declaration (001-022) | Y | Pull 1: 001-022<br>Pull 2: |
| YES | 137 | OTHER | **3 Pulls:**<br>Pull 1: 4/10/06 Park Email (001-004);<br>Pull 2: 3/11/06 Flynn Declaration -Unsigned- (001-004)<br>Pull 3: Reply Memo for Return of Property (001-029) | Y | Pull 2: 001-004<br>Pull 3: 001-029 |
| YES | 138 | PLEADINGS | N/A | Y | |
| YES | 139 | OTHER | **30 Pulls:**<br>Pull 1: 2/2007 Flynn Declaration (001-016);<br>Pull 2: 2/2007 Montgomery Declaration (001-009;<br>Pull 3: 2/26/2007 Email (001);<br>Pull 4: 2/13/2007 Email (001-003);<br>Pull 5: 2/2007 Montgomery Declaration (001-005);<br>Pull 6: 2/2007 Montgomery Declaration (001-006);<br>Pull 7: 2/2007 Flynn Declaration in Supp of Montgomery Opp. to Govt Motion to Strike (001-018);<br>Pull 8: 2/2007 Montgomery Declaration 2 copies -Unsigned-(001-019);<br>Pull 9: 3/2007 Email Chain (001-011);<br>Pull 10: 3/16/07 Email (001-004);<br>Pull 11: Complaint for violation of false claims act Draft-1 (001-046);<br>Pull 12: Complaint for violation of false claims act Draft-2 (001-047);<br>Pull 13: Complaint for violation of false claims act Draft-3 (001-044);<br>Pull 14: Complaint for violation of false claims act Draft-4 (001-040); | Pull 15: Complaint for violation of false claims act Draft-5 (001-046);<br>Pull 16: Complaint for violation of false claims act Draft-6 (001-046);<br>Pull 17: Flynn Declaration (001-004);<br>Pull 18: Flynn Declaration (001-006);<br>Pull 19: Motion to Unseal (001-017);<br>Pull 20: Flynn Declaration (001-012);<br>Pull 21: Flynn Declaration (001-011);<br>Pull 22: Negroponte Questions (001-009);<br>Pull 23: Negroponte Questions (001-006);<br>Pull 24: Negroponte Questions (001-004);<br>Pull 25: Negroponte Questions (001-004);<br>Pull 26: 2/9/07 Flynn Ltr (001-005);<br>Pull 27: 2/9/07 Flynn Ltr (001-005);<br>Pull 28: 2/9/07 Flynn Ltr (001-003);<br>Pull 29: 3/24/07 Email (001-002)<br>Pull 30: 1/2007 Montgomery Declaration (001-007)<br><br>N | |

**LINER FILES: DOCUMENT INVENTORY**

| YES | 140 | OTHER | 7 Pulls:<br>Pull 1: Transcript Excerpt (001-005);<br>Pull 2: Transcript Excerpt (001-005);<br>Pull 3: 8/16/06 Sealed Declaration of Montgomery -Unsigned- (001-009);<br>Pull 4: 8/16/06 Sealed Declaration of Montgomery -Unsigned-(001-019);<br>Pull 5: 8/16/06 Sealed Declaration of Montgomery -Unsigned- (001-020); | Pull 6: 10/06 2 Copies Sealed Declaration of Montgomery -Unsigned (001-045);<br>Pull 7: 11/30/06 Sealed Declaration of Montgomery -Unsigned- (001-022)              N | |
|------|------|------------|----|----|----|
| N/A | 141 | PLEADINGS | N/A | Y | |
| N/A | 142 | OTHER | N/A | Y | |
| N/A | 143 | OTHER | N/A | Y | |
| N/A | 144 | OTHER | N/A | Y | |
| N/A | 145 | OTHER | 1 Pull:<br>Pull 1: CD | Y | |
| N/A | 146 | PLEADINGS | N/A | Y | |
| YES | 147 | OTHER | 10 Pulls:<br>Pull 1: MONT40-43 (001-004);<br>Pull 2: MONT 288-296 (001-008);<br>Pull 3: MONT318-337 (001-020);<br>Pull 4: 4/13/07 Flynn Ltr (001-018);<br>Pull 5: 2/9/07 Flynn Ltr (2 copies) (001-010);<br>Pull 6: 6/22/06 Email (001-002);<br>Pull 7: 6/22/06 Email (001-005);<br>Pull 8: 3/1/06 Flynn Ltr (001-013);<br>Pull 9: 6/23/07 Flynn Email (001-007);<br>Pull 10: 6/23/07 Flynn Email (001) | Y | |
| N/A | 148 | OTHER | N/A | Y | |
| N/A | 149 | PLEADINGS | N/A | Y | |
| YES | 150 | PLEADINGS | 2 Pulls:<br>Pull 1: 10/06 Draft Montgomery Response to DOD Motion for Protective Order (001-044);<br>Pull 2: 03/22/07 Montgomery Response to DOD Motion for Reconsideration (001-009) | Y | Pull 1: 001-044<br>Pull 2: 001-009 |
| YES | 151 | OTHER | 1 Pull:<br>Pull 1: 6/11/07 Montgomery Declaration (001-004) | Y | |
| N/A | 152 | PLEADINGS | N/A | Y | |
| N/A | 153 | OTHER | N/A | Y | |
| N/A | 154 | OTHER | N/A | Y | |
| N/A | 155 | OTHER | N/A | Y | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | | |
|---|---|---|---|---|---|
| N/A | 156 | PLEADINGS | N/A | Y | |
| N/A | 157 | PLEADINGS | N/A | Y | |
| YES | 158 | OTHER | **6 Pulls:**<br>Pull 1: 4/13/07 Flynn Ltr (001-018);<br>Pull 2: 2/9/07 Flynn Ltr (001-010);<br>Pull 3: 6/22/06 Flynn Email (001-002);<br>Pull 4: 6/22/06 Flynn Email (001-002);<br>Pull 5: 3/1/06 Flynn Ltr (001-013);<br>Pull 6: 7/26/06 Flynn Ltr (001-007) | Y | |
| N/A | 159 | PLEADINGS | N/A | Y | |
| N/A | 160 | OTHER | N/A | Y | |
| N/A | 161 | PLEADINGS | N/A | Y | |
| N/A | 162 | DISCOVERY | N/A | Y | |
| N/A | 163 | PLEADINGS | N/A | Y | |
| YES | 164 | OTHER | **1 Pull:**<br>Pull 1: 4/13/07 Flynn Ltr. (001-009) | Y | |
| YES | 165 | OTHER | **2 Pulls:**<br>Pull 1: CD With Document Attached (001)<br>Pull 2: CD With Document Attached (001-030) | Y | |
| YES | 166 | OTHER | **3 Pulls:**<br>Pull 1: DM2845-2886 (001-042);<br>Pull 2: DM2987-2998 (001-012);<br>Pull 3: DM3145-3151 (001-007) | Y | |
| N/A | 167 | OTHER | N/A | Y | |
| N/A | 168 | PLEADINGS | N/A | Y | |
| N/A | 169 | OTHER | N/A | Y | |
| N/A | 170 | OTHER | N/A | Y | |
| YES | 171 | OTHER | **1 Pull:**<br>Pull 1: Draft Flynn Ltr (001-008) | Y | |
| YES | 172 | OTHER | **1 Pull:**<br>Pull 1: Potential witness list with handwritten notations (001-002) | Y | |
| N/A | 173 | PLEADINGS | N/A | Y | |
| YES | 174 | PLEADINGS | **4 Pulls:**<br>Pull 1: 2/27/07 Dec of Flynn (001-037);<br>Pull 2: 6/2/06 Dec of Michael West (001-008);<br>Pull 3: 06-cv-0263 Dkt# 125 Transcript (001-085);<br>Pull 4: 3/3/06 Dec of Michael West (001-014) | Y | |
| N/A | 175 | PLEADINGS | N/A | Y | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | | |
|---|---|---|---|---|---|
| YES | 176 | OTHER | **2 Pulls:**<br>**Pull 1:** 4/13/07 Flynn Ltr to Cheney **(001-009)**;<br>**Pull 2:** Dec of Flynn **(001-020)** | Y | |
| N/A | 177 | PLEADINGS | N/A | Y | |
| N/A | 178 | OTHER | N/A | Y | |
| YES | 179 | OTHER | **2 Pulls:**<br>**Pull 1:** 6/3/07 Email **(001-012)**;<br>**Pull 2:** 5/8/07 Email **(001)** | Y | |
| N/A | 180 | OTHER | **1 Pull:** CD | Y | |
| N/A | 181 | OTHER | **5 Pulls:** 5 CDs pulled | Y | |
| N/A | 182 | PLEADINGS | N/A | Y | |
| N/A | 183 | OTHER | N/A | Y | |
| N/A | 184 | OTHER | N/A | Y | |
| N/A | 185 | OTHER | N/A | Y | |
| N/A | 186 | OTHER | N/A | Y | |
| N/A | 187 | OTHER | N/A | Y | |
| N/A | 188 | PLEADINGS | **1 Pull:** CD pulled | Y | |
| N/A | 189 | OTHER | **1 Pull:** CD pulled | Y | |
| N/A | 190 | OTHER | **1 Pull:** CD pulled | Y | |
| N/A | 191 | OTHER | **2 Pulls:** 2 Hard drives removed | Y | |
| N/A | 192 | OTHER | N/A | Y | |
| YES | 193 | PLEADINGS | **2 Pulls:**<br>**Pull 1:** 06-cv-0263 Dkt# 103,  MONT318-337 **(001-020)**;<br>**Pull 2:** MONT288-296 **(001-009)**; | Y | |
| N/A | 194 | OTHER | N/A | Y | |
| YES | 195 | PLEADINGS | **1 Pull:** 3/22/07 Montgomery's Response to DoD's Request for Protection Order **(001-009)** | Y | |
| YES | 196 | OTHER | **1 Pull:**<br>**Pull 1:** Prayer for Relief **(001-042)** | Y | |
| YES | 197 | PLEADINGS | **1 Pull** :<br>**Pull 1:** 3/11/06 Dec of Flynn **(001-006)** | Y | |
| N/A | 198 | DISCOVERY | N/A | Y | |
| N/A | 199 | PLEADINGS | N/A | Y | |
| N/A | 200 | PLEADINGS | N/A | Y | |
| N/A | 201 | OTHER | Hard drives | N | |
| N/A | 202 | OTHER | Hard drives | N | |

LINER FILES: DOCUMENT INVENTORY

| N/A | 203 | OTHER | Hard drives | N | |
|---|---|---|---|---|---|
| N/A | 204 | OTHER | N/A | Y | |
| YES | 205 | OTHER | **8 Pulls:**<br>Pull 1: 4/10/06 Email (001-004);<br>Pull 2: 10/31/07 Email (001-002);<br>Pull 3: 3/16-18/07 Email chain (001-004);<br>Pull 4: 3/16-18/07 Email chain (001-007);<br>Pull 5: 3/16-18/07 Email chain (001-007);<br>Pull 6: 6/23/07 Email (001);<br>Pull 7: 3/11/06 Dec of Montgomery for Return of Property -Unsigned-<br>& 4/3/06 Reply Memo un Support of Motion for Return of Property<br>(001-033);<br>Pull 8: 3/11/06 Dec of Flynn: (001-004) | Y | |
| N/A | 206 | OTHER | N/A | Y | |
| YES | 207 | PLEADINGS | **6 Pulls:**<br>Pull 1: 2 CDs<br>Pull 2: Cover sheet and Index of Emails in "Inbox" (001-0038)<br>Pull 3: Index of Emails in "Sent" (001-015)<br>Pull 4: 1 CD<br>Pull 5: Index of Emails in "Inbox" (001-037)<br>Pull 6: Index of Emails in "Sent" (001-016) | Y | |
| N/A | 208 | OTHER | N/A | Y | |
| YES | 209 | PLEADINGS | **3 Pulls:**<br>Pull 1: Sealed Montgomery Declaration (001-036)<br>Pull 2: Working Chronology (001-014)<br>Pull 3: Sealed Montgomery Declaration (001-022) | Y | Pull 3: 001-022 |
| N/A | 210 | OTHER | Hard drives | N | |

**LINER FILES: HARD DRIVE INVENTORY**

| HARD DRIVE No. | SERIAL No. | ADDITIONAL INFO | DOJ COPY SERIAL No. | CLIENT COPY SERIAL No. |
|---|---|---|---|---|
| | | BOX 105 | | |
| HD - 40 | WMAEH1731597 | Security Bag No. 075287 | | |
| HD - 41 | WCAEP1015275 | Security Bag No.075277 | | |
| HD - 42 | WMAMR1202131 | Security Bag No. 075269 | | |
| HD - 43 | ZFUG712N | Security Bag No.075256; Copy of WMA8C2315047 | | |
| HD - 44 | WMAEH1732002 | Security Bag No. 075292 | | |
| HD - 45 | 9QG8HSDQ | Security Bag No. 075273 | | |
| HD - 46 | WMA9P1151187 | Security Bag No.075284 | | |
| HD - 47 | 9QG8N147 | Security Bag No. 075245; Copy of WMAMR1203238 | | |
| HD - 48 | 6QF462VG | Security Bag No.075279; Copy of WCAEP1015275 | | |
| HD - 49 | WMAEP1123872 | Security Bag No. 075263 | | |
| HD - 50 | 3PM08V7Q | | | |
| HD - 51 | 5QD337JK | | | |
| HD - 52 | WMACK1617687 | Security Bag No. 75261 | | |
| HD - 53 | WMAEP1142476 | Security Bag No. 075286 | | |
| HD - 54 | RG0VEH9A | Security Bag No. 075290: Copy of WMAEH1732002 | | |
| HD - 55 | WMAMR1202248 | Security Bag No. 075260 | | |
| HD - 56 | WMAEH1283328 | Security Bag No.075289 | | |
| HD - 57 | WMAMR1277950 | Security Bag No.075281 | | |
| HD - 58 | WMAEH1202303 | Security Bag No. 075265 | | |
| HD - 59 | 6QF46574 | Security Bag No. 075271; Copy of WMAEH1202303 | | |
| HD - 60 | WCAL75136659 | Security Bag No. 075285 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| HD – 61 | 7BA08HPG | Security Bag No. 075288 | | |
|---|---|---|---|---|
| HD – 62 | WMA8C2315047 | Security Bag No. 075257 | | |
| HD – 63 | WMAMR1068824 | Security Bag No. 075267 | | |
| HD – 64 | WMAMR1203238 | Security Bag No. 075246 | | |
| HD – 65 | | | | |
| HD – 66 | | | | |
| HD – 67 | | | | |
| HD – 68 | | | | |
| HD – 69 | | | | |
| HD – 70 | | | | |
| HD – 71 | | | | |
| HD – 72 | | | | |
| HD – 73 | | | | |
| HD – 74 | | | | |
| HD – 75 | | | | |
| HD – 76 | | | | |
| HD – 77 | | | | |
| HD – 78 | | | | |
| HD – 79 | | | | |
| HD – 80 | | | | |
| HD – 81 | | | | |
| HD – 82 | | | | |
| HD – 83 | | | | |
| HD – 84 | | | | |
| HD – 85 | | | | |
| HD – 86 | | | | |
| HD – 87 | | | | |
| HD – 88 | | | | |
| HD – 89 | | | | |
| HD – 90 | | | | |
| | | BOX 116 | | |
| HD – 1 | WMA8C4544113 | Security Bag No. 033654517 | | |
| HD – 2 | WCARW0431467 | Security Bag No. 075298; Copy of WMAEH2602257 | | |
| HD – 3 | WCARW0415948 | Security Bag No. 033654510; Copy of WMAEH2694097 | | |
| HD – 4 | WCA8C3998460 | Security Bag No. 033654515 | | |
| HD – 5 | WMAEH2694097 | Security Bag No. 033654518 | | |
| HD – 6 | WCAEP1014382 | Security Bag No. 033654520 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD – 7 | WMAEH2602257 | Security Bag No. 033654516 | | |
| HD – 8 | WCAEP1003948 | Security Bag No. 033654519 | | |
| HD – 9 | 9QG812MG | | | |
| HD – 10 | 9QJ0RXGJ | | | |
| | | BOX 127 | | |
| HD – 13 | WMAMR1538581 | | | |
| HD – 14 | WMAMR1612253 | | | |
| HD – 15 | WMAMR1624507 | | | |
| HD – 16 | WMA8C3243070 | | | |
| HD – 17 | WMAD15194737 | | | |
| HD – 18 | WMAD15335294 | | | |
| HD – 19 | 3CK00XXY | | | |
| HD – 20 | WMA8C1223396 | | | |
| HD – 21 | WCAD13691228 | | | |
| HD – 22 | WMAMR1673681 | | | |
| HD – 23 | WMAD16644525 | | | |
| HD – 24 | WMAMR1538197 | | | |
| HD – 25 | 3CK028W3 | | | |
| HD – 26 | WMAMR1538570 | | | |
| HD – 27 | WMAMR1509932 | | | |
| HD – 28 | WMAMR1580671 | | | |
| HD – 29 | WMAA61102098 | | | |
| HD – 30 | 2544801F3NQ0C6 | | | |
| HD – 31 | WMAMR1523649 | | | |
| HD – 32 | WMAMR1580666 | | | |
| HD – 33 | WMAMR1066012 | | | |
| HD – 34 | WMAMR1537929 | | | |
| HD – 35 | WMAMR1539942 | | | |
| HD – 36 | WMAMR1539825 | | | |
| HD – 37 | WCAD16502878 | | | |
| HD – 38 | WMAD15256807 | | | |
| HD – 39 | WMAMR1543003 | | | |
| | | BOX 191 | | |
| HD – 11 | 9QG7CDDE | Security Bag No. 072755 | | |
| HD – 12 | 6QG31F7K | Security Bag No.072754 | | |
| | | BOX 201 | | |
| HD – 65 | 3PM0686P | | | |
| HD – 66 | 9QM26YN3 | | | |
| HD – 67 | 9QM3FKKW | | | |
| HD – 68 | 3QD03188 | | | |
| | | BOX 202 | | |
| HD – 69 | 3QD08W2N | | | |
| HD – 70 | 3QD0L7T0 | | | |
| HD – 71 | 9QJ0WW9R | | | |
| | | BOX 203 | | |
| HD – 72 | 9QJ16874 | | | |
| HD – 73 | PAG2NLRC | | | |
| HD – 74 | 3QJ01RQ1 | | | |

LINER FILES: HARD DRIVE INVENTORY

| HD - 75 | 3PM0LVN8 | | | |
|---------|----------|---|---|---|
| HD - 76 | 5QG06MMH | | | |
| **BOX 210 *Labeled as defective** | | | | |
| HD - 77 | RBRAPJNA | Security Bag No. 075274; Copy of WMA8C4544113 | | |
| HD - 78 | WCARW0431405 | Security Bag No. 075255; Copy of WCAEP1003948 | | |
| HD - 79 | RG0VEMRA | Security Bag No. 075254; Copy of WMAEP1142476 | | |
| HD - 80 | WCARW0431298 | Security Bag No. 033654504; Copy of WCAEP1014382 | | |
| HD - 81 | R7CRDRKK | Security Bag No. 075293; Copy of WMACK1617687 | | |
| HD - 82 | RG0VAUYA | Security Bag No. 075278; Copy of WMAEH1731597 | | |
| HD - 83 | RG0VEMKA | Security Bag No. 075283; Copy of WCAL75136659 | | |
| HD - 84 | 9QG8LXX5 | Security Bag No. 075295; Copy of WMAMR1277950 | | |
| HD - 85 | 9Q8N28G | Security Bag No. 075248; Copy of WMAMR1202131 | | |
| HD - 86 | N/A | N/A | | |
| HD - 87 | R7CRD72K | Security Bag No. 033654508; Copy of WMAEH1283328 | | |
| HD - 88 | RBRAA9VA | Security Bag No. 033654501; Copy of WCA8C3998460 | | |
| HD - 89 | 9QG8LSVQ | Security Bag No. 075252; Copy of WMAMR1202248 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 90 | RG0ZLL8A | Security Bag No. 075262; Copy of WMAEP1123872 | | |

# EXHIBIT C

Dennis Lee Montgomery  -  November 18, 2010

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

In re: Dennis and Kathleen    )
Montgomery                    )
                              )
Michael J. Flynn,            )
                              )
        Plaintiff,           )
                              )
        vs.                   ) Case No.: 2:10-bk-18510-bb
                              )
Dennis Lee Montgomery and     )
Brenda Kathleen Montgomery,   )
                              )
        Defendants.           )
_____)

Videotaped Deposition of:    DENNIS LEE MONTGOMERY
Date:                        November 18, 2010
Reported by:                 Stephanie P. Borthwick
                             C.S.R. No. 12088

---

```
 1   For the United States of America:
 2      U.S. DEPARTMENT OF JUSTICE
 3      CIVIL DIVISION
 4      BY:  CARLOTTA P. WELLS, Senior Counsel
 5      Federal Programs Branch
 6      20 Massachusetts Avenue, NW
 7      Room 7150
 8      Washington, DC  20530
 9      (202) 514-4522
10   Also Present:
11      Michael J. Flynn, Esq.
12      Sharon Raya, Paralegal to Ms. Wells
13      Tom (last name withheld), U.S. Government
14      Morgan (last name withheld), U.S.
15      Government
16   Videographer:
17      Jesse Navarro, Orravan Video Litigation
18      Services
19
20
21
22
23
24
25
```

Page 3

---

```
 1       Deposition of DENNIS LEE MONTGOMERY, taken on
 2   behalf of the Plaintiff, before Stephanie P.
 3   Borthwick, a Certified Shorthand Reporter,
 4   commencing at the hour of 9:20 a.m., Thursday,
 5   November 18, 2010, at the offices of Yates Court
 6   Reporters, 74967 Sheryl Avenue, Palm Desert,
 7   California.
 8   APPEARANCES:
 9       For the Plaintiff:
10          CONANT LAW, LLC
11          Attorneys at Law
12          BY:  CHRISTOPHER J. CONANT, ESQ.
13          730 17th Street
14          Suite 200
15          Denver, Colorado  80202
16          (303) 298-1800
17       For the Defendants:
18          DION-KINDEM & CROCKETT
19          Attorneys at Law
20          BY:  WILLIAM E. CROCKETT, ESQ.
21          LNR Warner Center
22          21271 Burbank Boulevard
23          Suite 100
24          Woodland Hills, California  91367-6667
25          (818) 883-4400
```

Page 2

---

```
 1                    INDEX
 2
 3   Deposition of DENNIS LEE MONTGOMERY
 4      Taken on November 18, 2010
 5
 6   Examination By:                         Page
 7   MR. CONANT                               24
 8
 9   Information Requested:
10      (None)
11
12   Questions Instructed Not to Answer:   Page Line
13   Q.  Has your attorney, to your          45    3
14       knowledge, been in contact with any
15       agency of the United States
16       government concerning your personal
17       property that's listed on these
18       schedules?
19   Q.  Is it your testimony,               46    9
20       Mr. Montgomery, that you have no
21       personal property that falls within
22       the description of this paragraph
23       here on page 22-9?
24   ///
25   ///
```

Page 4

---

Dennis Lee Montgomery  -  November 18, 2010

| | | | |
|---|---|---|---|
| 1 | Q. | Have you ever described to anyone in | 53 | 3 |

Page 5

1  Q.  Have you ever described to anyone in
2      any form a noise filtering
3      technology that you had created?                53   3
4  Q.  You don't recall if it's true or
5      not, Mr. Montgomery?                            77   25
6  Q.  You mean to tell me that you met
7      with someone in the vice president's
8      office and you can't recall what it
9      was about, Mr. Montgomery?                      82   21
10 Q.  This is about the source code, isn't
11     it, Mr. Montgomery?                             85   15
12 Q.  Do you understand the English
13     language, Mr. Montgomery?                       99   19
14 Q.  Well, so you visited the vice
15     president's office, but you don't
16     recall the nature of the meeting?               107  12
17 Q.  What would cause your attorney to
18     put a statement like that on your
19     bankruptcy schedule?                            112  16
20 Q.  Can you explain to me your
21     conversations with Edra Blixseth
22     concerning --                                   119  6
23 Q.  -- the preparation of this document?           119  11
24 ///
25 ///

Page 5

1  Q.  Have you defrauded Mr. Kennedy in
2      connection with his investment in
3      Demaratech, LLC?                                144  25
4  Q.  Did -- Mr. Montgomery, during
5      President Obama's inauguration in
6      January of 2009, were you the cause
7      of any form of terror -- heightened
8      terror alert in the Washington,
9      D.C., area?                                     148  10
10 Q.  Do you ever monitor PACER in
11     Montana, U.S. District Court -- U.S.
12     Bankruptcy Court in the District of
13     Montana?                                        150  20
14 Q.  What attorney-client communications
15     would lead Mr. Flynn to believe that
16     you were causing terror threats in
17     or around January of 2009?                      151  18
18 Q.  When did Mr. Flynn cease to be your
19     attorney?                                       152  4
20 Q.  So you're suggesting that you didn't
21     write that, Mr. Montgomery?                     157  12
22 ///
23 ///
24 ///
25 ///

Page 7

1  Q.  Mr. Montgomery, can you please
2      explain to me your conversation with
3      Ms. Montgomery concerning the
4      preparation of this document, which
5      is marked as Plaintiff's Exhibit
6      No. 7.                                          123  15
7  Q.  Isn't it true, Mr. Montgomery, that
8      you worked with Ms. Blixseth to help
9      her kill the sale of the Yellowstone
10     Club to Cross Harbor?                           125  8
11 Q.  Mr. Montgomery, is this statement in
12     here regarding -- where it says
13     Dennis Montgomery and Demaratech, it
14     has been their desire from the first
15     contact to try and sell their
16     technology to various institutions
17     of the Israeli government, including
18     Mossad and Army Intelligence --                 140  7
19 Q.  Is this a true statement,
20     Mr. Montgomery, in any sense? Has
21     it ever been your desire to sell
22     technology to various institutions
23     within the Israeli government? Is
24     that a true statement,
25     Mr. Montgomery?                                 141  15

Page 6

1  Q.  Why would Edra tell you, "With all
2      going on, much of which you
3      encouraged me to move forward with,
4      why are you doing this at this
5      time?"                                          165  12
6  Q.  Mr. Montgomery, how does your
7      relationship with Edra Blixseth
8      implicate you in any criminal
9      proceeding?                                     166  2
10 Q.  Do you know why the Israeli
11     government would be?                            171  24
12 Q.  Why would Edra say, "You are the key
13     to our success"?                                180  5
14 Q.  Is it hard to recall what a person
15     does with $800,000, Mr. Montgomery?             227  25
16 Q.  You had a plan, because you knew the
17     software was always bogus and you
18     knew that the only way to get out
19     from the sanction was to get rid of
20     the litigation so you settled by
21     executing the $25 million judgment.
22     You knew at the time that you could
23     never satisfy the $25 million
24     judgment, so you knew the only way
25     to get out from the $25 million                 232  5

Page 8

2 (Pages 5 to 8)

Dennis Lee Montgomery  -  November 18, 2010

```
 1    judgment was to file for bankruptcy.
 2    And the whole time before that you
 3    knew that the software was
 4    fraudulent, yet you're getting paid
 5    $1.2 million a year for this
 6    fraudulent software.  So the whole
 7    time you're hoarding away this cash
 8    that you're getting, the
 9    $1.2 million a year you're getting,
10    because you know at some -- you know
11    it's all going to collapse when
12    you're discovered that your software
13    is a complete fraud.
14 Q.  Didn't you know the whole time the      233  17
15    software was bogus, that you were
16    pedaling bogus software?
17 Q.  The source code that we're been         234   3
18    referring to all day today in the
19    Plaintiff's Exhibit 3, in these
20    emails, the source code, you knew it
21    was bogus didn't you,
22    Mr. Montgomery?
23 ///
24 ///
25 ///
```
Page 9

```
 1 Exhibits:
 2   1    36-page U.S. Bankruptcy Court           33
 3        Summary of Schedules filed
 4        7/13/09
 5   2    Six-page Plaintiff's Second             49
 6        Set of Requests for Production
 7        of Documents
 8   3    23-page Sealed Declaration of           54
 9        Dennis Montgomery in Support
10        of his Oppositions to DOD's
11        and ETreppid's Motions for
12        Protective Orders
13   4    Six-page Dennis Montgomery's            61
14        Responses to Plaintiff's
15        Requests for Production of
16        Documents, Set Two
17   5    Three-page Second Declaration           90
18        of SA Michael A. West
19   6    November 8, 2007, redacted            114
20        letter to Timothy Blixseth on
21        the letterhead of U.S.
22        Department of Justice
23 ///
24 ///
25 ///
```
Page 10

```
 1   7    December 12, 2007, letter to          116
 2        Timothy Blixseth on the
 3        letterhead of the U.S.
 4        Department of Justice
 5   8    56-page printout of back              132
 6        records for Demaratech, LLC
 7   9    Two-page June 30, 2010, email         137
 8        from Concerned Citizen to
 9        Michael.west@ic.fbi.gov re
10        Montgomery
11  10    February 26, 2009, email              155
12        string, top email from
13        LearG2@aol.com to
14        dennis@ncoder.net et al., re
15        Blxware
16  11    Six pages of indictments              166
17  12    Email string dated November           169
18        11, 2010, between George
19        Birnbaum and Tim Blixseth re
20        Montgomery
21  13    Email string, top email dated         175
22        February 26, 2009, from
23        LearG2@aol.com to
24        dennis@ncoder.net, et al., re
25        Installation
```
Page 11

```
 1  14    Two-page email from                   177
 2        LearG2@aol.com to
 3        dennis@ncoder.net, et al., re
 4        Ratheon and other
 5        opportunities
 6  15    One-page email string, top            189
 7        email from LearG2@aol.com to
 8        dennis@ncoder.net, et al., re
 9        Secret Service
10  16    Six-page article entitled The         195
11        Man Who Conned the Pentagon
12  17    Eight-page email and                  201
13        attachment dated August 23,
14        2007, from Patricia Yarborough
15        to Jory Russell re Dennis
16        Montgomery
17  18    143 pages of bank records             219
18  19    15 pages of a Wells Fargo             285
19        Portfolio Management Account
20        for January 2007
21  20    36 pages of bank records of           303
22        Istvan Burgyan, Bates
23        Nos. 00349-384
24 ///
25 ///
```
Page 12

3  (Pages 9 to 12)

Dennis Lee Montgomery   -   November 18, 2010

| | | | |
|---|---|---|---|
| 1 | 21 | 19-page Wells Fargo PMA | 306 |
| 2 | | Package of Istvan Burgyan, | |
| 3 | | Bates Nos. 00552-70 | |
| 4 | 22 | Five pages of Istvan Burgyan's | 309 |
| 5 | | bank records, Bates | |
| 6 | | Nos. 00943-47 | |
| 7 | 23 | Two-page Bank of America | 312 |
| 8 | | statement of Istvan Burgyan, | |
| 9 | | Bates Nos. 00933-34 | |
| 10 | 24 | One page of photocopied | 313 |
| 11 | | documents including a | |
| 12 | | cashier's check paid to | |
| 13 | | Caesar's Casino and Wells | |
| 14 | | Fargo Bank records. | |
| 15 | 25 | 18 pages of MontBleu Resort | 315 |
| 16 | | Memo Reports | |
| 17 | 26 | Three-pages of win/loss | 324 |
| 18 | | documents | |
| 19 | 27 | 37 pages of Customer | 328 |
| 20 | | Transaction Inquiries | |
| 21 | 28 | 11 pages of miscellaneous | 330 |
| 22 | | casino documents | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

Page 13

1    because to do so would violate the terms of the
2    United States protective order, which all the
3    parties to the bankruptcy proceeding have agreed to.
4         MR. CROCKETT:  Bill Crockett on behalf of
5    Dennis Montgomery.
6         THE WITNESS:  Dennis Montgomery.
7         THE VIDEOGRAPHER:  Would the court reporter
8    please swear in the witness.
9         THE REPORTER:  Please raise your right
10   hand.
11        Do you solemnly state under penalty of
12   perjury that the testimony you will give in this
13   matter will be the truth, the whole truth, and
14   nothing but the truth?
15        THE WITNESS:  Yes.
16        THE REPORTER:  Thank you.
17        MR. CONANT:  Okay.  Thank you.
18        Before we start examining the witness, I
19   want to state for the record that there are present
20   in the room four representatives from the U.S.
21   Government, two of which apparently have no last
22   name.
23        We'll ask on the record of Ms. Wells to
24   provide their last names and the government agency
25   that they purportedly work for.

Page 15

1         THE VIDEOGRAPHER:  Good morning.  Here
2    begins Media No. 1 in the video deposition of Dennis
3    Lee Montgomery in the matter of Michael J. Flynn
4    versus Dennis Lee Montgomery, et al., in the
5    United States Bankruptcy Court of California, Case
6    No. 2:10-bk-18510-bb.
7         Today's date is November 18th, 2010.  The
8    time is 9:20 a.m.  This deposition is being taken at
9    74967 Sheryl Avenue, Palm Desert, California, and
10   was made at the request of Mr. Christopher Conant of
11   the law offices of Conant Law, LLC.
12        The videographer is Jesse Navarro here on
13   behalf of Orravan Video Litigation Services,
14   Indian Wells, California.
15        Would counsel and all present please
16   identify yourselves and state whom you represent.
17        MR. CONANT:  Christopher Conant for the
18   plaintiff, Michael J. Flynn.
19        MR. FLYNN:  And Michael J. Flynn in
20   persona.
21        MS. WELLS:  Carlotta Wells on behalf of the
22   United States and with the United States Department
23   of Justice.  Sharon Raya is with me from my office.
24   With me, also, are Morgan and Tom, who are with the
25   government and I can't disclose anything further

Page 14

1         MS. WELLS:  And I cannot, because to do so
2    would violate the terms of the United States
3    protective order.
4         MR. CONANT:  Ms. Wells, do you have a copy
5    of the protective order in front of you?
6         MS. WELLS:  I do.  Do you have one?
7         MR. CONANT:  I have a copy in front of me.
8    I'd like to actually get it admitted as an exhibit
9    in this deposition.
10        Let me -- while I work on getting extra
11   copies to admit as an exhibit, Ms. Wells, can you
12   review the protective order and identify which
13   specific portion of the protective order you're --
14        MS. WELLS:  Am I a witness now?  All I can
15   tell you is it's pretty self-evident from the face
16   of the United States protective order what's
17   protected, what isn't.
18        The information that's protected is set
19   forth in paragraphs 2 and paragraphs 3.
20        MR. CONANT:  How does those pertain
21   specifically to the identities of these gentlemen
22   and why they're here today?
23        MS. WELLS:  I think it's self-evident and
24   if you want to read those paragraphs into the
25   record, feel free to.

Page 16

4  (Pages 13 to 16)

Dennis Lee Montgomery  -  November 18, 2010

```
 1        MR. CONANT:  I don't -- well --
 2        MS. WELLS:  Paragraphs 2 and 3 of the
 3   United States protective order, which is
 4   Document 253, District of Nevada Case File 30656.
 5        MR. CONANT:  Ms. Wells, who is making the
 6   decision regarding what is -- why these gentleman
 7   are here?
 8        Who in the government made a decision why
 9   these gentlemen are here?  Who in the government
10   made a decision for these two gentlemen to be here
11   today?
12        MS. WELLS:  This particular deposition is
13   being handled in the manner that all information
14   related to this case has been handled.  It's been a
15   joint decision between those attorneys representing
16   the United States' interests and the agencies whose
17   information we're protecting.
18        That's all I'm going to say.
19        MR. CONANT:  Were these gentleman at all
20   involved in any way in the litigation in Nevada?
21        MS. WELLS:  I'm not going to go any further
22   than what I've already said.
23        MR. CONANT:  Were you meeting with Judge
24   Pro in the U.S. District Court for the district of
25   Nevada yesterday?
```
Page 17

```
 1   reviewed in connection with your meeting with Judge
 2   Pro that were -- that originated from my client
 3   Michael Flynn?
 4        MS. WELLS:  This is not the subject of this
 5   deposition.  We're not here to talk about this.  If
 6   Mr. Flynn wants to have a conversation with me about
 7   this we can have it, but it's not appropriate for
 8   the record.
 9        MR. CONANT:  It is appropriate for the
10   record.  You are --
11        MS. WELLS:  It does -- what does that have
12   to do with the information we're here to protect
13   now?  The long and the short of it is that there
14   were documents, as you know, from the Order that the
15   court in Montana sent to Judge Pro.
16        He asked the United States to take a look
17   at them to determine the extent to which there's
18   information that may or may not be protected under
19   the United States protective order.
20        Upon the limited review that we did in his
21   chambers yesterday, we determined that there was
22   enough of a question there that we need to take the
23   documents back with us to Washington to do a more
24   thorough review.  That's it.
25        MR. CONANT:  What documents did you review?
```
Page 19

```
 1        MS. WELLS:  At Judge Pro's insistence, yes.
 2   We met with him in his chambers yesterday.
 3        MR. CONANT:  Who is "we"?
 4        MS. WELLS:  The people representing the
 5   United States Department of Justice and the United
 6   States in this case.
 7        MR. CONANT:  Who were those?  I'm asking
 8   for the identities, Ms. Wells.
 9        MS. WELLS:  All I'm saying is that people
10   from the government met with him and I mean it
11   actually -- if you really need to know, it was the
12   four of us here.
13        MR. CONANT:  Did Judge Pro -- when did
14   Judge Pro contact you to meet with him?
15        MS. WELLS:  I'm not going to say anything
16   more other than we're complying with the terms of
17   the order that Judge Pro entered, I believe it was
18   October 30th, and we were there because of that
19   order.
20        MR. CONANT:  What order?
21        MS. WELLS:  Let's see.
22        It was the order dated October 28th, 2010,
23   Docket No. 1172, same case, Montgomery versus
24   eTreppid Technology.
25        MR. CONANT:  Were there any documents
```
Page 18

```
 1        MS. WELLS:  The documents that the court in
 2   Montana sent.
 3        MR. CONANT:  What documents were those?
 4        MS. WELLS:  I didn't take a list.  It's not
 5   a very big -- it's a small pile, not even an inch
 6   thick.
 7        MR. FLYNN:  This is Michael Flynn.  I'm
 8   going to put a statement on the record.
 9        The documents that were given to David
10   Cotner, counsel for the trustee in the Montana
11   bankruptcy proceeding, were very limited and I
12   specifically reviewed them before giving them to
13   Cotner.
14        They were apparently subsequently given to
15   Judge Kirscher and they had all been previously
16   reviewed by the federal government, Department of
17   Justice, and approved.  And except for the Sandoval
18   complaint, they are publicly on file in the Nevada
19   District Court and can be picked up online.
20        So unless documents were added that I don't
21   know about -- and I don't know about any of the
22   documents, I don't have the identity of the
23   documents that were given to Judge Kirscher or
24   subsequently conveyed to Judge Pro -- there are no
25   documents that do not comply with the US protective
```
Page 20

5 (Pages 17 to 20)

Dennis Lee Montgomery   -   November 18, 2010

Page 21

```
 1  order in any way.
 2       So if either documents were added by
 3  someone or there has been a change in the position
 4  of the Department of Justice with regard to the
 5  scope of the protective order, then there is nothing
 6  in any of the documents given to Cotner, apparently
 7  passed on to Judge Kirscher, which would violate the
 8  terms of the U.S. protective order.
 9       MR. CONANT:  Do you have a copy, Ms. Wells,
10  of the letter or whatever communication there was
11  between Judge Kirscher and Judge Pro?
12       MS. WELLS:  No.
13       MR. CONANT:  Who at the government have you
14  been talking to regarding the matter involving the
15  letter from Judge Kirscher to Judge Pro?
16       MS. WELLS:  I'm not here to answer these
17  questions.  I'm here to enforce the terms of the
18  United States protective order and only people with
19  the United States have that authority and the
20  ability to determine what's protected and what isn't
21  and that's all we're here for.
22       It's a very limited role that we're
23  playing, it's a very limited role, and I can tell
24  you on the record that what we're doing here today
25  is entirely consistent with what we've done ever
```

Page 22

```
 1  since we first got involved in this case and ever
 2  since Judge Pro acknowledged there was information
 3  to be protected.
 4       That's all I'm going to say and I'll keep
 5  saying the same thing over and over again.
 6       MR. FLYNN:  It's completely inaccurate.
 7  For the record, these gentlemen, however nice
 8  gentleman they may be, never participated and never
 9  appeared in courtrooms in any of the Nevada
10  proceedings, Ms. Wells, and you know it and I know
11  it.
12       So this four-person deluge from the
13  Department of Justice in Dennis Montgomery's
14  deposition is apparently being done for some reasons
15  completely extraneous to the materials in the
16  protective order, but why don't we get started.
17       MR. CONANT:  I just want to state one last
18  thing for the record.  When I deposed Istvan Burgyan
19  in this very case on September 22nd, the U.S.
20  Government showed no interest in this matter.
21       I had to call Mr. Gomez at his office in
22  D.C. halfway through the deposition, because there
23  became an issue regarding the protective order.
24  Mr. Gomez was completely indifferent regarding this
25  case and now, for some reason, we have four people
```

Page 23

```
 1  here from the US government, two of who, apparently,
 2  have no last names and are from some unidentified
 3  agency with the government.
 4       And for the record, Ms. Wells is not
 5  indicating how their involvement is at all
 6  implicated in the protective order.  The protective
 7  order only governs issues concerning intelligence
 8  agencies as defined in the National Security Act and
 9  we have no indication of what agencies these
10  gentlemen are with and whether they're with an
11  intelligence agency or whether it's an
12  administrative branch of the government that's not
13  included within the National Security Act as an
14  intelligence agency.
15       So we simply don't know what is -- what is
16  purportedly being protected by the protective order
17  or not.
18       MR. FLYNN:  We think -- at this juncture
19  I'll put on the record that I believe -- I didn't
20  believe it during the Nevada proceedings, I thought
21  there were legitimate interests to be protected in
22  terms of identities of intelligence agency
23  individuals, but at this point I believe that the
24  Department of Justice has gone far beyond that and
25  is now using, under the guise of national security
```

Page 24

```
 1  for reasons related to the facts that I put in the
 2  emails to you, Carlotta, has gone far beyond the
 3  scope of national security in an effort to cover up
 4  or conceal the fraudulent activities of
 5  Mr. Montgomery as I've repeatedly said in emails.
 6       So why don't we just start.
 7            EXAMINATION
 8  BY MR. CONANT:
 9       Q.  Okay.  All right.  Turning to
10  Mr. Montgomery.  Mr. Montgomery, let's start
11  something.
12       Can you state your name for the record.
13       A.  Dennis Montgomery.
14       Q.  What's your -- do you have a middle name?
15       A.  Lee.
16       Q.  Do you understand what it means to take a
17  deposition, Mr. Montgomery?
18       A.  Yes.
19       Q.  What do you understand that to mean?
20       A.  You're going to ask me questions; I'm going
21  to answer them.
22       Q.  Do you know -- do you understand that your
23  testimony today is under the penalty of perjury?
24       A.  Yes.
25       Q.  Do you understand what that means?
```

Dennis Lee Montgomery   -   November 18, 2010

1    A.    Yes.
2    Q.    What does it mean to you?
3    A.    You've got to tell the truth.
4    Q.    What happens if you don't tell the truth?
5    A.    You get in trouble.
6    Q.    What kind of trouble?
7    A.    Whatever.
8    Q.    What does that mean?
9         MR. CROCKETT:   Calls for speculation.  Next
10   question, Counsel.
11   BY MR. CONANT:
12   Q.    Mr. Montgomery, I'll represent to you that
13   if you do not tell the truth and you unintentionally
14   do not tell the truth you could be prosecuted by the
15   federal government for lying under oath and that
16   carries with it all sorts of criminal penalties,
17   which I'm sure your attorney can advise you about.
18        Mr. Montgomery, have you brought any
19   documents with you today to this deposition?
20   A.    No.
21   Q.    All right.  Mr. Montgomery, are you a
22   United States citizen?
23   A.    Yes.
24   Q.    Can you briefly describe to me your
25   background, your educational background, and your

Page 25

1    Q.    Doing what with computers?
2    A.    Biomedical work.
3    Q.    Mr. Montgomery, what kind of biomedical
4    work with computers were you doing?
5    A.    Electrocardiogram, blood gas analysis,
6    pulmonary function, those kinds of functions.
7    Q.    Functions.
8         How does that relate to -- what would you
9    do with computers?  Would you code software
10   programs?
11   A.    Yes.
12   Q.    And what is your background in software
13   development?
14   A.    Well, I started it then, at that period of
15   time.  The hospital had bought a number of computers
16   and were trying to do at that time, I believe,
17   automated EKG analysis and I was working with a
18   group of cardiologists to do it.
19   Q.    So at some point along the line is it fair
20   to say that you learned how to program computer
21   software?
22   A.    Yes.
23   Q.    How did you learn that?
24   A.    I just learned it.
25   Q.    Did you read books about it?

Page 27

1    work background?
2    A.    Go on?
3         I went to Grossmont College as a -- I got
4    an AA in biomedical technology.
5         Is that what you want, me to go forward
6    from there?
7    Q.    Yeah.  What year did you graduate from
8    Grossmont?
9    A.    I don't recall.  I think '73, '74.
10   Q.    Yeah, please.
11   A.    I went to San Diego State for a year -- I
12   believe, I don't remember the exact time -- and then
13   I began working as a biomedical technician at local
14   hospitals.
15   Q.    Okay.  From what years did you work as a
16   biomedical --
17   A.    I think '73 to, I would say, '76, '77.  I
18   don't recall specifically the exact date.
19   Q.    Okay.  When did you -- what did you do
20   after you worked in the hospital?
21   A.    I went to work as a consultant.
22   Q.    What does that mean, "consultant"?
23   A.    I was just trying to get work.
24   Q.    What kind of work?
25   A.    Computer.

Page 26

1    A.    I mean that's 30 years ago.  Yes, I'm sure
2    I read books.
3    Q.    Do you have any formal training in --
4    A.    I think there were computer programming
5    classes that were offered with the program.  I don't
6    recall at the time, because the PC wasn't available
7    yet.  They didn't come out to '81.
8         MR. FLYNN:   Did you take any of these
9    classes.
10   BY MR. CONANT:
11   Q.    Did you take any of these classes?
12   A.    I don't recall specifically.
13   Q.    So you don't recall whether you've ever
14   taken any class where you can learn how to program
15   computer software?
16   A.    I don't remember the list of classes.  I
17   just don't recall.
18   Q.    Have you ever taken a class?
19   A.    I don't -- at times I had to have, yes,
20   because there were classes that I took -- at the
21   time those computers were Hewlitt Packard.  They
22   were not IBM-based and I know I went to Hewlitt
23   Packard classes.
24   Q.    So you took some classes offered my Hewlitt
25   Packard?

Page 28

7 (Pages 25 to 28)

Dennis Lee Montgomery   -   November 18, 2010

| | |
|---|---|
| 1    A.    By the people making the computers. | 1   BY MR. CONANT: |
| 2    Q.    What years were those? | 2    Q.    Has any instructor ever taught you how to |
| 3    A.    Same time frame we discussed, between the | 3   write computer code, Mr. Montgomery? |
| 4   time while I was going to Grossmont College and | 4    A.    What do you mean "computer code"? |
| 5   San Diego State and then, I would say, up until even | 5    MR. CROCKETT:  I will object to the |
| 6   after I left as a consultant. | 6   question on the grounds as vague. |
| 7    Q.    I'm looking for some specific years. | 7    MR. CONANT:  I'm objecting to the fact that |
| 8    A.    '73 to '80 I guess, let's just say. | 8   your client is evading the question. |
| 9    Q.    Okay.  So how many classes in computer -- | 9    MR. CROCKETT:  Well, if you want to object |
| 10    A.    I'm sorry. | 10   to your questions, knock yourself out. |
| 11    Q.    Let me just back up here, so we can get | 11    MR. FLYNN:  Ask him -- |
| 12   this out on the record for the court reporter | 12   BY MR. CONANT: |
| 13   it's challenging when we speak over each other, so I | 13    Q.    Do you know what source code is, |
| 14   will try to not interrupt you, if you could try not | 14   Mr. Montgomery? |
| 15   to start your answer before I finish my question. | 15    MR. CROCKETT:  I'm sorry, I want to enter |
| 16    A.    All right. | 16   an objection right here.  This gentleman is not |
| 17    Q.    Okay.  So how many classes in software | 17   admitted as an attorney in the case.  He is the |
| 18   programming have you taken from, say, 2010 until, | 18   plaintiff.  He's not admitted pro hac.  He's not |
| 19   say, 1970? | 19   licensed in the state of California. |
| 20    A.    What do you mean by "classes"? | 20    Is he asking the questions or -- |
| 21    Q.    Were there -- where you had an instructor | 21    MR. CONANT:  Mr. Crockett, I'll conduct the |
| 22   who's teaching you how to, you know, create software | 22   deposition in the manner I feel appropriate.  He's |
| 23   code. | 23   the plaintiff here.  He can -- |
| 24    MR. CROCKETT:  Question is vague. | 24    MR. CROCKETT:  You want to sit in his lap? |
| 25   Ambiguous.  Lacks foundation. | 25    MR. CONANT:  Let me finish, please. |
| Page 29 | Page 31 |
| 1   BY MR. CONANT: | 1    He can participate in this deposition in |
| 2    Q.    Do you understand the question, | 2   any manner that I feel appropriate. |
| 3   Mr. Montgomery? | 3    MR. CROCKETT:  Okay. |
| 4    A.    Well, I'm not certain if you've ever asked | 4    MR. CONANT:  He's not harassing the |
| 5   me that I ever went to a class on computers. | 5   witness.  He's not doing anything unethical. |
| 6    Q.    Yeah, correct. | 6    I'll conduct the deposition, thank you. |
| 7    A.    Class meaning one time a week?  I don't -- | 7    MR. CROCKETT:  Is there a question pending? |
| 8    Q.    I don't know.  That's what I'm asking.  I | 8   BY MR. CONANT: |
| 9   just want to know how much training, formal or | 9    Q.    Do you know, Mr. Montgomery, what source |
| 10   informal, you have in programming computer software. | 10   code is? |
| 11    A.    What type of computers are you referring | 11    A.    Yes. |
| 12   to? | 12    Q.    What does the word source code mean to you? |
| 13    Q.    I don't know.  I'm not an expert in | 13    A.    A language used by a compiler to generate |
| 14   computers.  I'm a lawyer.  I'm not a -- I'm not a | 14   source code, to generate an executable code. |
| 15   computer guy, so that's why I'm asking. | 15    Q.    I don't understand what any of that means. |
| 16    MR. CROCKETT:  Have you -- | 16   Can you explain to me what a compiler is? |
| 17    MR. CONANT:  Mr. Crockett, please, let me | 17    A.    It's a program written by a person that |
| 18   finish my question. | 18   makes a development, a system development, for a |
| 19    MR. CROCKETT:  Go right ahead.  Is your | 19   computer language and gives you a number of tools by |
| 20   question finished? | 20   which you are to generate programs to run on that |
| 21    Is your question finished?  Is your | 21   platform. |
| 22   question finished? | 22    Q.    Have you ever had any training in how to |
| 23    You're asking me to wait. | 23   develop source code? |
| 24    MR. FLYNN:  Just ask if any instructor ever | 24    A.    I'm sure I have. |
| 25   taught him how to write code. | 25    Q.    What is that training? |
| Page 30 | Page 32 |

8 (Pages 29 to 32)

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 1    A.  I don't recall specifically. | 1    A.  I talked on the phone. |

Page 33 / Page 34 / Page 35 / Page 36

**Page 33**

1    A.  I don't recall specifically.
2    Q.  Okay.  So is it fair to say,
3 Mr. Montgomery, that you know how to write source
4 code, but you don't recall how you ever learned to
5 write it?
6         MR. CROCKETT:  Question's vague and
7 ambiguous.  Lacks foundation.  May assume facts not
8 in evidence.
9         You think you can answer it as it's
10 phrased, go ahead.
11        THE WITNESS:  You kind of just learn it
12 over the years.  As the technology develops, so do
13 you kind of with it.  That's my answer.
14        MR. CONANT:  Mr. Montgomery, I'm going to
15 hand to you what will be marked as --
16        You're going to have to help me keep track
17 here.  We'll be on Exhibit 1.
18        I only have three copies here.  I only
19 have -- the suitcase is only so big, so I'll hand
20 one to you; if you want the copy --
21        You'll mark the one that the witness has?
22        THE REPORTER:  Yeah.
23        (Exhibit 1 was marked for identification.)
24        MR. CONANT:  Mr. Crockett.
25        MR. CROCKETT:  Are you starting with 1?

                                          Page 33

**Page 34**

1         MS. WELLS:  Can I see a copy, just take a
2 look at it for a second?
3         MR. FLYNN:  We're going to go to the part
4 where the technology is listed.
5         MS. WELLS:  That's fine.
6 BY MR. CONANT:
7    Q.  Mr. Montgomery, can you please review this
8 document that I've handed you.
9    A.  Okay.
10   Q.  Let me know when you're reviewed it to your
11 satisfaction.
12        MR. FLYNN:  I'll mark the technology
13 section for the declaration.
14        MR. CONANT:  Okay.
15        THE WITNESS:  Okay.
16 BY MR. CONANT:
17   Q.  Okay.  Thank you, Mr. Montgomery.  Now
18 before I forget, I just had a few questions I want
19 to ask and then we'll move on to the schedule.
20        Can you tell me the last time you
21 communicated with Edra Blixseth?
22   A.  I think it was in the last week.
23   Q.  What did you communicate with her?
24   A.  I don't recall.
25   Q.  How did you communicate with her?

                                          Page 34

**Page 35**

1    A.  I talked on the phone.
2    Q.  On the phone?
3    A.  Yeah.
4    Q.  You talk about this deposition?
5    A.  I don't believe so.
6    Q.  Did you talk about anything regarding
7 Mr. Blixseth, Timothy L. Blixseth?
8    A.  I don't recall.
9    Q.  Anything regarding Mr. Flynn?
10   A.  I don't recall.
11   Q.  So you had a conversation with Ms. Blixseth
12 a week ago, but you don't recall anything about the
13 conversation; is that accurate, Mr. Montgomery?
14   A.  I don't recall specifically what we talked
15 about.
16   Q.  That wasn't it.  That didn't answer my
17 question.
18   A.  Okay.  I'm sorry.
19   Q.  Is it fair to say you talked to
20 Ms. Blixseth a week ago, but you have no idea what
21 you talked to her about?
22        MR. CROCKETT:  That mischaracterizes what
23 he said.  He said he didn't recall.
24        MR. CONANT:  I'm asking him to answer my
25 question.

                                          Page 35

**Page 36**

1         THE WITNESS:  I just did.  I already did.
2 I said I don't recall.
3 BY MR. CONANT:
4    Q.  It was a yes-or-no question.
5    A.  Well, if I don't recall I guess the answer
6 is no, I don't recall.
7    Q.  You don't recall.
8         Mr. Montgomery, yesterday you were in
9 Las Vegas, were you not?
10   A.  Yes.
11   Q.  What were you doing in Las Vegas yesterday?
12   A.  I'm going to take the -- I'm going invoke
13 my right to the Fifth Amendment.
14   Q.  Mr. Montgomery, are you aware of any
15 criminal proceedings against you at this time?
16   A.  I'm going to invoke my right under the
17 Fifth Amendment.
18   Q.  Well, I'm not asking you to tell me
19 anything about what you may have done.  I'm asking
20 you are you aware of any criminal proceedings
21 against you at this time?
22        MR. CROCKETT:  Counsel, he has advised you
23 and I will advise you that he is taking his Fifth
24 Amendment privilege and he's not going to answer
25 that question.

                                          Page 36

Dennis Lee Montgomery   -   November 18, 2010

---

1        And if you have a difficulty with it, I'm
2   sure we can take it up with a judge.
3        MR. CONANT:  Did he answer it -- well, did
4   he answer it by taking the Fifth Amendment,
5   Mr. Crockett?
6        MR. CROCKETT:  Did he answer what, the last
7   question?
8        MR. CONANT:  My last question.
9        MR. CROCKETT:  You heard him do that and
10  it's on the record, Counsel.
11  BY MR. CONANT:
12       Q.   Mr. Montgomery, so you're taking the Fifth
13  Amendment -- you're pleading the Fifth Amendment in
14  response to my question about whether you're aware
15  of any criminal proceedings against you; is that
16  correct?
17       A.   I've already answered the question.
18       MR. CROCKETT:  Asked and answered, Counsel.
19  Next question.
20  BY MR. CONANT:
21       Q.   Mr. Montgomery, I understand that you have
22  paid to the Clark County district attorney in Nevada
23  approximately $450,000; is that correct?
24       A.   I'm taking the Fifth Amendment.
25       Q.   Where did you get the money to pay the

Page 37

---

1   Clark County D.A. this approximately $450,000?
2        A.   I'm asserting my right under the Fifth
3   Amendment.
4        MR. FLYNN:  Did you get it from Istvan
5   Burgyan.
6   BY MR. CONANT:
7        Q.   Did you get it from Istvan Burgyan,
8   Mr. Montgomery?
9        A.   I'm asserting my right under the Fifth
10  Amendment.
11       MR. FLYNN:  Did you give money to Istvan
12  Burgyan.
13  BY MR. CONANT:
14       Q.   Have you ever given money to Istvan
15  Burgyan?
16       A.   I'm asserting my right under the Fifth
17  Amendment.
18       Q.   Okay.  Mr. Montgomery, do you now or have
19  you ever maintained an office in Palm Desert or this
20  general area?
21       A.   I'm asserting my right under the Fifth
22  Amendment.
23       Q.   Mr. Montgomery, you had within this office
24  a large amount of -- strike that.
25       You've had in this office computer

Page 38

---

1   equipment, have you not?
2        MR. CROCKETT:  Which office are you talking
3   about?
4        Which office are you talking about?  I'll
5   object to the question as vague and ask you to
6   rephrase it.
7        MR. FLYNN:  Within 300 yards of here.
8   BY MR. CONANT:
9        Q.   Within 300 yards of here, Mr. Montgomery,
10  you've maintained an office, have you not?
11       A.   I'm asserting my right under the Fifth
12  Amendment.
13       Q.   What happened with the equipment that was
14  stored in that office?
15       A.   I'm asserting my right under the Fifth
16  Amendment.
17       Q.   That was computer equipment, was it not,
18  Mr. Montgomery, that you maintained in that office?
19       A.   I'm asserting my right under the Fifth
20  Amendment.
21       Q.   Wasn't that computer equipment that you
22  obtained from Edra Blixseth, Mr. Montgomery?
23       A.   I'm asserting my right under the Fifth
24  Amendment.
25       Q.   Wasn't that equipment you obtained from a

Page 39

---

1   company called Blxware, Mr. Montgomery?
2        A.   I'm asserting my right under the Fifth
3   Amendment.
4        MR. CROCKETT:  Why don't you just sit in
5   his lap.
6        MR. CONANT:  Thank you, Mr. Crockett.  I
7   appreciate you keeping your comments to yourself.
8   If you're not going to object or advise your client,
9   then you can keep your comments to yourself.
10       MR. CROCKETT:  I object to him continually
11  asking questions.
12       MR. CONANT:  He's not asking any questions,
13  Mr. Crockett.
14       MR. CROCKETT:  Of course not.
15       A little louder, then he won't have to
16  repeat it.
17  BY MR. CONANT:
18       Q.   Mr. Montgomery, the computer equipment that
19  you took out of this office that's 300 yards away
20  from here, that was computer equipment that you
21  listed on your schedule; isn't that correct?
22       MR. CROCKETT:  Object to the question.
23  Assumes facts not in evidence.
24       Go ahead.
25       THE WITNESS:  I assert my right under the

Page 40

---

10 (Pages 37 to 40)

Dennis Lee Montgomery  -  November 18, 2010

1  Fifth Amendment.
2  BY MR. CONANT:
3      Q.   Mr. Montgomery, turn with me to your
4  schedules, which have been marked as Exhibit 1, and
5  let's go ahead and lay the foundation for these
6  first.
7           Mr. Montgomery, do you recognize this
8  document here that's marked as Exhibit No. 1?
9      A.   Yeah.  Yes.
10     Q.   What do you recognize this document to be?
11     A.   Looks like my bankruptcy filing.
12     Q.   Can you clarify that for me, your
13 bankruptcy filing?
14     A.   Looks like a document that was used in my
15 bankruptcy filing.
16     Q.   Okay.  Can you turn to the last page for me
17 of Exhibit 1.  Up at the, I guess, the top half of
18 the document purports to be a signature of Dennis
19 Lee Montgomery.
20          Do you see that, Mr. Montgomery?
21     A.   Yes.
22     Q.   Is that your signature?
23     A.   It appears to be.
24     Q.   Do you recall signing a document that
25 looked like this, Mr. Montgomery?

Page 41

1      A.   I signed a bankruptcy document.
2      Q.   Do you recall signing this document?
3      A.   If this is my bankruptcy document.
4      Q.   Is that a yes or a no?
5      A.   Yes.
6      Q.   Turn with me to -- one, two, three, four --
7  the fifth page of this, of your bankruptcy
8  Schedule B.
9           MR. CROCKETT:  For the record, this would
10 be page 22-5 as it's been handwritten in the lower
11 right-hand corner of the document.
12 BY MR. CONANT:
13     Q.   Turn with me to the --
14          MR. CROCKETT:  Is that correct, Counsel?  I
15 want to make sure we're on the same page.
16          MR. CONANT:  I'm going to clarify this
17 here.
18     Q.   Turn with me to the following page that
19 your counsel just identified to line number 35.  Do
20 you see that down at the bottom, "Other personal
21 property of any kind not already listed"?
22          Do you see that row I'm referring to?
23     A.   Yes.
24     Q.   Do you see that row identifies
25 approximately $38 million worth of personal

Page 42

1  property, Mr. Montgomery?
2      A.   Yes.
3      Q.   Okay.  Now flip with me to what is
4  identified down at the bottom right-hand corner as
5  22-8.  I'm looking at line 20 or Entry No. 22.
6           It's identified as Patents, Copyright and
7  other Intellectual Property.  Do you see that,
8  Mr. Montgomery?
9      A.   Yes.
10     Q.   Look over at the right-hand column there,
11 there purports to be a value of $10 million.
12          Do you see that?
13     A.   Yes.
14     Q.   Can you explain to me what that $10 million
15 item of intellectual property is, Mr. Montgomery?
16     A.   I'm asserting my right under the Fifth
17 Amendment.
18     Q.   All right.  Flip with me to the following
19 page identified at the bottom right-hand corner as
20 page 22-9.
21          Mr. Montgomery, are you at that page?
22     A.   Yes.
23     Q.   Do you see that bottom paragraph on this
24 page that begins with "In addition"?
25     A.   Yes.

Page 43

1      Q.   Can you read that paragraph for the record,
2  please.
3           MR. CROCKETT:  Go ahead.
4           THE WITNESS:  "In addition, Dennis
5  Montgomery is the holder of certain intellectual
6  property rights which are subject to the National
7  Security Act 1947, 11 U.S.C. Section 401(a) et
8  seq" -- I guess -- I don't know what that means.
9  BY MR. CONANT:
10     Q.   Et seq.
11     A.   -- "et seq., and is by such Act prohibited,
12 without the express consent of the United States
13 Department of Justice and certain other agencies of
14 the United States of America from making any
15 disclosures with respect thereto.
16          "Any requested information with respect
17 thereto must be directed to Raphael Gomez,
18 United States Department of Justice, Civil Division,
19 Senior Trial Counsel, 950 Pennsylvania Avenue,
20 Northwest, Washington, D.C., 20530, (202) 514-1318."
21     Q.   Thank you.
22          Mr. Montgomery, have you had any
23 discussions within the prior year with any
24 government agency concerning the intellectual
25 property that you just described?

Page 44

11 (Pages 41 to 44)

Dennis Lee Montgomery   -   November 18, 2010

1      A.   I assert my right under the Fifth
2  Amendment.
3      Q.   Has your attorney, to your knowledge, been
4  in contact with any agency of the United States
5  government concerning your personal property that's
6  listed on these schedules?
7      MR. CROCKETT:   I'll object to the question.
8  It's plainly calling for attorney-client
9  communication.
10      Instruct him not to answer.
11      MR. FLYNN:   Have him describe the
12  intellectual --
13  BY MR. CONANT:
14      Q.   Mr. Montgomery, can you briefly describe to
15  me the intellectual property that we're discussing
16  here that you just described in your schedules as
17  being subject to the National Security Act?
18      MR. CROCKETT:   Ms. Wells, do you have any
19  objection to him answering this question?
20      MS. WELLS:   No.
21      MR. FLYNN:   See, we're on the same side.
22      THE WITNESS:   I don't believe -- I
23  didn't -- I don't believe I put this segment on
24  there.   I could be wrong.   I don't recall that
25  specifically.

Page 45

1      Q.   Do you have any personal property that
2  falls within the category of intellectual property
3  that is described here on the bottom paragraph of
4  22-9?
5      MR. CROCKETT:   Well, I'll object to the
6  question again as it assumes facts not in evidence.
7  It may require him to draw a legal conclusion.
8      Why don't you define for him what you mean
9  by intellectual property in context of the question?
10      MR. CONANT:   I'm asking --
11      MR. CROCKETT:   Let me finish, Counsel.
12  Thank you.
13      MR. CONANT:   Are you done?
14      MR. CROCKETT:   Yes.
15      MR. CONANT:   Thank you.
16      Q.   There's a straightforward question here,
17  Mr. Montgomery.   This bottom paragraph of your
18  bankruptcy schedule identifies you as the holder of
19  certain intellectual property.
20      Do you see that, Mr. Montgomery?
21      MR. FLYNN:   Describe intellectual property.
22  Please describe the intellectual property.
23  BY MR. CONANT:
24      Q.   Can you answer the question,
25  Mr. Montgomery?

Page 47

1  BY MR. CONANT:
2      Q.   Mr. Montgomery, you signed these -- you
3  signed your schedules under penalty of perjury, did
4  you not?
5      A.   Yes.
6      Q.   So is it your testimony, Mr. Montgomery,
7  that you have no personal property that is subject
8  to -- I'm sorry, strike that.
9      Is it your testimony, Mr. Montgomery, that
10  you have no personal property that falls within the
11  description of this paragraph here on page 22-9?
12      MR. CROCKETT:   I'll object to the question.
13  It's argumentative.   It assumes facts not in
14  evidence.
15      Would you like to rephrase it, Counsel?
16      MR. CONANT:   No.   I want him to answer the
17  question.
18      MR. CROCKETT:   I'll instruct him not to
19  answer.
20  BY MR. CONANT:
21      Q.   Mr. Montgomery, do you have any personal
22  property that falls within the description --
23      MR. FLYNN:   Intellectual.
24      MR. CONANT:   I'm sorry.   Thank you,
25  Mr. Flynn.

Page 46

1      MR. CROCKETT:   Read the question back,
2  please, would you, Ms. Reporter.
3      MR. CONANT:   I'll just ask the question
4  again.
5      Q.   Mr. Montgomery, do you see this bottom
6  paragraph on the page identified as 22-9?
7      A.   Yes.
8      Q.   Do you see that it says Dennis Montgomery
9  is the holder of certain intellectual property
10  rights?
11      Do you see that, Mr. Montgomery?
12      A.   Yes.
13      Q.   Describe those intellectual property rights
14  to me.
15      A.   I assert my right under the Fifth
16  Amendment.
17      MR. FLYNN:   I'm glad these gentlemen
18  stayed.
19      MR. CROCKETT:   Can we go off the record for
20  a moment, please.   I need to talk to my client.
21      MR. CONANT:   You can go off the record.
22      MR. CROCKETT:   Thanks.
23      THE VIDEOGRAPHER:   Going off the record.
24  The time is 9:56 a.m.
25      (Recess taken.)

Page 48

12 (Pages 45 to 48)

Dennis Lee Montgomery  -  November 18, 2010

---

**Page 49**

```
 1          THE VIDEOGRAPHER:  The time is 10 a.m.
 2  We're back on the record.
 3          MR. CONANT:  All right.  Mr. Montgomery,
 4  I'm going to hand you what is going to be marked as
 5  Plaintiff's Exhibit 2.
 6          You'll want a copy of this, Ms. Wells.
 7          Do you need a copy?  I'm sorry, your name
 8  again?
 9          THE REPORTER:  Stephanie.
10          MR. CONANT:  Stephanie.
11          Do you need a copy, Stephanie, or are you
12  going to get --
13          THE REPORTER:  I can use his if he leaves
14  them there.
15          MR. CONANT:  Okay.
16          THE REPORTER:  Could you identify them for
17  the record as we go through for me, please.  Thanks.
18          MR. CONANT:  Yeah.
19          (Exhibit 2 was marked for identification.)
20  BY MR. CONANT:
21      Q.   Mr. Montgomery, I've handed you what is
22  going to be marked as Plaintiff's Exhibit 2.  These
23  are Plaintiff's Second Set of Requests for
24  Production of Documents that were served on your
25  counsel in this case by me.
```

---

**Page 50**

```
 1          Would you turn to page 2.  It's marked --
 2  at the bottom it's actually the third page of the
 3  document, but it's labeled as page 2.  Request for
 4  Production No. 1 asks you produce the source codes.
 5  If you look above Request for Production No. 1
 6  you'll see the definition of source codes.
 7          Do you see that, Mr. Montgomery, where it
 8  defines source codes?
 9      A.   Yes.
10      Q.   Can you read that for me where it defines
11  source codes?
12      A.   "Source codes means those computer software
13  codes that you were ordered to produce by the
14  United States District Court for the District of
15  Nevada for which you were sanctioned by the Court in
16  the amount of $2500 per day to compel your
17  production of those codes and which are referenced
18  in Docket Entry No. 815 in Case No. 3:06-cv-0056 in
19  the" United -- "in the U.S. District" for the "Court
20  for the District of Nevada and which is attached
21  hereto as Exhibit 1."
22      Q.   All right.  Can you turn to Exhibit No. 1
23  which is on the back of this document,
24  Mr. Montgomery.
25          Can you review that docket entry, Docket
```

---

**Page 51**

```
 1  Entry No. 815 and let me know when you have reviewed
 2  it to your satisfaction.
 3          (Witness complies.)
 4          THE WITNESS:  All right.  I've read it.
 5  BY MR. CONANT:
 6      Q.   Thank you, Mr. Montgomery.
 7          Now if you recall, Mr. Montgomery, you were
 8  sanctioned by the U.S. District Court for the
 9  District of Nevada to the tune of $2500 a day until
10  you produced the source code as referenced in
11  Exhibit 1: isn't that correct?
12      A.   I didn't recall that.  I recall there was a
13  sanction of some type.  I don't remember
14  specifically that.
15      Q.   Do you recall the sanction was to compel
16  you to produce the source codes referenced in this
17  Exhibit 1?
18      A.   I thought it was more than that.
19      Q.   What else did you think it involved, the
20  sanction order?
21      A.   I thought it was just a general production.
22      Q.   Did you ever produce the source codes
23  identified in this Exhibit 1, Mr. Montgomery?
24          Let me clarify:  Did you ever produce the
25  source codes as you were ordered to do by the U.S.
```

---

**Page 52**

```
 1  District Court for the District of Nevada?
 2      A.   I'm not certain.
 3      Q.   You're not certain whether you ever
 4  produced them, Mr. Montgomery?  Is that the answer
 5  to the question?
 6      A.   I'm not certain.  That's my answer.
 7      Q.   Did you ever produce noise filtering codes
 8  Mr. Montgomery?
 9      A.   I don't know what you mean.
10      Q.   Have you ever discussed noise filtering
11  technology to -- let me back up.
12          Have you ever described, in any declaration
13  or affidavit that you've signed, noise filtering
14  technology?
15      A.   I'm not certain.
16      Q.   Now these source codes here, these were
17  source codes for software that purportedly decrypted
18  transmissions being broadcast by Al-Jazeera?
19          MR. CROCKETT:  Is that a question?
20          MR. CONANT:  Yeah.
21          THE WITNESS:  I thought that was a
22  statement you were making.
23  BY MR. CONANT:
24      Q.   Have you ever --
25          MR. FLYNN:  Have you ever described to
```

---

13 (Pages 49 to 52)

Dennis Lee Montgomery   -   November 18, 2010

```
 1  anyone --
 2  BY MR. CONANT:
 3      Q.   Have you ever described to anyone in any
 4  form a noise filtering technology that you had
 5  created?
 6          MR. CROCKETT:  Technology different from
 7  software?  Object to the question as vague,
 8  ambiguous, not calculated to lead to the discovery
 9  of admissible evidence.
10  BY MR. CONANT:
11      Q.   When I refer to technology, Mr. Montgomery,
12  I refer to the word in the broadest sense, but as
13  relevant here it'll refer primarily to software,
14  computer software.
15          MR. CROCKETT:  What else does it refer to,
16  Counsel?
17          MR. CONANT:  I want Mr. Montgomery to
18  explain.
19          MR. CROCKETT:  Explain --
20          MR. CONANT:  He's represent --
21          MR. CROCKETT:  Excuse me, may I finish?
22          MR. CONANT:  No, let me finish.
23          MR. CROCKETT:  You had finished the
24  question.  You interrupted me, Mr. Conant.
25          MR. CONANT:  Thank you, Mr. Crockett.
                                              Page 53
```

```
 1  Mr. Montgomery?
 2      A.   Yes.
 3      Q.   Turn with me, Mr. Montgomery, to the second
 4  to last page of this document.  Do you see where it
 5  says Dennis Montgomery on the signature line,
 6  Mr. Montgomery?
 7      A.   Yes.
 8      Q.   Is that your signature, Mr. Montgomery?
 9      A.   It appears so.
10      Q.   Mr. Montgomery, turn with me to page No. 4.
11      A.   4 at the bottom or the fourth page?
12      Q.   Page No. 4 at the bottom, meaning the
13  number 4 appears at the bottom the page.
14      A.   Yeah.  Okay.
15      Q.   I'm going to read line No. 1 here beginning
16  with the sentence, "I have."  Please read along with
17  me:  "I have provided the," quote --
18      A.   I'm not on the right page then.  You're
19  talking 4 on the bottom?
20      Q.   Page 4 on the bottom.
21      A.   What line number?
22      Q.   Line No. 1.
23          MR. FLYNN:  You're there.
24          THE WITNESS:  My line says, "The local."
25  ///
                                              Page 55
```

```
 1          MR. CROCKETT:  You're welcome and I'll
 2  continue to speak, if I may, because you're asking
 3  him now to define what you mean by the use of the
 4  word technology and I'll instruct him not to answer
 5  to the extent there's any question pending and ask
 6  you to rephrase.
 7          MR. FLYNN:  That's your copy.  That's their
 8  copy.  I'll make sure we've got the same one.
 9          MR. CONANT:  Is it --
10          MR. FLYNN:  Yeah, that's his.
11          MR. CONANT:  We have four of these.
12          MR. FLYNN:  That's yours, Mr. Crockett.
13  That's yours, Carly.
14          MS. WELLS:  Thank you.
15          MR. CONANT:  Mr. Montgomery, I'm handing
16  you what's going to be marked as Plaintiff's Exhibit
17  No. 3.
18          (Exhibit 3 was marked for identification.)
19  BY MR. CONANT:
20      Q.   Mr. Montgomery, I've handed you what's
21  going to be marked as Plaintiff's Exhibit No. 3.
22  The title of this document is Sealed Declaration of
23  Dennis Montgomery in Support of his Oppositions to
24  DOD's and eTreppid's Motion for Protective Orders.
25          Do you see that on the first page,
                                              Page 54
```

```
 1  BY MR. CONANT:
 2      Q.   I'm starting with the first full sentence.
 3      A.   Oh, I'm sorry.  Okay.
 4      Q.   "I have provided the 'output' from my
 5  decoding programs without compensation to our
 6  government in order to stop terrorist attacks and
 7  save American lives.
 8          "My source codes for this decoding
 9  technology, which derives from my 'ODS' are what
10  Trepp and several government officials were
11  attempting to steal from me when they raided my
12  home."
13          Is that your statement, Mr. Montgomery?
14          MR. CROCKETT:  Document speaks for itself.
15  BY MR. CONANT:
16      Q.   Mr. Montgomery, can you answer the
17  question, please.
18      A.   What's the question?
19      Q.   Is that your statement?
20      A.   It's written out that piece of paper.
21      Q.   Which you signed; is that correct,
22  Mr. Montgomery?
23          MR. CROCKETT:  Counsel, this is really
24  argumentative.  You know that this is a statement
25  out of a declaration that he signed October 30th,
                                              Page 56
```

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

1  2006.
2  BY MR. CONANT:
3      Q.   Mr. Montgomery, is that a truthful
4  statement on your part?
5      MR. CROCKETT:  At what point in time,
6  Counsel?  The question is vague and ambiguous.
7  BY MR. CONANT:
8      Q.   When you wrote it, Mr. Montgomery.
9      MR. CROCKETT:  That also assumes facts not
10  in evidence.
11      MR. CONANT:  I'm sorry, let me back up.
12      Q.   When you signed this document, was this a
13  truthful statement on your part?
14      A.   I'm going to assert my right under the
15  Fifth Amendment.
16      Q.   Mr. Montgomery, describe what this decoding
17  program is and what you -- sorry.
18          Describe what you mean on this line 1 by
19  "decoding programs."
20      A.   I'm going to assert my right under the
21  Fifth Amendment.
22      Q.   Mr. Montgomery, describe what you mean on
23  line 2, starting with the first full sentence on
24  line 2, quote, "My source codes."
25          Please describe to me what "my source

Page 57

1  out here.
2      THE VIDEOGRAPHER:  Going off the record.
3  The time is 10:13 a.m.
4          (Break in the proceedings.)
5      THE VIDEOGRAPHER:  The time is 10:14 a.m.
6  We're back on the record.
7  BY MR. CONANT:
8      Q.   All right.  Mr. Montgomery, I wanted to
9  back up.  Before we went off the record, I wanted to
10  back up to my questioning pertaining to Exhibit
11  No. 3, which is the Sealed Declaration of Dennis
12  Montgomery in Support of his Oppositions to DOD's
13  and eTreppid's Motions for Protective Order, which
14  is a declaration you signed under penalty of
15  perjury.
16          Turn with me to the page identified at the
17  bottom as page No. 4 of this document.  And, just to
18  clarify, the paragraph I'm reading from begins on
19  line 1, goes to line 4 to 5.
20      MR. CROCKETT:  Actually, the paragraph
21  begins on line 25 of the preceding page, Counsel.
22      MR. CONANT:  I'm reading from line 1 of
23  page 4 at the very beginning of the first full
24  sentence.
25      MR. FLYNN:  Read the entire --

Page 59

1  codes" refers to?
2      A.   I'm going to assert my right under the
3  Fifth Amendment.
4      Q.   These, quote, unquote, "source codes," are
5  they not the same source codes that you identified
6  on your bankruptcy schedules on -- and then turn
7  back to -- we have Plaintiff's Exhibit 1, which is
8  the bankruptcy schedules.
9      MR. FLYNN:  Did you read the whole thing
10  into the record?
11  BY MR. CONANT:
12      Q.   All right.  Before you answer that
13  question, let me go back, Mr. Montgomery.
14      A.   Go back to what?
15      Q.   We're going to go back to Plaintiff's
16  Exhibit --
17          Stephanie, what Plaintiff's exhibit are we
18  on right now?
19      THE REPORTER:  3.
20      MR. CROCKETT:  Are we marking the
21  declaration?
22      MR. CONANT:  Yeah, start marking these
23  things.
24          Let me go -- can we go off the record here
25  for a second so I can get the exhibits straightened

Page 58

1  BY MR. CONANT:
2      Q.   And please follow along, Mr. Montgomery.
3          "I have provided the 'output' from my
4  decoding programs without compensation to our
5  government in order to stop terrorist attacks and
6  save American lives.  My source codes for this
7  decoding technology which derives from my 'ODS' are
8  what Trepp and several government officials were
9  attempting to steal from me when they raided my
10  home.
11      MR. FLYNN:  Did you ever create any source
12  code that was used to stop terrorist attacks?
13  BY MR. CONANT:
14      Q.   Mr. Montgomery, have you ever created any
15  source code that was used to stop terrorist attacks?
16      A.   I'm going to assert my right under the
17  Fifth Amendment.
18      MR. FLYNN:  All right.
19      MR. CONANT:  I'm going to keep going.
20      Q.   All right.  Mr. Montgomery, turn with me
21  back to Plaintiff's Exhibit No. 2.
22          All right.  We'll go look at Request for
23  Production No. 1 where you are requested to produce
24  the source codes.  I'm going to hand you what will
25  be marked as Plaintiff's Exhibit No. --

Page 60

15 (Pages 57 to 60)

Dennis Lee Montgomery  -  November 18, 2010

1        THE REPORTER:  -- 4.
2        MR. CONANT:  -- 4.
3        I got it.
4        All right.  Mr. Montgomery, I've handed you
5  what's marked as Plaintiff's Exhibit No. 4.  This is
6  Dennis Montgomery's Responses to Plaintiff's
7  Requests for Production of Documents, Set Two.
8        (Exhibit 4 was marked for identification.)
9  BY MR. CONANT:
10      Q.  Turn with me to what's identified as page 3
11  on the bottom of -- on the bottom of page 3,
12  Response to -- I'm reading, "Response to Request for
13  Production No. 1."
14      Your response, Mr. Montgomery, if you read
15  with me beginning on line 20 says, "Subject to and
16  without waiving the foregoing objections, Defendant
17  responds as follows:  After diligent search and
18  reasonable inquiry, the source codes are not in the
19  possession, custody or control of the Defendant.
20      "Defendant believes the source codes may be
21  in the possession, custody or control of the
22  United States Government."
23      Do you see that, Mr. Montgomery?
24      A.  Yes.
25      Q.  Is that a truthful statement,

Page 61

1  Mr. Montgomery?
2      A.  Well, there's several statements there.
3  Which one?
4        MR. CROCKETT:  I'll object.  Compound.
5  BY MR. CONANT:
6      Q.  The source codes are in the possession of
7  the government.
8      A.  I turned 12 drives over to the Liner law
9  firm as part of the discovery order that was issued
10  by Judge Cook.  I believe it was in June of '09.
11      No, excuse me, May of '09.  May of '0- --
12  yes, May of '09, prior to my bankruptcy filing.
13      Q.  Mr. Montgomery, is your testimony that
14  these source codes, which you've identified as worth
15  $500 million, are no longer in your possession?
16        MR. CROCKETT:  Sir, if you're referring to
17  a document or a statement that he's made --
18        THE WITNESS:  I don't --
19        MR. CROCKETT:  -- I'll object.  Assumes
20  facts not in evidence.  Lacks foundation.  Vague.
21  Ambiguous.  And if you'd read it back, I think it's
22  confusing too, but let's read it back.
23        MR. FLYNN:  What is your --
24        MR. CONANT:  As long as he's talking, she
25  can't read the question back, because she's required

Page 62

1  to take down every word that's said in this room,
2  Mr. Conant.
3        THE REPORTER:  That I can hear.
4        MR. CROCKETT:  That you can hear.  Well --
5  BY MR. CONANT:
6      Q.  Mr. Montgomery, what is your evaluation --
7        MR. CROCKETT:  Are you withdrawing the
8  prior question?
9        MR. CONANT:  I'm continuing on with the
10  deposition.
11      Q.  Mr. Montgomery, what is your evaluation of
12  these source codes that you refer to here in
13  Response to Request for Production No. 1?
14        MR. CROCKETT:  Well, the question lacks
15  foundation.  It's vague.  It's ambiguous.  It may be
16  compound.
17      Can you answer it as it's phrased or should
18  he rephrase it?
19        THE WITNESS:  I don't understand what
20  you're asking me.
21  BY MR. CONANT:
22      Q.  Mr. Montgomery, these source codes that are
23  referred to in these requests for production of
24  documents, these are included within the
25  intellectual property you identify in your

Page 63

1  bankruptcy schedules, are they not?
2      A.  I don't understand that question.
3      Q.  The source codes --
4        MR. FLYNN:  Start here where he says --
5        MR. CONANT:  All right.
6      Q.  All right.  We're going to withdraw the
7  prior line of questioning.  We'll go back to Exhibit
8  No. 3.
9        MR. FLYNN:  Read it into record.
10  BY MR. CONANT:
11      Q.  All right.  Mr. Montgomery, turn to page
12  No. 5 of this document.  I'm looking at the
13  beginning of paragraph No. 8 or labeled as paragraph
14  No. 8.
15      Do you see that, Mr. Montgomery, begins
16  with, "In September 2005"?
17      A.  I see the paragraph.
18      Q.  Okay.  I'm going to read into the record
19  the first sentence of that paragraph.
20      "In September 2005 Trepp told me that the
21  government had appropriated $100 million for the
22  coding technology but he was demanding
23  $500,000,000."
24      Do you see that sentence, Mr. Montgomery?
25      A.  The quote by Trepp?

Page 64

16  (Pages 61 to 64)

Dennis Lee Montgomery  -  November 18, 2010

1       MR. CROCKETT:  It's a yes-or-no question.
2  BY MR. CONANT:
3      Q.    The whole sentence that I just read, the
4  whole first sentence of paragraph No. 8,
5  Mr. Montgomery.
6      A.    I see it.
7      Q.    Was that a truthful statement when you made
8  that, Mr. Montgomery?
9       MR. CROCKETT:  So we're clear, are you
10  asking is it truthful that Trepp told him that?
11      MR. CONANT:  I'm asking is the sentence
12  true.
13      MR. CROCKETT:  That in September 2005 Trepp
14  told him the following information?
15      MR. CONANT:  Yes.
16      THE WITNESS:  It's on the declaration.
17      MR. FLYNN:  Where is the decoding
18  technology.
19  BY MR. CONANT:
20      Q.    Where is the decoding technology,
21  Mr. Montgomery?
22      A.    Is this Mr. Flynn asking me or you?
23      Q.    I'm asking you.  There's a question
24  pending.
25          Where is the decoding technology that you

                                            Page 65

1  reference in the sentence that I just read?
2       MR. CROCKETT:  If you know.
3       THE WITNESS:  I don't recall.
4       MR. FLYNN:  Do you have possession of it
5  now.
6  BY MR. CONANT:
7      Q.    Do you have possession of this technology
8  now, Mr. Montgomery?
9      A.    What technology?
10      Q.    The decoding technology referenced in the
11  sentence I just read.
12      A.    That was used in what time frame?
13      MR. CROCKETT:  I'm going to object to the
14  entire line of questioning, because this is all
15  based on decoding technology as described by Warren
16  Trepp in this declaration and perhaps you should ask
17  Mr. Trepp what he meant and get that on the record
18  so we can then have his --
19      MR. FLYNN:  That's false.  The decoding
20  technology was referenced earlier by him.
21      MR. CROCKETT:  If he's Geppetto, what does
22  that make you?
23      MR. FLYNN:  Statement.
24      MR. CONANT:  The document speaks for
25  itself.

                                            Page 66

1       MR. CROCKETT:  Yes, it does.
2       MR. CONANT:  Are you testifying,
3  Mr. Crockett, or is your client testifying?
4       MR. CROCKETT:  Is he asking questions or
5  are you?
6       MR. CONANT:  It doesn't matter,
7  Mr. Crockett.  It frankly doesn't matter.  I don't
8  understand.
9          If you want to get into this whole --
10      MR. FLYNN:  Just ignore him.
11      Do you have any source code technology in
12  your possession as described in your bankruptcy
13  schedule.
14      MR. CONANT:  Let's take a -- we're going to
15  take a brief recess and go off the record here.
16      THE VIDEOGRAPHER:  Going off the record.
17  The time is 10:23 a.m.
18      (Recess taken.)
19      THE VIDEOGRAPHER:  The time is 10:29 a.m.
20  We're back on the record.
21      MR. FLYNN:  Truth always triumphs.
22      THE WITNESS:  Ha ha, from you.
23      MR. FLYNN:  Just depends on the body count
24  to get there.
25  ///

                                            Page 67

1  BY MR. CONANT:
2      Q.    All right.  Mr. Montgomery --
3          We're back on the record, Stephanie?
4          Thank you.
5          Turn with me to Plaintiff's Exhibit No. 3,
6  if you would, page No. 2 and, just to be clear,
7  there's -- going forward on this deposition if
8  there's a document with a page number at the bottom,
9  when I refer to the page number I'm referring to the
10  actual number identified at the bottom of the page.
11      Do you understand, Mr. Montgomery?
12      A.    Yes.  Yes.
13      Q.    Great.
14      Look with me, page No. 2 right between
15  lines 18 and 19.
16      MR. FLYNN:  20, read it.
17  BY MR. CONANT:
18      Q.    I'm going to read here this paragraph that
19  starts, "Multiple software programs developed,
20  owned, possessed and used exclusively by me derived
21  from my 'ODS' between 1984 and December 31, 2002,
22  some of the source codes for which are direct
23  derivative of my copyrights and which, beginning in
24  November 2002, I began to adapt to military
25  applications on behalf of the Department of Defense,

                                            Page 68

                        17 (Pages 65 to 68)

Dennis Lee Montgomery  -  November 18, 2010

1  the Navy, the Air Force and" redacted, "mostly
2  utilized in the war on terror between March 2003 and
3  the present."
4      MR. FLYNN:  Is that a truthful statement?
5  BY MR. CONANT:
6      Q.  Is that a truthful statement,
7  Mr. Montgomery?
8      MR. CROCKETT:  I'm going to object to the
9  question, because it's compound because there are
10  multiple statements in there.
11      So are you asking him the entirety or you
12  want to break it down?
13      MR. FLYNN:  Any part.
14  BY MR. CONANT:
15      Q.  Is there any part of what I just read
16  that's not true, Mr. Montgomery?
17      A.  Is there any part that's not true?
18      Which -- is there any -- it's like a double
19  negative you're asking me.
20      MR. CROCKETT:  Yeah.
21  BY MR. CONANT:
22      Q.  Is there anything -- is there anything
23  that's not true in there, Mr. Montgomery?
24      You wrote that, I want to know --
25      A.  Actually, Mr. Flynn wrote it; I didn't.

Page 69

1  BY MR. CONANT:
2      Q.  Mr. Montgomery, is any part of that
3  statement untrue which I just read into the record?
4      MR. CROCKETT:  Well, I'll object.
5      THE WITNESS:  I don't know what's redacted.
6  Maybe if you tell me what's redacted I could tell
7  you.
8  BY MR. CONANT:
9      Q.  What I read, is there anything in here
10  that's not true, Mr. Montgomery?
11      A.  Is there anything in here that's not true?
12      MR. CROCKETT:  Are you asking as of today?
13  As of the date it was signed?  What?  It's vague as
14  to time.  It's also compound and I object on that
15  basis.
16  BY MR. CONANT:
17      Q.  When Mr. Montgomery signed this under
18  penalty of perjury --
19      A.  You mean the document that Mr. Flynn wrote.
20      MR. CROCKETT:  Just listen to the question.
21  BY MR. CONANT:
22      Q.  Mr. Montgomery, when you signed that
23  document under penalty of perjury, is there anything
24  in that statement that is untrue?
25      A.  I'm not certain.

Page 71

1      Q.  You signed it.
2      A.  Mr. Flynn wrote it.  Mr. Flynn wrote all of
3  this.  Let's make it clear.
4      Q.  You signed it.
5      A.  Mr. Flynn wrote this.
6      MR. FLYNN:  Just say is any part of it
7  untrue.
8      THE WITNESS:  Mr. Flynn, you wrote it as my
9  attorney.  Did you or did you not write it?
10      He's here.  Let's just --
11  BY MR. CONANT:
12      Q.  He's not --
13      A.  But he has no problem asking questions,
14  have him answer it.  Did you write this?  Did you
15  write this?
16      MR. FLYNN:  Next question.
17      THE WITNESS:  Yeah.
18  BY MR. CONANT:
19      Q.  This is a deposition of you,
20  Mr. Montgomery.  The questions are being asked of
21  you, not of anybody else in here.
22      MR. FLYNN:  Is any part of that untrue --
23      THE WITNESS:  Are you asking the question
24  or your attorney?
25  ///

Page 70

1      MR. FLYNN:  Just read the entire thing.
2  BY MR. CONANT:
3      Q.  All right.  Turn with me to page No. 4,
4  line 16, Mr. Montgomery, and we're again on
5  Plaintiff's Exhibit No. 3.
6      I'm going to start reading from the first
7  full paragraph of line 16, "No person at eTreppid is
8  able" --
9      A.  Oh, wait, I'm sorry.  Page 4?
10      Q.  Correct.
11      A.  I'm sorry, go ahead.
12      Q.  "No person at eTreppid is able, to my
13  knowledge, to create the source codes that I have
14  created having multiple applications in the war on
15  terror and other military uses.
16      "Conclusive proof on this issue is
17  established by the recent interception of the
18  attempts by terrorists operating out of London to
19  blow up jetliners originating in London and bound
20  for the U.S.
21      "I gave the appropriate authorities within
22  the U.S. Government accurate and very specific
23  intelligence regarding this terrorist plot from 'my
24  decoding software,' as I had done in the past, weeks
25  prior to the arrest by the London authorities --

Page 72

18 (Pages 69 to 72)

Dennis Lee Montgomery  -  November 18, 2010

```
 1  without compensation."
 2       I'm going to continue on to paragraph 7.
 3  "Neither Warren Trepp nor eTreppid Technologies nor
 4  any person working there have ever owned, possessed
 5  or processed 'output' from my source codes using the
 6  special government contracts.
 7       "Other eTreppid individuals, as well as
 8  government officials identified herein, had access
 9  to the output only after I had processed it."
10       Moving on to the following paragraph, "In
11  September 2005, Trepp told me that the government
12  had appropriated $100 million for the 'decoding
13  technology' but he was demanding $500 million."
14       MR. FLYNN:  Is any part of that untrue?
15  BY MR. CONANT:
16    Q.  Mr. Montgomery, is any part of what I read,
17  from page 4 starting at line 16 and continuing on to
18  page 5 ending on line 4 and a half, untrue?
19       MR. CROCKETT:  I'll object to the question
20  as assuming facts not in evidence.  It's also
21  argumentative.
22       You've taken statements out of context.
23  You're taking partial statements from a declaration
24  he signed under penalty of perjury and you haven't
25  established the appropriate foundation to do that.
```

Page 73

```
 1       In addition to which the document that is
 2  in front of him is redacted by someone other than us
 3  and I believe, based on his prior testimony, he's
 4  not certain of the statements that have been
 5  redacted and therefore presents a difficult problem
 6  for him to try to answer the question as you phrased
 7  it.
 8       You want to try to rephrase it?
 9       MR. CONANT:  No.  Mr. Crockett, for the
10  record, none of what I just read was redacted from
11  the document.
12       No. 2, I'll remind you your client is
13  testifying, not you.  You're coaching the witness
14  and you're obstructing his testimony, for the
15  record.
16       MR. CROCKETT:  For the record, that's --
17  you've made your statement.
18       THE WITNESS:  I don't know.  What's the
19  question?
20       MR. FLYNN:  Is any part of it untrue.
21       THE WITNESS:  Is he asking it or you?
22       MR. CROCKETT:  For the record, who's asking
23  the questions, Counsel?
24       THE WITNESS:  There's two people asking
25  questions.
```

Page 74

```
 1       MR. CROCKETT:  Which one should we listen
 2  to?
 3  BY MR. CONANT:
 4    Q.  Mr. Montgomery, is any part of that
 5  statement untrue?
 6       MR. CROCKETT:  Any part of what statement,
 7  Counsel?
 8       THE WITNESS:  Which one?
 9       MR. CONANT:  Again, Mr. Crockett --
10       (Simultaneous colloquy.)
11       THE REPORTER:  One at a time, please.
12       MR. CONANT:  For the record, Mr. Montgomery
13  and Mr. Crockett have felt it necessary to raise
14  their voices during this exchange for whatever
15  reason.
16       Now there's a question pending here.  Was
17  any of the statement, which I've identified as
18  beginning on page 4, line 16, continuing to page 5,
19  line 4 and a half, is any of that untrue,
20  Mr. Montgomery?
21       MR. CROCKETT:  The question is vague.  It's
22  ambiguous.
23       MR. CONANT:  You've already objected.
24  Thank you, Mr. Crockett.
25       MR. CROCKETT:  You've interrupted me again
```

Page 75

```
 1  and the next time we'll adjourn the depo, if you
 2  like, and go take this to a judge.  I'd be glad to
 3  put this record in front of a judge and let the
 4  judge decide whether or not what you're doing here
 5  is appropriate.
 6       MR. CONANT:  Very good.
 7       MR. CROCKETT:  Now if you'd like to let me
 8  finish my objection, I will, and if you want to cut
 9  me off, just say so.
10       MR. FLYNN:  Get an answer.
11  BY MR. CONANT:
12    Q.  I want an answer.
13    A.  Is he asking the question or are you?
14       MR. CROCKETT:  Can you read the question
15  back that he's supposed to be answering, please.
16       THE WITNESS:  Yeah.
17       MR. CONANT:  I'll just read it again.
18    Q.  Mr. Montgomery --
19    A.  Starting on what page?
20       Starting on what page?  Bottom of page 4?
21       MR. CROCKETT:  He said he's going to ask
22  the question again.
23  BY MR. CONANT:
24    Q.  Mr. Montgomery, is any part of your
25  statements on page 4, beginning at line 16, and
```

Page 76

19 (Pages 73 to 76)

Dennis Lee Montgomery  -  November 18, 2010

1  continuing to page 5, line 4 and a half, untrue?
2      MR. CROCKETT:  Sorry, the reference again?
3  Page what to what?
4      MR. CONANT:  We're looking, again, at
5  Plaintiff's Exhibit No. 3.
6      MR. CROCKETT:  I understand the exhibit.  I
7  want to make sure I've got the right --
8      MR. CONANT:  For I think the sixth time now
9  I'll identify the statement made by Mr. Montgomery
10  beginning on page 4, line 16, and going on to page
11  5, line 4 and a half.
12      THE WITNESS:  Well, the statement was made
13  by Mr. Flynn.  I signed the declaration.  This was
14  written by Mr. Flynn.  We got it?
15      MR. CROCKETT:  Just --
16      THE WITNESS:  I don't recall.
17      MR. CROCKETT:  The sentence that starts at
18  page 4, line 16, and you want it ended at
19  paragraph 8 on page 5 at line 7: is that right,
20  Counsel?
21      MR. CONANT:  It's on the record the lines
22  that I want him to identify.
23      THE WITNESS:  Yeah, I don't recall.
24  BY MR. CONANT:
25      Q.   You don't recall if it's true or not,

Page 77

1      Q.   What are those source codes that you have
2  created that you're referring to right there?
3      A.   I don't recall specifically.
4      Q.   You don't recall what those source codes
5  are, Mr. Montgomery?
6      A.   Be specific.
7      Q.   Have you created source codes for use by
8  the U.S. Government, Mr. Montgomery?
9      A.   Yes.
10      Q.   Can you describe the source codes that
11  you've created for use by the U.S. Government?
12      A.   During what time frame?
13      MR. FLYNN:  Any time.
14  BY MR. CONANT:
15      Q.   Any time frame.
16      A.   I would have to violate the U.S. protective
17  order to do that.
18      Q.   Mr. Montgomery, according to the U.S.
19  protective order, only the U.S. Government has the
20  right to --
21      A.   Okay, I'm sorry.
22      Q.   -- to invoke protection under the
23  protective order.
24      A.   But if I don't tell the Government I'm
25  going to violate the protective order then I would

Page 79

1  Mr. Montgomery?
2      MR. CROCKETT:  That's argumentative.  Don't
3  answer.
4  BY MR. CONANT:
5      Q.   Mr. Montgomery -- okay.  Let's narrow down
6  the details here.  Did you provide conclusive proof
7  that -- I'm sorry.  Let me back up.
8      Did you provide the U.S. Government with
9  information -- with information concerning attempts
10  by terrorists to blow up jetliners?
11      MR. CROCKETT:  At any point in time?
12  BY MR. CONANT:
13      Q.   With respect to reference to the statement.
14      A.   I don't recall if I did.
15      Q.   The statement where it says, "No person at
16  eTreppid is able, to my knowledge, to create the
17  source codes that I have created," what are these
18  source codes that you have created, Mr. Montgomery?
19      Can you please describe those.
20      A.   In regard to what?  ODS?
21      Q.   Mr. Montgomery, I'm asking -- I'm reading
22  beginning on page 4, line 16, first full sentence
23  beginning on line 16, "No person at eTreppid is
24  able, to my knowledge, to create the source codes
25  that I have created."

Page 78

1  violate it, wouldn't I?
2      Q.   I would want you to answer the question.
3      A.   I just --
4      Q.   Continue with your answer.
5      A.   I've answered it.
6      Q.   Mr. Montgomery, for the record, the
7  protective order --
8      MR. FLYNN:  Don't go there.
9      MR. CONANT:  All right.
10      MR. FLYNN:  Ask him if he gave --
11      MR. CONANT:  Let me --
12      MR. FLYNN:  -- very specific intelligence
13  regarding decoding -- did he give that information.
14  Did he give that information.
15  BY MR. CONANT:
16      Q.   Read with me, Mr. Montgomery, on page 4,
17  line 21, beginning with the first full sentence.
18      MR. FLYNN:  This the Cheney office.
19  BY MR. CONANT:
20      Q.   "I gave the appropriate authorities within
21  the U.S. Government accurate and very specific
22  intelligence regarding this terrorist plot from my
23  decoding software, as I have done in the past, weeks
24  prior to the arrests by the London authorities --
25  without compensation."

Page 80

20  (Pages 77 to 80)

Dennis Lee Montgomery   -   November 18, 2010

1       MR. FLYNN:  Did you do that.
2  BY MR. CONANT:
3       Q.   Did you give -- did you give the U.S.
4  Government this -- this very specific intelligence
5  that you're referring to here?
6       A.   I'm going to assert my right under the
7  Fifth Amendment.
8       Q.   Isn't it true, Mr. Montgomery, that this,
9  quote, unquote, "decoding software" that you
10 reference on line 22 is just a complete fraud?
11       MR. CROCKETT:  Hold it.
12       Go ahead.
13       THE WITNESS:  I'm going to assert my right
14 under the Fifth Amendment.
15       I couldn't hear Mr. Flynn's question.
16       MR. CONANT:  That's fine.  I'll repeat it.
17       THE WITNESS:  Okay.
18  BY MR. CONANT:
19       Q.   Beginning on line 21, going to line 24 and
20 a half where you reference this very specific
21 intelligence regarding the terrorist plot that you
22 got from your decoding software regarding these
23 arrests in London, isn't that the same information
24 you and Edra Blixseth provided to a person within
25 Dick Cheney's office?

Page 81

1       I'll object and instruct him not to answer.
2       MR. FLYNN:  Did you give him a CD with the
3  alleged terrorist plots.
4  BY MR. CONANT:
5       Q.   Did you give anyone in Dick Cheney's office
6  a CD regarding alleged terrorist plots?
7       THE WITNESS:  I don't recall.
8       MR. FLYNN:  Did you give it to Tim Blixseth
9  instead?  Did you give the CD to Tim Blixseth?
10  BY MR. CONANT:
11       Q.   Did you give the CD to Tim Blixseth?
12       A.   Is this Mr. Blixseth and you are both
13 Mr. Blixseth's attorneys?  Is this a Blixseth
14 question or a Flynn question?
15       Q.   I'm asking the questions, Mr. Montgomery.
16       A.   Yeah.
17       MR. CROCKETT:  Let's let him get it out on
18 the record.
19       Go ahead.
20  BY MR. CONANT:
21       Q.   Have you given any information about
22 terrorist plots to Tim Blixseth, Mr. Montgomery?
23       MR. CROCKETT:  At any point in time.
24       THE WITNESS:  I don't recall.
25  ///

Page 83

1       MR. CROCKETT:  I'll object to the question.
2  It lacks foundation.  It assumes facts not in
3  evidence.  It may be argumentative, I'm not sure.  I
4  don't know enough about the question.
5       Can you answer it the way it's phrased?
6       THE WITNESS:  No.
7       I don't understand what you're asking me.
8  BY MR. CONANT:
9       Q.   Did you provide -- have you ever talked to
10 anyone within Dick Cheney's office regarding --
11 regarding your decoding software?
12       A.   I went to their office.  I don't recall
13 that specifically.
14       Q.   Can you explain to me what your visit to
15 Dick Cheney's office was about?
16       A.   No.
17       Q.   Why can you not explain it?
18       A.   I can't recall.
19       MR. FLYNN:  Did you give him a CD.
20  BY MR. CONANT:
21       Q.   You mean to tell me that you met with
22 someone in the vice president's office and you can't
23 recall what it was about, Mr. Montgomery?
24       MR. CROCKETT:  Don't answer that question.
25 It's argumentative.

Page 82

1  BY MR. CONANT:
2       Q.   You don't recall if you have or not?
3       A.   That's correct.  That's my answer.
4       Q.   So you've got -- I'm reading this
5  declaration of yours, Mr. Montgomery --
6       A.   The one that Mr. Flynn wrote.
7       Q.   -- you're referencing all this source code.
8       What is the source code all about?  Can you
9  tell me about it?
10       A.   I don't recall specifically.
11       Q.   You don't recall what all this source code
12 is about concerning terrorist attacks?
13       MR. CROCKETT:  Question is argumentative.
14 I'll object.
15       THE WITNESS:  Ever?
16  BY MR. CONANT:
17       Q.   Yes.
18       A.   Ever.  Violates the United States
19 protective order.
20       MR. CONANT:  Ms. Wells, is there anything
21 in my question that would violate the U.S.
22 protective order?
23       MS. WELLS:  Can you please read the
24 question to me.
25  ///

Page 84

21 (Pages 81 to 84)

Dennis Lee Montgomery  -  November 18, 2010

BY MR. CONANT:
1   BY MR. CONANT:
2      Q.   Mr. Montgomery, the source code --
3         MR. CROCKETT:   You're withdrawing the prior
4   question?
5         MR. CONANT:   I'm rephrasing it.
6      Q.   Is there anything -- okay.  Let's back up
7   here and stay with me, if you can, Mr. Montgomery.
8      A.   I'll try.
9      Q.   Okay.  There's lots of references in this
10  declaration about your source code, isn't there?
11     A.   You want me to read the whole thing?
12        MR. CROCKETT:   Document speaks for itself.
13  Next question.
14  BY MR. CONANT:
15     Q.   This is about the source code, isn't it,
16  Mr. Montgomery?
17        MR. CROCKETT:   What's "this"?
18        MR. CONANT:   The document I'm referring to.
19  The document, Plaintiff's Exhibit 3.
20        MR. CROCKETT:   The document speaks for
21  itself and the question is argumentative as well.
22        Don't answer it.
23        Ask another one, Counsel.
24  BY MR. CONANT:
25     Q.   Mr. Montgomery, what is the source code

Page 85

1      A.   Did it exist?
2      Q.   Does it exist?
3         MR. CROCKETT:   He's asking you as of today,
4   if you know.
5         THE WITNESS:   To what time are you
6   referring to?
7   BY MR. CONANT:
8      Q.   Does it exist?
9         MR. CROCKETT:   That would be as of today:
10  correct, Counsel?
11        MR. FLYNN:   As referenced in your
12  schedules.
13  BY MR. CONANT:
14     Q.   Yes, today.
15     A.   I don't recall.
16     Q.   You don't recall --
17     A.   You just asked me the question.  I answered
18  it.
19     Q.   Did it ever exist, Mr. Montgomery?
20     A.   It could have.
21        MR. FLYNN:   Is it referenced --
22  BY MR. CONANT:
23     Q.   Is this decoding software referenced in
24  your bankruptcy schedule, Mr. Montgomery?
25     A.   Is the decoding -- I don't know.

Page 87

1   that you refer to throughout this declaration?
2      A.   I would have to read it again.
3      Q.   I just want -- we've read what we already
4   read.
5      A.   You've read 10 lines out of 30 pages.
6      Q.   Is there not -- have we not read
7   representations by you about software --
8         MR. CROCKETT:   Who's raising their voice
9   now, Counsel.
10  BY MR. CONANT:
11     Q.   Is there not --
12        MR. FLYNN:   Decoding software.  Is there
13  any decoding software.
14  BY MR. CONANT:
15     Q.   Mr. Montgomery, let's look at line 22,
16  page 4.
17     A.   I'm there.
18     Q.   All right.  Look at the phrase "decoding
19  software" in quotes.
20     A.   I see it.
21     Q.   Was there any such decoding software?
22     A.   Ever?
23     Q.   Yes.
24     A.   Yes.
25     Q.   Does it exist?

Page 86

1      Q.   What -- what intellectual property is
2   referenced in your bankruptcy schedules?
3      A.   Which exhibit would that be Mr. --
4      Q.   Let's go back to Exhibit No. 1.
5      A.   Okay.
6      Q.   I believe we're back to page 22-9.
7      A.   22-9.  Okay.
8      Q.   All right.  Bottom paragraph that you read
9   previously, "In addition, Dennis Montgomery is the
10  holder of certain intellectual property rights."
11        What is that?  What are those intellectual
12  property rights, Mr. Montgomery?
13     A.   I have to ask a question, because I'm not
14  certain of something.
15        MR. CROCKETT:   Well, on that ground I'll
16  object to the question.  It's vague and ambiguous
17  and assumes facts not in evidence and ask you to
18  rephrase.
19        MR. FLYNN:   What rights you're referring to
20  in your schedule.
21        MR. CONANT:   Yeah.
22     Q.   Mr. Montgomery, describe all intellectual
23  property rights that you're referring to here in
24  your bankruptcy schedule.
25     A.   That's his question or yours?

Page 88

Dennis Lee Montgomery  -  November 18, 2010

Page 89

```
 1      Q.   It's a question to you, Mr. Montgomery.
 2      A.   He's the one that said it.
 3      Q.   Fine.
 4      A.   I'm just wondering how long you're going to
 5   parrot what he keeps saying.
 6      Q.   As long as I need to.
 7      A.   I got it.
 8      What -- okay.  So I'm sorry, again, what
 9   was -- ask it again, please.
10      Q.   What is this intellectual property that you
11   reference here in your bankruptcy schedule?
12      A.   Okay.  You're referring to the paragraph on
13   the bottom of this document.  Is that what you're
14   referring to?
15      Q.   Correct.
16      A.   Okay.  I would like to ask you a question,
17   because I'm not certain of something.  So I don't
18   remember specifically that paragraph on the bottom
19   of the original document that I filed.  I'm not
20   saying it's not, but I'm not certain.
21      Q.   All right.
22      A.   So if somebody has my original or whatever,
23   I'd like to see it.
24      Q.   What do you mean by --
25      A.   I mean I don't remember that specifically,
```

Page 90

```
 1   me putting this on there.  Okay.  That's what I'm
 2   saying.  I'm not saying it wasn't on there, I'm not
 3   saying it wasn't put on there, but I don't remember
 4   specifically me putting that on there.
 5      Q.   All right.  Would it make sense -- I mean
 6   do you have intellectual property, though, that is
 7   subject to the National Security Act of 1947?
 8      MR. CROCKETT:  It's a yes-or-no question.
 9      THE WITNESS:  I'm not certain.
10      MR. FLYNN:  Mark this next exhibit.
11      MR. CONANT:  All right.
12      MR. FLYNN:  Mark it.  Copy for
13   Mr. Crockett.
14      MR. CONANT:  We're going to mark what's
15   going to be identified as Plaintiff's Exhibit No. 5,
16   which is the Second Declaration of SA Michael A.
17   West.
18          (Exhibit 5 was marked for identification.)
19      MR. CONANT:  Do you have a copy for me?
20      MR. FLYNN:  Yeah.
21      Read this entire paragraph into the record.
22      MR. CONANT:  6?
23      MR. FLYNN:  Yeah, read the entire paragraph
24   into the record.  Read it.
25      MR. CROCKETT:  Yeah, yeah, yeah.
```

Page 91

```
 1      THE WITNESS:  Okay.
 2      MR. FLYNN:  All right.  Terrorist regarding
 3   Al-Jazeera, ask him.  Ask him if he said -- ask him
 4   about the noise.
 5   BY MR. CONANT:
 6      Q.   All right.  Mr. Montgomery -- well, let me
 7   back up.
 8      I'll represent this is -- Plaintiff's
 9   Exhibit 5 is the Second Declaration of SA Michael A.
10   West.  I understand SA to refer to Special Agent
11   Michael West.  This was a document filed in Case
12   No. -06-263 [sic] in the United States District
13   Court for the District of Nevada, Docket No. 76-2.
14      Mr. Montgomery, turn with me to page 2,
15   paragraph 6, and read along.  "On August 10,
16   2006" --
17      A.   No. 2, I'm sorry.
18      MR. CROCKETT:  Page 2, paragraph 6.
19      THE WITNESS:  Okay.
20   BY MR. CONANT:
21      Q.   "On August 10, 2006, I received a telephone
22   call from Special Agent Gabriel Gunderson of the
23   Seattle FBI office who advised me that his office
24   received information from Azimyth, a company located
25   in Bellevue, Washington, which had discovered
```

Page 92

```
 1   terrorist threat-related information.
 2      "Special Agent Gunderson related that
 3   Michael Sandoval, chief executive officer of
 4   Azimyth, had contacted a retired Central
 5   Intelligence Agency former chief of station residing
 6   in Washington and offered to provide the U.S.
 7   Government terrorist threat-related information.
 8      "Special Agent Gunderson further related
 9   that Dennis L. Montgomery was the Azimyth employee
10   who located the information.  Special Agent
11   Gunderson advised me in a subsequent conversation
12   that Mr. Montgomery had reported that he located
13   increased noise in recent Al-Jazeera video
14   transmissions."
15      Do you see that sentence?
16      MR. CROCKETT:  Which sentence?  There are
17   multiple sentences there.
18      MR. CONANT:  I'm sorry.
19      Q.   Did you read that paragraph,
20   Mr. Montgomery?
21      A.   I listened when you read it.
22      Q.   Okay.  Is it true that you reported that
23   you located increased noise in recent Al-Jazeera
24   video transmissions?
25      A.   You'd have to ask Mr. West.  He signed
```

23 (Pages 89 to 92)

Dennis Lee Montgomery  -  November 18, 2010

Page 93

```
 1  this: I didn't.
 2      Q.   I'm asking you.
 3      A.   Well, I don't recall.
 4      Q.   Have you ever reported to anyone in the
 5  United States Government about things you've heard
 6  or saw in Al-Jazeera video transmissions?
 7          MR. CROCKETT:  That's mischaracterizes
 8  what's in this document.  It's also confusing.  It
 9  also lacks foundation and it's not limited as to
10  time.
11          With all those objections in place, do you
12  understand the question?
13          THE WITNESS:  You mean noise?  Is that what
14  you mean?  I'd have to take the -- it would violate
15  the U.S. protective order.
16  BY MR. CONANT:
17      Q.   Mr. Montgomery --
18          Ms. Wells --
19          MR. FLYNN:  No.
20          MR. CONANT:  I withdraw the question.
21          MR. FLYNN:  Did you provide at any time
22  after --
23          THE WITNESS:  I can't hear him.  Can you
24  speak up, please.
25          MR. CONANT:  I'll repeat the question.
```

Page 94

```
 1          THE WITNESS:  Oh.
 2          MR. FLYNN:  -- any information in the
 3  summer of 2006 through this -- relating to
 4  Al-Jazeera video transmissions.
 5  BY MR. CONANT:
 6      Q.   In the summer of 2006, Mr. Montgomery --
 7      A.   I don't think that's what he just said.
 8      Q.   Thank you.
 9          Mr. Montgomery, in the summer of 2006 did
10  you advise or contact Special Agent Gunderson
11  regarding any information you got from Al-Jazeera
12  video transmissions?
13          MR. FLYNN:  Did he give it to Sandoval.
14          THE WITNESS:  Is that your question or his?
15  I'm confused.  He just asked did I give it to
16  Sandoval and you asked me a question.  I'm confused
17  as to who I'm supposed to be answering.
18  BY MR. CONANT:
19      Q.   My question, Mr. --
20      A.   Okay.  Well, now I forgot it because he
21  asked me one.
22      Q.   Have you provided -- in the summer of 2006
23  did you provide anybody with any information
24  regarding things you were hearing or learning from
25  Al-Jazeera video transmissions?
```

Page 95

```
 1      A.   I believe it said "noise," didn't it?
 2  Noise.
 3          MR. CROCKETT:  I think this is a different
 4  question.
 5  BY MR. CONANT:
 6      Q.   My question, Mr. Montgomery.
 7      A.   I'm sorry.  I thought you were referring to
 8  paragraph 6 again.
 9      Q.   My question, Mr. Montgomery.
10      A.   Okay.
11          MR. CONANT:  Can you read my question back
12  for Mr. Montgomery, Ms. Borthwick.
13          MR. FLYNN:  And then did he claim he was
14  decrypting.
15          THE WITNESS:  Can you please speak up.  I
16  can't hear you, Mr. Flynn.  Speak up.
17          THE REPORTER:  Question, "In the summer of
18  2006 did you provide anybody with any information
19  regarding things you were hearing or learning from
20  Al-Jazeera video transmissions?"
21          THE WITNESS:  What's that, I didn't hear
22  you.  Oh.
23          MR. CONANT:  Ms. Borthwick's question.
24          THE WITNESS:  I'm sorry.
25          I can't recall.
```

Page 96

```
 1          MR. FLYNN:  Did you ever decrypt al-Qaida
 2  from Al-Jazeera video.
 3  BY MR. CONANT:
 4      Q.   Have you ever represented to anyone that
 5  you could decrypt Al-Jazeera video transmissions?
 6      A.   I don't know what the term "decrypt" means.
 7      Q.   Did you ever represent to anyone that there
 8  were messages hidden in Al-Jazeera video
 9  transmissions?
10      A.   What do you mean "messages"?
11      Q.   The common use.
12      A.   No, what's the common use?  I don't
13  understand.
14      Q.   Messages, Mr. Montgomery.
15          MR. FLYNN:  Or recordings.
16          THE WITNESS:  Is he asking the question or
17  are you?
18  BY MR. CONANT:
19      Q.   Did you represent to anyone that you could
20  identify target coordinates being transmitted in
21  Al-Jazeera?
22      A.   That I, personally, could?  That me could?
23  I don't recall.
24      Q.   All right.  Same question, did you ever
25  represent to anyone that software you had created
```

Dennis Lee Montgomery  -  November 18, 2010

---

1  could find hidden messages within Al-Jazeera video
2  transmissions?
3       MR. CROCKETT:  That's a different question.
4       THE WITNESS:  What do you mean "hidden"?
5       MR. CROCKETT:  We were talking about target
6  coordinates before.  We're back to messages?
7       MR. CONANT:  The question.  The question I
8  just asked.
9       MR. CROCKETT:  I'm just --
10      MR. CONANT:  Mr. Crockett, you are
11  interfering with Mr. Montgomery's testimony.
12      MR. CROCKETT:  No, I'm not.  I'm doing my
13  job, Mr. Conant, and if you don't understand that
14  I'm sorry.  I get to listen to your question, I get
15  to object and I get to finish my objection.
16      If you read the question back, please, I'll
17  file my objections.
18      THE WITNESS:  You want to -- I can't hear,
19  because you're talking too loud, Mr. Flynn.  Please
20  stop.  I can't hear what's going on.  You're
21  interfering with my right -- ability to give an
22  accurate deposition and to do a deposition.
23      Please stop doing what you're doing.  I
24  don't like it.
25      MR. CONANT:  Ms. Borthwick, can you --

Page 97

---

1       MR. FLYNN:  We're going to get to the
2  truth, Mr. Montgomery.
3       THE WITNESS:  Unfortunately, your warped
4  perception of the truth to benefit your client,
5  Mr. Tim Blixseth, and violating my attorney-client
6  privileges to do it is outrageous.  That's what's
7  outrageous.
8       MR. CROCKETT:  May we have the question
9  back please, Ms. Reporter.
10      THE WITNESS:  You're a real piece of work.
11      MR. CROCKETT:  Easy.
12      MR. FLYNN:  Target coordinates.
13      THE WITNESS:  I can't -- speak up if you're
14  going to talk.
15      I can't hear him.
16      MR. CROCKETT:  Mr. Flynn, every time --
17      And, Ms. Reporter, I would like you,
18  please, to record as much of Mr. Flynn as you can
19  hear.
20      But, Mr. Flynn, every time you speak she
21  has to stop and start taking down what you're
22  saying.  I'd asked for the question to be read back.
23  Can we have that happen, please.
24      MR. CONANT:  Ms. Borthwick, can you read
25  back my most recent question to Mr. Montgomery.

Page 98

---

1       THE REPORTER:  Question, "All right.  Same
2  question, did you ever represent to anyone that
3  software you had created could find hidden messages
4  within Al-Jazeera video transmissions?"
5       MR. CROCKETT:  I'll object to the question
6  on the grounds it assumes facts not in evidence,
7  that it is vague and ambiguous as to the use of the
8  term "messages" in the context of the question.
9       In addition, it is not in the record and
10  there's no evidence providing a foundation as to
11  what you mean by "Al-Jazeera broadcasts."
12  BY MR. CONANT:
13      Q.  Can you answer the question?
14      A.  I'm confused.  No, I'm confused.
15  "Messages," I don't understand what you mean.
16      Q.  What do you understand a message to be,
17  Mr. Montgomery?
18      A.  You tell me.  I'm confused.
19      Q.  Do you understand the English language,
20  Mr. Montgomery?
21      MR. CROCKETT:  It's argumentative.
22  Don't answer.
23      MR. CONANT:  I'm asking him a question.
24      THE WITNESS:  I can't hear him talk,
25  Mr. Flynn, when you keep interrupting and going over

Page 99

---

1  his voice.  Please stop it.
2       MR. FLYNN:  The record speaks for itself.
3       THE WITNESS:  I know it does, but I can't
4  hear him when you keep talking to him.
5       What's the question?
6       MR. FLYNN:  Decoding coordinates.
7       THE WITNESS:  I can't hear, Mr. Flynn,
8  when --
9       Go ahead.
10  BY MR. CONANT:
11      Q.  Do you understand the English language,
12  Mr. Montgomery?
13      A.  Yes.
14      Q.  What do you understand the word "message"
15  to mean within the English language?
16      A.  It could mean anything.
17      MR. CROCKETT:  As a noun or a verb?
18  BY MR. CONANT:
19      Q.  So you don't understand.
20      A.  It could mean anything.
21      Q.  That's what I'm asking.
22      A.  I got a message in a bottle.  That could be
23  a message.  I got a message from my wife, a text
24  message.  I got an email.  That could be a message.
25      Q.  Some form of communication then,

Page 100

---

25  (Pages 97 to 100)

Dennis Lee Montgomery   -   November 18, 2010

---

1  Mr. Montgomery?
2      A.   Some form of communi -- it could be, yes.
3      Q.   That's what you understand a message to be?
4      A.   No.  That's what you told me it meant.
5      Q.   I'm asking you:  Do you understand the word
6  "message" to mean some form of communication?
7      A.   It could mean that, yes.
8      Q.   Now have you ever told anyone that you had
9  software that could decode messages within
10 Al-Jazeera video transmissions?
11     A.   I'd violate the U.S. protective order in
12 answering that.
13          MR. CONANT:  For the record, Ms. Wells
14 raised no objection --
15          THE WITNESS:  Okay.
16          MR. CONANT:  -- to a violation --
17          THE WITNESS:  Okay.
18          MR. CONANT:  -- with respect to the U.S.
19 protective order.
20     Q.   Mr. Montgomery, have you ever told
21 anyone -- strike that.
22          Have you ever told Edra Blixseth that you
23 had software that could decode target coordinates in
24 communicating with an Al-Jazeera broadcast?
25     A.   I don't recall if I did or not.

Page 101

---

1      Q.   Did you ever -- Mr. Montgomery, did you
2  ever tell Tim Blixseth that you had created software
3  that could decode target coordinates hidden within
4  Al-Jazeera transmissions?
5      A.   I don't recall I did or not.
6           Are you Tim Blixseth's attorney?
7      Q.   Mr. Montgomery, I'm the one asking the
8  questions.
9      A.   I'm just curious.  I'd like to know.
10     Q.   Well, I'm not going to answer that.
11     A.   Okay.
12          I don't recall if I did or not.
13     Q.   All right.  Mr. Montgomery, did you ever
14 tell Michael Sandoval that you had created software
15 that could decode target coordinates hidden within
16 Al-Jazeera transmissions?
17     A.   That's different than the question you just
18 asked me.
19     Q.   That's okay.
20     A.   I don't recall if I did or not.
21     Q.   Did you ever create any software that could
22 detect terrorist communications?
23     A.   I wouldn't know.  What do you mean
24 "terrorist communications"?
25     Q.   Do you know what a terrorist is,

Page 102

---

1  Mr. Montgomery?
2      A.   No.  Why don't you describe it?
3      Q.   I think you described it.
4      A.   No, I just used the word.
5      Q.   Well, when you used the word -- let's look
6  here.
7           What document are we looking at?
8      Q.   Give me a second, please, Mr. Montgomery.
9           All right.  Let's look at page 4, line 19
10 and a half, of Plaintiff's Exhibit No. 3.
11     A.   Got it.
12          Which page?
13     Q.   Page 4.
14     A.   Yeah.
15          Okay.  Which line?
16     Q.   Let's look at line 19 and a half.
17     A.   Okay.
18     Q.   Let's see -- one, two, three, four -- the
19 fifth word over from the left margin I see the word
20 "terrorist."
21          Do you see that, Mr. Montgomery?
22     A.   Yes.
23     Q.   What do you understand the word "terrorist"
24 to mean, Mr. Montgomery?
25          MR. CROCKETT:  In that sentence --

Page 103

---

1          THE WITNESS:  I'm confused.  What do you
2  mean?
3          MR. CROCKETT:  -- or are you speaking
4  generally?  I'll object to the question.  It lacks
5  foundation.  It's vague and ambiguous.  It's not
6  clear what you're referring to.
7  BY MR. CONANT:
8      Q.   All right.  Mr. Montgomery, let's ask it
9  both ways since we're confused.  Generally, what do
10 you understand the word "terrorist" to mean?
11     A.   A bad person.
12     Q.   A bad person?
13          Am I a terrorist, Mr. Montgomery?
14          MR. CROCKETT:  Are you asking him to answer
15 that?
16 BY MR. CONANT:
17     Q.   Yes.
18     A.   No.
19     Q.   Now let's look at -- well, let's look now
20 at line 19 and a half, page 4.
21          MR. FLYNN:  Did you uncover terrorist --
22          THE WITNESS:  I can't hear him, Mr. Flynn,
23 when he --
24          MR. CROCKETT:  Be quiet so she can write
25 down what he said.

Page 104

---

26 (Pages 101 to 104)

Dennis Lee Montgomery   -   November 18, 2010

1      Q.    Now, Mr. Montgomery, can you turn with me
2  to what's going to be marked on my copy as
3  page 3-22 --
4          MR. FLYNN:   On the lower right-hand corner.
5  BY MR. CONANT:
6      Q.    -- on the lower right-hand corner.
7      A.    Okay.
8      Q.    Do you see -- I want to make sure we're on
9  the same page.   It appears we are.
10          Do you see this appears to be,
11  Mr. Montgomery, images of checks written on a
12  Demaratech, LLC, account?
13          Do you see that, Mr. Montgomery?
14      A.    Yes.
15      Q.    Do you see up in the upper left-hand corner
16  Check No. 1520, Mr. Montgomery?
17      A.    Yes.
18      Q.    It says, "Pay to the order of Dennis
19  Montgomery."
20          Do you see that, Mr. Montgomery?
21      A.    Yes.
22      Q.    Is that you, Mr. Montgomery?
23      A.    I believe so.
24      Q.    Do you see that it purports to be a check
25  made out to you in the amount of $12,500?

                                              Page 133

1      A.    Yes.
2      Q.    Did you receive that $12,500 from
3  Demaratech?
4      A.    I'm going to invoke my right under the
5  Fifth Amendment.
6      Q.    Mr. Montgomery, can you explain to me what
7  you did at Demaratech, LLC?
8      A.    I'm going to invoke my right under the
9  Fifth Amendment.
10      Q.    When I deposed Mr. Burgyan, I asked him
11  about the source codes -- or intellectual property
12  listed on your bankruptcy schedules and I asked him
13  if Demaratech was using in its business any of that
14  intellectual property that you listed on your
15  bankruptcy schedules.
16          Now, he said no, but he said something
17  curious.   He said that the -- it was derived.   The
18  software that Demaratech was using was derived from
19  your intellectual property.
20          Does that sound accurate to you,
21  Mr. Montgomery?
22      A.    I'm going to invoke my right under the
23  Fifth Amendment.
24      Q.    In what way is the software that Demaratech
25  is using different than the intellectual property

                                              Page 134

1  you listed on your bankruptcy schedule?
2      A.    I'm going to invoke my right under the
3  Fifth Amendment.
4      Q.    Okay.
5          MR. FLYNN:   Did he get that money for the
6  use of -- that's listed in the bankruptcy schedule.
7  BY MR. CONANT:
8      Q.    Mr. Montgomery, did you receive this
9  $12,500 for using the -- let me strike that.
10          Is this $12,500 that you received some form
11  of compensation for Demaratech using your
12  intellectual property, Mr. Montgomery?
13      A.    I'm going to invoke my right under the
14  Fifth Amendment.
15      Q.    All right.   I'm going to turn now to
16  page 3-29.
17          MR. FLYNN:   Did you say the date of that
18  last check?   Put the date on the record.
19          MR. CONANT:   All right.   For the record,
20  the date of the last check on page dash 3 -- 3-22
21  Check No. 1520 is dated March 3, 2010.
22      Q.    Now if you turn with me, Mr. Montgomery, to
23  page 3-29, if you look on the left-hand column
24  there's a check, Check No. 5038.
25          Do you see that, Mr. Montgomery?

                                              Page 135

1      A.    Yes.
2      Q.    It's made out to Dennis Montgomery.
3          Is that you, Mr. Montgomery?
4      A.    I presume so.
5      Q.    It's made out in the amount of $12,500.
6          Do you see that?
7      A.    Yes.
8      Q.    Did you receive that $12,500?
9      A.    I'm going to invoke my right under the
10  Fifth Amendment.
11      Q.    What did you do with that $12,500?
12      A.    I'm going to invoke my right under the
13  Fifth Amendment.
14      Q.    Isn't that $12,500 money you received
15  compensation for use by Demaratech of the
16  intellectual property you listed on your bankruptcy
17  schedule, Mr. Montgomery?
18      A.    I'm going to invoke my right under the
19  Fifth Amendment.
20      Q.    Mr. Montgomery, are you aware of any
21  efforts by anyone at Demaratech to sell software
22  technology to Israel?
23      A.    I'm going to invoke my right under the
24  Fifth Amendment.
25          MR. CONANT:   I'm going to introduce what's

                                              Page 136

34  (Pages 133 to 136)

Dennis Lee Montgomery  -  November 18, 2010

```
 1  going to be marked as Plaintiff's Exhibit No. 9.
 2          (Exhibit 9 was marked for identification.)
 3          MR. CROCKETT:  Mr. Conant, we don't need to
 4  take a break, but the deponent would like some water
 5  and there doesn't appear to be any more in the room.
 6          MR. CONANT:  There does not appear.
 7          Ms. Wells, you're going to want a copy.
 8          MR. FLYNN:  You're not getting mine,
 9  Mr. Crockett.
10          MR. CROCKETT:  Not asking for it.
11          Mr. Conant, we don't need to take a break,
12  an adjournment, but the deponent would like to have
13  some water and there isn't any more in the room.
14          MR. CONANT:  We can recess.
15          MR. CROCKETT:  Then we'll take a break and
16  we're getting some water.
17          THE REPORTER:  Mr. Montgomery, your --
18  your --
19          THE WITNESS:  I'm sorry.
20          MR. CROCKETT:  Get some water and come on
21  back.
22          MR. CONANT:  Go off the record.
23          THE VIDEOGRAPHER:  Going off the record.
24  The time is 11:43 a.m.
25          (Break in the proceedings.)
                                         Page 137
```

```
 1  Birnbaum who is associated with the government of
 2  Israel.
 3      A.  I'm sorry.  I didn't hear that.  That was
 4  my mistake.  What did you say?
 5      Q.  Simply describing what this document is,
 6  it's an email from Concerned Citizen to Michael
 7  West, who is an FBI agent.
 8          Concerned Citizen -- the Concerned Citizen
 9  email address is the email address of George
10  Birnbaum.
11          MR. CROCKETT:  Do you know the source of
12  this document, counsel?
13          MR. CONANT:  I do.
14          MR. CROCKETT:  What is it?
15          MR. CONANT:  I'm not going to -- I'm not
16  going to state.
17          MR. CROCKETT:  Then any question you ask is
18  going to lack foundation until you can explain where
19  you got this document, which appears to be an email
20  to an FBI agent.
21          MR. CONANT:  We'll continue on.
22          MR. CROCKETT:  We will.
23  BY MR. CONANT:
24      Q.  It says, "Dear Agent West, per my
25  conversation with Tim Blixseth I'm forwarding to you
                                         Page 139
```

```
 1          THE VIDEOGRAPHER:  The time is 11:45 a.m.
 2  We're back on the record.
 3  BY MR. CONANT:
 4      Q.  All right.  Mr. Montgomery, I don't know if
 5  you've had a chance to review Plaintiff's Exhibit 8,
 6  but, if you haven't --
 7      A.  You mean 9.
 8      Q.  I'm sorry, is it Plaintiff's Exhibit 9 now?
 9          Do you know who George Birnbaum is?
10      A.  I don't recall the name specifically.
11      Q.  Have you ever contacted -- have you ever
12  been in contact with anyone associated with the
13  government of Israel to sell software?
14      A.  I'm going to invoke my right under the
15  Fifth Amendment.
16      Q.  Can you please review Plaintiff's Exhibit
17  No. 9.
18      A.  I did.
19      Q.  All right.  Now I'm going to read -- I'm
20  going to represent that this, Plaintiff's Exhibit
21  No. 9, is an email dated June 30, 2010, from an
22  email address from Concerned Citizen to Michael
23  West, who's an FBI agent.
24          I'll represent that the Concerned Citizen
25  email is from a gentleman by the name of George
                                         Page 138
```

```
 1  a brief timeline of the events regarding my contact
 2  with Dennis Montgomery and Demaratech.
 3          "It has been their desire from the first
 4  contact to try and sell their technology to various
 5  institutions within the Israeli government,
 6  including the Mossad and Army Intelligence."
 7          Mr. Montgomery, is this statement in here
 8  regarding -- where it says Dennis Montgomery and
 9  Demaratech, it has been their desire from the first
10  contact to try and sell their technology to various
11  institutions of the Israeli government, including
12  Mossad and Army Intelligence --
13          MR. CROCKETT:  I'm going to object to the
14  question and any other question relating to this
15  document.  It is -- the questions lack foundation.
16  It appears to be argumentative.
17          This may well be a document that you
18  fabricated for purposes of these depositions and
19  unless and until you can identify the source of the
20  document and provide some basis for us to understand
21  that it's legitimate, you might as well go get a
22  book of fairy tales and ask him questions out of
23  those.
24          I'm going to instruct him not to answer.
25          MR. FLYNN:  I'll authenticate it.  It was
                                         Page 140
```

35 (Pages 137 to 140)

Dennis Lee Montgomery   -   November 18, 2010

Page 165

```
 1   authentic communication between you and Edra
 2   Blixseth?
 3       A.   I don't recall.
 4       Q.   You don't recall if you ever had this
 5   communication?
 6           MR. CROCKETT:  Asked and answered, Counsel.
 7           MR. CONANT:  All right.
 8           THE WITNESS:  You just keep asking the same
 9   question until you get an answer you want.  I've
10   answered it three times.  I don't recall.
11   BY MR. CONANT:
12       Q.   Why would Edra tell you, "With all going
13   on, much of which you encouraged me to move forward
14   with, why are you doing this at this time?"
15           MR. CROCKETT:  Calls for speculation.  I'll
16   instruct him not to answer.
17   BY MR. CONANT:
18       Q.   I'm asking you:  You have a relationship
19   with Edra Blixseth, do you not, Mr. Montgomery?
20       A.   I know Edra Blixseth.
21       Q.   Can you explain to me your prior business
22   relationship with Edra Blixseth?
23       A.   No.
24       Q.   Why can you not --
25       A.   I'll take the Fifth.  I'll assert the right
```

Page 166

```
 1   under the Fifth.
 2       Q.   Mr. Montgomery, how does your relationship
 3   with Edra Blixseth implicate you in any criminal
 4   proceeding?
 5           MR. CROCKETT:  Don't answer that question.
 6   BY MR. CONANT:
 7       Q.   Mr. Montgomery, you are under indictment by
 8   the Clark County D.A. for the state of Nevada, are
 9   you not?
10       A.   I'll assert my right under the Fifth
11   Amendment.
12           What, are you upset because I asserted my
13   right?  I'm still going to assert it.
14           MR. FLYNN:  C.J., let's break for lunch.
15           MR. CONANT:  Want to break for lunch?  Let
16   me just finish this last one.
17           I'm going to hand Mr. Montgomery what's
18   going to be marked as Plaintiff's Exhibit No. 11.
19           (Exhibit 11 was marked for identification.)
20           THE WITNESS:  Thank you.
21           MR. CONANT:  All right.  Plaintiff's
22   Exhibit No. 11 is represented to be a Summons issued
23   by the District Court for Clark County, Nevada.  I
24   will represent that I received this document in its
25   form, in the current -- in its current form from
```

Page 167

```
 1   Mr. Montgomery's counsel Steve Skirvin.
 2           Why there appears to be three separate
 3   copies of the same indictment, I don't know, but
 4   this is the way I received it from Mr. Skirvin.
 5       Q.   Mr. Montgomery, isn't it true you are under
 6   indictment by the Clark County district attorney for
 7   obtaining money under false pretenses?
 8       A.   I'll going to assert my right under the
 9   Fifth Amendment.
10       Q.   All right.  Theft, Mr. -- are you under
11   indictment by the Clark County DA for theft?
12       A.   I'll assert my right under the Fifth
13   Amendment.
14       Q.   Are you under indictment for drawing and
15   passing a check without sufficient funds in drawee
16   bank with intent to defraud?
17       A.   I'm going to assert my right under the
18   Fifth Amendment.
19       Q.   Are you aware -- okay.  So we're aware of
20   this indictment against you, Mr. Montgomery.
21           Are you aware of any other criminal
22   proceedings against you?
23       A.   I'll assert my right under the Fifth
24   Amendment.
25       Q.   Can you explain to me your current
```

Page 168

```
 1   relationship with Edra Blixseth?
 2       A.   I'll assert my right under the Fifth
 3   Amendment.
 4           MR. CONANT:  Let's break for lunch.
 5           THE VIDEOGRAPHER:  Going off the record.
 6   The time is 12:11 p.m.
 7           (Luncheon recess.)
 8           THE VIDEOGRAPHER:  The time is 1:17 p.m.
 9   We're back on the record.
10           MR. CONANT:  All right.  Mr. Montgomery.
11           Can we just -- do we need to swear him back
12   in?
13           THE REPORTER:  No.
14   BY MR. CONANT:
15       Q.   Where do you currently reside,
16   Mr. Montgomery?
17       A.   My address?
18       Q.   Yes.
19       A.   6 Toscana Way West, Rancho Mirage,
20   California.
21       Q.   Where do you currently work?
22       A.   Out of my home.
23       Q.   What do you do, currently?
24       A.   I'm unemployed.
25       Q.   Do you have any form of income right now,
```

42 (Pages 165 to 168)

Dennis Lee Montgomery  -  November 18, 2010

---

1  Mr. Montgomery?
2      A.   No.
3      Q.   All right.  All right.  Let's go back and
4  talk about Mr. Birnbaum.
5           Do you remember our discussion with
6  Mr. Birnbaum, Mr. Montgomery?
7      A.   Not really.
8      Q.   Have you ever talked to George Birnbaum?
9           MR. CROCKETT:  Asked and answered.
10 BY MR. CONANT:
11     Q.   So your answer, Mr. Montgomery?
12     A.   Asked and answered.
13          MR. CONANT:  All right.  I'm going to
14 hand -- well, I'll hand it to the court reporter so
15 she can mark it Plaintiff's Exhibit --
16          THE REPORTER:  12.
17          MR. CONANT:  -- 12.
18          (Exhibit 12 was marked for identification.)
19          MR. CONANT:  Copy for you.
20          MR. FLYNN:  Copy for --
21          MS. WELLS:  Is this ours to work with?
22          MR. FLYNN:  C.J., you got something to work
23 with?
24          MR. CONANT:  I'll wing it.
25          Find my copy here.

Page 169

---

1      Q.   Can you review that email, Mr. Montgomery?
2      A.   Yeah, I did.
3      Q.   All right.  Did you read down at the bottom
4  where -- I'll represent this is an email
5  correspondence between Tim Blixseth and George
6  Birnbaum dated, approximately, November -- well, let
7  me pull up my copy here.
8           All right.  Now at the bottom,
9  Mr. Montgomery, you'll see the email correspondence
10 begins down at the bottom dated November 11, 2010.
11 Tim Blixseth writes to George Birnbaum, "George, he
12 was indicted yesterday.  Best regards, Tim
13 Blixseth."  The subject in this email is
14 "Montgomery."
15          George Birnbaum writes, "Happy days.  The
16 guy is bad news.  I know the Israelis helped Feds
17 here.  One of the reasons I had to go dark on the
18 issue.  All the best."
19          Mr. Montgomery, do you have any reason --
20 do you know why Mr. Birnbaum would be -- would you
21 have knowledge of your involvement with the Israeli
22 government?
23          MR. CROCKETT:  I'll object to the question.
24 There's no foundation for this document.  There is
25 no factual basis that you've established that he

Page 170

---

1  would have any reason to understand what this email
2  is about.  It calls for speculation.
3           If you can answer the question, go ahead.
4           THE WITNESS:  I don't recall.
5  BY MR. CONANT:
6      Q.   You don't recall?
7      A.   I don't -- I don't understand this
8  document.
9      Q.   Do you know -- do you know why the Israeli
10 government would be investigating you,
11 Mr. Montgomery?
12          MR. CROCKETT:  Are you representing that
13 they are?
14          THE WITNESS:  You are?
15          MR. CONANT:  I'm asking a question if he
16 knows.
17          MR. CROCKETT:  If he knows why they would
18 be?
19          MR. CONANT:  Yeah.
20          MR. CROCKETT:  That would presume that they
21 are.  Do you know that they are?  Are you
22 representing that they are?
23 BY MR. CONANT:
24     Q.   Do you know why the Israeli government
25 would be?

Page 171

---

1          MR. CROCKETT:  Oh, Lord.  Calls for
2  speculation and it's argumentative.  I'll instruct
3  you not to answer.
4           THE WITNESS:  My attorney said not to
5  answer; I'm not going to answer.
6           MR. CONANT:  Mr. Crockett, you're -- you
7  are, in effect, trying to replace your testimony for
8  Mr. Montgomery's testimony.
9           MR. CROCKETT:  Would you like to adjourn
10 and we'll take this to the judge?  Would you like
11 to?  I'd be delighted to do that.
12          MR. CONANT:  I would like you to stop
13 obstructing --
14          MR. CROCKETT:  I'm going to do what I think
15 I need to do.  Counsel, if you don't like it, you're
16 welcome to take it to the court.
17          MR. CONANT:  You feel it appropriate to
18 obstruct your client from answering.
19          MR. CROCKETT:  Just like the last question
20 that you asked, you are assuming things that aren't
21 true and that you haven't any evidence of.
22          Now if you'd like to ask a question, go
23 ahead.
24          MR. CONANT:  Mr. Crockett, you understand
25 the difference between being in trial and asking a

Page 172

---

43 (Pages 169 to 172)

Dennis Lee Montgomery  -  November 18, 2010

Page 173

```
 1  witness questions at trial versus asking a
 2  witness --
 3      MR. CROCKETT:  Do you have a question for
 4  the witness?
 5      MR. CONANT:  I'm not done with my
 6  statement.
 7      Do you understand the difference between
 8  examining a witness in trial and examining a witness
 9  at a deposition, Mr. Crockett?
10      MR. CROCKETT:  Counsel, I'm not to going to
11  dignify that with a response.  If you have a
12  question, you can ask it.
13      MR. CONANT:  So you have -- you do not
14  understand the difference, Mr. Crockett?
15      MR. CROCKETT:  I understand what I
16  understand.  You need to be asking questions of the
17  witness, not of me, Counsel.
18      MR. CONANT:  Great.
19      MR. CROCKETT:  If you don't understand
20  that, you must not have ever taken a deposition
21  before.
22  BY MR. CONANT:
23      Q.  Okay.  Mr. Montgomery, have you ever had
24  any contact with the Israeli government concerning
25  any form of software that you own?
```

Page 174

```
 1      A.  I'm going to invoke my right under the
 2  Fifth Amendment.
 3      Q.  Are you aware of any federal investigation
 4  of you concerning your attempts to sell software to
 5  the Israeli government?
 6      A.  I'm going to invoke my right under the
 7  Fifth Amendment.
 8      Q.  Have you told anyone in the Israeli
 9  government in any form of words that you were having
10  your name cleared by the United States government?
11      A.  I'm going to invoke my right under the
12  Fifth Amendment.
13      Q.  Mr. Montgomery, has Edra Blixseth made any
14  effort to connect you to the Israeli government in
15  an effort to sell your software?
16      MR. CROCKETT:  Calls for speculation.
17  Assumes facts not in evidence.  Lacks factual
18  predicate.
19      THE WITNESS:  I'm going to assert my right
20  under the Fifth Amendment.
21  BY MR. CONANT:
22      Q.  And has Ron Burkle had any involvement in
23  you getting connected with the Israeli government in
24  an attempt to sell your software to the government?
25      A.  I don't even know who that is.
```

Page 175

```
 1      Q.  Have you ever discussed Ron Burkle with
 2  Edra Blixseth?
 3      A.  I just told you I don't who that person is.
 4      Q.  Have you ever heard the name Ron Burkle?
 5      A.  I don't -- I don't know.
 6      MR. CONANT:  All right.  I'm going to --
 7  let's see.  I'm going to introduce Plaintiff's
 8  Exhibit No. --
 9      13?
10      THE REPORTER:  Yes.
11      (Exhibit 13 was marked for identification.)
12      THE WITNESS:  Thanks.
13      THE REPORTER:  Welcome.
14  BY MR. CONANT:
15      Q.  All right.  Mr. Montgomery, I'm going to
16  represent this is a copy of an email that we pulled
17  off of Jory Russell's computer.
18      A.  Okay.
19      Q.  Again, at the top you'll see a From
20  LearG2@aol.com below that the To line
21  denni@ncoder.net below that beginning of a
22  sentence, "In a message dated 2/26/09
23  denni@ncoder.net writes, Joe L., facility
24  installation is scheduled for tomorrow.  He has
25  waited two months for it.  I just told him to cancel
```

Page 176

```
 1  it and I'm going home.
 2      "Brian is having a baby (scheduled
 3  C-section) tomorrow.  I was going to stay and work
 4  on the installation since it has taken two months to
 5  get the right people here, but not now."
 6      Do you see that, Mr. Montgomery?
 7      A.  Yes.
 8      Q.  Did you write that, Mr. Montgomery?
 9      A.  I don't recall.
10      Q.  Do you understand the context for that --
11  what I just read?
12      A.  Well, if the Brian is my son, that must
13  have been when his son was born, I guess.
14      Q.  So who is the Joe L. that you're referring
15  to?
16      A.  I don't recall writing this.  You just
17  asked me that.
18      Q.  Would it be Joe Libertore?
19      A.  It could be.
20      Q.  What would "facility installation" refer
21  to?
22      MR. CROCKETT:  Are you asking him to
23  speculate?
24      MR. CONANT:  I'm asking him to answer the
25  question, Mr. Crockett.
```

44 (Pages 173 to 176)

Dennis Lee Montgomery   -   November 18, 2010

Page 177

```
 1        THE WITNESS:  I don't recall.  You asked me
 2  if I wrote this, I said I don't recall.  You're
 3  referencing you got it off a hard drive, so I've
 4  answered it.
 5  BY MR. CONANT:
 6     Q.   Is that not your email address,
 7  denni@ncoder.net?
 8     A.   Yeah.  Sure.  You asked me that, I said
 9  yes.
10     Q.   And then below that paragraph I just
11  wrote -- I just read it says, "Why Dennis?"
12     A.   You asked me if I recall this email.  I
13  said I don't, so why that's on there I don't know.
14     Q.   Do you recognize the "why Dennis" as being
15  from Edra Blixseth?
16     A.   You mean those two words, "Why Dennis?"
17  Ever used in my life, ever, or only in this email?
18     Q.   I'm asking the "Why Dennis," right here in
19  this email?
20     A.   I have no idea.
21        MR. CONANT:  All right.  I'm going to
22  introduce what's going to be marked as Plaintiff's
23  Exhibit 14.
24        (Exhibit 14 was marked for identification.)
25        MR. CONANT:  Actually -- yeah.
```

Page 178

```
 1        I don't have a copy for them.
 2        MR. FLYNN:  You're going to need this;
 3  right?
 4        MR. CONANT:  Uh-huh.
 5     Q.   All right.  Have you had a chance to read
 6  this email, Mr. Montgomery?
 7     A.   No.
 8        MR. FLYNN:  While he's reading it, let them
 9  read.
10        (Witness reads.)
11        THE WITNESS:  Okay.
12  BY MR. CONANT:
13     Q.   All right.
14        All right.  Do you recall -- this is an
15  email that purports to be from LearG2@aol.com and
16  you recognize that's Edra Blixseth's email?
17     A.   Yes.
18     Q.   And it's to denni@ncoder.net.
19        Do you see that, Mr. Montgomery?
20     A.   Yes.
21     Q.   And that's your email address, isn't it?
22     A.   Yes.
23     Q.   It's dated August 27, 2008?
24        MR. CROCKETT:  Document speaks for itself.
25        THE WITNESS:  Yes.
```

Page 179

```
 1  BY MR. CONANT:
 2     Q.   Okay.  Now -- so this is an email that you
 3  received from Edra Blixseth; is that correct?
 4     A.   I don't know if I received it or not, but I
 5  see who sent it.
 6     Q.   Do you -- okay.
 7        Now I want to read the first full paragraph
 8  of the text starting with the first full sentence
 9  from Edra, "We are going over numbers and ways to
10  make this start paying for itself."
11     A.   Where is this at?
12        MR. CROCKETT:  What?
13  BY MR. CONANT:
14     Q.   First full paragraph of text in the email,
15  second sentence.
16        MR. CROCKETT:  First full paragraph starts,
17  "Dennis."
18        THE WITNESS:  "Dennis, I wanted to write."
19  BY MR. CONANT:
20     Q.   All right.  Correction, second full
21  paragraph.
22     A.   Okay.
23     Q.   "We are going over numbers and ways to make
24  this start paying for itself.  You, as always, are
25  the key to our success."
```

Page 180

```
 1        Now above that she says, "Dennis, I wanted
 2  to write as I'm very excited about what might be
 3  doors we can get open now and start monetizing
 4  Blxware."
 5        Why would Edra say, "You are the key to our
 6  success"?
 7        MR. CROCKETT:  Your question by its nature
 8  calls for speculation and is objectionable on that
 9  basis.
10        I'll instruct you not to answer.
11  BY MR. CONANT:
12     Q.   Mr. Montgomery, answer the question,
13  please.
14     A.   My attorney told me not to answer the
15  question.
16     Q.   Mr. Montgomery, have you ever had any
17  conversation with Ms. Blixseth about you being the
18  key to Blxware's success?
19     A.   I don't know.
20     Q.   Why would Edra Blixseth say such a thing to
21  you?
22        MR. CROCKETT:  Calls for speculation.
23  Lacks factual predicate and lacks foundation.
24  BY MR. CONANT:
25     Q.   Mr. Montgomery, please explain to me your
```

45 (Pages 177 to 180)

Dennis Lee Montgomery  -  November 18, 2010

```
 1  Cardiac Network, Inc.
 2       Do you see that, Mr. Montgomery?
 3    A.   Yes.
 4    Q.   Do you know why Cardiac Network, Inc.,
 5  would be depositing $200,000 into Istvan Burgyan's
 6  account?
 7    A.   I'm going to assert my right under the
 8  Fifth Amendment.
 9    Q.   Isn't it true that Demaratech was -- well,
10  strike that.
11       Isn't it true that Cardiac Network entered
12  into some arrangement with Istvan Burgyan in
13  exchange for technology that you were -- you had
14  created?
15    A.   I'm going to assert my right under the
16  Fifth Amendment.
17    Q.   Isn't that same technology the same
18  technology listed in your bankruptcy schedule,
19  Mr. Montgomery?
20    A.   I'm going to assert my right under the
21  Fifth Amendment.
22    Q.   Isn't it true that for a number of years
23  you were funneling money to Mr. Burgyan to conceal
24  cash from your creditors, Mr. Burgyan -- I mean
25  Mr. Montgomery?
```
Page 305

```
 1    A.   I'm going to assert my right under the
 2  Fifth Amendment.
 3    Q.   Okay.  All right.  Let's -- let me go --
 4  let's put that one away for now.  That's fine.
 5       Let's go to -- I'm going to hand you
 6  Plaintiff's Exhibit 21.
 7       (Exhibit 21 was marked for identification.)
 8  BY MR. CONANT:
 9    Q.   All right.
10       All right.  Mr. Montgomery, if you look at
11  Bates stamp No. 558 on Plaintiff's Exhibit 21 --
12    A.   558, okay.
13       MS. WELLS:  For the record, are these more
14  bank records?
15       MR. CONANT:  Yeah, for the record.
16       -- I see a deposit 12/14 into Istvan
17  Burgyan's bank account in the amount of $130,000
18  from Backhouse Fiduciary Services.
19       Do you know -- are you familiar with
20  Backhouse Fiduciary Services, Mr. Montgomery?
21    A.   I'm going to assert my right under the
22  Fifth Amendment.
23    Q.   Isn't Backhouse Fiduciary Services
24  connected with Josh Kennedy?
25    A.   I'm going to assert my right under the
```
Page 306

```
 1  Fifth Amendment.
 2    Q.   And isn't Josh Kennedy a funder of
 3  Demaratech, LLC?
 4    A.   I'm going to assert my right under the
 5  Fifth Amendment.
 6    Q.   Wasn't -- didn't Josh Kennedy invest this
 7  money in Demaratech based on representations by you
 8  that you had software that you could -- you could
 9  sell to a government agency?
10    A.   I'm going to assert my right under the
11  Fifth Amendment.
12       He's very distracting talking on the phone
13  over there.
14       I guess it doesn't matter.
15    Q.   All right.  Mr. Montgomery, can you turn to
16  Bates stamp No. 559.
17    A.   Yeah, okay.
18    Q.   I see a deposit dated 12/15 in the amount
19  of -- I'm sorry, it's a withdrawal in the amount of
20  a hundred thousand dollars.
21    A.   I see that.
22    Q.   Do you see that?
23    A.   Yes.
24    Q.   And the -- the description appears to be
25  David Z. Chesnoff.
```
Page 307

```
 1       Mr. Montgomery, who is David Chesnoff?
 2    A.   I'm going to assert my right under the
 3  Fifth Amendment.
 4    Q.   Isn't he your criminal defense counsel in
 5  Clark County, Nevada?
 6    A.   I'm going to assert my right under the
 7  Fifth Amendment.
 8    Q.   Didn't he appear for you yesterday at your
 9  arraignment, Mr. Montgomery?
10    A.   I'm going to assert my right under the
11  Fifth Amendment.
12    Q.   Speaking of the arraignment yesterday in
13  Clark County, what did the judge give you a two-week
14  extension for?
15    A.   I'm going to assert my right under the
16  Fifth Amendment.
17    Q.   Did he give you an extension to arrange
18  some sort of financing to pay off the DA,
19  Mr. Montgomery?
20    A.   I'm going to assert my right under the
21  Fifth Amendment.
22    Q.   Mr. Montgomery, you've paid the DA
23  $450,000 --
24       We've asked this question.  I'll move on.
25       Now I'm looking back at this 12/15
```
Page 308

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

Page 309

```
 1  withdrawal from Istvan Burgyan's account to what
 2  appears to be David Chesnoff who is your criminal
 3  counsel.
 4         Why would Istvan Burgyan pay a hundred
 5  thousand dollars to your criminal counsel?
 6     A.  I'm going to assert my right under the
 7  Fifth Amendment.
 8     Q.  Isn't it true this is really your hundred
 9  thousand dollars, Mr. Montgomery?
10     A.  I'm going to assert my right under the
11  Fifth Amendment.
12         MR. CONANT:  All right.  Let's hand you
13  what we've marked as Plaintiff's Exhibit No. 22.
14         (Exhibit 22 was marked for identification.)
15  BY MR. CONANT:
16     Q.  All right.  Mr. Montgomery, who do you --
17  do you pay your mortgage, Mr. Montgomery?
18     A.  Ever you mean?
19     Q.  Who do you have -- who do you currently
20  have -- what banks do you currently have to pay
21  mortgage payments to, Mr. Montgomery?
22     A.  Bank of America.
23     Q.  You just have one mortgage that you pay?
24     A.  No.  Aurora Home Loans, I don't know the
25  name of the bank but --
```

Page 310

```
 1     Q.  You think it's Aurora Loan Services?
 2         THE REPORTER:  Sorry?
 3         THE WITNESS:  Aurora.
 4  BY MR. CONANT:
 5     Q.  Aurora Loan, okay.
 6         I'm sorry, Mr. Montgomery, I didn't mean to
 7  cut you off.
 8         All right.  If you look at me [sic] with
 9  Bates stamp No. 944, there is a withdrawal in the
10  amount -- dated June 1, in the amount of $15,000.
11         Do you see that, Mr. Montgomery?
12     A.  Yes.
13     Q.  And the description is wire transfer out,
14  JMBM retainer, and then it says Joseph A.
15  Eisenberg -- or Gisenberg, PC.
16         Do you know who Joseph Gisenberg is,
17  Mr. Montgomery?
18     A.  I'm going to assert my right under the
19  Fifth Amendment.
20     Q.  Isn't he your counsel in your main
21  bankruptcy case, Mr. Montgomery?
22     A.  I'm going to assert my right.
23     Q.  Why would Mr. Burgyan pay $15,000, a
24  $15,000 retainer, to your bankruptcy counsel,
25  Mr. Montgomery?
```

Page 311

```
 1     A.  I'm going to assert my right under the
 2  Fifth Amendment.
 3     Q.  Isn't it true that this $15,000 is really
 4  your money, Mr. Montgomery?
 5     A.  I'm going to assert my right under the
 6  Fifth Amendment.
 7     Q.  Now you said a minute ago, Mr. Montgomery,
 8  that one of your mortgage payments is to Aurora Loan
 9  Services.
10     A.  That's correct.
11     Q.  Okay.  I see now, if you look down to
12  June 4 --
13     A.  I see.
14     Q.  -- you have a withdrawal in the amount of
15  $8,104.40.
16         Do you see that, Mr. Montgomery?
17     A.  Yes.
18     Q.  That's to Aurora Loan Services,
19  Mr. Montgomery?
20     A.  Yes.
21     Q.  Isn't that a mortgage payment,
22  Mr. Montgomery, for one of the mortgages that you
23  owe money to?
24         Or -- let me rephrase it.
25         This $8100 payment to Aurora Loan Services,
```

Page 312

```
 1  isn't that a payment for one of -- on a mortgage
 2  payment that you're responsible for, Mr. Montgomery?
 3     A.  I'm going to assert my right under the
 4  Fifth Amendment.
 5     Q.  It's really your -- so Mr. Burgyan is
 6  really paying -- strike that.
 7         All right.  Let's hand you what we've
 8  marked as Plaintiff's Exhibit 23.
 9         (Exhibit 23 was marked for identification.)
10  BY MR. CONANT:
11     Q.  All right.  If you look here at the
12  statement Bates stamp No. 934, again this is a
13  checking account of Istvan Burgyan.  Now all of
14  these -- Mr. Burgyan laid the foundation for all
15  these statements in his exam -- or deposition.
16         Could you look at the -- do you see,
17  Mr. Montgomery, a withdrawal in the amount of
18  $30,000 dated August -- August 3?
19     A.  Yes.
20     Q.  Now I see here that it's -- again in the
21  description we have another reference to David Z.
22  Chesnoff and then, again, the last word in this
23  description is Dennis.
24         What was that $30,000 paid for?
25     A.  I'm going to assert my right under the
```

Dennis Lee Montgomery  -  November 18, 2010

1  Fifth Amendment.
2      Q.   Isn't it -- those were funds paid to your
3  criminal counsel, are they not, Mr. Montgomery?
4      A.   I'm going to assert my right under the
5  Fifth Amendment.
6      Q.   Isn't that, in fact, your money,
7  Mr. Montgomery, that's going to Mr. Chesnoff?
8      A.   I'm going to assert my right under the
9  Fifth Amendment.
10          We need to stop.  I need to go to the rest
11 room.
12          MR. CONANT:  Okay.
13          THE VIDEOGRAPHER:  This marks the end of
14 Media No. 3.  The time is 4:19 p.m.  We're off the
15 record.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  This marks the beginning
18 of Media No. 4.  The time is 4:23 p.m.  We're back
19 on the record.
20          MR. CONANT:  All right.  Mr. Montgomery,
21 I'm going to hand you what'll be marked as
22 Plaintiff's Exhibit 24.
23          (Exhibit 24 was marked for identification.)
24 BY MR. CONANT:
25      Q.   All right.  Mr. Montgomery, take a second
                                              Page 313

1  cash with it, Mr. Montgomery?
2      A.   I'm going to assert my right under the
3  Fifth Amendment.
4      Q.   What did you do with the cash that you got
5  from the casino, Mr. Montgomery?
6      A.   I'm going to assert my right under the
7  Fifth Amendment.
8      Q.   Do you still have this $50,000 in cash,
9  Mr. Montgomery?
10     A.   I'm going to assert my right under the
11 Fifth Amendment.
12          MR. CONANT:  All right.  I'm going to hand
13 you what we've marked as Plaintiff's Exhibit 25.
14          (Exhibit 25 was marked for identification.)
15          THE WITNESS:  That's it.
16          MR. CONANT:  Sorry.
17 BY MR. CONANT:
18     Q.   Mr. Montgomery, can you tell me what -- can
19 you tell me what casinos you've gambled at since
20 2006?
21     A.   I'm going to assert my right under the
22 Fifth Amendment.
23     Q.   Between 2006 -- within the year 2006, can
24 you tell me how much money you've won gambling or
25 how much you money you've lost gambling?
                                              Page 315

1  to review this document.
2      A.   Okay.
3      Q.   I'm going to represent that this is a --
4  this is a document we got from a casino in relation
5  to a subpoena.
6          Does this -- did you -- is this your
7  cashier's check, Mr. Montgomery, that you -- I'm
8  sorry.  Let me back up.
9          Is this one of the cashier's checks that
10 you got from Wells Fargo Bank on April 25, 2006?
11     A.   I'm going to assert my right under the
12 Fifth Amendment.
13     Q.   What did you do with this -- did you bring
14 this cashier's check and cash it with -- I shouldn't
15 say "cash it."  Let me strike that.
16          Did you submit this cashier's check to
17 Caesar's Casino?
18     A.   I'm going to assert my right under the
19 Fifth Amendment.
20     Q.   What did you do -- what was the purpose of
21 giving Caesar's Casino this $50,000 cashier's check?
22     A.   I'm going to assert my right under the
23 Fifth Amendment.
24     Q.   Didn't you take this money out,
25 Mr. Mont- -- take this check to the casino and get
                                              Page 314

1      A.   I'm going to assert my right under the
2  Fifth Amendment.
3      Q.   I'll ask you the same question for 2007.
4  Can you tell me how much money you won gambling or
5  lost gambling?
6      A.   I'm going to assert my right under the
7  Fifth Amendment.
8      Q.   I'm asking for net.  When I'm asking how
9  much you won, how much you lost, I'm asking net for
10 the year.
11     A.   I'm going to assert my right under the
12 Fifth Amendment.
13     Q.   Isn't it true that -- well, let me back up.
14          For the year 2008 can you tell me how much
15 you won gambling or how much you lost gambling?
16     A.   I'm going to assert my right under the
17 Fifth Amendment.
18     Q.   Same question for 2009.
19     A.   Same answer.
20     Q.   Isn't it true that for the years 2008
21 through 2009 you've won more money gambling than
22 lost?
23     A.   I'm going to assert my right under the
24 Fifth Amendment.
25     Q.   Approximately how much money have you
                                              Page 316

Dennis Lee Montgomery   -   November 18, 2010

1  borrowed in one form or another, Mr. Montgomery,
2  from casinos --
3      A.   I'm going to assert my right under the
4  Fifth Amendment.
5      Q.   Let me finish the question.
6           Between the years 2006, 2009, how much
7  money have you borrowed from casinos,
8  Mr. Montgomery?
9      A.   I'm going to assert my right under the
10 Fifth Amendment.
11          MR. FLYNN:   When he was getting those
12 millions of dollars of cash from Edra Blixseth, was
13 he putting second mortgages on his homes.
14 BY MR. CONANT:
15     Q.   Mr. Montgomery, we just reviewed all your
16 bank statements where you received a large amount of
17 money from Edra Blixseth's entities.
18          During that time period, were you taking
19 out second mortgages on real estate?
20     A.   I'm going to invoke my right under the
21 Fifth Amendment.
22     Q.   What did you do with all the cash you took
23 out on these mortgages on your real estate?
24     A.   I'm going to invoke my right under the
25 Fifth Amendment.

Page 317

1  you --
2      A.   25.
3      Q.   On 25.
4           Can you flip with me to -- it's going to be
5  the -- one, two, three, four, five, six, seven --
6  the eighth page from the back.
7      A.   What's the top say?
8      Q.   Well, MontBleu Resort.
9      A.   How about memo ID, which number is it?
10     Q.   Memo ID 30936.
11     A.   Okay.  I see it.
12     Q.   All right.  On the right-hand column it
13 says, "Memo Title:  Customer robbed.  Memo Text:
14 4/6/6," I assume 4/6/2006, April 6, 2006, "Customer
15 visit today, he was robbed of $300,000 down in Reno.
16 Was not hurt.  Brought in $100K cashier's check to
17 take care of half his outstanding markers.  Says he
18 will pay the remainder within" seven -- I'm sorry,
19 "within three weeks.nan  Tickled remaining" hundred
20 thousand to 5/7/06 [sic].
21          I'll represent to you these are documents
22 that we received in connection with subpoenas we
23 served on the MontBleu Resort.
24          Is that true, Mr. Montgomery?  Did you tell
25 a casino that you were robbed of $300,000 in Reno?

Page 319

1      Q.   All right.  Did you put second mortgages on
2  each piece of real estate that you owned during this
3  time period?
4      A.   I'm going to invoke my right under the
5  Fifth Amendment.
6      Q.   All right.  Mr. Montgomery, do you not want
7  to file your tax returns for '08 and '09 because you
8  don't want to report your wins from gambling?
9      A.   I'm going to assert my right under the
10 Fifth Amendment.
11     Q.   All right.  Let me see here.
12          Have you ever reported to a casino that you
13 were robbed of a large amount of money,
14 Mr. Montgomery?
15     A.   I'm going to assert my right under the
16 Fifth Amendment.
17     Q.   Okay.  Were you, in fact, robbed of any
18 money at any time, Mr. Montgomery?
19     A.   I'm sorry.
20          Are you done?
21     Q.   I'm trying to find it.  It's in here.  I'm
22 just trying to find the exact reference to it,
23 because there's an interesting -- yeah.  I just want
24 to find it.
25          All right.  Mr. Montgomery, on -- are

Page 318

1      A.   Assert my right under the Fifth Amendment.
2           MR. FLYNN:   Here's how he did it, by making
3  it look like --
4  BY MR. CONANT:
5      Q.   How much money -- well, let's go back to --
6  how much money, approximately, were you borrowing?
7           Let me back up.  Do you understand what a
8  marker is in casino parlance?
9      A.   I'm going to assert my right under the
10 Fifth Amendment.
11     Q.   Isn't a marker kind of like a note that the
12 casino advances you money in some manner and you,
13 essentially, have to pay it back?
14     A.   I'm going to assert my right under the
15 Fifth Amendment.
16     Q.   So weren't you taking out markers to
17 gamble, you'd win, but then not pay back the marker?
18     A.   I'm sorry.  Are you done?
19     Q.   I'm done.
20     A.   I'm going to assert my right under the
21 Fifth Amendment.
22     Q.   Now I notice that this memo text, 4/6/2006,
23 this is the same day that you were receiving, I
24 think, based on your records, over a million dollars
25 from Opspring; is it not, Mr. Montgomery?

Page 320

Dennis Lee Montgomery  -  November 18, 2010

```
 1       THE WITNESS:  I despise that he keeps
 2  looking at the government and smiling and winking.
 3  It's just annoying.
 4       MR. CROCKETT:  Almost done.  Almost done.
 5       THE WITNESS:  I'm going to assert my right
 6  under the Fifth Amendment.
 7  BY MR. CONANT:
 8       Q.   So you were robbed -- you were purportedly
 9  robbed of $300,000, but at the same time it appears
10  that you still had outstanding markers owed to the
11  casinos.
12       In fact, this memo says brought in -- you
13  brought in a hundred K cashier's check to take care
14  of his -- "to take care of half his outstanding
15  markers."
16       So you had roughly $200,000 in outstanding
17  markers and you paid down a hundred thousand dollars
18  of those, but the very same day you're being paid
19  over a million dollars from -- you receive over a
20  million dollars from Edra's entities.
21       So the question is why didn't you just pay
22  off all your markers with all the money you were
23  receiving from Edra's entities?
24       A.   I'm going to assert my right under the
25  Fifth Amendment.
                                         Page 321
```

```
 1       MR. FLYNN:  He's hired an accountant to go
 2  through all of his records to determine what his
 3  wins and losses were at the casinos.
 4  BY MR. CONANT:
 5       Q.   Now, Mr. Montgomery, you said you haven't
 6  yet filed your tax returns for '08 or '09.  Have you
 7  hired an accountant to help you determine your wins
 8  and your losses from the various casinos?
 9       A.   I assert my right under the Fifth
10  Amendment.
11       Q.   What I mean hired an accountant, I mean
12  hired an accountant to help you prepare your tax
13  returns?
14       A.   I'm going to going to assert my right under
15  the Fifth Amendment.
16       Q.   All right.  Now, Mr. Montgomery, if you
17  flip to the next page here, September 1, '06, Memo
18  ID 42710, "Memo Text:  Customer requests increase to
19  300k, denied at this point.  Keep at 200k per Mike
20  Jones."
21       Who's Mike -- do you know who Mike Jones is
22  that they're referring to here?
23       A.   I'm going to assert my right under the
24  Fifth Amendment.
25       Q.   Were you asking casinos for extensions of
                                         Page 322
```

```
 1  credit, Mr. Montgomery, during this time period?
 2       A.   I'm going to assert my right under the
 3  Fifth Amendment.
 4       Q.   How much cash -- what is a -- what is a --
 5  what is a casino -- how does a casino operate with
 6  respect to how much money they're willing to extend
 7  to you on credit?
 8       MR. CROCKETT:  Calls for speculation.
 9  BY MR. CONANT:
10       Q.   In your experience with the casinos,
11  Mr. Montgomery, how do you get -- how did you
12  establish a line of credit with all these casinos,
13  Mr. Montgomery?
14       A.   I'm going to assert my right under the
15  Fifth Amendment.
16       MR. CONANT:  All right.
17       All right.  Just got to get through some of
18  these.  The amount, the volume, of documents here
19  you see from casinos is -- one point just absolutely
20  overwhelming, so we've had to get through some of
21  this.
22       All right.  Mr. Montgomery, I'm going to
23  hand you what will be marked as Plaintiff's Exhibit
24  No. 26.
25       Are we at 26?
                                         Page 323
```

```
 1       THE REPORTER:  Yes.
 2       (Exhibit 26 was marked for identification.)
 3       MR. CONANT:  All right.  I'll represent
 4  these are documents we have received in response to
 5  subpoenas.
 6       MR. CROCKETT:  When were these subpoenas
 7  served, counsel?
 8       MR. CONANT:  When?
 9       MR. CROCKETT:  Yes.
10       MR. CONANT:  I don't recall.  You received
11  notice of service.
12       MR. CROCKETT:  I don't believe we did.
13       MR. CONANT:  Your firm received notice of
14  service of the subpoenas.
15       MS. WELLS:  Can you identify for the record
16  what these documents are, please.
17       MR. CONANT:  Yeah.  These are letters
18  written to Dennis Montgomery from Caesar's Tahoe
19  asking for his win/loss records.
20       Q.   Mr. Montgomery, I see here on the first
21  page below -- the first page, "Dear Dennis, below is
22  your estimated win and/or loss information per your
23  request for the period September 2005 through
24  December 31, '05," and then it appears that your
25  total win/loss is $83,400.
                                         Page 324
```

81 (Pages 321 to 324)

Dennis Lee Montgomery  -  November 18, 2010

| | |
|---|---|
| 1    Do you recall why you requested this<br>2 information from the casino, Mr. Montgomery?<br>3    A.   I'm going to assert my right under the<br>4 Fifth Amendment.<br>5    Q.   Did you report this $83,000 win on your<br>6 2005 tax returns -- or your tax year 2005 tax<br>7 returns, Mr. Montgomery?<br>8    MR. CROCKETT:  Sorry, Counsel, all three of<br>9 these letters are dated September 16th and yet they<br>10 deal with years 2005, '-6 and '-7 and this is the<br>11 way they were produced to me.<br>12    MR. CONANT:  This is the way they were<br>13 produced to me.  I haven't altered these documents<br>14 in any way.<br>15    Q.   Mr. Montgomery?<br>16    A.   I'm sorry, rephrase the question.<br>17    MR. CROCKETT:  I'm sorry, read the question<br>18 back, please.<br>19 BY MR. CONANT:<br>20    Q.   Did you report this $83,400 win on your tax<br>21 year 2005 tax returns?<br>22    A.   I don't recall.  I don't recall.<br>23    Q.   Mr. Montgomery, isn't it true that part of<br>24 your entire scheme was to horde away a bunch of cash<br>25 and then file bankruptcy and claim that you lost all<br><br>Page 325 | 1 Fifth Amendment.<br>2    Q.   All right.  And then last page,<br>3 January '07 through December 31, '07, this document<br>4 purports to show that you lost 36,800.<br>5    Is that accurate, Mr. Montgomery?<br>6    A.   I'm going to assert my right under the<br>7 Fifth Amendment.<br>8    Q.   Did you report that loss on any of your tax<br>9 returns?<br>10    A.   I'm going to assert my right under the<br>11 Fifth Amendment.<br>12    Q.   All right.  Moving on.<br>13    MR. FLYNN:  Does he have an estimate of how<br>14 much he lost, how much he lost gambling --<br>15 BY MR. CONANT:<br>16    Q.   Mr. -- Mr. Montgomery, do you have an<br>17 estimate of the net amount of money you've lost<br>18 gambling between April '06 and March of 2009?<br>19    A.   I'm going to assert my right under the<br>20 Fifth Amendment.<br>21    MR. FLYNN:  Same thing on wins.<br>22 BY MR. CONANT:<br>23    Q.   Same question with respect to how much<br>24 you've won, net, between April '06 and March of<br>25 2009?<br><br>Page 327 |
| 1 your money gambling, Mr. Montgomery?<br>2    A.   Assert my right under the Fifth Amendment.<br>3    Q.   All right.  Mr. Montgomery, I'm looking at<br>4 the second page of this exhibit here, "Dear Dennis,<br>5 below is your estimated win and/or loss information<br>6 per your request for the period January 2006 through<br>7 December 31, 2006," and then it shows a loss of<br>8 $132,600.<br>9    Mr. Montgomery, do you recall why you<br>10 requested your win/loss record for this -- for the<br>11 MontBleu Resort?<br>12    A.   I'm going to assert my right under the<br>13 Fifth Amendment.<br>14    Q.   Did you report that $132,000 loss on your<br>15 taxes, Mr. Montgomery?<br>16    A.   I'm going to assert my right.<br>17    Q.   Did you really lose $132,600,<br>18 Mr. Montgomery?<br>19    A.   I'm going to assert my right under the<br>20 Fifth Amendment.<br>21    Q.   Does that include money that was borrowed?<br>22 Does the $132,000 included in this lawsuit, does<br>23 that include money that was borrowed by you from the<br>24 resort, Mr. Montgomery?<br>25    A.   I'm going to assert my right under the<br><br>Page 326 | 1    A.   Same answer.<br>2    MR. CONANT:  All right.<br>3    All right.  Okay.  Mr. Montgomery, I'm<br>4 going to hand you what's going to be marked as<br>5 Plaintiff's Exhibit 27, I believe.<br>6    (Exhibit 27 was marked for identification.)<br>7    THE WITNESS:  Thank you.<br>8    MR. CONANT:  I don't have an extra copy.<br>9    All right.  I'll represent this is a<br>10 printout from -- in response to a subpoena I served<br>11 on -- unfortunately which casino is not obvious, but<br>12 I can find the copy here.<br>13    Yes, Peppermill.  This is in response to a<br>14 subpoena I served on the Peppermill Resort -- or<br>15 Casino, I should say.<br>16    Q.   Now, Mr. Montgomery, I see here on<br>17 August 6, 2010, first entry here, says amount<br>18 $5,000, that they received a payment from you in the<br>19 amount of $5,000.<br>20    Do you recall making a payment to any<br>21 casino in the amount of $5,000 on or about August 6,<br>22 2010?<br>23    A.   I assert my right under the Fifth<br>24 Amendment.<br>25    Q.   And I see here for July 16 another payment<br><br>Page 328 |

82 (Pages 325 to 328)

Dennis Lee Montgomery  -  November 18, 2010

```
 1   in the amount of $5,000.
 2        Do you see that, Mr. Montgomery?
 3        A.   I see it.
 4        Q.   Okay.  Do you recall making that payment,
 5   Mr. Montgomery?
 6        A.   I assert my right under the Fifth
 7   Amendment.
 8        Q.   What are -- the source of the funds for
 9   that payment, Mr. Montgomery?
10        A.   I assert my right under the Fifth
11   Amendment.
12        Q.   Is this -- is this payment here part of an
13   arrangement with the casino or the DA to prevent
14   being indicted by any casino?
15        A.   I assert my right under the Fifth
16   Amendment.
17        Q.   Does this represent any arrangement with
18   you -- or between you and a casino or the Clark
19   County DA to avoid criminal sanctions,
20   Mr. Montgomery?
21        A.   Assert my right under the Fifth Amendment.
22        Q.   What's the source of these funds that
23   you're making payments with to the casino,
24   Mr. Montgomery?
25        A.   I assert my right under the Fifth
```
                                            Page 329

```
 1        MS. WELLS:  Do you mind identifying this
 2   for the record, please.
 3        MR. CONANT:  You'll probably want a copy of
 4   this.  It's a -- this is another document that we
 5   received in response to a subpoena -- sorry.
 6        This one was on, I believe, again, the
 7   Peppermill Resort.
 8        Q.   All right, Mr. Montgomery looking at a page
 9   that --
10        A.   Well, just tell me which one.
11        Q.   I'm trying to see how they identify this
12   here.
13        It says -- on the description says -- well,
14   let me just count it again -- one, two, three -- the
15   fourth page, the fourth page, and the description
16   under the section Additional Remarks begins --
17        A.   This page 4; right?
18        Q.   I believe so.
19        It says, "Last two 5K payments," do you see
20   that, Mr. Montgomery?
21        A.   Yes.
22        Q.   I'll read what's on this page.  "Last two
23   5K payments posted are from checks received from"
24   Dennis Montgomery -- "Dennis's attorney, Scott
25   Freeman.  Mr. Freeman keeps in touch with Rob Erwin
```
                                            Page 331

```
 1   Amendment.
 2        Q.   Aren't these -- aren't these pre funds that
 3   you stored away prior to filing for bankruptcy,
 4   Mr. Montgomery?
 5        A.   I assert my right under the Fifth
 6   Amendment.
 7        Q.   Okay.
 8        MR. FLYNN:  Ask him about the money he got
 9   from Edra.
10        MR. CONANT:  Mr. Montgomery, I'm going to
11   hand you what's been marked as Plaintiff's
12   Exhibit 28.
13        (Exhibit 28 was marked for identification.)
14        MR. CROCKETT:  Do you have extra copies of
15   these?
16        MR. CONANT:  I do of this one.
17        MR. CROCKETT:  I'd like a copy of this
18   before we leave.
19        THE WITNESS:  Well, actually --
20        MR. CROCKETT:  There's only one 27 and I'd
21   like a copy of it.
22        THE WITNESS:  Okay.
23   BY MR. CONANT:
24        Q.   Mr. Montgomery, I ask you to flip to the --
25   one, two, three -- I believe the third --
```
                                            Page 330

```
 1   and let's him know when he is sending a check.
 2        "Recently Mr. Freeman told Rob that Dennis
 3   is in Europe meeting with companies that may be
 4   interested in buying some of his software.  Rob
 5   spoke with Dennis's attorney, Scott Freeman," 10 --
 6   then we have the number 10/28.
 7        "Freeman told Rob that Dennis is currently
 8   in Paris signing contracts.  Maybe some money coming
 9   to us from this," question mark, question mark.
10        Do you see this description,
11   Mr. Montgomery?
12        A.   Yes.  I see what you read.
13        MR. FLYNN:  Ask him what software he was
14   pedaling.
15   BY MR. CONANT:
16        Q.   Now, the way I read this you've got two
17   dates going down the right-hand column 2/16/2010
18   then -- well, 11/20/09 and then below that 10/21/09
19   and my understanding of how these read is the date
20   for each line in the remarks section, each line
21   corresponds to the date in the right-hand column for
22   that line.
23        So on February 16th, 2010, it appears that
24   an attorney was representing to a representative of
25   this casino that you were in Europe meeting with
```
                                            Page 332

Dennis Lee Montgomery  -  November 18, 2010

1  companies that may be interested in buying some of
2  your software.
3          Do you see that, Mr. Montgomery?
4      A.  Yes.
5      Q.  Is that an accurate statement,
6  Mr. Montgomery?
7      A.  I'm going to assert my right under the
8  Fifth Amendment.
9      Q.  Were you in Europe trying to sell software?
10     A.  I'm going to assert my right under the
11 Fifth Amendment.
12     Q.  Was that software that was listed in your
13 bankruptcy schedule, Mr. Montgomery?
14     A.  I'm going to assert my right under the
15 Fifth Amendment.
16     Q.  Is this the same software that we saw
17 referred to everywhere in Plaintiff's Exhibit 3, the
18 source code that could detect terrorist attacks,
19 Mr. Montgomery?
20     A.  I'm going to assert my right under the
21 Fifth Amendment.
22     Q.  Is this when you were meeting with Israel
23 to try and sell them software?
24     A.  I'm going to assert my right under the
25 Fifth Amendment.

Page 333

1      Q.  Mr. Montgomery, I'm going to now talk --
2  turn to the part dated November 20, '09.
3      A.  Okay.
4      Q.  "Rob spoke with Dennis's attorney, Scott
5  Freeman.  Freeman told Rob that Dennis is currently
6  in Paris signing contracts."
7          Were you in Paris signing contracts in
8  approximately in November of '09?
9      A.  I'm going to assert my right under the
10 Fifth Amendment.
11     Q.  What contracts would those be referring to?
12     A.  I'm going to assert my right under the
13 Fifth Amendment.
14     Q.  And weren't those contracts associated with
15 property listed on your bankruptcy schedule,
16 Mr. Montgomery?
17     A.  I'm going to assert my right under the
18 Fifth Amendment.
19     Q.  At the same time were you attempting to
20 sell this software to the federal government?
21     A.  I'm going to assert my right under the
22 Fifth Amendment.
23     Q.  And when I mean "software," I mean the
24 software referenced in the dates for February 16,
25 2010.

Page 334

1      A.  I'm going to assert my right under the
2  Fifth Amendment.
3      Q.  Now did you have possession of this
4  software that you were supposedly in Europe meeting
5  with potential buyers?
6      A.  I'm going to assert my right under the
7  Fifth Amendment.
8      Q.  All right.
9          All right.  Turn to the next page.
10     A.  I have to leave at 5 o'clock.
11     Q.  We'll be done by 5 o'clock.
12     A.  Oh, okay.
13         Okay.
14     Q.  All right.  I see here first line under
15 additional remarks first full sentence, "Rob had
16 been told by him he would call Rob to let him know
17 about a payment to Dennis."
18         That was -- I'm sorry.  That was
19 October 21, '09, entry.
20         I'm looking now at September 18, '09,
21 entries.  "We received a call from local attorney
22 Scott Freeman about a month ago.  He said he's
23 working with Dennis's attorney in Las Vegas and
24 wanted to know if we had turned this over to the
25 DA's office.

Page 335

1          "Rob spoke with Scott and sounded as if
2  Dennis may want to make a payment arrangement.
3  Scott was going to get back to us."
4          Is that true, Mr. Montgomery, were you
5  trying to make a payment arrangement with the
6  Peppermill Casino?
7      A.  I'm asserting my right under the Fifth
8  Amendment.
9      Q.  How would you -- how would you make such a
10 payment arrangement, Mr. Montgomery, at this time in
11 September 18 of 2009?
12     A.  I'm asserting my right under the Fifth
13 Amendment.
14     Q.  All right.  Okay.
15         All right.  If you flip with me to -- oh,
16 on the right-hand side dates dated -- remarks dated
17 October of '06, October 16, '06.
18     A.  '06?
19     Q.  Yeah.
20     A.  Which, which period of time?
21         MR. CROCKETT:  Same exhibit.
22         THE WITNESS:  Oh, okay.
23         MR. FLYNN:  1099.
24 BY MR. CONANT:
25     Q.  All right.  Mr. Montgomery, between the

Page 336

84 (Pages 333 to 336)

Dennis Lee Montgomery   -   November 18, 2010

1  years of -- well, between April '06 and March of
2  2009, how -- what did -- what is reflected as your
3  income in W-2s issued to you by Edra Blixseth's
4  entities?
5      A.   I don't recall.
6      Q.   For any year?
7      A.   I don't recall.
8      Q.   Less than a million dollars or more than a
9  million dollars?
10      A.   For what period?
11      Q.   Let's start with year -- tax year 2006.
12      A.   Tax year or calendar year?
13      Q.   Tax year -- for tax year 2006, what would
14  be reflected in your W-2 for that tax year?
15      A.   I don't recall.
16      Q.   For 2007, would it be -- I'm talking about
17  tax year 2006 now, would it be less than a million
18  dollars or more than a million dollars?
19      A.   I believe we went already went through this
20  same exact question.
21      Q.   I asked you how much --
22      A.   I don't recall.
23      Q.   What would be reflected in your tax year
24  2007 W-2 --
25      A.   I don't recall -- I'm sorry.

Page 337

1      Q.   -- as your income from Ms. Blixseth's
2  entities?
3      A.   I don't recall.
4      Q.   Less than a million dollars or more than a
5  million dollars?
6      A.   For 2007?
7      Q.   Yes.
8      A.   I would think less.
9      Q.   And for 2008, what would be reflected in
10  your tax year 2008 W-2s?
11      A.   I want to make sure I don't get in trouble.
12      MR. CROCKETT:  I think you've confused both
13  of us.
14      THE WITNESS:  Yeah.  You've changed.  Which
15  one are you talking about?  The easiest way to tell
16  me is just that year.
17      Tax year, isn't that the next year?
18  BY MR. CONANT:
19      Q.   Well, if you're getting a W-2 for tax year
20  2008 --
21      MR. CROCKETT:  For calendar year 2008.
22      THE WITNESS:  You mean calendar year.
23      MR. CONANT:  Calendar year is -- for
24  individuals is same for -- it's the same for --
25      MR. CROCKETT:  Hold on.  I lost my

Page 338

1  microphone.
2      All right.  Sorry.
3      THE WITNESS:  I'm confused.  I thought the
4  tax year was the next -- the next year that reported
5  the previously year's.
6  BY MR. CONANT:
7      Q.   Right.
8      So your W-2 that reflects your taxes --
9  your income for 2008.  If I'm asking for your tax
10  year 2008 W-2, I want the W-2 --
11      A.   -- for 2007?
12      Q.   No, the W-2 that refers to your 2008
13  income.
14      MR. CROCKETT:  Which would be the one that
15  you would receive by January 31st, 2009.
16      THE WITNESS:  Right.  Right.  Right.
17  Right.
18      I don't recall.
19      What's the previous question you asked me
20  regarding 2007?  I want to -- I may have answered --
21  I want to make sure.
22  BY MR. CONANT:
23      Q.   Sure.
24      A.   Can you repeat it?
25      Q.   Yeah, for tax year 2007, what is reflected

Page 339

1  on your W-2 for that tax year?
2      A.   I don't recall.
3      MR. FLYNN:  Same question 1099s.
4  BY MR. CONANT:
5      Q.   Did you receive any 1099s from any of
6  Ms. Blixseth's entities?
7      A.   At one point I was getting W-2s and at one
8  point I was getting 1099s.  I don't remember when.
9      Q.   Do you recall how much your income was
10  reflected on any 1099 that you received for any tax
11  year?
12      A.   I don't recall, no.
13      Q.   And when I say -- I'm referring to 1099s
14  issued by Ms. Blixseth's entities.
15      A.   I understood the question.
16      I don't -- I'm not certain.  I don't recall
17  is my point.  I don't recall what I got on either a
18  W-2 or a 1099.
19      Q.   So it's safe to say that with respect to
20  1099s or W-2s for tax years 2006 through 2009 for
21  income you received from Edra Blixseth's entities,
22  you just don't recall what would be on those?
23      A.   I don't have my taxes on them and you've
24  been hitting me for eight straight hours and I'm
25  tired.

Page 340

Dennis Lee Montgomery  -  November 18, 2010

```
 1           MR. CROCKETT:  Answer the question.
 2           THE WITNESS:  I don't know.
 3           MR. CONANT:  That's all I wanted to know.
 4           MR. CROCKETT:  Because the documents are
 5   the best evidence anyway.
 6           THE WITNESS:  I know.
 7           It's 5.  I really need to leave at
 8   5 o'clock and it's 5 o'clock.
 9           Or is it not maybe.
10           MR. CONANT:  I have two minutes.
11           Anything further?
12           THE WITNESS:  Are these ours to take?
13           THE REPORTER:  No.
14           THE WITNESS:  These are yours?
15           MR. CROCKETT:  These are --
16   BY MR. CONANT:
17       Q.  Mr. Montgomery, the reference that we just
18   saw on these casino records, your attempts to sell
19   your software to countries overseas, did Edra
20   Blixseth have any involvement at all with your
21   efforts in that regard?
22       A.  I've answered the Fifth.
23           MR. CONANT:  It's 5 o'clock.
24   Mr. Montgomery needs to go, as does his attorney.
25   I'm going to hold -- I'll reserve the right to
```

Page 341

```
 1           I hereby declare under penalty of perjury
 2   under the laws of the State of California that I
 3   have read the foregoing deposition and that the
 4   testimony contained therein is a true and correct
 5   transcript of my testimony given at said time and
 6   place.
 7           Dated this _____ day of _____,
 8   2010, at _____, _____.
 9
10
11           _____
12           Signature of Witness
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 343

```
 1   continue this deposition subject to Judge Bluebon's
 2   (phonetic) rulings on the propriety of any refusal
 3   to answer in the case that there's no privilege, his
 4   refusal to produce documents that we've requested
 5   he's hid behind the Fifth Amendment privilege for.
 6           THE WITNESS:  Okay.
 7           MR. CONANT:  So with that, I think we'll go
 8   off the record.
 9           THE VIDEOGRAPHER:  This concludes today's
10   proceeding in the video deposition of Dennis Lee
11   Montgomery.  The total number of media used was
12   four.
13           We're going off the record.  The time is
14   5 p.m.
15           THE REPORTER:  Copies?
16           MS. WELLS:  Yes.
17           MR. CROCKETT:  You better send me one.
18           (The deposition was concluded at 5 p.m.)
19
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
```

Page 342

```
 1
 2              CERTIFICATE
 3                  OF
 4      CERTIFIED SHORTHAND REPORTER
 5
 6           I, Stephanie P. Borthwick, Certified
 7   Shorthand Reporter of the State of California, do
 8   hereby certify:
 9           That the foregoing deposition was taken
10   before me at the time and place therein set forth,
11   at which time DENNIS LEE MONTGOMERY was duly sworn
12   by me:
13           That the testimony of the witness and all
14   objections made at the time of the examination were
15   recorded stenographically by me and thereafter
16   transcribed, said transcript being a true copy of my
17   shorthand notes thereof, and a true record of the
18   testimony given by the witness.
19           In witness whereof, I have subscribed my
20   name this date:  December 7th, 2010.
21
22
23           _____
24           STEPHANIE P. BORTHWICK, CSR
25           Certificate No. 12088
```

Page 344

86 (Pages 341 to 344)

# EXHIBIT D

Case 1:23-mc-00078-CKK-MAU Document 17 Filed 07/28/25 Page 752 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 52 of 264
-151-

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
 2       BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                      ---o0o---
 3

 4    Dennis Montgomery, et al.,    : No. 3:06-cv-056-PMP-VPC
                                    :
 5                Plaintiff,        : August 19, 2008
                                    :
 6          -vs-                    : United States District Court
                                    : 400 S. Virginia Street
 7    ETreppid Technologies,        : Reno, Nevada  89501
      et al.,                       :
 8                                  :      VOLUME II
                  Defendant.        :
 9    _____:


10

11                       TRANSCRIPT OF
12              CONTINUED SHOW CAUSE HEARING


13    A P P E A R A N C E S:

14
      FOR THE PLAINTIFF:            Randall Sunshine
15                                  Ellyn Garofalo
                                    Attorneys at Law
16

17    FOR DEFENDANT ETREPPID:       Stephen Peek
                                    Jerry Snyder
18                                  Attorneys at Law

19    FOR COUNTER-DEFENDANTS:       Bridgett Robb-Peck
                                    Gregory Schwartz
20                                  Attorneys at Law

21    FOR INTERESTED PARTY:         Carlotta Wells
                                    U.S. Department of Defense
22

23

24    Proceedings recorded by mechanical stenography produced by
      computer-aided transcript
25
```

Case 1:23-mc-00078-CKK-MAU Document 1-7 Filed 07/28/23 Page 753 of 1046
Case 3:06-cv-00056-PMP-WPC Document 834 Filed 09/03/08 Page 53 of 264

152

1

2    Reported by:                    KATHRYN M. FRENCH, RPR, CCR
                                     NEVADA LICENSE NO. 392
3                                    CALIFORNIA LICENSE NO. 8536

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:23-mc-00078-CKK-MAU Document 157 Filed 07/28/23 Page 754 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 54 of 264

153

```
 1              Reno, Nevada, Tuesday, August 19, 2008, 9:00 a.m.

 2                            ---oOo---

 3

 4              THE COURT:  Thank you.  Please be seated.

 5              THE CLERK:  This is the date and time

 6    set for continued Show Cause Hearing in case number

 7    3:06-cv-056-PMP-VPC, Dennis Montgomery, and others, versus

 8    eTreppid Technologies, and others.

 9              Present on behalf of plaintiff, Ellyn Garofalo and

10    Randall Sunshine.

11              Present on behalf of defendant, Stephen Peek and

12    Jerry Snyder.

13              Present on behalf of counter-defendant,

14    Bridgett Robb-Peck.

15              Present on behalf of interested party,

16    Carlotta Wells.

17              THE COURT:  Good morning everybody.

18              Let the record reflect it is 9:08 a.m.  The Court

19    intends to start promptly nine o'clock a.m.  So I think

20    Mr. Peek may have been here early setting things up, but I

21    expect that we commence at nine o'clock sharp, just for

22    future reference.

23              Counsel.

24              MS. GAROFALO:  Good morning, Your Honor.  I

25    think the eight minutes late may have been well spent.
```

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

Case 1:23-mc-00073-CKK-MAU   Document 17-7   Filed 07/28/23   Page 755 of 1046
Case 3:06-cv-00056-MMD-WGC   Document 834   Filed 03/03/08   Page 5 of 204

-154

1    Mr. Peek and I have been discussing what is one of the key

2    issues here, which I think we have reached a resolution on.

3            As the Court knows, there's been much talk about

4    the Glogauer e-mails and PST files, the original PST files.

5    The Glogauer PST files have now been received back from the

6    Washington attorneys, Scatton lawyers, who were using that in

7    the Grand Jury proceedings.  There is an issue with one, at

8    least one, e-mail chain which, in response to a word search,

9    does indicate that there may be some information subject to

10   the State Secret's Privilege on the Glogauer PST.

11           We've talked to Ms. Wells, who will be talking to

12   her client about the best way to handle it.  We've indicated

13   to Mr. Peek that we would prefer Mr. Montgomery remove those

14   files, necessarily open those files.  And we've come up with

15   several alternatives that, hopefully, by the end of the day,

16   we will be able to convey to the Court that we have resolved

17   the issue, and that those hard drives will be produced

18   forthwith to Mr. Peek.

19           THE COURT:  All right.  Very good.

20        Mr. Peek.

21           MR. PEEK:  I have nothing to say.  I appreciate

22   the proffer, Your Honor, and I've accepted.  And, certainly,

23   we're going to be speaking with Ms. Wells and see if we can't

24   find a way to expedite this.

25           THE COURT:  Thank you very much.

Case 1:23-mc-00078-CKK-MAU Document 17-4 Filed 07/28/23 Page 756 of 1046
Case 3:06-cv-00056-PMP-WPC Document 834 Filed 09/03/08 Page 56 of 264

-155-

1           MS. GAROFALO:  Thank you.

2           THE COURT:  Thank you, counsel.

3       The other matter, counsel, we're just trying get

4   exhibits sorted out.  And I understand counsel can do that

5   later on today, toward the end of the afternoon.

6           Is that correct, counsel?

7           MR. SUNSHINE:  Yes, Your Honor.

8           THE COURT:  Okay.  Very good.

9       Correct, Mr. Peek?

10          MR. PEEK:  Yes, Your Honor.

11          THE COURT:  All right.  Mr. Peek, by my count,

12  you've got 4 hours and 17 minutes.

13          MR. PEEK:  That's about what I calculated, too,

14  Your Honor.

15          THE COURT:  All right.  So you may proceed, sir.

16          MR. PEEK:  Just need a witness, and we're ready

17  to go.

18          THE COURT:  All right.

19                  **DIRECT EXAMINATION (resumed)**

20  BY MR. PEEK:

21   Q   Mr. Montgomery, I wanted to go back and clear up a few

22  things that I hadn't covered yesterday.  And I'm going to

23  start with, at least, the NBC and Wall Street Journal

24  communications.

25          One thing I have not seen in any production at

Case 1:23-mc-00078-CKK-MAU Document 17-1 Filed 07/28/23 Page 757 of 1046
Case 3:06-cv-00056-PMP-WPC Document 834 Filed 09/03/08 Page 57 of 264

-156-

1   all, is any form of communications, whether it be cell phone

2   record or long distance phone call records of how NBC News was

3   contacted.

4           Did you contact NBC News?

5   A    No.

6   Q    Who did?

7   A    Tim Blixseth.

8   Q    Okay.  Did he do it -- do you know whether he did it by

9   telephone or by e-mail?

10  A    I believe phone.  I don't know for certain, but my

11  understanding was he was the one who had the contact with

12  them.

13  Q    And do you know at whose prompting Mr. Blixseth contacted

14  NBC News?

15  A    No.

16  Q    Was it at yours?

17  A    No.

18  Q    Did you tell Mr. Blixseth that you had certain e-mails

19  that would be of interest to NBC News?

20  A    I don't recall that I did or not.

21  Q    Well, why was it that he would contact NBC News, other

22  than to talk about the Jale Trepp and Glogauer e-mail?

23  A    You would have to ask him.

24  Q    Did you testify tell him about the Len Glogauer e-mail?

25  A    No.

Case 1:23-mc-00078-CKK-MAU Document 17-4 Filed 07/28/23 Page 758 of 1046
Case 3:06-cv-00056-MMD-WGC Document 834 Filed 03/03/08 Page 58 of 264

-157

1    Q    Did you give him a copy?

2    A    No.

3    Q    Did you tell him about the Jale Trepp e-mail?

4    A    I don't recall if I did or not.

5    Q    The Wall Street Journal, did you contact John Wilke, or

6    did somebody else contact John Wilke?

7    A    I didn't.

8    Q    Okay.  And who did?

9    A    I don't know if it was Tim or Edra.

10   Q    Okay.  One of those two?

11   A    I want to say Tim, but I'm -- I'm not certain.

12   Q    Okay.  And do you know when he did that?

13   A    No.

14   Q    Do you know whether he did it by phone or by e-mail?

15   A    I don't know.

16   Q    And do you know why he did it?

17   A    No.

18   Q    Did you tell him something that caused him to -- that you

19   believe caused him to contact the Wall Street Journal?

20   A    I did talk with him, I think, on one occasion.

21   Q    I mean, for example, did you tell him that you had a

22   Len Glogauer e-mail?

23   A    I don't recall if I said that exactly or not.

24   Q    Did you tell him what you believed about the Jale Trepp

25   e-mail?

Case 1:23-mc-00078-CKK-MAU Document 17-7 Filed 07/28/23 Page 759 of 1046
Case 3:06-cv-00056-MMD-WPC Document 834 Filed 03/03/08 Page 59 of 264

-158-

1  A   I don't recall that one specific instance or not.

2  Q   Did you tell him that you had evidence that Mr. Trepp had

3  given casino chips and cash to Congressman Gibbons?

4  A   I told him I saw it.

5  Q   You told him you saw it.  Okay.

6          And did you tell him you saw it on one, or more than

7  one instance, or more than one instance?

8              MS. GAROFALO:  Your Honor, objection.  Relevance

9  based on the -- objection.  Relevance.

10             THE COURT:  Mr. Peek.

11             MR. PEEK:  Your Honor, what I'm trying to get at

12 is whether there are communications that Mr. Montgomery would

13 have that should have been produced.

14             MS. GAROFALO:  I'll withdraw the objection at

15 this time, Your Honor, but we are here to focus --

16             MR. PEEK:  And I'll do this quickly.  Sorry.

17             MS. GAROFALO:  -- to the core issues.  Not to

18 the underlying merits of the case.

19             THE COURT:  I agree.  Okay.

20         All right.  The Court does concur, to some extent,

21 with Mr. Montgomery's counsel about the focus.

22         So, go ahead, with that comment, Mr. Peek.

23 BY MR. PEEK:

24  Q   Did you provide any communications to Mr. Blixseth via

25 e-mail, for example?

Case 1:23-mc-00078-CKK-MAU Document 157-4 Filed 07/28/25 Page 760 of 1046
Case 3:06-cv-00056-PMP-WPC Document 834 Filed 09/03/08 Page 90 of 264

-159-

1    A    I don't recall if I did or not.

2    Q    And if you did, those would be where, sir?

3    A    I mean, I don't have them.  If he has them -- maybe he

4    has them.  I don't know.

5    Q    When you say you don't have them, what efforts have you

6    made to look for them?

7    A    I've -- we went through this for four days.  I've looked

8    everywhere for everything you asked for, diligently.

9    Q    And you also told us yesterday that you believe if there

10   were any communications regarding your efforts to transfer,

11   sell, assign the data compression, anomaly detection, pattern

12   recognition, Object Tracking, Source Code, it would have been

13   on your computer, the computer that was seized by the FBI.

14        Do you remember that testimony from yesterday?

15   A    Yes, I -- yes.

16   Q    Okay.  And so that would be the only place that it would

17   be, or would it be other places?

18   A    I mean there could have been another copy of that drive,

19   or I mean --

20   Q    Well, you told us yesterday you thought there was another

21   copy of that drive because the video was on that.

22   A    Right.

23   Q    So was there another copy of that drive?

24   A    Not that I know of, but I've not looked through

25   everything.  There's still five drives left.  I've referred

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 761 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 10 of 205

-160-

1   to this before.

2   Q   Okay.  And so it would be somewhere on those five drives?

3   A   It could be.  I mean, I have a number of CDs, which it

4   could have been on those too.

5   Q   Now, after -- well, there are certainly some e-mails that

6   I think you have produced.  I don't know whether you produced

7   them or somebody else produced them, but there are e-mails of

8   communications with respect to the transfer, assignment of the

9   Source Code, correct?

10   A   Yes.

11   Q   You've seen those?

12   A   Yes.

13   Q   Okay.  Now, the other thing that we know is that the

14   FBI seized your material on or about March 1st of 2006,

15   correct?

16   A   Yes.

17   Q   And that we also know from Exhibit 9, which you've seen

18   before, I believe.  I -- let me just make sure I got the right

19   exhibit.

20           Actually, it's exhibit 8.

21           Let me just refer you to Exhibit 8.  That is your

22   response to requests for production that came from Miss Klar,

23   or from the Liner Law Firm to us, on or about May 26th.

24           Do you see that e-mail in the first page of that?

25   A   Yes.

Case 1:23-mc-00073-CKK-MAU   Document 1-34   Filed 07/26/23   Page 762 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 91 of 205

-161-

1   Q   And then attached to that are all the documents that are
2   referenced in that e-mail.
3           Do you see that?
4   A   Yes.
5   Q   Okay.  Do you recognize this production as something that
6   you produced on or about May 26th, 2006 -- excuse me, 2008.
7   A   No.  I mean, I -- I don't know that.
8   Q   Okay.  Well, let me just then follow-up.
9           Would you turn to a page that is marked MONT-184.
10  And these are in date numerical, ascending order.
11  A   Mine goes to 182 -- oh, no.  Then it starts with another
12  e-mail.
13          Oh, I see.  I got it.
14  Q   Okay.
15  A   Sorry.
16  Q   Do you see that e-mail there?
17  A   Yes.
18  Q   What's the address of Dennis Montgomery there?
19  A   Dennis@ncoder.net.
20  Q   Now, yesterday, you told us you didn't think you setup
21  that e-mail account in mid 2006.
22          Do you remember that testimony?
23  A   Yes.  Yes.
24  Q   You were wrong?
25  A   Yes.  Obviously.

Case 1:23-mc-00075-GKK-MAU  Document 174  Filed 07/28/23  Page 763 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 12 of 205

162

1   Q   You were using the Montgomery@ncoder.net in March of

2   2006, were you not?

3   A   I didn't think so, but it may have been.

4   Q   Well, did you get this e-mail that was addressed to

5   Dennis@ncoder.net?

6   A   I'm believing you.  I see it.

7   Q   You don't have to believe me.

8   A   I'm saying I may -- maybe I set it up earlier.  I don't

9   recall.

10  Q   Okay.  But, anyway, this is an e-mail dated March 27th,

11  2006, is it not?

12  A   Yes.

13  Q   It's e-mail that wouldn't be on your home computer,

14  isn't it?

15  A   Correct.

16  Q   Because your e-mail, your e-mail was seized on or about

17  March 1st?

18  A   Yes.

19  Q   So, yesterday, when you told us all of those e-mail

20  communications that would be on your -- with respect to

21  transfer assignment of the Source Code would be on your home

22  computer that was seized by the FBI, that is now in hard drive

23  with the nine one one serial number ending -- do you remember

24  that from yesterday?

25  A   I didn't think I said exactly that.

Case 1:23-mc-00075-CKK-MAU   Document 134   Filed 07/28/23   Page 764 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 23 of 205
163

1   Q   Well, that's what you told us yesterday.  If there were
2   any e-mails, they would be on that hard drive.  You've given
3   me everything.
4   A   I didn't say there wouldn't be any.  I said there would
5   be some.
6   Q   Oh, okay.  So there are some at Dennisencoder.net, are
7   there?
8   A   You keep asking me that.  There are none.
9   Q   There are none.  Well, here's one right here 184, is it
10  not?
11  A   I see that.
12  Q   It's on your e-mail.  It's on your e-mail, isn't it?
13  A   Yeah.  This could have shall be deleted a year ago.
14  Q   Okay.  So you deleted these e-mails?
15  A   No, I didn't.
16  Q   Well, they were deleted, correct?
17  A   I don't have that.  That's correct.
18  Q   Okay.  So these e-mails that you have that were produced,
19  didn't come from you, is that correct?  This e-mail, that
20  is --
21  A   I didn't --
22  Q   -- exhibit --
23  A   I don't -- I didn't have the agreements that I signed.
24  My attorney, Mike Flynn, did.  And he's never given them back
25  to me.  So, I couldn't have produced these signed documents

Case 1:23-mc-00073-CKK-MAU   Document 1-74   Filed 07/28/23   Page 765 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 25 of 205

-164-

 1   because Mr. Flynn is holding my documents -- like many other

 2   things.

 3    Q   Okay.  But you at least -- and you didn't have the

 4   e-mails either that are produced here?  Somebody else did.

 5    A   I don't know who produced this particular e-mail.  I

 6   mean, I don't know if Mike Flynn produced it.  I don't know.

 7    Q   Well, your -- you, through your lawyer, produced it.

 8   That's all I know.

 9    A   Okay.

10    Q   You don't know how they came into his possession, is that

11   your testimony?

12    A   I can't answer that without giving up attorney/client

13   privileged information.

14    Q   Well, did you provide e-mails to your attorneys that

15   covered the period of March 2006 through April 2006 that refer

16   to your transfer/assignment of the Source Code?

17    A   I didn't think -- the e-mails that I know of --

18    Q   Well --

19    A   Can I answer the question?

20    Q   It's a simple yes or no.

21        Did you or did you not provide --

22    A   I don't know specifically if that happened or not.

23    Q   Okay.  So you don't know whether you did provide these

24   e-mails that were produced by your counsel.

25        Is that your testimony?

Case 1:23-mc-00075-GKK-MAU  Document 17-4  Filed 07/26/23  Page 766 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/06/08  Page 15 of 205

-165

1    A    That's correct.

2    Q    Okay.  And where would those e-mails be today?

3    A    I believe I gave e-mails between myself and Mike Flynn

4    that were privileged e-mails.

5    Q    That's not what I asked.

6             Where are the e-mails that are referenced here --

7    A    Oh.

8    Q    -- in Exhibit 8?

9    A    I don't know.  I don't know.

10   Q    Okay.  And there are actually, in Exhibit 8, a number of

11   them.  You can look at, you know, MONT-185.

12   A    Yeah, I see them.

13   Q    186.

14   A    Which they all refer to Mike Flynn.

15   Q    Okay.  Did they come from Mike Flynn?

16   A    God, knowing him, I don't know.  I don't know.

17   Q    You don't know the source of these, is that correct?

18   A    No, but I did give the e-mails that were -- I thought

19   I was supposed to give that were e-mails that were between

20   myself and Mike Flynn.

21   Q    Okay.  So you had some of those someplace then?

22   A    Yes, at some point.

23   Q    Where did you have those?

24   A    I think they were burned onto a CD.

25   Q    And so then would that be all of the e-mails you had

Case 1:23-mc-00075-GKK-MAU  Document 134  Filed 07/28/23  Page 767 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 16 of 205

-166

1   between yourself and Mike Flynn that you burned on the CD?

2    A   I believe so.

3    Q   Okay.  And then you must have retained copies of those

4   e-mails in order to burn them onto a CD, is that correct?

5    A   No.  I gave them -- what I had, I burned them onto a CD.

6    Q   Right before you burned them onto a CD, you took them off

7   some other form of electronic media, did you not, sir?

8    A   I think there -- I didn't know what the original source

9   was.  I don't know whether it was a CD or disk drive.

10   Q   Well, how did they -- what source --

11              THE COURT:  Okay.  Stop.  Stop.

12              MR. PEEK:  -- or hard drive --

13              THE COURT:  I just want to admonish both

14   counsel, and you, Mr. Montgomery, the court reporter cannot

15   report accurately if you talk over one another.  So please

16   take care to not do that.

17              Go ahead, sir.  Start again.

18   BY MR. PEEK:

19   Q   From what media source did you obtain the e-mails between

20   you and Mike Flynn that you burned onto either a CD or a hard

21   drive?

22   A   An Outlet file.

23   Q   And where was that outlet file?

24   A   On a hard drive.

25   Q   And on whose hard drive was that?

Case 1:23-mc-00073-GKK-MAU  Document 174  Filed 07/28/23  Page 768 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 97 of 205

-167

1  A   Mine.

2  Q   Did the hard drive only save e-mails between you and

3  Mr. Flynn, or did it save all e-mails?

4  A   Just those.

5  Q   So did you setup one program in your computer that it

6  would only save e-mails between you and Mr. Flynn?

7  A   I don't remember if it was setup that way specifically

8  or not.

9  Q   Okay.  But for some reason or another, you kept only the

10  e-mails in your Outlook file between you and Mr. Flynn, but

11  not others, is that correct?

12  A   Yes.  Because Mr. Flynn was very adversarial to me.

13  Q   In 2006 he was?

14  A   Yes.

15  Q   Okay.  And that would be in March of 2006, he was very

16  adversarial to you?

17  A   No.  Not at the beginning.

18  Q   Well, when did you start saving your e-mails between you

19  and Mr. Flynn?

20  A   Well, since I knew Mr. Flynn.

21  Q   Okay.  And those are the only e-mails that you saved, is

22  that correct?  Is that your testimony?

23  A   I -- there were e-mails on Opspring's computers that

24  Michael Sandoval retained.

25  Q   But this is before Mr. Sandoval, in this Exhibit A, is

Case 1:23-mc-00073-GKK-MAU  Document 1-34  Filed 07/26/23  Page 769 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/08/08  Page 19 of 205

168

1    it not?

2     A    Yeah, I know.  But, you're talking about a month before.

3    This is the month of March.

4     Q    I am talking about the month of March.

5     A    I don't recall that, whether I did or not.

6     Q    Okay.  And these were saved on your personal computer

7    where the address is Dennis@ncoder.net, is that your

8    testimony, the ones with Mr. Flynn?

9     A    Yes.

10    Q    And you saved no others than the ones between you and

11   Mr. Flynn, is that your testimony as well?

12    A    I don't recall the others, if I did or not.

13    Q    And where are those e-mails today that -- just the ones

14   that you saved between you and Mr. Flynn?

15    A    My attorneys'.

16    Q    Okay.  And where are the ones that you had between you

17   and others?

18    A    Well, between Opspring, they were on Opspring's

19   computers, of which Mr. Sandoval retained.

20    Q    Okay.  And so Mr. Sandoval would have those?

21    A    I would say that's a good source.

22    Q    Okay.  And what about the others that were not the

23   Opspring e-mails?

24    A    Well, I just told you I had Opspring and Dennis@ncoder --

25    Q    I'm talking about the others that would be at

Case 1:23-mc-00075-GKK-MAU  Document 171  Filed 07/26/23  Page 770 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 770 of 205

169

1   Dennis@ncoder, where are they?

2   A   I haven't seen them.  I will look for them.

3   Q   Okay.  So you think they may exist?

4   A   I don't think so, but I will surely look.

5   Q   Okay.  Is this -- have you looked before today?

6   A   I've been looking for five months.

7   Q   Have you looked before today?

8   A   Yes, I have.

9   Q   Okay.  And in your search, did you find any e-mails that

10  would be responsive to any requests for production where you

11  had the e-mail address at Dennis@ncoder.net?

12  A   I had looked, but I don't think I found them originally.

13  I mean I haven't seen them.

14  Q   Okay.  You believe they exist?

15  A   There's a possibility.

16  Q   So it's just only a possibility that they may exist?

17  A   I've looked through a lot of information for five months.

18  Q   Okay.  Well the request went out to you in November

19  of '07.  Did you begin looking in November of '07, sir?

20  A   Yes.

21  Q   And?

22  A   And I believe I sent things to my original attorney,

23  Mr. Flynn.

24  Q   Mr. Flynn was not your attorney in November of '07, sir.

25  A   November of '07.

Case 1:23-mc-00075-GKK-MAU  Document 134  Filed 07/28/23  Page 771 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 20 of 205

—170

1    Q    That's correct, sir.

2    A    Okay.  I'm sorry.  I thought I had that wrong.

3    Q    Well, you did have it wrong.

4    A    Yeah, I got it wrong.  Yeah.

5         What was the question?

6    Q    The question was you've had it since November of '07,

7    when the request went out to you.  Did you begin looking in

8    November of '07 when the requests were sent to you?

9    A    Yes.  And I didn't find any at that time.

10   Q    So then you've been looking since November of '07, and

11   it's now August of '08.  So, that's approximately ten months.

12   Almost nine or ten -- eight, seven or eight months.

13   A    Is that a question?

14   Q    Yeah.  So you haven't found anything in this period of

15   time?

16   A    I have found stuff.

17   Q    November '07 --

18   A    I've produced four million files.  So, I can't say I

19   didn't find anything.  I have found something.

20   Q    Sir, my question was really related to the e-mails.

21   In November of '07, until today, August 19th, have you

22   found any e-mails, other than the ones that are between

23   you  and Mr. Flynn, that would be responsive to the requests

24   for production that would bear the e-mail address at

25   dennisncoder.net?

Case 1:23-mc-00073-GKK-MAU   Document 1-34   Filed 07/28/23   Page 772 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 21 of 205
                                                                    —171

1   A   And excluding my current attorneys?

2   Q   Yes, sir.

3   A   No.  I haven't found any.

4   Q   Okay.  And the request also required you to produce them

5   in native format.

6   A   Correct.

7   Q   With PST.  So, you haven't done that either, have you?

8   A   Well, if I find them, and they're in that format, I will

9   produce them.

10                  MR. PEEK:  I would offer exhibit 8, Your Honor.

11                  THE COURT:  Any objection?

12                  MS. GAROFALO:  No, Your Honor.

13                  THE COURT:  All right.  Exhibit 8, defendant's

14   Exhibit 8, is submitted.

15            (Whereupon, exhibit 8 -- document, was received in

16   evidence.)

17   BY MR. PEEK:

18    Q   Now, we talked yesterday about Mr. Visconti.

19            Do you remember that testimony yesterday of

20   Mr. Visconti?

21    A   That was the Chris Shockey e-mail?

22    Q   Yes.  Do you recall attending a meeting with Mr. Shockey

23   in December of 2007, in Bellevue, with yourself, Mr. Shockey,

24   Mr. Rhodes, Mr. Crisman, Mr. Visconti, Mr. Wehnt and

25   Mr. King?

Case 1:23-mc-00073-GKK-MAU   Document 1-7   Filed 07/26/23   Page 773 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 22 of 205

172

1   A   No.

2   Q   You don't have any recollection of that at all?

3   A   No, I don't recognize the guy's name.

4   Q   You do recognize the other names, Mr. Shockey and

5   Mr. Rhodes, and Mr. Crisman, do you not?

6   A   Yes.

7   Q   And you don't recognize the names Mr. Wehnt and Mr. King

8   then as well?

9   A   No.

10   Q   And did you, during -- well, did you ever make a

11   presentation to Mr. Visconti, Mr. Wehnt, and Mr. King, in

12   which you provided a demonstration of the technology showing

13   a CD quality movie, and what Dennis, what you described, as

14   a 19 to 1 video compression?

15   A   No.

16   Q   You don't ever recall doing that?

17   A   No.

18   Q   Do you have or did you have a demonstration of technology

19   showing the CD quality movie in a 19 to 1 video compression

20   while you were at Opspring?

21   A   No.

22   Q   You did not?

23   A   No.

24   Q   Okay.  Following along with some of those marketing

25   efforts, would you take a moment and look at Exhibit 20.

Case 1:23-mc-00075-GKK-MAU Document 137 Filed 07/28/23 Page 774 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 23 of 205

173

```
 1              THE COURT:  What volume, sir?

 2              MR. PEEK:  It's Volume 5, Your Honor.

 3              THE WITNESS:  Okay.

 4  BY MR. PEEK:

 5   Q   Do you recognize that?

 6   A   Which number?  Exhibit 20?

 7          I don't know what this --

 8   Q   There's an entire exhibit.  Would you please take a

 9  moment and take a look at it.

10              THE COURT:  There's a second page.

11  BY MR. PEEK:

12   Q   Do recognize this as the exhibit you submitted?

13   A   Yes, sir.

14   Q   And you signed it under penalty of perjury, didn't you,

15  sir.

16   A   Yes.

17   Q   Now, would you turn to paragraph 12 on page 6 of that

18  exhibit.

19   A   Okay.

20   Q   Declaration number 6.

21   A   Yes, I see it.

22          Which one is it?

23   Q   Paragraph 12.

24   A   Yes, I see it.

25   Q   And you say in your declaration:  "Throughout the summer
```

Case 1:23-mc-00073-GKK-MAU   Document 134   Filed 07/28/28   Page 775 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 25 of 265

-174

1    and fall of 2006, up to and including the present, I worked

2    with my current employers to improve my technology.  It is

3    significantly improved, and we have voluntarily used it in the

4    last 60 days to voluntarily provide intelligence information

5    to appropriate officials in, order to save American lives.

6    Even with its current limited use, it has specifically

7    diverted specific terrorist threats."

8             Was that your effort to market the technology to the

9    United States Government?

10   A    No.

11   Q    It was just a voluntary act on your part?

12   A    No.

13   Q    No effort to sell or market your --

14   A    Me?  No.

15   Q    Well, somebody at Opspring?

16   A    I didn't.  I wasn't involved.

17   Q    Did somebody at Opsprings do it, sir?

18   A    Well, you just asked me that question.

19   Q    Did somebody at Opsprings do it, sir; market the

20   technology to the United States Government?

21   A    I don't know if they did that specifically or not.

22   Q    Well, when you were providing these voluntary efforts to

23   the intelligence community of the United States Government,

24   were you doing so on behalf of Opsprings, or yourself, to

25   market the Source Code?

Case 1:23-mc-00073-GKK-MAU Document 134 Filed 07/26/28 Page 776 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 25 of 205

175

 1   A    No.  I would like the ask the government a question

 2   before I answer this.

 3   Q    If you want to.  I mean, this has been redacted already

 4   by the government.

 5   A    So you want me just to answer the question, right?

 6   Q    No.  Go ahead and ask the government.

 7               MR. PEEK:  Your Honor, I don't want to --

 8               THE WITNESS:  I'm not sure -- the question you

 9   asked me again was what?

10   BY MR. PEEK:

11   Q    The question was when you provided this information

12   described in paragraph 12, was it an effort, by Opspring, to

13   market the technology to the United States Government?

14   A    I don't think so.

15   Q    Why was it done then?

16   A    Uh, we thought it would be helpful.

17   Q    Did you think it would also be helpful to provide them

18   this information in order to show the benefits of the Source

19   Code?

20   A    Well, we weren't giving them the Source Code.  We were

21   just giving the output.

22   Q    Well, sir, the benefits of the Source Code, which would

23   be the outputs, correct?

24   A    No.

25   Q    Right?

Case 1:23-mc-00073-CKK-MAU   Document 134   Filed 07/28/23   Page 777 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 76 of 205
176

1    A    No.

2    Q    So this is not a marketing effort on your part?

3    A    No.

4    Q    Not a marketing effort on the part of Opspring, is that

5    your testimony?

6    A    Yes.

7    Q    Is --

8                MR. PEEK:  Your Honor, do I need to offer

9    declarations, Your Honor, that are already part of the record?

10   I'll just refer to them in closing, but if I -- otherwise, I

11   would offer Exhibit 20.

12               THE COURT:  All right.  Well, let's go ahead,

13   since they're exhibits.

14        Do you have any objection, counsel, just to having

15   it admitted?  It's part of the record as --

16               MS. GAROFALO:  No, Your Honor.

17               THE COURT:  All right.  20 is admitted.

18          (Whereupon, exhibit 20 -- a document, was received

19   in evidence.)

20               MR. PEEK:  Thank you.

21   BY MR. PEEK:

22   Q    Now, we covered yesterday your affidavit, or your, excuse

23   me, your declaration that you gave where you said that did not

24   contain any classified information.

25          Do you remember that from yesterday?

Case 1:23-mc-00073-GKK-MAU  Document 134  Filed 07/26/23  Page 778 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 73 of 205
177

1   A    Yes.

2   Q    Okay.  Now you've also made a representation to this

3   court in pleadings that at least 60 to 80 percent of the

4   technology data consists of files that are covered by the

5   U.S. Protective Order.

6            Do you remember that?

7   A    Yes.

8   Q    And is that still your testimony today?

9   A    I don't know if it -- if it's that high.  But, it's a

10  sizeable number.

11  Q    Okay.  And of that so-called 60 to 80 percent of

12  the technology data, have you provided any of it to the

13  government?

14  A    Yes.

15  Q    Okay.  And that's in the form, I think you said, of two

16  hard drives that you gave up recently?

17  A    Three.

18  Q    Three hard drives very recently.  Okay.

19            And how much data was on that?

20  A    I don't know specifically.  I would think a terabyte or

21  two.

22  Q    You would think.  Okay.  You don't know then?

23  A    Well, one of them was a terabyte.  I think the

24  other two, one was on a 500, and one was on a 750.  That's

25  two-and-a-quarter terabytes, and they weren't all full.  So,

Case 1:23-mc-00073-GKK-MAU   Document 1-34   Filed 07/28/23   Page 779 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 29 of 205

-178

```
 1   I don't know.
 2   Q   And how did you obtain this information, or this
 3   information on these drives you gave to the government?
 4   A   What do you mean how did I obtain it?
 5   Q   Just exactly how did you obtain it?  Did you take it from
 6   the eTreppid computers?
 7   A   No.
 8   Q   How did it come into your possession then, sir?
 9   A   Government.
10   Q   Okay.  So the government gave you these hard drives,
11   first of all, and then you copied them from the government
12   onto something, some of your own media, is that correct, your
13   electronic --
14   A   I think so.  Yeah.
15   Q   You think so or you know, sir?
16   A   I -- I don't know specifically.  Are you talking about
17   the drives that I've given to the government?
18   Q   No, no, sir.  I'm not talking about --
19   A   Okay.
20   Q   --  I'm talking about the data on the hard drives.
21   A   Yeah.
22   Q   Did you obtain the data on the hard drives from eTreppid?
23   A   No.
24   Q   Okay.  You said you got it from the government.
25   A   Yes.
```

Case 1:23-mc-00073-GKK-MAU Document 1-34 Filed 07/26/23 Page 780 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/08/08 Page 29 of 205

−179

1    Q    Okay.  When did the government give it to you

2    specifically?

3                    MS. WELLS:  Your Honor, I would caution

4    Mr. Montgomery in providing that answer.  To take the terms

5    of the Protective Order into account.

6                    MR. PEEK:  It's just a when.

7                    MS. WELLS:  That could be a problem.

8                    MR. PEEK:  A when has problems.  Okay.

9    BY MR. PEEK:

10   Q    When did you get if from the government?

11   A    When did I what?

12   Q    When did you get it from the government?

13   A    You want -- you say the date?

14   Q    No.  You can't say the date --

15                   MS. WELLS:  No.

16   BY MR. PEEK:

17   Q    -- if it came from a source covered by the State Secrets

18   Privilege?

19   A    You already asked me --

20                   THE COURT:  Stop.

21                   MR. PEEK:  I'll let Ms. --

22                   THE COURT:  Stop.

23                   MS. GAROFALO:  Your Honor, I think we're in

24   direct jeopardy of trespassing on the U.S. Protective Order.

25                   MR. PEEK:  He can --

Case 1:23-mc-00075-GKK-MAU   Document 137   Filed 07/28/23   Page 781 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 30 of 205

—180—

1            MS. GAROFALO:  If we are going to proceed,

2    I think we need to take a short break to confer with

3    Mr. Montgomery.

4            THE COURT:  All right.

5            MR. PEEK:  But can Mr. Montgomery confer with

6    the United States Government, Your Honor, before he answers

7    that question?

8            THE COURT:  Let me ask Ms. Wells.  She, as the

9    attorney for the government, if it is, she who will tell all

10   of us what is covered or not under the Protective Order.

11           So, Ms. Wells, you understand the nature of

12   Mr. Peek's questions.  What do you recommend we do.

13           MS. WELLS:  I would recommend that

14   Mr. Montgomery not answer that question, Your Honor.

15           THE COURT:  All right.  She -- counsel for

16   the United States has directed that, pursuant to the terms

17   of the U.S. Protective Order, Mr. Montgomery not answer that

18   question.

19           MR. PEEK:  Your Honor, may I confer with

20   Ms. Wells for a moment, because there are other agencies that

21   aren't covered by the States Secrets Privilege.

22           THE COURT:  All right.  Why don't you just take

23   a moment and speak privately.  We're not going to take a

24   recess.  Just the two of you can chat.

25           (Mr. Peek and Ms. Wells confer.)

Case 1:23-mc-00073-GKK-MAU   Document 134   Filed 07/26/28   Page 782 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 82 of 205

-181-

1          (Mr. Schwartz is now joined telephonically.)

2               THE CLERK:  Mr. Schwartz, are you there.

3               MR. SCHWARTZ:  I am.

4               THE COURT:  Thank you.

5          Good morning, Mr. Schwartz.  This is Judge Cooke.

6     We have commenced the Continued Order to Show Cause Hearing,

7     and Mr. Peek is examining Mr. Montgomery.

8               Go ahead, Mr. Peek.

9               MR. SCHWARTZ:  Thank you.

10    BY MR. PEEK:

11     Q   You've had occasion to meet with the United States

12    Government, so you know which agencies are covered by the U.S.

13    Protective Order, is that correct?

14     A   That's correct.

15     Q   Okay.  Knowing that, and excluding that from the

16    question, did any data on the hard drives you provided to

17    the government come from an agency not covered by the United

18    States Protective Order?

19     A   I'm not certain.

20     Q   Okay.  So I guess if I ask the "when," knowing that

21    they're from an agency not covered by the Protective Order,

22    your answer is also that you're not certain?

23     A   That's correct.

24     Q   I wanted to at least get into the record, at least, where

25    you made the representation to the Court.  So, I'm going to

Case 1:23-mc-00075-GKK-MAU Document 174 Filed 07/28/23 Page 783 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 32 of 205

-182-

1  have you look at, if you would, Document 604, filed in this

2  proceeding, page 3.

3          May I approach, Your Honor?

4              THE COURT:  You may.

5              THE WITNESS:  Is this in this binder?

6              MR. PEEK:  It's not in the binder, but it's part

7  of the court record.

8              THE WITNESS:  Okay.

9  BY MR. PEEK:

10  Q   If you look at the paragraph and the representation you

11  made to this court --

12  A   The one that's highlighted?

13              MS. GAROFALO:  I'm sorry, Your Honor.  But could

14  Mr. Peek please identify the document.

15              THE COURT:  Could you, please.

16              MR. PEEK:  Docket 604.

17  BY MR. PEEK:

18  Q   Could you read the title of it, since you have the title

19  of the document.

20  A   Emergency Request By Montgomery Parties For Status

21  Conference With the Montgomery Parties' Compliance With the

22  Court's Order May 7, 2008 Order.

23  Q   Okay.  And what representation did you make to the Court?

24  A   Do you want me to read it?

25  Q   Yes, sir.

Case 1:23-mc-00075-GKK-MAU Document 134 Filed 07/28/23 Page 784 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 33 of 205

-183-

1    A    "A substantial percentage, i.e. 60/80 of the technology

2    data consists of files the Montgomery parties reasonably

3    believe could fall within the provision of the U.S. Protective

4    Order, docket number 253, and the Non-Disclosure Agreements

5    executed by Dennis Montgomery, in connection with works

6    performed for the government of the protected data."

7    Q    Okay.  So of that 60, 80 percent -- you don't believe

8    it's that high today, is that correct?

9    A    It's probably not that high.

10   Q    Okay.  And have you submitted all of the 60 -- the amount

11   of data to the United States Government for their review?

12   A    No.

13   Q    And in May of 2007, you were telling the Court that

14   it existed.  Why have you not submitted that data to the

15   government in accordance with the procedures set forth in the

16   United States Protective Order?

17   A    Because for the last four months, I've been doing that.

18   Q    And all you found are just the three hard drives, is that

19   correct?

20   A    Yeah, with one million four hundred thousand files on it.

21   Q    Okay.  I understand what your testimony is.  All of

22   which you said was given to you personally by the United

23   States Government.

24   A    I said I believed that.

25   Q    Well, did it or did it not come to you directly from the

Case 1:23-mc-00073-GKK-MAU Document 134 Filed 07/26/28 Page 785 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/08/08 Page 34 of 205

-184-

 1   United States Government?  Or, did it come off of the

 2   computers at eTreppid?

 3    A   I can't remember right now everything that was on the

 4   drive that was given to them, to be certain whether that's

 5   correct or not.  I believe it is.  But, I'm not certain.

 6    Q   Thank you.

 7           Sir, when are you going to comply with the discovery

 8   orders and the Protective Order, and deliver all of the data

 9   that you believe is covered by the States Secrets Privilege to

10   the United States Government?

11    A   When it's all been segregated.

12    Q   When is that, sir?

13    A   Uh, by the end of the month.

14    Q   By the end of this month?

15    A   Yes.

16    Q   Correct?  Okay.

17           So you will deliver everything to the United States

18   Government, that you believe is covered by the States Secrets

19   Privilege, to the United States Government for their review,

20   on or before August 31st of 2008, is that correct?

21    A   Assuming I'm able to work on it, yes.

22    Q   Well --

23    A   Well, I've been in here.  I'm going to be here tomorrow.

24   I'm going to be here on Thursday.

25    Q   I just want to know the date certain.

Case 1:23-mc-00073-GKK-MAU   Document 1-74   Filed 07/26/23   Page 786 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 35 of 205

-185

1    A    I will surely try by the end of this month.

2    Q    Okay.  And if not by the end the month, what other date

3    would you give us?

4    A    I wouldn't think it would take more than a month to

5    complete everything that's left.

6    Q    Okay.  So that would be on or before September 19th would

7    be the latest date?

8    A    Yes.

9    Q    But you will begin doing it when?

10   A    Well, I've been doing it.

11   Q    When will you begin?

12   A    Can I speak?

13   Q    Okay.

14   A    I've been doing it for the last four months.

15   Q    I'll -- sorry.

16   A    But when I got hit with the second OSC hearing order

17   under the Source Code, I stopped doing that to work on that.

18   Q    Okay.  Let me ask my question again.

19        When will you begin doing the review to provide the

20   government the information that you believe is covered by the

21   States Secrets Privilege?

22   A    As soon as I return home.

23   Q    And when will that be?

24   A    Hopefully on Friday.

25   Q    Okay.  Now, there are also two articles the Wall Street

Case 1:23-mc-00073-GKK-MAU   Document 134   Filed 07/28/28   Page 787 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 86 of 205

-186-

1    Journal -- another area I forgot -- one was in November '06

2    and one was in February of '07.

3            Do you remember that?

4    A    No.

5    Q    Okay.  Let me refresh your recollection then.

6            Let me hand the Court exhibits 31 and 32, which are

7    in Volume VI.

8            Do you recognize exhibit 31, sir?  It was an article

9    that appeared in or around --

10   A    Yes.

11   Q    And you recognize Exhibit 32 as an article that appeared

12   in the Wall Street Journal on or about February 15th 2007?

13   A    I don't remember this one, but it's obviously my picture,

14   so -- oh, the Wall Street Journal?

15   Q    Yes.

16   A    No.

17   Q    You don't remember this article as appearing --

18   A    You said the Wall Street Journal, I thought.

19   Q    That's what I'm talking about.  Exhibit 32 is an article

20   in the Wall Street Journal.  The date of it is --

21   A    I was looking at 33, so --

22   Q    Okay.

23   A    Um, no.

24   Q    You don't recall this article?

25   A    No.  I thought there was one.

Case 1:23-mc-00075-CKK-MAU Document 174 Filed 07/28/23 Page 788 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 87 of 205

187

1    Q    Okay.  And in the article that appears on Exhibit 31,

2    there is no mention of a Jale Trepp e-mail is there?

3    A    Do you want me to read the article?

4    Q    If you need to, sir.

5    A    (Witness reviews document.)

6         No.

7    Q    Okay.  And is there mention of the Glogauer e-mail --

8    A    I didn't --

9              THE COURT:  Let him finish his question, sir.

10   BY MR. PEEK:

11   Q    Is there a mention of the Glogauer e-mail in this article

12   November 1st, 2006?

13   A    I didn't think so.

14   Q    Okay.  Do you know whether there was a second delivery of

15   e-mails to Mr. Wilke regarding Mr. Glogauer and Ms. Trepp

16   after the November 1st, 2006 article appeared?

17   A    I don't think so.

18   Q    Did you have any follow-up communications with Mr. Wilke

19   after the November 1st article appeared?

20   A    I spoke to him.  I -- I spoke to him.

21   Q    After November 1st, 2006, sir?

22   A    Yes.

23   Q    Did you do it by telephone?

24   A    Yes.

25   Q    Okay.

Case 1:23-mc-00073-GKK-MAU   Document 171   Filed 07/26/23   Page 789 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 88 of 205

-188-

1    A    Um, yes.

2    Q    Did you ever do it personally?

3    A    I think I only met him once.

4    Q    Okay.

5    A    You asked me this -- my nose is bleeding.  I really need

6    to stop for a minute.

7              THE COURT:  All right.

8              THE WITNESS:  I got a tissue.

9              THE COURT:  Do you want to take a recess, sir?

10             THE WITNESS:  Yeah.  Just for a few minutes.

11             THE COURT:  All right.  We'll take about a

12   five-minute recess.  And we will reconvene promptly, and I

13   mean promptly.  So, five minutes.

14             (Recess taken.)

15             THE CLERK:  Court is again in session.

16             THE COURT:  Please be seated.

17             THE WITNESS:  Sorry.

18             THE COURT:  You may proceed, Mr. Peek.

19   BY MR. PEEK:

20    Q    When you spoke to Mr. Wilke after November 1st, and

21   before February 5th, November 1st, 2006 and before November --

22   excuse me, after November 1st, 2006, and before February 15th,

23   2007, did you discuss the existence of e-mails with Mr. -- the

24   Glogauer e-mail and the Jale Trepp e-mail?

25    A    I don't think so.

Case 1:23-mc-00073-GKK-MAH Document 137 Filed 07/26/23 Page 790 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/06/08 Page 39 of 205

-189

 1   Q    So it's your testimony that no other e-mails were

 2   provided to Mr. Wilke after November 1st and before

 3   February 15th?

 4   A    I don't know the exact date that he got them, but that's

 5   correct.

 6   Q    Well, did he get them before November 1st --

 7   A    No.

 8   Q    -- 2006?

 9   A    I think I answered that.  I don't know.

10   Q    Well --

11   A    I'm not certain of the exact date because I have said I

12   don't believe I'm the one that gave them to him.

13   Q    I know you say you don't believe that.  But, you don't

14   know for certain whether you did or did not, isn't that

15   correct, sir?

16   A    I don't know.  I guess.

17               MR. PEEK:  I'd offer 31 and 32, Your Honor.

18               THE COURT:  Any objection, counsel.

19               MS. GAROFALO:  Yes.  Hearsay.  They're not

20   authenticated.

21               MR. PEEK:  They're not being introduced for

22   the truth, Your Honor.  They're just being introduced to

23   show the articles and what was contained in them.  There are

24   e-mails that are referenced only in the February 15th and

25   not the November 1st.  And it shows, again, if you will, the

Case 1:23-mc-00073-GKK-MAU  Document 134  Filed 07/28/23  Page 791 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 40 of 205

—190

```
 1    credibility of this witness.  They're not being introduced for
 2    the truth.
 3            MS. GAROFALO:  I think, Your Honor, that is
 4    for the truth as to whether or not the e-mails were provided
 5    or included in the article.  I still -- we still object on
 6    hearsay grounds.
 7            THE COURT:  Well, the objection is overruled.
 8    I think for purposes of this hearing, these e-mails, I don't
 9    believe they're being offered for the truth of the matter
10    asserted in the e-mails.  I think it goes to trying to
11    ascertain, for purposes of this Order to Show Cause Hearing,
12    the extent to which documents, Mr. Montgomery and the
13    Montgomery parties have been ordered to produce have been
14    produced.  And it's really serving as a benchmark in the
15    chronology of the events that occurred in this litigation that
16    relate to the document production.
17            Go ahead, Mr. Peek.
18            MR. PEEK:  Thank you.
19    BY MR. PEEK:
20     Q   You still have, I think, Exhibit 20 there, which is in
21    Volume 5, do you not, sir?
22     A   No.  They took the binder.
23            MR. PEEK:  Okay.  She'll get it back for you.
24            Thank you Miss Clerk.
25            THE COURT:  Exhibit 20, Mr. Peek?
```

Case 1:23-mc-00075-GKK-MAJc Document 134 Filed 07/26/23 Page 792 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 41 of 205

191

1           MR. PEEK:  Yes, Your Honor.

2           THE COURT:  Thank you.

3  BY MR. PEEK:

4  Q    Would you turn, sir, to page 3, paragraph 6.

5  A    Okay.

6  Q    And the sentence beginning on line 27.

7           Do you have that?

8  A    The one that says, "On that..."?

9  Q    Yes.

10 A    Yeah.

11 Q    And you wrote, at least in this declaration in February

12 of 2007, that:  "On that basis, and because of the failure of

13 our government to utilize my technology after my departure

14 from eTreppid, and because of Warren Trepp's attempts to steal

15 it with the raid on my home, my current employers engaged

16 in multiple meetings and conferences with high level Bush

17 administration officials beginning in May 2006, and continuing

18 to December 2006."

19           Is that correct?

20 A    Yes.

21 Q    And those were efforts to market the technology, were

22 they not?

23 A    No.

24 Q    Okay.  And then it says:  "In July 2006, they arranged a

25 meeting in Vice-President Cheney's office, which I attended

Case 1:23-mc-00073-GKK-MAU Document 1-34 Filed 07/26/23 Page 793 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/06/08 Page 42 of 265

-192

1   with several individuals for the purpose of educating and

2   explaining to the Vice-President that much of my work is so

3   highly compartmentalized within, that it was likely that some

4   high level official in the administration, even within the

5   intelligence community, including certain Air Force officials

6   aligned with Warren Trepp, potentially even the Director

7   of National Intelligence, John MacHunting (phonetic),

8   parentheses, whom certain distrusted, close parentheses,

9   did not know or understand the full scope of its utilization

10  on the war on terror, and/or competing financial interests

11  aligned with Trepp, given this event."

12          That was an effort to market as well, wasn't it?

13  A   No.

14  Q   It was not an effort to license the technology?

15  A   No.

16  Q   Okay.  Now there's an attachment to this exhibit, is

17  there not, which is a letter, Exhibit 1, from Mr. Flynn to

18  Mr. Rumsfeld, Cherchoff, and Alberto Gonzales, is there

19  not?

20  A   Yes.  Well, there was a fourth person but, obviously,

21  it's redacted.

22  Q   And then would you turn to page four of seven of that

23  letter.

24  A   Okay.

25  Q   The bottom of the page.

Case 1:23-mc-00075-GKK-MAU Document 1-74 Filed 07/26/28 Page 794 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/08/08 Page 43 of 205

-193-

1    A   Yes.

2    Q   Do you see the sentence beginning, "Mr. Montgomery..."

3    the last sentence there.

4    A   Yes.

5    Q   "Mr. Montgomery desires to enter into an exclusive

6    license agreement with the U.S. government as soon as

7    possible."

8            That's marketing the technology, the Source Code, is

9    it not?

10   A   No.

11   Q   Okay.  The License agreement is not any effort by you to

12   license -- excuse me licensing the technology --

13   A   It's --

14   Q   -- is not an effort to market it?

15   A   This is the day they raided my home.

16   Q   I know that, sir.  I'm just asking --

17   A   Can I finish speaking?

18   Q   Sorry.

19   A   This is the day they raided my home.  And this letter was

20   originally -- Mr. Flynn had originally written the letter that

21   I had seen days, before that, that did not have some of this

22   in there.  He sent this letter the, the day that they were,

23   you know, when they were at my home raiding me.

24   Q   Okay.  I, I understand that.

25   A   So --

Case 1:23-mc-00073-GKK-MAU  Document 134  Filed 07/26/28  Page 795 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 45 of 205

194

1   Q    But are --

2   A    Yeah.

3   Q    -- you telling this Court then that licensing of the

4   technology is not marketing the technology, the Source Code?

5   A    No.  I'm not saying that.  I don't remember -- I just

6   remember a lot was going on on that day.  And why this was

7   sent with those exact words, I can't explain.

8   Q    And there were a number of meetings after March 1st in

9   order to license the technology with the government.

10  A    With me?  No.

11          MS. GAROFALO:  Objection, Your Honor.

12  Relevance.  If this is going to documentation, Mr. Peek

13  should get there.  But it does not appear to be focused on

14  the discovery issue.

15          MR. PEEK:  Your Honor, the discovery issue is

16  any documents with respect to licensing the technology.  It

17  would appear to me that there would be additional documents

18  that would have been utilized by those individuals meeting

19  in that six-month period of time described by, described in

20  the affidavit, or in the declaration by Mr. Montgomery.  He

21  described it.  We don't have any of those so-called documents.

22          MS. GAROFALO:  I would ask the Court to then

23  direct Mr. Peek to focus his questions on what documents

24  exist; whether documents related to these meetings actually

25  exist, rather than explore the nature, the number of

Case 1:23-mc-00075-GKK-MAU Document 134 Filed 07/28/23 Page 796 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 45 of 205

195

 1  participants and so forth at the meetings, which doesn't seem

 2  to be relevant to this proceeding.

 3              MR. PEEK:  I have to establish a predicate,

 4  Your Honor that it was for the purpose of marketing, in order

 5  then to get the documents.

 6              THE COURT:  Right.

 7          The objection is overruled.  The Court, of course,

 8  is keenly interested in moving things along, but recognizes

 9  that part of the request for production that is part of this

10  Order to Show Cause hearing is this particular category of

11  documents.  So the Court, in trying to establish the basis

12  for Mr. Peek's inquiries is part of it, but please move on,

13  sir --

14              MR. PEEK:  I will.

15              THE COURT:  -- in your questions.

16  BY MR. PEEK:

17   Q   And then in the last page of the letter, page --

18  actually, second of last page, page 6 of 7 --

19   A   Okay.

20   Q   -- there's another statement there at the end of the

21  sentence where you want to license the software technology of

22  Mr. Montgomery.

23          Do you see that sentence?

24   A   Where is it?

25          Oh, yes, I see it.  I see that.

Case 1:23-mc-00073-GKK-MAU  Document 171  Filed 07/28/28  Page 797 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 46 of 205

—196

 1   Q   And that's another effort to market, is it not?

 2   A   Not really, no.  Why Michael put this in there when

 3   they're raiding my home, I can't tell you.

 4   Q   Okay.  Where are any of the documents relating to the

 5   efforts to license the technology, first in March of 2006,

 6   and then in that six-month period of time, or whatever period

 7   of time it was in your declaration?  Where are those?

 8   A   To my knowledge there are none, because no one did.

 9   Q   Are you saying you didn't make any presentations --

10   A   I --

11   Q   -- then to the government from May 2006, and continued to

12   December 2006?

13   A   I went to one meeting, one time, in Washington.  That's

14   it.

15   Q   Okay.  And your current employer, that being Opspring,

16   also went on multiple times in May, between May of 2006 and

17   December 2006, did they not?

18   A   I think they only went one time initially.  And they were

19   with me on the one meeting I went to D.C.  To my knowledge,

20   there were no others.

21   Q   Okay.  Well, then when you signed this declaration under

22   penalty of perjury, were you lying?

23   A   Which declaration?

24   Q   The one that's Exhibit 20, where you said that your

25   employers engaged in multiple meetings and conferences with

Case 1:23-mc-00073-GKK-MAU  Document 174  Filed 07/26/23  Page 798 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 47 of 205
—197

1   high level Bush administration officials, beginning May of

2   2006, to December 2006?  Is that a lie?

3    A   I just said -- no.  You just asked me multiple.  That's

4   two.  You asked me and I said there were two that I knew of.

5   Maybe they had others.  I can't tell you what Michael Sandoval

6   did.  You can talk to him.

7    Q   Okay.  Thank you.

8           Going back to the computers that you backed up, from

9   time to time.  You said that Mr. Trepp asked you to backup

10  computers as eTreppid, is that right?

11   A   Yes.

12   Q   Did he ask you to back up all the computers at eTreppid?

13   A   No.

14   Q   Or just the employees of eTreppid?

15   A   I don't know if he said all or both.  I don't recall

16  specifically.

17   Q   Well, one of the computers you backed up was

18  John Hughes, was it not?

19   A   Yes.

20   Q   Was John Hughes an employee of eTreppid?

21   A   I wouldn't know if he is or not.  I don't think he was.

22   Q   And why did you backup his computer?

23   A   Because it was failing, and he had to have another

24  laptop, so it had to be taken off his current laptop and put

25  on another laptop.

Case 1:23-mc-00075-GKK-MAU   Document 1-34   Filed 07/28/23   Page 799 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 49 of 205

-198

1    Q    And why did you retain the data on that?

2    A    I don't recall why I retained it.

3    Q    You recognize in the production that you made, you

4    provided, we have data related to Mr. Hughes, correct?

5    A    Yes.

6    Q    And that's not responsive to any request at all, is it?

7    A    Well, I wouldn't say that, because how did I know that he

8    didn't have something on his laptop that was responsive?

9    Q    Well, when you searched the data, did you look at

10   the John Hughes data to determine whether or not it was

11   responsive?

12   A    I don't recall if I did or not.

13   Q    Okay.  And then the e-mails, with respect to Jale Trepp,

14   that was on her computer, was it not?

15   A    I don't remember if it was or not, no.  I -- I'm not

16   certain.

17   Q    Well, we had e-mails that just appear to be only on Jale

18   Trepp's e-mail -- Jale Trepp's computer.  And we can go back

19   over that if you like in Exhibit 9.

20   A    Okay.  Go ahead.

21   Q    Okay.  Actually, it's Exhibit 8.  I apologize -- no.

22   It's Exhibit 9.

23          Do you know whether these e-mails that are set forth

24   in Exhibit 8, they're labeled at the top, Jale 1.  And then

25   there's some Jale 1-A, whether they came off of Jale Trepp's

Case 1:23-mc-00075-GKK-MAU   Document 134   Filed 07/28/23   Page 800 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 49 of 205
                                                                          199

 1  e-mail account, on her computer, or off of somebody else's?

 2  A   I don't know.  I'm sorry.  I don't recall.

 3  Q   Okay.  Did you in fact backup Jale Trepp's e-mail?

 4  A   Yes.

 5  Q   From her computer?

 6  A   I don't -- I don't remember -- the answer is yes.

 7  Q   And was that her home computer?

 8  A   Yes.

 9  Q   Were you directed to do that?

10  A   Yes.

11  Q   By whom?

12  A   Warren.

13  Q   And when were you directed to do that?

14  A   Multiple, multiple times.

15  Q   Okay.  Did he give you reasons why he wanted to do that?

16  A   I don't recall if he did or not.

17  Q   And where did you go to back this up?

18  A   It was at her house.

19  Q   Now you've also testified in this proceeding, have you

20  not, that you did not have access to any of the financial

21  information of eTreppid?

22  A   That's correct.

23  Q   And we have found on, at least your production, that

24  there are QuickBooks on the hard drives that you have

25  produced, are there not?

Case 1:23-mc-00073-CKK-MAU   Document 1-34   Filed 07/28/23   Page 801 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 90 of 205

-200-

 1   A   Yes.

 2   Q   And those are the financial records of eTreppid that you

 3   say you never had access to, aren't they?

 4   A   Um, there are QuickBooks records on there.  Whether those

 5   are those of eTreppid, I can't tell you.

 6   Q   Well, you testified that you never were given access to

 7   them, correct?

 8   A   Access to what?

 9   Q   To the financial information of eTreppid.

10   A   Yeah.  The paper, paper records.

11   Q   Well, were there -- so you were given the electronic form

12   of them off of Sue Perez's computer, or others in eTreppid's

13   offices that you backed up, correct?

14   A   I don't believe Sue Perez had QuickBooks.

15   Q   All right.  Did anybody have QuickBooks?

16   A   Monica, I believe, did.

17   Q   Okay.  So you backed up Monica?

18   A   Yes.

19   Q   And you had the access to that financial information that

20   was on Monica's computer, did you not?

21   A   I've seen it.  Yes.

22   Q   And it was QuickBooks, was it not?

23   A   I don't remember -- yes.

24   Q   And it contained a record of every receipt and

25   disbursement --

Case 1:23-mc-00075-GKK-MAU  Document 171  Filed 07/26/23  Page 802 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 91 of 105

-201-

1    A    Absolutely.

2    Q    -- did it not?

3    A    No.

4    Q    So when you told the Court that you were never given

5    access to any of the financial records of eTreppid, that was

6    a lie, wasn't it?

7    A    Nope.  No it wasn't.

8    Q    But you had, at least, access to all these computers

9    where there was electronic information regarding financials

10   of the company, did you not?

11   A    No.

12   Q    You did not?

13   A    No.

14   Q    Well, you backed it up, didn't you?

15   A    Yeah, but it's password locked.

16   Q    Oh.  All the QuickBooks are password locked?

17   A    I don't remember if all of them were, but one -- the one

18   I tried was.

19   Q    Which one did you dry?

20   A    I don't recall which one it was.

21            MS. GAROFALO:  Objection, Your Honor.

22   Relevance.  This does not seem to be going to documents or

23   the production or the responsiveness of production.  It just

24   seems to be examining Mr. Montgomery on his knowledge of

25   financial information.

Case 1:23-mc-00073-GKK-MAU   Document 17-1   Filed 07/26/28   Page 803 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 92 of 205

-202-

```
 1                    MR. PEEK:  I'll move on, Your Honor.

 2                    THE COURT:  All right.  The objection is

 3  sustained.

 4                    MR. PEEK:  This is Exhibit 46, Your Honor.  It's

 5  tabbed so that folks can put it in their binder.

 6                    THE CLERK:  Excuse me, Judge Cooke.  Yesterday,

 7  Mr. Peek remarked defendant's 45 and defendant's 46.

 8                    MR. PEEK:  I apologize.  Then this should be 47.

 9                    THE CLERK:  Yes.

10                    MR. PEEK:  I apologize for that.

11                    THE COURT:  This is 47 then?

12                    MR. PEEK:  Yes, Your Honor.

13                 (Whereupon, exhibit 47 -- a document, was marked for

14  identification only.)

15                    MR. PEEK:  Excuse me for the error.

16                 Does the witness have it then?

17                    THE CLERK:  Yes.

18  BY MR. PEEK:

19   Q   Mr. Montgomery, this is a letter from your counsel at

20  Liner, the Liner firm.

21                 Did you see that?

22   A   You mean Gunderson?

23   Q   Mr. Gunderson then.

24   A   Okay.  Yeah.

25   Q   I apologize.  I thought it was from the -- and in the --
```

Case 1:23-mc-00073-GKK-MAU Document 134 Filed 07/28/23 Page 804 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 93 of 205
-203-

1    this is produced in all those 21 hard drives, is it not?

2     A    I'll believe you.  I don't know.

3     Q    And in the second page of that letter, it says:

4              "I understand these drives contain electronic files

5    responsive to eTreppid's RFP One request, number 16."

6              Do you see that?

7     A    Yes.

8     Q    And that's what you believed when you produced them?

9     A    Yes.

10    Q    Let me show you what is request for production number 16.

11   That's in -- I think it's already a Court document, but I'm

12   going to go ahead and mark it as -- or it's Exhibit 34 in

13   Volume VI.

14              If we could have that for a moment.

15    A    Which number?

16              THE CLERK:  It should be up there.

17              MR. PEEK:  It's 34.  She's going to hand it to

18   you.

19              THE CLERK:  It should be there.

20              THE WITNESS:  No, I think I have it.

21              MR. PEEK:  It's in Volume VI.

22          Do you have it there?

23              THE WITNESS:  Yes.

24   \\\

25   \\\

Case 1:23-mc-00073-CKK-MAU  Document 174  Filed 07/26/23  Page 805 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 54 of 205

-204-

1   BY MR. PEEK:

2   Q   Why don't you take a moment and look at page 7 of 10 in

3   that.

4   A   I don't -- which page?

5   Q   Page 7 of 10.  It's marked at the bottom.

6   A   That doesn't make sense to me.

7   Q   It's Exhibit 34, please.

8   A   Exhibit 34.  You didn't say which exhibit.

9        Okay.  Okay.  (Witness reviews document.)

10       Okay.  Go ahead.

11  Q   And the request to you is:  "All documents that relate

12  to eTreppid's technology, products and/or research and

13  development efforts, parentheses, including but not limited

14  to any and all marketing documents, business plans,

15  PowerPoint presentations, white papers, correspondence,

16  and/or notes of any customers or potential customers.

17       Do you see that?

18  A   Yes.

19  Q   And these 21 hard drives are only responsive to that

20  request, are they not?

21  A   You mean as a result of all of these?

22  Q   Well, that's what your letter -- that's what your

23  counsel's letter says to me; that they're only responsive to

24  that request number 16.

25  A   I don't know if they're more responsive -- I mean, I

Case 1:23-mc-00073-GKK-MAdc Document 134 Filed 07/28/28 Page 806 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 55 of 205

-205-

1    would have to read every one of these.  I will, if you want.

2    Q    Well, it's only -- I'm just going by the letter.

3    A    Okay.

4    Q    The letter enclosed the hard drives and said they're

5    responsive to request number 16, does it not?

6    A    Yes.

7    Q    Okay.  And are there any documents on that, on those

8    21 hard drives that relate to the efforts by you -- you,

9    the defining term -- to market, or notes of meetings with

10   customers, or potential customers, after March of 2006?

11   A    I don't know if there are or not -- oh, after?  I'm

12   sorry.

13   Q    Yeah, after.

14   A    I don't know if there are or not.

15   Q    You represented that they were though, did you not, when

16   you gave them to us?

17   A    That there are not?

18   Q    No.  You represented that they were; that they did

19   contain marketing documents, business plans, PowerPoint

20   presentations, white papers, correspondence, and/or notes of

21   meetings with customers or potential customers.

22            MS. GAROFALO:  Objection, Your Honor, to the

23   extent that it misstates the document before Mr. Peek.  It's

24   from Mr. Gunderson, not from Mr. Montgomery.

25            MR. PEEK:  Excuse me.  You, as in your lawyer

Case 1:23-mc-00073-GKK-MAU  Document 171  Filed 07/28/23  Page 807 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 96 of 205

-206-

1   represented that.

2    A    Is that what he wrote in the letter?  You want me to read

3   it?

4    Q    That's what he wrote in the letter.  Yeah.

5    A    Okay.

6    Q    He had to have that information from some source?

7              MS. GAROFALO:  Objection.

8              MR. PEEK:  In order to make that representation,

9   did he not?

10             MS. GAROFALO:  Objection, to the extent that

11  calls for attorney/client communications.

12             MR. PEEK:  If he represents that in a pleading,

13  Your Honor, or in a letter, then that's a waiver of the

14  privilege.

15             THE COURT:  Okay.  I don't think -- the

16  objection is overruled.  I don't think Mr. Peek is asking

17  for any inquiry about any attorney/client communication.

18  Logically, one requests production of documents from one's

19  client.  The client responds to document production requests

20  and hands over documents that the client believes are

21  responsive to a particular document production request.  And

22  the attorney, in turn, sends them off to opposing counsel,

23  after having reviewed them.

24             So that's, generally, how it works.  So the attorney

25  has to, one, have relied on the client to have reviewed the

Case 1:23-mc-00073-GKK-MAU  Document 137  Filed 07/28/23  Page 808 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 57 of 205
—207—

 1  request for production to ascertain what documents or media

 2  might be responsive to the requests; and

 3          Two, upon receipt, the Attorney, generally,

 4  will review whatever is produced, and then pass it on to

 5  counsel.

 6          So --

 7          MS. GAROFALO:  That's generally correct, Your

 8  Honor.  But, in this case, it's a letter from Mr. Gunderson.

 9  There's no foundation as to whether Mr. Montgomery saw this

10  letter.  It may very well be just a typographical error in

11  the letter.  Mr. Gunderson -- at least no basis has been laid

12  for knowledge on Mr. Montgomery's part as to how the documents

13  were characterized by Mr. Gunderson.

14          THE COURT:  Well, that's true.  I suppose you

15  can ask Mr. Montgomery some questions about.

16  MR. PEEK:

17  Q   Well, you provided the hard drives to your counsel, did

18  you not?

19  A   Not to Mr. Gunderson.

20  Q   You provided them to the Liner firm?

21  A   Yes.

22  Q   And when you provided them, you believed they were

23  responsive to request number 16, did you not?

24  A   Yes.

25  Q   Okay.  So Mr. Gunderson's representation came, I guess,

Case 1:23-mc-00075-GKK-MAU  Document 134  Filed 07/26/23  Page 809 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08  Page 58 of 205

-208-

 1  indirectly from you, correct?

 2   A   I can't tell you.

 3   Q   Well, you represented it to your counsel, the Liner

 4  firm, who passed -- must have passed it on to Mr. Gunderson,

 5  correct?

 6   A   I can't say that.

 7              MS. GAROFALO:  Objection, to the extent that

 8  does implicate attorney --

 9              MR. PEEK:  Your Honor, they can't have the

10  games.  They can't have it both ways.  They can't say that

11  they represented to me that it's responsive to request

12  number 16, and then now stand here today in this courtroom

13  and say it's not.  I mean, either it is or it isn't, because

14  there's nothing on the hard drives that refers to post-2006

15  marketing efforts.  There's just more garbage.

16              THE COURT:  The objection is overruled.

17  BY MR. PEEK:

18   Q   Are there any files, any data at all on those 21

19  hard drives that are responsive to request number 16?

20   A   Yes.

21   Q   Okay.  Is there any data on there that is responsive to

22  request number 16 post-March 2006?

23   A   No.

24   Q   Where is that data?

25   A   I wasn't -- I told you that when you asked me that

Case 1:23-mc-00075-GKK-MAU  Document 174  Filed 07/26/28  Page 810 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/05/08  Page 39 of 205
                                                                    —209

1   before.  I wasn't involved in marketing business plans.

2   Q   Okay.  So you gave us data that eTreppid already had?

3   A   Well, I was required to give that to you.

4   Q   And is everything on the 21 hard drives related to white

5   papers, correspondence, marketing documents, business plans to

6   customers or potential customers?

7   A   Post?

8   Q   No, pre.

9   A   I wouldn't say everything.  I would say there's a lot.

10  Q   Okay.  How much of that would you say there is?

11  A   I, I have no idea.

12  Q   I mean, one percent of it?

13  A   No.  But, I'm sure you have a number.  I don't know.

14  Q   Okay.

15          MR. PEEK:  I believe that's all, Your Honor.  If

16  I could have just a moment to consult with my client and my

17  colleague.

18          THE COURT:  You may.

19          MR. PEEK:  May I approach?

20          THE COURT:  You may approach.

21          MR. PEEK:  I want to actually talk to Ms. Wells

22  for a minute.

23          THE COURT:  Oh, all right.

24      (Mr. Peek and Ms. Wells confer.)

25  \\\

Case 1:23-mc-00075-GKK-MAU   Document 171   Filed 07/26/23   Page 811 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/05/08   Page 60 of 205

-210-

1   BY MR. PEEK:

2    Q   Before you produced the 21 hard drives, did you make any

3   effort to duplicate it?

4    A   There were two of them, or three of them that were bad

5   and that actually had problems in duplication.  So, the answer

6   is yes.

7    Q   And what efforts did you make to duplicate files there?

8    A   Well, the drive was bad.  Since the bad drive was copied,

9   I didn't want to get rid of the bad drives while these

10   hearings were going and someone accuse me of --

11    Q   Well, there was 21 hard drives.  Did you make an effort

12   with all 21 hard drives to deduplicate?

13    A   I believe they were all duplicated.

14    Q   No.  That's not what I asked, sir.

15    A   Oh.

16    Q   There are files that are on the drives themselves that

17   are multiple copies of the same thing.

18    A   That are duplicates, you mean?

19    Q   Yes.  Did you make any effort to deduplicate that?

20    A   To deduplicate that?

21    Q   Yes.

22    A   No.

23    Q   Okay.  Thank you.

24              MR. PEEK:  That's all I have, Your Honor.

25              THE COURT:  As I recall, at the commencement of

Case 1:23-mc-00073-CKK-MAU Document 174 Filed 07/26/23 Page 812 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/05/08 Page 61 of 205

-211-

1  the Order to Show Cause hearing, Ms. Klar did have some brief

2  direct.  It was quite brief.

3           Do you wish to ask any questions on redirect?

4           MS. GAROFALO:  Uh, not at this time, Your Honor.

5  But, we do reserve the right to recall Mr. Montgomery.

6           THE COURT:  Okay.  Thank you.

7           Mr. Montgomery, you may step down, sir.

8           MR. PEEK:  And, Your Honor, I don't remember

9  exactly which exhibits were previously marked.  But since they

10 were identified previously, I would like to offer, if I could,

11 or get a list from the court.

12          THE CLERK:  Defendant's exhibits 1, 6, 9, 31,

13 45, 46, and 47 have all been marked.

14          MR. PEEK:  I would offer all of those,

15 Your Honor.

16          THE COURT:  Any objection?

17          MS. GAROFALO:  We have an objection to 45,

18 Your Honor.  It's hearsay, and has not been authenticated.

19 We object on those grounds.

20          Pending 45 admitted, we would ask the Court's

21 indulgence to address the other exhibits immediately after

22 lunch, or after the next break.

23          MR. PEEK:  Forty-five, I think, Your Honor, was

24 the e-mail.

25          THE CLERK:  Yes.

Case 1:23-mc-00073-CKK-MAU   Document 1-7   Filed 07/28/23   Page 813 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 253 of 265
                                                                        -413-

 1              MR. PEEK:  Thank you.

 2              THE COURT:  All right.  What I'm going to advise

 3   counsel, we still have a matter of exhibits to attend to.  I

 4   expect you to be here tomorrow morning by 8:30 a.m. to meet

 5   and confer and work with the clerk of court to figure out

 6   what exhibits are admitted or not.  We will begin promptly at

 7   nine o'clock a.m.

 8         Thank you.  We're in recess.

 9              MR. PEEK:  Thank you, Your Honor.

10         (Court Adjourned.)

11

12

13                         -o0o-

14

15         I certify that the foregoing is a correct
           transcript from the record of proceedings
16         in the above-entitled matter.

17         \s\ Kathryn M. French              August 29, 2008

18         _____           _____

           KATHRYN M. FRENCH, RPR, CCR                DATE
19         Official Reporter

20

21

22

23

24

25

Case 1:23-mc-00073-CKK-MAU   Document 1-7   Filed 07/28/23   Page 814 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 264 of 265

414

I N D E X

**DEFENSE'S WITNESSES:**                                      **PAGE:**


1)   **DENNIS MONTGOMERY (cont')**

         Direct Examination By Mr. Peek              155

2)   **JONATHAN KARCHMER**

         Direct Examination By Mr. Snyder            214
         Cross-examination By Ms. Garofalo           270
         Redirect Examination By Mr. Snyder          322
         Recross-examination By Ms. Garofalo         326

3)   **LEONARD GLOGAUER**

         Direct Examination By Mr. Peek              328
         Cross-examination By Ms. Garofalo           333

4)   **SLOAN VENABLES**

         Direct Examination By Mr. Peek              341
         Cross-examination By Ms. Garofalo           344
         Redirect Examination By Mr. Peek            347

5)   **WARREN TREPP**

         Direct Examination By Mr. Peek              348
         No Cross-examination

**PLAINTIFF'S WITNESSES:**

1)   **SCOTT COOPER**

         Direct Examination By Ms. Garofalo          360
         Cross-examination By Mr. Peek               384

Case 1:23-mc-00072-CKK-MAU Document 1-7 Filed 07/28/23 Page 815 of 1046
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 255 of 265

415

1              **I N D E X   O F   E X H I B I T S**

2

3     **EXHIBIT NUMBER:**                    **MARKED**      **RECEIVED**

4     Exhibit 8 -- document                              171

5     Exhibit 20  -- document                            176

6     Exhibit 47  -- document              202

7     Exhibit 45  -- document                            213

8     Exhibit 48  -- document              222           253

9     Exhibit 49  -- document                            259

10    Exhibit 50  -- box                   268

11

12

13    **PLAINTIFF'S EXHIBITS:**

14    Exhibits 1 and 2   -- documents       365

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
 2        BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                            ---o0o---
 3

 4    DENNIS MONTGOMERY and the      :
      Montgomery Family Trust,       :
 5                                   :
                     Plaintiffs,     :  No. 3:06-CV-56-PMP(VPC)
 6                                   :
            -vs-                     :  June 24, 2008
 7                                   :
      ETREPPID TECHNOLOGIES, LLC,    :  Reno, Nevada
 8    WARREN TREPP, and the          :
      UNITED STATES DEPARTMENT OF    :
 9    DEFENSE,                       :
                                     :
10                   Defendants.     :
                                     :
11     AND RELATED CASES             :

12

13        TRANSCRIPT OF CONTINUED ORDER TO SHOW CAUSE HEARING

14    APPEARANCES:

15    FOR THE PLAINTIFFS:  DEBORAH KLAR and MARK GUNDERSON
                           Attorneys at Law
16

17    FOR THE DEFENDANTS:  J. STEPHEN PEEK, JERRY SNYDER,
                           BRIDGETT ROBB PECK, GREGORY SCHWARTZ and
18                         ANDREW LIESE
                           Attorneys at Law
19

20    FOR INTERESTED       CARLOTTA WELLS and RAPHAEL GOMEZ
      PARTIES:             Assistant U.S. Attorneys
21

22    Reported by:             Margaret E. Griener, CCR #3, RDR
                                Official Reporter
23                              400 South Virginia Street
                                Reno, Nevada 89501
24                              (775)329-9980

25               COMPUTER-ASSISTED TRANSCRIPTION
```

```
 1              RENO, NEVADA, TUESDAY, JUNE 24, 2008, 9:00 A.M.

 2                            ---o0o---

 3

 4              THE CLERK:  This is the date and time set for

 5    the continued order to show cause hearing in case number

 6    06-CV-0056-PMP(VPC), Dennis Montgomery, et al., versus

 7    eTreppid Technologies, et al.

 8              Present on behalf of plaintiff, Deborah Klar and

 9    Mark Gunderson.

10              Present on behalf of defendants, Stephen Peek, Jerry

11    Snyder, Bridget Robb Peck.

12              Present telephonically on behalf of defendants,

13    Gregory Schwartz and Andrew Liese.

14              Present on behalf of interested party, Carlotta

15    Wells and Raphael Gomez.

16              THE COURT:  Thank you very much.  Please just

17    give me a moment to get my papers in order.

18              This is a continued hearing pursuant to this Court's

19    order to show cause concerning why Dennis Montgomery and the

20    Montgomery Family Trust should not be held in contempt of

21    court for failure to obey a series of discovery orders that

22    were issued in this case.

23              As the parties and counsel well know, we had a

24    day-long hearing on June 10, and it has been continued to

25    today.
```

Case 1:23-mc-00073-CKK-MAU Document 171 Filed 07/28/25 Page 819 of 1046
Case 3:06-cv-00056-MMD-WGC Document 731 Filed 07/03/08 Page 19 of 264

3

1          Just some preliminary matters.  First of all, the

2   Court, during the last -- the June 10th, hearing had several

3   exhibits, and I'm going to admit those into evidence.

4          Do counsel have any objections to those?  I believe

5   those are Exhibits 1 through -- let's see, the Court's

6   exhibits, I believe, were 1 through 16.  Is that correct,

7   Ms. Clerk?

8               THE CLERK:  Your Honor, I show 1 through 18.

9               THE COURT:  Were the court's exhibits?

10              THE CLERK:  Yes.

11              THE COURT:  All right.  Do counsel have any

12  objection to the admission of those exhibits?

13              MR. PEEK:  I don't, your Honor.  I would just

14  like to have a list from the clerk so that we know what we

15  have because I don't think -- I don't think all 18 were

16  actually shown to the witness and identified.

17              THE COURT:  All right.  Ms. Klar?

18              MS. KLAR:  Your Honor, we would like to see a

19  list before we take a position because --

20              THE COURT:  All right.

21              MS. KLAR:  -- Mr. Peek is right, they all were

22  not shown to the witness.

23              THE COURT:  All right.  What I'll do is at one

24  of the breaks we'll go ahead and take care of that, and,

25  Ms. Clerk, if you would provide copies of the exhibit list to

Case 1:23-mc-00075-GKK-MAU   Document 171   Filed 07/28/28   Page 820 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 30 of 205

-50-

1          MS. KLAR:  My understanding is, is that there is

2     some order which I've never seen because, as you know, I

3     wasn't involved in that proceeding.

4          According to at least counsel for eTreppid,

5     Mr. Montgomery was required to maintain those materials.  But

6     I'm not aware of any order that says he couldn't integrate

7     them with the other materials that he had.

8          MR. PEEK:  Your Honor, there's a -- Judge Pro,

9     when the motion for forensic images was made, issued an order,

10    and that order -- I believe it's March 27, 28, and I'll try to

11    locate it at a break --

12          THE COURT:  Was that in the search warrant

13    proceeding?

14          MR. PEEK:  No, no, it was in this proceeding,

15    your Honor.  You may recall that the FBI on motion by --

16    excuse me.

17          I'm trying to think exactly procedurally, your

18    Honor, what happened on the 41(g), but ultimately Judge Pro

19    ordered the property -- or you ordered the property returned,

20    and Judge Pro affirmed your order, then we made a motion in

21    this proceeding, this consolidated proceeding, to have it -- a

22    forensic image made of it.  Judge Pro denied that request but

23    ordered that it be photographed and that it be preserved and

24    protected.

25          And I believe that order is March -- it was before

Case 1:23-mc-00075-GKK-MAU   Document 131   Filed 07/28/23   Page 821 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/08/08   Page 31 of 205

-51-

1    the property was turned over on the 29th.

2              THE COURT:  Just for counsel appearing

3    telephonically, I'm looking at the docket sheet.

4              Well, I can't -- I can't recall.

5              In looking at the docket sheet just quickly, I don't

6    want to delay the proceedings, but I know that Judge Pro

7    issued an order concerning the FBI-seized materials that were

8    returned, but I am not clear on what the language -- what

9    number the language is and what it said.

10             MS. KLAR:  According to Mr. Peek, it said the

11   materials need to be preserved and protected.  That's not what

12   his question is asking.

13             His question is asking what did you do to segregate

14   it, and I don't think it's a fair question because I don't

15   think there's any evidence that that was an obligation.

16             MR. PEEK:  Well, the obligation to preserve,

17   your Honor, would be some method of segregating it so you can

18   preserve its integrity as opposed to commingling it with other

19   items.  That's what he said he did.  That's a clear violation

20   of Judge Pro's order and clear violation of the duty to -- you

21   know, the duty to preserve any evidence, otherwise it

22   constitutes spoliation.

23             I mean, there's no question about that this was a

24   subject matter of many disputes, so the fact that even if

25   there wasn't an order, there is an obligation on the part of a

 1   party to preserve evidence.  This is evidence.

 2               THE COURT:  Well, to the extent you're relying

 3   on Judge Pro's order for this line of questioning, I think you

 4   and Ms. Klar can argue about what the subtext of preserve

 5   means.  I need to see -- to review the order to really --

 6               MR. PEEK:  I'll ask the question a different

 7   way, your Honor.

 8               THE COURT:  All right.  Thank you.

 9               MR. PEEK:  Thank you.  I'd just like to move on.

10   I don't want to spend --

11               MS. KLAR:  Your Honor, I would just state for

12   the record I'm not aware of any case law that interprets the

13   word preserved in the manner implied by Mr. Peek.

14          It is evident that action was taken to preserve the

15   evidence.  I don't think that there's any case law that says

16   you can't commingle.

17               THE COURT:  All right.  Ms. Wells.

18               MS. WELLS:  Your Honor, I believe the order in

19   question may be 141 in the docket.

20               THE COURT:  Oh, thank you.

21               MR. PEEK:  Thank you.  That's why I need my

22   laptop.  May I -- thank you.

23                     (Discussion held off the record.)

24               THE COURT:  Oh, you're speaking of -- well, this

25   is proposed order 141.  Docket 141 is a proposed order.

Case 1:23-mc-00073-GHK-MAU Document 1-31 Filed 07/28/23 Page 823 of 1046
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/05/08 Page 33 of 205

53

 1          MR. PEEK:  Yeah, but I -- no, the Court did not

 2   adopt this order, your Honor, because this is one where we

 3   proposed to have it actually forensically copied.

 4          THE COURT:  Well, let's go ahead and move on.

 5          MR. PEEK:  We'll get it at the break so we can

 6   move on, and I'll ask the question in a different manner.

 7          THE COURT:  Thank you.  Go ahead, please.

 8   BY MR. PEEK:

 9   Q   Did you, when you created these six boxes, label the six

10   boxes in any way other than -- label the mixed -- label the

11   other two boxes in any way?

12   A   I don't remember if they were labeled.

13   Q   Okay.  Did you put other electronic media inside any of

14   the six boxes?

15   A   It's possible, yes.

16   Q   Okay.  I'm not asking about possibilities.  Do you know

17   whether you did or did not?  A simple yes or no.

18   A   I believe I did.

19   Q   Okay.  And what other electronic media did you put in

20   there?

21   A   I don't recall specifically.

22   Q   Okay.  And when you moved from Yarrow Point to Rancho

23   Mirage, did you put other electronic media, or do you know

24   whether the movers put other electronic media besides the

25   seized property into their boxes?

Case 1:23-mc-00073-GKK-MAU   Document 173   Filed 07/28/28   Page 824 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/09/08   Page 84 of 205

67

1    intermingled with other CDs and DVDs you had; is that correct?

2    A    I believe that's correct.

3    Q    So at some time along the way you lost the integrity of

4    what was seized and returned to you and what wasn't seized; is

5    that right?

6               MS. KLAR:   Objection -- objection, your Honor,

7    lacks foundation.   I don't know what it means to lack

8    integrity.

9               There is nothing in Judge Pro's order which says you

10   cannot commingle.   The order is very specific.   It says he's

11   prohibited from destroying, modifying, duplicating,

12   distributing, disseminating, hypothecating, transferring

13   licensing or assigning such property until such further order

14   of the court.

15              This Court has ordered that certain of these

16   documents be produced, and we assume, based on that order,

17   Mr. Montgomery is authorized to duplicate these materials.

18              But, again, we object to this line of questioning.

19   It has absolutely nothing to do with what we are here today

20   for.   We are not prepared to address issues relating to

21   whether or not Mr. Montgomery did or did not violate Judge

22   Pro's order.

23              THE COURT:   Well, the Court has reviewed the

24   order, it's docket number 143 which is the March 23rd, 2007,

25   minute order from a joint hearing between -- that Judge Pro

Case 1:23-mc-00073-GKK-MAU  Document 171  Filed 07/28/23  Page 825 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/08/08  Page 68 of 205

68

1  and I presided over concerning matters related to the search

2  warrant proceeding and the civil proceeding.

3        And, as always with minute orders, as counsel are

4  well aware, the minute order is simply that, it's a shorthand

5  order of what occurred at a proceeding, and I suspect that a

6  transcript of that hearing might be very illuminating

7  concerning -- insofar as it may flesh out what Judge Pro meant

8  or didn't mean.

9        I note for the record that just above the paragraph

10  entering the order there's a statement as follows:

11        "Ms. Wells advises the Court" -- pardon me.  Pardon

12  me, wrong section.  It's on page 3, in the middle it says,

13        "Ms. Wells advises the Court today the

14      government has no objections to the items being

15      returned to Mr. Montgomery as he is under an

16      injunction not to disseminate it, use it, share it,

17      or do anything with it except hold it."

18        And it is correct, as Ms. Klar has stated, that the

19  paragraph that she read into the record follows that which

20  states that the items are subject to the preliminary

21  injunction previously entered in this case, and then Judge Pro

22  outlines what is -- what is said in that preliminary

23  injunction until further order of the Court.

24        So I guess that is an issue, but if you could ask

25  your questions, Mr. Peek -- I mean, you're raising -- you're

Case 1:23-mc-00075-GKK-MAU Document 1-31 Filed 07/28/23 Page 826 of 1046
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 69 of 205

69

 1    obviously drawing objections by how you characterize things.

 2    I think you might have more success if you just reword them.

 3                    MR. PEEK:  I will, your Honor.

 4                    THE COURT:  All right.

 5    BY MR. PEEK:

 6     Q    Did you commingle the FBI-seized property with other

 7    electronic data?

 8     A    Yes.

 9     Q    And when did you do that?

10     A    Sometime between the point of which it was returned to

11    me, after that point.

12     Q    Did you take any steps at all to identify what was

13    FBI-seized property and what was being commingled with it?

14     A    I don't understand what you're asking.

15     Q    Well, what efforts, if any, did you -- did you take any

16    efforts to identify what property was FBI-seized property

17    versus what you were putting with the FBI-seized property?

18     A    I put it in a box that was marked that.

19     Q    Okay.  But did you add then other electronic data in the

20    form of CDs or disk drives into those same boxes?

21     A    At some point, yes.

22     Q    And I believe at some point you said the movers did the

23    same thing?

24     A    I believe so.

25     Q    And I think you told us you weren't able to label the

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00075-GKK-MAU  Document 173  Filed 07/28/28  Page 827 of 1046
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 33 of 205

93

1    from the government how to handle that transfer.

2                THE COURT:  All right.

3                MR. PEEK:  Your Honor, respectfully, this is too

4    little too late.  We were told on June 10th that the 30 CDs,

5    that they said that they were going to copy those immediately

6    and provide to us.  That was two weeks ago.

7                MS. KLAR:  Your Honor, given the fact that

8    eTreppid has yet to produce a single electronic file in

9    response to discovery, I'm at a loss to understand how

10   Mr. Peek with a straight face can say to the Court it's too

11   little too late.

12           They have the same discovery obligations as

13   Mr. Montgomery, and they told the Court last week that they

14   couldn't get all of this information produced for a couple of

15   months.

16           So we are doing the best we can.  The documents went

17   to -- not the documents, the CDs and the hard drives went to

18   Fulcrum, they are doing the best they can.

19                THE COURT:  All right.  Well, we'll address

20   these issues.

21                MR. PEEK:  In final argument.

22                THE COURT:  Right.  As well, I'll, of course,

23   want the United States counsel to be privy to discussions

24   about the issues that Ms. Klar just raised so we'll just wait

25   until he's finished, Mr. Montgomery has finished speaking with

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00073-CKK-MAU Document 173 Filed 07/28/23 Page 828 of 1046
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/08/08 Page 34 of 205

94

1    counsel for the government.

2                    (Discussion held off the record.)

3                    THE COURT:  Let the record reflect that

4    Mr. Montgomery has resumed the stand and has apparently

5    completed his conference with Mr. Gomez and Ms. Wells, counsel

6    for the United States.

7                    All right.  You may proceed, sir, Mr. Peek.

8                    THE WITNESS:  The question was?  I mean, I

9    forgot it now.

10                   THE COURT:  Ms. Court Reporter, could you please

11   read it back?

12                   (The question was read by the reporter as
                     follows:  Question:  And what conclusion did you draw
13                   from that request?)

14                   THE WITNESS:  The request was for the backup.

15   BY MR. PEEK:

16    Q   The backup of the specific Sue Perez, Warren, Len

17   Glogauer, Patty Gray, not the backup of classified information

18   that we know you gave to Mr. Trepp that he put in the safe,

19   I'm talking about these other backups?

20    A   Whoa, whoa.  I didn't say -- what do you mean give

21   Mr. Trepp and put in the safe?

22    Q   Go ahead, I'm sorry --

23    A   No, no, you're the one that asked.

24    Q   Okay.  Sorry.  What conclusion did you draw?

25    A   Pre-2002 I think he just wanted a copy of it.

Case 1:23-mc-00075-GKK-MAU Document 173 Filed 07/28/23 Page 829 of 1046
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 39 of 205

95

 1   Q   Okay.  What conclusion did you draw from why he wanted a

 2   copy out of the building?

 3                  MS. KLAR:  Objection, your Honor, lacks

 4   foundation.

 5                  THE COURT:  Overruled.  Go ahead and answer the

 6   question, sir.

 7                  THE WITNESS:  I don't recall specifically.  He

 8   just wanted one out of the building.

 9   BY MR. PEEK:

10   Q   Okay.  You didn't conclude, for example, that he wanted

11   to make sure that he maintained the data, it couldn't get

12   destroyed or lost?

13   A   That would be a reason.

14   Q   Okay.  And if you want to back up data, wouldn't you want

15   to back up all the data on each computer so you wouldn't

16   destroy or lose it?

17   A   That would be one conclusion.

18   Q   And you took the direction from the CEO and, in fact, did

19   back up all of the date on each of the computers?

20   A   Absolutely not.

21   Q   You did not.  Which data did you not back up?

22   A   The files that were open at the time the backup occurred.

23   Q   Okay.  So was that on every computer?

24   A   Whatever --

25                  MS. KLAR:  Objection, your Honor, we're back to

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 830 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 106 of 265

106

1    had a top secret clearance, and under no circumstances could

2    anybody have a good faith belief, including Mr. Montgomery,

3    that Sue Perez would have had any classified, state secret

4    information on her computer.

5                 THE WITNESS:  Allow me to talk to the government

6    first, then they can answer your question for you.

7                 THE COURT:  All right.

8                 MR. PEEK:  Take the time to do it, your Honor.

9                       (Discussion held off the record.)

10                THE COURT:  The record will reflect that

11   Mr. Montgomery has now resumed the witness stand and counsel

12   for the United States have also returned.

13         Go ahead, sir.

14                MS. WELLS:  Excuse me, your Honor.

15                THE COURT:  Yes.

16                MS. WELLS:  Based on our conversations with

17   Mr. Montgomery, we would actually request that he not answer

18   the question that Mr. Peek has posed to him under the terms of

19   the United States' protective order.

20         The fact that he may or may not have backed up

21   certain types of files on certain employees' systems could, in

22   fact, implicate the terms of the protective order.

23                MR. PEEK:  I'll respect that and move on, your

24   Honor.

25                THE COURT:  Thank you.

Case 1:23-mc-00073-CKK-MAU   Document 7-1   Filed 07/28/23   Page 831 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 107 of 265

—107

1    BY MR. PEEK:

2     Q    Backups are for disaster recovery, are they not?

3               MS. KLAR:  Objection, your Honor, relevance.

4               MR. PEEK:  Your Honor, may I have a little

5    latitude here?  I mean, what's the purpose here?  I mean, if

6    you're going to backup, I mean, there has to be some reason to

7    do it.

8          You don't just -- the CEO says do it, I mean, it's

9    obviously -- you do it for disaster recovery, and then I want

10   to go on again, if it's for disaster recovery, what files he

11   copied, why didn't he copy all the files.

12              THE COURT:  All right.  Well, I'll allow -- it's

13   five to 12:00 so --

14              MR. PEEK:  I'm mindful of the time as well.

15   BY MR. PEEK:

16    Q    For disaster recovery?

17              THE COURT:  All right.  I'm going to go ahead and

18   overrule the objection, but let's wrap it up.

19   BY MR. PEEK:

20    Q    For disaster recovery?

21    A    That would be one reason.

22    Q    Okay.  And so you would want to make sure that you

23   captured, because of the disaster -- a disaster might occur,

24   all of the work product, if you will, of the employees; is

25   that correct?

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00073-CKK-MAU   Document 13-1   Filed 07/28/23   Page 832 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 213 of 265

-213

1   varying PST files to put them into this text file, did they

2   not?

3    A    Not necessarily.

4    Q    Then how did it get done?  Was it done electronically

5   with a program?

6    A    I mean, there isn't only one way this file could have got

7   created.

8    Q    Okay.  Tell me --

9    A    Well, you just named one, I believe.

10   Q    Okay.  Is that the way it happened?

11   A    Not that I recall.

12   Q    How did it happen?

13   A    I don't recall.  You've asked me this --

14   Q    Okay.  You don't know, again.

15          So you or somebody gave it a name, and somebody

16   chose to put into that certain E-mails from the PST files that

17   you had in your possession; is that correct?

18    A    From the -- I can't say that every one of those came from

19   a PST because you've already asked me that question.

20   Q    Okay.

21              THE WITNESS:  Your Honor, I would like to stop

22   for a minute and take a break to use the restroom.

23              THE COURT:  All right.  We're going to take a

24   quick five-minute break until 4:10 --

25              MR. PEEK:  I'm not going to go anywhere, your

Case 1:23-mc-00073-CKK-MAU   Document 1-7   Filed 07/28/23   Page 833 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 234 of 265

-214

1    Honor.

2                    THE COURT:  We'll be in recess for five minutes.

3                        (A recess was taken.)

4                    MR. PEEK:  Your Honor, I want to apologize to

5    the Court, to Ms. Klar, I made representations to the Court

6    there was a defamation claim outstanding.  Mr. Snyder reminded

7    me there is not.  It will be the subject matter of further

8    conversation and motion practice as well.

9                    THE COURT:  All right.

10                    MR. PEEK:  But I wanted to at least clear that

11   up with the Court and apologize to the Court and Ms. Klar for

12   making that representation which was in fact wrong.

13                    THE COURT:  I understand the government wishes

14   to have a sidebar; is that correct?

15                    MS. WELLS:  That's correct.

16                    THE COURT:  Lawyers, if you're there appearing

17   telephonically, I apologize, but we are not able to hook you

18   in for the sidebar, but all other lawyers please come on over

19   here.

20                        (Following is discussion at sidebar.)

21                    THE COURT:  All right.  I understand that the

22   government has concerns about documents appearing in the

23   exhibits that eTreppid is examining Mr. Montgomery on this

24   afternoon.

25                    MS. WELLS:  Okay.  We have some concerns about

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 834 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 215 of 265

-215

1    some of the documents that are appearing in Exhibit 8 and

2    Exhibit 6, and what we would like to do is --

3                   MR. PEEK:  Eight or 9?

4                   MS. WELLS:  Eight.  You have not used 9 yet.

5                   MR. PEEK:  I'm using 9 right now.

6                   MS. WELLS:  No, we do not have concerns about 9,

7    we have concerns about 8 and 6, and there are pages within

8    those two exhibits that we would like to pull and take back to

9    Washington and make the redactions, and we'll provide copies

10   back to everybody.

11                  MR. GOMEZ:  There's also several pages --

12                  MS. WELLS:  No, that's Exhibit 6.

13                  THE COURT:  Okay.  So what I would propose we

14   do, I know you would like to FedEx these back this evening,

15   correct, sir?

16                  MS. WELLS:  Yes.

17                  THE COURT:  Okay.  And so -- all right.  So what

18   I propose we do, I understand -- and I'll put this on the

19   record, Ms. Klar, I think you mentioned to my law clerk or my

20   court clerk that Mr. Montgomery's --

21                  MS. KLAR:  He's hit the wall.

22                  THE COURT:  -- tired.  Anyway, we have some

23   other housekeeping matters to take up.

24                       I propose that we continue this and that I send

25   Mr. Gomez and Ms. Wells -- sorry, long day -- into my jury

Case 1:23-mc-00073-CKK-MAU   Document 137   Filed 07/28/23   Page 835 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 216 of 265

216

1    room, and you could begin -- we'll just hand over all the

2    binders now, and you can now get going on that, assured that

3    what we will do for the balance of the afternoon -- I think

4    we're going to be wrapping it up pretty quickly.

5              There were some housekeeping matters that we need to

6    take care of, we'll do that, and then we will be setting a

7    continued hearing so you'll need to --

8              MS. WELLS:  What I would suggest is that maybe

9    Mr. Ferrera and Mr. Gomez can take the binders and pull these

10   and then they can stay in the courtroom.

11             THE COURT:  All right.

12             MR. GUNDERSON:  What are we going to do with the

13   binders that counsel have?

14                        (Simultaneous indecipherable
                            conversation.)
15             MS. WELLS:  We are just removing the pages which

16   we believe need to be redacted.  We will be giving the

17   remained of the binders back to counsel.

18             THE COURT:  That was Ms. Wells.  Nobody talk.

19         All right.  Thank you.

20             MS. WELLS:  Thank you.

21                   (End of sidebar discussion.)

22             THE COURT:  All right.  The Court has had a

23   sidebar, and I'm going to have Mr. Gomez and the court

24   security officer take possession of -- is it all of the

25   binders; is that correct?

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 836 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 217 of 265

-217

```
 1                    MS. WELLS:  No, just binders 1 and 2.

 2                    THE COURT:  Take possession of binders 1 and 2,

 3    all copies.

 4                    MR. PEEK:  Are we done with his examination,

 5    your Honor?  Because Exhibit 9 is in my volume 2 so I

 6    didn't --

 7                    THE COURT:  I think we're finished.  I think

 8    that we're going to wrap things up for today.

 9               Well, I only have exhibit -- I only have binder 1,

10    volume 1.

11                    MR. GUNDERSON:  Your Honor, the Montgomery

12    parties are going to surrender their volumes 1 and 2 now to

13    the government.

14                         (Discussion held off the record.)

15                    THE WITNESS:  Can I step down or no?

16                    THE COURT:  You may step down.  I'm going to

17    have Mr. Montgomery step down.

18                    MR. PEEK:  Your Honor, I have another volume 1

19    here.

20                    MS. ROBB PECK:  Your Honor, and just for the

21    record, local counsel for both Atiego and Mr. Sandoval have

22    surrendered volumes 1 and 2 as well.

23                    THE COURT:  Thank you.

24               Go ahead and have a seat, Mr. Montgomery.

25                    THE WITNESS:  Okay.
```

Case 1:23-mc-00072-CKK-MAU   Document 131   Filed 07/28/23   Page 837 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 216 of 265

-218-

 1                THE COURT:  All right.  I just want to poll

 2     counsel so I'll just go around the room, the courtroom.

 3                So, Ms. Klar, have you provided the binders volumes

 4     1 and 2 to government counsel?

 5                MS. KLAR:  We have, your Honor.

 6                THE COURT:  All right.  And Ms. Robb Peck

 7     advises on behalf of Atiego and Mr. Sandoval she also did.

 8                MS. ROBB PECK:  That's correct, your Honor.

 9                THE COURT:  And I've provided volumes 1 and 2 of

10     my exhibits.  Did we have any additional exhibits, Ms. Clerk?

11                THE CLERK:  I did, your Honor, and I provided

12     those as well.

13                THE COURT:  All right.  And, Mr. Peek, have you

14     provided all of your copies that are here in the courtroom

15     to --

16                MR. PEEK:  I have, your Honor, and I've also

17     canvassed my staff to make sure that we didn't have any extras

18     here.

19                THE COURT:  All right, thank you.

20                All right.  So pursuant to the sidebar, the

21     government will be reviewing certain documents that are in

22     those exhibits.

23                And so Mr. Montgomery advised Ms. Klar that he would

24     really -- I think, is tired, and it turns out that -- I think

25     it's making sense to me that we set yet another date for

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00073-CKK-MAU   Document 171   Filed 07/28/23   Page 838 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 219 of 265

-219

1    continued hearing, but what I want to -- and we're going to

2    take care of some housekeeping matters as well.  We aren't

3    doing a continued hearing yet.

4            I want to take care of -- it's unfortunate, I've

5    lost my glasses.

6            MR. PEEK:  I do that all the time, your Honor.

7            THE COURT:  I don't know.

8        Oh, thank you, Ms. Court Reporter.

9        All right.  The first thing I'd like to do is go

10   over the exhibits.  All right.  I just want to go through the

11   laundry list.

12           I had the clerk of the court review the first

13   transcript of the June 10 hearing to determine which court

14   exhibits were actually discussed and the subject of questions,

15   and I'll just tell counsel what they are if you would like to

16   look at your exhibit list.

17           They were Exhibit 1, Exhibit 2, Exhibit 3,

18   Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 7, and Exhibit 12,

19   and Exhibit 16.  So, in other words, those were the only

20   exhibits on which the Court questioned Mr. Montgomery.

21           I think the other exhibits were included initially

22   with the thought that they might be the subject of inquiry,

23   and if other counsel are interested in having those admitted,

24   but I would like to ask if -- I'd like to admit those

25   exhibits, 1, 2, 3, 4, 5, 6, 7, 12 and 16.  Any comment from

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 839 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 220 of 265

-220-

1    counsel?

2              MR. PEEK:  No objection, your Honor.

3              MS. KLAR:  Your Honor, we have no objection, but

4    I'm wondering whether you questioned Mr. Montgomery about

5    number 9 which was the Court's May 21, 2008 order.  I don't

6    have independent recollection, but --

7              THE COURT:  I may have so let's go ahead and

8    include that as part of the record if there's no objection.

9         Hearing none, I'll also include Exhibit 9.

10        And I think some of these other items were never

11   intended to be exhibits, they just found their way somehow on

12   this list.  I don't know how.

13        But, so, any objection to those exhibits with that

14   exception?

15             MS. KLAR:  No objection, your Honor.

16             THE COURT:  Thank you very much, Ms. Klar.

17        Mr. Peek.

18             MR. PEEK:  No objection.

19             THE COURT:  Ms. Robb Peck?

20             MS. ROBB PECK:  No, your Honor.

21             THE COURT:  And Mr. Schwartz?

22             MS. SCHWARTZ:  No, your Honor.

23             THE COURT:  Mr. Liese?

24             MR. LIESE:  Mr. Liese, and no objection, your

25   Honor.

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 840 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 221 of 265

-221

1          THE COURT:  All right.  Thank you, sir.  I'm

2     sorry for mispronouncing your name.

3                    (Court's Exhibits 1 through 7, 9, 12 and
                      16 received in evidence.)
4          THE COURT:  All right.  Well, then as to your

5     exhibits, Mr. Peek, I guess we need to have the United States

6     review those exhibits, and then at the continued hearing we

7     can take up admission of those exhibits unless someone has

8     another proposal.

9          MR. PEEK:  I would at least offer Exhibit 9 and

10    Exhibit 31, your Honor.  Exhibit 31 was the second request for

11    production identified by Mr. Montgomery.  Exhibit 9 was the

12    production of the e-mails to the media.

13         THE COURT:  Let me just ask the government

14    before you respond, Ms. Klar, do you have any objections on

15    behalf of the government to admission of either of those

16    exhibits?

17         MS. WELLS:  Certainly not to Exhibit 31, and I

18    would just like to clarify on Exhibit 9, but I don't believe

19    we will, but if we could reserve that, I would appreciate it.

20         MR. PEEK:  I can wait then to offer that, your

21    Honor, just out of an abundance of caution.

22         THE COURT:  All right.  Let's reserve all of

23    those exhibits until such time as they're all reviewed.

24         Ms. Klar, any objection to that?

25         MS. KLAR:  No, your Honor.

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 841 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 222 of 265

-222

 1                THE COURT:  And, Ms. Robb Peck, any objection?

 2                MS. ROBB PECK:  No, your Honor.

 3                THE COURT:  Mr. Schwartz, any objection, sir?

 4                MR. SCHWARTZ:  No, your Honor.

 5                THE COURT:  Mr. Liese, any objection, sir?

 6                MR. LIESE:  No, your Honor.

 7                THE COURT:  All right, very good.

 8           All right.  Now, the next item -- I can't read my

 9      note, but I know that Ms. Klar wished to be heard on the

10      30(b)(6) deposition.

11           At -- I don't know if it was the June 10th hearing,

12      or if it was at last week's discovery status conference that

13      there was a discussion about 30(b)(6) deposition of eTreppid's

14      person most knowledgeable, and efforts were underway to set a

15      time for that, and, Ms. Klar, what do you have to report?

16                MS. KLAR:  An e-mail went out to all counsel, I

17      think, within a day or two of last week's hearing asking for

18      dates that were convenient during the next two weeks.

19           The response from most counsel was to give us dates.

20      The response from Mr. Peek was that he had yet another

21      vacation planned.

22           We then sent an e-mail to him on Friday saying,

23      Mr. Peek, can you please give us dates subsequent to your

24      return from your vacation, and also asking him to give us

25      dates for all the other vacations he has planned for the

Case 1:23-mc-00072-CKK-MAU   Document 131   Filed 07/28/23   Page 842 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 223 of 265

-223-

1    summer so that we can make sure not to schedule any

2    depositions on those dates.

3          We have not had the courtesy of a response that I'm

4    aware of, and we would like to convene that deposition

5    sometime right after the July 4 holiday which is when, I

6    believe, Mr. Peek returns.

7          THE COURT:  All right.  Mr. Peek, I just recall

8    from -- I think it was the June 10 hearing that you had a

9    holiday, a vacation planned.

10          MR. PEEK:  The 25th through the 5th.  I told

11    Ms. Klar, I told the Court that.

12          THE COURT:  Right, right.

13          MR. PEEK:  So I don't know what this "yet

14    another holiday" is, that's the same one I had.

15          THE COURT:  All right.  Well, so let's set a

16    date.

17          MR. PEEK:  Okay.  And, your Honor, I got the

18    correspondence late Friday.  Frankly, I have not had a chance

19    to get back to Ms. Klar.  I know it is certainly high on her

20    list of priorities.  Certainly today's hearing and preparing

21    for it was high on my list of priorities.

22          I wasn't ignoring her.  I responded very quickly the

23    first time I got the e-mail, I just got a little occupied.

24          And Mr. -- I will just tell the Court two things.

25    One, Mr. Trepp is not available from July 1st through

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 843 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 224 of 265

-224-

1    July 14th.  I start a jury trial in Las Vegas on July 14th,

2    I'm available the following week, which is the week of July

3    21st, and so is Mr. Trepp.

4           And I also think, your Honor, and this will be the

5    subject matter of a written motion, but I want to at least let

6    the Court know that I think it appropriate that discovery,

7    whether it be on my side or on Ms. Klar's side, in the nature

8    of oral discovery at least be held until such time as there is

9    complete production.

10          My concern is, and I'll put this in papers, is that

11   we start without a complete production by both sides and then

12   somebody comes back and says, oh, you've now given me more

13   documents, I want to take another one, or then there's a third

14   one.

15          And so I'll make that the subject matter of a motion

16   before we have the hearing on the 15th, but I'm available the

17   week of the 21st, your Honor.

18          THE COURT:  All right.  Then counsel are

19   directed to go ahead and schedule -- look at your calendars

20   and make -- please do your best.  I know it is the summer

21   vacation season, that's just -- for people, and there are also

22   special occasions that come during the summer that people have

23   to attend to.

24          So, though, until further order of the Court it is

25   ordered that counsel for the parties meet and confer and

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 844 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 225 of 265

-225

1    schedule the deposition -- I presume it would be Mr. Trepp is

2    the person most knowledgeable -- for the week of July 21,

3    2008, and that you do so, complete that, make that decision by

4    the end of this week, by June 27, 2008, get the time set, and,

5    Mr. Peek, if you're leaving for a vacation, please do your

6    best.

7              MR. PEEK:  I'll give Mr. Snyder my dates during

8    that week, as well as Mr. Trepp's.

9              THE COURT:  All right.

10             MR. PEEK:  And then the other thing, your Honor,

11   is I would just inquire whether or not Ms. Klar expects us to

12   go beyond one day.

13        We have not had a meet and confer, and I know we

14   need to have that --

15             THE COURT:  Right.

16             MR. PEEK:  -- on whether or not we're going --

17   how long the depositions are going to take place.

18             THE COURT:  Well, I think that's also another

19   subject of -- two issues are arising.  One, is the timing of

20   any oral discovery.  Two, is -- the next question is, of

21   course, how long these will take.

22        So I'm going to ask counsel to discuss that, that

23   should be part of your discussion between now and June 27th,

24   so that you can reach an understanding -- yes, Ms. Wells?

25             MS. WELLS:  Well, I just wanted to clarify, and

Case 1:23-mc-00073-CKK-MAU    Document 131    Filed 07/28/23    Page 845 of 1046
Case 3:08-cv-00058-PMP-VPC    Document 731    Filed 07/03/08    Page 226 of 265

-226-

1    I know that we have been included in the e-mails to date, but

2    your order only mentioned the parties, that the counsel for

3    the United States be included in the scheduling for this

4    deposition because, given the topic areas to be covered, it

5    does implicate --

6                    THE COURT:  Yes, I apologize for that oversight,

7    Ms. Wells.

8                    MS. WELLS:  And may I just state for the record,

9    I'm unavailable the week of the 21st, but I'm not sure whether

10   Mr. Gomez would be available.

11                   THE COURT:  All right, thank you.

12            Well, we're going to -- please do your best, and --

13                   MR. PEEK:  How about counsel, Mr. Schwartz and

14   Mr. Liese?

15                   THE COURT:  Well, I want everybody -- we are

16   going to have a chat about that today.

17                   MR. PEEK:  Okay.

18                   THE COURT:  That's why I'm giving you until the

19   27th to see what you can come up with, and maybe if you want

20   to stay after for a few minutes and discuss it, that's fine

21   with me.

22            Oh, I know.  Ms. Klar, you were going to report on a

23   discussion you had during a recess with counsel from

24   Washington, D.C.

25                   MS. KLAR:  Your Honor, I was not able to reach

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 846 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 227 of 265

-227

1  Mr. Pelchin, he is vacationing in Greece until July 4th, but I

2  was able to speak to the junior associate who is working on

3  this matter, and she will get an e-mail to him and try to

4  contact him tomorrow so I can have a conversation with him --

5           THE COURT:  All right.

6           MS. KLAR:  -- and a determination can be made

7  how to proceed with this issue.

8           Given Mr. Peek's schedule, it would appear that we

9  cannot reconvene this hearing until sometime after July 21st.

10           So given that fact, I think we will have adequate

11  time, but what I would ask the Court is, if a decision is made

12  to reproduce that PST file, would that run afoul of the

13  Court's order, and the point being, we would reproduce it and

14  have Fulcrum do whatever needs to be done so that they can be

15  available to respond to any questions.

16           THE COURT:  When you ask how would it run afoul

17  of the Court's order, tell me why you ask that question.

18           MS. KLAR:  Well, because I don't want to run

19  afoul of your order.

20           THE COURT:  Right.  Which order?

21           MS. KLAR:  Well, you ordered us to produce

22  something by a certain date.

23           THE COURT:  Oh, I see.

24           MS. KLAR:  And I am basically asking you to do a

25  substitute production, and the reason I'm doing that is

Case 1:23-mc-00073-CKK-MAU   Document 137   Filed 07/28/23   Page 847 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 234 of 265

-234-

1   that, sir.  Thank you, though.

2                MR. SCHWARTZ:  Just double checking.  Thank you,

3   your Honor.

4                MR. PEEK:  With respect to Mr. Montgomery, I'm

5   assuming that the two hour is my limit of cross.

6                THE COURT:  Yes.

7                MR. PEEK:  Ms. Klar may have some redirect of

8   him, I don't know.

9           And then with respect to Mr. Karchmer, we would have

10  two hours on direct, I don't know how much cross.

11               THE COURT:  All right.  And then so --

12               MR. PEEK:  And then Mr. Trepp would be an hour

13  and a half at the most.

14               THE COURT:  So that is five and a half hours.

15               MS. KLAR:  Your Honor, that doesn't give me very

16  much time for any kind of rebuttal.

17               THE COURT:  No, it doesn't.  What do you

18  anticipate?  Do you know at this time?

19               MS. KLAR:  I don't.  I'm assuming that I'm going

20  to have to put an expert on to respond to Mr. Karchmer, and I

21  think I also will have to -- I may have to put testimony on in

22  response to Mr. Trepp, and I would assume that I will be

23  cross-examining Mr. Trepp.

24               THE COURT:  All right.  Well -- all right.

25          Oh, please hand that extra exhibit -- the record is

Case 1:23-mc-00073-CKK-MAU   Document 131   Filed 07/28/23   Page 848 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 235 of 265

-235-

1    reflecting that the law clerk is delivering yet another binder

2    to Mr. Gomez that he needs to take a look at.

3           Please make sure, everybody, before you leave today,

4    I know everybody is doing their best, it's which binders?

5    One --

6           MS. WELLS:  1 and 2.

7           THE COURT:  Binders 1 and 2.  Don't take them.

8    Make sure when you're packing up, my law clerk will be here,

9    and we can deliver those to Mr. Gomez and the court security

10   officer.

11          All right.  Well, I'll -- what I'm going to tell --

12   I'm gone, so I'll tell counsel when I'm available.

13          I think what we're going to have to do is this,

14   rather than decide all of this today, I want to give counsel,

15   Mr. Peek and Ms. Klar, an opportunity to consider how you want

16   to proceed at the continued show cause hearing and what time

17   you think you're going to need, and then I think you can

18   submit what your individual proposals are about what you would

19   request from the Court in terms of time.

20          And then what I'll do is either issue an order

21   saying here's when I'm available and this is how much time

22   you're getting and this is when I can be available, but I will

23   tell you -- let's see.  I think next week is out, right?

24          Well, I'm available before July 21, but I guess --

25   and I'm available the week of July 21st on the 24th or the

Case 1:23-mc-00073-CKK-MAU   Document 1-7   Filed 07/28/23   Page 849 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 236 of 265

236

1    25th.

2              MR. PEEK:  Your Honor, as always, there's a

3    chance that a case could settle the week of the 14th, but I

4    don't --

5              THE COURT:  I'm just -- I understand.  I'm just

6    telling you that I'm available so you know, and I could

7    possibly continue a matter on July 23rd.  So July 23rd, 24th,

8    or 25th, I am out.  The Ninth Circuit conference is the

9    following week and I am gone, and I am gone for part of the

10   next week.

11             So I'm available the week of August 11 on Monday,

12   the 11th, Tuesday, the 12th.  I could revise my schedule to be

13   available the week of August 11 on the 11th, the 12th, 13th,

14   and the 14th.

15             We have on Tuesday, August 19, the status conference

16   with Judge Pro.  I'm available August 20th, could be available

17   the 21st and the 22nd also.  I think that gives you --

18             MR. PEEK:  When would you like us to give

19   you our --

20             THE COURT:  Wait a minute.

21             THE CLERK:  It was moved to Monday, the 18th.

22             THE COURT:  Oh, I'm sorry, I moved it, I moved

23   the hearing to accommodate Judge Pro's schedule.  I apologize,

24   that's now set for Monday, August 18th.

25             MR. PEEK:  Does that make the Court available on

Case 1:23-mc-00053-CKK-MAU   Document 1-7   Filed 07/28/23   Page 850 of 1046
Case 3:06-cv-00056-PMP-VPC   Document 731   Filed 07/03/08   Page 237 of 265

-237-

1    the 19th?

2                THE COURT:  Yes.  So I'm not asking you to do

3    this today, I want you all to go home and look at your

4    calendars, and then I want you to contact my court clerk on

5    the 27th of this -- of June, just say what days you're

6    available of those dates that I picked.  Talk to one another,

7    figure out what days you're available.

8                If we need to set it for two days.  Realistically, I

9    would rather do that and get it done than keep bringing you

10   all back at expense to your clients.

11               But what I also want, counsel, will it give you

12   adequate time to decide what amount of time you would like to

13   request, if you can do that by Friday, would that be

14   sufficient time, Ms. Klar?

15               MS. KLAR:  Yes, your Honor.

16               THE COURT:  All right.  And, Mr. Peek?

17               All right.  So -- and on the 27th, just file a paper

18   saying requested time and witnesses for evidentiary hearing,

19   and then I'll decide how long it's going to be and what I'm

20   going to do, and then, in the meantime, everybody can just

21   either jointly or separately file a notice of availability and

22   which dates you and your clients are available of the dates

23   that I mentioned.  All right?

24               MR. PEEK:  Thank you, your Honor.

25               MS. KLAR:  Thank you very much, your Honor.

Case 1:23-mc-00073-CKK-MAU Document 131 Filed 07/28/23 Page 851 of 1046
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 238 of 265

238

1          THE COURT:  Is there anything else that anyone

2    has?  Ms. Klar?

3          MS. KLAR:  No, your Honor.

4          THE COURT:  All right.  Mr. Peek?

5          MR. PEEK:  No, your Honor.

6          THE COURT:  Ms. Robb Peck?

7          MS. ROBB PECK:  No, your Honor.

8          THE COURT:  Mr. Schwartz?

9          MR. SCHWARTZ:  No, your Honor.

10         THE COURT:  Mr. Liese?

11         MR. LIESE:  No, your Honor.

12         THE COURT:  Ms. Wells and Mr. Gomez?

13         MS. WELLS:  No, your Honor.

14         THE COURT:  All right.  Thank you very much,

15   then, we're adjourned for today.

16                         -o0o-

17

18         I certify that the foregoing is a correct
           transcript from the record of proceedings
19         in the above-entitled matter.

20         /s/Margaret E. Griener        07/03/2008
           Margaret E. Griener, CCR #3, RDR, FCRR
21         Official Reporter

22

23

24

25

# EXHIBIT L

## AFFIDAVIT OF SERVICE

### UNITED STATES DISTRICT COURT
District of Minnesota

Case Number: 22-CV-0098-WMW-JFD

Plaintiff:
**SMARTMATIC USA CORP., ET AL**

vs.

Defendant:
**MICHAEL J. LINDELL AND MY PILLOW, INC.**

For:
Philip Ekman
PLATINUM COURIER SERVICE
11575 E. Laketowne Drive
Albertville, MN 55301

Received by PLATINUM COURIER SERVICE to be served on **CARLOTTA WELLS, 9301 GARDEN CT, POTOMAC, MD 20854**.

I, Constantine Mckoy, being duly sworn, depose and say that on the **21st day of March, 2023** at **6:52 pm, I:**

**INDIVIDUALLY/PERSONALLY** served defendant by delivering a true copy of the **SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION, EXHIBITS, COVER LETTER AND WITNESS FEE ($100)** with the date and hour of service endorsed thereon by me, to: **CARLOTTA WELLS** at the address of: **9301 GARDEN CT, POTOMAC, MD 20854**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 60, Sex: F, Race/Skin Color: White, Height: 5'4", Weight: 140, Hair: Dark Brown, Glasses: Y

Under penalty of perjury, I certify that the above made statements are true. I am over the age of 18, under no legal disabilities and have no interest in the above action. I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

LISA GARTON
Notary Public, State of Maryland
County of Frederick
My Commission Expires 1/18/2027

Subscribed and sworn to before me on 3/27/23 by
the affiant who is personally known to me.

_____
Notary Public

**Constantine Mckoy**
Process Server

**PLATINUM COURIER SERVICE**
**11575 E. Laketowne Drive**
**Albertville, MN 55301**
**(612) 221-2254**

Our Job Serial Number: PRS-2023010722

Copyright © 1992-2023 DreamBuilt Software, Inc - Process Server's Toolbox V8 2n

# EXHIBIT M



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

**Mailing Address**          **Overnight Delivery Address**
P.O. Box 883              1100 L Street, N.W.
Washington, D.C. 20044     Washington, D.C. 20005

---

Cassandra Snyder                          (202) 451-7729
Trial Attorney                            cassandra.m.snyder@usdoj.gov

April 3, 2023

<u>VIA E-MAIL</u>

Andrew Parker, Esq.
888 Colwell Building
123 N. 3rd St.
Minneapolis, MN 55401
parker@parkerdk.com

  Re: *Smartmatic USA Corp. et al., v. Michael J. Lindell, et al.,* No. 22-cv-0098 (D.
   Minn.)

Dear Mr. Parker:

  The Department of Justice ("the Department") sets forth below its response and objections
to your Rule 45 subpoena of Carlotta Wells, Assistant Branch Director of the Federal Programs
Branch in the Civil Division of the Department of Justice, dated March 20, 2023.  Your subpoena
seeks Ms. Wells' deposition testimony on the following subjects:

(1) Mr. Montgomery worked on U.S. government programs that involved information
protected by the State Secrets Privilege;

(2) the federal government undertook active measures to prevent Mr. Montgomery
from disclosing state secrets, including seizing documents from his attorney,
attending his deposition, and attending court hearings at which he testified;

(3) Ms. Wells engaged in conversations with Mr. Montgomery on multiple occasions
regarding the State Secrets Privilege and what information Mr. Montgomery was
permitted to disclose or prohibited from disclosing;

(4) the United States Government's desire to protect State Secret Information held by
Mr. Montgomery continues today; [and]

(5) Exhibits A, B, C, D, and E accurately reflect the events they describe.

Ex. 2 at 4.

1

The Department has considered this request under its *Touhy* regulations, issued pursuant to the Federal Housekeeping Statute, 5 U.S.C. § 301, and *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), set forth at 28 C.F.R. § 16.21 *et seq*. Pursuant to these regulations, the Department is empowered to determine whether to permit its employees to testify in cases, such as this one, in which the government is not a party. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1052–54 (8th Cir. 2007); *see also, e.g., Upsher-Smith Lab'ys, Inc. v. Fifth Third Bank*, No. 16-cv-556, 2017 WL 7369881, at *8 (D. Minn. Oct. 18, 2017).

In determining how to respond to a demand for information such as a deposition, the Department considers a number of factors, including whether the deposition is appropriate under the applicable rules of procedure and whether compliance with the subpoena would involve disclosure of classified or privileged information, or information that is otherwise protected by statute or regulation. 28 C.F.R. § 16.26. After considering these factors, we decline to authorize Ms. Wells' testimony in the above-referenced litigation and object to your subpoena on numerous grounds. As explained below, your requested testimony concerns a lawsuit filed seventeen years ago and dismissed over a decade ago, and you have failed to set forth any reasonable, plausible basis that the matters at issue in those court proceedings have any possible bearing on statements regarding 2020 election fraud or Smartmatic voting machines. Moreover, you seek testimony that is variously protected from disclosure via court order, testimony of which Ms. Wells has no personal knowledge and for which there exist more convenient sources, and testimony that is subject to privilege.

1. **The Testimony Sought Is Not Relevant to the Above-Referenced Litigation or Proportional to the Needs of the Case.**

First, Defendants' request for testimony is denied because the information Defendants seek is not relevant to the claims or defenses of any party to this litigation, nor proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) (providing that all discovery must be relevant to a claim or defense and proportional to the needs of the case); 28 C.F.R. § 16.26(a) ("In deciding whether to make disclosure pursuant to a demand, Department officials and attorneys should consider (1) whether such disclosure is appropriate under the rules of procedure governing the case . . . .").

Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited (collectively, "Smartmatic") filed the underlying defamation action against Michael J. Lindell and My Pillow, Inc. based on numerous statements by Mr. Lindell in the wake of the 2020 presidential election, in which Mr. Lindell claimed that Smartmatic voting technology was exploited in various ways to alter votes and election results to the detriment of former-President Donald Trump. According to Smartmatic, Mr. Lindell's assertions generally centered on the alleged failure and/or exploitation of certain "algorithms" in Smartmatic voting machines. *See* Compl. ¶ 75, ECF No. 1. Defendants claim that Ms. Wells' testimony on the above-described topics is relevant to Defendants' defenses, including "the defense that [Mr. Lindell's] allegedly defamatory statements were true, and the defense that the statements were plausible." Ex. 2 at 1.

Specially, Defendants assert that Ms. Wells' testimony will show that "Mr. Lindell's reliance on Mr. Montgomery and the information he stated he possessed was reasonable." *Id.* at 1.

You have failed to demonstrate any connection between the requested deposition testimony and that showing. *See Sterne Kessler Goldstein & Fox, PLLC*, 276 F.R.D. at 385 (explaining that asserting that counsel has "non-privileged, factual information without specifying precisely what information is sought or the benefit of that information is insufficient to overcome the potential risks that the Federal Rules were intended to protect against"). The requested testimony concerns Ms. Wells' representation of the United States in *Montgomery v. eTreppid Technologies, Inc.*, No. 06-cv-56 (D. Nev.), a lawsuit in which the United States asserted the state secrets privilege and obtained a Protective Order regarding certain information. That lawsuit was filed seventeen years ago and dismissed over a decade ago, and you have failed to set forth any reasonable, plausible basis that the matters at issue in those court proceedings, which predate your case by more than a decade and a half, have any possible bearing on statements regarding 2020 election fraud or Smartmatic voting machines. *See, e.g., Harrington v. Bergen Cnty.*, No. CV 14-5764 (SRC), 2017 WL 4387373, at *2 (D.N.J. Oct. 3, 2017) (affirming denial of discovery "concerning an unrelated criminal investigation that occurred nearly nine years ago" on the basis of proportionality and undue burden). On that basis alone, your request is improper.

Moreover, Ms. Wells' only involvement in *eTreppid* was as counsel for the United States in its assertion of the states secret privilege in that case. To the extent that topics (2) and (3) seek to establish that the government acted to protect certain information in that case, the government's unclassified filings entered on the public record in that case speak for themselves. Therefore, your request for testimony about the actions the government "undertook" in that case, Ex. 2 at 4, is cumulative and accordingly not relevant or proportional to the needs of the case, *see* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery when "the discovery sought is unreasonably cumulative or duplicative").

## 2. The Testimony Sought Is Not Authorized to the Extent it Seeks Information Protected from Disclosure by the Protective Order in *eTreppid*.

To the extent your request seeks testimony on subjects covered by the Protective Order in *eTreppid*, your request is denied. As you know, at the Government's request, the court entered an order in *eTreppid* prohibiting discovery of information relating to (1) "the existence or non-existence of any actual or proposed relationship" between the parties and any U.S. intelligence agency and (2) any "actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties." Protective Order ¶¶ 2–3, *eTreppid*, No. 06-cv-56 (D. Nev. Aug. 29, 2007), ECF No. 253. Your request for testimony concerning topics (1) and (3) regarding whether "Mr. Montgomery worked on U.S. government programs that involved information protected by the State Secrets Privilege" and his conversations with Ms. Wells regarding "what information Mr. Montgomery was . . . prohibited from disclosing" fall squarely within that prohibition. Ex. 2 at 4. As you plainly know, both your client and Mr. Montgomery have sought to lift the Protective Order, which remains in effect. *See* Mot. to Intervene and to Lift Protective Order, *eTreppid*, No. 06-cv-56 (D. Nev. Aug. 20, 2022), ECF No. 1216; Mot. to Restrict Application of State Secrets Privilege, Protective Order, and Classified

Information Nondisclosure Agreement, *eTreppid*, No. 06-cv-56 (D. Nev. Nov. 14, 2022), ECF No. 1236. Your request for Ms. Wells' testimony is denied on this additional ground.

**3.  The Testimony Sought Is Not Authorized to the Extent it Seeks Information About Which Ms. Wells Has No Personal Information or for Which There Is a More Convenient Source.**

The Department also denies your request to the extent you seek testimony on topics about which Ms. Wells has no personal knowledge. For example, Ms. Wells cannot testify concerning topic (4) – any desire by the United States "to protect State Secret Information held by Mr. Montgomery [] today." Ex. 2 at 4. The Government's position on your client's request to lift the Protective Order is a matter of public record in *eTreppid*. *See* U.S.'s Mem. in Opp. to Mot. to Intervene at 1, *eTreppid*, No. 06-cv-56 (D. Nev. Oct. 6, 2022), ECF No. 1232 (opposing the motion on substantive and procedural grounds and noting that "Lindell seeks this relief despite the fact that . . . he has not alleged that the protective order has actually prevented him from obtaining any information he needs"); U.S.'s Mem. in Opp. to Dennis Montgomery's Mot. Filed at ECF No. 1236 at 3, *eTreppid*, No. 06-cv-56 (D. Nev. Dec. 5, 2022), ECF No. 1243 (opposing the motion on substantive and procedural grounds and noting that "the Protective Order entered in this case has nothing to do with the defamation litigation against Lindell"). Ms. Wells has no further information regarding that topic. Ms. Wells also does not have personal knowledge concerning Mr. Montgomery's alleged technology based on her involvement in *eTreppid*, nor any matter concerning the underlying defamation lawsuit. She was simply counsel for the Government in connection with a matter that arose seventeen years ago, and in that role presented the Government's position and information to the court and took appropriate steps to protect the Government's interests when necessary in extrajudicial settings.

The Department also objects on undue burden grounds to providing information that can be more easily sought from another source. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery when that discovery "is obtainable from some other source that is more convenient, less burdensome, or less expensive"). Mr. Montgomery is a more convenient and less burdensome source of information regarding topics (1), (2), and (3) to the extent not prohibited from disclosure by the *eTreppid* Protective Order. *See Sterne Kessler*, 276 F.R.D. at 385 (quashing subpoena of former patent counsel because counsel was not the appropriate source of information regarding patent interview where respondent could instead depose the patent examiner and the patent inventor). You have provided no explanation for why Ms. Wells' duplicative and more attenuated testimony would be necessary on those topics. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery when "the discovery sought is unreasonably cumulative or duplicative"). Moreover, the *eTreppid* Protective Order did not preclude the parties in *eTreppid* from serving or taking any discovery from other parties or third parties relating to, *inter alia*, computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the parties. *See* Protective Order ¶ 4(c), *eTreppid*, No. 06-cv-56 (D. Nev. Aug. 29, 2007), ECF No. 253. You have not explained why such sources are insufficient to provide the information you seek. Finally, to the extent that you seek someone to testify as to the "accura[cy]" of Defendants' attachments, topic (5) can be more conveniently established through either Mr. Montgomery or the relevant court reporter. Ex. 2 at 4. For these reasons, your request is unduly burdensome and therefore denied.

**4. The Testimony Sought Is Not Authorized to the Extent it Seeks Privileged Information.**

The Department denies your request to the extent it seeks information that is privileged. The Department's *Touhy* regulations provide that the Department shall consider "[w]hether disclosure is appropriate under the relevant substantive law concerning privilege." 28 C.F.R. § 16.26(a)(2); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii). Notwithstanding Defendants' assertion that they "do not intend to ask Ms. Wells to disclose the substance of attorney-client communications or work product material generated in the course of her representation of the United States," Ex. 2 at 3, the deposition of trial counsel necessarily requires significant parsing between privileged information and non-privileged information. *See Sterne Kessler*, 276 F.R.D. at 385 ("Clearly a deposition of [counsel] would require diligent efforts to avoid disclosure of attorney-client communications and protected work-product material, a painstaking process that poses risks that other sources of discovery do not."); *United States v. All Assets Held in Acct. No. XXXXXXX*, No. 13-cv-1832, 2019 WL 95605, at *8 (D.D.C. Jan. 3, 2019) ("To successfully walk the tightrope between what is discoverable and what is privileged, [counsel] would have to distinguish what he affirmatively disclosed to third parties more than 17 years ago from his own mental impressions of the case."). Indeed, deposing counsel can lead to the revelation of counsel's "personal recollections" and "assembly of facts," which the Eighth Circuit has repeatedly confirmed are protected work product in and of themselves. *Evans v. Krook*, No. 20-CV-2474 (MJD/ECW), 2022 WL 17176186, at *9–10 (D. Minn. Nov. 23, 2022) (collecting cases); *see also Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1328–30 (8th Cir. 1986). In addition, your request appears to seek information based on or related to the state secrets privilege assertion in *eTreppid* and subject to the Protective Order in that case. Thus, to the extent your subpoena seeks such privileged information, your request is denied on this additional ground.

\*\*\*

For the foregoing reasons, the Department declines to authorize the requested deposition testimony of Ms. Wells. Please let me know if you have any questions or would like to discuss further.

Sincerely,

*/s/ Cassandra Snyder*
Cassandra Snyder
(202) 451-7729

# EXHIBIT N

ANDREW D. PARKER, ESQ. (pro hac vice forthcoming)
Arizona Bar No. 028314
E-Mail: parker@parkerdk.com
**PARKER DANIELS KIBORT LLC**
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
Facsimile: (612) 355-4101


ADAM R. FULTON, ESQ.
Nevada Bar No. 11572
E-mail: afulton@jfnvlaw.com
LOGAN G. WILLSON, ESQ.
Nevada Bar No. 14967
E-mail: logan@jfnvlaw.com
**JENNINGS & FULTON, LTD.**
2580 Sorrel Street
Las Vegas, Nevada 89146
Telephone: (702) 979-3565
Facsimile: (702) 362-2060

*Attorneys for* Proposed Intervenor

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DENNIS MONTGOMERY, an individual; and MONTGOMERY FAMILY TRUST, a California Trust, | CASE NO.: 3:06-cv-00056-PMP-VPC and 3:06-cv-00145-PMP-VPC |
| Plaintiff, | |
| v. | |
| ETREPPID TECHNOLOGIES, L.L.C., a Nevada Limited Liability Company; WARREN TREPP, an individual; DEPARTMENT OF DEFENSE of the UNITED STATES OF AMERICA; and DOES 1 through 10, | |
| Defendants. | |
| AND ALL RELATED CASE(S) | |

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AND TO LIFT PROTECTIVE ORDER

### Oral Argument Requested

Non-party Michael J. Lindell ("Lindell") hereby seeks to intervene in these actions for the limited purpose of obtaining the lifting of the Court's protective order entered on August 29, 2007 in case no. 06-cv-00056 as Doc. #253 ("Protective Order"). Lindell possesses data ("Data") obtained from party Dennis Montgomery ("Montgomery"), which Lindell seeks to use to defend himself against claims asserted in other litigation, and the Data may be covered by the Protective Order.

## I.
### Factual Background

Lindell is a defendant in US Dominion, Inc. et al. v. My Pillow, Inc. et al., case no. 1:21-cv-00445 in the United States District Court for the District of Columbia ("D.C. Litigation"). The plaintiffs' complaint in that action alleges Lindell defamed them by making various statements about electronic election equipment used in the 2020 presidential election being hacked to manipulate the results of the election. Decl. of Michael Lindell *See Exhibit A* at ¶ 3 & Ex. A ¶ 165 ("Lindell Decl."). In making these statements, Lindell relied in part upon information that originated with Montgomery. *Id.* ¶ 74; Lindell Decl. ¶ 4. Accordingly, Lindell seeks to use testimony and evidence concerning Montgomery's background and his work for U.S. intelligence agencies, and the information from Montgomery itself, to defend the reasonability and veracity of his allegedly defamatory statements in the D.C. Litigation. *Id.* ¶ 5.

The information that Lindell in part relied upon, the Data, comprises internet transmissions sent during the 2020 election that were collected by technology Montgomery developed and previously licensed to the US government. Lindell Decl. ¶ 7; Montgomery

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

*See Exhibit B* at Decl. ¶ 40. Montgomery has gathered extensive data showing that voting machine manufacturers and their employees were hacked several times, and information related to illegal US government surveillance programs that Montgomery worked in. Montgomery Decl. ¶ 38. Lindell agreed to acquire ownership rights to the Data from Montgomery. Lindell Decl. ¶ 6; Montgomery Decl. ¶ 39. The Protective Order entered by this Court prohibits the use or disclosure of information related to Montgomery's work for or relationship with U.S. intelligence agencies. *See* Doc. #253. Montgomery believes the Protective Order remains in place and precludes disclosure of the Data. Montgomery Decl. ¶ 41. Lindell seeks removal of this barrier to him using the Data, and testimony and evidence concerning Montgomery, to defend himself in the D.C. Litigation. Lindell Decl. ¶ 10.

## II.
### Lindell May Intervene in This Action for the Limited Purpose Modifying the Protective Order.

Fed. R. Civ. P. 24(a)(2) grants the right to intervene in an action under specified circumstances. Rule 24(b)(1)(B) grants the ability to intervene in an action on a permissive basis. Lindell can intervene in this action for his intended limited purpose, both permissively under Rule 24(b)(1)(B) and as of right under Rule 24(a)(2).

The "requirements for intervention" are to be "broadly interpreted in favor of intervention," *Kalbers v. United States DOJ*, 22 F.4th 816, 822 (9th Cir. 2021), and "The courts have widely recognized that the correct procedure for a nonparty to challenge a protective order is through intervention for that purpose." *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (citing *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 783 (1st Cir. 1988)).

/ / /

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

### A.    Lindell May Intervene on a Permissive Basis.

"Generally, permissive intervention under Rule 24(b) requires '(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action.'" *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013) (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 473 (9th Cir. 1992)). However, "[T]here is ample support for intervenor's argument that courts also recognize Rule 24(b) intervention as a proper method to modify a protective order." *Beckman*, 966 F.2d 470, 472 (9th Cir. 1992). Accordingly,

- "No independent jurisdictional basis is needed" when an intervenor seeks to modify a protective order rather than litigate a claim on the merits, *Beckman*, 966 F.2d at 473; *Pansy*, 23 F.3d at 778, n.3; *EEOC*, 146 F.3d at 1047; *In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 145 (2d Cir. 1987);

- "[M]otions to intervene for the purpose of seeking modification of a protective order in long-concluded litigation are not untimely," *Blum*, 712 F.3d at 1353 (citing "the growing consensus among the courts of appeals that intervention to challenge confidentiality orders may take place long after a case has been terminated"); *United Nuclear Corp.,* 905 F.2d at 1427 ("Rule 24(b)'s timeliness requirement is to prevent prejudice in the adjudication of the rights of the existing parties, a concern not present when the existing parties have settled their dispute and intervention is for a collateral purpose."); and

- "There is no reason to require such a strong nexus of fact or law when a party seeks to intervene only for the purpose of modifying a protective order." *Beckman*, 966 F.2d at 474. The requirement that a claim or defense present "common legal or

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

factual issues" to the main action is interpreted with "considerable breadth." *EEOC*, 146 F.2d at 1046; *Pansy*, 23 F.3d at 778. *See also Advance Loc. Media*, 918 F.3d at 1173 n.12 (when a party seeks to intervene only for the limited purpose of obtaining access to sealed judicial records, there need not be a "strong nexus of fact or law" to the issues in the original case) (quoting *Flynt*, 782 F.3d at 967); *Jessup v. Luther*, 227 F.3d 993, 997-99 (7th Cir. 2000); *Pansy*, 23 F.3d at 778; *In re Estelle*, 516 F.2d 480, 485 (5th Cir. 1975).

Here, all three requirements for permissive intervention are met. Lindell seeks to intervene for the limited purpose of modifying the Court's Protective Order. No independent jurisdictional basis is needed, the motion is not untimely, and there is a common question of law and fact between the grounds that considerations that justified the entry of the Protective Order originally, and whether those grounds still justify any restrictions of the Protective Order upon the Data. *Cf. Beckman* 966 F.2d at 474 ("The issue of interpretation of the policy supplies a sufficiently strong nexus between the district court action and the state actions to satisfy the commonality requirement").

An additional consideration for motions to intervene is whether intervention will "unduly delay or prejudice the adjudication of the original parties' rights." *Blum*, 712 F.3d at 1354. But, again, when the intervention is for the limited purpose of addressing a protective order, this consideration loses force. Where "[t]he existing parties have settled their dispute," intervention has "has little effect on the original parties' underlying rights." *Id.* This action was settled and all claims dismissed in 2009. *See* Order (Feb. 19, 2009) (doc. 100).

All elements for permissive intervention are met, and no part would be prejudiced by Lindell's limited intervention. Lindell should be permitted to intervene under Rule 24(b).

## B.    Lindell May Intervene as of Right.

Lindell also can intervene for his limited purpose as of right, pursuant to Fed. R. Civ. P. 24(a)(2). Under Rule 24(a)(2), a non-party may exercise the right to intervene if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Ninth Circuit has interpreted Rule 24(a)(2) as requiring four things of an intervenor: (1) its intervention motion is "timely"; (2) it "has a significantly protectable interest relating to . . . the subject of the action"; (3) it "is so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest"; and (4) its "interest is inadequately represented by the parties to the action." *Kalbers v. United States DOJ*, 22 F.4th 816, 822 (9th Cir. 2021) (quotations omitted). Each of those requirements is met here.

**Timeliness**.  Timeliness of a motion to intervene "hinges on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Kalbers*, 22 F.4th at 822 (quotation omitted). As discussed above, considerations of timeliness have a different meaning in the context of an intervention for the purpose of addressing a protective order, than in the context of affecting the substantive or procedural resolution of the parties' claims and defenses. The core consideration underlying the timeliness requirement is "to prevent prejudice in the adjudication of the rights of the existing parties," a factor that is

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

"not present when the existing parties have settled their dispute and intervention is for a collateral purpose." *United Nuclear Corp.*, 905 F.2d at 1427 (citing *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 786-87 (1st Cir. 1988) and *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159, 161-62 (6th Cir. 1987)). "While it is true that an application for intervention must be timely, 'timeliness is to be determined from all the circumstances,' and 'the point to which the suit has progressed . . . is not solely dispositive.'" *United Nuclear Corp.*, 905 F.2d at 1427 (quoting *NAACP v. New York*, 413 U.S. 345, 365-66 (1973))\; *Kalbers*, 22 F.4th at 826 ("stage of proceeding" factor uses a "nuanced, pragmatic approach" and "substance prevails over form" such that "[n]either the formal "stage" of the litigation" nor the "length of time that has passed since a suit was filed" is dispositive).

In this case, there is no possibility that any of the parties could be prejudiced in the adjudication of their rights, for that adjudication has been completed. "[P]rejudice must be connected in some way to the timing of the intervention motion." *Kalbers*, 22 F.4th at 825. Lindell has brought his motion to intervene at an appropriate time, seasonably after he became a defendant in the D.C. Litigation, decided to use the Data in his defense in that action, and realized that the Protective Order might lead to the imposition of penalties or harms if he did. This motion satisfies the timeliness requirement because no possibility of prejudice to any party as a result of the timing of the motion exists.

**<u>Significantly Protectable Interest</u>**. The significantly protectable interest factor is met because a non-party may intervene in an action for the purpose of litigating the substance of a protective order. *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 354 (11th Cir. 1987) ("[A]ppellants have standing to intervene in this action and challenge the propriety of the district court's protective order."). *See also In re Midland Nat. Life Ins.*

*Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1120 (9th Cir. 2012) (limited purpose intervenor successfully appealed district court order ruling concerning sealing order). Lindell also meets this factor by application of the ordinary test governing application of the factor. A "significantly protectable interest" must be an interest "protectable under some law" and there must be a "relationship between the legally protected interest and the claims at issue." *Kalbers*, 22 F.4th at 827; *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996). Here, Lindell has a strong interest in using the Data to defend himself against defamation claims, and a First Amendment interest in being free from prior restraint concerning the publication and use of the Data. There is an obvious relationship between Lindell's interests and the Protective Order which may forbid him from using or publishing the Data.

**Impair or Impede the Interest**. The third factor is met because the Protective Order may impair or impede Lindell's ability to publish or use the Data without incurring liability for contempt of court.

**Interest Not Adequately Protected**. The fourth factor is met because no other party to this action has any interest in the Data or in vindicating Lindell's ability to publish or use the data. This factor imposes a "minimal" burden, and is met if the intervenor shows that "representation of his interest *may* be inadequate." *Kalbers*, 22 F.4th at 828.

Lindell satisfies all four requirements for intervention as of right under Rule 24(a)(2).

### III.
### The Court Should Lift the Protective Order

After permitting Lindell to intervene in this action, the Court should lift the Protective Order, for three reasons.

/ / /

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

## A. Lindell Needs to Use the Data to Defend Himself.

Lindell will use the Data to defend the reasonability and veracity of his statements regarding the 2020 election at issue in the D.C. Litigation. Lindell Decl. ¶ 5. The statements were based on information received from Montgomery. *Id.* ¶ 4. The substance of the Data will show Lindell's reliance upon it to be reasonable and that the statements were truthful, both points which are defenses to a defamation claim.

## B. The Protective Order Is Stale.

The Protective Order was entered on August 29, 2007, fifteen years ago. It was based on an assertion that secrecy was needed to protect "national security interests" of the United States. Protective Order at 1-2. The affidavit on which the Protective Order was based stated that disclosure of "particular intelligence sources and methods" or the "classified contracting process" could harm U.S. national security. Decl. of John D. Negroponte ¶ 12 (Doc. 83-2). Those sources, methods, and contracts are now at least fifteen years out of date. Computer capabilities and software – the substance of Montgomery's work for eTreppid at issue in this action, *see* case no. 06-cv-00056 doc. 1 ¶¶ 1,7, 15-19 – that in 2007 were cutting-edge are now obsolete. Any need for secrecy to protect these matters has faded, and the Protective Order is no longer necessary. When the government invokes the state secrets privilege, it is the courts' "obligation to review the [government's claims] with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege." *Abilt v. CIA*, 848 F.3d 305, 312 (4th Cir. 2017) (quoting *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007)). At this time, after such a long period of time has passed, any initial justification for the Protective Order no longer justifies its restrictions on Montgomery or his Data.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

**C.** **The Government's State Secrets Claim Should Be Viewed with a Critical Eye, Where, as Here, It Conceals Constitutional Violations.**

Montgomery has reported to the FBI illegal domestic surveillance of Americans by the government in government programs that Montgomery worked in. Montgomery Decl. ¶¶ 30, 34, 38. The Data that Lindell seeks to use is related to Montgomery's work.[1] *Id.* ¶ 40. The government cannot be allowed to conceal its deprivations of constitutional rights through domestic surveillance by invoking the state secrets doctrine. The Court should review the government's professed need for the Protective Order critically to determine whether it is asserting state secrets for on a legitimate basis or whether it is attempting to cover up unconstitutional activities.

**IV.**
**CONCLUSION**

Lindell should be granted leave to intervene in this action for the limited purpose of obtaining the lifting or modification of the Protective Order, and the Protective Order should be lifted.

DATED: August 20th, 2022         **JENNINGS & FULTON, LTD.**

By:   */s/ Adam R. Fulton, Esq.*
      ADAM R. FULTON, ESQ.
      Nevada Bar 11572
      E-mail: afulton@jfnvlaw.com
      LOGAN G. WILSON, ESQ.
      Nevada Bar No. 14967
      E-mail: logan@jfnvlaw.com
      *Attorneys Michael J. Lindell*

---

[1] Members of Congress have stated that the CIA ran a bulk surveillance program that raises serious concerns about "warrantless backdoor searches of Americans." Senator Ron Wyden Press Release, February 10, 2022, *available at* https://www.wyden.senate.gov/news/press-releases/wyden-and-heinrich-newly-declassified-documents-reveal-previously-secret-cia-bulk-collection-problems-with-cia-handling-of-americans-information. *See also* Dustin Volz, *Secret CIA Bulk Surveillance Program Includes Some Americans' Records, Senators Say*, Wall St. J. (Feb. 10, 2022), *available at* https://www.wsj.com/articles/secret-cia-bulk-surveillance-program-includes-some-americans-records-senators-say-11644549582.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

# CERTIFICATE OF SERVICE

Pursuant to N.R.C.P. 5(b), I hereby certify that I am an employee of JENNINGS & FULTON, LTD., and that on the 20th day of August 2022, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AND TO LIFT PROTECTIVE ORDER** to be served as follows:

_____ by depositing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada, enclosed in a sealed envelope; or

_____ by facsimile transmission, pursuant to E.D.C.R. 7.26, as indicated below; or

__X__ by electronic service, pursuant to N.E.F.C.R. 9 and Administrative Order 14-2, as indicated below:

| | |
|---|---|
| Edmond "Buddy" Miller, Esq.<br>Bar No. 3116<br>STEPTOE & JOHNSON LLP<br>1610 Montclair Avenue, Suite C<br>Reno, NV 89509<br>bmiller@buddyrnillerlaw.com<br>Telephone: (775) 828-9898<br><br>*Attorney for*<br>*ETREPPID TECHNOLOGIES, L.L.C. and*<br>*WARREN TREPP* | Reid H. Weingarten, Esq.<br>Brian M. Heberlig, Esq.<br>Robert A. Ayers, Esq.<br>STEPTOE & JOHNSON LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-1795<br>rweingarten@steptoe.com<br>bheberlig@steptoe.com<br>rayers@steptoe.com |
| Dennis L. Kennedy, Esq.<br>Bailey Kennedy<br>8984 Spanish Ridge Avenue<br>Las Vegas, Nevada 89148-1302<br>dkennedv@baileykennedy.com<br>Facsimile: 702-562-8821 | Carlotta P. Wells, Esq.<br>Senior Trial Counsel<br>Federal Programs Branch<br>Civil Division – Room 7150<br>U.S. Department of Justice<br>20 Massachusetts Ave., NW<br>P.O. Box 883<br>Washington, DC 20044<br>Carlotta.Wells@usdoj.gov<br>Fax No. 202-616-8470 |
| J. Stephen Peek, Esq.<br>HOLLAND & HART LLP<br>5441 Kietzke Lane, Second Floor<br>Reno, NV 89511<br>speek@hollandhart.com | Greg Addington, Esq.<br>Assistant U.S. Attorney<br>100 W. Liberty Street, Suite 600<br>Reno, Nevada 89501<br>Greg.Addington@usdoj.gov<br>Facsimile: 784-5181 |

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ● FAX 702 362 2060

-11-

1
2
3
4
5
6

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

Raphael O. Gomez, Esq.
Senior Trial Counsel
Federal Programs Branch
Civil Division – Room 6144
U.S. Department of Justice
20 Massachusetts Ave., N.W.
P.O. Box 883
Washington, DC 20044
Raphael.Gomez@usdoj.gov
Facsimile: 202-616-8470

Roland Tellis, Esq.
Marshall B. Grossman, Esq.
Bingham McCutchen LLP
The Water Garden
1620 26th Street, 4th Floor, North Tower
Santa Monica, CA 90404
rolland.tellis@bingham.com
marshall.grossman@bingham.com
Facsimile: 310-907-2000

Robert E. Rohde, Esq.
Gregory G. Schwartz, Esq.
Rohde & Van Kampen
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
brohde@rohdelaw.com
gschwartz@rohdelaw.com
Facsimile: 206-405-2825

Ronald J. Logar, Esq.
Law Office of Logar & Pulver, PC
225 S. Arlington Avenue, Suite A
Reno, Nevada 89501
Zachary@logarpulver.com

Amanda J. Cowley, Esq.
Bradley Scott Schrager, Esq.
Gary R. Goodheart, Esq.
Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89169
acowley@jonesvargas.com
bschrager@jonesvargas.com
grg@jonesvargas.com

Bridget Robb Peck, Esq.
Lewis and Roca, LLP
50 W. Liberty Street, Suite 410
Reno, Nevada 89501
bpeck@lrlaw.com
Facsimile: 775-823-2929

Michael James Flynn, Esq.
Flynn & Stillman
P.O. Box 690
Rancho Santa Fe, CA
mjfbb@msn.com

Debbie Leonard, Esq.
Leigh T. Goddard, Esq.
John J. Frankovich, Esq.
McDonald Carano Wilson LLP
P.O. Box 2670
Reno, Nevada 89505-2670
dleonard@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com
jfrankovich@mcdonaldcarano.com

Ellyn S. Garofalo, Esq.
Liner Yankelevitz Sunshine &
Regenstreif LLP
1100 Glendon Avenue
Los Angeles, California 90024-3503
egarofalo@linerlaw.com

Thomas H. Casey, Esq.
The Law Office of Thomas H. Casey, Inc.
22342 Avenida Empresa, Suite 260
Rancho Santa Margarita, California 92688
msilva@tomcaseylaw.com

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

Timothy Ryan O'Reilly, Esq.
O'Reilly Law Group
325 S. Maryland Parkway
Las Vegas, Nevada 89101
tor@oreillylawgroup.com

*Via U.S. Mail*
The Montgomery Family Trust
6 Toscana Way W.
Rancho Mirage, CA 92770

*Via U.S. Mail*
Offspring LLC
600 106th Avenue NE, Suite 210
Bellevue, WA 98004-5045

*Via U.S. Mail*
Dennis Montgomery
6 Toscana Way W.
Rancho Mirage, CA 92770

*Via U.S. Mail*
Blxware LLC
600 106th Avenue NE, Suite 210
Bellevue, WA 98004-5045

*/s/ Norma Richter*
*An Employee of*
JENNINGS & FULTON, LTD.

-13-

# EXHIBIT O

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director

JAMES R. POWERS
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Email: James.R.Powers@usdoj.gov
Telephone: (202) 353-0543

*Attorneys for the United States of America*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| DENNIS MONTGOMERY, *et al.* | ) Case No: 3:06-cv-00056-MMD-CSD |
| | ) and |
| Plaintiffs, | ) No. 3:06-cv-145-MMD-VPC |
| | ) |
| v. | ) |
| | ) |
| ETREPPID TECHNOLOGIES, L.L.C., *et al.*, | ) UNITED STATES' MEMORANDUM IN |
| | ) OPPOSITION TO MOTION TO |
| Defendants. | ) INTERVENE AND TO LIFT |
| | ) PROTECTIVE ORDER |
| | ) |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

I.     This Litigation and the State Secrets Protective Order ..................................... 1

II.    Lindell's Intervention and D.C. Defamation Litigation .................................... 3

ARGUMENT .................................................................................................................. 4

I.     THE COURT SHOULD DENY THE MOTION BECAUSE LINDELL LACKS
       STANDING TO INTERVENE. ........................................................................... 5

II.    THE COURT SHOULD DENY THE MOTION TO INTERVENE FOR
       FAILURE TO MEET THE REQUIREMENTS FOR PERMISSIVE
       INTERVENTION OR INTERVENTION OF RIGHT .......................................... 7

       A.     Lindell Fails to Establish a Basis for Permissive Intervention. ............... 7

       B.     Lindell Cannot Intervene of Right. .......................................................... 9

III.   IF THE COURT PERMITS INTERVENTION, IT SHOULD DENY LINDELL'S
       MOTION TO LIFT THE PROTECTIVE ORDER. ............................................. 10

       A.     Lindell Has Not Established The Relevance of Information Subject to the
              Protective Order. ................................................................................... 10

       B.     No Good Cause Exists to Lift or Modify the Protective Order. ............. 12

CONCLUSION .............................................................................................................. 13

# **TABLE OF AUTHORITIES**

## **Cases**

*Aptheker v. Sec'y of State*,
  378 U.S. 500 (1964) ................................................................................ 12

*Beckman Indus. Inc., v. Int'l. Ins. Co.*,
  966 F.2d 470 (9th Cir. 1992) .......................................................... 8, 10

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*,
  712 F.3d 1349 (9th Cir. 2013) ................................................ 7, 8, 10

*Bond v. Utreras*,
  585 F.3d 1061 (7th Cir. 2009) .................................................................. 6

*Diamond v. Charles*,
  476 U.S. 54 (1986) ...................................................................................... 5

*Foltz v. State Farm Mutual Auto. Ins. Co.*,
  331 F.3d 1122 (9th Cir. 2003) .................................................. 11, 12, 13

*Haig v. Agee*,
  453 U.S. 280 (1981) .................................................................................. 12

*In re Alexander Grant & Co. Litig.*,
  820 F.2d 352 (11th Cir. 1987) ................................................................ 10

*In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*,
  686 F.3d 1115 (9th Cir. 2012) ................................................................ 10

*Kalbers v. U.S. Dep't of Justice*,
  22 F.4th 816 (9th Cir. 2021) ............................................................. 9, 10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................... 5

*Mohamed v. Jeppesen Dataplan, Inc.*,
  614 F.3d 1070 (9th Cir. 2010) ................................................................ 13

*Perry v. Schwarzenegger*,
  630 F.3d 898 (9th Cir. 2011) .................................................................... 5

*Roman v. Mayorkas*,
  No. EDCV2000768TJHPVC, 2021 WL 6103180 (C.D. Cal. Oct. 15, 2021) .......................... 8

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.-N. Dist. (San Jose)*,
  187 F.3d 1096 (9th Cir. 1999) ................................................................ 10

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)...............................................................................5

*Steel Co., v. Citizens for a Better Env't.*,
  523 U.S. 83 (1998).................................................................................5

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017)..........................................................................5

*United States v. Reynolds*,
  345 U.S. 1 (1953)............................................................................12, 13

*United States v. Zubaydah*,
  142 S. Ct. 959 (2022)...........................................................................13

# INTRODUCTION

Proposed-intervenor Michael Lindell has been sued in the District of Columbia for alleged defamation based on statements he made about the administration of the 2020 presidential election and his contentions that various forms of fraud and other malfeasance were perpetrated using the voting machines of a company called Dominion. Lindell has determined that it is necessary to intervene in this long-dismissed litigation in Nevada as part of his defense against the defamation claims he faces in D.C. in order to obtain relief from a protective order entered in this case pursuant to the state secrets privilege. *See* Mot. to Intervene and to Lift Protective Order, ECF No. 1216.

Lindell seeks this relief despite the fact that: he is not subject to the protective order entered in this case and that protective order does not apply to any litigation but the above-captioned cases in which it was entered; he has not alleged that the protective order has actually prevented him from obtaining any information he needs; no party or prior party to this litigation is a party to the defamation lawsuit; and neither this litigation nor the United States' motion for protective order have anything at all to do with voting, elections administration, or Dominion. On this last point, a simple look at the calendar shows that Lindell's motion is meritless: the United States sought the challenged protective order over 16 years ago and this lawsuit has been dismissed for over a decade, long predating the events in 2020 giving rise to the defamation litigation that ostensibly provides a basis for Lindell's intervention. For numerous reasons—jurisdictional, procedural, and substantive—the Court should deny Lindell's motion, as he has failed to establish any right to intervene or to obtain relief lifting the protective order entered at ECF No. 253.

# BACKGROUND

## I.     This Litigation and the State Secrets Protective Order

This litigation is comprised of two related actions, Civil Action No. 06-00056 (hereinafter referred to as the "Federal Case") and Civil Action No. 06-00145 (hereinafter referred to as the "Removed Case"), both filed in 2006.[1] In a complaint originally filed in state court, eTreppid

---

[1] Each citation to the "Federal Case" or "Removed Case" are to the docket of Civil Action No. 06-00056 or No. 06-00145 respectively. Citations to the docket that do not specifically reference one of these two identifiers are to the docket of the Federal Case.

Technologies, Inc., asserted claims to protect and recover trade secrets from Dennis Montgomery. Removed Case 3d Am. Complaint ¶ 63 *et seq.*, ECF No. 93. Montgomery, a former employee, officer, and director of eTreppid, filed a counter-complaint as well as a federal court action, alleging that eTreppid had infringed his copyright interests. Montgomery claimed that he is an inventor and software developer who developed certain software for which he was granted copyrights that he contributed in establishing eTreppid. Removed Case Counter-complaint ¶¶ 8–10, ECF No. 1-2; Federal Case 1st Am. Complaint ¶¶ 8–10, ECF No. 7. The dispute between Montgomery and eTreppid largely stemmed from the issue of the extent to which Montgomery retained the sole interest in derivative works based on the copyrighted technology. *See generally* Removed Case Counter-complaint ¶¶ 11–14; Federal Case 1st Am. Compl. ¶¶ 8–20.

Montgomery also asserted a claim in these lawsuits against the U.S. Department of Defense ("DoD"). *See* Removed Case Counter-complaint ¶¶ 22–27; Federal Case 1st Am. Compl. ¶¶ 68–74. This claim arose from a Classified Information Nondisclosure Agreement that Montgomery executed with the Defense Security Service, an agency within DoD, on September 16, 2003. *See* Montgomery Nondisclosure Agreement, Ex. 2, United States' Mot. for Protective Order, ECF No. 83-3. Specifically, Montgomery alleged that he was prevented from disclosing information necessary to his claims and defenses as to eTreppid because of the Nondisclosure Agreement. Removed Case Counter-complaint ¶¶ 22–27; Federal Case 1st Am. Compl. ¶¶ 68–74. Montgomery therefore sought a declaration from the Court that disclosure of information he wished to use in the litigation would not violate his Nondisclosure Agreement with the United States. *Id.*

DoD filed motions to dismiss as to Montgomery's claims against the agency for lack of subject matter jurisdiction.[2] While those motions were pending, on September 25, 2006, the United States moved for the entry of a protective order based on an assertion of the state secrets privilege by Director of National Intelligence John Negroponte. ECF No. 83-1, 83-2. The DNI's declaration established that disclosure of certain information at issue in the litigation reasonably

---

[2] DoD's motions to dismiss were later granted. ECF No. 177.

could be expected to cause serious, and in some cases exceptionally grave, damage to national security. Negroponte Decl. ¶ 12. The United States' motion was also supported by a classified declaration submitted for the Court's *ex parte*, *in camera* review. *Id.* ¶ 2.

The Court entered the requested protective order on August 29, 2007, excluding from "discovery or disclosure" information relating to two categories of information: (1) "the existence or non-existence of any actual or proposed relationship" between the parties and any U.S. intelligence agency and (2) any "actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties." Protective Order ¶¶ 2, 3, ECF No. 253. The Protective Order, however, exempted from its coverage discovery regarding "[t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties," as well as any "actual or potential commercial or government applications of" this technology, so long as it did not relate to the aforementioned categories concerning U.S. intelligence agencies. *Id.* ¶ 4(c), (e). The Protective Order's prohibitions applied only to "discovery or disclosure . . . during all proceedings in these actions," *i.e.* the above-captioned consolidated cases. *Id.* ¶ 1. Thus, by its terms, the Protective Order applied only to the parties to this litigation, only to discovery or disclosure within this litigation, and only to certain information regarding alleged activities or interests of the United States Government.

The litigation has since been resolved in full. The claims of Montgomery, eTreppid, and related parties were resolved by settlement and dismissed with prejudice on February 19, 2009. *See* Order ¶¶ 1, 2, ECF No. 962. The Court retained jurisdiction to resolve motions related to sanctions by Montgomery's former counsel, to enforce the United States' Protective Order, and to enforce the Parties' settlement agreement. *See id.* ¶ 3. The motions for sanctions were later resolved and judgment entered as to them on July 8, 2010. ECF No. 1171.

## II.     Lindell's Intervention and D.C. Defamation Litigation

Michael Lindell, an entrepreneur and salesman of pillows, has now moved to intervene in this litigation for the purpose of lifting the United States' Protective Order. Lindell's intervention

is based on a defamation lawsuit filed against him in the District of Columbia by Dominion, a company that "provides local election officials with tools they can use to run elections." Lindell Decl. Ex. A ¶ 157, ECF No. 1216-1 (Compl., *US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-00445 (D.D.C.) (hereinafter "Defamation Compl." or "defamation litigation"). Dominion's claims are rooted in numerous statements by Lindell in the wake of the 2020 presidential election, in which Lindell claimed that Dominion voting technology was exploited in various ways to alter votes and election results to the detriment of former-President Trump. *Id.* ¶¶ 164, 165. According to Dominion, Lindell's assertions generally centered on the alleged failure and/or exploitation of certain "algorithms" in Dominion voting machines. *See id.*

Lindell claims that he possesses certain "Data" obtained from Montgomery, which he seeks to use in defending himself in the defamation litigation. Lindell Decl. ¶ 6. Specifically, Lindell contends that this "Data compris[es] internet transmissions sent during the 2020 election that were collected by technology developed and previously licensed by Dennis Montgomery." *Id.* ¶ 7. But Lindell asserts that this data may be covered by the Protective Order and, therefore, relief in this Court is necessary. *Id.* ¶ 9. In order to obtain relief lifting the Protective Order, Lindell seeks to intervene in this litigation on one of two bases—permissive intervention pursuant to Rule 24(b)(1)(B) and intervention of right pursuant to Rule 24(a)(2). Mot. at 3–8.

## ARGUMENT

Lindell's motion should be denied for at least three reasons. First, the Court lacks jurisdiction to provide any of the relief Lindell seeks because he lacks standing to pursue it. Second, Lindell has failed to meet the requirements to intervene on either a permissive basis, pursuant to Rule 24(b)(1)(B), or of right, pursuant to Rule 24(a)(2). And third, even if there were jurisdiction and even if intervention were appropriate, Lindell has failed to establish a right to lifting the protective order entered in this litigation; the information subject to the order is utterly irrelevant to the defamation litigation and the United States has significant reliance interests in the order, which was issued on the basis of the state secrets privilege.

**I.    THE COURT SHOULD DENY THE MOTION BECAUSE LINDELL LACKS STANDING TO INTERVENE.**

Lindell's motion should be denied first and foremost because he lacks standing to pursue it.  Parties invoking federal jurisdiction bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)—namely, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Standing is necessary for parties to establish the existence of an Article III case or controversy and, thus, to invoke the jurisdiction of the federal courts.  *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998).

The standing requirement separately applies to intervenors in at least two circumstances. First, during pending litigation, an intervenor that "seeks additional relief beyond that which the plaintiff requests" must demonstrate standing.  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right.").  And second, an intervenor must also demonstrate standing where it seeks to continue litigation to which no party has any pending claim.  *See Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("[A]n intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."); *see also Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir. 2011) (explaining that although "[i]n general, an applicant for intervention need not establish Article III standing to intervene," standing is required where the intervenor seeks to appeal a judgment entered against a party in that party's absence).

Consistent with these principles, numerous courts of appeals have held that "an intervenor must establish standing to challenge a protective order after the case has been dismissed."  *Bond v. Utreras*, 585 F.3d 1061, 1071–72 (7th Cir. 2009) (citing cases from the First, Third, and Fifth Circuits).  That is the scenario presented by this case.  The claims of all Plaintiffs and Defendants

were resolved by settlement and dismissed with prejudice on February 19, 2009. *See* Order ¶¶ 1, 2, ECF No. 962. Lindell must accordingly demonstrate standing to pursue this otherwise dormant litigation.

But here, Lindell cannot establish any of the elements of Article III standing. To begin, Lindell has not articulated any cognizable injury. Lindell claims that his injury arises from his understanding that the information he obtained from Montgomery "may be covered by the Protective Order." Mot. at 2. But the Protective Order does not bind Lindell in any way as he is not a party to this litigation. Nor does the Protective Order apply to any litigation but the above-captioned cases. Protective Order ¶ 1 (Order's prohibitions applied only to "discovery or disclosure . . . during all proceedings in these actions," *i.e.* the above-captioned consolidated cases). The Protective Order is thus doubly irrelevant to any actions Lindell might take in the defamation litigation. Moreover, it does not appear that Lindell has actually been prevented from obtaining any information he requires by virtue of the protective order. Instead, Lindell simply says that he is unable to *use* the information he has already obtained. Lindell Decl. ¶¶ 6, 9, 10 (stating that Lindell has "agreed to acquire ownership from Montgomery" of "Data" for use in his defense but that he is "concerned that the Protective Order . . . prohibits the use or disclosure of the Data"). That is wrong; the Protective Order does not bind Lindell.

Nor has Lindell shown that the Protective Order governs the kind of information that Lindell says he needs for his defense in the defamation litigation such that any injury would be traceable to the Order. The Protective Order specifically exempts from its coverage information regarding "[t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties," as well as any "actual or potential commercial or government applications of" this technology. Protective Order ¶ 4(c), (e). But that is the only kind of information that Lindell has specifically indicated he needs. Lindell contends that he wishes to rely on "internet transmissions sent during the 2020 election that were collected by technology developed . . . by Dennis Montgomery." Lindell Decl. ¶ 7. The express terms of the Protective Order present no barrier to the use of such information.

The Protective Order also does not injure Lindell on the basis of its effect on Montgomery. Although Montgomery is subject to the Protective Order as a prior party to this litigation, that makes no difference here because, again, the Order only governs the conduct of the above-captioned proceedings, not unrelated litigation involving none of the same parties. To be clear, the Government does not mean to disclaim that Montgomery could be under some other nondisclosure obligation, such as a nondisclosure agreement with the United States. *See, e.g.*, Montgomery Nondisclosure Agreement, ECF No. 83-3. Nor does the Government concede that discovery directed to the United States in relation to the defamation litigation would be appropriate or that the United States would not be entitled to seek protection against discovery or disclosure in that litigation. The point is simply that the Protective Order entered in *this* case from which Lindell seeks relief has no relevant effect on the defamation litigation or his ability to obtain or use any information he needs therein. The motion should therefore be denied for lack of standing.

## II. THE COURT SHOULD DENY THE MOTION TO INTERVENE FOR FAILURE TO MEET THE REQUIREMENTS FOR PERMISSIVE INTERVENTION OR INTERVENTION OF RIGHT.

### A. Lindell Fails to Establish a Basis for Permissive Intervention.

Permissive intervention under rule 24(b) generally requires "(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013). At minimum, Lindell has failed to satisfy the third prong of this test, a common question of law and fact.

To be sure, a permissive intervenor seeking to lift or modify a protective order based on collateral litigation does not face a high burden in establishing a "common question of law and fact between the movant's claim or defense and the main action." *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473–74 (9th Cir. 1992). This is because they are not attempting to litigate any claim on the merits in the proceeding to which they intervene. *See id.* Nonetheless, the absence of a high burden is not the absence of any burden at all. For example, in *Beckman*, the Ninth Circuit affirmed the granting of permissive intervention in a case seeking modification of a

protective order on the basis of collateral litigation.  *Id.* at 471–72.  The collateral litigation involved the same defendant insurance company as the dormant case in which intervention was sought and it concerned interpretation of an insurance policy issued by that defendant.  *Id.*  The Ninth Circuit affirmed the district court's conclusion that the "importance of access to documents prepared for similar litigation involving the same parties satisfied the commonality requirement." *Id.* at 474 (emphasis added) (further explaining that the "issue of interpretation of the policy supplies a sufficiently strong nexus between the district court action and the state actions").  Thus, the lesson of the Ninth Circuit's *Beckman* decision is that a court evaluating a motion for limited intervention to modify a protective order based on collateral litigation should evaluate the relationship between the two litigations in assessing the "common question of law and fact."  *See also Roman v. Mayorkas*, No. EDCV2000768TJHPVC, 2021 WL 6103180, at *2 (C.D. Cal. Oct. 15, 2021) ("The common question of law and fact requirement is satisfied where the proposed intervenor is engaged in similar litigation involving the same parties, and, there is 'a sufficiently strong nexus between the action in which the prospective intervenor seeks to intervene and the parallel action.'" (quoting *Beckman*, 966 F.2d at 474)).

Here, Lindell has failed to show *any* relationship between the defamation litigation and this case.  None of the current or former parties to this litigation are party to the defamation litigation.  The claims concern various statements about election administration made in and around the year 2020, not anything to do with legal rights or responsibilities of Montgomery or his former business partner during the mid-2000s.  *See generally* Defamation Compl.  There is simply nothing in the motion to intervene that would show any relationship at all between this litigation and the defamation litigation adequate to show the existence of a "common question of law and fact."

Lindell hardly argues otherwise.  His sole support for the existence of this element is that "there is a common question of law and fact between the grounds that considerations that justified the entry of the Protective Order originally, and whether those grounds still justify any restrictions of the Protective Order upon the Data."  Mot. at 5.  It appears that Lindell is arguing that there is a common question of law and fact between the Government's original motion for a protective

order and his current motion to lift that protective order. That is beside the point. Under *Beckman*, Lindell must show some kind of relationship between the defamation litigation and this litigation to be permitted to intervene. He has not done so.

### B. Lindell Cannot Intervene of Right.

The Court should also deny Lindell's request for intervention of right. The Ninth Circuit's test for intervention of right

> requires a prospective intervenor to show that: (1) its motion is timely; (2) it has a significantly protectable interest relating to . . . the subject of the action; (3) it is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) its interest is inadequately represented by the parties to the action.

*Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 822 (9th Cir. 2021).

Lindell fails to meet, at minimum, the second and third elements of this test. Lindell has not shown *any* interest at all in the subject of this litigation, let alone a "significantly protectable interest." Put simply, Lindell has nothing to do with the business and copyright dispute among these parties that arose and was resolved well over a decade ago.

Lindell contends that his interest in litigating the protective order entered in this case allows him to largely sidestep the requirement to show a significantly protectable interest, asserting that this is met where a non-party "intervene[s] in an action for the purpose of litigating the substance of a protective order." Mot. at 7. This is an erroneously expansive articulation of even the permissive intervention standard as discussed above. And in any event, it has nothing to do with the standard for intervention of right, which requires a relationship between the movant's interests and the claims in the lawsuit to which intervention is sought. *See Kalbers*, 22 F.4th at 827 (explaining that "a proposed intervenor has a significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims" (citation omitted)). Indeed, the cases Lindell cites for his erroneously expansive standard either involved permissive intervention, *see In re Alexander Grant & Co. Litig.*, 820 F.2d 352 (11th Cir. 1987), or did not involve any appeal of a motion to intervene at all, *In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d

1115 (9th Cir. 2012) (noting motion to intervene was granted but not that any party appealed that decision). Lindell must show a significantly protectable interest in *this* litigation and he has failed to do so.

Nor would disposition of this action "impair or impede" Lindell's ability to protect his interests. To begin, this lawsuit has long since been resolved on the merits. And even if Lindell could show that the protective order provides a hook appropriate to this prong of the intervention inquiry, Lindell is not bound by the protective order for multiple reasons. *See supra* Argument Part I.

Ultimately, Lindell's attempt to invoke intervention of right is an ill fit for a party seeking a limited purpose intervention to litigate the scope of a protective order. The Ninth Circuit accordingly holds that *permissive* intervention is the appropriate vehicle for "[n]onparties seeking access to a judicial record in a civil case." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.--N. Dist. (San Jose)*, 187 F.3d 1096, 1100 (9th Cir. 1999). Indeed, the leading Ninth Circuit cases on limited purpose intervention to litigate a protective order involved permissive intervention, not intervention of right. *Beckman*, 966 F.2d at 471; *Blum*, 712 F.3d at 1353. The motion to intervene of right should be denied.

## III.    IF THE COURT PERMITS INTERVENTION, IT SHOULD DENY LINDELL'S MOTION TO LIFT THE PROTECTIVE ORDER.

### A.    Lindell Has Not Established The Relevance of Information Subject to the Protective Order.

A collateral litigant seeking to obtain information properly subject to a protective order "must demonstrate the relevance of the protected discovery to the collateral proceedings and its general discoverability therein." *Foltz v. State Farm Mutual Auto. Ins. Co.*, 331 F.3d 1122, 1132 (9th Cir. 2003). A court asked to modify a protective order "should satisfy itself that the protected discovery is sufficiently relevant to the collateral litigation that a substantial amount of duplicative discovery will be avoided by modifying the protective order." *Id.* This relevance determination "hinges on the degree of overlap in facts, parties, and issues between the suit covered by the protective order and the collateral proceedings." *Id.* (citation omitted).

Lindell contends that he must use information subject to the Protective Order to "defend the reasonability and veracity of his statements regarding the 2020 election at issue in the D.C. Litigation." Mot. at 9. Lindell appears to be referencing the Complaint's allegations of defamation with respect to numerous statements by Lindell, all of which allege election and/or voter fraud in the 2020 presidential election through Dominion's voting machines. *See* Defamation Compl. ¶ 165. Lindell asserts that these "statements were based on information received from Montgomery." Mot. at 9.

Lindell's assertions fail to meet the Ninth Circuit's test for relevance for at least three reasons. First, the Protective Order in this litigation was entered over 15 years ago, pursuant to an assertion of the state secrets privilege over 16 years ago. Just simply looking at a calendar shows that the Order had nothing to do with the 2020 election or alleged fraud therein. Second, neither the Protective Order nor the supporting materials submitted by the United States in seeking it had anything to do with voting, elections administration, or voting machines, whether manufactured by Dominion or any other entity.[3] And third, Lindell has not explained what the two categories of information that *are* subject to the Protective Order have to do with the defamation litigation. The closest Lindell comes on this score are statements that Montgomery has information related to purported "illegal US government surveillance programs" using Montgomery's technology that involved the surveillance of, among many others, voting machines manufactured by Dominion. Mot. at 3; Montgomery Decl. ¶ 38, ECF No. 1216-2. But even on its own terms, this baseless claim provides no support to Lindell. That is because Lindell has not explained what these farfetched allegations of surveillance have to do with his contentions that votes in the 2020 election were manipulated by anyone, let alone the United States Government.

In any event, Lindell certainly has not explained how "a substantial amount of duplicative discovery" in the defamation litigation "will be avoided by modifying the protective order" in this case. *See Foltz*, 331 F.3d at 1132. To the contrary, Lindell asserts that he already has the

---

[3] The Government is willing to make the previously submitted Classified Declaration available for the Court's review *ex parte* and *in camera*, should the Court believe it necessary to review the declaration to conclude that the information here is irrelevant to the defamation litigation.

1  information he seeks.  *See* Lindell Decl. ¶¶ 6, 9, 10.  He only asks for relief from the Court because

2  of his erroneous understanding that the protective order binds his conduct in the defamation

3  litigation.

4  **B.     No Good Cause Exists to Lift or Modify the Protective Order.**

5  Even where relevance is established, the Court "must weigh the countervailing reliance

6  interest of the party opposing modification" of a protective order.  *Foltz*, 331 F.3d at 1133.  Those

7  reliance interests are at their zenith in the context of the state secrets privilege, which exists to

8  exclude from litigation information where "there is a reasonable danger that compulsion of the

9  evidence will expose . . . matters which, in the interest of national security, should not be divulged."

10 *United States v. Reynolds*, 345 U.S. 1, 6–7, 10 (1953) (describing this privilege as "well established

11 in the law of evidence").  "It is 'obvious and unarguable' that no governmental interest is more

12 compelling than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307–09 (1981) (quoting

13 *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)).  And the state secrets privilege is absolute

14 in its effect, requiring exclusion of evidence against even the most compelling showing of need by

15 a litigant.  *United States v. Zubaydah*, 142 S. Ct. 959, 967 (2022) ("[I]n all events, 'even the most

16 compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that

17 military secrets are at stake." (quoting *Reynolds*, 345 U.S. at 11)).

18 The reliance interests of the United States in the Protective Order foreclose Lindell's

19 request to lift the Order.  Indeed, this is demonstrated by the effect of the Court's decision to uphold

20 the state secrets privilege assertion here.  Unlike an ordinary protective order limiting the persons

21 to whom protected information may be disclosed, a protective order entered pursuant to the state

22 secrets privilege causes "the evidence [to be] completely removed from the case."  *Mohamed v.

23 Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1082 (9th Cir. 2010) (citation omitted); *see also id.* at

24 1079 ("A successful assertion of privilege under *Reynolds* will remove the privileged evidence

25 from the litigation.").  Thus, this is far from a case where the Court is only being asked to permit

26 an additional party to view and use evidence already available to the other parties to the case.

   *Compare Foltz*, 331 F.3d at 1133 (approvingly quoting statement that a "legitimate interest" in

1   "continued secrecy as against the public at large can be accommodated by placing the collateral

2   litigants under the same restrictions on use and disclosure contained in the original protective

3   order" (citation omitted)), *with Mohamed*, 614 F.3d at 1082 (successful invocation of state secrets

4   privilege "completely remove[s]" the information from the case).

5       Lindell contests the United States' reliance interests on two grounds: that the protective

6   order is "stale" and that it conceals constitutional violations.  Mot. at 9–10.  Neither assertion has

7   merit.  As to the age of the protective order, Lindell cites no authority for the proposition that a

8   state secrets protective order necessarily becomes obsolete with the passage of time.  At minimum,

9   the United States is entitled to the protection of its reliance interests in a state secrets protective

10  order against the claims of parties that have demonstrated no necessity in having them lifted and

11  no relationship to the litigation in which they were entered.  And Lindell's contention that the

12  Protective Order in this case was entered to conceal violations of constitutional rights is baseless.

13  The unrebutted evidence before the Court is that the Protective Order was sought (and granted) to

14  protect "intelligence sources and methods," the disclosure of which could cause harm to national

15  security.  Negroponte Decl. ¶ 12.  Lindell's speculations to the contrary are inadequate to support

16  his claim for relief.[4]

17                                          **CONCLUSION**

18      For the foregoing reasons, the motion to intervene and to lift the protective order should be

19  denied.

20      Respectfully submitted this 6th day of October, 2022.

21                                          BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General
22
                                            ANTHONY J. COPPOLINO
23                                          Deputy Director

24                                          */s/ James R. Powers*

25  _____
    [4] The Court should reject Lindell's motion for the many reasons set forth above.  If the Court
26  nonetheless concludes that Lindell is entitled to some relief on the current record, the Court should
    permit the United States an additional 60 days in which to consider additional steps to protect its
    interests.

                                               13

JAMES R. POWERS
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice

*Attorneys for the United States of America*

# CERTIFICATE OF SERVICE

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 1100 L Street, NW, Washington, DC 20005. I am not a party to the above-entitled action. On the date set forth below, I caused service of the foregoing document through the Court's electronic filing and notice system (CM/ECF), and by sending a copy of same via ECF notice upon:

Edmond "Buddy" Miller, Esq.
Bar No. 3116
STEPTOE & JOHNSON LLP
1610 Montclair Avenue, Suite C
Reno, NV 89509
bmiller@buddyrnillerlaw.com

*Attorney for ETREPPID TECHNOLOGIES, L.L.C. and WARREN TREPP*

Reid H. Weingarten, Esq.
Brian M. Heberlig, Esq.
Robert A. Ayers, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W. Washington, D.C. 20036-1795 rweingarten@steptoe.com
bheberlig@steptoe.com rayers@steptoe.com

Dennis L. Kennedy, Esq.
Bailey Kennedy
8984 Spanish Ridge Avenue Las Vegas, Nevada 89148-1302
dkennedv@baileykennedv.com

Carlotta P. Wells, Esq. Senior Trial
Counsel Federal Programs Branch Civil
Division – Room 7150
U.S. Department of Justice 20
Massachusetts Ave., NW
P.O. Box 883
Washington, DC 20044
Carlotta.Wells@usdoj.gov

J. Stephen Peek, Esq.
HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, NV 89511
speek@hollandhart.com

Raphael O. Gomez, Esq. Senior
Trial Counsel Federal Programs
Branch Civil Division – Room
6144
U.S. Department of Justice 20
Massachusetts Ave., N.W.
P.O. Box 883
Washington, DC 20044
Raphael.Gomez@usdoj.gov

Roland Tellis, Esq. Marshall B.
Grossman, Esq. Bingham McCutchen
LLP The Water Garden
1620 26th Street, 4th Floor, North Tower
Santa Monica, CA 90404
rolland.tellis@bingham.com
marshall.grossman@bingham.com

15

Robert E. Rohde, Esq. Gregory
G. Schwartz, Esq. Rohde & Van
Kampen
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
brohde@rohdelaw.com
gschwartz@rohdelaw.com

Ronald J. Logar, Esq.
Law Office of Logar & Pulver, PC
225 S. Arlington Avenue, Suite A
Reno, Nevada 89501
Zachary@logarpulver.com

Amanda J. Cowley, Esq. Bradley
Scott Schrager, Esq. Gary R.
Goodheart, Esq.
Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89169
acowley@jonesvargas.com
bschrager@jonesvargas.com
grg@jonesvargas.com

Bridget Robb Peck, Esq.
Lewis and Roca, LLP
50 W. Liberty Street, Suite 410
Reno, Nevada 89501
bpeck@lrlaw.com

Michael James Flynn, Esq.
Flynn & Stillman
P.O. Box 690
Rancho Santa Fe, CA
mjfbb@msn.com

Debbie Leonard, Esq.
Leigh T. Goddard, Esq.
John J. Frankovich, Esq.
McDonald Carano Wilson LLP
P.O. Box 2670
Reno, Nevada 89505-2670
dleonard@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com
jfrankovich@mcdonaldcarano.com

Ellyn S. Garofalo, Esq.
Liner Yankelevitz Sunshine &
Regenstreif LLP
1100 Glendon Avenue
Los Angeles, California 90024-3503
egarofalo@linerlaw.com

Thomas H. Casey, Esq.
The Law Office of Thomas H. Casey, Inc.
22342 Avenida Empresa, Suite 260
Rancho Santa Margarita, California 92688
msilva@tomcaseylaw.com

Timothy Ryan O'Reilly, Esq.
O'Reilly Law Group
325 S. Maryland Parkway Las
Vegas, Nevada 89101
tor@oreillylawgroup.com

and by US Mail on:

| | |
|---|---|
| The Montgomery Family Trust 6 | Blxware LLC |
| Toscana Way W. | 600 106th Avenue NE, Suite 210 |
| Rancho Mirage, CA 92770 | Bellevue, WA 98004-5045 |

| | |
|---|---|
| Offspring LLC | Dennis Montgomery |
| 600 106th Avenue NE, Suite 210 | 6 Toscana Way W. |
| Bellevue, WA 98004-5045 | Rancho Mirage, CA 92770 |

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 6th day of October, 2022.

*/s/James Powers*
James R. Powers

# EXHIBIT P

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DENNIS MONTGOMERY, et al.,

      Plaintiffs

v.

ETREPPID TECHNOLOGIES, LLC, et al.,

      Defendants

Case Nos.: 3:06-cv-00056-MMD-CSD
3:06-cv-00145-MMD-VPC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 1216

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is a motion to intervene filed by non-party Michael J. Lindell. (ECF Nos. 1216, 1216-1, 1216-2.) The United States filed a response. (ECF No. 1232.) Lindell filed a reply. (ECF No. 1235.)

After a thorough review, it is recommended that Lindell's motion to intervene be denied.

## I. BACKGROUND

This litigation involves two related cases, case 3:06-cv-00056-MMD-CSD (the Federal Action), and case 3:06-cv-00145-MMD-VPC (the Removed Action). In the Removed Action, eTreppid Technologies, Inc., asserted claims to protect and recover trade secrets from Dennis Montgomery. (*See* Third Am. Compl., ECF No. 93 in 3:06-cv-00145-MMD-VPC.) Montgomery, who was a former employee, officer, and director of eTreppid, filed counterclaims against eTreppid, and its majority shareholder, Warren Trepp, asserting that Montgomery was the owner of certain copyrights and derivative works he contributed in establishing eTreppid. (ECF No. 1-2 in 3:06-cv-00145-MMD-VPC.) He also included a claim for declaratory relief

against the United States Department of Defense (DoD) regarding his obligations under a non-disclosure agreement and accounting for profits from eTreppid's use of the source code. (ECF No. 1-2.)

Montgomery also filed the Federal Action, asserting copyright infringement, misappropriation of trade secrets and related claims against eTreppid and Trepp. (ECF No. 1 in 3:06-cv-00056-MMD-CSD.) Montgomery then filed an amended complaint in the Federal Action that included a claim against the DoD, including copyright infringement (counts one and two), an accounting of profits derived from the source code (count four), conversion of the source code (count nine) and declaratory relief regarding Montgomery's non-disclosure agreement with the DoD (count ten). (ECF No. 7 in 3:06-cv-00056-MMD-CSD.)

Montgomery's claims against the United States largely related to a Classified Information Nondisclosure Agreement (NDA) Montgomery executed with the Defense Security Service, an agency within DoD, in September of 2003. (*Id.*; *see also* ECF No. 83-3 in 3:06-cv-00056-MMD-CSD.) Montgomery alleged he was prevented from disclosing information necessary to his claims and defenses as to eTreppid because of the NDA. He sought a declaration from the court that disclosure of the information he wanted to use in the litigation would not violate the NDA.

DoD filed motions to dismiss Montgomery's claims for lack of subject matter jurisdiction, which were later granted. (ECF No. 56, in 3:06-cv-000056-MMD-CSD, and ECF No. 39 in 3:06-cv-00145-PMP-VPC, order at ECF No. 177 in 3:06-cv-00056-MMD-CSD.) While the motions were pending, the United States moved for entry of a protective order based on assertion of the state secrets privilege by Director of National Intelligence (DNI) John Negroponte. (ECF No. 83 in 3:06-cv-00056-MMD-CSD.) The DNI asserted that disclosure of

certain of the information at issue could reasonably be expected to cause serious, and even grave, damage to national security.

On March 15, 2007, the Federal Action and the Removed Action were consolidated. (ECF No. 123 in 3:06-cv-00056-MMD-CSD.)

The court entered DoD's requested protective order on August 29, 2007. (ECF Nos. 252, 253.) The order found that certain information may or may not be relevant to the claims was subject to the state secrets privilege, and such information should not be subject to discovery or disclosure by any of the parties during all proceedings in these actions, and should be excluded from evidence at trial. The order excluded from discovery or disclosure two categories of information, including: (1) "the existence or non-existence of any actual or proposed relationship" between the parties and any U.S. intelligence agency and (2) any "actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties." (ECF No. 196 in 3:06-cv-00056-MMD-CSD.)

The protective order exempted from its coverage discovery of certain information, including "[t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties," as well as any "actual or potential commercial or government applications of" this technology, so long as it did not relate to the aforementioned categories concerning U.S. intelligence agencies. The protective order applied to "discovery or disclosure … during all proceedings in these" two actions. (*Id.*)

The Federal and Removed Actions were resolved in full by settlement, and were dismissed with prejudice on February 19, 2009. (ECF No. 962 in 3:06-cv-00056-MMD-CSD.) The court retained jurisdiction over the terms of the protective order. (*Id.*)

Non-party and proposed intervenor Lindell has been sued in the United States District Court for the District of Columbia, for defamation based on alleged statements he made about the administration of the 2020 presidential election and his contentions that various forms of fraud were perpetrated using the voting machines of a company called Dominion. *See US Dominion, Inc. v. My Pillow, Inc.*, case 1:21-cv-00445 (D. D.C.).

Lindell argues that he should be granted leave to intervene in this action both permissively, under Rule 24(b)(1)(B), and as of right under Rule 24(a)(2).

Lindell seeks to have the protective order in this action lifted so he may use data obtained from Montgomery to defend himself against claims asserted in defamation litigation. He argues the data he seeks to use in his defense may be covered by the protective order issued in this litigation. He asserts that he made the statements at issue in the *Dominion* case relying in part on information he received from Montgomery.

He seeks to use testimony and evidence concerning Montgomery's background and his work for U.S. intelligence agencies, and information from Montgomery himself, to defend against the defamation action. He states that the information he relied on is comprised of internet transmissions sent during the 2020 election that were collected by technology Montgomery developed and previously licensed to the United States. Lindell claims that Montgomery's data shows that voting machine manufacturers and their employees were hacked, as well as information related to illegal United States surveillance programs Montgomery worked in. Lindell claims he agreed to acquire ownership rights to Montgomery's data; however, the protective order entered in this case prohibits the use or disclosure of information related to Montgomery's work for or relationship with United States' intelligence agencies.

The United States opposes Lindell's motion, arguing Lindell lacks standing to intervene and he has not established a basis for either permissive or as of right intervention under Federal Rule of Civil Procedure 24. The United States further argues that if intervention is allowed, then good cause does not exist to lift or modify the protective order. (ECF No. 1232.)

After this motion was fully briefed, Montgomery filed a motion to restrict the application of the state secrets privilege, the protective order, and the NDA. (ECF No. 1236.) The court has recommended denial of that motion in a separate report and recommendation.

## II. DISCUSSION

A. **Intervention under Rule 24**

As is relevant here, a court *must* allow intervention if the person seeking intervention "claims an interest relating to the property or transaction that is the subject of the actin, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(1)-(2).

In addition, a court *may* allow intervention if the person seeking to intervene "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In determining whether to allow permissive intervention, the court must determine whether intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

**B. Standing**

As a preliminary matter, the United States argues that Lindell must demonstrate he has Article III standing to intervene in this long-closed litigation.

"Article III of the Constitution limits the exercise of judicial power to 'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017) (citing Article III, § 2, cl. 1). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Id.* (citation and quotation marks omitted). "'Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.'" *Id.* (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016)). To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,* 578 U.S. at 338 (citations omitted).

In *Laroe,* the Supreme Court held that a person seeking to intervene as of right under Rule 24(a)(2) "must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff." 581 U.S. at 435. "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Id.* at 439. "Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." *Id.*; *see also Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022) (intervenors seeking relief broader or different than existing parties must have standing, but those that seek the same relief sought by at least one existing party need not do so).

*Laroe* did not address whether Article III standing is required for permissive intervention. Nor did it address the scenario of intervention by a person seeking to intervene in a settled case for the limited purpose of lifting or modifying a protective order. Moreover, while Lindell seeks to intervene both as of right and permissively, courts have generally held that the procedure for a non-party to challenge a protective order is through permissive intervention. *See Beckman*

6

*Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992); *see also United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 783 (1st Cir. 1988); *Meyer Goldberg, Inc. of Lorain v. Fisher Foods*, 823 F.2d 159, 162 (6th Cir. 1987); *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 294 (2d Cir. 1979); *In re Beef Industry Antitrust Litig.*, 589 F.2d 786, 789 (5th Cir. 1979).

The Seventh Circuit addressed the interplay between Article III standing and Rule 24(b) permissive intervention in a case where permissive intervention was sought by a journalist after a case was settled in order to challenge a protective order that was entered in the case concerning citizen complaints against police officers. *Bond v. Utreas,* 585 F.3d 1061 (7th Cir. 2009). The court commented: "Intervention to challenge a protective order *after* a case has been dismissed interferes even more fundamentally: It revives a concluded case for the purpose of entertaining an outsider's claim of interest in the proceeds of the parties' discovery process." *Id.* at 1071. The Seventh Circuit concluded that the language of Rule 24(b) requiring that the court consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights "suggests that intervention postjudgment—which necessarily disturbs the final adjudication of the parties' rights—should generally be disfavored." *Id.* at 1071.

The Seventh Circuit held that "when a third party seeks intervention under Rule 24(b) for the purpose of challenging a protective order in a case or controversy that is no longer live—as when the case has been dismissed and none of the original parties has sought this relief postjudgment—the intervenor must meet the standing requirements of Article III in addition to Rule 24(b)'s requirements for permissive intervention." *Id.*

Under *Bond*, the court must first determine whether Lindell is seeking relief that one of the original parties has sought postjudgment, so that he may "piggyback" on their standing, and

7

1    if he may not, the court must then address whether Lindell has demonstrated independent

2    standing to request this relief.

3            Through the time Lindell's motion to intervene was completely briefed, no party to this

4    action had sought to lift or modify the protective order entered in this action. Instead, it was only

5    *after* the United States filed its response to Lindell's motion raising the standing argument, and

6    more than fifteen years after the protective order was entered, that Montgomery filed a motion to

7    restrict application of the protective order. The fact that Montgomery did not seek to lift or

8    modify the protective order until this point makes the position he now takes relative to the

9    protective order appear contrived. In any event, the court has issued a recommendation that

10   Montgomery's motion be denied. Therefore, the court finds Lindell must independently

11   demonstrate Article III standing to pursue this relief.

12           As the United States points out, the protective order was entered in this case to "protect

13   the classification, confidentiality, and the rights to information and documents developed and

14   disclosed in connection *with this litigation*, and to facilitate discovery by and among the parties

15   to *this action* and from third parties." (ECF No. 253 at 1.) The protective order provides that the

16   information subject to the state secrets privilege "shall not be subject to discovery or disclosure

17   by any of the Parties during all proceedings *in these actions* and shall be excluded from evidence

18   at trial." (*Id*. at 2.) It goes on to preclude discovery or the use in trial of certain information in

19   *this litigation*. (*Id*. at 2-5.) Lindell is not a party to this litigation, and the protective order does

20   not apply to any other litigation. Therefore, it is not the protective order entered in this case that

21   would preclude Lindell from introducing the information he seeks to utilize in his defense in the

22   defamation action. Lindell provides nothing more than speculation that he will somehow be

23   precluded from presenting this information because of the protective order in this litigation. In

sum, Lindell has not demonstrated an injury in fact that is traceable to protective order entered in this litigation.

Notwithstanding these findings, there may be other reasons that Montgomery is precluded from disclosing the information Lindell seeks to introduce in his defamation action, such as the NDA between Montgomery and the government. The NDA is between Montgomery and the government, is separate from the protective order entered by the court in this litigation, and the court has no authority to lift or modify the NDA.

For these reasons, Lindell's motion to intervene should be denied.

### III. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Lindell's motion to intervene (ECF No. 1216).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: May 15, 2023

_____
Craig S. Denney
United States Magistrate Judge

# EXHIBIT Q

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED,

                        Plaintiffs,

                  v.

MICHAEL J. LINDELL and MY PILLOW, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

Case No. 22-cv-0098-WMW-JFD

**FIRST SUPPLEMENTAL COMPLAINT AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PARTIES ............................................................................................................... 3

JURISDICTION & VENUE ................................................................................. 5

FACTUAL ALLEGATIONS ............................................................................... 6

I.   Smartmatic's Role as an Election Technology Company ................................. 6

    A.   Smartmatic grew from a small start-up into a successful multi-billion-dollar enterprise. 7

    B.   Smartmatic's success is built on its reputation for secure, reliable, and auditable election technology and software. ................................................................................. 8

    C.   Smartmatic had a relatively small, non-controversial role in the 2020 U.S. election. ..... 9

II.  Defendants' Disinformation Campaign Against Smartmatic ........................................... 17

    A.   The 2020 U.S. election was secure, reliable, and accurate. ............................................. 18

    B.   Mr. Lindell decided to sell an embellished story connecting voting machines to election fraud. .................................................................................................................... 23

    C.   Mr. Lindell engaged in a disinformation campaign against Smartmatic. ...................... 25

    D.   Mr. Lindell presented his statements about Smartmatic as factual and based on evidence. ........................................................................................................................ 48

III. Mr. Lindell's False Statements and Implications About Smartmatic ........................... 52

    A.   Mr. Lindell falsely stated and implied that Smartmatic's election technology and software were widely used in the 2020 U.S. election in order to attack the election. ..... 53

    B.   Mr. Lindell falsely stated and implied that Smartmatic had a corrupt relationship with Dominion and ES&S during the 2020 U.S. election in order to attack the election. ..... 56

    C.   Mr. Lindell falsely stated and implied that Smartmatic stole the 2020 U.S. election for Joe Biden and Kamala Harris. ....................................................................................... 59

    D.   Mr. Lindell falsely stated and implied that Smartmatic's election technology, hardware, and software were compromised or hacked by China or other foreign countries during the 2020 U.S. election. ................................................................................................... 65

    E.   Mr. Lindell falsely claimed that Smartmatic machines were connected to the Internet during the 2020 U.S. election in order to attack the election. ........................................ 69

F.   Mr. Lindell falsely stated and implied that Smartmatic was engaged in a widespread criminal conspiracy to steal the 2020 U.S. election. ...................................................... 71

G.   Mr. Lindell falsely stated and implied that Smartmatic's election technology, hardware, and software were designed to steal elections and have stolen elections before............ 73

**IV. Mr. Lindell Acted with Actual Malice and Ill Will Towards Smartmatic ..................... 75**

A.   Mr. Lindell had no basis for his statements and implications regarding Smartmatic. ... 76

B.   There was publicly available information that contradicted the claims Mr. Lindell and his guests were making. ................................................................................................. 78

C.   Mr. Lindell also had obvious reasons to doubt the veracity of his guests. ................... 113

D.   Mr. Lindell failed to exercise due care when publishing defamatory statements about Smartmatic. ................................................................................................................... 116

E.   Mr. Lindell used his disinformation campaign against Smartmatic for financial gain and acted with ill will and improper motives. ..................................................................... 119

F.   Mr. Lindell's statements about Smartmatic show personal animosity and ill will towards Smartmatic. ................................................................................................................... 124

**V.   Defendants' disinformation campaign irreparably harmed Smartmatic and its election technology and software. ................................................................................................... 125**

**CAUSES OF ACTION** ................................................................................................... 131

**FIRST CAUSE OF ACTION AGAINST BOTH DEFENDANTS** .................................... 131

**SECOND CAUSE OF ACTION AGAINST BOTH DEFENDANTS** ................................ 133

**PRAYER FOR RELIEF** ................................................................................................. 134

**JURY DEMAND** ............................................................................................................ 136

Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited (collectively, "Smartmatic"), through their attorneys, bring this complaint against Michael J. Lindell and My Pillow, Inc. d/b/a MyPillow (collectively, "Defendants").

## INTRODUCTION[1]

1.     Crazy like a fox. Mike Lindell knows exactly what he is doing, and it is dangerous.

2.     Mr. Lindell knows Joe Biden and Kamala Harris won the 2020 election for President and Vice President of the United States. He knows the election was not rigged, fixed, or stolen. He knows voting machines did not switch votes from former President Trump to now President Biden.

3.     These facts do not matter to Mr. Lindell because he knows he can sell. Mr. Lindell knows he can sell xenophobia. He knows he can sell conspiracy theory. He knows he can sell a preconceived story about voting machines stealing democracy by stealing votes from a president who is incredibly popular with millions of Americans. And, of course, Mr. Lindell—"the MyPillow Guy"—knows he needs to sell pillows to keep and increase his fortune.

4.     Mr. Lindell saw a once-in-a-lifetime opportunity following the 2020 U.S. election. President Trump lost the election. That is, and was, undeniable. But Mr. Lindell knew that millions of people who voted for President Trump were unhappy. He also knew that they would embrace anyone who championed the idea that President Trump did not lose the election, but had it stolen from him and from them.

---

[1] Smartmatic's election technology, hardware and software has been used in voting jurisdictions that are predominately Conservative, Liberal, Republican, Democrat, and other. Smartmatic is apolitical. Smartmatic does not take issue with legal challenges being raised regarding the rules implemented by voting jurisdictions during the 2020 U.S. election and the adherence to those rules. Smartmatic's lawsuit is focused on the fact that its election technology, hardware, and software were not used to steal the 2020 U.S. election.

5.     Mr. Lindell decided to become one of their champions. After others had gone silent, Mr. Lindell spoke out about the 2020 U.S. election being stolen from President Trump. He held rallies. He went on TV. He published videos. Once a fixture on late night infomercials embracing his pillows, in early 2021, Mr. Lindell's infomercials turned to spreading disinformation about the 2020 U.S. election.

6.     Mr. Lindell's message was as dangerous as it was factually inaccurate. Mr. Lindell told people that Smartmatic stole the 2020 U.S. election. He told people that Smartmatic's election technology, hardware, and software were hacked by China and other foreign countries. He told people that Smartmatic election technology, hardware, and software were developed for the sole purpose of stealing foreign elections by switching votes. And he told people that Smartmatic deployed its election technology, hardware, and software to do just that in the 2020 U.S. election. All lies.

7.     Mr. Lindell intentionally stoked the fires of xenophobia and party-divide for the noble purpose of selling his pillows. The MyPillow brand was, and is, a ubiquitous feature of Mr. Lindell's media appearances. The MyPillow logo is everywhere. Promo codes for ordering from MyPillow are conveniently and strategically placed during his appearances. Mr. Lindell's sales strategy is brilliant: "If you like what I am saying about election fraud, you are going to love my pillows, so buy them to support me and my message."

8.     It is time to end Mr. Lindell's campaign. Smartmatic had no role in the 2020 U.S. election outside of providing some technology, support, and services to Los Angeles County. That is it. Yet, Mr. Lindell sees fit to perpetuate a lie about the company because he wants to be seen as a champion of a deceptive message that still sells. But enough is enough. The country will sleep better at night knowing the judicial system holds people like Mr. Lindell accountable for spreading disinformation that deceives and harms others.

9.      Smartmatic brings defamation and Minnesota Deceptive Trade Practices claims against Defendants Michael J. Lindell and his company MyPillow. Smartmatic seeks to recover for the economic and non-economic damage caused by Defendants' disinformation campaign, punitive damages, attorneys' fees and costs, and a permanent injunction. Finally, Smartmatic seeks a declaration requiring Defendants to retract their false statements and implications fully and completely.

## PARTIES

10.      Plaintiff Smartmatic USA Corp. is an election technology and software company. The company's principal place of business is located in Boca Raton, Florida. It is incorporated in Delaware. During the 2020 U.S. election, Smartmatic USA Corp. provided election technology, support, and services to Los Angeles County. Its election technology and software were not used in any other county or State in the 2020 U.S. election.

11.      Plaintiff Smartmatic International Holding B.V. owns Smartmatic USA Corp. (100% ownership). The company's principal place of business is located in Amsterdam, Netherlands. It is incorporated in the Netherlands. Smartmatic International Holding B.V. owns multiple companies operating under the Smartmatic brand in almost two dozen countries.[2] Smartmatic International Holding B.V. did not play any role in the 2020 U.S. election outside of the technology, support, and services provided by Smartmatic USA Corp. for Los Angeles County.

12.      Plaintiff SGO Corporation Limited owns Smartmatic International Holding B.V. (100% ownership). The company's principal place of business is located in London, United Kingdom. It is incorporated in the United Kingdom. SGO Corporation Limited is the parent

---

[2] Smartmatic International Holding B.V. owns election technology and software companies in United States (Smartmatic USA Corp.), Barbados, Australia, United Kingdom, Panama, Haiti, Belgium, Singapore, Netherlands, Mexico, Ecuador, Brazil, Estonia, Taiwan, and the Philippines as well as branches in Colombia, Argentina, Honduras, Pakistan, Italy, Jamaica, and El Salvador.

company of Smartmatic International Holdings B.V. SGO Corporation also owns significant stock in other companies that were damaged by the disinformation campaign. SGO Corporation Limited did not play any role in the 2020 U.S. election outside of the technology, support, and services provided by Smartmatic USA Corp. for Los Angeles County.

13.     Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited are collectively referred to as "Smartmatic" in this complaint. Each of the companies owned by SGO Corporation Limited, directly or through Smartmatic International Holding B.V., was injured as a result of the Defendants' disinformation campaign that irreparably tarnished the Smartmatic brand (corporate and product).

14.     Defendant Michael J. Lindell ("the MyPillow guy") is an American businessman, entrepreneur, author, political activist, and political pundit. Mr. Lindell is a resident of Minnesota. Mr. Lindell is the founder and CEO of MyPillow. Following the 2020 U.S. election, Mr. Lindell began appearing on television, radio shows, and podcasts with regularity to discuss, or attack, the results of the election.

15.     Defendant MyPillow is a major, for-profit Minnesota manufacturing corporation with its principal place of business in Chaska, Minnesota. MyPillow has 15 retail locations, employs over 1,600 people, markets more than 100 products, and has sold over 50 million pillows throughout the United States. MyPillow sponsors political media, including the Right Side Broadcasting Network ("RSBN"), a media group that provides daily news coverage on the Internet. MyPillow routinely advertises on Fox News, One America News Network ("OANN"), Newsmax, and numerous other television, podcast, and radio stations.

16.     At all relevant times hereto, Mr. Lindell was acting as MyPillow's agent and within the scope of his employment, including during each and every appearance he made defaming Smartmatic.

4

17. After the November 2020 election, Mr. Lindell, both in his individual capacity and by and through his company MyPillow, began spreading a false narrative regarding the outcome of the election by disparaging and defaming Smartmatic. The narrative served his personal and financial interests as he and MyPillow benefitted from the publicity while creating a perception that the 2020 U.S. election was rigged and stolen by Smartmatic. The narrative and Mr. Lindell's defamation campaign also served MyPillow's financial interest.

18. Mr. Lindell used his business acumen to market MyPillow products to Trump supporters in the wake of the November 2020 election. Mr. Lindell crafted and broadcast a four-part documentary series; appeared on television shows, podcasts, and Internet radio programs with regularity; and held a two-day, live, and live-streamed conference to spread far and wide his false narrative blaming Smartmatic for the outcome of the 2020 U.S. election.

19. Mr. Lindell's appearances were also promotions for MyPillow. Mr. Lindell appeared as "the MyPillow guy" and advertised his products to viewers and listeners during the same program segments where he defamed Smartmatic. Mr. Lindell gave election related MyPillow promo codes, such as "FightforTrump" and "Proof," to viewers and listeners during the same program segments where he defamed Smartmatic.

## JURISDICTION & VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21. This Court has personal jurisdiction over Michael Lindell, an individual who resides in Minnesota. This Court also has personal jurisdiction over My Pillow, Inc., a company incorporated in Minnesota with its principal place of business in Chaska, Minnesota.

22.    Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391(b)(1) because Defendants Michael Lindell and MyPillow both reside in Minnesota.

## FACTUAL ALLEGATIONS

23.    Mr. Lindell is a shrewd businessman who used his personal and company wealth as a platform to (1) spread false information about Smartmatic; and (2) garner popularity and purchasers for his MyPillow products. When Donald Trump and Michael Pence lost the election, Mr. Lindell saw the opportunity to capitalize on their popularity. Mr. Lindell attended pro-Trump rallies and appeared on talk shows. Mr. Lindell claimed that Donald Trump and Michael Pence did not lose the election. Mr. Lindell claimed that the electronic voting technology companies, including Smartmatic, were hacked by China. Mr. Lindell claimed that the machines stole the election to make it appear as if Donald Trump and Michael Pence lost the election. Smartmatic was a main target in Mr. Lindell's false narrative.

## I.    Smartmatic's Role as an Election Technology Company

24.    Antonio Mugica and Roger Piñate founded Smartmatic in 2000 in Boca Raton, Florida. At the start, Smartmatic focused mainly on developing cybersecure technology for the banking industry, offering secure online protocols enabling hyper-secure interconnection between digital devices.

25.    Smartmatic turned its focus to election technology and software following the 2000 U.S. election and the "hanging chad" controversy in Florida. Mr. Mugica and Mr. Piñate realized that flawed technology had given election automation a bad reputation. With that in mind, they began to develop advanced voting platforms to restore people's faith in technology-driven elections. They wanted to take the same technology built for secure bank automation and use it to register, count, and transmit votes. They believed this could give people confidence that their ballots would be accurately counted.

26.     Since 2003, Smartmatic's election technology has processed more than 5 billion secure votes worldwide without a single security breach. Smartmatic has provided election services and implemented election technologies for election commissions in more than 25 countries on five continents.

27.     With each election, Smartmatic's mission is, and always has been, to increase integrity in the democratic process through enhanced citizen engagement and trust in election systems. Smartmatic harnesses the full power of technology to deliver reliable, accurate and auditable election results.

**A.      Smartmatic grew from a small start-up into a successful multi-billion-dollar enterprise.**

28.     Today, Smartmatic provides end-to-end election services to local, state, and national governments. Its portfolio of products has grown to include a comprehensive suite of technologies and services to make every phase of the election process more efficient and transparent.

29.     Smartmatic's products now include electronic voting machines (voters vote electronically using voting machines with a touch screen, and those machines count the votes as they are made), electronic counting machines (voters vote with paper ballots which can be counted electronically), ballot marking devices (voters make their selection on touch-screen machines that then print a paper ballot to be counted later by the government election authority), voter management (voter databases are built using biographic and/or biometric information to ensure that the voters are legally entitled to vote, and that there is one-voter/one-vote), poll worker support (technology facilitates poll station administration and enforcement of regulations), online voting (convenient and verifiable online—remote, over the internet—voting platforms) and election

7

management platforms (allows authorities to configure their systems, monitor operations, announce results, and train staff).

30.     Smartmatic's growth and product development is a story of industry-leading advancements and successes through relentless attention to reliability, accuracy, and auditability.

**B.     Smartmatic's success is built on its reputation for secure, reliable, and auditable election technology and software.**

31.     The secret to Smartmatic's success has been showing its commitment to its mission statement: to provide secure, reliable, and auditable election technology and software. Counties, states, and countries that choose to use Smartmatic's election technology and software understand that they are using a technology that has processed over 5 billion votes without any security breaches and with an auditable paper trail demonstrating that the elections were not rigged, hacked, or stolen.

32.     One of Smartmatic's best marketing tools are case studies. Case studies are opportunities for Smartmatic to demonstrate to a potential client how Smartmatic's election technology and software have been used by other counties, states, and countries to improve the voter experience and provide secure, reliable, and auditable results. These case studies demonstrate, time and time again, that Smartmatic's election technology and software can ensure quick and accurate voting results.

33.     Another one of Smartmatic's key marketing tools are references. Most opportunities for new clients include providing referrals who can talk about their experience with Smartmatic's election technology and software. Smartmatic's past successes, which the referrals discuss, are critical to new clients. New clients want to know that Smartmatic's election technology and software are secure, reliable, and auditable. That is what they learn from Smartmatic's referrals.

34.     Finally, Smartmatic is also fortunate to have been recognized as one of the best election technology and software companies in the world. For example, in 2005, The Carter Center and the European Union identified Smartmatic's election technology as one of the most secure, reliable, and auditable election technologies in the world. In 2012, former President Jimmy Carter called Smartmatic's solution "the best voting system in the world." These accolades and recognitions by some of the world's foremost election authorities are yet another key to Smartmatic's success. Its reputation as one of the "best voting systems in the world" is important for expanding existing relationships and developing new relationships with counties, states, and countries looking to improve their election technology.

### C.     Smartmatic had a relatively small, non-controversial role in the 2020 U.S. election.

35.     The 2020 U.S. election was a turning point for Smartmatic. In June 2018, Los Angeles County selected Smartmatic to help election authorities manufacture and implement a new election system for the County. This was a significant opportunity for Smartmatic to demonstrate the security, reliability and auditability of its election technology once again—this time on an even bigger stage. Success in Los Angeles County positioned Smartmatic to market its election technology and software to other counties and states in the United States and to voting jurisdictions around the world who were inclined to follow Los Angeles County's lead.

### 1.     Los Angeles County introduced a new Voting Solutions for All People initiative for the 2020 U.S. election.

36.     Los Angeles County is the nation's most populous voting jurisdiction with more than 5.4 million registered voters. Los Angeles County is one of the most complex election jurisdictions because of its geographic size, logistics, high bar for certification requirements, multiple language support requirements, and legally-mandated accessibility features for voters with disabilities.

9

37.     Since 2009, the Los Angeles County's Registrar-Recorder/County Clerk (the "Department") had been working to improve the voting experience through its Voting Solutions for All People ("VSAP") initiative. Given the size, complexity, and demographics of Los Angeles County, one of the Department's top priorities was to remove barriers and obstacles that made it difficult for voters to participate in the electoral process.

38.     The VSAP initiative sought to ensure that voters in Los Angeles County had greater opportunities to participate by providing expanded options for voting in a manner that is convenient, accessible, and secure. The Department described key aspects of the VSAP initiative as follows:

      a.    Redesigned Vote-by-Mail ("VBM") Ballot: The new VBM ballot was introduced to County voters in the November 2018 General Election. The new full-face VBM ballot features larger font sizes and clearer instructions making it easy to read, complete, and return. In addition, postage is prepaid, so there is no longer a need to attach a stamp. Voters who prefer to drop off their ballot in-person can do so at any VBM drop-off location or vote center throughout the County.

      b.    Redesigned Ballot Marking Device ("BMD"): The BMD replaces the County's legacy InkaVote system. The BMD allows every voter to customize their experience with both visual and audio access in thirteen languages and offers accessibility features that provide voters with disabilities equality and independence in casting ballots. For auditability and security, the BMDs produce human-readable paper ballots that exceed national voting system security standards.

c.       New Electronic Pollbook ("e-Pollbook"): The e-Pollbook replaces the printed roster that was previously used at voting centers for voters to check-in. The e-Pollbook is connected through a secure private network to the State of California database of eligible voters. This allows voters to check in and cast their ballot at any vote center in the County. The e-Pollbook is updated in real-time and will indicate if a voter has already cast a ballot ensuring voting integrity. In addition, the e-Pollbook enables eligible voters to register to vote at any vote center or update their registration.

d.       New Interactive Sample Ballot ("ISB"): The ISB is a new convenient option to expedite the in-person voting experience. The ISB allows the voter to mark their sample ballot digitally through a web-based application accessible through the Department's website. Upon completing selections, a Quick Response Code is generated producing a Poll Pass that the voter can print or save onto a mobile device, and which the voter can then take to any vote center to be scanned on the BMD. The voter's selections will be imported onto the BMD allowing the voter to once again review their selections and make any further changes prior to casting their ballot.

e.       Redesigned Modern Tally System: The Tally System is an innovative solution for paper ballot scanning and tabulation that is specifically designed to support Los Angeles County's need to process millions of ballots. It utilizes high-speed scanners to capture high-definition images of ballots and a message brokering architecture to process large volumes of digital images quickly and accurately. From paper ballot to digital image to final cast vote record, the Tally System captures data about how each ballot

11

is read and processed, allowing for the tracking and auditing of individual ballots to verify the integrity and accuracy of election results.

f.   Redesigned Vote Centers: Vote centers were located throughout the entire County. They each underwent comprehensive surveys and assessments to ensure they met Americans with Disabilities Act accessibility requirements and other qualifying criteria such as on-site parking availability, convenient access to public transit, and hours of operation.

g.   New Mobile Vote Center Program: The Department also implemented a new Mobile Vote Center Program to further expand voting opportunities to the public. The program supplemented existing vote centers that might have been highly congested and provided voting services to communities that might have been geographically isolated or not appropriately served by a standard vote center. Mobile voting units were deployed on a scheduled basis across the County to provide enhanced voting services and raise voter awareness during the voting period.

39.   The VSAP initiative included the first government-designed and owned voting system. The new system allowed voters to vote at any of the County's 978 centralized vote centers, a change made possible "by advanced technology like electronic poll books and ballot marking devices."

**2.   Los Angeles County selected Smartmatic to contribute election technology and software to the Voting Solutions for All People initiative.**

40.   Smartmatic was honored to be selected by the Department to assist with the VSAP initiative. In June 2018, Smartmatic entered into a contract to manufacture (hardware and software)

and implement new custom-designed BMDs in collaboration with Los Angeles County as part of its VSAP initiative.

41.     Smartmatic's role in the initiative was limited but important to the company as it provided an opportunity to demonstrate its technology and software in an important jurisdiction in the United States. By the end of 2019, Smartmatic had developed the BMDs and was manufacturing 31,100 units for Los Angeles County. Smartmatic also performed systems integration of the BMDs.

42.     In total, Smartmatic provided the following technology and services to Los Angeles County under the VSAP initiative: (1) engineered and manufactured the BMD hardware, (2) programmed and installed the BMD software, (3) led the California certification process, (4) created the backend software to manage the devices, (5) provided systems integration services, (6) built the VSAP operations center, (7) handled logistics and setup/breakdown of the vote centers, (8) oversaw real-time data management for deployment, and (9) supplied Help Desk services on Election Day.

### 3.     Smartmatic's involvement with Los Angeles County was a success.

43.     Smartmatic's election technology and software were used in the March 3, 2020, California presidential primary in Los Angeles County. It was an undisputed success. Loyola Marymount University conducted an exit poll following the primary and concluded that most voters trusted the election and felt the technology made the voting easier. (3/11/20 Loyola Marymount University, *2020 LA Votes Presidential Primary Exit Poll* (Exhibit 93).) The key findings included:

> This year, LA County implemented new voting technology. Compared to voting in previous elections, technology made voting in this primary:
>
> •     Much easier:          57.5%

- A bit easier:          17.6%

- The same:             13.2%

- A bit more difficult:  7.4%

- Much more difficult:  4.3%

How much do you trust that your vote will be counted as intended?

- Greatly trust:        51.7%

- Somewhat trust:       35.0%

- Somewhat distrust:   9.3%

- Greatly distrust:     4.0%

44.     The California primary election was the first test for Los Angeles County's VSAP initiative, with more than 860,000 voters casting in-person ballots. Respondents overwhelmingly agreed that they had positive voting experiences, with more than 85% choosing "excellent" or "good" when asked about their overall experience.

45.     The VSAP initiative was also well-received in the November general election. By the numbers:

- 791              Vote centers open on election day

- 31,000           BMDs manufactured by Smartmatic

- 19,445           BMDs deployed for the election

- 800+             Election workers hired and trained by Smartmatic

- 6,129,494        Citizens eligible to vote

- 5,785,377        Citizens registered to vote

- 73.8%            Turnout of registered voters

- 4,270,129        Votes cast in the 2020 general election

- 834,150          Votes cast in-person in the 2020 general election

14

46.     The November general election in Los Angeles County from a technology perspective was flawless. A County official described the system as a "success." There were no serious problems during the election in Los Angeles County, and voters experienced reduced lines and reduced delays. No questions were raised about security, reliability or auditability of the results in Los Angeles County. Expectations were high, and Smartmatic exceeded those expectations.

47.     Smartmatic was thrilled with its success in the Los Angeles County election. Counties and states in the United States and countries across the world pay attention to Los Angeles County when it comes to election technology and software. Smartmatic's contract with Los Angeles County was the largest in the United States. Smartmatic's successful participation in the VSAP initiative was seen as a once-in-a-lifetime opportunity for the company. It provided the company the ability to highlight its role in the largest voting jurisdiction in the United States, and highlight its success in facilitating secure, reliable, and auditable election results. This was the big success Smartmatic had been building towards for 20 years.

48.     There was no controversy in Los Angeles County. In the 2020 U.S. election, the Democratic candidates for President and Vice President won over 71% of the vote. In the 2016 U.S. election, the Democratic candidates for President and Vice President won over 72% of the vote. There was no material change in the voting pattern in Los Angeles County. Nor were there any allegations or suggestions that the vote in Los Angeles County had been rigged, hacked, or stolen.

49.     Smartmatic did not play any role in the general election outside of Los Angeles County. Smartmatic's election technology, software, equipment, and services were not used in any other county or state for the 2020 U.S. election. Smartmatic's software was not used in any other county or state. Smartmatic did not license or contract with any third party, including other election

15

technology companies, for the use of Smartmatic's technology, software, machines, or services in any other county or state for the 2020 U.S. election.

50.     Smartmatic's machines did not connect to the Internet during the election in Los Angeles County. Smartmatic's machines are "air-gapped" meaning they are "self-contained and never connected to the Internet." (11/11/20 Smartmatic Website, *Los Angeles County – Voting Solutions for All People* (Exhibit 103).) Votes cast using Smartmatic's election technology and software were hand delivered after paper ballots were printed from Smartmatic's machines.

51.     Given that Smartmatic had no role in the general election outside of Los Angeles County, Smartmatic had no reason to be concerned about being embroiled in a discussion about election outcomes in some of the states where the vote tally was closer than it was in California. For example, Nevada, Arizona, Georgia, Pennsylvania, Michigan, and Wisconsin were states where the vote tally between the Democratic and Republican nominees for President and Vice President were much closer than the margin in California. But, Smartmatic had no role whatsoever in the elections that took place in those states. For example:

a.     Nevada used election technology supplied by Dominion and Election Systems & Software ("ES&S"). (Nevada Secretary of State, *Voting System Testing and Security List* (Exhibit 62).)

b.     Arizona used election technology supplied by multiple companies, including Dominion and ES&S. (Arizona Secretary of State, *2020 Election Cycle/Voting Equipment* (Exhibit 57).)

c.     Georgia used election technology supplied by Dominion. (8/9/19 Georgia Secretary of State, *Dominion Voting System Certification* (Exhibit 42).)

d.     Pennsylvania certified multiple election technology companies for the 2020 election, including Dominion, ES&S, Unisyn Voting Systems, ClearBallot

16

Group, and Hart InterCivic. (Pennsylvania Department of State, *Electronic Voting Systems Certified after January 1, 2018* (Exhibit 52).)

e.      Michigan used election technology supplied by Dominion, ES&S, and Hart InterCivic. (Michigan Voter Information Center, *Voting Systems Map* (Exhibit 48).)

f.      Wisconsin approved multiple election technology companies for the 2020 election, including Dominion, ES&S, Sequoia Voting Systems, Premier Election Solutions, Populex, Vote-PAD, and ClearBallot Group. (Wisconsin Elections Commission, *Voting Equipment List by Municipality February 2020* (Exhibit 59).)

52.      Moreover, Smartmatic had no reason to get itself involved in any discussion about the election outcome outside of Los Angeles County. Apart from commenting on its role in the election in Los Angeles County, Smartmatic made no public comments about the 2020 U.S. election prior to the disinformation campaign. Smartmatic made no comments about the security, reliability, or auditability of the election technology and software used outside of Los Angeles County. Smartmatic made no public comments about election technology and software used in the 2020 U.S. election being hacked or compromised. Smartmatic made no public comments about the 2020 U.S. election being fixed, rigged, or stolen. Smartmatic had done a great job in Los Angeles County. It had no interests, and made no public comments, outside of its limited role.

## II.      Defendants' Disinformation Campaign Against Smartmatic

53.      In 2016, Mr. Lindell saw the magnetic power that presidential candidate Donald Trump had over many Americans. Seizing on the opportunity to share in the fame and grow MyPillow's profits, Mr. Lindell became a Donald Trump supporter, first meeting with him in 2016

before he was elected. Mr. Lindell attended White House events and other President Trump rallies and events in 2017, 2018, 2019, and 2020.

54.     President Trump, in turn, endorsed Mr. Lindell and MyPillow. During one press conference at the White House, President Trump said, "I actually bought a couple of [MyPillow] pillows and they're very good. They're great. I've slept so much better ever since."[3] During a rally in North Dakota, President Trump said of Mr. Lindell, "he's the greatest … he does make a great product, great pillows, I actually use them, believe it or not … and he's been with us right from the beginning."[4]

55.     Mr. Lindell saw that his unabashed support for President Trump grew Mr. Lindell's personal fame and fortune and attracted new MyPillow buyers and supporters. For example, in 2018, Mr. Lindell noted that his relationship with Trump has "been very good for business…" (11/4/18 CNN, *How Mike Lindell, the MyPillow guy, became a midterm messenger* (Exhibit 140).) In 2019, MyPillow's revenue exceeded $300 million. (1/27/21 The New York Times, *MyPillow C.E.O.'s Trump Conspiracy Theories Put Company on the Spot* (Exhibit 141).) In 2020, Mr. Lindell's personal estimated net worth was $300 million. (6/17/20 The List, *The MyPillow Guy's Net Worth is Even Higher Than You Think* (Exhibit 142).)

A.     **The 2020 U.S. election was secure, reliable, and accurate.**

56.     In November 2020, Joe Biden and Kamala Harris won the U.S. election for President and Vice President, and President Donald Trump and Vice President Michael Pence lost. The Democratic candidates secured 306 electoral votes. The Republican candidates secured 232 electoral votes. On the popular vote, the Democratic candidates received 81 million votes compared to 74 million for the Republican candidates. Among other states, the Democratic

---

[3] *Available at* https://www.youtube.com/watch?v=tSv_cGUhHOI.
[4] *Available at* https://www.youtube.com/watch?v=rzFJo9asFa0.

candidates won each of the states discussed above – Nevada, Arizona, Georgia, Pennsylvania, Michigan, and Wisconsin. The victories for the Democratic candidates in those states were verified and re-verified by each of their respective Secretaries of State.[5]

57.     The security, reliability, and accuracy of the 2020 U.S. election were repeatedly confirmed before Mr. Lindell began making his defamatory statements. Governors and Secretaries of State from across the country verified the security, reliability, and accuracy of their election results. For example:

a.     Nevada: Secretary of State Barbara Cegavske reported: "All voting machines undergo extensive pre-election and post-election examination to ensure they function as expected. The NV Gaming Control Board tests and certifies our systems. The post-election audits and recounts conducted in Nevada confirmed that the machines accurately tabulated the votes cast." (Nevada Secretary of State, *Facts v. Myths: Nevada 2020 Post-General Election* (Exhibit 64).)

b.     Arizona: Governor Doug Ducey stated: "We have some of the strongest election laws in the country, laws that prioritize accountability and clearly lay out procedures for conducting, canvassing, and even contesting the results of an election." (12/1/20 Twitter, @DougDucey (Exhibit 58).)

c.     Georgia: Secretary of State Brad Raffensperger reported: "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results." (11/19/20

---

[5] Outside of the election for President and Vice President, Republican candidates won elections in Nevada, Arizona, Georgia, Pennsylvania, Michigan, and Wisconsin. Those victories were verified by the respective Secretaries of State.

Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race* (Exhibit 44).)

    d.     Pennsylvania: Governor Tom Wolf reported: "To say there was voter fraud is a lie. To say the election was unconstitutional is a lie. To say our voting systems weren't secure is a lie." (11/12/20 Twitter, @GovernorTomWolf (Exhibit 55).)

    e.     Michigan: Secretary of State Joselyn Benson reported: "We have not seen any evidence of fraud or foul play in the actual administration of the election . . . What we have seen is that it was smooth, transparent, secure and accurate." (11/10/20 The New York Times, *The Times Called Officials in Every State: No Evidence of Voter Fraud* (Exhibit 101).)

    f.     Wisconsin: Elections Commission Administrator Meagan Wolfe reported: "At this time, no evidence has been provided that supports allegations of systematic or widespread election issues." (11/19/20 Wisconsin Star News, *No evidence has been provided that supports allegations of systemic or widespread election issues* (Exhibit 104).)

58.    On November 12, 2020, members of the Election Infrastructure Government Coordinating Council ("GCC") Executive Committee and members of the Election Infrastructure Sector Coordinating Council ("SCC") published a joint statement regarding the security, reliability, and accuracy of the election results. (11/12/20 CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees* (Exhibit 105).) The members included:

    •    Cybersecurity and Infrastructure Security Agency ("CISA") Assistant Director Bob Kolasky

- U.S. Election Assistance Commission Chair Benjamin Hovland

- National Association of Secretaries of State ("NASS") President Maggie Toulouse Oliver

- National Association of State Election Directors ("NASED") President Lori Augino

- Escambia County (Florida) Supervisor of Elections David Stafford

- Brian Hancock (Chair of SCC, Unisyn Voting Solutions)

- Sam Derheimer (Vice Chair of SCC, Hart InterCivic)

- Chris Wlaschin (Election Systems & Software)

- Ericka Hass (Electronic Registration Information Center)

- Maria Bianchi (Democracy Works)

59.     The joint statement stated: "The November 3rd election was the most secure in American history. Right now, across the country, election officials are reviewing and double checking the entire election process prior to finalizing the result."

60.     It continued: "When states have close elections, many will recount ballots. All of the states with close results in the 2020 presidential race have paper records of each vote, allowing the ability to go back and count each ballot if necessary. This is an added benefit for security and resilience. This process allows for the identification and correction of any mistakes or errors. **There is no evidence than any voting system deleted or lost votes, changed votes, or was in any way compromised.**" (emphasis in original).

61.     And it stated: "Other security measures like pre-election testing, state certification of voting equipment and the U.S. Election Assistance Commission (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020."

62.     Statements about the security, reliability, and accuracy of the 2020 U.S. election continued to be made by various government officials, entities, and committees into 2021.  On

21

June 23, 2021, the Republican-led Michigan Senate Oversight Committee, chaired by Trump ally Senator Ed McBroom, released a 55-page report, which stated that "The Committee found no evidence of widespread or systemic fraud in Michigan's prosecution of the 2020 election" and expressed total confidence that the state's 2020 election outcome—that Biden defeated Trump by about 155,000 votes, or 2.8%—"represent[s] the true results of the ballots cast by the people of Michigan." (6/23/21 Michigan Senate Oversight Committee, *Report on the November 2020 Election in Michigan* (Exhibit 133).)

63.     On June 24, 2021, the Supreme Court of the State of New York, Appellate Division, First Judicial Department, suspended Rudolph Giuliani from the practice of law after it determined that he had "made knowing false and misleading factual statements to support his claim that the presidential election was stolen from his client [Donald Trump]," based on "uncontroverted evidence" that he made "demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer for former President Donald J. Trump and the Trump campaign in connection with Trump's failed effort at reelection in 2020."  (*Matter of Giuliani*, 1976 A.D.3d 1, 4 (1st Dep't 2021) (Exhibit 134).)

64.     On June 27, 2021, reporting revealed that Attorney General William Barr had "received two briefings from cybersecurity experts at the Department of Homeland Security and the FBI" about the allegations of rigged voting machines, after which he and his team at the Department of Justice "realized from the beginning it was just bullshit." Barr further disclosed that "even if the machines somehow changed the count, it would show up when they were recounted by hand," and that Dominion's machines were just "counting machine[s], and they save everything that was counted. So you just reconcile the two. There had been no discrepancy reported anywhere, and I'm still not aware of any discrepancy." (6/27/21 The Atlantic, *Inside William Barr's Breakup with Trump* (Exhibit 135).)

65.     On August 3, 2021, a federal judge in Colorado disciplined two lawyers who filed a frivolous lawsuit based on lies against Dominion following the election, concluding that the case was frivolous and brought in bad faith. In his 68-page opinion, Judge N. Reid Neureiter concluded: "Albeit disorganized and fantastical, the Complaint's allegations are extraordinarily serious and, if accepted as true by large numbers of people, are the stuff of which violent insurrections are made." (*O'Rourke et al. v. Dominion Voting Systems, Inc. et al.*, No. 20-cv-3747, 2021 WL 3400671 (D. Colo. Aug. 3, 2021) (Exhibit 136).)

66.     The 2020 U.S. election for President and Vice President was not rigged. It was not compromised. It was not stolen.

**B.      Mr. Lindell decided to sell an embellished story connecting voting machines to election fraud.**

67.     Donald Trump had (and continues to have) a significant and loyal following. Donald Trump received approximately 70 million votes during the 2020 U.S. election. Donald Trump had over 88 million Twitter followers. His popularity was a tremendous asset.

68.     Mr. Lindell had already profited from President Trump's popularity before the election. Mr. Lindell's MyPillow products had received Donald Trump's endorsements. Mr. Lindell had personally received Donald Trump's endorsements. On information and belief, Mr. Lindell's (and, by extension, MyPillow's) bottom line was flourishing in part due to President Trump's endorsement.

69.     Mr. Lindell saw another business opportunity after President Donald Trump and Michael Pence lost the 2020 election. When it became clear that Joe Biden and Kamala Harris had officially won, Mr. Lindell latched onto a false narrative that the election was "stolen." Mr. Lindell decided to blame the voting machines. Mr. Lindell knew that he and his MyPillow products would garner attention in the media and stay on Donald Trump's supporters' minds by spreading a false

narrative with a technical premise: voting election technology is not secure, was hacked by China, and the voting machine companies stole the election. Smartmatic was to be one of the voting machine companies at the center of this false narrative.

70.     After the election, Mr. Lindell heard Mr. Rudolph Giuliani's and Ms. Sidney Powell's assertions that voting election technology was manipulated. (*Smartmatic v. Fox Corp., et al.*, N.Y. Index No. 151136/2021, Compl. at ¶¶ 89–94 (Exhibit 138).) Mr. Lindell also saw Fox News and others, such as Newsmax and OANN, broadcasting coverage about voting machine technology being hacked in favor of Joe Biden and Kamala Harris.

71.     Mr. Lindell knew that if he endorsed and grew this lie, he would continue rising to stardom in Donald Trump-supporter circles and, in turn, grow his personal and company wealth. Mr. Lindell decided to build off the story that the Smartmatic and Dominion voting technology companies were to blame for Donald Trump's and Michael Pence's loss in the 2020 U.S. election by claiming that the election was hacked.

72.     Mr. Lindell decided he would further embellish a preconceived story of Smartmatic's voting machine hacking and manipulation. He asserted that the 2020 U.S. election had been rigged in favor of Joe Biden and Kamala Harris through "***the machines***." Mr. Lindell claimed to have scientific, mathematical, and forensic "100% proof" of this election fraud by the machines.

73.     Mr. Lindell, of course, had no evidence that Smartmatic machines were hacked in the 2020 U.S. election or otherwise used to rig the election for Joe Biden and Kamala Harris. But Mr. Lindell knew that manufacturing "evidence" and making it seem as if that "evidence" was absolute and irrefutable would make for a more believable story.

74.     The story would also make Mr. Lindell (and MyPillow) money. Mr. Lindell would be able to cast himself as President Trump's only remaining friend and ally. He could also use the

attention brought to him as the primary, continuing warrior against the voting technology machines to sell his books and his MyPillow products.

**C.**     **Mr. Lindell engaged in a disinformation campaign against Smartmatic.**

75.      In December 2020 and January 2021, after all 50 states and Washington, D.C. certified their presidential election results, Mr. Lindell launched his attack on voting technology companies. During multiple appearances (both live at rallies in Washington, D.C. and online), Mr. Lindell claimed that the algorithms in voting machines were programmed to steal votes from Donald Trump and Michael Pence.

76.      Mr. Lindell and MyPillow sponsored a 20-city "March for Trump" bus tour promoting the January 6, 2021 rally in Washington, D.C. (1/26/21 BuzzFeed News, *How 'The Women for America First' Bus Tour Led to The Capitol Coup Attempt* (Exhibit 129).) The MyPillow logo appeared on the bus that toured around the United States.

77.      On the bus tour, Mr. Lindell was given a platform to talk about the election. He told the audiences that "Donald Trump got so many votes that they didn't expect that it broke the algorithms in those [voting] machines." (*Id.*)



78.     On January 5, 2021, Mr. Lindell spoke at the "Save the Republic" rally at the United States Capitol in Washington, D.C. He continued to spread his lie that election voting technology stole the 2020 U.S. election.

79.     On January 20, 2021, Joe Biden and Kamala Harris were sworn in as the President and Vice President. By then, several media sources (including Fox News and Newsmax) broadcast "clarification" program segments attempting to walk back their defamatory claims that Smartmatic was engaged in widespread election fraud. Mr. Lindell knew all of this. But Mr. Lindell believed that if he perpetuated the story against Smartmatic and convinced the public that the election was fraudulent through newfound "evidence," he would keep his name in the news.

80.     Mr. Lindell's calculated defamation campaign against Smartmatic was four-pronged. First, Mr. Lindell created and published a series of defamatory documentary videos purporting to release "evidence" and "facts" corroborating that Smartmatic's voting technology stole the 2020 U.S. election.

81.     Second, Mr. Lindell appeared on at least 13 Internet radio and television shows promoting his documentaries, driving traffic to his websites, advertising MyPillow, and defaming Smartmatic. During these programs, Mr. Lindell promised that he had "evidence" to support his defamatory claims about Smartmatic.

82.     Third, Mr. Lindell held an in-person and Internet live-streamed "Cyber Symposium" from August 10 to 12, 2021, during which he purported to uncover even more evidence that election voting machines, including Smartmatic's, rigged the 2020 election. Each of these irreparably harmed Smartmatic.

83.     Fourth, years after the 2020 presidential election, Mr. Lindell continued to perpetuate the falsehood that Smartmatic manipulated votes through a video he published on his self-created social media website, FrankSpeech.com, and through other mediums.

1. **Mr. Lindell's Defamation Campaign Against Smartmatic, Prong 1: The "Absolute" Documentary Series**

84.     In the first prong of his defamatory campaign, Mr. Lindell filmed, produced, and broadcast a four-part "Absolute" documentary series. In this series, Mr. Lindell claimed to reveal evidence that the 2020 U.S. election was stolen through election voting machine technology, including Smartmatic's. All four of Mr. Lindell's self-produced and published documentaries defamed Smartmatic.

85.     In his first documentary, "Absolute Proof," Mr. Lindell and his guest speakers claimed that China infiltrated the 2020 U.S. election through voting machine technology, including Smartmatic's. (*Absolute Proof* (Exhibit 1); Screenshots, *Absolute Proof* (Exhibit 2).) The two-hour documentary was live streamed by OANN and RSBN on their respective websites. It was also streamed by WVW Broadcast Network and posted to Mr. Lindell's personal Facebook page.

86.     From February 5 to February 8, 2021, OANN broadcast "Absolute Proof" thirteen times. On February 11, 2021, OANN broadcast "Absolute Proof" a fourteenth time, this time interspersed with an interview of Mr. Lindell by Steve Bannon. (*A Screening and Conversation of Absolute Proof* (Exhibit 14); Screenshots, *A Screening and Conversation of Absolute Proof* (Exhibit 15).)

27



87.     Mr. Lindell posted the first documentary to YouTube, Vimeo, Facebook, his self-created social media website FrankSpeech.com, and multiple of his personal websites, including LindellTV.com and MichaelJLindell.com. It also appears on Rumble and TheAmericanReport.org, among other websites.

88.     In "Absolute Proof" Mr. Lindell introduced himself as "the CEO of MyPillow." He then claimed that he had unequivocal proof that the 2020 U.S. election was rigged through election voting technology, including Smartmatic's:

> Mr. Lindell: I think it was like January 9th, all of a sudden, these people, they brought me some, a piece of evidence, that's 100% proved. It's like a print of inside the machine of the timestamp that showed another country, other countries attacking us, hacking into our election through these machines, and it shows a vote's flipped. And I'm going wow, I got to get this out there. And from that point on, I started putting it out there…

89.     Mr. Lindell's "Absolute Proof" documentary included several guest speakers: Mary Fanning, Phil Waldron, Matthew DePerno, Russell Ramsland, Shiva Ayyadurai, Patrick Colbeck, and Melissa Carone. As the creator and a publisher of this documentary on multiple platforms, Mr.

28

Lindell republished and endorsed all of the statements that each of these individuals made during his documentary.

90.    Colonel Phil Waldron said at the beginning of the "Absolute Proof" documentary:

Colonel Waldron: So a critical capability for any of this to happen are the inherent vulnerabilities that were built into ES&S and Dominion software, which is, you know, again, we've proven through [] our work that *this is all related directly back to the soft, Smartmatic, Smartmatic, SGO Smartmatic software core … the board of SGO Smartmatic,* because they own a, an air purification company. So just think about it, if you get to pick an administration that is favorable to your company, say if they [passed] the Green New Deal, and you're going to make billions and billions of dollars off of government-mandated air purification systems and public buildings… *you would spend quite a bit of money on the frontside to make sure the election was done*.



91.    Mr. Lindell then propagated the Smartmatic-specific theme himself:

Mr. Lindell: So why [] *would Texas*, they denied these Dominion ones, and in your opinion, so they must have looked at them and said there's something there we don't like, but then they, over here, *with Smartmatic and these other ones, they were okay with that? What would be your opinion of why, why one, they would deny one machine* that, because they're afraid of election fraud, and, and over here, they accepted that one?

Mr. Ramsland: I think that it sometimes has more to do with politics and influence, who gets through and who doesn't [] *for the machines*.

29

92. Mr. Lindell and Colonel Waldron referred specifically to Smartmatic in "Absolute Proof." Each and every one of the subsequent statements about "machines" and voting machine companies presented in the documentary led a reasonable viewer to believe the facts were referring to Smartmatic. Each of these statements appears in Section III, below.

93. In the final minutes of "Absolute Proof," Mr. Lindell claimed that the documentary showed "100%" that America was attacked through voting technology machines (including and implying Smartmatic):

> Mr. Lindell: And [] we've just shown everybody in the world 100% evidence that this was an attack on our country and is still under attack by China and other countries through the use of these machines used in our election.

94. Mr. Lindell's second documentary was called "Scientific Proof." It further alleged that the 2020 U.S. election was hacked through voting technology machines, including Smartmatic's. (*Scientific Proof* (Exhibit 3); Screenshots, *Scientific Proof* (Exhibit 4).) Mr. Lindell published "Scientific Proof," at least, on LindellTV.com, FrankSpeech.com, and MichaelJLindell.com. The documentary also appears on Rumble and TheAmericanReport.org. OANN aired "Scientific Proof" three times on April 3, 2021, and one time on April 4, 2021.



95.     Mr. Lindell had an ongoing dialogue with guest Dr. Douglas G. Frank during his second documentary, "Scientific Proof." As the creator and a publisher of this documentary on multiple platforms, Mr. Lindell republished and endorsed all of the statements of Dr. Douglas G. Frank.

96.     Mr. Lindell unequivocally stated in "Scientific Proof" that the "name of the machine" does not matter because all voting technology machines were responsible for "flipping" votes in the 2020 U.S. election:

> Mr. Lindell: I just want everyone to know that why we're showing other states and not just the swing state[s]. It was every state, it happened in your state []. Texas, when they said, oh, we didn't use the Dominion machines. ***Doesn't matter, the name of the, the name of the machine doesn't matter.***
>
> Dr. Frank: No.
>
> Mr. Lindell: ***Smartmatic, ES&S, don't matter…***



97.     Since Mr. Lindell referred specifically to Smartmatic, each and every one of the subsequent statements about "machines" and voting machine companies presented in the documentary led a reasonable viewer to think the facts were referring to Smartmatic. Each of these statements appears in Section III, below.

98.    Mr. Lindell's third documentary was called "Absolute Interference." (*Absolute Interference* (Exhibit 5); Screenshots, *Absolute Interference* (Exhibit 6).) This was billed as the "Sequel to Absolute Proof with New Evidence Foreign & Domestic Enemies Used Computers to Hack the 2020 Election." (The "computers" Mr. Lindell was referring to in the title are the voting technology machines, including Smartmatic's).



99.    Mr. Lindell published "Absolute Interference" on his personal websites, LindellTV.com, FrankSpeech.com, and MichaelJLindell.com. The video also appears on Rumble and TheAmericanReport.org. OANN broadcast "Absolute Interference" on April 22, 2021.

100.    Mr. Lindell had several guest speakers on his third documentary, "Absolute Interference," including General Michael Flynn and Dr. Douglas G. Frank. As the creator and a publisher of this documentary on multiple platforms, Mr. Lindell republished and endorsed all of the statements of these individuals.

101.    Mr. Lindell began the documentary with a clip from General Michael Flynn, which included the following:

> Mr. Flynn: Now we're into the 21st century, and we have these machines. And these machines, what we do know, ***one of the things that we do know***

*for certain, is that the machines are connected to the Internet.* Our FBI and CISA, the cyber arm of the Department of Homeland Security, yeah, they gave out these alerts, and they said, hey, Iran is interfering in our election process. ***The machines are not supposed to be connected to the Internet. They're supposed to be free of the Internet. Well, if it's connected to the Internet, that means that anybody in any country, and I can name some of the countries, so we know China…***



102. Mr. Lindell played another introductory clip at the beginning of "Absolute Interference," this time with Dr. Douglas G. Frank. Mere moments into the documentary, Mr. Lindell and Douglas Frank factually asserted and implied that Smartmatic voting technology was hacked in the 2020 U.S. election and that Smartmatic machines were connected to the Internet:

> Mr. Lindell: The same thing, the same machines, the same attack, the same people, the same corruption that went on, the same crime against humanity was all, crossed all those states.
>
> ***
>
> Mr. Lindell: 100% impossible, had to be machines.
>
> Dr. Frank: Yes.
>
> Mr. Lindell: And they had to be online.
>
> Dr. Frank: Constantly online

Mr. Lindell: Constantly online, everybody. No way you could ever do that humanly…

Dr. Frank: When I've shown this other people they've said, well, gee, how could people do that? And I say - -

Mr. Lindell: They can't, it has to be machines --

Dr. Frank: Has to be.

Mr. Lindell: ***And it rhymes with Dominion, and it rhymes with Smartmatic*** and ES&S, all these machines that were used out there cannot be done by humans and you have to have access before, during and after.

103.     Mr. Lindell pointed out in "Absolute Interference" that "Smartmatic" is one of the "machines" he will be referring to throughout the rest of the documentary:

Mr. Lindell: I have proof, 100% proof that ***our country was attacked by China***, by communism coming in, ***this foreign interference to our elections, through the machines, Dominion, Smartmatic, ES&S, all of them***.

104.     Since Mr. Lindell referred specifically to Smartmatic in "Absolute Interference," each and every one of the subsequent statements about "machines" and voting machine companies presented in the documentary led a reasonable viewer to think the facts were referring to Smartmatic. Each of these defamatory statements appears in Section III, below.

105.     Mr. Lindell's fourth documentary, "Absolutely 9-0," further alleged that the 2020 U.S. election was hacked through voting machine technology, including Smartmatic's. (*Absolutely 9-0* (Exhibit 7); Screenshots, *Absolutely 9-0* (Exhibit 8).) The premise of the documentary was that once the Supreme Court heard the "evidence" against the voting machine companies (including Smartmatic) it would vote 9-0 in favor of overturning the election.

106.     Mr. Lindell published "Absolutely 9-0" on his personal websites, LindellTV.com, FrankSpeech.com and MichaelJLindell.com. OANN broadcast "Absolutely 9-0" on June 5 and June 6, 2021.

107.    Mr. Lindell had an anonymous guest on his fourth documentary "Absolutely 9-0," who was purportedly an unnamed cybersecurity "expert." As the creator and a publisher of this documentary on multiple platforms, Mr. Lindell republished and endorsed all of the statements of this individual.



108.    Mr. Lindell began the fourth documentary by naming Smartmatic as a main perpetrator in an alleged cyber-attack against the United States during the 2020 election:

> Mr. Lindell: Hello everyone I'm Mike Lindell and as you all know on January 9th I received evidence of a cyber attack orchestrated by China on our 2020 election. I took that one piece of evidence, and I just went all in. This was something different, nobody had seen. **This was something that came through the machines, the Dominion machines, the Smartmatic and other machines**. This was a cyber attack. I didn't know anything about cyber attacks. And boy, I learned, I had to learn real fast... **this was 100% an attack by China on our country through these machines**.



109.    Since Mr. Lindell referred specifically to Smartmatic, each and every one of the subsequent statements about "machines" and voting machine companies presented in the documentary led a reasonable viewer to think the facts were referring to Smartmatic. Each of these defamatory statements appears in Section III, below.

**2.    Mr. Lindell's Defamation Campaign Against Smartmatic, Prong 2: Media Appearances**

110.    The second prong of Mr. Lindell's defamation campaign against Smartmatic was to appear on podcasts, Internet radio shows, and television shows to discuss how Smartmatic rigged the 2020 U.S. election. Mr. Lindell wanted to reach more than just individuals who self-selected to watch his documentary. Mr. Lindell aimed to spread his message about Smartmatic rigging the election as broadly as possible.

111.    In doing so, Mr. Lindell appeared on at least 13 media shows and defamed Smartmatic:

a.    On February 5, 2021, Mr. Lindell appeared on Steve Bannon's "War Room" podcast (*War Room* podcast, February 5, 2021 (Exhibit 9); Screenshots, *War Room* podcast, February 5, 2021 (Exhibit 10).);

b.      On February 6, 2021, Mr. Lindell appeared on Steve Bannon's "War Room" podcast (*War Room* podcast, February 6, 2021 (Exhibit 11).);

c.      On February 8, 2021, Mr. Lindell appeared on OANN's "Real America with Dan Ball" (*Real America with Dan Ball*, February 8, 2021 (Exhibit 12); Screenshots, *Real America with Dan Ball*, February 8, 2021 (Exhibit 13).);

d.      On February 11, 2021, Mr. Lindell appeared on an OANN Special with Steve Bannon (OANN, *A Screening and Conversation of Absolute Proof,* February 11, 2021 (Exhibit 14); Screenshots, OANN, *A Screening and Conversation of Absolute Proof,* February 11, 2021 (Exhibit 15).);

e.      On February 24, 2021, Mr. Lindell appeared on "The Pete Santilli Show" (*The Pete Santilli Show,* February 24, 2021 (Exhibit 16); Screenshots, *The Pete Santilli Show,* February 24, 2021 (Exhibit 17).);

f.      On March 26, 2021, Mr. Lindell appeared on Steve Bannon's "War Room" podcast (*War Room* podcast, March 26, 2021 (Exhibit 18) Screenshots, *War Room* podcast, March 26, 2021 (Exhibit 19).);

g.      On March 30, 2021, Mr. Lindell appeared on the "Eric Metaxas Radio Show" (*Eric Metaxas Radio Show,* March 30, 2021 (Exhibit 20); Screenshots, *Eric Metaxas Radio Show,* March 30, 2021 (Exhibit 21).);

h.      On April 1, 2021, Mr. Lindell appeared on "Indivisible" with John Stubbins (*Indivisible with John Stubbins*, April 1, 2021 (Exhibit 22); Screenshots, *Indivisible with John Stubbins,* April 1, 2021 (Exhibit 23).);

i.      On April 8, 2021, Mr. Lindell appeared on "USA Watchdog" with Greg Hunter (*USA Watchdog,* April 8, 2021 (Exhibit 24); Screenshots, *USA Watchdog,* April 8, 2021 (Exhibit 25).);

j.    On April 9, 2021, Mr. Lindell appeared on Steve Bannon's "War Room" podcast (*War Room* podcast, April 9, 2021 (Exhibit 26); Screenshots, *War Room* podcast, April 9, 2021 (Exhibit 27).);

k.    On May 3, 2021, Mr. Lindell appeared on OANN's "Newsroom" program with Pearson Sharp (Transcript, *OANN Newsroom,* May 3, 2021 (Exhibit 108); Screenshots, *OANN Newsroom*, May 3, 2021 (Exhibit 109).);

l.    On May 3, 2021, Mr. Lindell appeared on Steve Bannon's "War Room" podcast (*War Room* podcast, May 3, 2021 (Exhibit 28); Screenshots, *War Room* podcast, May 3, 2021 (Exhibit 29).); and

m.    On May 8, 2021, Mr. Lindell appeared on Steve Bannon's "War Room" podcast (*War Room* podcast, May 8, 2021 (Exhibit 30); Screenshots, *War Room* podcast, May 8, 2021 (Exhibit 31).).

112.    These programs reached a wide audience. For example, Bannon's "War Room" podcast aired each night on Newsmax. Newsmax's viewership was soaring. Newsmax's ratings jumped almost ten times greater post-election than they had been before November 2020. (11/18/20 Associated Press, *Trump-Friendly Newsmax seeks to cut into Fox's viewership* (Exhibit 126).)



113.    Take another example. Mr. Lindell appeared on OANN programming with Dan Ball. OANN's viewership was up post-election, too. The OANN website peaked at 15 million viewers per month from November through January. (10/6/2021 Reuters, *Special Report: How AT&T helped build far-right One America News* (Exhibit 132).)



114.    Defamatory statements made about Smartmatic during each of these media appearances are listed in Section III, below.

115.    Multiple times during the media prong of his disinformation campaign, Mr. Lindell made it seem as if he had evidence backing up his claims that Smartmatic stole the 2020 U.S. election. For example, Mr. Lindell appeared on the "Eric Metaxas Radio Show" on March 30, 2021, to promote his documentaries. (Exhibit 20.) In that program segment, Mr. Lindell said:

> "We got [] whistleblowers you're gonna see. We have people that worked on the inside [] maybe they'll come clean and get lesser sentences. [] I spent millions of dollars investigating [] Dominion, Smartmatic… the people behind these attacks, investigators that went over and cyber people that went over, got the IPs, and the IDs of people in China…"



116.    Take another example. On April 1, 2021, Mr. Lindell appeared on "Indivisible with John Stubbins" and said, "I'm going to be dumping evidence for the next five, six weeks before we get before the Supreme Court." (Exhibit 22.) He also said:

> [H]ere's what happened. This was a cyber attack on our country. Donald Trump really won 80 million to 66 million. All the evidence is there, I've already got all the evidence, it's already going to be, it's been on Absolute Proof. But now we have validated every IP, every ID address of all the computers here and over in China, and other countries. So all the evidence is there…

40



117.     Mr. Lindell never showed any of the "evidence" he purportedly had. There was no

evidence showing a cyber-attack on the 2020 U.S. election.

> **3.     Mr. Lindell's Defamation Campaign Against Smartmatic, Prong 3: "Mike Lindell's Cyber Symposium"**

118.     The third prong of Mr. Lindell's defamation campaign against Smartmatic was to

hold a two-day, in-person, live-streamed, and self-titled Cyber Symposium in Sioux Falls, South

Dakota from August 10 to 12, 2021. The purpose of "Mike Lindell's Cyber Symposium" was to

prove that China helped Joe Biden steal the 2020 presidential election using voting machine

technology. (8/15/2021, Business Insider, *Here's what happened at Mike Lindell's cyber*

*symposium…* (Exhibit 131).)

119.     Mr. Lindell claimed he had 37 terabytes of information "related to voter fraud" to

reveal at the Cyber Symposium. In an effort to garner viewership and instill credibility in his

information, Mr. Lindell offered $5 million to anyone who could *disprove* the data if they attended

the event in person. (*Id.*)



120.    Mr. Lindell live-streamed the "Mike Lindell Cyber Symposium" from his websites LindellTV.com and FrankSpeech.com. The "Mike Lindell Cyber Symposium" was also livestreamed on Rumble and RSBN, among other websites.

121.    Mr. Lindell hosted various guest speakers at his Cyber Symposium, including Douglas Frank, Phil Waldron, and Joe Oltmann. As the creator and a publisher of "Mike Lindell's Cyber Symposium" on multiple platforms and live in-person, Mr. Lindell republished and endorsed all of the statements of his guest speakers during the programming.



122.    Much of the content over the two-day Cyber Symposium defamed Smartmatic by alleging that the 2020 U.S. election was stolen through voting machines. Three taped segments of the Cyber Symposium specifically mentioned Smartmatic:

a.    First, a video narrated by Phil Waldron, re-aired multiple times each day during the Cyber Symposium (Cyber Symposium, Phil Waldron (Exhibit 34); Screenshots, Cyber Symposium, Phil Waldron (Exhibit 35).);

b.    Second, a monologue by Mr. Lindell during the Cyber Symposium (Cyber Symposium, Lindell (Exhibit 32); Screenshots, Cyber Symposium, Lindell (Exhibit 33).); and

c.    Third, a speech by Joseph Oltmann during the Cyber Symposium (Cyber Symposium, Oltmann (Exhibit 36); Screenshots, Cyber Symposium, Oltmann (Exhibit 37).)

123.    The Phil Waldron video alleged that Smartmatic software was used in "key battleground states" during the 2020 U.S. election. (Cyber Symposium, Phil Waldron (Exhibit

34).) The video purported to reveal the "inside story of the conspiracy to save the 2020 election" through "a well-funded cabal" of "left wing" people.



124. The Phil Waldron video was played multiple times throughout the Cyber Symposium. The video was also posted separately to Rumble.

125. Mr. Lindell's monologue during the Cyber Symposium defamed Smartmatic by claiming that Smartmatic machines are "built as a tool to take countries." (Cyber Symposium, Lindell (Exhibit 32).) Mr. Lindell claimed to have spent "millions of dollars" investigating this.

126. Joseph Oltmann defamed Smartmatic during the Cyber Symposium by claiming that Smartmatic uses the same hardware as Dominion Voting Systems. Mr. Oltmann said, "So they're using the same hardware, they just have a new badge put on it, one says Dominion Voting, and one says Smartmatic." (Cyber Symposium, Oltmann (Exhibit 36).)

127. Mr. Oltmann also presented a graph, allegedly showing that "people that worked for ESNS [sic], Hart, Dominion Voting Systems, Clear Ballot [and] Smartmatic" were all interrelated. "[T]hey basically recycle people through the company." (Cyber Sympsoium, Oltmann (Exhibit 36).)

44



128.    Specific defamatory statements about Smartmatic from each of these Cyber Symposium segments appear in Section III, below.

129.    During each of these three prongs of his defamation campaign against Smartmatic, Lindell claimed that he had "scientific proof" and "100% evidence" that: (1) Smartmatic was widely used in the 2020 U.S. election in order to attack the election; (2) Smartmatic had corrupt relationships with Dominion and ES&S during the 2020 U.S. election in order to attack the election; (3) Smartmatic stole the 2020 U.S. election in favor of Joe Biden and Kamala Harris; (4) Smartmatic's technology was compromised or hacked by China or other foreign countries; (5) Smartmatic machines were connected to the Internet during the 2020 U.S. election in order to attack the election; (6) Smartmatic was engaged in a criminal enterprise; and (8) Smartmatic technology was designed to steal and has stolen elections before.

**4.    Mr. Lindell's Defamation Campaign Against Smartmatic, Prong 4: Post-Complaint Defamation**

130.     The fourth prong of Mr. Lindell's defamation campaign against Smartmatic was to continue to defame Smartmatic and its voting technology even after Smartmatic brought this lawsuit.

131.     On January 4, 2023, Mr. Lindell posted a video to his social media website FrankSpeech.com.   (*Updates On The Smartmatic Lawsuit and The Cast Vote Records*, FrankSpeech.com, January 4, 2023 (Exhibit 143).)

132.     In the January 4, 2023 video, Mr. Lindell stated, "let me tell you about Smartmatic . . . in the 2020 election, do you think L.A. County was computer-manipulated or not? . . . Of course it was! And now we have the proof."  (*Id.*)

133.     In the same video, Mr. Lindell told his viewers that "we have an algorithm that came out of a Mesa County machine . . . those same algorithms of Smartmatic . . . this is Smartmatic and Dominion . . . ."  (*Id.*)

134.     For the entirety of the January 4, 2023 video, Mr. Lindell presented a banner at the bottom of the screen displaying a promo code viewers could use to save up to 66% off an order placed at MrPillow.com.  (*Id.*)



135.    On January 31, 2023, Mr. Lindell posted to Twitter to announce that he was going to be a guest on *Jimmy Kimmel Live!*, a late-night talk show broadcasted across the United States. Mr. Lindell tweeted: "I know I will be attacked but we have to get rid of the voting machines and I am willing to be humiliated to help get the word out and save our county!"  (1/31/23 Twitter, @realMikeLindell (Exhibit 144).)

136.    On February 1, 2023, Mr. Lindell appeared on *Jimmy Kimmel Live!*  Mr. Lindell appeared on the show inside a "claw machine." During that show, Mr. Lindell made the following statements:

a.      Jimmy Kimmel asked Mr. Lindell, "I know you are distrustful of machines . . . now that you are inside one, do you feel differently?"  In response, Mr. Lindell stated, "No.  Same thing.  There are . . . computers can be rigged out there, absolutely, in elections.  You know that."  (*MyPillow Mike Lindell's*

47

*Interview from Inside a Claw Machine*, Jimmy Kimmel Live!, February 1, 2023 (Exhibit 145).)

b.    Mr. Kimmel asked Mr. Lindell about the latter's failed bid for Chair of the Republican National Convention.  Specifically, Mr. Kimmel asked, "do you believe this was a rigged election too?"  Mr. Lindell responded, "No, absolutely not, Jimmy, cause there was no machines involved.  It was paper ballots, hand counted."  (*Id.*)

c.    After Mr. Kimmel asked Mr. Lindell about his feelings on various other kinds of machines, *i.e.*, ice machines, Mr. Lindell stated, "Jimmy, you can make fun of that, but we know the machines I'm talking about are voting machines, computers used in elections, because we wanna have elections and not selections."  (*Id.*)

d.    Mr. Lindell subsequently claimed to possess evidence of election fraud and said, "we gave it to the Facebook fact checkers.  Alan Duke, he looked at it and he won't . . . now he just went away cause he knows it was true."  (*Id.*)

**D.    Mr. Lindell presented his statements about Smartmatic as factual and based on evidence.**

137.    Mr. Lindell did not present his statements regarding Smartmatic as opinions, rhetorical hyperbole, or speculation. He did not present his statements regarding Smartmatic as educated guesses, possibilities, rumors, or mere allegations. Mr. Lindell presented his statements regarding Smartmatic as fact. Fact supported by "100% proof," "scientific evidence" and "forensic evidence."

138.     First, Mr. Lindell's entire four-part documentary series was premised on the claim that he was uncovering groundbreaking evidentiary proof of voting machines' vulnerability and fraud and exposing that evidentiary proof for the general public. For example:

    a.    Mr. Lindell states in his opening monologue of the "Absolute Proof" documentary, "I think it was like January 9th, all of a sudden, these people, ***they brought me some, a piece of evidence that's 100% proved. It's like a print-out of inside the machine of the timestamp*** that showed another country, other countries attacking us, hacking into our election through these machines, and it shows a vote's flipped. ***And I'm going, wow, I got to get this out there. And from that point on, I started putting it out there… [T]onight, you're going to see what they're hiding, you're going to see on this show.***" (*Absolute Proof*, (Exhibit 1).)

    b.    Mr. Lindell also states in the "Absolute Proof" documentary, "You know, ***what we're talking about here today is specific, these machines that were used to, to hack into our election*** and, and by foreign countries, including China…" (*Absolute Proof*, (Exhibit 1).)

    c.    Mr. Lindell states in his opening monologue of the "Absolutely 9-0" documentary, "[A]s you all know on January 9th ***I received evidence*** of a cyber attack orchestrated by China on our 2020 election. ***I took that one piece of evidence and I just went all in. This was something different, nobody had seen. This was something that came through the machines, the Dominion machines, the Smartmatic and other machines***." (*Absolutely 9-0* (Exhibit 7).)

    d.    Mr. Lindell told Steven Bannon on OANN, "You know, ***I have went out here with everything I have, because I'm 100%, 100% that we have all the proof. That's why it's called 'Absolute Proof.' 100%.***" (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

139.     Second, Mr. Lindell presented and endorsed other speakers with alleged scientific, cybersecurity, mathematics, and military operation credentials to bolster his own credibility. Mr. Lindell claimed that the statements he made about Smartmatic were supported by these "experts." For example:

    a.    In Mr. Lindell's "Scientific Proof" documentary, Mr. Lindell interviewed

        Dr. Douglas G. Frank, giving him the following introduction:

a)      Mr. Lindell: "What's your background? Tell everybody." Dr. Frank: "I'm a PhD scientist, *I've been doing science for about 40 years aggressively, got about 60 scientific publications.* Some of them were cover articles and invited articles, because I happen to make a pretty good discovery once, back in the early 90s. I left academics in 1996. And ever since then, I've been teaching at a special school for extraordinarily gifted kids, as well as working on new inventions and analyzing election data lately." Mr. Lindell: "*Right. So very overqualified everybody*…" (Exhibit 3).

b.      In Mr. Lindell's "Absolutely 9-0" documentary, Mr. Lindell interviewed an anonymous cybersecurity expert, giving him the following introduction:

a)      Mr. Lindell: "And with us right now is one of my *cybersecurity experts*. These guys are the best and this guy has *over 20 years of experience* working in both the private sector and with government law enforcement and intelligence agencies. He has many *information in cybersecurity certifications that specialize in advanced adversary detection, mitigation, and elimination.* And here he is now." (Exhibit 7).

c.      In Mr. Lindell's "Absolute Proof" documentary, Mr. Lindell interviewed Colonel Phil Waldron with the following introduction:

a)      Mr. Waldron: "Yeah, so my, *my background in the military is with influence operations, information operations, information warfare,* if you will… And again, as a, as a information warfare officer that's what I did. *I looked for vulnerabilities and ways to attack systems to create a strategic advantage* for US friendly forces." (Exhibit 1).

d.      In Mr. Lindell's "Absolute Proof" documentary, Mr. Lindell interviewed Russell Ramsland, giving him following introduction:

a)      Mr. Lindell: "So now we have with us Russell Ramsland. *He's a founding member of Allied Security Operational Group.* They're based in

Dallas, Texas, and **they do cyber forensics and security.**" (Exhibit 1).

e. In Mr. Lindell's "Absolute Proof" documentary, Mr. Lindell interviewed Dr. Shiva Ayyadurai, giving him the following introduction:

a) Mr. Lindell: "So now we have with us, Dr. Shiva. **He has four MIT degrees. He's an expert at system science and pattern analysis** and I met him four weeks ago… **And he knows all about these machines** now and we're going to hear some of the stuff that I found out [] this is a, **absolutely validates this election fraud with these machines**." (Exhibit 1).

Dr. Ayyadurai: "**I build large-scale computer systems and stuff I've used has been used by the Senate, has been used by the largest fortune 1000 companies in the world.** So I know how you move from paper-based systems to electronic systems." (Exhibit 1).

140. Third, Mr. Lindell said that his statements about Smartmatic were based on evidence, investigations, and facts. Mr. Lindell intentionally created the impression that his statements about Smartmatic were predicated on reliable, verifiable facts as opposed to speculation or opinion. For example:

a. Mr. Lindell: "[T]onight… you're going to see on this show. We have [] **cyber forensic experts, we're going to have 100%, you're going to see all this evidence that by the time you're done seeing it, you're going to go wow, 100%, it proves exactly what happened, that these machines were used to steal our election by other countries**, including China." (*Absolute Proof*, (Exhibit 1).)

b. Mr. Lindell: "You know, what I put out in this documentary [*Absolute Proof*], Steve, is like one-one-thousandth of what we have. **It's 100 percent proof in any court of law, you hold up, here it is**." (*War Room* podcast, February 5, 2021 (Exhibit 9).)

c. Mr. Lindell: "**It's the evidence, the hard evidence in this, in this documentary** [Absolute Proof] **these are the facts**. **There's nothing subjective**, there's no subjectivity. **It's all here's the facts**, here's what happened on the first, second, third, fourth here's what

happened each day, a print of what happened. So yeah, Dominion, Smartmatic both here." (*War Room* podcast, February 5, 2021 (Exhibit 9).)

d.   Mr. Lindell: "It doesn't mean the evidence isn't evidence. ***It's 100% proof. That's why it's called 'Absolute Proof.'*** " (*War Room* podcast, February 6, 2021 (Exhibit 11).)

e.   Mr. Lindell: "And we've, we've just shown everybody in the world ***100% evidence that this was an attack on our country and is still under attack by China and other countries through the use of these machines used in our election.*** " (*Absolute Proof*, (Exhibit 1).)

f.   Mr. Lindell: "***100% we have the election fraud. Watch my [] video, watch my documentary.*** And you too will go, what?" (*Real America with Dan Ball* (Exhibit 12).)

g.   Mr. Lindell: "***I have 100%, not 99%, 100% evidence that of everything that they did Smartmatic*** [] ES&S, all of those machines did and stole[] our country and stole[] our election." (*The Pete Santilli Show* (Exhibit 16).)

h.   Mr. Lindell: "They can't deny the cast vote records. . . . ***this is what these machines say happened in your county.  This isn't Mike Lindell, this isn't some cyberspace thing, this is what the machines are putting out, in order***." (*Updates On the Smartmatic Lawsuit and The Cast Vote Records* (Exhibit 143).)

141.   Mr. Lindell's efforts to create the impression that his statements about Smartmatic were truthful, accurate, and factual is one of the reasons that Smartmatic was damaged. Mr. Lindell's statements regarding Smartmatic were unequivocal.

## III.   Mr. Lindell's False Statements and Implications About Smartmatic

142.   Mr. Lindell's statements about Smartmatic were not facts. Mr. Lindell's statements about Smartmatic were lies. The demonstrably, verifiable facts are:

- Smartmatic's election technology and software were only used in Los Angeles County, and not used by any other voting machine company, for the 2020 U.S. election.

- Smartmatic was ***not*** in a business relationship with Dominion or ES&S during the 2020 U.S. election. Dominion, ES&S and Smartmatic are competitors. Dominion, ES&S, and Smartmatic did not share software during the 2020 U.S. election.

- Smartmatic's election technology, hardware, and software were ***not*** used to steal the 2020 U.S. election. Nor could they have been, given that Smartmatic's role was limited to Los Angeles County.

- Smartmatic's election technology, hardware and software were ***not*** compromised and hacked by China during the 2020 U.S. election. No one has identified a shred of evidence that there were cyber-security issues in Los Angeles County.

- Smartmatic was ***not*** engaged in a criminal enterprise to overturn the 2020 U.S. election. No one has identified a shred of evidence that Smartmatic was engaged in a criminal enterprise to overturn the election.

- Smartmatic's election technology, hardware and software were ***not*** designed to rig and fix elections and have ***not*** been used to rig and fix elections before. Smartmatic's election technology, hardware and software were designed for security, reliability, and auditability. No after-the-fact audit has ever found that Smartmatic's technology, hardware or software were used to rig, fix, or steal an election.

- Smartmatic's election technology and software were ***not*** connected to the Internet during the 2020 U.S. election. Smartmatic machines are "air-gapped," self-contained, and never connected to the Internet.

143. Mr. Lindell did not let these demonstrable, verifiable facts stand in his way of telling a story that would make him money and grow his fame.

**A.    Mr. Lindell falsely stated and implied that Smartmatic's election technology and software were widely used in the 2020 U.S. election in order to attack the election.**

144. Mr. Lindell stated and implied that Smartmatic election technology, hardware, and software were widely used during the 2020 U.S. election, including in the battleground states, and in two states with particularly close outcomes: Arizona and Michigan. Mr. Lindell could not persuade people that Smartmatic had stolen the election if Smartmatic's election technology, hardware, and software were not widely used during the 2020 U.S. election.

145.     Below are some of the statements that Mr. Lindell made and/or published[6] to create

the impression that Smartmatic technology, hardware, and software were widely used during the

2020 U.S. election:

a.     Mr. Lindell: "I mean, this is what they do. **Dominion, Smartmatic, all of them**. It's just like, you talk to Matt DePerno **in Michigan**, and they've been going through this every day for months. **And in Arizona**, you know, it's just like right now, when they find those [] all the stuff that's missing, it doesn't surprise anyone. I think everybody knows now, this is the biggest cover-up that's probably in history for a crime. **It's so massive that they've covered this up with the machine, or all the stuff that they did with the machines."** (*War Room* podcast, May 8, 2021 (Exhibit 30).)

b.     Mr. Lindell: "[O]ver the next five weeks, we're gonna dump all the evidence that came from these machines, Smartmatic and Dominion. **And right now as of today, you've got Maricopa County in Arizona**, that audit, they just picked the three cyber teams and what and right away Dominion's out there bad mouthing them… **And what you're gonna find is every state in this country that had machines – Dominion, Smartmatic, and ES&S**, they're all cousins, and they all [] have that rated waste feature. And they all were done voting flipped in this last election. We can never have machines again, in any election, here or anywhere in the world…" (*Indivisible with John Stubbins* (Exhibit 22).)

c.     Mr. Lindell: "Why didn't they just open up the machines? They did in two counties. **They did in Antrim County, Michigan, and in a primary [] in Massachusetts**. **Both of those counties were opened up the machines and they found the same thing.**" (*The Pete Santilli Show* (Exhibit 16).)

d.     Mr. Lindell: "**They're all split off from Smartmatic** that started in 2001, or 2002. **They're, every one of them is the same, they're interchangeable. And by the way, every state in the United States was I, had votes flip. It wasn't just those swing states…** [A]nd everyone says, well Dallas didn't have Dominion, because they didn't want it. No, they had the other one. They had SNS or whatever they had. [] [I]t didn't matter what machines you had, there was this whole thing, the cyber-attack…" (*The Pete Santilli Show* (Exhibit 16).)

e.     Colonel Waldron: "Some of the anomalies that we noticed in the 2020 general elections that **five key states all stopped counting at a certain time in these key battleground states**. **These were all where the software**

---

[6] Mr. Lindell is the creator, broadcaster, publisher and republisher of the four "Absolute" documentaries and of the "Mike Lindell Cyber Symposium." As such, Mr. Lindell is responsible for not only all of the statements he made, but also all of the statements his guests made during those documentaries and at that Symposium.

> *Dominion machines, ES&S machines were used, the the Smartmatic, the Gems software, so when the vote stopped counting*…" (Mike Lindell's Cyber Symposium (Exhibit 34).)

    f.    Mr. Lindell: "This was an attack on our country. ***These Dominion machines and Smartmatic, these machines that were [] the tools of this attack***, and we will never have another fair election if we [] don't stop that, so I will never back down." (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

    g.    Mr. Lindell: "***Smartmatic, ES&S, don't matter***. ***Just in Dallas alone***, there was 57 vote, 57,000 votes flipped on, and I don't even know if that was before noon." (*Scientific Proof* (Exhibit 3).)

146. Individuals who heard Mr. Lindell's statements were led to believe that Smartmatic's election technology, hardware, and software were widely used during the 2020 U.S. election, including in states with close outcomes, to attack the election. Mr. Lindell intended for individuals who heard or read his statements to draw that conclusion. That conclusion was an important component of the disinformation campaign.

147. Mr. Lindell's statements and implications that Smartmatic's election technology, hardware, and software were widely used during the 2020 U.S. election are demonstrably false and factually inaccurate. First, Smartmatic's election machines and software were only used in Los Angeles County during the 2020 U.S. election. They were not used in any other county or state during the 2020 U.S. election.

148. Second, Smartmatic's election technology, hardware, and software were not used in any county or state with close outcomes during the 2020 U.S. election. Smartmatic's election technology, hardware, and software were not used in the 2020 battleground states, Nevada, Arizona, Georgia, Pennsylvania, Michigan, or Wisconsin. Smartmatic's election technology, hardware, and software was not used in Texas. Smartmatic's election technology, hardware, and software were not used in any counties in any of these States.

149.    Third, Smartmatic's election technology, hardware, and software were not used by any other voting technology company during the 2020 U.S. election. Smartmatic's election technology, hardware, and software were not used by another company in Nevada, Arizona, Georgia, Pennsylvania, Michigan, or Wisconsin (or any counties within these States). Smartmatic's election technology, hardware, and software were not used by another company in Texas or any county within Texas.

**B.    Mr. Lindell falsely stated and implied that Smartmatic had a corrupt relationship with Dominion and ES&S during the 2020 U.S. election in order to attack the election.**

150.     In an attempt to convince the general public that all voting technology machines are interchangeable and that they all participated in a criminal conspiracy to overturn the 2020 U.S. election, Mr. Lindell claimed and implied that Smartmatic had links to Dominion and ES&S during the 2020 U.S. election. Mr. Lindell repeatedly stated and broadcasted statements from others that Smartmatic was connected to Dominion and ES&S.

151.    Below are some of the statements that Mr. Lindell made and/or broadcast to state and imply that Smartmatic had a corrupt relationship with Dominion and/or ES&S during the 2020 U.S. election:

   a.    Mr. Lindell: "We're going after them in the biggest way possible, and we're not – we're **including Smartmatic because now we've tied the two together. They're the mothership,** all of that's gonna come out too, that evidence. **They're all tied together in this corruption and this – and what went on to our country, the attack on our country,** but this is why we're doing it." (*War Room* podcast, April 9, 2021 (Exhibit 26).)

   b.    Mr. Lindell: "Texas still had machines, all the machines are the same. They're all – **you've got your ES&S, your Hart, your Diebold, your Dominion and your mothership, Smartmatic.**" (*War Room* podcast, May 3, 2021 (Exhibit 28).)

   c.    Mr. Lindell: "And what you're gonna find is every state in this country that had machines – **Dominion, Smartmatic, and ES&S, they're all cousins,** and they all [] have that rated waste feature. And they all were done voting

flipped in this last election. We can never have machines again, in any election, here or anywhere in the world…" (*Indivisible with John Stubbins* (Exhibit 22).)

d.   Colonel Waldron: "So a critical capability for any of this to happen are the inherent vulnerabilities that were ***built into ES&S and Dominion software, which is, you know, again, we've proven through, through our work that this is all related directly back to the soft, Smartmatic [] SGO Smartmatic software core***." (*Absolute Proof* (Exhibit 1).)

e.   Mr. Lindell: "***Smartmatic, ES&S, don't matter***. Just in Dallas alone, there was 57 vote, 57,000 votes flipped on, and I don't even know if that was before noon." (*Scientific Proof* (Exhibit 3).)

f.   Mr. Lindell: "100% it can only be done by machines. I can't stress that enough." Douglas Frank: "Absolutely." Mr. Lindell: "***And they all rhyme with Dominion, or Smartmatic, ES&S all of them.***" (*Scientific Proof* (Exhibit 3).)

g.   Mr. Lindell: "***This was something that came through the machines***, *the Dominion machines, the Smartmatic and other machines. **This was a cyber attack.***" (*Absolutely 9-0* (Exhibit 7).)

h.   Mr. Lindell: "[B]ut ***it's not just Dominion [] and not just Smartmatic, and not just the machine***. Look at what they're doing. ***They're all part of this attack on our country***." (*The Pete Santilli Show* (Exhibit 16).)

i.   Mr. Lindell: "***I have 100%, not 99%, 100% evidence that of everything that they did Smartmatic [] ES&S, all of those machines did*** and stole[] our country and stole[] our election." (*The Pete Santilli Show* (Exhibit 16).)

j.   Mr. Lindell: ***"Smartmatic started machines in Venezuela, around 2001 2002. When they [] brought them in there, they invented them and brought them in there*** and took down that country in two years. ***It was brought into the United States, they split with Dominion, ESS and Smartmatic. It's all, all they're built for is to steal elections.*** They've stolen in the United States…" (*The Pete Santilli Show* (Exhibit 16).)

k.   Mr. Lindell: "You know, what we, ***what everybody needs to know is that they're all, they're all cousins. They're all split off from Smartmatic*** that started in 2001, or 2002. They're, every one of them is the same, ***they're interchangeable***." (*The Pete Santilli Show* (Exhibit 16).)

l.   Mr. Lindell: "Not only that, they're, you know what they did to our country ***them and Smartmatic, let's not forget Smartmatic, they're like the mothership of this***. And for not only being involved in the biggest crime against our country, probably in history…" (*USA Watchdog* (Exhibit 24).)

m.   Mr. Lindell: "[B]ut the point of that, of bringing up the Texas thing is ***ESS, Smartmatic and Dominion, you can interchange the names, they all are the same.*** They cyber phonetics [sic] we showed goes through all these machines, ***they're all the same. This is [my] whole point***…" (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

n.   Mr. Lindell: "[A]s part of my due diligence, that's been all this week. I wanted to go back to where this all started. And Venezuela**, *it all started in Venezuela with Smartmatic, not Dominion or the other one, it was with Smartmatic.***" (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

o.   Mr. Lindell: "I've been obviously just fighting every day to get this, to the nation and everybody, the world[,] these machines where it got hacked, ***Dominion, Smartmatic, Hart all of them are the same, ES&S***. You just say Dominion, but it's all machines." (*Newsroom with Pearson Sharp* (Exhibit 108).)

p.   Mr Lindell: "We have an algorithm that came out of a Mesa County machine . . . those same algorithms of Smartmatic . . . this is Smartmatic and Dominion . . . ." ((*Updates On The Smartmatic Lawsuit and The Cast Vote Records* (Exhibit 143).)

q.   Mr. Oltmann: This particular piece is actually talking about ***the… similarities in testing of the equipment, the hardware, between Smartmatic and Dominion voting systems. So they're using the same hardware, they just have a new badge on it, one says Dominion Voting and one says Smartmatic… Yes, yeah. Made by the same supplier. Right***.

***

Mr. Oltmann: We were able to build an entire graph of the ***people that worked for ES&S, Hart, Dominion Voting Systems, Clear Ballot, Smartmatic,*** and ***they basically recycle people through the company***. (Mike Lindell's Cyber Symposium (Exhibit 36).)

152.   Individuals who heard Mr. Lindell's statements were led to believe that (1) Dominion, Smartmatic, and/or ES&S were related companies; (2) Dominion, Smartmatic, and/or ES&S used interchangeable voting technology, hardware, or software in the 2020 U.S. election; and/or (3) Dominion, Smartmatic and ES&S worked together for the 2020 U.S. election. Mr. Lindell intended for individuals who heard his statements to draw those conclusions. Those conclusions were an important component of the disinformation campaign.

153.    Mr. Lindell's statements and implications that (1) Dominion, Smartmatic, and ES&S were related companies; (2) Dominion, Smartmatic, and ES&S used interchangeable voting technology hardware or software in the 2020 U.S. election; and (3) Dominion, Smartmatic, and ES&S worked together for the 2020 U.S. election are demonstrably false and factually inaccurate. First, Smartmatic and Dominion have no corporate, business, or other relationship. Smartmatic and ES&S have no corporate, business, or other relationship. Smartmatic does not own Dominion or ES&S. Neither Dominion nor ES&S owns Smartmatic.

154.    Second, Dominion, Smartmatic, and ES&S are competitors. They compete against one other. Smartmatic does not assist Dominion or ES&S with their projects. The three companies do not work together. And the three companies did not work together in connection with the 2020 U.S. election.

155.    Third, Smartmatic's election technology, hardware, and software was not used by Dominion or ES&S during the 2020 U.S. election. Smartmatic did not license its technology, hardware, or software to Dominion or ES&S for use in the 2020 U.S. election. Neither Dominion nor ES&S purchased Smartmatic's election technology and software for use in the 2020 U.S. election.

156.    Fourth, Smartmatic's election technology and software were only used in Los Angeles County during the 2020 U.S. election. They were not used in any other county or state during the 2020 U.S. election. They were not used by any other voting technology company.

**C.    Mr. Lindell falsely stated and implied that Smartmatic stole the 2020 U.S. election for Joe Biden and Kamala Harris.**

157.    Mr. Lindell spread a story that the 2020 U.S. election was stolen from Donald Trump to garner publicity, financial support, and advertising airtime for himself personally and for his company, MyPillow. Given that objective, Mr. Lindell focused on persuading people that

electronic voting machines, including Smartmatic, stole the election for Joe Biden and Kamala Harris.

158.    Below are some of the statements that Lindell made and/or broadcast to create the impression that Smartmatic had stolen the 2020 U.S. election for Joe Biden and Kamala Harris:

a.    Mr. Lindell: "[B]ut *it's not just Dominion [] and not just Smartmatic and not just the machine*. Look at what they're doing. *They're all part of this attack on our country*." (*The Pete Santilli Show* (Exhibit 16).)

b.    Mr. Lindell: "I have, I have 100%, not 99%, 100% evidence that of everything that they did *Smartmatic [] ES&S, all of those machines did and stole[] our country and stole[] our election*." (*The Pete Santilli Show* (Exhibit 16).)

c.    Mr. Lindell: "Smartmatic started machines in Venezuela, around 2001, 2002. When they [] brought them in there, they invented them and brought them in there and took down that country in two years. It was brought into the United States, they split with Dominion, ESS and *Smartmatic*. *It's all, all they're built for is to steal elections. They've stolen in the United States…*" (*The Pete Santilli Show* (Exhibit 16).)

d.    Mr. Lindell: "[W]hat you're saying there, Dr. Frank, they're saying that *they've set this in the machine* –

Dr. Frank: Yes.

Mr. Lindell: Or set this beforehand - -

Dr. Frank: Yes.

Mr. Lindell: *That they set to see who was gonna win and they set this algorithm?*

Dr. Frank: Yes.

Mr. Lindell: Okay. These are the algorithms we've been telling you about." (*Scientific Proof* (Exhibit 3).)

e.    Mr. Lindell: "*The same thing, the same machines, the same attack, the same people, the same corruption that went on, the same crime against humanity was all, crossed all the states*." (*Scientific Proof* (Exhibit 3).)

f.    Mr. Lindell: "[T]he you know, *the purpose of this whole show, obviously, is to show everyone in the world that these machines that this was the*

*biggest fraud and the biggest crime I believe against humanity.* It was a crime against humanity." (*Absolute Proof* (Exhibit 1).)

g.  Mr. Lindell: "Could you guys all hear this? This is what we're up against, this Dominion, *these machines is the biggest fraud in election. They stole this.* But now the truth is all going to be revealed." (*Absolute Proof* (Exhibit 1).)

h.  Mr. Lindell: "Right. So I just want everyone out there to know this before you get into town. This is just a small country, [n]orthern Michigan, and they ended up flipping, we had 15,718 votes.

Mr. DePerno: 15,718 votes.

Mr. Lindell: Votes. *And 7,060 were flipped from Trump to Biden, is that correct*?

Mr. DePerno: And what's more even, it's even more –

Mr. Lindell: *By machines, right? It had to be done by the machines*.

Mr. Deperno: *Absolutely by machines*." (*Absolute Proof* (Exhibit 1).)

i.  Mr. Lindell: "Right they were just flipped. In order for that to be off, you do the conclusion which I would right now, 100%, how could that be off? It would be something wrong with what?

Mr. DePerno: The machines.

Mr. Lindell: The machines, the machines. And what we're showing here right now, what you're going to see, all this what we've been talking about, *this massive machine election fraud that went on, where countries hacked into our election*. And nationwide, this is one little county in northern Michigan, and *these machines would do it right down to the precinct*… And so what I want to tell you all is this is the perfect example, just so you know, right down to the precinct level, what went on with these machine[s]…" (*Absolute Proof* (Exhibit 1).)

j.  Mr. Lindell: "Right, so *both of them involved the machines, everybody*. One we've talked about in this show is here. But then the cyber one is what you just heard from Russell, which he said earlier, *this is all the attack by the other countries that hacked in which we're going to show you proof now that Russell doesn't even know that we have that's going to show who did it, the time they did it, the computer they did it off it, everything.*" (*Absolute Proof* (Exhibit 1).)

k.  Mr. Lindell: "And it's gonna come out. *And this is all, and that's just another way that, to cheat with these machines*." Michael Flynn: "Right."

61

Mr. Lindell: "***There's actually four ways, maybe even more we don't know about, but these are all the online ways***…" (*Absolute Interference* (Exhibit 5).)

l.    Mr. Lindell: "Talking about 'Absolute Proof' that documentary we did, where ***we have the spyware and these American heroes that were [] whistleblowers and stuff that were there and that worked for the government and stuff that, former and present, that were there and they were taking these footprints, these cyber footprints the night of the election, actually, from November 1st to 5th.*** And we have all the IP addresses… the ID's of the computers, we have all this of the attacks…" Douglas Frank: "Yes. I was on the edge of my seat watching that…***But the thing about it is, you're showing the incursions into the machines but what do they do when they're there? They have to know what to do. That's what the algorithm is telling them what to do.***" (*Scientific Proof* (Exhibit 3).)

m.   J. Alex Halderman: "***I know America's voting machines are vulnerable, because my colleagues and I have hacked them repeatedly***. ***We've created attacks that can spread from machine to machine like a computer virus and silently change election outcomes***. And in every single case, we've found ways for attackers to sabotage machines and to steal votes." Unknown Speaker 2: "When you say hacked, what were they able to do once they gained access to the machines?" Douglas Lute: "All sorts of things, ***they could manipulate the outcome of the vote, they could manipulate the tally. They could delete the tally. And they could compromise the vote in any number of ways***." (*Absolutely 9-0* (Exhibit 7).)

n.    Mr. Lindell: **"*This was an attack on our country, these Dominion machines and Smartmatic, these machines that were [] the tools of this attack***, and we will never have another fair election if we don't [] stop that, so I will never back down." (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

o.    Mr. Lindell: "We got whistleblowers you're gonna see. We have people that worked on the inside… maybe they'll come clean and get lesser sentences. [] ***I spent millions of dollars investigating [] Dominion, Smartmatic… the people behind these attacks***, investigators that went over and ***cyber people that went over, got the IPs and the IDs of people in China.***" (*Eric Metaxas Radio Show* (Exhibit 20).)

p.    Mr. Lindell: "Dominion, Smartmatic, Hart all of them are the same, ES&S. You just say Dominion, but it's all machines. ***China hacked into our election and flipped millions upon millions of votes***." (*Newsroom with Pearson Sharp* (Exhibit 108).)

q.    Mr. Lindell: "Well, I just met Dr. Shiva four weeks ago… And he knows all about these machines now and we're going to hear some of the stuff that

I found out [and] went wow, ***this is a, absolutely validates this election fraud with these machines…***

\*\*\*

Dr. Ayyadurai: I found out something interesting, I found out that these electronic voting machines, remember, there's two ways you can vote. One is you vote, you give a paper ballot, and the paper ballot is counted by human beings, two people, that's what occurred in Franklin County. But ***in those other counties, they take that paper ballot when you vote electronically –***

Mr. Lindell: ***Into a machine.***

Dr. Ayyadurai: It goes into a machine. And what happens in that machine? The paper ballot is converted to an image called a ballot image, no different than you taking a phone, a picture with your iPhone. Now so what is actually counted? The paper ballot gets put aside, the machine, the electronic quote unquote AI on the machine, actually tries to figure out where the circles are. And the machine is counting the ballot image. So at that stamp, ***at that point I realized, oh my god, the ballot image is the ballot, the images are the ballot…***

\*\*\*

Dr. Ayyadurai: The other piece of the puzzle was, I found out that ***the voting machines, as early as 2002, have a feature in there called a weighted race feature, where it's embedded into the system where you can multiply candidates votes by a percentage***. All right, so what that means is you get 1,000 votes, I get 1,000 votes, I can multiply your votes by two, my votes by point five. And if everyone, anyone doesn't believe this, go look up the deebot [sic] voting manual, go to page two dash 126 in the manual in the 2002 version, and you'll see it in there.

Mr. Lindell: ***So did, were you able to prove that yours, that your [election] was stole by the machines? Did you mathematically [] prove, did you prove 100% that this could only be recreated by a machine to do that, 60/40, that's it?***

Dr. Ayyadurai: ***Yeah***. So what we proved, Mike, was, first of all, we showed that the state had deleted the ballots images, which means that if they had the ballot image they could have found the algorithm.

\*\*\*

Mr. Lindell: ***This was a historical election fraud. This was coming from a lecture*** [sic] ***from machines, from these machines, of biblical proportions,***

*of historical proportions. And now this is, it's all going to get exposed.*
(*Absolute Proof* (Exhibit 1).)

r.    Mr. Lindell: Let me tell you about Smartmatic . . . in the 2020 election, do you think L.A. County was computer-manipulated or not? . . . Of course it was! And now we have the proof." *Updates On The Smartmatic Lawsuit and The Cast Vote Records*  (Exhibit 143.)

159.    Individuals who heard Mr. Lindell's statements were led to believe that Smartmatic's election technology, hardware, and software were used to steal the 2020 U.S. election in favor of Joe Biden and Kamala Harris and that Smartmatic acted to help steal the 2020 U.S. election. Mr. Lindell intended for individuals who heard or read his statements to draw these conclusions. This was a key component of Defendants' disinformation campaign.

160.    Mr. Lindell's statements and implication that Smartmatic and its election technology, hardware, and software were used to steal the 2020 U.S. election are demonstrably false and factually inaccurate. First, Smartmatic's election technology, hardware, and software were not used to steal the 2020 U.S. election for Joe Biden and Kamala Harris. They were not used to fix the election. They were not used to rig the election. They were not used to steal the election. And Smartmatic did not take any actions to steal or rig the election for Joe Biden and Kamala Harris.

161.    Second, Smartmatic's election technology and software were used only in Los Angeles County during the 2020 U.S. election. They were not used in any other county or state during the 2020 U.S. election. Smartmatic's election technology and software could not have been used to steal the election because they were not used anywhere during the election outside Los Angeles County.

162.    Third, Smartmatic's election technology, hardware, and software were not used in any county or state with close outcomes during the 2020 U.S. election. Smartmatic's election technology, hardware, and software were not used in Nevada, Arizona, Georgia, Pennsylvania,

Michigan, or Wisconsin. Smartmatic's election technology, hardware and software were not used in any counties in these states. Smartmatic's election technology, hardware and software were not used in Texas. Smartmatic's election technology, hardware and software could not have been used to steal the election in these states (or counties) because they were not used in those states and counties.

163.     Fourth, Smartmatic's election technology, hardware, and software were not used by any other voting technology company during the 2020 U.S. election. Smartmatic's election technology, hardware, and software were not used by another company in Nevada, Arizona, Georgia, Pennsylvania, Michigan, Wisconsin, or Texas (or any counties within these states). Smartmatic's election technology, hardware, and software could not have been used by another company to steal the 2020 U.S. election because no other company used Smartmatic's election technology, hardware, and software.

164.     Fifth, Smartmatic did not work with or assist any other voting technology company during the 2020 U.S. election. Smartmatic did not count the votes for any other voting technology company, including Dominion and ES&S. Smartmatic's election technology, hardware, and software could not have been used to manipulate the vote in favor of one candidate over another because its election technology, hardware, and software were not used outside Los Angeles County.

**D.     Mr. Lindell falsely stated and implied that Smartmatic's election technology, hardware, and software were compromised or hacked by China or other foreign countries during the 2020 U.S. election.**

165.     Mr. Lindell claimed that Smartmatic was a voluntary and willful participant in a scheme to steal the 2020 U.S. election. Mr. Lindell also claimed that Smartmatic's election technology, hardware, and software were compromised or hacked by China or other foreign countries during the 2020 U.S. election. Specifically, Mr. Lindell told people that Smartmatic

machines allowed China or other foreign countries to infiltrate the voting machine technology and alter the results in favor of Joe Biden and Kamala Harris.

166. Below are some of the statements that Mr. Lindell made and/or published to create the misimpression that Smartmatic's election technology, hardware, and software were compromised by China and other countries or hacked during the 2020 U.S. election:

a. Mr. Lindell: "***This was a cyber attack on our country.*** Donald Trump really won 80 million to 66 million. All the evidence is there, I've already got all the evidence… But now we have validated every IP, ***every ID address of all the companies here and over in China, and other countries***… even if you're a Democrat or Republican, you're gonna know this was an attack on our country." (*Indivisible with John Stubbins* (Exhibit 22).)

b. Mr. Lindell: "***This was a crime, an attack by China and other countries***, ***attack on our election*** and which we approved. ***60 some percent came right out of China,*** we have the IP addresses the IDs of computers, everything. We even have their passwords for crying out loud, we have everything." (*Indivisible with John Stubbins* (Exhibit 22).)

c. Mr. Lindell: "We have them from November 1 all the way through the election, and ***shows them a massive attack on our country by China*** and other country. ***China did 60% of this. It was all done through Dominion machines and [] Smartmatic machines***." (*Real America with Dan Ball* (Exhibit 12).)

d. Mr. Lindell: "But the people that attacked this country, if you watch my Absolute Proof, ***that we were hacked by foreign actors and [] domestic actors. [] [A]nd China by the way was 62% of the attack***… If these machines are not gone, if they're not gone, the world is done." (*The Pete Santilli Show* (Exhibit 16).)

e. Mr. Lindell: "***[T]his was the machine fraud. This was a cyber attack from another country.*** I look at this, I go, is this real. Then I dug into that. And from November 9th on I went, did a deep dive. And now all that evidence is out there." (*The Pete Santilli Show* (Exhibit 16).)

f. Mr. Lindell: "***[F]oreign countries, like China, came in and attacked our country using these machines***; Dominion, ***Smartmatic***, ES&S all these machines." (*War Room* podcast, March 26, 2021 (Exhibit 18).)

g. Ms. Fanning: "Now, red has been the most severe attacks, ***those lines are all coming out of China. Those are the most severe attacks on our election system.*** Now, this is, this exact information, the exact same type of information I should say, was presented to FBI Director, former FBI

Director James Comey, by a whistleblower in 2015. ***They knew, in fact that our election machines were open for hacking***, it's important to understand that there are prismatic scoring algorithms that they knew about that entered the election, and ***they steal the vote at the transfer points***. So at the point where the election, the vote is leaving the Secretary of State's office and these machines, that is the point at which the vote is stolen at the transfer points…" (*Absolute Proof* (Exhibit 1).)

h.  Mr. Lindell: "***100% it can only be done by machines.*** I can't stress that enough." Douglas Frank: "Absolutely." Mr. Lindell: "***And they all rhyme with Dominion, or Smartmatic ES&S, all of them***… [W]e have enough evidence that we're gonna dump for the next six weeks on the whole world and the country that by the time it gets to Supreme Court, everyone's gonna, they're all nine going to go 9-0 yes, so our country's been attacked. ***We have been attacked by foreign actors, starting with China***, and with help of domestic actors here that you know, they had to be let in…" (*Scientific Proof* (Exhibit 3).)

i.  Mr. Lindell: "So everybody knows what you're going to see, when you see this spike, you're going to see a forensic footprint, how this happened and ***who did it. China? Yes. If you're on the Internet, the bottom line is you can get, you can cheat, you can do all kinds of things.*** And that's because otherwise you can't explain any of these numbers. Right?" Matt DePerno: "That's correct. The machine results don't match up with the hand-tabulation." (*Absolute Proof* (Exhibit 1).)

j.  Mr. Lindell: "***[T]his was 100% an attack by China on our country through these machines.***" (*Absolutely 9-0* (Exhibit 7).)

k.  Mr. Lindell: "But I wanted to get on here and explain to everyone, ***this was an attack by China, on our country through these Dominion and these other machines,*** where, and they just hacked in, ***a cyber attack hacked into our election*** and flipped it to everyone, anyone that they wanted to win." (*Absolutely 9-0* (Exhibit 7).)

l.  Mr. Lindell: "This is why, when we say that Donald Trump really won this election by like almost 80 million to 68 million for Biden, how can you switch tens of millions of votes? ***It had to be done with computers, it had to be done with the machines, through these Dominion and through all these machines, and China, China did it***. It's a cyber attack of historical proportions." (*Absolutely 9-0* (Exhibit 7).)

m.  Mr. Flynn: "***China is clearly, I mean everything that we've learned about the ownership of some of these machines, some of these companies to, to how they're actually operating inside of this country***… Now you take it to the elections [] and you look at the machinery that we are using in our election process, which, you know, I don't know how we are going to go forward as a nation and continue to use these machines knowing that what

67

we just went through was really a false election. It was a false election." (*Absolute Interference* (Exhibit 5).)

n.  Mr. Lindell: "Dominion, Smartmatic, Hart all of them are the same, ES&S. You just say Dominion, but it's all machines. ***China hacked into our election and flipped millions upon millions of votes***." (*Newsroom with Pearson Sharp* (Exhibit 108).)

167.  Individuals who heard Mr. Lindell's statements were led to believe that Smartmatic's election technology, hardware, and software were compromised or hacked during the 2020 U.S. election by China or other foreign countries. Mr. Lindell intended for individuals who heard or read his statements to draw that conclusion. That conclusion was an important component of the disinformation campaign.

168.  Mr. Lindell's statements and implication that Smartmatic's election technology, hardware, and software were compromised or hacked by China or other foreign countries during the 2020 U.S. election are demonstrably false and factually inaccurate. First, Smartmatic's election technology, hardware, and software were not compromised or hacked during the 2020 U.S. election. There is no evidence of cyber-security problems in connection with the election in Los Angeles County, the only county where Smartmatic's election technology and software were used during the 2020 U.S. election.

169.  Second, Smartmatic's election technology, hardware, and software does not allow votes to be changed, manipulated, or altered at all. This is true of the election technology and software that Smartmatic used during the 2020 U.S. election in Los Angeles County. It is also true of the election technology, hardware, and software that Smartmatic has developed over the years.

170.  Third, Smartmatic did not work with or do anything whatsoever to assist China or any other foreign countries for the 2020 U.S. election.

171.  Fourth, no other foreign countries—including China—compromised or hacked the 2020 U.S. election.

**E.    Mr. Lindell falsely claimed that Smartmatic machines were connected to the Internet during the 2020 U.S. election in order to attack the election.**

172.    Mr. Lindell furthered his false theory that Smartmatic's election technology, hardware, and software were compromised or hacked by China or foreign countries by arguing a false premise: that Smartmatic's machines were connected to the Internet during the 2020 U.S. election.

173.    Below are some of the statements that Mr. Lindell made to create the false impression that Smartmatic's election machines were connected to the Internet during the 2020 U.S. election:

   a.    Mr. Lindell: "***I am going after Dominion and Smartmatic***, I'm going after them with a lawsuit if this doesn't all come out to the public and they all get exposed and then [] show what happened in our election… ***they're going to be crimes against our country that they used their [] their machines were all online***." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

   b.    Mr. Lindell: "We've got [voting machine companies] saying that they don't go online and they, it's right in their manual that they go online. ***We've got proof that they were online. We've got all the evidence.***" (*War Room* podcast, February 6, 2021 (Exhibit 11).)

   c.    Mr. Lindell: "I want everybody to know that. But you're gonna see [it] is impossible to be done by humans, it had to be done by machines***, i.e. computers, and they had to be online?***" Douglas Frank: ***"Absolutely, the whole time.*** You have to beforehand, during, and after." (*Scientific Proof* (Exhibit 3).)

   d.    Mr. Lindell: ***"It had to be machines***." Douglas Frank: "Yes." Mr. Lindell: "***And they had to be online.***" Douglas Frank: "***Constantly online.***" Mr. Lindell: "***Constantly online, everybody***." (*Scientific Proof* (Exhibit 3).)

   e.    Mr. Lindell: "Okay, I want to ask you there when you say horrify, can you explain to everybody watching this right now, what, ***what horrified you, was that the fact they could go online?***" Russell Ramsland: "***Well, there's no effective security at all for your votes.*** Your votes are stored overseas…" (*Absolute Proof* (Exhibit 1).)

   f.    Mr. Lindell: "Doesn't matter. Right. Somebody else picks our people for him so why vote, right? I mean, that's the way [] it would have been.

*Machines that go online, like, and it's not, now you said earlier, it's not just Dominion, it's all the, all the machines that were used in this election.* What, is that what you would say?" Russell Ramsland: "*Yes, that's absolutely a fair statement*. And look, let me [] tell you a little bit about that. You know, *for these people that say it's not online, we have videos of workers with pollbooks, who are swiping left on their pollbook and bringing up Netflix and getting a movie and watching it on their pollbook. How does that happen if it's not connected to the Internet?*" (*Absolute Proof* (Exhibit 1).)

g.  Mr. Lindell: "*I know they were all online, but they, is it illegal for them to be online?*" Russell Ramsland: "Well, it depends, some places yes, some places no. I mean, *the assurance is that you can trust the voting system because they're not online, but they are most clearly online*." (*Absolute Proof* (Exhibit 1).)

h.  Mr. Colbeck: "[*T*]*hey've already admitted to the fact that that control center had computers that were connected to the Internet*. And we saw the actual cable routed from the wall of the, of the TCF center to the control center. And we have election officials that admitted there were computers, in the control center that were connected to the Internet, and anybody [] worth their salt in IT land understands that if one computer is connected to the Internet, they're all connected to the Internet. You may say that it's air-gapped, you may say you have a firewall. These are people that eat firewalls for breakfast." Mr. Lindell: *"So what you're saying, you knowing that, so if it's connected to the Internet, somebody out there could have hacked in and did the flipping of the votes*." Patrick Colbeck: "Yep… So you may be thinking you're passing that information from point A to point B. But *there's nothing to prevent it from going to point C and the Internet, it's called a man in the middle attack.*" Mr. Lindell: "Right. *So that, so if you're on, if you're online, I mean that anybody could get in there and do that because they're intercepting that, it's interception. That's why you don't have, machines aren't supposed to be online in election, right?*" (*Absolute Proof* (Exhibit 1).)

i.  Mr. Flynn: "And these machines, what we do know, one of the things that *we do know for certain is that the machines are connected to the Internet*. And most people, most people in this country, when you go in to vote… none of those machines are supposed to be connected to the Internet, none of them… *because they're connected to the Internet, we have all these paths, these electronic pathways, or these electronic roads that lead from that machine where that individual voted*… and it goes back in through these IP addresses." (*Absolute Interference* (Exhibit 5).)

174.  Individuals who heard Mr. Lindell's statements were led to believe that Smartmatic machines were connected to the Internet during the 2020 U.S. election. Mr. Lindell intended for

individuals who heard or read his statements to draw that conclusion. That conclusion was a key component of Defendants' disinformation campaign.

175. Mr. Lindell's statements and implications that Smartmatic machines were connected to the Internet during the 2020 U.S. election are demonstrably false and factually inaccurate. First, Smartmatic's election technology and software for the 2020 U.S. election were not connected to the Internet or put online.

176. Second, votes cast using Smartmatic's election technology and software during the 2020 U.S. election were hand delivered after paper ballots were printed from Smartmatic's machines.

### F. Mr. Lindell falsely stated and implied that Smartmatic was engaged in a widespread criminal conspiracy to steal the 2020 U.S. election.

177. Mr. Lindell claimed that Smartmatic was engaged in a widespread criminal conspiracy with other voting technology companies and with foreign countries to steal the 2020 U.S. election. Mr. Lindell also claimed that Smartmatic was engaged in a criminal conspiracy that created and covered up election fraud.

178. Below are some of the statements that Mr. Lindell made and published to create the false narrative that Smartmatic was engaged in a widespread criminal conspiracy:

    a.    Mr. Lindell: "I mean, this is what they do. Dominion, Smartmatic, all of them. It's just like, you talk to Matt DePerno in Michigan, and they've been going through this every day for months… *I think everybody knows now, this is the biggest cover-up that's probably in history for a crime. It's so massive they've covered this up with the machine, or all the stuff that they did with the machines."* (*War Room* podcast, May 8, 2021 (Exhibit 30).)

    b.    Mr. Lindell: "Just like going back to Venezuela. *They took Venezuela in two years with Smartmatic. And, and it's this is their big plan. This is a very conceived plan.* And it's very organized, and very, you know, and they have all the marketing because they have all the evil media behind this." (*Indivisible with John Stubbins* (Exhibit 22).)

71

   c.    Mr. Lindell: "And you know, when you get a track record going all the way back to Venezuela where ***Smartmatic started in 2004, and you have all this track record*** and no – and every time it comes up, how bad it is or ***how corrupt it is or how [] they're rigged*** and get bought you know all this [] ***criminal activity,*** it just gets suppressed, and ***we've got to get it out now***." (*Indivisible with John Stubbins* (Exhibit 22).)

   d.    Mr. Lindell: "Smartmatic started machines in Venezuela, around 2001, 2002. When they [] ***brought them in there, they invented them and brought them in there and took down that country in two years***. It was brought into the United States, they split with Dominion, ESS and Smartmatic. It's all, ***all they're built for is to steal elections. They've stolen in the United States***…" (*The Pete Santilli Show* (Exhibit 16).)

   e.    Mr. Lindell: "Not only that, they're, you know what they did to our country them and Smartmatic, let's not forget Smartmatic, they're like the mothership of this. ***And for not only being involved in the biggest crime against our country, probably in history***…" (*USA Watchdog* (Exhibit 24).)

   f.    Mr. Lindell: "***Let's, let's open up the machines***. Let's look at this and here's what you're gonna find, ***this was the biggest crime against United States and the world in history***. I believe it's one of the biggest ever because it affects every single person on the planet." (*Scientific Proof* (Exhibit 3).)

179. Individuals who heard Mr. Lindell's statements were led to believe that Smartmatic was engaged in a widespread criminal conspiracy to rig the 2020 U.S. election. Mr. Lindell intended for individuals who heard his statements to draw that conclusion. That conclusion was a key component of Defendants' disinformation campaign.

180. Mr. Lindell's statements and implication that Smartmatic was engaged in a widespread criminal conspiracy are demonstrably false and factually inaccurate. First, Smartmatic does not have any plans, schemes, or "deals" with anyone—government or business—to rig or steal elections, including the 2020 U.S. election.

181. Second, Smartmatic does not have any undercover dealings with Dominion, ES&S, or any other voting technology company, especially with respect to the 2020 U.S. election.

182. Third, Smartmatic uses its technology to deliver reliable, accurate, and auditable election results. Smartmatic did not and has not engaged in a criminal conspiracy to alter election results, or otherwise fix or rig any election, especially the 2020 U.S. election.

### G. Mr. Lindell falsely stated and implied that Smartmatic's election technology, hardware, and software were designed to steal elections and have stolen elections before.

183. Mr. Lindell was not content portraying Smartmatic as having stolen the 2020 U.S. election. Mr. Lindell claimed that Smartmatic and its products served only one function: stealing elections. Mr. Lindell added credibility to his story about Smartmatic stealing the 2020 U.S. election for Joe Biden and Kamala Harris by telling people that the sole purpose of Smartmatic and its products is to steal elections.

184. Below are some of the statements that Mr. Lindell made to create the impression that Smartmatic's election technology, hardware, and software were designed to steal elections:

a. Mr. Lindell: "Just like going back to Venezuela. ***They took Venezuela in two years with Smartmatic. And, and it's this is their big plan. This is a very conceived plan.*** And it's very organized, and very, you know, and they have all the marketing because they have all the evil media behind this." (*Indivisible with John Stubbins* (Exhibit 22).)

b. Mr. Lindell: "***Smartmatic started machines in Venezuela***, around 2001, 2002. When they [] brought them in there, they invented them and brought them in there and took down that country in two years. It was brought into the United States, they split with Dominion, ESS and Smartmatic. ***It's all, all they're built for is to steal elections. They've stolen in the United States…***" (*The Pete Santilli Show* (Exhibit 16).)

c. Mr. Lindell: "Venezuela is where the machine started. ***Smartmatic started in Venezuela***. I got a whole big I've spent millions of dollars investigating this. ***They're built to take they're built as a tool to take countries***." (Mike Lindell's Cyber Symposium (Exhibit 32).)

d. Mr. Lindell: "Absolutely. And it's, you know, in Venezuela, when we went back, ***when it started in Venezuela, didn't they flip that country in two years, right?***" Michael Flynn: "Right so that [] what I learned, almost right after the election, when we started to really go, okay, wait a second, what happened and we started to talk about how the machines really were

impacting… really from the fourth through the seventh of November. We this, this issue of Venezuela came up and *we had the opportunity to [] get some feedback from one of the individuals who was in Venezuela at the time, who was working with [] the Chavez government*. And it actually caused, *they were able to take the, these machines that they had in Venezuela at the time to basically ensure that Chavez won the election and then subsequently down the road Maduro*. So [] *it was almost like the machinery was being tested, if you will, in another country to kind of get a sense of can you actually do this and to work for them*." (*Absolute Interference* (Exhibit 5).)

185.    Individuals who heard Mr. Lindell's statements were led to believe that Smartmatic's election technology, hardware, and software were designed to steal elections. Mr. Lindell intended for individuals who heard or read his statements to draw that conclusion. That conclusion was an important component of Defendants' disinformation campaign.

186.    Mr. Lindell's statements and implications that Smartmatic's election technology, hardware, and software were designed to steal elections are demonstrably false and factually inaccurate. First, Smartmatic's election technology, hardware, and software were not designed to steal elections. Smartmatic's election technology, hardware, and software were designed to ensure secure, reliable, and auditable elections.

187.    Second, Smartmatic's election technology, hardware, and software have not been used to steal elections. Smartmatic's election technology, hardware, and software have been used in thousands of elections over the last twenty years. Smartmatic's election technology, hardware, and software have not been used to steal any of those elections.

188.    Third, Smartmatic's election technology, hardware, and software did not steal elections in Venezuela. Smartmatic ceased participating in elections in Venezuela in 2017. Smartmatic ceased to provide election technology, hardware, and software in Venezuela after the Venezuelan government announced results that differed from the actual results. Smartmatic publicly denounced the Venezuelan government in 2017.

## IV. Mr. Lindell Acted with Actual Malice and Ill Will Towards Smartmatic[7]

189. Mr. Lindell knew that the statements and implications that he and his guest speakers made about Smartmatic were false and/or he acted with reckless disregard for whether the statements and implications were true. Mr. Lindell did not care about making truthful statements about Smartmatic. Mr. Lindell was motivated to tell a preconceived story about how Smartmatic stole the 2020 U.S. election for Joe Biden and Kamala Harris.

190. Mr. Lindell's actual malice with respect to his statements and implications about Smartmatic is illustrated by the following facts:

- Mr. Lindell had no basis for his statements about Smartmatic's role in the 2020 U.S. election.

- Mr. Lindell had obvious reasons to doubt what he was saying about Smartmatic outside of the 2020 U.S. election because it had been publicly debunked for months prior to his statements.

- Mr. Lindell had obvious reasons to doubt the veracity of the guest speaker "experts" he relied on and had obvious reasons to doubt the accuracy of the "evidence" they purported to provide.

- Mr. Lindell possessed and had access to a significant volume of information that contradicted the story he told about Smartmatic. Mr. Lindell reviewed this information (and therefore knew his statements and implications were false) and/or purposefully avoided reviewing this information because he did not want to know the truth.

- A minimal amount of investigation would easily establish the falsity of Mr. Lindell's statements about Smartmatic's role in the U.S. election. Mr. Lindell has stated that he spent millions of dollars investigating Smartmatic. He would have needed to spend only a fraction of that amount to learn of Smartmatic's limited, secure role as a voting technology and services provider in Los Angeles County.

---

[7] Smartmatic's discussion of Mr. Lindell's actual malice is not an admission that Smartmatic must allege and prove Mr. Lindell and MyPillow acted with actual malice to establish liability. As noted above, at all times during the disinformation campaign, Mr. Lindell was acting in his capacity as the CEO and agent of his company MyPillow. Mr. Lindell's actions—including with regards to actual malice—are therefore imputed to MyPillow.

191.     Mr. Lindell also acted with ill will towards Smartmatic and with a deliberate disregard for the rights and safety of Smartmatic and its officers and employees. Mr. Lindell could not further his story of election fraud without blaming Smartmatic. Mr. Lindell knew the damage it would cause the company. Mr. Lindell did not mind destroying a company because it served his personal and financial interests. For Mr. Lindell, this was not about changing the outcome of an election, this was about currying favor with President Trump, continuing to endear himself to the millions of Americans who supported President Trump, and making money.

**A.     Mr. Lindell had no basis for his statements and implications regarding Smartmatic.**

192.     Mr. Lindell perpetuated a story about Smartmatic and its election technology and software. He perpetuated a story to fit a preconceived narrative—that the 2020 U.S. election had been stolen by the election voting technology companies, including Smartmatic. Lindell did not have a basis for blaming Smartmatic.

**1.     Mr. Lindell did not have sources to prove something that did not happen.**

193.     There is one irrefutable fact that undermines nearly everything that Mr. Lindell said about Smartmatic during his disinformation campaign: Smartmatic's only role in the 2020 U.S. election was as a provider of election technology, support, and services to Los Angeles County. This fact was known to Mr. Lindell or readily ascertainable, and it puts the lie to nearly everything he said.

194.     Mr. Lindell stated and implied that Smartmatic's election technology, hardware, and software were widely used in the 2020 U.S. election, including in states with close outcomes, in order to attack the election. Mr. Lindell did not have any reliable source for this statement and implication because Smartmatic's election technology and software were only used in Los Angeles County.

76

195.     Mr. Lindell stated and implied that Dominion and ES&S had a corrupt relationship with Smartmatic during the 2020 U.S. election in order to attack the election. Mr. Lindell did not have any reliable source for this statement and implication because neither Dominion nor ES&S had a business relationship with Smartmatic during the 2020 U.S. election.

196.     Mr. Lindell stated and implied that Smartmatic stole the 2020 U.S. election for Joe Biden and Kamala Harris. Mr. Lindell did not have any reliable source for this statement and implication because Smartmatic's election technology, hardware, and software were not used in any of the states with close outcomes.

197.     Mr. Lindell stated and implied that Smartmatic's election technology, hardware, and software were compromised or hacked by China or other foreign countries during the 2020 U.S. election. Mr. Lindell did not have any reliable source for this statement and implication because no one raised legitimate cyber-security concerns with the election in Los Angeles County.

198.     Mr. Lindell stated and implied that Smartmatic election technology was connected to the Internet during the 2020 U.S. election in order to attack the election. Mr. Lindell did not have any reliable source for this statement and implication because there is no evidence that Smartmatic election technology was connected to the Internet during the 2020 U.S. election.

199.     Mr. Lindell stated and implied that Smartmatic was involved in a widespread criminal conspiracy to alter the results of the 2020 U.S. election. Mr. Lindell did not have any reliable source for this statement and implication because there is no evidence that Smartmatic was involved in a widespread criminal conspiracy to alter the results of the 2020 U.S. election.

200.     Mr. Lindell's disinformation campaign was not limited to distorting Smartmatic's role in the 2020 U.S. election. Mr. Lindell also defamed and disparaged Smartmatic by lying about the company's past. Mr. Lindell had no basis, or no credible basis, for these statements and implications either.

77

201.    Mr. Lindell stated and implied that Smartmatic's election technology and software were designed to steal elections. Mr. Lindell did not have any reliable source with firsthand knowledge supporting this statement and implication because it never happened.

**B.    There was publicly available information that contradicted the claims Mr. Lindell and his guests were making.**

202.    Mr. Lindell knew his and his guests' statements and implications regarding Smartmatic and its technology and software were false. Mr. Lindell possessed and had access to information that showed his statements and his guests' statements were false. Mr. Lindell also made statements for which he had no logical or factual basis.

**1.    Mr. Lindell knew Smartmatic's election technology, hardware, and software were not widely used in the 2020 U.S. election (and were not used in contested states).**

203.    A myriad of information was available to Mr. Lindell that showed his statements and implications about Smartmatic and the use of its technology, hardware, and software for the 2020 U.S. election (and in contested states) were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published his false statements knowing they were false based on this information.

204.    First, before the disinformation campaign, there was publicly available and easily accessible information showing which company's election technology, hardware, and software were selected for and used in each state in the country (and by county), including in contested states such as Georgia, Michigan, Pennsylvania, Arizona, Wisconsin, and Nevada.

205.    Each state publicly disclosed the election technology used in the 2020 U.S. election. This information showed that Smartmatic did not provide or manufacture any technology or software in any contested states discussed by Mr. Lindell and his guests.

78

206.    Nevertheless, in his documentary "Absolute Proof," (published in February 2020) Mr. Lindell asserted, "I just want everyone to know that why we're showing other states and not just the swing state[s]. It was every state, it happened in your state… Texas, when they said, oh, we didn't use the Dominion machines. Doesn't matter, the name of the, the name of the machine doesn't matter… Smartmatic, ES&S, don't matter…"

207.    Take another example. During "Mike Lindell's Cyber Symposium" in August 2021, Phil Waldron was broadcast in a pre-recorded video that was played at the Cyber Symposium multiple times over a two-day span. Mr. Waldron said, "[s]ome of the anomalies that we noticed in the 2020 general elections that five key states all stopped counting at a certain time in these key battleground states. These were all where the software Dominion machines, ES&S machines were used, the the Smartmatic, the Gems software, so when the vote stopped counting…"

208.    The "key battleground states" in the 2020 election were Georgia, Michigan, Pennsylvania, Arizona, and Wisconsin. (11/30/20 Business Insider, *All major battleground states in the 2020 election officially certify their results, cementing Biden's victory in the presidential race* (Exhibit 127).)

209.    Again, there was publicly available information from all of these states at the time that showed Smartmatic was not used in their 2020 elections. The role of Smartmatic in the contested states was easy to determine and contradicted the entire narrative about Smartmatic being a player in any way in the U.S. election controversy. For example:

210.    <u>Georgia</u>: In 2019, Georgia's RFP process demonstrated that Smartmatic was not chosen for the 2020 U.S. election. In response to the RFP, three separate companies submitted a bid. Those companies were: (1) ES&S, (2) Smartmatic, and (3) Dominion. Georgia chose two companies to advance in the process and to undergo further consideration: ES&S and Dominion. Smartmatic was not chosen. After further process with ES&S and Dominion, Dominion got the

contract with Georgia. (11/30/20 *Georgia Press Conference on 2020 Election Recount Update Transcript* (Exhibit 45).) The State of Georgia also publicly disclosed that it was using Dominion's election technology for the 2020 U.S. election—not Smartmatic. (Georgia Secretary of State Press Release, Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System (Exhibit 46); 8/9/19 Georgia Secretary of State, *Dominion Voting System Certification* (Exhibit 42).)

211.    Michigan: On January 24, 2017, Michigan's State Administrative Board approved only three vendors of voting systems: Dominion, ES&S, and Hart InterCivic. (Michigan Secretary of State, *Voting System Purchase* (Exhibit 49).) In early November, the State of Michigan publicly identified the use of the Dominion election management system and voting machines. There was no mention of Smartmatic. (11/6/20 Michigan Department of State Press Release (Exhibit 50).) The Secretary of State for Michigan also had a voting system map on its website that identified the vendor/manufacture for different locations. The map identified three companies: (1) Dominion, (2) Hart InterCivic, and (3) ES&S. Smartmatic was not identified. (Michigan Voter Information Center, *Voting Systems Map* (Exhibit 48).)

212.    Pennsylvania: The state of Pennsylvania publicly identified the election technology and software certified for use on its website. ES&S and Dominion were identified for use by Pennsylvania. Smartmatic was not identified. (Pennsylvania Department of State, *Electronic Voting Systems Certified After January 1, 2018* (Exhibit 52).) Pennsylvania was explicit in the voting systems available for use in the 2020 general election. On April 4, 2018, Acting Secretary of State Robert Torres required each of Pennsylvania's 67 counties to select new voting systems by no later than December 31, 2019, and to implement them no later than the June 2, 2020, primary election. (Pennsylvania Pressroom, *Department of States Tells Counties To Have New Voting Systems In Place By End Of 2019* (Exhibit 53).) The Pennsylvania Department of State

subsequently certified the following providers of electronic voting systems: (1) Unisyn, (2) ES&S, (3) Dominion, (4) ClearBallot, and (5) Hart Verity Voting. (Pennsylvania Department of State, *Electronic Voting Systems Certified After January 1, 2018* (Exhibit 52).) Counties then had the option to choose only from seven electronic voting systems offered by those five providers. Smartmatic was not one of them. (*Votes PA: New Voting Systems* (Exhibit 54).)

213.    <u>Arizona</u>: The state of Arizona publicly identified the election technology and software used for the 2020 U.S. election by manufacture on its website. Smartmatic was not one of them. (Arizona Secretary of State, *2020 Election Cycle/Voting Equipment* (Exhibit 57).)

214.    <u>Wisconsin</u>: In February 2020, the state of Wisconsin published a list of the voting equipment used by each municipality within the State. Smartmatic appears nowhere on that list. (Wisconsin Election Commission, *Voting Equipment List by Municipality February 2020* (Exhibit 41).) In addition, the Wisconsin election commission publicly identified the approved voting equipment manufacturers on its website. Smartmatic was not identified. (Wisconsin Election Commission, *Voting Equipment* (Exhibit 60).)

215.    <u>Nevada</u>: As of November 2020, all jurisdictions in Nevada used voting systems from either Dominion or ES&S. Smartmatic was not used. (Nevada Secretary of State: *Voting System* (Exhibit 62).)

216.    <u>Texas</u>: The state of Texas publicly identified the election technology and software certified for use on the website of the Secretary of State, VoteTexas.gov. The website identifies Dominion, ES&S, and Hart InterCivic as certified for use in Texas's elections. (VoteTexas.gov, *How to Vote* (Exhibit 116).)  Smartmatic was not identified. Furthermore, the Texas Secretary of State's website makes clear that it was Dominion—not Smartmatic—that had previously had issues with the State of Texas, but regardless, any issues had been resolved by the State of Texas

since it selected and certified Dominion as one of its voting systems. (Texas Secretary of State, *Voting System Examination(s) and Status for Dominion* (Exhibit 117).)

217. Second, before Mr. Lindell's disinformation campaign, it was widely known that ES&S, was the nation's largest manufacturer of voting technology. It was also widely known that three main election technology companies dominated the U.S. market for elections: (1) ES&S, (2) Dominion, and (3) Hart InterCivic. This list did not include Smartmatic. For example:

    a.    On October 29, 2018, it was reported that a trio of companies—ES&S, Dominion, and Hart InterCivic—sell and service more than 90 percent of the machinery on which votes in the country are cast and results tabulated. (10/29/18 Associated Press, *US election integrity depends on security-challenged firms* (Exhibit 86); 10/29/18 Associated Press, *Security-challenged firms are gatekeepers of US elections* (Exhibit 87).)

    b.    On March 27, 2019, Senator Amy Klobuchar and others sent a letter to the country's three largest election system vendors with questions on their security in anticipation of the 2020 U.S. election. Those vendors were (1) ES&S, (2) Dominion, and (3) Hart InterCivic—not Smartmatic. (3/27/19 Klobuchar Press Release, *Ranking Members Klobuchar, Warner, Reed, and Peters Press Election Equipment Manufacturers on Security* (Exhibit 88).)

    c.    On December 6, 2019, Senators Elizabeth Warren, Amy Klobuchar, and others sent letters to the private equity firms that owned or had investments in the vendors responsible for the "vast majority of voting machines and software in the United States" with questions in anticipation of the 2020 U.S. election, noting that these vendors collectively distribute voting machines and software for "over 90% of all eligible voters in the United

States." Those vendors were (1) ES&S, (2) Dominion, and (3) Hart InterCivic—not Smartmatic. (12/10/19 Warren Press Release, *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity* (Exhibit 92).)

    d.    On October 28, 2019, it was reported that half the country votes on machines made by ES&S. (10/28/19 ProPublica, *The Market for Voting Machines is Broken. This Company Has Thrived in It* (Exhibit 90).)

    e.    On May 2, 2019, it was reported that three companies dominate the market for voting machines in the country, with ES&S being the largest, followed by Dominion and Hart InterCivic. (5/2/19 National Public Radio, *Trips to Vegas and Chocolate-Covered Pretzels: Election Vendors Come Under Scrutiny* (Exhibit 89).)

    f.    On March 3, 2020, it was reported that ES&S, Dominion, and Hart InterCivic "together control about 90 percent of the U.S. market for voting systems." (11/3/20 Politico, *Playbook PM: Halftime* (Exhibit 98).)

    g.    On October 28, 2020, it was reported that ES&S and Dominion together produce the technology used by over three-quarters of U.S. voters, and the third-largest player was Hart InterCivic. (10/28/20 The Wall Street Journal, *Early Voting Shines Spotlight on Consolidated Voting-Equipment Market* (Exhibit 96).)

218.    This type of publicly available information showed that Smartmatic's election technology, hardware, and software was not widely used in the 2020 U.S. election and was not used in contested states.

219. Third, each major company or manufacturer of election technology, hardware, and software identified on their own websites the use of their technology, hardware, or software in the 2020 U.S. election before and during the disinformation campaign. This also showed the very limited use of Smartmatic's technology and software in the 2020 U.S. election (*i.e.*, only in one county in California). For example:

220. ES&S: Before and during the disinformation campaign, ES&S's website provided information that contradicted statements by Mr. Lindell about the use of Smartmatic's election technology in the 2020 U.S. election. For example, ES&S's website identified the wide use of its voting machines in the country, including its success in the 2020 election in Wisconsin and Pennsylvania jurisdictions (both within contested states) and touted the success of its high-speed ballot counting technology. (11/1/20 ES&S Website, *Getting the facts straight about elections* (Exhibit 77); 11/11/20 ES&S Website, *ES&S Equipment Efficiently, Accurately, Securely Records Election History* (Exhibit 78); 11/26/20 ES&S Website, *Getting the facts straight about elections* (Exhibit 79).)

221. Hart InterCivic: Before and during the disinformation campaign, Hart InterCivic's website provided information that contradicted statements by Mr. Lindell about the use of Smartmatic's election technology in the 2020 U.S. election. For example, Hart InterCivic's website identified the wide use of its technology systems in the country. (9/25/20 Hart Website, *Voting System Security Technology* (Exhibit 80); 9/28/20 Hart Website, *More Texas Counties Choose Hart InterCivic's Verity Voting* (Exhibit 81).)

222. Dominion: Before and during the disinformation campaign, Dominion's website provided information that contradicted statements by Mr. Lindell about the use of Smartmatic's election technology in the 2020 U.S. election. For example, Dominion's website identified that it was serving customers in 28 states and Puerto Rico. Its website indicates the states in which its

84

machines were used for the 2020 election. (11/1/20 Dominion Website, *About Dominion* (Exhibit 69).)

223.    Fourth, Smartmatic's website provided information about the company, its technology, hardware, and software, and its limited role in the 2020 U.S. election. Smartmatic's website stated as of November 14 that Smartmatic's ballot marking devices were "used exclusively in Lose [sic] Angeles County" and "were not used in any other state or any other jurisdiction in California or anywhere else in the U.S." (11/14/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 65).) Smartmatic's website stated as of November 16 that Smartmatic voting machines were specifically not used in Pennsylvania, Georgia, Arizona, Nevada, Michigan, or North Carolina. (11/16/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 66).)

224.    Fifth, organizations involved in certifying voting technology like the Election Assistance Commission (EAC) published information about the use of election technology in the 2020 U.S. election.

225.    For example, all the "key battleground states" in the 2020 election use some aspect of the federal testing and certification program for election technology and software. (NCSL, *Voting System Standards, Testing and Certification* (Exhibit 112).) The U.S. Election Assistance Commission (EAC) publicly identifies the voting systems that have been certified by the EAC by county and state. It provides a table on its website where a user can determine the manufacturer, product, and version of any technology and software used. It shows that Smartmatic was not used in any of the contested states. (U.S. EAC System Certification Process and Table of Voting Systems (Exhibit 113).)

226.    Sixth, before and during the disinformation campaign, organizations who identify and track election and voting equipment made information publicly available that showed the limited role of Smartmatic and its election technology and software in the 2020 U.S. election. For

example, Verified Voting (http://www.verifiedvoting.org) keeps a running map of all voting equipment in the United States, broken down by county. Anyone can get on the website and look up any county in the United States and determine whether a company's voting technology or software was used, and obtain detailed descriptions of it. (Verified Voting Website, *The Verifier – Search – November 2020* (Exhibit 114).)

227.    Seventh, before the disinformation campaign, there was publicly available information that contradicted statements that Smartmatic was denied use in the State of Texas. Texas publicly identified on the website of its Secretary of State that it employed election systems from three companies: (1) Dominion, (2) ES&S, and (3) Hart InterCivic. There was also information publicly available that showed that it was Dominion—not Smartmatic—that had previously had issues with the State of Texas, but regardless, any issues had been resolved by the State of Texas since it selected and certified Dominion as one of its voting systems. (VoteTexas.gov, *How to Vote* (Exhibit 116); Texas Secretary of State, *Voting System Examination(s) and Status for Dominion* (Exhibit 117).)

228.    Eighth, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs on February 4, 2021. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).) The suit laid out all of the above facts establishing that Smartmatic's election technology and software were only used in Los Angeles County and were not used in any battleground states in the 2020 U.S. election.

229.    Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right

in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021 (Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

> **2.    Mr. Lindell knew Smartmatic's election technology, hardware, and software were not used to steal the 2020 U.S. election.**

230.    A wealth of information was available to Mr. Lindell that showed his statements about Smartmatic and the use of its technology, hardware, and software to steal the 2020 U.S. election were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published his false statements knowing they were false based on this information.

231.    First, before and during the disinformation campaign, there was publicly available and easily accessible information showing that Smartmatic's technology and software were not used widely in the 2020 U.S. election (and only in Los Angeles County) and thus could not have been used to steal a national election. This information is discussed above. This information also made clear that the system Smartmatic provided to Los Angeles County does not count, tabulate, or store votes and that County officials tabulate the votes by counting the paper ballots produced by the system and cast by voters. (11/27/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 67); 11/11/20 Smartmatic Website, *Los Angeles County – Voting Solutions for All People* (Exhibit 103).)

232.    Second, before the disinformation campaign, there was publicly available and easily accessible information showing the efforts around securing the 2020 U.S. election, which make claims of a fixed, rigged, and stolen election not credible.

233.    For example, a joint statement was issued by national security agencies confirming the security of the election infrastructure and process in place for the 2020 U.S. election and that

any threats to the election would be vigilantly monitored. On November 5, 2019, the Department of Justice (Attorney General William Barr), the Department of Defense (Secretary Mark Esper), the Department of Homeland Security (Acting Secretary Kevin McAleenan), the Office of the Director of National Intelligence (Acting Director Joseph Maguire), the FBI (Director Christopher Wray), the National Security Agency (U.S. Cyber Command Commander and Director Gen. Paul Nakasone), and the Cybersecurity Infrastructure Security Agency (Director Christopher Krebs) issued a joint statement.

234.    In the statement, they stated that "[e]lection security is a top priority for the U.S. government" and that "[i]n an unprecedented level of coordination, the U.S. government is working with all 50 states and territories, local officials, and private sector partners to identify threats, broadly share information, and protect the democratic process." "While at this time we have no evidence of a compromise or disruption to election infrastructure that would enable adversaries to prevent voting, change vote counts, or disrupt the ability to tally votes, we continue to vigilantly monitor any threats to U.S. elections." (11/5/19 FBI National Press Office, *Joint Statement from DOJ, DOD, DHS, DNI, FBI, NSA, and CISA on Ensuring Security of 2020 Elections* (Exhibit 91).) No such threats were identified or reported by any of these agencies.

235.    Third, before and during Defendants' disinformation campaign, election experts and officials published statements rejecting any claims of vote rigging for the 2020 U.S. election. No state or federal government officials identified Smartmatic and its election technology and software as being used or even potentially implicated in a computer fraud to steal the 2020 U.S. election.

236.    Indeed, election officials and election security experts have long been clear that voter fraud is extraordinarily rare, and our system has strong checks in place to protect the integrity of the voting process in the country. For example:

237.     On September 24, 2020, Christopher Wray, Director of the FBI, stated during a hearing before the U.S. Senate Committee on Homeland Security and Government Affairs that "we have not seen, historically, any kind of coordinated national voter fraud effort in a major election, whether it's by mail or otherwise." (9/24/20 CNN Transcript (Exhibit 95); *see also* 9/24/20 C-SPAN Website, *FBI Director Says He Has Not Seen National Voter Fraud Effort by Mail.*[8])

238.     On November 4, 2020, the National Association of Secretaries of State (NASS) and the National Association of State Election Directors (NASED) issued a statement: "[o]ver the course of the election, more than 100 million ballots were safely and securely cast, both in-person and by mail." (11/4/20 Post-Election Joint Statement from NASS and NASED (Exhibit 99).)

239.     The NASS and NASED also issued a joint statement on October 30, 2020, to "express their confidence in [the] nation's elections systems, processes, safety and security." It further stated that "[s]tate election officials have been working diligently to bolster cybersecurity, strengthen existing infrastructure, address election misinformation and disinformation, as well as provide administrative and technical support for local election officials." And it made clear that "[v]oters and members of the media should be diligent in the face of election misinformation. Think critically about the source of information before repeating or retweeting it … contact your election official with any questions or concerns and follow verified election official social media accounts." (10/30/20 NASS and NASED 2020 Election Preparations and Reminders (Exhibit 97).)

240.     On November 12, 2020, the U.S. Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees issued a definitive statement that "[t]he November 3rd election was the most secure in American

---

[8] *Available at* http://www.c-span.org.video/?c4909510/fbi-director-national-voter-fraud-effort-mail.

history." It further stated, "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." And "[o]ther security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020." (11/12/20 CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committee* (Exhibit 105).)

241.    On November 16, 2020, a group of election security specialists issued a statement saying that there was no credible evidence of computer fraud in the 2020 election outcome. These specialists indicated they had studied the security of voting machines, voting systems, and technology used for government elections for decades. They stated "[a]nyone asserting that a US election was 'rigged' is making an *extraordinary* claim, one that must be supported by persuasive and verifiable evidence. Merely citing the existence of technical flaws does not establish that an attack occurred, much less that it altered an election outcome. It is simply speculation." Further, "[w]e are aware of alarming assertions being made that the 2020 election was 'rigged' by exploiting technical vulnerabilities. However, in every case of which we are aware, these claims either have been unsubstantiated or are technically incoherent. To our collective knowledge, no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise." (11/16/20 Letter from Election Security Specialists (Exhibit 106) (emphasis in original.)

242.    On November 19, 2020, it was reported that a spokeswoman for the National Association of Secretaries of State (NASS) said, "[e]lections in the United States of America are administered, run, counted and certified by state and local election officials. We have never heard

of votes being tabulated in a foreign country." (11/19/20 Verify, *No evidence that presidential election votes were tallied overseas* (Exhibit 107).)

243.    On November 29, 2020, a piece was published in which Chris Krebs, Former Director of the CISA, stated that election day "was quiet. And there was no indication or evidence that there was any evidence of hacking or compromise of election systems on, before, or after November 3 … We did a good job. We did it right. I'd do it a thousand times over." (11/30/20 CBS News, *Fired Director of U.S. Cyber Agency Chris Krebs Explains Why President Trump's Claims of Election Interference Are False* (Exhibit 110).)

244.    On December 1, 2020, Attorney General William Barr stated that "To date, [DOJ investigators] have not seen fraud on a scale that could have effected a different outcome in the election." (12/1/20 Associated Press, *Disputing Trump, Barr says no widespread election fraud* (Exhibit 111).)

245.    Fourth, individual states that were contested in the 2020 U.S. election performed audits and/or issued statements verifying their election process and rejecting claims of fraud or rigging. For example:

246.    <u>Georgia</u>: A November 19, 2020 Audit Report for the Georgia Presidential Contest stated "[f]rom November 11 to November 19, 2020, county election officials in Georgia, conducted a statewide risk-limiting audit of the Presidential Contest from the November 2020 General Election, as ordered by the Georgia Secretary of State." In reporting the outcome, it noted "the audit confirmed the original result of the election, namely that Joe Biden won the Presidential Contest in the State of Georgia." (emphasis in original) (11/19/20 Georgia Risk-Limiting Audit Report (Exhibit 43); *see also* 11/19/20 Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race* (Exhibit 44) ("Due to the tight margin of the race and the principles of risk-limiting audits, this audit was a full manual tally of all votes cast.

The audit confirmed that the original machine account accurately portrayed the winner of the election.").)

247.     On November 30, 2020, Georgia's Secretary of State, Brad Raffensperger, held a press conference and made clear that none of the allegations of potential election violations cast doubt on the integrity of the state's election results. At the conference, he stated: "There are those who are exploiting the emotions of many Trump supports with fantastic claims, half-truths, misinformation, and, frankly, they are misleading the President as well apparently." (11/30/20 *Georgia Press Conference on 2020 Election Recount Update Transcript* (Exhibit 45).)

248.     On January 6, 2021, Georgia's Secretary of State, Brad Raffensperger, sent a letter to Congress with a "Point by Point Refutation of False Claims about Georgia Elections." It described the multiple steps taken to confirm that the Presidential selection result was accurate and the software on the voting machines was accurate. It includes a section that addresses the allegations regarding Dominion Voting Machines and clearly states the claims were false. (1/6/21 Georgia Secretary of State Letter to Congress (Exhibit 47).)

249.     <u>Michigan</u>: Michigan's Bureau of Election made information about its election security available on its website, <u>www.Michigan.gov/ElectionSecurity</u>, including that "[t]here is no evidence voting machines in Michigan have ever been compromised or that votes have been changed." (1/5/21 Michigan Secretary of State, *Michigan's election was secure and fair, and the results are accurate* (Exhibit 51).)

250.     <u>Pennsylvania</u>: On November 12, 2020, Governor Tom Wolf tweeted, from his official government account, "Allegations of fraud and illegal activity have been repeatedly debunked. Pennsylvania had a free, fair, and secure election." (11/12/20 Twitter, @GovernorTomWolf (Exhibit 55).)

251.    On November 13, 2020, Governor Wolf issued the following statement: "All Pennsylvanians can have confidence in our election system and the accuracy of the vote." "The U.S. Department of Homeland Security's conclusion that our nation had the most secure election in history reaffirms the commitment to protecting our votes by local, state and national officials. Allegations of fraud and unfounded rumors of illegal activity have been repeatedly debunked. Those deliberate and false attacks are un-American and harm our democracy, and we should reject them. I thank the election and cyber-security experts for verifying that our nation's election was protected and secure." (11/13/20 Governor Tom Wolf: *U.S. Election was 'most secure in American history' Federal Agency says* (Exhibit 56).)

252.    Arizona: On December 1, 2020, in response to allegations from former President Trump that Arizona's election had been tainted by "corruption," Governor Doug Ducey issued a nine-tweet thread explaining that Arizona's election had been fair and free from fraud. Specifically, he stated: "In Arizona, we have some of the strongest election laws in the country, laws that prioritize accountability and clearly lay out procedures for conducting, canvassing, and even contesting the results of an election." (12/1/20 Twitter, @DougDoucey (Exhibit 58).)

253.    Wisconsin: On or about December 16, 2020, Wisconsin's Elections Commission, on its website, answered the question of whether Dominion voting equipment flipped votes from Trump to Biden: "[a]bsolutely not. Twenty-eight reporting units using Dominion systems were randomly selected after the election and audited for the Presidential contest, and all the audits confirmed that the hand-counted paper ballots exactly matched the electronic results from the machines." It also answered the question of whether there was widespread fraud in the 2020 election - saying there was no evidence of such fraud. And it stated that the claims made about

Dominion have not been substantiated. (12/16/20 Wisconsin Elections Commission, *Did Dominion Voting Equipment Slip Votes from Trump to Biden?* (Exhibit 61).)

254.    <u>Nevada</u>: On November 5, 2020, Nevada Governor Steve Sisolak held a press conference, in which he stated: "Nevada is widely recognized as being a leader in election administration, and I continue to have the utmost confidence in the abilities of Nevada's local election officials and Secretary of State Barbara Cegavske to accurately count every eligible vote cast in the Silver State. Our election administration officials are required to keep counting under state law and that is exactly what they'll do until every vote is counted. Despite national pressure, our election officials and public servants continue to prioritize accuracy and fairness in this process. That should make all Nevadans proud. I ask all Nevadans to support our election workers, trust this process and respect the results when they are certified as final." (11/5/20 Nevada Governor, *Governor Sisolak issues statement on President Trump's comments on the election* (Exhibit 63).)

255.    And Nevada state officials have expressly stated after certification of the election results that there was no evidence of voter fraud. In Secretary of State Barbara Cegavske's *Facts v. Myths: Nevada 2020 Post-General Election* document, posted on the Nevada Secretary of State website, the Secretary stated, "we have yet to see any evidence of widespread fraud." (Nevada Secretary of State, *Facts v. Myths: Nevada 2020 Post-General Election* (Exhibit 64).)

256.    In addition, on November 10, 2020, the New York Times reported contacting officials in every state on November 9 and 10, and that officials in all states but Texas reported no major voting issues. (11/10/20 The New York Times, *The Times Called Officials in Every State: No Evidence of Voter Fraud* (Exhibit 101).)

257.    Fifth, election technology companies issued public statements rejecting claims of fraud or rigging the 2020 U.S. election. For example, on November 7, 2020, Dominion issued a

statement that "[t]here are no credible reports or evidence of any system software errors in Georgia or Michigan." (11/7/20 Dominion Website, *Statement on Viral Claims/Rumors About Dominion Voting Systems* (Exhibit 70).)

258.    On November 13, 2020, Dominion's website included a page to set the record straight, including that the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) has debunked claims of voter fraud: "There is no evidence that any voting system deleted or lost votes, changed votes or was in any way compromised." It further stated "[n]o credible reports or evidence of any software issues exist." (11/13/20 Dominion Website, *Election 2020: Setting the Record Straight:  Facts & Rumors* (Exhibit 71); 11/17/20 Dominion Website, *Setting the Record Straight, Facts & Rumors* (Exhibit 72); 12/3/20 Dominion Website, *Election 2020: Setting the Record Straight:  Facts & Rumors* (Exhibit 76).)

259.    Sixth, on December 23, 2020, January 8, 2021, and February 4, 2021, Dominion sent retraction demand letters to Mr. Lindell, putting him on notice that his statements were false. (US Dominion, Inc., Retraction Demand Letters to Lindell (Exhibit 38).) In the January 8 letter, Dominion attached five publicly available news articles that specifically confirmed there was no rigging, hacking, or manipulation of votes in the 2020 election. (*Id.*) The January 8 letter put Mr. Lindell on notice that Maricopa County, Arizona's Board of Supervisors Chairman Clint Hickman (a Republican) reported on November 17, 2020, that there was "no evidence of fraud or misconduct" in the 2020 election. The January 8 letter put Mr. Lindell on notice that the Arizona Secretary of State Katie Hobbs stated on December 4, 2020, "the facts remain that this historic election had tremendous turnout and was both secure and accurate." The January 8 letter put Mr. Lindell on notice that "[e]very single vote can be audited with hand counts." The January 8 letter put Mr. Lindell on notice that Georgia's Voting System Implementation Manager said, on November 30, 2020, "I can guarantee that this is the most secure election in the State of Georgia."

260.     Seventh, multiple federal district courts rejected allegations that the 2020 U.S. election was "rigged" before Mr. Lindell began making defamatory statements about Smartmatic. *See, e.g., King v. Whitmer*, 505 F. Supp. 3d 720, 738 (E.D. Mich. 2020) (denying the requested relief because plaintiffs offered "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden"); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 721 (D. Ariz. 2020) (dismissing the case and finding over 300 pages of attachments to the complaint were "based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and holding that the allegations were "sorely wanting of relevant or reliable evidence"); *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 381 (3d Cir. 2020) ("Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.").

261.     Eighth, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs on February 4, 2021. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).) The suit laid out all of the above facts establishing that Smartmatic's technology, hardware, and software was not used to steal the 2020 U.S. election.

262.     Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021 (Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said,

"it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

> **3.** **Mr. Lindell knew that Smartmatic's election technology and software were not connected to the Internet during the 2020 U.S. election.**

263.    Information was available to Mr. Lindell that showed his statements about Smartmatic's election technology and software being connected to the Internet during active ballot-casting were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published his false statements knowing they were false based on this information.

264.    First, there were articles available on Smartmatic's website before and during the disinformation campaign about the use of Smartmatic's technology and software in Los Angeles County (and owned by the county). These articles show that the technology is not connected to the Internet, is not used to count votes, and does not store any data. It is noted that county officials tabulate votes by counting the paper ballots produced by the devices and cast by voters. (*See, e.g.,* 11/11/20 Smartmatic Website, *Los Angeles County—Voting Solutions for All People* (Exhibit 103).)

265.    Second, before and during the disinformation campaign, Dominion issued a similar statement contradicting claims related to any voting machines using the Internet during active ballot-casting. (11/13/20 Dominion Website, *Election 2020: Setting the Record Straight: Facts & Rumors* (Exhibit 71); 11/21/20 Dominion Website, *Election 2020: Setting the Record Straight, Fact Versus Rumors* (Exhibit 73); 11/26/20 Dominion Website, *Statement from Dominion on Sidney Powell's Charges* (Exhibit 75); 12/3/20 Dominion Website, *Election 2020: Setting the Record Straight: Facts & Rumors* (Exhibit 76).)

266.    Third, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo and Lou Dobbs on February 4, 2021. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).) The suit included as an exhibit a Smartmatic website page establishing that Smartmatic's election technology was not connected to the Internet.

267.    Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021 (Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

**4.    Mr. Lindell knew that Smartmatic's election technology and software were not compromised or hacked by China or other foreign countries during the 2020 U.S. election.**

268.    Information was available to Mr. Lindell that showed his statements about Smartmatic's election technology and software being compromised or hacked during the 2020 U.S. election were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published the false statements knowing they were false based on this information.

269.    First, as discussed above, before and during the disinformation campaign, there was publicly available and easily accessible information that Smartmatic's technology and software were used in only one county in the 2020 U.S. election, Los Angeles County. Mr. Lindell's statements about compromises and/or hacking for the 2020 U.S. election primarily related to

contested states and did not include the one state where Smartmatic's election technology and software were used (California was not contested).

270.     Second, before and during the disinformation campaign, there was publicly available information that showed there were no issues in the one county where Smartmatic's election technology and software were used during the 2020 U.S. election, Los Angeles County. Smartmatic and its system came through the 2020 election in that county "with flying colors" as noted by an initial case study made available on its website. There are no reports that Smartmatic's election technology and software had been compromised or hacked. (11/11/20 Smartmatic Website, *Los Angeles County – Voting Solutions for All People* (Exhibit 103); 11/10/20 Los Angeles Times, *L.A.'s $300-million voting systems gets high marks as votes trickle in across California* (Exhibit 102).)

271.     There was also information publicly available before the disinformation campaign about the work of Los Angeles County to certify Smartmatic's voting system for use, including descriptions of the state testing and certification process that exceeds the guidelines recommended by the U.S. Elections Assistance Commission (EAC) (and California's standards are also considered the most rigorous in the country). That information showed that every system goes through functional testing, source code review, accessibility and volume testing, and red team security testing that involved experts trying to "break into" the voting system. Smartmatic's system for Los Angeles County passed. (10/1/20 California Secretary of State Press Release, *Los Angeles County Launches VSAP 2.1 Voting System Certified* (Exhibit 39); 12/15/20 California Secretary of State Website, *Voting Technologies Approved for Use in California* (Exhibit 41).)

272.     The Smartmatic system that was actually used in the general election for Los Angeles County was VSAP 2.1, which was certified by California in October 2020. California Secretary of State Padilla said in a press release that VSAP was a "historic milestone in election

administration" and that the "public design and testing process for VSAP was one of the lengthiest and most inclusive ever conducted for voting technology." (10/1/20 California Secretary of State Press Release, *Los Angeles County Launches VSAP 2.1 Voting System Certified* (Exhibit 39).) Secretary Padilla said that the system underwent functional testing and source code review, among other things, and that California's Voting System Standards exceed the Voluntary Voting System Guidelines recommended by the U.S. Elections Assistance Commission and "are considered the most rigorous in the country." In his October 1, 2020 certification, Secretary Padilla stated that VSAP 2.1 "satisfies the accuracy, accessibility, usability, and security standards set forth in the California Voting Systems Standards and California law." (10/1/20 California Secretary of State, *Conditional Approval of Los Angeles County's Voting Solutions for All People (VSAP) 2.1 Voting Systems* (Exhibit 40).)

273.    Third, as discussed above, before and during the disinformation campaign, there was publicly available information that the 2020 U.S. election was secure, and federal, state, and local officials confirmed there was no basis to any claims of hacking. For example:

a.    On November 4, 2020, the Director of the Cybersecurity and Infrastructure Security Agency issued a statement that "after millions of Americans voted, we have no evidence any foreign adversary was capable of preventing Americans from voting or changing vote tallies." (11/4/20 CISA, *Statement from CISA Director Krebs Following Final Day of Voting* (Exhibit 100).)

b.    On November 12, 2020, the U.S. Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees issued a joint statement that "[t]he November 3rd election was the most secure in American history. Right now, across the country, election officials are reviewing and double checking the entire

100

election process prior to finalizing the result." It further stated, "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." And "[o]ther security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020." "While we know there are many unfounded claims and opportunities for misinformation about the process of our selections, we can assure you we have the utmost confidence in the security and integrity of our elections, and you should too." (11/12/20 CISA, *Joint Statement from Elections Infrastructure Government Coordinating Counsel & the Election Infrastructure Sector Coordinating Executive Committee* (Exhibit 105).)

c.  On November 12, 2020, a competitor company's Vice Chair, Sam Derheimer, signed the Joint Statement from the Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees providing that "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any compromised." (11/12/20 CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committee* (Exhibit 105).)

d.  On December 1, 2020, Attorney General Barr specifically addressed Defendants claims about Smartmatic and Dominion in an interview with the Associated Press: "There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to

101

skew the election results. And the DHS and DOJ have looked into that, and so far, we haven't seen anything to substantiate that." (12/1/20 Associated Press, *Disputing Trump, Barr says no widespread election fraud* (Exhibit 111).)

e.     On June 23, 2021, the Republican-led Michigan Senate Oversight Committee, chaired by Trump ally Senator Ed McBroom, released a 55-page report, which stated that "The Committee found no evidence of widespread or systemic fraud in Michigan's prosecution of the 2020 election" and expressed total confidence that the state's 2020 election outcome—that Biden defeated Trump by about 155,000 votes, or 2.8%— "represent[s] the true results of the ballots cast by the people of Michigan." (6/23/21, Michigan Senate Oversight Committee, *Report on the November 2020 Election in Michigan* (Exhibit 133).)

f.     On June 24, 2021, the Supreme Court of the State of New York, Appellate Division, First Judicial Department, suspended Rudolph Giuliani from the practice of law after it determined that he had "made knowing ***false and misleading factual statements*** to support his claim that the presidential election was stolen from his client [Donald Trump]," based on "uncontroverted evidence" that he made "demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer for former President Donald J. Trump and the Trump campaign in connection with Trump's failed effort at reelection in 2020." (*Matter of Giuliani*, 1976 A.D.3d 1, 4 (1st Dep't 2021) (Exhibit 134).)

g.    On June 27, 2021, reporting revealed that Attorney General William Barr had "received two briefings from cybersecurity experts at the Department of Homeland Security and the FBI" about the allegations of rigged voting machines, after which he and his team at the Department of Justice "realized from the beginning it was just bullshit." Barr further disclosed that "even if the machines somehow changed the count, it would show up when they were recounted by hand," and that Dominion's machines were just "counting machine[s], and they save everything that was counted. So you just reconcile the two. There had been no discrepancy reported anywhere, and I'm still not aware of any discrepancy." (6/27/21 The Atlantic, *Inside William Barr's Breakup with Trump* (Exhibit 135).)

h.    On August 3, 2021, a federal judge in Colorado disciplined two lawyers who filed a frivolous lawsuit based on lies against Dominion following the election, concluding that the case was frivolous and brought in bad faith. In his 68-page opinion, Judge N. Reid Neureiter concluded: "Albeit disorganized and fantastical, the Complaint's allegations are extraordinarily serious and, if accepted as true by large numbers of people, are the stuff of which violent insurrections are made." (*O'Rourke et al. v. Dominion Voting Systems, Inc. et al.,* No. 20-cv-3747, 2021 WL 3400671 (D. Colo. Aug. 3, 2021) (Exhibit 136).)

274.    Fourth, there was publicly available information by government officials that have authority over the election process about procedures and processes to test and certify any election technology used, including for the 2020 U.S. election. The information clearly shows various and

rigorous testing and certification processes to prevent hacking or any compromise to the voting systems during the election. (CISA, *#Protect2020 Rumor vs. Reality* (Exhibit 115).)

275. Fifth, before and during the disinformation campaign, Smartmatic's website indicated that its technology had been validated by institutions such as the Carter Center, the United Nations, the Organization of American States, and the European Union. Smartmatic also provided information that its election software had processed more than 5 billion votes over 20 years without a breach. (11/27/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 67).)

276. Sixth, before and during the disinformation campaign, there was publicly available information that before use in elections, voting systems undergo hardware and software testing to ensure they are consistent with state and/or federal requirements. Under these programs, voting system manufacturers submit their systems to undergo testing and review by an accredited laboratory or state testers. This testing checks if systems function as designed and meet applicable state and/or federal requirements or standards for accuracy, privacy, and accessibility. Certification testing usually includes a review of a system's source code as well as environmental, security, and functional testing. (CISA, *#Protect2020 Rumor vs. Reality* (Exhibit 115).)

277. Seventh, as discussed above, on January 8, 2021, Dominion sent Mr. Lindell a retraction demand letter, officially putting him on notice that his claims about voting machine fraud were false, and that Georgia and Arizona had both publicly confirmed the results of the 2020 election. (US Dominion Inc., Retraction Demand Letters to Lindell (Exhibit 38).)

278. Eighth, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs on February 4, 2021. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).) The suit laid out many of the above facts establishing

that Smartmatic's election technology and software were not hacked by any foreign country, including China.

279.    Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021 (Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

>    **5.    Mr. Lindell knew that Smartmatic's election technology, hardware, and software were not used by Dominion or ES&S during the 2020 U.S. election.**

280.    Information was available to Mr. Lindell that showed his statements about Smartmatic's election technology, hardware, and software being used by Dominion and/or ES&S in the 2020 U.S. election were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published his false statements knowing they were false based on this information.

281.    First, before and during the disinformation campaign, there was publicly available and easily accessible information that shows Smartmatic, Dominion, and ES&S are all separate companies.

282.    For example, the state filings for Smartmatic, Dominion, and ES&S show that they are three separate companies. (3/30/20 Smartmatic USA Corp., Annual Report filed with Florida Secretary of State (Exhibit 94); 6/25/10 Dominion Voting Systems, Inc., Statement of Foreign Entity Authority filed with Colorado Secretary of State (Exhibit 82); 6/21/2019 ES&S, Letter to

North Carolina State Board of Elections and Ethics Enforcement, *Ownership of Electronic Systems & Software, LLC* (Exhibit 139).)

283. There was also litigation between the Dominion and Smartmatic, and the public filings clearly establish those two companies are separate, they are competitors, and that their technology is separate. (9/18/12 Smartmatic Press Release, *Smartmatic International Sues Dominion Voting Systems for Licensing Breach and Improper Business Practices* (Exhibit 83); 5/1/13 Mem. Opinion in *Smartmatic Int'l Corp. v. Dominion Voting Systems Int'l Corp.*, No. 7844-VCP (Del. Ch.) (Exhibit 85).)

284. Second, as discussed above, before and during the disinformation campaign, there was publicly available and easily accessible information that Smartmatic's election technology and software were used in only one county in the 2020 U.S. election, Los Angeles County. (Verified Voting Website, *The Verifier – Search – November 2020, Filtered for Make: Smartmatic/Los Angeles County* (Exhibit 118).)

285. Smartmatic's own website also had information that made clear that Smartmatic had no ties to Dominion Voting Systems—no ownership ties, no software leasing, and no business at all between the two companies. It further noted that in 2009, Smartmatic licensed scanning machines from Dominion for use in the Philippines for a Smartmatic election project, which was the only contract with Dominion, that it was short-lived, and ended in a lawsuit. It further noted that that was the first and last time that Smartmatic and Dominion tried to do business together. (11/27/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 67).)

286. Third, Dominion's website similarly provided information that made clear it was a distinctly separate company from, and fierce competitor to Smartmatic, and not using Smartmatic's election technology and software. (11/13/20 Dominion Website, *Election 2020: Setting the Record Straight: Facts & Rumors* (Exhibit 71); 11/17/20 Dominion Website, *Election*

*2020: Setting the Record Straight, Fact Versus Rumors* (Exhibit 72); 11/21/20 Dominion Website, *Election 2020: Setting the Record Straight, Fact Versus Rumors* (Exhibit 73); 11/25/20 Dominion Website, *Election 2020: Setting the Record Straight, Fact Versus Rumors* (Exhibit 74); 11/26/20, Dominion Website, *Statement from Dominion on Sidney Powell's Charges* (Exhibit 75); 12/3/20 Dominion Website, *Election 2020: Setting the Record Straight, Fact Versus Rumors* (Exhibit 76).)

287.    Fourth, ES&S's website made available information that its voting systems do not use Smartmatic software, and that it has no financial or ownership ties to any other voting system manufacturer. (11/29/2021 ES&S Website, *Let's get the facts straight* (Exhibit 120); 12/25/2021 ES&S Website, *Let's get the facts straight* (Exhibit 121); 1/2/2021 ES&S Website, *Let's get the facts straight* (Exhibit 122).)

288.    Fifth, before and during the disinformation campaign, there was publicly available and easily accessible information related to the election technology used in each county and state that showed the specific systems and technology and software used in such county and state, along with the manufacturers identity. This information showed that Smartmatic's technology, hardware, and software were not used by Dominion or ES&S in the 2020 U.S. election.

289.    For example, Verified Voting (http://www.verifiedvoting.org) keeps a running map of all voting equipment in the United States, broken down by county. It separates voting equipment into three categories—hand marked paper ballots, ballot marking devices (BMDs) and systems, and direct recording electronic (DRE) systems. It identifies for each county in every state the polling place equipment, including the type of equipment used, the make, and the model. Any company that makes the equipment used is identified. The specific technology and software used by Dominion and ES&S in the 2020 U.S. election can be found and is described in detail for each county. (Verified Voting Website, *The Verifier – Search – November 2020, Filtered for Make: Dominion Voting Systems* (Exhibit 119).)

290.    Sixth, before and during Mr. Lindell's disinformation campaign against Smartmatic, Dominion filed suit against Sidney Powell (January 8, 2021); Rudolph Giuliani (January 25, 2021); Mr. Lindell (February 22, 2021); and Fox News Network (March 26, 2021). Dkt. 001, *US Dominion, Inc. et al., v. Sidney Powell et al.,* D.D.C., No. 21-cv-00040-CJN; Dkt. 001, *US Dominion, Inc. et al., v. Rudolph W. Giuliani,* D.D.C., No. 2021-cv-00213; Dkt. 001, *US Dominion, Inc. et al., v. My Pillow, Inc. and Michael J. Lindell*, D.D.C., No. 21-cv-00445; Dkt. 001, *US Dominion, Inc. et al., v. Fox News Network, LLC*, Delaware Superior Court, No. N21C-03-257 EMD. These suits laid out many facts establishing that Smartmatic and Dominion were separate companies that used separate election technology and software during the 2020 U.S. election.

291.    Seventh, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs on February 4, 2021. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).) The suit laid out many of the above facts establishing that Smartmatic, Dominion, and ES&S were separate companies that used separate election technology and software during the 2020 U.S. election.

292.    Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021 (Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

6.  **Mr. Lindell knew that Smartmatic was not engaged in a widespread criminal conspiracy to steal the 2020 U.S. election.**

293.    Information was available to Mr. Lindell that showed his statements about Smartmatic being engaged in a widespread criminal conspiracy to steal the 2020 U.S. election were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published his false statements knowing they were false based on this information.

294.    First, as discussed above, on January 8, 2021, Dominion sent Mr. Lindell a retraction demand letter, officially putting him on notice that his claims about voting machine fraud were false. (US Dominion, Inc., Retraction Demand Letters to Lindell (Exhibit 38).) The letter put Mr. Lindell on notice that he "quote-tweeted facially unreliable and discredited falsehoods" and "gave empty assurances" of "overwhelming proof" of wrongdoing. The letter informed Mr. Lindell that he has "failed to identify a scintilla of credible evidence that even *suggests* that Dominion is somehow involved in a global conspiracy to harvest millions of votes in favor of President-elect Biden" because "no such evidence exists."

295.    Second, before and during the disinformation campaign, Smartmatic's website noted that it does not have any plans, schemes or "deals" with anyone—government or business— to rig or steal elections, including the 2020 U.S. election. It also stated that its founders adhere to a strict ethics code that prohibits them from making political donations. (11/14/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 65); 11/27/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 67).)

296.    Third, before and during Mr. Lindell's disinformation campaign against Smartmatic, Dominion filed suit against Sidney Powell (January 8, 2021); Rudolph Giuliani (January 25, 2021); Mr. Lindell (February 22, 2021); and Fox News Network (March 26, 2021). Dkt. 001, *US Dominion, Inc. et al., v. Sidney Powell et al.,* D.D.C., No. 21-cv-00040-CJN; Dkt.

001, *US Dominion, Inc. et al., v. Rudolph W. Giuliani,* D.D.C., No. 2021-cv-00213; Dkt. 001, *US Dominion, Inc. et al., v. My Pillow, Inc. and Michael J. Lindell*, D.D.C., No. 21-cv-00445; Dkt. 001, *US Dominion, Inc. et al., v. Fox News Network, LLC*, Delaware Superior Court, No. N21C-03-257 EMD. These suits laid out many facts establishing that Smartmatic and Dominion were not involved in a criminal conspiracy to steal the 2020 U.S. election.

297.    Fourth, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs on February 4, 2021. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).) The suit laid out the above facts establishing that Smartmatic was not involved in a criminal conspiracy to steal the 2020 U.S. election.

298.    Fifth, multiple federal district courts rejected allegations that the 2020 U.S. election was "rigged" before Mr. Lindell began making defamatory statements about Smartmatic. *See, e.g., King v. Whitmer*, 505 F. Supp. 3d 720, 738 (E.D. Mich. 2020) (denying the requested relief because plaintiffs offered "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Bide."); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 721 (D. Ariz. 2020) (dismissing the case and finding over 300 pages of attachments to the complaint were "based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and holding that the allegations were "sorely wanting of relevant or reliable evidence"); *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 381 (3d Cir. 2020) ("Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.").

299.    Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly

during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021 (Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

> **7.  Mr. Lindell knew Smartmatic's election technology and software has not been designed and used to steal elections.**

300.    Information was available to Mr. Lindell that showed his statements about Smartmatic's election technology and software being designed and used to steal elections were false. Mr. Lindell either ignored this information, and thereby acted with reckless disregard, or published his false statements knowing they were false based on this information.

301.    First, before and during the disinformation campaign, information about audited elections that Smartmatic participated in, all over the world, was publicly available, and such information does not support statements that it has been used to steal elections.

302.    Second, before and during the disinformation campaign, information about the success and security of Smartmatic's election technology and software was publicly available from its website. For example, its website stated that its election technology had handled billions of votes in election projects on five continents without a single discrepancy and has never been compromised. Its election technology and software were designed to ensure secure, transparent, and auditable elections (and not to change votes or rig elections). (Smartmatic Website, *Facts About Smartmatic* (Exhibit 68).)

303.    There was publicly available information at the time of the disinformation campaign to show that third-party validators had authenticated Smartmatic's technology, including

the State of California, PriceWaterhouseCoopers, and the U.S. Election Assistance Commission. The United Nations, Organization of American States, and the European Union have also validated Smartmatic's technology. Former U.S. President Jimmy Carter of the Carter Center has called Smartmatic's electronic voting solution in Venezuela "the best in the world." (9/21/12 Smartmatic Press Release, *Carter: "The electoral system in Venezuela is the best in the world"* (Exhibit 84); 11/27/20 Smartmatic Website, *Smartmatic Fact-checked* (Exhibit 67).)

304.   Third**,** as discussed above, before and during the disinformation campaign, information about the certification of Smartmatic's election technology for Los Angeles County and Smartmatic's registration with the U.S. Election Assistance Commission was publicly available.

305.   Fourth, before and during the disinformation campaign, information was publicly available that showed Smartmatic had been approved as a Department of Defense vendor and a founding member of the Department of Homeland Security Election Infrastructure Sector Coordinating Council.

306.   Fifth, Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs on February 4, 2021. The suit laid out all of the above facts establishing that Smartmatic was not designed to steal elections. (Dkt. 001, *Smartmatic USA Corp., et al. v. Fox Corporation et al.*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (Exhibit 138).)

307.   Mr. Lindell knew that Smartmatic filed suit against Fox, Rudolph Giuliani, Sidney Powell, Jeanine Pirro, Maria Bartiromo, and Lou Dobbs. Mr. Lindell discussed the suit publicly during his disinformation campaign against Smartmatic. For example, on February 5, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "don't forget Smartmatic they're right in there, I think that they're the ones that went after Fox." (*War Room* podcast, February 5, 2021

(Exhibit 9).) On February 6, 2021, Mr. Lindell appeared on Bannon's War Room Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*War Room* podcast, February 6, 2021 (Exhibit 11).)

      **C.**     **Mr. Lindell also had obvious reasons to doubt the veracity of his guests.**

308.    Mr. Lindell brought a myriad of guests on his four-part "Absolute" documentaries and to his Cyber Symposium. Mr. Lindell knew that the individuals he brought on the documentary series and to speak at his Cyber Symposium were not credible nor legitimate "experts." These guests included Mary Fanning, Phil Waldron, Matthew DePerno, Russell Ramsland, Dr. Shiva Ayyudurai, Patrick Colbeck, Michael Flynn, Dr. Frank Douglas, and Joel Oltmann. Mr. Lindell knew that the statements these guests were making had been publicly discredited. Mr. Lindell had obvious reasons to doubt the guests' veracity but misled the audience as to their credibility.

309.    <u>Mary Fanning</u>: Ms. Fanning is a co-author of articles at *The American Report*—an Internet conspiracy theory blog—and self-proclaimed "national security" investigative reporter. Ms. Fanning has no publicly available credentials in the field of national security or journalism. Ms. Fanning's LinkedIn profile does not have any work history, credentials, or education related to cybersecurity, journalism, or election integrity. (*Mary Fanning Kirchhoefer*, LinkedIn (Exhibit 137).) In the past, Ms. Fanning perpetuated conspiracy theories, including the "Hammer and Scorecard" theory, which was debunked by Trump appointee Chris Krebs and other sources. (11/7/20 Twitter, @CISAKrebs (Exhibit 125).)

310.    Mr. Lindell was aware or should have been aware that Ms. Fanning is an unreliable source for information on Smartmatic and that she had no evidence to support her claims about Smartmatic. Ms. Fanning appeared in Mr. Lindell's documentary "Absolute Proof" and claimed that voting machines were hacked by China. Ms. Fanning did not provide any reliable evidence to substantiate this claim and had no firsthand knowledge to support this claim. Mr. Lindell published

Ms. Fanning's statements without informing viewers of the various reasons Ms. Fanning was not credible.

311.  <u>Russell Ramsland</u>: Despite being touted by Mr. Lindell as an expert in cyber forensics and security, Mr. Ramsland is neither. Mr. Ramsland was discredited by two courts for spreading false facts about the 2020 election before he appeared in Mr. Lindell's "Absolute" documentaries. First, in December 2020, the United States District Court for the District of Arizona dismissed a case challenging the results of the 2020 election, in part due to the "implausible conclusions" of Mr. Ramsland, among others. The court determined the sources in that case to be "wholly unreliable sources." *Bower v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020). Second, in December 2020, a Delaware judge determined that Mr. Ramsland had provided "materially false information" in support of his claims of voter manipulation. Rule to Show Cause, *Page v. Oath, Inc.*, No. S20-07-030 (Del. Super. Ct. Dec. 18, 2020).

312.  Mr. Lindell was aware or should have been aware that Mr. Ramsland was an unreliable source for information about Smartmatic based solely on the above Delaware and Arizona court opinions. But even if he did not, Mr. Lindell was put on notice that Mr. Ramsland was not a credible source on election integrity after Dominion filed suit against Rudolph Giuliani in January 2021, exposing the above-mentioned facts. Dominion also sent Mr. Lindell a retraction demand letter on February 4, 2021, directing him to its Complaint against Rudolph Giuliani for the truth about Mr. Ramsland. (US Dominion, Inc., Retraction Demand Letters to Lindell (Exhibit 38).)

313.  When Mr. Ramsland appeared in the "Absolute" documentaries, Mr. Lindell knew he did not have any evidence to support his claims about Smartmatic. Mr. Lindell published Mr. Ramsland's statements without informing viewers of the various reasons Mr. Ramsland was not credible.

314.   Dr. Shiva Ayyadurai: Dr. Ayyadurai (referred to as "Dr. Shiva" in "Absolute Proof") was billed as an "expert at system science and pattern analysis" with "four MIT degrees." (*Absolute Proof* (Exhibit 1).) Dr. Shiva purports to have invented e-mail at only 14-years-old. This claim has been debunked. E-mail was invented by the U.S. government's Advanced Research Projects Agency (2/23/12 National Museum of American History Statement (Exhibit 123).) Dr. Shiva has also adhered to conspiracy theories in the past, including that "the Coronavirus PATENT is owned by Pirbright Institute." (1/24/20 PolitiFact, *Fact-checking hoaxes and conspiracies about the coronavirus* (Exhibit 124).) The patent Mr. Ayyadurai cited as evidence for that theory related to a vaccine-form of coronavirus that could prevent diseases in birds and other animals.

315.   Mr. Lindell was aware or should have been aware that Dr. Ayyadurai was an unreliable source for information about Smartmatic and is known for promoting unsubstantiated conspiracy theories. When Dr. Ayyadurai appeared in "Absolute Proof," Mr. Lindell knew that he did not have any evidence to support his claims about Smartmatic. Mr. Lindell published Dr. Ayyadurai's statements without informing viewers of the various reasons he was not credible.

316.   Joseph Oltmann: Mr. Oltmann (a.k.a. "Mr. Otto") spoke on stage at Mike Lindell's Cyber Symposium. Mr. Oltmann rose to fame after claiming that in 2020 he infiltrated an antifa phone call and overheard an "Eric" at Dominion assuring that Donald Trump would lose the 2020 U.S. election. Mr. Oltmann has no election-related or cybersecurity credentials. Mr. Oltmann has subsequently been sued by American citizen Eric Coomer for perpetuating false allegations.

317.   Mr. Lindell was aware or should have been aware that Mr. Oltmann was an unreliable source for information about Smartmatic. When Mr. Oltmann appeared at Mr. Lindell's Cyber Symposium, Mr. Lindell knew that he did not have any evidence to support his claims about Smartmatic. Mr. Lindell published Mr. Oltmann's statements without informing viewers of the various reasons he was not credible.

318.    <u>Michael Flynn:</u> Mr. Flynn is a retired U.S. Army lieutenant general who twice pled guilty in 2018 to lying to the FBI about contacts with Russia. He was subsequently removed from his position as White House national security advisor and promptly embroiled in a legal battle. Mr. Flynn was banned from Twitter in January 2021 in accordance with a policy on "Coordinated Harmful Activity" for sharing QAnon conspiracy theory material. (NBC News, *Twitter bans Michael Flynn, Sidney Powell in QAnon account purge* (Exhibit 128).)

319.    Mr. Lindell was aware or should have been aware that Mr. Flynn was an unreliable source for information about Smartmatic and is known for promoting unsubstantiated conspiracy theories. When Mr. Flynn appeared in "Absolute Interference," Mr. Lindell knew that he did not have any evidence to support his claims about Smartmatic. Mr. Lindell published Mr. Flynn's statements without informing viewers of the various reasons he was not credible.

320.    Mr. Lindell was aware or should have been aware that this cast of characters was not credible or reliable. Mr. Lindell chose to broadcast, publish, and republish their defamatory statements about Smartmatic anyway.

**D.    Mr. Lindell failed to exercise due care when publishing defamatory statements about Smartmatic.**

321.    Mr. Lindell did not exercise due care when he published defamatory statements about Smartmatic. Mr. Lindell acted with reckless disregard for the truth in investigating or verifying the statements that he made and that his guests made. Mr. Lindell published misleading statements and portrayed them as facts and evidence. Mr. Lindell did not adhere to ethical obligations expected from those who widely disseminate information.

322.    If Mr. Lindell had exercised due care, he would not have been able to: (a) purposefully avoid learning the truth about Smartmatic and its technology and software used in the 2020 U.S. election; (b) publish the factually inaccurate and misleading reports about

Smartmatic and its technology and software; and (c) interject Smartmatic into a wide-ranging criminal fraud to fix the 2020 U.S. election.

323.     Mr. Lindell failed to exercise due care for at least eleven reasons. First, Mr. Lindell did not exercise due care by being accurate or fair when gathering and reporting information. Mr. Lindell stated and repeated information that he knew was inaccurate, stated and repeated information he knew was misleading, and purposefully avoided learning the truth. The truth was inconsistent with Mr. Lindell's preconceived narrative that Smartmatic had stolen the 2020 U.S. election.

324.     Second, Mr. Lindell did not exercise due care by verifying information before releasing it. Mr. Lindell did not corroborate information provided by his sources (whom he had obvious reasons to doubt) and did not verify or corroborate the many serious and broad-ranging statements and implications he published about Smartmatic. Mr. Lindell made no effort to reach out to Smartmatic before the start of his disinformation campaign for comment and/or to verify the accuracy of any statements and implications being made about Smartmatic, its history, its business, its technology, or software, and/or its role in the 2020 U.S. election.

325.     Third, Mr. Lindell did not exercise due care by gathering and updating information before and after publishing each report. Mr. Lindell purposefully avoided gathering information inconsistent with his preconceived narrative and did not fully and properly update his reporting after being told and learning it was factually inaccurate and misleading.

326.     Take just one example. On January 8, 2021, Dominion sent Mr. Lindell a retraction demand letter, explaining how multiple government officials stated there was no evidence of fraud or misconduct during the 2020 U.S. election. (US Dominion, Inc., Retraction Demand Letters to Lindell (Exhibit 38).) The letter attached articles from various news sources confirming that the

2020 U.S. election was not hacked or stolen. Yet, Mr. Lindell began his defamatory campaign against Smartmatic on February 5, 2021, almost a month after receiving this letter.

327. Fourth, Mr. Lindell did not exercise due care because he did not disclose information about his sources so that viewers could make informed decisions regarding credibility. Mr. Lindell failed to disclose his sources' lack of credibility and lack of firsthand knowledge. As discussed above, Mr. Lindell had obvious reasons to doubt the veracity of his guests. But, instead of disclosing those doubts, Mr. Lindell endorsed what they were saying.

328. Fifth, Mr. Lindell did not exercise due care because he did not seek out opposing views. Mr. Lindell intentionally avoided publishing statements by others who would have directly contradicted the false information he presented.

329. Sixth, Mr. Lindell did not exercise due care because he did not report facts with proper context. For example, Mr. Lindell did not call out his guests for stating they had evidence to support their statements about Smartmatic without actually showing or disclosing the evidence.

330. Seventh, Mr. Lindell did not exercise due care because he did not treat Smartmatic with respect. Mr. Lindell attacked an under-the-radar election company that participated in one county during the 2020 U.S. election. Mr. Lindell made Smartmatic and its executives out to be criminals in the minds of millions of viewers in the United States. Mr. Lindell did not care about the damage that he did to Smartmatic.

331. Eighth, Mr. Lindell did not exercise due care because he did not consider the impact of his defamation campaign. Mr. Lindell published statements with the intent of harming Smartmatic and undermining the public's confidence in the integrity of the 2020 U.S. election. Mr. Lindell did not consider the impact of his disinformation campaign on Smartmatic.

332. Ninth, Mr. Lindell did not exercise due care because he did not avoid conflicts of interest. Mr. Lindell allowed his guest to elevate their own self-interest above fairness and

accuracy. Mr. Lindell personally elevated his own self-interest, and that of his company MyPillow, above fairness and accuracy.

333.    Tenth, Mr. Lindell did not exercise due care because he was not transparent with viewers. Mr. Lindell failed to disclose to viewers that he was not publishing objective, fact-based statements about Smartmatic. Mr. Lindell misled viewers into believing that he was reporting facts as a result of an evidence-based "investigation," when they were not.

334.    Eleventh, Mr. Lindell did not exercise due care because he did not admit or correct his mistakes. Mr. Lindell failed to admit and correct the factual inaccuracies from the disinformation campaign after being informed of them. As explained above, there were multiple verified sources that confirmed the 2020 U.S. election was not stolen by Smartmatic. After learning of this information, Mr. Lindell did not issue a retraction and did not admit or correct his inaccurate statements about Smartmatic.

**E.    Mr. Lindell used his disinformation campaign against Smartmatic for financial gain and acted with ill will and improper motives.**

335.    Mr. Lindell not only knowingly participated in publishing false information about Smartmatic during the disinformation campaign, but he also did so with ill will and improper motives for self-promotion. Mr. Lindell acted on behalf of MyPillow and for personal financial gain.

336.    Mr. Lindell understood that making statements about Smartmatic could not change the outcome of the 2020 U.S. election. However, on information and belief, changing the outcome of the 2020 U.S. election was not his motivating factor when engaging in the disinformation campaign. Mr. Lindell used the disinformation to continue currying favor with President Trump and his supporters and to pursue his own personal and MyPillow's financial interests.

337.    Mr. Lindell sought the recognition and respect associated with being the President's friend and ally. He sought to capitalize on the popularity he gained as a primary promoter of the disinformation campaign against Smartmatic after Fox News, Newsmax, Rudolph Giuliani, and Sidney Powell had long-since ceased defaming Smartmatic. Mr. Lindell did not start defaming Smartmatic until 2021, after all 50 states certified the election results. Mr. Lindell was one of the last bastions of hope for Donald Trump supporters that did not want to lose faith that President Trump lost the 2020 election.

338.    Mr. Lindell has at least three websites where he regularly and continuously posts videos talking about the 2020 U.S. election being stolen from Donald Trump: FrankSpeech.com, MichaelJLindell.com, and LindellTV.com. Each of these websites both (1) prominently advertises for MyPillow and/or Mr. Lindell's book; and (2) defames Smartmatic.

339.    First, each website prominently advertises MyPillow products and offers "promo codes" to incentivize purchases from website users. For example, the "Home" Pages of LindellTV.com and FrankSpeech.com have the following graphic prominently displayed:



340.    Second, FrankSpeech.com has title bar with a "Podcasts" tab that leads the website user to the following podcasts by clicking the link: *The Eric Metaxas Radio Show* and *Indivisible*

*with John Stubbins*, among others. Mr. Lindell defamed Smartmatic on both of these shows, as explained above. (Exhibits 20, 22).

341.    In addition, FrankSpeech.com has a title bar with a "Fix2020First" tab that leads the website user to a page with videos from Mike Lindell's "Cyber Symposium." Mr. Lindell and his guests defamed Smartmatic at the Cyber Symposium. (*See e.g.,* Exhibits 32, 34, and 36). The same "Fix2020First" tab on FrankSpeech.com leads the website user to a page with all the videos from Mr. Lindell's "Absolute" documentary series. Each of these four videos defamed Smartmatic. (Exhibits 1, 3, 5 and 7).

342.    Mr. Lindell is also a self-published author and actively promotes his book on his websites and during program segments. Mr. Lindell gained public attention by touting his "from crack addict to CEO" story on his personal websites and on his business website, MyPillow.com. The MyPillow.com website has a section dedicated to selling Mr. Lindell's book (with a promo code and free shipping). The MyPillow.com website also has a section dedicated to selling Mr. FrankSpeech.com products, including yard signs, coffee mugs, and tee shirts.

343.    During the disinformation campaign against Smartmatic, Mr. Lindell leveraged his airtime to promote his story and his book. For example, during a program segment on *Indivisible with John Stubbins* on April 1, 2021, Mr. Lindell defamed Smartmatic, claiming, among other things, that the 2020 U.S. election was stolen through Smartmatic election technology. Mr. Lindell also promoted his book during the same program segment, saying "It's a great book of hope, it took me seven years to write… ***there's not a better time [] to launch this book than now***. And I've had – I pre-printed 3 million copies." (Exhibit 22) (emphasis added).

344.    During the disinformation campaign against Smartmatic, Mr. Lindell also leveraged his airtime to promote MyPillow.com. For example, during a program segment on *The Pete Santilli Show* on February 24, 2021, Mr. Lindell defamed Smartmatic, claiming that he had

evidence that Smartmatic stole the election, and then advertised MyPillow during the same program segment. The show played a pre-recorded video of Mr. Lindell advertising his "new Giza Dreams bed sheets" and suggesting that listeners "go to mypillow.com or call the number on your screen right now to get your very own MyPillow Giza Dream Sheet." (Exhibits 16, 17).

345. During the disinformation campaign, Mr. Lindell's personal profile increased dramatically. Mr. Lindell went from a limited public profile, to being known by the millions of individuals across the country who support President Trump. President Trump's supporters showed tremendous appreciation and admiration for what he was saying. On information and belief, this fame was a motivating factor for Mr. Lindell. Mr. Lindell understood he could not change the outcome of the election with his disinformation campaign. He could, however, gain a bigger audience for his book and gain more purchasers for his MyPillow products.

346. MyPillow's advertising efforts tie directly into the disinformation campaign against Smartmatic. MyPillow is prominently displayed on all three of Mr. Lindell's websites with "promo codes" to encourage purchases. Mr. Lindell made appearances that promoted his websites and MyPillow products while defaming Smartmatic. Mr. Lindell also continued to display "promo codes" in his defamatory broadcast about Smartmatic that he published after Smartmatic filed its Complaint in this case.

347. Mr. Lindell benefitted at Smartmatic's expense when people bought his MyPillow products after watching his defamatory statements about Smartmatic. Mr. Lindell's advertising efforts in conjunction with his defamatory statements about Smartmatic were apparently successful. After watching Internet video segments where Mr. Lindell defamed Smartmatic, viewers commented that they would purchase Mr. Lindell's products:









### F. Mr. Lindell's statements about Smartmatic show personal animosity and ill will towards Smartmatic.

348.     Mr. Lindell's preconceived, false storyline about Smartmatic stealing the 2020 U.S. election used exaggerated language, repetitiveness, outrageous falsehoods, hyperbole, and xenophobia to invoke panic in viewers and listeners. Mr. Lindell exhibited personal animosity, hate, spite, and ill will towards Smartmatic.

349.     For example, on February 11, 2021, Mr. Lindell appeared on OANN with Steve Bannon and said, "I wanted to go back to where this all started. And Venezuela, it all started in Venezuela with Smartmatic, not Dominion or the other one, it was with Smartmatic." (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

350.     During the same program segment, Mr. Lindell also said, "[t]his was an attack on our country, these Dominion machines and Smartmatic, these machines that were, that are, that were this, that were the tools of this attack, and we will never have another fair election if we don't,

if we don't stop that, so I will never back down." (*A Screening and Conversation of Absolute Proof* (Exhibit 14).)

351.    Take another example. On February 24, 2021, Mr. Lindell appeared on *The Pete Santilli Show*. He told Mr. Santilli, "Smartmatic started machines in Venezuela, around 2001, 2002. When they [] brought them in there, they invented them and brought them in there and took down that country in two years… They've stolen in the United States, the Communist Party is coming in. You have just like Nazi Germany, where you had, they take away communications." (*The Pete Santilli Show* (Exhibit 16).)

352.    Take another example. On April 1, 2021, Mr. Lindell appeared on *Indivisible with John Stubbins*. Mr. Lindell said, "And you know, when you got a track record going all the way back to Venezuela where Smartmatic started in 2004, and you have all this track record and no – and every time it comes up, how bad it is or how corrupt it is or how [] they're rigged and get bought you know all this all this criminal activity, it just gets suppressed, and we've got to get it out now… This is a very Communism Socialism takeover." (*Indivisible with John Stubbins* (Exhibit 22).)

353.    Mr. Lindell did not have any evidence for his outrageous statements about Smartmatic. Mr. Lindell repeatedly made his statements about Smartmatic even though he knew that Smartmatic was only involved in one county in the 2020 U.S. election. Mr. Lindell chose to mention "Venezuela" to invoke xenophobia and fear. Mr. Lindell's statements used hyperbole about Smartmatic, fueled from personal rage and hatred.

## V.    Defendants' disinformation campaign irreparably harmed Smartmatic and its election technology and software.

354.    Mr. Lindell published his defamatory statements against Smartmatic on multiple platforms over an elongated period of time. Mr. Lindell's defamatory statements were republished

by individuals who watched them originally and reposted them to other websites, such as Rumble.com. Mr. Lindell knew and understood this republication would happen. As a result, through Mr. Lindell's publication and republication, Mr. Lindell's statements about Smartmatic were widely and generally disseminated on the Internet.

355.     Mr. Lindell's defamatory statements led to Smartmatic's name and brand becoming synonymous with election fraud for members of the general public and government officials, particularly those in the United States. Mr. Lindell's defamatory statements cast Smartmatic as one of the voting technology companies, along with Dominion, that rigged the 2020 U.S. election; and, even worse, Mr. Lindell's statements created the impression that Smartmatic's software was not to be trusted because it was Smartmatic's software that switched votes in voting machines regardless of who supplied the machines.

356.     Prior to the 2020 U.S. election, Smartmatic was a known and trusted name among individuals responsible for selecting election technology and systems in voting jurisdictions in the United States and across the world. Smartmatic was not, however, a household name. Smartmatic's long history of helping to conduct secure, accurate, and auditable elections was not known among the general public.

357.     Mr. Lindell's defamatory statements irreparably tarnished Smartmatic's name and brand with members of the general public who watched his publications. Below are just a few examples of the reactions people had to Mr. Lindell's publications:

        a.      People who heard Mr. Lindell's defamatory statements came to believe that Smartmatic's election technology and software was used to steal elections and that Smartmatic is corrupt.



b.   People who heard Mr. Lindell's defamatory statements equated Smartmatic with Dominion, another voting machine company that Mr. Lindell indicated stole the 2020 U.S. election.



c.   People who heard Mr. Lindell's defamatory statements came to believe that Smartmatic machines were compromised or hacked by China.



d.      People who heard Mr. Lindell's defamatory statements believed that Smartmatic machines were connected to the Internet during the 2020 U.S. election.



358.    Smartmatic's name and brand similarly suffered with government officials, particularly those in the United States, who did not have firsthand experience with Smartmatic and electronic voting technology. Government officials with firsthand knowledge of Smartmatic's role in the 2020 U.S. election (*e.g.,* officials in Los Angeles County) were happy with how the election was conducted and confident in its outcome. Government officials who watched or read Mr. Lindell's publications about Smartmatic received a very different message.

359.    Defamatory statements about Smartmatic and Dominion have led to certain government officials becoming critical of the companies, specifically, and electronic voting,

generally. Government officials who had not previously opposed the use of electronic voting began to do so following Mr. Lindell's publications. This includes government officials directly or indirectly involved in the selection of the voting system used in their jurisdiction and the companies who supply machines and services for the selected voting system.

360.    The widespread and general distribution of Mr. Lindell's publications about Smartmatic have irreparably tarnished its reputation. Smartmatic's officers and employees have been threatened. Smartmatic's operations have come under attack—physically and electronically. Smartmatic has incurred the following out-of-pocket expenses:

  a.    Smartmatic has been required to expend in excess of $400,000 on public relations and crisis management following Mr. Lindell's publication of his defamatory statements and will spend millions more in the coming years.

  b.    Smartmatic has been required to spend in excess of $100,000 on cybersecurity following Mr. Lindell's publication of his defamatory statements and will spend millions more in the coming years.

  c.    Smartmatic has been required to spend in excess of $700,000 on retention and recruitment for personnel following Mr. Lindell's publication of his defamatory statements and will spend millions more in the coming years.

361.    Moreover, Mr. Lindell's publication of his defamatory statements has diminished Smartmatic's business value and prospects. Prior to the 2020 U.S. election, Smartmatic's business value and prospects were linked to its reputation in the industry for providing technology and software that guaranteed secure, accurate, and auditable elections. Individuals responsible for selecting voting systems in the United States and across the world understood they would not be second-guessed if they selected Smartmatic. They understood that selecting electronic voting and

Smartmatic was a safe choice based on Smartmatic's track record for providing secure, accurate, and auditable election results.

362. Mr. Lindell's defamation campaign was a direct assault on the reputation that Smartmatic relied upon for its business value and prospects. Mr. Lindell branded Smartmatic as a corrupt company whose election technology and software were used to steal elections. Far from providing secure, accurate, and audible election results, Mr. Lindell branded Smartmatic as a company whose technology and software meant elections were not secure, accurate, or auditable.

363. Mr. Lindell's branding of Smartmatic as a corrupt company substantially contributed to a "no win" situation for Smartmatic with individuals responsible for selecting voting systems. On the one hand, individuals who were not previously familiar with Smartmatic now have a negative impression of electronic voting systems, including those offered by Smartmatic. Those individuals are less likely to select electronic voting systems for their jurisdictions, and, even if they do, they are less likely to select Smartmatic. Mr. Lindell's publications contributed to that negative impression.

364. On the other hand, individuals who were familiar with Smartmatic prior to the publication of Mr. Lindell's defamatory statements have a constituency problem. Individuals familiar with Smartmatic understand its election technology and software ensure secure, accurate, and auditable election results. However, for some of them, their constituents have been exposed to, and believe, Mr. Lindell's defamatory statements about Smartmatic, Dominion, and election technology. As a result, their selection of electronic voting, generally, and Smartmatic, specifically, would be second-guessed by their constituents. These individuals are less likely to select electronic voting systems for their jurisdictions, and, even if they do, they are less likely to select Smartmatic. Mr. Lindell's publications contributed to this constituency problem.

365.     This "no win" situation has diminished Smartmatic's business value and prospects. Prior to the 2020 U.S. election, based on its historical business and pipeline, Smartmatic's business was valued in excess of $3.0 billion based on a modest multiplier. [9] Now, following Mr. Lindell's publication of his defamatory statements, Smartmatic's business is valued at less than $1 billion. The general and widespread publication and distribution of Mr. Lindell's defamatory statements about Smartmatic were a substantial cause of a portion of this business valuation decline.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION AGAINST BOTH DEFENDANTS

### (Defamation for False Statements and Implications)

366.     Smartmatic repeats, realleges, and incorporates by reference the allegations in paragraphs 1–365 of this Complaint as if fully stated herein.

367.     From February through June 2021, and again in 2023, Defendants published false statements and implications that (1) Smartmatic was widely used in the 2020 U.S. election in order to attack the election; (2) Smartmatic had a corrupt relationship with Dominion and/or ES&S during the 2020 U.S. election in order to attack the election; (3) Smartmatic stole the 2020 U.S. election; (4) Smartmatic's election technology or software was compromised or hacked by China; (5) Smartmatic's election technology was connected to the Internet during the 2020 U.S. election in order to attack the election; (6) Smartmatic is engaged in a widespread criminal enterprise; and (7) Smartmatic's technology was designed to steal elections. These false statements are pleaded in paragraphs 145, 151, 158, 166, 173, 178, 184 which set forth the particular words and statements used in the publications. The false implications were intentionally made through the false

---

[9] Smartmatic's business pipeline includes sales and opportunities through subsidiaries wholly-owned by Smartmatic International Holding B.V. in the United States, Barbados, Australia, United Kingdom, Panama, Haiti, Belgium, Singapore, Netherlands, Mexico, Ecuador, Brazil, Estonia, Taiwan, and the Philippines as well as branches in Columbia, Argentina, Honduras, Pakistan, Italy, Jamaica and El Salvador.

statements, by other statements that were misleading due to material omissions, by presenting misleading juxtapositions of statements, and when taking into account the context of each publication. The false implications were also made through the disinformation campaign as a whole. *See supra* ¶¶ 75–136.

368.    These false statements and implications were and would be reasonably understood to be statements of fact about Smartmatic.

369.    These statements and implications were false for the reasons stated in paragraphs 147–149, 153–156, 160–164, 168–171, 175–176, 180–181, and 186–188.

370.    These statements and implications were published without privilege or legal authorization, and if there was any such privilege or authorization (and there was not) it was intentionally abused.

371.    These statements and implications were broadcast, published and republished to third parties. The broadcasts, publications and republications with these false statements and implications were widely disseminated by Defendants.

372.    These statements and implications were defamatory because they harmed Smartmatic's reputation, lowered Smartmatic's reputation in the community, and exposed Smartmatic to public hatred, contempt, ridicule, and degradation.

373.    These statements and implications were defamatory *per se* since they charged Smartmatic with a serious crime and were of a nature tending to injure Smartmatic in its trade, business, and profession.

374.    Both of these Defendants acted with fault, at least negligence, and with actual malice. Each Defendant knew these defamatory statements and implications were false, or recklessly disregarded the truth or falsity of the statements and implications, when they broadcast,

published, and republished them. The allegations related to Defendants' actual malice include but are not limited to those pleaded in paragraphs 189–353.

375.    Both of these Defendants also acted deliberately and maliciously to injure Smartmatic out of ill will, and/or causelessly and wantonly made the statements for the purpose of injuring Smartmatic.

376.    These false statements and implications by the Defendants were a substantial factor in causing Smartmatic to suffer irreparable harm to its reputation and suffer economic loss, and Smartmatic is thus entitled to compensatory damages.

377.    Mr. Lindell was acting in his capacity as the founder, CEO, owner, operator, and representative of MyPillow at all relevant times hereto. Mr. Lindell is MyPillow's agent.

378.    As a direct and proximate result of these false statements and implications by Defendants, Smartmatic has also suffered and will continue to suffer actual, consequential, and special damages in an amount that will be determined at trial.

379.    Smartmatic is also entitled to punitive damages because Defendants acted with actual malice, ill will, and spite towards Smartmatic, and for improper motives.

## SECOND CAUSE OF ACTION AGAINST BOTH DEFENDANTS

### (Minnesota Deceptive Trade Practices, MSA § 325D.44(8))

380.    Smartmatic repeats, realleges, and incorporates by reference the allegations in paragraphs 1–379 of this Complaint as if fully stated herein.

381.    Defendants' false and defamatory statements, as described in detail above, constitute deceptive trade practices in violation of Minnesota Law, M.S.A. § 325D.44(8). Defendants' statements disparage Smartmatic's goods, services, and business by false and misleading representations of fact.

382.    The Defendants knew that their factual assertions about Smartmatic were deceptive, as stated in paragraphs 202–307. Mr. Lindell willfully made these statements while in the course of business as the founder, CEO, owner, operator, and representative of MyPillow. Mr. Lindell made these statements for a commercial purpose.

383.    Mr. Lindell used his status as the founder, CEO, owner, operator and representative of MyPillow to defame Smartmatic so that he and MyPillow could derive substantial financial benefit. Defendants derived increased financial benefit through increased sales of MyPillow products because they defamed Smartmatic.

384.    Mr. Lindell was acting in his capacity as the CEO, founder, owner, operator, and representative of MyPillow at all relevant times hereto. Mr. Lindell is MyPillow's agent.

385.    Defendants' statements have irreparably harmed Smartmatic and will further impair the value of Smartmatic's name, reputation and goodwill without a permanent injunction.

386.    Smartmatic is entitled to permanent injunctive relief by way of

    a.    removal of all of Mr. Lindell's defamatory statements;

    b.    enjoining Mr. Lindell and MyPillow from repeating such statements; and

    c.    enjoining Mr. Lindell and MyPillow from engaging in further deceptive trade practices relating to Smartmatic.

387.    Smartmatic is also entitled to recover from Lindell its cost of litigation, including reasonable attorneys' fees, pursuant to M.S.A. § 325D.45(2).

## PRAYER FOR RELIEF

388.    Wherefore, Smartmatic prays for judgment against Defendants for each of the causes of action raised herein. Smartmatic respectfully requests a judgment in its favor and against Defendants for:

    a.    Compensatory damages in an amount to be determined at trial;

b.      Actual, consequential, and special damages in an amount to be determined at trial;

c.      Punitive damages;

d.      Reasonable and necessary attorneys' fees;

e.      Reasonable and necessary costs of the suit;

f.      Prejudgment and post-judgment interest at the highest lawful rates;

g.      Declarative and injunctive relief; and

h.      Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Smartmatic requests a trial by jury on all matters raised herein.

Dated: April 7, 2023

/s/ *Michael E. Bloom*
Christopher K. Larus
   Minnesota Bar No. 0226828
   CLarus@robinskaplan.com
William E. Manske
   Minnesota Bar No. 0392348
   WManske@robinskaplan.com
Emily J. Tremblay
   Minnesota Bar No. 0395003
   ETremblay@robinskaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181

J. Erik Connolly (admitted *pro hac vice*)
   EConnolly@beneschlaw.com
   Illinois ARDC No. 6269558
Nicole E. Wrigley (admitted *pro hac vice*)
   Illinois ARDC No. 6278749
   NWrigley@beneschlaw.com
Michael E. Bloom (admitted *pro hac vice*)
   MBloom@beneschlaw.com
   Illinois ARDC No. 6302422
Julie M. Loftus (admitted *pro hac vice*)
   JLoftus@beneschlaw.com
   Illinois ARDC No. 6332174
**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949

James R. Bedell (admitted *pro hac vice*)
   JBedell@beneschlaw.com
   Ohio Bar No. 97921
**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

200 Public Square, Suite 2300
Cleveland, OH 44114
Telephone: (216) 363-4500

*Attorneys for the Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited*